IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| POINT BLANK SOLUTIONS, INC., *et al.*[1] | ) | Case No. 10-11255 (____) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF T. SCOTT AVILA IN SUPPORT OF FIRST DAY MOTIONS

I, T. Scott Avila, hereby declare that the following is true to the best of my

knowledge, information and belief:

1.      I am the Chief Restructuring Officer of each of the captioned debtors and

debtors in possession (collectively, these entities are referred to as the "Debtors" or the

"Company").  I have been the Chief Restructuring Officer ("CRO") of the Debtors since March

27, 2010.  I am also currently a managing partner of CRG Partners Group LLC, the proposed

restructuring advisors to the Debtors.  My current duties for the Debtors include general

supervision of, and responsibility for, the Debtors' business and financial affairs and activities

and reviewing, formulating and assisting with the Debtors' business plans and strategies.  I am

authorized to make decisions with respect to all aspects of the management and operation of the

Debtors' business including, without limitation, organization, human resources, marketing, sales,

---

[1] The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification numbers and their respective addresses, are: Point Blank Solutions Inc (9361), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor, Inc. (4044), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Protective Apparel Corporation of America (9051), 179 Mine Lane, Jacksboro, TN 37757; and PBSS, LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.

logistics, finance, administration, oversight, and of the prosecution of these bankruptcy cases. In

my capacities with the Debtors, I have general knowledge of the books and records of the

Debtors, and am familiar with the Debtors' financial and operational affairs.

2. I submit this declaration (the "Declaration") in support of the Debtors'

petitions and "first day" motions and applications, described further below (collectively, the

"First Day Motions"). Except as otherwise indicated, all statements in this Declaration are based

upon my personal knowledge, my review of the Debtors' books and records, relevant documents

and other information prepared or collected by the Debtors' employees, or my opinion based on

my experience with the Debtors' operations and financial condition. In making my statements

based on my review of the Debtors' books and records, relevant documents and other

information prepared or collected by the Debtors' employees, I have relied upon these employees

accurately recording, preparing or collecting any such documentation and other information. If I

were called to testify as a witness in this matter, I could and would competently testify to each of

the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I

am authorized to submit this Declaration on behalf of the Debtors.

3. Based on my personal knowledge, and through my review of the Debtors'

books, records and other information, I believe that the relief sought by the Debtors in the First

Day Motions is necessary to enable the Debtors to continue to operate as debtors in possession

during the course of their respective bankruptcy cases and in particular, up through a sale of

substantially all of the Debtors' assets, which such sale the Debtors seek to expeditiously

effectuate, as discussed more fully herein.

4.      Part I of this Declaration describes the business of the Debtors and the

developments that led to their filing for relief under chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code").  Part II of this Declaration sets forth the relevant facts in support

of the First Day Motions filed concurrently herewith in support of these chapter 11 cases (the

"Cases").[2]

**PART I**

A.      **Overview of the Debtors and their Operations**

**Introduction**

5.      PBSI is a leading manufacturer and provider of bullet, fragmentation and

stab resistant apparel and related ballistic accessories, which are used domestically and

internationally by military, law enforcement, security and corrections personnel, as well as

government agencies.  Since 1998, PBSI has supplied over 80% of U.S. military soft body armor

vest requirements to protect soldiers and law enforcement personnel around the world.  PBSI and

its debtor subsidiaries Point Blank Body Armor, Inc. ("PBBA") and Protective Apparel

Corporation of America ("PACA") are major suppliers in the domestic law enforcement market

with broad brand recognition and "best value" reputation.  The Debtors manufacture several

body armor products and related accessories that are sold worldwide to a variety of customers.

The Debtors' armor products and related accessories protect individuals from bodily injury and

death from multiple threats, including bullets, knives, and other sharp instruments and shrapnel

fragments.  The Debtors design, build and sell advanced systems that safeguard users from

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

specific threats as well. The Debtors' products are sold through a variety of means, including a corporate sales force, sales agents and a network of distributors.

## Business Operations

6.      The Debtors currently employ 920 full-time employees in hourly, salaried, supervisory, management, sales, administrative and manufacturing positions to perform the functions necessary to effectively and efficiently operate the Debtors' business. The Debtors maintain two manufacturing facilities located in Pompano Beach, FL and Jacksboro, TN. The Debtors' products are designed for domestic, international, military and law enforcement customers, as described below.

### Military Products

7.      The Debtors' military models are built to meet military specifications and undergo a rigorous test program as well as routine performance testing at independent U.S. testing facilities and at U.S. Army testing centers. Although the Debtors sell some vests to other government agencies, the Debtors' principal customer for these vests is the U.S. military. The U.S. military and other federal agencies purchase the Debtors' products directly through the contract bid process or through the U.S. General Services Administration ("GSA").

8.      Vests produced for the U.S. military and other federal agencies are sold by lots of 1,200 vests (the "Lots"). Prior to shipment of the Lots, the vests are tested for quality control. Nine vests are pulled from each Lot and submitted to the U.S. army for testing at an independent testing facility (the "Pulled Vests"). In the past, the testing process would take approximately one week, after which the Debtors would receive a letter of approval (a "Letter of

Approval") from the government agency approving the release and shipment of the Lot. Once a

Letter of Approval was received by the Debtor, they would ship and invoice the Lot and assign

the respective eligible accounts receivable to Bank of America ("BOFA")[3] for an advance of

funds against the Debtors revolving line of credit or term loan.[4]

       9.     In 1998, the U.S. Army and Marine Corps procured the Debtors'

Interceptor™ Outer Tactical Vest system ("OTV"), which is a soft armor vest with pouches for

hard armor plates for added ballistic protection over vital organs. The Debtors designed the

Interceptor™ OTV as a continually upgradeable, modular, soft body armor system specifically

for the U.S. military. The system includes a removable yoke/collar, as well as throat and groin

protection that can be customized by the wearer to address the specific threat faced.

       10.    In 2004, the Debtors developed for the U.S. Marine Corps an Armor

Protection Enhancement System. This modular system is designed to enhance the current

Interceptor™ OTV by providing equivalent protection to areas not previously covered by the

Interceptor™ OTV, including the underarm, shoulder and upper arms. The Interceptor™ OTV

system was first extensively used in combat in Afghanistan during Operation Enduring Freedom,

where it was credited with reducing the number of life-threatening wounds. During Operation

Iraqi Freedom, the Interceptor™ OTV system was widely deployed among U.S. combat forces.

---

[3] As described below, BOFA is the administrative agent and collateral agent for itself and all other lenders from time to time a party to that certain *Amended and Restated Loan and Security Agreement,* dated as of April 3, 2007, as amended and supplemented.

[4] As noted below, the U.S. Army's decision to perform the quality control testing at a new testing facility increased the testing process time from approximately one week to up to four weeks, which delayed the borrowings against our eligible accounts receivables and consequently delayed the advance of funds to the Debtors by BOFA.

11.    The Debtors manufacture and supply the Interceptor™ OTV to the U.S. military through contracts with the U.S. Department of Defense and pursuant to standard purchasing contracts of a type issued by the GSA.  The Debtors have developed multiple models of the Interceptor™ OTV customized to meet mission requirements.  Since the development of the Interceptor™ OTV, the Debtors have delivered over 1.5 million Interceptor™ OTVs and Improved Outer Tactical Vests ("IOTVs") to the military.

12.    In 2009, The Debtors derived approximately $61,884,000 in sales to the U.S. military and U.S. government, which was approximately 39.1% of all sales for that year.

**Law Enforcement Products**

13.    The Debtors manufacture and distribute a large variety of standard and specialized products to the law enforcement community, including police, federal agencies, corrections officers and security guards.  The Debtors test these and other vests in our own advanced technology center, as well as in independent U.S. test laboratories, to ensure that the vests meet or exceed National Institute of Justice standards.  The Debtors sell products to commercial customers directly through a sales force and through an extensive network of distributors.

14.    The majority of the Debtors' sales to law enforcement are concealable vests, which are sold to federal, state and local law enforcement.  These vests are individually sized to provide the optimal fit and protection.  The Debtors also make body armor products that are used by personnel in corrections facilities and other law enforcement employees who are exposed to threats primarily from knives and other sharp instruments.  These vests are

constructed with special blended fabrics, stainless steel and flexible woven fabrics, and are

available in both concealable and tactical models. The Debtors body armor products also include

tactical police jackets, unique vests for special agents, corrections vests and K-9 protection.

15.    In 2008, the Debtors featured new electro-shock weapon protection

technology in their top of the line Vision™ concealable vests, providing the only source for body

armor that protects from both bullets and electro-shock weapons.

16.    For 2009, the Debtors derived approximately $27,572,000 in

domestic/distributor sales, which constituted 17.4% of total 2009 sales.

**International Sales**

17.    While the Debtors sell the same products internationally that they do

domestically, the Debtors' International Interceptor, Frontier, and PACA International vests all

target specifically the international tactical body armor market. The Debtors increased

international sales from $25,035,000 in 2008 to $64,047,000 in 2009 based on award to PBBA of

additional contracts for the production of IOTVs.

18.    For 2009, the Debtors derived approximately $64,047,000 in international

sales, which constituted 40.5% of total sales for 2009.

**The Debtors' Customers**

19.    Products are sold domestically to the U.S. military, state and local law

enforcement agencies, correctional facilities, federal agencies and distributors. Sales to the U.S.

military or federal law enforcement agencies accounted for approximately 39.1% and 62.1% of

revenues for the years ended December 31, 2009 and 2008, respectively. The remaining sales

are primarily to domestic state and local law enforcement agencies, security and intelligence

agencies, distributors, federal and state correctional facilities, and international sales.

**B.    The Debtors' Corporate Structure and History**

20.    Attached hereto as **Exhibit A** is a detailed chart that sets forth the

corporate structure and organization for each entity.  PBBA, PACA and PBSS, LLC are each

subsidiaries of PBSI.  James Henderson is the Chief Executive Officer of the Debtors and is also

Chairman of the Board of Directors of each of the Debtors.  Mr. Henderson is a Managing

Director and operating partner of Steel Partners LLC ("Steel Partners"), a global management

firm and has been associated with Steel Partners and its affiliates since August 1999.[5]  In

addition to Mr Henderson, Terry Gibson serves on the Board of Directors of PBSI and is

affiliated with Steel Partners as a managing director of SP Corporate Services LLC, an affiliate

of SP Holdings, LP.  The other two directors Robert Chefitz and General Merrill A. McPeak are

not affiliated with Steel Partners.

