IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| POINT BLANK SOLUTIONS INC., et al.[1] | ) | Case No. 10-11255 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF THE DEBTORS PURSUANT TO
11 U.S.C. § 363 FOR ENTRY OF AN ORDER AUTHORIZING
THE EMPLOYMENT AND RETENTION OF CRG PARTNERS
GROUP LLC TO PROVIDE RESTRUCTURING SERVICES TO THE
DEBTORS AND OF T. SCOTT AVILA AS CHIEF RESTRUCTURING
OFFICER OF THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE**

Point Blank Solutions, Inc. and its affiliated chapter 11 debtors, debtors and debtors in possession (collectively, the "Debtors" or the "Company") hereby submit this motion (the "Motion") for entry of an order authorizing the Debtors' employment of CRG Partners Group LLC ("CRG") to perform restructuring services for the Debtors and of T. Scott Avila as Chief Restructuring Officer of the Debtors pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy Code") *nunc pro tunc* to the Petition Date. The facts supporting the relief requested in this Motion are set forth in *Declaration of T. Scott Avila in support of Debtors' Motion of the Debtors Pursuant to 11 U.S.C. § 363 for Entry of an Order Authorizing the Employment of CRG Partners Group Inc. to Provide Restructuring Services to the Debtors and of T. Scott Avila as Chief Restructuring Officer of the Debtors Nunc Pro Tunc to the Petition*

---

[1] The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification numbers and their respective addresses, are: Point Blank Solutions, Inc (9361), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor Inc. (4044), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Protective Apparel Corporation of America (9051), 179 Mine Lane, Jacksboro, TN 37757; and PBSS, LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.

*Date* (the "Avila Declaration") attached hereto as <u>Exhibit A</u>. In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code.

## Background

3. On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in the Debtors' chapter 11 cases.

4. Point Blank Solutions Inc. ("PBSI") is a leading manufacturer and provider of bullet, fragmentation and stab resistant apparel and related ballistic accessories, which are used domestically and internationally by military, law enforcement, security and corrections personnel, as well as government agencies. Since 1998, PBSI has supplied over 80% of U.S. military soft body armor vest requirements to protect soldiers and marines around the world. PBSI and its subsidiaries Point Blank Body Armor ("PBBA") and Protective Apparel

2

Corporation of America ("PACA") are major players in the domestic law enforcement market with broad brand recognition and a best value reputation. The Debtors' products are sold through a variety of means, including direct sale contracts, a corporate sales force, sales agents and a network of distributors.

5. The factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in detail in the *Declaration of T. Scott Avila in Support of First Day Motions* (the "Avila First Day Declaration") filed contemporaneously with this Motion and incorporated herein by reference.[2]

## Relief Requested

6. By this Motion, the Debtors seek to employ and retain (a) CRG to assist and perform restructuring services for the Debtors in these chapter 11 cases, and (b) T. Scott Avila, a managing partner with CRG, as Chief Restructuring Officer of the Debtors, each *nunc pro tunc* to the Petition Date, pursuant to section 363 of the Bankruptcy Code and on the terms set forth herein and in the engagement letter between the Debtors and CRG dated January 12, 2010, and any addendum between the Debtors and CRG (the "Engagement Letter"). A copy of the Engagement Letter is attached hereto as Exhibit B and incorporated herein by reference.

7. Pursuant to the Engagement Letter, as amended, Mr. T. Scott Avila will also serve as the Debtors' Chief Restructuring Officer (the "CRO"). The CRO will assist the Debtors in their operations and manage the Debtors' restructuring efforts, including negotiating

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Avila First Day Declaration.

with parties in interest, and coordinating the Debtors' employees and external professionals who are assisting the Debtors in their restructuring.

8. In accordance with the Engagement Letter, CRG will also provide staffing at various levels, to assist the CRO guide the Debtors through the chapter 11 process. The Board of Directors of Point Blank Solutions Inc. (the "Board") will have direct oversight and control over the CRO and other CRG professionals in these cases.

