IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| POINT BLANK SOLUTIONS, INC., *et al.*[1] | ) | Case No. 10-11255 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF DEBTORS FOR ORDER UNDER 11 U.S.C. §§ 105, 363, 503(b), 1107 AND 1108 AUTHORIZING (I) MAINTENANCE OF EXISTING BANK ACCOUNTS, (II) CONTINUED USE OF EXISTING BUSINESS FORMS, (III) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, (IV) CONTINUED PERFORMANCE OF INTERCOMPANY TRANSACTIONS AND PROVIDING ADMINISTRATIVE PRIORITY STATUS TO POSTPETITION INTERCOMPANY CLAIMS, AND (V) WAIVER OF SECTION 345(b) DEPOSIT AND INVESTMENT REQUIREMENTS**

The above-captioned debtors and debtors in possession (the "Debtors") hereby move the Court for entry of an order under 11 U.S.C. §§ 105, 363, 503(b), 1107 and 1108, authorizing (i) the maintenance of existing bank accounts, including the authority to pay routine prepetition banking fees owed to financial institutions, (ii) the continued use of existing business forms, (iii) the continued use of the existing cash management system for the Debtors, (iv) the continued performance of intercompany transactions and provision of administrative priority to postpetition intercompany claims, and (v) a limited waiver of 11 U.S.C. section 345(b) deposit and investment guidelines (the "Motion"). In support of the Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number and their respective addresses, are: Point Blank Solutions, Inc. (9361), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor Inc. (4044), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Protective Apparel Corporation of America (9051), 179 Mine Lane, Jacksboro, TN 37757; and PBSS, LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.

## Jurisdiction

1. This Court has jurisdiction to consider and determine this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105(a), 345(b), 363, 503(b), 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

3. On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 the Bankruptcy Code.

4. The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. No request has been made for the appointment of a trustee or an examiner in these cases, and no official committee has yet been appointed by the Office of the United States Trustee.

6. The factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in detail in the *Declaration of T. Scott Avila in Support of First Day*

*Motions* (the "Avila Declaration") filed contemporaneously with this Motion and incorporated herein by reference.[2]

## Relief Requested

7.    By this Motion, the Debtors seek authorization (1) to maintain their existing bank accounts and to pay any prepetition routine banking fees imposed by the financial institutions where the Debtors' bank accounts are maintained, (2) to continue to use their existing check stock and business forms until exhausted, (3) to continue to use their existing cash management system, (4) to continue performance of intercompany transactions and to provide administrative priority to postpetition intercompany claims, and (5) for a limited waiver of the deposit and investment guidelines imposed under section 345(b) of the Bankruptcy Code.

## The Prepetition Loan Agreement

8.    Prior to the Petition Date, Debtors Protective Apparel Corporation of America ("PACA") and Point Blank Body Armor, Inc. ("Point Blank") as borrowers, and Point Blank Solutions, Inc. as guarantor, and Bank of America, N.A., as successor by merger to LaSalle Business Credit, LLC, as administrative agent and collateral agent , entered into that certain *Amended and Restated Loan and Security Agreement*, dated as of April 3, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Loan Agreement").

9.    Pursuant to the Prepetition Loan Agreement and associated documentation, PACA and Point Blank borrowed certain funds under (a) a revolving loan

---

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Avila Declaration.

commitment (the "Revolving Loan"), and (b) a term loan commitment (the "Term Loan"). In addition, pursuant to the Prepetition Loan Agreement, certain letters of credit were issued on behalf of the Debtors for the benefit of various third parties.

