IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| POINT BLANK SOLUTIONS INC., *et al.*[1] | ) | Case No. 10-11255 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER:
(I) AUTHORIZING THE DEBTORS TO (A) PAY WAGES,
SALARIES, AND OTHER COMPENSATION, (B) MAINTAIN EMPLOYEE MEDICAL
AND SIMILAR BENEFITS, AND (C) PAY REIMBURSABLE EMPLOYEE EXPENSES;
AND (II) AUTHORIZING AND DIRECTING BANKS AND OTHER FINANCIAL
INSTITUTIONS TO PAY ALL CHECKS AND ELECTRONIC PAYMENT
<u>REQUESTS MADE BY THE DEBTORS RELATING TO THE FOREGOING</u>**

Point Blank Solutions, Inc. and its affiliated chapter 11 debtors, debtors and

debtors in possession (collectively, the "Debtors"), (the "Motion") move the Court for entry of

an order: (a) authorizing, but not requiring the Debtors to (i) pay and/or honor prepetition wages,

commissions, salaries, and other compensation, (ii) maintain employee medical and other

benefits and (iii) pay reimbursable employee expenses; and (b) authorizing banks and other

financial institutions to receive, process, honor, and pay all checks presented for payment and

electronic payment requests relating to the foregoing. In support of this Motion, the Debtors

respectfully state as follows:

---

[1]     The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification numbers and their respective addresses, are: Point Blank Solutions Inc (9361), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor, Inc. (4044), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Protective Apparel Corporation of America (9051), 179 Mine Lane, Jacksboro, TN 37757; and PBSS LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.

## Jurisdiction

1.     This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief requested herein are sections 105(a), 363(b) and 507(a) of title 11 of the United States Code (as amended, the "Bankruptcy Code") and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules").

## Background

3.     On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in the Debtors' chapter 11 cases.

4.     PBSI is a leading manufacturer and provider of bullet, fragmentation and stab resistant apparel and related ballistic accessories, which are used domestically and internationally by military, law enforcement, security and corrections personnel, as well as government agencies. Since 1998, PBSI has supplied over 80% of U.S. military soft body armor vest requirements to protect soldiers and law enforcement personnel around the world. PBSI and its debtor subsidiaries Point Blank Body Armor, Inc. ("PBBA") and Protective Apparel

Corporation of America ("PACA") are major suppliers in the domestic law enforcement market with broad brand recognition and "best value" reputation. The Debtors' products are sold through a variety of means, including a corporate sales force, sales agents and a network of distributors.

5.     The factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in detail in the *Declaration of T. Scott Avila in Support of First Day Motions* (the "Avila Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

6.     The Debtors currently employ 920 full-time employees in hourly, salaried, supervisory, management, sales, administrative, and manufacturing production positions to perform the functions necessary to effectively and efficiently operate the Debtors' business (collectively, the "Employees"). The Debtors employ both salaried and hourly Employees. 800 Employees are paid hourly and 120 Employees are salaried.

7.     To minimize the personal hardships that the Employees will suffer if their prepetition employment-related obligations are not paid or honored, to maintain the morale of the Employees during this critical time, and to minimize disruptions to the Debtors' ongoing business operations, the Debtors, by this Motion, seek authority, in their sole discretion, to: (i) pay unpaid prepetition claims for wages, commissions and salaries to the Employees (the "Unpaid Wages"); (ii) remit applicable withholding obligations to the proper third parties; (iii) honor and maintain certain benefits (as more fully set forth below) offered by the Debtors (the

"Benefits"); (iv) reimburse certain unpaid business expenses incurred prepetition by the Employees; and (v) pay all costs incident to the foregoing as set forth in detail below.

## The Debtors' Compensation and Benefits Programs

### A.    The Debtors' Workforce

8.    The Debtors' manufacturing facilities and corporate headquarters employ approximately 920 Employees. The majority of the Debtors' Employees, approximately 836 in all, perform critical core manufacturing functions in the Debtors' U.S. manufacturing facilities located in Pompano Beach, FL & Jacksboro, TN (the "Production Employees"). An additional 84 of the Debtors' Employees provide administrative support including, engineering, sales, purchasing, human resources, financing and accounting services to the manufacturing facilities (the "Administrative Employees"). In addition to their Employees, the Debtors also utilize the services of independent contractors who supplement the Debtors' commissioned sales force (the "Independent Contractors")None of the Debtors' Employees are associated with a national union.

### B.    The Debtors' Compensation Procedures

9.    The Debtors' aggregate monthly payroll including wages, salaries and commissions, is approximately $2.3 million per month. Production Employees are paid in arrears, on a weekly basis, with direct deposits or checks issued on the 6th or 7th day after the close of each pay period. Administrative Employees, including both salaried and certain hourly Employees, are paid one week in arrears on a bi-weekly basis, with direct deposits or checks

4

issued on the 6th or 7th day after the close of each pay period. The Debtors pay their Employees through an outside payroll administrator, Automated Date Processing, Inc. ("ADP").

