# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------x

In re                                              :     Chapter 11
                                                   :
POINT BLANK SOLUTIONS, INC., *et al.*,[1]:         Case No. 10-11255 (PJW)
                                                   :
                    Debtors.                       :     (Joint Administration Requested)
                                                   :

----------------------------------------------------x

## MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 FOR AUTHORIZATION TO: (1) INCUR SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING; (2) REPAY PREPETITION SECURED DEBT UPON ENTRY OF INTERIM ORDER; (3) USE CASH COLLATERAL; (4) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (5) GRANT ADEQUATE PROTECTION; (6) MODIFY THE AUTOMATIC STAY; AND (7) SCHEDULE A FINAL HEARING

The debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11

cases hereby move this Court (the "Motion"), pursuant to sections 105, 361, 362, 363 and 364 of

title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 4001-2

of the Local Rules for the United States Bankruptcy Court of the District of Delaware (the

"Local Rules"), for entry of an interim order on an expedited basis, substantially in the form

attached hereto as **Exhibit A** (the "Interim Order"), and ultimately, at a final hearing to be set by

the Court (the "Final Hearing"), a final order as set forth herein (the "Final Order").

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number and address, are: Point Blank Solutions, Inc. (9361), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor, Inc. (4044), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Protective Apparel Corporation of America (9051), 179 Mine Lane, Jacksboro, TN 37757; and PBSS, LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.

## Concise Summary of DIP Credit Agreement

1.      Pending the Final Hearing and entry of the Final Order, the Debtors request authority to obtain credit and incur debt (the "DIP Loan") on an interim basis under that certain *Debtor-in-Possession Financing Agreement* dated as of April 12, 2010, attached hereto as **Exhibit B** (the "DIP Credit Agreement"), excluding applicable exhibits and schedules.[2]

2.      Pursuant to Bankruptcy Rule 4001(c) and Local Rule 4001-2, the following are the material provisions of the DIP Credit Agreement and/or Interim Order:[3]

| | |
|---|---|
| **Borrower**: | Point Blank Solutions, Inc. ("PBSI" or "Parent"), and its subsidiaries: (i) Point Blank Body Armor, Inc. ("Point Blank"), (ii) Protective Apparel Corporation of America ("PACA"), and (iii) PBSS, LLC ("PBSS") (collectively, the "Borrower"). *See* DIP Credit Agreement at page 1. |
| **DIP Lender**: | Steel Partners II, L.P. (the "DIP Lender").[4] |
| **DIP Facility**: | A senior secured, first priority, debtor- in-possession revolving credit facility (the "DIP Facility") not to exceed the lesser of $20 |

---

[2]      All capitalized terms that are not expressly defined in this Motion shall have the meanings ascribed to such terms in the DIP Credit Agreement and any associated loan or collateral documents memorializing the financing thereunder with terms that substantially conform to the DIP Credit Agreement (collectively, the "DIP Loan Documents").

[3]      The summaries and descriptions of the terms and conditions of the DIP Credit Agreement and Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof. The summaries and descriptions are qualified in their entirety by the DIP Credit Agreement and the Interim Order. In the event there is any conflict between this Motion and the DIP Credit Agreement or Interim Order, the DIP Credit Agreement or Interim Order, as applicable, will control in all respects.

[4]      The DIP Lender is an affiliate of Steel Partners LLC ("Steel Partners"). Steel Partners currently owns 4.2% of the common stock of PBSI. James Henderson, the president and chief executive officer of each of the Debtors, and the chairman of the board of directors of each of the Debtors, is also a managing director of Steel Partners. Another member of the Debtors' board of directors is also affiliated with Steel Partners. In addition, another affiliate of the DIP Lender, SP Corporate Services LLC, was party to a *Management Services Agreement* with the Parent dated September 1, 2009, which was terminated pre-petition. Further details regarding the connections among the Debtors, their officers and directors, and Steel Partners are set forth in the *Declaration of Scott Avila in Support of First Day Motions* filed contemporaneously with this Motion. Under the DIP Credit Agreement, the Borrower has waived any claims that the Borrower may have against the DIP Lender (strictly in such capacity) with respect to any breach or alleged breach of agency or fiduciary duty or as a result of the relationship between the parties with, or acts or omissions of, James Henderson and/or SP Corporate Services LLC.

million or the Borrowing Base, as defined in the DIP Credit Agreement. *See* DIP Credit Agreement at page 1; Interim Order at ¶ 2. Generally speaking, the Borrowing Base under the DIP Credit Agreement consists of the sum of (a) 80% of the face amount of eligible accounts receivable, (b) 20% of the cost of eligible inventory, and (c) the amount of certain third-party recourse available for the benefit of the DIP Lender,[5] *less* certain reserves.[6] *See* DIP Credit Agreement at pages 12-13.

**Use of Cash Collateral**: Authorizing the Debtors' use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code, according to an Approved Budget (as defined below) on the terms and conditions set forth in the Interim Order and the DIP Loan Documents. *See* Interim Order at ¶ 3. The parties with an interest in cash collateral are (a) Bank of America, Inc., pursuant to that certain *Amended and Restated Loan and Security Agreement,* dated as of April 3, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Loan Agreement"),[7] and (b) E.I. duPont de Nemours and Company ("DuPont"), pursuant to that certain *Subordinated Note* dated October 29, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "DuPont Note").[8]

---

[5]     A condition precedent to the closing of the DIP Facility is the receipt by the DIP Lender of a limited guarantee from E.I. duPont de Nemours and Company of certain amounts outstanding under the DIP Facility (referred to hereinafter as the "DIP Guaranty").

[6]     The reserves consist of amounts established by the DIP Lender from time to time in its discretion, and include the amount of the Carve Out (defined below).

[7]     The Prepetition Loan Agreement is by and among Bank of America, N.A., as successor by merger to LaSalle Business Credit, LLC, as administrative agent and collateral agent (in such capacities, "Prepetition Agent") for itself and all other lenders from time to time a party thereto (collectively, "Prepetition Lenders"), PACA and Point Blank, as borrowers, and PBSI, as guarantor. In connection with the DIP Loan Agreement, however, the Prepetition Agent will release its security interests (the "Prepetition Liens") in all property of the estates upon repayment of all amounts outstanding under the Prepetition Loan Agreement pursuant to the Interim Order (with the sole exceptions of a security interest in (i) $551,936.70 of cash collateral held to support certain outstanding letters of credit (in the face amount of $525,654), and (ii) $250,000 held in a reserve account for expenses arising under the Prepetition Loan Agreement). Hence, the Prepetition Lenders will not be entitled to adequate protection on account of the Debtors' use of cash collateral (or otherwise).

[8]     The DuPont Note was made by PACA, Point Blank and PBSI to DuPont in connection with that certain *Amended and Restated Corporate Guarantee* dated October 29, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Guaranty"). Under the Prepetition Guaranty, DuPont guaranteed certain of the Debtors' obligations to the Prepetition Agent under the Prepetition Loan Agreement. The DuPont Note, and the liens and security interests granted by the Debtors to DuPont under such note (the "DuPont Prepetition Liens"), are contractually subordinated to the Debtors' obligations and liens under the Prepetition Loan Agreement.

3

**Use of DIP Loan Proceeds**:    Proceeds of the DIP Loan are to be used to (i) pursuant to the Interim Order, satisfy the Debtor's obligations under the Prepetition Loan Agreement and pay related transaction fees and expenses,[9] and (ii) fund the working capital and general corporate purposes of the Borrower and the payment of post-petition expenses arising in the Borrower's chapter 11 cases (including DIP Lender charges, professional fees and other costs incurred by the Debtors and their estates) according to an Approved Budget (as defined below). *See* DIP Credit Agreement at page 7; Interim Order at ¶ 2(c).

**Termination Date**:    The Borrower shall repay any outstanding advances, loans made and other charges incurred under the DIP Loan on the earliest of (the "Termination Date"): (i) September 30, 2010, (ii) the date of the acceleration of the DIP Loan following an Event of Default (as defined below) under the DIP Credit Agreement; (iii) the closing date of a sale of all or substantially all of the Debtors' assets under section 363 of the Bankruptcy Code; and (iv) the effective date of a confirmed plan of reorganization in the Debtors' chapter 11 cases. *See* DIP Credit Agreement at page 2.

**Interest**:    Interest on borrowings under the DIP Loan will be payable in arrears on the last business day at the end of each month at a rate per annum equal to: (i) 7.5% plus (ii) the Prime Rate, as defined in the DIP Credit Agreement. *See* DIP Credit Agreement at page 1.

