# EXHIBIT B

**DIP Credit Agreement**

Point Blank Solutions, Inc.
Protective Apparel Corporation of America
Point Blank Body Armor, Inc.
PBSS, LLC
2102 SW 2nd Street
Pompano Beach, Florida 33069

        Re:    Debtor-in-Possession Financing Agreement

Ladies and Gentlemen:

        This letter (the "<u>Agreement</u>") sets forth the definitive agreement for the provision of debtor-in-possession financing by Steel Partners II, L.P. (the "<u>Lender</u>") to Point Blank Solutions, Inc., Protective Apparel Corporation of America, Point Blank Body Armor, Inc., and PBSS, LLC, each as a debtor and debtor- in-possession (collectively, the "<u>Borrower</u>") under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), which cases (collectively, the "<u>Case</u>") were filed on April ___, 2010 (the "<u>Petition Date</u>").  The terms and conditions of the debtor-in-possession financing are as follows:

| | |
|---|---|
| Credit Facility: | During the term of this Agreement, the Borrower may borrow, repay and reborrow on a revolving basis from the Lender, provided that the outstanding principal amount of all loans made hereunder (each, a "<u>Loan</u>" and collectively, the "<u>Loans</u>") shall not exceed the lesser of $20,000,000 (the "<u>Line Cap</u>") or the Borrowing Base.  The Loans may, at the option of the Lender, be evidenced by a revolving credit note in form and substance satisfactory to Lender (the "<u>Note</u>") and upon the request of Lender, the Borrowers shall execute and deliver the Note to Lender. |
| Interest: | Loans shall bear interest at the Prime Rate plus 7.50% per annum.  After the occurrence and during the continuance of an Event of Default, the Loans and all other Obligations which are not paid when due shall bear interest at the Prime Rate plus 9.50% per annum. Interest on the Loans (and, to the extent applicable, the other Obligations) will be calculated on the basis of actual days elapsed over a year of 360 days. Interest shall be due and payable in arrears by the Borrower monthly on the first day of each month and on the Termination Date in an amount equal to the greater of (x) actual interest accrued on the Obligations in accordance with the foregoing, or (y) an amount equal to interest that would have accrued in accordance with the foregoing if the principal balance of the Obligations was $10,000,000 (except that, after the occurrence and during the continuance of an Event of Default, interest shall, at the option of the Lender, be payable on demand). |
| Arrangement Fee: | Upon the execution of this Agreement by the Borrower and the Lender, prior to the commencement of the Case, the Borrower shall pay Steel Partners, LLC, an affiliate of the Lender, in cash an arrangement fee in an amount equal to $400,000.  The arrangement fee shall be fully earned upon payment and shall not |

be subject to refund or rebate under any circumstances (including, without limitation, the failure of the Borrower to obtain approval from the Bankruptcy Court for this credit facility or the failure of the credit facility to be consummated for any reason).

**Closing Fee:** Upon the entry of the Interim Borrowing Order (the "Closing Date"), the Borrower shall pay to Steel Partners, LLC, an affiliate of the Lender, in cash a closing fee in an amount equal to $400,000. The arrangement fee paid hereunder shall be credited against the closing fee. The closing fee shall be fully earned upon the execution of this Agreement and shall not be subject to refund or rebate under any circumstances.

**Commitment Fees:** The Borrower shall pay the Lender (or if so directed by Lender, an Affiliate of Lender), a commitment fee equal to 0.75% per annum (on the basis of actual days elapsed over a year of 360 days) of the average daily difference between the Line Cap and the outstanding Loans during the calendar month just ended (or relevant period with respect to the payment being made for the first month ending after the Effective Date or on the Termination Date). The commitment fee shall be paid monthly in arrears, on the first day of each month and on the Termination Date.

**Termination Date:** All obligations under this Agreement, accrued or otherwise, shall be due and payable in full on (the "Termination Date") the earliest of (i) September 30, 2010; (ii) the occurrence of an Event of Default and the acceleration of the time for payment of the Obligations by the Lender; (iii) the closing date of a sale of all or substantially all of the Borrower's assets under Section 363 of the Bankruptcy Code, or (iv) the effective date of a confirmed plan of reorganization in the Case.

**Termination Fee:** Upon the Termination Date (whether by virtue of the consummation of a 363 sale, a plan of reorganization, maturity, acceleration of the time for payment of the Obligations or otherwise), the Borrower shall pay to Lender a termination fee in cash in the sum of $400,000. The termination fee shall be fully earned on the Closing Date, but payable on the Termination Date, and shall not be subject to refund or rebate under any circumstances.

**Administrative Agent:** A financial institution selected by the Lender. Initially, the Administrative Agent shall be _____. All costs incurred by the Lender to the Administrative Agent shall be reimbursed to the Lender by the Borrower on demand.

**Making of Loans:** In addition to the initial borrowing on the Closing Date, following the Closing Date, the Borrower may request borrowings to be made only weekly on Wednesday of each week (or if such day is not a Business Day, on the next succeeding Business Day). The Borrower shall give the Administrative Agent and the Lender one (1) Business Days' prior notice of each requested borrowing. Any such notice, to be effective, must be received by the Administrative Agent and the Lender not later than 2:00 pm, Eastern time, on the Business Day prior to the date on which such borrowing is to be made. Such notice shall be

irrevocable, shall contain disbursement instructions and shall specify the amount of the proposed borrowing and the intended use of the proceeds of the proposed borrowing. As long as the conditions precedent to such borrowing (as specified herein) are satisfied, the Lender shall make funds available to the Administrative Agent and the Administrative Agent shall, not later than 2:00 pm, Eastern time on such borrowing date (ie, Wednesday) disburse such funds in the manner specified in the notice of borrowing delivered by the Borrower. The Lender shall have no obligation to make any Loan if an Overadvance would result. The making of any such Overadvance on any one occasion shall not obligate the Lender to make or permit any Overadvance on any other occasion or to permit such Overadvances to remain outstanding.

Repayment of Loans:   (a)   The Borrower shall have the right at any time and from time to time to prepay (without a permanent reduction in the Line Cap) outstanding Loans in whole or in part, without premium or penalty.

(b)   If, at any time, Availability is less than zero, the Borrower will, immediately upon notice from the Lender prepay the Loans in an amount necessary to eliminate such deficiency.

