# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------x

In re                           :     Chapter 11

POINT BLANK SOLUTIONS, INC., *et al.*,[1] :     Case No. 10-11255 (PJW)

          Debtors.      :     Jointly Administered

                           :     Re: #23

---------------------------------------------------x

**FINAL ORDER PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363
AND 364, RULES 2002, 4001 AND 9014 OF THE FEDERAL RULES OF
BANKRUPTCY PROCEDURE AND LOCAL BANKRUPTCY RULES 2002-1
AND 4001-2: (1) AUTHORIZING INCURRENCE BY THE DEBTORS OF POST-
PETITION SECURED INDEBTEDNESS WITH PRIORITY OVER ALL OVER
SECURED INDEBTEDNESS AND WITH ADMINISTRATIVE SUPERPRIORITY,
(2) GRANTING LIENS, (3) AUTHORIZING USE OF CASH COLLATERAL
AND PROVIDING ADEQUATE PROTECTION, AND
(4) MODIFYING THE AUTOMATIC STAY**

THIS MATTER having come before this Court upon the motion dated April 14, 2010

(the "**DIP Motion**") filed by Point Blank Solutions, Inc., Protective Apparel Corporation of

America, Point Blank Body Armor, Inc., and PBSS, LLC (each, a "**Debtor**" and collectively, the

"**Debtors**"), as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "**Cases**") seeking, among other things, the entry of a final order (this "**Final

Order**") authorizing the Debtors to:

        (i)(a) Obtain credit under that financing arrangement (the "**DIP Facility**") in the

aggregate committed amount of up to $20,000,000 pursuant to (I) that certain *Debtor-In-*

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number and address, are: Point Blank Solutions, Inc. (9361), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor, Inc. (4044), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Protective Apparel Corporation of America (9051), 179 Mine Lane, Jacksboro, TN 37757; and PBSS, LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.

120

*Possession Financing Agreement* dated April 12, 2010 (the "**DIP Credit Agreement**"), substantially in the form filed of record in the Cases, by and among Protective Apparel Corporation of America ("**PACA**"), Point Blank Body Armor, Inc. ("**Point Blank**"), PBSS, LLC ("**PBSS**") and Point Blank Solutions, Inc. ("**Parent**" and together with PACA, Point Blank, and PBSS, collectively, the "**Borrowers**"), and Steel Partners II, L.P., a Delaware limited partnership (the "**DIP Lender**") and the administrative agent named therein (the "**Administrative Agent**"), and (II) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Lender, its affiliates and the Administrative Agent, including, without limitation, security agreements, pledge agreements, guaranties, notes, and Uniform Commercial Code ("**UCC**") financing statements (collectively, as may be amended, modified or supplemented and in effect from time to time, the "**DIP Financing Agreements**")[2]; and (b) incur the "Obligations" under and as defined in the DIP Credit Agreement (collectively, the "**DIP Obligations**");

(ii) Obtain and incur debt, pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, on terms and conditions described in the DIP Financing Agreements and this Final Order, secured by first priority, valid, priming, perfected and enforceable liens (as defined in Section 101(37) of chapter 11 of title 11 of the United States Code, as amended (the "**Bankruptcy Code**")) on property of the Debtors' estates pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in Section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions contained herein;

---

[2] Capitalized terms used in this Final Order but not defined herein shall have the meanings ascribed to such terms in the DIP Financing Agreements.

(iii) Use the proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Agreements) in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with the Budget (as defined below) solely for (a) working capital and general corporate purposes, (b) payment of costs of administration of the Cases, to the extent set forth in the Budget, and (c) pursuant to the Interim Order, payment in full of the Pre-Petition Debt (as defined below);

(iv) Grant, pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, the DIP Lender first-priority priming, valid, perfected and enforceable liens, subject only to the Carve Out (as defined below) and the Permitted Prior Liens (as defined below), upon all of the Debtors' real and personal property as provided in and as contemplated by this Final Order and the DIP Financing Agreements;

(v) Grant, pursuant to Section 364(c)(1) of the Bankruptcy Code, the DIP Lender superpriority administrative claim status in respect of all DIP Obligations, subject to the Carve Out as provided herein;

(vi) Authorize the use of "cash collateral" as such term is defined in Section 363 of the Bankruptcy Code (the "**Cash Collateral**") in which DuPont (as defined below) has an interest;

(vii) Grant DuPont (a) the DuPont Protections with respect to the Reimbursement Obligations (each as defined below), and (b) the DuPont Replacement Liens and the DuPont 507(b) Claim (each as defined below) to the extent of any diminution in the value of DuPont's interest in the Pre-Petition DuPont Collateral (as defined below), as adequate protection for the granting of the DIP Liens (as defined below) to the DIP Lender, the

70934-001\DOCS_DE:159875.2

subordination to the Carve Out, the use of Cash Collateral, and the imposition of the automatic stay;

(viii)    Request this Court to vacate and modify the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and this Final Order; and

(ix)    Request this Court to waive any applicable stay (including under Federal Rule of Bankruptcy Procedure 6004(h)) and provide for the immediate effectiveness of this Final Order.

The Court having held an emergency interim hearing on April 16, 2010 (the "**Interim Hearing**") to consider entry of an interim order and, after considering the Motion and the arguments and evidence presented at the Interim Hearing, the Court having entered its interim order on April 16, 2010 (Docket No. 48, the "**Interim Order**").

The Court having found that, under the circumstances, due and sufficient notice of the Motion and the final hearing thereon (the "**Final Hearing**," and together with the Interim Hearing, the "**Hearings**") was provided by the Debtors in accordance with the Bankruptcy Rules, the Local Rules and the Interim Order; and having held the Final Hearing on May 12, 2010; and after considering the DIP Motion, the Declaration of Scott Avila in Support of First Day Motions, the exhibits attached thereto, the DIP Financing Agreements, the evidence submitted at the Final Hearing and the full record of all prior proceedings in these cases; and it appearing that approval of the relief requested in the DIP Motion is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and their equity holders, and is essential for the continued operation of the Debtors' business; and all objections, if any, to the entry of

4

this Final Order having been withdrawn, resolved or overruled by this Court; and after due deliberation and consideration, and for good and sufficient cause appearing:

**BASED UPON THE RECORD ESTABLISHED AT THE FINAL HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    **Petition Date**.    On April 14, 2010 (the "**Petition Date**"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware.   The Debtors have continued in the management and operation of their business and property as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.   No trustee or examiner has been appointed in the Cases.

B.    **Jurisdiction and Venue**.    This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334, and over the persons and property affected hereby. Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Cases and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    **Committee Formation**.    A statutory committee of unsecured creditors ("the "**Creditors' Committee**") was appointed on April 26, 2010.

D.    **Notice**.    The Final Hearing is being held pursuant to the authorization of Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Local Rule 4001-2.   Notice of the Final Hearing has been provided by the Debtors, whether by telecopy, email, overnight courier or hand delivery on April 19, 2010, to certain parties in interest, including: (i) the Office of the United States Trustee, (ii) the Debtors' thirty-five (35) largest unsecured creditors on a consolidated basis, (iii) counsel to the Pre-Petition Agent (as defined below), (iv) the Pre-Petition Agent, (v) counsel to the DIP Lender, (vi) counsel to DuPont and (vii) all secured creditors of record.   Under the circumstances, such notice of the Final Hearing

5

and the relief requested in the DIP Motion is due and sufficient notice and complies with Sections 102(1), 364(c) and 364(d) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(c), 4001(d) and the local rules of the Court.

E. **Debtors' Acknowledgements and Agreements**. Without prejudice to the rights of parties in interest to the extent set forth in Paragraph 7 below, the Debtors admit, stipulate, acknowledge and agree (collectively, Paragraphs E (i) through E (vi) hereof shall be referred to herein as the "**Debtors' Stipulations**") as follows:

(i) **Pre-Petition Financing Agreements**. Prior to the commencement of the Cases, the Debtors (other than PBSS) were party to that certain Amended and Restated Loan and Security Agreement, dated as of April 3, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "**Pre-Petition Loan Agreement**"), by and among the Borrowers, Bank of America, N.A., as successor by merger to LaSalle Business Credit, LLC, as administrative agent and collateral agent (in such capacities, the "**Pre-Petition Agent**"), and the lenders party thereto (the "**Pre-Petition Lenders**", collectively with the Pre-Petition Agent, the "**Pre-Petition Secured Parties**") (the Pre-Petition Loan Agreement and all other agreements, documents, security agreements, guaranties, and instruments executed and/or delivered with, to, or in favor of any or all of the Pre-Petition Secured Parties, including, without limitation, notes, UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto, as may be amended, modified or supplemented and in effect from time to time, collectively, the "**Pre-Petition Financing Agreements**").

