IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 10-11255 (PJW) |
| POINT BLANK SOLUTIONS INC., *et al.*[1] | ) | |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | **Related Docket Nos. 589, 592, 593, 655,** |
| | ) | **711, 713, 721, 722, 724 and 725** |

**Objection Deadline: October 20, 2010 at 4:00 p.m. (ET)**
**Hearing Date: November 23, 2010 at 11:00 a.m. (ET)**

## DEBTOR POINT BLANK SOLUTIONS INC.'S REPLY IN SUPPORT OF MOTION FOR ORDER UNDER 11 U.S.C. § 365(a) AUTHORIZING REJECTION OF CLASS AND DERIVATIVE ACTION SETTLEMENT AGREEMENT

Point Blank Solutions Inc., a debtor and debtor in possession in the above-captioned

cases, hereby submits this reply in further support of *Debtor Point Blank Solutions Inc.'s Motion*

*for Order Under 11 U.S.C. § 365(a) Authorizing Rejection of Class and Derivative Action*

*Settlement Agreement* [Docket No. 589] and the *Supplement to Debtor Point Blank Solutions*

*Inc.'s Motion for Order Under 11 U.S.C. § 365(a) Authorizing Rejection of Class and Derivative*

*Action Settlement Agreement* [Docket No. 655], and in response to *Lead Plaintiffs' Objection to*

*Debtor Point Blank Solutions Inc.'s Motion for Order Under 11 U.S.C. § 365(a) Authorizing*

---

[1] Debtors in the above-captioned cases, along with the last four digits of each Debtor's federal tax
identification number and their respective addresses, are: Point Blank Solutions Inc. (9361), 2102 S.W.
2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor Inc. (4044), 2102 S.W. 2nd Street,
Pompano Beach, FL 33069; Protective Apparel Corporation of America (9051), 179 Mine Lane,
Jacksboro, TN 37757; and PBSS, LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.

*Rejection of Class and Derivative Action Settlement Agreement* [Docket No. 721] (the "Class

Plaintiffs' Objection"), the *Objection of David H. Brooks to Debtor Point Blank Solution Inc.'s*

*Motion for Order Under 11 U.S.C. § 365(a) Authorizing Rejection of Class and Derivative*

*Action Settlement Agreement* [Docket No. 711] (the "Brooks Objection"), *D. David Cohen's*

*Objection to Debtor Point Blank Solutions Inc.'s Motion for Order Under 11 U.S.C. § 365(a)*

*Authorizing Rejection of Class and Derivative Action Settlement Agreement* [Docket No. 713]

(the "Cohen Objection"), and *Dawn Schlegel's Objection to Debtor Point Blank Solutions Inc.'s*

*Motion for Order Under 11 U.S.C. § 365(a) Authorizing Rejection of Class and Derivative*

*Action Settlement Agreement* [Docket No. 725] (the "Schlegel Objection").[2] For the reasons set

forth herein, in the Rejection Motion and in the Supplement, Point Blank respectfully requests

that this Court enter an order authorizing Point Blank to reject the Settlement Agreement.[3]

## PRELIMINARY STATEMENT

1.      Point Blank seeks the Court's approval to reject the Settlement Agreement

because Point Blank has determined, in the exercise of its business judgment and with the

support of the Creditors Committee, that the Settlement Agreement is a burdensome executory

contract and that rejection of the Settlement Agreement will result in a net benefit to Point

---

[2] In support of the Rejection Motion, the Official Committee of Unsecured Creditors (the "Creditors Committee"), filed the *Statement of Official Committee of Unsecured Creditors In Support of the Motion of Point Blank Solutions Inc. Pursuant to 11 U.S.C. § 365(a) for Authority to Reject Pre-Petition Agreement* [Docket No. 722] (the "Creditors Committee Statement"). The Official Committee of Equity Security Holders (the "Equity Committee") also filed the *Response and Request for Adjournment of the Official Committee of Equity Security Holders to Debtor Point Blank Solution Inc.'s Motion for Order Under 11 U.S.C. § 365(a) Authorizing Rejection of Class and Derivative Action Settlement Agreement* [Docket No. 724] (the "Equity Committee Response").
[3] All capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Rejection Motion and the Supplement.

Blank's estate. As set forth in the Rejection Motion and Supplement, the Settlement Agreement consists of ten related and interdependent agreements entered into in connection with the settlement of the Class and Derivative Actions. The Settlement Agreement is an executory contract subject to rejection because each of the parties has material unperformed obligations under the Settlement Agreement, including: (i) the obligation to use "best efforts" to obtain final court approval of the Settlement Agreement; (ii) various obligations, including the obligation to exchange releases, in the event that the Settlement Agreement receives final court approval; and (iii) various "unwinding" obligations in the event that the Settlement Agreement does not receive final court approval. Rejection of the Settlement Agreement is an appropriate exercise of Point Blank's business judgment because the potential benefits of rejection – including the fact that rejection will compliment Point Blank's efforts to recover approximately $35,200,000 of Escrowed Funds – outweigh any "rejection damages" the estate may incur.

2.      Two main Objections to the Rejection Motion have been filed: the Class Plaintiffs' Objection and the Brooks Objection.[4] As set forth herein, however, neither the Class Plaintiffs nor Brooks provide any grounds for denying the relief requested in the Rejection Motion. The principal arguments set forth by Class Plaintiffs and Brooks, and the principal flaws in those arguments, are as follows:

a.      Brooks and the Class Plaintiffs erroneously assert that Point Blank will not be entitled to the $35,200,000 of Escrowed Funds upon rejection of the Settlement

---

[4] The Schlegel Objection adopts the arguments set forth in the Class Plaintiffs' Objection. *See* Schlegel Objection ¶ 1. Therefore, Point Blank's responses to the Class Plaintiffs' Objection apply equally to the Schlegel Objection. The Cohen Objection, which focuses primarily upon Point Blank's motivation in seeking to reject the Settlement Agreement, is discussed at paragraphs 30-31, *infra*.

