# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| POINT BLANK SOLUTIONS, INC., et al.,[1] | ) | Case No. 10-11255 (PJW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

Requested Deadline for Objections to Bid Procedures: November 30, 2010 at 12:00 p.m. Noon (Eastern time)
Requested Hearing Date on Bid Procedures Motion: December 1, 2010 at 3:00 p.m. (Eastern time)

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING BID PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS, (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE SALE AND APPROVE THE FORM AND MANNER OF NOTICE RELATED THERETO; (C) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (D) APPROVING CERTAIN EXPENSE REIMBURSEMENT PROVISIONS AND BREAKUP FEE; AND (E) GRANTING OTHER RELATED RELIEF

The above-captioned debtors and debtors in possession (the "Debtors") hereby move this

Court for the entry of an order: (a) approving bid procedures and certain overbid protections in

connection with the sale of certain of the Debtors' assets; (b) scheduling an auction and hearing

to consider the sale of and approve the form and manner of notices related thereto;

(c) establishing procedures for the assumption and assignment of certain contacts that will be

assumed and assigned as part of the sale; (d) authorizing the Debtors to provide certain expense

reimbursement provisions and breakup fee as described below; and (e) granting related relief

(this "Motion").

---

[1] The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification numbers and their respective addresses, are: Point Blank Solutions Inc (9361), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor, Inc. (4044), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Protective Apparel Corporation of America (9051), 179 Mine Lane, Jacksboro, TN 37757; and PBSS, LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.

Notwithstanding the lengthy and extensive marketing of their assets described below, the Debtors do not currently have a "stalking horse" bidder for their assets. The Bid Procedures (as defined below) contemplate that a buyer for the Debtors' assets will be identified at a later date, either at the auction contemplated by the Bid Procedures or, under appropriate circumstances, through the Debtors' identification of a Stalking Horse Purchaser (as defined below). There is significant urgency to the relief requested by this Motion given that the Debtors' existing debtor-in-possession financing facility (the "DIP Facility") with Steel Partners II, L.P. (the "DIP Lender") matures on December 31, 2010, and presently requires that a sale hearing be held no later than December 16, 2010 (the Debtors have requested that the DIP Lender extend this latter date to December 17, 2010).

In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction and Venue

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 1107 and 1108 of chapter 11 of title 11, United States Code (the "Bankruptcy Code"), Rules 2002(a)(2), 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 6004-1 and 9006-1 of the Local Rules of Bankruptcy

Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Background

4.    On April 14, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under the Bankruptcy Code. The Debtors are continuing in possession of their property and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.    No request is pending for the appointment of a trustee or an examiner in these cases.

6.    Two official committees have been appointed in these cases by the United States Trustee: the Official Committee of Unsecured Creditors (the "Creditors' Committee"), and the Official Committee of Equity Holders (the "Equity Committee," and together with the Creditors' Committee, the "Committees").

7.    The factual background regarding the Debtors, including their current and historical business operations and the events precipitating the chapter 11 filings, is set forth in detail in the *Declaration of T. Scott Avila in Support of First Day Motions*, previously filed in these cases and incorporated herein by reference.

8.    In order to maximize the value of the estates' assets for the benefit of all constituents, the Debtors have marketed their assets, and intend to go forward with a sale to the highest or best bidder(s). As things stand today, the Debtors must have a hearing on the sale of substantially all their assets by December 16, 2010 (the Debtors have requested that the DIP

Lender extend this date to December 17, 2010), and must complete the sale process before December 31, 2010 when the DIP Facility matures.

9.    Throughout these cases and at the behest of the Committees, the Debtors have considered alternatives to a sale, including the possibility of proposing a plan. The Debtors have also played an active role in assisting the Committees in considering plan alternatives. As the Court is aware, the Equity Committee has made a proposal to the Debtors and the Creditors' Committee regarding a possible structure for a plan. In response to that proposal, both the Debtors and the Creditors' Committee have addressed certain questions and concerns to representatives of the Equity Committee with respect to the proposal received, including with respect to (i) the level of financing needed and available to fund the Debtors through a plan process (and for a period beyond in the event the plan process was unsuccessful), and (ii) the funding needed to confirm the plan. To date, the Debtors have not received responses which have satisfied those concerns. Accordingly, the Debtors presently believe that, among other things, the Equity Committee's proposal lacks adequate pre- and post-confirmation committed financing that would be a prerequisite to completing the plan process and attaining a confirmable plan. Given that the Debtors' access to financing terminates on December 31, 2010, the Debtors have decided to proceed with the sale contemplated hereby. Nonetheless, as contemplated by the Bid Procedures, a Potential Bidder (as defined below) may submit a proposal for a chapter 11 plan relating to the Debtors and their assets and such proposal may be determined by the Debtors to constitute a Qualified Bid (as defined below).

