**<u>Exhibit A</u>**

**Asset Purchase Agreement**

(without Schedules)

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the **"Agreement"**) is made and entered into as of this ___ day of _____, 2010, by and between _____, a _____ (the **"Buyer"**), on the one hand, and Point Blank Solutions, Inc., a Delaware corporation (**"PB"**), Point Blank Body Armor, Inc., a New York corporation (**"PB Armor"**), Protective Apparel Corporation of America, a Delaware corporation (**"PACA"**), and PBSS, LLC, a Delaware limited liability company (**"PBSS"** and collectively with PB, PB Armor, and PACA, the **"Sellers"** and, together with Buyer, the **"Parties"**), each of the Sellers being a Debtor and Debtor in Possession under Case No. 10-11255 (PJW ) (the **"Bankruptcy Case"**) in the United States Bankruptcy Court for the District of Delaware (the **"Bankruptcy Court"**).

## RECITALS

A.      Collectively, the Sellers are manufacturers and suppliers of bullet, fragmentation, and stab resistant apparel and related ballistic accessories, which are used both domestically and internationally by military, law enforcement, security and corrections personnel, as well as by governmental agencies (the **"Business"**).

B.      Sellers wish to sell to Buyer, pursuant to Sections 363 of Chapter 11 of Title 11 of the United States Code (the **"Bankruptcy Code"**), substantially all of the assets of Sellers heretofore used exclusively in connection with or arising out of the operation of the Business, all at the price and on the other terms and conditions specified in detail below and Buyer wishes to so purchase and acquire such assets from Sellers.

C.      Capitalized terms used but not otherwise defined herein shall have their respective meanings set forth in **Exhibit "E"** hereto

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.      Transfer of Assets.

        1.1      Purchase and Sale of Assets.   Upon the terms and subject to the conditions set forth in this Agreement and entry of the Approval Order (as defined in Section 4.1.7 below), on the Closing Date, Sellers agree to sell, assign, transfer, convey and deliver (pursuant to Sections 363 and 365 of the Bankruptcy Code) to the Buyer, free and clear of all Liens to the extent provided in the Approval Order, Sellers' right, title and interest in substantially all of Sellers' assets, including, without limitation, the following (collectively, the **"Property"**) (other than the Excluded Assets (as defined in Section 1.2 below)) :

1.1.1 <u>Leases and Contracts</u>. Each Seller's right, title and interest in and to (i) the lessee's interest under those real property leases described on **Schedule 1.1.1-(i)** attached to this Agreement and incorporated herein by this reference (collectively, the **"Real Property Leases"**), (ii) the lessee's interest under those equipment, personal property and intangible property leases, rental agreements, licenses, contracts, agreements and similar arrangements, if any, described on **Schedule 1.1.1-(ii)** attached to this Agreement and incorporated herein by this reference (collectively, the **"Other Leases"**), (iii) those government contracts, including the contracts with the Department of Defense described on **Schedule 1.1.1-(iii)** attached to this Agreement and incorporated herein by this reference (collectively, the **"Government Contracts"**), and (iv) those other contracts, leases, orders, purchase orders, licenses, contracts, agreements and similar arrangements described on **Schedule 1.1.1-(iv)** attached to this Agreement and incorporated herein by this reference (collectively, the **"Other Contracts"** and together with the Real Property Leases and Other Leases and Government Contracts, the **"Leases and Contracts"**).

1.1.2 <u>Personal Property</u>. All of those items of equipment and tangible personal property owned by any of the Sellers and heretofore used exclusively in connection with the Business, including, without limitation, all such furniture, vehicles, machinery, equipment, tools, spare parts, computers, fixtures and furnishings and other items of tangible personal property listed or described in **Schedule 1.1.2** attached to this Agreement and incorporated herein by this reference (collectively, the **"Personal Property"**). As used herein, the Personal Property does not include the Inventory (as defined below). The Personal Property shall also expressly exclude any equipment or other tangible property held by any Sellers pursuant to a lease, rental agreement, contract, license or similar arrangement (a **"Contract"**) where Buyer does not assume the underlying Contract relating to such personal property at the Closing (collectively, **"Contracted Personalty"**).

1.1.3 <u>Intangible Property</u>. All intangible personal property owned or held by any Seller to the extent heretofore used exclusively in connection with the Business, but in all cases only to the extent of such Seller's interest and only to the extent transferable, together with all books, records and like items pertaining to the Business, the goodwill of the Business, patents, processes, trademarks (including "Interceptor"), trade names, trade names (including the names "Point Blank Body Armor", "Point Blank Solutions", and "Protective Apparel Corporation of America") service marks, catalogues, customer lists and other customer data bases, correspondence with present or prospective customers and suppliers, advertising materials, software programs, and telephone exchange numbers and facsimile numbers identified with the Business and any right, title and interest of Sellers in and to those items described on **Schedule 1.1.3** attached hereto and incorporated herein by this reference (collectively, the **"Intangible Property"**). As used in this Agreement, Intangible Property shall in all events exclude (i) any materials containing privileged communications or information about employees, disclosure of which would violate an employee's reasonable expectation of privacy and any other materials which are subject to attorney-client or any other privilege, and (ii) any software or other item of intangible property held by Sellers pursuant to a license or other Contract where Buyer does not assume the underlying Contract relating to such intangible personal property at the Closing (collectively, **"Contracted IP"**).

1.1.4 <u>Permits</u>. To the extent transferable and assignable, each Seller's interest in all licenses, certificates of occupancy, permits, registrations, certificates of public convenience and necessity, approvals, licenses, easements, authorizations and operating rights issued or granted by any governmental or similar authority having jurisdiction over the Business to the extent relating to the operation of the Business, including, without limitation, those described on **Schedule 1.1.4** attached hereto and incorporated herein by this reference (collectively, the **"Permits and Licenses"**).

1.1.5 <u>Accounts Receivable</u>. All accounts and notes receivable (whether current or non-current) of Sellers and all causes of action specifically pertaining t thereto (collectively, the **"Accounts Receivable"**).

1.1.6 <u>Inventory</u>. All supplies, goods, materials, raw materials, work in process, finished goods, replacement parts, maintenance supplies, inventory and stock in trade owned and held by any Sellers and other goods used or consumed in connection with the Leases and Contracts, maintained, held or stored by or for Sellers at any location whatsoever (collectively, the **"Inventory"**).

1.1.7 <u>Vendor Items</u>. All promotional allowances and vendor rebates and similar items of Sellers (collectively, the **"Vendor-Related Assets"**).

1.1.8 <u>Claims, Etc</u>. All claims, prepayments, warranties, guarantees, refunds, reimbursements, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature of Sellers (collectively, the **"Claims"**).

1.1.9 <u>Certain Insurance Rights</u>. To the extent assignable, Sellers' rights under insurance policies to the extent they relate to the Business for the period prior to the Closing Date.

1.2 <u>Excluded Assets</u>. Notwithstanding anything to the contrary in this Agreement, the Property shall exclude all of the following (collectively, the **"Excluded Assets"**): (i) those items excluded pursuant to the provisions of Section 1.1 above; (ii) Sellers' rights under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers pursuant to the terms and provisions hereof; (iii) all cash deposits and prepaid items relating to or arising in connection with the operation of the Business; (iv) all cash and cash equivalents (including checking account balances, certificates of deposit and other time deposits and petty cash) and marketable and other securities relating to or arising in connection with the operation of the Business, (v) all tax refunds, rebates, credits and similar items relating to or arising out of the operation of the Business and to any period, or portion of any period, on or prior to the Closing Date; (vi) insurance proceeds, claims and causes of action with respect to or arising in connection with (A) any Contract which is not assigned to Buyer at the Closing, or (B) any item of tangible or intangible property not acquired by Buyer at the Closing; or (C) any Directors & Officers Liability Insurance Policy (or similar policy) of any of the Sellers, or (D) any liability or obligation where Buyer has not assumed the associated liability or obligation as part of the Assumed Liabilities pursuant to Section 2.2 below, (v) any lease, rental agreement (in each case, whether relating to real or personal property), contract, license or similar arrangement

