# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

----------------------------------------------------x

In re                          :      Chapter 11

                            :

POINT BLANK SOLUTIONS, INC., *et al.*,[1]:      Case No. 10-11255 (PJW)

                            :

            Debtors.        :      Jointly Administered

                            :

----------------------------------------------------x

## MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING (i) REPLACEMENT POST-PETITION SECURED FINANCING, (ii) USE OF CASH COLLATERAL AND (iii) REPAYMENT OF EXISTING POST-PETITION SECURED FINANCING; (B) AUTHORIZING ENTRY INTO PLAN SUPPORT AGREEMENT; AND (C) SCHEDULING A FINAL HEARING

The Official Committee of Unsecured Creditors (the "**Creditors' Committee**") and the

Official Committee of Equity Security Holders (the "**Equity Committee**" and together the

"Official Committees") of the debtors and debtors in possession (the "Debtors") in the above-

captioned chapter 11 cases hereby move this Court (the "**Motion**"), pursuant to §§ 105, 361, 362,

363 and 364 of title 11 of the United States Code (the "**Bankruptcy Code**")[2], Rules 2002, 4001

and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules

2002-1 and 4001-2 of the Local Rules for the United States Bankruptcy Court of the District of

Delaware (the "**Local Rules**"), (a) for entry of an interim order, substantially in the form

attached hereto as Exhibit A (the "**Interim Order**"), and a final order (the "**Final Order**"),

authorizing the Debtors to (i) obtain post-petition secured financing on a superpriority basis, (ii)

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number and address, are:  Point Blank Solutions, Inc. (9361), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor, Inc. (4044), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Protective Apparel Corporation of America (9051), 179 Mine Lane, Jacksboro, TN 37757; and PBSS, LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.

1

use cash collateral, (iii) repay its existing pre-petition and post-petition secured debt; and (iv) enter into a plan support agreement (the "**Plan Support Agreement**") substantially in the form attached hereto as Exhibit B; and (b) for entry of an order scheduling a final hearing (the "**Final Hearing**") to consider entry of the Final Order.[3]  In support of this motion, the Official Committees respectfully state as follows:

# I.
## PRELIMINARY STATEMENT

1.     The Official Committees file this Motion pursuant to the Bankruptcy Court's Order entered on December 3, 2010 (Docket No. 855).  The major constituencies in this case are continuing to negotiate an agreed-upon framework for a plan of reorganization that would permit the Debtors to successfully reorganize and emerge from chapter 11 intact.  These terms are set forth in a plan term sheet (the "**Term Sheet**") that is annexed hereto as an exhibit to the Plan Support Agreement.  The Official Committees and DIP Lenders continue to seek the Debtors' support to  draft, file and seek confirmation of a plan of reorganization (the "**Plan**") that is consistent with the Term Sheet and an agreed-upon timeline.

2.     The Debtors do not yet support the Term Sheet Plan Support Agreement proposed by the Official Committees and DIP Lenders, and will remain bound by the terms of their existing post-petition secured financing arrangement (the "**Existing DIP Facility**"), which require the Debtors to seek approval of bid procedures for an auction and sale of substantially all the Debtors' operating assets to be held no later than December 16, 2010.  Failure to conduct a sale by that date is a default under the Existing DIP Facility.

---

[2]      Unless otherwise noted, section (§) references herein are to the Bankruptcy Code.
[3]      The Official Committees are filing this Motion without the current support of the Debtors in these cases. However, it is contemplated that the Debtors will join in support of the Motion once all terms and agreements are finalized.  In addition, the exhibits referred to in the Motion will be filed as soon as reasonably practicable.

3. After extensive discussions Lonestar Partners, L.P. (or its affiliate) (the "**Lonestar Lender**") and Privet Fund Management LLC and Prescott Group Capital Management (together, the "**Privet/Prescott Lenders**" and together with the Lonestar Lender, the "**DIP Lenders**"), an alternate source of post-petition financing has been located that will permit the Existing DIP Facility to be retired so that relief may be obtained from the existing sale-related covenants. This financing involves two separate but interdependent agreements. The first agreement is a fully negotiated $25,000,000 post-petition secured credit facility (the "**DIP Facility**"), the terms of which are set forth in that certain Debtor-in-Possession Financing Agreement, dated December \_\_\_, 2010 (the "**DIP Credit Agreement**") between the Debtors as borrowers and the DIP Lenders. A true and correct copy of the DIP Credit Agreement is attached as Exhibit C hereto. The proceeds from the DIP Facility are intended, among other things, to repay the Debtors' outstanding obligations under the Existing DIP Facility in their entirety immediately upon approval by the Court. The second agreement is an equity commitment agreement (the "Equity Commitment Agreement"). Although the specific terms of the Equity Commitment Agreement are still being negotiated, the DIP Lenders have committed to provide an equity infusion of no less than $15 million and no more than $25 million on the effective date of the Plan through a backstopped rights offering that will be made available to both pre-petition unsecured creditors and certain pre-petition shareholders. Each of these financing agreements is incorporated into the Term Sheet and thus enjoys the support of the supporters to the Plan Support Agreement.

4. Together, the Plan Support Agreement, the DIP Credit Agreement and the Equity Commitment Agreement (together, the "**Plan Agreements**" and, together with the Term Sheet, the "**Global Settlement**") form the cornerstones of a chapter 11 plan of reorganization. The

Global Settlement represents a compromise of certain stakeholders' rights and claims and provides the Debtors' key stakeholders with the form of consideration that these stakeholders seek to realize from the Debtors' estates.

5.     Consequently, the Official Committees respectfully request that this Court authorize them to execute the Plan Support Agreement and the DIP Credit Agreement and replace the Existing DIP Facility as the first step towards consummating a consensual plan of reorganization and the Global Settlement. The parties are not seeking approval of the equity commitment agreement described above at this time and will seek its approval in a subsequent motion.

## II.
## JURISDICTION AND VENUE

6.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for proceedings on this Motion is proper in this district pursuant to 28 U.S.C. § 1409.

7.     The statutory predicates for the relief requested herein are §§ 105, 361, 362, 363 and 364, and Bankruptcy Rules 2002, 4001 and 9014, and Local Rules 2002-1 and 4001-2.

