# EXHIBIT B

{00003447. }

# PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (the "Agreement") is made and entered into as of December 10, 2010 by and among the following parties, each of whom is a "Party" and, collectively, the "Parties": (i) (a) Point Blank Solutions, Inc., (b) Point Blank Body Armor, Inc., (c) Protective Apparel Corporation of America and (d) PBSS, LLC, as debtors and debtors in possession (collectively, the "Debtors"); (ii) the Official Committee of Unsecured Creditors (the "Creditors Committee"); (iii) the Official Committee of Equity Security Holders (the "Equity Committee"); (iv) Lonestar Capital Management, LLC, as investment advisor to Lonestar Partners, LP, or one or more of its affiliates, designees or assignees (the "Lonestar Support Party"), and (v) (a) Privet Opportunity Fund I, LLC, (b) Privet Fund Management LLC and (c) Prescott Group Capital Management (together, the "Equity Support Parties" and, together with the Lonestar Support Party, the "Support Parties").[1]

## RECITALS

**WHEREAS,** on April 14, 2010, the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")[2] in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS,** based on various factors, which the Debtors have extensively considered, the Debtors have determined that the consummation of the Plan (as defined below);

**WHEREAS,** upon entry of the Interim DIP Order (as defined below) and satisfaction of the conditions precedent set forth in the DIP Credit Agreement (as defined below), the Support Parties will provide, in accordance with the terms and conditions of that certain Debtor-in-Possession Financing Agreement (the "DIP Credit Agreement"), dated December ___, 2010 and attached hereto as Exhibit A, replacement senior secured postpetition financing (the "DIP Facility") that will be used, among other things, to repay in full the Debtors' existing senior secured postpetition financing (the "Existing DIP Facility");

**WHEREAS,** the Support Parties have agreed to provide a financial investment to be provided in accordance with the terms and conditions of an Equity Commitment Agreement (the "Commitment Agreement"), the terms of which are to be negotiated;

**WHEREAS,** the Parties now desire the Debtors to file, obtain confirmation of, and consummate a chapter 11 plan of reorganization in accordance with the terms and conditions set forth in the term sheet annexed hereto as Attachment 1, as such term sheet may be amended from time to time in accordance with the terms of this Agreement (the "Term Sheet", and such plan of reorganization, the "Plan");[3]

---

[1]     Unless otherwise noted herein or in the DIP Credit Agreement, any rights, actions, approvals, or consents of the Support Parties provided for herein shall require the approval or consent of each of the Support Parties.

[2]     Unless otherwise noted, section (§) references herein are to the Bankruptcy Code.

[3]     Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Term Sheet.

**WHEREAS,** the Parties have engaged in good faith negotiations with each other and with the objective of reaching an agreement with regard to the Plan and the Term Sheet;

**WHEREAS,** each Party has reviewed, or has had the opportunity to review, this Agreement and the Term Sheet with the assistance of professional legal advisors of its own choosing;

**WHEREAS,** each Party desires to support the Plan, to the extent consistent in all material respects with the Term Sheet;

**WHEREAS,** subject to the execution of definitive documentation and appropriate approvals by the Bankruptcy Court of the Plan and the associated disclosure statement (as the same may be amended pursuant to this Agreement from time to time in accordance with this Agreement, the "Disclosure Statement"), each of which shall be consistent with the Term Sheet, the following sets forth the agreement between the Parties concerning their respective obligations; and

**WHEREAS,** the Parties require that, as a condition of their willingness to execute this Agreement, the Debtors withdraw their *Motion for Entry of an Order (A) Approving Bid Procedure for the Sale of the Debtors' Assets, (B) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts; (D) Approving Certain Expense Reimbursement Provisions and Breakup Fee; and (E) Granting Other Related Relief,* dated November 23, 2010 (the "Bid Procedures Motion") and cancel the pending auction sale of substantially all the Debtors' assets (except for certain excluded assets) and related hearing regarding approval of such sale, currently proposed to be scheduled for December 15, 2010 and December 17, 2010, respectively.

## AGREEMENT

**NOW THEREFORE,** in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

**Section 1.**    **Term Sheet and Plan of Reorganization.**

The Term Sheet is incorporated herein by reference and is made part of this Agreement as if fully set forth herein. The general terms and conditions of the Plan are set forth in the Term Sheet; *provided, however,* that the Term Sheet is supplemented by the terms and conditions of this Agreement. In the event of any inconsistencies between the terms of this Agreement and the Term Sheet, the terms of this Agreement shall govern.

**Section 2.**    **Effectuating the Plan.**

To implement the Plan, the Parties have agreed, on the terms and conditions set forth herein, that the Parties shall use reasonable best efforts to effectuate the Plan, and without limiting the foregoing, shall use reasonable best efforts to take all actions necessary and appropriate to:

(a) on or prior to December 6, 2010 and in any event concurrently with the filing of the DIP Motion (as defined below), file a motion with the Bankruptcy Court, seeking the entry of an order approving this Agreement and authorizing the Parties to enter into, and perform under, this Agreement (the "PSA Motion");

(b) on or prior to December 6, 2010 and, in any event, concurrently with the filing of the PSA Motion, file a motion (the "DIP Motion") with the Bankruptcy Court seeking (i) the entry of an interim order substantially in the form attached hereto as Exhibit C or otherwise in form and substance satisfactory to the Support Parties (the "Interim DIP Order") on or prior to December 10, 2010, and (ii) the entry of a final order (the "Final DIP Order" and together with the Interim DIP Order, collectively, the "DIP Orders") containing substantially the same terms as the Interim Order (except as otherwise expressly set forth in the Interim Order) or otherwise in form and substance satisfactory to the Support Parties, as expeditiously as practicable under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bankruptcy Court's local rules (such federal and local rules, the "Bankruptcy Rules"), which DIP Orders shall, among other things, (i) authorize the Debtors to enter into, and perform its obligations in respect of, the DIP Facility, (ii) approve the repayment of the indebtedness owing to the Debtors' existing debtor in possession financing lender, and (iii) approve the liens, superpriority administrative claims and other protections provided to the Support Parties (for the avoidance of doubt, the PSA Motion and the DIP Motion may be filed as a single motion, which may be approved through one or more orders of the Bankruptcy Court);

(c) move the Bankruptcy Court to enter an order approving the Disclosure Statement (the "Disclosure Statement Order") as expeditiously as practicable under the Bankruptcy Code and the Bankruptcy Rules and, in any event, have the Disclosure Statement Order entered on or prior to February 18, 2011;

(d) solicit the requisite acceptances of the Plan in accordance with §§ 1125 and 1126 and the terms of the Disclosure Statement Order;

(e) move the Bankruptcy Court to confirm the Plan as expeditiously as practicable under the Bankruptcy Code and the Bankruptcy Rules, and, in any event, the order confirming the Plan entered on or prior to March 30, 2011; and

(f) consummate the Plan as expeditiously as practicable and, in any event, on or prior to April 14, 2011, in accordance with its terms and the terms of this Agreement.

