# EXHIBIT C

{00003447. }

Point Blank Solutions, Inc.
Protective Apparel Corporation of America
Point Blank Body Armor, Inc.
PBSS, LLC
2102 SW 2nd Street
Pompano Beach, Florida 33069

      Re:    Debtor-in-Possession Financing Agreement

Ladies and Gentlemen:

This letter (the "Agreement") sets forth the definitive agreement for the provision of debtor-in-possession financing by PB Funding, LLC ("Lonestar"), Privet Opportunity Fund I, LLC ("Privet") and Prescott Group Capital Management ("Prescott" and, together with Lonestar and Privet, the "Lenders" or, if appropriate in the context, each, a "Lender") to Point Blank Solutions, Inc., Protective Apparel Corporation of America, Point Blank Body Armor, Inc., and PBSS, LLC, each as a debtor and debtor-in-possession (collectively, the "Borrower" or "Borrowers" or, if appropriate in the context, each, a "Borrower") in a case under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases (collectively, the "Case" or, if appropriate in the context, each, a "Case") were filed on April 14, 2010 (the "Petition Date"). The terms and conditions of the debtor-in-possession financing are as follows:

| | |
|---|---|
| Credit Facility: | Subject to the terms and conditions hereof, each Lender agrees to make a term loan (the "Loans") to the Borrower on December 13, 2010 (the "Closing Date"), in an aggregate outstanding principal amount equal to the amount set forth opposite such Lender's name in Schedule 1 hereto (the "Commitment"). The obligations of each Lender under this Agreement shall be several and not joint. A Loan may, at the option of each Lender, be evidenced by a term note in form and substance satisfactory to all Lenders (the "Note") and, upon the request of such Lender, upon reasonable notice after the Closing Date, the Borrower shall execute and deliver the Note to such Lender. No Notes shall be delivered on the Closing Date. Loans, or any portion thereof, repaid or prepaid hereunder may not be reborrowed. |
| Interest: | Loans shall bear interest at the Prime Rate plus 11.00% per annum. After the occurrence and during the continuance of an Event of Default, the Loans and all other Obligations that are not paid when due shall bear interest at the Prime Rate plus 13.20% per annum. Interest on the Loans (and, to the extent applicable, the other Obligations) will be calculated on the basis of actual days elapsed over a year of 360 days. Interest shall be due and payable in arrears by the Borrower monthly on the first Business Day of each month, at the time of any optional or mandatory prepayment, and on the Termination Date (except that, after the |

occurrence and during the continuance of an Event of Default, interest shall, at the option of each Lender, be payable on demand).

| | |
|---|---|
| Arrangement Fee: | Upon the execution of this Agreement by the Borrower and each Lender, the Borrower shall pay in cash an arrangement fee to (a) Lonestar, in an amount equal to $175,000, (b) Privet, in an amount equal to $131,250, and (c) Prescott, in an amount equal to $131,250. The arrangement fee shall be fully earned upon payment and shall not be subject to refund or rebate under any circumstances. |
| Funding Fee: | Upon the funding of the Loans by the Lenders, the Borrower also shall pay to each Lender in cash a funding fee in an amount equal to 1.75% of such Loan funded by such Lender. |
| Termination Date: | All obligations under this Agreement, accrued or otherwise, shall be due and payable in cash and in full, on the earliest of (such date, the "Termination Date") (a) June 15, 2011; (b) the occurrence of an Event of Default and the acceleration of the time for payment of the Obligations by the Required Lenders; (c) the closing date of a sale of all or substantially all of the Borrower's assets under Section 363 of the Bankruptcy Code or otherwise; or (d) the effective date of a confirmed Plan of Reorganization. |
| Termination Fee: | Upon the Termination Date (whether by virtue of the consummation of a 363 sale, a Plan of Reorganization, maturity, acceleration of the time for payment of the Obligations or otherwise), the Borrower shall pay to each Lender a termination fee in cash equal to 1.75% of the aggregate outstanding amount of the Loan made by such Lender. Without duplication of the foregoing, upon any prepayment (mandatory or otherwise) or other repayment of the Loans, the Borrower shall pay to each Lender a termination fee in cash equal to 1.75% of the amount of the Loan made by such Lender that was repaid. The termination fee shall be fully earned on the Closing Date, but payable on the Termination Date and each such repayment date, and shall not be subject to refund or rebate under any circumstances. |
| Repayment and Prepayment of Loans: | (a)     The Borrower shall have the right at any time and from time to time to prepay outstanding Loans in whole or in part. Any prepayment (whether optional or mandatory) shall be accompanied by, and subject to payment of, the Termination Fee to the Lenders. |
| | (b)     All payments and prepayments (mandatory or otherwise) and all proceeds of any exercise of rights with respect to collateral shall be applied to the outstanding principal amount of the Loans and all other Obligations proportionately based on each Lender's Pro Rata Share. |
| | (c)     On the Termination Date, the credit facility provided hereunder |

2

shall terminate and the Borrower shall pay, in full and in cash, all outstanding Loans and all other outstanding Obligations, including the Termination Fee.

Mandatory Prepayment of Loans:

(a)     No later than the Business Day following the date of receipt by the Borrower of cash proceeds of any asset disposition, other than a sale of inventory for fair market value in the ordinary course of business and consistent with past practice, the Borrower shall prepay the Loans in an amount equal to all such proceeds, net of (A) reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by the Borrower in connection therewith (in each case, paid to non-affiliates), (B) transfer taxes actually paid or required to be accrued in accordance with GAAP and (C) an appropriate reserve for income taxes in accordance with GAAP in connection therewith.

(b)     If the Borrower incurs any indebtedness for borrowed money (other than ordinary course of business incurrences of trade credit and lease credit, in each case consistent with past practice), or issues any debt securities, no later than the Business Day following the date of receipt of the proceeds thereof, the Borrower shall prepay the Loans in cash in an amount equal to all such proceeds, net of underwriting discounts and other reasonable costs paid to non-affiliates in connection therewith.

(c)     If the Borrower issues any stock (other than stock issued in connection with a management compensation program, employee stock program or similar transaction or program consistent with prior programs), no later than the Business Day following the date of receipt of the proceeds thereof, the Borrower shall prepay the Loans in cash in an amount equal to all such proceeds, net of underwriting discounts and other reasonable costs paid to non-affiliates in connection therewith.

(d)     The preceding three paragraphs, (a) through (c), do not constitute consent to the consummation of any of the types of transactions described therein not permitted by the other terms of this Agreement.

(e)     The Loans shall also be prepaid as specified below under "Cash Management."

Cash Management:

(a)     On or before 15 Business Days following the Closing Date, unless such deadline has been extended with the consent of the Required Lenders, the Borrower shall enter into account control agreements in form and on commercially reasonably terms acceptable to the Required Lenders with respect to the existing debtor-in-possession collection account (the "<u>Collection Account</u>") and the debtor-in-possession operating account (the "<u>Operating Account</u>") of the Borrower. The

3

Borrower shall not maintain any other deposit or securities accounts without the prior written consent of the Required Lenders.

(b)     The Borrower shall cause all of its cash receipts to be deposited into the Collection Account on each Business Day. The Borrower may make disbursements from the Collection Account in accordance with the Approved Budget.

