# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------x

In re                                                  :     Chapter 11
                                                       :
POINT BLANK SOLUTIONS, INC., *et al.*,[1]:              Case No. 10-11255 (PJW)
                                                       :
                              Debtors.                 :     Jointly Administered
                                                       :     Re: 874 & 912
------------------------------------------------------x

## ORDER AUTHORIZING ON A FINAL BASIS (i) REPLACEMENT POSTPETITION SECURED FINANCING, (ii) USE OF CASH COLLATERAL, (iii) REPAYMENT OF EXISTING POSTPETITION SECURED FINANCING AND (iv) AUTHORIZING ENTRY INTO PLAN SUPPORT AGREEMENT

THIS MATTER came before this Court upon motion (the "**DIP Motion**") seeking the entry of an order (this "**Order**") authorizing Point Blank Solutions, Inc. ("**Parent**"), Protective Apparel Corporation of America ("**PACA**"), Point Blank Body Armor, Inc. ("**Point Blank**"), and PBSS, LLC ("**PBSS**" and, with Parent, PACA and Point Blank, each a "**Debtor**" and, collectively, the "**Debtors**"), as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Cases**"), on an <u>final</u> basis, to:

(i)(a) establish that financing arrangement (the "**DIP Facility**") in the aggregate amount of $25,000,000 pursuant to (1) that certain Debtor-In-Possession Financing Agreement (the "**DIP Credit Agreement**"), substantially in the form filed of record in the Cases and attached to the DIP Motion and as updated by evidence introduced at the interim hearing and the final hearing on the DIP Motion, by and among PACA, Point Blank, PBSS and Parent (collectively, the "**Borrowers**"), and PB Funding, LLC (or its affiliate or designee, the

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number and address, are: Point Blank Solutions, Inc. (9361), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor, Inc. (4044), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Protective Apparel Corporation of America (9051), 179 Mine Lane, Jacksboro, TN 37757; and PBSS, LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.

"**Lonestar Lender**") and Privet Opportunity Fund I, LLC and Prescott Group Capital Management (together, the "**Equity Lenders**" and together with the Lonestar Lender, the "**DIP Lenders**"), and (2) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Lenders and their affiliates, including, without limitation, security agreements, pledge agreements, guaranties, notes, and Uniform Commercial Code ("**UCC**") financing statements (collectively with the DIP Credit Agreement, as each may be amended, modified or supplemented and in effect from time to time, the "**DIP Financing Agreements**");[2] and (b) incur the "**Obligations**" under and as defined in the DIP Credit Agreement (collectively with all obligations under the DIP Financing Agreements, the "**DIP Obligations**");

(ii)  obtain and incur debt, pursuant to § 364(c) of title 11 of the United States Code (the "**Bankruptcy Code**"),[3] on a final basis in the aggregate amount of $25,000,000 on terms and conditions described in the DIP Financing Agreements and this Order, secured by first priority, valid, priming, perfected and enforceable liens (as defined in § 101(37)) on property of the Debtors' estates pursuant to §§ 364(c)(2), 364(c)(3) and 364(d), and with priority, as to administrative expenses, as provided in § 364(c)(1), subject to the terms and conditions contained herein;

(iii)  use the proceeds of the DIP Facility, as set forth in the DIP Credit Agreement, (net of any amounts used to pay fees, costs and expenses under the DIP Financing Agreements) in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with the Budget (as defined below) solely for (a) payment in full

---

[2] Capitalized terms used in this Order but not defined herein shall have the meanings ascribed to such terms in the DIP Financing Agreements.
[3] Unless otherwise noted, section (§) references used herein are to the Bankruptcy Code.

of the Existing DIP Facility (as defined below), (b) working capital and general corporate purposes, (c) to finance capital expenditures, (d) to pay fees and expenses in connection with the transactions contemplated hereby or otherwise in connection with the Debtors' chapter 11 cases, including all amounts accrued, to be accrued or otherwise owing or to be owed or paid in respect of (i) the carve out provided for pursuant to the Existing DIP Facility and, without duplication, (ii) the Carve Out (as defined below) provided for by the DIP Financing Agreements and this Order; and (e) for other payments explicitly permitted to be made by this Order.

(iv)     grant, pursuant to §§ 364(c)(2) and 364(c)(3), the DIP Lenders first-priority, valid, perfected and enforceable liens, subject only to the Carve Out, upon all of the Debtors' real and personal property as provided in and as contemplated by this Order and the DIP Financing Agreements;

(v)     grant, pursuant to § 364(c)(1), the DIP Lenders superpriority administrative claim status in respect of all DIP Obligations, subject to the Carve Out as provided herein;

(vi)     use "cash collateral" as such term is defined in § 363 (the "**Cash Collateral**");

(vii)     obtain a vacation and modification of the automatic stay imposed by § 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and this Order;

(viii)     request this Court to waive any applicable stay (including under Federal Rule of Bankruptcy Procedure 6004(h)) and provide for the immediate effectiveness of this Order.

(x)    enter into the plan support agreement (the "**Plan Support Agreement**") substantially in the form presented to the Court in connection with the DIP Motion; and

(xi)    allow the Lonestar Pre-Petition Claims (as defined below).

The Court held an emergency hearing on December 9, 2010 (the "**Interim Hearing**") to consider the request for entry of an order approving the relief requested in the DIP Motion on an interim basis, except for the Plan Support Agreement and certain other items, for which approval was sought on a final basis. After considering the DIP Motion and the arguments and evidence presented at the Interim Hearing, the Court entered its *Order (A) Authorizing on an Interim Basis (i) Replacement Postpetition Secured Financing, (ii) Use of Cash Collateral and (iii) Repayment of Existing Postpetition Secured Financing; (B) Authorizing on a Final Basis Entry into Plan Support Agreement; and (C) Scheduling a Final Hearing* [Docket No. 912] (the "**Interim Order**") granting the relief requested in the DIP Motion on an interim basis pending a final hearing, except for the Plan Support Agreement and certain other items that were approved on a final basis as set forth more fully in the Interim Order.

