# EXHIBIT A

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF VIRGINIA

FILED

UNITED STATES EX REL.
WAYNE B. KOLBECK
8882 Georgetown Lane
Boynton Beach, FL 33472

UNSEALED 1/7/10
~~FILED UNDER SEAL~~
~~AND IN CAMERA~~
~~Pursuant to~~
~~31 U.S.C. § 3730(b)(2) and~~
~~E.D. Va. Local Civil Rule 5(D)~~

2009 JUN -3  P 4: 17

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

                        Plaintiff/Relator

                v.

Case No.: 1:08CV1187-TSE/IDD

Point Blank Solutions, Inc. (Formerly
Known As DHB Industries, Inc.)
2102 SW 2nd Street
Pompano Beach, FL 33069

Point Blank Body Armor, Inc.
Atlantic Business Center
2102 SW 2nd Street
Pompano Beach, FL 33069

David H. Brooks
20 Red Ground Road
Old Westbury, NY 11568

**AMENDED COMPLAINT**

Sandra L. Hatfield
2654 Edgewood Ave
Schenectady, NY 12306

Larry Ellis
Point Blank Solutions Inc.
2102 SW 2nd Street
Pompano Beach, FL 33069

## INTRODUCTION

1.      This is an action to vindicate a fraud perpetrated on the United States and U.S.

combat soldiers who relied on the false representations of Defendants which claimed that

1

protective body armor vests they sold to the U.S. military would protect the lives of soldiers–that is, that the vests, in popular terms, were bullet proof.

a. Those representations were false for vests and component parts of vests manufactured and sold to the U.S. military by the Point Blank defendants (as defined herein).

b. In fact, the body armor, or so-called bullet proof vests manufactured by Point Blank were the product of a flawed manufacturing process which had been repeatedly compromised by Defendants Brooks and Hatfield to cut costs, speed product and delivery, and facilitate payment as they looted Point Blank for their own purposes.

c. The Point Blank defendants covered-up their flawed and defective manufacturing process to ensure the sale of their products to the U.S. military.

d. As a result, for their protection in combat, U.S. soldiers have relied and continue to rely on body armor that is the product of a standardless manufacturing process and which, in some instances, have subsequently been found to be defective or to contain defective components. Rather than correct the process and make sure that all vests and components sold to the U.S. military would protect soldiers as intended, Defendants covered up their fraud with repeated false representations to the United States to secure payment. As a result of these fraudulent representations, the United States paid over $1 billion to Point Blank.

2.      On behalf of the United States of America and himself, Relator, Wayne B. Kolbeck, brings this action under the False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA") and the applicable common law principles, to recover millions of dollars in fraudulent over-charges and, in addition, civil penalties and reasonable attorneys' fees, from Defendants Point Blank Solutions, Inc., (formerly known as DHB Industries, Inc.), Point Blank Body Armor, Inc. (collectively "Point Blank" or "the company"), David H. Brooks, a former CEO of the company,

2

Sandra Hatfield, former COO of the company and Larry Ellis, who replaced David H. Brooks as CEO of the company (collectively "Point Blank Defendants").

3.      Beginning in 1999 and continuing to the present, the Point Blank Defendants certified full and complete compliance with all contract specifications and standards for manufacturing and delivering thousands of Interceptor System body armor units to the U.S. military to protect combat soldiers.

4.      Each certification executed by the Point Blank Defendants was false.  The Interceptor Units and related component parts were delivered to the U.S. military based on fraudulent representations regarding:

> a. The ballistic tests;
>
> b. The camouflage standards;
>
> c. The infra red standards; and
>
> d. The Berry Amendment; and
>
> e. The Traceability requirements.

5.      The Point Blank Defendants certified that these vests were manufactured in accordance with National Institute of Justice ("NIJ") standards as required.  In fact, those representations were false, due to a flawed and compromised manufacturing and quality control process.  Indeed, the Point Blank Defendants knew that in many instances they sold to the government units they had determined to be defective.  This occurred in two circumstances.

> a. First, when units were determined to be defective prior to shipment, the lot was not supposed to be shipped, but instead withdrawn from the "for sale" inventory;
>
> > i. Withdrawing all units with a specific unit number was suppose to ensure that goods found to be defective were not sold to the U.S. military.  This is because a unit number was suppose to be assigned to all products made from the materials from a specific lot.

3

Thus, if a lot had a defect, the unit number could be readily identified and the defective products removed from inventory.

ii. Since the Point Blank Defendants had repeatedly compromised the manufacturing process and the quality control standards of the PB Plan (as defined herein), there could be no assurance that the materials from one lot were all assigned the same unit number. In fact, the compromised processes scattered materials from various lots throughout the manufacturing processes. A unit number thus did not represent all goods manufactured from a single lot – that is, the material from a single lot could not be traced to a single unit number. The unit numbers were arbitrary and essentially a cover-up of the flawed manufacturing process.

iii. Thus removing items with a specific unit number from inventory did not assure that all defective products were removed. Rather, as the Point Blank defendants knew, or were reckless in not knowing, units with materials determined to be defective remained in inventory and were sold to the U.S. military.

b. Second, any recall of defective products done by Point Blank Defendants was also a sham and a cover-up. As the Point Blank defendants knew, they could not effectively recall all products determined to be defective because of the flawed manufacturing process and arbitrarily assigned unit numbers.

6. As a result of Defendants' repeated falsifications and fraudulent misrepresentations the United States was defrauded out of over 1 billion dollars.

7. As a direct result of Defendants' repeated false statements and fraudulent misrepresentations, Defendants breached their contracts, were paid by mistake and were unjustifiably enriched.

4

8.     This suit seeks the repayment of the sums paid by the United States because of Defendants' false claims along with the imposition of statutory penalties and other appropriate relief.

## JURISDICTION

9.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345, 1331, and 1367. The Defendants are doing and/or previously did business within this District.

## VENUE

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3731(a).

## PARTIES

### Relator – Plaintiff

11.     Relator, Wayne B. Kolbeck, is a citizen of the United States and a resident of the State of Florida.

a.  He brings this action on behalf of himself and the United States, inclusive of the United States Department of Defense, the Defense Finance and Accounting Service ("DFAS") and the Armed Services of the United States who purchased body armor and equipment from the Defendants.

b.  This lawsuit was originally filed on November 13, 2008.  Mr. Kolbeck was employed by Point Blank from 1999 to April 2009.  During that period, he was the Director of Quality Assurance and Engineering.  Mr. Kolbeck has a B.S. in Textile Chemistry and an M.B.A. in Business Administration and has been certified as a quality engineer and auditor.

c.  Mr. Kolbeck has direct and independent knowledge of the information supporting the allegations of this Amended Complaint.  The allegations in the complaint regarding the manufacturing and quality control for production of the Interceptor and its related parts are not based upon public information.  He is the original source of the information, which has been voluntarily provided to the United States government prior to filing this Amended Complaint.

d.  During the applicable time period, Mr. Kolbeck repeatedly brought the manufacturing and control deficiencies detailed herein to the attention of company management, including David Brooks, Sandra Hatfield, and Larry Ellis.  Since those warnings were ignored and he could not remedy all of the deficiencies, due to the serious and life threatening nature of the manufacturing failures he was compelled to bring these matters to the attention of the United States and filed this action.  Until that time as a Point Blank employee, he generally did not disclose these matters to persons outside the company, attempting to try and correct the deficiencies from within.

### The Defendants

12.   Defendant Point Blank Solutions, Inc. ("PBS") is a publicly traded company currently incorporated in Delaware with its headquarters and primary manufacturing facilities in Broward County, Florida.  The company is organized as a holding company and sells its body armor products through two subsidiaries, Point Blank Body Armor, Inc., and Protective Apparel Corporation of America.  PBS's primary product is the Interceptor vest, a bullet-resistant vest all branches of the U.S. military currently use.  PBS conducted business in this District at all times relevant hereto.

13.   Defendant Point Blank Body Armor, Inc., ("Point Blank") is the primary subsidiary through which PBS manufactures its products.  It is located in Broward County,

Florida. It is the leading manufacturer and provider of bullet and protective resistant garments, fragmentation protective vests, slash and stab protective armor and related ballistic accessories. During the period from 2002 through 2006, 80 to 87% of Defendants' revenues were either directly or indirectly related to sales to the United States Department of Defense for the military. Point Blank conducted business in this District during the time period relevant hereto.

