# EXHIBIT E

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE
Point Blank Solutions Inc. Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5069
New York, NY 10150-5069

| In Re: Point Blank Solutions Inc., et al (f/k/a DHB Industries, Inc.) Debtors. | Chapter 11 Case No. 10-11255 (Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held | Case No. of Debtor |

**PROOF OF CLAIM**

Filed: USBC - District of Delaware
Point Blank Solutions, Inc., Et Al.
10-11255 (PJW)          0000000462

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

THIS SPACE IS FOR COURT USE ONLY

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

PBS (CREDITOR.DBF,CREDNUM/CREDNUM # 1000001102*****)
WAYNE KOLBECK
8382 GEORGETOWN LANE
BOYTON BEACH, FL 10437

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: 10-11255
(If known)

Filed on: 08/13/2010

Telephone number:          Email Address:

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:          Email Address:

1. Amount of Claim as of Date Case Filed: $ 3,000,000,000.00
   If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete Item 4.
   If all or part of your claim is entitled to priority, complete Item 5.
   If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
   ☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges.

2. Basis for Claim: See Attached Complaint
   (See instruction #2 on reverse side.)

3. Last four digits of any number by which creditor identifies debtor: _____
   3a. Debtor may have scheduled account as: _____
   (See instruction #3a on reverse side.)

4. Secured Claim (See instruction #4 on reverse side.)
   Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
   Nature of property or right of setoff:  ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
   Describe: _____
   Value of Property: $ _____   Annual Interest Rate _____%
   Amount of arrearage and other charges as of time case filed included in secured claim, if any:
   $ _____  Basis for perfection: _____
   Amount of Secured Claim $ _____   Amount Unsecured $ 3,000,000,000.00

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.
   Specify the priority of the claim:
   ☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
   ☐ Wages, salaries or commissions (up to $11,725*), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).
   ☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).
   ☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).
   ☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).
   ☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
   Amount entitled to priority:
   *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $ _____
   (See instruction #6 on reverse side.)

7. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

8. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See instruction 8 and definition of "redacted" on reverse side.)
   DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
   If the documents are not available, please explain:

FOR COURT USE ONLY

FILED
AUG 13 2010
EPIQ BANKRUPTCY SOLUTIONS, LLC

Date: 8/12/2010

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

*Wayne B. Kolbeck*

Penalty for presenting fraudulent claim. Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

WAYNE B. Kolbeck

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

**Items to be completed in Proof of Claim form**

**Name of Debtor, and Case Number:**
Fill in the name of the Debtor in the bankruptcy case, and the bankruptcy case number.

| 10-11255 | Point Blank Solutions, Inc. |
| 10-11257 | Point Blank Body Armor, Inc. |
| 10-11258 | PBSS, LLC |
| 10-11259 | Protective Apparel Corporation of America |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if the trustee or another party in interest files an objection to your claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). If the claim is based on the delivery of health care goods or services, see instruction 2. Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:

*If delivered by mail:*
Point Blank Solutions Inc.
Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5069
New York, NY 10150-5069

*If delivered by hand delivery or overnight courier:*
Epiq Bankruptcy Solutions, LLC
Attn: Point Blank Solutions Inc.
Claims Processing Center
757 Third Avenue, 3rd Floor
New York, NY 10017

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car.

A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

## INFORMATION

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system http://chapmaticll.com/pointblank to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

FILED

| | |
|---|---|
| UNITED STATES EX REL.<br>WAYNE B. KOLBECK<br>8882 Georgetown Lane<br>Boynton Beach, FL 33472<br><br>                    Plaintiff/Relator<br><br>                    v.<br><br>Point Blank Solutions, Inc. (Formerly<br>Known As DHB Industries, Inc.)<br>2102 SW 2nd Street<br>Pompano Beach, FL 33069<br><br>Point Blank Body Armor, Inc.<br>Atlantic Business Center<br>2102 SW 2nd Street<br>Pompano Beach, FL 33069<br><br>David H. Brooks<br>20 Red Ground Road<br>Old Westbury, NY 11568<br><br>Sandra L. Hatfield<br>2654 Edgewood Ave<br>Schenectady, NY 12306<br><br>Larry Ellis<br>Point Blank Solutions Inc.<br>2102 SW 2nd Street<br>Pompano Beach, FL 33069 | UNSEALED 1/7/10   2009 JUN -3  P 4: 17<br><br>~~FILED UNDER SEAL~~<br>~~AND IN CAMERA~~  CLERK US DISTRICT COURT<br>~~Pursuant to~~     ALEXANDRIA, VIRGINIA<br>~~31 U.S.C. § 3730(b)(2) and~~<br>~~E.D. Va. Local Civil Rule 5(B)~~<br><br><br>Case No.: 1:08CV1187-TSE/IDD<br><br><br><br>AMENDED COMPLAINT |

