company that all the material in lot #144 had to be destroyed, Point Blank used at least 278 yards of the material to manufacture units in subsequent lots which were sold to the government.

46.   When units failed the final acceptance test, Point Blank would represent that the defective units were removed from inventory and not sold to the government. This representation was based on the removal from inventory (or recalls) of all units with a specific unit number. Since the unit numbers were arbitrary and a fraudulent representation, Point Blank's representation was false - a false representation built upon a false representation.

47.   From 1999 to the present, a number of recalls of vests were made after they had already been shipped and were in use by U.S. military personnel. For example:

a.   In May 2005, the Marine Corps recalled at least 5,200 Interceptor Vests manufactured in 2004 by Point Blank due to "life-threatening" flaws in the vests. These vests had already been issued to Marines in Iraq, Afghanistan, and Djibouti.

b.   In November 2005, the Army and Marine Corps recalled over 18,000 Interceptor vests manufactured by Point Blank between 1999 and 2001 due to their failure to meet ballistic standards.

48.   When units were determined to be defective, Point Blank would recall the defective units from use by U.S. soldiers. In each instance, the failed units were recalled by unit number. Since the unit numbers were arbitrary and a fraudulent representation, Point Blank could not recall all defective units.

a.   Point Blank covered-up all of this with more false representations, specifically representing to the government that defective products had been recalled and removed from use - a cover-up of the cover-up.

23

b.  Point Blank's cover-up resulted in U.S. combat soldiers relying on Interceptor Systems to protect them from harm and safeguard their lives, which the company had specifically determined were defective.  Because of the cover-up, all recalls conducted by unit number -- which is all of them -- were largely meaningless.

49.      In early 2001, Point Blank contracted with its sister company, PACA, to make the other cuttings into Interceptor yoke/collar, throat and groin assemblies and later the DAPs for the Interceptor System.  All the other cuttings that had been accumulated in Oakland from 1999 to 2001 were packed up and shipped to PACA for processing into collars, throats, and groin ballistic panels to go with base vests.  These were used by late 2001.

50.      Beginning in late 2001 and continuing to the present, the fabric used to make the component parts manufactured by PACA were not subjected to the final acceptance ballistic test as required by the contract.  Point Blank had the fabric drop shipped directly to PACA's manufacturing facility.  PACA then cut the throat, collar, and groin pieces from those bolts of cloth.  No tests were conducted on this cloth beyond what was done by the manufacturer.  No final acceptance ballistic test was conducted on any of these components.  At the conclusion of the manufacturing process each unit was assigned an arbitrary unit number in the same manner as previously described.

51.      Mr. Kolbeck informed Point Blank that the procedures used to cut the component parts and the multiple plies failed to conform with the dictates of the PB Plan and the applicable contracts.  Ms. Hatfield told Mr. Kolbeck that he was wrong.  As Mr. Kolbeck explained later in a July 3, 2006 memorandum to Craig Trask, Plant Manager of the Deerfield Beach facility: "Near the end of 2001, Top Management (Sandra and Ronda) made the decision that the traceability requirement only applied to the body ballistics and not the accessories (namely, the

collar/yoke assembly, the insertable collar ballistics and the ballistics in the throat and groin). At that point Point Blank began to drop ship ballistics to PACA, who made the collar/yoke with the sewn-in collar and yoke ballistics. The ballistics received by PACA did not correspond to the lot numbers cut from the body ballistics."

52. Contrary to Ms. Hatfield's statements to Mr. Kolbeck and others, in demanding payment for the Interceptor Systems delivered to the U.S. military during the time period, Point Blank certified full compliance with, among other things: (a) the required ballistic test as to each Interceptor System and component part; and (b) that uniform ballistic lots were used in all Interceptor components. The latter was required by contract to ensure that all components of the same Interceptor came from the same ballistic material. This assured consistent ballistic protection from all ballistic components of each Interceptor vest. Each such certification was false. These false certifications meant that U.S. combat soldiers were furnished and relied on equipment intended to protect their lives but which was in fact was of unknown quality and the result of a deeply flawed manufacturing process.

## 5. The Berry Amendment

53. The 1999 contract and each contract listed on Exhibit A, required Point Blank to comply with the Berry Amendment. Beginning in 1999 and continuing through the time period, Point Blank used inferior quality and less expensive foreign sourced components in manufacturing key parts of the Interceptor System in direct violation of the Berry Amendment, the PB Plan and its express warranties repeatedly made to the government. The inferior quality materials, which endangered U.S. soldiers, included:

a. *The ripstop*: The ripstop is the synthetic waterproofing material which protects the Kevlar inserts in the vest.

