# EXHIBIT F

**PROOF OF CLAIM**

| In Re: | Chapter 11 |
|---|---|
| Point Blank Solutions Inc., *et al*, Debtor. | Case No. 10-11255 |
| Name of Debtor Against Which Claim is Held | Case No. of Debtor |

Filed: USBC - District of Delaware
Point Blank Solutions, Inc., EI Al.
10-11255 (PJW)        0000000452

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Wayne Kolbeck

8882 Georgetown Lane

Boynton Beach, FL 33472

Telephone number: 561.364.8809  Email Address: w.kolbeck@comcast.net

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
(If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:         Email Address:

1. **Amount of Claim as of Date Case Filed:** $ 743,788.30
   If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
   If all or part of your claim is entitled to priority, complete Item 5.
   If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
   ☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim.
   Attach itemized statement of interest or additional charges.

2. **Basis for Claim:** See Exhibit A attached hereto
   (See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** _____
   3a. **Debtor may have scheduled account as:** _____
   (See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
   Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
   Nature of property or right of setoff:  ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
   Describe: _____
   Value of Property: $_____  Annual Interest Rate _____%
   Amount of arrearage and other charges as of time case filed included in secured claim, if any:
   $_____  Basis for perfection: _____

   **Amount of Secured Claim:** $_____  **Amount Unsecured:** $ 743,788.30 *
   See Exhibit A attached hereto

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
   (See instruction #6 on reverse side.)

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

   Specify the priority of the claim:

   ☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

   ☐ Wages, salaries or commissions (up to $11,725*), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

   ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

   ☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

   ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

   ☒ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

   **Amount entitled to priority:**

   $ 743,785.30 *

   *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 8 and definition of "redacted" on reverse side.)*
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**FOR COURT USE ONLY**

FILED / RECEIVED

AUG 13 2010

EPIQ BANKRUPTCY SOLUTIONS, LLC

Date: 08/11/2010

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

*Wayne B. Kolbeck*

WAYNE B. KOLBECK

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# Exhibit A

This Proof of Claim (the "Claim") sets forth the unsecured* claim of Wayne D. Kolbeck ("Kolbeck") pursuant to 31 U.S.C. §3730(h) and Florida Statue §448.101, *et seq.* in the amount of $743,785.30 representing past back wages, future wages and attorney's fees arising out of Kolbeck's termination from Point Blank Solutions, Inc., on April 3, 2009 because of his activity as a whistleblower arising out of his cooperation with the U.S. Department of Justice in pursuing possible False Claims Act Violations (see 31 U.S.C. §3729 et seq.) during the period 2006 to the present. The approximate amount of the Claim consists of double back pay as provided for by statute ($278,172.70), future wages over the next four years of $98,178.65 per year ($392,714.60), Social Security loss ($62,898.00) and attorney's fees to date ($10,000.00).

* Some Claim amounts may be nondischargeable or afforded priority status, as these amounts may be related to criminal and/or civil penalties. Accordingly, Kolbeck reserves his right to pursue the amounts herein as cause(s) of action beyond the unsecured Claim. However, Kolbeck is not seeking double recovery by the filing of this Claim. Kolbeck will amend or withdraw this Claim if the amounts due are deemed nondischargeable or afforded priority status.

**Exhibit 1** is a copy of Kolbeck's email directed to the CEO of Point Blank Body Armor on October 26, 2006.

**Exhibit 2** is a copy of Point Blank Solution Inc.'s letter of termination of April 3, 2009.

**Exhibit 3** is the draft complaint.

**Exhibit 4** is the Complaint of Relator Wayne D. Kolbeck, which was filed in substantially this form in the Eastern District of Virginia in 2008.

Please note that the filing of this Claim is not a waiver of a right to move to withdraw the reference, or otherwise challenge the jurisdiction of this Court, with respect to the subject matter of this Claim, and any objections or other proceedings commenced against or otherwise involving Kolbeck.

# Exhibit 1

## Wayne Kolbeck

**From:** Larry Ellis [lellis@dhbt.com]
**Sent:** Thursday, October 26, 2006 10:44 AM
**To:** 'Wayne Kolbeck'
**Subject:** RE:

Wayne—this is news to me! I certainly do not want issues of quality brushed aside. As our chief quality control person, have you addressed your concerns with Caroline, John Siemer and UNICOR? I will be in the area next Wednesday, let's pick a time that we can meet and go through each of your concerns. Obviously, we must do the right thing.

Ellis

**From:** Wayne Kolbeck [mailto:wkolbeck@pointblankarmor.com]
**Sent:** Thursday, October 26, 2005 10:00 AM
**To:** lellis@dhbt.com
**Subject:**

Dear General:

As of this morning, October 26, 2006, 10:50 A.M., I am formally de3claring myself as your personal whistleblower. Whenever issues that I pass up the management hierarchy are not addressed or brushed aside with a wave of the hand, I have no one to turn to but you.

