32.     The next year Mr. Brooks and Ms. Hatfield took further steps to undercut compliance with the PB Plan. On January 2, 2001, the two Defendants directed that Mr. Kolbeck, the Quality Control Assurance Director, no longer report to senior management. This is directly contrary to ISO 9002 and undermined the authority of the position to enforce and maintain quality control standards.

*1.     The 1999 Interceptor Contract*

33.     In 1999 Point Blank was awarded a contract from the U.S. Military to manufacture the version of The Interceptor System available at that time. The contract extended through 2004 ("1999 contract"). Under the contract, the Army agreed to pay approximately $500 per Interceptor vest. The contract had a potential value of $190 million dollars. This was the first of several contracts for the Interceptor System and/or component parts awarded to Point Blank during the time period.

34.     Point Blank represented in bidding for the 1999 contract that it would meet or exceed each of the detailed quality control standards specified by the U.S. Military in the solicitation. Those representations and the requirements of the solicitation were incorporated in the 1999 contract. This same procedure was used for each contract listed on Exhibit A. Exhibit A represents only a partial list of solicitations, contracts, and delivery orders Point Blank received or entered into with the Department of Defense between 1998 and 2008. These contracts authorized Point Blank to receive over 1 Billion dollars upon delivery of over 2.5 million Interceptor and Improved Outer Tactical Vests, DAPS, and related component parts. In addition, there are additional contracts entered into by Point Blank and various government agencies, where repeated falsifications and misrepresentations were made resulting in the United States being defrauded for additional hundreds of millions of dollars. Any payment made to

14

Point Blank for performance under these or other contracts would have been made by DFAS, after Point Blank certified compliance with their performance and requested payment.

35. The representations made to secure the 1999 contract, as well as all other contracts, are substantially similar to those made in response to Solicitation W91CRB-04-R-0045, September 15, 2004. There the company represented: "Overall it is important to note that Point Blank Quality Assurance and Production Manual (available upon request) complies with all the conformance inspections of ISO 9001: 2000, ISO 9002: 1994 and all specific requirements referenced in CO/PD00-02D. The areas include, but are not limited to: All purchased raw materials and components for assembly of the OTV [The Interceptor]... Meeting all the objectives and responsibilities of the Interceptor Program .. Meeting all of the objectives and responsibilities of the Quality Management Team . . ." Point Blank also represented it would fully comply with the Berry Amendment.

36. Point Blank's representations to the U.S. military to secure the 1999 contract, as well as later contracts listed on Exhibit A, were based on compliance with the quality control system installed by Mr. Kolbeck, the PB Plan. Point Blank was awarded the 1999 contract and each contract listed on Exhibit A, based on its specific representations as well as its reputation for manufacturing the finest body armor, which would give U.S. combat soldiers the best life saving and injury avoidance protection available.

2. *False Certifications For The Initial Ballistic Tests*

37. Two ballistic tests are performed as part of the manufacturing process for the Interceptor System during the time period. Full compliance with each was required by the 1999 contract and each contract listed on Exhibit A.

a.  The first is a "shoot" test on the cloth used to make the vest and its component parts ("initial ballistic test"). This test is performed by the fabric manufacturer and presented to Point Blank, along with a Certificate of Compliance, to show that the fabric meets all requirements for use in the Interceptor.

b.  The second is also a "shoot" test. It is conducted on the completed Interceptor System ("final ballistic test"). This is the test that the Government requires to determine the acceptability of the interceptor shipping lot for acceptance.

c.  These tests, conducted in accordance with Military Standard 662F ("Mil Spec") at a NIJ laboratory or NIJ approved laboratory, are designed to ensure that U.S. combat soldiers are properly protected from life threatening shrapnel and gun fire.

38.  Beginning in 1999 and continuing through the time period Point Blank failed to comply with the initial ballistic test requests.

a.  The test was improperly conducted as it did not comply with the Mil-Spec standards.

b.  Traceability for the component parts and multiple plies was destroyed, resulting in some fabrics being tested, some not being tested and some fabric which failed the test being used.

39.  As to the Mil-Spec for the initial ballistic test, Point Blank modified the required procedures to increase the pass rate with the effect of rendering any testing and resulting Certificate of Compliance meaningless:

a.  Ballistic standard MIL-STD-662F dictates the manner in which the test is to be conducted. Under this standard a sample of the cloth is to be "shot in air," that is affixed to

16

a metal frame and shot with no backing which might fortify the cloth and thereby inflate the test results.

  b. Point Blank altered the test procedure by requiring the fabric manufacturer to test the cloth by affixing it to a clay mount which gave the cloth additional backing, diminishing the impact of the bullet and increasing the pass ratio. Failure to properly conduct the test rendered any test results, and COC based on these tests, worthless.

  c. Although Mr. Kolbeck repeatedly informed the company that the initial ballistic test was being improperly conducted no corrective action was taken.

  40. As to traceability, the 1999 contract, and each contract on Exhibit A, required that Point Blank certify compliance with the initial ballistic test in requesting payment. When that certification is provided, it is based on the test results and traceability to the COC certifying compliance with the initial ballistic test.

  a. The initial ballistic test is conducted on a sample from a specified bolt from the manufacturing lot, or identical batch of rolls of cloth. Following the initial ballistic test, if the sample passes a COC is issued.

  b. The fabric used to make each Interceptor System must be traceable to the same COC. This requirement applies to the fabric for each throat, neck, groin, ESBIs, and DAPs and the multiple plies of cloth used to make each of those components of the Interceptor System.

  c. When the Interceptor System is assembled in preparation for shipment these records permit the fabric for the vest, each component part, and each of the multiple plies to be traced back to a COC certifying that it passed the initial ballistic test. This process gives Point Blank a basis on which to certify compliance with this contract standard and ensures that

17

the soldier is receiving properly manufactured and standardized ballistic fabric in the equipment and the proper life saving protections.

