# EXHIBIT H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>c/o The United States Department of Justice<br>601 D Street N.W., Room 9126<br>Washington, D.C. 20004,<br><br>Plaintiff,<br><br>v.<br><br>POINT BLANK SOLUTIONS, INC.,<br>2102 SW 2nd Street<br>Pompano Beach, Florida 33069,<br><br>POINT BLANK BODY ARMOR, INC.<br>2102 SW 2nd Street<br>Pompano Beach, Florida 33069,<br><br>PROTECTIVE APPAREL CORPORATION<br>OF AMERICA<br>179 Mine Lane<br>Jacksboro, Tennessee 37757,<br><br>Defendants. | CV No. _____<br><br>COMPLAINT OF THE UNITED STATES<br>OF AMERICA<br><br>1.   VIOLATIONS OF THE FALSE<br>     CLAIMS ACT, 31 U.S.C. §<br>     3729(a)(1);<br>2.   VIOLATIONS OF THE FALSE<br>     CLAIMS ACT, 31 U.S.C. §<br>     3729(a)(1)(B);<br>3.   BREACH OF CONTRACT;<br>4.   PAYMENT BY MISTAKE;<br>5.   UNJUST ENRICHMENT<br><br>RELATED CASES:<br>United States v. Second Chance Body Armor, Inc., et al. (D.D.C. No. 04-0280); United States v. Toyobo Co. Ltd., et al. (D.D.C. No. 07-1144 RWR); United States v. Honeywell Int'l., Inc, (D.D.C. No. 08-961 RWR); United States v. First Choice Armor & Equipment, Inc., et al. (D.D.C. No. 09-01458 RWR) |

Plaintiff, the United States of America, alleges as follows:

## OVERVIEW

1.     This is an action brought by the United States to recover damages and civil

penalties under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33, and to recover damages for

breach of contract, payment by mistake, and unjust enrichment. All of these claims are premised

upon the conduct of the Defendants Point Blank Solutions, Inc., formerly DHB Industries, Inc.,

and its subsidiaries, Point Blank Body Armor, Inc. and Protective Apparel Corporation of

America (collectively, "Point Blank"), in submitting or causing to be submitted false claims for

payment and making or causing to be made false statements in connection with the sale of

defective Zylon body armor, primarily ballistic bullet-proof vests, to the United States and to state, local and tribal law enforcement agencies funded in part by federal funds.

2.      The Zylon body armor contained fabrics woven of Zylon or "PBO" fiber which was manufactured by Toyobo Co. Ltd. and Toyobo America, Inc. (collectively Toyobo). These defective Zylon vests were sold to the United States and to state, local and tribal authorities by Point Blank. Point Blank knew, within the meaning of the FCA, that the Zylon bullet-proof vests Point Blank sold were defective and degraded more quickly than Point Blank represented. As a result of Point Blank's conduct and representations, the United States paid for defective Zylon body armor. The United States also seeks damages for breach of contract, payment by mistake, and unjust enrichment against Point Blank.

## JURISDICTION

3.      This Court has jurisdiction over this action pursuant 28 U.S.C. §§ 1345 and 1331. The Defendants are doing and/or previously did business within this District. Specifically, a minimum of approximately 634 Zylon vests manufactured by Point Blank were delivered to or invoiced to the United States Government in this District. Additionally, the claims for payment for all Point Blank Zylon vests – over 16,688 Zylon vests – purchased under the Bullet Proof Vest Grant Partnership Act (BPVGPA) were submitted to the Office of Justice Programs (OJP) of the Department of Justice which is located within this District.

4.      Venue is proper within this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a). The Defendants are doing and/or previously did business within this District.

## PARTIES

### The United States of America

5.      The plaintiff is the United States of America. The United States brings this

- 2 -

lawsuit on behalf of its agencies, including, but not limited to, the Department of Justice (DOJ),

the General Services Administration (GSA), the Department of Defense (DoD), the Department

of Treasury, the Department of Homeland Security (DHS), the Department of the Interior

including, but not limited to, the United States Park Police (Park Police), and all other federal

agencies or divisions which purchased, or provided funds for the purchase of, ballistic vests

made in whole or in part with Zylon manufactured by Toyobo.

