IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| POINT BLANK SOLUTIONS, INC., et al.,[1] | ) | Case No. 10-11255 (PJW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

Requested Objection Deadline: February 8, 2011 at 4:00 p.m. (prevailing Eastern Time)
Requested Hearing Date: February 14, 2011 at 2:00 p.m. (prevailing Eastern Time)

## MOTION FOR ORDER AUTHORIZING DEBTORS TO (I) ENTER INTO SUBSCRIPTION AND BACKSTOP PURCHASE AGREEMENT AND (II) PAY RELATED FEES AND EXPENSES AND INDEMNIFY BACKSTOP PURCHASERS

Point Blank Solutions, Inc. ("Parent"), Point Blank Body Armor, Inc., Protective Apparel Corporation of America and PBSS, LLC (collectively with Parent, the "Debtors"),[2] debtors and debtors in possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), seek entry of an order, substantially in the form filed herewith (the "Order"), (i) approving Parent's entry into a Subscription and Backstop Purchase Agreement (the "Backstop Agreement"),[3] substantially in the form set forth in Exhibit A attached hereto, to be executed by and among Parent, Prescott Group Capital Management LLC, an Oklahoma limited liability company ("Prescott"), Privet Opportunity Fund I LLC, a Delaware limited liability company ("Privet"), and Lonestar Capital Management, LLC, as manager to PB Funding, LLC, a Delaware limited liability company ("PB Funding" and, together with Prescott and Privet, each a "Backstop Purchaser" and, collectively, the "Backstop Purchasers"), in connection with the *Joint Chapter*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number and its address, are: Point Blank Solutions, Inc. (9361), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor, Inc. (4044), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Protective Apparel Corporation of America (9051), 179 Mine Lane, Jacksboro, TN 37757; and PBSS, LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.
[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan, unless otherwise noted.
[3] The description of the Backstop Agreement presented herein is a summary of the principal terms of the Backstop Agreement, and is qualified in all respect—and the parties' obligations thereunder are subject to—to the actual terms and conditions of the Backstop Agreement.

*11 Plan of Reorganization* dated January 11, 2011 (as may be amended, modified or supplemented from time to time, the "Plan") [Docket No. 1006] and (ii) authorizing and approving the Debtors' (a) payment of the Backstop Fee (as defined below), (b) reimbursement of reasonable fees, expenses, disbursements and charges of the Backstop Purchasers incurred in connection with the Backstop Agreement and (c) indemnification of the Backstop Purchasers in accordance with the indemnification provisions set forth in the Backstop Agreement. In support of this motion,[4] the Debtors respectfully state as follows:

## I.
## PRELIMINARY STATEMENT

1. Through the Chapter 11 Cases, the Debtors have worked diligently toward ensuring an expeditious exit from chapter 11 in order to maximize the value of their estates for the benefit of their stakeholders. The Debtors have made substantial progress toward a successful reorganization. Specifically, the Court recently granted final approval of a $25,000,000 debtor in possession financing facility (the "DIP Financing"), which has enabled the Debtors to carry on their business in the normal course and shore up certain liquidity issues. In addition, the Debtors have proposed the Plan and accompanying Disclosure Statement for the Joint Chapter 11 Plan of Reorganization (as may be amended, modified or supplemented from time to time, the "Disclosure Statement") [Docket No. 1007], which set forth the Debtors' blueprint for a successful reorganization. A hearing to consider the adequacy of the Disclosure Statement is scheduled for February 14, 2011 at 2:00 p.m. (prevailing Eastern time).

