## Exhibit A

## Backstop Agreement

# SUBSCRIPTION AND BACKSTOP PURCHASE AGREEMENT

THIS SUBSCRIPTION AND BACKSTOP PURCHASE AGREEMENT (the "Agreement"), dated as of [___], 2011, is made and entered into by and among Point Blank Solutions, Inc., a Delaware corporation (as a debtor in possession and a reorganized debtor, as applicable, the "Company"), Prescott Group Capital Management LLC, an Oklahoma limited liability company ("Prescott"), Privet Opportunity Fund I LLC, a Delaware limited liability company ("Privet"), and Lonestar Capital Management, LLC, as manager to PB Funding, LLC, a Delaware limited liability company ("PB Funding"). Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings provided in the Plan.

## WITNESSETH:

WHEREAS, the Company and each of its wholly-owned subsidiaries, Point Blank Body Armor, Inc., Protective Apparel Corporation of America and PBSS, LLC, are debtors and debtors in possession (collectively, the "Debtors") in the chapter 11 cases currently pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 10-11255 (PJW) (jointly administered) (the "Chapter 11 Cases");

WHEREAS, on or about January 11, 2011, the Debtors filed with the Bankruptcy Court (1) that certain *Joint Chapter 11 Plan of Reorganization* (together with the exhibits and Plan Supplements annexed thereto or referred to therein, and as such may be modified or amended from time to time, the "Plan") and (2) a disclosure statement in support of the Plan (together with the exhibits and schedules annexed thereto or referred therein, as such may be modified or amended from time to time, the "Disclosure Statement");

WHEREAS, the Plan provides, among other things, that the Company will, subject to the terms and the conditions set forth in the Plan, issue shares of newly-issued common stock, par value $0.01 per share, of the Company (the "New Common Stock") in an aggregate amount of $15,000,000 to $25,000,000 (the "Total New Common Stock Issuance"), and offer (1) to Eligible Equity Holders (other than Prescott and Privet), certain nontransferable subscription rights ("Rights") to purchase 17.71% of the Total New Common Stock Issuance (i.e., between $2,656,500 and $4,427,500 of New Common Stock) (such offering, the "Equity Rights Offering") and (2) to Eligible Creditors, Rights to purchase an aggregate of 40% of the Total New Common Stock Issuance (i.e., between $6 million and $10 million of New Common Stock) (such offering, the "Creditor Rights Offering" and together with the Equity Rights Offering, the "Rights Offering");

WHEREAS, the Company will issue to the Eligible Holders the Rights, pursuant to which the Eligible Holders will have the right, but not the obligation, to subscribe for and purchase their *pro rata* share (based on the calculation set forth in the Plan) of New Common Stock at a price per share equal to $5.00 (the "Subscription Price");

WHEREAS, the Plan provides that each of Prescott and Privet will, subject to the terms and conditions set forth herein, subscribe for and purchase from the Company simultaneously with the closing

of the Rights Offering, an aggregate of 42.29% of the Total New Common Stock Issuance (i.e. between $6,343,500 and $10,572,500 of New Common Stock); and

WHEREAS, (1) each Backstop Purchaser desires to, and hereby does, agree to purchase certain shares of New Common Stock available for issuance upon the expiration of unexercised Rights, subject to the terms and conditions set forth herein, and (2) each of Privet and Prescott desires to, and hereby does, agree to purchase certain shares of New Common Stock not issuable pursuant to the Rights Offering or any Backstop Commitment, subject to the terms and conditions set forth herein.

NOW, THEREFORE, for and in consideration of the premises, and other good and valuable consideration the receipt and sufficiency of all of which is hereby acknowledged, the parties hereto agree as follows:

1.     The Backstop Commitments.

(a)     Subject to the terms, conditions and limitations set forth herein and in the Plan, each of Prescott and Privet (together, the "Equity Offering Backstop Purchasers"): (i) agrees that it shall not, and shall cause its Affiliates not to, participate or subscribe for shares of New Common Stock in the Equity Rights Offering, except as a Backstop Purchaser in accordance with clause (ii) of this Section 1(a), and (ii) agrees, or agrees to cause one or more of its Affiliates (in each case, severally and not jointly), to purchase from the Company at the Subscription Price, in accordance with the allocation set forth in Schedule I hereto, the number of shares of New Common Stock issuable pursuant to the aggregate number of Rights that were not properly exercised and paid for by the Eligible Equity Holders during the Subscription Exercise Period (such shares of New Common Stock not subscribed for by the Eligible Equity Holders are referred to herein as the "Unsubscribed Equity Offering Shares").

(b)     Subject to the terms, conditions and limitations set forth herein and in the Plan, PB Funding (together with Prescott and Privet, the "Backstop Purchasers") agrees, or agrees to cause one or more of its Affiliates, to purchase from the Company at the Subscription Price the number of shares of New Common Stock issuable pursuant to the aggregate number of Rights that were not properly exercised and paid for by the Eligible Creditors during the Subscription Exercise Period (such shares of New Common Stock not subscribed for by the Eligible Creditors are referred to herein as the "Unsubscribed Creditor Offering Shares" and together with the Unsubscribed Equity Offering Shares, the "Unsubscribed Shares").

(c)     The obligations of each Backstop Purchaser described in Section 1(a)(ii) and Section 1(b) shall be referred to herein as the "Backstop Commitment" and collectively as the "Backstop Commitments."

(d)     For the avoidance of doubt, the Backstop Commitment of (i) the Equity Offering Backstop Purchasers shall be several and not joint and shall not exceed $4,427,500 in the aggregate and shall be allocated between Prescott and Privet in accordance with the allocation set forth in Schedule I hereto and (ii) the Backstop Commitment of PB Funding shall not exceed $10.0 million.

2.     Subscription Agreement.

200367071 v2
DOCS_DE:167392.1

Each of Prescott and Privet hereby subscribes for and agrees (severally and not jointly), or in each case, agrees to cause one or more of its respective Affiliates, to purchase from the Company at the Subscription Price, in accordance with the allocation set forth in Schedule I hereto, shares of New Common Stock (the "Subscription Shares" and together with the Unsubscribed Shares, the "Purchased Shares") having an aggregate value equal to the product of (i) 42.29% and (ii) the Total New Common Stock Issuance. The Backstop Commitments, together with the obligation of Prescott and Privet described in this Section 2 shall be referred to herein as the "Commitments."

3.     The Closing.

(a)     As soon as practicable, but no more than two Business Days following the expiration of the Subscription Exercise Period and no less than five Business Days before the Effective Date, the Company shall notify each Backstop Purchaser of the number of Unsubscribed Shares, if any, and Subscription Shares to be purchased by the Backstop Purchasers pursuant to Section 1 and Section 2, as the case may be (the "Commitment Notice"). The delivery of and payment for the Purchased Shares is referred to herein as the "Closing," which shall take place at the offices of Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, Wilmington, DE 19801 on the Effective Date.

