IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| POINT BLANK SOLUTIONS, INC., et al., | : | Case No. 10-11255 (PJW) |
| | : | |
| Debtors. | : | Jointly Administered |
| | | Re: D.I. No. 1007 |

**OBJECTION OF DAVID H. BROOKS TO DEBTORS' DISCLOSURE STATEMENT DESCRIBING JOINT CHAPTER 11 PLAN OF REORGANIZATION**

David H. Brooks ("Brooks"), by and through his undersigned counsel, hereby files this objection ("Objection"), to the above-captioned debtors' ("Debtors") proposed Disclosure Statement Describing Joint Chapter 11 Plan of Reorganization ("Disclosure Statement" [D.I. No. 1007]. In support of this Objection, Brooks states as follows:

**PRELIMINARY STATEMENT**

The purpose of a disclosure statement is to provide a hypothetical investor with "adequate information" necessary to make an informed decision regarding whether to vote for or against a proposed plan of reorganization. In the present proceeding, Debtors' Disclosure Statement omits critical information regarding the funding and subsequent rejection by Debtors of the Settlement Agreement (as defined herein). The Disclosure Statement speaks at length regarding Debtors' rejection of the Settlement Agreement, yet fails to advise the Court and other interested parties that the Rejection Order is pending on appeal before the United States District Court for the District of Delaware.

Throughout the Disclosure Statement, Debtors state that the entry of the Rejection Order "allows Debtor to potentially recover $35,200,000" of the Escrowed Funds. Debtors make this representation despite the plain language of the Rejection Order, stating that "nothing herein

1

shall be construed as an adjudication of any party's rights with respect to the Escrowed Funds …" Rejection Order at p.3.

Debtors also suggest in the Disclosure Statement that it was Debtors, not Brooks or certain insurers, who funded the Escrowed Funds (as defined herein). Brooks submits that the Disclosure Statement, in its current form, should not be approved by the Court. By that, statements made by the Debtors in the Disclosure Statement are contrary to the plain language of key documents, namely the Settlement Agreement, and contrary to statements made by the Debtors in other proceedings.

## BACKGROUND

1.  On April 14, 2010 (the "Petition Date"), Debtors filed voluntary petitions for bankruptcy under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). According to the *Declaration of T. Scott Avila In Support of First Day Motions* (the "Declaration") [D.I. 3], Debtors' bankruptcy proceedings are the result of "[s]ignificant delays in the awarding of U.S. Military and Federal Government soft body armor contracts, uncertainties in the transition of civilian law enforcement and body armor certification standards, the continuing poor economic climate and the crisis in the credit markets …" Declaration at p.14.

2.  Several years prior to the Petition Date, on September 9, 2005, certain shareholders of the Debtor Point Blank Solutions, Inc. (f/k/a DHB Industries, Inc.) ("Point Blank") commenced class actions in the United States District Court for the Eastern District of New York. As alleged in their complaints, the class action plaintiffs brought claims against Point Blank under the Securities and Exchange Act of 1934 (the "Class Action")[1].

---

[1] The complaint filed in the Class Action is attached as Exhibit 1 to the Appendix of Exhibits to Debtor Point Blank Solutions Inc.'s Motion for Order Under 11 U.S.C. § 365(a) Authorizing Rejection of Class and Derivative Action Settlement Agreement (the "Appendix"), filed by Debtors with the Court on September 17, 2010 at D.I. Nos. 592 and 593.

3. On or about September 14, 2005, various derivative actions were also filed in the United States District Court for the Eastern District of New York (the "District Court"), purportedly on behalf of Point Blank, against certain of Point Blank's officers and directors. (the "Derivative Action")[2].

4. Ten months later, the parties to the Class Action and Derivative Action (the "Actions") entered in to a Memorandum of Understanding dated July 12, 2006 (the "MOU")[3]. The terms of the MOU were memorialized in a Stipulation and Agreement of Settlement (the "Stipulation")[4] on November 30, 2006. In addition to the Stipulation, certain of the parties to the Actions entered into related agreements that included: the Release Agreement and Contractual Undertakings ("Release" or "RACU")[5]; the Securities Purchase Agreement ("SPA"); the Registration Rights Agreement ("RRA"); the Warrant Exercise Agreement ("WEA"); the Escrow Agreement ("EA"); and the Agreement of Insureds ("AI")(these documents, collectively, constitute the "Settlement Agreement" or "Agreement")[6].