**C.    Significant Legal Proceedings**

21.    The Debtors are involved in certain legal proceedings that occurred prior

to the appointment of the Debtors' current Board of Directors, Chief Executive Officer and Chief

Financial Officer.  The Company expends approximately $600,000 in legal fees each month to

---

[5] Mr. Henderson is paid directly from the Debtors for his services as Chief Executive Officer.  Prior to April 12, 2010, Mr. Henderson was paid by SP Corporate Services, an affiliate of Steel Partners ("SPCS"), for his services as CEO of the Debtors.  SPCS and Point Blank Solutions, Inc. ("PBSI"), were parties to a management services agreement dated as of October 15, 2009 (the "Agreement") that governed the payment of Mr. Henderson's salary and expenses.  The effective date of the Agreement was September 1, 2009.  Pursuant to the Agreement, PBSI paid SPCS a monthly fee of $37,500 in consideration of Mr. Henderson's services as Chief Executive Officer of the Debtors. Mr. Henderson was then paid directly by SPCS.  In addition, Mr. Henderson previously received a monthly living expense of $8,000 paid by PBSI.

its professionals to defend itself and its former officers and directors against the allegations made

in these proceedings.

### Class Action and Derivative Lawsuits

22.    In 2005, a number of purported class actions lawsuits were filed in the

U.S. District Court for the Eastern District of New York (the "EDNY Court") against the

Debtors and certain of their former officers and directors.  The complaints were filed on behalf

of purchasers of the Debtors publicly traded securities during the period from April 21, 2004

through August 29, 2005. The complaints alleged, among other things, that the Debtors' public

disclosures were false or misleading and that the Debtors body armor products were defective

and failed to meet customer standards and that these facts should have been publicly disclosed.

The class action lawsuits were consolidated into a single class action lawsuit in March 2006 (the

"Class Action Suit") as the complaints were substantially similar to one another.

23.    During the same period, a number of derivative complaints were filed in

the EDNY Court against certain of the Debtors' former officers and directors and in some cases

against the Debtors' former auditors.  The complaints alleged, among other things, that the

Debtors breached their fiduciary duties, engaged in fraud, misrepresentation, misappropriation of

corporate information, waste of corporate assets, abuse of control and unjust enrichment.  The

derivative complaints were consolidated into a single shareholder derivative action (the

"Derivative Action") in March 2006

24.    In July 2006, the Debtors entered into a memorandum of understanding

(the "MOU") to settle both the Class Action Lawsuit and the Derivative Action.  According to

the MOU the class action would be settled subject to court approval, for $35.2 million in cash

and 3,184,713 shares of the Debtors' common stock.  The Derivative Action was settled subject

to court approval, in consideration of the adoption of certain corporate governance provisions,

and the payment of $0.3 million in legal fees to the lead counsel in the Derivative Action.  The

Debtors deposited into escrow $22.3 million in cash which represented the Debtors portion for

the cash settlement which was funded as follows: (i) $7.5 million from the exercise by the

Debtors' former Chief Executive Officer, David Brooks ("Brooks") of a warrant to acquire

3,000,000 shares of the Debtors' common stock at an exercise price of $2.50 per share, and (ii)

$14.8 million from the purchase by Brooks of 3,007,009 shares of stock at $4.93 per share.  Our

directors and liability insurers funded the remaining portion of the cash settlement, $12.9 million

pursuant to buyouts of the policies.  In addition to the cash settlement, the settlement also

provided for the issuance of an additional 3,184,713 of the Debtors' common stock to the

plaintiffs.[6]  The EDNY Court approved the terms of the MOU in June 2008.  The Class Action

Suit is final, except insofar as the ultimate outcome of the Derivative Action could affect it.  One

party has appealed the Derivative Action settlement.  The appeal of the Derivative Action is still

pending.  Under the various agreements, $8.7 million has already been distributed from escrow

to the lead plaintiff's counsel in the Class Action Suit.[7].

---

[6] A liability of $4.2 million is accrued in the Debtors' financial statements for the issuance of the common stock.

[7] In the event that the Settlement is not finally approved, then within five days upon receiving notice from the Debtor or Brooks, lead plaintiff would be required to refund the $8.7 million.

## Securities Litigation

25.    The Debtors are subject to ongoing investigations by the SEC and the U.S.

Attorneys' Office for the Eastern District of New York regarding alleged violations of federal

securities laws stemming from accounting irregularities and disclosure issues from 2003 through

2005.  In August 2009, the Debtors' received a Wells Notice from the SEC informing them that

the SEC's regional staff conducting the investigation had made a preliminary decision to

recommend that the SEC bring a civil injunctive action against the Debtors for possible

violations of securities regulations.  In October 2007, Brooks was indicted by the U.S. Attorney's

Office for the Eastern District of New York on charges of securities fraud, mail and wire fraud,

insider trading, obstruction of justice among other charges.  The Debtors' former Chief Financial

Officer, Dawn Schlegel, and former Chief Operating Officer, Sandra Hatfield, were also

indicted.  The U.S. Department of Justice obtained an order freezing Brooks' assets, including

the shares purchased by Brooks to fund the settlement amount of the Settlement Order.  The

Debtors cooperated with both the investigation and with the U.S. Attorneys' Office while that

office prepared for the criminal trials of Schlegel, Hatfield and Brooks.  The Debtors are also

engaged in discussions with the U.S. Attorney's Office concerning a potential non-prosecution

agreement.

## Outstanding Tax Payments

26.    The Debtors also failed to withhold and remit to the appropriate taxing

authorities certain income and payroll taxes from bonuses and exercises of certain stock options

made to certain former officers and employees from 2003 through early 2006.  As of the Petition

Date, the Debtors have repaid most of the total liability for the outstanding income and payroll taxes, but approximately $5.6 million in employment tax withholding obligations remains on the Debtors consolidated financial statements with respect to the aforementioned bonus payments and exercise of options.

### Zylon Litigation

27.    The Company is subject to an industry-wide investigation by the Civil Division of the U.S. Department of Justice (the "DOJ") into the manufacture and sale of body armor products containing Zylon, a ballistic yarn manufactured and marketed by Toyobo Co., Ltd. and Toyobo America, Inc. The Debtors have produced documents and witnesses for interviews in the DOJ's investigation and are in ongoing negotiations with the DOJ in an effort to resolve the outstanding issues between the parties. In the context of these confidential discussions, certain numbers have been discussed as to what DOJ believes its potential claims involve. The Debtors do not believe that DOJ has any viable claims against them in any amount. At this time, the Company cannot predict the outcome of this investigation.

**D.    Equity and Significant Indebtedness**

28.    PBSI is a publicly traded company; its common stock is listed and traded on the OTC Bulletin Board. As of the Petition Date, the largest holders of PBSI common stock are David Brooks (22.6%), Prescott Group Capital Management (9.5%) and Steel Partners (4.2%).[8] The remaining equity is publicly held.

---

[8] Mr. Brooks was the former Chief Executive Officer and director of each the Debtors. His employment with the Debtors and membership on the Debtors' respective boards of directors ended in July 2006.

29.    In 2007, the Debtors and subsidiaries PACA and PBBA entered into a Credit Facility with BOFA, with PBSI and PBSS, LLC as guarantors that certain *Amended and Restated Loan and Security Agreement*, dated as of April 3, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Loan Agreement").

30.    Pursuant to the Prepetition Loan Agreement and associated documentation, the Debtors borrowed certain funds under (a) a revolving loan commitment (the "Revolving Loan"), and (b) a loan commitment (the "Term Loan").  In addition, pursuant to the Prepetition Loan Agreement, certain letters of credit were issued on behalf of the Debtors for the benefit of various third parties.  E.I. duPont de Nemours and Company ("DuPont") has fully guaranteed the Borrowers' obligations under the Term Loan made under the Prepetition Loan Agreement.  As security for the contingent obligations of the Borrowers and the PBSI under the Prepetition Note, the Debtors granted to DuPont a junior, subordinated security interest in substantially the same assets and property that are subject to the prepetition liens conveyed to the Agent as security for the Debtors' obligations under the Prepetition Loan Agreement.

31.    As of the Petition Date, the Debtors estimate that approximately $10,526,000 remains outstanding under the Prepetition Loan Agreement, comprised of $10,000,000 in principal obligations outstanding under the Term Loan, and outstanding Letter of Credit Obligations (as defined in the Prepetition Loan Agreement) of approximately $526,000, plus additional amounts on account of accrued and unpaid interest, fees, costs and charges.  As of the Petition Date, there are no outstanding amounts due under the Revolving Loan.  On

February 23, 2010, the Agent notified the Borrowers and the Guarantor that all revolving loan

commitments under the Prepetition Loan Agreement were terminated.

32.    In addition to the indebtedness under the Term Loan, the Debtors owe

approximately $28,244,000 in trade debt to vendors and suppliers.

33.    As of December 31, 2009, on an unaudited consolidated basis, the Debtors

reported total book value assets of approximately $68,254,000 including approximately

$14,462,000 in accounts receivable and $33,178,000 in net inventory, and $71,997,000 in

liabilities, which included $21,655,000 in accounts payable, $15,103,000 in other accrued

expenses and current liabilities, $10,000,000 under the balance of the Term Loan, and

$11,703,000 on the balance of the Revolving Loan (now paid off as described above).  For the

2009 fiscal year, the Debtors, on an unaudited consolidated basis, reported net sales of

$158,262,000 and a net loss of approximately $40,000,000.

E.    **Circumstances Leading to the Commencement
of the Chapter 11 Cases and Goals of Chapter 11 Case**

34.    The events that occurred during 2008 and 2009 presented a significant

challenge to the Company. Significant delays in the awarding of U.S. Military and Federal

Government soft body armor contracts, uncertainties in the transition of civilian law enforcement

body armor certification standards, the continuing poor economic climate and the crisis in the

credit markets contributed to substantially reduced sales in 2008 and 2009.  In 2009, the

Company implemented staff reductions and facility consolidations as part of the "lean

manufacturing" transformation of our operations and cost cutting measures.  Due to careful and

focused management during this difficult economic period, the Company preserved operating

capacity by building rapidly scalable production cells and reducing operating waste.