### Qualifications of T. Scott Avila as CRO

9. Mr. Avila is well-suited to provide the restructuring services required by the Debtors. Mr. Avila helps operationally and financially distressed organizations through out-of-court workouts and chapter 11 reorganizations. Mr. Avila has been instrumental in a number of prominent restructurings, assuming various senior executive and advisory rolls on an interim basis including:

- Advisor for a $1.2 billion farm cooperative
- Chief restructuring officer and Chief Operating Officer of a $900 million international leasing and computer reseller
- Chief restructuring officer of a telecommunications service provider
- Chief restructuring officer of an international publishing and media company
- Chief Financial Officer of an international manufacturer of food products
- Court-appointed responsible officer of an office supply manufacturer
- Chief Financial Officer of an infomercial company

4

## Qualifications of CRG and Scope of Services of CRG and the CRO

10. The Debtors are familiar with the professional standing and reputation of CRG. CRG was retained prepetition to provide restructuring services to the Debtors. The Debtors understand that CRG has a wealth of experience in providing advisory services in restructurings and reorganizations and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

11. Moreover, Mr. Avila and various other CRG employees have devoted substantial amounts of time and effort prepetition to, among other things, researching options relative to maximizing the enterprise value of the Debtors, advising and assisting the Debtors with respect to the potential sale of substantially all of their assets, negotiating with critical secured and unsecured creditors, developing 2-week and 13-week cash flow projections, evaluating and communicating restructuring alternatives to the company, and supporting the Debtors' financial department in the management of its liquidity resources. CRG professionals were invaluable to the Debtors throughout this process and have played an instrumental role in their recent restructuring efforts to date.

12. Among other things, the CRO will provide assistance to the Debtors with respect to the management of the overall restructuring process, including a potential sale of the Debtors' assets for the benefit of creditors and developing an overall exit strategy for the Debtors in their chapter 11 cases.

13. Pursuant to the Engagement Letter, CRG will provide such business and restructuring services as CRG and the Debtors shall deem appropriate and feasible in order to

5

manage and advise the Debtors in the course of these chapter 11 cases, including, but not limited to:

- Preparing and reviewing possible reorganization plans and strategic alternatives for maximizing the debt repayment and enterprise value of the Debtors and/or the Debtors' business;

- Serving as the principal contact with the Debtors' creditors with respect to the Debtors' financial, operational, and reorganization matters. The CRO shall be authorized to directly communicate with parties in interest in the bankruptcy case;

- Assisting the Debtors in the preparation and management of a potential bankruptcy process;

- Performing such other services in connection with the reorganization as may be reasonably necessary to advance the debtors reorganization efforts under Chapter 11;

- Managing and directing the Debtors' professionals in the reorganization process and coordinate their efforts and individual work product with the representatives of the Debtors' various stakeholders consistent with the Debtors' overall reorganization goals;

- Assisting in reviewing and/or preparing short term liquidity forecasts;

- Providing support to the Debtors in discussions with vendors, landlords, and other unsecured creditors;

- Soliciting and evaluating financing proposals from potential parties;

- Solicit and evaluate purchase proposals from potential parties;

- Coordinate gathering of due diligence materials to be provided to selected potential parties;

- Assisting in the negotiation and documentation of a going concern restructuring transaction with one or more parties;

- Developing a rolling 13-week cash projection;

- Assisting the Debtors in its relationships with its existing lenders and creditors; and

- Rendering any other services as directed by the Debtors and/or the Board.

6

## Disinterestedness

14. To the best of the Debtors' knowledge and as disclosed herein and in the Avila Declaration, (a) CRG and Mr. Avila are "disinterested" within the meaning of section 101(14) of the Bankruptcy Code, and hold no interest adverse to the Debtors or their estates with respect to the matters as to which CRG and Mr. Avila are to be employed and (b) nether CRG or Mr. Avila have a connection to the Debtors, their creditors, or related parties except as disclosed in the Avila Declaration.

15. Specifically, CRG and Mr. Avila (a) not are creditors, equity security holders, or insiders of the Debtors, (b) are not and were not, within the two years before the Petition Date, directors, officers, or employees of the Debtors, and (c) do not have an interest materially adverse to the interest of the estates or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in the Debtors.