## The DIP Credit Agreement

10.     As set forth in the *Motion of Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 for Authorization to: (1) Incur Senior Secured Superpriority Postpetition Financing; (2) Use Cash Collateral; (3) Grant Liens and Provide Superpriority Administrative Expense Status; (4) Grant Adequate Protection; (5) Modify the Automatic Stay; and (6) Schedule a Final Hearing* (the "Financing Motion") filed concurrently herewith, the Debtors seek authority to enter into a credit agreement substantially in the form annexed as Exhibit B to the Financing Motion (the "DIP Credit Agreement") with Steel Partners Holdings, L.P., or one of its affiliates (the "Lender"). The DIP Credit Agreement provides a senior secured, first priority, debtor in possession revolving credit facility not to exceed the lesser of $20 million or the Borrowing Base (as that term is defined in the DIP Credit Agreement).

11.     Upon Court approval of the Financing Motion, the agent for the prepetition lenders (the "Agent") will release its security interest in all property of the Debtors' estates upon receipt of repayment in full of all amounts then outstanding under the Prepetition Loan Agreement. The Debtors nonetheless intend to maintain their Cash Management System at Bank of America ("BOFA") for a period not to extend past May 25, 2010, in order to ensure an

orderly transition to a replacement cash management system following repayment of the balance of the Prepetition Loan Agreement.

### The Debtors' Cash Management System

12.     The Debtors' cash management system (the "Cash Management System") is a network of bank accounts that facilitates the timely and efficient collection, management, and disbursement of funds used in the Debtors' business. Because of the nature of the Debtors' operations and the disruption that would result if the Debtors were forced to close their existing accounts, it is critical that the Cash Management System remain in place.

13.     The Debtors maintain a series of bank accounts at BOFA that comprise the Cash Management System. A listing of the Debtors' bank accounts (together, the "Bank Accounts") is attached hereto as **Exhibit A**. A diagram summarizing the role of each of the Bank Accounts in the Cash Management System is attached hereto as **Exhibit B**.

14.     <u>Collections</u>. Collections from sale revenues consist of checks and wire payments made by the Debtors' customers which are deposited into four (4) separate lockbox accounts for debtors Point Blank Solutions Inc., PACA, Point Blank, respectively (collectively, the "Lockbox Accounts"), reflected on **Exhibit A** and **Exhibit B** hereto.[3] Deposits into the Lockbox Accounts are swept by BOFA on a daily basis, and deposited by BOFA into an account (the "Revolving Loan Account") it maintains to both pay down any outstanding amounts then due under the Revolving Loan and to advance funds to the Operating Account which funds the

---

[3] The Debtors also maintain a lockbox account for collections from their former affiliate, LifeWear/NDL Products, Inc. LifeWear/NDL Products, Inc. was sold in 2009, but the Debtors still receive de minimis collections from receivables owed to them pursuant to the terms of the sale. These amounts are deposited into a lockbox account and then swept by BOFA to the Revolving Loan Account.

Debtors' operations and allows them to pay expenses.[4] As noted above, no amounts remain due under the Revolving Loan.

15. <u>Disbursements</u>. Prepetition, the Debtors manually issued checks drawn from certain zero balance accounts which were funded on an as-needed basis based on availability in the Revolving Loan Account (together, the "ZBA Accounts"). However, the ZBA Accounts are no longer operative and the Debtors manually fund amounts from the Operating Account to five disbursement accounts set forth on **Exhibit B** (the "Disbursement Accounts") and then issue payments from amounts deposited to the Disbursement Accounts to the ultimate payee. Payments by wire transfer are funded from the Operating Account to the applicable Disbursement Account. Once funded, wire transfers are transferred from the Disbursement Accounts to the recipient of the wire transfer.

16. Approximately $1.5 million to $7 million flows through the Cash Management System on a weekly basis. Fluctuations are primarily due to scheduled payroll payments and payments to the Debtors' suppliers. As of the Petition Date, the Debtors have approximately $4.7 million in cash or cash equivalents in their Disbursement Accounts.[5]

---

[4] As set forth in the Financing Motion, the Debtors will subsequently open a debtor in possession collection account (the "Collection Account") and a debtor and possession operating account (the "Operating Account") at such financial institutions designated by the Lender no later than May 25, 2010 after the Debtors transition out of their current Cash Management System. Cash receipts will be collected and deposited into the Collection Account on each business day and then applied to reduce the outstanding balance owed to the Lender under the DIP Credit Agreement. The Collection Account, once opened, will be under the sole and exclusive dominion of the Lender.