10.     On April 8, 2010, the Debtors delivered to ADP funds for paychecks distributed on April 12, 2010 (the "Last Administrative Employees and Production Employees' Pay Date"). The pre-petition payroll funding for the Last Administrative and Production Employees' Pay Date included payment for salaried Employee and hourly Employee wages between April 4, 2010 and April 10, 2010. Thus, as of the Petition Date, Production Employees and Administrative Employees are owed Unpaid Wages earned between April 11, 2010 and the Petition Date.

11.     As of the Petition Date, the Debtors owe an estimated $210,000.00 for the gross amount of earned but Unpaid Wages. No single Employee is owed more than $11,725 in Unpaid Wages. The Debtors therefore seek authority to pay the Unpaid Wages up to a total and aggregate amount of $250,000.00. In addition to the Unpaid Wages, the Debtors estimate that as of the Petition Date, approximately $57,540.00 of the Debtors' contributions to tax and insurance withholdings were incurred and unpaid in connection with the Unpaid Wages (the "Employer Tax Obligations"). The Debtors also request authority to pay the Employer Tax Obligations, up to $75,000.00 in connection with the payment of the Unpaid Wages, plus any amounts subsequently deemed to be due and owing pursuant to any audit of the Employer Tax Obligations which occurs after the Petition Date.

12.     As noted above, ADP processes the Debtors' payroll. ADP draws funds from the Debtors' account approximately two days in advance of each payday and are

5

responsible for paying all applicable withholdings and payroll taxes with respect to the Employees. In the ordinary course of business, the Debtors provide applicable schedules in advance of the payroll payment period, and ADP issues payroll checks. The Debtors pay approximately $10,500 per month to ADP on account of payroll processing services. The Debtors estimate that they may owe ADP approximately $10,500 on account of prepetition services. By this Motion, the Debtors request authority to continue to use ADP's payroll processing services to pay any prepetition amounts that may be due to ADP up to a total and aggregate amount of $15,000.

**C.      Payment of Independent Contractors**

13.      The Debtors' sales force includes three sales representatives from R.J. Wagner Marketing ("Wagner") and four sales representatives from Wills and Associates ("Wills") who are paid sales commissions directly from the Debtors as Independent Contractors. The Debtors seek to pay Independent Contractors for all services rendered prior to the Petition Date pursuant to the agreements with such Independent Contractors as described below.

14.      The Debtors utilize the sales representatives that are Independent Contractors to market the Debtors' products both in the U.S. and internationally. The sales representatives work strictly on commission. Commissions to the sales representative are paid based on a fixed commission schedule provided in the agreements with Wagner and Wills. Commissions to the sales representatives are paid within 30 days of the month in which the Debtors receive payment in full for the products sold from their customer. In the year prior to the Petition Date, the amount of commissions paid by the Debtors to their independent sales

6

representatives averaged approximately $63,000 per month. As of the Petition Date, to the best of the Debtors' belief, no sales representative is due Unpaid Wages in an amount in excess of $11,725 for sales that closed prior to the Petition Date. By this Motion, the Debtors request authority to continue to pay the Independent Contractors commissions for sales that close prior to the Petition Date in the ordinary course.

**D.      Business Expense Reimbursements**

15.      The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors. Such expenses typically include, but are not limited to, business-related travel expenses, including air travel, auto travel and car rental, lodging, meal charges, business lunches, telephone charges, and miscellaneous other allowed travel expenses (the "General Reimbursement Obligations"). Such General Reimbursement Obligations also include amounts billed by Employees to corporate charge cards for the purchase supplies, inventory, and equipment on behalf of the Debtors and in support of the Debtors' businesses.

16.      It is difficult for the Debtors to determine the exact amounts of General Reimbursement Obligations that are due and owing for any particular time period since the expenses incurred by Employees on behalf of the Debtors throughout the year vary on a monthly basis. Additionally, there may be some delay (typically up to one month) between when an Employee incurs an expense and submits the corresponding expense report for processing. Based on historical experience, the average monthly amount of General Reimbursement Obligations for all Employees was approximately $25,000.

7

17.     By this Motion, the Debtors seek authority to pay any prepetition General

Reimbursement Obligations (including any such amounts due to former employees) up to a total

amount of $50,000 and to continue to honor General Reimbursement Obligations incurred

postpetition in the ordinary course of the Debtors' business.

## E.     The Debtors' Health Benefits Programs

18.     The Debtors provide several health and related benefit plans to their

Employees, including medical and vision insurance dental insurance, life insurance, accidental

death and disability insurance, and short and long-term disability insurance (collectively, the

"Health Plans"), as described in more detail below.  Salaried Employees are eligible to

participate in the Health Plans commencing on the first day of the month following the start of

employment.  Hourly Employees are eligible to participate in the Health Plans after 90 days of

employment.

19.     The insurers of the Health Plans invoice the Debtors in advance for the

full amount of premiums owing for the Debtors' Employees as of the first of each month for that

month's coverage period.  As of the Petition Date, the Debtors have paid the monthly invoices

for April 2010 for the Health Plans.  Accordingly, as of the Petition Date, the Debtors have no

outstanding monthly invoices to the insurance providers for the Health Plans.  The Debtors seek

authority to pay any amounts owed for their Health Plans in the ordinary course of their

businesses, as more specifically set forth below.