**Default Rate**:    After the occurrence and during the continuance of an Event of Default, interest on borrowings under the DIP Loan will be payable on demand at a rate per annum equal to: (i) 9.5% plus (ii) the Prime Rate, as defined in the DIP Credit Agreement. *See* DIP Credit Agreement at page 1.

---

[9]    As of the Petition Date, $10,525,654 remains outstanding under the Prepetition Loan Agreement, comprised of $10 million in principal obligations outstanding under the Term Loan and $525,654 in outstanding Letter of Credit Obligations (as such terms are defined in the Prepetition Loan Agreement), plus additional amounts on account of accrued and unpaid interest, fees, costs and charges (approximately $50,000). The Debtors' obligation to reimburse the Prepetition Agent on account of a draw under each of the outstanding letters of credit, however, has been fully cash collateralized at 105% of the face amount of the letters of credit (*i.e.*, $551,936.70).

4

**DIP Fees**:[10]               Closing Fee. Upon the occurrence of the Closing Date (as defined in the DIP Credit Agreement), the Borrower shall pay to Steel Partners, in cash a closing fee in an amount equal to $400,000. The arrangement fee previously paid by the Borrower shall be credited against the closing fee. The closing fee shall be fully earned upon the execution of the DIP Credit Agreement and shall not be subject to refund or rebate.

Commitment Fee. The Borrower shall pay the DIP Lender (or an affiliate of the DIP Lender, if so directed), a commitment fee equal to 0.75% per annum (on the basis of actual days elapsed over a year of 360 days) of the average daily difference between the Line Cap and the outstanding Loans during the calendar month just ended (or relevant period with respect to the payment being made for the first month ending after the Effective Date or on the Termination Date). The commitment fee shall be paid monthly in arrears, on the first day of each month and on the Termination Date. *See* DIP Credit Agreement at page 2.

Termination Fee. Upon the Termination Date (whether by virtue of the consummation of a 363 sale, a plan of reorganization, maturity, acceleration of the time for payment of the Obligations or otherwise), the Borrower shall pay to the DIP Lender a termination fee in cash in the sum of $400,000. The termination fee shall be fully earned on the Closing Date and shall not be subject to refund or rebate. *See* DIP Credit Agreement at page 2.

**DIP Collateral**:           All obligations of the Debtors under the DIP Loan (the "Obligations"), will, pursuant to sections 364(c)(2) and (3) and section 364(d)(1) of the Bankruptcy Code, be secured by (i) a fully perfected first priority security interest in all assets of each Debtor, including all proceeds thereof (the "DIP Collateral"), *provided that*, the DIP Collateral shall not include any claims, defenses, causes of action or rights of the Debtors arising under sections 542-553 of the Bankruptcy Code (including all proceeds thereof, the "Avoidance Actions"), and (ii) a fully perfected second priority security interest in those assets of each Debtor that are subject to preexisting validly perfected and unavoidable liens senior to the liens securing the obligations under the Prepetition Loan

---

[10]     PBSI and the DIP Lender are parties to a pre-petition engagement letter dated as of March 26, 2010 ("DIP Engagement Letter"), under which the DIP Lender was engaged on behalf of the Debtors to arrange and establish the DIP Loan and PBSI agreed to pay an expense deposit of $100,000. In addition, prior to the commencement of the chapter 11 cases, upon execution of the DIP Credit Agreement, the Borrower paid Steel Partners an arrangement fee of $400,000. The arrangement fee was fully earned upon payment and is not subject to refund or rebate under any circumstances (including, without limitation, the failure of the Borrower to obtain approval from the Bankruptcy Court for the DIP Facility or the failure of the DIP Facility to be consummated).

Agreement or the DuPont Note ("Permitted Prior Liens"),[11] subject, in each case, to the Carve Out (as defined below). In addition, pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Lender will receive a super-priority administrative expense claim (the "DIP Superpriority Claim") over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code, subject to the Carve Out (as defined below) and excluding Avoidance Actions. The liens described in this paragraph are referred to as the "DIP Liens" Avoidance Actions do *not* include, however: (i) actions and proceeds arising under section 549 of the Bankruptcy Code, and (ii) the Specified Avoidance Actions and the proceeds thereof.[12] *See* DIP Credit Agreement at pages 4-5; Interim Order at ¶ 2(e).

**DIP Guaranty:**  A condition precedent to the DIP Loans is the receipt by the DIP Lender of the DIP Guaranty from DuPont. DuPont is willing to furnish the DIP Guaranty but only if its aggregate potential liability under the Prepetition Guaranty and the DIP Guaranty does not exceed $10,000,000 (plus interest and collections costs). The DIP Lender, DuPont and the Prepetition Lenders have agreed that nothing contained in the DIP Loan Documents shall modify the terms and conditions of the Prepetition Guaranty, which shall remain in full force and effect according to its terms. As set forth in an *Intercreditor Agreement* between DuPont and the DIP Lender, however, any payments actually made by DuPont under the Prepetition Guaranty shall permanently reduce the liability of DuPont under the DIP Guaranty by a corresponding amount. The DIP Lender, in turn, may then, in its sole and exclusive discretion, permanently reduce by such amount the "Line Cap" under the DIP Facility (*i.e.*, $20 million). *See* DIP Credit Agreement at pages 3, 10-11; Interim Order at ¶ 5.

In connection with the DIP Guaranty, as security for any reimbursement obligations of the Debtors that may arise in connection with any payments made by DuPont to the DIP Lender, DuPont shall receive (i) a security interest in the DIP Collateral

---

[11]   The Permitted Prior Liens, however, do *not* include the security interests held by DuPont under the DuPont Note made in connection with the Prepetition Guaranty.

[12]   The Specified Avoidance Actions refers to any Avoidance Action or other claims, and the proceeds thereof, not to exceed the aggregate amount of $10,000,000, brought against any of the Prepetition Lenders (before the deadline and subject to the conditions set forth in the Interim Order), to the extent such action or claims result in (and limited to the amount of) actual payment by DuPont to or for the benefit of the Prepetition Lenders under the Prepetition Guaranty.

DOCS_DE:159132.1

(the "DuPont Postpetition Liens") and (ii) a super-priority administrative expense claim (the "DuPont Superpriority Claim"), subordinate in each case to the DIP Liens and the Carve Out and excluding Avoidance Actions. Until the repayment of the DIP Loan, DuPont shall have no enforcement rights with respect to the DuPont Postpetition Liens or the DuPont Superpriority Claim. *See* Interim Order at ¶ 5.

Any recovery from any of the Prepetition Lenders on account of the Specified Avoidance Actions (a "Recovery"), to the extent such recovery results in an actual payment under DuPont's Prepetition Guaranty (a "Guaranty Payment"), shall be remitted by the Prepetition Lenders as follows: (i) for any Recovery in connection with a Specified Avoidance Action that is a Chapter 5 avoidance action: (x) if DuPont has not made payment under the DIP Guaranty, directly to the DIP Lender in the amount of the Guaranty Payment, for application to the DIP Obligations; (y) if DuPont has made payment under the DIP Guaranty, directly to DuPont in the amount of the Guaranty Payment, for application to the Reimbursement Obligations, and (z) in either case, to the extent of any such Recovery in excess of the Guaranty Payment, directly to the Debtors; and (ii) for any Recovery in connection with a Specified Avoidance Action that is not a Chapter 5 avoidance action: (x) if DuPont has not made payment under the DIP Guaranty, directly to the DIP Lender for application to the DIP Obligations until the Full Payment of Senior Obligations; and (y) if DuPont has made payment under the DIP Guaranty, directly to DuPont in the amount of the Guaranty Payment, for application to the Reimbursement Obligations, and then to the DIP Lender for application to the DIP Obligations until the Full Payment of Senior Obligations. If at the time a Recovery is remitted to the DIP Lender under the foregoing sub-clauses the Guaranty Payment is in excess of the then outstanding DIP Obligations, any such excess shall be held by the DIP Lender as DIP Collateral pending agreement of the DIP Lender and the Borrower or order of the Court. This clause (b) is entered on a final basis and is not subject to further review or modification at the Final Hearing. *See* Interim Order at ¶ 14(b).