(c)   The Loans shall be repaid daily in accordance with the provisions set forth below relating to cash management procedures.

(d)   The Lender may, in its sole and exclusive discretion, permanently reduce the Line Cap under the circumstances provided by Section 1.2(d) of the Intercreditor Agreement of even date herewith among the Lender and E.I. Dupont de Nemours and Company.

(e)   On the Termination Date, the credit facility provided hereunder shall be terminated in full and the Borrower shall pay, in full and in cash, all outstanding Loans and all other outstanding Obligations.

Cash Management:   (a)   On or before forty-five (45) days following the Closing Date, unless such deadline has been extended with the consent of the Lender, (i) the Borrower shall establish a debtor-in-possession collection account (the "Collection Account") and a debtor-in-possession operating account (the "Operating Account") with such financial institutions (each a "Depository") as the Lender may request, and (ii) shall cause each such Depository to enter into an account control agreement in form and on terms acceptable to the Lender in its sole discretion. Simultaneously with the entry of the Interim Borrowing Order, the Borrower shall obtain entry of an order authorizing the maintenance of existing Bank of America, N. A., accounts through May 25, 2010 pending the establishment of a Depository. The Borrower shall not maintain any other deposit or securities accounts without the prior written consent of the Lender.

(b)   The Borrower shall cause all of its cash receipts to be deposited into the Collection Account on each Business Day. The Collection Account shall at all times be under the sole dominion and control of the Lender. The Borrower

3

hereby acknowledges and agrees that the Borrower has no right of withdrawal from the Collection Account and the funds on deposit in the Collection Account shall be applied to the Obligations as provided in this Agreement. In the event that, notwithstanding the provisions of this Section, the Borrower receives or otherwise has dominion and control of any such proceeds or collections, such proceeds and collections shall be held in trust by such Borrower for the Lender, shall not be commingled with any of the Borrower's other funds or deposited in any account of the Borrower and shall, not later than the Business Day after receipt thereof, be deposited into the Collection Account or dealt with in such other fashion as the Borrower may be instructed by the Lender.

(c)     On each Business Day, the Lender shall apply the then collected balance of the Collection Account (net of fees charged, and of such impressed balances as may be required by the Depository at which the Collection Account is maintained) to reduce the outstanding principal balance of the Obligations in such order and manner as the Lender may determine, provided that interest on the unpaid principal balance of the Loans shall be calculated as if payments had been made one (1) Business Day after such application.

General Loan Provisions:     (a)     After the end of each month, the Lender shall send to the Borrower a statement accounting for the charges, Loans, and other transactions occurring among and between the Lender and the Borrower during that month. The monthly statements shall, absent manifest error, and otherwise subject to this Agreement, be an account stated, which is final, conclusive and binding on the Borrower.

(b)     The Borrower shall make each payment required to be made hereunder or under any other Loan Document (whether of principal, interest, fees or otherwise) to the Administrative Agent prior to 2:00 p.m., Eastern time, on the date when due, in immediately available funds, without setoff or counterclaim. Any amounts received after such time on any date may, in the discretion of the Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.

(c)     Any and all payments by or on account of any Obligation shall be made free and clear of and without deduction for any taxes; provided, however, that if the Borrower shall be required to deduct, or the Lender shall be required to remit, any taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions or remittances for taxes (including deductions applicable to additional sums payable under this Section) the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant governmental authority in accordance with applicable law.

(d)     As long as any Obligations shall be outstanding, the Borrower hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any lien of equal or greater priority than

the liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations other than as expressly set forth in the Interim Borrowing Order or the Final Borrowing Order.

Security:	Subject to the entry of the Interim Borrowing Order, the Obligations are secured by, and the Borrower hereby grants the Lender, a first perfected security interest and lien on all assets of the Borrower, including, without limitation, all inventory, accounts, equipment, deposit accounts (including the segregated account into which the Professional Fee Carve Out may be funded but subject to the payment of the Professional Fee Carve-Out), general intangibles (including all patents, trademarks, copyrights and other intellectual property), chattel paper, goods, investment property, cash (including the unused portion of any pre-petition retainers paid by the Borrower to its professionals and returned to Borrower according to the terms of each professional's engagement), and proceeds of leasehold interests. In addition, the Obligations shall constitute a super-priority administrative claim under Section 507(b) of the Bankruptcy Code having priority over all other administrative claims, including, without limitation, those specified in Bankruptcy Code Sections 105, 326, 328, 330,331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, and 1114. The Obligations will not be secured by, nor shall the super-priority administrative claim extend to, avoidance actions under Chapter 5 of the Bankruptcy Code and the proceeds thereof (with such proceeds, the "Avoidance Actions") (other than the "Specified Avoidance Actions, as defined in the Interim Borrowing Order and the proceeds thereof, and other than those arising under Section 549 of the Bankruptcy Code and the proceeds thereof), and will in each case be subject to the Professional Fee Carve-Out.

Representations:	(a)	The Borrower is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to own its property and assets and to carry on its business as now conducted and to execute and deliver and perform all its obligations under all Loan Documents. The Borrower is qualified to do business in, and is in good standing in, every jurisdiction in which the nature of its business or ownership or leasing of properties makes such qualification necessary.

(b)	The transactions contemplated hereby and by the other Loan Documents to be entered into by the Borrower are within the Borrower's corporate powers and, upon the entry of the Interim Borrowing Order, have been duly authorized by all necessary corporate, membership, partnership or other necessary action. This Agreement has been duly executed and delivered by the Borrower and upon the entry of the Interim Borrowing Order constitutes, and each other Loan Document, when executed and delivered by the Borrower will constitute, a legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms.

(c)	Subject to the entry of the Interim Borrowing Order, the transactions to be entered into and contemplated by the Loan Documents (i) do not require any consent or approval of, registration or filing with, or any other action by, any

governmental authority, except for such as have been obtained or made and are in full force and effect, (ii) will not violate any applicable law, (c) will not violate or result in a default under any indenture or any other agreement, instrument or other evidence of any material indebtedness or any other material contract, and (d) will not result in the creation or imposition of any lien on any asset of the Borrower, except liens in favor of the Lender.