(ii) **Pre-Petition Debt**. As of the Petition Date, the Debtors were indebted to the Pre-Petition Secured Parties under the Pre-Petition Financing Agreements in the principal amount of $10,000,000, plus letters of credit in the stated amount of $525,654 (the "**Pre-Petition Letters of Credit**"), plus interest accrued and accruing at the default rate (including post-petition interest), plus costs, expenses, fees and other amounts (including post-petition fees, costs and other amounts) of whatever nature arising under the Pre-Petition Financing Agreements, including attorneys' fees and legal expenses (all "Liabilities" under the Pre-Petition Financing Agreements, including those described in this subsection (ii), collectively, the "**Pre-Petition Debt**"). The Pre-Petition Letters of Credit have been cash-collateralized in an amount equal to 105% of the face amount thereof (the "**Pre-Petition L/C Cash Collateral**"), which Pre-Petition L/C Cash Collateral is maintained in the Pre-Petition Indemnity Account (as defined below).

6

**(iii)** **Pre-Petition First Lien Collateral**. The Pre-Petition Debt is secured by security interests and liens granted to, and for the benefit of, the Pre-Petition Secured Parties (the **"Pre-Petition First Liens"**) on substantially all of the personal property of the Debtors (other than PBSS) as further described in the Pre-Petition Financing Agreements, including, without limitation, accounts, inventory, general intangibles, equipment, goods, deposit accounts, investment property, and the proceeds and products, whether tangible or intangible, of any of the foregoing (collectively, the "**Pre-Petition First Lien Collateral**"). As of the Petition Date, (a) the Pre-Petition First Liens (I) are valid, binding, enforceable and properly perfected, (II) were granted to, and for the benefit of, the Pre-Petition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with the making of the loans and other financial accommodations secured thereby, (III) are not subject to avoidance, recharacterization, subordination or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (IV) are first priority security interests and liens on the Pre-Petition First Lien Collateral with priority over all other liens, security interests and other encumbrances except any valid, enforceable, properly perfected and non-avoidable liens permitted under the Pre-Petition Financing Agreements to be senior or pari passu with the Pre-Petition First Liens (such permitted senior liens are referred to herein as the "**Permitted Prior Liens**"); and (b) (I) the Pre-Petition Debt constitutes the legal, valid, binding obligations of the Debtors (other than PBSS), enforceable in accordance with the terms of the applicable Pre-Petition Financing Agreements (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code), (II) no setoffs, recoupments, offsets, defenses or counterclaims to any of the Pre-Petition Debt exist, and (III) no portion of the Pre-Petition Debt or any payments made to or for the benefit of any or all of the Pre-Petition Secured Parties (including, without limitation, the Pre-Petition Debt Payoff Amount (as defined below) made in accordance with the terms of the Interim Order) is subject to avoidance, recharacterization, recovery, subordination, offset, counterclaim, defense or other "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law. To avoid any doubt, the term "Permitted Prior Liens" does not include, and specifically excludes, the Pre-Petition DuPont Liens (as defined below), which pre-petition liens are to be subordinated to, and junior to, the liens and claims of the DIP Lender. The Pre-Petition First Liens encumber, and the Pre-Petition First Lien Collateral includes, one or more deposit accounts under the control of the Pre-Petition Agent (such account(s), the "**Pre-Petition Indemnity Account**") and the funds deposited therein. As of the Petition Date, the Pre-Petition Indemnity Account had a balance of $1,125,154.24.

**(iv)** **Release of Claims Against Pre-Petition Secured Parties**. Effective upon entry of the Interim Order, each Debtor and its estate shall be deemed to have waived, discharged and released the Pre-Petition Secured Parties, together with their respective affiliates, agents, attorneys, financial advisors, consultants, officers, directors and employees (all of the foregoing, the "**Pre-Petition Secured Party Releasees**"), of any and all "claims" (as defined in the Bankruptcy Code),

7

counterclaims, causes of action, defenses, setoff, recoupment or other offset rights against any and all of the Pre-Petition Secured Party Releasees, whether arising at law or in equity, including, without limitation, (a) any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law, and (b) any right or basis to challenge or object to any of the amount, validity or enforceability of the Pre-Petition Debt, or the validity, enforceability, priority or non-avoidability of the Pre-Petition First Liens, *provided that*, the foregoing waiver and release shall not extend to the Debtors' and the Prepetition Secured Parties' respective rights and obligations relating to the Pre-Petition Indemnity Account and the Pre-Petition L/C Cash Collateral.

(v) **Priming of DIP Liens.** In entering into the DIP Financing Agreements, and as consideration therefor, the Debtors hereby agree that until such time as (A) all DIP Obligations have been irrevocably paid in full in cash, (B) all commitments to lend have terminated, (collectively, (A) and (B) constitute the **"Full Payment of Senior Obligations"**), the Debtors shall not in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Lender under the Interim Order and this Final Order, by offering a subsequent lender or a party in interest a superior or pari passu lien or claim pursuant to Section 364(d) of the Bankruptcy Code or otherwise.

(vi) **Arm's Length Commercial Transaction.** (i) James Henderson, who is the president, chief executive officer and chairman of the board of directors of Parent, is affiliated with the DIP Lender, as was SP Corporate Services LLC, which was party to a Management Services Agreement with the Parent dated September 1, 2009, and which was terminated pre-petition; (ii) the DIP Financing Agreements have been negotiated by the Debtors with independent legal counsel and with the assistance of CRG Partners Group, LLC, and not as a result of any involvement by said James Henderson (or any other member (if any) of the board of directors of Parent who is affiliated with the DIP Lender) or SP Corporate Services, LLC; (iii) the DIP Financing Agreements evidence an arm's-length commercial transaction between the Debtors, on the one hand, and the DIP Lender, on the other hand, and the Debtors are capable of evaluating and understanding, and do understand and accept, the terms, risks and conditions of the transactions contemplated thereby; (iv) in connection with the transactions contemplated by the DIP Financing Agreements and the process leading to such transactions, the DIP Lender is and has been acting solely as a principal, and is not acting as an agent or fiduciary for the Debtors, stockholders, creditors or employees or any other party; and (v) the DIP Lender has not assumed and will not assume an advisory, agency or fiduciary responsibility to the Debtors with respect to any of the transactions contemplated hereby or the process leading thereto. Pursuant to the Interim Order, the Debtors have waived and released, to the fullest extent permitted by law, any claims that the Debtors may have against the DIP Lender (in such capacity) with respect to any breach or alleged breach of agency or fiduciary duty or as a result of the relationship between the parties with, or acts or omissions of, said James Henderson (or any other member (if any) of

the board of directors of Parent who is affiliated with the DIP Lender) and/or SP Corporate Services LLC.

F.  **Description of Pre-Petition DuPont Financing Documents.**

**(i)**  **Pre-Petition DuPont Guaranty**.  Pursuant to that certain Amended and Restated Corporate Guarantee dated October 29, 2009, executed and delivered by E. I. du Pont de Nemours and Company ("**DuPont**") in favor of the Pre-Petition Agent (for the benefit of the Pre-Petition Secured Parties), DuPont guaranteed up to $10,000,000 of the principal amount of the Pre-Petition Debt constituting the Term Loan under (and as defined in) the Pre-Petition Loan Agreement, plus reasonable collection and enforcement costs (including reasonable attorney fees) plus accrued interest thereon at the rate permitted to be charged under the Pre-Petition Loan Agreement (as may be amended, modified or supplemented and in effect from time to time, the "**Pre-Petition DuPont Guaranty**").