Agreement. According to Brooks, who was convicted in September 2010 on seventeen counts including securities fraud and insider trading based upon the same misconduct alleged in the Class and Derivative Actions, the Settlement Agreement is void and Brooks is entitled to the vast majority of the Escrowed Funds, despite the fact that the Escrowed Funds are Point Blank's proceeds from the sale of DHB stock to Brooks and the "buy-out" of Point Blank's insurance policies. According to the Class Plaintiffs, the Settlement Agreement is valid despite the absence of final court approval and approximately $10,000,000 of the Escrowed Funds should be retained by Class Plaintiffs' counsel (versus only $25,000,000 to be distributed to the class as a whole). As set forth in the Rejection Motion and the Supplement, however, neither Brooks nor the Class Plaintiffs are entitled to the Escrowed Funds. Instead, the Escrowed Funds are property of Point Blank's estate.

        b.      Class Plaintiffs (and, to some extent, Brooks) argue that the Settlement Agreement is not an executory contract subject to rejection by Point Blank. As set forth in the Rejection Motion and Supplement, however, the Settlement Agreement is executory because each of the parties to the Settlement Agreement has material unperformed obligations under the Settlement Agreement. Among other things, the parties to the Actions are required to use their "best efforts" to achieve the fundamental goal of obtaining final court approval of the settlement of the Actions. This obligation is particularly significant in light of the opinion (the "Opinion") issued on September 30, 2010 by the United States Court of Appeals for the Second Circuit (the "Second Circuit"). The Second Circuit's Opinion vacated and remanded the Derivative Action Judgment on the grounds that the indemnification and release provisions of

the Stipulation violate section 304 of the Sarbanes-Oxley Act of 2002. Unless the parties to the Actions use their "best efforts" to obtain final court approval of the Stipulation – by, for instance, filing a petition for a writ of certiorari in the United States Supreme Court – the settlement of the Actions cannot receive final court approval and the Stipulation will be terminated according to its terms. Thus, the obligation to use "best efforts" to obtain final court approval is undeniably a material unperformed obligation shared by each of the parties to the Actions. Furthermore, the parties to the Settlement Agreement have additional material unperformed obligations under the Settlement Agreement, including the obligation to exchange releases upon final court approval of the Settlement Agreement and various "unwinding" obligations in the event that the Settlement Agreement does not receive final court approval.

    c.  Class Plaintiffs argue that the Stipulation should not be considered together with the Settlement Agreement for purposes of rejection. Even if the Class Plaintiffs' argument was correct, the Stipulation as a "stand-alone" agreement is an executory contract subject to rejection by Point Blank. The Class Plaintiffs' argument is incorrect, however, because the Settlement Agreement (including the Stipulation) is a single contract. The provisions of the Settlement Agreement upon which Class Plaintiffs rely to argue that the Stipulation is a separate contract – such as the integration clause in the Stipulation and the arbitration provisions of the Agreement of Insureds – do not outweigh the fact that each agreement included in the Settlement Agreement was entered into for the common purpose of settling the Actions and was designed to implement the terms of the settlement as initially set forth in the MOU.

d.     Class Plaintiffs also argue that the settlement of the Class Action is divisible from the settlement of the Derivative Action, such that the settlement of the Class Action is not dependent upon final court approval of the settlement in the Derivative Action. This interpretation of the Settlement Agreement directly contradicts the intent of the parties as demonstrated by the plain language of the Stipulation. Furthermore, and most significantly, this interpretation of the Settlement Agreement is belied by Class Plaintiffs' own conduct. If the settlement of the Class Action was truly separate from the settlement of the Derivative Action, then there would be no reason for the Escrow Agent to delay distribution of the Escrowed Funds to class members pending final court approval of the settlement in the Derivative Action. The Escrow Agent (*i.e.*, Class Plaintiffs' counsel), of course, has not distributed the Escrowed Funds to the class members because the Escrow Agent obviously is aware that to do so in advance of final court approval in the Derivative Action would violate the Escrow Agent's obligations under the Escrow Agreement. Therefore, the indivisible nature of the settlement of the Class and Derivative Actions is demonstrated by both the terms of the Settlement Agreement and the conduct of the parties in accordance with such terms.

3.     Thus, none of the Objections to the Rejection Motion provide any grounds for denying the relief requested in the Rejection Motion. As set forth below, in the Rejection Motion and in the Supplement, Point Blank has determined in the exercise of its business judgment (and with the support of the Creditors Committee) that rejection of the Settlement Agreement is in the best interests of Point Blank's estate. Rejection will relieve Point Blank of its obligation to use "best efforts" to obtain final court approval of the Stipulation and of its

"unwinding" obligations in the event that the Stipulation does not receive final court approval (including its obligations with respect to the $14,825,000 "sale back" option held by Brooks, its obligation to pay $4,500,000 to Brooks and its obligation to "mutually agree" with the other Insureds as to the remaining $12,875,000 of the Escrowed Funds). Rejection of the Settlement Agreement thus will facilitate the turnover of the $35,200,000 of the Escrowed Funds, which will then be available for distribution in accordance with the priorities established by the Bankruptcy Code. Point Blank has, in fact, already filed its *Complaint for Turnover of Property of the Estate* [Docket No. 774, Adv. Docket No. 1] (the "Turnover Complaint") seeking turnover of (i) the amounts provisionally paid from the Escrowed Funds as attorneys fees and expenses to plaintiffs' counsel in the Actions and (ii) the remainder of the Escrowed Funds held by the Escrow Agent.[5] Thus, as explained in detail in the Rejection Motion, the potential benefits of rejection outweigh the "rejection damages" Point Blank is likely to incur, and therefore rejection of the Settlement Agreement should be approved.

## ARGUMENT

### The Escrowed Funds Are Property Of Point Blank's Estate

4.     The Brooks Objection and the Class Plaintiffs' Objection both share a common theme: Brooks and the Class Plaintiffs argue that, upon rejection of the Settlement Agreement, Point Blank will not be entitled to the $35,200,000 of Escrowed Funds. Brooks and the Class Plaintiffs are incorrect. According to both Brooks and the Class Plaintiffs, the vast

---

[5] Point Blank filed the Turnover Complaint on November 16, 2010. The adversary proceeding is captioned *Point Blank Solutions Inc. v. Robbins Geller Rudman & Dowd LLP, et al.*, Adv. No. 10-55361 (PJW).

majority of the Escrowed Funds ($22,325,000) will be returned to Brooks if the Settlement Agreement does not receive final court approval, because Brooks "wrote the check" to deposit the funds in the Escrow Account. *See, e.g.,* Class Plaintiffs' Objection ¶¶ 81-82. As set forth in the Rejection Motion, however, regardless of which party "wrote the check" to deposit this portion of the Escrowed Funds, Point Blank holds legal and equitable title to such funds as the proceeds of Point Blank's sale of DHB stock to Brooks. *See In re Allegheny Label, Inc.*, 128 B.R. 947, 952 (Bankr. W.D. Pa. 1991) (cited in Rejection Motion); *see also In re World Communications, Inc.*, 72 B.R. 498, 501 (D. Utah 1987) (escrow account holding proceeds from sales of debtor's products constituted property of the debtor's bankruptcy estate). Point Blank also holds legal and equitable title to the $12,875,000 of the Escrowed Funds deposited by the Insurance Carriers, because such funds represent the proceeds of the "sale" of Point Blank's insurance policies to the Insurance Carriers under the RISA. *See, e.g., In re Sacred Heart Hosp. of Norristown*, 182 B.R. 413, 420 (Bankr. E.D. Pa. 1995) (proceeds of D&O policy as a whole were property of the bankruptcy estate where proceeds available for debtor's liability exposure were not segregated from the proceeds available to the directors and officers); *see also In re Jasmine, Ltd.*, 258 B.R. 119, 128 (D.N.J. 2000) (proceeds of D&O policy were property of the estate).