## The Sale Process

10. The Debtors retained CRG Partners Group LLC ("CRG") prepetition as their financial advisor to advise the Debtors on restructuring and business matters, including the potential marketing and sale of assets related to the Debtors' business. Significant efforts have been undertaken by the Debtors and CRG relating to the preparation of marketing materials, creation of an electronic data room, and other marketing efforts as part of the sale process.

11. On or about July 9, 2010, CRG sent out a teaser memorandum highlighting the Debtors' assets to approximately 2,000 financial and strategic investors and industry participants. Over sixty parties returned executed non-disclosure agreements and conducted initial due diligence. CRG created an electronic data room with key documents and company-specific information in order to streamline the due diligence process. CRG received sixteen initial indications of interest, which were subsequently narrowed to six letters of intent. To those parties submitting letters of intent, CRG provided additional, more detailed information about the Debtors, and scheduled meetings with the Debtors' management. The Debtors, with the assistance of CRG and other professionals, subsequently engaged in negotiations with certain of the parties submitting letters of intent on the details of a sale. To date, however, the Debtors have not yet reached any definitive agreements.

12. The Debtors believe that the Bid Procedures proposed hereby will enable these estates to efficiently consummate a sale of the Debtors' assets at an auction to the highest or best bidder. The Debtors will continue to market their assets pending the outcome of the auction. The Debtors believe that such marketing of their assets over the period contemplated by

5

the Bid Procedures, in addition to over four months of marketing activities that have taken place to date, will result in the highest or best price for the estate assets.

## The Proposed Sale Agreement

13.    The Debtors have prepared a proposed form of Asset Purchase Agreement (the "Agreement") for the contemplated sale.[2]  A copy of the Agreement, without schedules, is attached hereto as Exhibit A.[3]  Pursuant to the terms of the Agreement and subject to the approval of the Court, the highest or best bidder at the auction will purchase the Debtors' assets, and assume certain executory contracts and unexpired leases (the "Assumed Contracts"), subject to the payment of applicable cure obligations, if any, but otherwise free and clear of any liens, claims or encumbrances.

14.    The principal terms of the Agreement are summarized below.  The description below only summarizes certain provisions of the Agreement, and the terms of the Agreement control in the event of any inconsistency.  The Debtors reserve the right to waive or modify any of the following parameters for the sale at or prior to the sale hearing.

(a.)    Purchase Price.  No less than $14,000,000, unless otherwise determined by the Debtors in their discretion.

(b.)    Assets.  Substantially all assets relating to the Debtors' business of manufacturing and supplying bullet, fragmentation, and stab resistant apparel and related ballistic accessories, which are used both domestically and internationally by military, law

---

[2] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

[3] Schedules to the Agreement will be made available to the DIP Lender, the Committees, and prospective bidders who execute a confidentiality agreement acceptable to the Debtors.

6

enforcement, security and corrections personnel, as well as by governmental agencies (the "Assets").

(c.) _Excluded Assets._ All of the Debtors' cash and cash equivalents, prepaid items, tax refunds, rebates and credits relating to the pre-closing period, certain insurance proceeds, and all preference or avoidance claims and actions of the Debtors' estates, including, without limitation, any and all rights, claims, and causes of action arising under Chapter 5 of the United States Bankruptcy Code, and all rights, claims, and causes of action of the Debtors (or which may result in a benefit to the Debtors) asserted or which may hereafter be asserted in any of the pending litigation proceedings in which any of the Debtors is a party or a potential beneficiary. The Excluded Assets include, without limitation, any and all of the Debtors' rights, claims, and causes of action relating to: (i) the Brooks class action settlement or the rejection thereof, (ii) any proceeding against former officers and directors under applicable provisions of Sarbanes-Oxley or other securities laws, (iii) any proceeding against Toyobo, (iv) the Debtors' right, title and interest in and to certain Zylon inventory, and (v) refunds, rebates, offsets or the like relating to the Assets from the Internal Revenue Service or other taxing authorities.

(d.) _Assumed Liabilities._ All obligations from and after the closing relating to the Assets, plus obligations under the Assumed Contracts, ordinary course employee obligations and postpetition trade payables, obligations to customers for refunds, rebates, returns, discounts and the like, and any postpetition product liability or warranty claims.

(e.) _Employee Matters._ The buyer shall indemnify and hold harmless the Debtors from any liability arising under the Worker Adjustment and Retraining Notification

70934-001\DOCS_SF:74756.5

Act, as amended, and any similar foreign, state or local law, for the buyer's failure to offer, hire, or continue to employ each of the Debtors' employees who remain employed by the Debtors as of immediately prior to the closing.