not assigned to Buyer at the Closing and all Contracted IP and/or Contracted Personalty held by any Seller pursuant thereto, (vii) all securities, whether capital stock or debt, of any Seller or any other entity; (viii) all tax records, minute books, stock transfer books and corporate seal of each Seller; (ix) any letters of credit or similar financial accommodations issued to any third party(ies) for the account of any Seller and any collateral therefor and other collateral deposits and prepaid items associated with the Property; (x) all rights, claims and causes of action of Sellers against former officers, directors, employees, members, principals, agents, and representatives of any Seller, including, without limitation, any arising under or in connection with the applicable provisions of Sarbanes-Oxley or other securities laws; (xi) all preference or avoidance claims and actions of any of the Sellers, including, without limitation, any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code; (xii) all rights, claims and causes of action of any Seller (or which may result in a benefit to any of the Sellers) asserted or which may hereafter be asserted in any of the litigation proceedings described on **Schedule 1.2(xii)** attached hereto and incorporated herein by this reference in which any Seller is a party or of which any Seller is a potential beneficiary, which claims, rights and causes of action shall in any event include, without limitation, any arising in connection with or relating to (xx) the settlement of the Brooks class action litigation (or any rejection thereof), and (yy) Toyobo, and (xiii) all supplies, goods, materials, inventory and stock in trade manufactured or provided by Zylon and carried on any Seller's books (collectively, the **"Zylon Goods"**), as well as all books, records and like items (including, without limitation, catalogues, data bases, correspondence, inspections, inspection reports, memoranda, advertising materials pertaining in any way to the Zylon Goods), and (xiv)those additional assets, if any, listed on **Schedule 1.2(xiv)** attached hereto and incorporated herein by this reference.

      1.3    <u>Instruments of Transfer</u>.  The sale, assignment, transfer, conveyance and delivery of the Property to Buyer shall be made by deeds, assignments, bill of sale, and other instruments of assignment, transfer and conveyance provided for in Section 3 below and such other instruments as may reasonably be requested by Buyer to transfer, convey, assign and deliver the Property to Buyer, but in all events only to the extent that the same do not impose any monetary obligations upon Sellers or in any other respect increase in any material way the burdens imposed by the other provisions of this Agreement upon  Sellers, or any of them.

    2.    Consideration and Liquidated Damages.

      2.1    <u>Purchase Price</u>.

      2.1.1.    The cash consideration to be paid by Buyer to Sellers for the Property (the **"Purchase Price"**) shall be an amount equal to _____ Dollars ($_____).

      2.1.2    The Purchase Price shall be paid as follows:

        (a)    Concurrently with the mutual execution and delivery of this Agreement (the date of such mutual execution and delivery is sometimes referred to herein as the **"Execution Date"**), Buyer shall deposit into an escrow (the **"Escrow"**) with an escrow agent (the **"Escrow Holder"**) reasonably acceptable to Sellers an amount equal to $_____ (the

"**Deposit**") in immediately available, good funds (funds delivered in this manner are referred to herein as "**Good Funds**"), pursuant to joint escrow instructions to be delivered to the Escrow Holder on or before the Execution Date. In turn, the Escrow Holder shall immediately deposit the Deposit into an interest-bearing account. So long as the Sellers are ready, willing and able to consummate or proceed with the consummation of the transactions contemplated by this Agreement, the Deposit shall become nonrefundable upon the termination of the transaction contemplated by this Agreement by reason of Buyer's default of any obligation hereunder (a "**Buyer Default Termination**"), it being agreed that Sellers shall not have the right to so terminate this Agreement unless Buyer has failed to cure the applicable default within five (5) days following its receipt of written notice thereof from Sellers. At the Closing, the Deposit (and any interest accrued thereon) shall be credited and applied toward payment of the Purchase Price. In the event the Deposit becomes nonrefundable by reason of a Buyer Default Termination, Escrow Holder shall immediately disburse the Deposit and all interest accrued thereon to Sellers to be retained by Sellers for their own account. If the transactions contemplated herein terminate by reason of (A) Sellers' material default under this Agreement, it being agreed that Buyer shall not have the right to so terminate this Agreement unless Sellers have failed to cure the applicable default within five (5) days following their receipt of written notice thereof from Buyer, or (B) the failure of a condition to Buyer's obligations hereunder, the Escrow Holder shall return to Buyer the Deposit (together with all interest accrued thereon), but less Buyer's one-half share of the Escrow Holder's escrow fees and charges.

        (b)    LIQUIDATED DAMAGES. BUYER AND SELLERS HEREBY ACKNOWLEDGE THAT, IN THE EVENT OF BUYER'S DEFAULT, IT WOULD BE IMPRACTICABLE AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES SELLERS MAY SUFFER OR INCUR IN THE EVENT THAT THE TRANSACTION CONTEMPLATED HEREIN FAILS TO CLOSE BY REASON OF SUCH DEFAULT. ACCORDINGLY, NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN< BUYER AND SELLERS HEREBY AGREE THAT CONSIDERING ALL OF THE CIRCUMSTANCES EXISTING AT THE EXECUTION OF THIS AGREEMENT, A REASONABLE ESTIMATE OF THE TOTAL DETRIMENT THAT SELLERS WOULD SUFFER IN THE EVENT THAT THE TRANSACTION CONTEMPLATED HEREIN FAILS TO CLOSE BY REASON OF BUYER'S DEFAULT IS AND SHALL BE AN AMOUNT EQUAL TO THE AMOUNT OF THE DEPOSIT. EXCEPT AS OTHERWISE PROVIDED IN CLAUSES (ii) AND (iii) BELOW, SAID AMOUNT SHALL REPRESENT THE FULL, AGREED, AND LIQUIDATED DAMAGES TO WHICH SELLERS ARE ENTITLED BY REASON OF BUYER'S BREACH AND SELLERS HEREBY EXPRESSLY WAIVE ANY AND ALL OTHER CLAIMS TO DAMAGES OR OTHER REMEDIES (WHETHER AT LAW OR IN EQUITY). UPON BUYER'S DEFAULT AND SELLERS' ELECTION TO TERMINATE THIS AGREEMENT BY REASON THEREOF, THIS AGREEMENT SHALL TERMINATE AND EXCEPT FOR (i) SELLERS' RIGHT TO COLLECT THE AMOUNT OF SUCH LIQUIDATED DAMAGES, (ii) ANY PROVISIONS AND OBLIGATIONS (INCLUDING, WITHOUT LIMITATION, BUYER'S INDEMNITY OBLIGATIONS) OF THIS AGREEMENT WHICH BY THEIR TERMS SURVIVE ANY TERMINATION OF THIS AGREEMENT, AND (iii) THE PARTIES' RESPECTIVE OBLIGATIONS UNDER SECTION 10.2 OF THIS AGREEMENT, THE PARTIES HERETO SHALL BE RELIEVED OF ANY

FURTHER LIABILITY OR OBLIGATION UNDER THIS AGREEMENT. BY PLACING THEIR INITIALS IN THE SPACES PROVIDED BELOW, EACH PARTY SPECIFICALLY ACKNOWLEDGES AND CONFIRMS THE ACCURACY OF THE STATEMENTS SET FORTH ABOVE AND THAT THEY WERE REPRESENTED BY COUNSEL OF THEIR CHOICE WHO FULLY EXPLAINED THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION AT THE TIME OF EXECUTION OF THIS AGREEMENT.

Sellers' Initials: _____    Buyer's Initials: _____

(b)    On the Closing Date, Buyer shall (A) cause the Escrow Holder to deliver the Deposit (together with all accrued interest thereon) to Sellers, and (B) pay and deliver, in Good Funds, the balance of the Purchase Price to Sellers.

2.2    Assumed Liabilities.

Effective as of the Closing Date, Buyer shall assume all the following liabilities and obligations of Sellers: (i) all obligations of Sellers now existing or hereafter arising or accruing under the Leases and Contracts, (ii) with respect to employees of Sellers as of the Closing Date, to the extent incurred in the ordinary course, (iii) with respect to trade payables of the Business to the extent incurred in the ordinary course after the commencement of the Bankruptcy Case and obligations to customers of Sellers for refunds, rebates, returns, discounts and the like  existing as of the Closing Date, and (iv) with respect to any product liability or warranty claims to the extent relating to or arising out of Sellers' activities after the commencement of the Bankruptcy Case (collectively, the **"Assumed Liabilities"**).