## III.
## RELIEF REQUESTED

8.     The Official Committees respectfully request entry of an Interim Order and Final Order, pursuant to §§ 105(a), 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), authorizing the Debtors to enter into the DIP Facility, repay the Existing DIP Facility, and enter into the Plan Support Agreement.

9.     More specifically, in the Interim Order, the Official Committees file the Motion to allow the Debtors to seek authority to, on an interim basis:

(a) obtain $25,000,000 of senior secured post-petition financing pursuant to and in accordance with the terms and conditions of the DIP Credit Agreement;

(b) use proceeds of the DIP Facility to provide working capital for and fund other general corporate purposes of the Debtors;

(c) use cash collateral and other collateral pursuant to §§ 363(c) and 363(e) and Rule 4001(b) and the Local Rules on the terms and conditions set forth in the Interim Order;

(d) grant the DIP Lenders liens on substantially all assets of the Debtors' estates pursuant to §§ 364(c)(2), (c)(3) and (d)(1), subject and subordinate only to the payment of the Carve-Out, as provided in and as contemplated by the Interim Order, DIP Credit Agreement and related collateral documents;

(e) grant the DIP Lenders, superpriority administrative expense claims pursuant to §§ 364(c)(1) and 507(b) with respect to the Obligations (as defined below), subject and subordinate only to the payment of the Carve-Out, on the terms and conditions set forth herein and in the DIP Credit Agreement and the Interim Order;

(f) repay in full the approximately $[5,500,000] outstanding under the Existing DIP Facility; and

(g) pay the reasonable and documented (i) fees and out-of-pocket expenses of the legal advisors to DIP Lenders, in each case for such advisors' services in connection with the transactions contemplated by the Equity Commitment Agreement.

and on a final basis:

(a) enter into the Plan Support Agreement;

{00005543. }
NYC/556829.7

(b)     allow the pre-petition unsecured claims of Lonestar Partners, L.P. (collectively, the "**Lonestar Pre-Petition Claims**") (i) against PACA (as defined below) in the amount of $373,572.10 as reflected in PACA's schedules of assets and liabilities, (ii) against Point Blank (as defined below) in the amount of $8,126,774.32 as reflected in Point Blank's schedules of assets and liabilities, and (iii) against the Parent (as defined below) in the amount $8,512,858.34 as reflected in Proof of Claim No. 284, it being understood that Lonestar Partners, L.P. is entitled only to a single recovery on account of the Lonestar Pre-Petition Claims. Provided however that nothing contained in the foregoing shall constitute a waiver of any rights, claims, or defenses the Estates may have against Lincoln Fabrics Inc. or any of its affiliates or subsidiaries related to the Lonestar Pre Petition Claims, including but limited to any Chapter 5 causes of action or claims;

(c)     pursuant to Bankruptcy Rule 4001, set a date for a hearing to consider entry of the Final Order authorizing and approving the DIP Facility on a final basis; and

(d)     pay the Break-Up Fee and Transaction Expenses (each as defined below) to the DIP Lenders in accordance with the terms of the Plan Support Agreement if the Debtors do not consummate the transactions contemplated thereby or successfully consummate an alternative transaction.

## IV.
## SUMMARY OF ESSENTIAL TERMS

10.     Pending the Final Hearing and entry of the Final Order, the Official Committees request that the Debtor seek authority to obtain credit and incur debt (the "**DIP Facility**") on an interim basis under the DIP Credit Agreement.[4]

**A.     Provisions to be Highlighted Pursuant to Local Rule 4001-2(a)(i)**

11.     The Official Committees believe that the following provisions of the proposed DIP Credit Agreement must be highlighted for the Debtors pursuant to Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2:

---

[4]     All capitalized terms that are not expressly defined in this Motion shall have the meanings ascribed to such terms in the DIP Credit Agreement and any associated loan or collateral documents memorializing the financing thereunder with terms that substantially conform to the DIP Credit Agreement (collectively, the "**DIP Financing Agreements**").

(a)     <u>Local Rule 4001-2(a)(1)(A)</u>. There are no provisions that grant cross-collateralization of post-petition collateral to secure pre-petition indebtedness.

(b)     <u>Local Rule 4001-2(a)(1)(B)</u>. The Interim Order operates to establish the validity and amount of the Lonestar Lender's pre-petition unsecured claim against the Debtors' estates. *See* Interim Order, at ¶ 20.

(c)     <u>Local Rule 4001-2(a)(1)(C)</u>. There is no proposed waiver of the estates' rights under § 506(c) in the Interim Order. The proposed waiver of the estates' rights under § 506(c) will be effective only <u>after</u> notice to parties in interest and entry of the Final Order granting such relief. *See* Interim Order, at ¶¶ 2(e), (f).

(d)     <u>Local Rule 4001-2(a)(1)(D)</u>. The DIP Lenders are seeking a lien on the Debtors' claims and causes of action arising under chapter 5 of the Bankruptcy Code and the proceeds thereof. *See* Interim Order, at ¶ 2(e).

(e)     <u>Local Rule 4001-2(a)(1)(E)</u>. There are no provisions that deem pre-petition secured debt to be a post-petition secured debt or that use post-petition loans from a pre-petition secured creditor to pay down part or all of that secured creditor's pre-petition debt.

(f)     <u>Local Rule 4001-2(a)(1)(F)</u>. The provisions of the Interim Order do not provide for disparate treatment of the professionals retained by the statutory committees from those retained by the Debtors. The Carve Out does not exclude professionals retained by the statutory committees but makes an allocation based on the respective anticipated tasks and responsibilities of the Debtors and the respective statutory committees. *See* Interim Order, at ¶ 8.

(g)     <u>Local Rule 4001-2(a)(1)(G)</u>. There are no provisions that seek to prime any secured lien without the consent of that lien holder.

(h)     <u>Limitations Regarding Proposed Plan of Reorganization</u>. The DIP Credit Agreement and Interim Order provide that the Debtors shall not propose or support any plan of reorganization other than the Plan without the consent of the DIP Lenders. *See* DIP Credit Agreement at page 14; Interim Order at ¶ 22(i).

(i)     <u>Limitations Regarding Alternative Financing</u>. The DIP Credit Agreement and Interim Order provide that the Debtors shall not in any way prime or seek to prime the security interests and liens provided to the DIP Lenders under the Interim Order and the Final Order, by offering a subsequent lender or a party in interest a superior or pari passu lien or claim pursuant to § 364(d) or otherwise. *See* DIP Credit Agreement at page 14; Interim Order at ¶ E(iii).