**Section 3.**     **Commitments of the Parties to this Agreement.**

As long as a Termination Event (as defined herein) has not occurred, or has occurred but has been duly waived or cured in accordance with the terms hereof, each Party hereto agrees for itself, that it will, subject to Section 8(c) hereof and subject to any restrictions imposed by applicable law:

(a) consent to and support the entry of the DIP Orders and the Debtors entering into and performing under the DIP Facility pursuant to the terms of the DIP Credit Agreement and the DIP Orders;

(b)     promptly upon execution of this Agreement, negotiate in good faith to prepare the definitive restructuring documentation (including, without limitation, the Plan, the Disclosure Statement and solicitation materials, post-reorganization financing documents, backstop commitment agreements, rights offering materials, other agreements and documents relating to the transactions contemplated hereby and the Term Sheet, and any motions, orders or other pleadings or court filings associated with the foregoing), which (a) shall contain provisions consistent with this Agreement and the Term Sheet and such other provisions as are mutually acceptable to the Parties and (b) shall not be filed with the Bankruptcy Court, distributed or disseminated to third parties or otherwise finalized without being approved by each of the Support Parties, which approval shall not be unreasonably delayed or withheld;

(c)     in the case of each of the Debtors, Creditors Committee, and Equity Committee, as the case may be, except where not reasonably practicable, shall provide draft copies of all motions or applications and other documents that any of such Parties intends to file with the Bankruptcy Court to counsel for the Support Parties at least three business days prior to the proposed filing date and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(d)     from and after the date hereof not directly or indirectly seek or support, as applicable, any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of the Debtors that could reasonably be expected to prevent, delay or impede solicitation, confirmation or consummation of the Plan or any document filed with the Bankruptcy Court in furtherance of soliciting or confirming the Plan or consummating the transactions contemplated thereby;

(e)     agree, if applicable, to permit disclosure in the Disclosure Statement and any filings by the Debtors with the Securities and Exchange Commission of the contents of this Agreement;

(f)     not object to or otherwise commence any proceeding or take any other action opposing any of the terms of this Agreement, the Disclosure Statement or the Plan, provided that nothing in this Agreement shall be construed as to prohibit any Party from appearing as a party in interest in any matter to be adjudicated in the Debtors' chapter 11 cases so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with the obligations of this Agreement and are not for the purpose of hindering, delaying or preventing the consummation of the Plan and the transactions contemplated thereby;

(g)     in the case of the Debtors, not take any action in connection with the operation of their businesses or the administration of the Debtors' chapter 11 cases inconsistent with this Agreement, the Plan or the Term Sheet;

(h)     in the case of the Creditors Committee and the Equity Committee, after the Disclosure Statement has been approved, pursuant to section 1125 of the Bankruptcy Code,

recommend to their respective members and constituents that they vote in favor of the Plan; and

(i)     the Support Parties shall use reasonable best efforts to assist the Debtors in preparing and formulating the Disclosure Statement and the Plan.

**Section 4.     Mutual Representations, Warranties, and Covenants.**

Each Party makes the following representations and warranties, solely with respect to itself, to each of the other Parties:

(a)     Enforceability.  Subject to the provisions of § 1125 and 1126, and except as set forth herein, this Agreement is a legal, valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(b)     No Consent or Approval.  Except as expressly provided in this Agreement, no consent or approval is required by any other entity for it to carry out the provisions of this Agreement; *provided, however*, that the Debtors shall have obtained all required consents and approvals no later than the hearing on the PSA Motion and the DIP Motion.

(c)     Power and Authority.  It has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement and the Plan.

(d)     Authorization.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

(e)     No Conflicts.  The execution, delivery and performance of this Agreement does not and shall not: (a) violate any provision of law, rule or regulations applicable to it or any of its subsidiaries; (b) violate its certificate of incorporation, bylaws or other organizational documents or those of any of its subsidiaries; or (c) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

**Section 5.     No Waiver of Participation and Preservation of Rights.**

This Agreement and the Plan are part of a proposed settlement of disputes among the Parties. Without limiting the foregoing sentence in any way, if the transactions contemplated by this Agreement or otherwise set forth in the Plan are not consummated as provided herein, if a Termination Event occurs, or if this Agreement is otherwise terminated for any reason, the Parties each fully reserve any and all of their respective rights, remedies, claims and interests.

**Section 6.**     **Acknowledgement.**

This Agreement and the Plan and the transactions contemplated herein and therein are the product of negotiations between the Parties and their respective representatives. This Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance of a plan of reorganization for the purposes of §§ 1125 and 1126 or otherwise. The Debtors will not solicit acceptances of the Plan from any holder of a Claim in any manner inconsistent with the Bankruptcy Code or applicable nonbankruptcy law. For the avoidance of doubt, nothing herein shall require any of the Parties to vote in favor of the Plan.