(c)     On each Business Day on which the then aggregate collected balance of the Collection Account and Operating Account (net of fees charged, and of such impressed balances as may be required by the depository at which such accounts are maintained) exceeds $35 million (the "Cash Threshold"), the Borrower shall pay such balance in excess of the Cash Threshold as a mandatory prepayment to reduce the outstanding principal balance of the Obligations.

General Loan Provisions:

(a)     After the end of any month, each Lender shall send to the Borrower a statement accounting for the charges, and other transactions occurring among and between such Lender and the Borrower during that month. The monthly statements shall, absent manifest error, and otherwise subject to this Agreement, be an account stated, which is final, conclusive and binding on the Borrower. Failure or delay by a Lender in delivering such statement shall in no way adversely affect such Lender or its rights hereunder (except to the extent of any corresponding delay in payment of expense reimbursements by the Borrower).

(b)     The Borrower shall make each payment required to be made hereunder or under any other Loan Document (whether of principal, interest, fees or otherwise) prior to 2:00 p.m., Eastern time, on the date when due, in immediately available funds, without setoff, reduction, defense, or counterclaim. Any amounts received after such time on any date may, in the discretion of the receiving Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.

(c)     Any and all payments by or on account of any Obligation shall be made free and clear of and without deduction for any taxes; provided, however, that if the Borrower shall be required to deduct, or a Lender shall be required to remit, any taxes from such payments, then (i) the sum payable to such Lender shall be increased as necessary so that after making all required deductions or remittances for taxes (including deductions applicable to additional sums payable under this Section) such Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant governmental authority in accordance with applicable law.

4

(d)     As long as any Obligations shall be outstanding, the Borrower hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any lien of equal or greater priority than the liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations other than as expressly set forth in the Interim Borrowing Order or the Final Borrowing Order.

Security:

Subject to the entry of the Interim Borrowing Order, the Obligations are secured by, and each Borrower hereby grants to each Lender, proportionately based on its Pro Rata Share, a first priority perfected security interest and lien (subject to no existing or future security interests or liens other than as specified in this paragraph or as listed on Schedule 3 hereto; such specified and listed liens, collectively, the "Permitted Liens") on all assets of such Borrower, including, without limitation, all inventory, accounts, equipment, deposit accounts (including the Collection Account, the Operating Account and the segregated account into which the Professional Fee Carve Out may be funded but subject to the payment of the Professional Fee Carve Out), general intangibles (including all rights to receive distributions from escrow accounts (including without limitation, the escrow account created under the Escrow Agreement, dated July 26, 2006, between DHB Industries, Inc. and the other settling defendants, RS Holdings and the other lead plaintiffs, and Lerach Coughlin Stola Geller Rudman & Robbins LLP, which was attached and incorporated fully into the Stipulation and Agreement of Settlement between the parties in *In re DHB Industries, Inc. Class Action Litigation* (No. CV 05-4296) and *In re DHB Industries, Inc. Derivative Litigation* (No. CV 05-4345), dated November 30, 2006), all patents, trademarks, copyrights and other intellectual property), chattel paper, goods, investment property, cash (whether or not constituting proceeds of collateral, and including the unused portion of any pre-petition retainers paid by the Borrower to its professionals and returned to Borrower according to the terms of each professional's engagement), proceeds of leasehold interests, insurance policies (including, without limitation, the insurance policies listed on Schedule 4 hereto), proceeds under insurance policies and contracts related to insurance policies (including, without limitation, the Release, Indemnity and Settlement Agreement, dated July 26, 2006, and entered into by National Union Fire Insurance Co. of Pittsburgh, Pa., XL Specialty Insurance Co., DHB Industries, Inc., David H. Brooks, Sandra Hatfield, Dawn M. Schlegel, Larry Elis, Barry Berkman, Cary Chasin, Jerome Krantz, and Gary Nadelman), and all tort and other claims (including, without limitation, commercial tort claims), counterclaims, causes of action, choses in action, defenses, rights of offset and setoff and other legal process (each, a "Claim"), including, without limitation, those arising out of (a) *In re DHB Industries, Inc. Class Action Litigation* (No. CV 05-4296) and *In re DHB Industries, Inc. Derivative*

5

*Litigation* (No. CV 05-4345) in the United States District Court for the Eastern District of New York, (b) the Department of Justice action in the United States District Court for the Eastern District of New York seeking criminal forfeiture of approximately $190 million in assets from David Brooks and Sandra Hatfield (No. 2:06-cr-00550-JS-AKT), (c) the separate suits by the Securities and Exchange Commission against David Brooks (No. 07-cv-61526-CMA) and Dawn M. Schlegel and Sandra L. Hatfield (No. 06-cv-61251-PAS) in the United States District Court for the Southern District of Florida seeking disgorgement of approximately $180 million for the benefit of the Borrower and/or its affiliates under Section 304 of the Sarbanes-Oxley Act, (d) the action brought by Point Blank Solutions Inc. against Robbins Geller Rudman & Dowd LLP, Labaton Sucharow LLP, Law Offices of Thomas G. Amon and Robbins Umeda LLP in the United States Bankruptcy Court for the District of Delaware (No. 10-55361) seeking the turnover of funds, (e) the action brought by Point Blank Solutions, Inc. against Toyobo America, Inc. and Toyobo Co., Ltd. in the United States District Court for the Southern District of Florida (No. 09-61166), (f) any action for indemnity and/or contribution against David Brooks or any other person related to any pending litigation against the Borrower and (g) any other federal or state investigation or lawsuit (whether initiated by the Department of Justice or any other federal or state authority or agency). Notwithstanding the foregoing, the collateral shall not include any policy of insurance to the extent that, and for so long as (1) the grant of a lien on such policy would result in such policy terminating or being terminated pursuant to the terms thereof and (2) such Borrower has made commercially reasonable efforts to obtain consent from the issuer of such policy to the grant of such lien and has failed. In addition, the Obligations shall constitute a super-priority administrative claim under Section 507(b) of the Bankruptcy Code having priority over all other administrative claims, including, without limitation, those specified in Bankruptcy Code Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, and 1114. For the avoidance of doubt, but subject to the Professional Fee Carve Out, the Obligations will be secured by, and the super-priority administrative claim shall extend to, all claims and causes of action arising under chapter 5 of the Bankruptcy Code (including all proceeds thereof, the "Avoidance Actions"); provided, however, that the foregoing liens and claims shall not extend to fifty percent (50%) of the proceeds of Avoidance Actions (except in the case of Avoidance Actions arising under § 549, in which case the liens and claims shall extend to one hundred percent (100%) of such proceeds), in each case net of reasonable fees and expenses (including professionals' fees) incurred in connection with the litigation and recovery of such proceeds.

Each Lender may, but no Lender is required to, file any financing statement or other document to perfect the security interest granted to

6

such Lender hereunder.

Representations:   Each Borrower hereby represents and warrants as follows:

(a)   Each Borrower is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to own its property and assets and to carry on its business as now conducted and to execute and deliver and perform all its obligations under all Loan Documents.   Each Borrower is qualified to do business in, and is in good standing in, every jurisdiction in which the nature of its business or ownership or leasing of properties makes such qualification necessary.