The Court having considered the DIP Motion, the DIP Financing Agreements, the Plan Support Agreement and the evidence submitted at the hearing on this Order (the "**Final Hearing**") and at the Interim Hearing; and due and proper notice of the DIP Motion and the Interim and Final Hearings having been given under the circumstances; and it appearing that approval of the relief requested in the DIP Motion is necessary and appropriate and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and their equity holders, and is essential for the continued operation of the Debtors' business; and all objections, if any, to the entry of this Order having been withdrawn, resolved or overruled by this

Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM AND FINAL HEARINGS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.      **Petition Date**.  On April 14, 2010 (the "**Petition Date**"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  The Debtors have continued in the management and operation of their business and property as debtors in possession pursuant to §§ 1107 and 1108. No trustee or examiner has been appointed in the Cases.

B.      **Jurisdiction and Venue**.  This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334, and over the persons and property affected hereby. Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Cases and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      **Committee Formation**.  On April 26, 2010, the Office of the United States Trustee (the "**U.S. Trustee**") formed an Official Committee of Unsecured Creditors (the "**Creditors Committee**").  On July 27, 2010, the U.S. Trustee formed an Official Committee of Equity Security Holders (the "**Equity Committee**").

D.      **Notice**.  The Final Hearing is being held pursuant to the authorization of Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Local Rule 4001-2.  Notice of the Final Hearing and the relief requested in the DIP Motion has been provided to: (i) the U.S. Trustee, (ii) counsel to the Pre-Petition Agent, (iii) counsel to DuPont, (iv) parties with liens of record on assets of the Debtors as of the Petition Date, (v) counsel to the Creditors Committee, (vi) counsel to the Equity Committee, (vii) counsel to the proposed DIP

Lenders, (viii) counsel to the Existing DIP Lender, and (ix) the Debtors' thirty-five (35) largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions. Under the circumstances, such notice of the Final Hearing and the relief requested in the DIP Motion is due and sufficient notice and complies with §§ 102(1), 364(c) and 364(d), Bankruptcy Rules 2002, 4001(c), 4001(d) and the local rules of the Court.

E. **Acknowledgements and Agreements**. The Debtors admit, stipulate, acknowledge and agree and, with respect to paragraph E(iv), the Debtors, the Creditors Committee and the Equity Committee admit, stipulate, acknowledge and agree as follows (collectively, Paragraphs E (i) through E (iv) hereof shall be referred to herein as the "**Stipulations**"):

> (i) **Existing DIP Facility**. In connection with the commencement of these chapter 11 cases, the Debtors obtained the $20,000,000 post-petition secured financing (the "**Existing DIP Facility**") pursuant to a Debtor-in-Possession Financing Agreement, dated April 12, 2010 (the "**Existing DIP Credit Agreement**"), with Steel Partners II, L.P. (the "**Existing DIP Lender**"). The Court entered a final order [Docket No. 120] (the "**Existing Final DIP Order**") authorizing the Debtors to enter into the Existing DIP Facility on May 12, 2010. Among other things, the proceeds from the Existing DIP Facility were used to pay in full the Debtors' pre-petition senior secured obligations under that certain Amended and Restated Loan and Security Agreement, dated as of April 3, 2007 (the "**Pre-Petition Loan Agreement**").

> (ii) **Existing DIP Collateral**. The obligations under the Existing DIP Credit Agreement were secured by security interests and liens (the "**Existing DIP Liens**") granted to, and for the benefit of, the Existing DIP Lender on substantially all of the Debtors' assets as further described in the Existing DIP Credit Agreement (collectively, the "**Existing DIP Collateral**").

> (iii) **Priming of DIP Liens**. In entering into the DIP Financing Agreements, and as consideration therefor, the Debtors hereby agree that until such time as all DIP Obligations have been irrevocably paid in full in cash, (the "**Full Payment of Senior Obligations**"), the Debtors shall not in any way prime or seek to prime the security interests and DIP Liens (as defined below) provided to the DIP Lenders under the Interim Order or this Order, by offering a subsequent lender or a party in interest a superior or pari passu lien or claim pursuant to § 364(d) or otherwise.

**(iv)** **Allowed Pre-Petition Claims.** The Debtors, the Creditors Committee and the Equity Committee agree and acknowledge that the pre-petition unsecured claims of Lonestar Partners, L.P. (collectively, the "**Lonestar Pre-Petition Claims**"), (i) against PACA in the amount of $373,572.10 as reflected in PACA's *Schedules of Assets and Liabilities*, (ii) against Point Blank in the amount of $8,126,774.32 as reflected in Point Blank's *Schedules of Assets and Liabilities*, and (iii) against the Parent in the amount of $8,512,858.34 as reflected in Proof of Claim No. 284, are valid claims and should be allowed in the full amounts of such claims, it being understood that (a) Proof of Claim No. 284 is duplicative of the Lonestar Pre-Petition Claims reflected in Point Blank's and PACA's *Schedules of Assets and Liabilities* and (b) Lonestar Partners, L.P. is entitled only to a single recovery on account of the Lonestar Pre-Petition Claims. The Debtors, the Creditors Committee and the Equity Committee waive and release their rights (i) to challenge or contest the extent, amount, validity, priority or ranking of any the Lonestar Pre-Petition Claims, (ii) to assert any claims or causes of action against Lonestar Partners, L.P. on account of the Lonestar Pre-Petition Claims or arising under chapter 5 of the Bankruptcy Code and (iii) to assert any defenses to or rights of counterclaim or setoff against the Lonestar Pre-Petition Claims, including any right of counterclaim or setoff that might otherwise arise under § 502(d); *provided, however*, that nothing contained in this paragraph E(iv) shall constitute a waiver of any rights, claims, or defenses the estates may have against Lincoln Fabrics Inc. or any of its affiliates or subsidiaries related to the Lonestar Pre-Petition Claims, including but not limited to any Avoidance Actions (as defined below). The parties reserve all rights in respect of the reconciliation of any duplicate amounts within the Lonestar Pre-Petition Claims.