14. Defendant David H. Brooks founded DHB Industries, Inc., in 1992 and purchased Point Blank out of bankruptcy in 1995. He served as DHB Industries' CEO and Chairman of the Board until he was ousted from his position in July 2006 and was subsequently indicted for diverting millions of dollars of company money for his personal use and engaging in widespread financial and accounting fraud. He is a Defendant in a criminal and a civil enforcement action both of which allege securities fraud brought by, respectively, the government and the Securities and Exchange Commission. *U.S. v. Brooks and Hatfield*, No. 06-0550 (S.D.N.Y. filed Oct. 24, 2007); *SEC v. Brooks*, No. 07-61526 (S.D. Fla. filed October 25, 2007). He previously has been enjoined and barred from associating with any broker or dealer for five years because of his role in an insider trading scheme. *Jeffrey Brooks Securities, Inc., Jeffrey Brooks and David Brooks, Exchange Act* Release No. 34-31657, 53 SEC Docket 0384 (Dec. 23, 1992); *SEC v. Haddad et al.*, 92 Civ. 9122 RPP (S.D.N.Y.).

15. Defendant Sandra L. Hatfield was the COO and Head of Government Projects for Point Blank Body Armor, Inc. from 2000 until approximately August 2005. Ms. Hatfield has also been indicted on criminal charges based on allegations of manipulating financial statements for her benefit and financial fraud and been named as a Defendant in an SEC securities fraud action. *SEC v. Schlegel*, No. 06-61251 (S.D. Fla. filed Aug. 17, 2006); *U.S. v. Brooks and Hatfield*, No. 06-0550 (S.D.N.Y. filed Oct. 24, 2007).

7

16.     Defendant General Larry Ellis was the CEO of Point Blank Solutions, Inc. from July 2006 until April 2009.

17.     Defendant Ellis, along with Point Blank Solutions, Inc., Point Blank Body Armor, Inc., David H. Brooks, and Sandra L. Hatfield, are sometimes referred to as the "Point Blank Defendants."

## BACKGROUND

### A.     The False Claims Act

18.     The False Claims Act, in pertinent part, imposes liability for damages and civil penalties on:

> Any person who —
>
> > (1) Knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
> >
> > (2) Knowingly makes, uses, or causes to be made or used, a false record of statement to get a false or fraudulent claim paid or approved by the Government.

### B.     Purchasing vests: Overview

19.     Generally, body armor for the U.S. military is purchased by the United States pursuant to solicitations and offers for contracts made by, and under the supervision of, the Defense Logistics Agency ("DLA") whose headquarters is located at Fort Belvoir, Virginia. Contracts entered into as a result of this process are administered under the auspices of the Defense Contract Management Agency ("DCMA") whose headquarters is also located at Fort Belvoir, Virginia. Invoices for payment under those contracts are processed under the supervision of the Defense Finance and Accounting Service ("DFAS") which is the financial and accounting organization for the Department of Defense. DFAS is headquartered in Arlington, Virginia. Exhibit A, which is attached hereto and incorporated herein, is a partial list of

8

solicitations, contracts, and delivery orders ("contracts") under which Point Blank received payments. Each contract was issued under the supervision of DLA, administered by DCMA and the presentations for payment and authorization for payment were made by DFAS.

 20. From 1999 to the present the United States Government purchased in excess of 2.5 million body armor units known as the Interceptor System (and its related parts) as defined below from Defendant Point Blank. Many of those purchases were made under the contracts listed on Exhibit A. Defendant Point Blank submitted at least 568 invoices (*see* partial list of contracts and delivery orders in Exhibit A) to the United States seeking payment for these goods under the contracts.

**C. The Military Vest Purchases: The Interceptor Program**

 21. The Interceptor Body Armor System is a body armor system manufactured by Point Blank for the U.S. military. It is designed to protect the upper torso of a soldier from ballistic and shrapnel threats. The system has several component parts which are manufactured and sold as a complete unit (collectively "The Interceptor System").

 a. An outer shell is made of multiple layers of fabric that must meet certain ballistic performance standards ("shell"). The shell contains a removable Kevlar insert ("Kevlar insert") that provides the soldier with the required ballistic protections. The Kevlar insert must be protected from moisture such as water or perspiration which can degrade its ballistic properties. That protection is provided by a non-removable covering or "rip stop."

 b. The vest closes in the front. It is held closed and in place on the soldier's body by the "hook and loop" which essentially is Velcro strips.

 c. The outer shell is covered by "webbing" which is part of the Modular Lightweight Load-carrying Equipment ("MOLLE") system. The system permits the soldier to

9

strap gear such as ammunition, first-aid pouches, grenades, radios and other essential equipment to the vest.

    d.  The front of the shell has a pocket ("front pocket") into which a Small Arms Protective Insert ("SAPI") plate can be inserted.  The plate provides additional ballistic protections.

    e.  The back of the vest has a similar pocket ("rear pocket") into which another SAPI plate can be inserted.

    f.  The collar, throat and groin parts attach to the vest, respectively, protect the soldier's neck, throat and groin ("related parts").  The related parts are made of several layers of the same fabric as the outer shell and are intended to have the same ballistic performance properties as the outer shell.  The collar also contains a pocket for an insert to fortify its ballistic performance.

    g.  The Interceptor System has additional protections for the solider by day and night.  By day it has specific color and camouflage patterns designed to conceal the soldier.  By night it has specific infra-red ("IR") properties which minimize the night time signature of the soldier when viewed with night vision gear.

    22.  In 2004 Point Blank developed for the U.S. Marine Corps an Armor Protection Enhancement System, essentially an improved version of the Interceptor System.  This new system has enhanced protections, providing additional deltoid and auxiliary protectors ("APEs") and Enhanced Side Ballistic Inserts ("ESBI") to give the upper/under arm, and side the same protections offered by the other parts of the vest.  A similar product was developed for the U.S. Army called the Deltoid Auxiliary Protection System ("DAPS") (collectively the "updated system").

10

**D.    Point Blank**

23.    Beginning in 1999 and continuing through the present ("the time period") Point Blank manufactured for, and sold to, the U.S. military the Interceptor System including the related parts and, after 2004 the DAPs, APEs, and ESBIs all of which are collectively referred to herein as The Interceptor System.

*1.    Point Blank's Quality Claims*

24.    Point Blank represented at all times pertinent hereto, that The Interceptor System is the finest body armor in the world and that it provides U.S. combat soldiers the very best protection available - in every day terms, it is "bullet proof." The company has repeatedly made these representations to the U.S. military and the public.

25.    Point Blank's representations regarding The Interceptor System are based on what the company claims is the rigorous, world class quality control standards in its manufacturing process. Those standards, according to the company, ensure that each Interceptor System made for the U.S. military is uniformly manufactured under the highest, most rigorous quality control standards. The company claims that its quality control and manufacturing standards meet or exceed all standards in military solicitations and contracts for the manufacture and purchase of body armor. Strict adherence to these quality control standards and manufacturing specifications ensures that U.S. combat soldiers receive the best protection from harm possible, according to Point Blank.

11

## 2.   *The Basis Of Its Quality Claims*

26.   In 1999 Mr. Kolbeck was hired by the company as the Director of Quality Assurance and Engineering ("QC Director"). Mr. Kolbeck was hired because of his expertise in quality control systems and related matters.

a. As QC Director, Mr. Kolbeck was responsible for the creation and maintenance of the quality control and related manufacturing system for all military body armor manufactured by the company, including The Interceptor System during the time period.

b. Mr. Kolbeck was also responsible for ensuring that all body armor manufactured for the U.S. military meet or exceeded each requirement specified in the solicitations by, and contracts with, the military.

27.   Beginning in 1999 Mr. Kolbeck established a comprehensive system of quality controls at Point Blank's Oakland Park manufacturing facility ("Oakland"). At that time Oakland was its only facility. The system was designed to ensure that the manufacturing process for The Interceptor System complied with all military specifications and that vests manufactured under the system provided U.S. military personnel the proper protections -- the armor would be "bullet proof" in popular terms. Accordingly, the system included the following elements:

a. ISO 9000/9002 standards: These are international quality standards. They are included in solicitations for, and contracts entered into, by Point Blank with the United States Department of Defense. ISO 9002 requires a manufacturer to comply with the higher-level quality standards. Its requirements include establishing a quality management system throughout the organization, having adequate quality control personnel, the performance of an annual management review, the adoption of a quality system, contract review, appropriate documentation and record maintenance, a documented Purchasing System that validates and

12

controls each vendor, and a mechanism for correction and safeguards to prevent the production of non-conforming products.

b. Berry Amendment compliance: § 905 of the DOD Appropriations Act 1993, P.L. 102-396 (as amended, § 832 of P.L. 107-107, 10 U.S.C. § 2533a). This amendment requires that all materials for products such as the Interceptor System be from U.S. sources. The purpose is for security reasons and to ensure that U.S. soldiers receive the best quality equipment.