INTRODUCTION

1.      This is an action to vindicate a fraud perpetrated on the United States and U.S.

combat soldiers who relied on the false representations of Defendants which claimed that

protective body armor vests they sold to the U.S. military would protect the lives of soldiers—
that is, that the vests, in popular terms, were bullet proof.

     a. Those representations were false for vests and component parts of vests
manufactured and sold to the U.S. military by the Point Blank defendants (as defined herein).

     b. In fact, the body armor, or so-called bullet proof vests manufactured by Point
Blank were the product of a flawed manufacturing process which had been repeatedly
compromised by Defendants Brooks and Hatfield to cut costs, speed product and delivery, and
facilitate payment as they looted Point Blank for their own purposes.

     c. The Point Blank defendants covered-up their flawed and defective
manufacturing process to ensure the sale of their products to the U.S. military.

     d. As a result, for their protection in combat, U.S. soldiers have relied and
continue to rely on body armor that is the product of a standardless manufacturing process and
which, in some instances, have subsequently been found to be defective or to contain defective
components. Rather than correct the process and make sure that all vests and components sold to
the U.S. military would protect soldiers as intended, Defendants covered up their fraud with
repeated false representations to the United States to secure payment. As a result of these
fraudulent representations, the United States paid over $1 billion to Point Blank.

    2.    On behalf of the United States of America and himself, Relator, Wayne B.
Kolbeck, brings this action under the False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA") and
the applicable common law principles, to recover millions of dollars in fraudulent over-charges
and, in addition, civil penalties and reasonable attorneys' fees, from Defendants Point Blank
Solutions, Inc., (formerly known as DHB Industries, Inc.), Point Blank Body Armor, Inc.
(collectively "Point Blank" or "the company"), David H. Brooks, a former CEO of the company,

Sandra Hatfield, former COO of the company and Larry Ellis, who replaced David H. Brooks as CEO of the company (collectively "Point Blank Defendants").

3.      Beginning in 1999 and continuing to the present, the Point Blank Defendants certified full and complete compliance with all contract specifications and standards for manufacturing and delivering thousands of Interceptor System body armor units to the U.S. military to protect combat soldiers.

4.      Each certification executed by the Point Blank Defendants was false. The Interceptor Units and related component parts were delivered to the U.S. military based on fraudulent representations regarding:

      a. The ballistic tests;

      b. The camouflage standards;

      c. The infra red standards; and

      d. The Berry Amendment; and

      e. The Traceability requirements.

5.      The Point Blank Defendants certified that these vests were manufactured in accordance with National Institute of Justice ("NIJ") standards as required. In fact, those representations were false, due to a flawed and compromised manufacturing and quality control process. Indeed, the Point Blank Defendants knew that in many instances they sold to the government units they had determined to be defective. This occurred in two circumstances.

      a. First, when units were determined to be defective prior to shipment, the lot was not supposed to be shipped, but instead withdrawn from the "for sale" inventory;

            i. Withdrawing all units with a specific unit number was suppose to ensure that goods found to be defective were not sold to the U.S. military. This is because a unit number was suppose to be assigned to all products made from the materials from a specific lot.

Thus, if a lot had a defect, the unit number could be readily identified and the defective products removed from inventory.

ii. Since the Point Blank Defendants had repeatedly compromised the manufacturing process and the quality control standards of the PB Plan (as defined herein), there could be no assurance that the materials from one lot were all assigned the same unit number. In fact, the compromised processes scattered materials from various lots throughout the manufacturing processes. A unit number thus did not represent all goods manufactured from a single lot – that is, the material from a single lot could not be traced to a single unit number. The unit numbers were arbitrary and essentially a cover-up of the flawed manufacturing process.

iii. Thus removing items with a specific unit number from inventory did not assure that all defective products were removed. Rather, as the Point Blank defendants knew, or were reckless in not knowing, units with materials determined to be defective remained in inventory and were sold to the U.S. military.

b. Second, any recall of defective products done by Point Blank Defendants was also a sham and a cover-up. As the Point Blank defendants knew, they could not effectively recall all products determined to be defective because of the flawed manufacturing process and arbitrarily assigned unit numbers.