25

i. The ballistic protection of the Kevlar insert degrades when exposed to moisture such as sweat from a soldier in a theater like Iraq or Afghanistan. The ripstop covering protects the functionality and survivability of the armor's ballistics. If the ripstop degrades and the Kevlar insert becomes wet, the ballistic protections it is designed to provide to the soldier deteriorate, exposing the soldier to increased risk of bodily harm.

ii. Despite its essential function, Point Blank secured the material from HLC Industries and others. These companies imported the material from Taiwan and other foreign sources. It was of inferior quality and did not provide the required protection.

b. *The hook and loop*: The hook and loop is critical to the proper functioning of The Interceptor System. It keeps the vest halves closed and secures the SAPI plates in the proper location on the torso of the soldier to ensure proper protection from munitions. Beginning in at least 2002 and continuing to the present, Point Blank has secured the materials for the hook and loop from foreign sources because it was significantly cheaper than domestic sources. The foreign sourced materials were of inferior quality. There have been multiple complaints by the Army regarding the substandard performance of the hook and loop. Those complaints have been ignored by Point Blank.

c. *The webbing*: The webbing, part of the MOLLE system on the outside of the vest, is another critical component of the Interceptor System. It enables a soldier to strap gear, such as ammunition, first-aid pouches, grenades, radios and other essential equipment to the body armor. If the webbing is faulty or sub-standard, then the soldier risks losing equipment which can be particularly dangerous during combat operations. Point Blank chose to save money by foreign sourcing the material for the webbing beginning in 2003 and continuing into

2007. The foreign sourced materials were of inferior quality. This compromised the quality and usefulness of this key Interceptor System component.

      d. *Foam in yoke*: The yoke fits around the neck of the soldier and is a key component of the Interceptor System. From 1999 to the present, all of the foam inserted into the yoke has been made in China.

      54.    Mr. Kolbeck repeatedly informed Point Blank and its senior management that the use of foreign sourced goods in the Interceptor System violated the requirements of its contracts with the United States as well as the company's own quality control system. Ms. Hatfield authorized the use of the foreign sourced goods asserting incorrectly that up to 10% of the materials in the Interceptor System could be foreign sourced under the Berry Amendment.

      55.    Cost cutting was not the only possible reason foreign sourced goods were used at Point Blank in the Interceptor System. As Mr. Kolbeck noted in a January 17, 2007 e-mail, the person responsible for the purchasing of this component was given travel gifts by the foreign supplier.

      56.    Ms. Hatfield's claims concerning the Berry Amendment are wrong and are contradicted by the express representations of Point Blank to the United States. In its response to solicitation W9/CRB-04-R-0045, September 15, 2004, which is typical of Point Bank's representations, the company stated: "All subcomponent materials meet or exceed the requirements of the specification and are Berry Amendment compliant. These components are based on readily available Mil-Spec items, all of which were selected based on cost and performance factors to maximize military utility and achieve the maximum delivery capacity." Defendants thus concealed and covered up their decision to dilute the protections provided U.S.

Soldiers by substituting lower quality, foreign-made components for the required Mil-Spec, domestically made components with false representations.

6.    *New Plants But No QC Standards*

57.    By 2001, Point Blank had made 33 deliveries of the Interceptor to the United States military valued at more than $100 million.

58.    Following September 11, 2001 and the terrorist attacks in Washington, D.C., New York City, and Pennsylvania, and with the build up to, and commencement of, the Iraq war, there was increased demand for the Interceptor System. This put increasing pressure on Point Blank's manufacturing process. During the time period, Defendants Brooks and Hatfield were also disregarding the internal financial controls of the company, looting it for their personal benefit and thus increasing the need for additional cash flow.

59.    On February 28, 2002, the Army issued a Solicitation and Offer for the Interceptor. It specified that acceptance would be based on factors other than cost and price alone — that is, the award would not necessarily be based on low price. Rather, manufacturing, production and quality were paramount.

60.    Point Blank was awarded the contract and the company was paid a premium price based on its representations that it could fully comply with all quality control standards and manufacturing requirements, including specifically ISO 9000:90002, Source Sampling and the Berry Amendment. Again these representations were based on the system installed by Mr. Kolbeck, the PB Plan.

61.    By April 22, 2002, the company had more than $140 million in orders and had shipped about 260,000 Interceptor vests to the United States military. It estimated that another $350 million in additional sales were in the pipeline.

62.     In August 2003, the lack of internal controls at Point Blank began to surface.
Point Blank's auditors resigned, citing the disregard by management for proper internal financial
controls. Subsequently, the reason for disregarding those controls became apparent: David
Brooks and Sandra Hatfield were looting the company, manipulating financial statements, and
taking the shareholder's money for themselves. Mr. Brooks and Ms. Hatfield continued to
degrade the internal Quality Assurance controls in the PB Plan to hasten production, lower the
cost of manufacturing and increase cash flow.

63.     Point Blank opened a second manufacturing facility at Deerfield Beach in early
2003 ("Deerfield"). At that time, Mr. Kolbeck was moved to the new plant.

64.     The new Deerfield plant produced all the Interceptor ballistic components, except
for the yoke/collar system, and combined those items with the outer shells produced by outside
sub-contractors to create a complete Interceptor System. The units were then shipped from the
plant to the United States Government.