I am currently have a moral and ethical dilemma over the products produced by Unicor. Since 1999, the vests that they have produced and sent directly to the Marines and Army, have non-conformances that imperil the lives of the soldiers wearing them. I am preparing a full report to you that I will send to you next week. In the meantime, please contact your daughter immediately and tell her to check the label in the outershell portions of her vest. If any of the outershell portions have Unicor labels on them, tell her to turn them in for a Point Blank model immediately. If she cannot, I will provide you with a five minute, ten-cent fix that will correct at least one of the major vulnerabilities.

Sincerely,

Wayne B. Kolbeck
Director, Quality Assurance and Engineering

9/6/2007

# Exhibit 2



Mr. Wayne Kolbeck
Quality Manager
Deerfield Facility
Point Blank Body Armor, Inc

April 3, 2009

Mr. Kolbeck,

This memorandum informs you that your employment with Point Blank Solutions, Inc. is terminated effective April 3, 2009.

Point Blank Solutions, Inc. and its subsidiaries are professionally run enterprises serving valued customers courteously and professionally. We view the company's business future positively and feel that your views are divergent from ours. During a meeting with the Prison Industry, you had an emotional outburst which caused the company considerable concern. In fact, management felt so strongly about the incident, it invited the Prison visitors back to offer an official apology. In August 2008, while members of the new board of directors were touring the Deerfield Facility, you again had an uncontrollable outburst. This event caused one of the members on the tour to comment on your unprofessionalism. On March 27, 2009, in the presence of visiting customers from PM Soldier Survivability and the Defense Contracting Management Agency you displayed personal traits that were simultaneously discourteous, disruptive and irresponsible. This conduct occurred after I spoke with you on March 25, 2009 and instructed you not to become agitated or irate. At that time, you agreed to temper your responses and to be constructive and non-confrontational. Your unprofessional behavior reflects negatively on this company and will not be tolerated.

Human Resources and I stand ready to assist you in this transition, (954) 630-0900.

E. Pearson
Vice President, Standards and Compliance
Point Blank Solutions, Inc.

Nationwide   800-413-5155
Phone        954-630-0900
Fax          954-630-9225

2102 SW 2ⁿᵈ Street • Pompano Beach, FL 33069 • www.pointblanksolutionsinc.com

## WAIVER AND RELEASE OF CLAIMS

THIS WAIVER AND RELEASE OF ALL CLAIMS ("Agreement") sets forth the voluntary agreement reached between WAYNE KOLBECK ("Employee") and POINT BLANK SOLUTIONS, INC. ("PBS").

1. Employee's employment with PBS will terminate effective April 3, 2009.

2. In exchange for the promises Employee has made in this Agreement, and within fifteen (15) business days after the Effective Date of this Agreement (as defined below), PBS will pay Employee three months severance, less applicable deductions and other legal withholdings and taxes ("Severance Payment"). Employee will be provided information as to COBRA rights by separate correspondence. Employee acknowledges and agrees that this Severance Payment constitutes adequate and sufficient consideration to which Employee would not otherwise be entitled but for execution of this Agreement.

3. In exchange for the promises PBS makes in this Agreement, in addition to other good and valuable consideration receipt of which Employee acknowledges, Employee waives and fully releases and forever discharges PBS and its related entities, including all of their past and present officers, directors, members, attorneys, agents, employees, predecessors, successors, insurers, and assigns (collectively, "Releasees"), from any and all claims, rights, and causes of action, in law or in equity, of any kind whatsoever, which Employee has or may have against any or all of the Releasees as of the Effective Date of this Agreement (as defined below), whether such claims, rights, or causes of action are now known or are later discovered. Employee agrees that this waiver and release shall be construed as broadly as possible and shall include, without limitation, any (1) contractual or other claims of employment or payment Employee may have against any or all of the Releasees; (2) claims, if any, arising out of or in connection with the initiation, separation, or existence of Employee's employment relationship with any or all of the Releasees; (3) claims, if any, regarding accrued leave, vacation, bonuses, back pay, overtime, commissions, or any other form of benefits connected with Employee's employment with any or all of the Releasees; and (4) claims, if any, arising under the Age Discrimination in Employment Act and any other federal, state, or local statute or regulation, and any allegation for costs, fees or other expenses including attorney's fees.

4. Employee is not entitled to re-employment with PBS and will not seek employment with PBS or any of the Releasees in any capacity at any time in the future. Employee agrees that this forbearance to seek future employment is purely contractual and is in no way involuntary, discriminatory or retaliatory. Employee acknowledges that he has been paid all wages, compensation, remuneration, salary and bonuses, if any, and any and all other pay due to Employee; that Employee has been provided with all leave (including leave under the Family and Medical Leave Act) to which Employee may have been entitled, if any; and that Employee has not suffered any workplace illness or injury other than any injury or illness of which Employee has already advised PBS, if any.