41.     Ms. Hatfield destroyed traceability as to the relevant parts and multiple plies by altering traceability ("Modified cutting procedure") beginning in 1999 to save costs. Under the PB Plan, the vest, vest collars, throats and groins as well as the multiple plies were required to be cut from the same fabric lot which could be traced to a COC. This insured traceability and compliance with the first ballistic test. Under the modified cutting procedure, which was contrary to the PB Plan and destroyed traceability:

　　　a.     The vest were cut;

　　　b.     The vest collars, throat, groins and multiple plies were cut from the remaining fabric and other lots of fabric ("other cutting");

　　　c.     The other cuttings were commingled and dumped into unmarked bins and stored for later use;

　　　d.     There were no records which permitted the other cuttings to be traced to a COC for the initial ballistic test or to the performance of these components in the final, acceptance testing for approval by the Government. Thus, there was no basis on which to certify that the excess cuttings or the multiple plies passed the initial ballistic test or the final ballistic acceptance testing;

　　　e.     The random mixing of the ballistic lots at the beginning of the vest manufacturing process precluded any ability to remove any plies that were part of a lot failure from the first ballistic test.

42.     Point Blank used the modified cutting procedure from 1999 through approximately 2001.

18

43. At the conclusion of the manufacturing process the component parts were assembled into a completed Interceptor System. For Systems delivered to the U.S. military between 1999 and 2001 this meant that the Interceptor System consisted of a vest along with the throat, neck and groin parts. For each of these units, Point Blank had no basis on which to assert that the throat, neck and groin parts, or even the multiple plies of fabric in the vest, had passed the initial ballistic test. In fact some had failed that test.

44. In early 2001 Point Blank contracted with its sister company, PACA, to make the other cuttings into Interceptor yoke/collar assemblies and later the DAPs for the Interceptor System. All the other cuttings that had been accumulated in Oakland from 1999 to 2001 were packed up and shipped to PACA for processing into collars, throats, and groin ballistic panels to go with base vests. These were used by late 2001. Beginning in late 2001 the fabric used to make the component parts manufactured by PACA from late 2001 to the present were not subjected to the final acceptance ballistic test as required by the contract. Point Blank had the fabric drop shipped directly to PACA's manufacturing facility. PACA then cut the throat, collar, and groin pieces from those bolts of cloth. No tests were conducted on this cloth beyond what was done by the manufacturer. No final acceptance ballistic test was conducted on any of these components.

45. Mr. Kolbeck informed Point Blank that the procedures used to cut the component parts and the multiple plies failed to conform with the dictates of the PB Plan and the applicable contracts. Ms. Hatfield told Mr. Kolbeck that he was wrong. As Mr. Kolbeck explained later in a July 3, 2006 memorandum to Craig Trask, Plant Manager of the Deerfield Beach facility: "Near the end of 2001, Top Management (Sandra and Ronda) made the decision that the traceability requirement only applied to the body ballistics and not the accessories (namely, the

19

collar/yoke assembly, the insert able collar ballistics and the ballistics in the throat and groin). At that point Point Blank began to drop ship ballistics to PACA, who made the collar/yoke with the sewn-in collar and yoke ballistics. The ballistics received by PACA did not correspond to the lot numbers cut from the body ballistics."

46. Despite Ms. Hatfield's statements to Mr. Kolbeck and others, in demanding payment for the Interceptor Systems delivered to the U.S. military during the time period, Point Blank certified full compliance with, among other things, (a) the first ballistic test as to each Interceptor System and component part; and (b) uniform ballistic lots in all Interceptor components, which was required by contract to ensure that all components of the same Interceptor came from the same ballistic lot assuring consistent ballistic protection from all ballistic components of each Interceptor vest. Each such certification was false for the reasons detailed above. These false certifications meant that U.S. combat soldiers were furnished and relied on equipment intended to protect their lives but which was in fact was of unknown quality and the result of a deeply flawed manufacturing process – it was defective.

## 1.    The Berry Amendment

47. The 1999 contract, and each contract listed on Exhibit A, required Point Blank to comply with the Berry Amendment. Beginning in 1999 and continuing through the time period, Point Blank used inferior quality and less expensive foreign sourced components in manufacturing key parts of the Interceptor System in direct violation of the Berry Amendment, the PB Plan and its express warranties repeatedly made to the government. The inferior quality materials, which endangered U.S. soldiers, included:

a.    *The ripstop*: The ripstop is the synthetic waterproofing material which protects the Kevlar inserts in the vest.

(i)     The ballistic protection of the Kevlar insert degrades when exposed to moisture such as sweat from a soldier in a theater like Iraq or Afghanistan. The ripstop covering protects the functionality and survivability of the armor's ballistics. If the ripstop degrades, the Kevlar insert becomes wet and the ballistic protections it is designed to provide to the soldier deteriorate, exposing the soldier to increased risk of bodily harm.