### The Defendants

6.      Defendant Point Blank Solutions, Inc. (formerly DHB Industries, Inc.) is a

Delaware corporation doing business in this District.  Point Blank Solutions' last known business

address is 2102 SW 2nd Street, Pompano Beach, Florida 33069.  Point Blank Solutions has

signed multiple tolling agreements as to the statute of limitations with the United States and its

current tolling agreement expires on October 12, 2010.  On or about April 14, 2010, Point Blank

Solutions, Inc. filed for the protection of the bankruptcy court by submitting a petition pursuant

to Chapter 11 of the Bankruptcy Code.  In re Point Blank Solutions, Inc., et al. (Bk. D. Del. 10-

11255).

7.      Defendant Point Blank Body Armor, Inc. is a Delaware corporation doing

business in this District.  Point Blank Body Armor's last known business address is 2102 SW

2nd Street, Pompano Beach, Florida 33069.  Point Blank Body Armor, Inc. is a subsidiary of

Point Blank Solutions, Inc.  Point Blank Body Armor has signed multiple tolling agreements as

to the statute of limitations with the United States and its current tolling agreement expires on

October 12, 2010.  On or about April 14, 2010, Point Blank Body Armor, Inc. filed for the

protection of the bankruptcy court by submitting a petition pursuant to Chapter 11 of the

Bankruptcy Code.  In re Point Blank Body Armor, Inc. (Bk. D. Del. 10-11257), consolidated as

- 3 -

In re Point Blank Solutions, Inc., et al. (Bk. D. Del. 10-11255).

      8.     Defendant Protective Apparel Corporation of America (PACA) is a New York corporation doing business in this District. PACA's last known business address is 179 Mine Lane, Jacksboro, Tennessee 37757. PACA is a subsidiary of Point Blank Solutions, Inc. PACA has signed multiple tolling agreements as to the statute of limitations with the United States and its current tolling agreement expires on October 12, 2010. On or about April 14, 2010, PACA filed for the protection of the bankruptcy court by submitting a petition pursuant to Chapter 11 of the Bankruptcy Code. In re Protective Apparel Corporation of America. (Bk. D. Del. 10-11259), consolidated as   In re Point Blank Solutions, Inc., et al. (Bk. D. Del. 10-11255).

## BACKGROUND

### A.    The False Claims Act

     13.     The United States' claim for submitting or causing to be submitted false claims to the United States is governed by the FCA, which provides, in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
>          \* \* \*
>
> is liable to the United States Government . . . .
>
> (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

     14.     Pursuant to the Fraud Enforcement and Recovery Act of 2009 (FERA), PL 111-21

(May 18, 2009), the United States' claim for making or causing to be made false statements or

records is governed by 31 U.S.C. § 3729(a)(1), which provides, in pertinent part, that:

> [A]ny person who-- . . .(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

**B.    The GSA Program**

15.    The General Services Administration (GSA) is an agency of the federal

government with the responsibility for administration of the Multiple Award Schedule (MAS)

contracting program (also known as the Federal Supply Schedule (FSS)).

16.    Under the MAS program, GSA negotiates contracts for commonly used

commercial off-the-shelf items with contractors.  Federal agencies can then purchase products

under MAS contracts directly from contractors at pre-negotiated prices, terms and conditions.

Products are grouped under pre-designated Special Item Numbers (SINs) which connote broad

categories of commercial products or services.

17.    The GSA Schedule included Zylon bullet-proof vests from Point Blank.  From

approximately 1999 to 2005, the United States Government purchased more than 33,934 Zylon

bullet-proof vests from Point Blank.  The United States paid more than $16,637,960.78 for these

Zylon vests purchased from the GSA schedule.  All of these vests carried a five-year warranty.

The claims for payment for each and every Point Blank Zylon vest sold to the United States

under the GSA schedule by Point Blank were false claims in that the Zylon in those vests was

defective and degraded substantially and quickly and, thus, did not meet their five-year warranty.

By the actions set forth in Paragraphs 25-57 of this Complaint, Point Blank knew that the Zylon

in these vests was defective and degraded substantially and quickly and did not comply with their five-year warranty. Notwithstanding this knowledge, Point Blank misrepresented the suitability of Zylon in ballistic applications. For these reasons, Point Blank knowingly presented or caused false claims to be presented to the federal government and knowingly made or caused to be made false statements.

18.     The federal agencies that paid for these Point Blank Zylon vests listed on the GSA schedule would not have paid for these vests if they had known that the Zylon in the vests degraded much more rapidly than disclosed by Point Blank and would not meet their five-year warranty.