2. As set forth in the Plan, the Debtors intend to fund their obligations under the Plan and anticipated post-Effective Date working capital needs through the issuance and sale of shares

---

[4] The Debtors reserve the right to amend or supplement this motion, as necessary, prior to the hearing date.
2

of newly-issued common stock, par value $0.01 per share, of Reorganized Parent (the "New Common Stock") in an aggregate amount of $15,000,000 to $25,000,000 (the "Total New Common Stock Issuance"). The issuance of New Common Stock under the Plan will be accomplished through two mechanisms: (i) a Rights Offering, pursuant to which Rights to purchase $8,656,500 of New Common Stock at the Subscription Price will be issued to Eligible Creditors in Class 4 and Eligible Equity Holders in Class 7, and (ii) a direct subscription, pursuant to which Privet and Prescott will subscribe directly for, and purchase, an additional $6,343,500 of New Common Stock.[5] If the Debtors require additional financing and an Exit Facility is unavailable, or cannot be obtained in an amount or on terms and conditions acceptable to the Backstop Purchasers, then the Backstop Purchasers, in their sole discretion, may increase the Rights Offering up to a maximum of $14,427,500, together with a proportionate increase in the direct issuance to Privet and Prescott of up to a maximum of $10,572,500, for a total of up to $25,000,000 of New Common Stock.

3. To facilitate the success of the Rights Offering, it is contemplated that (i) PB Funding will purchase the unsubscribed portion, if any, of New Common Stock offered to Eligible Creditors in Class 4 and (ii) Privet and Prescott will (on the allocation set forth in the Backstop Agreement) purchase the unsubscribed portion, if any, of New Common Stock offered to Eligible Equity Holders in Class 7. The terms and conditions of the Backstop Purchasers'

---

[5] The terms of the Rights Offering and the Backstop Agreement have been modified since the filing of the Plan on January 11, 2011, and will be reflected in an amended Plan to be filed prior to the February 14, 2011 hearing. A summary of those modified terms is set forth on Exhibit F to the *Motion for Entry of an Order (A) Approving the Adequacy of the Disclosure Statement; (B) Scheduling a Hearing to Confirm the Joint Chapter 11 Plan of Reorganization; (C) Establishing Deadline for Filing Objections to Confirmation; (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures; (D) Approving Subscription Form for Purposes of the Rights Offering and Related Procedures in Connection Therewith; and (F) Approving Form and Manner of Notice*, filed January 28, 2011 [Docket No. 1067] (the "Solicitation Motion"). The Equity Committee does not presently support the specific terms of the Rights Offering as set forth in Exhibit F and the Backstop Agreement. The Debtors reserve the right to supplement this Motion to the extent the terms of the Rights Offering, the procedures by which the Rights Offering will be conducted or the Backstop Agreement are modified as a result of such negotiations.

proposed commitments are set forth in the Backstop Agreement and summarized in the proposed Plan.

4.  The Backstop Agreement is an integral component of the Plan. Without the proceeds assured by the Backstop Purchasers' commitments under the Backstop Agreement, it is unlikely that the Debtors would be able to raise an adequate amount of capital through the Rights Offering or have a viable strategy for exiting from chapter 11—an untenable result for the Debtors that, by and large, are still dependent upon infusions of capital to fund their operations.

5.  The terms of the Backstop Agreement are fair and reasonable and generally consistent with those terms commonly seen in the marketplace. When viewed in light of the specific facts and circumstances of the Chapter 11 Cases, the commitments in the Backstop Agreement represent a remarkable result. Moreover, as has been set forth at length in court hearings to date, the selection of the various mechanisms and parties to provide the Debtors' overall chapter 11 financing is the result of a diligent process conducted by the Debtors in consultation with the two statutory committees and their retained professionals.

6.  In short, the Debtors' decision to enter into the Backstop Agreement is a prudent exercise of their business judgment in connection with their efforts to maximize value for all of their stakeholders, especially in light of the direction that the Chapter 11 Cases had been taking. The Debtors need liquidity to emerge from chapter 11, and submit that a fully backstopped rights offering on the terms provided in the Plan and the Backstop Agreement provides the Debtors' best vehicle to obtain such liquidity. The Backstop Agreement reflects a fully and fairly negotiated agreement that provides crucial support to the Debtors' efforts to successfully emerge from chapter 11. Accordingly, the Debtors respectfully request that the Court enter an order approving the Backstop Agreement, including the Backstop Fee and other obligations payable

thereunder, and authorizing the Debtors to enter into the Backstop Agreement and perform their obligations thereunder.