(b)     The following shall occur contemporaneously at the Closing:

(i)     each Backstop Purchaser, in satisfaction of its Commitment, shall pay to the Company at the Closing the purchase price for the Purchased Shares purchased by such Backstop Purchaser pursuant to Section 1 or Section 2, as applicable, by wire transfer in immediately available funds to such account of the Company as it shall have designated, no later than two Business Day prior to the Closing, by notice to the Backstop Purchasers; provided, however, that upon written notice of such Backstop Purchaser to the Company, such Backstop Purchaser may instead cause all or part of its payment obligations to be satisfied by offsetting against (x) any outstanding Backstop Fee that the Company owes to such Backstop Purchaser, and (y) any outstanding amounts of the DIP Claims that the Company owes to such Backstop Purchaser (or its Affiliates) under the DIP Loan Agreement, in each case, as of the Effective Date (together, the "Outstanding Company Obligations"); provided, further, that in the event the purchase price payable by such Backstop Purchaser is greater than the Outstanding Company Obligations plus the Backstop Fee (such amount, the "Difference"), such Backstop Purchaser shall pay to the Company, at the Closing, an amount equal to the Difference by wire transfer in immediately available funds to such account of the Company as it shall have designated, no later than two Business Day prior to the Closing, by notice to the Backstop Purchasers;

(ii)     the Purchased Shares to be purchased by each Backstop Purchaser, in the name of such Backstop Purchaser or its nominee as the Backstop Purchaser may specify prior to the Closing, shall be recorded in the register of the Company stockholders by the Company or by a transfer agent selected by the Board of Directors of the Company to maintain such register;

(iii)     the Company shall pay the reasonable out-of-pocket fees, costs, and expenses incurred in connection with this Agreement and the Rights Offering by each of the Backstop Purchasers, including, if not paid previously, reasonable fees and expenses of one law firm acting on behalf of each Backstop Purchaser (all of the fees, costs, and expenses set forth in this Section 3(b)(iii), collectively "Backstop Expenses");

3

(iv)     each of the Backstop Purchasers shall receive payment of, or credit for, its respective Backstop Fee in accordance with Section 3(b)(i) and Section 4;

(v)     each party to this Agreement, and any other person acquiring shares of New Common Stock who will hold in the aggregate 10% or more of the outstanding shares of New Common Stock immediately following the Closing, shall deliver to each other party a duly executed stockholders agreement in the form to be agreed by the parties hereto (the "Stockholders Agreement") based on the Stockholders' Agreement Term Sheet attached hereto as Exhibit A; and

(vi)     the Company shall deliver all certificates, instruments, and other documents required to satisfy their conditions set forth herein.

4.     Consideration for the Backstop Commitments.

In consideration for the Backstop Commitments, on the Effective Date, the Company shall pay a fee in cash (or provide a credit in accordance with Section 3(b)(i)) in an amount equal to (a) 4.0% of the amount of the Equity Rights Offering to the Equity Offering Backstop Purchasers, on a ratable basis in accordance with Schedule I, and (b) 4.0% of the amount of the Creditor Rights Offering to PB Funding (collectively, the "Backstop Fee").

5.     Representations and Warranties.

(a)     Except as set forth in the corresponding section of the disclosure schedules delivered by the Company to each Backstop Purchaser in connection with the execution of this Agreement (the "Company Disclosure Schedules"), the Company represents and warrants the following to each of the Backstop Purchasers:

(i)     Organization and Qualification. Each Debtor is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and has all requisite corporate or other power and authority to own, lease, and operate its properties and assets and to conduct its business as now being conducted, subject to the restrictions that may result solely from its status as a debtor in possession under the Bankruptcy Code. Each Debtor is duly qualified to transact business in each jurisdiction in which the nature of property owned or leased by it or the conduct of its business requires it to be so qualified, except where the failure to be duly qualified to transact business, would not reasonably be expected to be material.

(ii)     Company's Authorized Capital Stock. On the Effective Date, the authorized capital stock of the Company will consist of 10,000,000 shares of New Common Stock and the outstanding capital stock of the Company will consist of between 3,000,000 and 5,000,000 shares of New Common Stock (depending upon the size of the Right Offering), and all such capital stock, including the New Common Stock issued pursuant to the Rights Offering, will be duly authorized, validly issued, fully paid, and nonassessable, and, except as set forth in the Stockholders Agreement or the New Charter, all such shares will be free and clear of all Liens and not subject to any preemptive rights, rights of first refusal, option, warrant, call, subscription, and similar rights that would not be cancelled and extinguished under the Plan on the Effective Date.

4

(iii)     Other Debtors' Equity Interests. All of the issued capital stock and membership interests, as the case may be, of the Debtors (except for the Company) shall be duly and validly authorized and issued, fully paid, nonassessable (but only with respect to issued capital stock), and directly owned by the Company free and clear of all Liens and not subject to any preemptive rights, rights of first refusal, option, warrant, call, subscription, and similar rights that would not be cancelled and extinguished under the Plan on the Effective Date, except as shall be explicitly provided for under the Plan or the Confirmation Order (including any Liens granted under the Exit Facility).

(iv)     Power and Authority; Enforceability. The Company and each other Debtor, as the case may be, has the requisite corporate or other power and authority to execute and deliver this Agreement, the Ancillary Documents to which such Debtor is a party or bound by, the Plan, the Disclosure Statement and, subject to the approval of the Bankruptcy Court, the definitive documents necessary or appropriate to consummate the transactions contemplated hereby and thereby, and, as applicable, to file such documents with the Bankruptcy Court and, subject to the approval of the Bankruptcy Court, consummate the transactions contemplated hereby and thereby. The formulation, preparation, and, as applicable, filing of this Agreement, the Ancillary Documents, the Plan, the Disclosure Statement and such definitive documents have been, or shall have been on the filing date thereof, (A) duly and validly authorized by all necessary corporate or other action on the part of the Debtors, as applicable, and (B) duly and validly executed and delivered by the Debtor, as applicable. Upon the entry by the Bankruptcy Court of the Backstop Approval Order, this Agreement shall constitute a valid and binding obligation of the Debtors, enforceable against them in accordance with its terms.

(v)     No Conflict. Subject to entry of the Solicitation Order, (A) the execution and delivery of this Agreement, the Ancillary Documents, the Plan, the Disclosure Statement and each of the definitive documents necessary to effect the transactions contemplated hereby and thereby by the Debtors, do not and shall not (1) violate any provision of the articles of incorporation or by-laws or other organizational documents of the Debtors, as such documents may be amended pursuant to the Plan, this Agreement or the Ancillary Documents, or (2) conflict with, violate, constitute a breach of, or result in the creation of a Lien or any other encumbrance (except in connection with the Exit Facility) against, the Debtors or their properties pursuant to any material contract, agreement, or instrument by which the Debtors are bound, or any judgment, order, decree, law, statute, rule, regulation, or other judicial or governmental restriction to which the Debtors are subject; and (B) the performance of this Agreement, the Ancillary Documents, the Plan, the Disclosure Statement and each of the definitive documents necessary to effect the transactions contemplated hereby and thereby by the Debtors, as applicable, and the consummation by the Debtors of the transactions contemplated hereby and thereby in accordance with the terms hereof and thereof shall not (1) violate any provision of the articles of incorporation or by-laws or other organizational documents of such Debtor, as such documents may be amended pursuant to the Plan, this Agreement or the Ancillary Documents, or (2) conflict with, violate, constitute a breach of, or result in the creation of a Lien or any other encumbrance (except in connection with the Exit Facility) against, the Debtors or their properties pursuant to any material contract, agreement, or instrument by which the Debtors shall be bound, or any judgment, order, decree, law, statute, rule, regulation, or other judicial or governmental restriction to which the Debtors shall be subject in each case as of, and following, the Effective Date.

5

(vi)     No Material Adverse Effect. Since [_____], 2010, a Material Adverse Effect has not occurred with respect to any Debtor.

(vii)     Title to Property. Each Debtor owns and has good and marketable title to all of its material real and personal properties, which, on the Effective Date shall be free and clear of all Liens, except as shall be explicitly provided in the Confirmation Order.