5. Pursuant to the Stipulation, the parties to the Actions settled the Actions for $35,200,000 in cash, plus 3,184,713 shares of Point Blank's common stock. Inclusive in the cash amount of the Agreement was a $22,325,000 cash contribution funded by Brooks. The Brooks' settlement funds were deposited with an escrow agent (the "Escrow Agent") on July 31, 2006. On August 14, 2006, certain D&O insurers of Point Blank and its officers and directors deposited $12,875,000 with the Escrow Agent. Combined, the funds deposited by Brooks and the insurers totaled $35,200,000 (the "Escrowed Funds"). The Escrowed Funds were placed in,

---

[2] The complaint filed in the Derivative Action is attached as Exhibit 2 to the Appendix.
[3] The MOU is attached as Exhibit 3 to the Appendix.
[4] The Stipulation is attached as Exhibit 4 to the Appendix.
[5] The RACU is attached as Exhibit 6 to the Appendix.
[6] The SPA, RRA, WEA and EA are attached as Exhibits 7 through 10 of the Appendix. The AI is attached hereto as Exhibit "A".

and remain in, an interest bearing escrow account with the Escrow Agent, under and pursuant to the terms of the EA. To date, approximately $9,925,000 has been paid from the Escrowed Funds to counsel for the Plaintiffs in both Action.

6. The Stipulation defines the "Effective Date" as the "first date by which all of the events and conditions specified in ¶ 7.1 of this Section of this Stipulation shall have been met and have occurred, unless one or more of such conditions is waived or modified in writing and signed by Class Plaintiffs' Counsel, Derivative Counsel and counsel for each of the Defendants." Stipulation ¶ 1.15.

7. Section 2.3 of the Stipulation provides that "[i]n the event the Settlement is not finally approved by the Court in substantially the form of, and containing substantially the same provisions as those set forth in the Stipulation, then the cash portion of the Settlement Fund, plus interest earned thereon, less any permitted expenses therefrom, shall be paid, distributed and/or held by the Escrow Agent in the amounts and to the Persons an in the manner provided for in the Escrow Agreement." Stipulation ¶ 2.3. Likewise, Section 2.11 of the Stipulation states that should the "Effective Date [] not occur, or the Settlement is not approved by the Court, or is terminated for any other reason, the cash portion of the Settlement Fund shall be refunded as described in ¶ 7.4 below".

8. On September 30, 2010, the United States Court of Appeals for the Second Circuit ("Second Circuit") issued an opinion ("Opinion") finding that certain indemnification and release provisions of the Stipulation violate § 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243, thereby invalidating the Settlement Agreement. In so finding, the Second Circuit implied that the Stipulation, minus the particular indemnification and release provisions found to be invalid, might be approved. Neither the Eastern District Court, nor the parties to the Stipulation,

has yet agreed that the Stipulation, minus those provisions, should be approved.  However, the only parties benefiting from those provisions, Brooks and Point Blank's former Chief Financial Officer, have waived the same, and are agreeable to going forward with the Stipulation minus those provisions.

9. Under the Escrow Agreement, ¶ 4(c), once a "Court has finally disapproved the Settlement, the Stipulation of Settlement and the related documents, and all available reconsideration and appeal periods have lapsed, or (b) the failure of the Settling Parties to come to agreement on the terms of [a modified] Stipulation of Settlement … the Escrow Agent shall release and distribute the Escrowed Funds as follows:" (listing the order of distribution).  Escrow Agreement ¶ 4(c).  Neither such final disapproval or such modification has yet occurred.

10. On September 17, 2010, Debtors filed their Motion for Order Authorizing Rejection of Class and Derivative Action Settlement Agreement (the "Motion to Reject") [D.I. 589].  On December 22, 2010, this Court entered an Order Granting Debtors Motion to Reject (the "Rejection Order") [D.I. 949].  Since entry of the Rejection Order, Brooks and other interested parties in this proceeding filed Notices of Appeal with this Court, seeking appellate review of the Rejection Order.  See Notices of Appeal filed with this Court at docket item numbers 958 and 979 (hereinafter, the "Appeal").