### Recent Supply Interruptions

35.    Due to the percentage of company sales to the U.S. military and federal

law enforcement agencies, it is important to understand the nature of contracting with the federal

government and the possible effect of the federal government's budgeting process on the

Company's operating results and production backlog in any given year.  Frequently, there may

be events surrounding the U.S. and other defense budgets that create fluctuations in the

Company's backlog and portfolio of contracts with the federal government.  These include

availability of year-end monies to accomplish important last minute contracts for supplies and

services, enactment of a continuing resolution which limits spending to the previous year's level

until a budget is signed into law, late approval of a new budget, use and timing of a supplemental

appropriation, and several other possible events. These events can significantly affect the amount

of orders the Company has in backlog and the number as well as the size of the major contracts

for the Company's products.  In fact, several requests for proposals and the awarding of contracts

were delayed in 2008 and 2009.

36.    Most recently, in late 2009, the Debtors were awarded a 65,000 unit IOTV

contract from the U.S. Army.  As noted previously, in the past the testing process took

approximately one week, after which the Debtors would receive a Letter of Approval, allowing

the Debtors to ship the order, record the account receivable and sale at that time.  The eligible

accounts receivables provided a basis to obtain an advance of funds from the Revolving Loan.

The percentage of the eligible receivables that were pledged to BOFA secured the payment of the funds that were advanced. However, in the fourth quarter of 2009, the Army elected to test the pulled vests at the U.S. Army Aberdeen testing facility, which increased the test period from three days to thirty six days. Further adding to the delay, the U.S. Army identified certain deficiencies with the vests as tested, and required the Company to submit a corrective action report. While the vests were ultimately certified, the remedial activities included a stop work order for the U.S. Army vests from February 5, 2010 to February 27, 2010.

37.     This increased testing time and remedial actions significantly delayed approval for the Lots being tested, thereby preventing the Debtors' from obtaining advances against the eligible receivables from the orders of the U.S. Army. The extended testing period at the Aberdeen testing facility combined with the contract payment terms of net, 30 days, resulted in a cash cycle of up to 10 weeks from the date the raw materials were originally received by the Debtor to the date of payment. This extended payment cycle in conjunction with the contractually agreed "Pull" dates and the vendor payment terms ranging from cash in advance to net, 30 days, placed severe strain on the Debtors working capital. While the U.S. Army attempted to alleviate the cash strain through early performance billing, additional testing resulting from quality issues caused a further slow down in shipments and payments. In January 2010, BOFA reduced the amount it would advance on accounts receivable from 85% to 75% and for inventory from 29.5% to 20%. Additionally, availability blocks on borrowing remained in place as well as scheduled credit line reductions.

## Loan Default and Forbearance[9]

38.     In January 2010, BOFA renewed its request that the Debtors find

alternative financing and requested that the Debtors engage a consultant for the purpose of

reviewing and analyzing the Debtors' cash flows.  The Debtors, accordingly, engaged CRG

Partners Group, LLC ("CRG"), to perform this review.  On February 23, 2010, BOFA declared a

default under the Prepetition Loan Agreement at which time collections and/or funds from the

Debtors' accounts were used to reduce the revolving credit balance to zero.  BOFA further

advised the Debtors that any further collections received in the Debtors' deposit accounts would

be applied as a reduction to the outstanding balance of the Term Loan.  These actions taken by

BOFA effectively eliminated the Debtors' ability to obtain access to the working capital

necessary to operate their businesses.

39.     With the consent of DuPont, BOFA agreed to permit the Debtors' use of

cash collateral through the Petition Date.  Due to the continued deterioration in the Debtors' cash

flow, however, and to help ensure that day-to-day operations continue uninterrupted, that

administrative expenses in these chapter 11 cases are paid, and that an orderly process can be

implemented to create an ongoing path for the Debtors and their employees, the Debtors

determined that it was in the best interest of the Debtors, their estates, and their creditors to

commence the chapter 11 cases.

---

[9] Unless otherwise noted, capitalized terms used in this section have the meanings ascribed to them in the *Motion of Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 for Authorization to: (1) Incur Senior Secured Superpriority Postpetition Financing; (2) Repay Prepetition Secured Debt Upon Entry of Interim Order; (3) Use Cash Collateral; (4) Grant Liens and Provide Superpriority Administrative Expense Status; (5) Grant Adequate Protection; (6) Modify the Automatic Stay; and (7) Schedule a Final Hearing* (the "DIP Financing Motion") filed concurrently herewith

## Efforts to Obtain DIP Financing

40.     Prior to the Petition Date, the Debtors and their advisors canvassed approximately twenty sources of prospective postpetition financing, including financing from BOFA and various other third parties. In particular, CRG prepared a comprehensive presentation seeking financing proposals. The presentation was distributed to ten sophisticated providers of debtor-in-possession financing.

41.     BOFA indicated that they were not willing to extend further credit to the Debtors and insisted on full repayment of all outstanding obligations under the Prepetition Loan Agreement. The Debtors received expressions of interest from various other interested parties and detailed term sheets from four potential lenders. The Debtors then negotiated expeditiously with each of these parties to obtain the most favorable lending terms for the benefit of the estates. Following the Debtors' evaluation and comparison of the various financing proposals, the Debtors selected Steel Partners II, L.P. (the "DIP Lender") to provide senior secured, super-priority credit to the Debtors. On March 26, 2010, the Debtors executed the DIP Engagement Letter and then negotiated the definitive documentation set forth in that certain *Debtor-in-Possession Financing Agreement* dated April 12, 2010 (the "DIP Credit Agreement").

42.     In considering their options, the Debtors recognized that the obligations owed to BOFA are secured by substantially all of the Debtors' property and that such liens would either have to be primed in order to obtain postpetition financing or the Debtors would need to locate a lender willing to extend credit that would be junior to the liens of BOFA. Borrowing from another postpetition lender that required security senior to that of BOFA likely

could only be accomplished through an extended, contested hearing on whether the requirements

of section 364(d) of the Bankruptcy Code had been satisfied.  In light of the risks involved, the

fees and expenses that would be incurred, and economics offered by the proposed DIP Lender,

the Debtors determined that the proposed DIP Credit Agreement, and the repayment in full of the

amounts outstanding under the Prepetition Loan Agreement, is the best financing available under

the circumstances.

43.    Furthermore, the Debtors, in conjunction with their advisors, determined

that the financing terms and pricing set forth in the DIP Credit Agreement are consistent with, if

not superior to, recent comparable DIP financing arrangements.  The Debtors believe that the

proposed terms of the DIP Credit Agreement, hence, are consistent with current capital market

conditions for financing of this type.

44.    The Debtors negotiated the proposed DIP Credit Agreement with the DIP

Lender at arms' length and in accordance with their sound business judgment.  In light of the

connections between the DIP Lender and the Debtors, I, in conjunction with a subcommittee of

the board consisting only of the Debtors' independent directors, directly handled the evaluation

and negotiation of the various DIP financing term sheets and the ensuing DIP Credit Agreement

(with input on certain operational and corporate issues from officers of the Debtors).  The DIP

Credit Agreement has been entered into by the Debtors and the DIP Lender without collusion, as

a result of vigorous, well-advocated negotiation and with each of the parties represented by

independent counsel and advisors.

45.    The Debtors' budget has been carefully crafted to provide the Debtors

with the minimum liquidity required to prudently operate their business and meet their

anticipated post-petition operating and non-recurring expenses.  The amounts that the Debtors

seek to borrow under the interim order approving the DIP financing reflect the payment of

expenses that, in the Debtors' business judgment, are necessary to avoid immediate and

irreparable harm to the estates pending the final hearing to approve the DIP financing.

46.    After filing their petitions, the debtors intend to operate their businesses in

the ordinary course, while pursuing all options for maximizing value.  In the various First Day

Motions, the Debtors seek relief on an expedited basis that will help preserve the value of their

assets and permit them to conduct these cases efficiently and economically.  The basis for each

of the First Day Motions is set forth below.

## PART II

### First Day Motions and Applications

47.    In order to enable the Debtors to minimize the adverse effects of the

commencement of these chapter 11 cases, the Debtors have requested various types of relief in

the First Day Motions filed concurrently with this Declaration.  A summary of the relief sought

in each First Day Motion is set forth below.

48.    I have reviewed each of these First Day Motions (including the exhibits

and schedules thereto).  The facts stated therein are true and correct to the best of my knowledge,

information and belief, and I believe that the type of relief sought in each of the First Day

Motions:  (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption

to their current business operations; and (b) is essential to maximizing the value of the Debtors'

assets for the benefit of their estates and creditors.

A.   **Debtors' Motion for Order Directing Joint Administration
of Related Chapter 11 Cases**

49.   The Debtors in these Cases are affiliated entities.  I am informed by

counsel that the joint administration of the Cases will permit the Clerk of the Court to utilize a

single general docket for these Cases and combine notices to creditors of the Debtors' respective

estates and other parties in interest, which will result in significant savings to the estates.

Accordingly, I believe that the relief requested in the joint administration motion is in the best

interests of the Debtors' estates.

B.   **Application of Debtors for Order Under 28 U.S.C. § 156(c)
Authorizing and Approving the Retention of and Appointing
Epiq Bankruptcy Solutions, LLC as Noticing, Claims and Balloting Agent**

50.   The Debtors seek entry of an order authorizing and approving the

retention of and appointing Epiq Bankruptcy Solutions, LLC ("Epiq"), *nunc pro tunc* to the

Petition Date, as claims, noticing and balloting agent (the "Claims and Noticing Agent") for the

Debtors and, as applicable, the Clerk to, among other things: (i) serve as the Court's notice agent

to mail certain notices to the estates' creditors and parties-in-interest, (ii) provide computerized

claims, claims objections and balloting database services, and (iii) provide expertise, consultation

and assistance with claim and ballot processing and with other administrative information related

to the Debtors' bankruptcy cases.  With the large number of creditors that the Debtors have

identified, the Debtors believe it is in the best interests of their estates and their creditors to

appoint Epiq as agent for the Clerk.

51.    I understand that Epiq is one of the country's leading chapter 11

administrators with experience in noticing, claims processing, assisting with claims

reconciliation and distribution.  I believe Epiq is well qualified to provide the Debtors with

experienced noticing, claims and balloting services in connection with theses cases, and has

substantial experience in the matters upon which it is to be engaged.

52.    Accordingly, I believe it is in the best interest of the Debtors' estates to

seek the entry of an order retaining and appointing Epiq as the agent for the Clerk and as

custodian of official court records and to perform such other services as may be required by the

Debtors.  Additionally, the Debtors seek authorization to compensate Epiq for services rendered

and to reimburse Epiq for expenses incurred without further order of this Court upon the

Debtors' receipt of reasonably detailed statements of fees and expenses.