16. During the ninety day period prior to the Petition Date, the Debtors paid CRG approximately $577,004.05 for fees and expenses for CRG's representation of the Debtors pursuant to the terms of the Engagement Letter. As of the Petition Date, CRG did not hold a prepetition claim against the Debtors for services rendered or reimbursable fees in connection with the engagement. To the extent that CRG is holding funds from the Debtors in excess of fees earned and reimbursements due as of the Petition Date, CRG will hold such excess funds as a retainer to be applied against postpetition fees and expenses due from the Debtors to CRG, subject to compliance with applicable fee motion requirements.

17. Notwithstanding the efforts described in the Avila Declaration to identify and disclose CRG's connections with any parties in interest in these chapter 11 cases, because the Debtors are large enterprises, CRG is unable to state with certainty that every client relationship or other connection has been disclosed in the Avila Declaration. In this regard, if CRG or Mr. Avila discovers additional material information that it determines requires disclosure, CRG will file a supplemental disclosure with the Court.

## Compensation Terms

18. CRG and the Debtors have entered into the Engagement Letter to govern the relationship between them. CRG has agreed to provide the CRO and other professionals all of whom have a wide range of skills and abilities related to this type of assignment. With respect to the CRO and the staff who will be assisting the CRO, CRG will be compensated at the following hourly rates:

| Professional | Rate Per Hour |
|---|---|
| T. Scott Avila | $595 |
| C. Cooper Crouse | $450 |
| Dan deBrauwere | $425 |
| Matt Farrell | $350 |

19. In accordance with the normal billing practices of CRG, these hourly billing rates are revised periodically in the ordinary course of CRG's business. Pursuant to the Engagement Agreement, all fees and expenses incurred are payable weekly to CRG without the need for CRG to file fee applications with the Bankruptcy Court. CRG will, however, file quarterly statements of its fees and expenses and parties in interest shall have the right to object to fees paid when quarterly reports of compensation earned are filed with the Court.

70934-001\DOCS_DE:158899.1

20. In addition to the hourly fees set forth above, the Debtors shall pay CRG a cash fee (the "Restructuring Fee") of $100,000 upon the closing of a going concern sale transaction to an entity other than Steel Partners, or an entity controlled by Steel Partners.

21. The Debtors shall also pay directly or reimburse CRG upon receipt of periodic billings, for all reasonable out-of-pocket expenses incurred in connection with this assignment by CRG in providing the services as outlined herein.

22. While neither CRG, nor the CRO are being employed as professionals under section 327 of the Bankruptcy Code such that they would be subject to the compensation requirements of sections 330 and 331 of the Bankruptcy Code, CRG will submit quarterly statements to the United States Trustee and any official committee appointed in these cases for services rendered and expenses incurred as described above and the Debtors will be authorized to pay, in the ordinary course of their business, the amount invoiced by CRG for fees and expenses on a weekly basis. Such parties shall have the right to object to fees paid when quarterly reports of compensation earned are filed with the Court, provided that any such objection shall be filed within twenty (20) days of the filing of the quarterly report.

23. As of the Petition Date, CRG held a retainer from the Debtors in the amount of $220,000 (the "Retainer"), which was paid by the Debtors pursuant to the Engagement Letter. If the Retainer is unused as of the Petition Date, the retainer will be applied against unpaid invoices at the completion of the engagement and returned to the Debtors. CRG will maintain reasonably detailed records of any actual and necessary costs and expenses incurred in connection with services rendered.

9

70934-001\DOCS_DE:158899.1

## Indemnification

24. The *General Terms and Conditions* attached to the Engagement Letter also provide the following indemnification provision:

> Indemnity by Client. As part of the consideration for the agreement of CRG to furnish its services pursuant to this engagement letter, the Company agrees to indemnify and hold harmless CRG, its officers, directors, agents and employees and any successors and assigns (each, an Indemnified Party) to the fullest extent lawful from any and all claims, liabilities, losses, damages and expenses (or actions in respect thereof), as incurred, related to or arising out of or in connection with or related to this engagement, including, without limitation, any and all of such Indemnified Parties' reasonable expenses incurred in connection with investigating, preparing, defending or settling any action or claim arising from or relating to such liabilities, including all such Indemnified Parties' legal fees and expenses, provided, however, that the Company shall not be responsible for any losses, claims, damages, liabilities, or expenses of any Indemnified Parties to the extent, and only to the extent, that it is finally judicially determined that they are due primarily to such Indemnified Party's bad faith, willful misconduct or gross negligence. The indemnity and expense reimbursement obligations set forth herein (i) shall be in addition to any liability the Company may have to CRG at common law or otherwise; (ii) shall survive the expiration of CRG's engagement hereunder, (iii) shall apply to any modification of CRG's engagement hereunder and shall remain in full force and effect following the completion or termination of the engagement as amended or modified; and (iv) shall be finding any successor or assignee of the Company and its successors and assigns.

25. Finally, notwithstanding the terms of section 9 of the Engagement Letter with respect to the parties' alternative dispute resolution procedure, CRG has agreed that the United States Bankruptcy Court for the District of Delaware (the "Court") shall hear all disputes arising under this engagement or, in the event that the Court declines to exercise jurisdiction, disputes shall be addressed through the dispute resolution procedures set forth in the Engagement Letter.

70934-001\DOCS_DE:158899.1

## Authority for the Relief Requested

26. The Debtors request that the Court authorize the employment and indemnification of the CRG and the CRO *nunc pro tunc* to the Petition Date pursuant to the terms of the Engagement Letter, in the ordinary course of business.

27. Section 363(c) of the Bankruptcy Code authorizes the Debtors to enter into certain transactions and use property of the estate in the ordinary course of business. The retention of interim corporate officers and other temporary employees is proper under section 363 of the Bankruptcy Code. Numerous courts have authorized retention of officers utilizing this provision of the Bankruptcy Code. *See In re Mortgage Lenders Network USA, Inc.,* Case No. 07-10146 (PJW) (Bankr. D. Del. February 28, 2007); *In re Global Home Products, LLC,* Case No. 06-10340 (KG) (Bankr. D. Del. May 4, 2006); *In re Meridian Automotive Systems-Composite Operations, Inc., et al.,* Case No. 05-11168 (MFR) (Bankr. D. Del. July 19, 2005); *In re Cable & Wireless USA, Inc.,* Case No. 03-13711 (CGC) (Bankr. D. Del. Jan. 16, 2004); ); *In re Bridgeport Holdings,* Case No. 03-12825 (PJW) (Bankr. D. Del. 2003); *In re SHC, Inc.,* Case No. 03-12002 (MFW) (Bankr. D. Del. 2003).

28. Once a debtor articulates a valid business justification, "the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company'". *In re Integrated Resources, Inc.,* 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. VanGorkom,* 488 A2d 858, 872 (Del. 1985). The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. *In re Integrated Resources, Inc.,* 147 B.R. 650-656 (S.D.N.Y. 1992) (quoting *Smith v. VanGordom*

11

488 A.2d 858, 872 (Del. 1985)); *In re Johns-Manville Corp.,* 60 B.R. 612, 615 (Bankr. S.D.N.Y. 1986) ("The Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.")

29. The Debtors submit that the employment of CRG and Mr. Avila under the terms of the Engagement Letter would inure to the benefit of the Debtors' estates and their creditors. Moreover, both CRG and Mr. Avila are clearly qualified for the positions for which they are being employed. The Debtors have determined that the compensation terms of the Engagement Letter are within the range for senior executive officers employed with companies of comparable size, value and reputation. Accordingly, the Debtors' decision to enter into the Engagement Letter reflects an exercise of the Debtors' sound business judgment.

## Notice

30. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee and (ii) the Debtors' prepetition and postpetition secured lenders. Following the first day hearing in this case, this Motion will be served on (a) creditors holding the thirty-five largest unsecured claims against the Debtors on a consolidated basis, or their legal counsel (if known) and (b) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

31. No prior request for the relief sought herein has been made to this or any other court.

70934-001\DOCS_DE:158899.1

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated: April 14, 2010

**Point Blank Solutions Inc., et al.**

By: _____
James R. Henderson
Title: President and Chief Executive Officer

13

70934-001\DOCS_NY:20442.1