[5] In addition to the Disbursement Accounts, the Debtors maintain a *de minimis* petty cash account at Regions Bank for Debtor PACA, which contains less than $10,000 on deposit.

## The Court Should Authorize the
## Debtors to Maintain Their Existing Bank Accounts

17.     The United States Trustee for the District of Delaware has established

certain operating guidelines for debtors in possession.  One such provision requires a chapter 11

debtor in possession to open new bank accounts and close all existing accounts.  The United

States Trustee Guidelines also require that the new bank accounts only be opened with certain

financial institutions designated as authorized depositories by the United States Trustee.  This

requirement, designed to provide a clear line of demarcation between prepetition and postpetition

claims and payments, helps to protect against the inadvertent payment of prepetition claims by

preventing banks from honoring checks drawn before the Petition Date.

18.     The Debtors seek a waiver of the United States Trustee's requirement that

the Bank Accounts be closed and new postpetition bank accounts be opened at depositories

authorized by the United States Trustee.  If strictly enforced in this case, the United States

Trustee's requirement would cause a severe disruption in the Debtors' activities and would

impair the Debtors' ability to operate under chapter 11.

19.     Maintenance of the Bank Accounts will greatly facilitate the Debtors'

operations in chapter 11.  As noted above, all revenues and income realized by the Debtors

ultimately flows into the Revolving Loan and Operating Accounts and are disbursed through an

interlinked Cash Management System.  If the Bank Accounts were closed, the Debtors would

have to open new accounts and then attempt to arrange alternative electronic and manual

payment procedures for payments into and out of the Debtors' accounts, which would

completely disrupt the flow of postpetition receipts and disbursements.  In addition, closing the

Bank Accounts would require the Debtors to cancel and reinstitute wire transfer instructions which would be difficult to modify under exigent circumstances. These disruptions would severely impact and could irreparably harm the Debtors' ability to operate their business at this critical juncture.

20. To avoid disruptions and delays in the operation of the Debtors' business, the Debtors should be permitted to maintain their existing Bank Accounts and, if necessary, to open new accounts as debtor in possession accounts or to close any unneeded existing accounts.

21. To guard against improper transfers resulting from the postpetition honoring of prepetition checks, the Debtors will promptly notify each bank at which a Bank Account resides not to honor checks drawn on the Debtors' accounts before the Petition Date, except upon limited Court-approved exceptions. Subject to a prohibition against honoring prepetition checks or offsets without specific authorization from this Court, the Debtors request that they be authorized to maintain and continue the use of these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

22. If the relief requested herein is granted, the Debtors will not pay, and each of the banks where the Bank Accounts are maintained will be required not to pay, any debts incurred before the Petition Date, other than as specifically authorized through this Motion or otherwise ordered by the Court.

### The Court Should Authorize the Debtors to
### Continue Their Existing Cash Management System

23.     The Debtors hereby seek authority to continue to use their Cash

Management System, as such system may be modified pursuant to the requirements of any

Court-approved cash collateral order, and related order of this Court.

24.     For the reasons set forth above, the Debtors' Cash Management System

constitutes an essential business practice and was created and implemented by the management

of the Debtors in the exercise of their business judgment.  The widespread use of this particular

Cash Management System, moreover, is attributable to the numerous benefits it provides,

including the ability to (a) process and timely pay expenses; (b) allow a mechanism for deposits

from revenues; (c) ensure cash availability; (d) control and monitor corporate funds; and (e)

reduce administrative expenses by facilitating the movement of funds and the development of

timely and accurate balance and presentment information.  In addition, preserving a "business as

usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated

with a substantial disruption of the Cash Management System will facilitate and enhance the

Debtors' efforts to continue to operate postpetition.  Moreover, the Debtors submit that the relief

requested is consistent with the relief provided to debtors in a number of other cases pending in

this District.