20.     For most of the Health Plans, Employees make contributions and the

Debtors deduct the Employees' portion of the premiums owing under the Health Plans from the

8

Employees' Wages every pay period. As required by law, the Debtors also offer coverage under certain of the Health Plans to their former employees who have elected COBRA coverage. In the case of the former employees who have elected COBRA coverage, the Debtors do not pay any premiums on behalf of the Employees. Instead, such former employees pay the full amount of the premiums due to a third party COBRA administrator, Ceridian. Although the Debtors advance the premium amounts for these former employees when the Debtors pay their monthly invoices to the Health Plans, these amounts are reimbursed to the Debtors by Ceridian, who collects the premium amounts owing directly from the former employees and remits them to the Debtors. Ceridian retains 2% of the amounts collected from the previous employees as a fee for their services as COBRA administrator. As part of the relief requested hereunder, the Debtors request authority to pay any prepetition premium payments relating to COBRA coverage (which are fully paid by the former employees), to pay Ceridian for their services as COBRA administrator for their Health Plans and to continue to make such payments in the ordinary course of business.

9

**Medical and Vision Plans**

21.     The Debtors provide fully insured medical/vision insurance plans (the

"Medical Plans") to their Employees through two separate carriers.

a.     **PBSI/PBBA Employees**.  For Employees of Debtors Point Blank

Solutions, Inc and Point Blank Body Armor, Inc., the Debtors provide medical and vision

insurance through Humana Inc. ("Humana").  All PBSI and PBBA Employees are eligible to

participate in Humana's regional health maintenance organization ("HMO") network.  Under the

HMO plan, Employees have access to in-network savings with more than 400,000 doctors,

hospitals, pharmacies, and ancillary care providers, but are also provided benefits for covered

services from out-of-network providers.  The Debtors contribute a fixed percentage of the

monthly premiums due under the Humana HMO Medical Plan according to the following

schedule:

|  | HMO Employer Contribution | HMO Employer Contribution | HMO Employee Contribution | HMO Employee Contribution | Total Monthly Premium |
|---|---|---|---|---|---|
| Employee | 68% | $210.45 | 32% | $99.04 | $309.49 |
| Employee + Spouse | 55% | $373.10 | 45% | $305.26 | $678.36 |
| Employee + Children | 55% | $335.25 | 45% | $274.29 | $609.54 |
| Family | 55% | $533.33 | 45% | $436.36 | $969.69 |

Salaried Employees of PBSI and PBBA are also offered the choice to participate in Humana's

national point of service ("NPOS") plan.  Under the Humana's NPOS plan, participating

Employees have access to in-network savings with more than 500,000 doctors, hospitals,

pharmacies and other health care providers.  The NPOS plan also pays benefits for covered

10

services from out-of-network providers, but requires Employees to pay a yearly deductible of $500 per individual and $1,000 per family if these out of network services are accessed. The Debtors contribute a fixed percentage of the monthly premiums due under the Humana NPOS Medical Plan according to the following schedule:

|  | NPOS Employer Contribution | NPOS Employer Contribution | NPOS Employee Contribution | NPOS Employee Contribution | Total Monthly Premium |
|---|---|---|---|---|---|
| Employee | 65% | $220.07 | 35% | $143.42 | $363.49 |
| Employee + Spouse | 55% | $394.17 | 45% | $405.54 | $799.71 |
| Employee + Children | 55% | $353.39 | 45% | $363.35 | $716.74 |
| Family | 55% | $558.19 | 45% | $578.68 | $1,136.87 |

b. **PACA Employees**. The Debtors offer a fully insured medical and vision insurance plan to Employees of Debtor Protective Apparel Corporation of America through Cariten Healthcare, Inc. ("Cariten"). All PACA Employees are eligible to participate in either the Cariten HMO or the Cariten point-of-service ("POS") plan. Under the Cariten HMO Medical Plan, Employees must choose a primary care physician ("PCP") who coordinates all healthcare and makes referrals to specialists. The HMO plan generally does not cover medical services provided without a referral or by a non-participating provider, with the exception of emergency care. The Debtors contribute to the monthly premiums due under the Cariten HMO Medical Plan is as follows:

|  | HMO Employer Contribution | HMO Employer Contribution | HMO Employee Contribution | HMO Employee Contribution | Total Monthly Premium |
|---|---|---|---|---|---|
| Employee | 60% | $270.25 | 40% | $180.17 | $450.42 |
| Employee + Spouse | 60% | $589.15 | 40% | $392.76 | $981.91 |
| Employee + Children | 60% | $548.62 | 40% | $365.74 | $914.36 |
| Family | 60% | $774.29 | 40% | $516.19 | $1,290.48 |