**Adequate Protection:**   DuPont has consented to the Debtors' use of cash collateral on the terms and conditions set forth in the Interim Order. As adequate protection to DuPont[13] for any diminution in the value of its

---

[13]   As noted above, upon entry of the Interim Order and the repayment of obligations under the Prepetition Loan Agreement, the Prepetition Lenders shall release the Prepetition Liens and, thus, will not be entitled to adequate protection in these cases.

interests in the Debtors' property resulting from (i) the DIP Liens, (ii) the Carve Out, (iii) the use, sale or lease of the Debtors' property (including any cash collateral) pursuant to section 363(c) of the Bankruptcy Code, and (iv) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, DuPont will, subject to the terms of the Interim Order: (a) maintain its prepetition liens on the DIP Collateral, junior and subordinate to the Carve Out and the DIP Liens; (b) receive replacement liens on, and security interests in, the DIP Collateral (the "DuPont Replacement Liens"), subject only to the Carve Out, the DIP Liens, the Permitted Prior Liens, and the DuPont Postpetition Liens; and (c) receive an administrative claim with priority over all administrative expense claims and unsecured claims against the Debtors (the "DuPont 507(b) Claim"), subject only to the Carve Out, the DIP Superiority Claim, the DuPont Superpriority Claim, the DuPont Postpetition Liens and the DuPont Superpriority Claim, and excluding Avoidance Actions. *See* DIP Credit Agreement at pages 4 and 5; Interim Order at ¶ 5.

**Carve Out**:

Allowed professional fees and disbursements incurred by professional persons employed by the Debtors or a statutory committee in the chapter 11 cases (including, any expenses of the members of such statutory committee) ("Professional Expenses") may be paid to the extent authorized in the Approved Budget and subject to entry of a customary order of the Bankruptcy Court allowing for the interim payment of such amounts, and subject further to final Bankruptcy Court approval of any such Professional Expenses.

The (i) DIP Liens and the DIP Superpriority Claim, (ii) the DuPont Postpetition Liens and the DuPont Superpriority Claim, (iii) the DuPont Replacement Liens and the DuPont 507(b) Claim and (iv) the DuPont Prepetition Liens, are each subject to a carve out (the "Carve Out"), for the purpose of satisfying, and in an amount not to exceed: (A) the amount of all accrued but unpaid Professional Expenses incurred prior to the Termination Date, not to exceed the amounts set forth in the Approved Budget (including any unused amounts for Professional Expenses that are rolled forward under such Approved Budget), plus (B) $500,000 (allocated $400,000 towards the Borrower's professionals and $100,000 towards a statutory committee's professionals), which amount shall be funded by Debtors into a segregated account under the control of Debtors' counsel (the "Carve Out Account"), plus (C) fees incurred pursuant to 28 U.S.C. § 1930 and fees payable to the clerk of the Bankruptcy Court. The DIP Lender agrees that (i) upon a sale of all or substantially all of the Debtors' assets for cash, the

8

net cash proceeds of such sale shall be first applied to fund the Carve Out Account, and (ii) upon a sale of all or substantially all of the Debtors' assets pursuant to a credit bid with no (or insufficient) net cash proceeds, the DIP Lender shall fund the Carve Out Account as required by this Order; provided that, in no event shall any proceeds or other payments (including but not limited to, settlement payments) resulting from any Challenge that results in (and is limited to the amount of) actual payment under the Prepetition Guaranty be used to fund the Carve Out Account. Amounts on deposit in the Carve Out Account shall be used to satisfy Professional Expenses that are allowed and authorized to be paid as provided herein and by the Bankruptcy Court. *See* DIP Credit Agreement at pages 4-5 and 18-19; Interim Order at ¶ 8.

**Challenge Period:**      Any statutory committee appointed in these chapter 11 cases, and any other party in interest with standing, shall have the right, on or prior to 45 days after the Petition Date, to challenge the claims, liens, priority, and actions or inactions of the Prepetition Lenders. *See* Interim Order at ¶¶ E and 7.

**Financial Covenants:**      In addition to the specific affirmative and negative covenants set forth in the DIP Credit Agreement, the Debtors shall not pay any expenses other than those set forth in the Approved Budget. Moreover, commencing on the third Wednesday to occur on or after the Petition Date, for the two-week period ended the previous Friday, and each Wednesday thereafter, for the three-week period ended the previous Friday, (i) the Borrower's actual "Total Receipts" (labeled as such in the Approved Budget) for the initial two (2) week period and thereafter the three (3) week period then most recently ended shall not be less than 90% of the cumulative projected amounts for such period as set forth in the Approved Budget, (ii) the Borrower's actual Total Disbursements (labeled as such in the Approved Budget) for the initial two (2) week period and thereafter the three (3) week period then most recently ended shall not be more than 110% of the cumulative projected amounts of such disbursements for such period as set forth in the Approved Budget, and (iii) the Borrower's actual Net Cash Flow (labeled as such in the Approved Budget) for the initial two (2) week period and thereafter the three (3) week period then most recently ended shall not be less than 90% of the projected amounts for such period as set forth in the Approved Budget. The foregoing shall be tested each applicable week pursuant to the Variance Report delivered by the Borrower to the Lender on Wednesday of each week for the immediately preceding initial two (2) week period and subsequent three (3) week periods. *See* DIP Credit Agreement at page 8.

DOCS_DE:159132.1

**Defaults and Remedies:** Usual and customary for facilities of this type, as set forth in the DIP Credit Agreement, including but not limited to: (i) the termination or attempted termination by DuPont of the DIP Guaranty; (ii) dismissal or conversion of the chapter 11 cases; (ii) the appointment of a chapter 11 trustee; (iii) the granting of a superpriority claim or lien on the DIP Collateral that is superior to the DIP Lenders' claims or liens granted by the Interim Order or the Final Order; (iv) the appointment of an examiner with enlarged powers to operate the Debtors' business; (v) failure to pay principal, interest, and fees under the DIP Facility; (vi) entry of the Final Order shall not have occurred within thirty (30) days after the Petition Date; (vii) entry of an order granting relief from the automatic stay that to permit a party to proceed against the DIP Collateral or terminate a material agreement; and (viii) the Borrower shall fail to observe or perform when due any covenant, condition or agreement contained in any of the DIP Loan Documents, the Interim Order or the Final Order (collectively, "Events of Default"). *See* DIP Credit Agreement at pages 9-10.

Following the occurrence of an Event of Default, upon five (5) business days' notice to the Borrower, counsel to a statutory committee, and the United States Trustee, the automatic stay shall be modified to allow the DIP Lender to exercise its rights and remedies set forth under the DIP Credit Agreement, subject to the Carve Out. The Debtors shall be entitled to an emergency hearing with the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred. *See* DIP Credit Agreement at page 10; Interim Order at ¶ 17.

**Indemnification:** The Borrower shall indemnify the DIP Lender, its officers, directors, attorneys, advisors, agents, employees, representatives, and affiliates (each an "Indemnitee") against, and hold each Indemnitee harmless from, any claims in connection with (i) the DIP Loan Documents, (ii) the DIP Loan or the use of the proceeds therefrom, (iii) all current or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any governmental authority, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, provided that such indemnity (i) shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee, and (ii) shall only be available to the extent that such losses, claims, damages, liabilities or related expenses asserted against the Indemnitee arise on account of its capacity as a DIP Lender under this Agreement. Upon request by the Lender, the Borrower shall deposit with the

DOCS_DE:159132.1

Lender cash collateral to be maintained under the Lender's control to secure the Borrower's indemnification obligations as set forth herein in such amounts as the Lender may determine in its sole discretion, or, if the Borrower can establish cause by clear and convincing evidence for objecting to the amounts determined by the Lender, in such amount as may be determined by the Bankruptcy Court. *See* DIP Credit Agreement at page 19.

3.      The Debtors further request that the Court (i) set an emergency interim hearing (the "Interim Hearing") on the Motion for the Court to consider entry of the Interim Order, which authorizes the Debtors to (x) borrow under the DIP Facility Documents, on an interim basis, up to an aggregate principal amount not to exceed $14,700,000, (y) satisfy the Debtors' obligations under the Prepetition Loan Agreement, and (z) use cash collateral on an interim basis in accordance with the Approved Budget, (ii) schedule the Final Hearing on the Motion within thirty (30) days of the entry of the Interim Order to consider entry of the Final Order authorizing the balance of the borrowings under the DIP Facility Documents and authorizing the Debtors to use cash collateral in accordance with the Approved Budget on a final basis, and (iii) approve notice procedures with respect thereto.

4.      Notice of the Interim Hearing has been given to (i) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), (ii) counsel to the Prepetition Agent, (iii) counsel to DuPont, (iii) other parties with liens of record on assets of the Debtors as of the Petition Date, and (iv) the Debtors' thirty-five (35) largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions. The Debtors submit that such notice was good and sufficient under the circumstances, and no other or further notice is or shall be required.

## Jurisdiction and Venue

5.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for proceedings on this Motion is proper in this district pursuant to 28 U.S.C. § 1409.

6.      The statutory predicates for the relief requested herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001 and 9014, and Local Rules 2002-1 and 4001-2.

## Background

### A.      Overview of the Debtors

7.      On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or committee has been appointed in the Debtors' chapter 11 cases.