(d)  None of the reports, financial statements, certificates or other information (other than any projections, pro formas, budgets and general market information) concerning the Borrower furnished by or at the direction of the Borrower to the Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder when taken as a whole, contains, as of the date of this Agreement (or in the case of information delivered after the date hereof, as of the date furnished), any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading.  The projections and pro forma financial information (including, but not limited to, the Approved Budget) concerning the Borrower furnished by or at the direction of the Borrower to the Lender are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, it being recognized that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected amounts.

Covenants:                (a)  The Borrower will furnish to the Lender: (i) within thirty (30) days after the end of each month, the balance sheet and related statements of operations, stockholders' equity and cash flows of the Borrower, as of the end of and for such month and the elapsed portion of the fiscal year and the figures set forth in the Approved Budget, all certified by the Borrower's chief financial officer (or other officer) as presenting in all material respects the financial condition and results of operations of the Borrower in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes; (ii) on Tuesday along with each weekly borrowing request, and on Thursday of each week, a Borrowing Base certificate in form satisfactory to the Lender showing the Borrowing Base as of the close of business on the immediately preceding day, each Borrowing Base certificate to be certified as complete and correct in all material respects on behalf of the Borrower by its chief financial officer (or other officer); (iii)  on Tuesday of each week (or, if Tuesday is not a Business Day, on the next succeeding Business Day), an updated rolling thirteen (13) week cash flow projection (a "Proposed Budget"), together with a Variance Report, and (iv) such other information, including, without limitation, financial and collateral reports, as the Lender may reasonably request from time to time.  Upon receipt by the Borrower of written approval from the Lender of the Proposed Budget, the Proposed Budget shall become the Approved Budget. Unless the Lender provides written notice to the Debtors that the Lender has approved the Proposed Budget, the most recent Approved Budget

shall remain in effect until such time as a new Proposed Budget has been approved by the Lender.

(b)     The Borrower shall maintain insurance with financially sound and reputable insurers acceptable to the Lender on such of its property and in at least such amounts and against at least such risks as the Lender may require in its sole discretion, including casualty insurance, public liability insurance and such other insurance as may be required by law. On or before thirty (30) days following the Closing Date, the Borrower shall cause to be furnished to the Lender endorsements to such policies naming the Lender as loss payee or additional insured (as the Lender may require), which endorsements shall include (i) a provision that the insurer shall pay all proceeds otherwise payable to the Borrower under the policies directly to the Lender, and (ii) a provision to the effect that neither the Borrower, the Lender nor any other party shall be a co insurer.

(c)     The Borrower will from time to time upon the request of the Lender, permit the Lender or professionals (including consultants, accountants, lawyers and appraisers) retained by Lender upon reasonable prior notice and during normal business hours, to conduct appraisals and commercial finance examinations, including, without limitation, of (i) the Borrowers' practices in the computation of the Borrowing Base, and (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves. The Borrower shall pay all reasonable out-of-pocket fees and expenses of the Lender or such professionals with respect to such evaluations and appraisals.

(d)     The proceeds of Loans made hereunder will be used only (a) to repay up to the principal amount of $10,000,000 on account of the pre-petition indebtedness due to Bank of America, N.A., plus, interest, fees and expense reimbursements reasonably acceptable to the Lender, (b) to finance the acquisition of working capital assets of the Borrower in the ordinary course of business and in accordance with the Approved Budget, (c) to finance capital expenditures of the Borrower, in accordance with the Approved Budget, (d) to pay fees and expenses in connection with the transactions contemplated hereby and, to the extent approved by the Bankruptcy Court and as set forth in the DIP Orders, in connection with the Case, (e) for other payments permitted to be made by the DIP Orders and any other order of the Bankruptcy Court, and (f) for general corporate purposes, in each case to the extent expressly permitted under applicable law, the Loan Documents, the DIP Orders and in accordance with the Approved Budget. No part of the proceeds of any Loan will be used, whether directly or indirectly: (i) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to (a) the interests of Lender or its rights and remedies under this Agreement, the other Loan Documents or any of the DIP Orders, including, without limitation, for the payment of any services rendered by the professionals retained by the Borrower or the Creditors' Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense

or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or the liens securing same, (y) for monetary, injunctive or other affirmative relief against the Lender or its collateral, or (z) preventing, hindering or otherwise delaying the exercise by the Lender of any rights and remedies under any of the DIP Orders, the Loan Documents or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the court or otherwise) by the Lender upon any of the collateral; (ii) to make any distribution under a Plan of Reorganization in the Case; (iii) unless otherwise approved by the Bankruptcy Court, to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the Lender; and (iv) for any purpose that entails a violation of any of the regulations of the Federal Reserve Board, including Regulations U and X.

(e)     The Borrower will execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, compliance with any federal and/or state Assignment of Claims Act, and other documents), that may be required under any applicable law, or which the Lender may request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the liens created or intended to be created by the Loan Documents or the validity or priority of any such Lien, all at the expense of the Borrower.

(f)     The Borrower has engaged CRG Partners Group LLC ("CRG") as an independent consultant. Until such time as all Obligations have been repaid in full and this Agreement has been terminated, the Borrower shall continue to retain CRG to assist the Borrower with preparation of the Approved Budget and the other financial and collateral reporting required to be delivered to the Lender pursuant to this Agreement.    The Borrower authorizes the Lender to communicate directly with its independent certified public accountants, appraisers, financial advisors, investment bankers and consultants and authorizes and shall instruct those accountants, appraisers, financial advisors, investment bankers and consultants to provide reasonable assistance and information to the Lender relating to the Borrower with respect to the business, results of operations, prospects and financial condition of the Borrower.

(g)     The Borrower shall not use Loans to pay any item not contained in the Approved Budget, and shall strictly perform in accordance with the Approved Budget, subject to the following: commencing on the third Wednesday to occur on or after the Petition Date, for the two-week period ended the previous Friday, and each Wednesday thereafter, for the three-week period ended the previous Friday, (i) the Borrower's actual "Total Receipts" (labeled as such in the Approved Budget) for the initial two (2) week period and thereafter the three (3) week period then most recently ended shall not be less than 90% of the cumulative projected amounts for such period as set forth in the Approved

Budget, (ii) the Borrower's actual Total Disbursements (labeled as such in the Approved Budget) for the initial two (2) week period and thereafter the three (3) week period then most recently ended shall not be more than 110% of the cumulative projected amounts of such disbursements for such period as set forth in the Approved Budget, and (iii) the Borrower's actual Net Cash Flow (labeled as such in the Approved Budget) for the initial two (2) week period and thereafter the three (3) week period then most recently ended shall not be less than 90% of the projected amounts for such period as set forth in the Approved Budget. The foregoing shall be tested each applicable week pursuant to the Variance Report delivered by the Borrower to the Lender on Wednesday of each week for the immediately preceding initial two (2) week period and subsequent three (3) week periods.