**(ii)**  **Pre-Petition DuPont Agreements**.  Prior to the commencement of the Cases, as consideration for DuPont's providing the Pre-Petition DuPont Guaranty, the Debtors (other than PBSS) were party to that certain Subordinated Note dated October 29, 2009, in favor of DuPont, in an amount equal to the lesser of (a) $10,000,000 (plus reasonable collection and enforcement costs (including reasonable attorney fees) plus accrued interest thereon at the rate permitted to be charged under the Pre-Petition Loan Agreement) and (b) such amount as may be advanced by DuPont pursuant to the terms of the Pre-Petition DuPont Guaranty (together with all other agreements, documents, security agreements, guaranties, and instruments executed and/or delivered with, to, or in favor of DuPont, including, without limitation, notes, and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto, as may be amended, modified or supplemented and in effect from time to time, collectively, the "**Pre-Petition DuPont Agreements**").

**(iii)**  **Pre-Petition DuPont Collateral**.  To secure the indebtedness under the Pre-Petition DuPont Agreements (the "**Pre-Petition DuPont Debt**"), the Debtors (other than PBSS) granted security interests and liens (the "**Pre-Petition DuPont Liens**") to DuPont upon substantially all of their personal property, including, without limitation, accounts, inventory, general intangibles, equipment, goods, deposit accounts, investment property, and the proceeds and products, whether tangible or intangible, of any of the foregoing, (collectively, the "**Pre-Petition DuPont Collateral**"), with priority over all other liens other than the Pre-Petition First Liens and any Permitted Prior Liens.

G.  **Findings Regarding the Post-Petition Financing.**

**(i)**  **Need for Post-Petition Financing and Use of Cash Collateral**.  A critical need exists for the Debtors to obtain funds from the DIP Facility and have the use of

9

Cash Collateral in order to continue operations and to administer and preserve the value of their estates. The ability of the Debtors to finance their operations, to preserve and maintain the value of the Debtors' assets and maximize a return for all creditors requires the availability of working capital from the DIP Facility and permission to use Cash Collateral, the absence of which would harm the Debtors, their estates, their creditors and their equity holders and the possibility for a successful reorganization or sale of the Debtors' assets as a going concern or otherwise.

(ii) **No Credit Available on More Favorable Terms**. The Debtors have been unable to obtain (A) unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense, (B) credit for money borrowed with priority over any or all administrative expenses of the kind specified in Bankruptcy Code Sections 503(b) or 507(b), (C) credit for money borrowed secured solely by a lien on property of the estate that is not otherwise subject to a lien, or (D) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien, in each case, on more favorable terms and conditions than those provided in the DIP Credit Agreement and this Final Order. The Debtors are unable to obtain credit for borrowed money without granting to the DIP Lender the DIP Protections (as defined below).

(iii) **Pre-Petition First Liens**. To the extent set forth in Paragraph 7 of this Final Order, nothing herein shall prejudice the rights of any Creditors' Committee, or any other party in interest with requisite standing, to challenge the validity, priority, perfection or extent of the Pre-Petition Debt or the Pre-Petition First Liens in accordance with this Final Order.

(iv) **Permitted Prior Liens**. Nothing herein shall constitute a finding or ruling by this Court that any Permitted Prior Lien is valid, senior, perfected or unavoidable. Moreover, nothing shall prejudice the rights of any party in interest, including but not limited to the

10

Debtors, the DIP Lender, the Pre-Petition Secured Parties, DuPont, or any Creditors' Committee, to challenge the validity, priority, perfection or extent of any such Permitted Prior Lien.

H. **Section 506(c) Waiver**. As a further condition of the DIP Facility and any obligation of the DIP Lender to make credit extensions pursuant to the DIP Financing Agreements, upon entry of this Final Order, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in these Cases or any Successor Cases (as defined below)), shall be deemed to have waived any rights or benefits of Section 506(c) of the Bankruptcy Code in connection with the DIP Collateral (as defined below).

I. **Use of Proceeds of the DIP Facility**. Proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Agreements) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Credit Agreement, and in accordance with the Budget, solely for (i) working capital and general corporate purposes and (ii) payment of costs of administration of the Cases, to the extent set forth in the Budget. Pursuant to the Interim Order, the initial proceeds of the DIP Facility were used for payment in full of the Pre-Petition Debt.

J. **Section 552**. In light of DIP Lender's agreement to subordinate the DIP Liens and DIP Superpriority Claim to the Carve Out, the DIP Lender is entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply.

K. **Adequate Protection for DuPont**. Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, DuPont is entitled to receive adequate protection for any decrease in the value of its interest in the Pre-Petition DuPont Collateral (including Cash Collateral) on account of the grant of the DIP Liens, the subordination of the Pre-Petition DuPont Liens to the

Carve Out, the Debtor's use, sale or lease of the Pre-Petition DuPont Collateral (including Cash Collateral) during this Case, and the imposition of the automatic stay (in each case, a "**Diminution in Value**"). As adequate protection for any Diminution in Value, DuPont will receive: (1) the DuPont Replacement Liens and (2) the DuPont 507(b) Claim.

L. **Extension of Financing**. The DIP Lender has indicated a willingness to provide financing to the Debtors in accordance with the DIP Financing Agreements and subject to (i) the entry of the Interim Order and this Final Order, and (ii) findings by the Court that such financing is essential to the Debtors' estate, that the DIP Lender is extending the financing in good faith, and that the DIP Lender's claims, superpriority claim, security interests and liens and other protections granted pursuant to the Interim Order and this Final Order will not be affected by any subsequent reversal, modification, vacatur or amendment of the Interim Order or this Final Order or any other order, as provided in Section 364(e) of the Bankruptcy Code.

M. **Business Judgment and Good Faith Pursuant to Section 364(e)**. The terms and conditions of the DIP Financing Agreements and this Final Order, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available under the circumstances, have been fully disclosed, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. Moreover, the (i) DIP Financing Agreements and this Final Order were negotiated in good faith and at arms' length between the Debtors, the DIP Lender and DuPont, and (ii) use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the DIP Lender and DuPont are entitled to the protection and benefits of Section 364(e) of the Bankruptcy Code.

12

N. **Relief Essential; Best Interest**. The relief requested in the DIP Motion is necessary, essential, and appropriate for the continued operation of the Debtors' business and the management and preservation of the Debtors' assets and personal property. It is in the best interest of Debtors' estates to be allowed to obtain credit under the DIP Facility.

**NOW, THEREFORE**, on the DIP Motion of the Debtors and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the Pre-Petition Secured Parties, DuPont and the DIP Lender to the form and entry of this Final Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1. **Motion Granted**. The DIP Motion is granted on a final basis in accordance with the terms and conditions set forth in this Final Order and the DIP Credit Agreement.

2. **DIP Financing Agreements**.

(a) **Approval of DIP Financing Agreements**. Pursuant to the Interim Order, the Borrowers were authorized to incur the DIP Obligations in accordance with, and subject to, the terms of the Interim Order and the DIP Financing Agreements and to execute and deliver all instruments, certificates, agreements and documents which were required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by the Interim Order and the DIP Financing Agreements. Pursuant to this Final Order, the DIP Financing Agreements are approved on a final basis and the Debtors are hereby authorized to borrow the balance of the financing available under the DIP Facility and perform all acts, pay the principal, interest, fees, costs, expenses and other amounts due to the DIP Lender, any affiliate of the DIP Lender and the Administrative Agent set forth in the DIP Financing Agreements and this Final Order, as applicable, as such become due,

13

including, without limitation, closing fees, administrative fees, commitment fees, termination fees, and attorneys', financial advisors' and accountants' fees and disbursements as provided for in the DIP Financing Agreements and this Final Order, which amounts shall not otherwise be subject to approval of this Court, <u>provided that</u>, the DIP Lender shall provide the invoices for fees and expenses incurred for professionals retained by the DIP Lender (redacted for privileged or confidential information) to the U.S. Trustee and counsel to the Creditors' Committee; <u>provided further</u>, that the Court shall have jurisdiction to determine any dispute concerning such invoices. Under no circumstances shall professionals for the DIP Lender be required to comply with the U.S. Trustee fee guidelines.

(b)     **Authorization to Borrow**.  The Debtors are hereby authorized under the DIP Facility to borrow up to a total committed amount of $20,000,000.