5.      Class Plaintiffs also are incorrect in asserting that, upon rejection of the Settlement Agreement, the Stipulation will continue as to the other parties and the Escrowed Funds will be distributed to Class Plaintiffs and retained by plaintiffs' counsel in the Actions. By asserting that the Stipulation will continue as to the other parties, Class Plaintiffs ignore the

fact that rejection of the Settlement Agreement will relieve Point Blank – undeniably one of the primary parties to the Settlement Agreement – of its obligations under the Settlement Agreement, including its obligation to exchange releases with the other parties, its obligation to deliver the stock portion of the settlement and its obligation to use "best efforts" to obtain final court approval of the Settlement Agreement by filing a petition for writ of certiorari with respect to the Second Circuit's Opinion. Class Plaintiffs also ignore the fact that, while some of the other parties to the Settlement Agreement may have agreed to modify the Stipulation as a result of the Second Circuit's Opinion, Point Blank is unwilling to agree to a modification of the Stipulation. Finally, Class Plaintiffs ignore the fact that, absent a successful appeal of the Second Circuit's Opinion, the Stipulation in its present form will not (and indeed cannot) receive final court approval and thus the condition that would have allowed the Escrowed Funds to be distributed to Class Plaintiffs and retained by plaintiffs' counsel in the Actions will fail. The suggestion that the Stipulation, absent Point Blank's participation and absent a successful appeal of the Second Circuit's Opinion, might somehow proceed to final court approval in the Eastern District of New York is nonsensical.

### The Settlement Agreement Is An Executory Contract

6.     As set forth in the Rejection Motion and the Supplement, each of the parties to the Settlement Agreement has material unperformed obligations that render the Settlement Agreement an executory contract subject to rejection by Point Blank.[6] In an attempt

---

[6] Brooks argues in the Brooks Objection that Point Blank relies upon the "functional approach" to demonstrate that the Settlement Agreement is an executory contract. *See* Brooks Objection ¶ 38. This is entirely inaccurate. Point Blank seeks to reject the Settlement Agreement as an executory contract under the "Countryman" definition applied in the Third Circuit. *See* Rejection Motion ¶ 38.

to demonstrate that the Settlement Agreement is not an executory contract, each of the Objections to the Rejection Motion references the fact that on September 30, 2010 (*i.e.,* after the Petition Date and after the filing of the Rejection Motion), the Second Circuit vacated and remanded the Derivative Action Judgment on the grounds that the indemnification and release provisions of the Stipulation violate section 304 of the Sarbanes-Oxley Act of 2002. *See* Class Plaintiffs' Objection ¶¶ 51, 54; Brooks Objection ¶ 12; Cohen Objection ¶ 4(b); Equity Committee Response ¶ 2. In the Third Circuit, however, the "time for testing whether there are material unperformed obligations on both sides [of a contract] is when the bankruptcy petition is filed." *In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 240 (3d Cir. 1995) (cited in Supplement); *see also In re Waste Sys. Int'l, Inc.*, 280 B.R. 824, 827 (Bankr. D. Del. 2002) (cited in Supplement). Therefore, the Second Circuit's Opinion, which was issued after the Petition Date and after Point Blank filed the Rejection Motion, does not alter the conclusion set forth in the Rejection Motion that each of the parties has material unperformed obligations under the Settlement Agreement as of the Petition Date.[7]

7.     Moreover, even if events after the Petition Date (such as the Second Circuit's Opinion) are considered, each of the parties continues to have material unperformed obligations under the Settlement Agreement. For instance, Class Plaintiffs assert that there are no material unperformed obligations remaining under paragraph 8.1 of the Stipulation, which obligates the parties to the Stipulation to "cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of this Stipulation and to exercise their best

---

[7] *See* Rejection Motion ¶¶ 40(a)-(m) for a description of the parties' material unperformed obligations as of the Petition Date.

efforts to accomplish" the terms and conditions of the Stipulation. *See* Stipulation ¶ 8.1. This

assertion is untenable, however, especially in light of the Second Circuit's Opinion vacating and

remanding the Derivative Action Judgment. As a result of the Second Circuit's Opinion, the

Stipulation in its present form cannot receive final court approval unless one or more of the

parties to the Stipulation file a petition for writ of certiorari in the United States Supreme Court.

The "best efforts" of the parties to accomplish the terms and conditions of the Stipulation

therefore would include filing such a petition for writ of certiorari. As a result, the "best efforts"

obligation, which particularly in light of the Second Circuit's Opinion directly affects the

fundamental goal of achieving final court approval of the Stipulation, is a material unperformed

obligation under the Settlement Agreement. *See, e.g., In re Broadstripe, LLC*, 402 B.R. 646, 655

(Bankr. D. Del. 2009), *as amended* (Mar. 10, 2009) (cited in Rejection Motion); *In re High*

*Voltage Eng'g Corp.*, 397 B.R. 579, 598 (Bankr. D. Mass. 2008) *aff'd*, 403 B.R. 163 (D. Mass.

2009) (cited in Rejection Motion); *see also In re WorldCom, Inc.*, 343 B.R. 486, 494 (Bankr.

S.D.N.Y. 2006) (prepetition settlement agreement was executory contract where debtor was

obligated to make certain payments to non-debtor and use its best efforts to maximize recovery

in underlying condemnation action, and non-debtor was obligated to refrain from taking steps to

vacate related state court consent judgment); *In re Helm*, 335 B.R. 528, 537 (Bankr. S.D.N.Y.

2006) (contract was executory where non-debtor was obligated to collect royalties due to debtor,

and debtor was obligated to cooperate with collection efforts); *In re Balco Equities Ltd., Inc.*,

323 B.R. 85, 96 (Bankr. S.D.N.Y. 2005) (contract for sale of land was executory where debtor

was obligated to convey title, provide certain documents and cooperate with purchaser in

pursuing applications for final subdivision approval and building permits). Moreover, the "best efforts" obligation – including the obligation to file a petition for writ of certiorari – is shared by Point Blank and each of the other parties to the Stipulation, including the Class Plaintiffs.[8]

8.     The obligation to exchange releases upon final court approval of the Stipulation also is a material unperformed obligation of each of the parties to the Actions. *See* Stipulation ¶¶ 4.1, 4.5 (exchange of releases between the plaintiffs in the Actions and the Settling Defendants will not take effect until the Effective Date of the Stipulation).[9] The Class Plaintiffs attempt to deny the existence of this obligation by arguing that "[m]embers of the Class have long ago submitted their Proof of Claim and Release forms to the claims administrator in the Class Action." Class Plaintiffs' Objection ¶ 43.[10] In doing so, Class Plaintiffs overlook the