(f.) <u>Closing</u>. Within two (2) business days following entry of the sale order, and in no event later than December 27, 2010.

(g.) <u>Representations and Warranties</u>. The Agreement contains standard representations and warranties for a transaction of this nature. *See* Agreement, §§ 5 & 6.

(h.) <u>"AS-IS" Transaction</u>. Except as expressly set forth in the Agreement, the Debtors make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Assets. Accordingly, the buyer must be prepared to accept the Assets at the closing "AS IS, "WHERE IS," and "WITH ALL FAULTS."

15. The Debtors believe that the sale of the Assets as a going concern to the highest or best bidder determined in accordance with the Bid Procedures is far preferable to a piecemeal liquidation of the Assets. The Debtors further believe that their marketing of the Assets with the assistance of CRG and other professionals for approximately four months to date, and holding an auction for such Assets, will result in the highest or best price for the Assets.

16. The Debtors presently believe that in light of their financial situation and limited liquidity, the only viable approach presently available to these estates to maximize value is a going concern sale of the Assets.

## Relief Requested

17.     Pursuant to this Motion, the Debtors request that the Court, among other things:

(a.)     approve the proposed bid procedures (the "Bid Procedures"), including the overbid provisions and authority for the Debtors to designate a "stalking horse" purchaser subject to the parameters set forth in the Bid Procedures, attached hereto as Exhibit B;

(b.)     approve the procedures set forth herein for the assumption and assignment of certain executory contracts and unexpired leases in connection with the sale (the "Cure Procedures");

(c.)     establish a date for holding the auction (the "Auction") and approve certain procedures in connection therewith;

(d.)     schedule the hearing (the "Sale Hearing") to approve any sale transaction(s) to the highest or best bidder for the Assets (the "Successful Bidder") and establish deadlines for objections and responses to the relief requested in the sale motion filed concurrently herewith (the "Sale Motion"); and

(e.)     approve the form and manner of notice to be served upon certain parties, including:  (i) the form of notice, substantially in the form attached hereto as Exhibit C, to be served on the Sale and Bid Procedures Notice Parties (as defined below); (ii) the form of notice, substantially in the form attached hereto as Exhibit D, to be served on all known creditors of the Debtors (the "Creditor Notice"); and (iii) the form of notice to parties holding Assumed

Contracts in conjunction with the proposed sale, in substantially the form attached hereto as Exhibit E (the "Cure Notice").

## Sale Hearing

18.     The Debtors request that the Court schedule the Sale Hearing on **December 17, 2010 at 9:30 a.m. (Eastern time)**, in order to allow for entry of a sale order and closing of the sale by no later than December 27, 2010, and that objections, if any, to the Sale Motion be filed no later than **12:00 p.m. Noon (Eastern time) on December 14, 2010**.

## Proposed Bid Procedures

19.     The Bid Procedures are attached hereto as Exhibit B.  The Bid Procedures are summarized as follows:

(a.)     <u>Assets to be Sold</u>.  The Assets identified in the Agreement, or a portion thereof.  The Assets do not include the Excluded Assets, as defined in the Agreement.

(b.)     <u>Potential Bidders</u>.  Any person interested in participating in the bidding process for all or a portion of the Assets (each a "Potential Bidder") must satisfy the requirements set forth in the Bid Procedures.

(c.)     <u>Qualified Bidders</u>.  A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose bids for the assets of the Debtors do not overlap and who also are referred to in the Bid Procedures as a single Qualified Bidder) that delivers the documents described in the Bid Procedures with respect to its proof of financial ability to perform and otherwise satisfies the requirements of the Bid Procedures Order and the procedures set forth herein, and that the Debtors, in their discretion, and in consultation with the Debtors'

10

advisors and the Committees[4] determine is reasonably likely to submit a *bona fide* offer for the Assets and to be able to consummate a sale if selected as a Successful Bidder (defined below). Any Stalking Horse Purchaser (as defined below) is a Qualified Bidder and is deemed to satisfy all Bid requirements as set forth in the Bid Procedures. A Potential Bidder may submit a proposal for a chapter 11 plan relating to the Debtors and the Assets and such proposal may be determined by the Debtors to constitute a Qualified Bid (as defined below).

   (d.) <u>Bidding Process</u>. The Debtors and their advisors, shall: (i) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Bidders in conducting their due diligence investigations, as permitted by the provisions of the Bid Procedures; (iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the Assets (collectively, the "Bidding Process"). The Debtors may adopt rules for the Auction at or prior to the Auction that, in their reasonable discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bid Procedures Order. All such rules will provide that all Bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder (*i.e.*, the principals submitting the Bid) shall be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction.