2.3    Purchase Price Allocation.  Not later than twenty one (21) days prior to the Closing Date, Buyer shall prepare and deliver to Sellers for their review and consideration a schedule (the **"Allocation Schedule"**) allocating the Purchase Price among the various assets comprising the Property in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local tax law) or any successor provision.  If Sellers disagree with or raise objections to the Allocation Schedule, Buyer and Sellers will negotiate in good faith to resolve such objections.  If the Parties are able to agree upon the allocation of the Purchase Price, Buyer and Sellers shall report and file all tax returns (including any amended tax returns and claims for refund) consistent with such mutually agreed Purchase Price allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings).  Buyer and Sellers shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms.  If, on the other hand, the Parties are unable mutually to agree upon the manner in which the Purchase Price should be allocated, Buyer and Sellers shall be free to make their own respective allocations of the Purchase Price for tax purposes.

2.4    Disposition of Sellers L/C's.  At or prior to the Closing, as to then outstanding letters of credit or similar financial accommodations issued for Sellers' account and held by third parties (collectively, **"Sellers L/Cs"**), Buyer shall (i) obtain, at Buyer's sole cost and expense and deliver to the parties holding those Sellers L/Cs which are "standby" letters of

credit, replacement letters of credit or similar financial accommodations sufficient to cause such parties to release and return to Sellers at or prior to the Closing the undrawn originals of the Sellers L/Cs and all cash and other collateral therefor, and (ii) with respect to those of the Sellers L/Cs that are "documentary" letters of credit, deposit cash in an institution acceptable to Sellers in an amount equal to 110% of the aggregate face amount of such Sellers L/Cs pursuant to an agreement, in form and content reasonably satisfactory to Sellers, which provides, among other things, for Sellers' right to draw upon such cash immediately after and in amounts corresponding to such amounts as are drawn under such Sellers L/Cs.

2.5    <u>Collection of Accounts Receivable</u>. Sellers agree that, from and after the Closing Date, Buyer shall have the right and authority to collect for its own account the Accounts Receivable and to endorse with the name of the applicable Seller all checks received on account of the Accounts Receivable. Sellers agree that they will, within three (3) business days, transfer, assign and deliver to Buyer all cash and other property which it may receive (in the form it was received) with respect to any Accounts Receivable from and after the Closing Date, and pending any such delivery to Buyer of any such property, the applicable Seller shall hold any such property in trust for the benefit of Buyer separate and apart from the assets of the applicable Seller.

3.   <u>Closing Transactions</u>.

3.1    <u>Closing Conference</u>. The Closing of the transactions provided for herein (the **"Closing"**) shall take place at such place or places as the Parties may mutually agree upon.

3.2    <u>Closing Date</u>. The Closing shall be held upon the earlier to occur of (i) the second (2nd) business day following the satisfaction of the last of the conditions set forth in Sections 4.1 and 4.2 below, and (ii) December 27, 2010 (the **"Outside Date"**); provided, however, in the event the conditions to Closing have not been satisfied or waived by the Outside Date, then any Party who is not in default hereunder may terminate this Agreement. Alternatively, the Parties may mutually agree to an extended Closing Date. Until this Agreement is either terminated or the Parties have agreed upon an extended Closing Date, the Parties shall diligently continue to work to satisfy all conditions to Closing and the transaction contemplated herein shall close as soon as such conditions are satisfied or waived.

3.3    <u>Sellers' Deliveries to Buyer at Closing</u>. On the Closing Date, Sellers shall make the following deliveries to Buyer:

3.3.1   An Assignment and Assumption of Leases and Contracts substantially in the form and content attached as **Exhibit "A"** hereto, duly executed by Sellers pursuant to which each Seller shall assign to Buyer such Seller's respective interest in the Leases and Contracts (the **"Assignment of Leases"**).

3.3.2   A Bill of Sale and Assignment, duly executed by Sellers in the form and on the terms of the bill of sale attached hereto as **Exhibit "B,"** pursuant to which each Seller transfers and assigns to Buyer such Seller's right, title and interest in and to the Personal Property and the Assignment Property (the **"Bill of Sale"**).

3.3.3    A counterpart Assignment of Intangible Property, duly executed by Sellers, in the form and content of the assignment of intangible property attached as **Exhibit "C"** hereto, pursuant to which each Seller assigns to Buyer such Seller's interest, if any, in and to the Intangible Property (the **"Assignment of Intangible Property"**).

3.3.4    Possession and control of the Property, free and clear of all Liens to the extent provided in the Approval Order, excluding, in  all events, Buyer's obligations under this Agreement.

3.3.5    A copy of the Approval Order authorizing and approving the execution and delivery and performance of this Agreement, all other documents contemplated herein and the transactions contemplated hereby and thereby and the acts of the officers and employees of Sellers in carrying out the terms and provisions hereof.

3.3.6    Any consents, approvals and authorizations of third parties that are necessary, including authorization by the Bankruptcy Court (in form reasonably acceptable to Buyer), for the execution, delivery and consummation of this Agreement, but specifically excluding any such consents, approvals and/or authorizations the need for which is obviated by the entry of the Approval Order.

3.3.7    Any such other documents, funds or other things reasonably contemplated by this Agreement to be delivered by Sellers to Buyer at the Closing.

3.4    Buyer's Deliveries to Sellers at Closing.  On the Closing Date, Buyer shall make or cause the following deliveries to Sellers or Escrow Agent, as applicable :

3.4.1    Payment of the Purchase Price.

3.4.2    A counterpart of the Assignment of Leases, duly-executed by Buyer.

3.4.3    An Assumption of Liabilities with respect to the Assumed Liabilities, in the form and content attached as **Exhibit "D"** hereto and incorporated herein by this reference, duly-executed by Buyer (the **"Assumption of Liabilities"**).

3.4.4    Any such other documents, funds or other things reasonably contemplated by this Agreement to be delivered by Buyer to Sellers at the Closing.

3.5    Prorations.   Rent, current taxes, prepaid advertising, utilities and other items of expense (including, without limitation, any prepaid insurance, maintenance, tax or common area or like payments under the Real Property Leases or Other Leases and Contracts, or any of them) relating to or attributable to the Business and/or the Property shall be prorated between Sellers and Buyer as of the Closing Date.  All liabilities and obligations due in respect of periods prior to or as of the Closing Date shall be paid in full or otherwise satisfied by Sellers and all liabilities and obligations due in respect of periods after the Closing Date shall be paid in full or otherwise satisfied by Buyer; provided, however, the provisions of this Section 3.5 are

subject to Buyer's obligations to assume liabilities and obligations pursuant to Section 2.2, above.. Rent shall be prorated on the basis of a thirty (30) day month.

3.6     Sales, Use and Other Taxes.  Any sales, purchase, transfer, stamp, documentary stamp, use or similar taxes under the laws of the states in which any portion of the Property is located, or any subdivision of any such state, or under any federal law or the laws or regulations of any federal agency or authority,  which may be payable by reason of the sale or transfer of the Property under this Agreement or the transactions contemplated herein shall be borne and paid by Buyer .

3.7     Possession.  Right to possession of the Property shall transfer to Buyer on the Closing Date.  Sellers shall transfer and deliver to Buyer on the Closing Date such keys, locks and safe combinations and other similar items as Buyer may reasonably require to obtain occupation and control of the Property, and shall also make available to Buyer at their then existing locations the originals of all documents in Sellers' actual possession that are required to be transferred to Buyer by this Agreement.

4.     Conditions Precedent to Closing; Termination.

4.1     Conditions to Sellers' Obligations.  Sellers' obligation to make the deliveries required of Sellers at the Closing Date and otherwise consummate the transaction contemplated herein shall be subject to the satisfaction or waiver by Sellers of each of the following conditions:

4.1.1   All of the representations and warranties of Buyer contained herein shall continue to be true and correct at the Closing in all material respects.

4.1.2   Buyer shall have executed and delivered to Sellers the Assignment of Leases and the Assumption of Liabilities.

4.1.3   Buyer shall have delivered, or shall be prepared to deliver to Sellers at the Closing, all cash and other documents required of Buyer to be delivered at the Closing.

4.1.4   Buyer shall have delivered to Sellers evidence (in form and content reasonably satisfactory to Sellers) of all necessary entity action by Buyer in connection with the transactions contemplated hereby.

4.1.5   No action, suit or other proceedings shall be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

4.1.6 Buyer shall have substantially performed or tendered performance of each and every material covenant on Buyer's part to be performed which, by its terms, is required to be performed at or before the Closing.