(j)     Modification of the Automatic Stay. The Interim Order provides that the automatic stay under § 362(a) will be modified (a) upon an Event of Default under and according to the terms and conditions of the DIP Credit Agreement, and (b) to permit the attachment and perfection of any DIP Liens. *See* Interim Order at ¶ 6.

(k)     Indemnification. The DIP Credit Agreement provides that the Debtors will jointly and severally indemnify the DIP Lenders (strictly in its capacity as such) with respect to actions arising from the DIP Credit Agreement, excluding gross negligence and willful misconduct. *See* DIP Credit Agreement at pages 21 and 22.

**B.     Summary of Essential Terms Pursuant to Local Rule 4001(a)(ii)**

12.     Pursuant to Bankruptcy Rule 4001(c) and Local Rule 4001-2(a)(ii), the following is a summary of the essential terms of the DIP Credit Agreement and Interim Order:[5]

| | |
|---|---|
| **Borrower**: | Point Blank Solutions, Inc. ("**PBSI**" or "**Parent**"), and its subsidiaries: (a) Point Blank Body Armor, Inc. ("**Point Blank**"), (b) Protective Apparel Corporation of America ("**PACA**"), and (c) PBSS, LLC ("**PBSS**"). *See* DIP Credit Agreement at page 1. |
| **DIP Lenders**: | (i) Lonestar Partners, L.P. c/o Lonestar Capital Management, LLC, or one or more affiliates, designees or assignees and (ii) Privet Fund Management LLC and Prescott Group Capital Management. *See* DIP Credit Agreement at page 1. |
| **DIP Facility**: | A senior secured, first priority, debtor-in-possession term loan (the "**DIP Facility**") in the aggregate principal amount of $25,000,000.00. *See* DIP Credit Agreement at page 1. |
| **Use of Cash Collateral**: | Authorizing the Debtors' use of cash collateral, as such term is defined in § 363(a), according to a Budget (as defined below) on the terms and conditions set forth in the Interim Order and the DIP Financing Agreements. *See* Interim Order at ¶ 3. |
| **Use of Proceeds**: | Proceeds of the DIP Facility are to be used to (a) promptly following entry of the Interim Order, pay in full of the Existing DIP Facility, (b) working capital and general corporate purposes, |

---

[5]     The summaries and descriptions of the terms and conditions of the DIP Credit Agreement and Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof. The summaries and descriptions are qualified in their entirety by the DIP Credit Agreement and the Interim Order. In the event there is any conflict between this Motion and the DIP Credit Agreement or Interim Order, the DIP Credit Agreement or Interim Order, as applicable, will control in all respects.

|  | (c) to finance capital expenditures, (d) to pay fees and expenses in connection with the transactions contemplated hereby or otherwise in connection with the Debtors' chapter 11 cases; (e) for other payments explicitly permitted to be made by the Interim Order and the Final Order, and (f) for general corporate purposes. *See* DIP Credit Agreement at pages 9-10; Interim Order at ¶ 2(c). |
|---|---|
| **Budget:** | The Debtors have provided the DIP Lender with their current rolling thirteen-week budget setting forth in reasonable detail all projected receipts and disbursements of the Debtors on a weekly basis, which budget has been approved in form and substance by the DIP Lender (as amended from time to time, the "**Budget**"). A summary of the Budget is attached hereto as Exhibit D. In addition, the Debtors will periodically deliver an updated thirteen-week budget in form and substance reasonably acceptable to the DIP Lenders.[6] The Debtors believe that the Budget is achievable and will enable them to operate their business without the accrual of unpaid administrative expenses. |
| **Termination Date:** | The Debtors shall repay any outstanding advances, loans made and other charges incurred under the DIP Facility on the earlier to occur (the "**Termination Date**") of: (a) **[May 16]**, 2011, (b) the date of the acceleration of the DIP Facility following an Event of Default (as defined below) under the DIP Credit Agreement; (c) the closing date of a sale of all or substantially all of the Debtors' assets, and (d) the effective date of a confirmed plan of reorganization in the Debtors' chapter 11 cases consistent with the terms of the Term Sheet. *See* DIP Credit Agreement at page 2. |
| **Interest:** | Interest on borrowings under the DIP Facility will be payable in arrears on the first day of each month at a rate per annum equal to the Prime Rate plus 11.00% per annum. *See* DIP Credit Agreement at page 1. |
| **Default Rate:** | After the occurrence and during the continuance of an Event of Default, interest on borrowings under the DIP Facility will be payable at a rate per annum equal to the Prime Rate plus 13.20%. *See* DIP Credit Agreement at page 1. |
| **DIP Fees:** | Arrangement Fee. Upon the execution of the DIP Credit Agreement, the Debtors shall pay in cash an arrangement fee to (a) the Lonestar Lender, in an amount equal to $175,000, and (b) the |

---

[6]     Unless expressly provided otherwise herein or in the DIP Credit Agreement, the exercise of any rights, actions, or approvals by the DIP Lenders shall require the consent of the Supermajority Lenders (as defined in the DIP Credit Agreement).

Equity Lenders, in an aggregate amount equal to $262,500. *See* DIP Credit Agreement at page 2.

Funding Fee.  Upon the funding of the DIP Facility, the Debtors shall pay to each DIP Lender in cash a funding fee in an amount equal to 1.75% of the DIP Facility amount funded. *See* DIP Credit Agreement at page 2.

Termination Fee.  Upon the Termination Date (whether by virtue of the confirmation of a plan of reorganization, maturity, acceleration of the time for payment of the obligations of the Debtors under the DIP Credit Agreement (the "**Obligations**") or otherwise), the Debtors shall pay to the DIP Lenders a termination fee in cash in an amount equal to 1.75% of the DIP Facility amount funded. *See* DIP Credit Agreement at page 2.

**DIP Collateral**:

The Obligations will, pursuant to sections 364(c)(2) and (3) and § 364(d)(1), be secured by a fully perfected first priority security interest in all assets of each Debtor, including all proceeds thereof (the "**DIP Collateral**"). *See* DIP Credit Agreement at pages 5-6.