**Section 7.**     **Termination.**

(a)     <u>Termination Events</u>. This Agreement shall be terminated upon the earliest to occur of any the following:

(1)     upon the written agreement of each and all of the Parties to terminate this Agreement;

(2)     by any Party, upon three (3) business days' written notice to the other Parties (or such lesser time if the voting deadline for the Plan is to occur, or if the Confirmation Hearing is to commence within such period), if

(i)     subject to Section 3 hereof, any change, effect, event, occurrence, development, circumstance or state of facts occurs that has or would be expected to have a material adverse effect or that materially impairs the ability of any of the Parties to perform its obligations under this Agreement or have a material adverse effect on, or prevent or materially delay the consummation of the transactions contemplated by this Agreement; or

(ii)     if any other Party has materially breached any term of this Agreement; or

(3)     immediately and automatically, without any action required by the Parties, if:

(i)     any of the Debtors' chapter 11 cases is dismissed or converted to a case under chapter 7 of the Bankruptcy Code; or

(ii)     the Bankruptcy Court has entered an order in any of the Debtors' chapter 11 cases appointing an examiner with expanded powers or a trustee under chapter 7 or chapter 11 of the Bankruptcy Code;

(iii)     any court has entered a final, non-appealable judgment or order declaring this Agreement or any material portion of this Agreement to be unenforceable;

(iv)     any governmental authority, including any regulatory authority or court of competent jurisdiction, issues any ruling or order enjoining the consummation of a material portion of the transactions contemplated by this Agreement;

(v)     the Debtors have not joined in the PSA Motion and DIP Motion on or before the hearing on such motions or such later date as may be agreed to by the Support Parties;

(vi)     an order from the Bankruptcy Court, in form and substance acceptable to the Support Parties, approving the Debtors' entry into the DIP Facility (on an interim basis), the Commitment Agreement and this Agreement shall not have been entered on or before **December 10, 2010** or such later date as may be agreed to by the Support Parties;

(vii)     an order from the Bankruptcy Court, in form and substance acceptable to the Support Parties, approving the Debtors' entry into the DIP Facility (on a final basis) shall not have been entered on or before **January 5, 2011** or such later date as may be agreed to by the Support Parties;

(viii)     the Debtors have not filed the Plan and the Disclosure Statement with the Bankruptcy Court on or before **January 10, 2011** or such later date as may be agreed to by the Support Parties;

(ix)     an order approving the Disclosure Statement, in form and substance acceptable to the Support Parties, shall not have been entered by the Bankruptcy Court on or before **February 18, 2011** or such later date as may be agreed to by the Support Parties;

(x)     an order confirming the Plan, in form and substance acceptable to the Support Parties, shall not have been entered by the Bankruptcy Court on or before **March 30, 2011** or such later date as may be agreed to by the Support Parties;

(xi)     the Plan and the transactions contemplated therein shall not have been consummated on or before **April 14, 2011** or such later date as may be agreed to by the Support Parties;

(xii)     the Debtors have withdrawn the Plan or publicly announced their intention not to support the Plan or provided written notice to the Support Parties (or any of their respective representatives) of such intention in violation of this Agreement;

(xiii)     any Party files, propounds or otherwise supports any chapter 11 plan other than the Plan;

(xiv)    (i) any term of any document contemplated herein or in the Term Sheet, including, without limitation, any of the definitive documents referenced in Section 3(2) of this Agreement, that has been executed, been filed with the Bankruptcy Court, become effective or otherwise been finalized, has not been approved by the Support Parties in accordance with this Agreement or the Term Sheet or (ii) any such document that has been previously approved by the Support Parties is modified without the consent of the Support Parties required by such document;

(xv)    a "Termination Date" (as defined in the DIP Credit Agreement) occurs; or

(xvi)    the effective date of the Plan occurs.

Each of the foregoing shall be a "Termination Event." The provisions of this Section 7(a) are intended solely for the benefit of the Parties; *provided, however*, that a Party may not seek to terminate this Agreement based upon a material breach or a failure of a condition in this Agreement arising out of its own actions or omissions. The Parties hereby waive any requirement under § 362 to lift the automatic stay (the "Automatic Stay") in connection with giving any notice described in this Section 7(a) (and agree not to object to any non-breaching Party seeking to lift the Automatic Stay in connection with giving any such notice, if necessary). Any such termination (or partial termination) of this Agreement shall not restrict the Parties' rights and remedies for any breach of this Agreement by any Party, including, but not limited to, the reservation of rights set forth in Section 5 hereof.

(b)    Effects of Termination. In the event this Agreement is terminated (or is terminated with respect to any Party), the Parties hereto (or the Parties with respect to which this Agreement has been terminated, as applicable) shall not have any continuing liability or obligation under this Agreement and each Party (or each Party with respect to which this Agreement has been terminated, as applicable) shall have all the rights and remedies available to it under applicable law; *provided, however*, that no such termination shall relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of termination.

**Section 8.    Miscellaneous Terms.**

(a)    Binding Obligation. Subject to the provisions of §§ 1125 and 1126, this Agreement is a legally valid and binding obligation of the Parties, enforceable in accordance with its terms, and shall inure to the benefit of the Parties and their representatives. Nothing in this Agreement, express or implied, shall give to any entity, other than the Parties and their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, Affiliates, successors, assigns, heirs, executors, administrators and representatives, any benefit or any legal or equitable right, remedy or claim under this Agreement.

8

(b) <u>Assignment</u>. Except with respect to Participants (as defined in the DIP Credit Agreement), no rights or obligations of any Party under this Agreement may be assigned or transferred to any other entity.

(c) <u>Fiduciary Duties</u>. Notwithstanding anything to the contrary herein, nothing in this Agreement shall prohibit the Debtors or any member of any statutory committee appointed in these cases or its professionals from taking or refraining from taking any action deemed necessary by such entity while acting in such fiduciary capacity to comply with its or their fiduciary obligations under applicable law. Nothing herein will limit or affect, or give rise to any liability, to the extent required for the discharge of the fiduciary obligations described in this section except for the payment of the Break-Up Fee and Transaction Expenses as required in Section 9 below.

(d) <u>Further Assurances</u>. The Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the agreements and understandings of the Parties, whether the same occurs before or after the date of this Agreement.

(e) <u>Headings</u>. The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof.

(f) <u>Governing Law</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAWS PRINCIPLES THEREOF. By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought exclusively in the Bankruptcy Court to the extent such court has jurisdiction and agrees to exercise it. By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the exclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding. If the Bankruptcy Court lacks or declines to exercise such jurisdiction, the Parties agree that any action relating to this Agreement shall be brought in the state or federal courts of the State of New York.

(g) <u>Complete Agreement, Interpretation and Modification.</u>

(1) <u>Complete Agreement</u>. This Agreement, the Plan, the Term Sheet, the Commitment Agreement and the other agreements, exhibits and other documents referenced herein and therein constitute the complete agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, oral or written, between or among the Parties with respect thereto.