(b)   The transactions contemplated hereby and by the other Loan Documents to be entered into by the Borrower are within the Borrower's corporate powers and, upon the entry of the Interim Borrowing Order, have been duly authorized by all necessary corporate, membership, partnership or other necessary action.  This Agreement has been duly executed and delivered by the Borrower and upon the entry of the Interim Borrowing Order constitutes, and each other Loan Document, when executed and delivered by the Borrower will constitute, a legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms.

(c)   Subject to the entry of the Interim Borrowing Order and payment in full of the Existing DIP (as defined below), the transactions to be entered into and contemplated by the Loan Documents (i) do not require any consent or approval of, registration or filing with, or any other action by, any governmental authority, except for such as have been obtained or made and are in full force and effect, (ii) will not violate any applicable law, (iii) will not violate or result in a default under any indenture or any other agreement, instrument or other evidence of any material indebtedness or any other material contract, and (iv) will not result in the creation or imposition of any lien on any asset of the Borrower, except liens in favor of the Lenders.

(d)   None of the reports, financial statements, certificates or other information (other than any projections, pro formas, budgets and general market information) concerning the Borrower furnished by or at the direction of the Borrower to any Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder when taken as a whole, contains, as of the date of this Agreement (or in the case of information delivered after the date hereof, as of the date furnished), any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading.   The projections and pro forma financial

7

information (including, but not limited to, the Approved Budget) concerning the Borrower furnished by or at the direction of the Borrower to the Lenders are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, it being recognized that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected amounts.

(e)     The Interim Borrowing Order (with respect to the period prior to entry of the Final Borrowing Order) or the Final Borrowing Order (with respect to the period on and after entry of the Final Borrowing Order), as the case may be, and the transactions contemplated hereby and thereby, are in full force and effect and have not been vacated, reversed, modified, amended or stayed without the prior written consent of the Required Lenders.

(f)     The Borrower has a preexisting business relationship with the Lenders, and the Borrower, by reason of the Borrower's own business and financial experience, has the capacity to protect the Borrower's own interests in connection with the transactions contemplated by this Agreement.

Covenants:                Unless otherwise consented to by the Required Lenders:

(a)     The Borrower will furnish to each Lender: (i) within thirty (30) days after the end of each month, the balance sheet and related statements of operations, stockholders' equity and cash flows of the Borrower, as of the end of and for such month and the elapsed portion of the fiscal year and the figures set forth in the Approved Budget, all certified by the Borrower's chief financial officer or controller (or other officer) as presenting in all material respects the financial condition and results of operations of the Borrower in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes; (ii) on Tuesday of each week (or, if Tuesday is not a Business Day, on the next succeeding Business Day), an updated rolling thirteen (13) week cash flow projection (a "Proposed Budget"), together with a Variance Report, and (iii) such other information, including, without limitation, financial and collateral reports, as any Lender may reasonably request from time to time. Upon receipt by the Borrower of written approval from (x) each Lender with respect to the initial Proposed Budget or (y) the Required Lenders with respect to each subsequent Proposed Budget, the Proposed Budget shall become the Approved Budget. If the Required Lenders fail to provide a written approval or rejection to the Borrower within 5 days of the delivery (which may be by electronic mail) of the Proposed Budget, the Borrower shall use commercially reasonable efforts to contact each non-

8

responsive Lender to seek approval of the Proposed Budget. If the Required Lenders fail to provide a written approval or rejection within 10 days after the Proposed Budget was delivered, the Proposed Budget shall be deemed to be approved by the Required Lenders. Unless each Lender provides written notice to the Borrower that such Lender has approved the Proposed Budget (or such Proposed Budget is otherwise deemed approved by the procedures under the preceding two sentences), the most recent Approved Budget shall remain in effect until such time as a new Proposed Budget has been approved by the Required Lenders.

(b)     The Borrower shall maintain insurance with financially sound and reputable insurers acceptable to the Required Lenders on such of its property and in at least such amounts and against at least such risks as the Required Lenders may require in their sole discretion, including casualty insurance, public liability insurance and such other insurance as may be required by law. On or before thirty (30) days following the Closing Date, the Borrower shall cause to be furnished to each Lender endorsements to such policies naming the Lenders, according to their Pro Rata Shares, as loss payee or additional insured (as the Required Lenders may require), which endorsements shall include (i) a provision that the insurer shall pay all proceeds otherwise payable to the Borrower under the policies directly to the Lenders, and (ii) a provision to the effect that neither the Borrower, the Lenders nor any other party shall be a co-insurer. The Borrower shall not sell, assign or otherwise transfer any insurance policy or any right to proceeds thereof except in connection with a sale of assets permitted under paragraph (j) below.

(c)     The Borrower will from time to time upon the request of any Lender, (i) permit such Lender or professionals (including consultants, accountants, lawyers and appraisers) retained by such Lender upon reasonable prior notice and during normal business hours, to conduct appraisals and commercial finance examinations and (ii) participate in conference calls with the Lenders (which conference calls may, if requested by any Lender, be weekly) and not unreasonably frequent meetings with the Lenders (which meetings shall be scheduled upon reasonable prior notice), in each case to review and discuss the then-pending Proposed Budget and other matters pertaining to the business, operations, properties, assets, condition (financial or otherwise) or prospects of the Borrower. The Borrower shall pay all reasonable out-of-pocket fees and expenses of any such Lender or such professionals with respect to such evaluations and appraisals.

(d)     The proceeds of Loans made hereunder will be used only (a) to repay up to the principal amount of $20,000,000 on account of the senior secured revolving credit facility as set forth in the debtor-in-possession financing letter agreement, dated as of April 16, 2010 (as amended by that certain Waiver and First Amendment to Credit

9

Agreement, dated as of September 1, 2010, and as further amended by that certain Waiver, Consent and Second Amendment to Credit Agreement, dated as of October 26, 2010), among Steel Partners II, L.P., as the lender, and the Borrower (the "Existing DIP"), plus, interest, fees, expense reimbursements and other obligations owing thereunder not in excess of $7,500,000 in the aggregate, (b) to finance the acquisition of working capital assets of the Borrower in the ordinary course of business and in accordance with the Approved Budget, (c) to finance capital expenditures of the Borrower, in accordance with the Approved Budget, (d) to pay fees and expenses in connection with the transactions contemplated hereby or otherwise in connection with the Case whether incurred before or after the Closing Date, (e) for other payments explicitly permitted to be made by the DIP Orders and, to the extent permitted by the Approved Budget, any other order of the Bankruptcy Court, and (f) for general corporate purposes, in each case to the extent expressly permitted under applicable law, the Loan Documents, the DIP Orders and in accordance with the Approved Budget. No part of the proceeds of any Loan will be used, whether directly or indirectly: (i) to finance in any way any Claim, action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of any Lender or any of its affiliates, officers, directors, employees or attorneys (in each case, whether in its capacity as such or otherwise) or their rights and remedies under this Agreement, the other Loan Documents, any of the DIP Orders, or any other matter, whether or not related to or arising out of the Case, including, without limitation, for the payment of any services rendered by the professionals retained by the Borrower, the Creditors' Committee or the Equity Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or the liens securing same, (y) for monetary, injunctive or other affirmative relief against any Lender or any of its affiliates, officers, directors, employees or attorneys or their collateral, or (z) preventing, hindering or otherwise delaying the exercise by the Lenders of any rights and remedies under any of the DIP Orders, the Loan Documents or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the court or otherwise) by the Lenders upon any of the collateral; (ii) to make any distribution under a Plan of Reorganization in the Case; (iii) unless otherwise approved by the Bankruptcy Court, to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the Required Lenders; and (iv) for any purpose that entails a violation of any of the regulations of the Federal Reserve Board, including

10

Regulations U and X.