F.    **Findings Regarding the Post-Petition Financing .**

(i)    **Need for Post-Petition Financing and Use of Cash Collateral.** In light of the imminent maturity date of the Existing DIP Facility, and a threatened termination of the Existing DIP Facility by the Existing DIP Lender, an immediate need existed for the Debtors to obtain funds from the DIP Facility and have the use of Cash Collateral in order to, among other things, repay the Existing DIP Facility, continue operations, and administer and preserve the value of their estates. Immediate and irreparable loss or damage would have been caused to the Debtors' estates if immediate financing were not obtained and permission to use Cash Collateral were not granted. The Debtors' access to sufficient working capital and liquidity to preserve and maintain the value of the Debtors' assets and maximize a return for all creditors requires the availability of working capital from the DIP Facility and permission to use Cash Collateral, the absence of which would immediately and irreparably harm the Debtors, their estates, their creditors and their equity holders and the possibility for a successful reorganization in accordance with the terms of the Plan Support Agreement (as defined below).

(ii)    **No Credit Available on More Favorable Terms**. The Debtors are unable to obtain (A) unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense, (B) credit for money borrowed with

priority over any or all administrative expenses of the kind specified in Bankruptcy Code Sections 503(b) or 507(b), (C) credit for money borrowed secured solely by a lien on property of the estate that is not otherwise subject to a lien, or (D) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien, in each case, on more favorable terms and conditions than those provided in the DIP Credit Agreement and this Order. The Debtors are unable to obtain credit for borrowed money without granting to the DIP Lenders the DIP Protections (as defined below).

(iii) **Plan Support Agreement**. The Debtors, the Creditors Committee, the Equity Committee, and the DIP Lenders or their affiliates have entered into, and the Court has approved the Debtors' entry into, the Plan Support Agreement, pursuant to which, among other things, (x) the Debtors agreed to file and use commercially reasonable efforts to obtain confirmation of, and to consummate, the Plan of Reorganization (as defined in the DIP Credit Agreement), the principal terms of which are described in the Plan Support Agreement pursuant to the timetable set forth therein and (y) the non-Debtor parties thereto agreed, subject to receipt of a Court-approved Disclosure Statement to support the confirmation and consummation of the Plan of Reorganization and all transactions contemplated thereby. The DIP Lenders, pursuant to the terms and conditions of a certain equity commitment agreement between the Debtors and such parties to provide a standby commitment, have agreed to purchase any unsubscribed portion of the equity of the applicable reorganized Debtors to be offered to certain of the Debtors' pre-petition unsecured creditors and interest holders in connection with a proposed plan reorganization. The parties to the Plan Support Agreement have consented to, and have agreed to support, the DIP Facility and the parties' undertakings in the Plan Support Agreement are conditioned upon, among other things, this Court's approval of the DIP Facility pursuant to the Interim Order and this Order.

G. **Section 506(c) Waiver**. As a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Financing Agreements, upon entry of this Order, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in these Cases or any Successor Cases (as defined below)), shall be deemed to have waived any rights or benefits of § 506(c) in connection with the DIP Collateral (as defined below).

H. **Use of Proceeds of the DIP Facility**. Proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Agreements) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Credit

8

Agreement, and in accordance with the Budget, as follows: (a) for payment in full of the Existing DIP Facility (as defined below), (b) for working capital and general corporate purposes, (c) to finance capital expenditures, (d) to pay fees and expenses in connection with the transactions contemplated hereby or otherwise in connection with the Debtors' chapter 11 cases, including all amounts accrued, to be accrued or otherwise owing or to be owed or paid in respect of (i) the carve out provided for pursuant to the Existing DIP Facility and, without duplication, (ii) the Carve Out provided for by the DIP Financing Agreements and this Order; and (e) for other payments explicitly permitted to be made by the Interim Order and this Order.

I.  **Section 552**.  In light of DIP Lenders' agreement to subordinate the DIP Liens and DIP Superpriority Claim (as defined below) to the Carve Out, the DIP Lenders are entitled to all of the rights and benefits of § 552(b) and the "equities of the case" exception shall not apply.

J.  **Extension of Financing**.  The DIP Lenders have provided financing to the Debtors in accordance with the DIP Financing Agreements and subject to (i) the entry of the Interim Order and this Order, and (ii) findings by the Court that such financing is essential to the Debtors' estates, that the DIP Lenders are extending the financing in good faith, and that the DIP Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to the Interim Order and this Order and the DIP Financing Agreements will not be affected by any subsequent reversal, modification, vacatur or amendment of the Interim Order or this Order or any other order, as provided in § 364(e).

K.  **Business Judgment and Good Faith Pursuant to Section 364(e)**.  The terms and conditions of the DIP Financing Agreements, the Plan Support Agreement, the Interim Order and this Order, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available under the circumstances, have been fully disclosed, reflect the Debtors' exercise of

prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Financing Agreements, the Plan Support Agreement, the Interim Order and this Order were negotiated in good faith and at arms' length between the Debtors, the statutory committees and the DIP Lenders, and use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the DIP Lenders are entitled to the protection and benefits of § 364(e).