c. Source Sampling: Makes a contractor responsible for assuring complete compliance with contract requirements including quality control at its facilities, as well as those of its suppliers and subcontractors. Source sampling can only be approved by testing and obtaining Certificates of Compliance ("COCs") from U.S. government certified labs. For contracts listed in Exhibit A, Point Blank relied on COCs from labs that it knew, or was reckless in not knowing, were not certified by the U.S. government as required by each individual contract.

i. Adherence to these standards ensure that raw materials for critical safety items to protect U.S. combat soldiers, such as the outer shell of the Interceptor, are pre-approved for conformance to applicable specifications prior to being released for processing into the end product.

ii. Requires the use of the National Institute of Justice ("NIJ") laboratories, or laboratories approved by the NIJ, for all ballistic acceptance testing to ensure proper testing to maximize the protection for soldiers.

d. Record keeping: Requires detailed records regarding the components used in the manufacturing process, the steps and inspections taken, and the tests administered.

i. There must be detailed records for each lot of fabric used to manufacture The Interceptor System.

ii. Those records must permit each fabric lot to be traceable throughout the manufacturing process to the completed product ("traceability"). Traceability permits review of the manufacturing and quality control process. It also enables the company to certify compliance with required contracting standards thereby ensuring the equipment is properly manufactured to protect soldiers.

iii. The final ballistic test for The Interceptor System is based on traceability because the test assumes complete compliance with the initial ballistic test and each required quality control step. Absent traceability, there is no assurance that final ballistic test results are accurate, or that soldiers are being given the proper protection.

iv. Absent records demonstrating compliance with the specified quality control standards and manufacturing process, there is no assurance that final acceptance testing is accurate because that testing assumes the uniformity of the ballistic protection throughout the identified shipping lot. Absent the required records, uniformity cannot be established.

v. Absent traceability, Point Blank has no basis on which to certify compliance with contract specifications and to demand payment from the government for the finished goods.

e. At the conclusion of the manufacturing process, each part of the Interceptor System has a number affixed to it. Each part of the unit is assigned the same number ("unit number"). The unit number is documented and is designed to provide a direct link back through the manufacturing process to the original fabric lot. This permits the company to remove any

14

vests determined to be defective before shipment, or alternatively, to recall all units discovered to be flawed or defective after shipment.

28.     The system installed by Mr. Kolbeck was, in accordance with ISO standards, a "top down" system.  Specifically, it required supervision by senior management to ensure that the necessary controls were enforced throughout the manufacturing process and that the system was improved and updated as required.  The system was designed to apply to all subcontractors.

29.     The system and standards Mr. Kolbeck installed and implemented are detailed in a comprehensive, written quality control manual available at Point Blank, as well as in a complete set of quality assurance procedures, work instructions, and record keeping documents.

30.     In 2000, after the system was fully installed, it was certified as ISO compliant ("PB Plan").  That certification was good for a three year period.  The certification assumes that the company would continue to adhere to the system installed by Mr. Kolbeck.  In fact, the company failed to adhere to the PB Plan and took affirmative steps which under-cut it.  Later, the company covered up these actions.

31.     Ms. Hatfield began to undercut the quality control system almost immediately.

a.     ISO 9002 requires that senior management hold periodic meetings to review the implementation of the standards.  Senior management supervision is critical because it facilitates implementation and enforcement of the system throughout the manufacturing process — quality control must flow down through the system from the top.

b.     The first management review meeting was held on July 12, 2000.  Shortly after the meeting began then COO Sandra Hatfield abruptly announced that she was "tired" of discussing quality control and that she had "real work" to do.  Ms. Hatfield walked out of the meeting bringing it to an end.  No Management Review meetings were held after July 12, 2000.

c. The refusal of senior management to participate and ensure implementation and continued operation of the system directly undercut its effectiveness and is contrary to the PB Plan.

32.     The next year Mr. Brooks and Ms. Hatfield took further steps to undercut compliance with the PB Plan.  On January 2, 2001, the two Defendants directed that Mr. Kolbeck, the QC Director, no longer report to senior management.  This is directly contrary to ISO 9002 and undermined the authority of the position to enforce and maintain quality control standards.

3.     *The 1999 Interceptor Contract*

33.     In 1999 Point Blank was awarded a contract from the U.S. military to manufacture the version of The Interceptor System available at that time.  The contract extended through 2004 ("1999 contract").  Under the contract, the Army agreed to pay approximately $500 per Interceptor vest.  The contract had a potential value of $190 million dollars.  This was the first of several contracts for the Interceptor System and/or component parts awarded to Point Blank during the time period.

34.     Point Blank represented in bidding for the 1999 contract that it would meet or exceed each of the detailed quality control standards specified by the U.S. Military in the solicitation.  Those representations and the requirements of the solicitation were incorporated in the 1999 contract.  This same procedure was used for each contract listed on Exhibit A.  Exhibit A represents only a partial list of solicitations, contracts, and delivery orders Point Blank received or entered into with the Department of Defense between 1998 and 2008.  Under these contracts, Point Blank was paid over 1 billion dollars upon delivery of over 2.5 million Interceptor and Improved Outer Tactical Vests, DAPS, and related component parts.

16

35.     The representations made to secure the 1999 contract, as well as all other contracts, are substantially similar to those made in response to Solicitation W91CRB-04-R-0045, September 15, 2004.  There the company represented:  "Overall it is important to note that Point Blank Quality Assurance and Procedure Manual (available upon request) complies with all the conformance inspections of ISO 9001: 2000, ISO 9002:1994 and all specific requirements referenced in CO/PD00-02D.  The areas covered include, but are not limited to:  All purchased raw materials and components for assembly of the OTV [The Interceptor] . . . Meeting all the objectives and responsibilities of the Interceptor Program [and]. . . Meeting all of the objectives and responsibilities of the Quality Management Team."  Point Blank also represented it would fully comply with the Berry Amendment.

36.     Point Blank's representations to the U.S. military to secure the 1999 contract, as well as later contracts, including those listed on Exhibit A, were based on compliance with the quality control system installed by Mr. Kolbeck, the PB Plan.  Point Blank was awarded the 1999 contract, and all other contracts, including those listed on Exhibit A, based on its specific representations as to quality control and contract compliance based on the PB Plan, as well as its reputation for manufacturing the finest body armor.  These requirements were to ensure that U.S. combat soldiers received the best life saving and injury avoidance protection available.

4.     *False Certifications For The Initial Ballistic Tests*

37.     Two ballistic tests are performed as part of the manufacturing process for the Interceptor System during the time period.  Full compliance with each was required by the 1999 contract and each other contract entered into including those listed on Exhibit A.

a. The first is a "shoot" test on the cloth used to make the vest and its component parts ("initial ballistic test").  This test is performed by the fabric manufacturer and presented to

17

Point Blank, along with a Certificate of Compliance ("COC"), to show that the fabric meets all requirements for use in the Interceptor.

b. The second is also a "shoot" test. It is conducted on the completed Interceptor System ("final ballistic test"). This is the test that the Government requires to determine the acceptability of the interceptor shipping lot for acceptance.

c. These tests, conducted in accordance with Military Standard 662F ("Mil Spec") at a NIJ laboratory or NIJ approved laboratory, are designed to ensure that U.S. combat soldiers are properly protected from life threatening shrapnel and gun fire.

38. Beginning in 1999 and continuing through the time period, Point Blank failed to comply with the initial ballistic test requests.

a. The test was improperly conducted as it did not comply with the Mil-Spec standards.

b. Traceability for the component parts and multiple plies was destroyed, resulting in some fabrics being tested, some not being tested, and some fabric which failed the test being used.

39. As to the Mil-Spec for the initial ballistic test, Point Blank modified the required procedures to increase the pass rate with the effect of rendering any testing and resulting Certificate of Compliance meaningless:

a. Ballistic standard MIL-STD-662F dictates the manner in which the test is to be conducted. Under this standard a sample of the cloth is to be "shot in air," that is affixed to a metal frame and shot with no backing which might fortify the cloth and thereby inflate the test results.

18

b.  Point Blank altered the test procedure by requiring the fabric manufacturer to test the cloth by affixing it to a clay mount which gave the cloth additional backing, diminishing the impact of the bullet and increasing the pass ratio.  Failure to properly conduct the test rendered any test results, and COC based on these tests, worthless.

c.  Although Mr. Kolbeck repeatedly informed the company that the initial ballistic test was being improperly conducted, no corrective action has been taken.