6. As a result of Defendants' repeated falsifications and fraudulent misrepresentations the United States was defrauded out of over 1 billion dollars.

7. As a direct result of Defendants' repeated false statements and fraudulent misrepresentations, Defendants breached their contracts, were paid by mistake and were unjustifiably enriched.

4

8.      This suit seeks the repayment of the sums paid by the United States because of Defendants' false claims along with the imposition of statutory penalties and other appropriate relief.

## JURISDICTION

9.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345,1331, and 1367. The Defendants are doing and/or previously did business within this District.

## VENUE

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3731(a).

## PARTIES

### Relator –Plaintiff

11.     Relator, Wayne B. Kolbeck, is a citizen of the United States and a resident of the State of Florida.

a. He brings this action on behalf of himself and the United States, inclusive of the United States Department of Defense, the Defense Finance and Accounting Service ("DFAS") and the Armed Services of the United States who purchased body armor and equipment from the Defendants.

b. This lawsuit was originally filed on November 13, 2008. Mr. Kolbeck was employed by Point Blank from 1999 to April 2009. During that period, he was the Director of Quality Assurance and Engineering. Mr. Kolbeck has a B.S. in Textile Chemistry and an M.B.A. in Business Administration and has been certified as a quality engineer and auditor.

c.  Mr. Kolbeck has direct and independent knowledge of the information supporting the allegations of this Amended Complaint.  The allegations in the complaint regarding the manufacturing and quality control for production of the Interceptor and its related parts are not based upon public information.  He is the original source of the information, which has been voluntarily provided to the United States government prior to filing this Amended Complaint.

d.  During the applicable time period, Mr. Kolbeck repeatedly brought the manufacturing and control deficiencies detailed herein to the attention of company management, including David Brooks, Sandra Hatfield, and Larry Ellis.  Since those warnings were ignored and he could not remedy all of the deficiencies, due to the serious and life threatening nature of the manufacturing failures he was compelled to bring these matters to the attention of the United States and filed this action.  Until that time as a Point Blank employee, he generally did not disclose these matters to persons outside the company, attempting to try and correct the deficiencies from within.

### The Defendants

12.  Defendant Point Blank Solutions, Inc. ("PBS") is a publicly traded company currently incorporated in Delaware with its headquarters and primary manufacturing facilities in Broward County, Florida.  The company is organized as a holding company and sells its body armor products through two subsidiaries, Point Blank Body Armor, Inc., and Protective Apparel Corporation of America.  PBS's primary product is the Interceptor vest, a bullet-resistant vest all branches of the U.S. military currently use.  PBS conducted business in this District at all times relevant hereto.

13.  Defendant Point Blank Body Armor, Inc., ("Point Blank") is the primary subsidiary through which PBS manufactures its products.  It is located in Broward County,

Florida. It is the leading manufacturer and provider of bullet and protective resistant garments, fragmentation protective vests, slash and stab protective armor and related ballistic accessories. During the period from 2002 through 2006, 80 to 87% of Defendants' revenues were either directly or indirectly related to sales to the United States Department of Defense for the military. Point Blank conducted business in this District during the time period relevant hereto.

14.     Defendant David H. Brooks founded DHB Industries, Inc., in 1992 and purchased Point Blank out of bankruptcy in 1995. He served as DHB Industries' CEO and Chairman of the Board until he was ousted from his position in July 2006 and was subsequently indicted for diverting millions of dollars of company money for his personal use and engaging in widespread financial and accounting fraud. He is a Defendant in a criminal and a civil enforcement action both of which allege securities fraud brought by, respectively, the government and the Securities and Exchange Commission. *U.S. v. Brooks and Hatfield*, No. 06-0550 (S.D.N.Y. filed Oct. 24, 2007); *SEC v. Brooks*, No. 07-61526 (S.D. Fla. filed October 25, 2007). He previously has been enjoined and barred from associating with any broker or dealer for five years because of his role in an insider trading scheme. *Jeffrey Brooks Securities, Inc., Jeffrey Brooks and David Brooks, Exchange Act Release No. 34-31657, 53 SEC Docket 0384 (Dec. 23, 1992); *SEC v. Haddad et al.*, 92 Civ. 9122 RPP (S.D.N.Y.).