65.     In 2004, Point Blank added a third manufacturing facility, this time at Pompano
Beach, Florida ("Pompano"). In 2006, this plant began to manufacture the collar/yoke assembly
as well as other components. Those components were then combined with the outershell
produced by subcontractors and assembled into complete units for shipment to the United States.

66.     When Deerfield and Pompano opened, Mr. Kolbeck, in each instance, furnished
the supervisors at the new facility with a copy of the quality control system, the PB Plan, he had
created for the company. The system was never installed at Pompano. Mr. Kolbeck tried to
install the PB Plan at Deerfield but was at least in part thwarted by senior management. No
comprehensive ISO compliant quality control system was ever installed at Deerfield Beach or at
Pompano. Point Blank management disregarded Mr. Kolbeck's numerous communiqués stating

that neither plant was ISO-compliant and that the production function was disregarding the PB Plan to facilitate shipments. Following his transfer to Deerfield, Mr. Kolbeck could not assure compliance with the PB Plan at other plants. Indeed, even at Deerfield Mr. Kolbeck had inadequate resources. Senior management ignored his concerns about the lack of resources.

### 7.   Continued Deterioration of QC Standards

67.   In an August 2003 letter to CEO David Brooks and COO Sandra Hatfield, Mr. Kolbeck admonished the company and its senior management about the growing quality control deficiencies. In a December 12, 2003 e-mail to senior management Mr. Kolbeck reiterated his protests regarding the circumvention and disregard of quality control standards and systems and contract requirements. Mr. Kolbeck's repeated protests and suggestions to correct those systems were ignored.

68.   At fiscal year end 2003, Point Blank's outside auditors identified multiple internal financial control deficiencies. In a filing made with the Securities and Exchange Commission the outside auditors stated that the company had material deficiencies in its internal controls and failed to comply with SEC accounting rules. This disregard for internal financial controls mirrored in the Company's disregard of Quality Assurance controls.

### 8.   A Critical Life Threatening Error at UNICOR

69.   Point Blank's subcontractors also failed to follow proper quality control and Interceptor contract specified standards. Only one of five subcontractors that did work on the Interceptor System had any quality and manufacturing system standards that approximated an ISO 9002 compliant system as required by the contracts.

70.    Although Point Blank was responsible for ensuring that the product manufactured by each subcontractor met each specification and requirement, the company refused to permit Mr. Kolbeck to review the manufacturing processes at any of the subcontractors.

71.    Mr. Kolbeck did inspect the goods from subcontractors which came into his plant. He was unable to review subcontractor goods shipped to the other manufacturing facilities of the company or directly to the military.

72.    In some instances, Point Blank had subcontractor goods shipped to Pompano and ultimately to the U.S. military to avoid inspection by Mr. Kolbeck and his inspection team. Mr. Kolbeck's repeated protests of these actions were ignored.

73.    Circumventing quality control created a particularly dangerous situation for U.S. soldiers relying on UNICOR made vests that Point Blank purchased.

   a. UNICOR is a prison subcontractor.

   b. In making the vest, UNICOR failed to follow the stitching pattern for the front pocket which holds the SAPI plate. By improperly stitching this critical component, the pocket permitted the SAPI plate to shift about one inch to the right side, leaving a portion of the soldier's left chest exposed to life threatening projectiles.

   c. Despite repeated requests by Mr. Kolbeck beginning as early as 1999, UNICOR failed to correct the error.

   d. Mr. Kolbeck corrected the error at Oakland Park and, after his transfer, at Deerfield by ordering that the front pocket be re-stitched following the correct pattern.

74.    Beginning in 2003, UNICOR vests were shipped to the then newly opened Deerfield manufacturing facility and then to the U.S. Military. Beginning in 2004, UNICOR vests were shipped to the then newly opened Pompano manufacturing facility and then to the

31

U.S. military. Only the Deerfield facility corrected the placement of the front pocket leaving all

soldiers relying on Interceptor Systems manufactured at Pompano exposed to potentially deadly

risk because of the error. Point Blank covered up this deficiency by falsely certifying full

compliance for each of these vests.

75.     In 2003, several vests were rejected for, among other things, defects in sewing the

front pocket. As Mr. Kolbeck noted in a November 26, 2006 e-mail to Ronda Graves, the Chief

Operating manager of Point Blank: "The FPI Interceptor, Extra-Large, that Rick sent to me to

inspect has several non-conformances that make the garment unacceptable. The non-

conformances are as follows: The front plate pocket opening is too big (15 1/4"), and the pocket

is too wide, meaning that the plate does not sit in the center of the vest, but is offset to the right."

In the same e-mail, Mr. Kolbeck also noted that the back plate pocket was not properly stitched

leaving it out of place and too low. Misplacement of the front and back plates left the soldier

exposed to injury. This is just one of a series of e-mails regarding this problem.

76.     In 2007, the Deerfield Quality control inspectors rejected more vests because of

the placement of the front pocket. At the time, Point Blank had 29,635 UNICOR vests in

inventory. All were rejected. According to the quality control report, 429 vests were inspected.

Only 36 passed resulting in a 91% failure rate.