5. Employee retains the right to file a charge with, or participate in any investigation or proceeding before any governmental agency such as the Equal Employment Opportunity Commission. If Employee does file such a charge, however, this Agreement prevents Employee from recovering any relief .

Employee

{M2799795;1}

1 of 2

PBS

whatsoever, including any award of money, as a result of such charge or future action/proceeding based on such charge. Employee shall not take any action or make any comments which might embarrass, harass or adversely affect PBS or any of the Releasees.

6.    Any waiver of a breach of this Agreement must be in writing and signed by the waiving party. Nothing in this Agreement shall be construed as an admission or concession by PBS or by Employee of any wrongdoing. Employee may not assign any rights under this Agreement. This Agreement shall be binding upon the personal representative and heirs of Employee. This Agreement may be assigned by PBS and shall inure to the benefit of and be enforceable by any of its successors and assigns. This Agreement contains the complete, full, and exclusive understanding of Employee and PBS and supersedes any and all other oral or written agreements between them. Any amendments to this Agreement shall be in writing and signed by the party against which it is to be enforced. In any action concerning this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and costs. If any provision of this Agreement is invalid, illegal or unenforceable, except for the release/waiver provisions in paragraph 3 above, it shall not affect the other provisions of this Agreement, which shall remain in effect. This Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted. This Agreement is governed by the laws of the State of Florida, and venue of any action brought under this Agreement shall be exclusively in Broward County, Florida. Any trial/hearing/proceeding under this Agreement shall be heard by a **JUDGE WITHOUT A JURY**.

7.    Employee has up to 21 days after receiving this Agreement to decide whether to sign it. Employee should take as much of the 21 days as the Employee needs to in order to properly evaluate the release/waiver and other provisions contained in this Agreement. Any changes of whatever kind which may be made after the Agreement is initially provided to Employee will not restart the running of the 21 day period. Employee is advised to consult with an attorney prior to signing this Agreement. After signing this Agreement, Employee may revoke this Agreement by providing written notice of revocation to: Jennifer Coberly, Esquire, Point Blank Solutions, 2102 S.W. 2nd Street, Pompano Beach, Florida, which written notice must be received no later than 5:00 p.m. (Eastern Time) on the end of the seventh day after Employee signs this Agreement. If there is no timely revocation, the Agreement shall become effective and enforceable. The "**Effective Date**" of this Agreement shall be the eighth day following the date of signing of this Agreement by Employee.

BOTH PARTIES, HAVING HAD A FULL OPPORTUNITY TO REVIEW THE FOREGOING, AND BOTH PARTIES, BEING IN COMPLETE AND FULL AGREEMENT AS TO THE TERMS OF THIS AGREEMENT, HAVE VOLUNTARILY SIGNED THIS AGREEMENT.

**EMPLOYEE**                                        **POINT BLANK SOLUTIONS, INC.**

_____                 _____

Print Name: Wayne Kolbeck                By:    Ervin Pearson              ,
                                                          as authorized representative of
                                                          Point Blank Solutions, Inc.

                                                          Title:  Vice President, Standards and Compliance

_____                 _____
Date                                                      Date

{M2799795;1}

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.:

WAYNE KOLBECK,

     Plaintiff,

v.

POINT BLANK BODY ARMOR, INC.,
a Florida corporation,

     Defendant.

_____/

## COMPLAINT

Plaintiff, WAYNE KOLBECK, hereby sues Defendant, POINT BLANK BODY

ARMOR, INC., and alleges:

### NATURE OF ACTION

1.     This is an unlawful employment practices and discrimination case brought

by Plaintiff, WAYNE KOLBECK against his former employer, POINT BLANK BODY

ARMOR, INC. Plaintiff sues pursuant to the Federal False Claims Act and the Florida

Whistleblower Protection Act. Pursuant to the Federal False Claims Act and the Florida

Whistleblower Protection Act, Plaintiff seeks past lost wages, future lost wages,

compensatory damages, lost benefits, attorney's fees and costs.

### JURISDICTION AND VENUE

2.     This action arises out of the Federal False Claims Act, 31 U.S.C. §3729, *et*

*seq.* and specifically, 31 U.S.C. §3730(h) and the Florida Whistleblower Protection Act,

Florida Statute §448.101, *et seq.*

3.     Attorneys' fees and costs are sought pursuant to 31 U.S.C. §3730(h) and Florida Statute §448.104.

4.     This Court has federal question jurisdiction of this claim pursuant to 28 U.S.C. §1331, as Count I arises under the laws of the United States and pendant jurisdiction of Plaintiff's State Law claims arising out of the same actions.

5.     Venue is proper in the United States District Court for the Southern District of Florida and Broward County, Florida because the Defendant maintains its principal place of business in Broward County, Florida.