(ii)     Despite its essential function Point Blank secured the material from HLC Industries and others. These companies imported the material from Taiwan and other foreign sources. It was of inferior quality and did not provide the required protection.

b.     *The hook and loop*:  The hook and loop is critical to the proper functioning of The Interceptor System. It keeps the vest halves closed and secures the SAPI plates in the proper location on the torso of the soldier to ensure proper protection from munitions. Beginning in at least 2002 and continuing to the present, Point Blank has secured the materials for the hook and loop from foreign sources because it was significantly cheaper than domestic sources. The foreign sourced materials were of inferior quality. There have been multiple complaints by the Army regarding the substandard performance of the hook and loop. Those complaints have been ignored by Point Blank.

c.     *The webbing*:  The webbing, part of the MOLLE system on the outside of the vest, is another critical component of the Interceptor System. It enables a soldier to strap gear, such as ammunition, first-aid pouches, grenades, radios and other essential equipment to the body armor. If the webbing is faulty or sub-standard, then the soldier risks losing equipment which can be particularly dangerous during combat operations. Point Blank chose to save money by foreign sourcing the material for the webbing beginning in 2003 and continuing into

21

2007. The foreign sourced materials were of inferior quality. This compromised the quality and usefulness of this key Interceptor System component.

      d.    *Foam in yoke*: The yoke fits around the neck of the soldier and is a key component of the Interceptor System. From 1999 to the present, all of the foam inserted into the yoke has been made in China.

    48.    Mr. Kolbeck repeatedly informed Point Blank and its senior management that the use of foreign sourced goods in the Interceptor System violated the requirements of its contracts with the United States as well as the company's own quality control system. Ms. Hatfield authorized the use of the foreign sourced goods based on her incorrect claim that up to 10% of the materials in the Interceptor System could be foreign sourced under the Berry Amendment.

    49.    Cost cutting was not the only reason foreign sourced goods were used at Point Blank in the Interceptor System. As Mr. Kolbeck noted in a January 17, 2007 e-mail, the person responsible for the purchasing of this component was given travel gifts by the foreign supplier.

    50.    Ms. Hatfield's claims are wrong and are contradicted by the express representations of Point Blank. In its response to solicitation W9/CRB-04-R-0045, September 15, 2004, which is typical of Point Bank's representations, the company stated: "All subcomponent materials meet or exceed the requirements of the specification and are Berry Amendment compliant. These components are based on readily available Mil-Spec items, all of which were selected based on cost and performance factors to maximize military utility and achieve the maximum delivery capacity." Defendants were not permitted to dilute the protections provided U.S. Soldiers by substituting lower quality, foreign-made components for the required Mil-Spec, domestically made components.

### 1. *New Plants But No QC Standards*

22

51.    By 2001 Point Blank had made 33 deliveries of the Interceptor to the United States military valued at more than $100 million.

52.    Following September 11, 2001 and the terrorist attacks in Washington, D.C., New York City and the debacle in Pennsylvania, and with the build up to, and commencement of, the Iraq war, there was increased demand for the Interceptor System. This put increasing pressure on Point Blank's manufacturing process. During the time period Defendants Brooks and Hatfield were also disregarding the internal financial controls of the company, looting it for their personal benefit and increasing the need for additional cash flow.

53.    On February 28, 2002, the Army issued a Solicitation and Offer for the Interceptor. It specified that acceptance would be based on factors other than cost and price alone -- that is, the award would not necessarily be based on low price. Rather, manufacturing, production and quality were paramount.

54.    Point Blank was awarded the contract and the company was paid a premium price based on its representations that it could fully comply with all quality control standards and manufacturing requirements, including specifically ISO 9000: 90002, Source Sampling and the Berry Amendment. Again these representations, were based on the system installed by Mr. Kolbeck, the PB Plan.

55.    By April 22, 2002 the company had more than $140 million in orders and had shipped about 260,000 Interceptor vests to the United States military. It estimated that another $350 million in additional sales were in the pipeline.

56.    In August 2003 the lack of internal controls began to surface. Point Blank's auditors resigned citing the disregard by management for proper internal financial controls. Subsequently, the reason for disregarding those controls became apparent: David Brooks and

23

Sandra Hatfield were looting the company, taking the shareholder's money for themselves. In addition to disregarding the internal financial controls, David Brooks and Sandra Hatfield continued to degrade the internal Quality Assurance controls in the PB Plan in order to hasten production, lower the cost of manufacturing and increase cash flow.

57.     Point Blank opened a second manufacturing facility at Deerfield Beach in early 2003 ("Deerfield"). The plant produced all the Interceptor ballistic components, except for the yoke/collar system and received all the outer shell components produced by outside sub-contractors. This plant assembled and shipped the completed Interceptors units to the United States Government.

58.     The next year Point Blank added a third manufacturing facility, this time at Pompano Beach, Florida ("Pompano"). This plant began to manufacture the collar/yoke assembly for the Interceptor in 2006. In 2006, this plant also began production of the ballistic components for the Interceptor and began receiving the outer shell components from outside sub-contractors and assembling the finished Interceptor unit for shipment to the United States Government. This process remains in place to the present.

59.     When the Deerfield plant was opened, top management moved Mr. Kolbeck to Deerfield.

60.     When Deerfield and Pompano opened Mr. Kolbeck, in each instance, furnished the supervisors at the new facility with a copy of the quality control system, the PB Plan, he had created for the company. The system was never installed at Pompano. Mr. Kolbeck tried to install the PB Plan at Deerfield but was at least in part thwarted by senior management. No comprehensive ISO compliant quality control system was ever installed at Deerfield Beach or at Pompano. Point Blank management disregarded Mr. Kolbeck's numerous communiqués stating

24

that neither plant was ISO-compliant and that the production function was disregarding the PB Plan to facilitate shipments. Following his transfer to Deerfield, Mr. Kolbeck could not assure compliance with the PB Plan at other plants.

### 2.   *Continued Deterioration of QC Standards*

61.   In an August 2003 letter to CEO David Brooks and COO Sandra Hatfield, Mr. Kolbeck admonished the company and its senior management about the growing quality control deficiencies. Later that year in a December 12, 2003 e-mail to senior management Mr. Kolbeck reiterated his protests regarding the circumvention and disregard of quality control standards and systems and contract requirements. Mr. Kolbeck's repeated protests were ignored as were his repeated suggestions to improve those systems.