C.     The Bullet Proof Vest Grant Partnership Act Program

19.     In late 1997, after two state troopers without bullet-proof vests were killed in shootings, Congress created a grant program called the Bullet Proof Vest Grant Partnership Act (BPVGPA), 42 U.S.C. § 3796ll, *et seq.* Under the BPVGPA, the United States reimburses eligible state, local and tribal authorities for up to fifty percent of the cost of ballistic vests. The exact amount state, local and tribal law enforcement agencies are reimbursed for any specific vest depends on the entitlement cap for each such agency for that fiscal year. The BPVGPA grant program is administered by the OJP.

20.     Purchasers under the BPVGPA grant program cannot be reimbursed until they certify to OJP that they have paid for and received the vests. State, local and tribal authorities do not receive funds from the BPVGPA in advance of their purchases or in advance of their receipt of the vests.

21.     From approximately 1999 to 2005, Point Blank sold a minimum of 16,688 Zylon vests to state, local, and tribal law enforcement entities under the BPVGPA. The federal

government reimbursed these state, local, and tribal law enforcement agencies at least

$4,194,947.57 for these Point Blank Zylon vests under the BPVGPA. The claims for payment

for each and every Point Blank Zylon vest presented to the United States by state, local and tribal

law enforcement agencies pursuant to the BPVGPA were false claims in that the Zylon in those

vests was defective and degraded substantially and quickly and, thus, did not meet their five-year

warranty. By the actions set forth in Paragraphs 25-57 of this Complaint, Point Blank knew that

the Zylon in these vests was defective and degraded substantially and quickly and would not

meet their five-year warranty. For these reasons, Point Blank knowingly caused false claims to

be presented to the federal government.

      22.     The United States would not have reimbursed the claims for payment for the Point

Blank Zylon vests under the BPVGPA Program if it had they known that the Zylon in the vests

was degrading more rapidly than disclosed by Point Blank and was a defective product.

**D.    Other Federal Purchases**

      23.     Other federal agencies purchased Zylon bullet-proof vests directly from Point

Blank or from their distributors pursuant to federal contracts, other than through the GSA

Schedule. From approximately 1999 on, the federal government purchased Zylon bullet-proof

vests from Point Blank. The claims for payment for each and every Point Blank Zylon vest sold

to the United States under federal contracts by Point Blank were false claims in that the Zylon in

those vests was defective and degraded substantially and quickly and, thus, did not meet their

five-year warranty. By the actions set forth in Paragraphs 25-57 of this Complaint, Point Blank

knew that the Zylon in these vests was defective and degraded substantially and quickly and did

not meet their five-year warranty. For these reasons, Point Blank knowingly caused false claims

to be presented to the federal government.

24.     The United States would not have paid for the Point Blank Zylon vests if it had known that Zylon in these vests was degrading more rapidly than disclosed by Point Blank and was a defective product.

## THE POINT BLANK SCHEME

25.     Point Blank manufactured and sold Zylon vests beginning in late 1999 and continuing through August 2005. Upon information and belief, Point Blank did not employ or retain any chemists or polymer experts, but nevertheless marketed the Zylon vests as suitable for law enforcement use.

26.     The United States is informed and believes and on that basis alleges that, in or about 1998, Allen Price (Price), then an employee of Point Blank, visited Toyobo in New York City, in an effort to obtain Zylon for use in Point Blank bullet-proof vests. By February 1999, Point Blank and Toyobo had agreed that Point Blank could market and sell Zylon armor to the United States Government and federal agencies, but not to the United States commercial law enforcement market (as Second Chance Body Armor had a one-year exclusive arrangement with Toyobo to supply that market). Point Blank aggressively sought to expand its Zylon vest sales into the United States commercial law enforcement market at the earliest opportunity.

27.     From 1999 to 2005, Point Blank's marketing emphasized thin and lightweight Zylon vests as a critical element of its sales pitch to the United States' body armor market.

28.     From 1999 to 2005, Point Blank issued a five-year warranty on the Zylon vests. Upon information and belief, Point Blank offered this warranty because other companies in the industry did so and they needed to do so to compete. The Point Blank warranty expressly stated: "All ballistic protective components are warranted for five (5) years from date of purchase." The PACA warranty expressly stated: "For five (5) years after the date of purchase, Protective

Apparel Corporation of America warrants that the ballistic and/or stab panels will prevent the penetration of the labeled projectiles at their designated threat level/type."

29.     Beginning in July 2001, Point Blank received correspondence from Toyobo, the Zylon fiber manufacturer, about Zylon degradation. (This correspondence constituted only a small portion of the information concerning Zylon degradation in Toyobo's possession. Toyobo's misconduct as it relates to Point Blank's Zylon vests is the subject of a separate lawsuit entitled, United States v. Toyobo Co., Ltd., et al. (D.D.C. No. 07-1144)). This data highlighted problems with Zylon degradation due to age, light, heat, and humidity. Upon information and belief, Point Blank made no changes to their vest designs in response to the Toyobo data.