## II.
## JURISDICTION AND VENUE

7. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

8. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9. The bases for the relief requested herein are §§ 105(a), 363(b), 503(b) and 507(a) of title 11 of the United States Code (the "Bankruptcy Code")[6] and Rules 2002, 6004(h) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## III.
## BACKGROUND

A.  **The Chapter 11 Cases**

10. On April 14, 2010 (the "Petition Date"), the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to §§ 1107(a) and 1108. No examiner or trustee has been appointed in the Chapter 11 Cases. On April 26, 2010, the Office of the United States Trustee formed the Official Committee of Unsecured Creditors (the "Creditors' Committee") and appointed five initial members thereto. On July 27, 2010, the Office of the United States Trustee appointed an Official Committee of Equity Security Holders (the "Equity Committee") and appointed seven initial members thereto.

---

[6] Unless otherwise noted, section (§) references used herein are to the Bankruptcy Code.

5

11. On May 14, 2010, the Debtors filed their schedules of assets and liabilities and, on October 12, 2010, the Debtors filed certain amendments thereto (as amended, the "Schedules").

12. On January 11, 2011, the Debtors filed the Plan and Disclosure Statement. A hearing to consider the adequacy of the Disclosure Statement, authorize the Debtors to solicit votes on the Disclosure Statement and approve the procedures by which the Rights Offering will be conducted is currently scheduled for February 14, 2011, at 2:00 p.m. prevailing Eastern Time.

B. **The Backstop Agreement**

13. A key component of the Plan is the Backstop Purchasers' proposed commitments to fully backstop the Rights Offering and (in the case of Privet and Prescott) directly subscribe for the New Common Stock of Reorganized Parent to be issued as part of the proposed Plan. Subject to the terms and conditions of the Plan, the Rights Offering Procedures and the Backstop Agreement, based on a Total New Common Stock Issuance of $15,000,000, Eligible Creditors will be issued nontransferable subscription Rights to purchase an aggregate of $6,000,000 of New Common Stock (the "Creditor Rights Offering") and Eligible Equity Holders (excluding Privet and Prescott) will be issued nontransferable subscription Rights to purchase an aggregate of $2,656,500 of New Common Stock (the "Equity Rights Offering" and, together with the Creditor Rights Offering, the "Rights Offering"). The Creditor Rights Offering may be increased to a maximum of $10,000,000 and the Equity Rights Offering may be increased to a maximum of $4,427,500.

14. Under the terms of the Backstop Agreement, (i) PB Funding would purchase the number of shares of New Common Stock issuable pursuant to the aggregate number of Rights that were not properly exercised and paid for by the Eligible Creditors during the Subscription

Exercise Period (the "Unsubscribed Creditor Offering Shares") and (ii) Privet and Prescott would purchase the number of shares of New Common Stock issuable pursuant to the aggregate number of Rights that were not properly exercised and paid for by the Eligible Equity Holders during the Subscription Exercise Period (the "Unsubscribed Equity Offering Shares" and, together with the Unsubscribed Creditor Offering Shares, the "Unsubscribed Shares"). The foregoing commitments are referred to in the Backstop Agreement as the "Backstop Commitments."

15. The Backstop Agreement further provides that each of Prescott and Privet will subscribe for and purchase, in accordance with the allocation set forth in Schedule I to the Backstop Agreement, an aggregate of $6,343,500 of New Common Stock (the "Subscription Shares"), which may be increased up to maximum of $10,572,500. The Backstop Commitments, together with the foregoing direct subscription, are referred to in the Backstop Agreement as the "Commitments." In each case, the Backstop Purchasers will purchase shares of New Common Stock under their respective Commitments at the same Subscription Price paid by Eligible Creditors and Eligible Equity Holders that exercise their Rights to participate in the Rights Offering.