(viii)     Litigation. There is no pending litigation, proceeding, or governmental investigation (collectively, "Litigation") to which any Debtor is a party, or to the knowledge of any Debtor, threatened, against any Debtor or any properties or rights of any Debtor that would, individually or in the aggregate, reasonably be expected to be materially adverse to Debtors.

(ix)     No Violation or Default. No Debtor is in violation of any term of any judgment, writ, decree, injunction, or order entered by any court or governmental authority and outstanding against it or any of its properties or rights, subject to the restrictions that may result solely from its status as a debtor-in-possession under the Bankruptcy Code. No Debtor is in conflict with, or in default or violation of, any law or agreement applicable to it or by which any property or asset of such Debtor is bound or affected, except to the extent that the same would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(x)     Disclosure Statement. The Disclosure Statement, when approved by the Bankruptcy Court pursuant to the Solicitation Order, will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading. Notwithstanding the foregoing, the Company makes no representation and warranty with respect to any statements or omissions made in reliance on and in conformity with information that any Backstop Purchaser furnished to the Company in writing expressly for use in the Disclosure Statement or any amendment or supplement thereto.

(xi)     Securities Registration Exemption. Assuming the representations of each Backstop Purchaser set forth in Section 5(b)(v) and (vi) are true and correct, the Rights Offering and the issuance of the Unsubscribed Shares to the Backstop Purchasers, and the issuance of the Subscription Shares to each of Prescott and Privet, shall be exempt from registration pursuant to Regulation D as promulgated under the Securities Act of 1933, as amended (the "Securities Act").

(xii)     Takeover Statutes; Charter. No "fair price," "moratorium," "control share acquisition", "business combination" or other similar anti-takeover statute or regulation is applicable to the Company, the New Common Stock, the sale and issuance of the New Common Stock or the other transactions contemplated by this Agreement and the Plan.

(xiii)     No Broker's Fees. Except for the Backstop Fee, no Debtor is a party to any contract, agreement or understanding with any person that would give rise to a valid claim against any Debtor or the Backstop Purchasers for a brokerage commission, finder's fee or like payment in connection with the transactions contemplated by this Agreement and the Plan. No professional employed or compensated by the Debtors (including any person or entity employed under Section 363 of

6

the Bankruptcy Code) or by any statutory committee appointed in any of the Chapter 11 Cases shall be considered a "broker" for purposes of this Section 5(a)(xiii).

(xiv)     Arm's Length.  Notwithstanding anything herein to the contrary, the Company acknowledges and agrees that (a) the transactions contemplated hereby are arm's length commercial transactions between the Company, on the one hand, and the Backstop Purchasers, on the other, (b) in connection therewith and with the processes leading to such transactions, each Backstop Purchaser is acting solely as a principal and not the agent or fiduciary of the Company or any other Debtor, (c) no Backstop Purchaser has assumed an advisory or fiduciary responsibility in favor of any of the Debtors or their estates with respect to any legal, tax, investment, accounting, regulatory, or other matters involving the transactions contemplated herein or the processes leading thereto (irrespective of whether such Backstop Purchaser has advised or is currently advising any Debtor on other matters), and (d) the Company and the other Debtors have consulted their own legal and financial advisors to the extent they deemed appropriate.  The Company agrees that it will not, and agrees that it will cause the other Debtors not to, claim that any Backstop Purchaser has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to any of the Debtors or their estates, in connection with the transactions contemplated herein or the processes leading thereto.

(b)     Each Backstop Purchaser, severally and not jointly, hereby represents and warrants the following to the Company:

(i)     Organization; Power and Authority.  It is a limited liability company duly organized, validly existing, and in good standing under the laws of its state of organization and has all requisite power and authority to execute, deliver, and perform its obligations hereunder and to consummate the transactions contemplated hereby.

(ii)     Execution and Delivery.  The execution, delivery, and performance by such Backstop Purchaser, of this Agreement, and the Stockholders Agreement,  and the consummation by such Backstop Purchaser of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of such Backstop Purchaser.

(iii)     Enforceability.  This Agreement has been duly executed and delivered by such Backstop Purchaser and constitutes the legal, valid, and binding obligation of such Backstop Purchaser, enforceable against such Backstop Purchaser in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or affecting the enforcement of creditors' rights in general and by general principles of equity.

(iv)     No Conflict.  The execution, delivery, and performance of this Agreement and the consummation by such Backstop Purchaser of the transactions contemplated hereby do not and shall not (A) violate any provision of the limited liability company agreement or other organizational documents of such Backstop Purchaser or (B) conflict with, violate, constitute a breach of, or result in the creation of a Lien or any other encumbrance against, such Backstop Purchaser or its properties pursuant to any material contract, agreement, or instrument by which such Backstop Purchaser is bound or any judgment, order, decree, law, statute, rule, regulation, or other judicial or governmental restriction to which such Backstop Purchaser is subject.

7

(v)     Accredited Investor.  It is an "accredited investor" within the meaning of Regulation D of the Securities Act, with such knowledge and experience in financial and business matters as are necessary in order to evaluate the merits and risks of an investment in the Purchased Shares.

(vi)     Securities Laws Compliance.  The Purchased Shares to be received by such Backstop Purchaser hereunder will be acquired for such Backstop Purchaser's own account or on behalf of managed accounts and not with a view to the resale or distribution of any part thereof in violation of the Securities Act, and such Backstop Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same in violation of the Securities Act. Notwithstanding anything in this Section 5(b)(vi) to the contrary, by making the representations herein, such Backstop Purchaser does not agree to hold the Purchased Shares for any minimum or other specific term and reserves the right to dispose of its Purchased Shares at any time in accordance with or pursuant to a registration statement or an exemption from the registration requirements under the Securities Act and any applicable state securities laws.

(vii)     Funds.  At the Closing, each Backstop Purchaser will have sufficient cash or Outstanding Company Obligations available to pay or set-off any amount it may owe the Company in accordance with Section 3(b)(i).

(viii)     Independent Investigation; Retention of Tax Advisors.  It has made its own inquiry and investigation into the Company and has undertaken such investigation and had access to such information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  It has consulted its own tax advisors with regard to the transactions contemplated by this Agreement and the tax consequences thereof.

(ix)     No Registration Under the Securities Act.  It understands (i) that the Purchased Shares to be purchased by it pursuant to the terms of this Agreement have not been registered under the Securities Act or any state securities laws, (ii) that the Company shall not be required to effect any registration or qualification of the Purchased Shares under the Securities Act or any state securities laws (except as required by the Stockholders Agreement), (iii) that the Purchased Shares will be issued in reliance upon exemptions contained in the Securities Act or interpretations thereof and in the applicable state securities laws, in each case to the extent that Section 1145 of the Bankruptcy Code is not applicable, and (iv) that the Purchased Shares may not be offered for sale, sold or otherwise transferred, in each case to the extent Section 1145 of the Bankruptcy Code is not applicable, except pursuant to a registration statement under the Securities Act or in a transaction exempt from or not subject to registration under the Securities Act.

(x)     No Proceedings.  No litigation or proceeding against such Backstop Purchaser is pending before any court, arbitrator, or administrative or governmental body, nor, to each Backstop Purchaser's knowledge, is any such proceeding threatened against such Backstop Purchaser that would adversely affect such Backstop Purchaser's ability to enter into this Agreement or fully perform its obligations hereunder.