11. Debtors filed their Disclosure Statement with this Court on January 11, 2011 [D.I. 1007].

**ARGUMENT**

12. Brooks objects to the Disclosure Statement as it fails to provide "adequate information" as required under section 1125 of the Bankruptcy Code.  Specifically, the Disclosure Statement fails to provide any information regarding the Appeal and provides

5

inadequate information regarding the Parties' contentions concerning the Escrowed Funds and the Settlement Agreement.

13. "A plan of reorganization may not be submitted to a debtor's creditors unless and until a disclosure statement has been approved by the court containing 'adequate information.'" In re Oxford Homes, Inc., 204 B.R. 264 (Bankr. D. Me. 1997). Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" in the context of a disclosure statement as:

> …[I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records … that would enable [] a hypothetical investor of the relevant class to make an informed judgment about the plan … and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of the additional information to creditors and other parties in interest, and the cost of providing additional information …

11 U.S.C. § 1125(a)(1).

14. The legislative history of the Bankruptcy Code makes clear that the adequacy of a disclosure statement is determined by applying a subjective standard which is based upon the circumstances of the case. See, H.R. Dep. No 595, 95th Cong., 1st Sess. 408-09 (1977); S. Rep. No. 989, 95th Cong., 2nd Sess. 102-21 (1978). Furthermore, courts have developed a list of the type of information which should be addressed in a disclosure statement. In re Scioto Valley Mortgage Co., 88 B.R. 168 (Bankr. E.D. OH. 1988).

15. Some of the factors listed by the court in Scioto and relevant to the Debtors' Disclosure Statement include (i) information regarding claims against the estate; and (ii) the existence, likelihood and possible success of non-bankruptcy litigation. Id. at 171-72.

16. Debtors' Disclosure Statement fails to provide "adequate information" concerning the circumstances surrounding the Settlement and Appeal. Instead of providing sufficient information that adequately informs creditors of Debtors' proposed plan of reorganization, the

6

Disclosure Statement often provides nothing more than Debtors' legal conclusions regarding issues that have yet to be determined by this Court.

**Lack of Information Concerning the Appeal**

17. The third and fourth paragraphs of page 20 of the Disclosure Statement, under the subheading "Significant Legal Proceedings," make the following disclosure regarding Debtors' Motion to Reject:

> PBSI filed a motion to reject the Settlement Agreement in the Bankruptcy Court on September 17, 2010 [Docket 589] (the "Rejection Motion"). PBSI sought to reject the Settlement Agreement for a number of reasons. First, rejection of the Settlement Agreement would allow PBSI to potentially recover approximately $35,200,000 of the cash settlement as property of PBSI's estate. Second, if the Settlement Agreement were rejected, PBSI would be entitled to assert the claims from the derivative action against Brooks and Schlegel, among others and the general releases exchanged between PBSI and Brooks pursuant to the Settlement Agreement will become null and void. Finally, because the Appeal has not yet been decided at the time of filing of the Rejection Motion, rejection of the Settlement Agreement would ensure that the Debtors would be relieved of any obligation to indemnify Brooks and Schlegel for any amounts paid by them to Point Blank under SOX § 304 and retain any amounts paid by Brooks or Schlegel under SOX § 304
>
> On September 30, 210, the Second Circuit granted the Appeal and held that the indemnification and release provisions of the Settlement Agreement violated SOX § 304. The Second Circuit vacated and reversed the judgment of the EDNY Court with respect to this portion of the Settlement Agreement. Meanwhile, PBSI proceeded with the prosecution of the Rejection Motion in the Bankruptcy Court because of the additional benefits that would inure to the benefit of PBSI's estate summarized above beyond exercising of PBSI's indemnification obligations as mandated by the Second Circuit's disposition of the Appeal. On December 22, 2010, the Bankruptcy Court entered an order granting the Rejection Motion.