C.    **Motion of Debtors for Order Under 11 U.S.C. §§ 105, 345,
363, 503(b), 1107, and 1108 Authorizing (I) Maintenance of Existing
Bank Accounts, (II) Continued Use of Existing Business Forms,
(III) Continued Use of Existing Cash Management System, (IV) Continued
Performance of Intercompany Transactions and Providing for Administrative
Priority Status to Postpetition Intercompany Claims; and
(V) Waiver of Section 345(b) Deposit and Investment Requirements**

53.    The Debtors seek authorization (1) to maintain their existing bank

accounts and to pay any prepetition routine banking fees imposed by the financial institutions

where the Debtors' bank accounts are maintained, (2) to continue to use their existing check

stock and business forms until exhausted, (3) to continue to use their existing cash management

system, (4) to continue performance of intercompany transactions and to provide administrative

priority to postpetition intercompany claims, and (5) for a limited waiver of the deposit and

investment guidelines imposed under section 345(b) of the Bankruptcy Code.

54.     The Debtors' cash management system (the "Cash Management System")

is a network of bank accounts (together, the "Bank Accounts") that facilitates the timely and

efficient collection, management, and disbursement of funds used in the Debtors' business.

Because of the nature of the Debtors' operations and the disruption that would result if the

Debtors were forced to close their existing accounts, I believe that it is critical that the Cash

Management System remain in place.

55.     Collections.  Collections from sale revenues consist of checks and wire

payments made by the Debtors' customers which are deposited into four (4) separate lockbox

accounts (collectively, the "Lockbox Accounts").  Deposits into the Lockbox Accounts are swept

by BOFA on a daily basis, and deposited by BOFA into an account (the "Revolving Loan

Account") it maintains to both pay down any outstanding amounts then due under the Revolving

Loan and to advance funds to the Operating Account which funds the Debtors' operations and

allows them to pay expenses.

56.     Disbursements.  Prepetition, the Debtors manually issued checks drawn

from certain zero balance accounts which were funded on an as-needed basis based on

availability in the Revolving Loan Account (together, the "ZBA Accounts").  However, the ZBA

Accounts are no longer operative and the Debtors manually fund amounts from the Operating

Account to five disbursement accounts (the "Disbursement Accounts") and then issue payments

from amounts deposited to the Disbursement Accounts to the ultimate payee. Payments by wire transfer are funded from the Operating Account to the applicable Disbursement Account. Once funded, wire transfers are transferred from the Disbursement Accounts to the recipient of the wire transfer.

57.    Approximately $1.5 million to $7 million flows through the Cash Management System on a weekly basis. Fluctuations are primarily due to scheduled payroll payments and payments to the Debtors' suppliers. As of the Petition Date, the Debtors have approximately $4.7 million in cash or cash equivalents in their Disbursement Accounts.

58.    The Debtors' Cash Management System constitutes an essential business practice and was created and implemented by the management of the Debtors in the exercise of their business judgment. The widespread use of this particular Cash Management System, moreover, is attributable to the numerous benefits it provides, including the ability to (a) process and timely pay expenses; (b) allow a mechanism for deposits from revenues; (c) ensure cash availability; (d) control and monitor corporate funds; and (e) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. In addition, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption of the Cash Management System will facilitate and enhance the Debtors' efforts to continue to operate postpetition. Moreover, the Debtors submit that the relief requested is consistent with the relief provided to debtors in a number of other cases pending in this District.

59.     To maintain their existing Cash Management System and minimize expense to their estates, the Debtors also seek authority to:

(i)      continue to use all correspondence and business forms (including, but not limited to letterhead, purchase orders, invoices, etc.) until such time as the Debtors can effectuate the necessary changes to their pre-printed and computer-generated forms in order to add the "debtor in possession" label, and continue using their existing pre-printed check stock without reference to their "debtor in possession" status until the existing pre-printed stock has been exhausted, provided that the Debtors shall add the "debtor in possession" designation to any new checks ordered after the depletion of the existing stock;

(ii)     authorize BOFA to continue to hold $32,000 as advance payment and security for all BOFA's fees, costs and charges in respect to the cash management services rendered by BOFA to the Debtors for the month ending March 31, 2010 and from and after the Petition Date (the "BOFA Bank Fee Claims"), and to apply such funds against the Debtors' payment obligations as and when they become due for such pre-Petition Date monthly period ending March 31, 2010 and such post-Petition Date period;

(iii)    ensure each individual Debtor will not, at the expense of its creditors, fund the operations of another entity, all intercompany claims against a Debtor by another Debtor or non-debtor subsidiary arising after the Petition Date as a result of ordinary course intercompany transactions through the Cash Management System (collectively, "Intercompany Claims"), be accorded administrative priority expense status; and

        (iv)    maintain their Bank Accounts without posting a bond or other security, as would otherwise be required under the Bankruptcy Code whenever the funds on deposit exceed the amount permitted.

        60.    I believe that maintenance of the Bank Accounts will greatly facilitate the Debtors' operations in chapter 11. As noted above, all revenues and income realized by the Debtors ultimately flows into the Revolving Loan and Operating Accounts and are disbursed through an interlinked Cash Management System. If the Bank Accounts were closed, the Debtors would have to open new accounts and then attempt to arrange alternative electronic and manual payment procedures for payments into and out of the Debtors' accounts, which would completely disrupt the flow of postpetition receipts and disbursements. In addition, closing the Bank Accounts would require the Debtors to cancel and reinstitute wire transfer instructions which would be difficult to modify under exigent circumstances. I believe that these disruptions would severely impact and could irreparably harm the Debtors' ability to operate their business at this critical juncture. To avoid disruptions and delays in the operation of the Debtors' business, the Debtors should be permitted to maintain their existing Bank Accounts and, if necessary, to open new accounts as debtor in possession accounts or to close any unneeded existing accounts.

        61.    To minimize expense to their estates, the Debtors seek authority to continue to use all correspondence and business forms until such time as the Debtors can effectuate the necessary changes to their pre-printed and computer-generated forms in order to add the "debtor in possession" label. The Debtors' business and correspondence forms are

entirely pre-printed.  I believe it is critical that the Debtors continue to utilize their existing business forms without disruption to conserve estate resources.

62.    Prior to the Petition Date, certain of the Debtors engaged in intercompany financial transactions in the ordinary course of business (collectively, the "Intercompany Transactions"), and as part of the Debtors' consolidated Cash Management System.  At any given time, there may be balances due and owing from one Debtor to another Debtor.  These balances represent extensions of intercompany credit made in the ordinary course of business and are an essential component of the Cash Management System.  The Debtors maintain records of these transfers of cash and can ascertain, trace and account for these Intercompany Transactions.  The Debtors, moreover, will continue to maintain such records, including records of all current intercompany accounts receivable and payable.  Throughout the reorganization process, I believe it will be critically important that the Debtors be allowed to maintain their intercompany practices.

63.    Finally, because of the nature of their operating business, the Debtors may, at certain times, have funds accumulated in the Bank Accounts that exceed the limits provided in the Bankruptcy Code, and therefore necessitate a waiver of these limits.  I believe that unless the Debtors are granted a waiver, the Debtors' business will be prejudiced.

D.     **Motion of the Debtors for Entry of an Order:(I) Authorizing the
       Debtors o (A) Pay Wages, Salaries, and Other Compensation,
       (B) Maintain Employee Medical and Similar Benefits, and (C) Pay
       Reimbursable Employee Expenses; and (II) Authorizing and Directing
       Banks and Other Financial Institutions to Pay All Checks and Electronic
       Payment Requests Made by the Debtors Relating to the Foregoing**

    64. The Debtors currently employ 920 full-time employees in hourly, salaried,

supervisory, management, sales, administrative, and manufacturing production positions to

perform the functions necessary to effectively and efficiently operate the Debtors' business

(collectively, the "Employees"). The Debtors employ both salaried and hourly Employees. 800

Employees are paid hourly and 120 Employees are salaried.

    65. To minimize the personal hardships that the Employees will suffer if their

prepetition employment-related obligations are not paid or honored, to maintain the morale of the

Employees during this critical time, and to minimize disruptions to the Debtors' ongoing

business operations, the Debtors seek authority, in their sole discretion, to: (i) pay unpaid

prepetition claims for wages, commissions and salaries to the Employees (the "Unpaid Wages");

(ii) remit applicable withholding obligations to the proper third parties; (iii) honor and maintain

certain benefits (as more fully set forth below) offered by the Debtors (the "Benefits"); (iv)

reimburse certain unpaid business expenses incurred prepetition by the Employees; and (v) pay

all costs incident to the foregoing.

    66. <u>Unpaid Wages</u>. As of the Petition Date, the Debtors owe an estimated

$210,000.00 for the gross amount of earned but Unpaid Wages. No single Employee is owed

more than $11,725 in Unpaid Wages. The Debtors therefore seek authority to pay the Unpaid

Wages up to a total and aggregate amount of $250,000.00. In addition to the Unpaid Wages, the

Debtors estimate that as of the Petition Date, approximately $57,540.00 of the Debtors' contributions to tax and insurance withholdings were incurred and unpaid in connection with the Unpaid Wages (the "Employer Tax Obligations"). The Debtors also request authority to pay the Employer Tax Obligations, up to $75,000.00 in connection with the payment of the Unpaid Wages, plus any amounts subsequently deemed to be due and owing pursuant to any audit of the Employer Tax Obligations which occurs after the Petition Date.

67.    Payroll Administrator. Outside payroll administrator, Automated Date Processing, Inc. ("ADP"), ADP draws funds from the Debtors' account approximately two days in advance of each payday and are responsible for paying all applicable withholdings and payroll taxes with respect to the Employees. In the ordinary course of business, the Debtors provide applicable schedules in advance of the payroll payment period, and ADP issues payroll checks. The Debtors pay approximately $10,500 per month to ADP on account of payroll processing services. The Debtors estimate that they may owe ADP approximately $10,500 on account of prepetition services. The Debtors request authority to continue to use ADP's payroll processing services to pay any prepetition amounts that may be due to ADP up to a total and aggregate amount of $15,000.

68.    Independent Contractors. The Debtors' sales force includes three sales representatives from R.J. Wagner Marketing and four sales representatives from Wills and Associates who are paid sales commissions directly from the Debtors as Independent Contractors. The Debtors seek to pay Independent Contractors for all services rendered prior to the Petition Date pursuant to the agreements with such Independent Contractors.