### The Court Should Grant the Debtors Authority to Use
### Existing Business Forms and Checks to the Limited Extent Requested Below

25.     To minimize expense to their estates, the Debtors also request authority (i)

to continue to use all correspondence and business forms (including, but not limited to letterhead,

purchase orders, invoices, etc.) until such time as the Debtors can effectuate the necessary

changes to their pre-printed and computer-generated forms in order to add the "debtor in possession" label, and (ii) to continue using their existing pre-printed check stock without reference to their "debtor in possession" status until the existing pre-printed stock has been exhausted, provided that the Debtors shall add the "debtor in possession" designation to any new checks ordered after the depletion of the existing stock. The Debtors' business and correspondence forms are entirely pre-printed. With respect to these pre-printed forms, the Debtors request that they be allowed to continue to use their existing forms, provided that they add the "debtor in possession" labels to forms that are ordered once the existing stock is depleted. The Debtors estimate that the cost to implement these changes would cost approximately $2,000 and would take approximately two weeks to implement.

### Payment of Outstanding Routine Prepetition Expenses
### Relating to the Operation of the Cash Management System

26.     In the ordinary course of the operation and maintenance of the Cash Management System, the Debtors incur routine bank charges and fees relating to the administration of the Cash Management System. The Debtors request that BOFA be authorized to continue to hold $32,000 as advance payment and security for all BOFA's fees, costs and charges in respect to the cash management services rendered by BOFA to the Debtors for the month ending March 31, 2010 and from and after the Petition Date (the "BOFA Bank Fee Claims"), and to apply such funds against the Debtors' payment obligations as and when they become due for such pre-Petition Date monthly period ending March 31, 2010 and such post-Petition Date period (with any unused portion of such advance payment, if any, to be returned to the Debtors upon satisfaction in full of all obligations of the Debtors to BOFA in respect of their

cash management arrangements). To the extent any BOFA Bank Fee Claims are not satisfied

form the amounts currently held by BOFA as described above, the Debtors respectfully request

that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, allowed postpetition

claims held by BOFA against the Debtors BOFA Bank Fee Claims be accorded administrative

priority expense status; provided, for the avoidance of doubt, that such BOFA Bank Fee Claims

shall at all times be junior and subordinate to the Super-Priority Claims or any other claims of

the Lender as set forth in any order granting the Financing Motion or the DIP Credit Agreement.

**The Debtors Should Be Authorized to Continue Their
Intercompany Arrangements; Intercompany Claims
Should Be Accorded Administrative Expense Status**

27.     Prior to the Petition Date, certain of the Debtors engaged in intercompany

financial transactions in the ordinary course of business (collectively, the "Intercompany

Transactions"), and as part of the Debtors' consolidated Cash Management System.

28.     At any given time, there may be balances due and owing from one Debtor

to another Debtor. These balances represent extensions of intercompany credit made in the

ordinary course of business and are an essential component of the Cash Management System.

The Debtors maintain records of these transfers of cash and can ascertain, trace and account for

these Intercompany Transactions. The Debtors, moreover, will continue to maintain such

records, including records of all current intercompany accounts receivable and payable.