11

PACA Employees may also choose the Cariten POS Medical Plan to combine the cost-effectiveness of the HMO plan with the flexibility of a preferred provider organization. As with the Cariten HMO Medical Plan, Employees covered by the Cariten POS Medical Plan choose a PCP to coordinate healthcare and make referrals as needed, but also have the option of being referred to a specialist or healthcare facility outside of the Cariten provider network at a reduced benefit level. The Cariten POS Medical Plan requires Employees to pay a yearly deductible of $500 per individual or $2,500 per family. As with the other Medical Plans, the Debtors contribute a fixed percentage of the monthly premiums due under the Cariten POS Medical Plan according to the following schedule:

| | HMO POS Employer Contribution | HMO POS Employer Contribution | HMO POS Employee Contribution | HMO POS Employee Contribution | Total Monthly Premium |
|---|---|---|---|---|---|
| Employee | 60% | $227.95 | 40% | $151.96 | $379.91 |
| Employee + Spouse | 60% | $496.93 | 40% | $331.28 | $828.21 |
| Employee + Children[ | 60% | $462.73 | 40% | $308.49 | $771.22 |
| Family | 60% | $653.06 | 40% | $435.37 | $1,088.43 |

22. Each pay period, the Debtors deduct from the Employees' Wages, the Employees' portion of the Medical Plan contribution, which amount depends upon the plan they select (together, the "Medical Plan Contributions"). On average, the Debtors pay approximately $280,000.00 on account of their Medical Plans to their insurers each month, which amount includes the Employee contributions deducted from Employee Wages later in the same month and $11,000.00 in COBRA premium payments.

12

23.     As of the Petition Date, the Debtors have paid their April 2010 invoices received from Humana and Cariten on account of their Medical Plans. Out of an abundance of caution, the Debtors seek authority to pay Humana and Cariten the Medical Plan Contributions not to exceed $50,000.00 for any other Medical Plan Contributions that came due pre-petition for which the Debtors are not yet aware. The Debtors seek authority to continue to offer their Medical Plans postpetition in the ordinary case of business and in their discretion.

### Dental Plans

24.     The Debtors offer their eligible Employees with dental insurance through Delta Dental (the "Dental Plan"). Employees may select from two levels of coverage. Under the dental health maintenance organization ("DHMO") option, PBSI and PBBA Employees are offered a prepaid plan featuring set copayments, no annual deductibles, no maximums for most diagnostic and preventive services, and coverage for more than 250 procedures. The Debtors contribute to the monthly premiums of PBSI and PBBA Employees due under the DHMO Dental Plan pursuant to the following schedule:

| | DHMO Employer Contribution | DHMO Employer Contribution | DHMO Employee Contribution | DHMO Employee Contribution | Total Monthly Premium |
|---|---|---|---|---|---|
| Employee | 40% | $3.25 | 60% | $4.87 | $8.12 |
| Employee + 1 | 40% | $5.68 | 60% | $8.53 | $14.21 |
| Family | 40% | $8.92 | 60% | $13.38 | $22.30 |

Employees may also participate in Delta Dental's preferred provider organization ("PPO") plan. The monthly premiums owed by all Employees under the PPO Dental Plan and premiums owed by PACA Employees under the DHMO Dental Plan are paid in full by the Employees.

13

25. Each pay period, the Debtors deduct from the Employees' Wages, the Employees' portion of the Dental Plan contribution, which amount depends upon the plan they select (together, the "Dental Plan Contributions"). On average, the Debtors pay approximately $10,500 on account of their Dental Plans per month, which amount includes the Employee contributions deducted from Employee Wages later in the same month and $200.00 in COBRA premium payments.

26. As of the Petition Date, the Debtors have paid all previous invoices received from Delta Dental on account of their Dental Plans. Out of an abundance of caution, the Debtors seek authority to pay Delta Dental the Dental Plan Contributions not to exceed $5,000.00 for any other Dental Plan Contributions that will come due pre- petition for which the Debtors are not yet aware. The Debtors seek authority to continue to offer their Dental Plans postpetition in the ordinary case of business and in their discretion.

## Life, AD&D, Supplemental Cancer Insurance and Disability Insurance

27. The Debtors provide their Employees with life insurance and accidental death and dismemberment insurance and make additional life insurance, short-term disability insurance, supplemental cancer insurance and long-term disability insurance available to Employees though their insurance carriers. The Debtors seek authority to continue to offer the Life Insurance, AD&D Insurance, Supplemental Cancer Insurance and Disability Insurance postpetition in the ordinary course of business in their discretion. The Debtors' premium contributions to the Life Insurance, AD&D Insurance, Supplemental Cancer Insurance and

14

Disability Insurance total, in the aggregate, approximately $20,000.00 per month. The Debtors seek authority to pay up to $10,000 for all of these programs for any pre-petition amounts that may be owed for which they are not yet aware.