8.      PBSI is a leading manufacturer and provider of bullet, fragmentation and stab resistant apparel and related ballistic accessories, which are used domestically and internationally by military, law enforcement, security and corrections personnel, as well as various government agencies.  Since 1998, PBSI has supplied over 80% of U.S. military soft body armor vest requirements to protect soldiers and law enforcement personnel around the

12

world.  PBSI and its debtor subsidiaries, Point Blank and PACA, are also major suppliers in the domestic law enforcement market with broad brand recognition.

9.     The Debtors manufacture several body armor products and related accessories that are sold worldwide to a variety of domestic and international military and law enforcement customers.  The Debtors' armor products and related accessories protect individuals from bodily injury and death from multiple threats, including bullets, knives, and other sharp instruments and shrapnel fragments.  The Debtors design, build and sell advanced systems that safeguard users from specific threats as well.  The Debtors' products are sold through a variety of means, including sales contracts, a corporate sales force, sales agents and a network of distributors.

10.     The Debtors currently employ 936 full-time employees in hourly, salaried, supervisory, management, sales, administrative and manufacturing positions to perform the functions necessary to effectively and efficiently operate the Debtors' business.  The Debtors maintain two leased manufacturing facilities located in Pompano Beach, Florida (also the company's headquarters) and Jacksboro, Tennessee where their products are manufactured.

11.     The factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in further detail in the *Declaration of Scott Avila in Support of First Day Motions* (the "Avila Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

13

## B.    The Prepetition Loan Agreement

12.    Prior to the Petition Date, PACA and Point Blank (as borrowers) and PBSI (as guarantor), entered into the Prepetition Loan Agreement with the Prepetition Lenders pursuant to which the Prepetition Lenders extended credit to the Borrowers on the terms set forth therein.

13.    Pursuant to the Prepetition Loan Agreement[14] and associated documentation, PACA and Point Blank borrowed certain funds under (a) a revolving loan commitment (the "Revolving Loan"),[15] and (b) a term loan commitment (the "Term Loan"). In addition, pursuant to the Prepetition Loan Agreement, certain letters of credit (hereinafter, "Letters of Credit") were issued on behalf of the Debtors for the benefit of various third parties (*i.e.*, the Debtor's former workers' compensation insurer, the lessor of one of its leased premises, and a utility provider).

14.    As noted above, as of the Petition Date, approximately $10,526,000 remains outstanding under the Prepetition Loan Agreement, comprised of $10 million in principal obligations outstanding under the Term Loan and outstanding Letter of Credit Obligations (as defined in the Prepetition Loan Agreement) of approximately $526,000, plus additional amounts on account of accrued and unpaid interest, fees, costs and charges. The

---

[14]    The Prepetition Loan Agreement is an amendment and restatement in its entirety of that certain *Loan and Security Agreement* dated as of September 24, 2001.

[15]    As of the Petition Date, there are no outstanding amounts due under the Revolving Loan. On February 23, 2010, the Agent notified the Borrowers and the Guarantor that all revolving loan commitments under the Prepetition Loan Agreement were terminated.

14

Debtors' obligation to reimburse the Prepetition Agent on account of a draw under each of the outstanding letters of credit has, however, been fully cash collateralized.

15. Subject to certain validly perfected prior liens (*i.e.*, Permitted Prior Liens), the obligations under the Prepetition Loan Agreement are allegedly secured by a first priority, senior lien on substantially all personal property of the Borrowers. In addition, the guaranty obligations of the Parent are also secured by substantially all of its assets.

16. Pursuant to the Prepetition Guaranty, discussed in greater detail below, DuPont has guaranteed the Borrowers' obligations under the Term Loan made under the Prepetition Loan Agreement.

## C. The DuPont Note

17. Prior to the Petition Date, DuPont issued the Prepetition Guaranty under which it agreed to guarantee the Debtors' obligations to the Prepetition Agent under the Term Loan made pursuant to the Prepetition Loan Agreement in an amount not to exceed $10 million, plus the Prepetition Agent's reasonable collection and enforcement costs and accrued interest under such loan.

18. In connection with the Prepetition Guaranty, the Debtors issued the DuPont Note payable to DuPont in the amount of $10 million (or such lesser amount as DuPont may have paid to the Prepetition Agent under the Prepetition Guaranty).

19. As security for the contingent obligations of the Debtors under the DuPont Note, the Debtors granted to DuPont a junior, subordinated security interest in substantially the

same assets and property conveyed to the Prepetition Agent as security for the Debtors'
obligations under the Prepetition Loan Agreement.

**D.    Reasons Leading to the Necessity for a Chapter 11 Filing**

20.    As described more fully in the Avila Declaration, in late 2009, the Debtors
were awarded a significant contract with the U.S. Army. Typically, the testing process for the
Debtors' products would take approximately one week, after which the Debtors would receive a
formal "letter of approval" allowing the Debtors to ship the order and record the ensuing account
receivable. The eligible accounts receivables would then provide a basis to obtain an advance of
funds under the Prepetition Loan Agreement.

21.    In early 2010, however, the Army elected to conduct testing at its
Aberdeen testing facility, which significantly increased the testing period from one week to up to
four weeks. This increased testing time delayed the receipt of approvals for the manufacturing
lots being tested, thereby preventing the Debtors from obtaining timely loan advances against the
eligible receivables on account of the Army's orders. The extended testing period, combined
with the Army's contract payment terms, resulted in an extended cash cycle of up to 10 weeks
from the date the raw materials were first received by the Debtors to the eventual date of
payment. This extended cash cycle, in conjunction with other factors, placed a severe strain on
the Debtors' working capital.

22.    Although the Army attempted to alleviate the cash strain through early
performance billing, additional testing resulting from quality issues caused a further delay in
shipments and payments. Moreover, in January 2010, the Prepetition Agent reduced the amount

16

that it would advance on accounts receivable from 85% to 75%, and on inventory from 29.5% to

20%. Additionally, availability blocks on borrowing under the Prepetition Loan Agreement

remained in place as well as scheduled credit line reductions.

23.     In January 2010, the Prepetition Agent renewed its request that the

Debtors find alternative financing and requested that the Debtors engage a consultant for the

purpose of reviewing and analyzing the Debtors' cash flows.  The Debtors, accordingly, engaged

CRG Partners Group, LLC ("CRG"), to perform this review.  On February 23, 2010, the

Prepetition Agent declared a default under the Prepetition Loan Agreement at which time

collections and/or funds from the Debtors' accounts were used to reduce the revolving credit

balance to zero.  The Prepetition Agent further advised the Debtors that any further collections

received in the Debtors' deposit accounts would be applied as a reduction to the outstanding

balance of the Term Loan.  These actions taken by the Prepetition Agent effectively eliminated

the Debtors' ability to obtain access to the working capital necessary to operate their businesses.

24.     With the consent of DuPont, the Prepetition Agent agreed to permit the

Debtors' use of cash collateral through the Petition Date.  Due to the continued deterioration in

the Debtors' cash flow, however, and to help ensure that day-to-day operations can continue, that

administrative expenses in these chapter 11 cases are paid, and that an orderly process can be

implemented to create an ongoing path for the Debtors and their employees, the Debtors

determined that it was in the best interest of the Debtors, their estates, and their creditors to

commence the chapter 11 cases.

## Relief Requested

25.     The Debtors require financing and authority to use cash collateral to fund, among other things, the Debtors' cash requirements for working capital and general corporate needs. The Debtors are unable to obtain adequate unsecured credit allowable under section 503 of the Bankruptcy Code as an administrative expense or other financing under sections 364(c) or 364(d) of the Bankruptcy Code on equal or more favorable terms than those set forth in the DIP Credit Agreement. After considering all alternatives, the Debtors have concluded in the exercise of their prudent business judgment that the loan facility provided under the DIP Credit Agreement represents the best working capital financing available to them. Hence, the Debtors request approval of the DIP Credit Agreement and authority to use cash collateral to maintain their going concern operations and maximize the value of their estates.

## A.     Efforts to Obtain DIP Financing

26.     Prior to the Petition Date, the Debtors and their advisors canvassed approximately twenty sources of prospective postpetition financing, including financing from the Prepetition Lenders and various other third parties. In particular, CRG prepared a comprehensive presentation seeking financing proposals. The presentation was distributed to ten sophisticated providers of debtor-in-possession financing.

27.     The Prepetition Lenders indicated that they were not willing to extend further credit to the Debtors and insisted on full repayment of all outstanding obligations under the Prepetition Loan Agreement. The Debtors received expressions of interest from various other interested parties and detailed term sheets from four potential lenders. The Debtors then

18

negotiated expeditiously with each of these parties to obtain the most favorable lending terms for the benefit of the estates. Following the Debtors' evaluation and comparison of the various financing proposals, the Debtors selected the DIP Lender to provide credit under the terms of the DIP Credit Agreement. On March 26, 2010, the Debtors executed the DIP Engagement Letter and then negotiated the definitive documentation set forth in the DIP Credit Agreement.