(h)     The Borrower will not seek or consent to any of the following: (i) any order which authorizes the rejection of any leases or material contracts of the Borrower without the Lender's prior consent; (ii) any modification, stay, vacation or amendment to the DIP Orders to which the Lender has not consented in writing; (iii) a priority claim or administrative expense against Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Lender in respect of the Obligations, except with respect to the Professional Fee Carve Out; (iv) any Lien on any collateral having a priority equal or superior to the lien securing the Obligations, other than with respect to the Professional Fee Carve Out and the liens permitted by the DIP Orders; (v) any order which authorizes the payment of any indebtedness for money borrowed or other pre-petition claims (other than the pre-petition indebtedness to Bank of America, N.A. incurred prior to the commencement of the Case and such other indebtedness as contained in the Approved Budget or as the Lender may agree in writing); or (vi) any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

Events of Default:     The following shall constitute Events of Default under this Agreement:

(a)     the Borrower shall fail to pay any principal of any Loan or any interest, fees, expense reimbursements, or other amounts under the Loan Documents when and as the same shall become due and payable;

(b)     any representation or warranty made by the Borrower in any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, document or financial statement furnished pursuant to any Loan Document shall prove to have been incorrect in any material respect when made or deemed made;

(c)     the Borrower shall fail to observe or perform when due any covenant, condition or agreement contained in any Loan Document, including, without limitation, any DIP Order;

(d)     a Change in Control shall occur;

(e)     any "challenge" (as defined in the DIP Orders) by or on behalf of any Person (including, without limitation, the Borrower, the Creditors' Committee or a trustee) to the validity of any Loan Document or the enforceability of any Loan Document strictly in accordance with the subject Loan Document's terms or which seeks to void, avoid, limit, or otherwise adversely affect any security interest created by or in any Loan Document or any payment made pursuant thereto;

(f)     any lien purported to be created under any Loan Document shall cease to be, or shall be asserted by the Borrower or any other Person not to be, a valid and perfected lien on any material item of collateral, with the priority required by the applicable Loan Document;

(g)     the entry of an order in the Case which stays, modifies (in any manner adverse to the Lender), or reverses any DIP Order or which otherwise materially adversely affects, as determined by the Lender in its reasonable discretion, the effectiveness of any DIP Order without the express written consent of the Lender;

(h)     either (i) the appointment in the Case of a trustee or of any examiner having expanded powers to operate all or any part of the Borrower's business, or (ii) the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code;

(i)     the failure of the Bankruptcy Court to enter a Final Borrowing Order, in form and substance satisfactory to the Lender, within thirty (30) days after the Petition Date;

(j)     the entry of any order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code which permits any creditor to (i) realize upon, or to exercise any right or remedy with respect to, any collateral, or (ii) to terminate any license, franchise, or other material agreement;

(k)     the filing of any application by the Borrower without the express prior written consent of the Lender for the approval of any super-priority claim in the Case which is pari passu with or senior to the priority of the claims of the Lender for the Obligations, or there shall arise any such super-priority claim under the Bankruptcy Code (other than the Professional Fee Carve-Out);

(l)     the entry of any order in the Case which provides adequate protection, or the granting by the Borrower of similar relief in favor of any one or more of a Borrower's pre-petition creditors, contrary to the terms and conditions of any DIP Order or the terms hereof;

(m)     The filing of a motion by the Borrower seeking approval of a Disclosure Statement and a Plan of Reorganization, or the entry of an order confirming a Plan of Reorganization, that does not require repayment in full in cash of all Obligations on the effective date of such Plan of Reorganization; or

(n)     The termination or attempted termination by E.I. Dupont de Nemours and Company of its Limited Guaranty of the Borrower's Obligations to the Lender.

Remedies on Default:     Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of such event, the Lender may subject to the terms of the DIP Orders, take any or all of the following actions, at the same or different times: (i) terminate its commitment to make Loans to the Borrower hereunder; (ii) declare the Obligations then outstanding to be due and payable in whole, and thereupon the principal of the Loans and all other Obligations so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Loan Parties accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Loan Parties; or (iii) exercise such other rights and remedies as provided in the DIP Orders. In lieu of the exercise by the Lender of any or all of its rights and remedies after the occurrence and during the continuance of an Event of Default, the Lender may, by written notice to the Borrower require the Borrower to file a motion seeking to establish bidding procedures for, and to pursue, the sale or any or all of the Borrower's assets on terms acceptable to the Lender. The Borrower shall file such motion within ten (10) Business Days of the Lender's request and shall diligently prosecute such motion.  If the Borrower fails to so file or diligently pursue the motion, the Lender may file a motion requesting authority to file and prosecute such a motion in the name of the Borrower.

Conditions Precedent:     This Agreement shall not become effective and the Lender shall have no obligations to make any Loans to the Borrower unless and until each of the following conditions are fulfilled to the satisfaction of the Lender in its sole discretion:

(a)  The Lender shall have received from each party a counterpart of this Agreement and all other Loan Documents signed on behalf of such party.

(b)  The Lender shall have received a Borrowing Base certificate dated the Closing Date, relating to the period ended on April 10, 2010 and executed by an officer of the Borrower.

(c)  Each of the Interim Borrowing Order and the Cash Management Order shall have been entered, shall be in full force and effect, and shall not have been reversed, vacated or stayed, or modified without the prior written consent of the Lender, and all other necessary consents and approvals to the transactions contemplated hereby shall have been obtained and shall be satisfactory to the Lender in its sole discretion.

(d) The Lender shall have received the initial Approved Budget, which shall be in form and substance satisfactory to the Lender.

(e) All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the approval of this Agreement (including, without limitation, the DIP Orders) and concerning other matters related hereto shall be in form and substance satisfactory to the Lender in its sole discretion.