(c)     **Application of DIP Proceeds**.  The proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Credit Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements and in accordance with the Budget, solely for items contained in the Budget for (i) working capital and general corporate purposes and (ii) payment of costs of administration of the Cases.  Pursuant to the Interim Order, the first advance under the DIP Facility was used to repay in full the Pre-Petition Debt as set forth in the payoff letter from the Pre-Petition Agent to the Debtors (the "**Pre-Petition Debt Payoff Amount**"); <u>provided</u>, <u>however</u>, the Pre-Petition Debt Payoff Amount was net of the amounts deposited in the Pre-Petition Indemnity Account in excess of the Pre-Petition L/C Cash Collateral and $250,000 (such $250,000 is referred to herein as the "**Post-Petition Expense Reserve Amount**"), which excess funds deposited in the Pre-Petition Indemnity Account other than the Pre-Petition L/C Cash Collateral and Post-Petition

14

Expense Reserve Amount were applied to reduce the outstanding amount of the Pre-Petition Debt in connection with the repayment of the Pre-Petition Debt authorized by the Interim Order.

(d) **Conditions Precedent**. The DIP Lender shall have no obligation to make any loan or advance under the DIP Credit Agreement unless the conditions precedent to making such loan under the DIP Credit Agreement have been satisfied in full or waived in accordance with the DIP Credit Agreement.

(e) **Post-Petition Liens**. Effective immediately upon the execution of the Interim Order, and on a final basis pursuant to this Final Order, the DIP Lender is hereby granted pursuant to Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, priming first-priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests and liens (collectively, the "**DIP Liens**"), senior and superior in priority to all other secured and unsecured creditors of the Debtors' estate except as otherwise provided in the Interim Order and this Final Order, upon and to all presently owned and hereafter acquired assets and real and personal property of the Debtors, including, without limitation, the following (collectively, the "**DIP Collateral**"):

(a) Accounts;

(b) Equipment;

(c) General Intangibles, including, without limitation, excess retainers of Case Professionals[3], Payment Intangibles and Intellectual Property;

(d) Inventory;

(e) Commercial Tort Claims;

(f) Deposit Accounts (including, without limitation, the Carve Out Account (as defined below), but subject to the payment of the Carve Out);

(g) Fixtures;

(h) Real Property;

---

[3] DIP Lender acknowledges and agrees that its lien in excess retainers of Case Professionals shall attach solely to such excess retainers as are returned to Debtors in accordance with any applicable engagement letters or agreements.

(i)     All proceeds from leases of real property;

(j)     Goods;

(k)     Supporting Obligations and Letter of Credit Rights;

(l)     Documents (including, if applicable, electronic documents);

(m)     Chattel Paper;

(n)     Instruments;

(o)     Investment Property including, without limitation, all ownership or membership interests in any subsidiaries or affiliates, including Lifestone Materials, LLC (whether or not controlled by any Debtor, but only to the extent that the grant of such lien would not, in and of itself, otherwise violate the terms of any applicable agreement relating to such interest; provided that, in all events, the DIP Collateral shall include all proceeds of any of the foregoing, including proceeds of ownership or membership interests in Lifestone Materials, LLC, regardless of whether the grant of a lien on such interest would violate the terms of any applicable agreement relating thereto);

(p)     the Pre-Petition Indemnity Account, to the extent of any balance released by the Pre-Petition Secured Parties in accordance with Paragraph 2(g) below;

(q)     the proceeds of any avoidance actions brought pursuant to Section 549 of the Bankruptcy Code;

(r)     any recoveries under Section 506(c) of the Bankruptcy Code (other than any such recoveries from the DIP Collateral);

(s)     any money, policies and certificates of insurance, deposits, cash or other assets;

(t)     all of Debtors' books, records and information relating to any of the foregoing ((a) through (s)) and/or to the operation of any Debtor's business, and all rights of access to such Debtor's books, records and information and all property in which such Debtor's books, records and information are stored, recorded and maintained;

(u)     all insurance proceeds, refunds, and premium rebates, including, without limitation, proceeds of fire and credit insurance, whether any of such proceeds, refunds, and premium rebates arise out of any of the foregoing ((a) through (t)) or otherwise;

(v)     all liens, guaranties, rights, remedies, and privileges pertaining to any of the foregoing ((a) through (u)), including the right of stoppage in transit; and

(w)     any of the foregoing, and all products, Proceeds (cash and non-cash), substitutions, Accessions and/or replacements of or to any of the foregoing;

provided, however, that the DIP Collateral (i) shall not include any avoidance action under Chapter 5 of the Bankruptcy Code or the proceeds thereof (including such proceeds, the

"**Avoidance Actions**"), other than (x) any Avoidance Action or other claims, and the proceeds thereof, not to exceed the aggregate amount of $10,000,000, brought against any of the Pre-Petition Secured Parties, to the extent such action or claims result in (and limited to the amount of) actual payment under the Pre-Petition DuPont Guaranty (such Avoidance Actions or other claims and the proceeds thereof, the "**Specified Avoidance Actions**"), provided that, the Pre-Petition Agent shall provide prior written notice to the Debtors at least seven (7) Business Days before making a formal demand under the Pre-Petition DuPont Guaranty, (y) proceeds of any avoidance action brought pursuant to Section 549 of the Bankruptcy Code, and (z) proceeds of any other avoidance actions under Chapter 5 of the Bankruptcy Code to the extent that any Carve Out funded the Debtors' or the Creditors' Committee's expenses in investigating such actions, commencing such actions, and conducting the litigation and/or settlement discussions that resulted in the receipt of such proceeds, but only to the extent necessary to reimburse the DIP Lender for the amount of the Carve Out used for those purposes, (ii) shall not include the Debtors' interests in leaseholds, but only the proceeds thereof, and (iii) shall be subject to the payment of the Carve Out.

(f) **DIP Lien Priority**. The DIP Liens granted to the DIP Lender, as provided herein, (a) are created pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, (b) are first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or lien or claim to any of the DIP Collateral, and are subject only to: (x) the Carve Out, and (y) any Permitted Prior Liens. The DIP Liens shall secure all DIP Obligations. The DIP Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Cases and shall be valid and enforceable against any trustee appointed in the Cases, upon the conversion of any of the Cases

to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "**Successor Cases**"), and/or upon the dismissal of any of the Cases. The DIP Liens shall not be subject to Sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code. Without in any manner limiting the priority of the DIP Liens set forth above, and notwithstanding any other term of this Final Order to the contrary, the Pre-Petition DuPont Liens, the DuPont Replacement Liens (as defined below) and the DuPont Post-Petition Liens, and any and all other liens, mortgages, security interests and encumbrances of any kind granted by any Debtor in favor of DuPont, whether existing pre-petition or arising post-petition, are hereby made expressly subject and subordinate in all respects to the DIP Liens and, without limiting the foregoing, until Full Payment of Senior Obligations, DuPont shall have no enforcement rights with respect to such liens and security interests. If in connection with (i) any enforcement action by the DIP Lender against the DIP Collateral, or (ii) any sale or other disposition of any DIP Collateral by the Debtors outside the ordinary course of business which has been consented to by the DIP Lender, the DIP Liens in such assets are being released; then, in each case, the liens and security interests of DuPont on such assets (if any) shall be automatically, unconditionally and simultaneously released and DuPont shall promptly execute and deliver to the DIP Lender such termination statements, releases and other documents as the DIP Lender may request to effectively confirm such release, and DuPont shall be deemed to have provided its consent to such sale or disposition.

(g)     **Termination of Pre-Petition First Liens; Continuing Rights of Pre-Petition Secured Parties**. Pursuant to the Interim Order, upon the Pre-Petition Agent's receipt of the Pre-Petition Debt Payoff Amount, the Pre-Petition First Liens and all other security interests and other liens in favor of the Pre-Petition Secured Parties on the assets of the Debtors