---

[8] Class Plaintiffs can intervene in the Derivative Action under Federal Rule of Civil Procedure 24 for purposes of appealing the Second Circuit's Opinion. *See, e.g., Com. Land Title Ins. Co. v. Corman Const., Inc.*, 508 U.S. 958, 113 S. Ct. 2926, 124 L. Ed. 2d 677 (1993) (granting motion to intervene in order to file a petition for writ of certiorari); *Ross v. Marshall*, 426 F.3d 745, 761 (5th Cir. 2005) (district court erred in denying insurer's motion to intervene as of right in order to appeal judgment against insured); *Americans United for Separation of Church & State v. City of Grand Rapids*, 922 F.2d 303, 306 (6th Cir. 1990) (granting religious organization's motion to intervene as of right in order to appeal district court's order enjoining city from allowing religious organization to erect religious display, where city had decided not to appeal). Nothing herein shall be construed, however, as a concession that the filing of a petition for writ of certiorari with respect to the Second Circuit's Opinion would not violate the automatic stay in the above-captioned Chapter 11 cases. Debtors expressly reserve all rights to seek enforcement of the automatic stay in the event that any party files such a petition for writ of certiorari, seeks to continue the Actions or any other proceedings against Debtors or otherwise attempts to exercise control over property of Debtors' estates.

[9] In the Brooks Objection, Brooks argues that the obligation to exchange releases is no longer an unperformed obligation because Brooks and Point Blank exchanged general releases in the RACU, which will become null and void if the Settlement Agreement does not receive final court approval. *See* Brooks Objection ¶¶ 17-19; *see also* RACU ¶¶ 9-11. This argument appears to be based on Brooks' misunderstanding of which releases have yet to be exchanged under the Settlement Agreement. As clearly set forth in the Rejection Motion, the parties to the Actions are required under the Stipulation to exchange releases of all claims asserted in or arising from the Actions upon final court approval of the Stipulation. *See* Rejection Motion ¶¶ 16, 40(a).

[10] On November 1, 2010, Point Blank served document requests on Class Plaintiffs' counsel seeking production of the Proof of Claim and Release forms. The document requests called for production within seven days. Class Plaintiffs' counsel subsequently agreed to produce a "sample" Proof of Claim and Release form and to provide Point Blank with information regarding the total amount of claims filed. To

significance of the decision in *Columbia Gas Sys. Inc.* In that case, the settlement agreement at issue (unlike the Settlement Agreement in this case) had already received final court approval at the time the debtor sought to reject the agreement. *In re Columbia Gas Sys. Inc.*, 50 F.3d at 236. Final court approval of the settlement agreement in that case gave effect to the releases contained in the settlement agreement and, as such, was the "linchpin" of the agreement. *Id.* at 242. The Third Circuit held that ministerial acts to be performed after such final court approval, such as the execution of releases by individual class members in order to receive payment, did not render the settlement agreement executory because all rights to prosecute claims against the debtor were extinguished upon final court approval of the settlement agreement. *Id.* As noted by Class Plaintiffs, in *Columbia Gas* the "claims were extinguished upon final court approval and the parties made that event, not execution of the releases [by individual class members], key to the agreement." *Id.* In this case, as in *Columbia Gas*, final court approval is the "key" to the Settlement Agreement because the releases contained in the Settlement Agreement will not take effect and the parties' claims will not be extinguished unless and until the Settlement Agreement receives final court approval. Unlike *Columbia Gas*, however, the Settlement Agreement in this case has not received final court approval, and thus the obligation to exchange releases remains a material unperformed obligation of each of the parties to the Settlement Agreement.

9. Furthermore, as set forth in the Rejection Motion and the Supplement, the parties to the Settlement Agreement have material unperformed obligations with respect to the

---

date, Class Plaintiffs have not produced the requested documents or information. Therefore, Point Blank reserves the right to supplement this Reply upon Class Plaintiffs' production (whether voluntarily or upon an order granting a motion to compel) of the requested documents and information.

"unwinding" of the Settlement Agreement in the event that the Settlement Agreement does not receive final court approval. For instance, plaintiffs' counsel in the Actions will be required to refund approximately $9,925,000 of the Escrowed Funds, and the Escrow Agent will be obligated to release the Escrowed Funds. Stipulation ¶¶ 2.6, 6.4, 6.5; EA ¶ 4. Brooks also may exercise a "sale back" option against Point Blank with respect to $14,825,000 of the Escrowed Funds and (absent the bankruptcy filing) Point Blank would be required to pay or cause to be paid $4,500,000 to Brooks. SPA ¶ 4.3; WEA ¶ 5. Finally, the Insureds will be obligated to mutually agree on the form of a trust agreement and the details of the trust with respect to $12,875,000 of the Escrowed Funds. AI ¶ 2. Although the Class Plaintiffs argue that these "unwinding" obligations do not render the Settlement Agreement executory because the obligations "will be triggered only upon termination of the Stipulation," this argument is not supported by case law. Class Plaintiffs' Objection ¶ 61. To the contrary, in *In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009), the court held that an agreement that contained "layers of material obligations … that change depending on the particular contingency that occurs" was an executory contract. Here, as in *AbitibiBowater Inc.*, the "layers of material obligations" that vary depending on whether the Settlement Agreement receives final court approval are sufficient to render the Settlement Agreement an executory contract.

10.     Finally, the parties to the Settlement Agreement have material unperformed obligations in addition to the "best efforts" obligation under the Stipulation, the obligation to exchange releases and the "unwinding" obligations in the event the Settlement Agreement does not receive final court approval. As described in detail in the Rejection Motion,

the additional material unperformed obligations of the parties include, without limitation, the following:

- Point Blank and Brooks are obligated under the RACU to each use their reasonable best efforts to consummate and secure judicial approval of the settlements contemplated by the MOU, including diligent advocacy of the settlements at all stages of court and appellate proceedings (RACU ¶ 2);

- Brooks is required to pay all taxes "attributable to personal income received by him from [Point Blank], including any fines, penalties or back taxes incurred by [Point Blank] solely as a result of personal income paid" to Brooks (RACU ¶ 17(f)) and is obligated to reimburse Point Blank for the advance of expenses by Point Blank pursuant to DHB's Articles of Incorporation, DHB's Amended and Restated By-Laws and Delaware law in the event it is determined that Brooks is not entitled to indemnification of such expenses (Undertaking);

- Point Blank is obligated to deliver the stock portion of the settlement to the claims administrator (Stipulation ¶ 2.4);

- If the Second Circuit's Opinion is reversed on appeal, Point Blank will be obligated to release and indemnify Brooks and Schlegel for any amounts paid by them to Point Blank pursuant to a judgment in any action under SOX § 304 (Stipulation ¶¶ 1.27, 4.7); and

- The Escrow Agent is obligated to hold, invest and release the cash portion of the settlement, to make such elections as are necessary to treat the settlement fund as a "qualified settlement fund" for tax purposes, to timely and properly file all informational and other tax returns for the settlement fund and to timely pay all taxes and tax expenses from the cash portion of the settlement fund (Stipulation ¶¶ 2.5, 2.10, EA ¶¶ 4-5).