---

[4] For the avoidance of doubt, the Debtors shall be under no obligation to consult with any party who submits a bid or proposal to acquire the Assets, and such party shall be treated as a Potential Bidder for purposes of the Bid Procedures.

(e.)    Bid Deadline. The Debtors propose that the deadline for submitting bids by a Qualified Bidder shall be **December 13, 2010, at 12:00 p.m. Noon (Eastern time)** (the "Bid Deadline").  Prior to the Bid Deadline, a Qualified Bidder that desires to make an offer, solicitation or proposal (a "Bid") shall deliver written copies of its Bid to the Debtors, Point Blank Solutions, Inc., 2102 S.W. 2nd Street, Pompano Beach, Florida 33069, Attn: Scott Avila, Chief Restructuring Officer, with a copy to counsel for the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 N. Market St., 17th Floor, Wilmington, Delaware 19801, Attn: Laura Davis Jones.  A Bid received after the Bid Deadline shall not constitute a Qualified Bid, provided, however, that the DIP Lender may submit a Bid for the Assets at or prior to the Auction as set forth below.

(f.)    Bid Requirements. The Debtors propose that, to be eligible to participate in the Auction, each Bid and each Qualified Bidder submitting such a Bid must be determined by the Debtors to satisfy each of the following conditions, unless waived or modified by the Debtors in their discretion:

(1)    Good Faith Deposit. Each Bid must be accompanied by a deposit (the "Good Faith Deposit") in the form of a certified check or cash payable to the order of the Debtors in an amount to be determined by the Debtors, but in any event no less than the greater of 10% of the Bidder's offer or $750,000.  The Debtors reserve the right to modify the amount of the Good Faith Deposit in their discretion.

(2)    Minimum Bid. The consideration proposed by the Bid may include only cash and/or other consideration acceptable to the Debtors in an amount of no less than $14,000,000 (the "Minimum Bid"), provided, however, that in the event that the Debtors select a Stalking Horse Purchaser, in order to qualify for the Auction, any competing Bid must be for more than an amount equal to the offer of the Stalking Horse Purchaser, plus the aggregate of the sum of (a) $150,000 in cash; and (b) the dollar value of the Breakup Fee (as defined below), if any, in cash. Notwithstanding the foregoing, the DIP Lender may make a Qualified Bid

12

for the collateral securing its claims to the fullest extent permitted by section 363(k) of Bankruptcy Code, provided that the DIP Lender shall post a cash deposit equal to the greater of $750,000 or 10% of the excess of the amount of its Bid over the value of its credit bid, and must provide for payment in cash at closing so that the total consideration payable to the Debtors is equal to the Minimum Bid, as set forth above.

(3)     Irrevocable.  All Bids must be, and the Agreement is, irrevocable until two (2) business days after the Assets have been sold pursuant to the closing of the sale or sales approved by the Bankruptcy Court (the "Termination Date").

(4)     Principal Terms.  A Bid must include an executed agreement pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction (the "Contemplated Transaction Documents").  A Bid shall include a copy of the Agreement marked to show all changes requested by the Bidder (including those related to the purchase price).  The Contemplated Transaction Documents must include a commitment to close by no later than December 27, 2010.  A Bid should propose a contemplated transaction involving all or substantially all of the Assets, provided, however, that the Debtors in their discretion may consider proposals for less than substantially all the Assets, provided further that the Debtors will evaluate all Bids, in their sole discretion, to determine whether such Bid or combination of Bids maximizes the value of the Debtors' estates as a whole.

For the avoidance of any doubt, the Debtors note that Bids do not have to be for substantially all of the Assets, provided that the other requirements of the Bid Procedures are satisfied.

(1)     Contingencies.  A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or review of due diligence other than as may be included in the Agreement, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties at or before closing or the satisfaction in all material respects at the closing of specified conditions set forth in the Agreement.

(2)     Financing Sources.  A Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Debtors with appropriate contact information for such financing sources.

(3)      <u>No Fees Payable to Qualified Bidder</u>. Except with respect to the Breakup Fee, if any, that may be provided to the Stalking Horse Purchaser, if any, a Bid may not request or entitle the Qualified Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment. Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under Bankruptcy Code § 503 related in any way to the submission of its Bid or the Bid Procedures.

(4)      <u>Immediate Payment of the Breakup Fee</u>. A Bid must allow for the immediate payment of the Breakup Fee, if any, to the Stalking Horse Purchaser, if any, from the first proceeds of the cash portion of the purchase price of such Bid.