4.1.7 The Bankruptcy Court shall have entered an order in substantially the form set forth in **Exhibit "B"** to that certain Debtors' Motion For an Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Assets Outside the Ordinary Course of Business, (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code;(C) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief (the **"Approval Order"**) and the Approval Order shall not have been stayed as of the Closing Date.

4.1.8 Buyer and Seller shall have entered into a transition services agreement (in form and content reasonably satisfactory to both Buyer and Seller) pursuant to which Buyer agrees to perform and render certain post-Closing services to Seller in connection with, among other things, Seller's efforts to manage, exploit and dispose of the Excluded Assets and administer and close the Bankruptcy Case.

4.2 <u>Conditions to Buyer's Obligations</u>. Buyer's obligation to make the deliveries required of Buyer at the Closing and otherwise consummate the transaction contemplated herein shall be subject to the satisfaction or waiver by Buyer of each of the following conditions:

4.2.1 Sellers shall have substantially performed or tendered performance of each and every covenant on Sellers' part to be performed which, by its terms, is required to be performed or capable of performance at or before the Closing.

4.2.2 All of the representations and warranties of Sellers contained herein shall continue to be true and correct at the Closing in all material respects.

4.2.3 Sellers shall have executed and be prepared to deliver to Buyer the Assignment of Leases, the Assumption of Liabilities, the Bill of Sale, and the Assignment of Intangible Property.

4.2.4 Sellers shall have delivered, or shall be prepared to deliver to Buyer at the Closing, all other documents required of Sellers to be delivered at the Closing.

4.2.5 No action, suit or other proceedings shall be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

4.2.6    The Bankruptcy Court shall have entered the Approval Order  and the Approval Order shall not have been stayed as of the Closing Date.

4.2.7    The Leases and Contracts assigned to Buyer at the Closing (whether by virtue of the effect of the Approval Order rendering consent to assignment unnecessary or by virtue of written consents to assignment obtained from the applicable counterparties) shall include all of the Contracts and Leases described on **Schedule 4.2.7** attached hereto and incorporated herein by this reference).

Any waiver of a condition shall be effective only if such waiver is stated in writing and signed by the waiving Party; provided, however, that the consent of a Party to the Closing shall constitute a waiver by such Party of any conditions to Closing not satisfied as of the Closing Date.

4.3    Termination.

4.3.1    Right to Terminate. In addition to any termination pursuant to Section 2.1.2(a) above, this Agreement may be terminated and the transactions contemplated hereby may be abandoned in the following circumstances:

(a)    by mutual written consent, duly authorized by Buyer and Sellers;

(b)    by either Buyer or Sellers if the Closing shall not have occurred on or before the Outside Date; provided, however, that the right to terminate this Agreement under this provision shall not be available to any party whose willful failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to have occurred on or before such date;

(c)    by either Buyer or Sellers, if a court or governmental authority shall have issued an Order or taken any other action which has become final and non-appealable and which restrains, enjoins or otherwise prohibits the consummation of the transactions contemplated by this Agreement;

(d)    by Buyer if Sellers' Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code pursuant to the provisions of the Bankruptcy Code;

(e)    by Buyer if the Bankruptcy Court orders the appointment of a trustee or examiner with expanded powers pursuant to the provisions of the Bankruptcy Code in the Bankruptcy Case; or

(f)    by Buyer if Sellers are not able, for any reason other than because of Buyer, to assign at Closing any of the Leases and Contracts specifically listed on **Schedule 4.3.1(f)** attached hereto and incorporated herein by this reference.

4.3.2.    Effect of Termination.  In the event of the termination of this Agreement pursuant to Section 2.1.2(a) or Section 4.3.1, this Agreement (other than this Section (f), Section **Error! Reference source not found.** and Article X, which shall survive such

termination) will forthwith become void, and there will be no liability on the part of Buyer or Sellers or any of their respective officers, directors, agents or other representatives to the others and all rights and obligations of any party hereto will cease, provided, however, that (i) nothing herein will relieve any party from liability for any breach of any representation, warranty, covenant, agreement or other obligation contained in this Agreement which occurred prior to termination of this Agreement in accordance with its terms, and (ii) the provisions of 2.1.2(a) and 2.1.2(b) above shall in all events apply to any Buyer Default Termination (as defined in Section 2.1.2(a) above).

        4.3.3    Deposit Refund; Limitation of Damages;. In the event this Agreement is terminated other than as a result of a Buyer Default Termination, then the Deposit shall be immediately returned to Buyer free and clear of any Liens.

        5.   Sellers' Representations and Warranties. Sellers hereby make (each as to themselves only) the following representations and warranties to Buyer:

        5.1    Organization, Standing and Power. Sellers are duly organized, validly existing and in good standing under the laws of the states of their respective organization set forth in the preamble to this Agreement. Sellers have all requisite entity power and authority to own, lease and, subject to the provisions of the Bankruptcy Code applicable to debtors in possession, operate its properties, to carry on Sellers' business as now being conducted. Subject to entry of the Approval Order, Sellers have the power and authority to execute, deliver and perform this Agreement and all writings relating hereto.

        5.2    Validity and Execution. This Agreement has been duly executed and delivered by Sellers and, upon entry of the Approval Order, will constitute the valid and binding obligation of Sellers enforceable against it in accordance with its terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other laws (whether statutory, regulatory or decisional), now or hereafter in effect, relating to or affecting the rights of creditors generally or by equitable principles (regardless of whether considered in a proceeding at law or in equity).

        5.3    No Conflict. Subject to the entry of the Approval Order, the consummation of the transactions herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Sellers do not and will not: (i) conflict with or result in a breach of the articles of incorporation, by-laws or operating agreement, as applicable, of Sellers; (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority, or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which any Seller is a Party or by which Buyer or its assets or properties may be bound.

        5.4    Litigation. Except for the Bankruptcy Case and except as set forth on **Schedule 5.4** hereto, to Sellers' Knowledge (which, for purposes of this Agreement means and refers only to the actual current knowledge of _____ and _____), there is no material litigation or investigation pending or threatened against or materially adversely affecting the Property, before any court or governmental authority. To Sellers' Knowledge, except for the

Bankruptcy Case, Sellers are not subject to any outstanding Litigation or Order, which, individually or in the aggregate, would prevent, or materially delay Sellers from consummating the transactions contemplated by this Agreement.

5.5 <u>Compliance with Law</u>. To Sellers' Knowledge, (i) Sellers are, and have conducted and continue to conduct the Business as it relates, directly or indirectly, to the Property, in material compliance with, and are not in material default or violation of, any laws, Orders and other material requirements applicable to the Business or by which any of the Property is bound or affected, (ii) Sellers are not subject to any Order that has a Material Adverse Affect, individually or in the aggregate, on the Business or the Property, (iii) except as set forth on **Schedule 5.5(iii)** hereto, Sellers have not received any notice or other communication (whether written or oral) from any governmental authority or other Person regarding any actual, alleged, possible or potential breach, violation of or non-compliance with any Order by the Sellers, as it relates, directly or indirectly, to the Business and the Property, and (iv) there is no law or Order, and the Sellers are not aware of any proposed law or Order, which would prohibit or restrict Buyer from, or otherwise impose a Material Adverse Affect on Buyer in conducting the Business as it relates, directly or indirectly, to the Property in any jurisdiction in which such Business is now conducted.

5.6 <u>No Other Agreements to Purchase</u>. Sellers have not entered into any agreement with any other Person (written or oral) which grants such third party the right or option purchase or acquire from Sellers any of the Property, other than purchase orders for Inventory accepted by Sellers in the ordinary course of business, consistent with past practice.

5.7 <u>Inventory</u>. **Schedule 5.7** sets forth a true, complete and correct list of Inventory of Sellers and any prepaid deposits for any of the Inventory. The Inventory consists only of items of a quality and quantity usable or saleable in the ordinary course of business, and within a reasonable period of time. To Sellers' Knowledge, (i) Sellers have good and marketable title to the Inventory free and clear of all Liens, (ii) the Inventory does not include any items held on consignment, and (iii) Sellers are not under any obligation or liability with respect to accepting returns of items of Inventory or merchandise in the possession of its customers other than in the ordinary course of business consistent with past practice. **Schedule 5.7** contains a complete list of the addresses of all warehouses and other facilities in which the Inventory is located at the direction of Sellers.