**Superpriority Rights:**

Pursuant to the Interim Order and, upon entry of the Final Order, the loans and obligations under the proposed DIP Credit Agreement will, pursuant to § 364(c)(1), receive and be entitled to a superpriority administrative expense claim over all costs and expenses of the kinds specified in, or ordered pursuant to §§ 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provision under the Bankruptcy Code, subject to the Carve Out. *See* Interim Order at ¶ 2(e).

**Carve Out**:

The (i) DIP Lenders' liens and superpriority administrative claims are each subject to a carve out (the "**Carve Out**"), for the purpose of satisfying amounts: (a) payable pursuant to 28 U.S.C. Section 1930(a)(6) and fees payable to the clerk of the Court and (b) for allowed (or authorized to be paid by the Court) reasonable fees and expenses of attorneys and financial advisors employed by the Debtors,the Creditors Committee and the Equity Committee (including expenses of the members of the Creditors Committee and Equity Committee) pursuant to Sections 327 and 1103 of the Bankruptcy Code (the "**Case Professionals**"), and, as to amounts described in clause (b), not to exceed the sum of (x) $550,000.

**Stipulations**:

Among other stipulations, the Debtors, the Creditors Committee, and the Equity Committee agree and acknowledge that the Lonestar Pre-Petition Claims, (i) against PACA (as defined below) in the amount of $373,572.10 as reflected in PACA's schedules of

assets and liabilities, (ii) against Point Blank (as defined below) in the amount of $8,126,774.32 as reflected in Point Blank's schedules of assets and liabilities, and (iii) against the Parent (as defined below) in the amount of $8,512,858.34 as reflected in Proof of Claim No. 284, are valid claims and should be allowed in the full amounts of such claims, it being understood that Lonestar Partners, L.P. is entitled only to a single recovery on account of the Lonestar Pre-Petition Claims. The Debtors, the Creditors Committee and the Equity Committee further waive and release their rights (i) to challenge or contest the extent, amount, or validity of any the Lonestar Pre-Petition Claims, (ii) to assert any claims or causes of action against Lonestar Partners, L.P. on account of the Lonestar Pre-Petition Claims or arising under chapter 5 of the Bankruptcy Code and (iii) to assert any defenses to or rights of counterclaim or setoff against the Lonestar Pre-Petition Claims, including any right of counterclaim or setoff that might otherwise arise under § 502(d).

**Financial Covenants**:  In addition to the specific affirmative and negative covenants set forth in the DIP Credit Agreement, the Debtors shall not pay any expenses other than those set forth in the Budget. Moreover, commencing on the third Wednesday to occur on or after the Petition Date, for the two-week period ended the previous Friday, and each Wednesday thereafter, for the three-week period ended the previous Friday, (i) the Debtors' actual "Total Receipts" (labeled as such in the Budget) for the initial two (2) week period and thereafter the three (3) week period then most recently ended shall not be less than 90% of the cumulative projected amounts for such period as set forth in the Budget, (ii) the Debtors' actual Total Disbursements (labeled as such in the Budget) for the initial two (2) week period and thereafter the three (3) week period then most recently ended shall not be more than 110% of the cumulative projected amounts of such disbursements for such period as set forth in the Budget, and (iii) the Debtors' actual Net Cash Flow (labeled as such in the Budget) for the initial two (2) week period and thereafter the three (3) week period then most recently ended shall not be less than 90% of the projected amounts for such period as set forth in the Budget. The foregoing shall be tested each applicable week pursuant to the Variance Report delivered by the Debtors to the DIP Lenders on Wednesday of each week for the immediately preceding initial two (2) week period and subsequent three (3) week periods. *See* DIP Credit Agreement at page 11.

**Defaults and Remedies**:  Usual and customary for facilities of this type, as set forth in the DIP Credit Agreement, including but not limited to: (i) dismissal or conversion of the chapter 11 cases; (ii) the appointment of a

chapter 11 trustee; (iii) the granting of a superpriority claim or lien on the DIP Collateral that is superior to the DIP Lenders' claims or liens granted by the Interim Order or the Final Order; (iv) the appointment of an examiner with enlarged powers to operate the Debtors' business; (v) failure to pay principal, interest, and fees under the DIP Facility; (vi) entry of an order granting relief from the automatic stay that to permit a party to proceed against the DIP Collateral or terminate a material agreement; and (vii) the Debtors shall fail to observe or perform when due any covenant, condition or agreement contained in any of the DIP Financing Agreements, the Interim Order or the Final Order (collectively, "**Events of Default**"). *See* DIP Credit Agreement at pages 13-14.

Following the occurrence of an Event of Default, upon five (5) business days' notice to the Debtors, counsel to a statutory committee, and the United States Trustee, the automatic stay shall be modified to allow the DIP Lenders to exercise its rights and remedies set forth under the DIP Credit Agreement, subject to the Carve Out. The Debtors shall be entitled to an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred. *See* DIP Credit Agreement at page 15.

|                      |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                  |
| -------------------- | ---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| **Indemnification**: | The Debtors shall indemnify the DIP Lenders and their respective officers, directors, attorneys, advisors, agents, employees, representatives, and affiliates (each an "**Indemnitee**") against, and hold each Indemnitee harmless from, any claims in connection with (i) the DIP Financing Agreements, (ii) the DIP Facility or the use of the proceeds therefrom, (iii) all current or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any governmental authority, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, <u>provided</u> that such indemnity (i) shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses resulted from the |

The Debtors shall indemnify the DIP Lenders and their respective officers, directors, attorneys, advisors, agents, employees, representatives, and affiliates (each an "**Indemnitee**") against, and hold each Indemnitee harmless from, any claims in connection with (i) the DIP Financing Agreements, (ii) the DIP Facility or the use of the proceeds therefrom, (iii) all current or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any governmental authority, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, <u>provided</u> that such indemnity (i) shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee, and (ii) shall only be available to the extent that such losses, claims, damages, liabilities or related expenses asserted against the Indemnitee arise on account of its capacity as a DIP Lender under the DIP Credit Agreement. Upon request by the DIP Lenders, the Debtors shall deposit with the DIP Lenders cash collateral to be maintained under the DIP Lenders' control to secure the Debtors' indemnification obligations as set forth herein in such amounts as the DIP Lenders may determine in their sole discretion, or, if the Debtors can establish cause by clear and convincing evidence for objecting to the amounts determined by

the DIP Lender, in such amount as may be determined by the Court. *See* DIP Credit Agreement at pages 21-22.