(2)  Interpretation. This Agreement is the product of negotiation by and among the Parties. Any Party enforcing or interpreting this Agreement shall interpret it in a neutral manner. There shall be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

(3)  Modification of this Agreement and the Plan.  The Plan and this Agreement (including the Term Sheet) may only be modified, altered, amended or supplemented, or otherwise deviated from by waiver, consent or otherwise, by an agreement in writing signed by each Party hereto.

(h)  Conditions to Effectiveness.  Except with respect to the Parties' obligations under Sections 2(a) and (b) above, which are effective immediately upon execution of this Agreement, this Agreement shall become effective upon the satisfaction of the following conditions precedent (unless waived by the Parties in their respective sole discretion):

(1)  each Party hereto shall have duly executed and delivered a counterpart to this Agreement to each other Party hereto;

(2)  the Bankruptcy Court shall have entered an order approving the terms of this Agreement and authorizing the Parties to perform their obligations hereunder;

(3)  the Debtors shall have withdrawn the Bid Procedures Motion; and

(4)  the Loans (as defined in the DIP Credit Agreement) shall have been funded to the Debtors on the Closing Date (as defined in the DIP Credit Agreement) in the amount of the Commitment (as defined in the DIP Credit Agreement).

(i)  Execution of this Agreement.  This Agreement may be executed and delivered (by facsimile or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

(j)  Settlement Discussions.  This Agreement, the Plan and the Term Sheet are part of a proposed settlement of a dispute between the Parties. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

(k)  Consideration.  The Debtors and the other Parties hereby acknowledge that no consideration, other than that specifically described herein and in the Plan and the Term Sheet, shall be due or paid to any Party for its agreement to support the Plan in accordance with the terms and conditions of this Agreement, other than the Debtors' representations,

warranties and agreement to use its commercially reasonable best efforts to obtain approval of the Disclosure Statement and to seek to confirm and consummate the Plan.

(l)     Relationship Among Parties.   Notwithstanding anything herein to the contrary, the duties and obligations of the Parties under this Agreement shall be several, not joint.  Furthermore, it is understood and agreed that, other than as provided in this Agreement, no Party has any duty of trust or confidence in any form with any other Party, and there are no commitments among or between them.  In this regard, it is understood and agreed nothing in this Agreement shall affect that any Party's right to trade in any debt or equity securities of the Debtors and their subsidiaries without the consent of the Debtors or any other Party, subject to applicable securities laws or any other agreement to which any Support Party and the Debtors are party.  No Party shall have any responsibility for any such trading by any other entity by virtue of this Agreement.  No prior history, pattern or practice of sharing confidences among or between Parties shall in any way affect or negate this understanding and agreement.

(m)    Notices.  All notices hereunder shall be delivered in writing and sent by facsimile, courier or registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice), as the case may be:

(1)     If to the Debtors, to:

Point Blank Solutions, Inc.
2101 S.W. 2nd Street
Pompano Beach, FL 33069

with copies (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
919 North Market Street
17th Floor
Wilmington, DE 19801
Facsimile:   (302) 652-4400
Attention: Laura Davis Jones

(2)     If to the Creditors Committee, to:

Arent Fox LLP
1675 Broadway
New York, NY 10019
Facsimile:   (212) 484-3990
Attention: Robert M. Hirsh

(3)    If to the Equity Committee, to:

        Bayard, P.A.
        222 Delaware Avenue, Suite 900
        P.O. Box 25130
        Wilmington, DE 19899
        Facsimile:  (302) 658-6395
        Attention:  Neil B. Glassman

        and

        Morrison Cohen LLP
        909 Third Avenue
        New York, NY 10022-4784
        Facsimile:  (917)522-3103
        Attention:  Joseph T. Moldovan

(4)    If to the Lonestar Support Party, to:

        Lonestar Capital Management, LLC
        One Maritime Plaza
        Suite 1105
        San Francisco, CA 94111
        Facsimile:  (415) 362-7977
        Attention: Vikas Tandon

        with copies (which shall not constitute notice) to:

        Akin Gump Strauss Hauer & Feld LLP
        2029 Century Park East
        Suite 2400
        Los Angeles, CA 90067-3010
        Facsimile:  (310) 229-1001
        Attention:  David P. Simonds

(5)    If to the Equity Support Parties, to:

        Privet Opportunity Fund I, LLC
        Privet Fund Management LLC
        50 Old Ivy Road, Suite 230
        Atlanta, GA 30324
        Attention:  Ryan Levenson

        with copies (which shall not constitute notice) to:

Reed Smith LLP
1201 Market Street - Suite 1500
Wilmington, DE 19801
Facsimile: (302) 778-7575
Attention: Kurt F. Gwynne

and

Reed Smith LLP
599 Lexington Avenue
22nd Floor
New York, NY 10022
Facsimile: (21) 521-5450
Attention: Edward J. Estrada

and to

Prescott Group Capital Management
1924 S. Utica Avenue, Suite 1120
Tulsa, OK 74104
Attention: Eric Green

Any notice given by delivery, mail or courier shall be effective when received. Any notice given by facsimile or email shall be effective upon oral or machine confirmation of transmission.

(n)     Time is of the Essence.   The Parties agree that time is of the essence with respect to each and every term and provision of this Agreement.

**Section 9.     Break-Up Fee and Transaction Expenses Reimbursement for Support Parties.**

(a)     The Parties hereby agree and acknowledge that Support Parties have made a "substantial contribution" (within the meaning of § 503(b)(3)(D)) in the Debtors' chapter 11 cases by, among other things, (i) engaging in legal, business and other due diligence, negotiation and documentation relating to the DIP Facility, this Agreement and the Equity Commitment Agreement, and (ii) executing and delivering a definitive DIP Credit Agreement, all of which enabled the Parties to pursue the Plan as a superior alternative to the sale of all or a substantial portion of the Debtors' assets pursuant to the previously scheduled auction or otherwise.