(e) The Borrower will execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, compliance with any federal and/or state Assignment of Claims Act, and other documents), that may be required under any applicable law, or which any Lender may request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the liens created or intended to be created by the Loan Documents or the validity or priority of any such Lien, all at the expense of the Borrower.

(f) The Borrower has engaged CRG Partners Group LLC ("CRG") as an independent consultant. Until such time as all Obligations have been repaid in full and this Agreement has been terminated, the Borrower shall continue to retain CRG to assist the Borrower with preparation of the Approved Budget and the other financial and collateral reporting required to be delivered to the Lenders pursuant to this Agreement. The Borrower authorizes each Lender to communicate directly with its independent certified public accountants, appraisers, financial advisors, investment bankers and consultants and authorizes and shall instruct those accountants, appraisers, financial advisors, investment bankers and consultants to provide reasonable assistance and information to the Lenders relating to the Borrower with respect to the business, results of operations, prospects and financial condition of the Borrower.

(g) The Borrower shall not use Loans to pay any item not contained in the Approved Budget, and shall strictly perform in accordance with the Approved Budget, subject to the following: commencing on the third Wednesday to occur on or after the Closing Date and each Wednesday thereafter, for the four (4) week period ended the previous Friday, (i) the Borrower's actual "Total Receipts" (labeled as such in the Approved Budget) for the four (4) week period then most recently ended shall not be less than 90% of the cumulative projected amounts for such period as set forth in the Approved Budget, (ii) the Borrower's actual "Total Disbursements" (labeled as such in the Approved Budget) for the four-week period then most recently ended shall not be more than 110% of the cumulative projected amounts of such disbursements for such period as set forth in the Approved Budget, and (iii) the Borrower's actual "Net Cash Flow" (labeled as such in the Approved Budget) for the four (4) week period then most recently ended shall not be less than 90% of the projected amounts for such period as set forth in the Approved Budget. The foregoing shall be tested each applicable week pursuant to the Variance Report delivered by the Borrower to each Lender on Wednesday of each week for the immediately preceding initial four (4)

week period and subsequent four (4) week periods; provided, however, if any of the Borrower's actual Total Receipts, Total Disbursements or Net Cash Flow fail to satisfy the required percentages of the projected amounts listed above, the Borrower shall not be in breach of the above requirements until the failure of such test again on the following Wednesday as calculated for the immediately preceding six (6) week period.

(h)     The Borrower will not seek or consent to any of the following: (i) any order which authorizes the rejection of any leases or material contracts of the Borrower without the Required Lenders' prior written consent (other than with respect to those leases and material contracts specified on Schedule 2 hereto); (ii) any modification, stay, vacation or amendment to the DIP Orders to which the Required Lenders have not consented in writing; (iii) a priority claim or administrative expense against Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Lenders in respect of the Obligations, except with respect to the Professional Fee Carve Out; (iv) any Lien on any of its assets, other than with respect to the Professional Fee Carve Out and the liens permitted by the DIP Orders; (v) any order which authorizes the payment of any indebtedness for money borrowed or other pre-petition claims other than indebtedness as contained in the Approved Budget or as the Required Lenders may agree in writing; or (vi) any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

(i)     The Borrower shall not have any indebtedness for money borrowed other than (i) the Obligations and (ii) ordinary course of business incurrences of trade credit and lease credit, in each case consistent with past practice. The Borrower shall not have any lien or security interest on its assets or property other than as described above under the heading "Security."

(j)     The Borrower shall not: (i) pay any dividend or make any other distribution in respect of any equity; (ii) invest in or purchase any stock or securities or rights to purchase any such stock or securities, of any Person; (iii) sell (pursuant to Section 363 of the Bankruptcy Code or otherwise), assign, transfer or otherwise dispose of, any assets other than (A) sales of inventory for fair market value in the ordinary course of business and consistent with past practice, (B) dispositions of assets having a value not in excess of $100,000 and (C) dispositions approved by the Required Lenders; (iv) acquire any assets except as provided in

the Approved Budget; (v) settle matters relating to any Claims or potential Claims of the Borrower without consent of the Required Lenders, including, without limitation, in the matters of (A) *In re DHB Industries, Inc. Class Action Litigation* (No. CV 05-4296) and *In re DHB Industries, Inc. Derivative Litigation* (No. CV 05-4345) in the United States District Court for the Eastern District of New York, (B) the Department of Justice action in the United States District Court for the Eastern District of New York seeking criminal forfeiture of approximately $190 million in assets from David Brooks and Sandra Hatfield (No. 2:06-cr-00550-JS-AKT), (C) the separate suits by the Securities and Exchange Commission against David Brooks (No. 07-cv-61526-CMA) and Dawn M. Schlegel and Sandra L. Hatfield (No. 06-cv-61251-PAS) in the United States District Court for the Southern District of Florida seeking disgorgement of approximately $180 million for the benefit of the Borrower and/or its affiliates under Section 304 of the Sarbanes-Oxley Act, (D) the action brought by Point Blank Solutions Inc. against Robbins Geller Rudman & Dowd LLP, Labaton Sucharow LLP, Law Offices of Thomas G. Amon, and Robbins Umeda LLP in the United States Bankruptcy Court for the District of Delaware (No. 10-55361) seeking the turnover of funds, (E) the action brought by Point Blank Solutions, Inc. against Toyobo America, Inc. and Toyobo Co., Ltd. in the United States District Court for the Southern District of Florida (No. 09-61166) and (F) any action for indemnity and/or contribution against David Brooks or any other person related to any pending litigation against the Borrower.

(k)     Until entry of the confirmation order approving the Plan of Reorganization, the Borrower shall (i) comply in all material respects with the terms of the Plan Support Agreement and (ii) not take any action that would create a Termination Event under, and as defined in, the Plan Support Agreement. The Borrower shall use commercially reasonable efforts during the pendency of the Case (x) to obtain Bankruptcy Court approval of the Interim Borrowing Order on or prior to December 10, 2010 and the Final Borrowing Order on or prior to January 5, 2011 and (y) obtain Bankruptcy Court approval of, and/or confirmation of, and/or consummate, as the case may be, the Plan of Reorganization and related Disclosure Statement.

| | |
|---|---|
| Events of Default: | The following shall constitute Events of Default under this Agreement: |

(a)     the Borrower shall fail to pay any principal of any Loan or any interest, fees, expense reimbursements, or other Obligations or amounts under the Loan Documents when and as the same shall become due and payable;

(b)     any representation or warranty made by the Borrower in any Loan Document or any amendment or modification thereof or waiver

13

thereunder, or in any report, certificate, document or financial statement furnished pursuant to any Loan Document shall prove to have been incorrect in any material respect when made or deemed made;

(c)     the Borrower shall fail to observe or perform when due (i) any covenant set forth in clause (k) of "Covenants" above for 60 days or (ii) any other covenant, condition or agreement contained in any Loan Document, including, without limitation, any DIP Order;

(d)     a Change in Control shall occur;