L. **Relief Essential; Best Interest**. The relief requested in the DIP Motion is necessary, essential, and appropriate for the continued operation of the Debtors' business and the management and preservation of the Debtors' assets and personal property. It is in the best interest of Debtors' estates to be allowed to establish the DIP Facility contemplated by the DIP Credit Agreement and to enter into the Plan Support Agreement.

M. **The Lonestar Pre-Petition Claims are Valid**. The Lonestar Pre-Petition Claims are valid claims and should be allowed in the full amounts of such claims.

N. **Entry of Order**. For the reasons stated above, the Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(c)(2).

**NOW, THEREFORE**, on the DIP Motion of the Debtors and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the Creditors Committee, the Equity Committee and the DIP Lenders to the form and entry of this Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.    **Motion Granted**.  The DIP Motion is granted in accordance with the terms and conditions set forth in this Order, the DIP Credit Agreement and the Plan Support Agreement on a final basis with regard to all relief contained herein.

2.    **DIP Financing Agreements**.

   (a)    **Approval of Entry Into DIP Financing Agreements**.  The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Financing Agreements and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Order and the DIP Financing Agreements and to execute and deliver all instruments, certificates, agreements and documents that may be required or necessary for the Debtors' performance under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by the DIP Financing Agreements, the Interim Order and this Order.  The DIP Financing Agreements are approved on a final basis and the Debtors are authorized to borrow the funds available under the DIP Facility and to do and perform all acts, pay the principal, interest, fees, costs, expenses and other amounts due to the DIP Lenders, any affiliate of the DIP Lenders set forth in the DIP Financing Agreements and this Order, as applicable, as such become due, including, without limitation, closing fees, administrative fees, commitment fees, termination fees, and attorneys', financial advisors' and accountants' fees and disbursements as provided for in the DIP Financing Agreements, the Interim Order and this Order, which amounts shall not otherwise be subject to application to, or approval of, this Court; *provided*, that the DIP Lenders shall provide the invoices for fees and expenses incurred for professionals retained by the DIP Lenders (redacted for privileged or confidential information) to the U.S. Trustee and counsel to the Creditors Committee and Equity Committee; and *provided*,

11

*further*, that the Court shall have jurisdiction to determine any dispute concerning such invoices. Under no circumstances shall professionals for the DIP Lenders be required to comply with the U.S. Trustee fee guidelines.

(b)  **Authorization to Borrow**.  The Debtors were authorized under the Interim Order and the DIP Facility, and are authorized under this Order, to borrow the total amount of $25,000,000.

(c)  **Application of DIP Proceeds**.  The proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Credit Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements and in accordance with the Budget, as follows: (a) payment in full of the Existing DIP Facility (as defined below), (b) working capital and general corporate purposes, (c) to finance capital expenditures, (d) to pay fees and expenses in connection with the transactions contemplated hereby or otherwise in connection with the Debtors' chapter 11 cases, including all amounts accrued, to be accrued or otherwise owing or to be owed or paid in respect of (i) the carve out provided for pursuant to the Existing DIP Facility and, without duplication, (ii) the Carve Out provided for by the DIP Financing Agreements and this Order; and (e) for other payments explicitly permitted to be made by the Interim Order and this Order.

(d)  **Post-Petition Liens**.  Effective immediately upon the execution of the Interim Order and on a final basis pursuant to this Order, the DIP Lenders are hereby granted, pursuant to §§ 364(c)(2) and (3), fully perfected first priority liens (the "**DIP Liens**") on and security interests in all assets of each Debtor and its estate, including all proceeds thereof (the "**DIP Collateral**"), subject only to (i) the payment of the Carve Out and (ii) Permitted Liens (as defined in the DIP Credit Agreement.

(e) **Avoidance Actions**. The DIP Collateral shall expressly include, and the DIP Superpriority Claim (as defined below) shall be payable from, all claims and causes of action arising under chapter 5 of the Bankruptcy Code (including all proceeds thereof, the "**Avoidance Actions**"); provided, however, that the foregoing liens and claims shall not extend to fifty percent (50%) of the proceeds of Avoidance Actions (except in the case of Avoidance Actions arising under § 549, in which case the liens and claims shall extend to one hundred percent (100%) of such proceeds), in each case net of reasonable fees and expenses (including professionals' fees) incurred in connection with the litigation and recovery of such proceeds.

(f) **DIP Lien Priority**. The DIP Liens to be created and granted to the DIP Lenders, as provided herein, (a) are created pursuant to §§ 364(c)(2) and 364(c)(3), (b) are first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or lien or claim to any of the DIP Collateral, and are subject only to the Carve Out and the Permitted Liens. The DIP Liens shall secure all DIP Obligations and shall be senior in right to all liens on and security interests in all assets of the Debtors and their estates, subject only to Permitted Liens and the Carve Out. The DIP Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Cases and shall be valid and enforceable against any trustee appointed in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "**Successor Cases**"), and/or upon the dismissal of any of the Cases. The DIP Liens shall not be subject to §§ 510, 549, 550 or 551 or, if approved in the Final Order, § 506(c).

(g) **Termination of Existing Liens**. Pursuant to the Interim Order, immediately upon the Existing DIP Lender's receipt of the funds paying in full the Existing DIP

Obligations on December 13, 2010, the Existing DIP Liens were automatically terminated and released without the need for any further action.

(h) **Enforceable Obligations**. The DIP Financing Agreements shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable against the Debtors, their estates and any successor thereto and their creditors, in accordance with their terms.

(i) **Protection of DIP Lenders and Other Rights**. The Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Financing Agreements, the Interim Order, and this Order, and in strict compliance with the Budget (subject to any variances thereto permitted by the DIP Financing Agreements).