40.   As to traceability, the 1999 contract, and each contract including those listed in Exhibit A required that Point Blank certify compliance with the initial ballistic test in requesting payment.  When that certification is provided, it is based on the test results and traceability to the COC.

a.  The initial ballistic test is conducted on a sample from a specified bolt from the manufacturing lot, or identical batch of rolls of cloth.  Following the initial ballistic test, if the sample passes, a COC is issued.

b.  The fabric used to make each Interceptor System must be traceable to the same COC.  This requirement applies to the fabric for each throat, neck, groin, ESBIs, and DAPs and the multiple plies of cloth used to make each of those components of the Interceptor System.

c.  When The Interceptor System is assembled in preparation for shipment, and the unit number is assigned to each component, that number ties directly to these records.  This permits the fabric for the vest, each component part, and each of the multiple plies to be traced back to a COC certifying that it passed the initial ballistic test.  This process gives Point Blank a basis on which to certify compliance with this contract standard, and ensures that the soldier is receiving a properly manufactured Interceptor System that meets or exceeds the applicable standards.

19

41.    Ms. Hatfield destroyed traceability as to the relevant parts and multiple plies used throughout the system by altering the procedures used to cut the cloth for these parts and plies ("Modified cutting procedure") beginning in 1999 to cut costs. Under the PB Plan, the vest, vest collars, throats and groins as well as the multiple plies were required to be cut from the same fabric lot which could be traced to a COC. This insured traceability, compliance, and directly linked the cuttings and resulting components to the test results. It alone ensured that if a lot was determined to be defective, all parts manufactured in that lot could be removed from inventory or be recalled.

42.    Under the modified cutting procedure, which was contrary to the PB Plan and which destroyed traceability:

a.    The vests were cut;

b.    The vest collars, throat, groins and multiple plies for the body of the vest were cut from the remaining fabric and other lots of fabric, creating excess ballistic parts ("other cuttings");

c.    The other cuttings were commingled and dumped into unmarked bins and stored for later use;

d.    During the manufacturing process, Point Blank would use the other cuttings as necessary in the manufacturing of vests;

e.    If a lot fell short of the required number of vests, typically because of manufacturing errors, Point Plan would take "spare" vests from a fixed pile kept for that purpose, which were made from materials drawn from various lots to fill out the manufacturing lot.

f.    There were no records which permitted the other cuttings to be traced to a COC for the initial ballistic test or to the performance of these components in the final, acceptance

20

testing for approval by the Government.  Thus, there was no basis on which to certify that the other cuttings passed the initial ballistic test or the final ballistic acceptance testing;

g.  The random mixing of the ballistic lots at the beginning of the vest manufacturing process precluded any ability to remove any plies that were part of a lot which failed in the first ballistic test, or which were later determined to be defective.  Accordingly, units were sold to the government and used by soldiers which contained fabric that failed the first ballistic test.

h.  Point Blank used the modified cutting procedure from 1999 through approximately 2001.

43.  At the conclusion of the manufacturing process the component parts were assembled into a completed Interceptor System for delivery under a contract.  For Systems delivered to the U.S. military between 1999 and 2001 this meant that the Interceptor System consisted of a vest along with the throat, neck and groin parts.

a.  Each component part in a completed Interceptor System had a label affixed to it.  Point Blank put the unit number on that label which, according to the PB Plan, ensured traceability.

b.  If a defect was discovered, the defective vests would be removed from use by removing all vests with a specific lot number from inventory.  Likewise, if a recall became necessary because a defect was discovered, the defective units would be removed from use by recalling all of the vests with a specific unit number.  This process was designed to ensure that defective vests were not sold to the government and relied on by U.S. Soldiers, or if sold they could be recalled - that is, no soldier would rely on a defective vest.

21

44.     In fact, the unit numbers were a fraudulent cover-up by Point Blank, carried out to conceal the fact that there is no traceability.  At the end of the manufacturing process, a unit number was affixed to each part of a completed system.  That number, in effect, represented that the unit, and each component in the unit, could be traced back through the manufacturing process, and that all of the fabric could be traced back to a single lot in accordance with the PB plan.  Essentially, the unit number represented that the product could be traced back through a uniform manufacturing and testing process and that if defects or failures were discovered at any step in the process, then all units using materials from the defective or failed lot could be removed from inventory or recalled.  Since there was no traceability, in fact the unit numbers were useless.  They gave the appearance of traceability and represented that a quality control manufacturing process was used, which was false.  The number is a fraud.

45.     From 1999 to the present, units periodically failed final acceptance tests.  For example:

a.  In March 2003, lots # 60-9 and #60-12 failed their final acceptance tests, and at least 2,000 vests were segregated and destroyed instead of being shipped to the military.

b.  In August 2004, lots #69-99 and #69-102 failed their final acceptance tests, and at least 2,000 vests were segregated and destroyed instead of being shipped to the military.

c.  In January 2006, at least 2,400 sets of DAPS failed the final acceptance tests, and were segregated and destroyed instead of being shipped to the military.

d.  At least 6,000 IOTVs from five other lots failed their final acceptance tests, and were segregated and destroyed instead of being shipped to the military.

e.  In February 2009, at least 1,200 IOTVs from lot # 144 failed the final acceptance test, and were segregated and destroyed.  Although Mr. Kolbeck informed the

22

company that all the material in lot #144 had to be destroyed, Point Blank used at least 278 yards

of the material to manufacture units in subsequent lots which were sold to the government.

46.    When units failed the final acceptance test, Point Blank would represent that the

defective units were removed from inventory and not sold to the government. This representation

was based on the removal from inventory (or recalls) of all units with a specific unit number.

Since the unit numbers were arbitrary and a fraudulent representation, Point Blank's

representation was false - a false representation built upon a false representation.

47.    From 1999 to the present, a number of recalls of vests were made after they had

already been shipped and were in use by U.S. military personnel. For example:

a. In May 2005, the Marine Corps recalled at least 5,200 Interceptor Vests

manufactured in 2004 by Point Blank due to "life-threatening" flaws in the vests. These vests

had already been issued to Marines in Iraq, Afghanistan, and Djibouti.

b. In November 2005, the Army and Marine Corps recalled over 18,000

Interceptor vests manufactured by Point Blank between 1999 and 2001 due to their failure to

meet ballistic standards.

48.    When units were determined to be defective, Point Blank would recall the

defective units from use by U.S. soldiers. In each instance, the failed units were recalled by unit

number. Since the unit numbers were arbitrary and a fraudulent representation, Point Blank

could not recall all defective units.

a. Point Blank covered-up all of this with more false representations, specifically

representing to the government that defective products had been recalled and removed from use -

a cover-up of the cover-up.

23

b. Point Blank's cover-up resulted in U.S. combat soldiers relying on Interceptor Systems to protect them from harm and safeguard their lives, which the company had specifically determined were defective. Because of the cover-up, all recalls conducted by unit number -- which is all of them -- were largely meaningless.

49.    In early 2001, Point Blank contracted with its sister company, PACA, to make the other cuttings into Interceptor yoke/collar, throat and groin assemblies and later the DAPs for the Interceptor System. All the other cuttings that had been accumulated in Oakland from 1999 to 2001 were packed up and shipped to PACA for processing into collars, throats, and groin ballistic panels to go with base vests. These were used by late 2001.

50.    Beginning in late 2001 and continuing to the present, the fabric used to make the component parts manufactured by PACA were not subjected to the final acceptance ballistic test as required by the contract. Point Blank had the fabric drop shipped directly to PACA's manufacturing facility. PACA then cut the throat, collar, and groin pieces from those bolts of cloth. No tests were conducted on this cloth beyond what was done by the manufacturer. No final acceptance ballistic test was conducted on any of these components. At the conclusion of the manufacturing process each unit was assigned an arbitrary unit number in the same manner as previously described.

51.    Mr. Kolbeck informed Point Blank that the procedures used to cut the component parts and the multiple plies failed to conform with the dictates of the PB Plan and the applicable contracts. Ms. Hatfield told Mr. Kolbeck that he was wrong. As Mr. Kolbeck explained later in a July 3, 2006 memorandum to Craig Trask, Plant Manager of the Deerfield Beach facility: "Near the end of 2001, Top Management (Sandra and Ronda) made the decision that the traceability requirement only applied to the body ballistics and not the accessories (namely, the

24

collar/yoke assembly, the insertable collar ballistics and the ballistics in the throat and groin). At that point Point Blank began to drop ship ballistics to PACA, who made the collar/yoke with the sewn-in collar and yoke ballistics. The ballistics received by PACA did not correspond to the lot numbers cut from the body ballistics."

52.     Contrary to Ms. Hatfield's statements to Mr. Kolbeck and others, in demanding payment for the Interceptor Systems delivered to the U.S. military during the time period, Point Blank certified full compliance with, among other things: (a) the required ballistic test as to each Interceptor System and component part; and (b) that uniform ballistic lots were used in all Interceptor components.  The latter was required by contract to ensure that all components of the same Interceptor came from the same ballistic material.  This assured consistent ballistic protection from all ballistic components of each Interceptor vest.  Each such certification was false.  These false certifications meant that U.S. combat soldiers were furnished and relied on equipment intended to protect their lives but which was in fact was of unknown quality and the result of a deeply flawed manufacturing process.