15.     Defendant Sandra L. Hatfield was the COO and Head of Government Projects for Point Blank Body Armor, Inc. from 2000 until approximately August 2005. Ms. Hatfield has also been indicted on criminal charges based on allegations of manipulating financial statements for her benefit and financial fraud and been named as a Defendant in an SEC securities fraud action. *SEC v. Schlegel*, No. 06-61251 (S.D. Fla. filed Aug. 17, 2006); *U.S. v. Brooks and Hatfield*, No. 06-0550 (S.D.N.Y. filed Oct. 24, 2007).

7

16.     Defendant General Larry Ellis was the CEO of Point Blank Solutions, Inc. from July 2006 until April 2009.

17.     Defendant Ellis, along with Point Blank Solutions, Inc., Point Blank Body Armor, Inc., David H. Brooks, and Sandra L. Hatfield, are sometimes referred to as the "Point Blank Defendants."

## BACKGROUND

### A.    The False Claims Act

18.     The False Claims Act, in pertinent part, imposes liability for damages and civil penalties on:

Any person who —

> (1) Knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> (2) Knowingly makes, uses, or causes to be made or used, a false record of statement to get a false or fraudulent claim paid or approved by the Government.

### B.    Purchasing vests: Overview

19.     Generally, body armor for the U.S. military is purchased by the United States pursuant to solicitations and offers for contracts made by, and under the supervision of, the Defense Logistics Agency ("DLA") whose headquarters is located at Fort Belvoir, Virginia. Contracts entered into as a result of this process are administered under the auspices of the Defense Contract Management Agency ("DCMA") whose headquarters is also located at Fort Belvoir, Virginia. Invoices for payment under those contracts are processed under the supervision of the Defense Finance and Accounting Service ("DFAS") which is the financial and accounting organization for the Department of Defense. DFAS is headquartered in Arlington, Virginia. Exhibit A, which is attached hereto and incorporated herein, is a partial list of

8

solicitations, contracts, and delivery orders ("contracts") under which Point Blank received payments. Each contract was issued under the supervision of DLA, administered by DCMA and the presentations for payment and authorization for payment were made by DFAS.

20.    From 1999 to the present the United States Government purchased in excess of 2.5 million body armor units known as the Interceptor System (and its related parts) as defined below from Defendant Point Blank. Many of those purchases were made under the contracts listed on Exhibit A. Defendant Point Blank submitted at least 568 invoices (*see* partial list of contracts and delivery orders in Exhibit A) to the United States seeking payment for these goods under the contracts.

C.    **The Military Vest Purchases: The Interceptor Program**

21.    The Interceptor Body Armor System is a body armor system manufactured by Point Blank for the U.S. military. It is designed to protect the upper torso of a soldier from ballistic and shrapnel threats. The system has several component parts which are manufactured and sold as a complete unit (collectively "The Interceptor System").

a.    An outer shell is made of multiple layers of fabric that must meet certain ballistic performance standards ("shell"). The shell contains a removable Kevlar insert ("Kevlar insert") that provides the soldier with the required ballistic protections. The Kevlar insert must be protected from moisture such as water or perspiration which can degrade its ballistic properties. That protection is provided by a non-removable covering or "rip stop."

b.    The vest closes in the front. It is held closed and in place on the soldier's body by the "hook and loop" which essentially is Velcro strips.

c.    The outer shell is covered by "webbing" which is part of the Modular Lightweight Load-carrying Equipment ("MOLLE") system. The system permits the soldier to

9

strap gear such as ammunition, first-aid pouches, grenades, radios and other essential equipment to the vest.

d. The front of the shell has a pocket ("front pocket") into which a Small Arms Protective Insert ("SAPI") plate can be inserted. The plate provides additional ballistic protections.

e. The back of the vest has a similar pocket ("rear pocket") into which another SAPI plate can be inserted.

f. The collar, throat and groin parts attach to the vest, respectively, protect the soldier's neck, throat and groin ("related parts"). The related parts are made of several layers of the same fabric as the outer shell and are intended to have the same ballistic performance properties as the outer shell. The collar also contains a pocket for an insert to fortify its ballistic performance.

g. The Interceptor System has additional protections for the solider by day and night. By day it has specific color and camouflage patterns designed to conceal the soldier. By night it has specific infra-red ("IR") properties which minimize the night time signature of the soldier when viewed with night vision gear.