77.     Subsequently, Mr. Kolbeck again raised the problem with Joe Sers, Product

Manager for clothing and textiles at UNICOR. Mr. Sers tried to disclaim responsibility for the

defect. Mr. Kolbeck rejected this claim in an e-mail to Mr. Sers dated March 13, 2007 which

traced the history of the problem:

> As a matter of fact, UNICOR has been making the front plate pocket wrong ever
> since 1999. By not attaching the pocket to the right armhole seam, the pocket
> sags down when the soldier places the plate in the vest. By only taking a 1/2"
> seam allowance on the right side of the front plate pocket, rather than the required

32

1 1/2" seam, the plate is allowed to shift too far to the right by 1", thereby leaving the left chest overly exposed. This vulnerability has potentially resulted in injuries and deaths that could have been prevented if the pocket was sewn correctly. The bad ones are the ones that you shipped directly to the military, because, as I said, I made sure that all the vests that Point Blank shipped [from Deerfield where Mr. Kolbeck was located] had the correct plate pocket seams.

As long as UNICOR continues to make the plate pocket incorrectly, the CASRED potential of the Interceptor is altered. Since you were copied on these e-mails over the past 8 years, you know full well that the UNICOR vests are incorrectly made and do not meet the military specifications. Thousands of our soldiers have Interceptors were their left front chest is exposed due to incorrect UNICOR sewing.

78.     This defect was not corrected until 2007, when UNICOR finally agreed to change its stitching on vests being supplied to Point Blank.

79.     A study done by the Armed Forces Institute of Pathology for the Marine Corps System Command in 2005 on Interceptor Systems considered the importance of the location of the SAPI plates. In part, the study found that "[t]hirty-one of 39 injuries outside the plated area were very close to the plate edge. Five injuries appeared to have occurred in areas that would routinely be covered by the plate." While it does not appear that the Armed Forces Institute of Pathology was aware of the flawed UNICOR vests, these findings illustrate the danger created by the error Point Blank refused to correct at plants where Mr. Kolbeck was not located.

*9.     Key Standards Ignored: Source Sampling*

80.     Throughout this period, Point Blank continued to bid for and be awarded contracts for the Interceptor System and/or its component parts from the U.S. military as reflected in Exhibit A. The awards were based on Point Blank's repeated representations of superior quality and full contract compliance. Those representations keyed to the PB system. These assertions were false.

81.     In 2004, there were additional solicitations for the Interceptor and its new DAPs components. Each solicitation contained manufacturing and quality control standards similar to

those in earlier solicitations. In its response to Solicitation W91CRB-04-R-0045, dated 15-Sept-2004, the company stated that "Point Blank has been able to confirm that we are offering the best value with the best delivery at the lowest risk to the U.S. Army." At the time, Point Blank was delivering 20,000 Interceptors per month and had been for 22 months under multiple contracts. Based on new ballistic testing, the company concluded it could increase production and delivery to 25,000 per month.

82.     To secure this contract, Point Blank represented that it would comply with all source sampling requirements incorporated in the contract. Standards for source sampling are set by clauses called out in each contract and incorporated into it. Mr. Kolbeck incorporated those standards in the PB Plan.

83.     Contractual source sampling standards ensure that the materials used in the manufacturing process comply with specific characteristics such as shade, color, tensile strength and infra-red requirements. Natick Research Labs approved labs approved the standards. Fabric manufacturers are supposed to test for compliance and issue a COC. Point Blank is then responsible for monitoring its supply-chain to ensure that the production of fabric complies with the approved specifications. The specifications in solicitation W91CRB-040R09945, dated September 15, 2004, were used for several contracts. These standards are typical of those used for each Interceptor components contract, including those listed on Exhibit A. It specifies:

> "Special Provisions CRITICAL APPLICATION ITEM--SOURCE INSPECTION REQUIRED    THE CONTRACTOR SHALL PROVIDE MEASUREMENTS AND CERTIFICATIONS OF CONFORMANCE FOR ALL MATERIAL PROPERTIES IDENTIFIED IN THE PERFORMANCE REQUIREMENTS BY SPECIFIC TEST METHODS (emphasis original).

84.     The contract requirements included:

    a. Outer-shell fabric/webbing: The webbing is part of the MOLLE system used by the soldier to affix other gear to the outside of the Interceptor.