## PARTIES

6.     Plaintiff, WAYNE KOLBECK (hereinafter KOLBECK), is a resident of Palm Beach County, Florida and is otherwise, *sui juris.*

7.     At all times material hereto, Defendant, POINT BLANK BODY ARMOR, INC. (hereinafter POINT BLANK), is a Florida corporation with its principal place of business located in Broward County, Florida.

## FACTUAL BACKGROUND

8.     KOLBECK is a chemical textile engineer employed POINT BLANK'S Director of Quality Assurance and Engineering from June 28, 1999 until April 3, 2009, when he was terminated.

9.     At all times material hereto, KOLBECK was fully qualified for the position he held with POINT BLANK, fulfilled his employer's expectations and performed his job in an above satisfactory manner.

2

10.     During his employment, KOLBECK was responsible for quality assurance and control in the construction of bullet proof vests sold to the U.S. Army and various law enforcement agencies.

11.     During his employment, KOLBECK discovered that POINT BLANK was producing bullet proof vests which were improperly constructed and did not meet the specifications of the United States Government, some failings which might ultimately expose United States soldiers or law enforcement personnel to risk of injury as a result of defective construction.

12.     On numerous occasions, KOLBECK advised his superiors of his concerns regarding the construction of the vests and the failure of POINT BLANK's products to meet the specifications called for by its government contracts. Some of those complaints were made in writing, examples of which are attached hereto as exhibits _____ through _____.

13.     In September 2007, the U.S. Department of Justice (hereinafter DOJ) requested KOLBECK to cooperate in an ongoing investigation regarding the quality of the bullet proof vests and POINT BLANK's compliance with the United States Department of Defense (hereinafter DOD) specifications.

14.     Attorneys for Defendant, POINT BLANK, were present for portions of these interviews and were notified by Plaintiff of his intent to cooperate in the investigations and of his status as a whistle-blower.

15.     KOLBECK continued to cooperate with the U.S. DOJ for approximately two years and continues to do so today.

3

16.　　On November 13, 2008, KOLBECK filed his original complaint as the Relater in a lawsuit against POINT BLANK and others in the U.S. District Court for the Eastern District of Virginia, alleging violations of the Federal False Claims Act (see attached exhibit _____, copy of Amended Complaint, which is incorporated herein by reference).

17.　　On numerous occasions throughout recent years, Kolbeck refused to aid in POINT BLANKS cover-up of its improper activities to various government agents and inspectors. He was privy to numerous conversations in which POINT BLANK officers or employees committed misrepresentations or omissions regarding POINT BLANK's methods of construction, inspection and accounting.

18.　　In October and November 2006, KOLBECK emailed POINT BLANK management declaring to them that he was a "whistle-blower" (see attached exhibits ____ - ____).

19.　　On numerous occasions, Plaintiff advised officers of the company, agents of the United States Government and certain customers and/or vendors area of his concerns. Specifically, On March 27, 2009, Plaintiff shared his concerns regarding quality control and/or compliance with contract specifications members of "PM Soldier and _____" and the "Defense Contracting Management Agency.

20.　　On April 3, 2009, Plaintiff was terminated from his position by the company (see attached exhibit _____, April 3, 2009 Memorandum notifying Plaintiff of termination).

4

## VIOLATION OF FEDERAL FALSE CLAIMS ACT
## (31 U.S.C. §3730(h))

21. Plaintiff re-alleges and reincorporates by reference the allegations contained in paragraphs 1-20 as if set forth fully herein.

22. KOLBECK is a person entitled to relief pursuant to the False Claims Act.

23. As set forth more fully above, POINT BLANK took adverse employment action against KOLBECK, including but not limited to termination of his employment, based on his constant concerns regarding the construction quality of the bullet proof vests, his insistence on high quality production of same, his cooperation in the ongoing investigation as conducted by the U.S. Department of Justice and his refusal to participate in hiding the company's omissions and misrepresentations.

24. As a direct and proximate result of POINT BLANK'S unlawful discrimination, KOLBECK has incurred economic losses, lost wages and benefits, past and future.

25. As a direct and proximate result of POINT BLANK'S unlawful discrimination based upon his status as a whistle-blower, KOLBECK has experienced pain and suffering, humiliation, mental anguish and inconvenience.

26. WHEREFORE, Plaintiff, WAYNE KOLBECK, respectfully requests this Court:

    a. Award Plaintiff double lost wages, benefits in the past, and other economic damages as appropriate;

    b. Award Plaintiff compensatory damages for pain and suffering, humiliation, mental anguish and inconvenience;

5

c.  Award Plaintiff a return to his position with the company without loss of benefits, income or seniority and complete expungement of his personnel file;

d.  Award Plaintiff reasonable attorneys' fees and costs;

e.  Award other relief as this Court deems appropriate.


## VIOLATION OF FLORIDA WHISTLEBLOWER PROTECTION ACT
### (Fla. Stat. §448.101, *et seq.*)

27.  Plaintiff re-alleges and reincorporates by reference the allegations contained in paragraphs 1-20 as if set forth fully herein.