62.   At fiscal year end 2003, Point Blank's outside auditors identified multiple internal financial control deficiencies. In a filing made with the Securities and Exchange Commission the outside auditors stated that the company had material deficiencies in its internal controls and failed to comply with SEC accounting rules. This lack of internal controls was also mirrored in the Company's disregard of proper Quality Assurance activities and controls.

### 3.   *A Critical Life Threatening Error at a Subcontractor*

63.   Point Blank's subcontractors also failed to adhere to proper quality control and Interceptor contract specified standards. Only one of five subcontractors that did work on the Interceptor System had any quality and manufacturing system standards that approximated an ISO 9002 compliant system as required by the contracts.

64.   Although Point Blank was responsible for ensuring that the product manufactured by each subcontractor met each specification and requirement, the company refused to permit Mr. Kolbeck to review the manufacturing processes at any of the subcontractors.

25

65.     Mr. Kolbeck did inspect the goods from subcontractors which came into his plant. He was unable to review subcontractor goods shipped to the other two manufacturing facilities of the company or directly to the military.

66.     In some instances Point Blank had subcontractor goods shipped to Pompano and ultimately to the U.S. military to avoid inspection by Mr. Kolbeck and his inspection team. Mr. Kolbeck repeatedly protested this circumvention of quality control standards to no avail. While at Deerfield, Mr. Kolbeck repeatedly reported to top management the lack of adequate resources necessary to fulfill his mission of maintaining even minimal standards.

67.     Circumventing quality control created a particularly dangerous situation for U.S. soldiers relying on Unicor made vests that Point Blank purchased.

    a.     Unicor is a prison subcontractor.

    b.     In making the vest Unicor failed to follow the stitching pattern for the front pocket which holds the SAPI plate. By improperly stitching this critical component the pocket permitted the SAPI plate to shift about one inch to the side, leaving a portion of the soldier's chest exposed to life threatening projectiles.

    c.     Despite repeated requests by Mr. Kolbeck beginning as early as 1999, Unicor failed to correct the error.

    d.     Mr. Kolbeck corrected the error at Oakland Park and, after his transfer, at Deerfield by ordering that the front pocket be re-stitched following the correct pattern.

68.     Beginning in 2003 Unicor vests were shipped to the then newly opened Deerfield manufacturing facility and then to the U.S. Military. Beginning in 2004 Unicor vests were shipped to the then newly opened Pompano manufacturing facility and then to the U.S. military. Only the Deerfield facility corrected the placement of the front pocket leaving all soldiers relying

26

on Interceptor Systems manufactured at Pompano exposed to potentially deadly risk because of the error. Nevertheless, Point Blank certified full compliance for each of these vests, a certification which is false.

69.     In 2003 several vests were rejected for, among other things, defects in sewing the front pocket. As Mr. Kolbeck noted in a November 26, 2006 e-mail to Ronda Graves, the Chief Operating manager of Point Blank: "The FPI Interceptor, Extra-Large, that Rick sent to me to inspect has several non-conformances that make the garment unacceptable. The non-conformances are as follows: The front plate pocket opening is to too big (15 1/4"), and the pocket is too wide, meaning that the plate does not sit in the center of the vest, but is offset to the right." In the same e-mail Mr. Kolbeck also noted that the back plate pocket was not properly stitched leaving it out of place and too low. Misplacement of the front and back plates left the soldier exposed to injury. This is just one of a series of e-mails regarding this problem.

70.     In 2007 the Deerfield Quality control inspectors rejected more vests because of the placement of the front pocket. At the time Point Blank had 29,635 Unicor vests in inventory. All were rejected. According to the quality control report 429 vests were inspected. Only 36 passed for a 91% failure rate.

71.     Subsequently Mr. Kolbeck again raised the problem with Joe Sers, Product Manager for clothing and textiles at UNICOR. Mr. Sers tried to disclaim responsibility for the defect. Mr. Kolbeck rejected this claim in an e-mail to Mr. Sers dated March 13, 2007 which traced the history of the problem:

> As a matter of fact, Unicor has been making the front plate pocket wrong ever since 1999. By not attaching the pocket to the right armhole seam, the pocket sags down when the soldier places the plate in the vest. By only taking a 1/2" seam allowance on the right side of the front plate pocket, rather than the required 1 1/2" seam, the plate is allowed to shift too far to the right by 1", thereby leaving the left chest overly exposed. This vulnerability has potentially resulted in

27

injuries and deaths that could have been prevented if the pocket was sewn correctly. The bad ones are the ones that you shipped directly to the military, because, as I said, I made sure that all the vests that Point Blank shipped [from Deerfield where Mr. Kolbeck was located] had the correct plate pocket seams.

As long as Unicor continues to make the plate pocket incorrectly, the CASRED potential of the Interceptor is altered. Since you were copied on these e-mails over the past 8 years, you know full well that the Unicor vests are incorrectly made and do not meet the military specifications. Thousands of our soldiers have Interceptors were their left front chest is exposed due to incorrect UNICOR sewing.

72.     This defect was not corrected until 2007, when Unicor finally agreed to change its stitching on vests being supplied to Point Blank.

73.     A study done by the Armed Forces Institute of Pathology for the Marine Corps System Command in 2005 on Interceptor Systems considered the importance of the location of the SAPI plates. In part the study found that "Thirty-one of 39 injuries outside the plated area were very close to the plate edge. Five injuries appeared to have occurred in areas that would routinely be covered by the plate." While it does not appear that the Armed Forces Institute of Pathology was aware of the flawed Unicor vests, these findings illustrate the danger created by the error Point Blank refused to correct at plants not under Mr. Kolbeck's control.