34.     In or about July 2001, DSM, a Dutch company, which manufactured a Zylon laminate product for ballistic applications, issued an "URGENT URGENT URGENT URGENT" announcement that it had "serious indications that the use of PBO-fiber in bullet-resistant vests may not be justified." DSM concluded that "[b]ecause of the serious nature of these indications DSM HPF decided to put on hold the market introduction of its PBO-fiber containing product offered to you as Zylon UD-SB10." The United States alleges that, by at least July 6, 2001, Point Blank was aware of the DSM announcement, having received a letter from Toyobo on that date discussing it.

35.     On the same day as the DSM announcement, Toyobo informed Point Blank that it had been doing accelerated aging testing on Zylon and announced that "the strength of Zylon decreases under high temperature and humidity conditions." At that time, Toyobo estimated that Zylon would lose five percent of its tensile strength in ten years at normal conditions. Toyobo also informed Point Blank about the DSM announcement. Despite its own July 2001 data (and other, earlier Toyobo data) which showed a loss of Zylon strength at high temperature and high

humidity, Toyobo falsely claimed "we have not found any serious indication from our test using Zylon fiber up to now."

36.     Upon information and belief, Allen Price, while an employee of Point Blank, contacted Lance Miller, Director of the National Law Enforcement and Corrections Technology Center (NLECTC), in or about July 2001 and attributed the DSM announcement to an international business dispute over the distribution of Zylon fiber between Europe, the Pacific Rim, and the United States.

37.     By August 2001, Point Blank was aware that the Zylon degradation problem was worse that Toyobo had first indicated. On or about August 28, 2001, Toyobo informed Point Blank that its July 2001 estimate of a five percent tensile strength loss in ten years was not accurate.  Toyobo informed Point Blank that it had found a bigger strength drop than previously expected at 40°C (104°F) and 80% humidity: 5% at 10 days, 7.5% at 100 days (over 3 months) and 10% at 1000 days (less than 3 years).

38.     In the fall of 2001, after Allen Price left his employment with Point Blank on or about September 28, 2001, Sandra Hatfield, Chief Operating Officer, asked Wayne Kolbeck, Point Blank's Quality Director, to review some documents which had come from Toyobo, addressed to Price.  These documents included technical information on Zylon degradation under conditions of heat and humidity, dated September 28, 2001.  Kolbeck interpreted these documents to mean that Zylon degraded under normal heat and light conditions. He expressed concern to Sandra Hatfield that Zylon was not a good fiber to use, in light of the five-year warranty on Point Blank's ballistic vests.  Kolbeck sought and obtained authorization to send a Point Blank Zylon vest for testing.  Upon information and belief, the vest failed the testing, which result Kolbeck took to Sandra Hatfield, who called it an "anomaly," dismissing the results.

- 10 -

Kolbeck indicated that was the end of the conversation and of his involvement with the issue of Zylon degradation.

39.     On or about November 26, 2001, Toyobo sent Zylon degradation data to Point Blank which revealed a dramatic drop in Zylon's tensile strength when it was exposed to 40°C (104° F) and 70-80% humidity.  Toyobo noted in its cover letter for the data that the strength loss did not follow a straight line in the logarithmic plot, and that the mechanism of change was not clear at the time.

40.     In January 2002, Toyobo informed Point Blank that it had withdrawn its November data regarding Zylon degradation on the ground it was "statistically not correct and not reliable." At this time, Point Blank could no longer continue to rely in good faith on Toyobo's Zylon degradation data.  The best case scenario was that Toyobo's previously announced data was "statistically not correct and not reliable." The worst case was that Toyobo was simply deleting the bad data.

41.     In early December, 2001, Barrday, Inc., a ballistic fabric weaver which supplied Point Blank with Zylon fabric for ballistic bullet-proof vests, sent out a letter to its customers, including Point Blank, indicating that since receiving Toyobo's November 26, 2001 degradation data, it had decided to suspend direct commercial sales of Zylon product.  In February 2002, Barrday notified Point Blank that it would resume weaving Zylon, but stated that Point Blank would have to execute an indemnification agreement first.  Upon information and belief, no product other than Zylon sold by Barrday to Point Blank required an indemnification agreement.  Barrday's proposed indemnification letter required Point Blank to certify, among other things, that its customers had received a copy of the Toyobo November 26, 2001 technical update and understood the issue.  Upon information and belief, no product other than Zylon sold

by Barrday to Point Blank required disclosure of technical data to the customer.