16. In consideration of their agreement to provide the Backstop Commitments, the Debtors propose to pay the Backstop Purchasers a fee (the "Backstop Fee") in an amount equal to (i) 4.0% of the amount of the Equity Rights Offering to the Equity Offering Backstop Purchasers, on a ratable basis in accordance with Schedule I to the Subscription and Backstop Agreement and (ii) 4.0% of the amount of the Creditor Rights Offering to PB Funding.[7] The Debtors will also reimburse the reasonable out-of-pocket fees, costs, and expenses incurred in

---

[7] The Backstop Fee and Backstop Expenses are separate and distinct from, and paid under different circumstances from, the breakup fee and related expense reimbursement approved in connection with the Court's approval by order entered December 10, 2010 of the Plan Support Agreement, dated the same date.

connection with the Backstop Agreement and the Rights Offering, including reasonable fees and expenses of one law firm acting on behalf of each Backstop Purchaser. Pursuant to Section 6.3(d) of the Plan and the applicable terms of the Backstop Agreement, each Backstop Purchaser may elect to offset its payment obligations under the Backstop Agreement for the purchase of Unsubscribed Shares and Purchased Shares, as applicable, against (i) any outstanding Backstop Fee (as defined below) owed to such Backstop Purchaser and (ii) any outstanding amount of the DIP Claims owed to such Backstop Purchaser.

17. As set forth more fully in Section 12 of the Backstop Agreement, the Debtors have also agreed to indemnify (the "Indemnification") each Backstop Purchaser and the other Indemnified Parties (as defined in the Backstop Agreement) from and against any losses, damages, liabilities, claims, costs and expenses arising out of or relating to (i) any breach or inaccuracy of the Surviving Representations, (ii) any breach or violation by the Debtors of their covenants and agreements set forth in this Agreement, and (iii) any such action, suit, or proceeding by a third-party that is not an Affiliate of any party hereto arising out of or related to this Agreement or the transactions contemplated hereby; provided that the Indemnification shall not extend to losses, damages, liabilities, claims, costs, and expenses, including interest, court costs, attorneys' fees or expenses relating thereto, to the extent that they are finally judicially determined to have resulted from (x) the fraud or willful misconduct of such Indemnified Party, or (y) with respect to clause (iii) in the immediately preceding sentence, the gross negligence of such Indemnified Party.

## IV.
## RELIEF REQUESTED

18. By this motion, the Debtors respectfully request that the Court (i) authorize Parent to enter into and perform its obligations under the Backstop Agreement, (ii) authorize the

8

payment of the Backstop Fee and Backstop Expenses and (iii) authorize the Indemnification of the Backstop Purchasers, all as provided for more fully in the Backstop Agreement.

## V.
## BASIS FOR RELIEF REQUESTED

### A. Sound Business Justification Exists for Entry into the Backstop Agreement

19. Section 363(b)(1) provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A court may authorize such a use of the property of an estate if a debtor demonstrates a sound business judgment for it and when the use of the property is proposed in good faith. *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *The Official Comm. of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992); *see also Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991).

20. The debtor has the burden to establish that a valid business purpose exists for the use of estate property in a manner that is not in the ordinary course of business. *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999). *See also Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983). Once the debtor articulates a valid business justification, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief the action was in the best interest of the company. *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc).*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *see also In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995). The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. *Integrated Res., Inc.*, 147 BR. At 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see*

9

*Committee of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions"). Thus, the Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification. *See Schipper*, 933 F.2d at 515; *Lionel*, 722 F.2d at 1071.

21. Additionally, § 105(a) provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Pursuant to § 105(a), orders are appropriate where they are essential to the debtor's reorganization efforts and do not pose a burden on the debtor's creditors. *See U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n (In re U.S. Lines, Inc.)*, 197 F.3d 631, 640 (2d Cir. 1999); *Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.").

22. The Debtors submit that their entry into the Backstop Agreement for purposes of commencing the Rights Offering and the direct issuance of New Common Stock to Privet and Prescott is a sound exercise of business judgment. In consultation with their advisors and other interested parties, the Debtors have concluded that the Rights Offering must be fully subscribed for the Debtors to exit chapter 11 with sufficient liquidity. The Debtors are a capital-intensive enterprise that still requires funding in order to address their liquidity needs. The funds provided by the Rights Offering are integral to the Debtors' ability to successfully emerge from chapter 11 and is one of the key elements to the viability of the Plan. The Debtors submit that a fully

subscribed Rights Offering can only be assured by obtaining the commitment of the Backstop Purchasers to backstop the Rights Offering and purchase all Unsubscribed Shares and, in the case of Privet and Prescott, the Subscription Shares.