6.      Certain Conditions.

(a)      The obligations of each Backstop Purchaser to consummate the transactions contemplated herein shall be subject to the satisfaction (or waiver by such Backstop Purchaser) of each of the following conditions:

(i)      (A) one or more orders approving the Disclosure Statement, this Agreement (and the Company's entry into this Agreement and the performance of all of its obligations hereunder) and any definitive agreements reasonably necessary to effect the Rights Offering (collectively, the "Solicitation Order"), in each case in form and substance acceptable to the Backstop Purchasers, which approval shall not be unreasonably denied, withheld or delayed, shall have been entered by the Bankruptcy Court no later than February 18, 2011 and (B) the Solicitation Order shall, as of the Closing, be a Final Order and otherwise in effect;

(ii)      (A) an order (or orders, if more than one) approving the Plan and the Ancillary Documents (the "Confirmation Order"), in form and substance acceptable to the Backstop Purchasers, which approval shall not be unreasonably denied, withheld or delayed, shall have been entered by the Bankruptcy Court no later than March 30, 2011 and (B) the Confirmation Order shall, as of the Closing, be a Final Order and otherwise in effect, and (C) none of the Debtors shall have made a public announcement, entered into an agreement, or filed any pleading, evidencing its intention to support or otherwise supports any transaction with respect to the reorganization or sale of any of the Debtors or otherwise shall have taken any action that is materially inconsistent with the transactions contemplated by the Plan or this Agreement;

(iii)      the Plan shall be consummated in all respects in accordance with its terms and with Section 8(a) of this Agreement, and all of the conditions precedent to the Confirmation and the occurrence of the Effective Date of the Plan (other than the consummation of the transactions contemplated by this Agreement) shall have been satisfied in all respects or waived, in each case in accordance with Section 12.2 and Section 12.3 of the Plan, on or prior to April 14, 2011 in a manner satisfactory to the Backstop Purchasers;

(iv)      the Plan and Disclosure Statement shall be in form and substance acceptable to the Backstop Purchasers, which approval shall not be unreasonably denied, withheld or delayed;

(v)      the Rights Offering shall have been conducted in accordance with the terms of this Agreement, the Plan and the Rights Offering Procedures, and the Subscription Exercise Period shall have expired and each Backstop Purchaser shall have received the Commitment Notice in accordance with Section 3(a);

(vi)      the Backstop Purchasers shall have received payment of, or credit for, the Backstop Fee in accordance with Section 3(b)(i) and Section 4;

(vii)      all conditions to the consummation of the Rights Offering set forth in the Plan and the Disclosure Statement shall have been satisfied;

9

(viii) no other Backstop Purchaser shall have notified the Company or any other Backstop Purchaser of its intention to terminate, or otherwise not perform, its obligations under this Agreement;

(ix) each party hereto shall have executed and delivered to each other party hereto the Stockholders Agreement;

(x) on the Effective Date, after giving effect to the consummation of the Rights Offering and the Closing hereunder, the number of record holders of outstanding shares of New Common Stock shall not exceed 450;

(xi) on or prior to the Effective Date, the Company shall have filed with the office of the Delaware Secretary of State a complete and valid amended and restated certificate of incorporation in the form to be agreed by the parties hereto ("New Charter") and the New Charter shall be in full force and effect;

(xii) on or prior to the Effective Date, the Company shall have duly adopted the amended and restated by-laws in the form to be agreed by the parties hereto ("New By-Laws," and together with the New Charter, the Stockholders Agreement and the New Employment Agreements, the "Ancillary Documents") and the New By-Laws shall be in full force and effect;

(xiii) neither the DIP Loan Agreement nor the Plan Support Agreement shall have terminated or expired in accordance with their respective terms;

(xiv) (A) the representations and warranties of the Company contained in this Agreement that are qualified as to materiality, material adverse effect, Material Adverse Effect, or similar qualifiers, and the representation and warranty contained in Section 5(a)(vi) (No Material Adverse Effect), shall be true and correct in all respects on and as of the date hereof and as of the Effective Date with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all respects as of such specified date), and (B) the representations and warranties of the Company contained in this Agreement that are not so qualified shall be true and correct in all material respects on and as of the date hereof and as of the Effective Date with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all material respects as of such specified date), and (C) in all material respects, the Company shall have performed or complied with, or caused the other Debtors to have performed or complied with, all covenants required to be performed or complied with under this Agreement on or prior to the Effective Date, and the Company shall have delivered to each of the Backstop Purchasers a certificate of its Chief Executive Officer or Chief Financial Officer to the effect that each of the conditions specified in this Section 6(a)(xiii) is satisfied in all respects; and

(xv) no provision of any applicable law or regulation and no judgment, injunction, decree, or other legal restraint shall prohibit the consummation of the Plan, the Rights Offering or the transactions contemplated by this Agreement.

(b)     The obligations of the Company to consummate the transactions contemplated herein shall be subject to the satisfaction (or waiver by the Company) of each of the following conditions:

(i)     (x) the Confirmation Order shall have been entered by the Bankruptcy Court, in form and substance acceptable to the Company and the Backstop Purchasers, which approval shall not be unreasonably denied, withheld or delayed, and (y) all of the conditions precedent to the Confirmation and the occurrence of the Effective Date of the Plan (other than the consummation of the transactions contemplated by this Agreement) shall have been satisfied in all respects or waived, in each case in accordance with Section 12.2 and Section 12.3 of the Plan, on or prior to April 14, 2011 in a manner satisfactory to the Company;

(ii)     (A) the representations and warranties of each of the Backstop Purchasers contained in this Agreement that are qualified as to materiality, material adverse effect, or similar qualifiers shall be true and correct in all respects, on and as of the date hereof and the Effective Date with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct as of such specified date), and (B) the representations and warranties of each of the Backstop Purchasers contained in this Agreement that are not so qualified shall be true and correct in all material respects on and as of the date hereof and the Effective Date with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all material respects as of such specified date), and (C) in all material respects, each of the Backstop Purchasers shall have performed or complied with its covenants required to be performed or complied with under this Agreement on or prior to the Effective Date, and each of the Backstop Purchasers shall have delivered to the Company a certificate to the effect that each of the conditions specified in this Section 5(b)(ii) is satisfied in all respects; and

(iii)     no provision of any applicable law or regulation and no judgment, injunction, decree, or other legal restraint shall prohibit the consummation of the Plan or the Rights Offering or the transactions contemplated by this Agreement.

(iv)     No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued in each case by any federal or state government or applicable regulatory authority that, as of the Effective Date, prohibits the issuance or sale of the Purchased Shares pursuant to this Agreement.

(c)     The Backstop Purchasers may not rely as a basis for not consummating the transactions contemplated herein, on the failure of any condition set forth in Section 6(a) to be satisfied, if such failure was the direct result of a significant action taken by all (and not less than all) of the Backstop Purchasers in breach of the Backstop Purchasers' obligations hereunder, and in no event shall any action or inaction taken by the Backstop Purchasers as lenders in accordance with the DIP Loan Agreement be deemed to be a breach of the Backstop Purchasers' obligations hereunder. For the avoidance of doubt and notwithstanding the ability of any Backstop Purchaser who did not so breach its obligations hereunder to rely on the failure of any closing condition set forth in Section 6(a), nothing in this Section 6(c) shall

11

prevent the Company from exercising any rights it may have with respect to a Backstop Purchaser that actually breached its obligations hereunder.

(d)     Notwithstanding anything to the contrary contained herein, nothing contained in this Agreement shall limit or impair any right or remedy of a Backstop Purchaser as an owner of any loan or other debt incurred by Company or any of its Subsidiaries or impose any liability or obligation upon any Backstop Purchaser with respect to its ownership of such indebtedness.