18. Brooks filed his Notice of Appeal of the Rejection Order on December 23, 2010. Debtors, however, make no reference to Brooks' Appeal of the Rejection Order in the Disclosure Statement, despite Brooks having filed the Appeal eighteen (18) days prior to Debtors' filing of the Disclosure Statement. Aside from omitting Brooks' Appeal, Debtors fail to reference in the Disclosure Statement that the Plaintiffs in the Class Action and Derivative Action also appealed

7

the Rejection Order.  In its present form, the Disclosure Statement therefore fails to provide adequate information regarding the status of the Rejection Order.  In order for the Court to approve the Disclosure Statement, Brooks request that Debtors properly disclose that the Rejection Order is on appeal to the United Stated District Court for the District of Delaware, including the possible outcomes of those appeals, the timing of the same and the effect of a possible reversal of the Rejection Order.

19. Aside from not referencing the appeal of the Rejection Order, Debtors also omit pertinent information concerning the Second Circuit Opinion.  In referring to the Second Circuit Opinion, Debtors state in the Disclosure Statement that the Second Circuit "held that the indemnification and release provisions of the Settlement Agreement violated SOX § 304." Debtors fail to provide the entire holding of the Second Circuit wherein they "join our sister circuits in holding that [SOX] § 304 does not create a private cause of action."  See Opinion at p. 12, attached hereto as Exhibit "A".

**The Rejection Order Does not Determine Ownership of the Escrowed Funds**

20. In the Disclosure Statement, Debtors state that they filed the Motion to Reject, in part, because "rejection of the Settlement Agreement would allow PBSI to potentially recover approximately $35,200,000 of the cash settlement as property of PBSI's estate …" Disclosure Statement at p. 20.  Debtors also state in the Disclosure Statement that "[o]n December 22, 2010, the Bankruptcy Court entered an order granting the Rejection Motion." Id.  Debtors omit, however, any reference to the section of the Court's Rejection Order that states that "nothing herein shall be construed as an adjudication of any party's rights with respect to the Escrowed Funds that are the subject of the Complaint for the Turnover of Property of the Estate [Docket

No. 774], all of which rights are reserved …" A copy of the Rejection Order is attached hereto as Exhibit "B".

21. In its present form, the Disclosure Statement suggests that the Rejection Order allows Debtors to recover the $35,200,000 in Escrowed Funds. In order to satisfy the Bankruptcy Code's requirement that the Debtors provide "adequate information," the Disclosure Statement must make clear that the determination of the Debtors' interest in the Escrowed Funds, along with the interests of Brooks and any of the other parties to the Turnover Action, will be decided by the Court through the Turnover Action, not through the Motion to Reject.

**The Settlement Agreement May Become Final**

22. In paragraph 3, page 21 of the Disclosure Statement, Debtors state the following:

Because the payments were expressly conditioned on final court approval in the Actions, and as a result of the Second Circuit decision on the Appeal, the Settlement Agreement cannot become final, and the portion of the funds provisionally paid to the Law Firm Defendants must be returned to the PBSI's estate.

23. Brooks objects to the above-referenced portion of the Disclosure Statement as Debtors, instead of providing "adequate information" regarding the Settlement Agreement, instead merely reiterate Debtors' legal arguments as set forth in the Turnover Action.

24. On July 8, 2008, the Eastern District Court entered its Final Judgment and Order of Dismissal for both the Class Action and Derivative Action (the "Final Judgments"). Soon after, appeals of the Final Judgments were filed in the United States Court of Appeals for the Second Circuit (the "Second Circuit"). The Second Circuit issued an opinion (the "Opinion") on the appeals on September 30, 2010. Pursuant to the Opinion, the Second Circuit held that the indemnification provision contained within the Stipulation (the "SOX Indemnification Provision") violates section 304 of the Sarbanes Oxley Act of 2002 ("SOX").

25. Debtors state in the Disclosure Statement that the "Settlement Agreement cannot become final." This is incorrect. Brooks and Dawn M. Schlegel ("<u>Schlegel</u>") are the only beneficiaries of the SOX Indemnification Provision. Both Brooks and Schlegel have filed papers in the Eastern District Court stipulating that they will adhere to the Stipulation in its original form without the SOX Indemnification Provision that was struck down by the Second Circuit. Whether that, as a matter of law, is sufficient for the Eastern District Court to reaffirm its approval of the Settlement and issue new final judgments has yet to be determined.