69.    <u>General Reimbursement Obligations</u>.  The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors.  Such expenses typically include, but are not limited to, business-related travel expenses, including air travel, auto travel and car rental, lodging, meal charges, business lunches, telephone charges, and miscellaneous other allowed travel expenses (the "General Reimbursement Obligations").  Such General Reimbursement Obligations also include amounts billed by Employees to corporate charge cards for the purchase supplies, inventory, and equipment on behalf of the Debtors and in support of the Debtors' businesses.  The Debtors seek authority to pay any prepetition General Reimbursement Obligations (including any such amounts due to former employees) up to a total amount of $50,000 and to continue to honor General Reimbursement Obligations incurred postpetition in the ordinary course of the Debtors' business.

70.    <u>Health Plans</u>.  The Debtors provide several health and related benefit plans to their Employees, including medical and vision insurance dental insurance, life insurance, accidental death and disability insurance, and short and long-term disability insurance (collectively, the "Health Plans"), as described in more detail below.  The insurers of the Health Plans invoice the Debtors in advance for the full amount of premiums owing for the Debtors' Employees as of the first of each month for that month's coverage period.

71.    The Debtors provide fully insured medical/vision insurance plans (the "Medical Plans") to their Employees through two separate carriers.  For Employees of Debtors Point Blank Solutions, Inc and Point Blank Body Armor, Inc., the Debtors provide medical and

vision insurance through Humana Inc. ("Humana"). The Debtors offer a fully insured medical

and vision insurance plan to Employees of Debtor Protective Apparel Corporation of America

through Cariten Healthcare, Inc. ("Cariten"). Each pay period, the Debtors deduct from the

Employees' Wages, the Employees' portion of the Medical Plan contribution, which amount

depends upon the plan they select (together, the "Medical Plan Contributions"). On average, the

Debtors pay approximately $280,000.00 on account of their Medical Plans to their insurers each

month, which amount includes the Employee contributions deducted from Employee Wages later

in the same month and $11,000.00 in COBRA premium payments. As of the Petition Date, the

Debtors have paid their April 2010 invoices received from Humana and Cariten on account of

their Medical Plans. Out of an abundance of caution, the Debtors seek authority to pay Humana

and Cariten the Medical Plan Contributions not to exceed $50,000.00 for any other Medical Plan

Contributions that came due pre-petition for which the Debtors are not yet aware. The Debtors

seek authority to continue to offer their Medical Plans postpetition in the ordinary case of

business and in their discretion.

72.     The Debtors offer their eligible Employees with dental insurance through

Delta Dental (the "Dental Plan"). Each pay period, the Debtors deduct from the Employees'

Wages, the Employees' portion of the Dental Plan contribution, which amount depends upon the

plan they select (together, the "Dental Plan Contributions"). On average, the Debtors pay

approximately $10,500 on account of their Dental Plans per month, which amount includes the

Employee contributions deducted from Employee Wages later in the same month and $200.00 in

COBRA premium payments. As of the Petition Date, the Debtors have paid all previous

invoices received from Delta Dental on account of their Dental Plans. Out of an abundance of

caution, the Debtors seek authority to pay Delta Dental the Dental Plan Contributions not to

exceed $5,000.00 for any other Dental Plan Contributions that will come due pre- petition for

which the Debtors are not yet aware. The Debtors seek authority to continue to offer their Dental

Plans postpetition in the ordinary case of business and in their discretion.

> 73.    The Debtors provide their Employees with life insurance and accidental

death and dismemberment insurance and make additional life insurance, short-term disability

insurance, supplemental cancer insurance and long-term disability insurance available to

Employees though their insurance carriers. The Debtors seek authority to continue to offer the

Life Insurance, AD&D Insurance, Supplemental Cancer Insurance and Disability Insurance

postpetition in the ordinary course of business in their discretion. The Debtors' premium

contributions to the Life Insurance, AD&D Insurance, Supplemental Cancer Insurance and

Disability Insurance total, in the aggregate, approximately $20,000.00 per month. The Debtors

seek authority to pay up to $10,000 for all of these programs for any pre-petition amounts that

may be owed for which they are not yet aware.

> 74.    Workers' Compensation Under the laws of the various states where the

Debtors conduct their businesses, the Debtors are required to maintain workers' compensation

insurance to provide their Employees with coverage for claims arising from or related to their

employment with the Debtors. The Debtors currently maintain an annual workers' compensation

policy (the "Workers' Compensation Policy") with the Hartford Insurance Company

("Hartford"). In addition to their current, fully-insured Workers' Compensation Policy with

Hartford, the Debtors are still contingently obligated for costs pursuant to previous years' self-insured workers' compensation coverage through Sentry Insurance ("Sentry"). The Debtors submit that the continuance of their Workers' Compensation Policy is appropriate in the ordinary course of business, but out of an abundance of caution, seek authority to maintain their workers' compensation insurance in accordance with applicable law postpetition and to pay all premium installments to Hartford as they come due in the ordinary course of business for going forward coverage. In addition, the Debtors seek to make all payments to Sentry as they come due in order to meet its existing obligations under its previous self-insured worker's compensation coverage.

75.    <u>Vacation</u>. The Debtors provide all full-time Employees vacation time. Vacation benefits vary based on the Employee's tenure and position. Vacation time is accrued based on time worked. Full-time salaried and hourly paid Employees are eligible for paid vacation days as the days are accrued. The amount of vacation earned by Employees per week is based on the number of years of service an Employee has completed since the date they commenced employment. The Debtors request authority in their discretion to honor existing vacation and sick obligations accrued prior to the Petition Date by their Employees and develop any similar policies regarding time away from work and holidays on a post-petition basis and in the ordinary course of the Debtors' business.

76.    <u>401(k) Plan</u>. The Debtors maintain a 401(k) plan for the benefit of their Employees (the "401(k) Plan"). The 401(k) Plan provides for automatic pre tax salary deductions of eligible compensation up to certain limits set by the Internal Revenue Code.

Approximately 126 Employees participate in the 401(k) Plan, and the approximate monthly

amount collectively withheld from Employees' paychecks is $24,054.69. The Debtors do not

currently pay matching contributions to the 401(k) plan. As of the Petition Date, there are no

accrued but unfunded matching contributions with respect to the 401(k) Plan. The Debtors

utilize ADP as the Plan Trustee and Recordkeeper. The Debtors pay ADP approximately $1,500

per month for the administrative costs and monthly processing fee for the 401(k) Plan. The

Debtors request authority, in their discretion, to continue their existing 401(k) Plan and pay any

401(k) fees in the ordinary course of the Debtors' business.

77.    I believe it is important to honor the Debtors' existing obligations to their

employees (the "Prepetition Employee Obligations.") and to continue to provide the package of

benefits to their Employees (the "Employee Programs") after filing of these Chapter 11 cases.

Many Employees live from paycheck to paycheck and rely exclusively on receiving their full

compensation or reimbursement of their expenses in order to continue to pay their daily living

expenses. These Employees may be exposed to significant financial and healthcare related

problems if the Debtors are not permitted to pay and/or honor the Unpaid Wages and Benefits,

and the expenses associated therewith, in the ordinary course of the Debtors' business.

Moreover, I believe that if the Debtors are unable to honor accrued Unpaid Wages and the

Benefits described above, including honoring earned vacation time, Employee morale and

loyalty will be jeopardized at a time when Employee support is critical.

78.    If the Debtors are not authorized to pay for medical benefits, then many of

the Debtors' Employees may not be reimbursed or otherwise have their medical benefits claims

paid. In addition, certain Employees may become primarily obligated for the payment of these claims in cases where health care providers have not been reimbursed. I believe that potentially enormous hardship could be visited upon these employees if the Debtors are not authorized to honor the resultant Medical Plan Contributions. The Debtors believe the uncertainty regarding the payment of Medical Plan Contributions will cause significant anxiety at precisely the time the Debtors needs their Employees to perform their jobs at peak efficiency.

79. The Employer Tax Obligations and other amounts either voluntarily or involuntarily withheld from Employee paychecks (collectively, the "Withholding Obligations") principally represent employee earnings that governments (in the case of taxes), Employees (in the case of voluntary Withholding Obligations), and judicial authorities (in the case of involuntary Withholding Obligations), have designated for deduction from Employee paychecks. The failure to transfer these withheld funds could result in hardship to certain Employees. The Debtors expect inquiries from garnishers regarding the Debtors' failure to submit, among other things, child support and alimony payments, which are not the Debtors' property but, rather, have been withheld from Employee paychecks. Moreover, if the Debtors cannot remit these amounts, the Debtors' Employees may face legal action due to the Debtors' failure to submit these payments.

80. The Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the success of these Chapter 11 Cases. I believe that deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to maximize the value of their

assets.  Satisfaction of the Unpaid Wages and Benefits, as described herein, is necessary to

maintain the Employees' morale during the case and to insure continued, efficient operation in

order to maximize value for all creditors.

E.    **Motion Of The Debtors For An Order (I) Authorizing The Debtors To Pay Prepetition Sales, Use And Similar Taxes And Regulatory Fees In The Ordinary Course Of Business And (II) Authorizing Banks And Financial Institutions To Honor And Process Checks And Transfers Related Thereto**

81.    In connection with the normal operations of their business, the Debtors

collect and incur various taxes, which the Debtors remit to various federal, state, and local taxing

authorities (collectively, the "Taxing Authorities").  The Debtors incur sale and use tax

obligations in the states of Florida, Washington, California, and Tennessee.  The Debtors collect

and withhold sales taxes in the states in which they operate in connection with their

manufacturing and sales operations which are then turned over to the applicable taxing

authorities on a monthly, quarterly or annual basis depending on the jurisdiction.  The Debtors

also incur use taxes imposed by certain states in which they operate for certain inventory and

equipment that the Debtors consume in the operation of their business.  Finally, the Debtors

incur franchise taxes from the state and local jurisdictions in the states and towns in which the

Debtors operate their facilities.

82.    Prepetition, the largest  amount of unpaid taxes relate to the Industrial

Funding Fee that the Debtors are responsible for collecting and turning over to the U.S.

Government (the "IFF").  The IFF is a fee imposed by the federal government and paid by the

Debtors' customers from the sale of the Debtors' products.  The Debtors are responsible for

collecting and remitting this fee to the federal government. Because of the timing of these collections and the associated payments, the Debtors believe that they have not turned over the total amount of taxes collected on behalf of the Taxing Authorities. As of the Petition Date, the Debtors believe that they may owe up to approximately $10,000 in prepetition IFF fees, $700 in unremitted prepetition use taxes and approximately $300 in unpaid franchise taxes.