29.     To ensure each individual Debtor will not, at the expense of its creditors,

fund the operations of another entity, the Debtors respectfully request that, pursuant to sections

503(b)(1) and 364(b) of the Bankruptcy Code, all intercompany claims against a Debtor by

another Debtor or non-debtor subsidiary arising after the Petition Date as a result of ordinary course intercompany transactions through the Cash Management System (collectively, "Intercompany Claims"), be accorded administrative priority expense status; provided, for the avoidance of doubt, that such Intercompany Claims shall at all times be junior and subordinate to the Super-Priority Claims granted pursuant to any approved cash collateral order to the Agent and the Lender. If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

### The Court Should Grant a Limited § 345(b) Waiver
### on an Interim Basis Subject to Final Approval

30.     The Debtors seek an interim waiver of section 345(b) of the Bankruptcy Code subject to final approval. The waiver would permit the Debtors to maintain their Bank Accounts without posting a bond or other security, as would otherwise be required under section 345(b) whenever the funds on deposit exceed the amount permitted under section 345(b). The Debtors' believe that their Bank Accounts are (a) covered by FDIC insurance and contain amounts which are within the limits of such insurance, and/or (b) with financial institutions which have standing collateralization agreements with the office of the United States Trustee. To the extent needed for a particular Bank Account, the Debtors will work with the various financial institutions to put acceptable collateralization agreements in place or otherwise satisfy the requirements of the Bankruptcy Code. As noted above, the Debtors' Bank Accounts may, at certain times, contain cash in excess of the FDIC insurance limits.

**Authority for the Requested Relief**

A.   **The Continued Use of the Debtors' Routine Cash Management
     System, Bank Accounts and Business Forms is Essential to the
     Debtors' Operations, and Approval to Maintain the Status Quo
     is Routinely Granted Under Bankruptcy Code Sections 363 and 105**

        31.   Bankruptcy courts routinely grant chapter 11 debtors authority to continue

utilizing existing cash management systems, and treat requests for such authority as a relatively

"simple matter." *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). This

is particularly true where, as here, the chapter 11 case involves affiliated entities with complex

financial affairs. In *In re Charter Co.*, 778 F.2d 617 (11th Cir. 1985), for example, the

bankruptcy court entered an order authorizing the debtor and forty-three (43) of its subsidiaries

"to continue to consolidate the management of its cash as has been usual and customary in the

past, and to transfer monies from affiliated entity to entity, including operating entities that are

not debtors." *Id.* at 620. The Eleventh Circuit Court of Appeals then affirmed a subsequent

district court decision denying a creditor's motion for leave to appeal the bankruptcy court's cash

management order, holding that authorizing the debtor to utilize its prepetition "routine cash

management system" was "entirely consistent" with applicable provisions of the Bankruptcy

Code. *Id.* at 621.

        32.   Likewise, in another context, the bankruptcy court in the *Columbia Gas*

chapter 11 case explained that a centralized cash management system "allows efficient utilization

of cash resources and recognizes the impracticabilities of maintaining separate cash accounts for

the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934

(Bankr. D. Del. 1993), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993), *cert. denied*

*sub nom. Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp.*, 114 S.

Ct. 1050 (1994). The Third Circuit agreed, emphasizing that a requirement to maintain all

accounts separately "would be a huge administrative burden and economically inefficient."

*Columbia Gas*, 997 F.2d at 1061. *See also In re Southmark Corp.*, 49 F.3d 111, 114 (5th Cir.

1995) (cash management system allows debtor "to administer more efficiently and effectively its

financial operations and assets"); *In re UNR Indus., Inc.*, 46 B.R. 25, 27 (Bankr. N.D. Ill. 1984).

33.     Section 363(c)(1) of the Bankruptcy Code authorizes the debtor in

possession to "use property of the estate in the ordinary course of business without notice or a

hearing." 11 U.S.C. § 363(c)(1). The purpose of section 363(c)(1) of the Bankruptcy Code is to

provide a debtor in possession with the flexibility to engage in the ordinary transactions required

to operate its business without undue oversight by creditors or the court. *Medical Malpractice*

*Ins. Ass'n. v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2nd Cir. 1997). Included within the

purview of section 363(c) is a debtor's ability to continue the "routine transactions" necessitated

by a debtor's cash management system. *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re*

*Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996). Accordingly, the Debtors seek authority

under section 363(c)(1) of the Bankruptcy Code to continue the collection, concentration, and

disbursement of cash pursuant to their Cash Management System as described above.