28.     Life Insurance and AD&D Insurance.  The Debtors provide life insurance and accidental death and dismemberment insurance ("AD&D Insurance") through Mutual of Omaha based on the Employee's age and according to the following schedule:

| Employee Age | Policy Amount | Life per employee | ADD per employee | # of Employees per age band |
|---|---|---|---|---|
| 70+ | $ 7,500.00 | $1.01 | $ 0.15 | 30 |
| 65-69 | $ 9,750.00 | $1.32 | $ 0.20 | 35 |
| 64- | $ 15,000.00 | $2.03 | $ 0.30 | 700 |

The Debtors pay 100% of such premiums and the cost to the Debtors to provide such coverage is approximately $2,000 per month.

29.     Voluntary Insurance.  The Debtors also offer their Employees with an option to elect (at their cost) additional life insurance, additional accidental death and dismemberment insurance, voluntary short-term disability insurance and voluntary long term disability insurance through Mutual of Omaha, which policies provide coverage above what the Debtors offer ("Voluntary Programs").  In addition, the Debtors offer their PACA Employees with an option to elect (at their cost) Supplemental Cancer Insurance through Bay Bridge Administrators, LLC. Under these Voluntary Programs, the Debtors pre-pay the premium payments for their Employees at the beginning of each month and then deduct from the Employees' Wages the applicable premiums to reimburse themselves for amounts paid to Mutual of Omaha and Bay Bridge Administrators, LLC.  Such amounts are included in the Withholding

15

Obligations discussed above. The Debtors seek authority to continue to offer the Voluntary Programs postpetition in their ordinary course of business.

## F.   Workers' Compensation

30.   Under the laws of the various states where the Debtors conduct their businesses, the Debtors are required to maintain workers' compensation insurance to provide their Employees with coverage for claims arising from or related to their employment with the Debtors. The Debtors currently maintain an annual workers' compensation policy (the "Workers' Compensation Policy") with the Hartford Insurance Company ("Hartford") pursuant to which Hartford provides workers' compensation insurance coverage up to the statutory limits and up to $1,000,000 per occurrence for employer liability. The Debtors pay no deductible or self-insured retention under their Workers' Compensation Policy, and are not subject to any retroactive adjustments to their current premiums. The current term of the Workers' Compensation Policy runs through February 16, 2011, and costs $438,127.00 on an annual basis.[2]

31.   In addition to their current, fully-insured Workers' Compensation Policy with Hartford, the Debtors are still contingently obligated for costs pursuant to previous years' self-insured workers' compensation coverage through Sentry Insurance ("Sentry"). The Debtors make monthly payments to Sentry of approximately $20,000 for claims that continue to be paid

---

[2] The Debtors have paid Hartford a down payment of $109,531.75 and will make 10 monthly payments of $32,859.53 to pay the annual premium in full.

under the previous self-insured program. The Sentry insurance program is backed by a letter of credit in the amount of $375,000.

32.     The Debtors submit that the continuance of their Workers' Compensation Policy is appropriate in the ordinary course of business, but out of an abundance of caution, seek authority to maintain their workers' compensation insurance in accordance with applicable law postpetition and to pay all premium installments to Hartford as they come due in the ordinary course of business for going forward coverage. In addition, the Debtors seek to make all payments to Sentry as they come due in order to meet its existing obligations under its previous self-insured worker's compensation coverage.

## G.     Vacation and Other Time-Off Benefits.

33.     The Debtors provide all full-time Employees vacation time. Vacation benefits vary based on the Employee's tenure and position. Vacation time is accrued based on time worked. Full-time salaried and hourly paid Employees are eligible for paid vacation days as the days are accrued. The amount of vacation earned by Employees per week is based on the number of years of service an Employee has completed since the date they commenced employment. The schedule of vacation benefits earned by Employees follows:

17

| Years of Service | Accrual Rate | Total Hours | Total Days |
|---|---|---|---|
| 0-2 | 0.77 | 40 | 5 |
| 3-9 | 1.4 | 80 | 10 |
| 10+ | 2.17 | 120 | 15 |

34.     Vacation is paid by the Debtors at the employee's base rate at the time the vacation is taken. Vacation pay does not include overtime or any special forms of compensation such as incentives, commissions, or bonuses. If a holiday falls during the employee's vacation, the day will be charged to holiday pay, as applicable rather than vacation pay. The Debtors encourages their Employees to use the available vacation time in the year it is earned. If the available vacation is not used by the end of the anniversary year, accrued, unused days will not be carried over to the next year, Employees lose any unused vacation days.

35.     The Debtors also provide their Employees with three paid sick days, seven paid holiday days and one paid personal day per year.

36.     The Debtors request authority in their discretion to honor existing vacation and sick obligations accrued prior to the Petition Date by their Employees and develop any similar policies regarding time away from work and holidays on a post-petition basis and in the ordinary course of the Debtors' business.