28. In considering their options, the Debtors recognized that the obligations owed to the Prepetition Lenders are secured by substantially all of the Debtors' property and that such liens would either have to be primed in order to obtain postpetition financing or the Debtors would need to locate a lender willing to extend credit that would be junior to the liens of the Prepetition Lenders. Borrowing from another postpetition lender that required security senior to that of the Prepetition Lenders likely could only be accomplished through an extended, contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code had been satisfied. In light of the risks involved, the fees and expenses that would be incurred, and economics offered by the proposed DIP Lender, the Debtors determined that the proposed DIP Credit Agreement, and the repayment in full of the amounts outstanding under the Prepetition Loan Agreement, is the best financing available under the circumstances.

29. Furthermore, the Debtors, in conjunction with their advisors, determined that the financing terms and pricing set forth in the DIP Credit Agreement are consistent with, if not superior to, recent comparable DIP financing arrangements. The Debtors believe that the proposed terms of the DIP Credit Agreement, hence, are consistent with current capital market conditions for financing of this type.

30.     The Debtors negotiated the proposed DIP Credit Agreement with the DIP

Lender at arms' length and in accordance with their sound business judgment. In light of the

connections between the DIP Lender and the Debtors, the Debtors' chief restructuring officer

(Mr. Avila), in conjunction with a subcommittee of the board consisting only of the Debtors'

independent directors, directly handled the evaluation and negotiation of the various DIP

financing term sheets and the ensuing DIP Credit Agreement. As set forth in the Avila

Declaration, the DIP Credit Agreement has been entered into by the Debtors and the DIP Lender

without collusion, as a result of vigorous, well-advocated negotiation and with each of the parties

represented by independent counsel and advisors.

31.     Last, the Debtors' budget has been carefully crafted to provide the Debtors

with the minimum liquidity required to prudently operate their business and meet their

anticipated post-petition operating and non-recurring expenses. The amounts that the Debtors

seek to borrow under the Interim Order reflect the payment of expenses that, in the Debtors'

business judgment, are necessary to avoid immediate and irreparable harm to the estates pending

the Final Hearing.

**B.      Implementation of DIP Credit Agreement**

32.     The Debtors and the DIP Lender engaged in extensive, arm's-length

negotiations with respect to the terms and conditions of the proposed DIP Credit Agreement.

The DIP Credit Agreement permits the Debtors to draw immediately up to $14,700,000 after

entry of the Interim Order and pending entry of the Final Order. In addition to repaying the

outstanding obligations under the Prepetition Loan Agreement, this amount is anticipated to

permit the Debtors to meet their administrative obligations during the initial stages of these chapter 11 cases.

33.     The Debtors have provided a budget to the DIP Lender, setting forth in reasonable detail all projected receipts and disbursements of the Debtors on a weekly basis for the thirteen (13) week period following the Petition Date, which budget has been approved in form and substance by the DIP Lender (as amended from time to time, the "Approved Budget"). A summary of the Approved Budget is attached hereto as **Exhibit C**.  In addition, the Debtors will periodically deliver an updated thirteen-week budget in form and substance reasonably acceptable to the DIP Lender.  The Debtors believe that the Approved Budget is achievable and will enable them to operate their business without the accrual of unpaid administrative expenses.

## C.     Liens and Claims

34.     Pursuant to the Interim Order and, upon entry of the Final Order, the loans and obligations under the proposed DIP Credit Agreement will:

a)     Pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a fully perfected first priority lien on all DIP Collateral that is not otherwise subject to a lien and all proceeds thereof (excluding, however, any Avoidance Actions), subject to the Carve Out;

b)     Pursuant to section 364(d)(1)(A), be secured by a fully perfected first priority, senior priming lien on all DIP Collateral that is subject to the existing liens securing the obligations of the Debtors to the Prepetition Lenders and DuPont and all proceeds thereof, subject to the Permitted Prior Liens and the Carve Out; and

c)     Pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by fully perfected second priority liens on all DIP Collateral that is subject to the existing Permitted Prior Liens and all proceeds thereof, subject to the Carve Out.

21

35.     Furthermore, pursuant to the Interim Order and, upon entry of the Final Order, the loans and obligations under the proposed DIP Credit Agreement will, pursuant to section 364(c)(1) of the Bankruptcy Code, receive and be entitled to a superpriority administrative expense claim over all costs and expenses of the kinds specified in, or ordered pursuant to sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provision under the Bankruptcy Code, subject to the Carve Out and excluding any Avoidance Actions.

## D.     DIP Guaranty

36.     One condition precedent, among others, to the funding of the DIP Loans is the receipt by the DIP Lender of a new, limited guaranty from DuPont of the last $10 million borrowed under the DIP Facility (the "DIP Guaranty"). DuPont is willing to furnish the DIP Guaranty but only if its aggregate potential liability under the Prepetition Guaranty and the DIP Guaranty does not exceed the principal sum of $10,000,000 (plus interest and collections costs).

37.     The DIP Lender, DuPont and the Prepetition Lenders have agreed, accordingly, that nothing contained in the DIP Loan Documents shall modify the terms and conditions of the Prepetition Guaranty. Unless and until terminated, the Prepetition Guaranty shall remain in full force and effect according to its terms. Any payments actually made by DuPont under the Prepetition Guaranty, however, shall permanently reduce the liability of DuPont under the DIP Guaranty. The DIP Lender, in turn, may then permanently reduce (by a corresponding amount) the "Line Cap" under the DIP Facility (i.e., $20 million).

22

38. In connection with the DIP Guaranty, as security for any reimbursement obligations that may arise in connection with any payments to the DIP Lender, DuPont shall receive the DuPont Postpetition Liens (in the DIP Collateral) and the DuPont Superpriority Claim (together, the "DuPont Protections), subordinate in each case to the DIP Liens and the Carve Out and excluding Avoidance Actions. Until the full repayment of the DIP Loan, however, DuPont shall have no enforcement rights with respect to the DuPont Protections. The DuPont Protections are in addition to, and not in lieu of, DuPont's subrogation rights as a result of payments made under the DIP Guaranty, all of which rights of subrogation, subject to the terms of the DIP Guaranty, are preserved.

**E.     Provisions To Be Highlighted Pursuant
To The Bankruptcy Rules And Local Rule 4001-2**

39. The Debtors believe that the following provisions of the proposed DIP Credit Agreement must be highlighted pursuant to Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2:

a)   **Repayment of Prepetition Secured Debt**. The DIP Loan provides for the repayment in full of all loans and all of the Debtors' other obligations under the Prepetition Loan Agreement (with the exception of (i) the Debtors' obligations relating to the Letters of Credit, as to which the Prepetition Agent shall hold, and be granted a security interest in, a deposit account with $551,936.70 of cash collateral, representing 105% of the face amount of the Letters of Credit, and (ii) the Debtors' obligations relating to costs and expenses under the Prepetition Loan Agreement, as to which the Prepetition Agent shall hold, and be granted a security interest in, a deposit account with $250,000 of cash collateral. *See* DIP Credit Agreement at page 7; Interim Order at ¶ 2(c).

b) **Binding Estates to Validity, Perfection, or Amount of Prepetition Secured Debt**. The Debtors will waive any and all claims arising from or related to the Prepetition Lenders' claims, liens, priority, actions or inactions, including without limitation, waiving any right to challenge the validity, perfection, priority, extent or enforceability of obligations under the Prepetition Loan Agreement or the liens on or security interests in the assets of the Debtors securing the obligations under the Prepetition Loan Agreement, including without limitation, seeking to equitably subordinate or avoid the liens securing the obligations under the Prepetition Loan Agreement; *provided, however*, the foregoing waivers will be subject to the rights of a statutory committee appointed in these chapter 11 cases, or of any other party in interest with requisite standing, on or prior to 45 days after the Petition Date, to challenge the claims, liens, priority, and actions or inactions of the Prepetition Lenders. *See* Interim Order at ¶ E and 6. The Debtors believe that a reduced 45-day investigation period is necessary and appropriate in these cases. First, the amounts outstanding under the Prepetition Loan Agreement (approximately $10.5 million) and the related security interests in favor of the Prepetition Agent are relatively modest and straightforward and can be quickly investigated. (Aside from the Prepetition Agent and DuPont, it appears that only one other party has filed a lien of record.) Second, the Debtors' obligations under the Prepetition Loan Agreement are guaranteed by DuPont pursuant to the Prepetition Guaranty. As a condition of the DIP Facility, however, the DIP Lender has required that DuPont also guarantee a portion of the DIP Loan. The Prepetition Agent, moreover, has required the establishment of a cash reserve to satisfy potential future expenses. The reduced 45-day period will enable the Debtors to timely recover reserved funds and obtain the release of the Prepetition Guaranty.