(f) There shall not be pending any litigation or other proceeding which has not been stayed under Section 362 of the Bankruptcy Code, the result of which could reasonably be expected to have a material adverse effect on the business, financial condition or prospects of the Borrower or the validity or enforceability of the rights of the Lender hereunder and under the other Loan Documents, excluding any pending litigation under the federal False Claims Act or similar applicable state statutes.

(g) After giving effect to the consummation of the transactions contemplated under this Agreement and the other Loan Documents on the Closing Date, no Default or Event of Default shall exist.

(h) The Lender shall have received results of searches or other evidence satisfactory to the Lender in its sole discretion indicating the absence of liens on the assets of the Borrower, except for liens held by DuPont, CIT Communications Finance Corp., and Great America Leasing Corp., liens for which termination statements and releases are being tendered on the Closing Date or to which the Lender otherwise consents in writing.

(i) The Lender shall have received on or before thirty (30) days after the Closing Date, and be satisfied with, evidence of the Borrower's insurance, together with such endorsements as are required by the Loan Documents.

(j) All fees due to the Lender and all reimbursement of expenses incurred by the Lender in connection with the establishment of the credit facility contemplated hereby (including the Closing Fee and the fees and expenses of counsel to the Lender), shall have been paid in full.

(k) The Lender shall have received a certificate, satisfactory in form and substance to the Lender in its sole discretion, certifying that, as of the Effective Date, the representations and warranties made by the Borrower in the Loan Documents and otherwise are true and complete in all material respects and that no Default or Event of Default exists.

(l) The Lender shall have received a limited guaranty (satisfactory in form and substance to the Lender) from E.I. Dupont de Nemours and Company of the last $10,000,000 of the DIP Facility.

Conditions to All Loans:     The obligation of the Lender to make each Loan after the Effective Date is subject to the following conditions precedent:

(a) All representations and warranties contained in this Agreement and the other Loan Documents or otherwise made in writing in connection herewith or therewith shall be true and correct in all material respects on and as of the date of each borrowing with the same effect as if made on and as of such date, other than representations and warranties that relate solely to an earlier date.

(b) On the date of each borrowing hereunder and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing.

(c) No event shall have occurred (or failed to occur) which could reasonably be expected to have a material adverse effect on the business, financial condition or prospects of the Borrower or the validity or enforceability of the rights of the Lender hereunder and under the other Loan Documents.

Certain Definitions:    As used herein, the following terms have the means set forth below:

"Approved Budget" means the Borrower's rolling thirteen (13) week cash flow projection, reflecting on a line-item basis anticipated sales, cash receipts, inventory levels, and expenditures for the subject period and annexed hereto as Schedule 1, as same shall be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods), in case of the initial budget or subsequent modifications or supplements to which the Lender agrees in writing in its sole discretion, and as to the initial budget or subsequent modifications or supplements, together with such supporting documentation as requested by the Lender in its sole discretion.

"Availability" means the lesser of (a) or (b), where:

(a)     is the result of:

        (i)     The Line Cap,

        Minus

        (ii)     The aggregate unpaid principal balance of Loans to, or for the account of, the Borrower;

(b)     is the result of:

        (i)     the Borrowing Base,

        Minus

        (ii)     the aggregate unpaid balance of Loans to, or for the account of, the Borrower.

"Borrowing Base" means

(a)     Up to 80% of the face amount of the Borrower's Eligible Accounts (less maximum discounts, credits and allowances which may be taken by, or granted to, the account debtors in connection therewith in the ordinary course of the Borrower's business);

plus

(b)     Up to 20% of the Borrower's Eligible Inventory valued at cost;

plus

(c)     the amount of the limited guaranty from E.I. Dupont de Nemours and Company;

minus

(d)     such reserves as the Lender elects to establish from time to time in its sole discretion, including, without limitation, a reserve in the amount of the Professional Fee Carve Out.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to remain closed.

"Cash Management Order" means an order entered by the Bankruptcy Court, in form and substance satisfactory to the Lender in its reasonable discretion, authorizing the Borrower to, among other things, continue their cash management systems, as such order may be amended, modified or supplemented from time to time with the express written consent of the Lender and the Borrower and with the approval of the Bankruptcy Court.

"Change in Control" means, at any time:

(a)     a majority of the members of the board of directors or other equivalent governing body of any Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the Closing Date, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body; or

(b)     any person or "group" (within the meaning of the Securities and Exchange Act of 1934, as amended) is or becomes the beneficial owner (within the meaning of Rule 13d-3 or 13d-5 of the Securities and Exchange Act of 1934, as amended, except that such person shall be deemed to have "beneficial ownership" of all capital stock that such person has the right to acquire, whether such right is exercisable

immediately or only after the passage of time) directly or indirectly of twenty-five percent (25%) or more (on a fully diluted basis) of the total then outstanding capital stock of the Borrower, whether as a result of the acquisition or issuance of securities of the Borrower, a merger, consolidation, liquidation or dissolution of the Borrower, a direct or indirect transfers of securities or otherwise.

"Creditors' Committee" means any official committee of creditors formed, appointed or approved in the Case pursuant to the Bankruptcy Code.

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of any cure period or both would, unless cured or waived, become an Event of Default.

"DIP Orders" means and refers to the Interim Borrowing Order and the Final Borrowing Order .

"Disclosure Statement" means a disclosure statement filed in the Case in connection with a Plan of Reorganization.