18

were automatically terminated and released without any further action. Notwithstanding any provision in this Final Order, any DIP Financing Agreements or otherwise: (i) the Pre-Petition Agent shall continue to maintain, and hold a first priority, perfected lien and security interest in, the Pre-Petition Indemnity Account and the Post-Petition Expense Reserve Amount deposited therein, until the earliest to occur (such earliest date, the "**Post-Petition Expense Reserve Release Date**") of (I) if no party (including any Creditors' Committee) asserts a Challenge (as defined below) in accordance with Paragraph 7 of this Final Order during the Challenge Period (as defined below), the Challenge Period Termination Date (as defined below), or (II) if any party, including any Creditors' Committee, asserts a Challenge (as defined below) in accordance with Paragraph 7 of this Final Order, the first business day immediately following entry of a final, non-appealable order by this Court, or if applicable another court of competent jurisdiction over the Challenge (as defined below), finally resolving all Challenges (as defined below) (or if applicable, approving the settlement of all Challenges); (ii) the Pre-Petition Secured Parties shall continue to have the right to use the Post-Petition Expense Reserve Amount as and when necessary to pay for fees, costs and expenses of the Pre-Petition Secured Parties (including attorney fees and costs) incurred in connection with these Cases and/or any Challenge, and any other fees, costs and expenses (including attorney fees and costs) that would have been reimbursable under, and subject to any restrictions to such reimbursement set forth in, the Pre-Petition Financing Agreements if incurred prior to the Petition Date; (iii) the Pre-Petition Secured Parties (and to the extent applicable, any issuer of a Pre-Petition Letter of Credit) shall continue to hold a first priority perfected lien and security interest in the Pre-Petition L/C Cash Collateral, and shall be entitled to apply Pre-Petition L/C Cash Collateral to outstanding obligations in respect of the Pre-Petition Letters of Credit as and when they become payable

19

under the applicable Pre-Petition Financing Agreements; (iv) the Pre-Petition Secured Parties (and any letter of credit issuer to the extent applicable) shall have the right not to renew any and all Pre-Petition Letters of Credit at the end of their respective current terms (without taking into account any evergreen or other renewal provision) but the Debtors shall be permitted to keep the Pre-Petition Letters of Credit outstanding solely during such respective current terms for so long as the Pre-Petition L/C Cash Collateral fully secures the Pre-Petition Secured Parties' (and any letter of credit issuer's) obligations in respect of the Pre-Petition Letters of Credit; and (v) the automatic stay shall be deemed modified by this Final Order to the extent necessary to permit the Pre-Petition Secured Parties to exercise their rights under this Paragraph 2(g) without any further order of this Court or notice to any party. Within two (2) Business Days immediately following the Post-Petition Expense Reserve Release Date, the Pre-Petition Secured Parties shall remit the entire unused balance of the Post-Petition Expense Reserve Amount, if any, to the Debtors, and such remittance shall constitute DIP Collateral and will be applied in reduction of the DIP Obligations in accordance with the DIP Financing Agreements. In addition, within two (2) Business Days immediately following the date on which all obligations of the Pre-Petition Secured Parties (and any corresponding letter of creditor issuer) in respect of each Pre-Petition Letter of Credit, including, without limitation, all then accrued unpaid fees, costs and charges related thereto (all such obligations, the "**Pre-Petition L/C Obligations**"), are fully and finally satisfied, the Pre-Petition Agent shall remit to the Debtors Pre-Petition L/C Cash Collateral equal to the difference between (a) 105% of the stated amount of such Pre-Petition Letter of Credit, minus (b) the aggregate amount of all Pre-Petition L/C Obligations in respect of such Pre-Petition Letter of Credit, and such remittance shall constitute DIP Collateral and will be applied in reduction of the DIP Obligations in accordance with the DIP Financing Agreements. For the

20

avoidance of doubt, upon the repayment of the Pre-Petition Debt in accordance with the terms of this Final Order and so long as the Debtors comply with the terms of this Final Order benefitting the Pre-Petition Secured Parties, the Pre-Petition Secured Parties shall not be entitled to any adequate protection in these Cases; provided, however, that solely in the event that the Pre-Petition Debt is not fully repaid, the rights of the Pre-Petition Secured Parties to seek and obtain adequate protection in respect of their interests in the Pre-Petition First Lien Collateral are hereby fully preserved. Nothing in this Final Order, the DIP Financing Agreements or otherwise shall in any way prejudice, affect or otherwise impair any of the rights of the Pre-Petition Secured Parties under the Pre-Petition DuPont Guaranty.

(h) **Enforceable Obligations**. The DIP Financing Agreements shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable against the Debtors, their estates and any successor thereto and their creditors, in accordance with their terms.

(i) **Protection of DIP Lender and Other Rights**. From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Financing Agreements and this Final Order and in strict compliance with the Budget (subject to any variances thereto permitted by the DIP Financing Agreements).

(j) **Superpriority Administrative Claim Status.** Subject to the payment of the Carve Out, and other than with respect to Avoidance Actions and the proceeds thereof not constituting Specified Avoidance Actions, all DIP Obligations shall be an allowed superpriority administrative expense claim under Section 364(c)(1) of the Bankruptcy Code (the "**DIP Superpriority Claim**" and, together with the DIP Liens, the "**DIP Protections**"). The DIP

Superpriority Claim shall have, in these Cases and any Successor Cases, priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. Other than the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Bankruptcy Code Sections 328, 330, or 331, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the DIP Protections or the DIP Obligations, or with any other claims of the DIP Lender arising hereunder.

3. **Authorization to Use Cash Collateral and Proceeds of DIP Financing Agreements**. Pursuant to the terms and conditions of this Final Order, the DIP Financing Agreements, and in accordance with the budget (as the same may be modified from time to time consistent with the terms of the DIP Financing Agreements (the "**Budget**"), filed on record in the Cases and attached to the DIP Motion, the Debtors are authorized to use Cash Collateral and the advances under the DIP Financing Agreements during the period commencing immediately after the entry of the Interim Order and terminating upon the Commitment Termination Date (as defined below). The Budget may be updated (with the consent and/or at the request of the DIP Lender from time to time), provided that such updated Budget shall be in form and substance acceptable to the DIP Lender, in its sole discretion, and the Debtors shall be required always to comply with the Budget pursuant to the terms of the DIP Financing Agreements.

22

4.    **Adequate Protection for DuPont**.  As adequate protection for any Diminution in Value of its interest in the Pre-Petition DuPont Collateral (including Cash Collateral), DuPont shall receive adequate protection as follows:

(a)    **Pre-Petition Replacement Liens**.  To the extent of the Diminution in Value of the Pre-Petition DuPont Collateral, DuPont shall have, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, additional and replacement security interests and liens in the DIP Collateral (the "**DuPont Replacement Liens**").  The DuPont Replacement Liens shall be junior only to the DIP Liens, Permitted Prior Liens, the DuPont Post-Petition Liens and the Carve Out as provided herein and otherwise shall not be made subject to or pari passu with any lien or security interest by any court order heretofore or hereafter entered in the Cases.  The DuPont Replacement Liens shall be valid and enforceable in any Successor Case, against any trustee appointed in the Cases or any Successor Case, and/or upon the dismissal of any of the Cases or any Successor Case.  The DuPont Replacement Liens shall not be subject to Sections 510, 549, 550 or 551 of the Bankruptcy Code, or if approved in the Final Order, Section 506(c) of the Bankruptcy Code.

(b)    **DuPont 507(b) Claim**.  In the event that the adequate protection provided to DuPont hereunder is insufficient to compensate for the Diminution in Value of the interest of DuPont in the Pre-Petition DuPont Collateral during the Cases or any Successor Case, to the extent of the Diminution in Value of the Pre-Petition DuPont Collateral, DuPont shall have an allowed claim (the "**DuPont 507(b) Claim**") under section 507(b) of the Bankruptcy Code in these Cases and any Successor Case, provided that, the DuPont 507(b) Claim shall be junior in right of payment to all DIP Obligations and the Reimbursement Obligations (as defined below),

and subject to the Carve Out and shall not extend to Avoidance Actions and the proceeds thereof (other than Specified Avoidance Actions).

5. **Protection of DuPont Reimbursement Obligations**

(a)    Effective immediately upon the execution of the Interim Order, and on a final basis under this Final Order, DuPont is hereby granted pursuant to Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition security interests and liens (collectively, the "**DuPont Post-Petition Liens**") upon and to all DIP Collateral, to secure the reimbursement obligations (the "**Reimbursement Obligations**") of the Debtors with respect to the Corporate Guaranty, executed by DuPont in favor of the DIP Lender, securing up to $10,000,000 in principal amount of the obligations of the Debtors under the DIP Credit Agreement (the "**DuPont Post-Petition Guaranty**").  The DuPont Post-Petition Liens shall be superior to any security, mortgage, or collateral interest or lien or claim to any of the DIP Collateral other than: (w) the DIP Liens, (x) the Carve Out, and (y) any Permitted Prior Liens.

(b)    If and to the extent DuPont makes an actual payment to the DIP Lender under the DIP Guaranty, DuPont shall be correspondingly subrogated to the DIP Superpriority Claim in the amount of such payment.