Thus, each of the parties to the Settlement Agreement has material unperformed obligations under the Settlement Agreement and, as a result, the Settlement Agreement is an executory contract under 11 U.S.C. § 365.

### The Settlement Agreement Is A Single Contract For Purposes Of Rejection

11. As set forth in the Rejection Motion, the Settlement Agreement is a single contract that consists of the MOU, the Stipulation, the Supplemental Agreement, the RACU, the Securities Purchase Agreement, the Registration Rights Agreement, the Warrant Exercise Agreement, the Escrow Agreement, the Undertaking and the Agreement of Insureds. According to the Class Plaintiffs, however, the Stipulation is not part of the Settlement Agreement for purposes of rejection.[11] Even assuming this argument was correct, the Stipulation nonetheless would be subject to rejection by Point Blank because, as set forth above, the obligations to exchange releases and to use "best efforts" to obtain final court approval are material unperformed obligations shared by each of the parties to the Stipulation. Therefore, the

---

[11] Brooks appears to agree with Point Blank that the Settlement Agreement is a single contract. *See* Brooks Objection ¶ 20.

Stipulation is an executory contract regardless of whether it is viewed as a "stand-alone" agreement or as part of the Settlement Agreement as a whole.

12.     Despite the Class Plaintiffs' arguments to the contrary, however, the Settlement Agreement (including the Stipulation) is a single contract. As explained in detail in the Rejection Motion, the ten agreements that comprise the Settlement Agreement were entered into to accomplish a single purpose (*i.e.*, settlement of the Actions) and each agreement was a necessary component of that transaction, as demonstrated by the fact that the terms of the settlement were outlined initially in the MOU and then implemented by each of the remaining agreements. In this regard, the agreements at issue here are similar to those considered by the court in *This Is Me, Inc. v. Taylor*, 157 F.3d 139 (2d Cir. 1998). In *This Is Me, Inc.*, the court held that a "run of the play" contract, a video contract and a security agreement should be read together because the various agreements all related to a single project (the services of an actor in a Broadway production) of which both the videotaped and live performances were components. 157 F.3d at 145. In that case, the terms of two of the contracts – like the agreements in this case – had initially been set forth in a single contract that later was superseded and bifurcated into the two new contracts. *Id.* at 143; *see also River Terrace Associates, LLC v. Bank of New York*, 10 Misc. 3d 1052(A), 809 N.Y.S.2d 483 (N.Y. Sup. Ct. 2005) *aff'd,* 23 A.D.3d 308, 804 N.Y.S.2d 728 (N.Y. App. Div. 2005) (rejecting argument that credit agreement and collar agreement were separate contracts, where both agreements related to same construction project, because argument that contracts related to different transactions – one for a loan and one for interest rate protection – elevated form over substance).

13.     The decision in *This Is Me, Inc.* also refutes the Class Plaintiffs'

contention that "the presence of an integration clause is dispositive of the argument that two

separate agreements are in fact one." Class Plaintiffs' Objection ¶ 26.  In *This Is Me, Inc.*, the

court held that the "run of the play" contract, the video contract and the security agreement

should be read together despite an integration clause in the video contract providing that the

video contract and the "run of the play" contract constituted the entire agreement between the

parties.  157 F.3d at 144-45; *see also Carvel Corp. v. Diversified Mgmt. Group, Inc.*, 930 F.2d

228, 233 (2d Cir. 1991) (promissory notes and distributorship agreement "must be treated as a

single contract" where promissory notes were executed for sole purpose of making payments

under the distributorship agreement, despite "facially absolute language" of notes).  Moreover,

even the cases cited by Class Plaintiffs do not hold that the presence of an integration clause is a

dispositive factor in the "single contract" analysis.  *See, e.g., In re AbitibiBowater Inc.*, 418 B.R.

at 828 (holding that "no single item here may be determinative of the issue" and finding, in

addition to existence of integration clause in one contract, that two agreements were executed

nearly 20 years apart and for separate purposes); *Debary v. Harrah's Operating Co., Inc.*, 465 F.

Supp. 2d 250, 267 (S.D.N.Y. 2006) (holding that non-party was not third-party beneficiary of

contract where "[a]side from containing no provisions that clearly confer any benefit directly on

[the non-party]," the contract also contained an integration clause); *In re Gulf Oil/Cities Serv.

Tender Offer Litig.*, 725 F. Supp. 712, 731 (S.D.N.Y. 1989) (holding that shareholder parties to

tender offer could not enforce terms of merger agreement between target corporation and tender

offeror; existence of integration clauses in tender offer and merger agreement was one factor

court considered in its evaluation of both "the text and the context" of the contracts); *In re Am. Home Mortg. Holdings, Inc.*, 390 B.R. 120, 136-37 (Bankr. D. Del. 2008) (existence of integration clause in forward swap agreements was one factor court considered in ascertaining intent of the parties and determining that debtor had no standing to enforce forward swap agreements to which it was not a party).[12]

14.    Class Plaintiffs' remaining arguments are similarly unpersuasive. For instance, Class Plaintiffs argue that the Stipulation "does not mention" the remaining agreements that constitute the Settlement Agreements. This is inaccurate. Paragraph 4.6 of the Stipulation references the Undertaking and further provides that "any and all obligations of any Defendant to any other Defendant under any existing contract or agreement between or among any of them shall also remain in full force and effect, including, without limitation, **any agreement entered into in connection with the Settlement**." Stipulation ¶ 4.6 (emphasis added).

15.    Class Plaintiffs also argue that the arbitration provisions in the Agreement of Insureds indicate that the Settlement Agreement is not a single contract for purposes of rejection. The arbitration provisions of the Agreement of Insureds, however, take effect only upon failure of the Settlement Agreement to receive final court approval, apply solely to issues arising under the Agreement of Insureds and thus can be read in conjunction with the remainder of the Settlement Agreement. Therefore, the arbitration provisions of the Agreement of Insureds do not indicate that the parties intended for the Agreement of Insureds to be separate from the

---

[12] The remaining case cited by Class Plaintiffs, *DDCLAB Ltd. v. E.I. DuPont De Nemours & Co.*, 03 CV 3654GBD, 2005 WL 425495 (S.D.N.Y. Feb. 18, 2005), did not involve a "single contract" analysis and instead applied the parole evidence rule to bar evidence of an alleged oral agreement.

remainder of the Settlement Agreement. *See, e.g., World Bus. Ctr., Inc. v. Euro-Am. Lodging Corp.*, 309 A.D.2d 166, 170, 764 N.Y.S.2d 27, 30 (N.Y. App. Div. 2003) (arbitration clauses in two of nine documents executed in connection with complex transaction for sale of a hotel were limited to a single issue, regardless of whether the nine agreements were read together or separately).