(g.)      <u>Qualified Bids</u>. The Debtors propose that a Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements and that satisfies the Bid Deadline requirement above shall constitute a "Qualified Bid," if the Debtors believe, in their reasonable discretion, that such Bid would be consummated if selected as the Successful Bid. The Debtors shall have the right to reject any and all bids that they believe, in their reasonable discretion and in consultation with the Committees, do not comply with the Bid Procedures. A Potential Bidder may submit a proposal for a chapter 11 plan relating to the Debtors and the Assets and such proposal may be determined by the Debtors to constitute a Qualified Bid.

(h.)      <u>Auction</u>. The Debtors will conduct the Auction to determine the highest or best bid with respect to the Assets.

(1)      The Debtors shall provide the Stalking Horse Purchaser, if any, and all Qualified Bidders with copies of all Qualified Bids in advance of the Auction, but may exclude any confidential financial information, as determined by the Debtors in their reasonable discretion or which has been so designated by the Qualified Bidder. Unless otherwise designated by the Debtors, the Debtors propose that the Auction shall commence at **10:00 a.m. (Eastern time) on December 15, 2010**, at the offices of Pachulski

Stang Ziehl & Jones LLP, 919 N. Market St., 17th Floor, Wilmington, DE 19899.

(2)    In advance of the Auction, the Debtors will notify all Qualified Bidders of (i) the highest or best Qualified Bid, as determined by the Debtors in their discretion (the "Baseline Bid") and (ii) the time and place of the Auction, and provide copies of all Qualified Bids to all Qualified Bidders, the DIP Lender, and the Committees.

(3)    The Debtors propose that, if no higher or better offer is obtained at the Auction, then the Stalking Horse Purchaser, if any, will be deemed the Successful Bidder.

(4)    Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. Only the authorized representative of each of the Qualified Bidders, the Debtors, the DIP Lender, and the Committees shall be permitted to attend.

(5)    During the Auction, bidding shall begin initially with the highest Baseline Bid, which may be the Bid of a Stalking Horse Purchaser, and subsequently continue with an initial minimum overbid of $150,000 (plus the Breakup Fee, if any, in the event that the Baseline Bid is the Bid of a Stalking Horse Purchaser). Except as otherwise set forth herein, the Debtors may conduct the Auction in the manner they determine will result in the highest or best offer for the Assets.

(6)    Any Overbid after the Baseline Bid shall be made in increments of at least $100,000 in cash. Additional consideration in excess of the amount set forth in the Baseline Bid may include only cash and/or other consideration acceptable to the Debtors, in consultation with the Committees; provided, however, that any overbids by a Stalking Horse Purchaser thereafter shall only be required to be equal to the sum of (1) the then existing lead Bid plus (2) $100,000 less (3) the dollar value of the Breakup Fee, if any.

(7)    Additional provisions regarding the conduct of the Auction are set forth in the Bid Procedures.

(8)    Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall immediately identify the highest or best offer for the Assets (which may be an aggregate of bids for less than all of the Assets) (the "Successful Bid") and the entity submitting such Successful Bid (the "Successful Bidder"), which highest or best offer will provide the greatest amount of net value to the Debtors, and the next highest or best offers after the Successful Bid (the "Back-up Bids") and the entities submitting the Back-up Bids (the "Back-up Bidders"), and advise the Qualified Bidders of such determination. As stated above, all Bids must

15

be irrevocable until the Termination Date, which is two (2) business days after the Assets have been sold pursuant to the closing of the sale or sales approved by the Bankruptcy Court.

(i.)     Acceptance of Successful Bid. The Debtors shall sell the Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after the Sale Hearing. The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of such Qualified Bid. The Debtors will be deemed to have accepted a Qualified Bid only when the Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing.

(j.)     Breakup Fee/Expense Reimbursement. The Debtors may solicit "stalking horse" bids for the Assets prior to the Auction. Recognizing a stalking horse bidder's expenditure of time, energy and resources, and that the stalking horse provides a floor bid with respect to the Assets that it offers to purchase, the Debtors seek authority to provide the following bidding protections in the event that a stalking horse (the "Stalking Horse Purchaser") is selected by the Debtors in their sole discretion in advance of the Auction.

(1)     The Debtors may agree to pay a Stalking Horse Purchaser a breakup fee and/or expense reimbursement in an amount not to exceed 2.0% of the cash or cash equivalent portion of the purchase price (the "Breakup Fee") offered by such Stalking Horse Purchaser, in cash or other immediately available good funds in the event that: (i) the Stalking Horse Bidder is not approved by the Bankruptcy Court as the purchaser of the Assets on which it bid, (ii) the Stalking Horse Purchaser is not in default of its obligations under its purchase agreement with the Debtors, and (iii) the Assets on which the Stalking Horse Purchaser bid are thereafter sold to a Successful Bidder(s) at the Auction for consideration in excess of the purchase price provided for in the purchase agreement with the Stalking Horse Purchaser notwithstanding the Stalking Horse Purchaser's willingness and ability to consummate the transactions contemplated by the Stalking Horse Purchaser's purchase agreement. Such payment shall be made to the Stalking Horse Purchaser solely out of the proceeds of

16

closing with the Successful Bidder(s) of the Assets on which the Stalking Horse Purchaser bid.