5.8 <u>Personal Property</u>. To Sellers' Knowledge, (i) Sellers have good and marketable title to all tangible personal property used in the Business, and (ii) with tht exception of Liens which will be removed from the effect of the Approval Order, all such tangible personal property is free and clear of all Liens.

5.9 <u>Real Property; Real Property Leases</u>.

5.9.1 Sellers do not own fee simple title to any real property.

5.9.2 There is no lease of real property or rights therein under which Sellers, with respect to the Business, is a lessee or sublessee other than the Real Property Leases.

To Sellers' Knowledge, a complete and correct copy of the Real Property Leases and all amendments thereto have been furnished to Buyer. To Sellers' Knowledge, no proceeding is pending or threatened for the taking or condemnation of all or any portion of the property demised under the Real Property Leases.

      5.9.3   To Sellers' Knowledge, the premises demised under the Real Property Leases, including the walls, ceilings and other structural elements of any improvements erected on the properties demised under the Real Property Leases and the building systems such as heating, plumbing, ventilation, air conditioning, mechanical and electric, are: (i) in good working order, repair and operating condition as of the date hereof, ordinary wear and tear excepted; and (ii) without any structural defects.

      5.10   Insurance.  Sellers have furnished to Buyer true and complete copies of all insurance policies and fidelity and surety bonds covering the assets, business, equipment, properties and operations of Sellers as it relates to the Property, a list of which (by type, carrier, policy number, limits, premium and expiration date) is set forth in **Schedule 5.10**. All such insurance policies are in full force and effect.

      5.11   Accounts Receivable.  A true, complete and accurate list of all Accounts Receivable of Sellers relating to the Business as of the date hereof are set forth on **Schedule 5.11** and have arisen solely out of bona fide sales and deliveries of goods, performance of services and other business transactions in the ordinary course of the Business.

      5.12   Customers and Vendors.  **Schedule 5.12** contains a complete and accurate list of the 20 largest customers (based on revenues) and 10 largest vendors (based on expenses) for the Business for the ten months ended October 31, 2010 and for the fiscal year ended December 31, 2009. The material business activity between Sellers and the 20 largest customers and vendors during calendar year 2010 as set forth on **Schedule 5.12** has not changed in any material respect. To Sellers' Knowledge, Sellers have not received written notice that any such customer or any such vendor (i) does not plan to continue to do business with Buyer after the Closing Date, or (ii) plans to reduce its supplies to or volume of orders from Buyer after the Closing Date.

    6.  Buyer's Warranties and Representations.  In addition to the representations and warranties contained elsewhere in this Agreement, Buyer hereby makes the following representations and warranties to Sellers:

      6.1   Organization, Standing and Power.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of _____. Buyer has all requisite entity power and authority to own, lease and operate its properties, to carry on its business as now being conducted and to execute, deliver and perform this Agreement and all writings relating hereto.

      6.2   No Conflict.  The execution, delivery and performance of this Agreement and all writings relating hereto by Buyer have been duly and validly authorized. The execution and delivery of this Agreement, the consummation of the transactions herein contemplated, and

the performance of, fulfillment of and compliance with the terms and conditions hereof by Buyer do not and will not: (i) conflict with or result in a breach of the articles of incorporation or by-laws of Buyer or, if applicable, other organizational documents or agreements of Buyer; (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority; or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Buyer is a Party or by which Buyer or its assets or properties may be bound.

7. "AS IS" Transaction. Buyer hereby acknowledges and agrees that, except only as provided in Section 5 above, Sellers makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Property (including, without limitation, income to be derived or expenses to be incurred in connection with the Property, the physical condition of the Personal Property or Inventory, the environmental condition or other matter relating to the physical condition of any real property or improvements which are the subject of any Real Property Lease, the zoning of the real property or improvements which are the subject of any Real Property Lease, the value of the Property (or any portion thereof), the transferability of the Property or any portion thereof, the terms, amount, validity, collectibility or enforceability of the Accounts Receivable or any Assumed Liabilities or Lease or Contract, the merchantability or fitness of the Personal Property, the Inventory or any other portion of the Property for any particular purpose, whether the assignment of any Lease or Contract without the consent of the counterparties thereto or any Lease or Contract would constitute a breach or default under such Lease or Contract). Without in any way limiting the foregoing, Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Property. Buyer further acknowledges that Buyer has conducted an independent inspection and investigation of the physical condition of all portions the Property and all such other matters relating to or affecting or comprising the Property and/or the Assumed Liabilities (including, without limitation, those matters, if any, disclosed to Buyer pursuant to **Schedule 7** attached hereto and incorporated herein by this reference) as Buyer deemed necessary or appropriate and that in proceeding with its acquisition of the Property, Buyer is doing so based solely upon such independent inspections and investigations. Accordingly, except only for the representations set forth in Section 5 above, Buyer will accept the Property at the Closing **"AS IS, "WHERE IS," and "WITH ALL FAULTS."**

8. Operation Pending Closing. Except (i) as otherwise expressly contemplated by this Agreement, (ii) with the prior written consent of Buyer, (iii) as prohibited or restricted by the Bankruptcy Code, or (iv) as described on **Schedule "8"** attached hereto and incorporated herein by this reference, from the date hereof until the Closing Date, the Sellers shall: (a) conduct the Business in the usual and ordinary course in a manner substantially similar to the manner in which the Sellers has operated, consistent with past practice (including with respect to the payment of accounts payable of Sellers), (b) use commercially reasonable efforts to preserve intact the Business, to keep available the services of its current employees and agents and to maintain its relations and goodwill with its suppliers, customers, distributors and any others with whom or with which it has business relations, (c) to maintain appropriate levels of Inventory (consistent with past practice) and (d) not take any action inconsistent with this Agreement or with the consummation of the Closing.

9. Employee Matters.

9.1    Prior to the Closing, Buyer shall offer to employ, commencing immediately following the Closing, a sufficient number of all employees of Sellers (at salaries and compensation levels and on terms and conditions of employment applicable to their employment by Buyer) so that Seller will not incur any liability under the Worker Adjustment and Retraining Notification Act, as amended, or any similar foreign, state or local law or regulations relating to any of the foregoing (the "**WARN Act**") by reason of the consummation of the transactions contemplated herein. Such employees who become employees of Buyer shall be collectively referred to as the **"Transferred Employees."**

9.2    Buyer shall give Transferred Employees full credit for purposes of eligibility and vesting and benefit accrual (other than benefit accrual under a defined benefit pension plan) under the employee benefit plans or arrangements maintained by the Buyer in which such Transferred Employees participate for such Transferred Employees' service with the Sellers.

9.3    With respect to any welfare benefit plans maintained by Buyer for the benefit of Transferred Employees on and after the Closing Date, Buyer shall (i) cause there to be waived any eligibility requirements or pre-existing condition limitations, and (ii) give effect, in determining any deductible and maximum out-of-pocket limitations, amounts paid by such Transferred Employees with respect to benefit plans heretofore maintained by the Sellers.

9.4    Buyer shall indemnify, defend and protect and save hold Seller and Seller's affiliates, officers, directors, employees, representatives, agents, and shareholders harmless of, from and against for any losses, liabilities, claims, actions, causes of actions, penalties, fines, costs and expenses (including without limitation , all court costs and reasonable attorneys' fees suffered, incurred or arising under the WARN Act by reason of Buyer's failure to satisfy the requirements of Section 9.1 above.