13.     On December 3, 2010, the Court entered an *Order Granting Joint Motion of Official Committees of Unsecured Creditors and Equity Security Holders to Shorten the Notice Period With Respect to the Emergency Motion to Approve Replacement Interim and Final Debtor in Possession Financing* [Docket No. 857], in which the Court scheduled an emergency hearing for December 9, 2010 at 10:00 am Prevailing Eastern Time to consider entry of the Interim Order, which authorizes the Debtors to (i) borrow under the DIP Financing Agreements, on an interim basis, up to an aggregate principal amount not to exceed $25,000,000, (ii) satisfy the Debtors' obligations under the Existing DIP Facility, (iii) use cash collateral on an interim basis in accordance with the Budget; and (iv) final approval of the Plan Support Agreement.  The Official Committees on behalf of the Debtors further request that the Court (a) schedule the Final Hearing on the Motion within thirty (30) days of the entry of the Interim Order to consider entry of the Final Order authorizing the balance of the borrowings under the DIP Financing Agreements and authorizing the Debtors to use cash collateral in accordance with the Budget on a final basis, and (b) approve notice procedures with respect thereto.

14.     Notice of the Interim Hearing has been given to (i) the Office of the United States Trustee, (ii) counsel to the Pre-Petition Agent (as defined below), (iii) counsel to DuPont, (iv) parties with liens of record on assets of the Debtors as of the Petition Date, (v) counsel to the Creditors Committee, (vi) counsel to the Equity Committee, (vii) counsel to the proposed DIP Lenders, (viii) counsel to the Existing DIP Lender, (ix) the Debtors' thirty-five (35) largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions, and (x) all other parties requesting notice pursuant to Bankruptcy Rule 2002.  The Official Committees

submit that such notice was good and sufficient under the circumstances, and no other or further notice is or shall be required.

## V.
## BACKGROUND

### A.    Overview of the Debtors

15.    On April 14, 2010 (the "**Petition Date**"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to §§ 1107(a) and 1108.

16.    The U.S. Trustee formed an Official Committee of Unsecured Creditors (the "**Creditors Committee**") on April 26, 2010. On July 27, 2010, the U.S. Trustee formed an Official Committee of Equity Security Holders (the "**Equity Committee**"). No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

17.    The factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in further detail in the *Declaration of Scott Avila in Support of First Day Motions* (the "**Avila Declaration**") filed on the Petition Date and incorporated herein by reference.

### B.    The Existing DIP Facility

18.    In connection with the commencement of these chapter 11 cases, the Debtors obtained the $20,000,000 superpriority senior secured Existing DIP Facility pursuant to a Debtor-in-Possession Financing Agreement, dated April 12, 2010 (the "**Existing DIP Credit Agreement**"), with Steel Partners II, L.P. (the "**Existing DIP Lender**"). The Court entered a final order [Docket No. 120] (the "**Existing Final DIP Order**") authorizing the Debtors to enter into the Existing DIP Facility on May 12, 2010. Among other things, the proceeds from the

{00005543. }
NYC/556829.7

Existing DIP Facility were used to pay in full the Debtors' pre-petition senior secured obligations under that certain Amended and Restated Loan and Security Agreement, dated as of April 3, 2007.

19.     The Existing DIP Credit Agreement, as amended, imposes certain milestones on the Debtors requiring a sale of substantially all the Debtors' assets under § 363 Code.  The first such amendment, dated as of July 19, 2010 compelled the Debtors to pursue a marketing and sale process for substantially all the Debtors' assets under § 363, and established certain deadlines— or milestones—in connection with that process.  Pursuant to the first amendment to the Existing DIP Credit Agreement, the failure by the Debtors to timely meet any one of these milestones constitutes an event of default under the Existing DIP Credit Agreement.  The second amendment to the Existing DIP Credit Agreement extended those milestones.  In particular, (i) November 1, 2010 was established as the deadline by which the Debtors were to identify a potential stalking horse bidder; (ii) December 3, 2010 was established as the deadline by which the Debtors were required to obtain approval of bid procedures in connection with the proposed sale process, and (iii) December 16, 2010 was established as the deadline by which a sale hearing was to be conducted.

20.     Despite the Debtors' efforts, however, no stalking horse bidder has been identified.  As a result, under the terms of the Existing DIP Credit Agreement, the Debtors are compelled to seek approval of bid procedures and conduct a "naked" sale on or before December 16, 2010.

21.     On December 2, 2010, the Court conducted a hearing on the Debtors' motion [Docket No. 800] for approval of bid procedures in connection with a sale of substantially all the Debtors' assets.  In the course of that hearing, the DIP Lenders advised the Court that they were

in the process of negotiating an agreement among themselves, the Debtors, the Creditors Committee and the Equity Committee to provide a replacement post-petition credit facility that would be used to take out the Existing DIP Facility and relieve the Debtors of continuing a potentially disastrous sale process. In addition, the parties announced they were negotiating the terms for a plan of *reorganization* that would permit the Debtors to successfully emerge from chapter 11 as a going concern. Based on that tentative agreement, the parties asked the Court to adjourn the hearing on the Debtors' bid procedures motion to permit them additional time to finalize the agreement and file an appropriate motion with the Court. The Court granted that request and adjourned the hearing on the Debtors' bid procedures motion to December 9, 2010, provided that this Motion was filed on or before December 6, 2010.

**C.     Terms of the Plan Support Agreement**

22.     The Plan Support Agreement, which is attached as Exhibit B hereto, sets forth the parties' commitment to and obligations with respect to a plan of reorganization (the "**Plan**") based on the Term Sheet. It includes customary conditions for such documents, such as an agreement to support such a Plan, negotiate in good faith to reach definitive documentation, and not take any actions that will delay or impede consummation of the proposed Plan.

23.     The Term Sheet, in turn, outlines the proposed Plan. The key terms of the proposed Plan are as follows:

(a)     <u>Rights Offering</u>. Debtors will reorganize and emerge from chapter 11 ("**Reorganized Debtors**") through a rights offering (the "**Rights Offering**") of no less than $15 million and no more than $25 million, backstopped by Lonestar Capital Management LLC or one or more of its affiliates, Privet Fund Management LLC and Prescott Group Capital Management (collectively, the "**Backstop Group**").