(b)     As a result of such substantial contribution and demonstrable value provided by Support Parties to the Debtors' estates and creditors, and in order to induce Support Parties to execute and deliver the DIP Credit Agreement by providing the Support Parties with economic protection against the risk of the Debtors, notwithstanding the terms of this Agreement, pursuing a Competing Transaction (as defined below), the Parties hereby agree that Support Parties shall be entitled, pursuant to §§ 363 and 503(b), to payment of (i) a fee in the aggregate amount of $750,000 (the "Break-Up Fee"), payable

13

pro rata based upon the backstop commitment of each Support Party, plus (ii) reimbursement for all of their reasonable costs and expenses incurred in connection with the transactions contemplated by this Agreement and the DIP Facility (including without limitation, the reasonable fees and expenses of their respective legal counsel, Akin Gump Strauss Hauer & Feld LLP, Pepper Hamilton LLP and Reed Smith LLP, and any other professionals retained by Support Parties) up to a maximum of $200,000 per Support Party (collectively, the "Transaction Expenses"), which Break-Up Fee and Transaction Expenses shall be payable solely in the event the Support Parties are not in material breach of this Agreement and the Debtors (i) consummate a transaction relating to the sale of all or a substantial portion of the Debtors' assets, (ii) confirm a plan of reorganization or liquidation of the Debtors other than pursuant to the Plan or (iii) obtain approval of any new postpetition financing (other than exit financing in connection with the Plan) the proceeds of which are used to repay the DIP Facility (any such transaction other than the transaction contemplated by the Plan, a "Competing Transaction"). For the avoidance of doubt, the right to attorneys' fees under this Agreement is separate and independent of any Party's right (including in their capacity as DIP Lender under the DIP Credit Agreement) to recover attorneys' fees under the DIP Credit Agreement.

(c)  In furtherance of the Debtors' payment obligations in respect of the Break-Up Fee and Transaction Expenses, the Parties agree that the Debtors shall file with the Bankruptcy Court on or before December 6, 2010, and use commercially reasonable efforts to schedule an expedited hearing thereon on or before December 9, 2010, and all Parties agree to use commercially reasonable efforts to support, a motion for the entry of an order (the "Break-Up Fee Approval Order"), in form and substance reasonably satisfactory to the Support Parties, authorizing payment of the Break-Up Fee and the Transaction Expenses in immediately available funds to Support Parties in accordance with the terms and conditions of this Section. The Break-Up Fee Approval Order may be incorporated into the order of the Bankruptcy Court approving the Debtors' execution, delivery and performance of this Agreement and/or the DIP Credit Agreement. Payment of the Break-Up Fee and the Transaction Expenses shall be the Support Parties' sole and exclusive right and remedy relating to any Competing Transaction.

(d)  This Section is without prejudice to the right of any other Party to assert that it is entitled to a substantial contribution payment under § 503(b)(3)(D), and if any such request is made by any such Party (other than the Support Parties pursuant to this Section), all Parties other than such requesting Party reserve their rights to oppose any such request.

(e)  Nothing in this Agreement shall limit any right, power, or protection provided to the Support Parties under the DIP Credit Agreement, including any right to reimbursement of fees and expenses.

IN WITNESS WHEREOF, the Parties have entered into this Agreement as of the date first set forth above.

Point Blank Solutions, Inc.,                          The Official Committee of Unsecured
Point Blank Body Armor, Inc.,                         Creditors
Protective Apparel Corporation of America
PBSS, LLC, as debtors and debtors in
possession


By: _____          By: _____

The Official Committee of Equity Security           Lonestar Capital Management, LLC, as
Holders                                             investment advisor to Lonestar Partners, LP


By: _____          By: _____

Privet Fund Management LLC                          Prescott Group Capital Management


By: _____          By: _____

Privet Opportunity Fund I, LLC


By: _____

**Attachment 1 to Plan Support Agreement**

**Plan Term Sheet**

## CRITICAL ELEMENTS TO BE
## INCLUDED IN A PLAN OF REORGANIZATION

This Plan Term Sheet reflects the terms negotiated in the chapter 11 cases of Point Blank Solutions, Inc., Point Blank Body Armor, Inc., Protective Apparel Corporation of America and PBSS, LLC, (collectively, the "Debtors") by (i) the Debtors, (ii) the Official Committee of Unsecured Creditors (the "Creditors' Committee"), (iii) the Official Committee of Equity Security Holders (the "Equity Committee"), (iv) Lonestar Capital Management, LLC, as investment advisor to Lonestar Partners, LP, or one or more of its affiliates, designees or assignees ("Lonestar"), (v) Prescott Group Capital Management, LLC ("Prescott"), and (vi) Privet Opportunity Fund I, LLC and Privet Fund Management LLC ("Privet", together with Lonestar and Prescott, the "Backstop Group", and, together with the Debtors, Creditors' Committee and the Equity Committee, the "Plan Proponents"), to be implemented through a plan of reorganization (the "Plan") under title 11 of the United States Code (the "Bankruptcy Code").

THIS TERM SHEET DOES NOT CONSTITUTE A SOLICITATION OF VOTES FOR A PLAN OF REORGANIZATION FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR AN OFFER WITH RESPECT TO ANY SECURITIES. SUCH OFFER OR SOLICITATION MAY ONLY BE MADE IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE

### 1. Certain Defined Terms.

The following terms herein are defined terms, and each such term not parenthetically or otherwise defined herein shall have the meaning ascribed to it in that certain Plan Support Agreement, dated as of _____, by and among the Plan Proponents (as amended, the "Plan Support Agreement").