(e)     any challenge by or on behalf of any Person (including, without limitation, the Borrower, the Creditors' Committee, the Equity Committee or a trustee) to the validity of any Loan Document or the enforceability of any Loan Document strictly in accordance with the subject Loan Document's terms or which seeks to void, avoid, limit, or otherwise adversely affect any security interest created by or in any Loan Document or any payment made pursuant thereto;

(f)     any lien purported to be created under any Loan Document shall cease to be, or shall be asserted by the Borrower or any other Person not to be, a valid and perfected lien on any material item of collateral, with the priority required by the applicable Loan Document;

(g)     the entry of an order in any Case that stays, modifies (in any manner adverse to any Lender), or reverses any DIP Order or which otherwise materially adversely affects, as determined by the Required Lenders in their reasonable discretion, the effectiveness of any DIP Order without the express written consent of the Required Lenders;

(h)     either (i) the appointment in any Case of a trustee or of any examiner having expanded powers to operate all or any part of the Borrower's business, or (ii) the conversion of any Case to a case under chapter 7 of the Bankruptcy Code;

(i)     the failure of the Bankruptcy Court to enter a Final Borrowing Order, in form and substance satisfactory to the Required Lenders, on or prior to January 5, 2011;

(j)     the entry of any order providing relief from the automatic stay otherwise imposed by Section 362 of the Bankruptcy Code that permits any creditor to (i) realize upon, or to exercise any right or remedy with respect to, any collateral in excess of $100,000 in the aggregate during the term of this Agreement, or (ii) to terminate any license, franchise, or other material agreement;

(k)     the filing of any application by the Borrower without the express prior written consent of each Lender for the approval of any super-

14

priority claim in the Case which is pari passu with or senior to the priority of the claims of such Lender for the Obligations, or there shall arise any such super-priority claim under the Bankruptcy Code (other than the Professional Fee Carve Out); provided, however, if such application would result in the indefeasible repayment in full in cash of all Obligations to each Lender, such consent shall not be required;

(1)  the entry of any order in the Case which provides adequate protection, or the granting by the Borrower of similar relief in favor of any one or more of a Borrower's pre-petition creditors, contrary to the terms and conditions of any DIP Order or the terms hereof;

(m)  the filing of (i) any sale motion under Section 363 of the Bankruptcy Code or (ii) any chapter 11 plan of reorganization or accompanying disclosure statement in the Case, that in either case (x) is not consented to by the Required Lenders (unless such sale or chapter 11 plan of reorganization would result in the indefeasible repayment in full in cash of all the Obligations to each Lender) or (y) purports to prohibit or restrict any Lender's right to credit bid its Pro Rata Share of the Loans and other outstanding Obligations; or

(n) the passage of 60 days after the earlier of (i) the Plan Support Agreement shall be terminated by any party thereto or shall otherwise cease to be in full force and effect, or shall have been amended, supplemented or otherwise modified in any manner that in the good faith judgment of the Required Lenders adversely affects the interests, rights or remedies of the Lenders, and (ii) any party to the Plan Support Agreement shall have breached the Plan Support Agreement in any manner that in the good faith judgment of the Required Lenders adversely affects the interests, rights or remedies of the Lenders.

Remedies on Default:  Upon the occurrence of any Event of Default, and at any time thereafter during the continuance of such event, the Required Lenders may, subject to the terms of the DIP Orders, take any or all of the following actions, at the same or different times: (i) declare the Obligations then outstanding to be due and payable in whole, and thereupon the principal of the Loans and all other Obligations so declared to be due and payable, together with accrued interest thereon and all fees and other obligations accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Lenders or (ii) exercise such other rights and remedies as provided in the DIP Orders or as permitted under applicable law.  In lieu of the exercise by the Lenders of any or all of their rights and remedies after the occurrence and during the continuance of an Event of Default, the Required Lenders may, by written notice to the Borrower require the Borrower to file a motion seeking to establish bidding procedures for, and to pursue, the sale or any or all of the

15

Borrower's assets on terms acceptable to the Required Lenders. The Borrower shall file such motion within ten (10) Business Days of the Required Lenders' request and shall diligently prosecute such motion. If the Borrower fails to so file or diligently pursue the motion, a Lender may file a motion requesting authority to file and prosecute such a motion in the name of the Borrower. If the Required Lenders elect to exercise rights or remedies with respect to the collateral, they shall so notify all Lenders. The manner and timing of exercise of such rights or remedies shall be determined by the Required Lenders.

Credit Bidding: At any sale under Section 363 or 1129 of the Bankruptcy Code, each Lender shall have the right to credit bid its Loan and its Pro Rata Share of all other outstanding Obligations.

Conditions Precedent: No Lender shall have an obligation to make any Loan to the Borrower unless and until each of the following conditions are fulfilled to the satisfaction of each Lender in its sole discretion:

(a) Each Lender shall have received from each party a counterpart of this Agreement and all other Loan Documents signed on behalf of such party.

(b) The Interim Borrowing Order shall have been entered, shall be in full force and effect, and shall not have been reversed, vacated or stayed, or modified without the prior written consent of the Lender, and all other necessary consents and approvals to the transactions contemplated hereby shall have been obtained and shall be satisfactory to each Lender in its sole discretion.

(c) Each Lender shall have received the initial Proposed Budget, which shall be in form and substance satisfactory to such Lender.

(d) All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the approval of this Agreement (including, without limitation, the DIP Orders) and concerning other matters related hereto shall be in form and substance satisfactory to such Lender in its sole discretion.

(e) There shall not be pending any litigation or other proceeding that has not been stayed under Section 362 of the Bankruptcy Code, the result of which could reasonably be expected to have a material adverse effect on the business, financial condition or prospects of the Borrower or the validity or enforceability of the rights of the Lender hereunder and under the other Loan Documents, excluding any pending litigation under the federal False Claims Act or similar applicable state statutes.

(f) After giving effect to the consummation of the transactions contemplated under this Agreement and the other Loan Documents on

16

the Closing Date, no Default or Event of Default shall exist.

(g)     Each Lender shall have received results of searches or other evidence satisfactory to such Lender in its sole discretion indicating the absence of liens on the assets of the Borrower other than as permitted under the paragraph above entitled "Security."

(h)     The Lenders shall have received releases satisfactory to each Lender in its sole discretion with respect to the liens on the assets of the Borrower held by Steel Partners II, L.P., Bank of America, N.A. and E. I. du Pont de Nemours and Company, and termination statements with respect to Steel Partners II, L.P. and E. I. du Pont de Nemours and Company.

(i)     Each Lender shall have received and be satisfied with evidence of the Borrower's insurance as are required by the Loan Documents.

(j)     Each Lender shall have received a certificate, satisfactory in form and substance to such Lender in its sole discretion, certifying that, as of the Closing Date, the representations and warranties made by the Borrower in the Loan Documents and otherwise are true and complete and that no Default or Event of Default exists.

(k)     The Plan Support Agreement shall have been duly executed and delivered by the parties thereto, shall be in full force and effect and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders.