(j) **Superpriority Administrative Claim Status.** In addition, pursuant to Section 364(c)(1), the DIP Lenders shall receive a super-priority administrative expense claim (the "**DIP Superpriority Claim**" and, together with the DIP Liens, the "**DIP Protections**") over all other costs and expenses of the kinds specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code in an amount equal to the total DIP Obligations, subject to the Carve Out (as defined below). Until the DIP Obligations are paid in full, the DIP Superpriority Claim shall have, in these Cases and any Successor Cases, priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to §§ 105, 326, 328, 330, 331, 503(a), 506(c), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, whether or not such expenses or claims may become secured by a

judgment lien or other non-consensual lien, levy or attachment. Other than the Carve Out, no costs or expenses of administration, including, without limitation, professional fees accrued and payable under Bankruptcy Code Sections 328, 330, or 331, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the DIP Protections or the DIP Obligations, or with any other claims of the DIP Lenders arising hereunder.

3. **Authorization to Use Cash Collateral and Proceeds of DIP Financing Agreements**. Pursuant to the terms and conditions of the Interim Order, this Order, the DIP Financing Agreements, and in accordance with the budget (as the same may be modified from time to time consistent with the terms of the DIP Financing Agreements) (the "**Budget**"), filed on record in the Cases and attached to the DIP Motion and as updated by evidence introduced at the Interim Hearing and the Final Hearing, the Debtors are authorized, on a final basis, to use Cash Collateral and the borrowing under the DIP Financing Agreements during the period commencing immediately after the entry of the Order and terminating upon the Commitment Termination Date (as defined below). The Budget may be updated (with the consent and/or at the request of the DIP Lenders from time to time); *provided*, that such updated Budget shall be provided to the Creditors Committee and the DIP Lenders and shall be in form and substance acceptable to the DIP Lenders to the extent required under the DIP Financing Agreements, in their sole discretion. The Debtors shall be required always to comply with the Budget pursuant to the terms of the DIP Financing Agreements.

4. **Post-Petition Lien Perfection**. This Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document

that might otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreement or taking any assignment of any contract or obtaining consent to any such assignment to the extent possible without resulting in such contract terminating or being terminated pursuant to the terms thereof) to validate or perfect the DIP Liens, or to entitle the DIP Liens, to the priorities granted herein. Notwithstanding the foregoing, the DIP Lenders may, in their sole discretion, file such financing statements, mortgages, notices of liens and other similar documents and take such other actions, and are hereby granted relief from the automatic stay pursuant to § 362 in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded at the time and on the date of the entry of this Order. The Debtors shall execute and deliver to the DIP Lenders all such financing statements, mortgages, notices and other documents as the DIP Lenders may request in their sole discretion to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens granted pursuant hereto. The DIP Lenders, in their sole discretion, may file a photocopy of this Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Order.

5. **Bar of Challenges and Claims**. The Stipulations shall be binding on the Debtors, the Creditors Committee and the Equity Committee, as applicable, and each is deemed to have irrevocably waived and relinquished any and all rights to contest the representations made therein as of the date of the entry of the Interim Order, and the Lonestar Pre-Petition

Claims shall be and hereby are deemed allowed for all purposes in these Cases and in any Successor Cases; *provided*, *however*, that the parties reserve all rights in respect of the reconciliation of any duplicate amounts within the Lonestar Pre-Petition Claims; and *provided*, *further*, that nothing contained in this paragraph 5 shall constitute a waiver of any rights, claims, or defenses the estates may have against Lincoln Fabrics Inc. or any of its affiliates or subsidiaries related to the Lonestar Pre-Petition Claims, including but not limited to any Avoidance Actions. The parties reserve all rights in respect of the reconciliation of any duplicate amounts within the Lonestar Pre-Petition Claims. Without limiting the foregoing, the Stipulations shall also be forever binding upon all of the Debtors' estates, all official and unofficial committees and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases. Notwithstanding the foregoing, the parties reserve all rights in respect of the reconciliation of any duplicate amounts within the Lonestar Pre-Petition Claims.

6. **Carve Out**. Subject to the terms and conditions contained in this Paragraph 6, the DIP Protections are subordinate to the Carve Out (as defined below). As used herein, the term "**Carve Out**" shall mean amounts: (a) payable pursuant to 28 U.S.C. § 1930(a)(6) and fees payable to the clerk of the Court and (b) for accrued (or authorized to be paid by the Court) reasonable fees and expenses of attorneys and financial advisors employed by the Debtors, the Creditors Committee and the Equity Committee (including expenses of the members of such statutory committees) pursuant to §§ 327 and 1103 (the "**Case Professionals**"), and, as to amounts described in clause (b), not to exceed the sum of (x) $600,000 (allocated $400,000 towards the Debtors' Case Professionals, $100,000 towards the Creditors Committee's professionals (including Creditors Committee members) and $100,000 towards the Equity Committee's professionals (including Equity Committee members)), which amount, under this

clause (b)(x) if not already so funded pursuant to the Existing Final DIP Order, shall be funded by Debtors into a segregated account under the control of Debtors' counsel (the "**Carve Out Account**"), plus (y) such amounts which are accrued but unpaid in the Case as of the Commitment Termination Date; *provided*, that such amounts under clause (y) are consistent with the Budget, which unpaid amounts shall be funded into the Carve Out Account upon the Commitment Termination Date.  For the avoidance of doubt, the Carve Out shall include, without duplication, all accrued but unpaid amounts in the Case covered by the carve out provided for by the Existing DIP Facility to the extent consistent with the then-current "Approved Budget" thereunder (as may be subsequently allowed or authorized to be paid by the Court).  The DIP Lenders acknowledge and agree that, to the extent the Carve Out Account is not already funded, (i) upon a sale of all or substantially all of the Debtors' assets for cash, the net cash proceeds of such sale shall be first applied to fund the Carve Out Account required by this Order, and (ii) upon a sale of all or substantially all of the Debtors' assets pursuant to a credit bid with no (or insufficient) net cash proceeds, the DIP Lenders shall fund the Carve Out Account as required by this Order.  For purposes of this Order, references to the Carve Out shall include the Carve Out Account and funds therein.