5.     *The Berry Amendment*

53.     The 1999 contract and each contract listed on Exhibit A, required Point Blank to comply with the Berry Amendment.  Beginning in 1999 and continuing through the time period, Point Blank used inferior quality and less expensive foreign sourced components in manufacturing key parts of the Interceptor System in direct violation of the Berry Amendment, the PB Plan and its express warranties repeatedly made to the government.  The inferior quality materials, which endangered U.S. soldiers, included:

        a. *The ripstop*:  The ripstop is the synthetic waterproofing material which protects the Kevlar inserts in the vest.

25

i. The ballistic protection of the Kevlar insert degrades when exposed to moisture such as sweat from a soldier in a theater like Iraq or Afghanistan. The ripstop covering protects the functionality and survivability of the armor's ballistics. If the ripstop degrades and the Kevlar insert becomes wet, the ballistic protections it is designed to provide to the soldier deteriorate, exposing the soldier to increased risk of bodily harm.

ii. Despite its essential function, Point Blank secured the material from HLC Industries and others. These companies imported the material from Taiwan and other foreign sources. It was of inferior quality and did not provide the required protection.

b. *The hook and loop*: The hook and loop is critical to the proper functioning of The Interceptor System. It keeps the vest halves closed and secures the SAPI plates in the proper location on the torso of the soldier to ensure proper protection from munitions. Beginning in at least 2002 and continuing to the present, Point Blank has secured the materials for the hook and loop from foreign sources because it was significantly cheaper than domestic sources. The foreign sourced materials were of inferior quality. There have been multiple complaints by the Army regarding the substandard performance of the hook and loop. Those complaints have been ignored by Point Blank.

c. *The webbing*: The webbing, part of the MOLLE system on the outside of the vest, is another critical component of the Interceptor System. It enables a soldier to strap gear, such as ammunition, first-aid pouches, grenades, radios and other essential equipment to the body armor. If the webbing is faulty or sub-standard, then the soldier risks losing equipment which can be particularly dangerous during combat operations. Point Blank chose to save money by foreign sourcing the material for the webbing beginning in 2003 and continuing into

26

2007. The foreign sourced materials were of inferior quality. This compromised the quality and usefulness of this key Interceptor System component.

d. *Foam in yoke*: The yoke fits around the neck of the soldier and is a key component of the Interceptor System. From 1999 to the present, all of the foam inserted into the yoke has been made in China.

54. Mr. Kolbeck repeatedly informed Point Blank and its senior management that the use of foreign sourced goods in the Interceptor System violated the requirements of its contracts with the United States as well as the company's own quality control system. Ms. Hatfield authorized the use of the foreign sourced goods asserting incorrectly that up to 10% of the materials in the Interceptor System could be foreign sourced under the Berry Amendment.

55. Cost cutting was not the only possible reason foreign sourced goods were used at Point Blank in the Interceptor System. As Mr. Kolbeck noted in a January 17, 2007 e-mail, the person responsible for the purchasing of this component was given travel gifts by the foreign supplier.

56. Ms. Hatfield's claims concerning the Berry Amendment are wrong and are contradicted by the express representations of Point Blank to the United States. In its response to solicitation W9/CRB-04-R-0045, September 15, 2004, which is typical of Point Bank's representations, the company stated: "All subcomponent materials meet or exceed the requirements of the specification and are Berry Amendment compliant. These components are based on readily available Mil-Spec items, all of which were selected based on cost and performance factors to maximize military utility and achieve the maximum delivery capacity." Defendants thus concealed and covered up their decision to dilute the protections provided U.S.

Soldiers by substituting lower quality, foreign-made components for the required Mil-Spec, domestically made components with false representations.

6.   *New Plants But No QC Standards*

57.   By 2001, Point Blank had made 33 deliveries of the Interceptor to the United States military valued at more than $100 million.

58.   Following September 11, 2001 and the terrorist attacks in Washington, D.C., New York City, and Pennsylvania, and with the build up to, and commencement of, the Iraq war, there was increased demand for the Interceptor System. This put increasing pressure on Point Blank's manufacturing process. During the time period, Defendants Brooks and Hatfield were also disregarding the internal financial controls of the company, looting it for their personal benefit and thus increasing the need for additional cash flow.

59.   On February 28, 2002, the Army issued a Solicitation and Offer for the Interceptor. It specified that acceptance would be based on factors other than cost and price alone — that is, the award would not necessarily be based on low price. Rather, manufacturing, production and quality were paramount.

60.   Point Blank was awarded the contract and the company was paid a premium price based on its representations that it could fully comply with all quality control standards and manufacturing requirements, including specifically ISO 9000:90002, Source Sampling and the Berry Amendment. Again these representations were based on the system installed by Mr. Kolbeck, the PB Plan.

61.   By April 22, 2002, the company had more than $140 million in orders and had shipped about 260,000 Interceptor vests to the United States military. It estimated that another $350 million in additional sales were in the pipeline.

28

62. In August 2003, the lack of internal controls at Point Blank began to surface. Point Blank's auditors resigned, citing the disregard by management for proper internal financial controls. Subsequently, the reason for disregarding those controls became apparent: David Brooks and Sandra Hatfield were looting the company, manipulating financial statements, and taking the shareholder's money for themselves. Mr. Brooks and Ms. Hatfield continued to degrade the internal Quality Assurance controls in the PB Plan to hasten production, lower the cost of manufacturing and increase cash flow.

63. Point Blank opened a second manufacturing facility at Deerfield Beach in early 2003 ("Deerfield"). At that time, Mr. Kolbeck was moved to the new plant.

64. The new Deerfield plant produced all the Interceptor ballistic components, except for the yoke/collar system, and combined those items with the outer shells produced by outside sub-contractors to create a complete Interceptor System. The units were then shipped from the plant to the United States Government.

65. In 2004, Point Blank added a third manufacturing facility, this time at Pompano Beach, Florida ("Pompano"). In 2006, this plant began to manufacture the collar/yoke assembly as well as other components. Those components were then combined with the outershell produced by subcontractors and assembled into complete units for shipment to the United States.

66. When Deerfield and Pompano opened, Mr. Kolbeck, in each instance, furnished the supervisors at the new facility with a copy of the quality control system, the PB Plan, he had created for the company. The system was never installed at Pompano. Mr. Kolbeck tried to install the PB Plan at Deerfield but was at least in part thwarted by senior management. No comprehensive ISO compliant quality control system was ever installed at Deerfield Beach or at Pompano. Point Blank management disregarded Mr. Kolbeck's numerous communiqués stating

29

that neither plant was ISO-compliant and that the production function was disregarding the PB Plan to facilitate shipments. Following his transfer to Deerfield, Mr. Kolbeck could not assure compliance with the PB Plan at other plants. Indeed, even at Deerfield Mr. Kolbeck had inadequate resources. Senior management ignored his concerns about the lack of resources.

**7.    Continued Deterioration of QC Standards**

67.    In an August 2003 letter to CBO David Brooks and COO Sandra Hatfield, Mr. Kolbeck admonished the company and its senior management about the growing quality control deficiencies. In a December 12, 2003 e-mail to senior management Mr. Kolbeck reiterated his protests regarding the circumvention and disregard of quality control standards and systems and contract requirements. Mr. Kolbeck's repeated protests and suggestions to correct those systems were ignored.

68.    At fiscal year end 2003, Point Blank's outside auditors identified multiple internal financial control deficiencies. In a filing made with the Securities and Exchange Commission the outside auditors stated that the company had material deficiencies in its internal controls and failed to comply with SEC accounting rules. This disregard for internal financial controls mirrored in the Company's disregard of Quality Assurance controls.

**8.    A Critical Life Threatening Error at UNICOR**

69.    Point Blank's subcontractors also failed to follow proper quality control and Interceptor contract specified standards. Only one of five subcontractors that did work on the Interceptor System had any quality and manufacturing system standards that approximated an ISO 9002 compliant system as required by the contracts.

70.     Although Point Blank was responsible for ensuring that the product manufactured by each subcontractor met each specification and requirement, the company refused to permit Mr. Kolbeck to review the manufacturing processes at any of the subcontractors.

71.     Mr. Kolbeck did inspect the goods from subcontractors which came into his plant. He was unable to review subcontractor goods shipped to the other manufacturing facilities of the company or directly to the military.

72.     In some instances, Point Blank had subcontractor goods shipped to Pompano and ultimately to the U.S. military to avoid inspection by Mr. Kolbeck and his inspection team. Mr. Kolbeck's repeated protests of these actions were ignored.