22. In 2004 Point Blank developed for the U.S. Marine Corps an Armor Protection Enhancement System, essentially an improved version of the Interceptor System. This new system has enhanced protections, providing additional deltoid and auxiliary protectors ("APEs") and Enhanced Side Ballistic Inserts ("ESBI") to give the upper/under arm, and side the same protections offered by the other parts of the vest. A similar product was developed for the U.S. Army called the Deltoid Auxiliary Protection System ("DAPS") (collectively the "updated system").

10

**D.    Point Blank**

23.    Beginning in 1999 and continuing through the present ("the time period") Point Blank manufactured for, and sold to, the U.S. military the Interceptor System including the related parts and, after 2004 the DAPs, APEs, and ESBIs all of which are collectively referred to herein as The Interceptor System.

*1.    Point Blank's Quality Claims*

24.    Point Blank represented at all times pertinent hereto, that The Interceptor System is the finest body armor in the world and that it provides U.S. combat soldiers the very best protection available - in every day terms, it is "bullet proof." The company has repeatedly made these representations to the U.S. military and the public.

25.    Point Blank's representations regarding The Interceptor System are based on what the company claims is the rigorous, world class quality control standards in its manufacturing process. Those standards, according to the company, ensure that each Interceptor System made for the U.S. military is uniformly manufactured under the highest, most rigorous quality control standards. The company claims that its quality control and manufacturing standards meet or exceed all standards in military solicitations and contracts for the manufacture and purchase of body armor. Strict adherence to these quality control standards and manufacturing specifications ensures that U.S. combat soldiers receive the best protection from harm possible, according to Point Blank.

11

## 2.    *The Basis Of Its Quality Claims*

26.    In 1999 Mr. Kolbeck was hired by the company as the Director of Quality Assurance and Engineering ("QC Director"). Mr. Kolbeck was hired because of his expertise in quality control systems and related matters.

a. As QC Director, Mr. Kolbeck was responsible for the creation and maintenance of the quality control and related manufacturing system for all military body armor manufactured by the company, including The Interceptor System during the time period.

b. Mr. Kolbeck was also responsible for ensuring that all body armor manufactured for the U.S. military meet or exceeded each requirement specified in the solicitations by, and contracts with, the military.

27.    Beginning in 1999 Mr. Kolbeck established a comprehensive system of quality controls at Point Blank's Oakland Park manufacturing facility ("Oakland"). At that time Oakland was its only facility. The system was designed to ensure that the manufacturing process for The Interceptor System complied with all military specifications and that vests manufactured under the system provided U.S. military personnel the proper protections -- the armor would be "bullet proof" in popular terms. Accordingly, the system included the following elements:

a. ISO 9000/9002 standards: These are international quality standards. They are included in solicitations for, and contracts entered into, by Point Blank with the United States Department of Defense. ISO 9002 requires a manufacturer to comply with the higher-level quality standards. Its requirements include establishing a quality management system throughout the organization, having adequate quality control personnel, the performance of an annual management review, the adoption of a quality system, contract review, appropriate documentation and record maintenance, a documented Purchasing System that validates and

12

controls each vendor, and a mechanism for correction and safeguards to prevent the production of non-conforming products.

b. Berry Amendment compliance:  § 905 of the DOD Appropriations Act 1993, P.L. 102-396 (as amended, § 832 of P.L. 107-107, 10 U.S.C. § 2533s).  This amendment requires that all materials for products such as the Interceptor System be from U.S. sources.  The purpose is for security reasons and to ensure that U.S. soldiers receive the best quality equipment.

c.  Source Sampling:  Makes a contractor responsible for assuring complete compliance with contract requirements including quality control at its facilities, as well as those of its suppliers and subcontractors.  Source sampling can only be approved by testing and obtaining Certificates of Compliance ("COCs") from U.S. government certified labs.  For contracts listed in Exhibit A, Point Blank relied on COCs from labs that it knew, or was reckless in not knowing, were not certified by the U.S. government as required by each individual contract.

i.  Adherence to these standards ensure that raw materials for critical safety items to protect U.S. combat soldiers, such as the outer shell of the Interceptor, are pre-approved for conformance to applicable specifications prior to being released for processing into the end product.