34

i. The standards require that the thread used to attach the webbing to the vest be bonded. If the thread is not properly bonded, the webbing is not properly secured to the vest and can pull away from the vest, resulting in a loss of critical gear by the soldier.

ii. Point Blank shipped thousands of vests on which the webbing was sewn onto the fabric with a mixture of properly and improperly made thread. Dark colored threads used by Point Blank are properly made and properly bonded together. The light colored threads were not properly bonded, are defective, and should have been thrown out. Point Blank mixed the light and dark threads during the production process to conceal the defective threads.

b. Shading: Shading is critical to the Interceptor because it is part of the camouflage which helps conceal the soldier from the enemy during daylight. Point Blank is responsible under its Interceptor contracts for the colors and shading on the vests. Those colors and shading must comply with the United States approved shade # 3729.

i. Although Point Blank knew that there were significant variations in the shades in many instances and, accordingly, that they were wrong, the company did not take any steps to correct the errors or do any testing. Rather, Point Blank simply closed its eyes, refusing to see the obvious, and blindly – and wrongfully – relied on the COC from the fabric manufacturer.

ii. In fact, Point Blank did not even have the requisite manuals with the shading information necessary to conduct the testing. As Mr. Kolbeck noted in a September 2005 memorandum to management: "I urge us to get a copy of the quality manuals from all fabric finishers. I have asked for this in the past, but management rebuffed me. We should have this as part of our vendor certification program."

35

iii.  The Army has repeatedly complained about problems with the color and shading. The Army has also raised concerns about rapidly fading colors and reported that the dye has washed out with use.

iv.  Mr. Kolbeck repeatedly demanded that Point Blank obtain the proper shade testing material. Each request has been refused.

c.  IR specifications: The IR or infra-red specifications for the vest are an essential part of its protections because they are designed to minimize the IR signature of the soldier at night, ensuring that he is not visible to an enemy using night vision gear. Although the fabric manufacturer furnished Point Blank with a COC regarding the IR specifications, Point Blank was ultimately responsible for compliance with the IR specifications under each Interceptor contract. Nevertheless:

i.  Point Blank has never done any testing for IR compliance.

ii.  Point Blank has never had the equipment to conduct the IR tests.

iii.  Point Blank consistently refused Mr. Kolbeck's requests to obtain the proper equipment to conduct the tests. Point Blank instead relied on the COCs issued by the manufacturers, that it knew or was reckless in not knowing were invalid.

d.  Shrinkage: Shrinkage indicates that the fabric has not been properly manufactured. The Army has repeatedly reported problems with shrinkage. In some instances Point Blank had the wrong fabric. Nevertheless, the company has consistently ignored the problem and no steps were taken to investigate it.

85.  Under Point Blank's manufacturing system, all outer shell raw materials are drop shipped to the sub-contractors who process the raw materials into finished outer shells. The company did not take any steps to ensure that raw materials were compliant with contract

specifications. Since four of the five Point Blank subcontractors did not have any quality control systems, the company knew or was reckless in not knowing that the materials were not properly tested. Mr. Kolbeck protested this disregard of standards in a November 14, 2003 e-mail to company management. His comments were ignored.

86.     The DSCP has emphasized the necessity for source sampling to the company. Subsequently, Mr. Kolbeck, in a February 9, 2007 memorandum to company management, repeated the importance of source sampling, noting: "the IR [infra-red] specifications are vital to the survivability of the soldier in the field." Point Blank took no action.

87.     Because of the failure to conduct proper source sampling, there could be no assurance that the Interceptor System or its component parts could provide the camouflage necessary to conceal and protect combat soldiers during the day. Failure to source sample meant that there could be no assurance that the Interceptor provided the proper protections for combat soldiers from detection at night. Point Blank's failures meant that by day and by night there could be no assurance that U.S. combat soldiers were provided protections critical to their survival.

88.     When making each demand for payment under each contract in Exhibit A, Point Blank certified compliance with the source sampling requirements. Each certification is false.

*10.    The Final Ballistic Test Is Invalid*

89.     The final ballistic testing for the Interceptor System required a specific number of units be "shot" at an approved facility ("final ballistic test").

         a. The final ballistic test is based on two key assumptions: (1) that there is traceability and (2) that the manufacturing process is rigidly controlled so that each vest is substantially identical. As James Mackiewicz, Team Leader, Marine Corps Team, explained in a

37

memorandum dated 24 August 2004 to Thomas Bouchard, U.S. Army Robert Morris Acquisition

Center, Natick, MA which recommended that Interceptors manufactured by Point Blank be

rejected:

> Ballistic verification testing is designed to provide one final method of validation of performance required to support acceptance of a lot of items. The ballistic quality assurance test is based on the premise that one vest is made similar to another (fibers, fabric, ply lay-up and etc.) in the lot and that a history of materials and production can be tracked throughout the manufacturing process. This is the contracted production method, which supports the government ability to ensure uniformity of each item within a lot. If the tracking history of the material/production cannot be identified with an end item the ballistic quality assurance test has essentially no validity as a representative measure of performance of an item within a lot. (Emphasis added.)

    b. These assumptions permitted only a small sample to be "shot," minimizing the

number destroyed from each lot and maximizing the number delivered to the U.S. military and

Point Blank's profit.

    c. Each assumption is based on Point Blank's certification that it fully complied

with the PB Plan.

    90.    Point Blank's final ballistic test for the Interceptor System has been worthless

since at least 1999.

    a. The number of vests shot is based on regression analysis which assumes each

vest is of uniform quality and that it was manufactured in accordance with the contract

specifications and the PB Plan. Since Point Blank failed to comply with these standards the

shoot test was invalid and worthless.

    b. The test also assumed traceability. Since traceability had been destroyed by

Ms. Hatfield, this alone rendered the final ballistic test worthless.