28.  As set forth more fully above, POINT BLANK took adverse employment action against KOLBECK, including but not limited to termination of his employment, based on his constant concerns regarding the construction quality of bullet proof vests, his insistence on high quality production of same and his cooperation in the ongoing investigation as conducted by the U.S. Department of Justice.

29.  KOLBECK advised POINT BLANK of his concerns regarding the quality of the bullet proof vests on numerous occasions throughout his employment and gave POINT BLANK an opportunity to correct the problem.

30.  Instead of taking corrective action to ensure the quality of its bullet proof vests, POINT BLANK retaliated against KOLBECK by terminating his employment on April 3, 2009.

WHEREFORE, Plaintiff, WAYNE KOLBECK, respectfully requests this Court:

6

a.   Award Plaintiff lost wages, benefits, past and future, and other economic

damages as appropriate;

b.   Award Plaintiff compensatory damages for humiliation, mental anguish

and inconvenience;

c.   Any other relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues so triable.

s/ James O. Williams, Jr.
JAMES O. WILLIAMS, JR., ESQUIRE
Florida Bar No.: 614513
Williams, Leininger & Cosby, P.A.
1555 Palm Beach Lakes Blvd.
Suite 301
West Palm Beach, Florida 33401
Telephone No.: (561)615-5666
Facsimile No.: (561)615-9606

DATED: _____, 2010.

7

# Exhibit 4

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF VIRGINIA

UNITED STATES EX REL.
WAYNE B. KOLBECK
8882 Georgetown Lane
Boynton Beach, FL 33472

                 Plaintiff/Relator

        v.

Point Blank Solutions, Inc. (Formerly
Known As DHB Industries, Inc.)
2102 SW 2nd Street
Pompano Beach, FL 33069

Point Blank Body Armor, Inc.
Atlantic Business Center
2102 SW 2nd Street
Pompano Beach, FL 33069

David H. Brooks
20 Red Ground Road
Old Westbury, NY 11568

Sandra L. Hatfield
2654 Edgewood Ave
Schenectady, NY 12306

Larry Ellis
Point Blank Solutions Inc.
2102 SW 2nd Street
Pompano Beach, FL 33069

FILED UNDER SEAL
AND IN CAMERA
Pursuant to
31 U.S.C. § 3730(b)(2) and
E.D. Va. Local Civil Rule 5(B)

Case No.: _____

# COMPLAINT

## INTRODUCTION

1.      This is an action to vindicate a fraud perpetrated on the United States and U.S.

combat soldiers who relied on the false representations Defendants made to the United States

claiming that body armor vests they sold to the U.S. military would protect the lives of soldiers–
that is, that the vests were bullet proof, within the meaning herein. Those representations as
Defendants knew were false. In fact the body armor or so-called bullet proof vests purchased
from Point Blank were defective, the product of a flawed manufacturing process which had been
repeatedly compromised by Defendants Brooks and Hatfield to cut costs, speed product and
delivery, and facilitate payment as they looted Point Blank for their own purposes. As a result
the United States paid over $1 billion to Point Blank based on fraudulent representations. More
importantly soldiers who relied on Point Blank's body armor to save their lives as they served
their country were defrauded – that is, denied the protections to which they were entitled, and
exposed to injury and death because of Defendants' fraud.

2.      On behalf of the United States of America and himself, Relator, Wayne B.
Kolbeck, brings this action under the False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA") and
the applicable common law principles, to recover millions of dollars in fraudulent over-charges
and, in addition, civil penalties and reasonable attorneys' fees, from Defendants Point Blank
Solutions, Inc., (formerly known as DHB Industries, Inc.), Point Blank Body Armor, Inc.
(collectively "Point Blank" or "the company"), David H. Brooks, former CEO of the company,
Sandra Hatfield, former COO of the company and Larry Ellis, the current CEO of the company.

3.      Beginning in 1999 and continuing to the present, Defendants certified full and
complete compliance with all contract specifications and standards for manufacturing and
delivering thousands of Interceptor System body armor units to the U.S. military to protect
combat soldiers.

4.     Each certification executed by Defendants was false.  The Interceptor Units and related component parts were delivered to the U.S. military based on fraudulent representations regarding:

      a.     The ballistic tests;

      b.     The camouflage standards;

      c.     The infra red standards; and

      d.     The Berry Amendment.

5.     Defendants certified that these vests were manufactured in accord with National Institute of Justice ("NIJ") standards as required.  In fact those representations were false, due to flawed manufacturing and quality control conditions existing at the Point Blank manufacturing facilities, as well as insufficient verification of the conformance of the ballistic materials to required specifications.

6.     As a result of Defendants repeated false representations, U.S. combat soldiers were denied the life saving gear to which they were entitled.

7.     As a result of Defendants repeated falsifications and misrepresentations the United States was defrauded out of over 1 billion dollars.