*1.      Key Standards Ignored: Source Sampling*

74.     Throughout this period Point Blank continued to bid for and be awarded contracts for the Interceptor System and/or its component parts from the U.S. military as reflected in Exhibit A. The awards were based on Point Blank's repeated representations of superior quality and full contract compliance, and the PB system. These assertions were false.

75.     In 2004 there were additional solicitations for the Interceptor and its new DAPs components. Each solicitation contained manufacturing and quality control standards similar to those in earlier solicitations. In its response to Solicitation W91CRB-04-R-0045, dated 15-Sept-2004, the company stated that "Point Blank has been able to confirm that we are offering the best

28

value with the best delivery at the lowest risk to the U.S. Army." At the time Point Blank stated it was delivering 20,000 Interceptors per month and had been for 22 months under multiple contracts, reflected on Exhibit A. Based on new ballistic testing the company concluded it could increase production and delivery to 25,000 per month.

76. To secure this contract Point Blank represented that it would comply with all source sampling requirements incorporated in the contract. Standards for source sampling are set by clauses called out in each contract and incorporated in the quality control program Mr. Kolbeck created for Point Blank as it had in each Interceptor contract.

77. Contractual source sampling standards ensure that the materials used in the manufacturing process comply with specific characteristics such as shade, color, tensile strength and infra-red requirements. Initially, fabrics were required to be sent to Natick Research Labs approved labs for certification and approval under the terms of the contract. Point Blank is then responsible for monitoring their supply-chain to ensure that the production of fabric complies with the approved specifications. The specifications in solicitation W91CRB-040R09945 dated September 15, 2004, used for several contracts and which is typical of those used for each Interceptor components contract listed on Exhibit A specifies:

"Special Provisions CRITICAL APPLICATION ITEM--SOURCE INSPECTION REQUIRED THE CONTRACTOR SHALL PROVIDE MEASUREMENTS AND CERTIFICATIONS OF CONFORMANCE FOR ALL MATERIAL PROPERTIES IDENTIFIED IN THE PERFORMANCE REQUIREMENTS BY SPECIFIC TEST METHODS (emphasis original).

78. The contract requirements included:

a. Outer-shell fabric/webbing: The webbing is part of the MOLLE system used by the soldier to affix other gear to the outside of the Interceptor.

(i)     The standards require that the thread used to attach the webbing to the vest be fused. If the thread is not properly fused the webbing is not properly secured to the vest and can pull away from the vest resulting in a loss of critical gear by the soldier.

(ii)     Point Blank shipped thousands of vests on which the webbing was sewn onto the fabric with a mixture of properly and improperly made thread. Dark colored threats used by Point Blank are properly made and properly fused together. The light colored threads were not properly fused, are defective and should have been thrown out. Point Blank mixed the light and dark threads during the production process to conceal the defective threads.

b.     *Shading*: Shading is critical to the Interceptor because it is part of the camouflage which helps conceal the soldier from the enemy during daylight. Point Blank is responsible under its Interceptor contracts for the colors and shading on the vests. Those colors and shading must comply with the United States approved shade # 3729.

(i)     Point Blank did not do any testing at any time on the color or shading, other than relying on the Certificates of Compliance from the fabric manufacturers.

(ii)     In fact, Point Blank did not even have the requisite manuals with the shading information necessary to conduct the testing. As Mr. Kolbeck noted in a September 2005 memorandum to management: "I urge us to get a copy of the quality manuals from all fabric finishers. I have asked for this in the past, but management rebuffed me. We should have this as part of our vendor certification program."

(iii)     Some shades on units shipped by the company to the military have been off by as much as 60%.

30

(iv)     The Army has repeatedly complained about problems with the color and shading. In addition, the Army has raised concerns about rapidly fading colors and reported that the dye has washed out with use.

(v)     Mr. Kolbeck repeatedly demanded that Point Blank obtain the proper shade testing material. Each request has been refused. Point Blank instead relied on the COCs issued by the manufacturers, that it knew or was reckless in not knowing to be invalid, as the material was not tested by certified labs as required by the contracts.

c.     *IR specifications*: The IR or infra-red specifications for the vest are an essential part of its protections because they are designed to minimize the IR signature of the soldier at night, ensuring that he is not visible to an enemy using night vision gear. Point Blank was responsible for compliance with the IR specifications under each Interceptor contract.

(i)     Point Blank has never done any testing for IR compliance.

(ii)     Point Blank has never had the equipment to conduct the IR tests.

(iii)     Point Blank consistently refused Mr. Kolbeck's requests to obtain the proper equipment to conduct the tests. Point Blank instead relied on the COCs issued by the manufacturers, that it knew or was reckless in not knowing to be invalid, as the material was not tested by certified labs as required by the contracts. There was no basis on which to certify that the materials tested complied with required specifications.

d.     *Shrinkage*: The Army has repeatedly reported problems with shrinkage. Shrinkage indicates that the fabric has not been properly manufactured. In some instances Point Blank had the wrong fabric. Nevertheless, the company has consistently ignored the problem and no steps were taken to investigate it.

31

79.     Under Point Blank's manufacturing system, all outer shell raw materials are drop shipped to the sub-contractors who process the raw materials into finished outer shells. The company did not take any steps to ensure that raw materials were compliant with contract specifications. Since four of the five Point Blank subcontractors did not have any quality control systems, the company knew or was reckless in not knowing that the materials were not properly tested. Mr. Kolbeck protested this disregard of standards in a November 14, 2003 e-mail to company management. His comments were ignored.

80.     The DSCP, reiterated the necessity for source sampling to the company. Subsequently, Mr. Kolbeck, in a February 9, 2007 memorandum to company management, again emphasized the importance of source sampling noting: "the IR [infra-red] specifications are vital to the survivability of the soldier in the field." Point Blank took no action.