42.     Upon information and belief, Point Blank complained to Toyobo about Barrday's indemnification agreement and said that Point Blank was shifting its purchases of woven non-laminated Zylon fabric to Hexcel, another ballistic Zylon fabric weaver (which also required an indemnification agreement, but featuring different content).

43.     In July 2002, discussion between Point Blank and Barrday resulted in a revised indemnification letter. It was identical to the previous version proposed by Barrday, except that it eliminated the customer notification requirement. Upon information and belief, Point Blank employees admitted that they could not recall any weavers seeking indemnification for materials other than Zylon.

44.     In May 2003, personnel at Hexcel noticed large, dark red discolored portions of Zylon yarn on the looms. Hexcel temporarily shut down all Zylon weaving, waiting for assurance from Toyobo that the yarn and fabric in question was suitable for ballistic applications. In July 2003, Steve Young of Point Blank met with representatives of Toyobo, Hexcel, Itochu Corporation and Itochu International, Inc. (collectively "Itochu," an importer of Zylon fiber), to discuss the issue of Red Thread Zylon. Upon information and belief, Young was informed that the Red Thread problem was due to too much alkaline in the Zylon manufacturing process, and that Red Thread Zylon was up to 20% weaker than normal Zylon, but Young's response was that there was "no issue." Upon information and belief, Young also inquired about the hydrolysis issue (the degradation of Zylon under conditions of heat and humidity), and was told that it would take two years to realize a mechanical improvement of Zylon. Material containing "red Zylon marks" was, in fact, shipped to Point Blank in July 2003.

45.     In June 2003, Officer Tony Zeppetella of Oceanside, California and Officer Ed

- 12 -

Limbacher of Forest Hills, PA were shot through their 100% Zylon ballistic vests. Their vests were manufactured by Second Chance Body Armor, Inc., another Zylon vest manufacturer. These Zylon vests were less than one year old.

46.     By no later than August 2003, Point Blank was aware of the Second Chance Zylon vest failures. Shortly after the officer shootings, law enforcement officers began e-mailing Point Blank, inquiring about the safety of their Zylon vests. One officer complained about the lack of information on Zylon and Toyobo's tests coming from Point Blank and other body armor manufacturers; the officer went on to say that "I feel ethically and morally companies using Zylon should be upfront about the degradation issue so the officers wearing the vests can decide. Especially since this has been known since July of 2001."

47.     In early September 2003, Steve Young met with representatives of Toyobo and Itochu; they discussed the Zeppetella and Limbacher shootings, a penetration incident in Washington state, and comments coming in from customers indicating that they would not buy Zylon vests in the future. Upon information and belief, Young inquired about ways to alleviate Zylon degradation, including sealing the Zylon panel or waterproofing on the Zylon thread itself, but he was told by Toyobo that these proposals would not work.

48.     Also in September 2003, Barrday again stopped weaving Zylon, this time permanently. Upon information and belief, Michael Buckstein, CEO of Barrday, told Sandra Hatfield about his discomfort and wish to get out of the Zylon business until the hydrolysis issue was resolved. Point Blank officials were quickly in contact with other weavers, indicating that they would continue to use Zylon.

49.     Thereafter, Point Blank sent a short statement to customers indicating that the company was working internally and with the National Institute of Justice to substantiate Zylon

information. Point Blank personnel were encouraged to keep their responses to customers

limited until all the facts could be gathered. Point Blank employees acknowledged, however,

that the real question was whether Zylon breaks down, and that they did not know the answer to

that question yet. Yet, Point Blank continued selling Zylon vests.

50.     On or about October 10, 2003, Toyobo disclosed to Point Blank that it had

conducted fiber strength tests on fiber removed from woven Zylon fabric beginning in 2001 that

showed a greater and more serious degradation than Toyobo's previously published data of raw

Zylon fiber. (This information was significant because Toyobo had previously disclosed only

testing performed on raw Zylon fiber, not fiber removed from woven Zylon fabric, which was

closer to the condition of Zylon fiber in Zylon vests.)  Despite knowing that Toyobo had failed to

disclose significant data to Point Blank from July 2001 to September 2003, Point Blank

continued to sell Zylon vests to the United States Government and to state, local, and tribal law

enforcement officers until August 25, 2005. Additionally, on or about October 10, 2003, Toyobo

released test results from ballistic testing on new Zylon fabric, on fabric which had been stored in

a warehouse from one to three years, and on fabric which had been subjected to conditions of

176°F and 80% relative humidity for fifty (50) days. Because this data was favorable to the use

of Zylon, Point Blank chose to rely on Toyobo's warehouse testing data in Point Blank's later

communications to customers.