23. In return, and with regard to economic terms, the Backstop Purchasers require payment of the Backstop Fee, reimbursement of the Backstop Expenses and the incurrence of the Indemnification. The Debtors believe that the terms and conditions set forth in the Backstop Agreement are fair and reasonable, are well within the range of "market" fees, protections and other terms typically received by backstop parties in rights offerings of similar size and complexity and reflect an exercise of their sound business judgment. Moreover, the terms of the Backstop Agreement are the product of extensive negotiations among the Debtors, both statutory committees and the Backstop Purchasers, as well as their respective counsel and financial advisors. The Debtors also believe that, in light of all of the facts and circumstances of the Chapter 11 Cases, not only are these terms (and the other terms provided for in the Backstop Agreement) fair, reasonable and appropriate and negotiated at arm's length, but they are integral to assuring that the Debtors' estates can maximize their value for all of their stakeholders.

24. In light of the foregoing, the Debtors submit that the relief requested herein is a prudent exercise of their business judgment, as it will aid in providing the Debtors with the financing necessary for the implementation of the Plan and an effective and successful emergence from chapter 11. It should also provide the Debtors with additional capital that should leave the Debtors with a healthy balance sheet upon exit and allow the Debtors to continue their current operations and undertake future improvements and developments in their operations and facilities.

B. **The Backstop Fee, Expenses and Indemnification Are Reasonable**

25. The Debtors submit that the Backstop Fee, Backstop Expenses and Indemnification are necessary inducements for the Backstop Purchasers to enter into the Backstop Agreement, particularly in light of the financial risks that the Backstop Purchasers are undertaking. It is both reasonable and properly designed to compensate the Backstop Purchasers for their respective commitments to guarantee the Rights Offering. Notably, the Backstop Purchasers are not acquiring any shares of New Common Stock at a discount to the Subscription Price paid by Eligible Creditors and Eligible Equity Holders, so the Backstop Fee represents their sole source of direct compensation for assuming their respective obligations under the Backstop Agreement. In addition, the Backstop Fee is payable only upon the consummation of the Rights Offering and the occurrence of the Effective Date under the Plan. Finally, the Backstop Fee was a necessary condition for the Backstop Purchasers to enter into the Backstop Agreement. Absent the Backstop Fee, the Debtors would have been unlikely to obtain the financing commitments required by the Plan.

26. The Debtors further submit that both the reimbursement of Backstop Expenses and the Indemnification are reasonable, appropriate and customary in financing transactions such as this, both in and out of chapter 11, and should be approved. The Backstop Expenses, specifically, will compensate the Backstop Purchasers for their actual costs incurred in connection with their obligations under the Backstop Agreement and participating in the negotiation of Plan. The Backstop Expenses and the Indemnification are also the result of arm's length negotiations between the Debtors, the two statutory committees and the Backstop Purchasers, and the Debtors believe that the terms thereof are fair and reasonable in light of the undertakings that the Backstop Purchasers have had to date, and will continue to have, in

12

developing and pursuing confirmation of the Plan, as well as the consummation of the Rights Offering.

27. Courts in this and other districts have approved similar fees and premiums as a reasonable use of assets in other recent chapter 11 cases. *See In re Aventine Renewable Energy Holdings, Inc.*, No. 09-11214 (KG) (Bankr. D. Del. Jan. 13, 2010) (approving a breakup fee, expense reimbursement and indemnification obligations); *In re Accuride Corp.*, No. 09-13449 (BLS) (Bankr. D. Del. Nov. 2, 2009) (approving (i) a $5,600,000 backstop fee plus 4% of new equity issued under a plan related to a $140,000,000 notes offering, (ii) a break-up fee of $10,000,000 and (iii) expense reimbursement); *In re Dayton Superior Corp.*, No. 09-11351 (BLS) (Bankr. D. Del. Aug. 24, 2009) (alternate transaction fee of 3% of the rights offering amount); *In re Landsource Cmtys. Dev. LLC*, No. 08-11111 (KJC) (Bankr. D. Del. June 2, 2009) (approving premium equal to 5% of a $140,000,000 offering, which was payable in cash in the event that an "Alternative Transaction" occurred, and approving expense reimbursement); *In re Key Plastics, Inc.*, No. 08-13324 (MFW) (Bankr. D. Del. Dec. 17, 2008) (approving an alternate transaction fee of 7.5% of the rights offering amount); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Aug. 17, 2007) (approving a backstop fee of 4% of the rights offering amount and an alternative transaction fee of 3% of the rights offering amount).