7.     <u>Satisfaction of the Commitment</u>.

Each Backstop Purchaser may, in its sole discretion, satisfy its Commitment directly or indirectly through one or more of its Affiliates, separate accounts within its control, or investment funds under its or its Affiliates' management.

8.     <u>Certain Covenants</u>.

(a)     <u>Plan and Disclosure Statement</u>. The Plan and the Disclosure Statement shall be in form and substance acceptable to the Company and the Backstop Purchasers, which approval shall not be unreasonably denied, withheld or delayed. The Company will provide to the Backstop Purchasers and their counsel a copy of any amendments, modifications, or changes to the Plan, the Disclosure Statement, each Ancillary Document or any other definitive document necessary to effect the Rights Offering, and in each case, the Company shall provide the Backstop Purchaser and their counsel a reasonable opportunity to review and comment on such documents; <u>provided</u>, that the Company shall not file or otherwise make any amendment, modification or change to the Plan, the Disclosure Statement, each Ancillary Document or any other definitive document necessary to effect the Rights Offering, without obtaining the prior written of the Backstop Purchasers, which shall not be unreasonably denied, withheld or delayed.

(b)     <u>Reasonable Best Efforts</u>. The Company shall use reasonable best efforts to cause the conditions set forth in <u>Section 6</u> (Certain Conditions) to be satisfied and to consummate the transactions contemplated herein within the time periods specified in <u>Section 6</u> (Closing Conditions) or otherwise as promptly as practicable after the date hereof and to use reasonable best efforts to seek entry of the Confirmation Order.

(c)     <u>Payment of Backstop Expenses</u>. The Company shall pay or cause to be paid in full all Backstop Expenses incurred by the Backstop Purchasers in accordance with <u>Section 3(b)(iii)</u> or, if this Agreement is terminated prior to the Effective Date, at the time of any such termination.

(d)     <u>Notice of Changes</u>. The Company shall promptly deliver to each of the Backstop Purchasers written notice upon becoming aware of any matter, event, or development that would (i) render any representation or warranty made by it herein inaccurate or incomplete in any material respect or (ii) constitute or result in a material breach by it of, or a failure by it to comply with, any covenant, condition or agreement in the Plan or herein to be complied with or satisfied by it on or prior to the Effective Date.

(e)     <u>Further Assurances</u>. The Company shall, and shall cause the other Debtors to, execute and deliver, or cause to be executed and delivered, such further instruments or documents or take such other action as may be reasonably necessary (or as reasonably requested by the Backstop

12

Purchasers) to carry out the Rights Offering, but without materially increasing the Company's obligations beyond those provided elsewhere this Agreement.

9.    Other Backstop Purchaser Commitments.

Notwithstanding anything to the contrary herein, no Backstop Purchaser shall have any liability for the Commitment (or any portion thereof) of any other Backstop Purchaser. No Party Affiliate shall have any liability or obligation of any nature whatsoever in connection with or under this Agreement or the transactions contemplated hereby (except for any fraud or willful misconduct by an such party), and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

10.    Certain Consent Rights.

Each Debtor hereby covenants that, without the prior written consent of the Backstop Purchasers, which shall not be unreasonably denied, withheld or delayed, it shall not, prior to the termination of this Agreement, enter into any agreement with respect to its securities, or amend any existing agreement with respect to such securities in any manner inconsistent with the rights of any of the Backstop Purchasers pursuant to this Agreement.

11.    Termination by Backstop Purchaser; Survival.

(a)    The Backstop Purchasers shall be entitled to terminate their obligations under this Agreement (i) by, and upon delivery of, written notice thereof to the Company in the event any Debtor (A) breaches this Agreement and fails to cure such breach within ten Business Days (or such shorter period of time if the Closing is scheduled to occur in less than ten Business Days) from the receipt of notice of such breach, (B) fails to satisfy any of the terms or conditions of this Agreement or the Plan (subject to the same cure rights as set forth in clause (i)(A) above), or the satisfaction of any such term or condition becomes impossible to satisfy, or (C) does not or cannot satisfy all of the conditions set forth in Section 6 (Certain Conditions) by April 14, 2011; or (ii) upon the termination or expiration of the Plan Support Agreement or the DIP Loan Agreement.

(b)    The Company agrees and acknowledges that the representations and warranties set forth in Section 5(a) (the "Surviving Representations") shall survive the Closing.

(c)    Upon any termination or expiration of this Agreement, the provisions of Section 8(c) (Payment of Backstop Expenses), Section 9 (Other Backstop Purchaser Commitments), Section 11 (Termination by Backstop Purchaser; Survival), Section 12 (Indemnification; Several, Not Joint, Obligations), Section 13 (Notices), Section 14 (Successor and Assigns; Assignment), Section 15 (Entire Agreement), Section 16 (Interpretation and Construction), Section 17 (Amendments), Section 18 (Extension; Waivers), Section 20 (Governing Law; Jurisdiction) and Section 21 (Waiver of Jury Trial) shall survive any such termination or expiration, and the parties to this Agreement shall remain liable (subject to Section 12(b) (Several, Not Joint, Obligations)) for their respective breaches of this Agreement prior to its termination.

200367071 v2
DOCS_DE:167392.1

(d)     Nothing in this Agreement shall limit any right, power, or protection provided to the DIP Lenders under the DIP Loan Agreement, including any right to reimbursement of fees and expenses thereunder.

12.     Indemnification; Several, Not Joint, Obligations; Releases.

(a)     The Debtors, jointly and severally, (each, an "Indemnifying Party") shall indemnify, defend, and hold harmless each Backstop Purchaser and each such Backstop Purchaser's Affiliates and each of their respective officers, directors, members, managers, partners, stockholders, affiliates, employees, attorneys, advisors, agents, and other representatives and any Affiliate of the foregoing, and each of its respective successors and permitted assigns (each, an "Indemnified Party") from and against, and shall promptly reimburse each Indemnified Party for, any and all losses, damages, liabilities, claims, costs, and expenses, including, interest, court costs, and reasonable attorneys' fees and expenses relating to, arising out of, resulting from or in connection with (i) any breach or inaccuracy of the Surviving Representations, (ii) any breach or violation by the Debtors of their covenants and agreements set forth in this Agreement, and (iii) any such action, suit, or proceeding by a third-party that is not an Affiliate of any party hereto arising out of or related to this Agreement or the transactions contemplated hereby (collectively, "Indemnified Liabilities").  For the avoidance of doubt, nothing herein shall be deemed to obligate any Debtor to indemnify, defend or hold any Indemnified Party harmless of, from or against any losses, damages, liabilities, claims, costs, and expenses, including interest, court costs, attorneys' fees or expenses relating thereto, to the extent that they are finally judicially determined to have resulted from (x) the fraud or willful misconduct of such Indemnified Party, or (y) with respect to clause (iii) in the immediately preceding sentence, the gross negligence of such Indemnified Party.

(b)     Notwithstanding anything to the contrary herein, the agreements, representations, warranties and obligations of the Backstop Purchasers under this Agreement are, in all respects, several and not joint. Furthermore, the parties hereto understand and agree that, other than as expressly provided in this Agreement, no Backstop Purchaser holds or owes any duty of trust or confidence in any form from or to any other party hereto, and there are no commitments among or between them.  In this regard, the parties hereto understand and agree that nothing in this Agreement shall affect any the rights of any party hereto to trade in any debt or equity securities of the Debtors without the consent of the Debtors or any other party hereto, subject to applicable securities laws or any other agreement to which any party hereto is a party or bound by.  No party hereto shall have any responsibility for any such trading by such other entity by virtue of this Agreement.  No prior history, pattern or practice of sharing confidences among or between the parties hereto shall in any way affect or negate this understanding and agreement.