26. While Debtors have rejected the Settlement Agreement, the law is clear that Debtors' rejection does not terminate or nullify the Settlement Agreement. Furthermore, rejection of the Settlement Agreement does not automatically convert the Escrowed Funds into property of the estate.

27. "Rejection [of an executory contract] merely frees the estate from the obligation to perform; it does not make the contract disappear." <u>Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham)</u>, 138 B.R. 687, 703 (Bankr. S. D. N.Y. 1992). Debtors' rejection of the Settlement Agreement frees the estate from its obligations to perform under the Settlement Agreement, however, rejection does not void or eliminate the Settlement Agreement. On page 15 of its Opinion, the Second Circuit held as follows:

> Because we conclude that the indemnification and release provisions of the Settlement violate § 304 of the Sarbanes Oxley Act, 15 U.S.C. § 7243, we do not reach the question of whether the Settlement is substantively and procedurally fair, reasonable and adequate. Nor do we reach the issues pertaining to attorneys' fees. The district court will need to reexamine those issues in any event, either <u>in the context of a revised settlement</u> or the outcome of further litigation.

Opinion at p. 15 (emphasis added).

28. Despite Debtors' rejection, the Eastern District Court, in its discretion and subject to relief from stay from this Court, may revise the Settlement Agreement so as to conform with

the Second Circuit's Opinion. In previous filings in the Eastern District Court and the Second Circuit, Debtors fully and vigorously supported every aspect of the Settlement Agreement. Debtors' filing for bankruptcy does not change Debtors' prior representations and arguments filed with other courts in support of the Settlement Agreement.

29. It is well understood that rejection of a contract constitutes merely a breach. Courts must look to applicable state law to determine the consequence of the rejecting estate's breach. <u>Nobelman v. Am. Sav. Bank.</u>, 524 U.S. 324 (1993). Under New York law, escrow accounts are not property which would vest in the Debtors' estates. <u>In re TTS, Inc.</u>, 125 B.R. 441, 414 (Bankr.D.Del. 1991), *aff'd* 158 B.R. 583, 587 (D.Del. 1993). Brooks asks the Court to not approve those provisions of the Disclosure Statement that suggest that Debtors' rejection of the Settlement Agreement entitles Debtors' to the Escrowed Funds.

**<u>Debtors Did Not Fund the Settlement</u>**

30. The last paragraph of page 19 of the Disclosure Statement reads as follows:

The Debtors deposited into escrow $22.3 million in cash which represented the Debtors' portion for the cash settlement which was funded as follows: (i) $7.5 million from the exercise by Debtors' former Chief Executive Office, Brooks, of a warrant to acquire 3,000,000 shares of the Debtors' common stock at an exercise price of $2.50 per share; and (ii) $14.8 million from the purchase by Brooks of 3,007,099 shares of stock at $4.93 per share.

Disclosure Statement, p. 19.

31. Debtors' statement above (i.e. "Debtors deposited into escrow $22.3 million") suggests that Debtors provided the consideration for this portion of the Settlement Agreement. However, paragraph 4 of the MOU clearly states that "[t]he balance of $22,325,000 shall be funded by David H. Brooks …" It was the funds provided by Brooks, not Debtors, that were "deposited into escrow." Debtors' representation that they "deposited into escrow $22.3 million"

11

is contrary to how the Settlement Agreement was funded and contrary to the plain language of the Settlement Agreement.

32. On or about August 14, 2009, Debtors filed their *Brief for Defendant-Appellee DHB Industries, Inc.* (the "Debtors' Brief") with the Second Circuit in support of the Settlement Agreement. According to a special committee of the Debtors, Second Circuit approval of the Settlement Agreement "was in the best interest of the Company and its shareholders, especially because it did not involve any out-of-pocket expenditures by DHB." See Debtors' Brief at p. 23, attached hereto as Exhibit "C". Through Debtors' Brief filed with the Second Circuit, Debtors' acknowledge that the Settlement Agreement required no "expenditures" by the Debtors, but instead relied on funding provided by Brooks and certain insurers.