83.     The Debtors seek authority to pay, in the Debtors' sole discretion, prepetition taxes owed to the Taxing Authorities (as defined below), including, without limitation, taxes subsequently determined upon audit to be owed for periods prior to the Petition Date. The Debtors request authority to make such payments in an aggregate amount (excluding amounts paid prepetition by checks that have not yet cleared on the Petition Date) not to exceed $11,000, which is the aggregate maximum sum that the Debtors currently believe may be due on account of prepetition Taxes incurred in the period immediately preceding the Petition Date.

84.     I believe that payment of the taxes is critical to the Debtors' continued, uninterrupted operations. Non-payment of the taxes may cause the Taxing Authorities to take precipitous actions, including but not limited to, conducting audits, filing liens, seeking to impose liability against the Debtors and their directors and officers, and, if applicable, seeking to lift the automatic stay, all of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates. Payment of the taxes will avoid these unnecessary and potentially costly governmental actions.

**F.     Debtors' Motion for an Order Authorizing, But Not Directing, Debtors to Pay Prepetition Claims of Shippers and Granting Related Relief**

85.     The Debtors seek entry of an order authorizing, but not directing, the Debtors, in their business judgment, to pay prepetition obligations owed to common carriers for ground transportation, air freight, ocean freight, and similar charges and freight forwarding charges incurred by Shippers on behalf of the Debtors (which freight forwarding charges may include in the amount payable to the freight forwarder or provider for charges for customs duties and dock facilities), including those that give rise (or legitimately may give rise) to any statutory or common-law possessory liens on account of unpaid charges owing from the Debtors to such Shippers (collectively, "Shipping Obligations"). The Debtors propose to pay such claims, when, in the Debtors' sole discretion, the Shippers' exercise of contractual or statutory self-help remedies would unduly disrupt the Debtors' businesses. The Debtors request the authority, but not the direction, to pay up to $150,000 on account of such Shipping Obligations.

86.     The Debtors use a variety of shippers to procure inbound shipments of materials from their suppliers to the Debtors' warehouses located in Jacksboro, TN and in Pompano Beach, FL (together, the "Warehouses") and to their subcontractors. The Debtors select a shipper based on the following criteria: (i) size of the shipment, (ii) the price charged by the shipper; and (iii) the availability of a particular shipper and the time of delivery to the Warehouses. For small packages consisting of four boxes or less and/or packages weighing less than 400 lbs ("Small Shipments"), the Debtors use United Parcel Service ("UPS") or Federal Express for inbound shipments. For medium to larger shipments that consist of boxes that are palletized that are less than a truck load ("LTL Shipments"), the Debtors use either Federal

Express Freight or Cargo Transportation Services, Inc. ("CTS") to transport materials to the

Warehouses by truck.  For larger shipments ("TL Shipments"), the Debtors use either CTS or

Service By Air ("SBA") to transport materials by truck to the Warehouses.

       87.    The Debtors produce completed vests in 1,200 unit lots (the "Lots") from

their manufacturing facilities in Florida and Tennessee.  Once completed, the Debtors "pull"

sample vests from the completed lots, which are then sent to a designated testing facility for

inspection (the "Pulled Vests").  The Debtors primary customers consist of the United States

Army and other federal agencies, including the Federal Prison System.  The Debtors use Federal

Express or UPS to ship the Pulled Vests to the testing facility.  After the testing is complete for

the Pulled Vests, letters of acceptance are issued and the shipments are assembled to be delivered

to the customer.  The Debtors contract with either CTS or SBA to ship the TL Shipments by

ground to the Army's distribution center in Haymarket, PA and to the federal prison's

distribution center in Yazoo City, MS.

       88.    The Debtors use the same carriers to ship products to their international

and commercial customers.  In the case of international shipments, the Debtors will use either

Federal Express or UPS to ship Small Shipments.  For domestic shipments to commercial

customers, the Debtors use CTS to ground ship LTL Shipments or LT Shipments.  For large

international shipments, the Debtors use SBA to air-freight their products.  SBA uses the services

of third party logistic suppliers, including freight forwarders, customs agents, warehouses and

other servicers (collectively, the "Logistics Providers") in order to transport the products from

the Warehouses to the location of the international customer.  The Debtors do not directly engage

or use the Logistic Providers and the fees paid to these entities are included in the fees paid to

SBA with respect to international shipments. As of the Petition Date, the Debtors do not believe

that they owe any in unpaid shipping charges with respect to international and commercial

shipments.

89.     The Debtors expect that, as of the Petition Date, certain Shippers may

have outstanding invoices for merchandise delivered to the Debtors prior to the Petition Date or

in the case of SBA, stored for the Debtors by the Logistic Providers hired by SBA on the Petition

Date that may constitute Shipping Obligations.

90.     I believe that failure to pay these Shipping Obligations will result in

certain Shippers discontinuing shipments of merchandise, thereby adversely affecting the

Debtors' distribution system. I further believe that certain Shippers may withhold essential

merchandise in their possession pending payment. Payment of some or all of these charges will

prevent the disruption to the Debtors' businesses that will result from such actions. Moreover, I

believe that some of these Shippers may contend that they are entitled to possessory liens in any

goods they hold as of the Petition Date, pursuant to state or other applicable law, and will refuse

to deliver or release such goods until their claims have been satisfied and their liens redeemed.

The Debtors' payment, on the exercise of their business judgment and in their discretion, of the

amounts owing to Shippers as requested herein, will eliminate the need to provide such adequate

protection and reduce the amount of potential secured claims against the Debtors' estates, which

would take priority over any general unsecured claims.

91.    In addition, I am informed that the value of the goods in the possession of the Shippers, together with the potential injury to the Debtors from disruption of their businesses if the goods are not released, far exceeds the amount of unpaid Shipping Obligations that the Debtors seek to pay. I therefore believe that it is necessary and important to continued business operations that the Debtors pay these Shipping Obligations. Moreover, if the Debtors are not able to make payments sought herein to those Shippers whose services the Debtors utilized prepetition, I believe many of such Shippers will cease to do business with the Debtors, forcing the Debtors to obtain substitute carriers with little or no warning. I believe that such an arrangement would almost certainly obligate the Debtors to pay premium charges to the replacement carriers in order to obtain timely delivery of their inventory and other goods essential to their operations, and would in any event severely disrupt the Debtors' operations.

G.    **Motion For Entry Of An Order Pursuant To Sections 105(a),363(c), 1107(a), And 1108 Of The Bankruptcy Code And Bankruptcy Rules 6003 And 6004 Authorizing The Debtors To Honor Prepetition Obligations To Customers And To Otherwise Continue Customer Practices And Programs In The Ordinary Course Of Business**

92.    Prior to the Petition Date and in the ordinary course of their businesses, the Debtors engaged in certain quality control practices as required by, and agreed to in, their customer contracts in order to maximize sales, engender customer loyalty, and develop and sustain brand loyalty and a positive reputation in the marketplace (the "Customer Programs"). The Customer Programs create incentives for continuing and increased sales to the Debtors' customers. The common goals of the Customer Programs are to meet competitive pressures,

ensure customer satisfaction, and generate brand loyalty and goodwill for the Debtors, thereby

retaining current customers, attracting new ones, and ultimately enhancing net revenue.

93.     I believe that the Debtors need to continue those Customer Programs post-

petition that have been cost-effective and beneficial to their business and are otherwise required

under the prepetition customer contracts and, in connection therewith, seek authority to honor

their prepetition obligations with respect to such Customer Programs.  I believe that such relief is

necessary to preserve the Debtors' critical business relationships and goodwill for the benefit of

their estates.  I further believe it is in the best interests of the Debtors, their estates and creditors,

to honor, in the Debtors' discretion, their prepetition obligations in connection with the Customer

Programs, and to continue the Customer Programs in the ordinary course of business.

94.     Testing and Cure Obligations.  The Debtors generally sell their products

pursuant to contracts with  various military, law enforcement, security companies, and

corrections facilities that are among the Debtors' customers.  Pursuant to certain of the Debtors'

customer contracts, the acceptance of the Debtors' products by the customer is conditioned upon

control testing of the products for quality and safety.  Under such contracts, the customer will

require testing of 9 vests out of the production lot, which consist of 1,200 vests prior to shipment

of the product to the customer.  If the vests do not conform to the stated quality and safety

specifications, the Debtors must re-work the products before the customer is required to accept

delivery.  If the Debtors successfully complete the re-work of the products, then the customer is

obligated to accept delivery and pay the balance due.  If the Debtors do not successfully fix the

products, then the customer is not obligated to accept delivery or to pay for the products. The costs of testing and cure are borne by the Debtors under the terms of the applicable contracts.

95.    It has been the Debtors' experience that the testing process typically lasts between one and four weeks. After the completion of the testing the Debtors may need to take steps to correct issues identified during the testing. Thus, at any given time, there could be prepetition orders as to which the Debtors have not performed testing and cure obligations for lots that are still in production and related internal costs for labor and materials that must be paid during the postpetition period are still outstanding. The Debtors pay fees to third parties HP White, Chesapeake Testing Center, and Aberdeen Testing Center to perform the testing. The Debtors seek authority (i) to pay prepetition testing fees to third parties up to the amount of $45,000, and (ii) to perform its cure obligations related to prepetition contracts, including to cover all internal costs of labor and materials in connection therewith up to a maximum amount of $250,000.

96.    Prompt-Pay Discount Program. The Debtors have also implemented a prompt-pay program whereby certain customers are eligible for a discount on outstanding invoices in exchange for accelerated payment of such invoices (the "Prompt-Pay Discount Program"). The Prompt-Pay Discount Program is applicable to the outstanding invoices of Unicor and the U.S. Army. Specifically, Unicor has agreed to accelerate payment of approximately $1,502,000 of outstanding invoices from net-30 day terms to 5 days in exchange for a 5% discount on the balance owed. With respect to the Army, the Debtors have proposed

that eleven outstanding invoices totaling approximately $7,800,000 will receive a 2% discount in exchange for accelerated payment.

97.    If the Debtors are prohibited from honoring their prepetition Customer Program obligations, and maintaining those Customer Programs postpetition in a manner consistent with their past business practices, I believe that the customers will likely lose confidence in the Debtors, thereby impeding the Debtors' ability to maintain and enhance their business operations for the benefit of their creditors.  I further believe that the Debtors' failure to honor the Customer Programs would significantly disadvantage the Debtors in the marketplace in which such programs are commonplace, and there is no reason to think that the Debtors' loyal customers would stay loyal if the Debtors did not honor or continue their Customer Program obligations.  Ultimately, the damage from refusing to honor these obligations or continue these programs far exceeds the cost associated with honoring prepetition obligations and continuing the Customer Programs.  At this critical early state, the Debtors simply cannot risk any loss of customer confidence as a result of the Debtors' failure to honor prepetition obligations to customers or discontinuing their Customer Programs.  I believe that honoring the Customer Programs will protect the Debtors' goodwill during this critical time and enhance the Debtors' ability to generate revenue.