34.     Additionally the Court may exercise its equitable powers to grant the relief

requested herein. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any

order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C.

§ 105(a). Continuing the Debtor's Cash Management System without interruption is vital to the success of these chapter 11 cases.

35.     In other cases in this District, this Court has granted relief similar to that requested in this Motion. *See, e.g., In re Latham International, Inc., et al.*, Case No. 09-14490 (SS) (Bankr. D. Del. December 23, 2009), *In re Champion Enterprises, Inc., et al.*, Case No. 09-14019 (KJC) (Bankr. D. Del November 20, 2009), *In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del. May 5, 2009); *In re Monaco Coach Corporation, et al.*, Case No. 09-10750 (KJC) (Bankr. D. Del. March 10, 2009); *In re eToys Direct 1, LLC, et al.*, Case No. 08-13412 (BLS) (Bankr. D. Del. Dec. 30, 2008); *In re NetEffect, Inc.,* Case No. 08-12008 (KJC) (Bankr. D. Del. Aug. 28, 2008); *In re Western Nonwovens, Inc., et al.*, Case No. 08-11435 (PJW) (Bankr. D. Del. July 15, 2008); *In re Global Motorsport Group, Inc., et al.*, Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 1, 2008); *In re Aegis Mortgage Corp.,* Case No 07-11119 (BLS) (Bankr. D. Del. Aug. 16, 2007); *In re Mortgage Lenders Network, USA, Inc.*, Case No. 07-10146 (PJW) (Bankr. D. Del. Feb. 5, 2007); *In re Global Home Products, LLC et al.*, Case No. 06-10340 (Bankr. D. Del. April 11, 2006); *In re Maxide Acquisition, Inc.*, Case No. 05-10429 (Bankr. D. Del. Feb. 15, 2005); *In re Cable and Wireless USA, Inc., et al.*, Case No. 03-13711 (Bankr. D. Del. Dec. 10, 2003); *In re Redback Networks Inc.*, Case No. 03-13359 (Bankr. D. Del. Nov. 5, 2003); *In re Chi Chi's, Inc.*, Case No. 03-13063 (Bankr. D. Del. Oct. 9, 2003).

36.     It is well within the Court's equitable power under section 105(a) to approve the continued use of the Cash Management System and Bank Accounts, and to authorize the Debtors' continued use of their existing business forms, including, but not limited to,

purchase orders, letterhead, envelopes, promotional materials, checks, and business forms,

without reference to the Debtors' debtor in possession status, substantially in the forms existing

immediately before the Petition Date, at least until such existing business forms are exhausted

and replacement forms with the "debtor in possession" designation are obtained.

**B.      An Interim Waiver of Section 345(b) to Allow the Debtors to
         Continue to Use Their Bank Accounts Without the Need for Posting
         a Bond or Providing Other Security is Appropriate**

          37.     The Debtors seek an interim waiver of the requirements of section 345 of

the Bankruptcy Code, subject to final approval by this Court.  Section 345(a) authorizes deposits

or investments of money "as will yield the maximum reasonable net return on such money,

taking into account the safety of such deposit or investment."  Section 345(b) provides:

> Except with respect to a deposit or investment that is insured or
> guaranteed by the United States or by a department, agency, or
> instrumentality of the United States or backed by the full faith and credit
> of the United States, the trustee shall require from an entity with which
> such money is deposited or invested --

> 1)      a bond –

>          A.      in favor of the United States;

>          B.      secured by the undertaking of a corporate
>                  surety approved by the United States trustee
>                  for the district in which the case is pending;
>                  and

>          C.      conditioned on --

>                  i)       a proper accounting of all money so deposited or
>                           invested and for any return on such money;

>                  ii)      prompt repayment of such money and return; and

>                  iii)     faithful performance of duties as a depository; or

2)    the deposit of securities of the kind specified in section 9303 of title 31 unless the court for cause orders otherwise.