**H.     401(k) Savings Plans**

37.     The Debtors maintain a 401(k) plan for the benefit of their Employees (the "401(k) Plan"). The 401(k) Plan provides for automatic pre tax salary deductions of eligible compensation up to certain limits set by the Internal Revenue Code. Approximately 126

18

Employees participate in the 401(k) Plan, and the approximate monthly amount collectively withheld from Employees' paychecks is $24,054.69. The Debtors do not currently pay matching contributions to the 401(k) plan. As of the Petition Date, there are no accrued but unfunded matching contributions with respect to the 401(k) Plan. The Debtors utilize ADP as the Plan Trustee and Recordkeeper. The Debtors pay ADP approximately $1,500 per month for the administrative costs and monthly processing fee for the 401(k) Plan. The Debtors request authority, in their discretion, to continue their existing 401(k) Plan and pay any 401(k) fees in the ordinary course of the Debtors' business.

## I.  Incentive and Bonus Plans

38.  In the ordinary course of business, the Debtors maintain various incentive plans to encourage their Employees to maximize the value of the Debtors' enterprise (collectively, the "Incentive Plans"). These Incentive Plans are an important component of employee compensation and provide substantial value to the Debtors' estates because they encourage Employees to achieve important financial performance and quality goals. Given that no payments under the Incentive Plans are currently due, the Debtors are not seeking authority to honor obligations under the Incentive Plans at this time and will seek further relief from the Court, as appropriate, before making any payment to any Employee on account of the Incentive Plans.

19

**<u>Relief Requested</u>**[3]

39.     Pursuant to sections 105(a), and 363(b)(1) and (c)(1) of the Bankruptcy

Code and the "necessity of payment" doctrine, the Debtors seek authority to pay or honor, in

their sole discretion:

- a.   the Unpaid Wages, including any associated payroll processing obligations;

- b.   any prepetition obligations owed to Independent Contractors for services rendered prior to the Petition Date pursuant to the agreements with such Independent Contractors;

- c.   any Employer Tax Obligations attributable to the period prior to the Petition Date and to remit the same to applicable taxing authorities or other appropriate third-parties;

- d.   the General Reimbursement Obligations;

- e.   all prepetition obligations under the Medical Plans including the Medical Plan Contributions;

- f.   all prepetition obligations under the Dental Plans including the Dental Plan Contributions;

- g.   all prepetition obligations under the Workers' Compensation Policy, including those obligations incurred prepetition and liquidated post-petition;

- h.   honor vacation time earned prepetition by Employees; and

- i.   any other prepetition claims or obligations described in this Motion for which such authority is specifically requested herein

(with each of the foregoing referred to collectively as the "Prepetition Employee Obligations.").

40.     The Debtors also seek authority to continue, in their sole discretion, on a

postpetition basis:

- a.   the Health Plans, including the Medical Plans and the Dental Plans;

- b.   the Disability Insurance, Life Insurance and Voluntary Life Insurance Programs;

- c.   the Workers' Compensation Policy;

---

[3] Nothing in this Motion is intended to or shall convert any prepetition claim into an administrative claim.

    d.     vacation policies pursuant to the terms of the Debtors' applicable policies and this Motion;

    e.     their existing 401(k) Plan including payment of any 401(k) fees in the ordinary course of the Debtors' business; and

    f.     any other benefit program described in this Motion for which authority is specifically requested herein

(with each of the foregoing referred to collectively as the "Employee Programs.").

41.    The Debtors represent that (i) they will not distribute any amounts over $11,725 directly to any individual employee on account Unpaid Wages, and (ii) they will not pay any amounts in excess of the estimated outstanding amounts for each category of prepetition claim identified herein without further order from this Court.

42.    To enable the Debtors to accomplish the foregoing, the Debtors request that the Court authorize and direct the Debtors' banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing.

43.    Notwithstanding the authority requested in this Motion, the Debtors, in the ordinary course of business sometimes modify, change and discontinue employee programs and implement new employee programs and will continue to do so during these Chapter 11 Cases, and will provide notice thereof as required by applicable rules and law.

**Basis for Relief**

44.    Statutory support for the requested relief exists pursuant to sections 105(a), 363(b)(1) and (c)(1), and 507(a) of the Bankruptcy Code and the "necessity of payment" doctrine (discussed *infra*). Bankruptcy Code section 363(b)(1) authorizes a debtor in possession to use property of the estate other than in the ordinary course of business after notice

21

and a hearing. Bankruptcy Code section 363(c) authorizes a debtor in possession to enter into transactions in the ordinary course of business without notice and a hearing. Bankruptcy Code section 105(a) further provides, in pertinent part, that this Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.

45. The relief requested in this Motion is supported by the well-established "necessity of payment" doctrine.[4] The "necessity of payment" doctrine, which has been embraced by the Third Circuit, "teaches no more than, if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized even if it is made out of corpus." *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3rd Cir. 1981). *See also In re Sharon Steel Corp.*, 159 B.R. 730, 737 (Bankr. W.D. Pa. 1993) (embracing "necessity of payment" doctrine and citing *Lehigh & New England Ry. Co.* with approval). Similarly, the court in *In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr. S.D.N.Y. 1989), stated that the "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." *Id.* at 176. In that case, the court permitted Eastern Air Lines, Inc., to pay its current employees' prepetition wages, salaries, medical benefits, and business expense claims. Judge Lifland relied on his equitable powers under Bankruptcy Code section 105(a) and, in particular, the "necessity of payment" doctrine to authorize such payments, recognizing that the debtor had to make the