c) **Waiver of Rights Under Section 506(c)**. The proposed waiver of the estates' rights under section 506(c) of the Bankruptcy Code will be effective only <u>after</u> notice to parties in interest and entry of the Final Order granting such relief. *See* Interim Order at ¶ 10.

d) **Limitations Regarding Proposed Plan of Reorganization**. The DIP Credit Agreement and Interim Order provide that the Debtors shall not propose or support any plan of reorganization or entry of any confirmation order that is not conditioned upon the indefeasible payment in full in cash on or prior to the effective date of such plan of all of the Debtors' obligations under the DIP Credit

Agreement. *See* DIP Credit Agreement at page 10; Interim Order at ¶ 19(i).

e) **Limitations Regarding Alternative Financing**. The DIP Credit Agreement and Interim Order provide that the Debtors shall not in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Lender under this Interim Order and the Final Order, by offering a subsequent lender or a party in interest a superior or pari passu lien or claim pursuant to Section 364(d) of the Bankruptcy Code or otherwise. *See* DIP Credit Agreement at pages 8-9 and 10; Interim·Order at ¶ E(v)

f) **Modification of the Automatic Stay**. The DIP Credit Agreement and Interim Order provide that the automatic stay under section 362(a) of the Bankruptcy Code will be modified (a) upon an Event of Default under and according to the terms and conditions of the DIP Credit Agreement, and (b) to permit the attachment and perfection of any DIP Liens. *See* DIP Credit Agreement at page 10; Interim Order at ¶ 17.

g) **Indemnification**. The DIP Credit Agreement provides that the Debtors will jointly and severally indemnify the DIP Lender (strictly in its capacity as such) with respect to actions arising from the DIP Credit Agreement, excluding gross negligence and willful misconduct. *See* DIP Credit Agreement at pages 19 and 20.

h) **Carve Out**. The Carve Out for Professional Fees and Expenses (as defined in the DIP Credit Agreement) is for an amount not to exceed the sum of (x) amounts accrued but unpaid in the cases as of the Termination Date that are consistent with the Approved Budget and allowed by the Bankruptcy Court, plus (y) $500,000 (allocated $400,000 towards the Borrower's professionals and $100,000 towards the Creditors' Committee's professionals). The Carve Out does not exclude professionals retained by a creditors' committee but (like the Approved Budget) makes an allocation based on the respective anticipated tasks and responsibilities of the Debtors and such committee. Interim Order at ¶ 8.

i) **Lien on Specified Avoidance Actions, Other Avoidance Actions**. Under the Interim Order, the DIP Liens shall attach to the (i) Specified Avoidance Actions (*i.e.*, any action and the proceeds thereof, not to exceed the aggregate amount of

$10,000,000, brought against any of the Prepetition Lenders, to the extent such action results in an actual payment by DuPont under the Prepetition Guaranty), (ii) proceeds of actions under section 549 of the Bankruptcy Code, and (iii) proceeds of any Avoidance Actions to the extent that any Carve Out funded such action or resulted in the receipt of such proceeds (but only to the extent necessary to reimburse the DIP Lender for the amount of the Carve Out used for such purposes). The lien on the Specified Avoidance Actions is necessary and appropriate in light of the "linkage" between the Prepetition Guaranty issued by DuPont in favor of the Prepetition Agent and the new DIP Guaranty issued by DuPont in favor of the DIP Lender. DuPont is willing to issue the DIP Guaranty only if its aggregate potential liability under the Prepetition Guaranty and the DIP Guaranty does not exceed the principal sum of $10,000,000 (plus interest and collections costs). Accordingly, if and to the extent a Specified Avoidance Action results in a recovery from the Prepetition Lenders and subsequently triggers an actual payment under the Prepetition Guaranty, DuPont's exposure under the DIP Guaranty will be correspondingly reduced. The DIP Lender may then, in its discretion, correspondingly reduce the commitment amount under the DIP Loan and will be entitled to apply the proceeds of the Specified Avoidance Action in reduction of the amounts borrowed under the DIP Loan. Inasmuch as the borrowings under the DIP Loan are being used to repay the Term Loan under the Prepetition Loan Agreement, the DIP Lender should receive the proceeds of any recovery in satisfaction of such borrowings. The DIP Lien on the Specified Avoidance Actions, hence, ensures that the DIP Lender will either enjoy the full benefit of the DIP Guaranty or, if such guaranty is reduced, will receive collateral to correspondingly reduce its exposure under the DIP Loan. These application of collateral provisions under paragraph 14(b) of the Interim Order are to be entered on a final basis not subject to further review or modification at the Final Hearing. DIP Credit Agreement at pages 3, 4-5; Interim Order at ¶ 2(e), 14(b).

## F. **Events of Default**

40. The DIP Credit Agreement contains customary events of default for loan agreements of this type. They include, but are not limited to, the following:

a) entry of an order dismissing any of the Debtors' chapter 11 cases or converting any of the Debtors' chapter 11 cases to a chapter 7 case;

b) entry of an order appointing a chapter 11 trustee in any of the Debtors' chapter 11 cases;

c) entry of an order granting any other party a super-priority claim or lien equal or superior to those granted to the DIP Lender;

d) entry of an order staying, reversing, vacating or otherwise modifying, in each case in a manner adverse to the DIP Lender (in the judgment of the DIP Lender) and without the prior written consent of the DIP Lender, the DIP Loan, the Interim Order or the Final Order approving the DIP Loan;

e) entry of an order in any of the Debtors' chapter 11 cases appointing an examiner having enlarged powers to operate or manage the financial affairs of the Borrower or any of the Debtors;

f) entry of an order in any of the Debtors' chapter 11 cases under Sections 506(c) or 552(b) of the Bankruptcy Code against the DIP Lender regarding the DIP Loan adverse to its rights and remedies under the DIP Loan or any Bankruptcy Court order;

g) failure of Debtors to pay principal, interest, fees, or other amounts owing in connection with the DIP Loan when due;

h) the Debtors engaging in or supporting any challenge to the validity, perfection, priority, extent or enforceability of the DIP Loan or the liens on or security interests in the assets of the Debtors securing the DIP Loan;

i) entry of the Final Order shall not have occurred within 30 days after the entry of the Interim Order;

j) entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any DIP Collateral;

k) the filing of a motion by the Borrower seeking approval of a disclosure statement and a plan of reorganization, or the entry of an order confirming a plan of reorganization, that does not require

repayment in full in cash of all Obligations under the DIP Loan on the effective date of such plan; and

l) the termination or attempted termination by DuPont of the DIP Guaranty.

## G. Waivers of Rights

41. In addition to the aforementioned limitations on the right to challenge the claims and liens of the Prepetition Lenders, the Debtors will waive any and all claims arising from or related to the Prepetition Lenders' claims, liens, priority, actions or inactions, including without limitation, waiving any right to challenge the validity, perfection, priority, extent or enforceability of the Prepetition Loan Agreement or the liens on or security interests in the assets of the Debtors securing the Prepetition Loan Agreement, including without limitation seeking to equitably subordinate or avoid the liens securing the Prepetition Loan Agreement; *provided*, *however*, the foregoing waivers will be subject to the right of the statutory committee of unsecured creditors (or other party in interest) to investigate and bring any such claims against, and, with respect to the claims held by, the Prepetition Lenders within 45 days after the Petition Date.

## H. Indemnification

42. The Debtors shall jointly and severally indemnify and hold harmless, and provide limitations of liability to the DIP Lender (strictly in its capacity as such), each of its affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys, and representatives in connection with the DIP Loan, subject to customary limitations for gross negligence and willful misconduct. Upon request by the Lender, the Borrower shall deposit with

the Lender cash collateral to be maintained under the Lender's control to secure the Borrower's indemnification obligations as set forth herein in such amounts as the Lender may determine in its sole discretion, or, if the Borrower can establish cause by clear and convincing evidence for objecting to the amounts determined by the Lender, in such amount as may be determined by the Bankruptcy Court.

## I. Use of Cash Collateral and Proposed Adequate Protection

43.     The proceeds of collateral and the cash and other amounts on deposit or maintained in the Debtors' bank accounts constitute the cash collateral of DuPont,[16] subject to its security interests (to the extent valid and perfected), in accordance with section 552(b) of the Bankruptcy Code (collectively, the "Cash Collateral").

44.     To the extent its interests in property of the Debtors' estates are secured by valid and perfected liens as of the Petition Date, DuPont is also entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of its interests in such collateral under the DuPont Note to the extent there is any diminution in value of such collateral from and after the Petition Date.