"Eligible Inventory" shall mean Inventory (as defined in the Uniform Commercial Code of the State of New York, hereinafter the "UCC") of a Borrower which is acceptable to Lender in its sole discretion for lending purposes. Without limiting Lender's discretion, Lender shall consider Inventory to be Eligible Inventory if it meets, and so long as it continues to meet, the following requirements:

(i)     it is owned by a Borrower, such Borrower has the right to subject it to a security interest in favor of Lender and it is subject to a first priority perfected security interest in favor of Lender and to no other claim, lien, security interest or encumbrance whatsoever, other than Permitted Prior Liens (as defined in the DIP Orders);

(ii)    it is located on one of the Borrower's current places of business located in Pompano Beach, Florida or Jacksboro, Tennessee (or other locations of which Lender has been advised and approved in writing) and is not in transit except between such locations;

(iii)   if held for sale or lease or furnishing under contracts of service, it is (except as Lender may otherwise consent in writing) new and unused and free from defects which would, in Lender's sole determination affect its market value;

(iv)    it is not stored with a bailee, consignee, warehouseman, processor or similar party unless Lender has given its prior written approval and the relevant Borrower has caused any such bailee, consignee, warehouseman, processor or similar party to issue and deliver to Lender, in form and substance acceptable to Lender, such Uniform Commercial Code financing statements, warehouse receipts, waivers and other documents as Lender shall require, or is on consignment to a Borrower from any Person;

(v)     Lender has determined, in accordance with Lender's customary business practices, that it is not unacceptable due to age, type, category or quantity, or is otherwise deemed to be ineligible by Lender in its sole discretion;

(vi)     it does not consist of supplies, packaging, parts or sample Inventory;

(vii)     no Borrower has returned, has attempted to return, is in the process of returning or intends to return such Inventory to the vendor thereof;

(viii)     it is not damaged, obsolete, slow moving or not currently usable or saleable in the normal course of the applicable Borrower's operations;

(ix)     it is not Inventory (A) with respect to which any of the representations and warranties contained in this Agreement are untrue; or (B) which violates any of the covenants of any Borrower contained in this Agreement; provided that, in any event, inventory owned by any Borrower which is in the possession of FMS Technologies, LLC, a South Carolina limited liability company, or LifeStone Materials, LLC, a Delaware limited liability company, shall not be considered to be Eligible Inventory unless and until such time as Lender determines in its sole discretion that such Inventory shall be considered Eligible Inventory;

(x)     it is not subject to any prepayment or progress billing arrangement as determined by Lender; and

(xi)     it is not work-in-process.

"Eligible Receivables" shall mean an Account (as defined in the UCC) owing to a Borrower which is acceptable to Lender in its sole discretion for lending purposes. Without limiting Lender's discretion, Lender shall consider an Account (or portion thereof) to be an Eligible Receivable if it meets, and so long as it continues to meet, the following requirements:

(i)     it is genuine and in all respects what it purports to be;

(ii)     it is owned by a Borrower, such Borrower has the right to subject it to a security interest in favor of Lender or assign it to Lender and it is subject to a first priority perfected security interest in favor of Lender and to no other claim, lien, security interest or encumbrance whatsoever, other than Permitted Prior Liens (as defined in the DIP Orders);

(iii)     it arises from (A) the performance of services by a Borrower in the ordinary course of such Borrower's business, and such services have been fully performed and acknowledged and accepted by the Account Debtor (as defined in the UCC) thereunder; or (B) the sale or lease of Goods (as defined in the UCC) by a Borrower in the ordinary course of such Borrower's business, and (w) such Goods have been completed in accordance with the Account Debtor's specifications (if any) and shipped to the Account Debtor, (x) or, in the case of

Accounts where the United States Government is the Account Debtor, such Goods have been segregated in an area of a warehouse where such Borrower to which such Accounts are owed stores Inventory, clearly designated as containing Goods to be shipped to the United States Government and which Goods have been accepted and approved by the United States Government on a completed and signed form DD-250, (y) and shall not include any portion of Goods which such Account Debtor has refused to accept, returned or offered to return, which are the subject of such Account, and (z) such Borrower has possession of, or such Borrower has delivered to Lender (at Lender's request), shipping and delivery receipts evidencing shipment of such Goods;

(iv)     it is evidenced by an invoice rendered to the Account Debtor thereunder and is not outstanding beyond the earlier of: (a) sixty (60) days past the due date; or (b) ninety (90) days past the invoice date;

(v)     it is a valid, legally enforceable and unconditional obligation of the Account Debtor thereunder; provided that any portion of such Account, and only such portion, which is subject to setoff, counterclaim, credit, allowance or adjustment by such Account Debtor, or to any claim by such Account Debtor denying liability thereunder in whole or in part, shall not be deemed an "Eligible Account" hereunder;

(vi)     it does not arise out of a contract or order which fails in any material respect to comply with the requirements of applicable law;

(vii)     the Account Debtor thereunder is not a current or former director, officer, employee or Lender or of a Borrower, a current or former Subsidiary of a Borrower or a current or former Affiliate of a Borrower;

(viii)     the Account Debtor is located within the United States of America or is owing by the United States Government wherever located;

(ix)     it is not an Account owing by the United States Government (except as noted below), unless (A)(i) on or before sixty (60) days following the Closing Date, the Lender shall have received all documentation requested by it with respect to the Federal Assignment of Claims Act of 1940 in connection with any Account Debtor that is the United States Government of any department, agency or instrumentality thereof, and (ii) the underlying contract shall either explicitly incorporate by reference the "Assignment of Claims (Jan. 1986)" clause including its "Alternate I" as set forth in "48 C.F.R. 52.232-23" or include the actual text of the clause and its Alternate I. Notwithstanding the foregoing, Accounts owing up to $625,000 in aggregate gross receivables from the United States Government shall be Eligible Receivables;

(x)     it is not an Account owing by any state or local government, or any department, agency or instrumentality thereof, unless the Borrower to which the Account is payable has assigned, on or before sixty (60) days following the Closing Date, its right to payment of such Account to the Lender pursuant to, and

in full compliance with, any local applicable law comparable to the Federal Assignment of Claims Act of 1940; provided, however, that an Account that is an "Eligible Account" in all other respects shall not be deemed to be ineligible under this clause (x) solely because it has not been duly assigned in compliance with such applicable local law, so long as: (A) the face amount of each such Account does not exceed $15,000 and (B) the aggregate outstanding amount of all such Accounts referenced in the immediately preceding clause (A) does not exceed $50,000 at any time;

(xi)     it is not an Account owing by an Account Debtor located in a state which requires the Borrower to which the Account is payable, as a precondition to commencing or maintaining an action in the courts of that state, either to (A) receive a certificate of authority to do business and be in good standing in such state; or (B) file a notice of business activities report or similar report with such state's taxing authority, unless (x) such Borrower has taken the actions described in the immediately preceding clauses (A) or (B); (y) the failure to take one of the actions described in either immediately preceding clause (A) or (B) may be cured retroactively by such Borrower at its election; or (z) such Borrower has proven, to Lender's satisfaction, that it is exempt from any such requirements under any such state's laws;