(c)    Subject and subordinate to the DIP Protections, DuPont shall have, with respect to the DuPont Post-Petition Liens and its subrogation rights under the DIP Superpriority Claim (the "**DuPont Protections**"), all of the rights, remedies, protections and limitations afforded the DIP Lender with respect to the DIP Protections under the DIP Credit Agreement (excluding, however, for the avoidance of doubt, any rights as a lender under the DIP Credit Agreement), the Interim Order, and this Final Order, including, without limitation, the

24

prohibition of granting senior or parity liens or administrative expenses (pending full payment of the Reimbursement Obligations), the exclusion from the Carve Out of certain fees, and the protections afforded by 11 U.S.C. § 364(e); provided that, until Full Payment of Senior Obligations, DuPont shall have no enforcement rights with respect to the DuPont Protections.

(d)     The DuPont Protections are in addition to, and not in replacement or diminution of or substitution for, DuPont's rights of subrogation with respect to the DIP Protections as a result of payments made under or with respect to the DuPont Post-Petition Guaranty, all of which rights of subrogation, subject to the terms of the DuPont Post-Petition Guaranty, are hereby expressly preserved and confirmed.

6.     **Post-Petition Lien Perfection**.     This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens, the DuPont Post-Petition Liens and the DuPont Replacement Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreement) to validate or perfect the DIP Liens, the DuPont Post-Petition Liens and the DuPont Replacement Liens or to entitle the DIP Liens, the DuPont Post-Petition Liens and the DuPont Replacement Liens to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file such financing statements, mortgages, notices of liens and other similar documents, and is hereby granted relief from the automatic stay of Section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded at the time and on the date of the

25

commencement of the Cases. The Debtors shall execute and deliver to the DIP Lender all such financing statements, mortgages, notices and other documents as the DIP Lender may request in its sole discretion to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens granted pursuant hereto. The DIP Lender, in its sole discretion, may file a photocopy of this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Final Order.

7.    **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**. The Debtors' Stipulations shall be binding on the Debtors, and the Debtors shall be deemed to have irrevocably waived and relinquished any and all Challenges (as defined below), as of the Petition Date upon the entry of the Interim Order. Without limiting the foregoing, the Debtors' Stipulations shall also be forever binding upon all of the Debtors' estates and all official and unofficial committees, creditors, interest holders, and other parties in interest in these Cases and any Successor Cases, in each case unless (i) such party in interest commences, by the earlier of (x) ~~June 28~~ July 28, 2010, or (y) the date an order is entered confirming a Plan (as defined below) (such time period established by the earlier of clauses (x) and (y), as the same may be extended in accordance with this Paragraph 7, is referred to herein as the "**Challenge Period**," and the date that is the next calendar day after the termination of the Challenge Period, in the event that no Challenge (as defined below) is raised during the Challenge Period, is referred to as the "**Challenge Period Termination Date**"), (A) a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, findings or releases included in the Debtors' Stipulations, or (B) a contested matter or adversary proceeding against any or all

26

of the Pre-Petition Secured Parties in connection with or related to the Pre-Petition Debt, or the actions or inactions of any of the Pre-Petition Secured Parties arising out of or related to the Pre-Petition Debt or otherwise, including, without limitation, any claim against any or all of the Pre-Petition Secured Parties in the nature of a "lender liability" cause of action, setoff, counterclaim or defense to the Pre-Petition Debt (including but not limited to those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against any of the Pre-Petition Secured Parties) (the objections, challenges, actions and claims referenced in clauses (i)(A) and (B), collectively, the "**Challenges**," and each individually, a "**Challenge**"), and (ii) there is a final, non-appealable order in favor of such party in interest sustaining any such Challenges in any such timely filed contested matter or adversary proceeding; provided, however, that in no event shall any objection or challenge by any party in interest (including any Creditors' Committee) to the procedures established in this Paragraph 7 constitute a "Challenge" hereunder. If no Challenges have been timely asserted in any such adversary proceeding or contested matter, then, upon the Challenge Period Termination Date, and for all purposes in these Cases and any Successor Case, (i) all payments made to or for the benefit of the Pre-Petition Secured Parties pursuant to the Interim Order, this Final Order or otherwise (whether made prior to, on or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense or avoidance, (ii) any and all such Challenges by any party in interest shall be deemed to be forever released, waived and barred, (iii) the Pre-Petition Debt shall be deemed to be a fully allowed secured claim within the meaning of section 506 of the Bankruptcy Code (which claim and liens shall have been deemed satisfied in full by the repayment of the Pre-Petition Debt as provided herein), and (iv) the Debtors' Stipulations, including the release provisions therein, shall be binding on all parties in

interest, including any Creditors' Committee. Notwithstanding the foregoing, to the extent any Challenges are timely asserted in any such adversary proceeding or contested matter, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party in interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such adversary proceeding or contested matter. The Challenge Period may only be extended with the written consent of the Pre-Petition Agent.

8. **Carve Out**. Subject to the terms and conditions contained in this Paragraph 8, (x) the DIP Protections are subordinate to the Carve Out (as defined below), (y) the DuPont Protections are subordinate to the DIP Protections and the Carve Out, and (z) the DuPont Replacement Liens, the DuPont 507(b) Claim and the DuPont Pre-Petition Liens are subordinate to the DIP Protections, the DuPont Protections and the Carve Out. As used herein, the term "**Carve Out**" shall mean amounts: (a) payable pursuant to 28 U.S.C. Section 1930(a)(6) and fees payable to the clerk of the Court and (b) for allowed (or authorized to be paid by the Court) reasonable fees and expenses of attorneys and financial advisors employed by the Debtors and the Creditors' Committee (including expenses of the members of the Creditors' Committee) pursuant to Sections 327 and 1103 of the Bankruptcy Code (the "**Case Professionals**"), and, as to amounts described in clause (b), not to exceed the sum of (x) $5,500,000 (allocated $400,000 towards the Debtors' Case Professionals and $100,000 towards the Creditors' Committee's Case Professionals (including members of the Creditors' Committee)), which amount shall be funded by Debtors into a segregated account under the control of Debtors' counsel (the "**Carve Out**

Account"), plus (y) such amounts which are accrued but unpaid in the Case as of the Commitment Termination Date, provided that, such amounts under clause (y) are consistent with the Budget, which unpaid amounts shall be funded into the Carve Out Account commencing upon the Commitment Termination Date through collection of proceeds of the DIP Collateral (except as agreed in the following sentence upon a sale of the Debtors' assets). The DIP Lender acknowledges and agrees that (i) upon a sale of all or substantially all of the Debtors' assets for cash, the net cash proceeds of such sale shall be first applied to fund the Carve Out Account required by this Order, and (ii) upon a sale of all or substantially all of the Debtors' assets pursuant to a credit bid with no (or insufficient) net cash proceeds, the DIP Lender shall fund the Carve Out Account as required by this Order. In no event, however, shall any proceeds or other payments (including but not limited to, settlement payments) resulting from any Challenge that results in (and is limited to the amount of) actual payment under the Pre-Petition DuPont Guaranty be used to fund the Carve-Out Account. For purposes of this Final Order, references to the Carve Out shall include the Carve Out Account and funds therein. As provided in the DIP Credit Agreement, the Borrowing Base (as defined therein) shall be reduced by a reserve in the amount of the Carve Out. The Carve Out shall exclude any fees and expenses (x) which are incurred in connection with the assertion or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (A) invalidating, setting aside, avoiding, or subordinating, in whole or in part, (i) the DIP Obligations or (ii) the DIP Lender's Liens in the DIP Collateral, or (B) preventing, hindering or delaying, whether directly or indirectly, the DIP Lender's assertion or enforcement of the DIP Liens, security interests or realization upon any DIP Collateral; (y) which are incurred incidental to the use of cash

29

collateral of the DIP Lender in connection with either (1) the sale or other disposition of any other DIP Collateral which is not permitted under the DIP Credit Agreement, or (2) the incurrence of any indebtedness which is not permitted under the DIP Credit Agreement, in each case, to the extent the DIP Lender has not provided its express written consent; or (z) arising after the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code. Except as otherwise provided in this Paragraph 8, nothing contained in this Final Order shall be deemed a consent by the DIP Lender to any charge, lien, assessment or claim against the DIP Collateral under Section 506(c) of the Bankruptcy Code or otherwise. Nothing herein shall be construed to obligate the DIP Lender itself, in any way, to pay any professional fees of any Case Professional or expenses of any members of the Creditors' Committee (except, for the avoidance of doubt, through proceeds of the DIP Facility or proceeds of the DIP Collateral, and as contemplated by the Budget), or to assure that the Debtors have sufficient funds on hand to pay any of the foregoing or to advance funds to establish the Carve Out (except, for the avoidance of doubt, as contemplated by this Order to establish the initial $500,000 of the Carve Out with proceeds of the DIP Facility, and to fund the Carve Out in the event that the DIP Facility is used in part to credit bid as the successful bid in a sale of all or substantially all of the Debtors' assets and insufficient cash proceeds are otherwise unavailable). Subject to Paragraph 9 hereof, for so long as a DIP Order Event of Default shall not have occurred and be continuing, the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under Sections 330 and 331 of the Bankruptcy Code and in accordance with the Budget, as the same may be due and payable, without reducing the Carve Out. The payment of the Carve Out shall not reduce the amount of the DIP Obligations.