16. Finally, Class Plaintiffs argue that the application of Delaware law to the Undertaking indicates that the Settlement Agreement is not a single contract. The Undertaking, however, does not contain a "choice of law" provision in favor of Delaware law. Instead, the Undertaking is governed by Delaware law because the rights at issue in that agreement – Brooks' indemnification rights as a director and officer of a Delaware corporation – are by necessity governed by Delaware law. In other words, the parties to the Settlement Agreement did not intentionally insert a different "choice of law" provision in the Undertaking. Thus, the application of Delaware law to the Undertaking does not indicate that the parties intended the Undertaking to be separate from the remainder of the Settlement Agreement.

## The Settlement Of The Class And Derivative Action Is Indivisible

17. In an attempt to avoid the consequences of the failure of the Stipulation to receive final court approval in the Derivative Action, Class Plaintiffs argue that the settlement of the Class Action is divisible from the settlement of the Derivative Action. This argument, however, is not supported by applicable case law and is contradicted both by the plain language of the Settlement Agreement and by the conduct of the parties in accordance with the Settlement Agreement.

18.     "Under New York law, the measure of whether a contract's provisions are severable is a question of intent, determined from the language of the contract and the circumstances under which the contract was made." *Refinemet Int'l Co. v. Eastbourne N.V.*, 815 F. Supp. 738, 742 (S.D.N.Y. 1993) *aff'd*, 25 F.3d 105 (2d Cir. 1994); *see also Barden & Robeson Corp. v. Timmerman*, 116 A.D.2d 814, 815-16, 497 N.Y.S.2d 196, 197 (N.Y. App. Div. 1986) ("Whether a contract is entire or severable generally is a question of intention, to be determined from the language employed by the parties, viewed in the light of the circumstances surrounding them at the time they contracted.") (quotation omitted). "Where the parties contemplate fulfillment of the entire contract, the contract is treated as indivisible." *Barden & Robeson Corp.*, 116 A.D.2d at 816, 497 N.Y.S.2d at 197. "Though divisibility of performance may be one indication that the parties intended the contract to be divisible, such a finding of intent need not follow where other circumstances suggest a contrary intention." *Nederlandse Draadindustrie NDI B.V. v. Grand Pre-Stressed Corp.*, 466 F. Supp. 846, 852 (E.D.N.Y. 1979) *aff'd sub nom. Nederlandse Draadindustrie Ndi B. v. v. Grand Pre-Stressed Corp.*, 614 F.2d 1289 (2d Cir. 1979). The question "is essentially one of fact, and no uniform formula has been devised to resolve all questions of contract divisibility." *Nederlandse Draadindustrie NDI B.V.*, 466 F. Supp. at 852.

19.     In this case, the plain language of the Stipulation belies Class Plaintiffs' argument that the "only connection between the two settlements is the Stipulation's provision that it will become effective, *inter alia*, after the Judgments in both Actions become Final." Class Plaintiffs' Objection ¶ 69. Numerous provisions of the Settlement Agreement indicate that

the parties intended for the settlement of the Class and Derivation Action to be indivisible. *See, e.g.*, Stipulation ¶¶ 1.15, 1.17, 7.1 (Effective Date of the Stipulation defined as the first date by which, among other things, the Judgments entered in **both** Actions are affirmed on appeal) (emphasis added); Stipulation ¶ 2.12 (corporate governance policies to be adopted in connection with settlement of Derivative Action "were jointly developed and negotiated by the Lead Plaintiffs and Lead Counsel in the Class Action and the Derivative Action"); Stipulation ¶¶ 4.1, 4.5 (claims asserted in or arising out of either Action will not be "fully, finally, and forever released, relinquished and discharged" until the Effective Date); Stipulation ¶ 7.2 (a "condition of this Stipulation is that this Stipulation and Settlement shall be approved by the Court as provided herein" and if "appellate review is sought and on such review **either** of the [judgments approving the settlement of the Actions] is materially modified or reversed … this Stipulation shall be canceled and terminated" unless the parties otherwise agree in writing) (emphasis added); Stipulation ¶ 7.4 ("In the event the Settlement is not approved by the Court or this Stipulation shall terminate or shall not become Effective **for any reason** … the Settlement Fund … shall be refunded or paid out by the Escrow Agent as directed by the terms of the Escrow Agreement.") (emphasis added); Stipulation ¶ 7.5 ("In the event that the Settlement is not approved by the Court or this Stipulation shall terminate or shall not become Effective **for any reason**, the Settling Parties shall be restored to their respective positions in the Actions …") (emphasis added); Stipulation ¶ 8.3 ("The Settling Parties intend this Settlement to be a final and complete resolution of all disputes among them with respect to the Actions.").

20.     Class Plaintiffs also argue that "the Stipulation's provision that it will become effective, *inter alia*, after the Judgments in both Actions become Final" is a cross-default provision that does not integrate the settlement of the Class and Derivative Actions. Class Plaintiffs' Objection ¶ 69. The cases cited by Class Plaintiffs in support of this argument are inapposite. *See, e.g., In re IT Group, Inc.*, 350 B.R. 166, 179 (Bankr. D. Del. 2006) (declining to enforce cross-default provision in order to allow debtor to assume two subcontracts without performing obligations under third subcontract); *In re UAL Corp.*, 346 B.R. 456, 467-68 (Bankr. N.D. Ill. 2006) (declining to enforce cross-default provision in order to allow debtor to assume airport use agreement without performing obligations under bond payment agreements). Applicable case law instead indicates that the existence of a cross-default provision – or, more accurately, the fact that the Stipulation according to its terms will be terminated and will not become effective in either Action if the Stipulation does not receive final court approval in the Derivative Action – is a strong indication that the settlement of the Class and Derivative Action is indivisible. *See, e.g., River Terrace Associates, LLC*, 10 Misc. 3d 1052(A), 809 N.Y.S.2d 483 (credit agreement and collar agreement were integrated contracts where, "[m]ost important, the contracts contain cross-default provisions whereby [one party's] default under one agreement constituted a default under the other"). Equally significant is the fact that the parties to the Settlement Agreement included a cross-default provision linking the Class Action settlement to the Derivative Action settlement rather than a "severability" clause to divide the settlement of the Actions. *See Refinemet Int'l Co.*, 815 F. Supp. at 743 ("Moreover, in the absence of any language in the contract stating it to be enforceable notwithstanding a breach of the provision to

pay the promised Kearny sale proceeds, the Court declines to rewrite a contract negotiated at arms length to insert a severability clause which neither of these parties saw fit to insert in the contract.").