(2)        In the event a Stalking Horse Purchaser is designated, any bid(s) submitted by a party or parties other than the Stalking Horse Purchaser must be in an amount that is sufficient to pay the Breakup Fee and result in additional consideration to the Debtors' estates in the amount of at least $150,000 (as compared to the purchase price offered by such Stalking Horse Purchaser), after payment of the Breakup Fee.

### Notice of Sale Hearing

20.    As noted above, the Debtors request that the Court schedule the Sale Hearing on **December 17, 2010 at 9:30 a.m. (Eastern time)**. The Debtors propose that objections, if any, to the Sale Motion be filed on or before **12:00 p.m. Noon (Eastern time) on December 14, 2010**.

21.    The Debtors request that the Court approve the manner of notice of the Sale Motion, the Bid Procedures, the Auction, and the Sale Hearing, substantially in the form attached hereto as Exhibit C (the "Sale and Bid Procedures Notice"), which the Debtors will serve on the following parties:

(a.)    the U.S. Trustee;

(b.)    counsel to the DIP Lender and each of the Committees;

(c.)    all parties known to be asserting a lien on any of the Assets and who would appear as potentially holding a lien on any search conducted to determine who asserts a lien on the Debtors' assets;

(d.)    all known counterparties to the Assumed Contracts;

(e.)    all entities known to have expressed an interest in bidding on the Assets;

(f.)     the United States Attorney's office;

(g.)     all state attorney generals in states in which the Debtors do business;

(h.)     state taxing authorities in the states in which the Debtors do business and the Internal Revenue Service;

(i.)     environmental authorities in the states or smaller applicable jurisdictions in which the Debtors do business;

(j.)     the Stalking Horse Purchaser, if any, and its counsel; and

(k.)     all other parties that had filed a notice of appearance and demand for service of papers in these bankruptcy cases under Bankruptcy Rule 9010(b) as of the date of entry of the Bid Procedures Order (collectively, the "Sale and Bid Procedures Notice Parties").

22.     Additionally, the Debtors propose to serve the Creditor Notice substantially in the form attached hereto as Exhibit D on all known creditors of the Debtors.

23.     The Debtors propose to serve the Sale and Bid Procedures Notice and the Creditor Notice within two (2) Business Days from the date of entry of an order granting this Motion (the "Bid Procedures Order"), by first-class mail, postage prepaid, on the appropriate parties as described above. Both the Sale and Bid Procedures Notice and the Creditor Notice will provide that any party that has not received a copy of the Sale Motion or the Bid Procedures Order that wishes to obtain a copy of such documents may make such a request, in writing, to

Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box, 8705, Wilmington, Delaware, 19899-8705 (Courier 19801) (Attn: Laura Davis Jones, Esquire).

24.     The foregoing notice shall provide parties in interest approximately fourteen (14) days' notice of the Court-approved Bid Procedures and Sale Hearing, assuming that the Court approves the schedule proposed hereby. In order to further maximize notice, the Debtors have served this Motion and the associated Sale Motion on all of the Notice Parties, which will provide such parties with approximately twenty-five (25) days' notice of the substance of the proposed Sale and the requested Sale Hearing. The Debtors submit that no other or further notice should be required.

## Sale Hearing

25.     At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the sale of the Assets to the Successful Bidder, free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code (other than the Permitted Liens as defined in the Sale Motion and except as otherwise provided therein) with all such liens, claims and interests to attach to the proceeds of the sale, except as otherwise provided with the same validity and in the same order of priority as they attached to the Assets prior to the sale, including the assumption by the Debtors and assignment to the Successful Bidder of the Assumed Contracts pursuant to section 365 of the Bankruptcy Code. The Debtors will present additional evidence, as necessary, at the Sale Hearing and submit that the relief sought herein, including the sale and related assumption and assignment of contracts and leases, is fair, reasonable and in the best interest of these estates.

## Closing

26. The closing shall take place in accordance with terms of the Agreement, or in accordance with the terms of such other agreement approved by the Bankruptcy Court at the Sale Hearing.