10. Miscellaneous.

10.1    Risk of Loss. Damage and Destruction; Condemnation.  Sellers shall promptly notify Buyer of the occurrence of any material damage to or destruction of the Property that occurs prior to the Closing Date.  In the event of any uninsured damage to or destruction of the Property prior to the Closing Date the cost of which to repair would total $[_____] or less, then such damage or destruction shall have no effect whatsoever on the Purchase Price or Buyer's or Sellers' obligation to close.  Should any uninsured damage or destruction to the Property occur prior to the Closing Date the cost of which to repair would total more than $[_____] but less than $[_____], then unless Sellers causes the same to be repaired and restored in all material respects prior to the Closing Date (in which case the Purchase Price shall be unaffected and the parties shall proceed with the Closing as though such damage, destruction or proceedings had never occurred or been initiated), Buyer's sole remedy shall be to receive a dollar-for-dollar reduction in the Purchase Price in an amount equal to the sum of (i) the cost of such repairs, less (ii) the amount of any insurance proceeds with respect thereto assigned to Buyer at the Closing,  and consummate the transaction contemplated herein. If any uninsured

damage or destruction to the Property occurs prior to the Closing Date the cost of which to repair would total $[_____] or more, then irrespective of whether the same can be repaired and/or restored prior to the Closing Date, Buyer shall have the right and option to either (i) terminate the transaction contemplated herein, or (ii) elect to receive, as its sole and exclusive remedy by reason of such damage, destruction, a Purchase Price reduction in the amount of $[_____] and consummate the transaction contemplated herein as though the damage or destruction had never occurred or been initiated.  In all other events or in the event that Buyer elects to consummate the purchase pursuant to clause (ii) above, (xx) all insurance or condemnation proceeds, including business interruption and rental loss proceeds, collected by or paid to Sellers prior to the Closing Date, shall be credited against the Purchase Price on Buyer's account or the Purchase Price shall be adjusted by an amount agreed between Buyer and Sellers, and (yy) all entitlement to all other insurance or condemnation proceeds arising out of such damage or destruction or proceedings and not collected prior to the Closing Date shall be assigned to Buyer at the Closing. Notwithstanding anything to the contrary in this Agreement, the risk of loss or damage to the Property shall unconditionally shift to the Buyer on the Closing Date. For avoidance of doubt, Buyer and Sellers intend that the provisions of this Section 10.1 shall control over any right or remedy to which the Buyer may otherwise be entitled under this Agreement by reason of the occurrence of any event subject to this Section 10.1.

10.2     Attorneys' Fees.  In the event that either Party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that action or proceeding shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

10.3     Reasonable Access to Records and Certain Personnel.  In order to facilitate Sellers' efforts to administer and close the Bankruptcy Case (including, without limitation, the preparation of filings in the Bankruptcy Case and state, local and federal tax returns and other filings, reconciliation of claims filed in the Case, removal of corporate and other records and information relating or belonging to entities other than Sellers), for a period of three (3) years following the Closing, (i) the Buyer shall permit Sellers' counsel and other professionals and counsel for any successor to Sellers and its respective professionals (collectively, **"Permitted Access Parties"**) reasonable access to the financial and other books and records relating to the Property or the Business and the systems containing such information, books and records, which access shall include (xx) the right of such Permitted Access Parties to copy or remove, as applicable, at such Permitted Access Parties' expense, such documents and records as they may request in furtherance of the purposes described above, and (yy) Buyer's copying and delivering to the relevant Permitted Access Parties such documents or records as they may request, but only to the extent such Permitted Access Parties furnish Buyer with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Buyer for the reasonable costs and expenses thereof, and (ii) Buyer shall provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access during regular business hours to such Transferred Employees. as Seller may hereafter designate in writing, to assist Sellers  and the other Permitted Access Parties

(including by providing and generating, at Sellers or such other Permitted Access Parties' cost or expense, if applicable, such information, reports, filings and analyses as Sellers or the other Permitted Access Parties may reasonably request from time to time) in their post-Closing activities (including, without limitation, preparation of tax returns), provided that such access and assistance does not unreasonably interfere with the Buyer's business operations.

        10.4   <u>Notices</u>.  Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by any Party to the other may be effected by personal delivery in writing, or by registered or certified mail, postage prepaid, return receipt requested or by facsimile, and shall be deemed communicated as of the date of mailing or facsimile transmission (with answer back confirmation of such transmission).  Mailed notices shall be addressed as set forth below, but each Party may change his address by written notice in accordance with this Section 10.4.

| To Sellers: | _____ |
|---|---|
| | _____ |
| | Attn: T. Scott Avila, |
| | Chief Restructuring Officer |
| | Facsimile:  (__) ____-_____ |
| With a copy to: | Pachulski Stang Ziehl & Jones LLP |
| | 919 North Market Street, 17th Floor |
| | Wilmington, Delaware  19899 |
| | Attn: Laura Davis Jones, Esq. |
| | Facsimile:  (302) 652-4400 |
| To Buyer: | _____ |
| | _____ |
| | Attn: _____ |
| | Facsimile:  (__) ____-_____ |
| With a copy to: | _____ |
| | _____ |
| | Attn: _____ |
| | Facsimile:  (__) ____-_____ |

        10.5   <u>Entire Agreement</u>.  This instrument, that certain Confidentiality Agreement dated _____, 2010, between [_____] and Buyer, and the documents to be executed pursuant hereto contain the entire agreement between the Parties relating to the sale of the Property.  Any oral representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the Party to be charged.

        10.6   <u>Modification</u>.  This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the Parties hereto.

10.7     Closing Date.  All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

10.8     Severability.  Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

10.9     Captions.  All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

10.10    Further Assurances.  Each Party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by any other Party for the purpose of giving effect to the transactions contemplated herein or the intentions of the Parties with respect thereto; provided that nothing herein shall be deemed to require any Party to execute or deliver any such further assurance, document or instrument to the extent that the same could in any material way increase the burdens, obligations or liabilities otherwise imposed upon such Party by this Agreement.

10.11    Waiver.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the Party making the waiver.

10.12    Brokerage Obligations. Sellers and the Buyer each represent and warrant to the other that, other than _____ (the **"Broker"**), Sellers' investment banker, such Party has incurred no liability to any broker or agent with respect to the payment of any commission or other compensation regarding the consummation of the transaction contemplated hereby.  It is agreed that if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions are ever asserted against Buyer or Sellers in connection with this transaction by any party other than the Broker (for whose commission or other compensation Sellers shall be solely responsible), all such claims shall be handled and paid by the Party whose actions form the basis of such claim and such Party shall indemnify, defend (with counsel reasonably satisfactory to the Party entitled to indemnification), protect and save and hold the other harmless from and against any and all such claims or demands asserted by any person, firm or corporation in connection with the transaction contemplated hereby.

10.13    Payment of Fees and Expenses.  Except as provided in Section 10.2 above, each Party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the transaction described herein.

10.14   Survival.  The respective representations and warranties of Buyer and Sellers under this Agreement shall lapse and cease to be of any further force or effect effective upon the Closing.  Except as provided in the immediately preceding sentence, the covenants and agreements of Sellers and Buyer herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing.

10.15   Assignments.  This Agreement shall not be assigned by any Party hereto without the prior written consent of the other Party hereto, which consent the Parties may grant or withhold in their sole and absolute discretion.

10.16   Binding Effect.  Subject to the provisions of Section 10.15, above, this Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the Parties hereto.

10.17   Applicable Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware .

10.18   Good Faith.  All Parties hereto agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after Closing.

10.19   Construction.  In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party hereto.

10.20   Counterparts.  This Agreement may be signed in counterparts.  The Parties further agree that this Agreement may be executed by the exchange of facsimile signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon thereafter as reasonable in the circumstances.

10.21   Time is of the Essence.  Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

10.22   Interpretation and Rules of Construction.  In this Agreement, except to the extent that the context otherwise requires:

10.22.1 when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or a Schedule to, this Agreement unless otherwise indicated;

10.22.2 the headings and captions used in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

10.22.3 whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

10.22.4 the words "hereof," "herein" and "hereunder" and works of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

10.22.5 all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

10.22.6 the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

10.22.7 any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

10.22.8 references to a person are also to its permitted successors and assigns; and

10.22.9 the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

**In Witness Whereof,** Buyer and Sellers have executed this Asset Purchase Agreement as of the day and year first above written.