(b)     <u>Exit Financing</u>. The Reorganized Debtors will obtain a senior secured financing facility in the amount of at least $20 million to be entered into

on or before the Effective Date with the lenders party thereto, as determined prior to emergence through a competitive financing process

(c)  Funding of Plan Payments.  Allowed claims under the Plan will be funded through the proceeds of either or both of the Rights Offering or an exit facility.

(d)  Recovery Trust.  On the effective date of the Plan, the Debtors' interests in certain claims and causes of action (including avoidance actions) will be transferred to a litigation trust (the "**Recovery Trust**") for the benefit of general unsecured creditors and other stakeholders entitled to share in the recoveries from such causes of action.  The Recovery Trust will receive an initial funding of $1,000,000 on the effective date of the Plan to fund litigation expenses.  In addition, the Recovery Trust will be permitted to borrow up to $500,000 per year (to a maximum of $1,000,000) from the Reorganized Debtors to fund litigation expenses.  Net recoveries to the Recovery Trust will be split as follows: 80% to the Recovery Trust for the benefit of holders of allowed general unsecured claims; 20% to Reorganized Debtors.  Once holders of allowed general unsecured claims have received 100% of their allowed claim amounts plus 8% interest from the Petition Date to the last payment date, further recoveries will be split as follows: 70% to the Reorganized Debtors; 30% to holders of existing equity securities.

24.  In addition, the Term Sheet sets forth interim obligations and events that will facilitate the Debtors' consummation of the Plan.  Among other such provisions, the Plan Support Agreement contains terms regarding the parties' support for the proposed Plan, including entry of the Interim and Final DIP Orders.  Specifically, the Plan Support Agreement provides that:

(a)  by December 9, 2010, the Interim Order approving entry into the DIP Facility and the Plan Support Agreement shall have been entered;

(b)  by January 7, 2011, the Final Order shall have been entered;

(c)  by January 10, 2011, the Debtors shall have filed a Plan and supporting Disclosure Statement;

(d)  by February 18, 2011, the Court shall have entered an order approving the Disclosure Statement;

(e)  by March 31, 2011, the Court shall have entered an order confirming the Plan.

{00005543. }
NYC/556829.7

Failure to comply with these milestones constitutes an event of default under each of the Plan Support Agreement, the DIP Credit Agreement and the Equity Commitment Agreement.

25.     The Plan Support Agreement also contemplates the DIP Lenders being awarded (i) a fee in the aggregate amount of $750,000 (the "**Break-Up Fee**"), payable pro rata based upon the backstop commitment of each of the DIP Lenders; plus (ii) reimbursement for all of the DIP Lenders' reasonable costs and expenses incurred in connection with the transactions contemplated by the Plan Support Agreement and the DIP Facility (including without limitation, the reasonable fees and expenses of their respective legal counsel) up to a maximum of $200,000 per DIP Lender (collectively, the "**Transaction Expenses**"), which Break-Up Fee and Transaction Expenses shall be payable upon the closing of a transaction relating to the sale of all or a substantial portion of the Debtors' assets or the reorganization of the Debtors other than pursuant to the Plan.

26.     The signatories to the Plan Support Agreement have requested, as a condition of moving forward with the Global Settlement, that the Debtors cancel the auction scheduled for December 16, 2009.

## IV.
## RELIEF REQUESTED

27.     As they have since the commencement of these cases, the Debtors continue to require financing and authority to use cash collateral to fund, among other things, the Debtors' cash requirements for working capital and general corporate needs; furthermore, the Debtors believe these needs will increase in the next 3 months due to new orders received.  More immediately, the Existing DIP Credit Agreement imposes a sale process and deadlines on the Debtors that the Official Committees believe are not in the best interests of the Debtors' estates, their creditors and equity security holders.  The Debtors' failure to satisfy the milestones set forth

in the second amendment will automatically trigger an event of default under the terms of the Existing DIP Credit Agreement, at which point all outstanding obligations under the Existing DIP Credit Agreement will become immediately due and payable. Accordingly, the Debtors have an immediate need for an alternative source of post-petition financing both to meeting their ongoing cash requirements and to retire the Existing DIP Credit Agreement.

28. The Debtors are unable to obtain adequate unsecured credit allowable under § 503 as an administrative expense or other financing under §§ 364(c) or 364(d) on equal or more favorable terms than those set forth in the DIP Credit Agreement. After considering all alternatives, the Official Committees have concluded that the loan facility provided under the DIP Credit Agreement represents the best working capital financing available to them. Hence, the OfficialCommittees request approval of the DIP Credit Agreement and authority to use cash collateral to maintain their going concern operations and maximize the value of their estates.

**V.**
**APPLICABLE AUTHORITY**

29. Approval of the DIP Credit Agreement and use of Cash Collateral will provide the Debtors with continuing ongoing access to the funds necessary to pay their current and ongoing operating expenses, while simultaneously allowing them to retire the Existing DIP Facility, obtain relief from the sale process compelled by the Existing DIP Lender and move forward with the proposed Plan. Unless these expenditures are made, the Debtors will be forced to proceed with a "naked" sale of substantially all their assets to the substantial detriment of all other stakeholders in these cases.

**A.      The Replacement DIP Facility should be approved.**

30.     Pursuant to § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estates.  *See*, *e.g.*, *In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties.").

31.     Section 364(c) provides, in pertinent part, that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(l) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
> (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> (2)     secured by a lien on property of the estates that is not otherwise subject to a lien; or
> (3)     secured by a junior lien on property of the estates that is subject to a lien.

11 U.S.C. § 364(c).

32.     In satisfying the standards of § 364(c), a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available of the type set forth in §§ 364(a) and (b).  *See*, *e.g.*, *Bray v. Shenandoah Fed. Sav. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated by good-faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *Ames Dept.*

*Stores*, 115 B.R. at 40 (finding that debtor demonstrated the unavailability of unsecured financing where debtor approached several lending institutions).