| **Effective Date** | The Effective Date means the day, as determined by the Debtors in consultation with the Creditors' Committee and the Equity Committee and that is acceptable to the Plan Proponents, that is the business day as soon as reasonably practicable after all conditions to the Effective Date in the Plan have been met or waived. The projected date shall be on or before April 15, 2011. |
|---|---|
| **Newco** | Newco means the reorganized debtors or successors to the Debtors pursuant to the Plan. |
| **Exit Facility** | Exit Facility means a senior secured financing facility acceptable to the Backstop Group and expected to be entered into on or prior to the Effective Date by and among Newco and the lenders party thereto, as determined prior to emergence through a |

| | competitive financing process. |
|---|---|
| **Administrative Expense Claim** | Administrative Expense Claim means any claim arising or accruing on or after the Petition Date, which is entitled to priority status pursuant to Sections 503(b) and 507(a)(1) of the Bankruptcy Code, including Court-approved professional fees and expenses. Administrative Expense Claims shall be subject to collars and conditions to the Effective Date in a form and/or amount to be negotiated. |
| **General Unsecured Claim** | General Unsecured Claim means any allowed claim which is not an Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Secured Claim, Subordinated Unsecured Claim or Other Section 510(b) Claim. |
| **Replacement DIP Lenders** | Replacement DIP Lenders means PB Funding, LLC or other affiliate of Lonestar (the "Lonestar Lender") and Privet and Prescott. |
| **Replacement DIP Facility Claim** | Replacement DIP Facility Claim means a claim arising in connection with the $25 million post-petition secured credit facility between the Debtors and the Replacement DIP Lenders ("Replacement DIP Facility"). |
| **Priority Tax Claim** | Priority Tax Claim means claims arising under Bankruptcy Code section 507(a)(8) for priority tax obligations. Priority Tax Claims shall be subject to collars as conditions to the Effective Date in a form and/or amount to be negotiated. |
| **Recovery Trust Reserve** | Recovery Trust Reserve means the sum of $1,000,000 to be placed into the Recovery Trust to be used by the Plan Trust Administrator to prosecute Estate Claims. |
| **Ordinary Course Claim** | Ordinary Course Claim means claims assumed by Newco, in the ordinary course of business, including (i) post-petition accounts payable; (ii) post-petition employee-related expenses and claims; and (iii) post-petition contracts (including capital leases). Ordinary Course Claims shall be subject to collars as conditions to the Effective Date in a form and/or amount to be negotiated. |
| **Other Priority Claim** | Other Priority Claim means claims arising under Bankruptcy Code section 507(a) other than an Administrative Expense Claims or Priority Tax Claims. Other Priority Claims shall be subject to collars as conditions to the Effective Date in a form and/or amount to be negotiated. |
| **Secured Claim** | Secured Claim means (a) that portion of an allowed claim to the |

| | |
|---|---|
| | extent it is equal to the value of the holder's perfected security interest or lien in the Debtors' property securing such allowed claim or (b) an allowed claim for which a valid election is made pursuant to Section 1111(b) of the Bankruptcy Code to have all of it treated as secured. |
| **Subordinated Unsecured Claims** | Subordinated Unsecured Claims means an unsecured claim that is subordinated to General Unsecured Claims. |
| **Other Subordinated Claims and Interests** | Other Subordinated Claims and Interests means claims which are not Subordinated Unsecured Claims and interests that are recharacterized and/or subordinated to the extent permitted by applicable law. |

### 2. Classification and Treatment of Claims and Interests.

| | |
|---|---|
| **Class 1** <br><br> **Administrative Expense Claims (Professionals' and Ordinary Course Claims)** | On the Effective Date (or, if later, on the due date or date of allowance) or as soon thereafter as reasonably practicable, each holder of an allowed Administrative Expense Claim shall receive payment in full in cash of the unpaid portion of such allowed claims. On the Effective Date, Newco shall assume and pay the Ordinary Course Claims in the ordinary course of its business. Administrative Expense Claims and Ordinary Course Claims will be paid in full by the Plan. |
| **Class 2** <br><br> **Replacement DIP Facility Claims** | On the Effective Date, the Replacement DIP Facility will be paid in full or credited against Rights Offering obligations as provided herein. The claims of the Replacement DIP Lenders will be paid in full by the Plan or otherwise credited against Rights Offering obligations as provided herein. |
| **Class 3a** <br><br> **Priority Tax Claims** | At the election of Newco, on the later of the Effective Date or such later dates permitted by Bankruptcy Code section 1129(a)(9)(C)(ii), each holder of an allowed Priority Tax Claim shall receive payment in full in cash or such other treatment as may be agreed to by the holder thereof. Priority Tax Claims will be paid in full by the Plan. |
| **Class 3b** <br><br> **Other Priority Claims** | On the later of the Effective Date and the latest date permitted by the Bankruptcy Code, each holder of Other Priority Claims shall receive payment in full in cash or such other treatment as may be agreed to by the holder thereof. Other Priority Claims are unimpaired and will be paid in full by the Plan. |

| | |
|---|---|
| **Class 4**<br>**Secured Claims** | On the Effective Date, unless reinstated, each holder of an allowed Secured Claim shall receive payment in full in cash of the unpaid portion of such allowed Secured Claim, return of the collateral securing such Claim, or such other treatment as may be agreed to by the holder thereto. Secured Claims are unimpaired and will be paid in full or otherwise satisfied by the Plan. |
| **Class 5**<br>**General Unsecured Claims** | On the Effective Date, each holder of an allowed General Unsecured Claim shall receive (i) an initial distribution of its pro rata share of $3 million (the "GUC Cash"); (ii) the right to elect participation (if eligible and subject to applicable securities and other laws), based on its pro rata share of the $6 Million-Creditor Offering and/or the Increased-Creditor Offering (as described herein); and (iii) its beneficial interest in the Recovery Trust. General Unsecured Claims are impaired and shall be entitled to receive up to 100 percent of their allowed claims (plus 8 percent interest from the Petition Date until paid to the extent permitted by applicable law). |
| **Class 6**<br>**Subordinated Unsecured Claims** | After payment in full to all senior classes (i.e., Class 5), each holder of an allowed Subordinated Unsecured Claim will receive its pro rata share of beneficial interests in the Recovery Trust. Holders of Subordinated Unsecured Claims are impaired by the Plan. |
| **Class 7**<br>**Intercompany Claims of Wholly-Owned Subsidiaries** | Intercompany claims among the Debtors' wholly-owned subsidiaries will be cancelled. Holders of such intercompany claims are impaired and will not receive any distribution under the Plan. |
| **Class 8**<br>**Class Action, Derivative Action Claims** | The holders of allowed Class Action and Derivative Action Claims shall receive either (i) the funds available pursuant to any settlement or litigated result between such claimants and the estate in the rejection motion and pending adversary proceeding or (ii) a pro rata share of the recoveries from the Recovery Trust pari passu with Old Equity Interests. The holders of Class Action and Derivative Action claims are impaired. |