(l)     Each Lender shall have received evidence satisfactory to it that the Borrower has fully, finally and forever released and discharged such Lender and all of its past, present and future officers, directors, members, partners, employees, servants, agents, representatives, attorneys, assigns, heirs, parents, subsidiaries, affiliates and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future Claims, actions, demands, suits, liabilities, liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held

17

in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the other Loan Documents, and the transactions contemplated hereby and thereby, including without limitation the preparation, negotiation, performance, amendment, administration and enforcement of the Loan Documents, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing, on account of its capacity as a Lender (or as an officer, director, member, partner, employee, servant, agent, representative, attorney, assign, heir, parent, subsidiary, affiliate, or Person acting for or on behalf of a Lender) under this Agreement, other than Claims directly arising out of gross negligence, willful misconduct or a breach of (x) that Amended and Restated Confidentiality Agreement, dated as of November 18, 2010, between the Borrower and Lonestar Partners, L.P. (the "Lonestar Confidentiality Agreement"), (y) that Confidentiality Agreement, dated as of September __, 2010, between the Borrower and the Official Committee of Equity Security Holders and its members or (z) that Confidentiality Agreement, dated as of July 21, 2010, between the Borrower and Privet Fund Management LLC, by a Released Party (as judicially determined by a final order of a court with competent jurisdiction).

(m) All representations and warranties contained in this Agreement and the other Loan Documents or otherwise made in writing in connection herewith or therewith are true and correct.

(n) All fees due to each Lender and all reimbursement of expenses incurred by each Lender in connection with the Loans and the other transactions contemplated hereby and otherwise in connection with the Case (including the Closing Fee and the fees and expenses of counsel and financial advisors to each Lender), whether incurred before or after the Closing Date, shall have been paid in full.

(o) All Lenders shall be contemporaneously making their Loans to the Borrower on the Closing Date.

Certain Definitions: As used herein, the following terms have the meanings set forth below:

"Approved Budget" means the Borrower's rolling thirteen (13) week cash flow projection, reflecting on a line-item basis anticipated sales, cash receipts, inventory levels, and expenditures for the subject period and annexed hereto as Schedule 5, (a) in case of the initial Proposed Budget, to which each Lender agrees in writing in its sole discretion and prior to the funding of the Loans, and (b) as to subsequent modifications, supplements, or additional budgets, to which the

18

Required Lenders agree (or are deemed to agree as described under clause (a) of "Covenants" above), in both cases together with such supporting documentation as reasonably requested by such Lender or the Required Lenders.

"Bankruptcy Code" means title 11 of the United States Code, as amended.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to remain closed.

"Change in Control" means, at any time:

(a)     a majority of the members of the board of directors or other equivalent governing body of any Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the Closing Date, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body; or

(b)     any person or "group" (within the meaning of the Securities and Exchange Act of 1934, as amended) is or becomes the beneficial owner (within the meaning of Rule 13d-3 or 13d-5 of the Securities and Exchange Act of 1934, as amended, except that such person shall be deemed to have "beneficial ownership" of all capital stock that such person has the right to acquire, whether such right is exercisable immediately or only after the passage of time) directly or indirectly of twenty-five percent (25%) or more (on a fully diluted basis) of the total then outstanding capital stock of the Borrower, whether as a result of the acquisition or issuance of securities of the Borrower, a merger, consolidation, liquidation or dissolution of the Borrower, a direct or indirect transfers of securities or otherwise.

"Creditors' Committee" means any official committee of creditors formed, appointed or approved in the Case pursuant to the Bankruptcy Code.

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of any cure period or both would, unless cured or waived, become an Event of Default.

19

"DIP Orders" means and refers to the Interim Borrowing Order and the Final Borrowing Order.

"Disclosure Statement" means a disclosure statement filed in the Case in connection with a Plan of Reorganization.

"Equity Committee" means any official committee of equity security holders formed, appointed or approved in the Case pursuant to the Bankruptcy Code.

"Event of Default" has the meaning assigned to such term in this Agreement. An "Event of Default" shall be deemed to be continuing unless and until that Event of Default has been duly waived in writing by the Required Lenders.

"Final Borrowing Order" means an order of the Bankruptcy Court which order shall be in form, scope and substance acceptable to the Required Lenders, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur (or guaranty) Obligations, grant liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of each Lender's claims, which order is a Final Order.

"Final Order" means an order or judgment of the Bankruptcy Court as entered on the docket of the Clerk of the Bankruptcy Court, that has not been reversed, stayed, modified or amended.

"GAAP" means United States generally accepted accounting principles in effect as of the date of determination thereof, as historically applied by the Borrower.

"Interim Borrowing Order" means an order entered by the Bankruptcy Court, in form, scope and substance acceptable to the Required Lenders, approving, on an interim basis, the Borrower's entering into and performing its obligations under this Agreement and the other Loan Documents.

"Loan Documents" means this Agreement, the Note, the deposit account control agreements, the DIP Orders, and any other instrument or agreement now or hereafter executed and delivered in connection herewith, or in connection with any transaction arising out of this Agreement, each as amended and in effect from time to time.

"Obligations" means the due and punctual payment of (i) the principal of, and interest on, the Loans, as and when due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) each payment required to be made by the Borrower under this Agreement or any other Loan Document, when and as due, including

fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise, of the Borrower to the Lenders under this Agreement and the other Loan Documents. Without limiting the foregoing, the Obligations shall constitute allowed administrative expense claims in the Case having priority pursuant to Section 364(c)(1) of the Bankruptcy Code over all administrative expense claims and unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code but excluding the Professional Fee Carve Out. Notwithstanding the foregoing, the Obligations may not be paid from 50% of the proceeds (net of reasonable fees and expenses (including professionals' fees) incurred in connection with the litigation and recovery of such proceeds) of Avoidance Actions (except in the case of Avoidance Actions arising under § 549, in which case the Obligations have priority as noted in the preceding sentence and may be paid from such proceeds).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

"Plan of Reorganization" means a plan filed under chapter 11 of the Bankruptcy Code in any Case, together with all exhibits, schedules, annexes, supplements and other attachments thereto, in each case, consistent with the terms of the Plan Support Agreement and containing such other terms that are not inconsistent with, or do not conflict with, the terms of the Loan Documents and do not adversely affect any Lender's interests, liens, rights, remedies, benefits or other protections under Loan Documents.

"Plan Support Agreement" means that certain Plan Support Agreement, dated as of December 10, 2010, by and among the Borrowers, the Creditors' Committee, the Equity Committee and the Lenders, in the form attached hereto as Exhibit A, together with all exhibits, supplements, annexes, schedules and any other attachments thereto, in each case as amended, restated, supplemented or otherwise modified from time to time pursuant to the terms of the Plan Support Agreement.

"Prime Rate" The greater of (a) 3.50% per annum or (b) the variable annual rate of interest equal to the "prime rate" as published from time to time in the Wall Street Journal or any other financial news service chosen by the Required Lenders from time to time.

"Pro Rata Share" means, with respect to any Lender, the percentage obtained by dividing (a) the aggregate outstanding principal amount of such Lender's Loan, by (b) the aggregate outstanding principal amount

of all Loans.

"Professional Fee Carve Out" means a carve out for Professional Fees and Expenses in an amount not to exceed the sum of (x) amounts accrued but unpaid in the Case as of the Termination Date that are consistent with the Approved Budget and allowed by the Bankruptcy Court, plus (y) $600,000 (allocated $400,000 towards the Borrower's professionals, $100,000 towards the Creditors' Committee's professionals and $100,000 towards the Equity Committee's professionals) which amount may be funded by Borrower into a segregated account, with the balance of any unfunded portion of the Professional Fee Carve Out to be funded into that account on the Termination Date. For the avoidance of doubt, the Professional Fee Carve Out shall include, without duplication, all accrued but unpaid amounts in the Case covered by the professional fee carve out provided for under the Existing DIP Facility to the extent consistent with the then-current "Approved Budget" thereunder as may be subsequently allowed or authorized for payment by the Bankruptcy Court.