The Carve Out shall exclude any fees and expenses (x) which are incurred in connection with the assertion or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (A) invalidating, setting aside, avoiding, subordinating, or otherwise adversely affecting the DIP Lenders' claims and interests in the Debtors' chapter 11 cases, in such capacities, in whole or in part, (i) the DIP Obligations or (ii) the DIP Lenders' Liens in the DIP Collateral, or (B) preventing, hindering or delaying, whether directly or

indirectly, the DIP Lenders' assertion or enforcement of the DIP Liens, security interests or realization upon any DIP Collateral; (y) which are incurred incidental to the use of cash collateral of the DIP Lenders in connection with either (1) the sale or other disposition of any other DIP Collateral which is not permitted under the DIP Credit Agreement, or (2) the incurrence of any indebtedness which is not permitted under the DIP Credit Agreement, in each case, to the extent the DIP Lenders have not provided their express written consent; or (z) arising after the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code. Except as otherwise provided in this Paragraph 6, nothing contained in this Order shall be deemed a consent by the DIP Lenders to any charge, lien, assessment or claim against the DIP Collateral under § 506(c) or otherwise. Nothing herein shall be construed to obligate the DIP Lenders themselves, in any way, to pay any professional fees of any Case Professional or expenses of any members of any statutory committee or to assure that the Debtors have sufficient funds on hand to pay any of the foregoing or to advance funds to establish the Carve Out except to the extent required by this Paragraph 6. Subject to Paragraph 7 hereof, for so long as a DIP Order Event of Default shall not have occurred and be continuing, the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under §§ 328, 330 and 331 and in accordance with the Budget, as the same may be due and payable, without reducing the Carve Out. The payment of the Carve Out shall not reduce the amount of the DIP Obligations.

7. **Payment of Compensation**. Nothing contained herein shall be construed as (i) allowing the fees or expenses of any Case Professionals, (ii) affecting the rights of the DIP Lenders to object to the allowance and payment of such fees and expenses or (iii) permitting the Debtors to pay any such amounts not set forth in the Budget.

8.    **Section 506(c) Claims**.  Except to the extent of the Carve Out with respect to the DIP Collateral, no expenses of administration of the Cases or any Successor Cases shall be charged against or recovered from the DIP Collateral pursuant to §506 without the prior written consent of the DIP Lenders.

9.    **Collateral Rights**.  Unless the DIP Lenders have provided their prior written consent, there shall not be entered in these Cases or in any Successor Cases any order which authorizes any of the following:

(a)    except as permitted under the DIP Credit Agreement or in conjunction with the Full Payment of Senior Obligations, the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or entitled to priority administrative status which is equal or senior to those granted to the DIP Lenders; or

(b)    the Debtors' return of goods constituting DIP Collateral pursuant to § 546(h), except as expressly permitted by the DIP Credit Agreement.

10.    **Proceeds of Subsequent Financing**.  Without limiting the provisions and protections of Paragraph 9 above, if at any time prior to the Full Payment of Senior Obligations, the Debtors, their estates, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to Bankruptcy Code Sections 364(b), 364(c) or 364(d) in violation of the DIP Credit Agreement, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be applied solely to reduce the DIP Obligations until the Full Payment of Senior Obligations.

11.    **Commitment Termination Date**.  All (a) DIP Obligations shall be immediately due and payable, and (b) authority to use the proceeds of the DIP Financing Agreements shall

cease, both on the date that is the earliest to occur of (the "**Commitment Termination Date**"): (a) June 15, 2011; or (b) the occurrence of a DIP Order Event of Default and the acceleration of the time for payment of the Obligations by the Required Lenders; (c) the closing date of a sale of all or substantially all of the Borrower's assets under § 363 or otherwise; or (d) the effective date of a confirmed Plan of Reorganization. To the extent applicable, the automatic stay is hereby waived in regards to the occurrence of the Commitment Termination Date.

12.     **Bank Accounts**.    Proceeds of the DIP Facility and Cash Collateral shall be maintained by the Debtors in accordance with the DIP Credit Agreement and this Court's *Order Authorizing (i) Maintenance of Existing Bank Accounts, (ii) Continued Use of Existing Business Forms, (iii) Continued Use of Existing Cash Management System, and (iv) Continued Performance of Intercompany Transactions and Providing Administrative Expense Priority Status to Postpetition Intercompany Claims, and (v) Waiver of Section 345(b) Deposit and Investment Requirements* [Docket No. 42].

13.     **Events of Default.**  The occurrence of any of the following events shall constitute an event of default under this Order (a "**DIP Order Event of Default**"):

(a)     the failure by any of the Debtors to comply with any term of this Order;

(b)     the passage of sixty (60) days after the occurrence of a Termination Event (as defined in the Plan Support Agreement);

(c)     an Event of Default (as defined in the DIP Credit Agreement); or

(d)     the Commitment Termination Date.

14.     **Rights and Remedies Upon DIP Order Event of Default**.

(a)     Any automatic stay otherwise applicable to the DIP Lenders is hereby modified so that after the occurrence of any DIP Order Event of Default and at any time thereafter upon five (5) business days prior written notice of such occurrence, in each case given

to each of counsel for the Debtors, counsel for the Creditors Committee, counsel for the Equity Committee, and the U.S. Trustee, the DIP Lenders shall be entitled to exercise their rights and remedies in accordance with the DIP Financing Agreements or as otherwise permitted under applicable law. Following the giving of notice by the DIP Lenders of the occurrence of a DIP Order Event of Default, the Debtors shall be entitled to an emergency hearing before this Court solely for the purpose of contesting whether a DIP Order Event of Default has occurred. If the Debtors do not contest the right of the DIP Lenders to exercise their remedies based upon whether a DIP Order Event of Default has occurred within such time period, or if the Debtors do timely contest the occurrence of a DIP Order Event of Default, the automatic stay, as to the DIP Lenders, shall automatically terminate at the end of such notice period.