73.     Circumventing quality control created a particularly dangerous situation for U.S. soldiers relying on UNICOR made vests that Point Blank purchased.

        a. UNICOR is a prison subcontractor.

        b. In making the vest, UNICOR failed to follow the stitching pattern for the front pocket which holds the SAPI plate. By improperly stitching this critical component, the pocket permitted the SAPI plate to shift about one inch to the right side, leaving a portion of the soldier's left chest exposed to life threatening projectiles.

        c. Despite repeated requests by Mr. Kolbeck beginning as early as 1999, UNICOR failed to correct the error.

        d. Mr. Kolbeck corrected the error at Oakland Park and, after his transfer, at Deerfield by ordering that the front pocket be re-stitched following the correct pattern.

74.     Beginning in 2003, UNICOR vests were shipped to the then newly opened Deerfield manufacturing facility and then to the U.S. Military. Beginning in 2004, UNICOR vests were shipped to the then newly opened Pompano manufacturing facility and then to the

31

U.S. military. Only the Deerfield facility corrected the placement of the front pocket leaving all soldiers relying on Interceptor Systems manufactured at Pompano exposed to potentially deadly risk because of the error. Point Blank covered up this deficiency by falsely certifying full compliance for each of these vests.

75.     In 2003, several vests were rejected for, among other things, defects in sewing the front pocket. As Mr. Kolbeck noted in a November 26, 2006 e-mail to Ronda Graves, the Chief Operating manager of Point Blank: "The FPI Interceptor, Extra-Large, that Rick sent to me to inspect has several non-conformances that make the garment unacceptable. The non-conformances are as follows: The front plate pocket opening is too big (15 1/4"), and the pocket is too wide, meaning that the plate does not sit in the center of the vest, but is offset to the right." In the same e-mail, Mr. Kolbeck also noted that the back plate pocket was not properly stitched leaving it out of place and too low. Misplacement of the front and back plates left the soldier exposed to injury. This is just one of a series of e-mails regarding this problem.

76.     In 2007, the Deerfield Quality control inspectors rejected more vests because of the placement of the front pocket. At the time, Point Blank had 29,635 UNICOR vests in inventory. All were rejected. According to the quality control report, 429 vests were inspected. Only 36 passed resulting in a 91% failure rate.

77.     Subsequently, Mr. Kolbeck again raised the problem with Joe Sers, Product Manager for clothing and textiles at UNICOR. Mr. Sers tried to disclaim responsibility for the defect. Mr. Kolbeck rejected this claim in an e-mail to Mr. Sers dated March 13, 2007 which traced the history of the problem:

> As a matter of fact, UNICOR has been making the front plate pocket wrong ever since 1999. By not attaching the pocket to the right armhole seam, the pocket sags down when the soldier places the plate in the vest. By only taking a 1/2" seam allowance on the right side of the front plate pocket, rather than the required

32

1 1/2" seam, the plate is allowed to shift too far to the right by 1", thereby leaving the left chest overly exposed. This vulnerability has potentially resulted in injuries and deaths that could have been prevented if the pocket was sewn correctly. The bad ones are the ones that you shipped directly to the military, because, as I said, I made sure that all the vests that Point Blank shipped [from Deerfield where Mr. Kolbeck was located] had the correct plate pocket seams.

As long as UNICOR continues to make the plate pocket incorrectly, the CASRED potential of the Interceptor is altered. Since you were copied on these e-mails over the past 8 years, you know full well that the UNICOR vests are incorrectly made and do not meet the military specifications. Thousands of our soldiers have Interceptors were their left front chest is exposed due to incorrect UNICOR sewing.

78.    This defect was not corrected until 2007, when UNICOR finally agreed to change its stitching on vests being supplied to Point Blank.

79.    A study done by the Armed Forces Institute of Pathology for the Marine Corps System Command in 2005 on Interceptor Systems considered the importance of the location of the SAPI plates. In part, the study found that "[t]hirty-one of 39 injuries outside the plated area were very close to the plate edge. Five injuries appeared to have occurred in areas that would routinely be covered by the plate." While it does not appear that the Armed Forces Institute of Pathology was aware of the flawed UNICOR vests, these findings illustrate the danger created by the error Point Blank refused to correct at plants where Mr. Kolbeck was not located.

9.    *Key Standards Ignored: Source Sampling*

80.    Throughout this period, Point Blank continued to bid for and be awarded contracts for the Interceptor System and/or its component parts from the U.S. military as reflected in Exhibit A. The awards were based on Point Blank's repeated representations of superior quality and full contract compliance. Those representations keyed to the PB system. These assertions were false.

81.    In 2004, there were additional solicitations for the Interceptor and its new DAPs components. Each solicitation contained manufacturing and quality control standards similar to

33

those in earlier solicitations. In its response to Solicitation W91CRB-04-R-0045, dated 15-Sept-2004, the company stated that "Point Blank has been able to confirm that we are offering the best value with the best delivery at the lowest risk to the U.S. Army." At the time, Point Blank was delivering 20,000 Interceptors per month and had been for 22 months under multiple contracts. Based on new ballistic testing, the company concluded it could increase production and delivery to 25,000 per month.

82.    To secure this contract, Point Blank represented that it would comply with all source sampling requirements incorporated in the contract. Standards for source sampling are set by clauses called out in each contract and incorporated into it. Mr. Kolbeck incorporated those standards in the PB Plan.

83.    Contractual source sampling standards ensure that the materials used in the manufacturing process comply with specific characteristics such as shade, color, tensile strength and infra-red requirements. Natick Research Labs approved labs approved the standards. Fabric manufacturers are supposed to test for compliance and issue a COC. Point Blank is then responsible for monitoring its supply-chain to ensure that the production of fabric complies with the approved specifications. The specifications in solicitation W91CRB-040R09945, dated September 15, 2004, were used for several contracts. These standards are typical of those used for each Interceptor components contract, including those listed on Exhibit A. It specifies:

> "Special Provisions CRITICAL APPLICATION ITEM--SOURCE INSPECTION REQUIRED   THE CONTRACTOR SHALL PROVIDE MEASUREMENTS AND CERTIFICATIONS OF CONFORMANCE FOR ALL MATERIAL PROPERTIES IDENTIFIED IN THE PERFORMANCE REQUIREMENTS BY SPECIFIC TEST METHODS (emphasis original).

84.    The contract requirements included:

a. Outer-shell fabric/webbing: The webbing is part of the MOLLE system used by the soldier to affix other gear to the outside of the Interceptor.

34

i. The standards require that the thread used to attach the webbing to the vest be bonded. If the thread is not properly bonded, the webbing is not properly secured to the vest and can pull away from the vest, resulting in a loss of critical gear by the soldier.

ii. Point Blank shipped thousands of vests on which the webbing was sewn onto the fabric with a mixture of properly and improperly made thread. Dark colored threads used by Point Blank are properly made and properly bonded together. The light colored threads were not properly bonded, are defective, and should have been thrown out. Point Blank mixed the light and dark threads during the production process to conceal the defective threads.

b. Shading: Shading is critical to the Interceptor because it is part of the camouflage which helps conceal the soldier from the enemy during daylight. Point Blank is responsible under its Interceptor contracts for the colors and shading on the vests. Those colors and shading must comply with the United States approved shade # 3729.

i. Although Point Blank knew that there were significant variations in the shades in many instances and, accordingly, that they were wrong, the company did not take any steps to correct the errors or do any testing. Rather, Point Blank simply closed its eyes, refusing to see the obvious, and blindly -- and wrongfully -- relied on the COC from the fabric manufacturer.

ii. In fact, Point Blank did not even have the requisite manuals with the shading information necessary to conduct the testing. As Mr. Kolbeck noted in a September 2005 memorandum to management: "I urge us to get a copy of the quality manuals from all fabric finishers. I have asked for this in the past, but management rebuffed me. We should have this as part of our vendor certification program."

35

iii. The Army has repeatedly complained about problems with the color and shading. The Army has also raised concerns about rapidly fading colors and reported that the dye has washed out with use.

iv. Mr. Kolbeck repeatedly demanded that Point Blank obtain the proper shade testing material. Each request has been refused.

c. IR specifications: The IR or infra-red specifications for the vest are an essential part of its protections because they are designed to minimize the IR signature of the soldier at night, ensuring that he is not visible to an enemy using night vision gear. Although the fabric manufacturer furnished Point Blank with a COC regarding the IR specifications, Point Blank was ultimately responsible for compliance with the IR specifications under each Interceptor contract. Nevertheless:

i. Point Blank has never done any testing for IR compliance.

ii. Point Blank has never had the equipment to conduct the IR tests.

iii. Point Blank consistently refused Mr. Kolbeck's requests to obtain the proper equipment to conduct the tests. Point Blank instead relied on the COCs issued by the manufacturers, that it knew or was reckless in not knowing were invalid.

d. Shrinkage: Shrinkage indicates that the fabric has not been properly manufactured. The Army has repeatedly reported problems with shrinkage. In some instances Point Blank had the wrong fabric. Nevertheless, the company has consistently ignored the problem and no steps were taken to investigate it.