ii.  Requires the use of the National Institute of Justice ("NIJ") laboratories, or laboratories approved by the NIJ, for all ballistic acceptance testing to ensure proper testing to maximize the protection for soldiers.

d.  Record keeping:  Requires detailed records regarding the components used in the manufacturing process, the steps and inspections taken, and the tests administered.

i. There must be detailed records for each lot of fabric used to manufacture The Interceptor System.

ii. Those records must permit each fabric lot to be traceable throughout the manufacturing process to the completed product ("traceability"). Traceability permits review of the manufacturing and quality control process. It also enables the company to certify compliance with required contracting standards thereby ensuring the equipment is properly manufactured to protect soldiers.

iii. The final ballistic test for The Interceptor System is based on traceability because the test assumes complete compliance with the initial ballistic test and each required quality control step. Absent traceability, there is no assurance that final ballistic test results are accurate, or that soldiers are being given the proper protection.

iv. Absent records demonstrating compliance with the specified quality control standards and manufacturing process, there is no assurance that final acceptance testing is accurate because that testing assumes the uniformity of the ballistic protection throughout the identified shipping lot. Absent the required records, uniformity cannot be established.

v. Absent traceability, Point Blank has no basis on which to certify compliance with contract specifications and to demand payment from the government for the finished goods.

e. At the conclusion of the manufacturing process, each part of the Interceptor System has a number affixed to it. Each part of the unit is assigned the same number ("unit number"). The unit number is documented and is designed to provide a direct link back through the manufacturing process to the original fabric lot. This permits the company to remove any

14

vests determined to be defective before shipment, or alternatively, to recall all units discovered to be flawed or defective after shipment.

28.     The system installed by Mr. Kolbeck was, in accordance with ISO standards, a "top down" system.  Specifically, it required supervision by senior management to ensure that the necessary controls were enforced throughout the manufacturing process and that the system was improved and updated as required.  The system was designed to apply to all subcontractors.

29.     The system and standards Mr. Kolbeck installed and implemented are detailed in a comprehensive, written quality control manual available at Point Blank, as well as in a complete set of quality assurance procedures, work instructions, and record keeping documents.

30.     In 2000, after the system was fully installed, it was certified as ISO compliant ("PB Plan").  That certification was good for a three year period.  The certification assumes that the company would continue to adhere to the system installed by Mr. Kolbeck.  In fact, the company failed to adhere to the PB Plan and took affirmative steps which under-cut it.  Later, the company covered up these actions.

31.     Ms. Hatfield began to undercut the quality control system almost immediately.

        a.  ISO 9002 requires that senior management hold periodic meetings to review the implementation of the standards.  Senior management supervision is critical because it facilitates implementation and enforcement of the system throughout the manufacturing process – quality control must flow down through the system from the top.

        b.  The first management review meeting was held on July 12, 2000.  Shortly after the meeting began then COO Sandra Hatfield abruptly announced that she was "tired" of discussing quality control and that she had "real work" to do.  Ms. Hatfield walked out of the meeting bringing it to an end.  No Management Review meetings were held after July 12, 2000.

c. The refusal of senior management to participate and ensure implementation and continued operation of the system directly undercut its effectiveness and is contrary to the PB Plan.

32.     The next year Mr. Brooks and Ms. Hatfield took further steps to undercut compliance with the PB Plan. On January 2, 2001, the two Defendants directed that Mr. Kolbeck, the QC Director, no longer report to senior management. This is directly contrary to ISO 9002 and undermined the authority of the position to enforce and maintain quality control standards.

**3.      *The 1999 Interceptor Contract***

33.     In 1999 Point Blank was awarded a contract from the U.S. military to manufacture the version of The Interceptor System available at that time. The contract extended through 2004 ("1999 contract"). Under the contract, the Army agreed to pay approximately $500 per Interceptor vest. The contract had a potential value of $190 million dollars. This was the first of several contracts for the Interceptor System and/or component parts awarded to Point Blank during the time period.

34.     Point Blank represented in bidding for the 1999 contract that it would meet or exceed each of the detailed quality control standards specified by the U.S. Military in the solicitation. Those representations and the requirements of the solicitation were incorporated in the 1999 contract. This same procedure was used for each contract listed on Exhibit A. Exhibit A represents only a partial list of solicitations, contracts, and delivery orders Point Blank received or entered into with the Department of Defense between 1998 and 2008. Under these contracts, Point Blank was paid over 1 billion dollars upon delivery of over 2.5 million Interceptor and Improved Outer Tactical Vests, DAPS, and related component parts.