91.     Nevertheless, Point Blank continued to certify full compliance for all delivered units during this time period. This certification was made for each payment under each contract including those on Exhibit A. Each such certification was false.

92.     The invalidity of the final ballistic test, coupled with the invalid initial ballistic test and the lack of any such testing for certain parts of the system meant, at a minimum, that there was no way to determine if soldiers in battle relying on the Interceptor System were receiving the protection which the U.S. Army intended to provide to them. In addition, because of the flawed manufacturing process and the cover-up lot numbers assigned to each unit, when there was a failure of either test, Point Blank had no way to ensure that the defective units were either removed from inventory or recalled, despite claims to the contrary. This means that soldiers were placed in harms way with protective gear which at a minimum, had been produced by a flawed and compromised process, and in some instances had been determined to be defective, all because of Defendants' fraud.

## 11.     *Change In Management – No Change In Process*

93.     In 2005 Sandra Hatfield was forced to leave the company. Ms. Hatfield was named as a Defendant in an SEC enforcement action accusing her of securities fraud based on, among others, allegations that she had manipulated Point Blank's financial statements for her own personal benefit. *SEC v. Schlegel and Hatfield*, No. 06-61251 (S.D. Fla. filed Aug. 17, 2006). The next year, the board of directors ousted Mr. Brooks. Subsequently, the SEC brought an enforcement action against him for securities fraud, alleging he had looted the company at the expense of its shareholders. Both Mr. Brooks and Ms. Hatfield were also indicted for securities fraud based, among other things, on manipulating financial statements and allegations of looting Point Blank. *U.S. v. Brooks and Hatfield*, No. 06-0550 (S.D.N.Y. filed Oct. 24, 2007);

94.    Retired General Larry Ellis was appointed CEO. Mr. Kolbeck briefed General Ellis on the manufacturing and quality control deficiencies at the company in writing as well as in a personal meeting. No corrective action was taken. The internal manufacturing and quality systems of the company continued to be defective. The company continued, however, to manufacture the Interceptor System and its components and deliver them to the Army.

95.    Mr. Kolbeck reiterated his concerns in an August 2007 communication to management which noted in part that "the entire Quality Assurance program is being circumvented by Production." The communication went on to state that at Point Blank, production and meeting contract quotas had become the only goal at the expense of quality assurance and manufacturing standards. Stated differently, Interceptors and the related components were shipped for use by U.S. soldiers without the quality control assurances required by the solicitations and promised by Point Blank when it was awarded the contracts.

**12.    *Shifting Standards Increase The Risk For Soldiers***

96.    In 2007 Point Blank changed the design and ballistic protections of the collars for the Interceptor without the permission of, or notice to, the military.

a. Initially, the collars were manufactured with 8 ply Twaron or Kevlar (fabrics with ballistic qualities) sewn into the neck guard.  Soldiers were issued removable inserts composed of 18 ply 706 Kevlar and 8 ply Twaron for an 18/8 ply composition ("old insert"). When the insert was put in the collar, the total composition was 8/18/8 layers of a Kevlar and Twaron mix. This complied with the contract requirements for ballistic protection.

b. In 2007 Point Blank changed the mix. Now the neck guard is manufactured of an 8/18 mix. The insert is now made of 8 ply Twaron ("new insert").

     c. Pre-2008 vests have a collar made of only 8 ply Twaron sewn into the collar. Thus when the new insert is put in the collar of a pre-2008 Interceptor the composition is 8/8 rather than the required and Government approved 8/18/8. Soldiers using the new insert in a pre 2007 vest are thus placed seriously at risk.

     d. The company is not authorized to alter the manufacturing process. This change violates contract standards. The company has not given any notice of this change or hazard to the U.S. military. When delivering these units and demanding payment, Point Blank falsely certified full compliance with all contract requirements.

     97.    Before the modified vest went into production in 2007, Mr. Kolbeck and his quality control team inspected and rejected a lot of 30,000 UNICOR made vests. Of the rejected vests 3,500 could not be repaired because they had support defects in addition to a misplaced front pocket. The 3,500 vests were rejected by the military and Point Blank. Caroline Pang, V. P. of Operations for Point Blank, directed that the rejected vests be placed in inventory.

     98.    Recently, Point Blank received an order for 45,000 of the old type vests. The company shipped 3,000 defective vests to Pompano to fill part of the order despite the fact that they were determined defective by the company in the past and that their condition has deteriorated since that conclusion was reached. Those vests were offered to the Government. The Contracting Officer called for a complete inspection of these vests. Despite Point Blank's offer of an 8% discount for the use of these vests, the Government rejected the vests.