8.     As a direct result of Defendants repeated false statements and misrepresentations Defendants breached their contracts, were paid by mistake and were unjustifiably enriched.

9.     This suit seeks the repayment of the sums paid by the United States because of Defendants' false claims along with the imposition of statutory penalties and other appropriate relief.

3

## JURISDICTION

10.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345,1331, and 1367. The Defendants are doing and/or previously did business within this District.

## VENUE

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3731(a).

## PARTIES

### Relator –Plaintiff

12.     Relator, Wayne B. Kolbeck, is a citizen of the United States and a resident of the State of Florida.

a.     He brings this action on behalf of himself and the United States, inclusive of the United States Department of Defense, the Defense Finance and Accounting Service ("DFAS") and the Armed Services of the United States who purchased body armor and equipment from the Defendants.

b.     Mr. Kolbeck has been employed by Point Blank since 1999. During that period he has been the Director of Quality Assurance and Engineering. Mr. Kolbeck has a B.S. in Textile Chemistry and an M.B.A. in Business Administration and has been certified as a quality engineer and auditor.

c.     Mr. Kolbeck has direct and independent knowledge of the information supporting the allegations of this Complaint. The allegations in the complaint regarding the manufacturing and quality control for production of the Interceptor and its related parts are not based upon public information. He is the original source of the information, which has been voluntarily provided to the United States government prior to filing this Complaint.

4

## The Defendants

13.     Defendant Point Blank Solutions, Inc. ("PBS") is a publicly traded company currently incorporated in Delaware with its headquarters and primary manufacturing facilities in Broward County, Florida. The company is organized as a holding company and sells its body armor products through two subsidiaries, Point Blank Body Armor, Inc., and Protective Apparel Corporation of America. PBS's primary product is the Interceptor vest, a bullet-resistant vest all branches of the U.S. military currently use. PBS conducted business in this District at all times relevant hereto.

14.     Defendant Point Blank Body Armor, Inc., ("Point Blank") is the primary subsidiary through which PBS manufactures its products. It is located in Broward County, Florida. It is the leading manufacturer and provider of bullet and protective resistant garments, fragmentation protective vests, slash and stab protective armor and related ballistic accessories. During the period from 2002 through 2006, 80 to 87% of Defendants' revenues were either directly or indirectly related to sales to the United States Department of Defense for the military. Point Blank conducted business in this District during the time period relevant hereto.

15.     Defendant David H. Brooks founded DHB Industries, Inc., in 1992 and purchased Point Blank out of bankruptcy in 1995. He served as DHB Industries' CEO and Chairman of the Board until he was ousted from his position in July 2006 and was subsequently indicted for diverting millions of dollars of company money for his personal use and engaging in widespread financial and accounting fraud. He is a Defendant in a criminal and a civil enforcement action both of which allege securities fraud brought by, respectively, the government and the Securities and Exchange Commission. *U.S. v. Brooks and Hatfield*, No. 06-0550 (S.D.N.Y. filed Oct. 24, 2007); *SEC v. Brooks*, No. 07-61526 (S.D. Fla. filed October 25, 2007). He previously has been enjoined and barred from associating with any broker or dealer for five years because of his role

5

in an insider trading scheme. *Jeffrey Brooks Securities, Inc., Jeffrey Brooks and David Brooks, Exchange Act* Release No. 34-31657, 53 SEC Docket 0384 (Dec. 23, 1992); *SEC v. Haddad et al.,* 92 Civ. 9122 RPP (S.D.N.Y.).

16.     Defendant Sandra L. Hatfield was the COO and Head of Government Projects for Point Blank Body Armor, Inc. from 2000 until approximately August 2005. Ms. Hatfield has also been indicted on criminal charges based on allegations of looting and financial fraud and been named as a Defendant in an SEC securities fraud action. *SEC v. Schlegel,* No. 06-61251 (S.D. Fla. filed Aug. 17, 2006); *U.S. v. Brooks and Hatfield,* No. 06-0550 (S.D.N.Y. filed Oct. 24, 2007).

17.     Defendant General Larry Ellis has been the CEO of Point Blank Solutions, Inc. since July 2006.

## BACKGROUND

### B.     The False Claims Act

18.     The False Claims Act, in pertinent part, imposes liability for damages and civil penalties on:

> Any person who —
>
>> (1) Knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>>
>> (2) Knowingly makes, uses, or causes to be made or used, a false record of statement to get a false or fraudulent claim paid or approved by the Government.