81.     Because of the failure to conduct proper source sampling, there could be no assurance that the Interceptor System or its component parts could provide the camouflage necessary to conceal and protect combat soldiers during the day. Failure to source sample meant that there could be no assurance that the Interceptor provided the proper protections for combat soldiers from detection at night. Point Blank's failures meant that by day and by night there could be no assurance that U.S. combat soldiers were provided protections critical to their survival.

82.     When making each demand for payment under each contract in Exhibit A, Point Blank certified compliance with the source sampling requirements. Each certification is false.

*1.     The Final Ballistic Test Is Invalid*

83.     The final ballistic testing for the Interceptor System required a specific number of units be "shot" at an approved facility ("final ballistic test").

32

a.    The final ballistic test is based on two key assumptions: (1) that there is traceability and (2) that the manufacturing process is rigidly controlled so that each vest is substantially identical. As James Mackiewicz, Team Leader, Marine Corps Team, explained in a memorandum dated 24 August 2004 to Thomas Bouchard, U.S. Army Robert Morris Acquisition Center, Natick, MA which recommended that Interceptors manufactured by Point Blank be rejected:

> Ballistic verification testing is designed to provide one final method of validation of performance required to support acceptance of a lot of items. The ballistic quality assurance test is based on the premise that one vest is made similar to another (fibers, fabric, ply lay-up and etc.) in the lot and that a history of materials and production can be tracked throughout the manufacturing process. This is the contracted production method, which supports the government ability to ensure uniformity of each item within a lot. If the tracking history of the material/production cannot be identified with an end item the ballistic quality assurance test has essentially no validity as a representative measure of performance of an item within a lot. (Emphasis added.)

b.    These assumptions permitted only a small sample to be "shot," minimizing the number destroyed from each lot and maximizing the number delivered to the U.S. military and Point Blank's profit.

c.    Each assumption is based on Point Blank's certification that it fully complied with the PB Plan.

84.    Point Blank's final ballistic test for the Interceptor System has been worthless since at least 1999.

a.    The number of vests shot is based on regression analysis which assumes each vest is of uniform quality and that it was manufactured in accordance with the contract specifications and the PB Plan. Since Point Blank failed to comply with these standards the shoot test was invalid and worthless.

33

b.     The test also assumed traceability. Since traceability had been destroyed by Ms. Hatfield this alone rendered the final ballistic test worthless.

85.     Nevertheless, Point Blank continued to certify full compliance for all delivered units during this time period. This certification was made for each payment under each contract on Exhibit A. Each such certification was false.

86.     The invalidity of the final ballistic test, coupled with the invalid initial ballistic test and the lack of any such testing for certain parts of the system meant, at a minimum, that there was no way to determine if soldiers in battle relying on the Interceptor System were receiving the protection which the U.S. Army intended to provide to them. More specifically it meant that soldiers were placed in harms way with protective gear which had been compromised and which may have left them unprotected, all because of Defendants' fraud.

*1.     Change In Management – No Change In Process*

87.     In 2005 Sandra Hatfield was forced to leave the company. Ms. Hatfield was named as a Defendant in an SEC enforcement action accusing her of securities fraud based on allegations that she had looted the company. *SEC v. Schlegel and Hatfield*, No. 06-61251 (S.D. Fla. filed Aug. 17, 2006). The next year the board of directors ousted Mr. Brooks. Subsequently the SEC brought an enforcement action against him for securities fraud that also alleged he had looted the company at the expense of its shareholders. Both Mr. Brooks and Ms. Hatfield were also indicted for securities fraud based, among other things, on allegations of looting Point Blank.

88.     Retired General Larry Ellis was appointed CEO. Mr. Kolbeck briefed General Ellis on the manufacturing and quality control deficiencies at the company in writing as well as in a personal meeting. No corrective action was taken. The internal manufacturing and quality

34

systems of the company continued to be defective. The company continued however to manufacture the Interceptor System and its components and deliver them to the Army.

89.     Mr. Kolbeck reiterated his concerns in an August 2007 communication to management which noted in part that "the entire Quality Assurance program is being circumvented by Production." The communication went on to state that at Point Blank, production and meeting contract quotas had become the only goal at the expense of quality assurance and manufacturing standards. Stated differently, Interceptors and the related components were shipped for use by U.S. soldiers without the quality control assurances required by the solicitations and promised by Point Blank when it was awarded the contracts.

### 2.      *Shifting Standards Increase The Risk For Soldiers*

90.     In 2007 Point Blank changed the design and ballistic protections of the collars for the Interceptor without the permission of, or notice to, the military.

a.      Initially the collars were manufactured with 8 ply Twaron or Kevlar (fabrics with ballistic qualities) sewn into the neck guard. Soldiers were issued removable inserts composed of 18 ply 706 Kevlar and 8 ply Twaron for an 18/8 ply composition ("old insert"). When the insert was put in the collar the total composition was 8/18/8 layers of a Kevlar and Twaron mix. This complied with the contract requirements for ballistic protection.

b.      In 2007 Point Blank changed the mix. Now the neck guard is manufactured of an 8/18 mix. The insert is now made of 8 ply Twaron ("new insert").

c.      Pre-2008 vests have a collar made of only 8 ply Twaron sewn into the collar. Thus when the new insert is put in the collar of a pre-2008 Interceptor the composition is 8/8 rather than the required and Government approved 8/18/8. Soldiers using the new insert in a pre 2007 vest are thus placed seriously at risk.

35

d. The company has not given any notice of this hazard to the U.S. military.