51.     On or about October 13, 2003, Steve Young met with Toyobo personnel, and

later reported that Toyobo was not able to define the effect of long term wear on their fiber or

fabric, but thought this would best be obtained from vest manufacturers. Young further

suggested to Toyobo that modulus (a physical property of Zylon describing the fiber's resistance

to stretch) might be more important than tensile strength when subjected to ballistic testing. In

- 14 -

that meeting, Toyobo asked if Point Blank had withdrawn its vests from the market, which

Young said was a rumor that was not true.  Young also reported that Toyobo had said it would

take a process modification to correct the deficiency of Zylon's long-term strength loss, but that

they did not expect that the change could be made before 2005.  Young further reported that

Toyobo offered monetary assistance to Point Blank if they decided to do a study of long term

performance of Point Blank's vests in the marketplace.

52.     In November 2003, Point Blank began gathering used Zylon vests from the field

for testing, emphasizing that this process was to be done "discreetly."  Also in late 2003, Point

Blank began sending a Zylon position letter to law enforcement officers.  It touted Toyobo's

ballistic testing (apparently that described in Paragraph 50, above), said that tensile strength

apparently has little effect on the overall ballistic properties of the Zylon fabric, and stated that

the results of Toyobo's testing showed little significant change in ballistic performance between

the old material and the new.  However, by early 2004, Point Blank was still requesting that

Toyobo perform additional ballistic testing on Zylon, and Toyobo was still refusing, saying that it

might test ballistic performance of fabric when it introduced a new fiber in the near future.

Young responded that Toyobo was best suited to provide this data as it understood the fiber,

chemistry and other related scientific parameters, and he cited Toyobo's technical staff as those

who were best suited to making these determinations.  Although Toyobo decined to conduct the

additional ballistic testing requested by Point Blank, Point Blank continued to sell Zylon vests.

53.     Point Blank's Zylon study results were finalized on or about August 1, 2004, with

the release of the DHB Armor Group Armor Safety Report.  The analysis of test results focused

on whether the V-50s (a measurement of the velocity at which 50% of the shots fired at a

ballistic material will penetrate) were within +/- 3 standard deviations of benchmark data, despite

- 15 -

the fact that field shoots often used a pass/fail test, more akin to a "V-0" (a measurement of the velocity at which 0% of the shots fired at a ballistic material will penetrate). On or about July 30, 2004, Point Blank personnel met with representatives of Toyobo, Itochu, and Lincoln Fabrics, Inc. (another ballistic Zylon weaver), and reported the results of the Zylon study. Upon information and belief, Point Blank lobbied for more Zylon, saying that there would be no other material than Zylon to make lightweight vests and that the major opportunity of Point Blank was in Zylon.

54.     On September 16, 2003, Young was forwarded a report that the Kent, Washington police department had conducted testing which illustrated the worsening performance of Zylon vests over three years of use, while Kevlar vests continued to perform well, even after seven years. (The Kent, Washington police department had tested new and used Zylon and Kevlar vests, for comparative assessment.) The report went on to denounce the use of Zylon, Spectra, and laminates in soft body armor, based on the testing. Although Young received this at the same time as he was forwarding information to the sales staff for release to customers, upon information and belief, this item was not distributed.

55.     In late May 2004, Toyobo emailed Point Blank about a "new and improved" Zylon fiber which "continues to have exceptional physical properties, including high tensile strength, modulus and thermal stability, but which is also characterized by superior environmental stabilities," including an improved "stability of Zylon fiber when it has been exposed to humidity and/or sunlight." In June 2004, Steve Young and Tom Dragone met with Tadao Kuroki of Toyobo, as well as Toyobo's legal counsel. Steve Young reported that Toyobo stated that customers for new Blue Zylon would be limited to those who had remained steadfast during the controversy. Point Blank cautioned Toyobo that the new Zylon should be presented as

- 16 -

"The Next Generation" fiber and that Toyobo should not show any undue concern for the old fiber.

56.     In July 2004, Dragone reviewed Toyobo's technical data on the new Zylon. Dragone noted that one of the charts showed a loss of 200 feet per second in the V-50 measurement after only fifty days, and commented, "That is not good!" Dragone further commented that Toyobo was "shooting themselves in the foot by releasing information that is either not supporting their claims, or is poorly presented. Either way, it is out, and the 'mad dogs' will feast on it." In October 2004, Toyobo informed Point Blank that it was postponing its introduction of new Zylon until mid-2005; Dragone reacted negatively to this news, stating that he was counting on moving to the new generation "ASAP for obvious reasons." Blue Zylon was ultimately never commercialized by Toyobo.