C. **The Backstop Fee, Expense Reimbursement and Indemnification Should Be Afforded Administrative Expense Status**

28. Finally, in accordance with §§ 503(b)(1)(A) and 507(a)(2), the Backstop Fee, Backstop Expenses and Indemnification (if an indemnification event occurs) should be afforded administrative expense priority. The costs and expenses charged and incurred by the Backstop Purchasers for the benefit of the Debtors in connection with the Rights Offering and accompanying direct subscription are entitled to the highest level of priority for their "actual,

13

necessary costs and expenses of preserving the estate...." 11 U.S.C. § 503(b)(1). Under the prevailing test, for a claim to be entitled to administrative expense priority under § 503(b)(1), "the debt must arise from a transaction with the debtor in possession...[and] the consideration supporting the claimant's right to payment [must be] beneficial to the debtor in possession in the operation of the business." See, e.g., *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 532-33 (3d Cir. 1999) (quoting *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 950 (1st Cir. 1976)).

29. The Backstop Purchasers' efforts to date and their ongoing commitments under the Backstop Agreement have been, and will be, of direct benefit to the Debtors, their estates and the future success of the Chapter 11 Cases. The Backstop Purchasers have been integrally involved in the negotiation and formulation of the proposed Plan and its key terms. Under the terms of the Backstop Agreement, the Backstop Purchasers further propose to support a necessary infusion of equity financing that will facilitate the Debtors' emergence from chapter 11 under the terms of the Plan. Absent the Backstop Purchasers' commitment, the Debtors would be without the capital needed to effectuate a successful reorganization of their business if Eligible Holders elected not to exercise their rights to purchase the New Common Stock under the Rights Offering.

30. For all of the foregoing reasons, the Backstop Fee, the Backstop Expenses and Indemnification associated with the proposed Rights Offering and Backstop Agreement are actual and necessary costs of preserving the Debtors' estates, and should therefore be granted under § 503(b)(1)(a).

# VI.
## WAIVER OF THE STAY PROVIDED BY BANKRUPTCY RULE 6004

31. The Debtors further seek a waiver of any stay of the effectiveness of the Order. Pursuant to Bankruptcy Rule 6004(h), "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Based upon the facts and circumstances set forth herein, the Debtors submit that ample cause exists to justify a waiver of any stay imposed by Bankruptcy Rules 6004(h), 7062 or 9014 to the extent they apply. The Debtors must proceed expeditiously to commence the Rights Offering concurrently with the solicitation of votes on the proposed Plan. The Plan, of course, is premised in significant part upon obtaining a successful Rights Offering, which in turn depends upon the support of the Backstop Purchasers. By approving this motion, this Court will be approving a motion integral to confirmation of the Plan.

32. The Debtors submit that the waiver of the stay under Bankruptcy Rule 6004 is appropriate here to facilitate the immediate commencement of the Rights Offering, as backstopped by the Backstop Purchasers. The certainty of funding of the Rights Offering, and consequently the viability of the Plan, depends on approval of the Backstop Agreement and the related relief sought in this motion. Accordingly, the Debtors submit that a waiver of the stay under Bankruptcy Rule 6004 is appropriate and necessary.

*[Remainder of page intentionally left blank]*

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter an order, substantially in the form filed herewith, (i) granting the relief requested herein and (ii) granting such other and further relief as may be appropriate.

Dated: January 31, 2011

PACHULSKI STANG ZIEHL & JONES LLP

_____
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
Timothy P. Cairns (Bar No. 4228)
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone: 302/652-4100
Facsimile: 302/652-4400
Email: ljones@pszjlaw.com
       dbertenthal@pszjlaw.com
       jfried@pszjlaw.com
       tcairns@pszjlaw.com

Counsel for the Debtors and Debtors in Possession