(c)     The Party Affiliates shall be releasees covered by, and benefitting from, the releases, exculpations and injunctions to be set forth in the Plan (as described in the Plan Support Agreement).

13.     Notices.

(a)     All notices, requests, and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally, by facsimile transmission, by nationally recognized overnight courier or mailed (first class postage prepaid) to the parties at the following addresses or facsimile numbers.

14

| If to any Backstop Purchaser: | To the address set forth beneath such Backstop Purchaser's signature to this Agreement |
|---|---|
| | -- and -- |
| If to the Company: | Point Blank Solutions, Inc.<br>2101 S.W. 2nd Street<br>Pompano Beach, Florida 33069<br>Attn: President<br>Facsimile: [___] |
| With a copy (which shall not constitute notice) to: | Pachulski Stang Ziehl & Jones LLP<br>919 North Market Street, 17th Floor<br>Wilmington, DE 19801<br>Attn: Laura Davis Jones<br>Facsimile: (302) 652-4400 |

(b)     All such notices, requests and other communications shall be deemed to have been received (i) in the case of personal delivery or delivery by facsimile, on the date of such delivery, (ii) in the case of dispatch by nationally recognized overnight courier, on the next Business Day following such dispatch and (iii) in the case of mailing, on the fifth Business Day after the posting thereof.

14.     Successors and Assigns; Assignment.

The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Any Backstop Purchaser may assign, delegate, or otherwise transfer this Agreement or any of its rights or obligations hereunder without the consent of any other party hereto, to any of its Affiliates or any entity or person over which such Backstop Purchaser or any of its Affiliates exercises investment authority, including with respect to voting and dispositive rights; provided, that any such assignment shall not relieve such Backstop Purchaser from liability resulting from a default by any assignee of its obligations hereunder; and provided further, that a Backstop Purchaser, may not, directly or indirect, assign, delegate or otherwise transfer its rights or obligations hereunder to more than eight Affiliates of such Backstop Purchaser (including such Backstop Purchaser). Neither the Company nor any of the other Debtors may assign, delegate, or otherwise transfer this Agreement or any of their rights or obligations hereunder without the consent of the Backstop Purchasers, which shall not be unreasonably denied, withheld or delayed, and any purported assignment in violation of this Section 13 shall be null and void ab initio without limiting any other remedies available to the other parties hereto. Nothing in this Agreement is intended to confer upon any person not a party hereto (other than Indemnified Parties) any right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement, including any right to confer third party beneficiary rights.

15.     Entire Agreement.

This Agreement and the Plan Support Agreement contain the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, written or oral, with respect to such subject matter.  The parties hereto represent and

15

warrant that there are no other agreements or understandings, written or oral, regarding any of the subject matter hereof other than as set forth herein. Furthermore, in the event of a conflict or inconsistency between this Agreement and the Plan Support Agreement regarding the interpretation of the terms of this Agreement, this Agreement, together with its Exhibits, Annexes and Schedules shall govern.

16.     Interpretation and Construction.

For purposes of this Agreement, (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, any reference in this Agreement made to an Article, Section, Exhibit, Annex or Schedule refers to an Article or Section of, or Exhibit, Annex or Schedule to, this Agreement; (e) unless otherwise stated, the words "herein," "hereof" and "hereto" refer to this Agreement in its entirety rather than to a particular portion of this Agreement; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any immaterial effectuating provisions may be interpreted by the Debtors and their respective successor and assigns in a manner that is consistent with the overall purpose and intent of this Agreement all without further Bankruptcy Court order.

17. Amendments.

This Agreement may not be amended or modified except by a written instrument signed by each Backstop Purchaser and the Company. Except as otherwise set forth in this Agreement, any reference in this Agreement to documents, conditions, or other items that require the satisfaction or consent of the Backstop Purchasers, the taking of any affirmative action by them (including Section 11 (Termination by Backstop Purchaser; Survival) hereof) shall require the satisfaction, consent, or agreement to waive by all the Backstop Purchasers, which shall not be unreasonably denied, withheld or delayed.

18. Extensions; Waivers.

Any party may, for itself only, (a) extend the time for the performance of any of the obligations of any other party under this Agreement, (b) waive any inaccuracies in the representations and warranties of any other party contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the agreements or conditions for the benefit of such party contained herein. Any such extension or waiver will be valid only if set forth in a writing signed by the party to be bound thereby. No waiver by any party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence. Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor will any

16

single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

19. Counterparts.

This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute an original and all of which when taken together shall constitute one and the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

20. Governing Law; Jurisdiction.

This Agreement shall be governed by the laws of the State of New York without regard to its conflicts of laws principles that would require the application of the laws of any other jurisdiction. Each party to this Agreement irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby brought by any other party or its successors or assigns shall be brought and determined (a) in the Bankruptcy Court or (b) if the Bankruptcy Court no longer has (or will not exercise) jurisdiction over the Chapter 11 Cases or such legal action or proceeding, in any New York State or federal court sitting in the Borough of Manhattan in the City of New York, or, if such court lacks subject matter jurisdiction, in any appropriate New York State or federal court. Each party to this Agreement hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

21. WAIVER OF JURY TRIAL.

EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

21. Reorganized Debtors Obligated Post-Effective Date. For the avoidance of all doubt, upon and after the occurrence of the Effective Date, any and all references herein to "Debtor" or "Debtors" shall mean and refer only to the Debtors, each as reorganized pursuant to the Plan and Confirmation Order (collectively, the "Reorganized Debtors"), and all obligations of "Debtor" or "Debtors" hereunder shall from and after the Effective Date conclusively be deemed to be the obligations of the Reorganized Debtors only.

[Remainder of Page Intentionally Blank]

200367071 v2
DOCS_DE:167392.1

IN WITNESS WHEREOF, the parties hereto have executed this Subscription and Backstop Purchase Agreement as of the date first written above.

POINT BLANK SOLUTIONS, INC.

By: _____

Name:

Title:

PRESCOTT GROUP CAPITAL MANAGEMENT LLC

By: _____
    Name:
    Title:

Address:
1924 S. Utica Avenue, Suite 1120
Tulsa, OK 74104
Attn: Eric Green
Facsimile: [__]

PRIVET FUND MANAGEMENT, LLC, as manager to
PRIVET OPPORTUNITY FUND I, LLC

By: _____

    Name:

    Title:

Address:

50 Old Ivy Road, Suite 230

Atlanta GA, 30342

Attn: Ryan Levenson

Facsimile: (404) 467-6101

With a copy to:

REED SMITH LLP

1201 Market Street – Suite 1500

Wilmington, DE 19801

Attn: Kurt F. Gwynne

Facsimile: (302) 778-7575


    and

REED SMITH LLP

599 Lexington Avenue

New York, NY 10022

Attn: Edward J. Estrada

       Eulalia M. Mack

       Aron Izower

Facsimile: (212) 521-5450

LONESTAR CAPITAL MANAGEMENT, LLC as manager to
PB FUNDING, LLC

By: _____

    Name:
    Title:

Address:
One Maritime Plaza, Suite 1105
San Francisco, CA 94111
Attn:  Vikas Tandon
Facsimile:  (415) 362-7977

With a copy to:

AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
Attn:    David P Simonds
Facsimile:       (310) 552-6744

**Allocation between Equity Offering Backstop Purchasers**

Unsubscribed Equity Offering Shares Allocation

Prescott                                    50.00%

Privet                                        50.00%


Subscription Shares Allocation

Prescott                                    48.475%

Privet                                        51.525%

**Index of Defined Terms**

"Affiliate" means, with respect to any person or entity, any person or entity directly or indirectly controlling, controlled by or under common control with, such other person or entity. For purposes of this definition, "control" when used with respect to any person or entity, means the possession, directly or indirectly, of the power to cause the direction of management and/or policies of such person, whether through the ownership of voting securities, by contract, or otherwise.

"Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

"Lien" means any charge, security interest, community property interest, condition, equitable interest, lien, option, pledge, mortgage, right of way, easement, encroachment, servitude, right of first offer, right of first refusal or contractual restriction of any kind, including any restriction or covenant with respect to use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"Material Adverse Effect" shall mean any change, effect, event, occurrence, development, circumstance, or state of facts which, either alone or in combination, has had or would reasonably be expected to have a materially adverse effect on the business, properties, operations, financial condition or results of operations of the Company and its subsidiaries taken as a whole (including any debarment or restriction imposed on the Debtors from serving as a government contractor), or which would reasonably be expected to materially impair its or their ability to perform its or their obligations under this Agreement or have a materially adverse effect on or prevent or materially delay the consummation of the transactions contemplated by this Agreement, the Plan or the Disclosure Statement.

"Party Affiliates" shall mean any director, officer, employee, representative or agent of any Backstop Purchaser, any of such Backstop Purchaser's Affiliates or any direct or indirect holder of any equity interests or securities of any such Backstop Purchaser (whether such holder is a limited or general partner, member, stockholder or otherwise) and, without limiting the foregoing, shall include each of: Ryan Levenson, Privet Fund Management LLC, Privet Fund, L.P., Angel Oak Partners Fund I, LLC, James Rubright and Ben Rosenzweig.

| Term | Section |
|---|---|
| Agreement | Preamble |
| Ancillary Documents | Section 6(a)(xii) |
| Backstop Expenses | Section 3(b)(iii) |
| Backstop Commitment | Section 1(c) |
| Backstop Fee | Section 4 |

| Term | Section |
| --- | --- |
| Backstop Purchasers | Section 1(b) |
| Bankruptcy Court | Recitals |
| Chapter 11 Cases | Recitals |
| Closing | Section 3(a) |
| Commitment | Section 2 |
| Commitment Notice | Section 3(a) |
| Company | Preamble |
| Company Disclosure Schedules | Section 5(a) |
| Confirmation Order | Section 6(a)(ii) |
| Creditor Rights Offering | Recitals |
| Debtors | Recitals |
| Difference | Section 3(b)(i) |
| Disclosure Statement | Recitals |
| Eligible Creditor | Recitals |
| Eligible Equity Holder | Recitals |
| Equity Offering Backstop Purchasers | Section 1(a) |
| Equity Rights Offering | Recitals |
| Indemnified Liabilities | Section 12(a) |
| Indemnified Party | Section 12(a) |
| Litigation | Section 5(a)(viii) |
| New By-Laws | Section 6(a)(xii) |
| New Charter | Section 6(a)(xi) |
| New Common Stock | Recitals |
| Outstanding Company Obligations | Section 3(b)(i) |
| PB Funding | Preamble |
| Plan | Recitals |
| Prescott | Preamble |
| Privet | Preamble |
| Purchased Shares | Section 2 |
| Rights | Recitals |
| Rights Offering | Recitals |
| Securities Act | Section 5(a)(xi) |
| Solicitation Order | Section 6(a)(i) |
| Stockholders Agreement | Section 3(b)(v) |
| Subscription Price | Recitals |
| Subscription Shares | Section 2 |
| Surviving Representations | Section 11(b) |
| Unsubscribed Creditor Offering Shares | Section 1(b) |
| Unsubscribed Equity Offering Shares | Section 1(a) |
| Unsubscribed Shares | Section 1(b) |

**Exhibit A**

**Stockholders' Agreement Term Sheet**

[See attached]

## POINT BLANK SOLUTIONS, INC.
## STOCKHOLDERS AGREEMENT TERM SHEET

**Parties:**

1.  Point Blank Solutions, Inc., a Delaware corporation ("PBSI" and, together with its subsidiaries, the "Company").

2.  The following holders (collectively, the "New Equityholders") of shares of new common stock of PBSI (the "New Common Stock") issued in connection with the Closing (as defined below) (and their respective permitted transferees of New Common Stock):

    (A)  Lonestar Capital Management, LLC (together with certain affiliates, "Lonestar"), Privet Fund Management LLC (together with certain affiliates including Privet Opportunity Fund I, LLC and Privet Fund L.P., "Privet"), and Prescott Group Capital Management (together with certain affiliates, "Prescott"); and

    (B)  Any Person acquiring shares of new Common Stock who holds in the aggregate 10% or more of the New Common Stock outstanding immediately following the Closing.

**Board of Directors:**

After the consummation of the Restructuring (the "Closing", and such date, the "Closing Date"), the board of directors of PBSI shall be comprised of five (5) directors constituted as follows:

- for as long as Lonestar is the beneficial or record owner of at least 10% of the outstanding New Common Stock of PBSI, one (1) director shall be appointed by Lonestar,

- for as long as Prescott is the beneficial or record owner of at least 10% of the outstanding New Common Stock of PBSI, one (1) director shall be appointed by Prescott,

- for as long as Privet is the beneficial or record owner of at least 10% of the outstanding New Common Stock of PBSI, one (1) director shall be appointed by Privet (which director shall serve as the chairman of the board),

- for as long as Lonestar is the beneficial or record owner of at least 10% of the outstanding New Common Stock of PBSI, one (1) director shall be appointed by Lonestar and either Prescott or Privet for as long as Prescott or Privet, as applicable, is the beneficial or record owner of at least 10% of the outstanding New Common Stock of PBSI, and

- one (1) director shall be the chief executive officer of PBSI.

Initially, the board members (other than the CEO) and chairman shall be as follows: (a) [_____] shall be the Lonestar appointee, (b) [_____] shall be the Prescott appointee, (c) Ryan Levenson shall be the Privet appointee and board chairman, and (d) [_____] shall be the Lonestar/Prescott or Privet

appointee.[1] The boards of directors or similar governing bodies of each subsidiary will be similarly constituted.

Each New Equityholder will agree to vote its shares in any election of directors for the candidates nominated in accordance with this provision.

**Transfer Restrictions on New Common Stock:**

Without the prior written consent of Lonestar, Privet and Prescott, in each case for as long as Lonestar, Privet or Prescott, as applicable, is the beneficial or record owner of at least 20% of the outstanding New Common Stock, no New Equityholder may, directly or indirectly, (i) transfer more than 10% of the New Common Stock outstanding at the time of transfer to any Person (other than to an affiliate as set forth below) or (ii) transfer shares of New Common Stock if as a result of such transfer any Person or "group" would beneficially own more than 50% of the outstanding New Common Stock. There shall be no other transfer restrictions on the New Common Stock other than (x) compliance with customary provisions with respect to the transfer of restricted stock received in a private placement and (y) compliance with the provision in PBSI's charter restricting the number of record holders of New Common Stock to 450 and (z) execution of a joinder to the Stockholders Agreement if the transferee is not already a signatory thereto (collectively, the "Surviving Transfer Requirements").