**Premium Paid by Brooks**

33. Debtors also incorrectly state that the warrant for Brooks' acquisition of 3,000,000 shares was at an exercise price of $2.50 per share. Disclosure Statement, p. 19. Two mechanisms funded the escrow deposits from Brooks. First, Brooks owned warrants exercisable for the purchase price of 3,000,000 shares of the Debtors at $1 per share. Brooks agreed to exercise those warrants at $3.50 per share, a $2.50 share premium over the contractual exercise price. See Exhibit "B" to MOU, attached hereto as Exhibit "D". This generated $7,500,000, of which the premium constituted $4,500,000. Secondly, Mr. Brooks purchased 3,007,099 shares of Debtors' stock at $4.93 per share for total proceeds of $14,825.000. MOU, Exhibit "B", § B4, attached hereto as Exhibit "D".

34. To provide "adequate information" as required under the Bankruptcy Code, the Disclosure Statement should state that Brooks' warrants contained an exercise price of $1.00 per share, however, Brooks agreed to pay an additional premium of $1.50 per share in order to fund

12

the Settlement Agreement. By paying the additional premium (the $1.50 per share), Brooks increased the amount paid into the Settlement Agreement by $4.5 million more than called for in the warrants.

35. Like with the warrants, Brooks also agreed to pay a premium in the purchase of 3,007,099 shares of Debtors' common stock, at $4.93 per share, to fund the Settlement. Again, in the last paragraph of page 19 of the Disclosure Statement, Debtors misstate that Debtors deposited $22.3 million, in part, by including the "$14.8 million from the purchase by Brooks of 3,007,099 shares of stock at $4.93 per share." Debtors do not disclose that Brooks purchased the 3,007,099 shares at $4.93 a share, representing a minimum premium of $3.00 per share at the then trading price of Debtors' common stock.

## CONCLUSION

36. Brooks requests the Court not approve Debtors' Disclosure Statement for the reasons set forth above. The test for whether the Disclosure Statement provides "adequate information" hinges on whether a hypothetical investor can make an informed decision about whether to accept or reject Debtors' Plan of Reorganization. Those pages in the Disclosure Statement which discuss the terms of the Settlement Agreement, the funding of the Settlement Agreement, as well as the effect of Debtors' rejection thereof, provide incorrect and/or inadequate information that does not allow parties to make informed decisions about whether to accept or reject the Plan of Reorganization.

37. To the extent the Court is inclined to approve the Disclosure Statement, Brooks requests the Court require Debtors to revise and amend the Disclosure Statement to reflect the following:

    (i)    disclose that the Rejection Order is presently pending on appeal to the United States District Court for the District of Delaware;

13

(ii) remove any reference in the Disclosure Statement that the rejection of the Settlement Agreement would allow Debtors to recover the Escrowed Funds;

(iii) remove any reference in the Disclosure Statement to Debtors' contention that the Settlement Agreement "cannot become final" and that the Escrowed Funds must be returned to the Debtors;

(iv) remove any reference in the Disclosure Statement that Debtors funded or deposited the $23.2 million contributed to the Escrowed Funds and/or state that this, or any other court, has yet to decide who is to be paid the funds comprising the Escrowed Funds in the event the Settlement is not finally approved; and,

(v) include in the Disclosure Statement an explanation of the premiums paid by Brooks for the exercise price for the warrants and purchase price for Debtors' common stock; and

(vi) include in the Disclosure Statement an explanation of the $12,875,000 of the Escrowed Funds funded by the D&O insurance carrier, and used by the Debtors, and that this $12,875,000, plus interest, is to be maintained for the benefit of the officers and directors of Point Blank and Point Blank in the event the Settlement is not finally approved.

WHEREFORE, for the reasons stated above, David H. Brooks respectfully requests this Court deny Debtors' request for approval of the Disclosure Statement. Alternatively, Brooks requests this Court require Debtors to revise the language in the Disclosure Statement as set forth above.

FOX ROTHSCHILD LLP

/s/ L. JASON CORNELL
L. JASON CORNELL (No. 3821)
919 N. Market Street, Suite 1300
P.O. Box 2323
Wilmington, DE 19899-2323
(302) 654 -7444
jcornell@foxrothschild.com

Attorneys for David H. Brooks

February 8, 2011