98.    Further, I believe that honoring the Prompt-Pay Discount Program is critical for the Debtors' cash flow needs for operations.  If the Debtors are not authorized to honor the Prompt-Pay Discount Program, then Unicor and the Army are unlikely to pay on an accelerated basis.  Without accelerated payments, the Debtors will be forced to increase their

borrowing under the proposed DIP facility, thereby destroying the Debtors' ability to meet their

obligations and to continue operations.

**H.    Motion Of The Debtors Pursuant To Sections 105(a) And 363 Of The Bankruptcy Code And Bankruptcy Rules 6003 And 6004 For An Order Authorizing, But Not Requiring, The Payment Of Prepetition Claims Of Critical Trade Vendors**

99.    The Debtors seek entry of an order authorizing them to pay, in the exercise

of their business judgment and in their sole discretion, up to $700,000 of prepetition claims of

DuPont (the "DuPont Payment") to ensure the uninterrupted functioning of the Debtors'

manufacturing and business operations.  The DuPont Payment is vital to the Debtors'

reorganization efforts.  DuPont provides Kevlar® brand fiber ("Kevlar"), a critical component of

the fabric that the Debtors use in their products.  As a certified supplier pursuant to the federal

government's lengthy certification process, DuPont cannot be easily replaced by another vendor

in a commercially reasonable manner.  I believe that a failure to make the DuPont Payment may

cause DuPont to terminate its provision of Kevlar to the Debtors and/or to the Debtors' weavers,

likely resulting in material harm to the Debtors, their businesses and their estates.

100.    Approximately 39.1% of the Debtors' revenue is generated from the

manufacturing and sale of body armor to the U.S. armed forces, which products are subject to the

federal government's certification process for government contractors.  The certification process

is applied to each supplier that provides goods and services in connection with the performance

of the contract.  In the Debtors' experience, obtaining certification upon a change in suppliers

takes approximately 90 - 120 days to complete.

101.    E.I. du Pont de Nemours and Company ("DuPont") supplies the Kevlar fiber that is woven into the fabric that the Debtors use in all of their armored, soft body vests. The Kevlar fiber typically comprises from 50-100% of the total fiber that is woven into the fabric.  DuPont is an approved supplier of the Debtors pursuant to the certification process and cannot be speedily replaced.  The delay that changing certified suppliers would cause to the Debtors' manufacturing process would result in serious harm to the Debtors' business, as well as harm to the customers that are counting on timely delivery of armored vests.

102.    DuPont asserts that it has no direct contractual obligation to the Debtors to supply their weavers and any interruption in supply would have severe consequences to the Debtors and their estates.  If DuPont decided to unilaterally terminate or cease selling Kevlar to the weavers that supply the Debtors' fabric because of the unpaid prepetition debt, the Debtors' ability to produce and deliver finished goods to customers would be severely compromised. Therefore, preservation of the Debtors' business relationship with DuPont is crucial to the Debtors' ability to successfully operate in chapter 11 and, in the exceptional circumstances described herein, the Debtors request authority to make the DuPont Payment.

103.    The Debtors seek authority to pay DuPont up to  $700,000 in prepetition debt. The debt is for prepetition supplies to the Debtors that have not been paid for.  The Debtors agreed to seek this relief pursuant to a term sheet between the Debtors and DuPont, which reflected an agreed treatment of pre- and post-petition rebates and offsets and consents by DuPont regarding the assumption/assignment of certain prepetition agreements.

104.    The amount that the Debtors seek authority to pay to DuPont is equal to approximately 2% of total outstanding prepetition trade debt.  I believe that failure to make the DuPont Payment would result in (i) the Debtors' inability to obtain necessary goods and materials and services for their manufacturing operations, (ii) negative severe effects on the Debtors' customers, and (iii) temporary closure of the manufacturing facilities operated by the Debtors.  Any temporary closures would likely prevent the Debtors from satisfying customer orders and the Debtors would risk that their customers would look to competitors to fulfill their order.

I.    **Motion of the Debtors for an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment**

105.    In the normal course of business, the Debtors have relationships with various utility companies and other providers (each a "Utility Provider" and, collectively, the "Utility Providers") for the provision of telephone, gas, electricity and related services (the "Utility Services").  The Debtors estimate that their average monthly postpetition payments to the Utility Providers will aggregate approximately $82,000.

106.    Because uninterrupted Utility Services are critical to the Debtors' ongoing operations, the Debtors seek the entry of an order:  (a) prohibiting the Utility Providers from altering, refusing or discontinuing services; (b) deeming Utility Providers adequately assured of future performance; and (c) establishing procedures for determining adequate assurance of future payment.

107.    In order to provide adequate assurance of payment for future services to the Utility Providers, the Debtors propose to make a deposit (a "Utility Deposit") equal to 50% of the Debtors' estimated cost of their monthly utility consumption to each Utility which the Debtors intend to continue to utilize during the course of these Cases. The Debtors estimate that the Utility Deposits, in the aggregate, will total approximately $41,000. The Debtors propose to make Utility Deposits to each of the Utility Providers within ten days after the entry of an interim order, pending further order of the Court, for the purpose of providing each Utility Provider with adequate assurance of payment of its postpetition services to the Debtors.

108.    In addition, the Debtors seek to establish reasonable procedures by which a Utility Provider may request additional adequate assurance of future payment, in the event that such Utility Provider believes that its Utility Deposit does not provide it with satisfactory adequate assurance.

109.    It is my belief that the Debtors cannot continue to operate without continued Utility Services. If any of the Utility Providers alter, refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted. In contrast, the Utility Providers will not be prejudiced by the continuation of their services and will be paid all postpetition utility charges. It is therefore critical that Utility Services continue uninterrupted. I believe that such relief is in the best interests of the Debtors' estates.

**J.      Motion of Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 for Authorization to: (1) Incur Senior Secured Superpriority Postpetition Financing; (2) Repay Prepetition Secured Debt Upon Entry of Interim Order; (3) Use Cash Collateral; (4) Grant Liens and Provide Superpriority Administrative Expense Status; (5) Grant Adequate Protection; (6) Modify the Automatic Stay; and (7) Schedule a Final Hearing**

110.    Pending the final hearing and entry of the final order, the Debtors seek

authority to obtain credit and incur debt (the "DIP Loan") on an interim basis under the DIP

Credit Agreement which is attached to (as Exhibit A) and described in detail in the above titled

DIP Financing Motion filed concurrently herewith.  The Debtors seek an emergency interim

hearing (the "Interim Hearing") on the DIP Financing Motion for the Court to consider entry of

an interim order, which authorizes the Debtors to (x) borrow under the DIP Facility

Documents,[10] on an interim basis, up to an aggregate principal amount not to exceed

$14,700,000, (y) satisfy the Debtors' obligations under the Prepetition Loan Agreement, and (z)

use cash collateral on an interim basis in accordance with the Approved Budget.  The Debtors

also seek to schedule a final hearing on the DIP Financing Motion within thirty (30) days of the

entry of the interim order to consider entry of the final order authorizing the balance of the

borrowings under the DIP Facility Documents and authorizing the Debtors to use cash collateral

in accordance with the Approved Budget on a final basis.

111.    The Debtors have provided a budget to the DIP Lender, setting forth in

reasonable detail all projected receipts and disbursements of the Debtors on a weekly basis for

---

[10] Unless otherwise noted, capitalized terms used in this section have the meanings ascribed in the DIP Financing Motion.

the thirteen (13) week period following the Petition Date, which budget has been approved in form and substance by the DIP Lender (as amended from time to time, the "Approved Budget")

112.    Pursuant to the Interim Order and, upon entry of the Final Order, the loans and obligations under the proposed DIP Credit Agreement will: (i) be secured by a fully perfected first priority lien on all DIP Collateral that is not otherwise subject to a lien and all proceeds thereof (excluding, however, any Avoidance Actions[11]), subject to the Carve Out; (ii) be secured by a fully perfected first priority, senior priming lien on all DIP Collateral that is subject to the existing liens securing the obligations of the Debtors to the Prepetition Lenders and DuPont and all proceeds thereof, subject to the Permitted Prior Liens and the Carve Out; and (iii) be secured by fully perfected second priority liens on all DIP Collateral that is subject to the existing Permitted Prior Liens and all proceeds thereof, subject to the Carve Out.

113.    Furthermore, pursuant to the Interim Order and, upon entry of the Final Order, the loans and obligations under the proposed DIP Credit Agreement will receive and be entitled to a superpriority administrative expense claim over all costs and expenses of the kinds specified in, or ordered pursuant to the Bankruptcy Code, subject to the Carve Out and excluding any Avoidance Actions.

---

[11]    The Avoidance Actions do not include, however, and the DIP Lender will receive a lien under the Interim Order on the: (i) Specified Avoidance Actions (*i.e.*, any action and the proceeds thereof, not to exceed the aggregate amount of $10,000,000, brought against any of the Prepetition Lenders, to the extent such action results in an actual payment by DuPont under the Prepetition Guaranty), (ii) proceeds of actions under section 549 of the Bankruptcy Code, and (iii) proceeds of any Avoidance Actions to the extent that any Carve Out funded such action or resulted in the receipt of such proceeds (but only to the extent necessary to reimburse the DIP Lender for the amount of the Carve Out used for such purposes).

114.   One condition precedent, among others, to the funding of the DIP Loans is the receipt by the DIP Lender of a new, limited guaranty from DuPont of the last $10 million borrowed under the DIP Facility (the "DIP Guaranty").  DuPont is willing to furnish the DIP Guaranty but only if its aggregate potential liability under the Prepetition Guaranty and the DIP Guaranty does not exceed the principal sum of $10,000,000 (plus interest and collections costs).