38.    The Court's ability to excuse strict performance of the deposit and investment requirements of section 345(b) "for cause" arises from the 1994 amendments to the Bankruptcy Code. The legislative history of that amendment provides:

> Section 345 of the Code governs investments of funds of bankruptcy estates. The purposes (sic) is to make sure that funds of a bankrupt that are obliged to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankruptcy estate. Under current law, all investments are required to be FDIC insured, collateralized or bonded. While this requirement is wise in the case of a smaller debtor with limited funds that cannot afford a risky investment to be lost, it can work to needlessly handcuff larger, more sophisticated Debtors. This section would amend the Code to allow the courts to approve investments other than those permitted by section 345(b) for just cause, thereby overruling In re Columbia Gas Systems, Inc., 33 F.3d 294 (3d Cir. 1994).

*In re Service Merchandise Company, Inc.,* 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (quoting H.R. Rep. 103-834, 103rd Cong., 2nd Sess. 224 (Oct. 4, 1994); 140 Cong. Rec. H10767 (Oct. 4, 1994)) (emphasis added).

39.    In determining whether the "for cause" standard has been met, the Court should consider a "totality of the circumstances," utilizing the following factors:

a.    The sophistication of the debtor's business;

b.    The size of the debtor's business operations;

c.    The amount of the investments involved;

d.    The bank ratings (Moody's and Standard and Poor's) of the financial institutions where the debtor in possession funds are held;

e.    The complexity of the case;

f.      The safeguards in place within the debtor's own business of insuring the safety of the funds;

g.      The debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

h.      The benefit to the debtor;

i.      The harm, if any, to the estate; and

j.      The reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

*Id.*

40.     Because of the nature of their operating business, the Debtors may, at certain times, have funds accumulated in the Bank Accounts that exceed the limits provided in section 345, and therefore necessitate a waiver of section 345(b).  Unless the Debtors are granted a waiver, the Debtors' business will be prejudiced for the reasons discussed above.  The Debtors will also present a form of collateralization agreement to any Bank which is not already a signatory to a blanket collateralization agreement with the Office of the United States Trustee. The Debtors submit that their funds will not be sufficiently at risk to necessitate strict adherence to the requirements of section 345(b) of the Bankruptcy Code.

41.     In other chapter 11 cases, courts have liberally construed the requirement of section 345(b) that a debtor in possession obtain a bond from any entity with which its money is deposited or invested.  In those instances, courts, including many within this district, have waived the requirements of section 345(b) and replaced them with alternative procedures.  *See*

*e.g., In re Latham International, Inc., et al.*, Case No. 09-14490 (SS) (Bankr. D. Del. December 22, 2009), *In re Champion Enterprises, Inc., et al.*, Case No. 09-14019 (KJC) (Bankr. D. Del November 20, 2009), *In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del. May 5, 2009); *In re Monaco Coach Corporation, et al.*, Case No. 09-10750 (KJC) (Bankr. D. Del. March 10, 2009); *In re eToys Direct 1, LLC, et al.*, Case No. 08-13412(BLS) (Bankr. D. Del. Dec. 30, 2008); *In re Global Motorsport Group, et al.* Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 1, 2008); *In re Aegis Mortgage Corp.,* Case No 07-11119 (BLS) (Bankr. D. Del. Aug. 16, 2007); *In re Mortgage Lenders Network, USA, Inc.*, Case No. 07-10146 (PJW) (Bankr. D. Del. Feb. 5, 2007); *In re Breuners Home Furnishings Corp.*, Case No. 04-12030(PJW) (Bankr. D. Del. July 16, 2004); *In re Redback Networks, Inc.,* Case No. 03-13359 (CGC) (Bankr. D. Del. Nov. 5, 2003); *In re Focal Communications Corporation*, Case No. 02-13709 (KJC) (Bankr. D. Del. Dec. 20, 2002); *In re Integrated Health Services, Inc.,* Case No. 00-389 (MFW) (Bankr. D. Del. Feb. 2, 2000).