---

[4] The doctrine was first articulated by the Supreme Court in railroad reorganization cases, *see Miltenberger v. Logansport Ry.*, 106 U.S. 286 (1882), and it has been held to be equally applicable to non-railroad debtor cases. *See, e.g., Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (hotel); *In re Gulf Air, Inc.*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (airline).

payments in order to retain its current employees and maintain positive employee moral--two factors that he deemed critical to the rehabilitation of an operating debtor. *Id.* at 176-77 (*citing* H.R. Rep. No. 595 95th Cong. 1st Sess. 16 (1977)). Other courts also have found that the "necessity of payment" doctrine applies to the payment of prepetition employee compensation and benefits. *See In re Chateaugay Corp.*, 80 B.R. 279, 281 (Bankr. S.D.N.Y. 1987) (under the "necessity of payment" doctrine, bankruptcy court should defer to the debtor's business judgment in permitting payment of certain workers' compensation claims).

46. This Court similarly has approved the payment of prepetition claims of employees for wages, salaries, expenses, and benefits on the grounds that the payment of such claims was necessary to effectuate a successful reorganization or liquidation. *See, e.g., In re DHP Holdings II Corp.,* Case No. 08-183422 (Bankr. D. Del. Jan. 5, 2009); *In re EZ Lube, LLC.*, Case No. 08-13256 (CSS) (Bankr. D. Del. Dec. 10, 2008); *In re NetEffect, Inc.*, Case No. 08-12008 (KJC) (Bankr. D. Del. Aug. 28, 2008); *In re Western Nonwovens Inc.*, Case No. 08-11435 (PJW) (Bankr. D. Del. July 15, 2008); *In re Global Motorsport Group, Inc.*, Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 1, 2008)*; In re Answer Financial Inc.*, Case No. 08-10140 (MFW) (Bankr. D. Del. Jan. 23, 2008); *In re Aegis Mortgage Corporation*, Case No. 07-11119 (BLS) (Bankr. D. Del. Aug. 15, 2007); *In re Mortgage Lenders Network USA, Inc.*, Case No. 07-10146 (Bankr. D. Del. Feb. 7, 2007) (PJW); *In re Global Home Products LLC, et al.*, Case No. 06-10340 (Bankr. D. Del. Apr. 11, 2006)(KG); *In re Proxim Corp.*, Case No. 05-11639 (PJW) (Bankr. D. Del. June 15, 2005); *In re Maxide Acquisition, Inc.*, Case No. 05-10429

23

(MFW) (Bankr. D. Del. Feb. 15, 2005); *In re Redback Networks, Inc.*, Case No. 03-13359 (MFW) (Bankr. D. Del. Nov. 5, 2003).

47.     The "necessity of payment" doctrine authorizes the Debtors to pay the amounts it seeks authority to pay pursuant to this Motion because the Debtors' Employees are critical assets necessary both to the Debtors' operations and the successful prosecution of these Chapter 11 Cases.

48.     Pursuant to sections 507(a)(4) of the Bankruptcy Code, claims of Employees of the Debtors for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date are afforded priority unsecured status to the extent of $11,725 per Employee. The Debtors believe that all of the Unpaid Wages relating to the period prior to the Petition Date constitute priority claims under sections 507(a)(4) of the Bankruptcy Code. As priority claims, the Unpaid Wages must be paid in full before any general unsecured obligations of the Debtors may be satisfied. Accordingly, the relief requested may affect only the timing of the payment of these priority obligations, and will not prejudice the rights of general unsecured creditors or other parties in interest.

49.     Pursuant to the relief requested herein, the Debtors request authority only to pay up to the $11,725 statutory cap under Bankruptcy Code section 507(a)(4) to each Employee on account of all Unpaid Wages collectively owing to such Employee.[5]

---

[5]  In the event any unpaid amounts owing to any Employee on account of Unpaid Wages exceed the $10,950 statutory cap, the Debtors reserve the right to petition the Court for authority to pay such amounts.

24

50. Many Employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses. These Employees may be exposed to significant financial and healthcare related problems if the Debtors are not permitted to pay and/or honor the Unpaid Wages and Benefits, and the expenses associated therewith, in the ordinary course of the Debtors' business. Moreover, the Debtors believe that if they are unable to honor accrued Unpaid Wages and the Benefits described above, including honoring earned vacation time, Employee morale and loyalty will be jeopardized at a time when Employee support is critical.

51. If the Debtors are not authorized to pay for medical benefits, then many of the Debtors' Employees may not be reimbursed or otherwise have their medical benefits claims paid. In addition, certain Employees may become primarily obligated for the payment of these claims in cases where health care providers have not been reimbursed. The Debtors believe that potentially enormous hardship could be visited upon these employees if the Debtors are not authorized to honor the resultant Medical Plan Contributions. The Debtors believe the uncertainty regarding the payment of Medical Plan Contributions will cause significant anxiety at precisely the time the Debtors needs their Employees to perform their jobs at peak efficiency. Furthermore, the Debtors believe that the Medical Plan Contributions are entitled to priority status under sections 507(a)(5)(A) and (B) of the Bankruptcy Code.