45.     Upon entry of the Interim Order, proceeds of the DIP Loan will be used to satisfy and repay the Debtors' obligations under the Prepetition Loan Agreement. Hence, the Debtors are not required to further adequately protect the interests of the Prepetition Lenders in property of the Debtors' estates. DuPont, moreover, has consented to the Debtors' use of Cash

---

[16]     Again, as noted, following the repayment of the Debtors' obligations under the Prepetition Loan Agreement, the Prepetition Lenders will release their security interests against the Debtors and, accordingly, will not be entitled to adequate protection.

29

Collateral in the ordinary course of business in accordance with the Approved Budget, subject to the approval and entry of the Interim Order and the adequate protection liens and claims discussed below.

46.     As adequate protection for any diminution in value, DuPont will: (i) maintain its liens on the DIP Collateral, junior and subordinate to the Carve Out and the DIP Liens; (ii) be granted replacement liens on, and security interests in, the DIP Collateral, subject only to the Carve Out and the liens on, and security interests in, the DIP Collateral granted to the DIP Lender under the DIP Loan and the Orders, as the case may be, and any valid and perfected preexisting Permitted Prior Liens; and (iii) be granted an administrative claim under section 507(b) of the Bankruptcy Code with priority over all administrative expense claims and unsecured claims against the Debtors, subject only to the Carve Out and to the DIP Superpriority Claim granted to the DIP Lender.

**J.      Carve Out**

47.     The professional fees and expenses incurred by professional persons employed by the Debtors or a statutory committee in the chapter 11 cases (including, any expenses of the members of such statutory committee) ("Professional Expenses") may be paid to the extent authorized in the Approved Budget and subject to entry of a customary order of the Bankruptcy Court allowing for the interim payment of such amounts, and subject further to final Bankruptcy Court approval of any such Professional Expenses.

48.     The DIP Liens and the DIP Superpriority Claim (and the post-petition liens, super-priority claims and adequate protection liens and claims granted to DuPont) will be

30

subject to a carve out (the "Carve Out"), for the purpose of, and in an amount not to exceed: (A) accrued but unpaid Professional Expenses incurred prior to the Termination Date under the DIP Credit Agreement, *provided*, such portion of the Carve Out shall not exceed the amounts set forth in the Approved Budget for such items through such date (including any unused amounts for Professional Expenses that are rolled forward under such Approved Budget), plus (B) $500,000 for the payment of Professional Expenses arising the Termination Date under the DIP Credit Agreement (allocated $400,000 towards the Borrower's professionals and $100,000 towards the Creditors' Committee's professionals), plus (C) fees incurred pursuant to 28 U.S.C. § 1930 and fees payable to the clerk of the Bankruptcy Court, to the extent such fees were incurred prior to the Termination Date.

       49.     The Interim Order includes provisions providing that the Borrower will fund a segregated account -- the Carve Out Account -- in an amount not to exceed $500,000. The DIP Lender has also agreed that (i) upon a sale of all or substantially all of the Debtors' assets for cash, the net cash proceeds of such sale shall be first applied to fund the Carve Out Account required by this Order, and (ii) upon a sale of all or substantially all of the Debtors' assets pursuant to a credit bid with no (or insufficient) net cash proceeds, the DIP Lender shall fund the Carve Out Account; provided that, in no event shall any proceeds or other payments (including but not limited to, settlement payments) resulting from any Challenge that results in (and is limited to the amount of) actual payment under the Pre-Petition DuPont Guaranty be used to fund the Carve-Out Account. Amounts on deposit in the Carve Out Account shall be used to

satisfy Professional Expenses that are allowed and authorized to be paid as provided herein and by the Bankruptcy Court.

**The DIP Credit Agreement and**
**Use of Cash Collateral Should Be Authorized**

50.     Approval of the DIP Credit Agreement and use of Cash Collateral will provide the Debtors with immediate and ongoing access to the funds necessary to pay their current and ongoing operating expenses, including postpetition wages and salaries and utility and vendor costs.  Unless these expenditures are made, the Debtors will be forced to cease operations, which would (i) result in irreparable harm to their business, (ii) destroy going concern value, and (iii) deny the Debtors the opportunity to reorganize and maximize value.

51.     Because the Debtors' available Cash Collateral is insufficient to fund such expenditures, the borrowing under the DIP Credit Agreement is critically necessary to preserve and enhance the value of the Debtors' estates for the benefit of all stakeholders in these chapter 11 cases.  In addition, the availability under the DIP Credit Agreement will provide confidence to the Debtors' vendors and will be viewed favorably by the Debtors' employees, thereby aiding in the administration of the Cases and promoting a successful reorganization.  Accordingly, the timely approval of the relief requested herein is imperative and should be approved.

A.     **Debtor-in-Possession Financing**

(i)     Approval Under Section 364(c) of the Bankruptcy Code

52.     Pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain

32

unsecured credit and the borrowing is in the best interests of the estates. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties.").

   53. Section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
>   (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
>   (2) secured by a lien on property of the estates that is not otherwise subject to a lien; or
>
>   (3) secured by a junior lien on property of the estates that is subject to a lien.

11 U.S.C. § 364(c).

   54. In satisfying the standards of section 364(c) of the Bankruptcy Code, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available of the type set forth in sections 364(a) and (b) of the Bankruptcy Code. *See, e.g., Bray v. Shenandoah Federal Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated by good-faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every

possible lender before concluding that such credit is unavailable"); *Ames Dept. Stores*, 115 B.R. at 40 (finding that debtor demonstrated the unavailability of unsecured financing where debtor approached several lending institutions).

55.     Instead, the debtor's efforts are to be considered on a case by case basis, particularly "[g]iven the 'time is of the essence' nature of this type of financing." *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). In *In re Sky Valley, Inc.*, 100 B.R. 107, 112-13 (Bankr. N.D. Ga. 1988), the Court stated that "it would be unrealistic and unnecessary to require Debtors to conduct such an exhaustive search for financing" where the business suffered from financial stress, had little or no unencumbered property, and the primary property was subject to numerous liens, and thus the Debtors' approach of only four lenders was sufficient under such circumstances. *See also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (section 364(d)(1)(A) satisfied where two banks refused to provide unsecured credit to debtor); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D. N.Y. 1992) (element satisfied where "specialist in commercial lending practices ... explained that most banks lend money only in return for a senior secured position. The debtor cannot obtain financing secured by a lien on unencumbered property ... because there is no property in the estate which is not already subject to a lien.").

56.     The Debtors satisfy the requirements of section 364(c) of the Bankruptcy Code because the Debtors are unable to obtain credit otherwise, relevant secured creditors are adequately protected, and the proposed financing is in the best interests of the estates.

34

57. The Debtors believe that any reorganization of their business is not possible without access to sufficient working capital and liquidity through the incurrence of postpetition financing under the DIP Credit Agreement and the use of Cash Collateral. The use of Cash Collateral alone is insufficient to meet the Debtors' postpetition liquidity needs. The Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of the Debtors' estates under section 364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the DIP Lender on terms more favorable than the terms of the DIP Credit Agreement. The only source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Credit Agreement.

58. The Debtors believe that their efforts to obtain credit except as provided under the DIP Credit Agreement have been impacted by the fact that all or substantially all of the Debtors' assets are encumbered. Prior to the commencement of these chapter 11 cases, the Debtors solicited potential debtor in possession financing from several sources. Such financing proposals would, however, have entailed the "priming" of the Prepetition Lenders' "blanket" liens, which the Debtors concluded would likely necessitate the consent of such lenders.

59. Although the Debtors requested that the Prepetition Lenders entertain certain continued post-petition financing, the Prepetition Lenders were not willing to extend any further financing except on the terms and conditions offered by the DIP Lender under

the DIP Credit Agreement (namely, repayment in full of the outstanding amounts under the Prepetition Loan Agreement). After considering all of their alternatives, the Debtors have concluded, in the exercise of their business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of the DIP Credit Agreement represents the best financing presently available to the Debtors. Moreover, the Debtors and their advisors have further concluded, in the exercise of their business judgment, that the loan terms and pricing provided under the DIP Credit Agreement are within the range of comparable financing arrangements recently effectuated in other chapter 11 cases.

60.    The Debtors further submit that the other terms and conditions of the DIP Credit Agreement are the best possible under the circumstances of these cases, and were negotiated in good faith and at arm's-length with all parties represented by experienced counsel. Accordingly, the DIP Lender should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Credit Agreement are later modified, vacated, or terminated by subsequent order of this or any other Court, the DIP Lender will be fully protected with respect to any amounts previously disbursed.