(xii)    it is not an Account owing by an Account Debtor if, when such Account is added to such Account Debtor's other indebtedness to Borrowers, the result is that more than fifty percent (50%) of the face amount of all Accounts then owing by such Account Debtor are not "Eligible Accounts" hereunder;

(xiii)   it is not an Account with respect to which the Account Debtor's obligation to pay is subject to any repurchase obligation or return right, as with sales made on a bill-and-hold, guaranteed sale, sale on approval, sale or return or consignment basis;

(xiv) it is not an Account (A) with respect to which any representation or warranty contained in this Agreement is untrue; or (B) which violates any of the covenants of any Borrower contained in this Agreement;

(xv)     it is not an Account owing by an Account Debtor which, when added to all other indebtedness to Borrowers owing by such Account Debtor, exceeds (A) 20% of all Accounts owing by all Account Debtors except Defense Accounting & Account Service or any department thereof ("DFAS") and Federal Prison Industries, Inc.; provided, however, that at no time shall the Accounts owing by DFAS exceed 85% of all Accounts owing by all Account Debtors and at no time shall the Accounts owing by Federal Prison Industries, Inc. exceed 80% of all Accounts owing by all Account Debtors, or (B) a credit limit determined by Lender in its sole discretion, exercised in a commercially reasonable manner, for that Account Debtor (except that (i) Accounts excluded from "Eligible Accounts" solely by reason of this clause (xv) shall be "Eligible Accounts" to the extent of such credit limit and (ii) Lender will not establish any credit limit under this

clause (B) for the United States Government so long as no Default or Event of Default has occurred and is continuing);

(xvi)  it does not arise out of progress billings or prior to completion of an order, or is not subject to any adverse security deposit or other similar advance made by or for the benefit of the applicable Account Debtor;

(xvii) it is not an Account which constitutes advertising, finance charges, service charges or excise taxes; and

(xix)  it is not an Account that is otherwise deemed to be ineligible by Lender in its sole discretion.

"Event of Default" has the meaning assigned to such term in this Agreement. An "Event of Default" shall be deemed to be continuing unless and until that Event of Default has been duly waived in writing by the Lender.

"Final Borrowing Order" means an order of the Bankruptcy Court which order shall be in form, scope and substance acceptable to the Lender, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur (or guaranty) Obligations, grant liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of the Lender's claims, which order is a Final Order.

"Final Order" means an order or judgment of the Bankruptcy Court as entered on the docket of the Clerk of the Bankruptcy Court, that has not been reversed, stayed, modified or amended.

"Interim Borrowing Order" means an order entered by the Bankruptcy Court, in form, scope and substance acceptable to the Lender, approving, on an interim basis, the Borrower's entering into and performing its obligations under this Agreement and the other Loan Documents.

"Loan Documents" means this Agreement, the Note, all Borrowing Base Certificates, the deposit account control agreements, the DIP Orders, and any other instrument or agreement now or hereafter executed and delivered in connection herewith, or in connection with any transaction arising out of this Agreement, each as amended and in effect from time to time.

"Obligations" means (a) the due and punctual payment of (i) the principal of, and interest on, the Loans, as and when due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) each payment required to be made by the Borrower under this Agreement or any other Loan Document, when and as due, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise, of the Borrower to the Lender under this Agreement and the other Loan Documents. Without limiting the foregoing, the Obligations shall constitute allowed administrative expense claims in the Case having priority pursuant to Section 364(c)(1) of the Bankruptcy Code over all administrative expense claims and unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind

specified in Sections 503(b) and 507(b) of the Bankruptcy Code but excluding the Professional Fee Carve-Out and Avoidance Actions other than the "Specified Avoidance Actions", as defined in the Interim Borrowing Order, and other than those arising under Section 549 of the Bankruptcy Code.

"Overadvance" means a Loan to the extent that, immediately after its having been made, Availability is less than zero.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

"Plan of Reorganization" means a plan filed in the Case pursuant to Chapter 11 of the Bankruptcy Code.

"Prime Rate" The greater of (a) 3.25% per annum or (b) the variable annual rate of interest equal to the "prime rate" as published from time to time in the Wall Street Journal or any other financial news service chosen by the Lender from time to time.

"Professional Fee Carve Out" means a carve out for Professional Fees and Expenses in an amount not to exceed the sum (x) amounts accrued but unpaid in the Case as of the Termination Date that are consistent with the Approved Budget and allowed by the Bankruptcy Court, plus (y) $500,000 (allocated $400,000 towards the Borrower's professionals and $100,000 towards the Creditors' Committee's professionals) which amount may be funded by Borrower into a segregated account, with the balance of any unfunded portion of the Professional Fee Carve Out to be funded into that account upon a Termination Event.

"Professional Fees and Expenses" means (a) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and fees payable to the clerk of the Bankruptcy Court, and (b) professional fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by the Borrower or the Creditors' Committee (including expenses of members of such committee) or other statutory committee appointed in the Case pursuant to §§327 and 1103 of the Bankruptcy Code or any Chapter 11 or Chapter 7 trustees appointed in the Case.

"Variance Report" means a report prepared by the Borrower's management reflecting on a line-item basis the Borrower's actual performance compared to the Approved Budget for the applicable periods after the Closing Date and the percentage variance of the Borrower's actual results from those reflected in the then extant Approved Budget, along with management's explanation of such variance.

| | |
|---|---|
| Expenses: | The Borrower shall reimburse the Lender on demand for all costs and expenses, including reasonable attorneys' fees and fees and charges of the Administrative Agent, incurred by the Lender in the preparation, negotiation, amendment, administration and enforcement of this Agreement and the other Loan Documents. |
| Indemnification: | The Borrower shall each indemnify the Lender, its officers, directors, attorneys, advisors, agents, employees, representatives, and affiliates (each an |

"Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement and any other Loan Document contemplated hereby, the performance by the Borrower of its obligations thereunder or the consummation of the transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) all current or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any governmental authority, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto, provided that such indemnity (i) shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee, and (ii) shall only be available to the extent that such losses, claims, damages, liabilities or related expenses asserted against the Indemnitee arise on account of its capacity as a Lender under this Agreement. Upon request by the Lender, the Borrower shall deposit with the Lender cash collateral to be maintained under the Lender's control to secure the Borrower's indemnification obligations as set forth herein in such amounts as the Lender may determine in its sole discretion, or, if the Borrower can establish cause by clear and convincing evidence for objecting to the amounts determined by the Lender, in such amount as may be determined by the Bankruptcy Court.