30

9. **Payment of Compensation**. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Creditors' Committee or of any person or shall affect the rights of the DIP Lender or DuPont to object to the allowance and payment of such fees and expenses or to permit the Debtors to pay any such amounts not set forth in the Budget.

10. **[Reserved]**.

11. **Collateral Rights**. Unless the DIP Lender has provided its prior written consent, there shall not be entered in these proceedings, or in any Successor Cases, any order which authorizes any of the following:

(a)    except as permitted under the DIP Credit Agreement or in conjunction with the Full Payment of Senior Obligations, the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or entitled to priority administrative status which is equal or senior to those granted to the DIP Lender; or

(b)    the Debtors' return of goods constituting DIP Collateral pursuant to Section 546(h) of the Bankruptcy Code, except as expressly permitted by the DIP Credit Agreement.

12. **Proceeds of Subsequent Financing**. Without limiting the provisions and protections of Paragraph 11 above, if at any time prior to the Full Payment of Senior Obligations, the Debtors, their estates, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to Bankruptcy Code Sections 364(b), 364(c) or 364(d) in violation of the DIP Credit Agreement, then all of the cash

31

proceeds derived from such credit or debt and all cash collateral shall immediately be applied solely to reduce the DIP Obligations until the Full Payment of Senior Obligations.

13. **Commitment Termination Date**. All (a) DIP Obligations shall be immediately due and payable, and (b) authority to use the proceeds of the DIP Financing Agreements shall cease, both on the date that is the earliest to occur of (the "**Commitment Termination Date**"): (i) September 30, 2010, (ii) date on which the maturity of the DIP Obligations is accelerated and the commitments of the DIP Lender are irrevocably terminated in accordance with the DIP Financing Agreements following a DIP Order Event of Default, (iii) the failure of the Debtors to obtain the entry of this Final Order on or before the date which is thirty (30) days after the date of the entry of the Interim Order, (iv) the closing date of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code or (iv) the effective date of a confirmed plan of reorganization.

14. **Payment from Proceeds of Collateral**.

(a)    All products and proceeds of the DIP Collateral and the Pre-Petition DuPont Collateral (including, for the avoidance of doubt, proceeds from receivables and sales in the ordinary course of business, insurance proceeds, and proceeds of all dispositions thereof, whether or not in the ordinary course) regardless of whether such collateral came into existence prior to the Petition Date, shall be remitted in the manner set forth in Paragraph 12.

(b)    Without limiting the foregoing clause (a), with respect to any recovery (a "Recovery") from any of the Pre-Petition Secured Parties on account of the Specified Avoidance Actions, to the extent such Recovery results in an actual payment under the Pre-Petition DuPont Guaranty (a "Guaranty Payment"), the Recovery shall be remitted by the Pre-Petition Secured Parties as follows: (i) for any Recovery in connection with a Specified Avoidance Action that is

32

a Chapter 5 avoidance action: (x) if DuPont has not made payment under the DuPont Post-Petition Guaranty, directly to the DIP Lender in the amount of the Guaranty Payment, for application to the DIP Obligations; (y) if DuPont has made payment under the DuPont Post-Petition Guaranty, directly to DuPont in the amount of the Guaranty Payment, for application to the Reimbursement Obligations, and (z) in either case, to the extent of any such Recovery in excess of the Guaranty Payment, directly to the Debtors; and (ii) for any Recovery in connection with a Specified Avoidance Action that is not a Chapter 5 avoidance action: (x) if DuPont has not made payment under the DuPont Post-Petition Guaranty, directly to the DIP Lender for application to the DIP Obligations until the Full Payment of Senior Obligations; and (y) if DuPont has made payment under the DuPont Post-Petition Guaranty, directly to DuPont in the amount of the Guaranty Payment, for application to the Reimbursement Obligations, and then to the DIP Lender for application to the DIP Obligations until the Full Payment of Senior Obligations. If at the time a Recovery is remitted to the DIP Lender under the foregoing sub-clauses the Guaranty Payment is in excess of the then outstanding DIP Obligations, any such excess shall be held by the DIP Lender as DIP Collateral pending agreement of the DIP Lender and the Borrower or order of the Court.

15. **Disposition of Collateral**. The Debtors shall not (a) sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, without the prior written consent of the DIP Lender (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Lender or an order of this Court), except for sales of the Debtors' inventory in the ordinary course of business or except as otherwise provided for in the DIP Credit Agreement, the Interim Order and this Final Order or as approved by the Court, or (b)

33

assume, reject or assign any leasehold interest without prior consultation with the DIP Lender, except as otherwise provided for in the DIP Credit Agreement or as approved by the Court.

16. **Events of Default.** The occurrence of any of the following events shall constitute an event of default under this Final Order (a **"DIP Order Event of Default"**):

(a)     Failure by any of the Debtors to comply with any term of this Final Order;

(b)     An Event of Default (as defined in the DIP Credit Agreement); or

(c)     The Commitment Termination Date.

17. **Rights and Remedies Upon DIP Order Event of Default.**

(a)     Any automatic stay otherwise applicable to the DIP Lender is hereby modified so that after the occurrence of any DIP Order Event of Default and at any time thereafter upon five (5) business days prior written notice of such occurrence, in each case given to each of counsel for the Debtors, counsel for the Creditors' Committee, if any, the Debtors' twenty (20) largest creditors if no Creditors' Committee has been appointed, and the U.S. Trustee, the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the DIP Financing Agreements. Immediately following the giving of notice by the DIP Lender of the occurrence of a DIP Order Event of Default: (i) the Debtors shall continue to deliver and cause the delivery of the proceeds of DIP Collateral to the DIP Lender as provided in the DIP Credit Agreement and this Final Order; (ii) the DIP Lender shall continue to apply such proceeds in accordance with the provisions of this Final Order and the DIP Credit Agreement; (iii) the Debtors shall have no right to use any of such proceeds, nor any other Cash Collateral other than towards the satisfaction of the DIP Obligations and the Carve Out; and (iv) any obligation otherwise imposed on the DIP Lender to provide any loan or advance to the Debtors pursuant to the DIP Facility shall be suspended. Following the giving of notice by the DIP Lender of the

34

occurrence of a DIP Order Event of Default, the Debtors shall be entitled to an emergency hearing before this Court solely for the purpose of contesting whether a DIP Order Event of Default has occurred. If the Debtors do not contest the right of the DIP Lender to exercise its remedies based upon whether a DIP Order Event of Default has occurred within such time period, or if the Debtors do timely contest the occurrence of a DIP Order Event of Default and the Court after notice and hearing declines to stay the enforcement thereof, the automatic stay, as to the DIP Lender, shall automatically terminate at the end of such notice period.

(b)     In any exercise of their rights and remedies upon a DIP Order Event of Default under the DIP Financing Agreements, as applicable, the DIP Lender is authorized to proceed under or pursuant to the DIP Financing Agreements.

(c)     The automatic stay imposed under Bankruptcy Code Section 362(a) is hereby modified pursuant to the terms of this Final Order as necessary to (1) permit the Debtors to grant the DuPont Replacement Liens, the DuPont Post-Petition Liens and the DIP Liens, and to incur all liabilities and obligations to (x) DuPont under this Final Order and with respect to the Reimbursement Obligations and (y) the DIP Lender under the DIP Financing Agreements and this Final Order, as applicable, and (2) authorize the DIP Lender and the Pre-Petition Secured Parties to retain and apply payments hereunder.