21. Furthermore, and perhaps most telling, the conduct of the parties while awaiting final court approval of the Stipulation in the Derivative Action demonstrates that the settlement of the Class and Derivative Action is indivisible. If, as argued in the Class Plaintiffs' Objection, the settlement of the Class Action is not dependent on the settlement of the Derivative Action, there would be no reason for the Escrow Agent to delay distribution of the Escrowed Funds pending final court approval in the Derivative Action. The Escrow Agent has not distributed the Escrowed Funds, of course, in recognition of the fact that the Escrowed Funds cannot be distributed to members of the class unless the Stipulation receives final court approval in the Derivative Action. Indeed, and as the Escrow Agent surely recognizes, distribution of the Escrowed Funds to members of the class without final court approval of the Stipulation in the Derivative Action would constitute a breach of the Escrow Agent's duties under the Escrow Agreement. *See, e.g.,* EA ¶ 4(b) (permitting Escrow Agent to release Escrowed Funds for distribution to class members only upon final court approval of the Stipulation); EA ¶ 7(b) (subjecting Escrow Agent to liability for willful default or gross negligence). Therefore, based on the plain language of the Settlement Agreement and the conduct of the parties, the settlement of the Class Action is indivisible from the settlement of the Derivative Action.

22. Finally, the Class Plaintiffs' argument that Point Blank's rejection of the Settlement Agreement constitutes a waiver of the requirement that the Stipulation receive final

court approval in both Actions is incorrect. Under New York law, waiver "requires proof of a voluntary and intentional relinquishment of a known and otherwise enforceable right." *Peck v. Peck*, 232 A.D.2d 540, 540, 649 N.Y.S.2d 22, 23 (N.Y. App. Div. 1996). In this case, however, Point Blank has no "known and otherwise enforceable right" to unilaterally waive the requirement that the Stipulation receive final court approval in both Actions, nor has Point Blank voluntarily or intentionally relinquished any such right. According to its terms, the Stipulation will not become effective until the first date by which, among other things, the Stipulation receives final court approval in both Actions (including resolution of any appellate review) unless such condition "is waived or modified **in writing and signed by Class Plaintiffs' Counsel, Derivative Counsel, and counsel for each of the Defendants**." Stipulation ¶ 1.15 (emphasis added). Here, it is indisputable that the condition of final court approval in both Actions has not been waived or modified in writing and signed by Class Plaintiffs' counsel, the Derivative Plaintiff's counsel or counsel for each of the Settling Defendants. Therefore, the requirement that the Stipulation receive final court approval in both Actions has not been waived by Point Blank or any of the other parties to the Settlement Agreement.

23. Moreover, even according to Class Plaintiffs, Point Blank cannot be deemed to have waived the requirement of final court approval in both Actions unless Point Blank has "blocked" final court approval "through a breach of the duty of good faith and fair dealing." *See* Class Plaintiffs' Objection ¶¶ 79-80. Point Blank has not, however, blocked final court approval of the Stipulation through a breach of the duty of good faith and fair dealing or otherwise. As set forth above, the Second Circuit's Opinion vacated and remanded the Judgment

entered in the Derivative Action. Absent a successful appeal of the Second Circuit's Opinion – which none of the parties, including the Class Plaintiffs, have chosen to pursue – the Stipulation will not receive final court approval in the Derivative Action. Thus, the Stipulation has failed to receive final court approval in the Derivative Action as a result of the Second Circuit's Opinion, not through any action taken by Point Blank to "block" final court approval. Finally, even if Point Blank has "blocked" final court approval by filing the Rejection Motion, the Class Plaintiffs cite no authority for the proposition that Point Blank's exercise of its rights as a debtor in possession under the Bankruptcy Code (including its right to reject the Settlement Agreement as an executory contract) constitutes a breach of the duty of good faith and fair dealing.

### Rejection Of The Settlement Agreement Should Be Approved

**A.     Rejection of the Settlement Agreement is An Appropriate Exercise of Point Blank's Business Judgment**

24.     Point Blank has determined, in the exercise of its business judgment, that rejection of the Settlement Agreement will confer substantial benefits on Point Blank's estate and that the potential benefits of rejection outweigh any "rejection damages" the estate may incur.[13] As discussed above, rejection will relieve Point Blank of its "best efforts" obligation and of its "unwinding" obligations in the event that the Settlement Agreement does not receive final court approval (including its obligations with respect to the $14,825,000 "sale back" option held by Brooks, its obligation to pay $4,500,000 to Brooks and its obligation to "mutually agree" with the other Insureds as to the remaining $12,875,000 of the Escrowed Funds). Rejection of the

---

[13] Point Blank's analysis of the benefits and burdens of rejection of the Settlement Agreement is set forth in detail in the Rejection Motion. *See* Rejection Motion ¶¶ 43-49.

Settlement Agreement thus will compliment Point Blank's efforts (via the Turnover Complaint)

to recover the $35,200,000 of Escrowed Funds as property of Point Blank's estate. Furthermore,

Point Blank will be entitled to assert the claims alleged in the Derivative Action against Brooks,

Schlegel, Hatfield and the other defendants in the Derivative Action. The support of the

Creditors Committee with respect to Point Blank's determination that rejection is in the best

interests of Point Blank's estate provides strong backing for Point Blank's decision to reject the

Settlement Agreement.[14] *See, e.g.,* Creditors Committee Statement ¶¶ 3, 7-8; *see also In re*

*Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) (noting that creditors

committee had joined in motion to reject ticket agreement, and holding that counterparty's claim

that both debtor and the committee had "made an unwise decision as to what is in the best

interests of creditors and [the debtor's] other constituents is insufficient as a matter of law to

deny the exercise of [the debtor's] business judgment in seeking to reject an executory

contract"); *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 850 (Bankr. W.D. Pa. 1987)

(official committee of unsecured creditors' support of debtor's decision to reject contract was

significant consideration supporting soundness of debtor's decision, because "[i]t cannot be

supposed that the committee of unsecured creditors, which is duty bound to act in the best

---

[14] Prior to the issuance of the Second Circuit's Opinion, the Equity Committee also recognized that the benefits of rejection outweighed the burdens. *See* Equity Committee Response ¶ 11. The Equity Committee now requests adjournment of the Rejection Motion on the grounds that the Second Circuit has vacated the Judgment in the Derivative Action. As set forth above, however, rejection at this time remains necessary and appropriate because rejection will relieve Point Blank of its obligation to seek review of the Second Circuit's Opinion and will compliment Point Blank's recovery of the $35,200,000 of Escrowed Funds by relieving Point Blank of its "unwinding" obligations in the event that the Settlement Agreement does not receive final court approval.

interests of unsecured creditors, would support a decision which is inimical to the best interests of the debtor's estate and unsecured creditors").