## Procedures for the Assumption and Assignment of Assumed Contracts

27. At the closing, the Debtors intend to assume and assign to the Successful Bidder, certain executory contracts and unexpired leases identified on certain schedules to the Agreement (*i.e.*, the Assumed Contracts).[5] The list of the Assumed Contracts is (or will be) attached to the Agreement, provided, however, that the Successful Bidder may add to the list of Assumed Contracts (so long as the Debtors file and serve the Cure Notice on each affected contract counterparty within ten (10) calendar days before the Sale Hearing), and may remove any executory contract or lease to the list of Assumed Contracts at any time prior to the closing of the sale.

28. The Debtors propose to serve the Cure Notice, in substantially the form annexed hereto as <u>Exhibit E</u>, upon each counterparty whose agreement is on the list of Assumed Contracts no later than two (2) business days after entry of the Order approving the Bid Procedures. The Cure Notice also will identify the amounts, if any, that the Debtors believe are owed to each counterparty to an Assumed Contract in order to cure any defaults that exist under such contract (the "Cure Costs"). The Debtors have proposed that the Cure Notice will state the

---

[5] The inclusion of any agreement in the list of Assumed Contracts does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtors expressly reserve the right to challenge the status of any agreement included in the list of Assumed Contracts.

date by which any objection to the Cure Costs or the assumption and assignment of the Assumed Contract (including with respect to adequate assurance of future performance) must be filed and served, which the Debtors propose to be **December 14, 2010 at 12:00 p.m. Noon (Eastern time)**. If a contract or lease is assumed and assigned pursuant to the Bankruptcy Court's order approving same, then unless the affected counterparty properly files and serves an objection to the Cure Costs contained in the Cure Notice, the counterparty will receive at the time of the closing (or as soon as reasonably practicable thereafter), the Cure Costs as set forth in the Cure Notice, with payment made pursuant to the terms of the Agreement, or the agreement of the Successful Bidder. If an objection is filed by a counterparty to an Assumed Contract with respect to the amount of the Cure Costs set forth in the Cure Notice, the Debtors propose that such objection must set forth a specific default under the Assumed Contract and claim a specific monetary amount that differs from the amount (if any) specified by the Debtors in the Cure Notice or, alternatively, state why the counterparty believes any Cure Costs are owing, and state the basis for any other objection to the assumption and assignment of the Assumed Contract.

29. The Successful Bidder, shall assume and be responsible for payment of any Cure Costs that may be owed to any counterparty to the Assumed Contracts in accordance with the terms of the Agreement. The Successful Bidder shall be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Contracts. The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Assumed Contracts pursuant to section

21

365(b) of the Bankruptcy Code at the Sale Hearing. The Debtors further propose that Cure Costs disputed by any counterparty will be resolved by the Court at the Sale Hearing.

30. Except to the extent otherwise provided in the Agreement or the agreement entered into with the Successful Bidder(s), subject to the payment of any Cure Costs, the assignee of an Assumed Contract will not be subject to any liability to the assigned contract counterparty that accrued or arose before the closing date of the sale of the Assets and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to 11 U.S.C. § 365(k).

### Approval of the Breakup Fee
### and Bid Procedures is Appropriate

31. The Breakup Fee and the Bid Procedures described herein are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values. The Stalking Horse Purchaser, if any, will be the stalking horse for competitive bids, perhaps leading to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured.

32. As indicated above, the Debtors hereby request that the Court approve the overbid requirements and Bid Procedures as are customary in similar circumstances, including granting the Debtors discretion to agree to the Breakup Fee, within specified parameters, in favor of a Stalking Horse Purchaser in the event that one is selected by the Debtors. The Debtors submit that cause exists to approve such payments and procedures because they are fair and reasonable under the circumstances and will encourage competitive bidding and the highest or best price for the Assets.

70934-001\DOCS_SF:74756.5

33.     Bidding incentives encourage a potential purchaser to invest the requisite time, money and effort to negotiate with the Debtors and perform the necessary due diligence attendant to the acquisition of the Assets, despite the inherent risks and uncertainties of the chapter 11 process.  Historically, bankruptcy courts have approved bidding incentives similar to the Breakup Fee, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  *See, e.g.*, *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

34.     The Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context.  *In re Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F. 3d 527 (3rd Cir. 1999), the court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code § 503(b) govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some benefit to the Debtors' estates.  *See id.* at 533.

35.     The *O'Brien* court identified at least two instances in which bidding incentives such as expense reimbursements and breakup fees may provide benefit to the estate. First, benefit may be found if "assurance of a breakup fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding

70934-001\DOCS_SF:74756.5

would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induces a bidder to research the value of the Debtors and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

36.     Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Debtors' proposed authority to approve a Breakup Fee in these cases passes muster. The Breakup Fee is fair and reasonable in amount, and is reasonably intended to compensate for the risk that a Stalking Horse Purchaser, should one be selected by the Debtors, is taking by setting a baseline price for the Assets and investing resources in making a bid.