**BUYER:**

_____, a
_____

By:_____
Name: _____
Its:  _____

**SELLERS:**

**Point Blank Solutions, Inc. a Delaware corporation and Debtor and Debtor in Possession**

By:_____
Name: _____
Its:  _____

**Point Blank Body Armor, Inc., a New York corporation and Debtor and Debtor in Possession**

By:_____
Name: _____
Its:  _____

**Protective Apparel Corporation of America, a Delaware corporation and Debtor and Debtor in Possession**

By:_____
Name: _____
Its:  _____

**[Signatures continued on next page]**

[Signatures continued from prior page]

**PBSS, LLC, a Delaware limited liability company and Debtor and Debtor in Possession**


By:_____

Name: _____

Its: _____

## All SCHEDULES

**[To be attached]**

## ASSIGNMENT AND ASSUMPTION OF LEASES AND CONTRACTS

This Assignment and Assumption of Leases and Contracts (this **"Assignment"**) is entered into as of this ___th day of December , 2010, between Point Blank Solutions, Inc., a Delaware corporation (**"PB"**), Point Blank Body Armor, Inc., a New York corporation (**"PB Armor"**), Protective Apparel Corporation of America, a Delaware corporation (**"PACA"**), and PBSS, LLC, a Delaware limited liability company (**"PBSS"** and collectively with PB, PB Armor, and PACA, the **"Assignor"**), each of the entities comprising Assignor being a Debtor and Debtor in Possession under Case No. 10-11255 (PJW )in the United States Bankruptcy Court for the District of Delaware, on the one hand, and _____, a _____ (the **"Assignee"**), on the other hand, with respect to the following facts and circumstances:

A.      Assignor, as the Sellers, and Assignee, as Buyer, have heretofore entered into that certain Asset Purchase Agreement dated _____, 2010 (the **"Purchase Agreement"**).  Except for terms specifically defined herein, the capitalized terms used in this Assignment shall have the same meanings as capitalized terms used in the Purchase Agreement.

B.      Concurrently with the mutual execution and delivery of this Assignment, Assignor and Assignee are consummating the transactions contemplated by the Purchase Agreement.  Assignor and Assignee are executing and delivering this Assignment in satisfaction of their respective obligations pursuant to Sections 3.3.1 and 3.4.2 of the Purchase Agreement.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which Assignor and Assignee hereby acknowledge, Assignor and Assignee hereby agree as follows:

1.      <u>Assignment</u>.  Effective as of the Closing Date, Assignor hereby assigns to Assignee all of his right, title and interest in and to the Leases and Contracts (collectively, the **"Assigned Contracts"**).

2.      <u>Assumption</u>.  Effective as of the Closing Date, Assignee hereby accepts the foregoing assignment and assumes and agrees to be bound by the terms and provisions of the Assigned Contracts and to faithfully perform all of Assignor's obligations thereunder to be performed from and after the Closing Date as though Assignee had been the original contracting Party thereunder.

3.      <u>Attorneys' Fees</u>.  In the event that either Party hereto brings and action or other proceeding to enforce or interpret the terms and provisions of this Assignment, the prevailing Party in that action or proceeding shall be entitled to have and recover from the non-prevailing Party therein all such fees, costs and expenses (including, without limitation, all court costs and

reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

4. <u>Amendments</u>. This Assignment may only be amended by a writing signed by both Assignor and Assignee.

5. <u>Execution in Counterparts</u>. This Assignment may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the Parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Assignment bearing their original signature promptly thereafter.

6. <u>Delivery Pursuant to Purchase Agreement</u>. Notwithstanding anything to the contrary herein, Assignor and Assignee are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7).

7. <u>Governing Law</u>. This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

**IN WITNESS WHEREOF**, Assignor and Assignee have executed this Assignment as of the day and year first set forth above.

**<u>ASSIGNOR:</u>**

**Point Blank Solutions, Inc. a Delaware corporation and Debtor and Debtor in Possession**

By:_____
Name: _____
Its: _____

**Point Blank Body Armor, Inc., a New York corporation and Debtor and Debtor in Possession**

By:_____
Name: _____
Its: _____

**Protective Apparel Corporation of America, a Delaware corporation and Debtor and Debtor in Possession**

By:_____
Name: _____
Its: _____

**PBSS, LLC, a Delaware  limited liability companyand Debtor and Debtor in Possession**

By:_____
Name: _____
Its: _____

**ASSIGNEE:**

_____, a _____


**By:**_____
**Name:** _____
**Its:** _____

**Exhibit "B"**

**<u>BILL OF SALE AND ASSIGNMENT</u>**

Pursuant to Section 3.3.2 of that certain Asset Purchase Agreement dated _____, 2010 (the **"Agreement"**), by and between _____, a _____(**"Buyer"**), on the one hand, Point Blank Solutions, Inc., a Delaware corporation (**"PB"**), Point Blank Body Armor, Inc., a New York corporation (**"PB Armor"**), Protective Apparel Corporation of America, a Delaware corporation (**"PACA"**), and PBSS, LLC, a Delaware limited liability company (**"PBSS"** and collectively with PB, PB Armor, and PACA, the **"Sellers"**), each of the entities comprising Sellers being a Debtor and Debtor in Possession under Case No. 10-11255 (PJW ) in the United States Bankruptcy Court for the District of Delaware, on the other hand, and for good and valuable consideration, the receipt and sufficiency of which Sellers hereby expressly acknowledges, Sellers, each as to their respective interest therein, hereby sells, transfers, assigns and delivers to Buyer Sellers' right, title and interest in and to (i) the Personal Property, and (ii) the other Assignment Property.

Except for terms specifically defined in this Bill of Sale, all capitalized terms used in herein shall have the same meanings as such terms have when utilized in the Agreement.

Sellers covenant and agree to execute and deliver further instruments of transfer and assignment and take such other action as Buyer may reasonably request to more effectively transfer and assign to and vest in Buyer each of the Personal Property and Assignment Property; provided that nothing herein shall be deemed to require Sellers to execute or deliver any such further document or instrument or take any such action to the extent that the same could in any material way increase the burdens, obligations or liabilities otherwise imposed upon Sellers by this Agreement.

Notwithstanding anything to the contrary herein, Sellers are executing and delivering this Bill of Sale and Assignment in accordance with and subject to all of the terms and provisions of the Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7 of the Agreement).

**IN WITNESS WHEREOF**, Sellers has caused this Bill of Sale and Assignment to be executed as of the _____ day of December , 2010.

**SELLERS:**

**Point Blank Solutions, Inc. a Delaware corporation and Debtor and Debtor in Possession**


By:_____
Name: _____
Its: _____


**Point Blank Body Armor, Inc., a New York corporation and Debtor and Debtor in Possession**


By:_____
Name: _____
Its: _____


**Protective Apparel Corporation of America, a Delaware corporation and Debtor and Debtor in Possession**


By:_____
Name: _____
Its: _____


**PBSS, LLC, a Delaware limited liability companyand Debtor and Debtor in Possession**


By:_____
Name: _____
Its: _____


**Exhibit "C"**

# ASSIGNMENT OF INTANGIBLE PROPERTY

Point Blank Solutions, Inc., a Delaware corporation (**"PB"**), Point Blank Body Armor, Inc., a New York corporation (**"PB Armor"**), Protective Apparel Corporation of America, a Delaware corporation (**"PACA"**), and PBSS, LLC, a Delaware limited liability company (**"PBSS"** and collectively with PB, PB Armor, and PACA, the **"Assignor"**), each of the entities comprising Assignor being a Debtor and Debtor in Possession under Case No. 10-11255 (PJW ) in the United States Bankruptcy Court for the District of Delaware are executing this Assignment of Intangible Property (the **"Assignment"**) in favor of _____ (the **"Assignee"**), with respect to the following facts and circumstances:

(A)     Assignor and Assignee have heretofore entered into that certain Asset Purchase Agreement dated _____, 2010 (the **"Agreement"**). Except for terms specifically defined in this Assignment, the capitalized terms used in this Assignment shall have the same meanings as such terms when used in the Agreement.

(B)     Concurrently with the execution and delivery of this Assignment, Assignor and Assignee are consummating the transactions contemplated by the Agreement. Pursuant to Section 3.3.3 of the Agreement, Assignor is required to execute and deliver this Assignment at the Closing.

**NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION**, the receipt and sufficiency of which Assignor hereby expressly acknowledges, each entity comprising Assignor, as to itself, hereby assigns, conveys, transfers and sets over unto Assignee, all of its right, title and interest, if any, in and to all Intangible Property. This Assignment shall inure to the benefit of, and be binding upon, the successors, executors, administrators, legal representatives and assigns of Assignor and Assignee.

Notwithstanding anything to the contrary herein, the entities comprising Assignor are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7).

In the event that Assignor or Assignee brings an action or other proceeding to enforce or interpret the terms and provisions of this Assignment, the prevailing Party(ies) in that action or proceeding shall be entitled to have and recover from the non-prevailing Party(ies) all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party(ies) may suffer or incur in the pursuit or defense of such action or proceeding.