33.     Instead, the debtor's efforts are to be considered on a case by case basis, particularly "[g]iven the 'time is of the essence' nature of this type of financing." *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987).  In *In re Sky Valley, Inc.*, 100 B.R. 107, 112-13 (Bankr. N.D. Ga. 1988), the Court stated that "it would be unrealistic and unnecessary to require Debtors to conduct such an exhaustive search for financing" where the business suffered from financial stress, had little or no unencumbered property, and the primary property was subject to numerous liens, and thus the Debtors' approach of only four lenders was sufficient under such circumstances.  *See also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (section 364(d)(1)(A) satisfied where two banks refused to provide unsecured credit to debtor); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D. N.Y. 1992) (element satisfied where "specialist in commercial lending practices … explained that most banks lend money only in return for a senior secured position.  The debtor cannot obtain financing secured by a lien on unencumbered property … because there is no property in the estate which is not already subject to a lien.").

34.     The exigencies of the Debtors' current situation easily satisfy this requirement. Absent the approval of the proposed DIP Facility and the repayment of the Existing DIP Facility in full, the Debtors will be faced with a Morton's Fork in which they must either proceed with the approval of the proposed bid procedures and a "naked" sale of substantially all their assets or risk the immediate termination of the Existing DIP Facility.  Under the circumstances, the proposed DIP Facility is the Debtors' best option to receive continuing access to necessary post-

petition financing while opening up a path to successfully reorganize and emerge from chapter 11 intact.

35.     The use of Cash Collateral alone is insufficient to meet the Debtors' post-petition liquidity needs.  The Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under §§ 364(b) and 503(b)(1) or (b) under § 364(c)(1), (ii) adequate credit secured by (x) a senior lien on unencumbered assets of the Debtors' estates under § 364(c)(2) and (y) a junior lien on encumbered assets under § 364(c)(3), or (iii) secured credit under § 364(d)(1) from sources other than the DIP Lender on terms more favorable than the terms of the DIP Credit Agreement. The only source of secured credit available to the Debtors, other than the use of Cash Collateral or the Existing DIP Facility, is the DIP Credit Agreement.

36.     The Official Committees believe that the financing to be provided by the DIP Lenders pursuant to the terms of the DIP Credit Agreement represents the best financing presently available to the Debtors.  Moreover, the Official Committees concluded that the loan terms and pricing provided under the DIP Credit Agreement are within the range of comparable financing arrangements recently effectuated in other chapter 11 cases, including the Existing DIP Facility.

37.     The Official Committees further submit that the other terms and conditions of the DIP Credit Agreement are the best possible under the circumstances of these cases, and were negotiated in good faith and at arm's-length with all parties represented by experienced counsel. Accordingly, the DIP Lenders should be provided with the benefit and protection of § 364(e), such that if any of the provisions of the DIP Credit Agreement are later modified, vacated, or terminated by subsequent order of this or any other Court, the DIP Lenders will be fully protected with respect to any amounts previously disbursed.

**B.** **The Debtors should be permitted to repay the Existing DIP Facility in full and enter into the Plan Support Agreement.**

38.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Approval of a debtor's actions under section 363(b)(1) of the Bankruptcy Code requires the debtor to show that its decision was based on its business judgment. *See Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "good business reason").  To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06-11202, 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs., Inc.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

39.     Once the debtor articulates a valid business justification, the business judgment rule creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted).  The debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" *In re Aerovox, Inc.*, 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting *In re Interco, Inc.*, 128 B.R. 229, 234) (Bankr. E.D. Mo. 1991).

"Courts are loathe to interfere with corporate decisions absent a showing of bad faith, self interest or gross negligence." *Integrated Res.*, 147 B.R. at 656.

40.     The Official Committees believe that the transactions contemplated by the Global Settlement will promote a prompt and consensual consummation of these chapter 11 cases and are in the best interest of all stakeholders. The effectiveness of each of the Plan Agreements is conditioned upon the approval of the other two, and thus approval of all three is necessary to effectuate the transactions contemplated therein. The Official Committees request authorization to repay the Existing DIP Facility in full with the proceeds of the DIP Facility and use cash collateral as set forth in the Interim Order and in the DIP Agreement. This authority is necessary to implement the transactions contemplated by the Global Settlement, and for the Debtors to have access to the liquidity it needs to operate their businesses going forward. In particular, repayment of the Existing DIP Facility will allow the Debtors to move forward in these chapter 11 cases free of the conditions of the Existing Final DIP Order (such as the requirement for the Debtors to sell substantially all their assets), which continue for the benefit of the Existing DIP Lender until the Existing DIP Facility is paid in full.

41.     The repayment of the amounts outstanding under the Existing DIP Credit Agreement that is contemplated by the DIP Credit Agreement is appropriate under the circumstances and will not prejudice the Debtors or their estates. Moreover, repayment of the Existing DIP Facility will result in the release of all liens presently encumbering the Debtors' assets and permit new liens to be granted in favor of the DIP Lenders without requiring the DIP Lenders to seek authority to prime existing liens pursuant to § 365(d)(1). The Official Committees believe that repayment of the Existing DIP Credit Agreement is permissible and appropriate and should be approved by the Court.

{00005543. }
NYC/556829.7

42.     In addition, the Official Committees request that this Court determine that entry into the Plan Support Agreement by the parties thereto, and the performance of their obligations thereunder, does not violate any law, including the Bankruptcy Code, and does not give rise to any claim or remedy against any of the parties thereto under § 1125(e), including the designation of the vote of any party thereto under § 1126(e).  The parties to the Plan Support Agreement continue to negotiate the agreement in good faith and would not be willing to enter in that agreement if so doing would expose them to liability for potential claims.

43.     Moreover, this Court should approve the payment of the Break-Up Fee and Transaction Expenses because the DIP Lenders have made a substantial contribution to these chapter 11 cases and have not received a full commitment fee in connection with the DIP Facility.  The Break-Up Fee and Transaction Expenses are only payable if the Debtors consummate a transaction other than the transactions contemplated by the Plan.  The DIP Lenders have enabled the Debtors to pursue a plan of reorganization, which will maximize the value of the Debtors' estates and returns to creditors and interest holders.  Given the positive impact of the DIP Lenders' financing efforts on the Debtors' estates, payment of the Break-Up Fee is appropriate and reasonable in the event that, subsequent to this Motion, the Debtors determine to pursue some other, more attractive alternative.  The signatories to the Plan Support Agreement similarly have recognized the DIP Lenders' outstanding contributions and have consented to the Break-Up Fee.