NYC/556707.12

| Class 9<br>**Old Equity Interests** | Old Equity Interests shall be extinguished or otherwise addressed pursuant to the Plan. After payment in full to all senior classes (*i.e.*, Classes 5 and 6), each holder of an allowed Old Equity Interest in the Debtors will receive a pro rata share of any residual allowed recovery in the Recovery Trust pursuant to the treatment as defined in the section "Distribution of Recoveries and Estate Claims and Interests". The record date will be established pursuant to the Plan. Holders of Old Equity Interests are impaired under the Plan. Old Equity Interests shall be extinguished or otherwise addressed pursuant to the Plan. For the avoidance of doubt, claims recharacterized and/or subordinated pursuant to Bankruptcy Code section 510 which are not otherwise Other Subordinated Claims and Interests will be contained and treated in Class 9. |
|---|---|
| **Class 10**<br>**Other Subordinated Claims**<br>**and Interests** | Holders of Other Subordinated Claims and Interests will be subordinated to Class 9 Interests and will receive no recovery under the Plan or from the Recovery Trust. Class 10 Claims or Interests are impaired under the Plan. |

### 3.    Implementation/Sources of Funding and Other Provisions

| **Recovery Trust** | The Recovery Trust will be comprised of (a) the Recovery Trust Reserve of $1,000,000 to be used for trust expenses and administration, (b) the Estate Claims (defined below) and (c) any other assets, recoveries or proceeds excluded under the Plan. The Recovery Trust shall be entitled to borrow from Newco up to $500,000 per year (limited to a $1 million aggregate cap, including accrued interest and charges). |
|---|---|
| | The Recovery Trust will be administered and controlled by a four-member oversight committee (the "Plan Oversight Committee"). The Creditors Committee, in consultation with Lonestar and Newco, shall select a voting administrator (the "Plan Trust Administrator"). The Plan Oversight Committee shall be comprised of four board members with voting rights (i) two chosen by the Creditors' Committee, in consultation with Lonestar and Newco; (ii) one chosen by Newco; and (iii) one chosen by Lonestar. Upon satisfaction in full of the claims in Class 5 (plus 8 percent interest from the Petition Date until paid), and Class 6, the two Creditors' Committee-appointed board members shall resign. The Plan Oversight Committee then shall be comprised of three board members, two chosen by Newco and one chosen by the Equity Committee. The Plan Oversight Committee shall have the right to replace the Plan Trust Administrator. |

NYC/556707.12

| **Estate Claims** | Estate Claims shall be comprised of claims arising under Chapter 5 of the Bankruptcy Code, claims against the Debtors' former and current officers and directors, any rights related to recovery of funds under Class Action/Derivative Action claims, any and all claims to forfeiture proceeds and Sarbanes Oxley 304 proceeds, the Toyobo litigation and all other litigation claims, causes of action, recoveries, and proceeds thereof belonging to the Estates including but not limited to claims and proceeds under insurance policies and contracts related to insurance policies (including, without limitation, the [provide D&O insurance buy-out contract information], dated [    ]), and all tort and other claims (including, without limitation, commercial tort claims), counterclaims, causes of action, choses in action, defenses, rights of offset and setoff and other legal process (each, a "Claim"), including, without limitation, those arising out of (a) *In re DHB Industries, Inc. Class Action Litigation* (No. CV 05-4296) and *In re DHB Industries, Inc. Derivative Litigation* (No. CV 05-4345) in the United States District Court for the Eastern District of New York, (b) the Department of Justice action in the United States District Court for the Eastern District of New York seeking criminal forfeiture of approximately $190 million in assets from David Brooks and Sandra Hatfield (No. 2:06-cr-00550-JS-AKT), (c) the separate suits by the Securities and Exchange Commission against David Brooks (No. 07-cv-61526-CMA) and Dawn M. Schlegel and Sandra L. Hatfield (No. 06-cv-61251-PAS) in the United States District Court for the Southern District of Florida seeking disgorgement of approximately $180 million for the benefit of the Borrower and/or its affiliates under Section 304 of the Sarbanes-Oxley Act, (d) the action brought by Point Blank Solutions Inc. against Robbins Geller Rudman & Dowd LLP, Labaton Sucharow LLP, Law Offices of Thomas G. Amon and Robbins Umeda LLP in the United States Bankruptcy Court for the District of Delaware (No. 10-55361) seeking the turnover of funds, (e) the action brought by Point Blank Solutions, Inc. against Toyobo America, Inc. and Toyobo Co., Ltd. in the United States District Court for the Southern District of Florida (No. 09-61166), (f) any and all claims and causes action and any pending actions including but not limited to claims for indemnity and/or contribution against David Brooks or any other person related to any pending litigation against the Borrower and (g) any other federal or state investigation or lawsuit (whether initiated by the Department of Justice or any other federal, state or local or international authority or agency). |
| --- | --- |

| | |
|---|---|
| **Distribution of Recoveries of Estate Claims and Interests** | Until the holders of Claims in Classes 5 and 6 have been paid in full (including interest with regard to Class 5 to the extent permitted by applicable law), the Recovery Trust and Newco shall share the proceeds of the Estate Claims as follows: 80% to the Recovery Trust and 20% to Newco.<br><br>To the extent there are proceeds from recoveries of the Estate Claims that are available after satisfaction in full of the Claims in Classes 5 and 6 by the Recovery Trust, 70% of the proceeds of the Estate Claims shall be available for distribution to Newco and 30% shall be available for distribution by the Recovery Trust to holders of allowed Class 8 and 9 Interests. |
| **Means for Implementation** | As conditions to confirmation, the Plan will be implemented by (i) a fully funded Rights Offering of at least $15 million and no more than $25 million and, (ii) to the extent available on commercially reasonable terms, an Exit Facility. Newco will take all steps necessary and appropriate to the timely consummation of the Plan to satisfy the requirements of and comply with all statutes, rules and regulations governing its public securities, including without limitation by seeking relief, if appropriate, under Section 1145 of the Bankruptcy Code to the extent applicable to any securities being distributed under the Plan. |