"Professional Fees and Expenses" means (a) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and fees payable to the clerk of the Bankruptcy Court, and (b) professional fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by the Borrower, the Creditors' Committee or the Equity Committee (including expenses of members of such committee) or other statutory committee appointed in the Case pursuant to §§327, 328 and 1103 of the Bankruptcy Code or any chapter 11 or chapter 7 trustees appointed in the Case.

"Required Lenders" means the consent of the Lenders having 67% or more of the aggregate outstanding principal amount of all Loans.

"Variance Report" means a report prepared by the Borrower's management reflecting on a line-item basis the Borrower's actual performance compared to the Approved Budget for the applicable periods after the Closing Date and the percentage variance of the Borrower's actual results from those reflected in the then extant Approved Budget, along with management's explanation of such variance.

Expenses:  The Borrower shall reimburse each Lender on demand for all costs and expenses, including reasonable attorneys' fees and financial advisors' fees incurred by such Lender in the preparation, negotiation, performance, amendment, administration and enforcement of this Agreement and the other Loan Documents and the transactions contemplated hereby or otherwise in connection with the Case, whether incurred before or after the Closing Date; provided, however, Prescott

22

shall not be reimbursed for reasonable attorneys' fees incurred prior to December 9, 2010.

| Indemnification: | The Borrower shall indemnify each Lender, its officers, directors, members, partners, servants, attorneys, advisors, agents, assigns, heirs, parents, employees, representatives, subsidiaries, affiliates and each Person acting for or on behalf of any of them (each an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, Claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement and any other Loan Document contemplated hereby, the performance by the Borrower of its obligations thereunder or the consummation of the transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) all current or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any governmental authority relating to the foregoing, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto, provided that such indemnity (i) shall not, as to any Indemnitee, be available to the extent that such losses, Claims, damages, liabilities or related expenses resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee, and (ii) shall only be available to the extent that such losses, claims, damages, liabilities or related expenses asserted against the Indemnitee arise on account of its capacity as a Lender (or as an officer, director, member, partner, servant, attorney, advisor, agent, assign, heir, parent, employee, representative, subsidiary, affiliate or a Person acting for or on behalf of a Lender) under this Agreement. Upon request by the Required Lenders, the Borrower shall deposit with each of the Lenders cash collateral to be maintained under each such Lender's control to secure the Borrower's indemnification obligations as set forth herein in such amounts as the Required Lenders may determine in their sole discretion, or, if the Borrower can establish cause by clear and convincing evidence for objecting to the amounts determined by the Required Lenders, in such amount as may be determined by the Bankruptcy Court. |
|---|---|
| Miscellaneous: | (a)     Each Lender, without the request of any Borrower and whether or not a Default or Event of Default then exists, may charge any interest, fee, service charge, expense reimbursement or other payment to which the Lender is entitled from the Borrower pursuant hereto or any other loan document as a Loan.  Such Lender shall advise the Borrower of any such advance or charge promptly after the making thereof.  Any amount which is so advanced or charged shall bear interest at the interest rate |

then applicable hereunder.

(b)     The Obligations are the joint and several obligation of each Borrower.  The obligations of the Borrower hereunder are continuing unconditional obligations and shall not be released by any (i) waiver, deferral or delay by any Lender, (ii) release of any obligor or surety or any security for the Obligations, (iii) failure to marshal security, (iv) any other change in the terms of this Agreement, the DIP Orders or the other loan documents, in each case subject to the amendment provisions thereof, including, without limitation, any change to the maturity date, the interest rate, or the amounts available to be borrowed, or (v) all other suretyship defenses and any other matters which may otherwise operate to release any Borrower from its obligations hereunder.  With the written consent of a Borrower, and subject to the DIP Orders, the Lenders are hereby authorized, without notice or demand and without affecting the liability of any non-consenting Borrower hereunder, to at any time and from time to time amend, waive, supplement or otherwise modify the terms and conditions of this Agreement, the DIP Orders and the other loan documents, in each case subject to the amendment provisions thereof, including, without limitation, the right to (A) renew, extend, accelerate or otherwise change the time for payment of, or other terms relating to, the Obligations or otherwise modify, amend or change the terms of this Agreement or any other agreement, document or instrument now or hereafter executed and delivered to any Lender; (B) take and hold security or collateral for the payment of Obligations and exchange, enforce and release any such security or collateral; (C) apply such security or collateral and direct the order or manner of sale thereof as in its sole discretion it may determine; and (D) settle, release, compromise, collect or otherwise liquidate Obligations and any security or collateral therefor in any manner, without affecting or impairing the obligations of any Borrower which does not consent thereto hereunder.

(c)     The Borrower acknowledges and agrees that: (i) this Agreement has been negotiated by the Borrower with independent legal counsel and with the assistance of CRG Partners Group, LLC, (ii) this Agreement is an arm's-length commercial transaction between the Borrower on the one hand, and the Lenders, on the other hand, as the case may be, and the Borrower is capable of evaluating and understanding and understands and accept the terms, risks and conditions of the transactions contemplated hereby; (iii) in connection with the transaction contemplated hereby and the process leading to such transaction, each Lender is and has been acting solely as a principal and is not acting as an agent or fiduciary for the Borrower, stockholders, creditors or employees or any other party (it being acknowledged that Privet and Prescott were Equity Committee members and held duties in such capacity but are now acting in their individual capacities as Lenders); and (iv) Lenders have not assumed and will not assume an

24

advisory, agency or fiduciary responsibility to the Borrower or any other entity with respect to any of the transactions contemplated hereby or the process leading thereto.

(d)     No failure or delay by any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any other rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be in writing by the Required Lenders, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

(e)     Subject to the entry of the Interim Borrowing Order, the provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any such attempted assignment or transfer without such consent shall be null and void) and, notwithstanding any prior agreements between the Borrower and any Lender or Lenders (including, without limitation, the Lonestar Confidentiality Agreement), any Lender may assign or otherwise transfer any of its rights or obligations hereunder (i) to an assignee in accordance with the provisions below, (ii) by way of participation in accordance with the provisions below or (iii) by way of pledge or assignment of a security interest subject to the restrictions below:

(1)     Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loan at the time owing to it) without the consent of the Borrower or the other Lenders; provided that any partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned.

(2)     Any Lender may at any time, without the consent of, or notice to, the Borrower, sell participations to any Person (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loan owing to it); provided that (i) such Lender's obligations under this

Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement.

(3) Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f) This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all contemporaneous or previous agreements and understandings, oral or written, relating to the subject matter hereof. Delivery of an executed counterpart of a signature page of this Agreement by telecopy or e-mail shall be effective as delivery of a manually executed counterpart of this Agreement.

(g) No amendment, modification, termination or waiver of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Required Lenders and the Borrower. Notwithstanding the foregoing, no amendment, modification, termination or waiver that results in (i) an increase in any Lender's Commitment, (ii) the reduction of the principal of, rate of interest on or fees payable with respect to the Loans or (iii) the extension of any scheduled payment date, shall be effective unless the same shall be in writing and signed by all Lenders and the Borrower.