(b)     In any exercise of their rights and remedies upon a DIP Order Event of Default under the DIP Financing Agreements, as applicable, the DIP Lenders are authorized to proceed under or pursuant to the DIP Financing Agreements or as otherwise permitted under applicable law.

(c)     The automatic stay imposed under Bankruptcy Code Section 362(a) is hereby modified pursuant to the terms of this Order as necessary to (1) permit the Debtors to grant the DIP Liens, and to incur all liabilities and obligations to the DIP Lenders under the DIP Financing Agreements and this Order, as applicable, and (2) authorize the DIP Lenders to retain and apply payments hereunder.

(e)     Nothing included herein shall prejudice, impair, or otherwise affect the DIP Lenders' rights to seek any other or supplemental relief in respect of the Debtors or to exercise their rights provided in the DIP Financing Agreements or as otherwise permitted under applicable law.

(f)     Notwithstanding anything in this Order to the contrary, in the event that the DIP Lenders exercise their rights and remedies upon a default and seek to take possession of any premises where any DIP Collateral is located, their rights and remedies with respect to taking possession of such premises shall be limited to (i) relief provided by further order of this Court; (ii) any agreement with the applicable landlord; (iii) the terms of any applicable lease; and (iv) applicable non-bankruptcy law.

15.     **Proofs of Claim**.  The DIP Lenders shall not be required to file a proof of claim in these Cases.

16.     **Allowance of the Lonestar Pre-Petition Claims**.  The Lonestar Pre-Petition Claims shall be and hereby are deemed allowed claims, not subject to any other or further claims, cause of action, objection, challenge, counterclaim, setoff, defense, subordination, recharacterization, recovery, defense or avoidance action pursuant to § 502(d) or otherwise, by any party in interest for any reason, including, without limitation by any successor to or estate representative of any Debtor.   Neither the Debtors, the Creditors Committee, the Equity Committee nor any creditor, interest holder or any other party in interest shall (i) challenge or contest the extent, amount, validity, priority or ranking of any of the Lonestar Pre-Petition Claims, (ii) assert any claims or causes of action against Lonestar Partners, L.P. on account of the Lonestar Pre-Petition Claims or arising under chapter 5 of the Bankruptcy Code or (iii) to assert any defenses to or rights of counterclaim or setoff against the Lonestar Pre-Petition Claims, including any right of counterclaim or setoff that might otherwise arise under § 502(d); *provided, however*, that nothing contained in this paragraph 16 shall constitute a waiver of any rights, claims, or defenses the estates may have against Lincoln Fabrics Inc. or any of its affiliates or subsidiaries related to the Lonestar Pre-Petition Claims, including but not limited to

any Avoidance Actions. The parties reserve all rights in respect of the reconciliation of any duplicate amounts within the Lonestar Pre-Petition Claims. Notwithstanding the foregoing, the parties reserve all rights in respect of the reconciliation of any duplicate amounts within the Lonestar Pre-Petition Claims.

17. **Releases**. The releases contained in the DIP Credit Agreement are approved in their entirety and became fully enforceable immediately upon the entry of the Interim Order, and the Debtors are authorized to take such steps as are necessary to execute and deliver such releases.

18. **Plan Support Agreement**.

(a) Pursuant to Bankruptcy Code Sections 105(a) and 363(b), the Debtors, the Creditors Committee, the Equity Committee and the DIP Lenders (or their respective affiliates, as applicable) (collectively, the "**Plan Support Parties**") are authorized to execute, deliver and implement the Plan Support Agreement and all exhibits and attachments thereto, and to take any and all actions necessary and proper to implement and satisfy its obligations under the terms of the Plan Support Agreement.

(b) In accordance with the terms of the Plan Support Agreement, the Debtors are hereby deemed to have withdrawn their *Motion for Entry of an Order (A) Approving Bid Procedure for the Sale of the Debtors' Assets, (B) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts; (D) Approving Certain Expense Reimbursement Provisions and Breakup Fee; and (E) Granting Other Related Relief* [Docket No. 800].

(c)     In accordance with the terms of the Plan Support Agreement, the Break-Up Fee and Transaction Expenses (as defined in the Plan Support Agreement) are approved and the Debtors are authorized and directed to pay the Break-Up Fee and Transaction Expenses under the terms and conditions set forth in the Plan Support Agreement, in which case the Break-Up Fee and Transaction Expenses shall be entitled to the DIP Protections.

(d)     The entry into the Plan Support Agreement by the Plan Support Parties, and the performance and fulfillment of their obligations thereunder, does not violate any law, including the Bankruptcy Code, and does not give rise to any claim or remedy against any of the Parties under § 1125(e), including the designation of the vote of any Party under § 1126(e), on account of entering into the Plan Support Agreement and the performance and fulfillment of their obligations thereunder.

19.     **Other Rights and Obligations**.

(a)     **Good Faith Under § 364(e). No Modification or Stay of this Order**. Based on the findings set forth in this Order and in accordance with § 364(e), which is applicable to the DIP Facility contemplated by this Order, in the event any or all of the provisions of this Order are hereafter modified, amended or vacated by a subsequent order of this or any other Court, the DIP Lenders are entitled to the protections provided in § 364(e) and no such modification, amendment or vacation shall affect the validity, enforceability, extent, amount, priority or ranking of any advances made hereunder, or under the DIP Financing Agreements or the liens or priority authorized or created hereby or thereby.  Notwithstanding any such modification, amendment or vacation, any claim granted to the DIP Lenders hereunder arising prior to the effective date of such modification, amendment or vacation of any DIP Protections granted to the DIP Lenders shall be governed in all respects by the original provisions of this

Order, and the DIP Lenders shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Protections granted herein, with respect to any such claim. Since the loans made pursuant to the DIP Credit Agreement are made in reliance on this Order, the obligations owed to the DIP Lenders prior to the effective date of any stay, modification or vacation of this Order shall not, as a result of any subsequent order in the Cases or in any Successor Cases, be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Lenders under this Order and the DIP Financing Agreements.