85. Under Point Blank's manufacturing system, all outer shell raw materials are drop shipped to the sub-contractors who process the raw materials into finished outer shells. The company did not take any steps to ensure that raw materials were compliant with contract

36

specifications. Since four of the five Point Blank subcontractors did not have any quality control systems, the company knew or was reckless in not knowing that the materials were not properly tested. Mr. Kolbeck protested this disregard of standards in a November 14, 2003 e-mail to company management. His comments were ignored.

86.     The DSCP has emphasized the necessity for source sampling to the company. Subsequently, Mr. Kolbeck, in a February 9, 2007 memorandum to company management, repeated the importance of source sampling, noting: "the IR [infra-red] specifications are vital to the survivability of the soldier in the field." Point Blank took no action.

87.     Because of the failure to conduct proper source sampling, there could be no assurance that the Interceptor System or its component parts could provide the camouflage necessary to conceal and protect combat soldiers during the day. Failure to source sample meant that there could be no assurance that the Interceptor provided the proper protections for combat soldiers from detection at night. Point Blank's failures meant that by day and by night there could be no assurance that U.S. combat soldiers were provided protections critical to their survival.

88.     When making each demand for payment under each contract in Exhibit A, Point Blank certified compliance with the source sampling requirements. Each certification is false.

*10.     The Final Ballistic Test Is Invalid*

89.     The final ballistic testing for the Interceptor System required a specific number of units be "shot" at an approved facility ("final ballistic test").

a. The final ballistic test is based on two key assumptions: (1) that there is traceability and (2) that the manufacturing process is rigidly controlled so that each vest is substantially identical. As James Mackiewicz, Team Leader, Marine Corps Team, explained in a

37

memorandum dated 24 August 2004 to Thomas Bouchard, U.S. Army Robert Morris Acquisition

Center, Natick, MA which recommended that Interceptors manufactured by Point Blank be

rejected:

> Ballistic verification testing is designed to provide one final method of validation
> of performance required to support acceptance of a lot of items.  The ballistic
> quality assurance test is based on the premise that one vest is made similar to
> another (fibers, fabric, ply lay-up and etc.) in the lot and that a history of materials
> and production can be tracked throughout the manufacturing process.  This is the
> contracted production method, which supports the government ability to ensure
> uniformity  of  each . item  within  a  lot.    If the  tracking  history  of  the
> material/production cannot be identified with an end item the ballistic quality
> assurance  test  has  essentially  no  validity  as  a  representative  measure  of
> performance of an item within a lot. (Emphasis added.)

b.  These assumptions permitted only a small sample to be "shot," minimizing the

number destroyed from each lot and maximizing the number delivered to the U.S. military and

Point Blank's profit.

c.  Each assumption is based on Point Blank's certification that it fully complied

with the PB Plan.

90.    Point Blank's final ballistic test for the Interceptor System has been worthless

since at least 1999.

a.  The number of vests shot is based on regression analysis which assumes each

vest is of uniform quality and that it was manufactured in accordance with the contract

specifications and the PB Plan.  Since Point Blank failed to comply with these standards the

shoot test was invalid and worthless.

b.  The test also assumed traceability.  Since traceability had been destroyed by

Ms. Hatfield, this alone rendered the final ballistic test worthless.

38

91.     Nevertheless, Point Blank continued to certify full compliance for all delivered units during this time period.  This certification was made for each payment under each contract including those on Exhibit A.  Each such certification was false.

92.     The invalidity of the final ballistic test, coupled with the invalid initial ballistic test and the lack of any such testing for certain parts of the system meant, at a minimum, that there was no way to determine if soldiers in battle relying on the Interceptor System were receiving the protection which the U.S. Army intended to provide to them.  In addition, because of the flawed manufacturing process and the cover-up lot numbers assigned to each unit, when there was a failure of either test, Point Blank had no way to ensure that the defective units were either removed from inventory or recalled, despite claims to the contrary.  This means that soldiers were placed in harms way with protective gear which at a minimum, had been produced by a flawed and compromised process, and in some instances had been determined to be defective, all because of Defendants' fraud.

*11.     Change In Management -- No Change In Process*

93.     In 2005 Sandra Hatfield was forced to leave the company.  Ms. Hatfield was named as a Defendant in an SEC enforcement action accusing her of securities fraud based on, among others, allegations that she had manipulated Point Blank's financial statements for her own personal benefit.  *SEC v. Schlegel and Hatfield*, No. 06-61251 (S.D. Fla. filed Aug. 17, 2006).  The next year, the board of directors ousted Mr. Brooks.  Subsequently, the SEC brought an enforcement action against him for securities fraud, alleging he had looted the company at the expense of its shareholders.  Both Mr. Brooks and Ms. Hatfield were also indicted for securities fraud based, among other things, on manipulating financial statements and allegations of looting Point Blank.  *U.S. v. Brooks and Hatfield*, No. 06-0550 (S.D.N.Y. filed Oct. 24, 2007);

39

94.     Retired General Larry Ellis was appointed CEO. Mr. Kolbeck briefed General
Ellis on the manufacturing and quality control deficiencies at the company in writing as well as
in a personal meeting. No corrective action was taken. The internal manufacturing and quality
systems of the company continued to be defective. The company continued, however, to
manufacture the Interceptor System and its components and deliver them to the Army.

95.     Mr. Kolbeck reiterated his concerns in an August 2007 communication to
management which noted in part that "the entire Quality Assurance program is being
circumvented by Production." The communication went on to state that at Point Blank,
production and meeting contract quotas had become the only goal at the expense of quality
assurance and manufacturing standards. Stated differently, Interceptors and the related
components were shipped for use by U.S. soldiers without the quality control assurances
required by the solicitations and promised by Point Blank when it was awarded the contracts.

*12.     Shifting Standards Increase The Risk For Soldiers*

96.     In 2007 Point Blank changed the design and ballistic protections of the collars for
the Interceptor without the permission of, or notice to, the military.

a. Initially, the collars were manufactured with 8 ply Twaron or Kevlar (fabrics
with ballistic qualities) sewn into the neck guard.   Soldiers were issued removable inserts
composed of 18 ply 706 Kevlar and 8 ply Twaron for an 18/8 ply composition ("old insert").
When the insert was put in the collar, the total composition was 8/18/8 layers of a Kevlar and
Twaron mix. This complied with the contract requirements for ballistic protection.

b. In 2007 Point Blank changed the mix. Now the neck guard is manufactured of
an 8/18 mix. The insert is now made of 8 ply Twaron ("new insert").

40

c. Pre-2008 vests have a collar made of only 8 ply Twaron sewn into the collar. Thus when the new insert is put in the collar of a pre-2008 Interceptor the composition is 8/8 rather than the required and Government approved 8/18/8. Soldiers using the new insert in a pre 2007 vest are thus placed seriously at risk.

d. The company is not authorized to alter the manufacturing process. This change violates contract standards. The company has not given any notice of this change or hazard to the U.S. military. When delivering these units and demanding payment, Point Blank falsely certified full compliance with all contract requirements.

97.     Before the modified vest went into production in 2007, Mr. Kolbeck and his quality control team inspected and rejected a lot of 30,000 UNICOR made vests. Of the rejected vests 3,500 could not be repaired because they had support defects in addition to a misplaced front pocket. The 3,500 vests were rejected by the military and Point Blank. Caroline Pang, V. P. of Operations for Point Blank, directed that the rejected vests be placed in inventory.

98.     Recently, Point Blank received an order for 45,000 of the old type vests. The company shipped 3,000 defective vests to Pompano to fill part of the order despite the fact that they were determined defective by the company in the past and that their condition has deteriorated since that conclusion was reached. Those vests were offered to the Government. The Contracting Officer called for a complete inspection of these vests. Despite Point Blank's offer of an 8% discount for the use of these vests, the Government rejected the vests.

99.     Beginning in late 2008, Point Blank acknowledged, at least internally, that the PB Plan had been totally compromised, and that the company had no effective quality control process or any real basis for its representation of compliance to the government. The company retained a consultant to install an updated ISO quality control system. In April 2009 however,

41

the company terminated Mr. Kolbeck. Although Point Blank claimed it had cause to terminate Mr. Kolbeck, the reasons given were a pretext to cover-up its past failures. Indeed, the company failed to follow its own internal procedures in making the termination. Terminating Mr. Kolbeck will permit the company to claim that its new ISO based system is just updated. That claim is false. It is another cover-up of Point Blank's fraud.