16

35.     The representations made to secure the 1999 contract, as well as all other contracts, are substantially similar to those made in response to Solicitation W91CRB-04-R-0045, September 15, 2004. There the company represented: "Overall it is important to note that Point Blank Quality Assurance and Procedure Manual (available upon request) complies with all the conformance inspections of ISO 9001: 2000, ISO 9002:1994 and all specific requirements referenced in CO/PD00-02D. The areas covered include, but are not limited to: All purchased raw materials and components for assembly of the OTV [The Interceptor] . . . Meeting all the objectives and responsibilities of the Interceptor Program [and]. . . Meeting all of the objectives and responsibilities of the Quality Management Team." Point Blank also represented it would fully comply with the Berry Amendment.

36.     Point Blank's representations to the U.S. military to secure the 1999 contract, as well as later contracts, including those listed on Exhibit A, were based on compliance with the quality control system installed by Mr. Kolbeck, the PB Plan. Point Blank was awarded the 1999 contract, and all other contracts, including those listed on Exhibit A, based on its specific representations as to quality control and contract compliance based on the PB Plan, as well as its reputation for manufacturing the finest body armor. These requirements were to ensure that U.S. combat soldiers received the best life saving and injury avoidance protection available.

4.     *False Certifications For The Initial Ballistic Tests*

37.     Two ballistic tests are performed as part of the manufacturing process for the Interceptor System during the time period. Full compliance with each was required by the 1999 contract and each other contract entered into including those listed on Exhibit A.

a. The first is a "shoot" test on the cloth used to make the vest and its component parts ("initial ballistic test"). This test is performed by the fabric manufacturer and presented to

17

Point Blank, along with a Certificate of Compliance ("COC"), to show that the fabric meets all requirements for use in the Interceptor.

      b. The second is also a "shoot" test. It is conducted on the completed Interceptor System ("final ballistic test"). This is the test that the Government requires to determine the acceptability of the interceptor shipping lot for acceptance.

      c. These tests, conducted in accordance with Military Standard 662F ("Mil Spec") at a NIJ laboratory or NIJ approved laboratory, are designed to ensure that U.S. combat soldiers are properly protected from life threatening shrapnel and gun fire.

38.    Beginning in 1999 and continuing through the time period, Point Blank failed to comply with the initial ballistic test requests.

      a. The test was improperly conducted as it did not comply with the Mil-Spec standards.

      b. Traceability for the component parts and multiple plies was destroyed, resulting in some fabrics being tested, some not being tested, and some fabric which failed the test being used.

39.    As to the Mil-Spec for the initial ballistic test, Point Blank modified the required procedures to increase the pass rate with the effect of rendering any testing and resulting Certificate of Compliance meaningless:

      a. Ballistic standard MIL-STD-662F dictates the manner in which the test is to be conducted. Under this standard a sample of the cloth is to be "shot in air," that is affixed to a metal frame and shot with no backing which might fortify the cloth and thereby inflate the test results.

18

b.  Point Blank altered the test procedure by requiring the fabric manufacturer to test the cloth by affixing it to a clay mount which gave the cloth additional backing, diminishing the impact of the bullet and increasing the pass ratio.  Failure to properly conduct the test rendered any test results, and COC based on these tests, worthless.

c.  Although Mr. Kolbeck repeatedly informed the company that the initial ballistic test was being improperly conducted, no corrective action has been taken.

40.     As to traceability, the 1999 contract, and each contract including those listed in Exhibit A required that Point Blank certify compliance with the initial ballistic test in requesting payment.  When that certification is provided, it is based on the test results and traceability to the COC.

a.  The initial ballistic test is conducted on a sample from a specified bolt from the manufacturing lot, or identical batch of rolls of cloth.  Following the initial ballistic test, if the sample passes, a COC is issued.

b.  The fabric used to make each Interceptor System must be traceable to the same COC.  This requirement applies to the fabric for each throat, neck, groin, ESBIs, and DAPs and the multiple plies of cloth used to make each of those components of the Interceptor System.

c.  When The Interceptor System is assembled in preparation for shipment, and the unit number is assigned to each component, that number ties directly to these records.  This permits the fabric for the vest, each component part, and each of the multiple plies to be traced back to a COC certifying that it passed the initial ballistic test.  This process gives Point Blank a basis on which to certify compliance with this contract standard, and ensures that the soldier is receiving a properly manufactured Interceptor System that meets or exceeds the applicable standards.