     99.    Beginning in late 2008, Point Blank acknowledged, at least internally, that the PB Plan had been totally compromised, and that the company had no effective quality control process or any real basis for its representation of compliance to the government. The company retained a consultant to install an updated ISO quality control system. In April 2009 however,

41

the company terminated Mr. Kolbeck. Although Point Blank claimed it had cause to terminate Mr. Kolbeck, the reasons given were a pretext to cover-up its past failures. Indeed, the company failed to follow its own internal procedures in making the termination. Terminating Mr. Kolbeck will permit the company to claim that its new ISO based system is just updated. That claim is false. It is another cover-up of Point Blank's fraud.

**13.   *Premium Price***

100.   The United States military paid Point Blank a premium price for many of the Interceptor Systems and their related components. That premium price had two components: (1) the difference between a competitive bid price and market; and (2) $50 per Interceptor over and above the going market price. The military agreed to pay the premium because of Point Blank's representations of high quality standards and the specific representations in its bid that it met or exceeded all manufacturing standards and military specifications. As Marine Corps Team Leader James Mackiewicz stated in a memorandum of 24 August 2004 to Thomas Bouchard, U.S. Army Robert Morris Acquisition Center, Natick, MD ("Mackiewicz memo"):

> It should also be noted that during source selection other offers provided technically acceptable proposals [for the Interceptor] but one of the deciding factors was Point Blank's quality assurance plan. The additional cost to the government for selecting Point Blank is approximately $50.00 per vest.

**14.   *Fraudulent Demands For Payments***

101.   Despite its failure to comply with the requisite manufacturing and quality control standards Point Blank demanded and received payment under each Interceptor contract on Exhibit A.

102.   Pursuant to the Demands for Payment the U.S. Department of Defense paid in excess of one billion dollars ($1,000,000,000.00) under the contracts to Point Blank.

42

103.   Those payments and the Point Blank Defendants demand for payment were based on its express representations of compliance with all solicitation and contract specification in the manufacture and production of the Interceptor System and all of its related parts.

a.  In each instance, when Point Blank made a demand for payment it specifically represented that it had fully complied with all specifications of the solicitation and contract.

b.  As Solicitation Number SP 100-02-R-4025, February 28, 2002 states in part (and which is representative of the solicitations throughout the period): "Submission of an invoice to the Government for payment is a certification that the supplies for which the Government is being billed have been shipped or delivered in accordance with the shipping instructions issued by the ordering officer, in the quantities shown on the invoice and that such supplies are in the quantity and of the quality designated by the cited contract, notwithstanding any other provision of the contract."

c.  For each request for payment under each contract listed on Exhibit A Defendants represented full compliance with all quality control and manufacturing standards included on each solicitation and contract.  This includes those asserting full compliance with the ISO requirements, the first ballistic test, the final ballistic test, source sampling and the Berry Amendment.

d.  In fact, each of those representations is false since the Point Blank Defendants failed to comply with the quality control and manufacturing specifications in the contracts listed on Exhibit A thereby defrauding the U.S. government.  Defendants were unjustifiably enriched as a result of their fraud.

43

104.    While the U.S. government was defrauded as a direct and proximate result of the Point Blank Defendants' wrongful conduct, the real victim of Defendants fraud are the men and women of the U. S. military, who deserve the very best protection this nation can provide them.

## COUNT ONE
### (Violation of FCA § 3729(a)(1), Point Blank Defendants)

105.    Paragraphs 1 through 104 are incorporated herein by reference.

106.    All Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States for payment, in violation of FCA, 31 U.S.C. § 3729(e)(1). Specifically, all Defendants presented or caused to be presented claims for payment under the Contracts listed in Exhibit A for Interceptor Systems and/or component parts which Defendants knew, recklessly disregarded or deliberately ignored were defective.  All of these claims were knowingly false claims under the FCA.

107.    By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## COUNT TWO
### (Violation of FCA § 3729(a)(2), Point Blank Defendants)

108.    Paragraphs 1 through 104 are incorporated herein by reference.

109.    All Defendants knowingly made or caused to be made false statements in order to get a false claim paid by the United Stated for payment, in violation of the FCA, 31, U.S.C. § 372(a)(2).  Specifically, all Defendants made or caused to be made false statements in connection with false claims for payment under the contracts listed on Exhibit A for Interceptor Systems and/or the related parts which Defendants knew, recklessly disregarded or deliberately ignored were defective.  All of these claims were knowingly false claims under the FCA.

### COUNT THREE
#### (Common law fraud, Point Blank Defendants)

110.   Paragraphs 1 through 104 are hereby incorporated herein by reference.

111.   Point Blank Defendants falsely represented that The Interceptor System and its component parts which were paid for by the United States were manufactured in accord with the specifications in the contracts which were designed to protect U.S. combat soldiers.

112.   Point Blank Defendants failed to inform the United States that The Interceptor Systems and related parts were defective.  At the time when the Point Blank Defendants failed to make this disclosure, Point Blank Defendants had a duty to disclose due to their superior knowledge and the life threatening nature of the defects.

113.   Point Blank Defendants knew that their representations, both direct and implied, that the Interceptor Systems and related parts complied with the contractual requirements were false.

114.   These representations were material.

115.   Point Blank Defendants knew that the United States would rely, and intended that the United States rely, on these false representations.