### X.     Purchasing vests

19.     Generally body armor for the U.S. military is purchased by the United States pursuant to solicitations and offers for contracts made by, and under the supervision of, the

6

Defense Logistics Agency ("DLA") whose headquarters is located at Fort Belvoir, Virginia. Contracts entered into as a result of this process are administered under the auspices of the Defense Contract Management Agency ("DCMA") whose headquarters is also located at Fort Belvoir, Virginia. Invoices for payment under those contracts are processed under the supervision of the Defense Finance and Accounting Service ("DFAS") which is the financial and accounting organization for the Department of Defense. DFAS is headquartered in Arlington, Virginia. Exhibit A is a partial list of solicitations, contracts, and delivery orders ("contracts") under which Point Blank received payments and which is attached hereto and incorporated herein. Each contract was issued under the supervision of DLA, administered by DCMA and the presentations for payment and authorization for payment were made by DFAS.

20.     From 1999 to the present the United States Government purchased in excess of 2.5 million body armor units known as the Interceptor System (and its related parts) as defined below from Defendant Point Blank. Many of those purchases were made under the contracts listed on Exhibit A. Defendant Point Blank submitted at least 568 invoices (*see* partial list of contracts and delivery orders in Exhibit A) to the United States seeking payment for these goods under the contracts. By these actions, Defendants knowingly caused all of these invoices for false claims to be presented.

Δ.      **The Military Vest Purchases**

*1.*      *The Interceptor Program*

21.     The Interceptor Body Armor System is a body armor system manufactured by Point Blank for the U.S. Military. It is designed to protect the upper torso of a soldier from ballistic and shrapnel threats. The system has several component parts which are manufactured and sold as a complete unit (collectively "The Interceptor System").

7

a. An outer shell is made of multiple layers of fabric that must meet certain ballistic performance standards ("shell"). The shell contains a removable Kevlar insert ("Kevlar insert") that provides the soldier with the required ballistic protections. The Kevlar insert must be protected from moisture such as water or perspiration which can degrade its ballistic properties. That protection is provided by a removable covering or "rip stop."

b. The vest closes in the front. It is held closed and in place on the soldier's body by the "hook and loop" which essentially is Velcro strips.

c. The outer shell is covered by "webbing" which is part of the Modular Lightweight Load-carrying Equipment ("MOLLE") system. The system permits the soldier to strap gear such as ammunition, first-aid pouches, grenades, radios and other essential equipment to the vest.

d. The front of the shell has a pocket ("front pocket") into which a Small Arms Protective Insert ("SAPI") plate can be inserted. The plate provides additional ballistic protections.

e. The back of the vest has a similar pocket ("rear pocket") into which another SAPI plate can be inserted.

f. The collar, throat and groin parts attach to the vest, respectively, protect the soldier's neck, throat and groin ("related parts"). The related parts are made of several layers of the same fabric as the outer shell and are intended to have the same ballistic performance properties as the outer shell. The collar also contains a pocket for an insert to fortify its ballistic performance.

g. The Interceptor System has additional protections for the solider by day and night. By day it has specific color and camouflage patterns designed to conceal the soldier.

8

By night it has specific infra-red ("IR") properties which minimize the night time signature of the soldier when viewed with night vision gear.

22.     In 2004 Point Blank developed for the U.S. Marine Corps an Armor Protection Enhancement System, essentially an improved version of the Interceptor System. This new system has enhanced protections, providing adding deltoid and auxiliary protectors ("APEs") and Enhanced Side Ballistic Inserts ("ESBI") to give the upper/under arm, and side the same protections offered by the other parts of the vest. A similar product was developed for the U.S. Army called the Deltoid Auxiliary Protection System ("DAPS") (collectively the "updated system").

23.     Beginning in 1999 and continuing through the present ("the time period") Point Blank manufactured for, and sold to, the U.S. Military the Interceptor System which included the related parts and, after 2004 the DAPs, APEs, and ESBI all of which is collectively referred to herein as The Interceptor System.

*1.     Point Blank's Quality Claims*

24.     Point Blank represented at all times pertinent hereto, that The Interceptor System is the finest body armor in the world and that it provides U.S. combat soldiers the very best protection available, - in every day terms, it is "bullet proof." The company has repeatedly made these representations to the U.S. military and the public.

25.     Point Blank's representations regarding The Interceptor System are based on what the company claims is the rigorous, world class quality control standards in its manufacturing process. Those standards, according to the company, ensure that each Interceptor System made for the U.S. military is uniformly manufactured under the highest, most rigorous quality control standards. The company claims that its quality control and manufacturing standards meet or

9

exceed all standards in military solicitations and contracts for the manufacture and purchase of body armor. Strict adherence to these quality control standards and manufacturing specifications ensures that U.S. combat soldiers receive the best protection from harm possible according to Point Blank.

## 2.   *The Basis Of Its Quality Claims*

26.     In 1999 Mr. Kolbeck was hired by the company as the Director of Quality Assurance and Engineering ("QC Director"). Mr. Kolbeck was hired because of his expertise in quality control systems and related matters.

a.     As QC Director, Mr. Kolbeck was responsible for the creation and maintenance of the quality control and related manufacturing system for all military body armor manufactured by the company, including The Interceptor System during the time period.

b.     Mr. Kolbeck is also responsible for ensuring that all body armor manufactured for the U.S. military meets or exceeded each requirement specified in the solicitations by, and contracts with, the military.