91. Before the modified vest went into production in 2007 Mr. Kolbeck and his quality control team inspected and rejected a lot of 30,000 Unicor made vests. Of the rejected vests 3,500 could not be repaired because they had support defects in addition to a misplaced front pocket. The 3,500 vests were rejected by the military and Point Blank. Caroline Pang, V. P. of Operations for Point Blank directed that the rejected vests be placed in inventory.

92. Recently, Point Blank received an order for 45,000 of the old type vests. The company shipped 3,000 defective vests to Pompano to fill part of the order despite the fact that they were determined defective by the company in the past and that their condition has deteriorated since that conclusion was reached. Those vests were offered to the Government. The Contracting Officer called for a complete inspection of these vests. Despite Point Blank's offer of an 8% discount for the use of these vests, the Government rejected the vests.

*1. Premium Price*

93. The United States military paid Point Blank a premium price for many of the Interceptor Systems and their related components. That premium price had two components: (1) the difference between a competitive bid price and market; and (2) $50 per Interceptor over and above the going market price. The military agreed to pay the premium because of Point Blank's representations of high quality standards and the specific representations in its bid that it met or exceeded all manufacturing standards and military specifications. As Marine Corps Team Leader James Mickiewicz stated in a memorandum of 24 August 2004 to Thomas Bouchard, U.S. Army Robert Morris Acquisition Center, Natick, MD ("Mackiewicz memo"):

> It should also be noted that during source selection other offers provided technically acceptable proposals [for the Interceptor] but one of the deciding factors was Point Blank's quality assurance plan. The additional cost to the government for selecting Point Blank is approximately $50.00 per vest.

36

## 2. *Fraudulent Demands For Payments*

94. Despite its failure to comply with the requisite manufacturing and quality control standards Point Blank demanded and received payment under each Interceptor contract on Exhibit A.

95. Pursuant to the Demands for Payment the U.S. Department of Defense paid in excess of one billion dollars ($1,000,000,000.00) under the contracts to Point Blank.

96. Those payments and Defendants demand for payment were based on its express representations of compliance with all solicitation and contract specification in the manufacture and production of the Interceptor System and all of its related parts.

a. In each instance when Point Blank made a demand for payment it specifically represented that it had fully complied with all specifications of the solicitation and contract.

b. As Solicitation Number SP 100-02-R-4025, February 28, 2002 states in part (and which is representative of the solicitations throughout the period): "Submission of an invoice to the Government for payment is a certification that the supplies for which the Government is being billed have been shipped or delivered in accordance with the shipping instructions issued by the ordering officer, in the quantities shown on the invoice and that such supplies are in the quantity and of the quality designated by the cited contract, notwithstanding any other provision of the contract . . ."

c. For each request for payment under each contract listed on Exhibit A Defendants represented full compliance with all quality control and manufacturing standards included on each solicitation and contract. This includes those asserting full compliance with the

37

ISO requirements, the first ballistic test, the final ballistic test, source sampling and the Berry Amendment.

d.    In fact each of those representations is false since Defendants failed to comply with the quality control and manufacturing specifications in the contracts listed on Exhibit A thereby defrauding the U.S. government.  Defendants were unjustifiably enriched as a result of their fraud.

97.    While the U.S. government was defrauded as a direct and proximate result of Defendants' wrongful conduct, the real victim of Defendants fraud are the men and women of the U. S. military, who deserved the very best protection this nation can provide them.

## COUNT ONE
(Violation of FCA § 3729(a)(1) all Defendants for military contracts)

98.    Paragraphs 1 through 97 are incorporated herein by reference.

99.    All Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States for payment, in violation of FCA, 31 U.S.C. § 3729(e)(1).  Specifically, all Defendants presented or caused to be presented claims for payment under the Contracts listed on Exhibit A for Interceptor Systems and/or component parts which Defendants knew, recklessly disregarded or deliberately ignored were defective.  All of these claims were knowingly false claims under the FCA.

100.    By virtue of thee false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## COUNT TWO
(Violation of FCA § 3729(a)(2) all Defendants for military contacts)

101.    Paragraphs 1 through 100 are incorporated herein by reference.

38

102. All Defendants knowingly made or caused to be made false statements in order to get a false claim paid by the United Stated for payment, in violation of the FCA, 31, U.S.C. § 372(a)(2). Specifically, all Defendants made or caused to be made false statements in connection with false claims for payment under the contracts listed on Exhibit A for Interceptor Systems and/or the related parts which Defendants knew, recklessly disregarded or deliberately ignored were defective. All of these claims were knowingly false claims under the FCA.

## COUNT THREE
[Common law fraud against all Defendants for military vests]

103. Paragraphs 1 through 102 are hereby incorporated herein by reference.

104. Defendants falsely represented that the Interceptor System and its component parts which were paid for by the United States were manufactured in accord with the specifications in the contracts which were designed to protect U.S. combat soldiers.

105. Defendants failed to inform the United States that the Interceptor Systems and related parts were defective. At the time when the Defendants failed to make this disclosure, Defendant had a duty to disclose due to their superior knowledge and the life threatening nature of the defects.

106. Defendants knew that their representations, both direct and implied, that the Interceptor Systems and related parts complied with the contractual requirements were false.

107. These representations were material.

108. Defendants knew that the United States would rely, and intended that the United States rely, on these false representations.

109. The United States justifiably relied upon these false representations and material omissions.

39

110.    By virtue of Defendants' fraud, the United States suffered damages in an amount to be determined at trial.

111.    The actions of Defendants in making these false representations and material omissions with the intent that the United States and its agencies would rely on these false representations and material omissions, was malicious, wanton, and reprehensible conduct. Therefore, punitive damages sufficient to punish and deter these Defendants should be assessed against them in an amount to be determined at trial.