57.     In August 2005, the National Institute of Justice (NIJ) tested eight Point Blank vests and two PACA vests. Nearly half of the Point Blank concealable vests that were tested experienced penetrations, and all showed excessive back face deformation.[1] The results for the PACA vests that were tested were similar. Following the release of this report, Point Blank stopped selling Zylon vests.

## COUNT 1

### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1) AGAINST POINT BLANK

58.     The United States re-alleges and incorporates herein by reference paragraphs 1 through 57.

---

[1] Back face deformation is the effect of a non penetrating projectile on the rear face of a strike plate. Excessive deformation can lead to serious injuries at the site of impact, even open wounds, even though no bullet perforated the vest.

- 17 -

59.     Point Blank knowingly presented or caused to be presented false or fraudulent claims to the United States for payment for Zylon bullet proof vests sold to federal agencies which Point Blank knew, recklessly disregarded or deliberately ignored were defective, in violation of the FCA, 31 U.S.C. § 3729 (a)(1).  Additionally, Point Blank presented or caused to be presented by state, local, and tribal law enforcement agencies false claims for payment under the BPVGPA for Zylon ballistic vests which Point Blank knew were defective.  These Point Blank vests were defective in that they were degrading more quickly than disclosed by Point Blank and they did not meet their five-year warranties.  Each and every claim for payment for any Zylon vest presented to the United States was false.  All of these claims were knowingly false claims under the FCA.

60.     By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

**COUNT 2**
**VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(B)**
**AGAINST POINT BLANK**

61.     The United States re-alleges and incorporates herein by reference paragraphs 1 through 57.

62.     Point Blank knowingly made or caused to be made false statements and false records material to false claims for Zylon bullet proof vests sold to federal agencies being paid by the United States which Point Blank knew, recklessly disregarded or deliberately ignored were defective, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B).  Additionally, Point Blank made or caused to be made false statements and records in connection with false claims for payment made by state, local, and tribal law enforcement agencies under the BPVGPA for Zylon vests which Point Blank knew were defective. These Point Blank vests were defective in that they

- 18 -

were degrading more quickly than disclosed by Point Blank and they did not meet their five-year warranties.

63.     By virtue of these false statements, the United States suffered damages in an amount to be determined at trial.

### COUNT 3

### BREACH OF CONTRACT
### AGAINST POINT BLANK

64.     The United States re-alleges and incorporates herein by reference paragraphs 1 through 57.

65.     Point Blank entered into contracts with the United States, including but not limited to the GSA contract and direct contracts with other federal agencies.  These contracts imposed obligations on Point Blank, including but not limited to, a five-year warranty on the Zylon bullet proof vests provided to the United States under these contracts.

66.     Point Blank breached its contractual obligations (including its warranty) to: a) provide Zylon bullet proof vests that were free of all defects in material and workmanship, b) comply with the warranty requirements of these contracts; c) take adequate corrective action upon the discovery of the defects in the Zylon fabric, and d) adequately identify nonconforming material.

67.     By virtue of these breaches of its contractual obligations, the United States suffered damages in an amount to be determined at trial.

### COUNT 4

### PAYMENT BY MISTAKE
### AGAINST POINT BLANK

68.     The United States re-alleges and incorporates herein by reference paragraphs 1

through 57.

69.     For years 1999 – 2005, the United States made payments to Defendant Point

Blank in the erroneous belief that this Defendant was entitled to reimbursement, without

knowing that Defendant's claims were made as part of a scheme to sell the United States

defective bulletproof vests.  These payments included direct payments to Point Blank under the

GSA MAS schedule and the other federal purchases, as well as indirect payments to Point Blank

under the BPVGPA.

70.     The United States' erroneous beliefs were material to the amount of the payments

made by the United States.

71.     Because of these mistakes of fact, this Defendant received funds to which it was

not entitled.

72.     By reason of the overpayments, the United States is entitled to damages in an

amount to be established at trial.

## COUNT 5

### UNJUST ENRICHMENT
### AGAINST POINT BLANK

73.     The United States re-alleges and incorporates herein by reference paragraphs 1

through 57.

74.     From 1999 to 2005, the United States paid Point Blank for defective bulletproof

vests made of Zylon due to false statements and omissions by Point Blank and these payments

unjustly enriched Point Blank.