Transfers will be permitted to affiliates of the stockholder (including through distributions to shareholders or partners), subject to any such permitted transferee executing a customary joinder to be bound by the terms of the Stockholders Agreement.

**Drag-Along Right:[2]**

If New Equityholders representing more than 50% of the New Common Stock outstanding at such time agree to sell their shares in a bona fide transaction, all other New Equityholders shall be subject to customary drag-along provisions.

**Pre-emptive Rights:**

If PBSI issues any equity or equity-linked securities, each New Equityholder who is an "accredited investor" will have, for so long as such New Equityholder owns more than 5% of the outstanding New Common Stock, the right to purchase a *pro rata* portion of such offering based upon its equity ownership, subject to customary exceptions.

**Co-Sale Rights:**

Each New Equityholder will have the right to participate in any transaction that results in the sale by any New Equityholder (other than to their respective affiliates) of shares representing 15% of the outstanding New Common Stock, on a pro rata basis, on the same price and the same terms as the sellers have proposed to accept.

**Registration Rights:**

Pre-IPO Registration Rights. The New Equityholders representing more than 50% of the outstanding New Common Stock shall have the right to cause PBSI to conduct an initial public offering of the New Common Stock (an "IPO") at any time.

---

[1] *Names to be determined.*

[2] *Provision also to be included in the Certificate of Incorporation.*

<u>Post-IPO Registration Rights</u>.  Following an IPO, each New Equityholder will each be granted (a) unlimited S-3 short-form demand registration rights, so long as the price to public is at least $10,000,000 and (b) unlimited piggyback rights on all other registrations, in each case subject to customary restrictions and postponements.  In addition, each New Equityholder owning more than 15% will have the right to two S-1 long-form registrations.

For the avoidance of doubt, consent, if required under "Transfer Restrictions," shall be required in connection with any Pre- or Post-IPO exercise of registration rights except that no joinder shall be required of any purchaser in connection with any such offering.

<u>Cutbacks</u>.  The New Equityholders (excluding any compensation based equity acquired by management stockholders on or after the Closing Date) will be *pari passu* with each other, and will have priority, with respect to underwriters' cut backs, in all registrations.

<u>Market Standoff</u>.  Each New Equityholder will agree to a market standoff of no more than 180 days in the case of an IPO.

<u>Expenses</u>.  PBSI will pay all expenses in connection with the exercise of the registration rights, including, without limitation, the reasonable attorney's fees and expenses of one counsel to the New Equityholders in connection with an IPO.

**Information Rights:**

Each New Equityholder owning more than 10% of the outstanding New Common Stock will have the right to inspect the properties, books and other records of PBSI at reasonable times and upon reasonable notice. Each New Equityholder owning more than 10% of the outstanding New Common Stock will have the right to reasonably request from time to time (i) any other information (financial or otherwise) and (ii) to have access to PBSI's or any subsidiary's management, auditors and legal counsel.  Such information rights will be subject to customary exceptions and qualifications regarding confidentiality and competitors.

Within 90 days after the Effective Date, bid and ask quotations for the New Common Stock will be available on the Pink Sheets marketplace and PBSI will prepare and make publicly available adequate current information as discussed in the version of the Pink OTC Market Guidelines for Providing Adequate Current Information that is in effect at the time the information is being made available; provided, however, that PBSI shall not be required to prepare and make publicly available any information required by any changes to the version of the Pink OTC Market Guidelines for Providing Adequate Current Information as in effect on the Closing Date (a copy of which is attached hereto as Exhibit ___) if PBSI's board of directors reasonably determines that the preparation and availability of information required by such changes would be materially burdensome to PBSI.

**Amendment:**

The Stockholders Agreement may be amended, restated, supplemented or modified only with the written consent of (i) New Equityholders holding 66-2/3% of the shares of New Common Stock subject to the Stockholders Agreement and (ii) each Qualified Holder; provided, however, that no such amendment, restatement, supplement or modification shall materially and adversely affect any New Equityholder disproportionately to the other New Equityholders without such New

Equityholder's written consent; provided further, however, that notwithstanding anything herein or otherwise to the contrary, in no event shall the number or allocation of directors as provided herein be amended, restated, supplemented or modified without the prior written consent of Lonestar, Privet and Prescott, in each case for as long as Lonestar, Privet or Prescott, as applicable, is the beneficial or record owner of at least 10% of the outstanding New Common Stock. As used herein "Qualified Holder" means Prescott, Privet and Lonestar so long as each such New Equityholder owns (beneficial or record) the lesser of (x) 15% of the total outstanding New Common Stock and (y) the percentage of the total amount of New Common Stock owned by such New Equityholder on the Effective Date.

**Termination:** Subject to customary survival provisions, the Stockholders Agreement shall automatically terminate upon the earlier of (x) the consummation of an IPO (other than the registration rights set forth therein), (y) the consummation of a sale of PBSI resulting in a change of control (by asset or stock sale) and (z) the written consent of New Equityholders representing 66-2/3% of the shares of New Common Stock subject to the Stockholders Agreement. Notwithstanding the prior sentence, the rights and obligations of the New Equityholders with respect to the provisions under (a) the first sentence in the first paragraph under the heading "Transfer Restrictions on New Common Stock," and (b) the heading "Co-Sale Rights", shall terminate on the later of (i) the 24 month anniversary of the effective date of the Stockholders Agreement, and (ii) the date on which PBSI's independent auditor delivers to PBSI the consolidated audited financial statements for PBSI's 2012 fiscal year but in no event later than the 36 month anniversary of the effective date of the Stockholders Agreement. For the avoidance of doubt, the Surviving Transfer Requirements shall continue in full force and effect until the termination of the Stockholders Agreement.

In addition, the rights and obligations (other than any confidentiality obligations) of each New Equityholder shall terminate with respect to such New Equityholder upon the transfer in accordance with the terms of the Stockholders Agreement of all shares of New Common Stock held by such holder.

**Consent Rights:** The Company shall not take any of the actions set forth below without the prior written consent of Lonestar, Privet and Prescott, in each case for as long as Lonestar, Privet or Prescott, as applicable, is the beneficial or record owner of at least 20% of the outstanding New Common Stock: (i) initiating or conducting an IPO; (ii) effecting a sale of the Company or any transaction which results in any Person or "group" beneficially owning more than 50% of the outstanding New Common Stock; (iii) any acquisition by the Company of any business (whether by purchase of stock or assets) for consideration in excess of $1,000,000; (iv) incurring any debt or pledging of assets of the Company; (v) any sales or other dispositions of assets of the Company exceeding $1,000,000; (vi) making capital expenditures in excess of $500,000 in the aggregate, per fiscal year, not included in the annual operating budget; (vii) the making of investments in or loans to any other Person (including, without limitation, the purchase of debt securities) by the Company for consideration in excess of $1,000,000, other than investments in and loans to wholly-owned subsidiaries; (viii) the declaration or payment of any dividends by the Company or the repurchase of any securities of the Company (except from employees of the Company pursuant to employment agreements or other grants or agreements); (ix) changing the Company's fiscal year at any time between the

Closing Date and the date that is the later of (a) the 24 month anniversary of the effective date of the Stockholders Agreement, and (b) the date on which PBSI's independent auditor delivers to PBSI the consolidated audited financial statements for PBSI's 2012 fiscal year; and (x) resolving, committing or agreeing to take any of the foregoing actions.

The stockholders agreement will provide that the 20% equity threshold for purposes of determining consent rights under the stockholders agreement will be determined without taking into account the exercise of management stock options, if any, issued pursuant to any management incentive plan.

*******