115.   The DIP Lender, DuPont and BOFA have agreed, accordingly, that nothing contained in the DIP Loan Documents shall modify the terms and conditions of the Prepetition Guaranty.  Unless and until terminated, the Prepetition Guaranty shall remain in full force and effect according to its terms.  Any payments actually made by DuPont under the Prepetition Guaranty, however, shall permanently reduce the liability of DuPont under the DIP Guaranty.  The DIP Lender, in turn, may then permanently reduce (by a corresponding amount) the "Line Cap" under the DIP Facility (i.e., $20 million).[12]

116.   In connection with the DIP Guaranty, as security for any reimbursement obligations that may arise in connection with any payments to the DIP Lender, DuPont shall receive the DuPont Postpetition Liens (in the DIP Collateral) and the DuPont Superpriority Claim (together, the "DuPont Protections"), subordinate in each case to the DIP Liens and the Carve Out and excluding Avoidance Actions.  Until the full repayment of the DIP Loan,

---

[12]       Generally speaking, as set forth in further detail in paragraph 14(b) of the proposed Interim Order and an *Intercreditor Agreement* between the DIP Lender and DuPont, any recovery from any of the Prepetition Lenders on account of the Specified Avoidance Actions, to the extent such recovery results in an actual payment under DuPont's Prepetition Guaranty, shall be remitted by the Prepetition Lenders to either the DIP Lender or DuPont, depending on whether DuPont has made a payment to the DIP Lender under the DIP Guaranty.   The Debtors have requested that these protections be entered on a final basis and not subject to further review or modification at the Final Hearing.  I believe that these provisions are warranted and necessary in light of the linkage between DuPont's Prepetition Guaranty (in favor of BOFA) and its DIP Guaranty (in favor of the DIP Lender).

however, DuPont shall have no enforcement rights with respect to the DuPont Protections. The

DuPont Protections are in addition to, and not in lieu of, DuPont's subrogation rights as a result

of payments made under the DIP Guaranty, all of which rights of subrogation, subject to the

terms of the DIP Guaranty, are preserved.

117.    The proceeds of collateral and the cash and other amounts on deposit or

maintained in the Debtors' bank accounts constitute the cash collateral of DuPont, subject to its

security interests (collectively, the "Cash Collateral"). To the extent its interests in property of

the Debtors' estates are secured by valid and perfected liens as of the Petition Date, DuPont is

also entitled to adequate protection of its interests in such collateral under the DuPont Note to the

extent there is any diminution in value of such collateral from and after the Petition Date.[13]

118.    DuPont has consented to the Debtors' use of Cash Collateral in the

ordinary course of business in accordance with the Approved Budget, subject to the approval and

entry of the Interim Order and the adequate protection liens and claims discussed below.

119.    As adequate protection for any diminution in value, DuPont will: (i)

maintain its liens on the DIP Collateral, junior and subordinate to the Carve Out and the DIP

Liens; (ii) be granted replacement liens on, and security interests in, the DIP Collateral, subject

only to the Carve Out and the liens on, and security interests in, the DIP Collateral granted to the

DIP Lender under the DIP Loan and the Orders, as the case may be, and any valid and perfected

preexisting Permitted Prior Liens; and (iii) be granted an administrative claim under section

---

[13]    Upon entry of the Interim Order, proceeds of the DIP Loan will be used to satisfy and repay the Debtors' obligations under the Prepetition Loan Agreement. Hence, the Debtors are not required to further adequately protect the interests of BOFA in property of the Debtors' estates.

507(b) of the Bankruptcy Code with priority over all administrative expense claims and unsecured claims against the Debtors, subject only to the Carve Out and to the DIP Superpriority Claim granted to the DIP Lender.

120.    The professional fees and expenses incurred by professional persons employed by the Debtors or a statutory committee in the chapter 11 cases (including, any expenses of the members of such statutory committee) ("Professional Expenses") may be paid to the extent authorized in the Approved Budget and subject to entry of a customary order of the Bankruptcy Court allowing for the interim payment of such amounts, and subject further to final Bankruptcy Court approval of any such Professional Expenses.

121.    Approval of the DIP Credit Agreement and use of Cash Collateral will provide the Debtors with immediate and ongoing access to the funds necessary to pay their current and ongoing operating expenses, including postpetition wages and salaries and utility and vendor costs. Unless these expenditures are made, I believe the Debtors will be forced to cease operations, which would (i) result in irreparable harm to their business, (ii) destroy going concern value, and (iii) deny the Debtors the opportunity to reorganize and maximize value.

122.    Because the Debtors' available Cash Collateral is insufficient to fund such expenditures, I believe the borrowing under the DIP Credit Agreement is critically necessary to preserve and enhance the value of the Debtors' estates for the benefit of all stakeholders in these chapter 11 cases. In addition, the availability under the DIP Credit Agreement will provide confidence to the Debtors' vendors and will be viewed favorably by the Debtors' employees, thereby aiding in the administration of the Cases and promoting a successful reorganization.

Accordingly, I believe the timely approval of the relief requested herein is imperative and should be approved.

123.    I believe the Debtors satisfy the requirements of the Bankruptcy Code to obtain the DIP financing because the Debtors are unable to obtain credit otherwise, relevant secured creditors are adequately protected, and the proposed financing is in the best interests of the estates.

124.    I believe that any reorganization of the Debtors' business is not possible without access to sufficient working capital and liquidity through the incurrence of postpetition financing under the DIP Credit Agreement and the use of Cash Collateral. The use of Cash Collateral alone is insufficient to meet the Debtors' postpetition liquidity needs. I believe that the Debtors are unable to obtain (i) adequate unsecured credit, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of the Debtors' estates and (y) a junior lien on encumbered assets, or (iii) secured credit from sources other than the DIP Lender on terms more favorable than the terms of the DIP Credit Agreement. I believe that the only source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Credit Agreement.

125.    I believe that the Debtors' efforts to obtain credit except as provided under the DIP Credit Agreement have been impacted by the fact that all or substantially all of the Debtors' assets are encumbered. Although the Debtors requested that BOFA entertain certain continued post-petition financing, BOFA was not willing to extend any further financing except on the terms and conditions offered by the DIP Lender under the DIP Credit Agreement (namely, repayment in full of the outstanding amounts under the Prepetition Loan Agreement). After

considering all of the Debtors' alternatives, I believe that the financing to be provided by the DIP Lender pursuant to the terms of the DIP Credit Agreement represents the best financing presently available to the Debtors.   Moreover, I believe that the loan terms and pricing provided under the DIP Credit Agreement are within the range of comparable financing arrangements recently effectuated in other chapter 11 cases.

126.   I believe that the other terms and conditions of the DIP Credit Agreement are the best possible under the circumstances of these cases, and were negotiated in good faith and at arm's-length with all parties represented by experienced counsel.  As noted above, in light of the connections between certain representatives of the Debtors and the DIP Lender, I personally handled, in conjunction with a subcommittee of the board consisting only of the Debtors' independent directors, the evaluation and negotiation of the various DIP financing term sheets and the ensuing DIP Credit Agreement (with input on certain operational and corporate issues from officers of the Debtors).  Accordingly, the DIP Lender should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Credit Agreement are later modified, vacated, or terminated by subsequent order of this or any other Court, the DIP Lender will be fully protected with respect to any amounts previously disbursed.

127.   I believe that the repayment of the amounts outstanding under the Prepetition Loan Agreement that is contemplated by the DIP Credit Agreement is appropriate under the circumstances and will not prejudice the Debtors or their estates.

128.    I believe that repayment of the Prepetition Loan Agreement is permissible and appropriate and should be approved by the Court.    First, the validity, enforceability and priority of the liens granted by the Debtors under the Prepetition Loan Agreement are subject to the "challenge" rights of a statutory committee.    Hence, insofar as the satisfaction of the Prepetition Loan Agreement is premised upon the validity of the blanket liens granted by the Debtors under the Prepetition Loan Agreement, a committee will have an opportunity to examine the propriety of such repayment.    Second, I believe that the current amount outstanding under the Prepetition Loan Agreement (*i.e.*, approximately $10.5 million) is less than the value of the collateral securing the claims under the Prepetition Loan Agreement.    Hence, I believe that there should be no prejudice from the proposed repayment to other creditors of these estates because BOFA already asserts security interests in the assets that the Debtors propose to pledge to the DIP Lender providing the funds to satisfy the Prepetition Loan Agreement under the DIP Credit Agreement.

129.    I further believe the Debtors satisfy the standard under the Bankruptcy Code to obtain financing that is secured by a "priming lien" that is senior or equal to existing liens against property of the estate.    Here, BOFA is being repaid from the proceeds of the DIP Loan and, accordingly, has agreed to release its liens upon the entry of the Interim Order. Moreover, DuPont has not only consented to the relief requested herein, but its interests in the DIP Collateral are protected by the adequate protection relief proposed herein.    As adequate protection, DuPont will (a) maintain liens on the DIP Collateral, junior and subordinate to the Carve Out and the liens securing the DIP Loan; (b) be granted replacement liens on, and security

interests in, the DIP Collateral, subject only to the Carve Out and the liens on, and security

interests in, the DIP Collateral granted to the DIP Lender under the DIP Loan and the Orders, as

the case may be, and any valid and perfected preexisting liens held by third parties; and (c) will

be granted an administrative claim with priority over all administrative expense claims and

unsecured claims against the Debtors, subject only to the Carve Out and to the superpriority

claims granted to the DIP Lender under the DIP Credit Agreement.

130.    I also believe that the Debtors satisfy the standard under the Bankruptcy

Code for use of cash collateral because DuPont consents to the Debtors' use of Cash Collateral

on the terms set forth in the Approved Budget and the DIP Financing Motion.

131.    Finally, I believe that the authorization to obtain the DIP Credit

Agreement and use of Cash Collateral pending a Final Hearing will preserve the value of the

Debtors' business only if authorization is granted immediately.  In this instance, the Debtors

must have immediate use of the funds provided under the DIP Credit Agreement and the Cash

Collateral to the extent contemplated herein to pay their ongoing operational expenses and to

maximize the value of their estates.  Funds are urgently needed to meet all of the Debtors'

liquidity needs and to administer these cases in an orderly and efficient manner.  In the absence

of immediate postpetition financing, I believe that the Debtors' ability to preserve the value of

their business and assets will be immediately and irreparably jeopardized, resulting in significant

harm to the Debtors' estates.

132.    The Debtors seek authorization on an interim basis to borrow up to

$14,700,000 under the DIP Credit Agreement and to use Cash Collateral for the purposes set

forth in the Approved Budget (including repayment of amounts outstanding under the Prepetition

Loan Agreement) pending the Final Hearing.  I believe that interim relief requested in the DIP

Financing Motion, pending the Final Hearing, is necessary, appropriate and fully warranted, and

is essential to avoid immediate and irreparable harm to the Debtors, their estates, and their

creditors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  April **14**, 2010

_____

By:     T. Scott Avila
Title:   Chief Restructuring Officer

# EXHIBIT A

**EXHIBIT A**

**POINT BLANK CORPORATE STRUCTURE**