42.     For the foregoing reasons, it is critical that the Debtors continue to utilize their existing Cash Management System and continue to use their existing business forms as set forth herein, without disruption.  Accordingly, it is appropriate and entirely consistent with applicable provisions of the Bankruptcy Code and case law for the Court to approve the Debtors' centralized Cash Management System in its current form and grant a waiver of the requirements of section 345(b) of the Bankruptcy Code on an interim basis pending a final hearing.

**C.    The Debtors Should Be Permitted to Continue
Intercompany Transactions in the Ordinary Course of Business**

43.    Throughout the reorganization process, it will be critically important that the Debtors be allowed to maintain their intercompany practices. As noted above, continuation of the Intercompany Transactions is important to the Debtors' efforts to operate their businesses in the ordinary course.

44.    Thus, the Debtors respectfully request authority to continue performing Intercompany Transactions in the ordinary course of business without need for further Court order, and any intercompany claims arising postpetition should be accorded administrative priority status under section 503(b) of the Bankruptcy Code just like any other postpetition claim. Courts have routinely granted such authority in other complex, multi-debtor chapter 11 cases for similar reasons. *See, e.g., In re Latham International, Inc., et al.*, Case No. 09-14490 (SS) (Bankr. D. Del. December 23, 2009), *In re Champion Enterprises, Inc., et al.*, Case No. 09-14019 (KJC) (Bankr. D. Del November 20, 2009)*In re Visteon Corp.*, Case No. 09-11786 (CSS) (Bankr. D. Del. July 17, 2009); *In re Source Interlink Companies, Inc.*, Case No. 09-11424 (KG) (Bankr. D. Del. April 30, 2009); *In re Nobex Corporation*, Case No. 05-20050 (MFW) (Bankr. D. Del., Dec. 6, 2005); *In re FLYi, Inc.*, Case No. 05-20011 (MFW) (Bankr. D. Del. Nov. 8, 2005); *In re W. R. Grace & Co.*, Case No. 01-01139 (Bankr. D. Del. Apr. 2, 2001); *In re Montgomery Ward Holding Corp.*, Case No. 97-01409 (PJW) (Bankr. D. Del. July 8, 1997); *In re Mid-Valley. Inc.*, Case No. 03-35592 (JKF) (Bankr. W.D. Pa. June 8, 2004) (interim order authorizing debtors to continue to engage in intercompany agreements in the ordinary course of business).

## Waiver of Bankruptcy Rules 6003 and 6004

45.     Pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 20 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b). For the reasons described more fully above, and as supported by the Avila Declaration, and to the extent that the relief requested herein implicates Rule 6003(b), the Debtors submit that the requirements of Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

46.     Finally, to implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

## Notice

47.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; and (b) the Debtors' prepetition and post-petition lenders. As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

48.     No prior motion for the relief requested herein has been made to this or

any other Court.

WHEREFORE, the Debtors respectfully request that the Court grant the relief

requested herein and such other further relief as the Court deems appropriate.

Dated: April *14*, 2010

> PACHULSKI STANG ZIEHL & JONES LLP
>
> Laura Davis Jones (Bar No. 2436)
> David M. Bertenthal (CA Bar No. 167624)
> Joshua M. Fried (CA Bar No. 181541)
> Timothy P. Cairns (Bar No. 4228)
> 919 N. Market Street, 17th Floor
> Wilmington, DE 19801
> Telephone:  302/652-4100
> Facsimile:  302/652-4400
> Email: ljones@pszjlaw.com
>         dbertenthal@pszjlaw.com
>         jfried@pszjlaw.com
>         tcairns@pszjlaw.com
>
> [Proposed] Counsel for the Debtors and
> Debtors in Possession