52. The Employer Tax Obligations and other amounts either voluntarily or involuntarily withheld from Employee paychecks (collectively, the "Withholding Obligations") do not constitute property of the Debtors' estate and principally represent employee earnings that

25

governments (in the case of taxes), Employees (in the case of voluntary Withholding Obligations), and judicial authorities (in the case of involuntary Withholding Obligations), have designated for deduction from Employee paychecks. The failure to transfer these withheld funds could result in hardship to certain Employees. The Debtors expect inquiries from garnishers regarding the Debtors' failure to submit, among other things, child support and alimony payments, which are not the Debtors' property but, rather, have been withheld from Employee paychecks. Moreover, if the Debtors cannot remit these amounts, the Debtors' Employees may face legal action due to the Debtors' failure to submit these payments.

53.     Finally, the Debtors submit that with respect to the wage-related taxes that constitute "trust fund" taxes, the payment of such taxes will not prejudice other creditors of the Debtors' estate given that the relevant taxing authorities would have a priority claim under section 507(a)(8) of the Bankruptcy Code in respect of such obligations. Moreover, the monies payable for trust fund taxes, as well as the other funds that are held in trust for the benefit of third parties, such as withheld funds with respect to the 401(k) Plan, are not property of the Debtors' estate. *See, e.g., Begier v. IRS*, 496 U.S. 53 (1990) (withholding taxes are property held by a debtor in trust for another and, as such, are not property of the debtor's estates).

54.     The Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the success of these Chapter 11 Cases. Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to maximize the value of their assets. Satisfaction of the Unpaid Wages and Benefits, as described herein, is necessary to maintain the Employees'

morale during the case and to insure continued, efficient operation in order to maximize value for all creditors.

### Satisfaction Of Bankruptcy Rule 6003 And Waiver Of Bankruptcy Rule 6004

55.     Finally, Pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure, which became effective December 1, 2007, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 20 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b). For the reasons described more fully above and as supported by the Knight Declaration, the Debtors submit that the requirements of Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

56.     To implement the foregoing successfully and insure the wages and benefits owed to Employees are not interrupted, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

### No Assumption or Assignment of Employee Benefits

57.     To the extent any Employee Benefits or related agreement is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not, at this time, seek to assume any such contract. Accordingly, if the Court authorizes the payments described above, such payments should not be deemed to constitute a postpetition

27

assumption or adoption of the programs, policies, or agreements as executory contracts pursuant

to section 365 of the Bankruptcy Code. Moreover, authorization to pay all amounts on account

of Unpaid Wages and Benefits shall not affect the Debtors' right to contest the amount or

validity of these obligations.

### Request for Authority for Banks and Other Financial Institutions to Honor Checks Issued to Pay Wages and Benefits, to Honor All Fund Transfer Requests Relating to the Foregoing, and to Pay All Processing Fees Associated with Payment of Employee Wages and Benefits

58.     The Debtors request that all applicable banks and other financial

institutions be authorized to receive, process, honor, and pay all checks presented for payment

and to honor all fund transfer requests made by the Debtors to Employees, whether such checks

were presented or fund transfer requests were submitted prior to, on, or after the Petition Date.

The Debtors represent that they have (or will have) sufficient postpetition funding to pay

promptly all Unpaid Wages and Benefits, to the extent described herein, on an ongoing basis and

in the ordinary course of business. Nothing contained in this Motion, however, shall constitute a

request for authority to assume any agreements, policies, or procedures relating to Unpaid Wages

and Benefits. Further, the Debtors seek to retain the discretion to decide which Unpaid Wages

and Benefits it will pay and honor, and nothing in this Motion shall be deemed an admission by

the Debtor that any Unpaid Wages and Benefits will in fact be paid or honored.

59.     Finally, the Debtors request authority to pay all of the processing fees

associated with payment of the Unpaid Wages and Benefits including, but not limited to, any

fees owed to any third party administrators of Benefits as described in the Motion.

28

## Notice

60.     Notice of this Motion has been given to (i) the Office of the United States Trustee and (ii) the Debtors' prepetition and postpetition secured lenders or, in lieu thereof, to their counsel, if known.  As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

61.     No prior motion for the relief requested herein has been made to this or any other court.

68700-001\DOCS_DE:157900.8
68700-001\DOCS_DE:157900.9

WHEREFORE the Court should authorize, but not require, the Debtors to pay all of the above listed in this Motion, including: prepetition wages, salaries, and other compensation, employee medical and similar benefits, and reimbursable employee expenses, and authorize banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing, and grant such other and further relief as is just and proper.

Dated: April 14, 2010

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail:       ljones@pszjlaw.com
              dbertenthal@pszjlaw.com
              tcairns@pszjlaw.com

[Proposed] Counsel to Debtors and
Debtors in Possession

68700-001\DOCS_DE:157900.8
68700-001\DOCS_DE:157900.9