61.    Finally, the repayment of the amounts outstanding under the Prepetition Loan Agreement that is contemplated by the DIP Credit Agreement is appropriate under the circumstances and will not prejudice the Debtors or their estates.

62.    The Debtors believe that repayment of the Prepetition Loan Agreement is permissible and appropriate and should be approved by the Court. First, the validity, enforceability and priority of the liens granted by the Debtors under the Prepetition Loan

36

Agreement are subject to the "challenge" rights of a statutory committee. Hence, insofar as the satisfaction of the Prepetition Loan Agreement is premised upon the validity of the blanket liens granted by the Debtors under the Prepetition Loan Agreement, a committee will have an opportunity to examine the propriety of such repayment. Second, the Debtors believe that the current amount outstanding under the Prepetition Loan Agreement (*i.e.*, approximately $10.5 million) is less than the value of the collateral securing the claims under the Prepetition Loan Agreement. Courts have permitted debtors to use postpetition financing to pay prepetition claims of a lender when the loan cannot be obtained on any other basis and the claims of the prepetition lender are fully secured. *In re Beker Indus. Corp.*, 58 B.R. 725, 742 (Bankr. S.D.N.Y. 1986) (recognizing that unsecured creditors do not object to cross collateralization when the lender's prepetition claim is fully secured by a perfected first priority lien). Similarly, the proposed repayment does not affect the priority of payment since the collateral cannot be primed to pay administrative claims. *Hartford Underwriters Ins. Co. v. Union Planters Bankr, N.A.*, 530 U.S. 1, 4-5 (2000) (recognizing that an administrative expense claim allowable under section 503(b) of the Bankruptcy Code may not prime the claims held by a creditor having a perfected, first priority lien against all of the debtor's assets).

   63. Hence, there should be no prejudice from the proposed repayment to other creditors of these estates because the Prepetition Lenders already assert security interests in the assets that the Debtors propose to pledge to the DIP Lender providing the funds to satisfy the Prepetition Loan Agreement under the DIP Credit Agreement.

37

(ii)     Approval Under Section 364(d) of the Bankruptcy Code

64.     When a debtor is not able to obtain financing pursuant to the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain such financing that is secured by a "priming lien" that is senior or equal to existing liens against property of the estate. 11 U.S.C. § 364(d). Section 364(d)(1) of the Bankruptcy Code governs financing that is secured by a priming lien and provides that a court may authorize a debtor to obtain such debt provided that (i) the debtor is not able to obtain credit otherwise and (ii) the lien being primed is adequately protected.

65.     In the context of section 364(d), collateral only requires adequate protection to the extent that a priming lien will result in a decrease in the value of such entity's interest in the subject property. *See In re 495 Central Park Ave. Corp.*, 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization."); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) (quoting *In re Sharon Steel Corp.*, 159 B.R. 165 (Bankr. W.D. Pa. 1993) ("The purpose of providing 'adequate protection' is to insure that a secured creditor receives in value essentially what he bargained for."); *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996) (citing *In re 495 Central Park Ave. Corp.*). What constitutes adequate protection is decided on a case-by-case basis. *See In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Becker Indus. Corp.*, 58 B.R. 725, 236 (Bankr. S.D.N.Y. 1986).

38

66. The Debtors satisfy the standard under section 364(d) of the Bankruptcy Code. Here, the Prepetition Lenders are being repaid from the proceeds of the DIP Loan and, accordingly, have agreed to release their liens upon the entry of the Interim Order. Moreover, DuPont has not only consented to the relief requested herein but its interests in the DIP Collateral is protected by the adequate protection relief proposed herein. As adequate protection, DuPont will (a) maintain liens on the DIP Collateral, junior and subordinate to the Carve Out and the liens securing the DIP Loan; (b) be granted replacement liens on, and security interests in, the DIP Collateral, subject only to the Carve Out and the liens on, and security interests in, the DIP Collateral granted to the DIP Lender under the DIP Loan and the Orders, as the case may be, and any valid and perfected preexisting liens held by third parties; and (c) will be granted an administrative claim with priority over all administrative expense claims and unsecured claims against the Debtors, subject only to the Carve Out and to the superpriority claims granted to the DIP Lender under the DIP Credit Agreement.

67. In light of the foregoing, the DIP Credit Agreement is vital to maximizing the value of the Debtors' estates. Consequently, without access to the DIP Loan and the continued use of Cash Collateral, the Debtors and their estates would suffer immediate and irreparable harm because they could not continue to operate.

B. **Use of Cash Collateral**

68. The Debtors' use of property of the estates is governed by section 363 of the Bankruptcy Code. Section 363(c)(1) provides, in pertinent part, that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders

39

> otherwise, the trustee [or debtor-in-possession] may enter into
> transactions, including the sale or lease of property of the estates,
> in the ordinary course of business, without notice or hearing, and
> may use property of the estates in the ordinary course of business
> without notice or hearing.

11 U.S.C. § 363(c)(1).

69.     The Bankruptcy Code establishes a special requirement, however,

regarding the debtor in possession's use of "cash collateral," defined as "cash, negotiable

instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever

acquired in which the estates and an entity other than the estates have an interest . . .." 11 U.S.C.

§ 363(a). Section 363(c)(2) of the Bankruptcy Code permits the debtor in possession to use, sell

or lease cash collateral under subsection (c)(1) only if either of two alternative circumstances

exist:

> (A) each entity that has an interest in such cash collateral consents;
> or (B) the court, after notice and a hearing, authorizes such use,
> sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

70.     Here, DuPont consents to the Debtors' use of Cash Collateral on the terms

set forth in the Approved Budget and this Motion.

**Interim Authorization**

71.     The authorization to obtain the DIP Credit Agreement and use of Cash

Collateral pending a Final Hearing will preserve the value of the Debtors' business only if

authorization is granted immediately.

72.     Local Rule 4001-2(b) specifically contemplates that it might be necessary

to grant interim authorization to obtain postpetition financing or use of cash collateral because of

40

the business exigencies of individual cases. *See also* 11 U.S.C. § 102(1) (defining "after notice and a hearing" to mean after such notice and such opportunity for a hearing as is appropriate in the particular circumstances of a given case).

73. In this instance, the Debtors must have immediate use of the funds provided under the DIP Credit Agreement and the Cash Collateral to the extent contemplated herein to pay their ongoing operational expenses and to maximize the value of their estates. Funds are urgently needed to meet all of the Debtors' liquidity needs and to administer these cases in an orderly and efficient manner. In the absence of immediate postpetition financing, the Debtors' ability to preserve the value of their business and assets will be immediately and irreparably jeopardized, resulting in significant harm to the Debtors' estates.

74. The Debtors seek authorization on an interim basis to borrow up to $14,700,000 under the DIP Credit Agreement and to use Cash Collateral for the purposes set forth in the Approved Budget (including repayment of amounts outstanding under the Prepetition Loan Agreement) pending the Final Hearing.

75. Based on the foregoing, the Debtors submit that interim relief requested in this Motion, pending the Final Hearing, is necessary, appropriate and fully warranted, and is essential to avoid immediate and irreparable harm to the Debtors, their estates, and their creditors.

## Notice

76. The Debtors have provided notice of the Motion and the Interim Hearing by facsimile or overnight mail to: (i) the U.S. Trustee, (ii) counsel to the Prepetition Agent, (iii)

41

counsel to DuPont, (iv) parties with liens of record on assets of the Debtors as of the Petition Date, and (v) the Debtors' thirty-five (35) largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

77.     Upon entry of the Interim Order, the Debtors shall give notice of the request for entry of a Final Order to: (i) the U.S. Trustee, (ii) counsel to the Prepetition Agent, (iii) counsel to DuPont, (iii) parties with liens of record on assets of the Debtors as of the Petition Date, (v) the Debtors' thirty-five (35) largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions; and (vi) all other parties requesting notice pursuant to Bankruptcy Rule 2002.

## No Prior Request

78.     No previous application for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request: (i) entry of the Interim Order attached to this Motion, approving the DIP Credit Agreement and use of Cash Collateral on an interim basis pending the Final Hearing; (ii) scheduling the Final Hearing on this Motion for approval of the DIP Credit Agreement and use of Cash Collateral on a final basis; (iii) final approval of the DIP Credit Agreement and use of Cash Collateral following the Final Hearing; and (iv) such further relief as is just and proper.

Dated: April 14, 2010

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
Henry C. Kevane (CA Bar No. 125757)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (Bar No. 4228)
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone: 302/652-4100
Facsimile: 302/652-4400
Email: ljones@pszjlaw.com
       hkevane@pszjlaw.com
       dbertenthal@pszjlaw.com
       tcairns@pszjlaw.com

[Proposed] Counsel for the Debtors and Debtors in Possession