Miscellaneous:     (a)     The Lender, without the request of any Borrower and whether or not a Default or Event of Default then exists, may charge any interest, fee, service charge, expense reimbursement or other payment to which the Lender is entitled from the Borrower pursuant hereto or any other loan document as a Loan notwithstanding that an Overadvance may result thereby. The Lender shall advise the Borrower of any such advance or charge promptly after the making thereof. Any amount which is so advanced or charged shall bear interest at the interest rate then applicable hereunder.

(b)     The Obligations are the joint and several obligation of each Borrower. The obligations of the Borrower hereunder are continuing unconditional obligations and shall not be released by any (i) waiver, deferral or delay by the Lender, (ii) release of any obligor or surety or any security for the Obligations, (iii) failure to marshal security, (iv) any other change in the terms of this Agreement, the DIP Orders or the other loan documents, including, without limitation, any change to the maturity date, the interest rate, or the amounts available to be borrowed, or (v) all other suretyship defenses and any other matters which may otherwise operate to release any Borrower from its obligations hereunder. With the written consent of a Borrower, and subject to the DIP Orders, the Lender is hereby authorized, without notice or demand and without affecting the liability of any non-consenting Borrower hereunder, to at any time and from time to time amend, waive, supplement or otherwise modify the terms and conditions of this Agreement, the DIP Orders and the other loan

documents including, without limitation, the right to (A) renew, extend, accelerate or otherwise change the time for payment of, or other terms relating to, the Obligations or otherwise modify, amend or change the terms of this Agreement or other agreement, document or instrument now or hereafter executed and delivered to Lender; (B) take and hold security or collateral for the payment of Obligations and exchange, enforce and release any such security or collateral; (C) apply such security or collateral and direct the order or manner of sale thereof as in its sole discretion it may determine; and (D) settle, release, compromise, collect or otherwise liquidate Obligations and any security or collateral therefor in any manner, without affecting or impairing the obligations of any Borrower which does not consent thereto hereunder.

(c)     The Borrower acknowledges and agrees that: (i) James Henderson, who is the Borrower's chief executive officer is affiliated with the Lender, as was SP Corporate Services LLC which was party to a Management Services Agreement with the Borrower dated September 1, 2009 which was terminated pre-petition, (ii) this Agreement has been negotiated by the Borrower with independent legal counsel and with the assistance of CRG Partners Group, LLC and not as a result of any involvement by said James Henderson or SP Corporate Services, LLC, (iii) this Agreement is an arm's-length commercial transaction between the Borrower on the one hand, and the Lender, on the other hand, as the case may be, and the Borrower is capable of evaluating and understanding and understands and accept the terms, risks and conditions of the transactions contemplated hereby; (iv) in connection with the transaction contemplated hereby and the process leading to such transaction, the Lender is and has been acting solely as a principal and is not acting as an agent or fiduciary, for the Borrower, stockholders, creditors or employees or any other party; and (v) the Lender has not assumed and will not assume an advisory, agency or fiduciary responsibility to the Borrower's with respect to any of the transactions contemplated hereby or the process leading thereto. The Borrower hereby waive and release, to the fullest extent permitted by law, any claims that the Borrower may have against the Lender (strictly in such capacity) with respect to any breach or alleged breach of agency or fiduciary duty or as a result of the relationship between the parties with, or acts or omissions of, James Henderson and/or SP Corporate Services LLC.

(d)     No failure or delay by the Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Lender hereunder and under the other Loan Documents are cumulative and are not exclusive of any other rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be in writing by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

(e)     Subject to the entry of the Interim Borrowing Order, the provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any such attempted assignment or transfer without such consent shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby any legal or equitable right, remedy or claim under or by reason of this Agreement.

(f)     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all contemporaneous or previous agreements and understandings, oral or written, relating to the subject matter hereof.    Delivery of an executed counterpart of a signature page of this Agreement by telecopy or e-mail shall be effective as delivery of a manually executed counterpart of this Agreement.

(g)     Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

(h)     THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, AND THE BANKRUPTCY CODE.

(i)     EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

(j)     THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS.    EACH PARTY HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT FOR ALL PURPOSES IN CONNECTION WITH THIS AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS.

(k)     In the event of any inconsistency between the terms of the DIP Orders and the Loan Documents, the terms of the DIP Orders shall control.

Please indicate your acknowledgment of the foregoing by signing and returning to the Lender the enclosed copy of this letter at the address shown on the first page hereof.

[signature pages follow]

Very truly yours,

STEEL PARTNERS II, L.P.

By: Steel Partners II GP LLC, its General Partner

By: _____
Name: _____SANFORD ANTIGNAS_____
Title: _____Chief Operating Officer____

*Acknowledged, Agreed and Accepted:*

**POINT BLANK SOLUTIONS, INC.,** as Borrower

By: _____
Name: _____
Title: _____

**POINT   BLANK   BODY   ARMOR
CORPORATION,** as Borrower

By: _____
Name: _____
Title: _____

**PROTECTIVE APPAREL CORPORATION OF
AMERICA.,** as Borrower

By: _____
Name: _____
Title: _____

**PBSS, LLC,** as Borrower

By: _____
Name: _____
Title: _____

Very truly yours,

STEEL PARTNERS II, L.P.

By: Steel Partners II GP LLC, its General Partner

By: _____

Name: _____

Title: _____


*Acknowledged, Agreed and Accepted:*

**POINT BLANK SOLUTIONS, INC.,** as Borrower

By: _____

Name: T. Scott Avila

Title: CRO


**POINT BLANK BODY ARMOR CORPORATION,** as Borrower

By: _____

Name: T. Scott Avila

Title: CRO


**PROTECTIVE APPAREL CORPORATION OF AMERICA.,** as Borrower

By: _____

Name: T. Scott Avila

Title: CRO


**PBSS, LLC,** as Borrower

By: _____

Name: T. Scott Avila

Title: CRO