(e)     Nothing included herein shall prejudice, impair, or otherwise affect the DIP Lender's rights to seek any other or supplemental relief in respect of the Debtors, or the DIP Lender's rights, as provided in the DIP Financing Agreements, to suspend or terminate the making of loans under the DIP Financing Agreements.

(f)     Notwithstanding anything in this Final Order to the contrary, in the event that the DIP Lender exercises its rights and remedies upon a default and seeks to take possession

of any premises where any DIP Collateral is located, its rights and remedies with respect to taking possession of such premises shall be limited to (i) relief provided by further order of this Court; (ii) any agreement with the applicable landlord; (iii) the terms of any applicable lease; and (iv) applicable non-bankruptcy law.

18. **Proofs of Claim**. Neither the DIP Lender nor any Pre-Petition Secured Party shall be required to file a proof of claim in these Cases.

19. **Other Rights and Obligations**.

(a) **Good Faith Under Section 364(e) of the Bankruptcy Code. No Modification or Stay of This Final Order**. Based on the findings set forth in this Final Order and in accordance with Section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Final Order, in the event any or all of the provisions of this Final Order are hereafter modified, amended or vacated by a subsequent order of this or any other Court, the DIP Lender and DuPont are entitled to the protections provided in Section 364(e) of the Bankruptcy Code and no such modification, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or the liens or priority authorized or created hereby. Notwithstanding any such modification, amendment or vacation, any claim granted to the DIP Lender or DuPont hereunder arising prior to the effective date of such modification, amendment or vacation of any DIP Protections or DuPont Protections granted to the DIP Lender or DuPont shall be governed in all respects by the original provisions of this Final Order, and the DIP Lender and DuPont shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Protections and the DuPont Protections granted herein, with respect to any such claim. Since the loans made pursuant to the DIP Credit Agreement are made in reliance on this Final Order, the obligations owed to the DIP Lender or to DuPont prior to the effective date

36

of any stay, modification or vacation of this Final Order shall not, as a result of any subsequent order in the Cases or in any Successor Cases, be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Lender or DuPont under this Final Order and/or the DIP Financing Agreements.

(b)     **Expenses**.  As provided in the DIP Financing Agreements, all costs and expenses of the DIP Lender and all fees and charges of the Administrative Agent in connection with the DIP Financing Agreements, including, without limitation, legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement of fees and expenses, and other out of pocket expenses will be paid by the Debtors as and when required by the terms of the DIP Financing Agreements.  Payment of such fees and expenses shall not be subject to allowance by the Court. The DIP Lender shall provide to the U.S. Trustee and counsel to any Creditors' Committee, the invoices for fees and expenses incurred for professionals retained by the DIP Lender (redacted for privileged or confidential information).  Under no circumstances shall professionals for the DIP Lender be required to comply with the U.S. Trustee fee guidelines.

(c)     **Binding Effect**.  The provisions of this Final Order shall be binding upon and inure to the benefit of the DIP Lender, the Pre-Petition Secured Parties, DuPont, and the Debtors.  Any successors or assigns of the Debtors (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors) whether in the Cases, in any Successor Cases, or upon dismissal of any such chapter 11 or chapter 7 case shall be bound by the provisions of this Final Order.

(d)     **No Waiver**. The failure of the DIP Lender to seek relief or otherwise exercise its rights and remedies under the DIP Financing Agreements, the DIP Facility, this Final Order or otherwise, as applicable, shall not constitute a waiver of any of the DIP Lender's rights hereunder, thereunder, or otherwise. Notwithstanding anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights and remedies of the DIP Lender or, except as otherwise expressly provided herein or in the DuPont Post-Petition Guaranty, of DuPont, under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the DIP Lender or DuPont to (i) request conversion of the Cases to cases under Chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases, (ii) propose, subject to the provisions of Section 1121 of the Bankruptcy Code, a plan of reorganization or plan of liquidation for the Debtors (a "**Plan**"), or (iii) exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Lender or DuPont.

(e)     **No Third Party Rights**. Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

(f)     **No Marshaling**. The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

(g)     **Section 552(b)**. The DIP Lender shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender with respect to proceeds, product, offspring or profits of any of the DIP Collateral.

38

(h)    **Amendment**.  The Debtors and the DIP Lender may enter into waivers, consents and amendments with respect the DIP Financing Agreements (a) without the need for further Court approval provided that (i) notice is given to the Office of the United States Trustee and any Creditors' Committee appointed in these Cases, and (ii) such amendment, consent or waiver, in the reasonable judgment of the Debtors and the DIP Lender, after consultation with any Committee, is both non-prejudicial to the rights of third parties and is not material, or (b) with Court approval, upon ten (10) days prior notice of such amendment, consent or waiver to the Office of the United States Trustee and any Creditors' Committee appointed in these Cases. Except as otherwise provided herein, no waiver, consent, modification or amendment of any of the provisions of this Final Order or the DIP Financing Agreements shall be effective unless set forth in writing, signed by or on behalf of all of the Debtors, and the DIP Lender, and without limiting the foregoing, no waiver, consent, modification or amendment to any of the provisions of this Final Order that could affect the rights, remedies and other protections of any of the Pre-Petition Secured Parties shall be effective unless set forth in writing signed by the Pre-Petition Agent, and, to the extent the rights and remedies of DuPont under this Final Order would be affected thereby, DuPont.

(i)    **Survival of Final Order**.  The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any Plan in the Cases, (ii) converting any of the Cases to a case(s) under chapter 7 of the Bankruptcy Code, or (iii) dismissing any of the Cases, (iv) withdrawing of the reference of any of the Cases from this Court, or (v) providing for abstention from handling or retaining of jurisdiction of any of the Cases in this Court.  The terms and provisions of this Final Order including the DIP Protections granted pursuant to this Final Order and the DIP Financing

39

Agreements, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections and protections for the Pre-Petition Secured Parties shall maintain their priority as provided by this Final Order until all the obligations of the Debtors to the DIP Lender pursuant to the DIP Financing Agreements have been indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms). The Debtors shall not propose or support any Plan that is not conditioned upon the payment in full in cash of all of the DIP Obligations on or prior to the earlier to occur of (i) the effective date of such Plan and (ii) the Commitment Termination Date.

(j)     **Inconsistency**.  In the event of any inconsistency between the terms and conditions of the DIP Financing Agreements and of this Final Order, the provisions of this Final Order shall govern and control.

(k)     **Enforceability**.  This Final Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

(l)     **Objections Overruled**.  All objections to the DIP Motion to the extent not withdrawn or resolved, are hereby overruled.

(m)     **No Waivers or Modification of Final Order**.  The Debtors irrevocably waive any right to seek any modification or extension of this Final Order without the prior written consent of the DIP Lender, and, to the extent the rights and remedies of DuPont under this Final Order would be affected thereby, DuPont, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender or DuPont.  The Debtors further irrevocably waive any right to seek any waiver, consent, modification or amendment to any of

40

the provisions of this Final Order that could affect the rights, remedies and other protections of any of the Pre-Petition Secured Parties without the prior written consent of the Pre-Petition Agent, and no such consent shall be implied by any other action, inaction or acquiescence of the Pre-Petition Agent.

        (n)     **Waiver of any Applicable Stay**.  Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Final Order.

       20.    **Survival of Protections**.  Unless and until the Full Payment of Senior Obligations and the discharge of the Reimbursement Obligations, the protections afforded to the DIP Lender, DuPont and the Pre-Petition Secured Parties pursuant to this Final Order and, where applicable, under the DIP Financing Agreements, and any actions taken pursuant thereto, shall survive the entry of any order confirming a Plan or converting the Cases to a case(s) under Chapter 7 of the Bankruptcy Code, and the DIP Protections, the DuPont Protections and the protections granted to the Pre-Petition Secured Parties hereunder shall continue in these proceedings and in any Successor Cases, and such protections shall maintain their respective priorities as provided by this Final Order.

       21.    **Retention of Jurisdiction**.  The Court has and will retain jurisdiction to enforce this Final Order according to its terms.

SO ORDERED by the Court this 12th day of May, 2010.

_____
The Honorable Peter J. Walsh
United States Bankruptcy Judge

70934-001\DOCS_DE:159875.2