**B.  Point Blank Did Not File the Rejection Motion in Bad Faith**

25.    Despite the Class Plaintiffs' argument to the contrary, Point Blank's decision to reject the Settlement Agreement is not based upon bad faith, whim or caprice. *See* Class Plaintiffs' Objection ¶ 85. To the contrary, Point Blank seeks to reject the Settlement Agreement pursuant to the good faith exercise of its business judgment in order comply with its duty to maximize the value of its assets for the benefit of all creditors in accordance with the terms of the Bankruptcy Code.

26.    A debtor's right to reject an executory contract is "vital to the basic purpose [of] a Chapter 11 reorganization. *N.L.R.B. v. Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 1197, 79 L.Ed.2d. (1984). This is so because "[t]he interest of third party creditors is at the core of § 365." *In re Trans World Airlines, Inc.*, 261 B.R. 103, 117 (Bankr. D. Del. 2001). Moreover,

> the ability to reject an executory contract is rooted in the principle of maximizing the return to creditors by permitting a debtor in possession to renounce title to and abandon burdensome property if such action is in the best interest of the estate. Its a fundamental right of the bankruptcy system because it provides a mechanism through which severe financial burdens may be lifted while the debtor proceeds to reorganization.

*In re Trans World Airlines*, 261 B.R. at 117 (citations omitted). Point Blank's effort to exercise its fundamental right as a debtor in possession to reject the Settlement Agreement under section 365 of the Bankruptcy Code in order to facilitate the recovery of $35,200,000 is neither whimsical, capricious, nor indicative of bad faith.

27.     Furthermore, Class Plaintiffs cannot legitimately use the doctrine of judicial estoppel to manufacture a charge of "bad faith" against Point Blank to derail its rejection of the Settlement Agreement.  The application of the doctrine of judicial estoppel in the Third Circuit requires a showing of intentional wrongdoing.  *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996).  The assertion of an inconsistent position alone does not trigger its application.  *Id.*  Rather, the self-contradiction must be used as a means of obtaining unfair advantage.  *Id.*  "An inconsistent argument sufficient to invoke judicial estoppel must be attributable to intentional wrongdoing." *Id.*

28.     As explained in *Trans World Airlines*, whether a litigant asserts inconsistent positions within the meaning of the judicial estoppel doctrine entails a two part inquiry:

> Is party's present position inconsistent with a position it asserted in its prior judicial proceeding?  If so, did the party assert either or both of the inconsistent positions in bad faith – i.e. with the intent to play fast and loose with the court?  Judicial estoppel is an appropriate remedy only if both prongs are satisfied.

*Trans World Airlines*, 261 B.R. at 111; *Ryan Operations*, 81 F.3d at 361, 364.

29.     Here, the two part test is not satisfied for two reasons.  First, on the Petition Date, Point Blank came into existence as a debtor in possession.  Since the debtor in possession did not previously exist during the prior court proceedings, it could not have taken any position at that time, and therefore cannot now be credibly charged with taking an inconsistent position.  Second, even if Point Blank had taken a position during the prior court proceedings that is now inconsistent with its proposed rejection of the Settlement Agreement,

such actions are not attributable to intentional wrongdoing. Instead, such actions are attributable

to Point Blank's exercise of its fundamental right to reject burdensome executory contracts under

section 365 of the Bankruptcy Code. Such action – which debtors are expressly authorized to do

under section 365 of the Bankruptcy Code – does not trigger the "extraordinary remedy" of

judicial estoppel, which is "to be invoked when a party's inconsistent behavior will otherwise

result in a miscarriage of justice[.]" *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d

414, 424 (3d Cir. 1988).

### C. Point Blank Did Not File the Rejection Motion to Keep Steel Partners in Control or to Force a Liquidation

30.     Point Blank did not file the Rejection Motion in order to keep Steel

Partners in control of the Debtors' bankruptcy cases, as asserted by Cohen in paragraph 9 of the

Cohen Objection. As noted above, Point Blank filed the Rejection Motion in order to reject the

Settlement Agreement. Pursuant to the exercise of its business judgment, Point Blank believes

the Settlement Agreement is burdensome, and that its rejection will facilitate the augmentation of

Point Blank's estate by approximately $35,200,000 (among other benefits). It is this potential

access to additional funds for the benefit of all of its creditors that motivated Point Blank's filing

of the Rejection Motion. The involvement of Steel Partners in the Debtors' bankruptcy cases is

irrelevant to this analysis.

31.     Likewise, Point Blank did not file the Rejection Motion to force a

liquidation of the Debtors for the benefit of Steel Partners, as alleged by Cohen in paragraph 14

of the Cohen Objection. Point Blank does not understand Cohen's accusation. Any increase in

the amount of funds brought into Point Blank's estate ultimately decreases the possibility of a

liquidation. Since Cohen ostensibly opposes a liquation, he should support the rejection of the Settlement Agreement, since rejection would help minimize the possibility of a liquidation. Accordingly, Cohen's liquidation argument is not well founded.

### D. The Impact of Rejection on the Class Plaintiffs is not Relevant to the Rejection Analysis

32. Finally, Class Plaintiffs' argument that rejection of the Settlement Agreement is "fundamentally unfair and inequitable" to the members of the class is not relevant to the determination of whether rejection of the Settlement Agreement is an appropriate exercise of Point Blank's business judgment. *See* Class Plaintiffs' Objection ¶ 89. "Courts in [the Third Circuit] that have addressed whether the potential burden imposed on a nondebtor party should be a factor in considering whether to permit the rejection have declined to undertake such an inquiry as irrelevant and unnecessary." *In re Trans World Airlines, Inc.*, 261 B.R. at 123 (citations omitted); *see also In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. at 848 (effect of rejection on counterparty is not a material fact to be weighed under the business judgment test). "[I]n a rejection motion determination the focus is the benefit to the debtor's estate." *In re Trans World Airlines, Inc.*, 261 B.R. at 123. In this case, as set forth above, in the Rejection Motion and in the Supplement, rejection of the Settlement Agreement will result in a net benefit to Point Blank's estate. Therefore, and especially in light of the fact that the Rejection Motion has the support of the Creditors Committee, rejection of the Settlement Agreement is an appropriate exercise of Point Blank's business judgment and should be approved.

WHEREFORE, for the reasons set forth herein, in the Rejection Motion and in the Supplement, Point Blank respectfully requests that the Court enter an order authorizing Point Blank to reject the Settlement Agreement and granting such other relief as is just and proper.

Dated: November 17, 2010

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
Alan J. Kornfeld (CA Bar No. 130063)
Curtis A. Hehn (Bar No. 4264)
Timothy P. Cairns (Bar No. 4228)
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
akornfeld@pszjlaw.com
chehn@pszjlaw.com
tcairns@pszjlaw.com

Counsel for Debtors and Debtors in Possession