37.     Furthermore, the Breakup Fee, which at maximum would total no more than 2.0% of the cash or cash equivalent portion of the purchase price, prior to any adjustments thereto, is within the spectrum of expense reimbursement and termination fees approved by bankruptcy courts in chapter 11 cases. *See e.g. In re Monaco Coach Corporation, et al.*, Case No. 09-10750 (KJC) (Bankr. D. Del. May 1, 2009) (court approved a break up fee of approximately 5.77%, or $3,000,000, in connection with sale); *In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del. May 4, 2009) (court approved a break up fee of approximately 3.68% in connection with sale)*; In re Champion Enterprises, Inc. et al.*, Case No. 09-14019 (KG) (Bankr. D. Del. November 14, 2009) (court approved a break up fee and expense reimbursement that totals less than 3% of total amount of credit bid, or no more than $4,000,000,

in connection with sale); *In re Global Motorsport Group, Inc., et al.*, (Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008) (court approved a breakup fee of approximately 4%, or $500,000 in connection with sale); *In re Global Home Products*, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (court approved a breakup fee of 3.3%, or $700,000, in connection with sale); *In re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (court approved a breakup fee of 3.64%, or $4,000,000, in connection with $110,000,000 sale); *In re Montgomery Ward Holding Corp.*, et al., Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (court approved termination fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate assets); *In re Medlab, Inc.*, Case No, 97-1893 (PJW) (Bankr. D. Del. April 28, 1998) (court approved termination fee of 3.12%, or $250,000, in connection with $8,000,000 sale transaction); *In re Anchor Container Corp. et, al.*, Case Nos. 96-1434 and 96-1516 (PJW) (Bankr. D. Del. Dec. 20, 1996) (court approved termination fee of 2.43%, or $8,000,000, in connection with $327,900,000 sale of substantially all of debtors' assets); *In re FoxMeyer Corp. et al.*, Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (court approved termination fee of 7.47%, or $6,500,000, in connection with $87,000,000 sale of substantially all of Debtors' assets); *In re Edison Bros. Stores. Inc. et al.*, Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (court approved termination fee of 3.5%, or $600,000, in connection with $17,000,000 sale of Debtors' entertainment division); *In re Continental Airlines, Inc.*, Case No. 90-932 (HSB) (Bankr. D. Del.) (court approved breakup fee of 2.4%, or $1,500,000, in connection with $61,000,000 sale transaction).

38.     For the reasons set forth above, the Debtors respectfully request approval of: (a) the proposed overbid protections including the Breakup Fee to be authorized in favor of a Stalking Horse Purchaser in the Debtors' discretion; (b) the Bid Procedures for the conduct of overbidding, the Auction and selection of the Successful Bidder(s); (c) the procedures set forth herein for notice to counterparties under executory contracts and leases proposed to be assumed and assigned in connection with the proposed sale, and the determination and payment of Cure Costs to the counterparties to leases or contracts to be assumed and assigned; (d) the scheduling of the Sale Hearing and other matters for which scheduling is requested herein; and (e) the related relief sought hereby.

### No Prior Request

39.     No prior request for the relief sought in this Motion has been made to this or any other court.

### Notice

40.     Concurrently with this filing, copies of this Motion (which sets forth various requested dates relating to the sale) will be provided to (a) the Office of the United States Trustee; (b) counsel to the DIP Lender; (c) counsel to the Committees; (d) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure; (e) all parties who assert liens with respect to the Assets; (f) all entities who executed non-disclosure agreements with the Debtors or CRG in connection with a potential acquisition of any or all of the Assets or who otherwise have expressed to the Debtors an interest in purchasing the Assets; (g) all counterparties to Assumed Contracts; (h) the United States Attorney's office; (i)

all state attorneys general in states in which the Assets are located; (j) the Internal Revenue Service; and (k) for each state in which the Assets are located, the applicable taxing authorities.

41.    In addition, within two (2) business days following entry of the Bid Procedures Order, the Debtors will provide notice of the Bid Procedures Order and the Sale Hearing with definitive dates once determined by the Court in the Bid Procedures Order on the parties set forth above and the Debtors' known creditors.

42.    The Debtors respectfully submit that such notice is sufficient, and request that the Court find that no further notice of the relief requested herein is required.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, substantially in the form filed contemporaneously with this Motion, granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated: November 23, 2010

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
Timothy P. Cairns (Bar No. 4228)
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone:  302/652-4100
Facsimile:  302/652-4400
Email: ljones@pszjlaw.com
        dbertenthal@pszjlaw.com
        jfried@pszjlaw.com
        tcairns@pszjlaw.com

Counsel for the Debtors and Debtors in Possession

70934-001\DOCS_SF:74756.5