This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of Delaware .

**IN WITNESS WHEREOF,** Assignor and Assignee have executed this Assignment as of the ___ day of December , 2010.

**ASSIGNOR:**

**Point Blank Solutions, Inc. a Delaware corporation and Debtor and Debtor in Possession**

By:_____
Name: _____
Its:  _____

**Point Blank Body Armor, Inc., a New York corporation and Debtor and Debtor in Possession**

By:_____
Name: _____
Its:  _____

**Protective Apparel Corporation of America, a Delaware corporation and Debtor and Debtor in Possession**

By:_____
Name: _____
Its:  _____

**PBSS, LLC, a Delaware  limited liability companyand Debtor and Debtor in Possession**

By:_____
Name: _____
Its:  _____

**ASSIGNEE:**

_____, a _____

**By:**_____
**Name:** _____
**Its:** _____

## ASSUMPTION AGREEMENT

This Assumption Agreement (this **"Assumption"**) is entered into as of this _____ day of December , 2010, by _____, a _____ (the **"Buyer"**) in favor of Point Blank Solutions, Inc., a Delaware corporation (**"PB"**), Point Blank Body Armor, Inc., a New York corporation (**"PB Armor"**), Protective Apparel Corporation of America, a Delaware corporation (**"PACA"**), and PBSS, LLC, a Delaware limited liability company (**"PBSS"** and collectively with PB, PB Armor, and PACA, the **"Sellers"**), each of the entities comprising Sellers being a Debtor and Debtor in Possession under Case No. 10-11255 (PJW ) in the United States Bankruptcy Court for the District of Delaware, with respect to the following facts and circumstances:

A.     Sellers and Buyer have heretofore entered into that certain Asset Purchase Agreement dated _____, 2010 (the **"Purchase Agreement"**).  Except for terms specifically defined herein, the capitalized terms used in this Assumption shall have the same meanings as capitalized terms used in the Purchase Agreement.

B.     Concurrently with the execution and delivery of this Assumption, Buyer and Sellers are consummating the transactions contemplated by the Purchase Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which Buyer hereby acknowledges, Buyer hereby agrees as follows:

1.     <u>Assumption</u>.  Effective as of the Closing Date, Buyer hereby assumes and agrees fully and faithfully to perform all of the Assumed Liabilities.

2.     <u>Attorneys' Fees</u>.  In the event that either Party(ies) hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Assumption, the prevailing Party(ies) in that action or proceeding shall be entitled to have and recover from the non-prevailing Party(ies) therein all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party(ies) may suffer or incur in the pursuit or defense of such action or proceeding.

3.     <u>Amendments</u>.  This Assumption may only be amended by a writing signed by both Buyer and Sellers.

4.     <u>Governing Law</u>.  This Assumption shall be governed by and construed and enforced in accordance with the laws of the State of Delaware .

5.     <u>Execution in Counterparts</u>.  This Assumption may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Assumption bearing their original signature promptly thereafter.

**IN WITNESS WHEREOF**, Buyer has executed this Assumption as of the day and year first set forth above.

**BUYER:**

_____, **a**

_____

**By:**_____
**Name:** _____
**Its:** _____

**SELLERS:**

**Point Blank Solutions, Inc. a Delaware corporation and Debtor and Debtor in Possession**

**By:**_____
**Name:** _____
**Its:** _____

**Point Blank Body Armor, Inc., a New York corporation and Debtor and Debtor in Possession**

**By:**_____
**Name:** _____
**Its:** _____

**Protective Apparel Corporation of America, a Delaware corporation and Debtor and Debtor in Possession**

**By:**_____
**Name:** _____
**Its:** _____

**PBSS, LLC, a Delaware limited liability company and Debtor and Debtor in Possession**


By:_____
Name: _____
Its: _____

## ADDITIONAL DEFINTIONS

In addition to the terms defined elsewhere in this Agreement, the following terms when used in this Agreement shall have the respective meanings set forth below:

(1) <u>Environmental Law</u>" means any law or regulation pertaining to: (a) the protection of health, safety and the indoor or outdoor environment; (b) the conservation, management or use of natural resources and wildlife; (c) the protection or use of surface water and ground water; (d) the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, emission, discharge, release, threatened release, abatement, removal, remediation or handling of, or exposure to, any hazardous substance; or (e) pollution (including any emission, discharge or release to air, land, surface water and ground water of any material); and includes, without limitation, CERCLA and the Solid Waste Disposal Act, as amended 42 U.S.C. § 6901 et seq.

(2) "<u>Indebtedness</u>" means, with respect to any Person, (a) all indebtedness of such Person, whether or not contingent, for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services, (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of Sellers or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person as lessee under leases that have been or should be, in accordance with generally accepted accounting principles (GAAP), recorded as capital leases, (f) all obligations, contingent or otherwise, of such Person under acceptance, letter of credit or similar facilities, (g) all obligations of such Person to purchase, redeem, retire, defease or otherwise acquire for value any capital stock of such Person or any warrants, rights or options to acquire such capital stock, valued, in the case of redeemable preferred stock, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (h) all Indebtedness of others referred to in clauses (a) through (g) above guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (1) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness, (2) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness or to assure the holder of such Indebtedness against loss, (3) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (4) otherwise to assure a creditor against loss and all Indebtedness referred to in clauses (a) through (f) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without

limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

(3) "Liens" means all liens or other interests as defined in 11 U.S.C. § 363(f), encumbrances, rights of third parties (express or implied), claims (as defined in Section 101(5) of the Bankruptcy Code), Indebtedness, obligations, liabilities, judgments, demands, subleases, contractual commitments, mortgages, pledges, guarantees, security interests, conditional sale or other title retention agreements, [defects?], charges, options, rights of first refusal, reservations, restrictions or interests of any kind, rights of others of every type and description, whether arising prior to or subsequent to the commencement of the Chapter 11, and whether imposed by agreement, understanding, law, equity or otherwise, whether secured or unsecured, including without limitation:

(a) any and all claims, demands, damages, actions, causes of action, contracts, agreements, charges, sums of money, claims for attorney's fees, claim of any violation of any state or federal statutes, rules or regulations, and lawsuits of every kind and description, whether known or unknown, now existing, or which may hereafter arise against Sellers; and

(b) employment contracts, accrued wages, salary or vacation pay, or unemployment compensation or severance pay to any present or former employee of Sellers, any obligation to hire or otherwise employ any employees of Sellers whether under any union agreements or otherwise, or obligations under any other employee benefit plan maintained by or for which any Seller is obligated or bound including, without limitation, those based upon length of service with any Seller or any and all other obligations owed to the former or present employees of any Seller, provided, however, (i) the term "Liens" shall specifically exclude any of the foregoing which comprise part of the Assumed Liabilities pursuant to Section 2.2 hereof and any liabilities or obligations under the WARN Act to the extent of Buyer's obligations with respect thereto pursuant to Article 9 of this Agreement and (ii) and in no event shall any provision of this Agreement requiring the removal of Liens be deemed to limit or affect Buyer's obligations with respect to the Assumed Liabilities (or any of them) or under the any of the provisions of Article 9 hereof in any way; and

(c) any and all liabilities and obligations under any Environmental Law; and

(d) any claims based on or asserting that Buyer is a successor in interest to Sellers.

(4) "Litigation" means any suit, action, arbitration, cause of action, claim, complaint, criminal prosecution, investigation, inquiry, demand letter, governmental or other administrative proceeding, whether at law or at equity, before or by any court, governmental authority, arbitrator or other tribunal.

(5) "Material Adverse Effect" means any circumstance, change in, or effect on, the Business or Sellers, other than the Bankruptcy Case, that, individually or in the aggregate with any

other circumstances, changes in, or effects on, Sellers or the Business (a) is, or could be, materially adverse to the Property, or (b) could materially adversely affect the ability of Buyer to use the Property in the manner in which it is currently operated or conducted, or contemplated to be conducted, by Sellers.

(6) "Order" shall mean any judgment, order, writ, injunction, ruling, stipulation, determination, award or decree of or by, or any settlement under the jurisdiction of, any court or governmental authority.

(7) "Person" means any natural person, corporation, limited liability company, unincorporated organization, partnership, association, joint stock company, joint venture, trust or any other entity.

1263501.3