**C.     The Debtors should be permitted the continued use of Cash Collateral.**

44.     The Debtors' use of property of the estates is governed by § 363.   Section 363(c)(1) provides, in pertinent part, that:

> If the business of the debtor is authorized to be operated under
> section . . . 1108 . . . of this title and unless the court orders
> otherwise, the trustee [or debtor-in-possession] may enter into
> transactions, including the sale or lease of property of the estates,
> in the ordinary course of business, without notice or hearing, and
> may use property of the estates in the ordinary course of business
> without notice or hearing.

11 U.S.C. § 363(c)(1).

45.     The Bankruptcy Code establishes a special requirement, however, regarding the

debtor in possession's use of "cash collateral," defined as "cash, negotiable instruments,

documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in

which the estates and an entity other than the estates have an interest . . .." 11 U.S.C. § 363(a).

Section 363(c)(2) permits the debtor in possession to use, sell or lease cash collateral under

subsection (c)(1) only if either of two alternative circumstances exist:

> (A) each entity that has an interest in such cash collateral consents;
> or (B) the court, after notice and a hearing, authorizes such use,
> sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

# VI.
# INTERIM AUTHORIZATION

46.     The authorization to obtain the DIP Credit Agreement and use of Cash Collateral

pending a Final Hearing will preserve the value of the Debtors' business only if authorization is

granted immediately.

47.     Local Rule 4001-2(b) specifically contemplates that it might be necessary to grant

interim authorization to obtain post-petition financing or use of cash collateral because of the

business exigencies of individual cases.  *See also* 11 U.S.C. § 102(1) (defining "after notice and

a hearing" to mean after such notice and such opportunity for a hearing as is appropriate in the particular circumstances of a given case).

48.     In this instance, the Debtors must have immediate use of the funds provided under the DIP Credit Agreement and the Cash Collateral to the extent contemplated herein to pay their ongoing operational expenses and to maximize the value of their estates.  Funds are urgently needed to meet all of the Debtors' liquidity needs and to administer these cases in an orderly and efficient manner.  In the absence of immediate post-petition financing, the Debtors' ability to preserve the value of their business and assets will be immediately and irreparably jeopardized, resulting in significant harm to the Debtors' estates.

49.     The Official Committees seek authorization on an interim basis allow the Debtors to borrow up to $25,000,000 under the DIP Credit Agreement and to use Cash Collateral for the purposes set forth in the Budget pending the Final Hearing.

50.     Based on the foregoing, the Official Committees submit that interim relief requested in this Motion, pending the Final Hearing, is necessary, appropriate and fully warranted, and is essential to avoid immediate and irreparable harm to the Debtors, their estates, and their creditors.

### VII.
### NOTICE

51.     The Official Committees have provided notice of the Motion and the Interim Hearing by facsimile or overnight mail to: (i) the U.S. Trustee, (ii) counsel to the Pre-Petition Agent, (iii) counsel to DuPont, (iv) parties with liens of record on assets of the Debtors as of the Petition Date, (v) counsel to the Creditors Committee, (vi) counsel to the Equity Committee, (vii) counsel to the proposed DIP Lenders, (viii) counsel to the Existing DIP Lender, and (ix) the Debtors' thirty-five (35) largest unsecured creditors on a consolidated basis, as identified in their

chapter 11 petitions. The Official Committees submit that, in light of the nature of the relief requested, no other or further notice need be given.

52. Upon entry of the Interim Order, the Official Committees shall give notice of the request for entry of a Final Order to: (i) the Office of the United States Trustee, (ii) counsel to DuPont, (iii) parties with liens of record on assets of the Debtors as of the Petition Date, (iv) counsel to the Creditors Committee, (v) counsel to the Equity Committee, (vi) counsel to the proposed DIP Lenders, (vii) counsel to the Existing DIP Lender, (viii) the Debtors' thirty-five (35) largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions, and (x) all other parties requesting notice pursuant to Bankruptcy Rule 2002.

## VIII.
## NO PRIOR REQUEST

53. No previous application for the relief sought herein has been made by the Debtors to this or any other court. WHEREFORE, the Official Committees respectfully request: (i) entry of the Interim Order attached to this Motion, approving the DIP Credit Agreement and use of Cash Collateral on an interim basis pending the Final Hearing and the Plan Support Agreement on a final basis; (ii) scheduling the Final Hearing on this Motion for approval of the DIP Credit Agreement and use of Cash Collateral on a final basis; (iii) final approval of the DIP Credit Agreement and use of Cash Collateral following the Final Hearing; and (iv) such further relief as is just and proper.

Dated: December 6, 2010

BAYARD, P.A.                                  THE ROSNER LAW GROUP, LLC

/s/ Justin R. Alberto                         /s/ Brian L. Arban
Neil B. Glassman (No. 2087)                   Frederick B. Rosner (No. 3995)

Charlene D. Davis (No. 2336)
Colin R. Robinson (admitted pro hac vice)
Justin R. Alberto (No. 5126)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19889
Telephone: (302) 655-5000
Email: nglassman@bayardlaw.com
        Cdavis@bayardlaw.com
        crobinson@bayardlaw.com
        jalberto@bayardlaw.com

Brian L. Arban (No. 4511)
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Telephone (302) 777-1111
Email: frosner@mrs-law.com
        barban@mrs-law.com

-and-

MORRISON COHEN LLP

Joseph T. Moldovan
Michael Dal Lago
909 Third Avenue
New York, New York 10022
Telephone: (212) 735-8600
Facsimile: (212) 735-8708
Email: jmoldovan@morriscohen.com
        mdallago@morriscohen.com

*Co-Counsel for the Official Committee
Of Equity Security Holders*

ARENT FOX LLP

Robert M. Hirsh
George Angelich
1675 Broadway
New York, NY 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
Email: hirsh.robert@arentfox.com
        angelich.george@arentfox.com

*Co-Counsel to the Official Committee
of Unsecured Creditors*

# EXHIBIT A

**Proposed Interim Order**

NYC/556829.7

# EXHIBIT B

**Plan Support Agreement**

NYC/556829.7

# EXHIBIT C

**DIP Credit Agreement**

NYC/556829.7

# EXHIBIT D

**Budget**

NYC/556829.7