NYC/556707.12

| **Rights Offering to Existing Equity and Creditors, and Backstop Group** | As a condition to confirmation, Newco will sponsor and issue, on the Effective Date, a $15 million rights offering/capital raise (the "Rights Offering") in exchange for 100 percent of the common shares in Newco. In the event that exit financing is unavailable or insufficient, the Rights Offering will increase to a maximum of $25 million, at the discretion of the Backstop Group. |
|---|---|
| | $15 million Rights Offering: The Rights Offering will be split 60/40 such that $9 million will be offered for purchase, pro rata, to current holders of equity interests in the Debtors (other than those found guilty of a felony or whose equity interests are otherwise cancelled or deemed disallowed or subordinated) (the "$9 Million-Equity Offering") and $6 million will be offered for purchase, pro rata, to creditors (the "$6 Million-Creditor Offering"). |
| | $5.85 Million of the $9 Million-Equity Offering will be reserved for eligible current equity interest holders and $3.15 million of the $9 million Equity Offering will be reserved for Prescott and Privet. |
| | Increased-Rights Offering: In the event that exit financing is unavailable or insufficient, the Rights Offering will increase to a maximum of $25 million, but in no event more than such amount, at the discretion of the Backstop Group. Under such circumstances, 60% of the Rights Offering will be reserved for eligible current equity interest holders (the "Increased-Equity Offering") and the remaining 40% of the Rights Offering will be reserved for the creditors (the "Increased-Creditor Offering"). |
| | 65% of the Increased-Equity Offering will be reserved for eligible current equity interest holders and the 35% of the Increased-Equity Offering will be reserved for Prescott and Privet. |
| | In the event that the Rights Offering is not fully subscribed, the Backstop Group will provide the backstopping necessary ($15 million equity backstop from Privet and Prescott and $10 million creditor backstop from PB Funding, LLC). The Backstop Group and Lonestar may utilize any amount/credit available on account of the unpaid portion of the Replacement DIP Facility to purchase the remainder of all outstanding shares. |
| | As noted above, the Rights Offering may, in the discretion of the Backstop Group, range in amount from $15 million to $25 million (but no greater). For the avoidance of doubt, the respective amounts of the Equity Offering (including amounts reserved for Prescott and Privet) and the Creditor Offering, together with any backstop obligation, shall be adjusted in a proportionate/corresponding fashion. |

NYC/556707.12

| | |
|---|---|
| **Post-Confirmation Financing** | The Debtors, in consultation with the other Plan Proponents, shall seek to acquire the Exit Facility and will use commercially reasonable efforts to cooperate with potential exit lenders, including the payment (pursuant to an approved budget and with court approval) of any reasonable diligence/attorneys' fees of such potential exit lenders. |
| **Plan Documentation** | Documentation with respect to the Plan shall be in form and substance satisfactory to the Creditor's Committee, the Equity Committee, Lonestar, Prescott, Privet and the Debtors. |
| **Plan Exculpation and Release** | The Plan shall include a provision, in form and content reasonably satisfactory to Lonestar, Prescott and Privet, releasing and exculpating each of them from any claims, causes of action, liabilities, or damages arising after the petition date and relating to the Debtor; the bankruptcy; the Replacement DIP Facility; the Plan; the disclosure statement; the Rights Offering, the Backstop Commitment Agreement and any related agreements; or the negotiation and consummation of the transactions contemplated by the Replacement DIP Facility, the Plan, the disclosure statement; the Right Offering, the Backstop Commitment Agreement and any related agreements, except for liability arising from willful misconduct, gross negligence or fraud (as determined in a Final Order by a court of competent jurisdiction). |
| | The Plan shall include, in form and content reasonably satisfactory to Lonestar, Prescott, and Privet, a consensual third party release of claims and causes of action held by creditors and equity security holders that vote in favor of the Plan to the extent such claims and causes of action relate to the Debtor; the bankruptcy; the Replacement DIP Facility; the Plan; the disclosure statement; the Right Offering, the Backstop Commitment Agreement and any related agreements; or the negotiation and consummation of the transactions contemplated by the Replacement DIP Facility, the Plan, or the disclosure statement, the Right Offering, the Backstop Commitment Agreement and any related agreements, except for liability arising from willful misconduct, gross negligence or fraud (as determined in a Final Order by a court of competent jurisdiction). |
| | The Plan shall include customary exculpation and release provisions, which shall include a provision, in form and content reasonably satisfactory to the Debtors, the Creditors' Committee, and the Equity Committee releasing and exculpating each of them (and their respective members, officers, directors, employees, representatives and professionals) from any claims, causes of action, liabilities, or damages arising after the petition date and relating to the Debtor; the bankruptcy; the Replacement DIP Facility; the Plan; the disclosure |

NYC/556707.12

|  | statement; the Right Offering, the Backstop Commitment Agreement and any related agreements; or the negotiation and consummation of the transactions contemplated by the Replacement DIP Facility, the Plan, the disclosure statement, the Right Offering, the Backstop Commitment Agreement and any related agreements, except for liability arising from willful misconduct, gross negligence or fraud (as determined in a Final Order by a court of competent jurisdiction). |
|  | The Plan shall include, in form and content reasonably satisfactory to the Debtors, the Creditors' Committee, and the Equity Committee a consensual third party release of claims and causes of action held by creditors and equity security holders that vote in favor of the Plan against such entities (and their respective members, officers, directors, employees, representatives and professionals) to the extent such claims and causes of action relate to the Debtor; the bankruptcy; the Replacement DIP Facility; the Plan; the disclosure statement; the Right Offering, the Backstop Commitment Agreement and any related agreements; or the negotiation and consummation of the transactions contemplated by the Replacement DIP Facility, the Plan, the disclosure statement, the Right Offering, the Backstop Commitment Agreement and any related agreements, except for liability arising from willful misconduct, gross negligence or fraud (as determined in a Final Order by a court of competent jurisdiction). |
|  | All persons or entities shall be enjoined from filing or otherwise asserting any claim or cause of action that is the subject of a release or exculpation under the Plan. |
| **Corporate Governance** (charter, including significant/major shareholder rights) | Terms to be agreed upon by Backstop Group. |
| **Registration Rights Agreement** | Terms to be agreed upon by Backstop Group with review by Equity Committee. |
| **Backstop Commitment Agreement** | Terms, including market backstop fee, to be agreed upon by Backstop Group. |
| **Management and Board** | Terms to be agreed upon by Backstop Group. |

NYC/556707.12