(h) Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

26

(i)     THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF, AND THE BANKRUPTCY CODE.

(j)     EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

(k)     THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS. EACH PARTY HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT FOR ALL PURPOSES IN CONNECTION WITH THIS AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS.

(l)     In the event of any inconsistency between the terms of the DIP Orders and the Loan Documents, the terms of the DIP Orders shall control.

(m)     Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided above, the Released Parties and the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(n)     Notwithstanding the foregoing, in the event the interest provisions of the Loans contained in this Agreement, in any Note, in any other agreements documenting the Loans or any other instrument securing the Loans shall result, for any reason at any time during the life of any Loan, in any effective rate of interest which, for any month, transcends the limit of any usury law applicable to any Loan, all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice between or by any party hereto, be applied upon principal immediately upon receipt of such moneys by the Lenders, with the same force and effect as though the payor had specifically designated such extra sums to be so applied to principal and the Lenders had agreed to accept such extra payment as a premium-free prepayment, so that in no event shall any Lender receive

27

or be entitled to receive interest (or any amount treated as interest under applicable law) in excess of the maximum amount permitted under applicable law.

Please indicate your acknowledgment of the foregoing by signing and returning to each Lender a copy of this letter at the address shown on the first page hereof.

[signature pages follow]

200281226v20

Very truly yours,

**PB FUNDING, LLC**

By: [                    ]

By: _____
Name: _____
Title: _____

**PRIVET OPPORTUNITY FUND I, LLC**

By: [                    ]


By: _____
Name: _____
Title: _____

**PRESCOTT GROUP CAPITAL MANAGEMENT**

By: [                    ]


By:     _____
Name:   _____
Title:  _____

*Acknowledged, Agreed and Accepted:*

**POINT BLANK SOLUTIONS, INC.**, as Borrower

By: _____
Name: _____
Title: _____


**POINT BLANK BODY ARMOR CORPORATION**, as Borrower

By: _____
Name: _____
Title: _____


**PROTECTIVE APPAREL CORPORATION OF AMERICA**, as Borrower

By: _____
Name: _____
Title: _____


**PBSS, LLC**, as Borrower

By: _____
Name: _____
Title: _____

## Schedule 1

### Commitments

| Commitment | Lender |
|---|---|
| <u>Commitment</u> | <u>Lender</u> |
| $10,000,000 | PB Funding, LLC |
| $7,500,000 | Privet Opportunity Fund I, LLC |
| $7,500,000 | Prescott Group Capital Management |

## Schedule 2

## Leases and Material Contracts

1.      Debtor Point Blank Solutions Inc.'s Motion for Order Under 11 U.S.C. §365(A) Authorizing Rejection of Class and Derivative Action Settlement Agreement (Filed 9/17/10) [Docket No. 589].

2.      Agreement, dated November 12, 2009, by and between Point Blank Solutions, Inc. and Thompson Reuters for the provision of corporate governance assistance tools, audio webcasting and messaging.

3.      Copier Lease

## Schedule 3

### Additional Liens

1.    CIT Communications Finance Corporation
2.    E.I. DuPont de Nemours and Company (being released upon closing)
3.    La Salle Business Credit, LLC (predecessor to Bank of America, N.A.) (already released; filings to be terminated post-closing)
4.    Steel Partners II, L.P. (being released upon closing)
5.    Great American Leasing Corporation
6.    Toyota Motor Credit Corporation

## Schedule 4

### Insurance Policies

1.      Commercial Automobile coverage with Allstate Insurance Company, policy number 048848934 BAP, effective from October 20, 2010 to October 20, 2011 (named insured: NDL Products Inc).

2.      Commercial Automobile coverage with Chubb Custom Insurance Company, policy number 73542967, effective from August 3, 2010 to August 3, 2011 (named insured: PBSS LLC, Point Blank Solutions, Inc., DHB Industries, Inc., DHB Capital Group, Inc., DHB Armor Group, Inc., DHB Marketing Group, Inc., Point Blank Body Armor, Inc., Protective Apparel Corporation of America, Inc., Zunblindages S.A., DHB Sports Group, Inc., NDL Products, Inc., NDL International, Inc., Grid Inc., Dr. Bonesavers, Inc a/k/a D B S, Hitman, Inc., Flexaid Inc., Orthopedic Products, Inc., Hard Armor, Inc., Lanxide Armor Products, Inc., Lanxide Electronic Components, Inc., Intelligent Data Corp., DHB K K, Point Blank International S.A. and Life Wear Technologies, Inc.).

3.      Directors, Officers and Corporate Liability coverage with U.S. Specialty Insurance Company, policy number 14-MGU-09-A18651, effective from March 28, 2009 to January 31, 2011 (named insured: Point Blank Solutions, Inc.).

4.      Side 'A' Directors and Officers Excess and Lead Difference-in-Conditions coverage with Allied World National Assurance Company, policy number C011592/001, effective from March 28, 2009 to January 31, 2011 (named insured: Point Blank Solutions, Inc.).

5.      Employment Practices Liability coverage with National Union Fire Insurance Company of Pittsburgh, PA, policy number 01-893-87-32, effective from May 31, 2010 to May 31, 2011 (named insured: Point Blank Solutions, Inc.).

6.      Excess Liability coverage with Allied World Assurance Company, policy number 03058178, effective from August 3, 2010 to August 3, 2011 (named insured: Point Blank Solutions, Inc.).

7.      Workers Compensation and Employers Liability coverage with The Hartford, policy number 12 WB JW7205, effective from February 16, 2010 to February 16, 2011 (named insured: Point Blank Solutions, Inc., Point Blank Body Armor, Inc. and Protective Apparel Corporation of America, Inc.).

8.      International General Liability coverage with Great Northern Insurance Company, policy number 7957-90-72 DTW, effective from August 3, 2010 to August 3, 2011 (named insured: Point Blank Solutions Inc, Point Blank Body Armor Inc. and Protective Apparel Corporation of America Inc.).

9.    Fiduciary Liability coverage with National Union Fire Insurance Company of Pittsburgh, Pa., effective from August 14, 2010 to August 14, 2011 (named insured: Point Blank Solutions, Inc).

10.    Flood coverage with The Standard Fire Insurance Company, policy number 6501143785, effective from July 11, 2010 to July 11, 2011 (named insured: Point Blank Body Armor Inc).

11.    Umbrella coverage with Chubb Custom Insurance Company, policy number 79465464, effective from August 3, 2010 to August 3, 2011 (named insured: Point Blank Solutions, Inc.).

12.    General Liability coverage with Chubb Custom Insurance Company, policy number 79465259, effective from August 3, 2010 to August 3, 2011 (named insured: Point Blank Solutions, Inc.).

13.    Commercial Automobile coverage with Progressive Express Insurance Company, policy number 05741018-3, effective from April 27, 2010 to April 27, 2011 (named insured: Point Blank Body Armor).

14.    General Liability coverage with Chubb de Mexico, Compania de Seguros, S.A. de C.V., policy number 6 RP 948572, effective from August 3, 2010 to August 3, 2011 (named insured: Point Blank Body Armor Inc.)

**Schedule 5**

**Approved Budget**

**EXHIBIT A**

**PLAN SUPPORT AGREEMENT**