(b) **Expenses**. As provided in the DIP Financing Agreements, all costs and expenses of the DIP Lenders in connection with the DIP Financing Agreements and the transactions contemplated thereby or otherwise in connection with the Cases, including, without limitation, legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement of fees and expenses, and other out of pocket expenses will be paid by the Debtors as and when required by the terms of the DIP Financing Agreements. Payment of such fees and expenses shall not be subject to application to, or allowance by, the Court. The DIP Lenders shall provide the invoices for fees and expenses incurred for professionals retained by the DIP Lenders (redacted for privileged or confidential information) to the U.S. Trustee and counsel to the Creditors Committee and Equity Committee; and *provided, further*, that the Court shall have jurisdiction to determine any dispute concerning such invoices. Under no circumstances shall professionals for the DIP Lenders be required to comply with the U.S. Trustee fee guidelines.

(c) **Binding Effect**. Any successors or assigns of the Debtors (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with

respect to the property of the estates of the Debtors) whether in the Cases, in any Successor Cases, or upon dismissal of any such chapter 11 or chapter 7 case shall be bound by the provisions of this Order.

(d) **No Waiver**. The failure of the DIP Lenders to seek relief or otherwise exercise their rights and remedies under the DIP Financing Agreements, the DIP Facility, this Order or otherwise, as applicable, shall not constitute a waiver of any of the DIP Lenders' rights hereunder, thereunder, or otherwise. Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights and remedies of the DIP Lenders under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the DIP Lenders to, subject to the terms of the Plan Support Agreement, (i) request conversion of the Cases to cases under Chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases, (ii) request termination of the exclusive periods to file and solicit acceptances to a plan, (iii) propose, subject to the provisions of § 1121, a plan of reorganization or plan of liquidation for the Debtors, or (iv) exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Lenders.

(e) **No Third Party Rights**. Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

(f) **No Marshaling**. The DIP Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

(g)  **Section 552(b)**.  The DIP Lenders shall be entitled to all of the rights and benefits of § 552(b) and the "equities of the case" exception under § 552(b) shall not apply to the DIP Lenders with respect to proceeds, product, offspring or profits of any of the DIP Collateral.

(h)  **Amendment**.  The Debtors and the DIP Lenders may enter into waivers, consents and amendments with respect the DIP Financing Agreements (a) without the need for further Court approval provided that (i) notice is given to the Office of the United States Trustee and any statutory committees appointed in these Cases, and (ii) such amendment, consent or waiver, in the reasonable judgment of the Debtors and the DIP Lenders, after consultation with any statutory committees, is both non-prejudicial to the rights of third parties and is not material, or (b) with Court approval, upon ten (10) days prior notice of such amendment, consent or waiver to the Office of the United States Trustee and statutory committees appointed in these Cases and all other parties requesting notices in these Cases.  Except as otherwise provided herein, no waiver, consent, modification or amendment of any of the provisions of this Order or the DIP Financing Agreements shall be effective unless set forth in writing, signed by or on behalf of all of the Debtors, and all of the DIP Lenders.

(i)  **Survival of Order**.  The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any Plan in the Cases, (ii) converting any of the Cases to a case(s) under chapter 7 of the Bankruptcy Code, or (iii) dismissing any of the Cases, (iv) withdrawing of the reference of any of the Cases from this Court, or (v) providing for abstention from handling or retaining of jurisdiction of any of the Cases in this Court.  The terms and provisions of this Order including the DIP Protections granted pursuant to this Order and the DIP Financing Agreements, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections shall maintain their

priority as provided by this Order until all the obligations of the Debtors to the DIP Lenders pursuant to the DIP Financing Agreements have been indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms). Except as provided in or contemplated by the Plan Support Agreement or the DIP Financing Agreements or as otherwise ordered by the Court, the Debtors shall not propose or support any chapter 11 plan other than the Plan set forth in the Term Sheet and the Plan Support Agreement.

(j)     **Inconsistency**.  In the event of any inconsistency between the terms and conditions of the DIP Financing Agreements and of this Order, the provisions of this Order shall govern and control.

(k)     **Enforceability**.  This Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable immediately upon execution hereof.

(l)     **Objections Overruled**.  All objections to the DIP Motion to the extent not withdrawn or resolved, are hereby overruled.

(m)     **No Waivers or Modification of Order**.  The Debtors irrevocably waive any right to seek any modification or extension of this Order without the prior written consent of each of the DIP Lenders, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lenders.

(n)     **Waiver of any Applicable Stay**.  Any applicable stay (including, without limitation, under Bankruptcy Rules 6004(h) and 7062) is hereby waived and shall not apply to this Order.

20. **DIP Lenders' Consent**. Unless otherwise noted herein, in the DIP Credit Agreement, the Plan Support Agreement or any of the DIP Financing Agreements, any rights, actions, approvals, or consents of the DIP Lenders provided for herein shall require the approval or consent of the Required Lenders (as defined in the DIP Credit Agreement).

21. **Retention of Jurisdiction**. The Court has and will retain jurisdiction to enforce this Order according to its terms.

SO ORDERED by the Court this 28 day of Dec, 2010.

The Honorable Peter J. Walsh
United States Bankruptcy Judge