**13.   Premium Price**

100.   The United States military paid Point Blank a premium price for many of the Interceptor Systems and their related components. That premium price had two components: (1) the difference between a competitive bid price and market; and (2) $50 per Interceptor over and above the going market price. The military agreed to pay the premium because of Point Blank's representations of high quality standards and the specific representations in its bid that it met or exceeded all manufacturing standards and military specifications. As Marine Corps Team Leader James Mackiewicz stated in a memorandum of 24 August 2004 to Thomas Bouchard, U.S. Army Robert Morris Acquisition Center, Natick, MD ("Mackiewicz memo"):

> It should also be noted that during source selection other offers provided technically acceptable proposals [for the Interceptor] but one of the deciding factors was Point Blank's quality assurance plan. The additional cost to the government for selecting Point Blank is approximately $50.00 per vest.

**14.   Fraudulent Demands For Payments**

101.   Despite its failure to comply with the requisite manufacturing and quality control standards Point Blank demanded and received payment under each Interceptor contract on Exhibit A.

102.   Pursuant to the Demands for Payment the U.S. Department of Defense paid in excess of one billion dollars ($1,000,000,000.00) under the contracts to Point Blank.

103.    Those payments and the Point Blank Defendants demand for payment were based on its express representations of compliance with all solicitation and contract specification in the manufacture and production of the Interceptor System and all of its related parts.

a.    In each instance, when Point Blank made a demand for payment it specifically represented that it had fully complied with all specifications of the solicitation and contract.

b.    As Solicitation Number SP 100-02-R-4025, February 28, 2002 states in part (and which is representative of the solicitations throughout the period): "Submission of an invoice to the Government for payment is a certification that the supplies for which the Government is being billed have been shipped or delivered in accordance with the shipping instructions issued by the ordering officer, in the quantities shown on the invoice and that such supplies are in the quantity and of the quality designated by the cited contract, notwithstanding any other provision of the contract."

c.    For each request for payment under each contract listed on Exhibit A Defendants represented full compliance with all quality control and manufacturing standards included on each solicitation and contract.  This includes those asserting full compliance with the ISO requirements, the first ballistic test, the final ballistic test, source sampling and the Berry Amendment.

d.    In fact, each of those representations is false since the Point Blank Defendants failed to comply with the quality control and manufacturing specifications in the contracts listed on Exhibit A thereby defrauding the U.S. government.  Defendants were unjustifiably enriched as a result of their fraud.

43

104.   While the U.S. government was defrauded as a direct and proximate result of the Point Blank Defendants' wrongful conduct, the real victim of Defendants fraud are the men and women of the U. S. military, who deserve the very best protection this nation can provide them.

## COUNT ONE
### (Violation of FCA § 3729(a)(1), Point Blank Defendants)

105.   Paragraphs 1 through 104 are incorporated herein by reference.

106.   All Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States for payment, in violation of FCA, 31 U.S.C. § 3729(e)(1). Specifically, all Defendants presented or caused to be presented claims for payment under the Contracts listed in Exhibit A for Interceptor Systems and/or component parts which Defendants knew, recklessly disregarded or deliberately ignored were defective. All of these claims were knowingly false claims under the FCA.

107.   By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## COUNT TWO
### (Violation of FCA § 3729(a)(2), Point Blank Defendants)

108.   Paragraphs 1 through 104 are incorporated herein by reference.

109.   All Defendants knowingly made or caused to be made false statements in order to get a false claim paid by the United Stated for payment, in violation of the FCA, 31, U.S.C. § 372(a)(2). Specifically, all Defendants made or caused to be made false statements in connection with false claims for payment under the contracts listed on Exhibit A for Interceptor Systems and/or the related parts which Defendants knew, recklessly disregarded or deliberately ignored were defective. All of these claims were knowingly false claims under the FCA.

44

**COUNT THREE**
(Common law fraud, Point Blank Defendants)

110.   Paragraphs 1 through 104 are hereby incorporated herein by reference.

111.   Point Blank Defendants falsely represented that The Interceptor System and its component parts which were paid for by the United States were manufactured in accord with the specifications in the contracts which were designed to protect U.S. combat soldiers.

112.   Point Blank Defendants failed to inform the United States that The Interceptor Systems and related parts were defective. At the time when the Point Blank Defendants failed to make this disclosure, Point Blank Defendants had a duty to disclose due to their superior knowledge and the life threatening nature of the defects.

113.   Point Blank Defendants knew that their representations, both direct and implied, that the Interceptor Systems and related parts complied with the contractual requirements were false.

114.   These representations were material.

115.   Point Blank Defendants knew that the United States would rely, and intended that the United States rely, on these false representations.

116.   The United States justifiably relied upon these false representations and material omissions.

117.   By virtue of Point Blank Defendants' fraud, the United States suffered damages in an amount to be determined at trial.

118.   The actions of Point Blank Defendants in making these false representations and material omissions with the intent that the United States and its agencies would rely on these false representations and material omissions, was malicious, wanton, and reprehensible conduct.

45

Therefore, punitive damages sufficient to punish and deter Point Blank Defendants should be assessed against them in an amount to be determined at trial.

## COUNT FOUR
### (Mistake, Point Blank Defendants)

119.   Paragraphs 1 through 104 are incorporated by reference herein.

120.   For the fiscal years 1998 through the present, the United States made payments to Point Blank Defendants in the erroneous belief that Point Blank Defendants were entitled to reimbursement, without knowing that Point Blank Defendants' claims were false.  These payments include those for the Interceptor System and its component parts under the contracts listed on Exhibit A.

121.   The United States' erroneous beliefs were material to the amount of the payments made by the United States.

122.   Because of these mistakes of fact, Point Blank Defendants received funds to which it was not entitled.

123.   By reason of the overpayments, the United States is entitled to damages in an amount to be established at trial.

## COUNT FIVE
### (Unjust enrichment, Point Blank Defendants)

124.   Paragraphs 1 through 104 are incorporated herein by reference.

125.   From 1999 to the present, the United States conferred a benefit upon Point Blank by paying for defective Interceptor Systems and the related parts due to the false statements and omissions by Point Blank Defendants.  The Point Blank Defendants knew that this benefit was conferred unjustly, and they have unjustly retained that benefit.

46

126.   The United States is entitled to the return of all payments by the United States directly or indirectly to Point Blank for Interceptor Systems and related parts due to the false claims presented for fiscal years 1998 to the present.

127.   By reason of the above-described payments, Point Blank Defendants have received money, directly or indirectly, to which they were not entitled. They, therefore, have been unjustly enriched in an amount to be established at trial.

## COUNT SIX
### (Breach of contract, Point Blank)

128.   Paragraphs 1 through 104 are incorporated herein by reference.

129.   Point Blank entered into contracts with the United States including but not limited to those listed on Exhibit A. Those contracts imposed obligations on Point Blank, including but not limited to, manufacturing the Interceptor System and its component parts in accordance with specifications contained in those contracts.

130.   Point Blank breached its contractual obligations by failing to comply with the provisions of the contracts, including but not limited to, a) failing to properly conduct the initial ballistic test; b) failing to properly conduct the final ballistic test; c) failing to perform source sampling; and d) failing to comply with the Berry Amendment.

131.   As a result of Point Blank's material breach of contract, the United States has been damaged by the defective Interceptor Systems and related parts in an amount to be determined at trial.

## PRAYER FOR RELIEF

132.   WHEREFORE, Relator, on behalf of the United States, requests that judgment be entered in its favor on each count and against all Defendants as follows

    a.   Damages in an amount to be determined on Counts 1, 2, 3, 4, and 6;

47

b.    For the amount by which defendant was unjustly enriched on Count 5;

c.    Treble damages on Counts 1 and 2;

d.    A civil penalty in an amount to be determined at trial on Counts 1, and 2;

e.    Punitive damages on Count 3;

f.    The costs of this action;

g.    Reasonable attorneys fees and expenses; and

h.    Such other relief as the Court deems just and appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs/Relators hereby demand trial by jury.

Dated: June 3, 2009

Respectfully Submitted,

PORTER WRIGHT MORRIS & ARTHUR LLP

John C. Monica Jr. (VA Bar # 32858)
jmonica@porterwright.com
Thomas O. Gorman
Adam J. Tiffen
1919 Pennsylvania Avenue NW
Suite 500
Washington, D.C. 20006-3434
Telephone:(202) 778-3000
Fax:(202) 778-3063

COUNSEL FOR PLAINTIFF/RELATOR

48