41.     Ms. Hatfield destroyed traceability as to the relevant parts and multiple plies used throughout the system by altering the procedures used to cut the cloth for these parts and plies ("Modified cutting procedure") beginning in 1999 to cut costs.  Under the PB Plan, the vest, vest collars, throats and groins as well as the multiple plies were required to be cut from the same fabric lot which could be traced to a COC.  This insured traceability, compliance, and directly linked the cuttings and resulting components to the test results.  It alone ensured that if a lot was determined to be defective, all parts manufactured in that lot could be removed from inventory or be recalled.

42.     Under the modified cutting procedure, which was contrary to the PB Plan and which destroyed traceability:

a.  The vests were cut;

b.  The vest collars, throat, groins and multiple plies for the body of the vest were cut from the remaining fabric and other lots of fabric, creating excess ballistic parts ("other cuttings");

c.  The other cuttings were commingled and dumped into unmarked bins and stored for later use;

d.  During the manufacturing process, Point Blank would use the other cuttings as necessary in the manufacturing of vests;

e.  If a lot fell short of the required number of vests, typically because of manufacturing errors, Point Plan would take "spare" vests from a fixed pile kept for that purpose, which were made from materials drawn from various lots to fill out the manufacturing lot.

f.  There were no records which permitted the other cuttings to be traced to a COC for the initial ballistic test or to the performance of these components in the final, acceptance

20

testing for approval by the Government. Thus, there was no basis on which to certify that the other cuttings passed the initial ballistic test or the final ballistic acceptance testing;

g. The random mixing of the ballistic lots at the beginning of the vest manufacturing process precluded any ability to remove any plies that were part of a lot which failed in the first ballistic test, or which were later determined to be defective. Accordingly, units were sold to the government and used by soldiers which contained fabric that failed the first ballistic test.

h. Point Blank used the modified cutting procedure from 1999 through approximately 2001.

43. At the conclusion of the manufacturing process the component parts were assembled into a completed Interceptor System for delivery under a contract. For Systems delivered to the U.S. military between 1999 and 2001 this meant that the Interceptor System consisted of a vest along with the throat, neck and groin parts.

a. Each component part in a completed Interceptor System had a label affixed to it. Point Blank put the unit number on that label which, according to the PB Plan, ensured traceability.

b. If a defect was discovered, the defective vests would be removed from use by removing all vests with a specific lot number from inventory. Likewise, if a recall became necessary because a defect was discovered, the defective units would be removed from use by recalling all of the vests with a specific unit number. This process was designed to ensure that defective vests were not sold to the government and relied on by U.S. Soldiers, or if sold they could be recalled - that is, no soldier would rely on a defective vest.

21

44. In fact, the unit numbers were a fraudulent cover-up by Point Blank, carried out to conceal the fact that there is no traceability. At the end of the manufacturing process, a unit number was affixed to each part of a completed system. That number, in effect, represented that the unit, and each component in the unit, could be traced back through the manufacturing process, and that all of the fabric could be traced back to a single lot in accordance with the PB plan. Essentially, the unit number represented that the product could be traced back through a uniform manufacturing and testing process and that if defects or failures were discovered at any step in the process, then all units using materials from the defective or failed lot could be removed from inventory or recalled. Since there was no traceability, in fact the unit numbers were useless. They gave the appearance of traceability and represented that a quality control manufacturing process was used, which was false. The number is a fraud.

45. From 1999 to the present, units periodically failed final acceptance tests. For example:

a. In March 2003, lots # 60-9 and #60-12 failed their final acceptance tests, and at least 2,000 vests were segregated and destroyed instead of being shipped to the military.

b. In August 2004, lots #69-99 and #69-102 failed their final acceptance tests, and at least 2,000 vests were segregated and destroyed instead of being shipped to the military.

c. In January 2006, at least 2,400 sets of DAPS failed the final acceptance tests, and were segregated and destroyed instead of being shipped to the military.

d. At least 6,000 IOTVs from five other lots failed their final acceptance tests, and were segregated and destroyed instead of being shipped to the military.

e. In February 2009, at least 1,200 IOTVs from lot # 144 failed the final acceptance test, and were segregated and destroyed. Although Mr. Kolbeck informed the

22