116.   The United States justifiably relied upon these false representations and material omissions.

117.   By virtue of Point Blank Defendants' fraud, the United States suffered damages in an amount to be determined at trial.

118.   The actions of Point Blank Defendants in making these false representations and material omissions with the intent that the United States and its agencies would rely on these false representations and material omissions, was malicious, wanton, and reprehensible conduct.

Therefore, punitive damages sufficient to punish and deter Point Blank Defendants should be assessed against them in an amount to be determined at trial.

## COUNT FOUR
### (Mistake, Point Blank Defendants)

119.   Paragraphs 1 through 104 are incorporated by reference herein.

120.   For the fiscal years 1998 through the present, the United States made payments to Point Blank Defendants in the erroneous belief that Point Blank Defendants were entitled to reimbursement, without knowing that Point Blank Defendants' claims were false. These payments include those for the Interceptor System and its component parts under the contracts listed on Exhibit A.

121.   The United States' erroneous beliefs were material to the amount of the payments made by the United States.

122.   Because of these mistakes of fact, Point Blank Defendants received funds to which it was not entitled.

123.   By reason of the overpayments, the United States is entitled to damages in an amount to be established at trial.

## COUNT FIVE
### (Unjust enrichment, Point Blank Defendants)

124.   Paragraphs 1 through 104 are incorporated herein by reference.

125.   From 1999 to the present, the United States conferred a benefit upon Point Blank by paying for defective Interceptor Systems and the related parts due to the false statements and omissions by Point Blank Defendants. The Point Blank Defendants knew that this benefit was conferred unjustly, and they have unjustly retained that benefit.

126.   The United States is entitled to the return of all payments by the United States directly or indirectly to Point Blank for Interceptor Systems and related parts due to the false claims presented for fiscal years 1998 to the present.

127.   By reason of the above-described payments, Point Blank Defendants have received money, directly or indirectly, to which they were not entitled.  They, therefore, have been unjustly enriched in an amount to be established at trial.

## COUNT SIX
### (Breach of contract, Point Blank)

128.   Paragraphs 1 through 104 are incorporated herein by reference.

129.   Point Blank entered into contracts with the United States including but not limited to those listed on Exhibit A.  Those contracts imposed obligations on Point Blank, including but not limited to, manufacturing the Interceptor System and its component parts in accordance with specifications contained in those contracts.

130.   Point Blank breached its contractual obligations by failing to comply with the provisions of the contracts, including but not limited to, a) failing to properly conduct the initial ballistic test; b) failing to properly conduct the final ballistic test; c) failing to perform source sampling; and d) failing to comply with the Berry Amendment.

131.   As a result of Point Blank's material breach of contract, the United States has been damaged by the defective Interceptor Systems and related parts in an amount to be determined at trial.

## PRAYER FOR RELIEF

132.   WHEREFORE, Relator, on behalf of the United States, requests that judgment be entered in its favor on each count and against all Defendants as follows

    a.   Damages in an amount to be determined on Counts 1, 2, 3, 4, and 6;

b.  For the amount by which defendant was unjustly enriched on Count 5;

c.  Treble damages on Counts 1 and 2;

d.  A civil penalty in an amount to be determined at trial on Counts 1, and 2;

e.  Punitive damages on Count 3;

f.  The costs of this action;

g.  Reasonable attorneys fees and expenses; and

h.  Such other relief as the Court deems just and appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs/Relators hereby demand trial by jury.

Dated: June 3, 2009                         Respectfully Submitted,

PORTER WRIGHT MORRIS & ARTHUR LLP

John C. Monica Jr. (VA Bar # 32858)
jmonica@porterwright.com
Thomas O. Gorman
Adam J. Tiffen
1919 Pennsylvania Avenue NW
Suite 500
Washington, D.C. 20006-3434
Telephone:(202) 778-3000
Fax:(202) 778-3063

COUNSEL FOR PLAINTIFF/RELATOR

48

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Amended Complaint filed UNDER SEAL this 3rd day of June, 2009 before the United States Court for the Eastern District of Virginia, was served by Certified Mail, pursuant to 31 USC § 3730(b)(2) upon the following counsel:

Hon. Eric H. Holder Jr.
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Dana Boente
U.S. Attorney
2100 Jamieson Ave, NW
Alexandria, VA 22314

_____
John C. Monica



**EPIQ SYSTEMS**

Inbound Date & Time: 8/13/2010 3:23:33 PM
Recepient          Rowan, Natalie
Client             PBS
Client – other

EPIQ458

RECEIVED
AUG 1 3 2010
By

From: Emily E. Toohey
202 628-8100

To:
Epiq Bankruptcy Solutions LLC
757 Third Ave
3ʳᵈ Floor
New York, NY 10017

RECEIVED
AUG 1 3 2010
By

Instructions:
MUST DELIVER NO LATER THAN 4PM !!!!!!!!!!!!!

RECEIVED
AUG 1 3 2010
By

RECEIVED
AUG 1 3 2010
By