27.     Beginning in 1999 Mr. Kolbeck established a comprehensive system of quality controls at Point Blank's Oakland Park manufacturing facility ("Oakland"). At that time Oakland was its only facility. The system was designed to ensure that the manufacturing process for The Interceptor System complied with all military specifications and that vests manufactured under the system provided U.S. military personnel the proper protections – the armor would be "bullet proof" in popular terms. Accordingly, the system included the following elements:

a.     ISO 9000/9002 standards: These are international quality standards. They are included in solicitation for, and contracts entered into, by Point Blank with the United States Department of Defense. ISO 9002 requires a manufacturer to comply with the higher-level

10

quality standards. Its requirements include establishing a quality management system throughout the organization, having adequate quality control personnel, the performance of an annual management review, the adoption of a quality system, contract review, appropriate documentation and record maintenance, a documented Purchasing System that validates and controls each vendor, and a mechanism for correction and safeguards to prevent the production of non-conforming products.

      b.      Berry Amendment compliance: § 905 of the DOD Appropriations Act 1993, P.L. 102-396 (as amended, § 832 of P.L. 107-107, 10 U.S.C. § 2533a). This amendment requires that all materials for products such as the Interceptor System be from U.S. sources. The purpose is for security reasons and to ensure that U.S. soldiers receive the best quality equipment.

      c.      Source Sampling: Makes a contractor responsible for assuring complete compliance with contract requirements including quality control at its facilities, as well as those of its suppliers and subcontractors. Source sampling can only be approved by testing and obtaining Certificates of Compliance ("COCs") from U.S. government certified labs. For contracts listed in Exhibit A, Point Blank relied on COCs from labs that it knew, or was reckless in not knowing, were not certified by the U.S. government as specified in each individual contract.

      (i)      Adherence to these standards ensure that raw materials for critical safety items to protect U.S. combat soldiers, such as the outer shell of the Interceptor, are pre-approved for conformance to applicable specifications prior to being released for processing into the end product.

11

(ii)     Requires the use of the National Institute of Justice ("NIJ") laboratories, or laboratories approved by the NIJ, for all ballistic acceptance testing to ensure proper testing to maximize the protection for soldiers.

d.     Record keeping:  Requires detailed records regarding the components used in the manufacturing process, the steps and inspections taken, and the tests administered.

(i)     There must be detailed records for each lot of fabric used to manufacture The Interceptor System.

(ii)     Those records must permit each fabric lot to be traceable through out the manufacturing process to the completed product ("traceability").  Traceability permits review of the manufacturing and quality control process.  It also enables the company to certify compliance with required contracting standards thereby ensuring the equipment is properly manufactured to protect soldiers.

(iii)     The final ballistic test for The Interceptor System is based on traceability because the test assumes complete compliance with the initial ballistic test and each required quality control step.  Absent traceability there is no assurance that final ballistic test results are accurate, or that soldiers are being given the proper protection.

(iv)     Absent records demonstrating compliance with the specified quality control standards and manufacturing process, the final acceptance testing is inadequate to determine the uniformity of the ballistic protection throughout the identified shipping lot.

(v)     Absent traceability Point Blank has no basis on which to certify compliance with contract specifications and to demand payment from the government for the finished goods.

12

28.     The system installed by Mr. Kolbeck was, in accord with ISO standards, a "top down" system.  Specifically, it required supervision by senior management to ensure that the necessary controls were enforced throughout the manufacturing process and that the system is improved and updated as required.  The system was designed to apply to all subcontractors.

29.     The system and standards Mr. Kolbeck installed and implemented are detailed in a comprehensive, written quality control manual available at Point Blank, as well as in a complete set of quality assurance procedures, work instructions, and record keeping documents.

30.     In 2000, after the system was fully installed, it was certified as ISO compliant ("PB Plan").  That certification was good for a three year period.  The certification assumes that the company would continue to adhere to the system installed by Mr. Kolbeck.

31.     Ms. Hatfield began to undercut the quality control system almost immediately.

a.      ISO 9002 requires that senior management hold periodic meetings to review the implementations of the standards.  Senior management supervision is critical because it facilitates implementation and enforcement of the system throughout the manufacturing process – quality control must flow down through the system from the top.

b.      The first management review meeting was held on July 12, 2000.  Shortly after the meeting began then COO Sandra Hatfield abruptly announced that she was "tired" of discussing quality control and that she had "real work" to do.  Ms. Hatfield walked out of the meeting, bringing it to an end.  No Management Review meetings were held after July 12, 2000.

c.      The refusal of senior management to participate and ensure implementation and continued operation of the system directly undercut its effectiveness and is contrary to the PB Plan.

WASHINGTON/#170376v.4
August 12, 2010 - 16:08 s8/p8