### COUNT FOUR
[Against all Defendants for mistake as to the military contracts]

112.    Paragraphs 1 through 111 are incorporated by reference herein.

113.    For the fiscal years 1998 through the present, the United States made payments to Defendant Point Blank in the erroneous belief that this Defendant was entitled to reimbursement, without knowing that Defendant's claims were false. These payments include those for the Interceptor System and its component parts under the contracts listed on Exhibit A.

114.    The United States' erroneous beliefs were material to the amount of the payments made by the United States.

115.    Because of these mistakes of fact, this Defendant received funds to which it was not entitled.

116.    By reason of the overpayments, the United States is entitled to damages in an amount to be established at trial.

### COUNT FIVE
[For unjust enrichment as to the military contracts]

117.    Paragraphs 1 through 116 are incorporated herein by reference.

WASHINGTON/#170376v.4
August 12, 2010 - 16:08 all/p8

118.   From 1999 to the present the United States paid for defective Interceptor Systems and the related parts due to the false statements and omissions by all Defendants.

119.   The United States is entitled to the return of all payments by the United States directly or indirectly to Point Blank for Interceptor Systems and related parts due to the false claims presented for fiscal years 1998 to the present.

120.   By reason of the above-described payments, Defendants have received money, directly or indirectly, to which they were not entitled.  They therefore have been unjustly enriched in an amount to be established at trial.

## COUNT SIX
[Breach of contract against Point Blank for military contracts]

121.   Paragraphs 1 through 120 are incorporated herein by reference.

122.   Point Blank entered into contracts with the United States including but not limited to those listed on Exhibit A.  Those contracts imposed obligations on Point Blank, including but not limited to, manufacturing the Interceptor System and its component parts in accord with specifications contained in those contracts.

123.   Point Blank breached its contractual obligations by failing to comply with the provisions of the contracts, including but not limited to, a) failing to properly conduct the initial ballistic test; b) failing to properly conduct the final ballistic test; c) failing to perform source sampling; and d) failing to comply with the Berry Amendment.

124.   As a result of Point Blank's breach of contract, the United States has been damaged by the defective Interceptor Systems and related parts in an amount to be determined at trial.

41

## PRAYER FOR RELIEF

125.    WHEREFORE, Relator, on behalf of the United States, requests that judgment be entered in its favor on each count and against the Defendants as follows

        e.    Damages in an amount to be determined at trial on each count;

        f.    Treble damages on Counts 1 and 2;

        g.    A civil penalty in an amount to be determined at trial on Counts 1 and 2;

        h.    Punitive damages on Counts 3;

        i.    The costs of this action;

        j.    Reasonable attorneys fees and expenses; and

        k.    Such other relief as the Court deems just and appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, qui tam Plaintiffs/Relators hereby demand trial by jury.

Dated: November 13, 2008          Respectfully Submitted,

         PORTER WRIGHT MORRIS & ARTHUR LLP

         John C. Monica Jr. (VA Bar # 32858)
jmonica@porterwright.com
Thomas O. Gorman
Adam J. Tiffen
1919 Pennsylvania Avenue NW
Suite 500
Washington, D.C. 20006-3434
Telephone:(202) 778-3000
Fax:(202) 778-3063

COUNSEL FOR PLAINTIFF/RELATOR

42



**Elliott Greenleaf**

www.elliottgreenleaf.com
A Professional Corporation

1105 Market Street, Suite 1700
P.O. Box 2327
Wilmington, Delaware 19899

Phone: (302) 384-9400 • Fax: (302) 384-9399

August 12, 2010

**BY FEDERAL EXPRESS**
**Tracking # 871065167233**

Point Blank Solutions Claims Processing Center
c/o Epiq Bankruptcy Solutions LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

Re: **Point Blank Solutions Inc.**
     **Case No. 10-11255**

To Whom It May Concern:

Enclosed is the original Proof of Claim, and a copy of the same, submitted by the Wayne Kolbeck in the above-referenced matter, in the amount of $743,785.30.

Please retain the original for your files; date-stamp the copy and return it to me in the enclosed, self-addressed, stamped envelope. If you have any questions, please call my office (302-384-9400). Thank you.

Sincerely,

Shelley Kinsella

Enclosures

**FedEx** US Airbill
Express

200

8710 6516 7233

Recipient's Copy

**1 From** This portion can be removed for Recipient's records.

Date 8/12/10  FedEx Tracking Number 871065167233

Sender's Name Shelley A. Kinsella Phone

Company ELLIOTT GREENLEAF SIEDZIKOWSKI

Address 1105 N MARKET ST STE 1700

City WILMINGTON  State DE  ZIP 19801-1228

RECEIVED AUG 18 2010

**2 Your Internal Billing Reference** 60192-1

**3 To**
Recipient's Name Point Blank Solutions Claims Processing Center

Company Epiq Bankruptcy Solutions

Address 757 Third Avenue 3rd Flwr

City New York  State NY  ZIP 10017

0414181672

8710 6516 7233

553

**4a Express Package Service**  *Packages up to 150 lbs.*
- FedEx Priority Overnight
- FedEx Standard Overnight
- FedEx First Overnight
- FedEx 2Day
- FedEx Express Saver

**4b Express Freight Service**  *Packages over 150 lbs.*
- FedEx 1Day Freight
- FedEx 2Day Freight
- FedEx 3Day Freight

**5 Packaging**
- FedEx Envelope
- ☑ FedEx Pak
- FedEx Box
- FedEx Tube
- Other

**6 Special Handling and Delivery Signature Options**
- SATURDAY Delivery
- ☑ No Signature Required
- Direct Signature
- Indirect Signature

**7 Payment** Bill to
- ☑ Sender
- Recipient
- Third Party
- Credit Card
- Cash/Check

Total Packages  Total Weight  Total Declared Value