75.     The United States is entitled to the return of all payments made by the United

States directly or indirectly to the body armor manufacturer for Zylon vests due to the false

claims presented for years 1999 to the present time.

76.    By reason of the above-described payments, Point Blank has received money,

directly or indirectly, to which it was not entitled.  Point Blank therefore has been unjustly

enriched in an amount to be established at trial.

### PRAYER FOR RELIEF

**AS TO COUNT 1:**

As against all Defendants, judgment in an amount equal to:

1.    statutory damages in an amount to be established at trial;

2.    civil penalties for each false claim or false statement as provided by law;

3.    the cost of this action, plus interest, as provided by law; and

4.    any other relief that this Court deems appropriate.

**AS TO COUNT 2:**

As against all Defendants, judgment in an amount equal to:

1.    statutory damages in an amount to be established at trial;

2.    civil penalties for each false claim or false statement as provided by law;

3.    the cost of this action, plus interest, as provided by law; and

4.    any other relief that this Court deems appropriate.

**AS TO COUNT 3:**

Against all Defendants, judgment in an amount equal to:

1.    all damages caused by Point Blank's breach of their contractual obligations in an

amount to be established at trial;

2.    all reasonably foreseeable damages which flowed Point Blank's breach of its

contractual obligations in an amount to be established at trial;

3.    the cost of this action, plus interest, as provided by law; and

4.    any other relief that this Court deems appropriate.

## AS TO COUNT 4

As against all Defendants, judgment in an amount equal to:

1.    the money paid by the United States to Point Blank, plus interest;

2.    the cost of this action, plus interest, as provided by law; and

3.    any other relief that this Court deems appropriate.

## AS TO COUNT 5

As against all Defendants, judgment in an amount equal to:

1.    the money paid by the United States to, or received by, Point Blank directly or

indirectly, plus interest;

2.    the cost of this action, plus interest, as provided by law; and

3.    any other relief that this Court deems appropriate.

Dated: *Oct. 7, 2010*

TONY WEST
ASSISTANT ATTORNEY GENERAL

By: _____
MICHAEL D. GRANSTON
ALAN E. KLEINBURD
ALICIA J. BENTLEY
CALLIE R. OWEN
A. THOMAS MORRIS
JENNIFER CHORPENING
ATTORNEYS
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station

- 22 -

Washington, D.C. 20044
Tel:    202-616-9854
Fax:    202-514-0280

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

**I (a) PLAINTIFFS**

UNITED STATES OF AMERICA

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Alicia J Bentley, United States Department of Justice
601 D Street, NW Room 9136, Washington, D C 20004
(202) 616-9854

**DEFENDANTS**
Point Blank Solutions, Inc , Point Blank Body Armor, Inc , and
Protective Apparel Corporation of America

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Broward (FL)
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE

Case: 1:10-cv-01716
Assigned To : Roberts, Richard W.
Assign. Date : 10/7/2010
Description: General Civil

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

☒ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III CITIZE.**
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.  CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**☐ A.  Antitrust**

☐ 410 Antitrust

**☐ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☑ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D.  Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**☒ E.  General Civil (Other)  OR  ☐ F.  Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☑ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ **G.  Habeas Corpus/ 2255**<br><br>☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ **H.  Employment Discrimination**<br><br>☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **I.  FOIA/PRIVACY ACT**<br><br>☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **J.  Student Loan**<br><br>☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| ☐ **K.  Labor/ERISA (non-employment)**<br><br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ **L.  Other Civil Rights (non-employment)**<br><br>☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ **M.  Contract**<br><br>☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ **N.  Three-Judge Court**<br><br>☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V.  ORIGIN**

☑ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ Multi district Litigation ☐ 7 Appeal to District Judge from Mag. Judge

**VI.  CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

False Claims Act, 31 U.S.C. § 3729, Causing false claims to be made to the United States for defective bullet-proof vests

**VII.  REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   **DEMAND $**   Check YES only if demanded in complaint **JURY DEMAND:** ☐ YES ☑ NO

**VIII.  RELATED CASE(S) IF ANY**  (See instruction)  ☑ YES ☐ NO  If yes, please complete related case form.
JUDGE Hon Richard W Roberts   DOCKET NUMBER DDC No  04-0280 + attached

DATE  10-7-10   SIGNATURE OF ATTORNEY OF RECORD  *Susan H. Bentley*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  Listed below are tips for completing the civil cover sheet.  These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**  CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint.  You may select only one category.  You must also select one corresponding nature of suit found under the category of case.

**VI.**  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.