# EXHIBIT C

# 08-3860-cv

## United States Court of Appeals

### *for the*

## Second Circuit

D. DAVID COHEN,

*Intervenor-Appellant,*

– v. –

ALVIN VIRAY, Derivatively on Behalf of DHB Industries, Inc.,

*Plaintiff-Appellee,*

DAVID H. BROOKS, DHB INDUSTRIES INC, SANDRA HATFIELD, DAWN
M. SCHLEGEL, JEROME KRANTZ, GARY NADELMAN, CARY CHASIN,
BARRY BERKMAN, LARRY ELLIS, DAVID BROOKS INTERNATIONAL
INC., TERRY BROOKS, ELIZABETH BROOKS INTERNATIONAL INC.,
ANDREW BROOKS INTERNATIONAL INC., JEFFREY BROOKS,
TACTICAL ARMOR PRODUCTS, INC.

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE
## DHB INDUSTRIES, INC.

ERIC RIEDER
DAVID P. KASAKOVE
CHRIS M. LAROCCO
*Of Counsel*

BRYAN CAVE LLP
*Attorneys for Defendant-Appellee
DHB Industries, Inc.*
1290 Avenue of the Americas
New York, New York 10104
(212) 541-2000

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Defendant-Appellee DHB Industries, Inc. (now known as Point Blank Solutions, Inc.) hereby states, pursuant to Fed. R. App. P. 26.1, that it is a publicly held Delaware Corporation, that it has no parent corporation, and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iv

PRELIMINARY STATEMENT ................................................................... 1

COUNTER-STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .................................................................................................... 5

COUNTER-STATEMENT OF THE CASE ............................................... 8

    Nature Of The Case .......................................................................... 8

    Course Of Proceedings .................................................................. 10

        The District Court Preliminarily Approves The Settlement .... 11

        Only Eight Shareholders Object To The Settlement ............... 15

        The DOJ Appears Before The District Court ......................... 16

        The June 25, 2008 Hearing ................................................... 24

    Disposition Below ......................................................................... 28

    Other Pending Legal Proceedings ................................................. 29

COUNTER-STATEMENT OF FACTS ..................................................... 34

    A Company In Crisis ..................................................................... 34

    Settlement Negotiations ................................................................ 38

    The Settlement Terms ................................................................... 42

    Funding The Settlement ................................................................ 43

SUMMARY OF ARGUMENT .................................................................. 47

ARGUMENT ............................................................................................. 52

    COUNTER-STATEMENT OF STANDARD OF REVIEW ............ 52

POINT I      THE DISTRICT COURT DID NOT ABUSE ITS
DISCRETION WHEN IT APPROVED THE
SETTLEMENT................................................................. 52

    A.    The District Court Properly Applied The
Correct Standards When It Approved The
Settlement............................................................. 52

    B.    The District Court Properly Decided That
The Settlement Was Procedurally Fair................ 52

    C.    The District Court Properly Decided That
The Derivative Settlement Is Substantively
Fair....................................................................... 52

        1.    The Benefits Achieved By The
Settlement Weigh In Its Favor.................. 52

        2.    The Risks Of Continued Litigation
Outweigh The Likelihood Of Success....... 52

        3.    The Complexity, Expense And Likely
Duration Of The Litigation Weigh In
Favor Of Settlement.................................. 52

        4.    The Reaction Of The Shareholders To
The Settlement Weighs In Favor Of
Settlement................................................. 52

POINT II   THE SETTLEMENT DOES NOT VIOLATE
§ 304 OF THE SARBANES OXLEY ACT OR
PUBLIC POLICY........................................................... 52

    A.    The § 304 Argument Has Been Waived............. 52

    B.    No Deference Is Due The SEC's Position In
This Case As To § 304 ........................................ 52

    C.    The Indemnification In The Settlement Is
Not Prohibited By § 304(b) Because The
Statute Says Nothing About Indemnification...... 52

C055352/0202426/1546445.1

D.    The § 304 Indemnification In The
Settlement Does Not Violate Public Policy ........ 52

    1.    The Indemnification Is Retrospective,
Not Prospective  And Concerns
Settlement of Mature Claims .................... 52

    2.    Section 29(a) Further Supports The
304 Indemnification .................................. 52

    3.    The Totality Of Circumstances
Compels The Conclusion That The
Settlement Is In  Accordance With
Public Policy ............................................ 52

POINT III    THE DISTRICT COURT DID NOT ABUSE ITS
DISCRETION IN REJECTING THE FEE AND
EXPENSE APPLICATION OF COHEN'S
COUNSEL ............................................................. 52

CONCLUSION ............................................................. 52

C055352/0202426/1546445.1

# TABLE OF AUTHORITIES

## CASES

*Allianz Ins. Co. v. Lerner*, 416 F.3d 109 (2d Cir. 2005)...............47

*In re AOL Time Warner S'holder Derivative Litig.*, No. 02 Civ. 6302
    (SWK), 2006 WL 2572114
    (S.D.N.Y. Sept. 6, 2006) ...........................30, 33, 39, 42, 43

*Baker, Watts & Co. v. Miles & Stockbridge*, 876 F.2d 1101
    (4th Cir. 1989) .........................................................54

*Board of Governors of the Federal Reserve Sys. v. Dimension Fin.
    Corp.*, 474 U.S. 361 (1986)...........................................53

*Bogle-Assegai v. Connecticut*, 470 F.3d 498 (2d Cir. 2006),
    *cert denied*, 128 S. Ct. 1121 (2008) ...........................46, 47

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988)...........48

*Bunker Ramo-Eltra Corp. v. Fairchild Indus., Inc.*, 639 F. Supp. 409
    (D. Md. 1986) .........................................................59

*Catskill Mountains Chapter Of Trout Unlimited, Inc. v. City of New
    York*, 273 F.3d 481 (2d. Cir. 2001), *cert. denied*,
    549 U.S. 1252 (2007) ..................................................49

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) ...............................................47, 48

*Christensen v. Harris County*, 529 U.S. 576 (2000) ...................48

*City of Detroit v. Grinnell Corporation*,
    495 F.2d 448 (2d Cir. 1974) .........................................36

*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249 (1992).........52

*De La Mota v. U.S. Dep't of Education*, 412 F.3d 71
    (2d Cir. 2005) .........................................................49

C055352/0202426/1546445.1

*In re DHB Industries, Inc. Class Action Litig.*, No. 05-CV-04296
(E.D.N.Y Sept. 9, 2005) ...................................................... 6

*E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279 (2002) ................................ 52

*Eichenholtz v. Brennan*, 52 F.3d 478 (3d Cir. 1995).................................. 54

*In re Elan Sec. Litig.*, 385 F. Supp. 2d 363 (S.D.N.Y. 2005)...................... 63

*First Golden Bancorporation v. Weiszmann*, 942 F.2d 726
(10th Cir. 1991) .................................................................. 55

*In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436
(S.D.N.Y. 2004)............................................................... 42

*Globus v. Law Research Service, Inc.*, 418 F.2d 1276 (2d Cir. 1969),
*cert. denied*, 397 U.S. 913 (1970) .............................................. 28, 54

*Goodman v. Epstein*, 582 F.2d 388 (7th Cir.1978)................................... 60

*Greene v. United States*, 13 F.3d 577 (2d Cir. 1994) ................................ 48

*In re Host Am. Corp. Sec. Litig.*, No. 305-CV-01250 (VLB),
2008 WL 659579 (D. Conn. Mar. 07, 2008).............................. 32, 39

*In re Interpublic Sec. Litig.*, No. 02 Civ 6527 (DLC),
2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004) ................................ 32

*Korn v. Franchard Corp.*, 388 F. Supp. 1326 (S.D.N.Y. 1975) ........... 60, 61

*Krasner v. Dreyfus Corp.*, 90 F.R.D. 665 (S.D.N.Y. 1981) ...................... 33

*Lamie v. U.S. Tr.*, 540 U.S. 526 (2004)................................................. 50

*Lancer Offshore, Inc. v. Dominion Income Mgmnt. Corp.*,
No. 01 Civ. 4860 (LMM), 2002 WL 441309
(S.D.N.Y. Mar. 20, 2002)..................................................... 60

*Laventhol et al. v. Horwitch*, 637 F.2d 672 (9th Cir. 1980) ...................... 55

C055352/0202426/1546445.1

*M. Fortunoff of Westbury Corp. v. Peerless Ins. Co.*, 432 F.3d 127
    (2d Cir. 2005) ........................................................................ 48, 49

*Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358
    (S.D.N.Y. 2002)....................................................................... 39, 44

*Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co. of
    Chicago*, 834 F.2d 677 (7th Cir. 1987) ............................................. 37

*Mathes v. Roberts*, 85 F.R.D. 710 (S.D.N.Y. 1980)............................... 31, 33

*McLean v. Alexander*, 449 F. Supp. 1251 (D.Del. 1978),
    *rev'd on other grounds*, 599 F.2d 1190 (3d Cir. 1979) .............. 56, 57

*In re Merrill Lynch Focus Twenty Fund Inv. Co. Act Litig.*,
    218 F.R.D. 377 (E.D.N.Y. 2003), *aff'd sub nom., Scalisi v.
    Fund Asset Mgmt., L.P.*, 380 F.3d 133 (2d Cir. 2004)...................... 41

*In re Metropolitan Life Derivative Litig.*, 935 F. Supp. 286
    (S.D.N.Y. 1996).................................................................. 30, 31, 44

*Moseman v. Van Leer*, 263 F.3d 129 (4th Cir. 2001) .................................. 60

*In re Nortel Networks Corp. Sec. Litig.*,
    539 F.3d 129 (2d Cir. 2008) ...................................................... 46, 47

*Rattner v. Bidzos,* No. Civ. A. 19700, 2003 WL 22284323
    (Del. Ch. Oct. 7, 2003) ................................................................... 41

*Republic Nat'l Life Ins. Co. v. Beasley*, 73 F.R.D. 658
    (S.D.N.Y. 1977)....................................................................... 31, 33

*SEC v. David H. Brooks*, CV-07-61526 (S.D. Fla. Oct 25, 2007) ........ 10, 18

*SEC v. Dawn M. Schlegel and Sandra L. Hatfield*, CV-06-61251
    (S.D. Fla. Aug. 17, 2006) ................................................................ 17

*Srein v. Soft Drink Workers Union Local 812*, 93 F.3d 1088
    (2d Cir. 1996) .................................................................................. 61

C055352/0202426/1546445.1

*Stull v. Baker*, 410 F Supp. 1326 (S.D.N.Y. 1976)......................................... 33

*In re Sumitomo Copper Litig.*, 189 F.R.D. 274 (S.D.N.Y. 1999) .............. 43

*United States v. David H. Brooks & Sandra Hatfield*, CR-06-550
    (E.D.N.Y. Oct. 24, 2007)............................................................. 10, 17

*United States v. Dawn Schlegel and Sandra Hatfield*, CR-06-550
    (E.D.N.Y. Aug. 16, 2006) .................................................................. 17

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ..................................................... 43, 44, 47

*Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982)............................ 30, 31

*Weinberger v. Bankston,* No. Civ. A. 6336, 1987 WL 20182
    (Del.Ch. Nov. 19, 1987) ...................................................... 57, 58, 59

*White v. Auerbach*, 500 F.2d 822 (2d Cir. 1974).......................................... 63

*Young v. Katz*, 447 F.2d 431 (5th Cir. 1971)................................................ 36

C055352/0202426/1546445.1

# STATUTES AND OTHER AUTHORITIES

15 U.S.C. § 78cc(a)...................................................................... 59

15 U.S.C. § 7202(a)..................................................................... 48

15 U.S.C. § 7243(a).................................................................50-51

15 U.S.C. § 7243(b).............................................................49-50, 51

18 U.S.C. § 981(a)(1)(C) ............................................................ 18

28 U.S.C. § 1715.......................................................................... 7

28 U.S.C. § 1715(d)..................................................................... 8

28 U.S.C. § 2461(c) .................................................................. 18

Fed. R. Civ. P. 23.1.................................................................... 41

*Webster's II New Riverside University Dictionary*, 452, 621
    (Anne G. Soukhanov et al. eds., 1984)............................... 51

C055352/0202426/1546445.1

## PRELIMINARY STATEMENT

Defendant-Appellee DHB Industries, Inc., now known as Point Blank Solutions, Inc. ("DHB" or the "Company"), submits this brief in opposition to Intervenor-Appellant D. David Cohen's brief ("Cohen Br.") and in response to the Department of Justice's *amicus curiae* brief ("DOJ Br.").

This appeal seeks to unwind a significant settlement of class and derivative litigation against the Company and its former directors and officers which promises greatly to benefit the Company and its shareholders. The 2006 settlement enabled the Company to avoid bankruptcy, adopt important corporate governance reforms, install new management, and turn its full attention to rebuilding, freed from the burden of costly and time-consuming litigation that it could not afford. In addition, the Company's shareholders will recover approximately $35 million, plus additional stock in the Company.

The settlement, which resolves the derivative and class actions in tandem, was approved in July 2008 by the United States District Court for the Eastern District of New York ("District Court"). It was negotiated and agreed to by seventeen parties over the course of nine months, and was considered by the District Court in proceedings that extended for eighteen months. The settlement was reviewed and approved by a special committee

of DHB directors in the exercise of their independent business judgment on behalf of DHB. The settlement is also supported by the Company's shareholders. Out of 11,000 shareholders only eight objected to the settlement. No large institutional investors in the Company, of whom there were many, objected to the settlement. And only one shareholder, Cohen, is appealing the approval of the settlement.

Contrary to the contentions of Cohen and the DOJ, the District Court properly exercised its discretion when it approved the settlement, finding that it was "fair, just, reasonable and adequate...." (SPA-2).[1]

In seeking to unwind the settlement, Cohen and the DOJ pull out of context a single provision in which DHB agreed to indemnify Defendants–Appellees David H. Brooks ("Brooks"), DHB's founder and former CEO, and Dawn M. Schlegel ("Schlegel"), DHB's former CFO, from liability under § 304 of the Sarbanes-Oxley Act of 2002 ("SOX"), 15 U.S.C. § 7243, under which the SEC may seek reimbursement, for the benefit of a public company, of certain bonuses and profits of CEOs and CFOs. Cohen and the DOJ argue that the provision is either contrary to the text of SOX § 304(b)

---

[1]    References to "SPA-___" refer to pages of the Special Appendix.
References to "A-___" refer to pages of the Appendix.
References to "ADD-___" refer to pages of the Addendum to this Brief ("Addendum").

2

or against public policy. Both arguments fail and neither one provides a basis to unwind a settlement that will benefit both DHB and its thousands of shareholders without adverse effect on securities law deterrence.

A ruling in this case preventing indemnification of § 304 liability and reversing the District Court's approval of the settlement would inflict significant harm on DHB, its shareholders and class members. Conversely, the Stipulation of Settlement ("Stipulation") approved by the District Court has no effect on the government's ability to pursue forfeiture, restitution, fines, disgorgement and civil penalties from former executives, and would not in any sense encourage flouting the securities laws. Upending the settlement would therefore serve no practical purpose and benefit neither the parties nor the public.

## COUNTER-STATEMENT OF
## THE ISSUES PRESENTED FOR REVIEW

While Cohen and the DOJ list seven issues for review, there are in fact only four issues for review.

1.     Did the District Court abuse its discretion in approving "the Stipulation and Settlement in all respects" and finding that the settlement of the derivative action was "fair, just, reasonable and adequate as to each of the Settling Parties"? (SPA-2).

2.    Did the District Court abuse its discretion when it approved a settlement of a class action and derivative action, which included a provision in which a public company agreed to indemnify its former CEO and CFO against any liability under § 304 of the Sarbanes-Oxley Act of 2002, and to pay to them an amount equal to any payment made by them to the Company pursuant to that section, where: the agreement to indemnify was made only with respect to <u>past</u> alleged conduct and was entered into <u>after</u> the alleged violations had occurred; the indemnification was provided in consideration of one of the indemnitees providing substantial monies to enable the Company to fund the settlement; the settlement was approved by an independent board committee; the class and derivative litigation threatened to bankrupt the company; and the indemnification has no effect on any of the government's direct remedies?

3.    Did the District Court abuse its discretion in approving the $300,000 fee and expense application of derivative plaintiff's counsel, given the benefits accruing to the Company from the settlement?[2]

---

[2]    We leave it to Derivative Plaintiff's counsel to argue in support of the District Court's award to them.

C055352/0202426/1546445.1

4.    Did the District Court abuse its discretion in rejecting the fee and expense application of Objector-Cohen's counsel, given that Cohen did not in any way improve the settlement of the derivative action?

## COUNTER-STATEMENT OF THE CASE

### Nature Of The Case

This appeal challenges the District Court's Final Judgment and Order of Dismissal of Derivative Action with Prejudice ("Judgment"), which approved the settlement of a consolidated derivative action and a related consolidated class action against DHB and individual defendants. (SPA-1-7). The derivative action alleged breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment against DHB, as the nominal defendant, individual officer and director defendants, and others. (A-129-226).

The parties' settlement of the derivative action was embodied in a single Stipulation that also included the settlement of the class action brought against DHB and individual defendants alleging violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934. (A-444-744). (The settlement of both actions pursuant to the Stipulation is referred to as the "Settlement"). Under the Settlement, DHB implemented significant corporate governance reforms, certain officers and directors of the Company

resigned, and the class members are to receive approximately $35 million and additional stock in the Company. (A-455-457; A-460-468).

## Course Of Proceedings

This case began in September 2005 with the filing of a series of complaints styled as class actions. (*See In re DHB Industries, Inc. Class Action Litig.*, No. 05-CV-04296 (E.D.N.Y Sept. 9, 2005)).[3] At about the same time, a series of related derivative actions was also filed. (A-40-70; A-125). In January 2006, the District Court consolidated the class actions and the derivative actions (A-124-128; ADD-22-23 at entry #69), and on March 20, 2006, a consolidated complaint was filed in each action. (A-129-226; Addendum at entry #80). In May 2006, the defendants filed motions to dismiss both consolidated complaints. (A-228-394; ADD-29-34 at entries #96, 97, 105, 107, 111, 116-118, 121-122). Because of settlement discussions taking place among the parties, the District Court did not decide the motions, but instead held them in abeyance to permit the discussions to proceed. (A-23 at entry #97, ADD-36 at entry #130). On July 19, 2006, the parties disclosed that they had signed a Memorandum of Understanding ("MOU") reflecting an agreement in principle to settle both the derivative

---

[3] The Civil Docket for *In re DHB Industries, Inc. Class Action Litig.*, of which this Court may take judicial notice, appears in the Addendum at ADD-1-71.

and class actions; this agreement was to be embodied in the Stipulation. (A-441).

### The District Court Preliminarily Approves The Settlement

On December 15, 2006, lead class plaintiffs and derivative plaintiff filed the Stipulation and Exhibits and their motions for preliminary approval of the Settlement, resolving both the class and derivative actions. (A-745-802; ADD-39-40 at entries #161, 162).

The District Court held a preliminary approval hearing on January 19, 2007, at which both parties and non-parties to the Settlement, including Cohen, were heard. (A-950-1019). On February 9, 2007, at the request of various defendants, the District Court permitted the motion for preliminary approval to be withdrawn, in order to permit notice of the Settlement to be sent to the Attorney General of the United States ("Attorney General") and appropriate state governmental agencies under the Class Action Fairness Act ("CAFA"), which provides for notice to government officials of certain class action settlements so as to allow them an opportunity to comment. 28 U.S.C. § 1715. (ADD-46 at entry #215). Accordingly, on March 12 and 13, 2007, the Stipulation and new motions for preliminary approval were filed. (A-28 at entry #140; ADD-47 at entries #227, 228). On March 21, 2007, Defendants served the CAFA notification on the Attorney General and

appropriate state agencies in 50 states and the District of Columbia. (ADD-48 at entry #238). Under CAFA, notified officials have 90 days to comment before a court may issue a judgment on a settlement. 28 U.S.C. § 1715(d).

On May 29, 2007, following extensive briefing, the District Court held a second preliminary approval hearing. (A-1045-1085). The District Court heard argument from all parties and from non-parties, including Cohen. On July 3, 2007, well after the 90 days for comment provided by CAFA, the District Court issued an order preliminarily approving the Stipulation and the Settlement of both actions, ordering that a final fairness hearing be held on October 5, 2007 on the settlement of both actions, and providing that appropriate notice be given to shareholders and putative class members, so that those non-parties would have an opportunity to appear at the fairness hearing to object provided that they filed written objections with the District Court by September 21, 2007. (A-1205-1213; ADD-51 at entry #265).

Only Eight Shareholders Object To The Settlement

Of some 11,000 DHB shareholders, only eight shareholders (including Cohen), purporting to hold .06% of DHB's common stock, filed written objections to the Settlement. (A-1417, 1422-1442). DHB's largest shareholders did not object to the Settlement. Notably, Harbinger Capital

Partners ("Harbinger"), DHB's second largest shareholder, which held approximately 16.6% of outstanding shares, did not object. (A-1402, 1408-1409). Harbinger had appeared at the May 2007 preliminary approval hearing, expressed particular concern about the derivative settlement, and sought changes in the notice of pendency, which were accepted by the parties and implemented. (A-1059-1076; A-1251-1252). But it, like DHB's other institutional investors, such as Fidelity, Charles Schwab, Nationwide, ING and CALPERS, did not object to the Settlement. (A-1790).

### The DOJ Appears Before The District Court

No governmental agency notified under CAFA responded within the 90-day statutory deadline. Nor did any agency—including the DOJ or SEC—file objections by the September 21, 2007 deadline under the District Court's order. However, on October 4, 2007, one day before the scheduled final fairness hearing, the DOJ Office of Commercial Litigation petitioned the District Court for an "extension" of its time pursuant to CAFA to evaluate the Settlement, and further requested that the District Court not issue a final decision concerning the fairness of the proposed Settlement until 45 days after the October 5, 2007 hearing, during which time the DOJ could lodge objections, if any, to the Settlement. (A-1496-1498). The DOJ did not express a view concerning the Settlement at the October 5th hearing

other than to state its request for 45 days to determine its position. It made clear it was not requesting the District Court to postpone the hearing, but rather was asking the Court not to decide whether to approve the Settlement before the 45 days expired. (A-1502-1507).

The District Court granted the DOJ's request. (A-1663). Thereafter, on October 25, 2007, Brooks and Defendant–Appellee Sandra Hatfield, former DHB Chief Operating Officer ("Hatfield"), were indicted in the Eastern District of New York, superseding a prior indictment of Schlegel and Hatfield; Brooks also was charged by the SEC in a civil enforcement proceeding in the Southern District of Florida. *See respectively,* Superseding Indictment in *United States v. David H. Brooks & Sandra Hatfield*, CR-06-550 (E.D.N.Y. Oct. 24, 2007),[4] Complaint in *SEC v. David H. Brooks*, CV-07-61526 (S.D.Fla. Oct. 25, 2007).[5]

On November 19, 2007, the DOJ Office of Commercial Litigation, identifying itself as *amicus curiae* in the class and derivative litigations, submitted a Motion For Leave To File Objections To Proposed Settlement (which was granted by the District Court (A-1736)) and its Objections To

---

[4]  The Superseding Indictment in *United States v. David H. Brooks & Sandra Hatfield*, of which this Court may take judicial notice, appears in the Addendum at ADD-72-142.

[5]  The Complaint in *SEC v. David H. Brooks*, of which this Court may take judicial notice, appears in the Addendum at ADD-143-174.

C055352/0202426/1546445.1

The Proposed Settlement. (A-1737-1744). The DOJ made two principal objections. First, it expressed concern that the Settlement, which included releases of defendants, might be construed to interfere with the United States' remedies, including those seeking restitution, in the criminal proceeding against Brooks, Schlegel and Hatfield. In order to rectify this issue, the DOJ proposed that language be added to the Settlement providing that "nothing contained in this Settlement is intended to limit the United States' ability to pursue forfeiture, restitution or fines in any criminal, civil or administrative proceeding." (A-1738). Second, the DOJ contended that indemnification under § 304 was contrary to public policy and would undermine pending and potential actions brought by the SEC against Brooks and Schlegel under § 304. (A-1739-1741).

The parties submitted responses to the DOJ's objections. (A-1710-1735). DHB, while not disagreeing with the substance of the proposed language concerning non-interference with governmental remedies, stated that such language was unnecessary because the Settlement "does not, and cannot, release any claims that the U.S. Attorney or the Securities and Exchange Commission might bring." (A-1718). DHB focused most of its seven-page brief responding to the DOJ's objections to the § 304 indemnification. (A-1718-1721). In addition to DHB, six other parties

disagreed with the DOJ's objection concerning § 304. (A-1712-1714; A-1726; A-1733-1734).

Yet, despite this disagreement on § 304, in its December 10, 2007 Reply to Responses to Objections to the Proposed Settlement, the DOJ did not respond at all to the parties' responses concerning the § 304 indemnification. Rather, the DOJ focused exclusively on its request that the Settlement include language protecting the government's pursuit of forfeiture, restitution or fines. (A-1754-1756).

In its Sur-Reply Memorandum, dated December 14, 2007, DHB noted that the DOJ's Reply was confined to the single issue concerning the protection of the government's remedies to pursue forfeiture, restitution or fines. DHB stated that it did not object to the DOJ's proposed modification of the Settlement addressing this single issue. (A-1757-1760). On December 26, 2007, the United States Attorney for the Eastern District of New York submitted a letter to the District Court joining in that portion of the DOJ's objections seeking the insertion of additional language "plainly stating that nothing in the settlement agreement is intended to limit the settling class members' rights to restitution arising out of any criminal proceeding." (A-1763). The U.S. Attorney's letter did not raise any objection to the § 304 provision of the Settlement.

C055352/0202426/1546445.1

In early January 2008, Defendants–Appellees Jerome Krantz, Gary Nadelman, Cary Chasin, and Barry Berkman, all former outside directors of DHB, filed a letter with the District Court stating that they also did not object to modification of the Settlement to include the language proposed by the DOJ. (A-1766). Brooks also filed a letter stating he agreed to this language, but conditioned his agreement on the inclusion of additional language making clear that the provision of the Settlement concerning the § 304 indemnification "shall remain in full force and effect." (A-1764-1765).

Thus, although DHB's Sur-Reply specifically noted that the only remaining objection of the DOJ addressed its concern about preserving the government's remedies of forfeiture, restitution or fines, and Brooks sought to explicitly preserve the § 304 indemnification, the DOJ never submitted any response to these filings seeking to maintain its objection to the § 304 indemnification or opposing the language preserving that indemnification proposed by Brooks. Likewise, the SEC never communicated with any of the parties, never filed a letter with the District Court, and never otherwise objected to the § 304 indemnification provision.

C055352/0202426/1546445.1

## The June 25, 2008 Hearing

Six months later, on June 25, 2008, the District Court held a final hearing. In addition to the parties, Cohen and the DOJ Office of Commercial Litigation appeared, as did Lena Bedik, then an objector to the class action settlement, and a Shareholders Committee purporting to represent six additional objectors to the Settlement. (A-1774-1776).

Also attending was an Assistant U.S. Attorney from the Eastern District of New York, where Brooks, Schlegel, and Hatfield were under indictment. The prosecutor, however, did not express a view on the Settlement and stated to the District Court that he was "observing but not appearing." (A-1777).

At this June 25, 2008 hearing, consistent with the December 2007 and January 2008 exchange among the parties, the DOJ and the U.S. Attorney, the parties agreed to modify the Stipulation to address the concerns of the DOJ and the United States Attorney, by including language preserving the government's right "to pursue forfeiture, restitution, or fines in any criminal, civil or administrative proceeding, except that Paragraph 4.7 of this Stipulation [concerning § 304] shall remain in full force and effect." (A-1777-1778; SPA-6 at § 12).

Given this modification of the Settlement, and the DOJ's failure to address § 304 in its Reply or object to the additional language proposed by Brooks, the District Court was under the impression that the DOJ would withdraw its § 304 objection. (A-1777-1778). But when Judge Seybert asked the DOJ to confirm this, the DOJ stated that it was not withdrawing its objection to the § 304 indemnification. (A-1778).

In light of the DOJ's six months of silence on the § 304 indemnification, including its failure to include any discussion of this provision in its Reply Brief, counsel for Lead Plaintiff and Brooks both argued that the DOJ had either withdrawn or waived this objection. (A-1779-1781). Addressing why the DOJ had not addressed § 304 in its Reply, its counsel said that, "we did not need to respond ... because there is simply no case law concerning the issue of 304." (A-1782).

When the District Court indicated that the DOJ might have waived its § 304 objection, the DOJ then offered to file a sur-reply. The District Court rejected this request, noting that the case was three years old, that the parties had initially worked out a settlement within six to nine months, and that "I permitted the government to come in on a Johnny-come-lately basis ..." (A-1783). The District Court further noted that the SEC had never appeared in the case and asked the DOJ why the SEC was not present in Court if the

15

§ 304 indemnification was of such concern. (A-1784). In response, counsel for the DOJ said, for the first time, that the SEC "chose the commercial litigation branch as their representative." (A-1784). The District Court then gave the DOJ, and the parties, further opportunity to address the DOJ's objection to the § 304 indemnification (A-1784-1788), and based on the parties' papers and oral argument, ultimately ruled that there was no basis to sustain the DOJ's objection concerning § 304. (A-1788).

**Disposition Below**

On July 8, 2008, the District Court entered the Final Derivative Judgment and Class Action Judgment approving the Settlement and Stipulation and dismissing the derivative and class actions with prejudice. (SPA-1-7). Cohen filed a timely notice of appeal on August 6, 2008. (A-1814-1815).

The DOJ filed a notice of appeal in the derivative action on September 5, 2008, 59 days after entry of the judgment. DHB moved to dismiss the appeal on the ground that it was untimely. Subsequently, the DOJ moved to withdraw its appeal and indicated that it would, instead, file a brief as *amicus curiae*.

C055352/0202426/1546445.1

## Other Pending Legal Proceedings

Both the criminal and SEC proceedings against Brooks, Schlegel and Hatfield are still pending. Originally, on August 16, 2006, criminal indictments were filed against Schlegel and Hatfield in the Eastern District of New York, charging them with securities fraud and conspiracy, in which the government also sought criminal forfeiture. *See* Indictment in *United States v. Dawn Schlegel and Sandra Hatfield*, CR-06-550, (E.D.N.Y. Aug. 16, 2006). On August 17, 2006, the SEC filed a civil complaint against Schlegel and Hatfield in the District Court for the Southern District of Florida, alleging securities fraud under § 10(b) of the Exchange Act, in which the SEC sought disgorgement of all ill-gotten gains from each of them along with applicable civil penalties. Contrary to Cohen's contention (Cohen Br. at 5, 25, 27), that complaint does not mention § 304 at all. *See* Complaint in *SEC v. Dawn M. Schlegel and Sandra L. Hatfield*, CV-06-61251 (S.D.Fla. Aug. 17, 2006).

As noted above, the October 25, 2007 indictment of Brooks and Hatfield superseded the August 16, 2006 indictment of Schlegel and Hatfield. The superseding indictment charged Brooks with nineteen counts, including securities fraud and insider trading under § 10(b), mail and wire fraud. *See* Superseding Indictment in *United States v. David H. Brooks &*

*Sandra Hatfield*, CR-06-550 (E.D.N.Y. Oct. 24, 2007) (ADD-71-142). In addition to the threat of criminal restitution, the superseding indictment states that the government will seek criminal forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) for a sum of money equal to at least approximately $190,604,894, as well as all right, title and interest in a significant number of Brooks' assets. (ADD-137-141).

At the same time as the superseding indictment, on October 25, 2007, the SEC filed a civil complaint against Brooks in the Southern District of Florida. *See* Complaint in *SEC v. David H. Brooks*, CV-07-61526 (S.D.Fla. Oct. 25, 2007) (ADD-143-174). The SEC Complaint asserts nine securities law violations under § 10(b) and Rule 10b-5. (ADD-167-172). As relief for the § 10(b) violations, it seeks an order "requiring [Brooks] to disgorge all ill-gotten gains, including prejudgment interest, resulting from the violations alleged in [the] Complaint," including $186 million in proceeds from the alleged insider trading. It also seeks civil penalties pursuant to §§ 21(d)(3) and 21A of the Exchange Act. (ADD-173). The SEC Complaint asserts no separate cause of action under § 304; rather, as an alternate form of relief to the other remedies sought, the SEC asks the court to "Issue an Order directing Defendant to repay bonuses and stock profits, pursuant to 304 []." (ADD-173). The SEC's civil action against Brooks has been stayed pending

18

disposition of the criminal charges against him, as have the SEC civil proceedings against Schlegel and Hatfield.

As set forth by the United States Attorney, the government has restrained approximately $180 million of Brooks' assets, including the 6,757,099 shares of DHB stock that Brooks received in connection with the stock transactions that helped fund the Settlement (*see infra*), and expects that additional assets of Brooks' may be available for restitution should there be a conviction. (A-1761-1763). The criminal trial against Brooks and Hatfield is scheduled for January 2010. As the District Court indicated, if the government successfully prosecutes its criminal case against Brooks, there will be little left "of any civil litigation." (A-1783).

## **COUNTER-STATEMENT OF FACTS**

### **A Company In Crisis**

DHB, a Delaware corporation whose principal offices are located in Pompano Beach, Florida, manufactures various types of body armor and other bullet and projectile resistant garments. It sells primarily to the United States military and law enforcement agencies. (A-1365).

At the time of the negotiations that culminated in the signing of the MOU in July 2006, the Company was in a highly vulnerable state. It was doubtful whether DHB would be able to survive, and very likely that, if the

derivative and class actions were not settled, the Company would be forced into bankruptcy. (A-1347).

The Company's crisis began in August 2005, when it announced that it had ceased production of its product made from the material Zylon after the National Institute of Justice revoked its previous certification of products manufactured by DHB and others containing Zylon, and that it would be taking a $60 million charge against earnings. DHB's stock price dropped almost immediately from $6.90 to $4.50 per share. Also, at this time the SEC was undertaking an investigation of DHB, focusing on certain related party transactions and executive compensation matters regarding the Company and Brooks. (A-1347).

In the wake of the Zylon announcement, Hatfield, then DHB's Chief Operating Officer, resigned. On March 31, 2006, the Company disclosed that, as a result of the identification of certain adjustments of inventory, investors should no longer rely on DHB's previously issued interim financial statements for 2005. On April 7, 2006, Schlegel, then DHB's CFO, resigned and left the Board. Less than two weeks later, DHB announced it had received a notice of default under a Loan Agreement with its principal lender. (A-1348).

The drumbeat of adverse news continued. On May 25, 2006, the Company received a "Wells Notice" that SEC staff had preliminarily determined to recommend that the SEC bring an enforcement action against DHB for alleged violations of the antifraud, reporting, and books and records provisions of the Exchange Act. On June 26, 2006, the Company received a notice of delisting from the American Stock Exchange due to the Company's inability to file its quarterly report on Form 10-Q. On July 6, 2006, the Company's stock plummeted to less than $1.00 per share. (A-1348).

In response, the Company took action to restore confidence in DHB and its leadership. On July 8, 2006, the Board of Directors placed Brooks on paid administrative leave, and formed an Executive Committee that did not include Brooks. (A-1348). The full powers of the Board were delegated to the Executive Committee in order to enable it to deal with the many issues confronting the Company. That same day, General Larry Ellis, a retired four-star general from the United States Army who had joined the Board in 2004, was named acting CEO, and Senator William Campbell, a retired longtime California State Senator who joined the Board on May 9, 2006, was named Chairman of the Board. (A-1348).

## Settlement Negotiations

In the class and derivative actions, extensive arm's length settlement discussions began in March 2006 and lasted several months. Those discussions culminated in a draft MOU setting forth the terms of the proposed Settlement. (A-1348-1351). On July 8, 2006, the Executive Committee appointed a Special Committee to review the terms of the draft MOU and determine whether the proposed Settlement was in the best interests of DHB and its shareholders. The Special Committee consisted of Senator Campbell and General Ellis, who were each picked based on the Executive Committee's determination that they were not self-interested parties and were best able to render an independent decision concerning the advisability of entering into the Settlement. Neither Senator Campbell nor General Ellis had sold any DHB stock during the proposed class period. Senator Campbell was not named as a defendant in either action. General Ellis was a defendant in the derivative action because he was a director at the time, but it is not alleged that he personally engaged in any misconduct. (A-1349).

Upon being presented with the draft MOU, Senator Campbell and General Ellis each consulted independent counsel that had no prior ties to the Company or any of the defendants in the actions. They also consulted

the Company's counsel that had represented DHB in the negotiations. The Special Committee's deliberations and review of the MOU were intense and focused. (A-1350). Senator Campbell and General Ellis, with the advice of their respective independent counsel, considered, among other factors: the complexity, expense and likely duration of the litigation; the likelihood of success in defending against the actions; the potential damages (which could have exceeded $100 million); the inability of the Company to withstand such a judgment; the reasonableness of the proposed Settlement in light of this possible recovery; various ways to fund the Settlement that would most benefit the Company and its shareholders; and the negative effect the litigation would likely have on the Company's ability to operate. (A-1350).

A key concern was that if the litigation continued, DHB's ability to turn itself around would be imperiled. (A-1351). Thus, the Special Committee, after careful consideration and in the exercise of its business judgment, concluded that settlement of the actions was in the best interests of the Company and its shareholders, especially because it did not involve any out-of-pocket expenditure by DHB. (A-1350-51). The Special Committee concluded further that entering into the Settlement was its only reasonable course, enabling the Company to devote its full attention to business operations and avert financial disaster. (A-1351).

23

## The Settlement Terms

As is often the case in such lawsuits, the MOU provided for resolution of both the derivative and class actions: the derivative action was to be settled in consideration of DHB's adoption of important corporate governance reform provisions (A-460-467) and the payment of $300,000 for lead derivative counsel's fees and expenses (A-455); and the class action was to be settled for a payment to the class of $34.9 million in cash and 3,184,713 shares of company stock. (A-455-456). As additional settlement consideration, Brooks agreed to resign from the Board of Directors of DHB and from all other positions held by him in DHB and agreed to a five year ban on his employment by the Company or service on the Board. (A-467-468). The other individual defendants on the Board of Directors during the period in question, except for General Ellis, also agreed to resign and to submit to a five-year ban on their employment by the Company or service on the Board. (A-468).

## Funding The Settlement

DHB did not have the financial resources to contribute cash to the Settlement. Some amount would be available under the directors and officers insurance policy, but it was clearly not enough to meet plaintiffs' demands. (A-1351-1352). While it had been hoped that a private equity

firm would make an investment in DHB and thereby provide cash to fund a resolution, that prospect fell through. Only one additional source of cash remained: Brooks. He agreed to enter into certain transactions in which he would receive unregistered Company shares in exchange for cash that the Company could then use to fund approximately $22 million of the Settlement. The balance of the cash portion of the Settlement would be provided from insurance, and the Company agreed to provide additional consideration in the form of stock. (A-1351-1352).

In the Settlement transactions with the Company, Brooks paid a premium in exchange for the shares he received. The transactions involved two separate components, a Warrant Exercise Agreement and a Securities Purchase Agreement. In the warrant transaction, Brooks exercised, on an accelerated basis, warrants already held by him at a price of $2.50 per share, although the strike price was $1 per share, thus paying a premium over the strike price. Under the Securities Purchase Agreement, Brooks entered into a private placement with the Company under which he purchased unregistered stock at a premium price of $4.93. The MOU was negotiated during early July 2006, when the Company's stock was trading in the range of $0.85 to $1.50, and was signed by the Company on July 12, when the stock price was $1.45. (A-1352).

25

As is typical in a settlement transaction, in return for his agreement to fund the Settlement, Brooks sought finality and required that DHB and the class and derivative plaintiffs release him from any claims arising out of his past alleged conduct as an officer and director of the Company. (A-1352).

Potential liability under § 304, however, presented a particular problem, because any claim under the statute was thought to be controlled by the SEC, but payable to the Company. Brooks asked for a release by the Company of § 304 liability, in the event that courts held that a company had a private right of action under that statute. But since it was viewed as most likely that such a claim could be asserted only by the SEC, and thus the Company's release would have no effect, Brooks further insisted that DHB indemnify him and Schlegel for any liability under § 304. (A-1779-1780). Since the § 304 award would go to benefit the Company, the Special Committee deemed it appropriate to consider this request, and the indemnification for past alleged conduct was ultimately included in the Stipulation. (A-453 ¶ 1.27; A-471 ¶ 4.7).

## SUMMARY OF ARGUMENT

The District Court properly exercised its discretion when it approved the Settlement. The Settlement, approved by a Special Committee of DHB Directors in the exercise of its business judgment and the result of arm's

length negotiation between the parties, is procedurally fair. The Settlement is also substantively fair, greatly benefiting the Company and its shareholders. Under the Settlement, the Company avoided bankruptcy in 2006, adopted important governance reforms, and installed new management. The shareholders will benefit by receiving approximately $35 million and Company stock.

Cohen and the DOJ's challenges to the § 304 indemnification do not provide a basis to reverse the District Court's judgment approving the Settlement. As a threshold matter, the argument that the § 304 indemnification is contrary to the text of § 304(b) fails because it was never raised before the District Court, and has therefore been waived. Even if considered, the textual argument lacks merit because it is unsupported by the text of the statute: § 304 (b) states only that the SEC may "exempt" corporate executives from a § 304 reimbursement duty, but it contains no reference to whether parties, as part of a settlement of mature claims, may agree to indemnify a CEO or CFO for liability under the statute. It contains no reference to indemnification at all. If Congress had wanted to prohibit indemnification or otherwise restrict what issuers such as DHB could do with their proceeds from a § 304 reimbursement it could readily have done

so, but it did not. Contrary to Cohen's suggestion, there is no basis for a court to rewrite § 304.

The Settlement is not against public policy. This argument has also been waived. Further, the authority relied on by Cohen and the DOJ stands for the principle that indemnification of securities law liability is contrary to public policy under "circumstances [that] would encourage flouting the policy of the common law and the Securities Act." *Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1288 (2d Cir. 1969), *cert. denied*, 397 U.S. 913 (1970). That principle has been applied to <u>anticipatory</u> indemnifications, such as underwriter-issuer agreements, where the indemnification would give an underwriter a "free ticket" at the outset of its work to commit fraud or ignore legal duties. That principle has no application to the circumstances of this case, where a company agreed to indemnify parties for alleged <u>past</u> conduct by giving up a benefit it might receive in the future in exchange for cash it needed at the time of settlement.

This Settlement was also approved by an independent board committee, was critical to saving the Company, and has no effect on any of the government's direct remedies (e.g., criminal and SEC civil enforcement actions under § 10(b) of the Exchange Act and various criminal statutes). These are not circumstances where the indemnification would provide a

"roadmap" to other CEOs and CFOs in the future and encourage the flouting of the securities laws. (DOJ Br. at 24-25). The position set forth by Cohen and the DOJ not only ignores these critical distinctions, but also ignores the strong public policy supporting the settlement of securities litigation.

Finally, the District Court properly exercised its discretion when it rejected the fee and expense application of Cohen's counsel on the ground that Cohen's objections did not improve the Settlement in any regard.

## ARGUMENT

## COUNTER-STATEMENT OF STANDARD OF REVIEW

Contrary to Cohen's contention that the standard of review is *de novo* with respect to whether the District Court erred in approving the Settlement that included an indemnification under § 304 (Cohen Br. at 6), this Court should apply an abuse of discretion standard as to <u>all</u> of the issues raised on this appeal. As fully discussed below, although this case does concern a provision of SOX that has not been the subject of extensive precedent, the basic issues raised - - whether parties in settling mature claims may provide an indemnification for past conduct and whether such a settlement encourages flouting of the law - - are not new or novel, and involve questions that have been decided in both securities law and various other litigation contexts. Further, the issue of whether the indemnification

29

provision involved here is against public policy entails consideration of the particulars of a settlement and thus necessarily involves the exercise of a court's discretion.

## POINT I

## THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT APPROVED THE SETTLEMENT

Cohen argues that the District Court abused its discretion, and committed reversible error, when it approved the Settlement and found that it was both substantively and procedurally fair. (Cohen Br. at 40). As set forth below, the District Court properly exercised its discretion in approving the Settlement.

It is well-established that public policy favors settlement of litigation, including derivative actions. *See In re Metropolitan Life Derivative Litig.*, 935 F. Supp. 286, 291 (S.D.N.Y. 1996) ("Public policy, of course, favors settlement.") (citing *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982)). As this Circuit has long recognized, "[t]here are weighty justifications, such as the reduction of litigation and related expenses, for the general public policy favoring the settlement of litigation." *In re AOL Time Warner S'holder Derivative Litig.*, No. 02 Civ. 6302 (SWK), 2006 WL 2572114, at *3 (S.D.N.Y. Sept. 6, 2006) (citing *Weinberger,* 698 F.2d at 73). "Moreover, because shareholder derivative actions are 'notoriously difficult

and unpredictable, ... settlements are favored." ' *Id.* (quoting *Mathes v. Roberts*, 85 F.R.D. 710, 713 (S.D.N.Y. 1980).

## A.  The District Court Properly Applied The Correct Standards When It Approved The Settlement

The standards for whether to approve the proposed settlement of a class action or derivative suit are well established. "The central question is whether the compromise is fair, reasonable and adequate." *In re Metropolitan Life Derivative Litig.*, 935 F. Supp. at 291 (citing *Weinberger*, 698 F.2d at 73). The court must also be satisfied that a derivative settlement "fairly and adequately serves the interests of the corporation on whose behalf the derivative action was instituted." *Mathes*, 85 F.R.D. at 713 (quoting *Republic Nat'l Life Ins. Co. v. Beasley*, 73 F.R.D. 658, 667 (S.D.N.Y. 1977)).

Cohen contends that the District Court erred by failing to consider the derivative action settlement on its own merits. This argument is flatly contradicted by the record. It is true that the derivative action and the class action were settled as part of a single Settlement, pursuant to a Stipulation that expressly provided that the finality of the settlement of each action was dependent on the finality of the settlement of the other.[6] (A-445; A-477-478

---

[6] Cohen suggests that the joint settlement of class and derivative litigation is somehow irregular, but there is no basis for this

at ¶¶ 7.1 and 7.2). However, Judge Seybert considered the settlement of the derivative action on its own terms, as well as in context with the class action settlement, and made numerous specific findings concerning the derivative action. At the June 2008 hearing, the District Court noted the fact that only eight of 11,000 current shareholders opposed the Settlement. (A-1789-1790). Judge Seybert further observed that "one of the largest shareholders, Harbinger Capital Partners, who appeared at the preliminary hearing ..." and expressed concerns solely about the settlement of the derivative action, "have not objected to the settlement." (A-1790). In addition, Judge Seybert specifically considered and responded, point by point, to each of the objections raised about the derivative action settlement by Cohen and the

---

suggestion. Class and derivative actions are typically settled together. Further, as Cohen's own cited case law demonstrates (Cohen Br. at 34-35), it is not unusual for a class action to be settled primarily through a significant payment to the class members, and for a derivative action to be settled primarily through the implementation of corporate governance changes. For example, in *In re Host Am. Corp. Sec. Litig.*, No. 305-CV-01250 (VLB), 2008 WL 659579 (D. Conn. Mar. 07, 2008), cited by Cohen, the class action was to be settled by a $2.45 million payment to the class, and the derivative action was to be settled by the implementation of corporate governance changes. The district court approved the settlement over the objections of a shareholder who contended that the settlement should be rejected unless the shareholders received money damages from the corporation's directors. *Id.* at *2; *see also In re Interpublic Sec. Litig.*, No. 02 Civ 6527 (DLC), 2004 WL 2397190, at *4-5 (S.D.N.Y. Oct. 26, 2004) (also cited by Cohen).

C055352/0202426/1546445.1

other objecting shareholders. (A-1794-1801). In denying their objections, Judge Seybert specifically addressed the very issues that Cohen raises in Point II of his brief. Thus, it cannot be maintained that the District Court failed to assess separately the fairness of the derivative action settlement.

In considering fairness for derivative action settlements, the District Court looked to both the negotiating process that produced the settlement (i.e., procedural fairness), as well as the settlement's substantive terms.[7] *See In re AOL Time Warner S'holder Derivative Litig.*, 2006 WL 2572114 at *2 (citations omitted).

---

[7] The court's function "is not to substitute [its] business judgment for that of the negotiators who bargained at arm's length, but only to insure that the arrangement is not so unfair as to require disapproval." *Krasner v. Dreyfus Corp.*, 90 F.R.D. 665, 666-67 (S.D.N.Y. 1981) (citation omitted). Moreover, in a derivative action, the good faith business judgment of independent directors exercised in the best interests of the company and its shareholders is entitled to deference and is an appropriate ground for approval of a settlement. *Republic Nat'l Life Ins.*, 73 F.R.D. at 668 (citing *Stull v. Baker*, 410 F. Supp. 1326 (S.D.N.Y. 1976)). The Court's role in passing upon the fairness, reasonableness, and adequacy of the settlement is "limited to the extent that its business judgment is not to be substituted for that of the parties who worked out the settlement [;] . . . the only question . . . is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval." *Mathes*, 85 F.R.D. at 713.

**B.     The District Court Properly Decided
         That The Settlement Was Procedurally Fair**

Cohen contends that the District Court erred when it approved the

Settlement because the parties failed to demonstrate that the Settlement was

the product of arm's length negotiations, or that DHB had gained sufficient

information through discovery to be able to make a knowledgeable decision.

(Cohen Br. at 39-40).  However, as was made clear at the final hearing, the

District Court fully considered and correctly rejected these unsupported

contentions.  (A-1795).

The District Court found the Settlement was the product of arm's

length negotiations (A-1793), stating that, with respect to "[t]he early stages

of this proceeding, there certainly has been sufficient evidence that this has

been an arm's length negotiation." (A-1795).  The lead derivative plaintiff

and the lead class plaintiffs were separately represented, as were DHB,

Brooks, and the other defendants.  Negotiations between the adverse counsel

from March through July 2006 culminated in the MOU.  (A-1346-1351).

There were also subsequent negotiations through November 2006 to

implement the transactions to fund the Settlement and to draft and execute

the Stipulation.  (A-1552-1553).

The District Court also found there was no evidence supporting

Cohen's assertions that Brooks dictated the terms of the Settlement, and that

34

the Company did not act independently when it entered into the Settlement. (A-1795). To the contrary, as the District Court noted, the record reflected that the Settlement was approved on behalf of DHB by the Special Committee after Brooks was put on leave. (A-1348-1350). In the proper exercise of its business judgment, the Special Committee subjected the Settlement to careful review and consideration. The vote removing Brooks from his position as CEO of DHB further undercuts Cohen's argument that there was not a "truly independent disinterested body" that reviewed the proposed Settlement on DHB's behalf, since the Executive Committee voted to remove Brooks at the same time it created the Special Committee to review the Settlement. (A-1348).

Moreover, General Ellis and Senator Campbell each reviewed the Settlement with his own independent counsel that had no prior ties to DHB or any of the defendants in the actions. The Special Committee engaged in further review of the Settlement with counsel that was then representing DHB in the litigation and negotiations. (A-1349-1350).

In light of this record, Cohen's argument that the District Court erred by not holding an "evidentiary hearing to evaluate the procedural fairness of

the Settlement" (Cohen Br. at 40) is unwarranted.[8] This Court, in *City of Detroit v. Grinnell Corporation*, 495 F.2d 448 (2d Cir. 1974), rejected just the kind of evidentiary hearing Cohen proposed here. In *City of Detroit*, the District Court approved a settlement of three consolidated private antitrust national class actions. On appeal, plaintiffs argued that "the District Court committed reversible error when it refused to permit an evidentiary hearing to investigate the propriety of the settlement." *Id.* at 454. This Court rejected that argument, *id.* at 462-63, holding that, while the District Court must have "sufficient facts intelligently to approve the settlement," an evidentiary hearing is not required. This Court explained that "the court is only called upon to consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." *Id.* at 462 (quoting *Young v. Katz*, 447 F.2d 431, 433 (5th Cir. 1971)). In short, "the settlement hearing must not be turned into a trial or a rehearsal of the trial." *City of Detroit*, 495 F.2d at 462.

---

[8]     Cohen requested that an evidentiary hearing be held prior to both the preliminary hearing and the final hearing. (A-1026-1040; A-1668-1676). At each instance, Cohen's request was fully argued by the parties (A-1041-1044; A-1049-1059; A-1677-1681), with the District Court ultimately determining that an evidentiary hearing was not warranted. (A-1086; A-1790-1793).

C055352/0202426/1546445.1

An evidentiary hearing concerning the procedural fairness of a settlement is not warranted unless the party seeking it submits evidence that the settlement was collusive. *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co. of Chicago*, 834 F.2d 677, 684 (7th Cir. 1987) (affirming denial of discovery sought by objectors). As the District Court recognized at the final hearing, there was no such evidence here. Cohen's contentions were pure speculation, directly rebutted by the Company's and the other parties' evidentiary submissions.

Likewise, the District Court properly exercised its discretion when it found that the parties had "enough information to make an informed decision as to the merits" (A-1790), and denied Cohen's objection that the Settlement was deficient because plaintiff's counsel had failed to engage in adequate discovery on behalf of DHB's shareholders. There was extensive pre-litigation discovery, as reflected in the ninety-seven page Verified Consolidated Shareholder Derivative Complaint and Jury Demand, which fully detailed the factual allegations supporting lead plaintiffs' causes of action. (A-129-229). As Judge Seybert noted, "although there's been limited discovery, there has been a lot done on this case. ... lead counsel have submitted an affidavit indicating that counsel conducted a thorough investigation of the plaintiff's claims, and the possible defenses." (A-1790).

C055352/0202426/1546445.1

In sum, the District Court properly exercised its discretion in concluding that the Settlement was the result of arm's length negotiations, and was procedurally fair.

## C. The District Court Properly Decided That The Derivative Settlement Is Substantively Fair

On substantive fairness, Cohen's argument is that DHB is "worse off than if no claims had been brought at all." (Cohen Br. at 38). This is false, as the District Court found. DHB benefits greatly from the Settlement.

### 1. The Benefits Achieved By The Settlement Weigh In Its Favor

Cohen's contention that one of the key benefits of the derivative action Settlement – extensive corporate governance reform measures – is nothing more than a "fig leaf" was rejected by the District Court, and was wholly unsupported by any evidentiary submission. Rather, as explained by Robert A.G. Monks, an expert in the field of corporate governance, the governance reforms instituted under the Settlement "are at the forefront of good corporate governance, [and] are beneficial to the company and its shareholders …." (A-1443).

The governance measures are outlined in detail in the Stipulation. They include the resignation of Brooks and other individual defendants from the Board of Directors and their submission to a five year ban on their

employment by the Company. (A-460-468). The corporate reforms are an important part of the value of the Settlement. *See, e.g., In re Host Am. Corp. Sec. Litig.*, 2008 WL 659579, at *2 (cited by Cohen); *In re AOL Time Warner S'holder Derivative Litig.*, 2006 WL 2572114, at *4 ("[the] extensive compliance and governance provisions will not only help deter the type of misconduct underlying Plaintiffs' claims, but may enhance investor confidence..."). By ensuring director independence and rigorous corporate governance, these reforms provide a benefit that is not readily quantifiable but is of tremendous value, enabling DHB to regain credibility in the marketplace and avoid future problems resulting from failures of governance. Indeed, as part of the process of corporate reform made possible by the Settlement, DHB was able to file its 2006 10-K with a new audited financial statement in October 2007, a critical step in rectifying past management problems and turning around the Company. (A-1548).

Moreover, as set forth in the Campbell Declaration, by settling all of the outstanding litigation, including the class action, the Settlement frees DHB from the burden of expensive and time-consuming litigation, in which the Company advances litigation costs for the defendants, and enables the Company to turn its full attention to the key issues of restoring compliance and credibility. (A-1351). *See Maley v. Del Global Techs. Corp.*, 186 F.

Supp. 2d 358, 365 (S.D.N.Y. 2002) (holding that defendant's dire financial condition weighed in favor of settlement approval). Further, it avoids a potentially massive judgment against it in the class action. In essence, a key benefit that the Company receives through the Settlement is its continued survival.

Cohen's complaint that it was somehow improper for Brooks to help fund the Settlement is also unwarranted, as the District Court recognized. Judge Seybert noted that Brooks "had the wealth to fund the settlement amount." (A-1799). It was clearly to the Company's advantage that it did not have to fund the class action Settlement with existing cash (which it did not have), but was able to enter into transactions with Brooks yielding $22 million for this purpose (with the balance of the cash portion of the settlement fund provided through the Company's insurance policies). (A-1351-1353). Resolving the derivative case pursuant to the Settlement was critical to achieving this result.

### 2. The Risks Of Continued Litigation Outweigh The Likelihood Of Success

Cohen's argument that the indictments against Brooks, Hatfield and Schlegel support the conclusion that the derivative action would have been successful, and that the Settlement undervalued the benefits of continued litigation relative to the benefits of settlement (Cohen Br. at 13-14, 36-37),

40

fails to fully account for the problems the derivative plaintiff faced in establishing liability. (A-1792).

All of the individual defendants filed motions to dismiss contending, among other things, that the derivative action was improperly filed without demand having been made on the Company. (A-228-394). Lead derivative plaintiff faced substantial difficulty in overcoming the normal presumption of the business judgment rule under Delaware law, which sets a high standard for excusal of demand. As fully set forth in defendants' briefs in support of their motions to dismiss, plaintiff's failure to make a pre-lawsuit demand on DHB's Board of Directors, and to allege with the requisite particularity the reasons why demand would have been futile, could well have warranted dismissal of this action under Fed. R. Civ. P. 23.1.[9] (A-243-265; A-385; A-390; A-392; A-394).

---

[9] *See, e.g., In re Merrill Lynch Focus Twenty Fund Inv. Co. Act Litig.,* 218 F.R.D. 377, 380 (E.D.N.Y. 2003) (noting Rule 23.1's particularity requirement and dismissing complaint for failure to adequately allege that demand was excused as futile), *aff'd sub nom., Scalisi v. Fund Asset Mgmt., L.P.,* 380 F.3d 133 (2d Cir. 2004); *Rattner v. Bidzos,* No. Civ. A. 19700, 2003 WL 22284323, at *7 (Del. Ch. Oct. 7, 2003) (commenting that under Delaware's equivalent of Rule 23.1, "pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely" by Delaware's Rule 8(a)).

The litigation also involved complex issues, such as the various defendants' knowledge and intent concerning multiple securities transactions and the issuance of financial statements. As demonstrated by the motion practice began by defendants, they were ready and able to litigate such issues vigorously.

Cohen also ignores the risks of litigation with respect to the ability to recover a damage award from defendants, both in terms of proving liability and damages, and recovering on any judgment. Corporate claims of breach of fiduciary duty are particularly difficult matters in which to prove damages. *See, e.g., In re AOL Time Warner S'holder Derivative Litig.*, 2006 WL 2572114, at *5; *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004). The prospect of recovery on behalf of DHB was made more difficult by the pendency of the class action litigation, in which shareholders were suing the same individual defendants.

The allegations in the indictments and SEC enforcement proceedings against Brooks, Schlegel and Hatfield, while potentially helpful in one sense to a Company action against them, heightened the difficulties of the Company in obtaining and recovering a judgment from them. First, civil proceedings are invariably stayed pending the resolution of criminal proceedings, so any case against them by the Company, directly or

42

derivatively, would have had to await conclusion of the criminal trials. Further, as noted above, the U.S. Attorney has notified the District Court that it is seeking over $180 million in restitution in the criminal proceedings against Brooks, Hatfield and Schlegel. (A-1761-63). Thus, as the District Court noted, defendants' ability to pay civil damages to the Company appeared highly uncertain, even if liability could have been established. (A-1783).

The considerable risks of establishing liability and recovering damages weigh heavily in favor of settlement approval. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) (district court properly concluded that establishing liability was not a given and that this weighed in favor of settlement approval). In addition, courts have recognized that "no matter how confident one may be in the outcome of litigation, such confidence is often misplaced." *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 282 (S.D.N.Y. 1999). A factor that favors settlement is the possibility that even if a plaintiff succeeds in establishing liability, the plaintiff could still recover only disappointing damages or no damages at all. *See In re AOL Time Warner S'holder Derivative Litig.*, 2006 WL 2572114, at *5 ("The tangible benefits of the Settlement are put into stark relief by the considerable barriers to any potential recovery at trial.").

43

In contrast to the considerable risks of an unsuccessful litigation, the Settlement offers the significant benefits described above, including the corporate governance reforms and the ability to recover from a life-threatening crisis and restore shareholder value. The risk-benefit analysis strongly supports the Settlement.

### 3. The Complexity, Expense And Likely Duration Of The Litigation Weigh In Favor Of Settlement

In seeking to unwind the Settlement and force DHB to pursue continued litigation, Cohen fails to consider the harmful effects on the Company that would have been caused by expensive, protracted litigation. *See Wal-Mart*, 396 F.3d at 118 (holding that the district court properly concluded that potential for three month trial and several years of appellate review favored settlement approval); *In re Metropolitan Life Derivative Litig.*, 935 F. Supp. at 293-294 ("Continued litigation of this case would put a strain on all the parties."); *Maley*, 186 F. Supp. 2d at 364 (holding that the substantial likelihood continued litigation would force the defendant into bankruptcy weighed in favor of settlement approval).

As explained in the Campbell Declaration, the continuation of the class litigation -- with its enormous expense, its potential for crushing liability, and its diversion and distraction of the Company's management from the difficult efforts to deal with the Company's enormous problems,

financial and otherwise -- would have been devastating for the Company, if not fatal. (A-1351).

### 4. The Reaction Of The Shareholders To The Settlement Weighs In Favor Of Settlement

Cohen ignores that the vast majority of DHB shareholders did not object to the Settlement and that only he is appealing the approval of the Settlement. This includes DHB's second largest shareholder, Harbinger, which held 16.6% of those shares (A-1408), and which was very active in the litigation. As noted above, after focusing particularized critical attention on the derivative action part of the Settlement at the hearing on preliminary approval, and obtaining changes in the proposed Notice to shareholders, Harbinger did not object. Nor did any of the other institutional shareholders of DHB. (A-1790).

In sum, the Distict Court correctly exercised its discretion when it found that the "Stipulation and Settlement are fair, just, reasonable and adequate as to each of the Settling Parties," and "approve[d] the Stipulation and Settlement in all respects." (SPA-2).

C055352/0202426/1546445.1

## THE SETTLEMENT DOES NOT VIOLATE § 304
## OF THE SARBANES OXLEY ACT OR PUBLIC POLICY

### A.  The § 304 Argument Has Been Waived

Before this Court, Cohen and the DOJ assert two basic arguments relating to § 304: first, that the Settlement's § 304 indemnification violates the language of § 304(b) by usurping the SEC's alleged exclusive authority to "exempt" Brooks from the obligations of § 304(a); and, second, that the indemnification granted in the Settlement violates public policy. As set forth below, both arguments fail. Also, both Cohen and the DOJ failed to make the first argument before the District Court, and Cohen waived the public policy argument as well by not making it in a timely manner. Because the issue was not properly raised below, and the DOJ is an *amicus* before this Court, the DOJ may not address this issue. Thus, these arguments are not properly before the Court.[10]

"'[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal.'" *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008) (quoting *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006), *cert denied*,

---

[10]  DHB hereby adopts and incorporates by reference the waiver arguments set forth in the brief filed by Plaintiff-Appellee Alvin Viray at pages 1-3 and 15-17, which it will not repeat here.

128 S. Ct. 1121 (2008) (quoting, in turn, *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994))); *see also Wal-mart Stores, Inc.*, 396 F.3d at 124 n. 29 ("[W]here a party has shifted his position on appeal and advances arguments available but not pressed below, ... waiver will bar raising the issue on appeal." (internal quotation marks and citation omitted)). Although this Court has discretion to consider arguments waived below, "the circumstances normally 'do not militate in favor of an exercise of discretion to address ... new arguments on appeal' where those arguments were 'available to the [parties] below' and they 'proffer no reason for their failure to raise the arguments below.'" *Nortel Networks*, 539 F.3d at 133 (quoting *Bogle-Assegai*, 470 F.3d at 504 (quoting, in turn, *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 114 (2d Cir. 2005))). Neither Cohen nor the DOJ has set forth any reason why this Court should consider such arguments on appeal. In any event, both arguments lack merit, as demonstrated below.

**B.     No Deference Is Due The SEC's Position In This Case As To § 304**

Cohen argues that this Court should accord a high level of deference to the position of the SEC as to § 304, invoking such authority as *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). However, *Chevron* deference is plainly inapplicable here. That standard applies to the interpretation of ambiguous statutes by agencies that

have been granted rulemaking authority under such statutes. *Id.* at 844-45.

Although the SEC has been granted rulemaking authority under SOX,

pursuant to 15 U.S.C. § 7202(a), no SEC rulemaking interpreting the statute

is present in this case. *Chevron* deference is not applicable "to agency

litigating positions that are wholly unsupported by regulations, rulings, or

administrative practice." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204,

212 (1988). The SEC has promulgated no regulations, rules, opinion letters,

press releases, or guidelines regarding § 304.

Not even the DOJ contends that *Chevron* deference should apply here,

instead arguing that this Court should give "appropriate deference" to the

SEC's views as set forth in the DOJ's *amicus* brief. (DOJ Br. at 17). It cites

to *M. Fortunoff of Westbury Corp. v. Peerless Ins. Co.*, 432 F.3d 127, 139

(2d Cir. 2005), which rejected application of *Chevron* deference to the

Federal Motor Carrier Safety Administration ("FMCSA") interpretation of a

statute under rulemaking authority granted by that statute, on the basis that

the statutory rulemaking authority had expired. Instead, this Court stated

that the FMCSA's interpretation was entitled to respect "'to the extent that

th[e] interpretation[ ] ha[s] the power to persuade.'" *Id.* at 138 (quoting

*Christensen v. Harris County*, 529 U.S. 576, 586-87 (2000)). Unlike here,

the FMCSA had at least engaged in a systematic rulemaking process. *Id.* at 133.

By contrast, with regard to § 304, there has been no rulemaking process at all by the SEC. At most, through the DOJ's *amicus* brief, which for the first time, here on appeal, bears the SEC's name as well, the SEC is simply advancing a position in litigation. This Court has often noted that an agency position adopted in the course of litigation lacks the indicia of expertise, regularity, rigorous consideration, and public scrutiny that justify such deference. *Catskill Mountains Chapter Of Trout Unlimited, Inc. v. City of New York,* 273 F.3d 481, 491 (2d. Cir. 2001), *cert. denied,* 549 U.S. 1252 (2007) (commenting on a non-formal, non-binding articulation of an agency's views that would not justify *Chevron* deference); *see also De La Mota v. U.S. Dep't of Educ.,* 412 F.3d 71, 78-80 (2d Cir. 2005) (rejecting an interpretation of an agency's rules that did not emerge through formal procedures). Similarly, the DOJ's position in this case (including the SEC's silence before the District Court) does not reflect the expertise, regularity, or rigorous consideration that might warrant deference.

## C. The Indemnification In The Settlement Is Not Prohibited By § 304(b) Because The Statute Says Nothing About Indemnification

Cohen's textual argument, also advanced by *amicus,* that approval of the Settlement should be overturned because it violates the text of § 304(b)

C055352/0202426/1546445.1

is without merit. Section 304(b) states in its entirety: "The Commission may exempt any person from the application of subsection (a) of this section, as it deems necessary and appropriate." 15 U.S.C. § 7243(b). Although the statute does not state that "only" the Commission may exempt persons, Cohen contends that this language confers exclusive power to exempt upon the SEC. He further asserts that the Settlement contravenes this provision by "exempting" DHB's former CEO and CFO from the application of subsection (a). (Cohen Br. at 27-30). This argument fails, however, because the Settlement does not "exempt" anyone from § 304 liability.

As Cohen acknowledges, "When discerning congressional intent, the starting point is the text of the statute itself." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (Cohen Br. at 28). Yet, Cohen's reading of the statute goes well beyond its text. Section 304(a) makes it mandatory for CEOs and CFOs of public companies to reimburse certain compensation and stock sale profits when a public company, as a result of misconduct, is required to prepare an accounting restatement due to material noncompliance of the issuer. 15 U.S.C. § 7243(a).[11] Paragraph (a) of the statute, by its terms,

---

[11]     304(a) states in its entirety: (a) Additional compensation prior to noncompliance with Commission financial reporting requirements

mandates reimbursement, without requiring a showing of misconduct by the CEO or CFO. Paragraph (b) provides flexibility to the SEC to grant relief from the application of this statute in appropriate circumstances. Thus, the text states that the SEC "may <u>exempt</u> any person from the application of subsection (a) ...." 15 U.S.C. § 7243(b) (emphasis supplied). Section (b) does no more than give to the SEC the discretion to "exempt" certain CEOs and CFOs from having to reimburse the company.

The text says nothing about <u>indemnification</u> of liability under § 304(a). "Exempt" and "indemnify" have two distinct meanings. "Exempt" is to "free from a duty of obligation required of others," while "indemnify" in this context is to "make compensation to for damage, loss, or injury." *Webster's II New Riverside University Dictionary*, 452, 621 (Anne G. Soukhanov et al. eds., 1984). Further, the text does not address in any

---

If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for—

(1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and

(2) any profits realized from the sale of securities of the issuer during that 12-month period.

way what rights or limitations a company may have with respect to any § 304 reimbursement that it receives under the statute. The Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (citations omitted). In the case of § 304, Congress imposed no conditions on how an issuer company might use any § 304 reimbursement, much less proscribe its use to help bring about the settlement of a potentially crushing litigation.

The DOJ cites *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279 (2002), in support of its statutory argument, but that reliance is misplaced. (DOJ Br. at 21-22). In *Waffle House*, an employer contended that a mandatory arbitration clause in an employment agreement barred the EEOC from filing an enforcement action alleging discrimination against the employer in federal court. The Supreme Court held that the employment agreement, to which the EEOC was not a party, could not bar the agency's enforcement action. *Id.* at 296-97. The case said nothing about indemnification and did not involve a settlement. It provides no support for the attempt to convert the word "exempt" into "indemnify," as Cohen and the DOJ seek to do here.

Implicitly acknowledging the weakness of his textual argument, Cohen claims that the indemnification provision "frustrates congressional

intent." (Cohen Br. at 29-30). However, the Supreme Court has cautioned against appealing to a statute's "broad purposes" to expand the meaning of its plain language. In *Board of Governors of the Federal Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361 (1986), the Board sought to broaden the statutory definition of the term "bank" to serve what it claimed to be the policy and "plain purpose" of the subject legislation as a whole. The Supreme Court was clear in rebuking this argument:

> The "plain purpose" of legislation, however, is determined in the first instance with reference to the plain language of the statute itself .... Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.

*Id.* at 373-74.

This reasoning is equally applicable here. This Court should not read into the statute what is not there. If Congress had meant to preclude companies from indemnifying CEOs and CFOs from § 304 liability, as part of derivative action settlements or otherwise, it could have done so. Because the Settlement does not exempt Brooks or Schlegel from claims under § 304, the Settlement does not violate the terms of the statute.

### D. The § 304 Indemnification In The Settlement Does Not Violate Public Policy

Cohen and the DOJ also contend that the indemnification of § 304 liability is contrary to public policy. This argument was correctly rejected by the District Court. Both Cohen and the DOJ rely on *Globus* and other cases rejecting indemnification provisions under certain factual circumstances, but that authority has no application to the distinctive facts of this case.

In determining whether an indemnity violates public policy, the relevant analysis turns on whether allowing an indemnity would encourage flouting the law. *See Globus*, 418 F.2d at 1288 ("Given this state of the record, we concur in Judge Mansfield's ruling that to tolerate indemnity under these circumstances would encourage flouting the policy of the common law and the Securities Act."); DOJ Br. at 24 (focusing on whether indemnification would "destroy the deterrent effect of the law"). In the *Globus* scenario, the answer seems clear: an underwriter, given a promise of indemnification by an issuer when it begins work on a securities offering by that issuer, would have a dramatically reduced incentive to diligently carry out its responsibility to investigate the company. It would have, as it were, an indemnification in its back pocket.

C055352/0202426/1546445.1

The same rationale applies in other decisions following *Globus*. *See Eichenholtz v. Brennan*, 52 F.3d 478, 485 (3d Cir. 1995) (availability of indemnification "would effectively eliminate the underwriter's incentive to fulfill its investigative obligation."); *Baker, Watts & Co. v. Miles & Stockbridge*, 876 F.2d 1101, 1108 (4th Cir. 1989) (action for indemnification "would frustrate the basic enforcement of federal securities laws"); *Laventhol et al. v. Horwitch*, 637 F.2d 672 (9th Cir. 1980) (denying indemnity of underwriter and accountants/preparers of registration statement). The same rationale also applies to the decisions from other circuits denying indemnification of liability for short-swing trading under § 16(b) of the Exchange Act. *See First Golden Bancorporation v. Weiszmann*, 942 F.2d 726, 729 (10th Cir. 1991) (cited by the DOJ).[12]

In the circumstances of this case, the answer to the key question is decidedly different. Here the indemnification would not encourage flouting the law. As set forth above, the indemnification was agreed to as part of the settlement of mature claims regarding alleged past conduct by the CEO and

---

[12] *Weiszman* did not even involve a contractual indemnification against an issuer by a former officer but rather a claim by that officer against third parties; circumstances entirely inapplicable here. Interestingly, the settlement in *Weiszman* involved the issuer foregoing potential recovery pursuant to § 16(b) in exchange for nothing more than its former officer releasing his counterclaims against the company. *Weiszmann*, 942 F.2d at 728.

55

CFO. They did not have this indemnification in their back pockets at the time of their actions. None of the authority relied on by Cohen or the DOJ involves a case where the indemnification was extended as part of a settlement. The Settlement also involved paying substantial consideration, which the Company needed to avert financial disaster.

Further, the Settlement was approved after the CEO and CFO were removed from control, and was approved by an independent committee of the Board. Moreover, the indemnification here involves a type of liability that, although it may be litigated by the SEC, provides recovery to the Company for its own use. Also, the indemnification here does not apply to any of the government's direct remedies and recoveries against the CEO and CFO, all of which the government controls and may retain, and thus there remain substantial remedies being pursued against the beneficiaries of the § 304 indemnity here that are not subject to any indemnification.

Under these circumstances, there is no basis to conclude that the indemnification would encourage violations of the securities laws.

1.    **The Indemnification Is Retrospective, Not Prospective And Concerns Settlement of Mature Claims**

All of the cases cited by Cohen and the DOJ involve possible enforcement of indemnifications of future conduct; none involves an indemnification provided as a part of a settlement of mature claims where

56

the indemnification relates to past conduct. The distinction between prospective and retrospective indemnifications is important. In *McLean v. Alexander*, 449 F. Supp. 1251 (D.Del. 1978), *rev'd on other grounds*, 599 F.2d 1190 (3d Cir. 1979) the court found that the weight of authority considered agreements providing indemnification against actual wrongdoing to be against public policy. But it specifically noted that "[i]ndemnification agreements between plaintiff and defendant are not necessarily subject to the same considerations of public policy given that plaintiff has the free choice to sue in the first place. If plaintiff wishes to reduce its claim or indemnify the defendant in order to effectuate settlement, one cannot conclude that such a decision is impermissible." *Id.* at 1266.

Similarly, in *Weinberger v. Bankston*, No. Civ. A. 6336, 1987 WL 20182 (Del.Ch. Nov. 19, 1987), the court relied on *McLean* and applied the same principle in granting summary judgment rejecting derivative claims that directors of a company had breached their duties by approving the payment of legal fees incurred by two stockholders during a proxy fight. The court previously found that the company and the two individual stockholders had violated § 14(a) of the Exchange Act during a proxy contest and had set aside the election. The parties then settled their proxy battle, and as part of the settlement, the company agreed to partially

reimburse the individuals for the expenses they incurred during the proxy contest.

Subsequently, a derivative action was filed challenging the settlement as illegal and contending that the company's directors wasted corporate assets by approving the payment of nearly $1 million to the individuals in settlement for their proxy contest expenses.

The derivative plaintiff challenged the indemnification provisions, as do Cohen and the DOJ here, based on authority finding indemnification of securities law liability against public policy. The Chancery Court disagreed:

> The problem with plaintiffs' argument is that it does not recognize any distinction between a claim for indemnification and a decision to settle pending litigation. The cases addressing the policy against indemnification for securities laws violators did not involve settlements and one such case expressly recognized that settlements are not necessarily subject to the same policy considerations:.... [Citing and quoting from *McLean*].... The distinction recognized in *McLean*, although not elaborated upon, seems to have been made in recognition of the fact that a settlement, by definition, is a compromise of claims that have not yet been finally adjudicated. Voluntary settlement of litigation is favored in the law, . . . and the decision to settle is within the exercise of the directors' business judgment. [citation omitted]. The fact that the underlying claim may have involved illegal activity does not deprive the directors of their power to settle the claim and does not make the settlement unlawful.

58

*Id.* at *3. On this basis, the court granted summary judgment, rejecting the claim that the settlement was against public policy because of the indemnification clause. *Id.*

## 2. Section 29(a) Further Supports The § 304 Indemnification

The DOJ contends in its brief that the issues raised under § 29(a) of the Exchange Act, 15 U.S.C. § 78cc(a), present similar concerns to the indemnification in the present case. (DOJ Br. at 26). It cites *Bunker Ramo-Eltra Corp. v. Fairchild Indus., Inc.*, 639 F. Supp. 409 (D. Md. 1986), among other cases applying § 29(a). Like the other cases cited, *Bunker Ramo-Eltra* involves a prospective indemnification, not analogous to the Settlement provision here. *Bunker Ramo-Eltra* nevertheless provides useful guidance in its treatment of § 29(a), in that it likens indemnifications prohibited by public policy to the waivers prohibited by § 29(a).[13] *Id.* at 418-19.

This case law under § 29(a), far from supporting the position of Cohen and the DOJ, provides powerful support for the conclusion that the § 304 indemnification in the Settlement does not violate public policy. This is because courts have interpreted § 29(a), despite its prohibition on

---

[13] In its entirety, § 29(a) reads: "<u>Waiver provisions</u>: Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void."

"waivers of compliance," to permit releases of matured claims between settling parties.

In *Lancer Offshore, Inc. v. Dominion Income Mgmnt. Corp.*, No. 01 Civ. 4860 (LMM), 2002 WL 441309, at *5 (S.D.N.Y. Mar. 20, 2002), where the plaintiff opposed enforcement of a settlement and release, the court noted that, "it is well settled that § 29(a) only invalidates releases between parties which, in attempt to circumvent compliance with the federal laws, are anticipatory waivers of compliance with the Exchange Act." The court stated further, "Releases of claims under the federal securities laws are valid 'as to mature, ripened claims of which the releasing party had knowledge before signing the release.'" *Id.* (citing *Moseman v. Van Leer*, 263 F.3d 129, 133 (4th Cir. 2001) (quoting, in turn, *Goodman v. Epstein*, 582 F.2d 388, 402 (7th Cir.1978)) (emphasis supplied).

Similarly, in *Korn v. Franchard Corp.*, 388 F. Supp. 1326 (S.D.N.Y. 1975), where the defendant company had sent out settlement checks (the endorsement of which operated as a release of claims against the company), the court held that § 29(a) only prohibited attempts to obtain anticipatory waivers of compliance with the Act, and that it should not be construed to apply to the release of matured claims. The court reasoned that "[t]o rule otherwise would foreclose the parties from settling matured claims and force

every claimant to pursue the litigation to its costly conclusion." *Id.* at 1329.[14]

### 3. The Totality Of Circumstances Compels The Conclusion That The Settlement Is In Accordance With Public Policy

As set forth above, an indemnification provided for past alleged conduct as part of a settlement is a significant factor that weighs in support of the Settlement and against a finding that the indemnification would encourage flouting of the law. By contrast, an anticipatory indemnification involves a kind of "blank check" that is not present when a party seeks to obtain indemnification for past conduct.

---

[14] This Court has indicated that the same may be true in other statutory contexts. For example, in *Srein v. Soft Drink Workers Union Local 812*, 93 F.3d 1088 (2d Cir. 1996), this Court analyzed whether ERISA § 410(a), which states that an agreement purporting to relieve a fiduciary from liability shall be void as against public policy, voided an indemnification provision in a settlement agreement. Following litigation, a settlement was reached between CIGNA and the union that included an indemnification provision. Hearing an appeal in a separate suit involving CIGNA's attempt to enforce the settlement provision, this Court noted that § 410(a) "has been applied to bar the waiver of a future liability..." but said that "[i]t is not obvious to us, however, that § 410(a) voids the indemnification clause of the Settlement Agreement [], nor have we found any cases that have fully addressed this specific issue." *Id.* at 1096. Ultimately, this Court did not rule on this specific issue, but the opinion demonstrates that this Court recognizes the different policy concerns connected to indemnification in settlement as opposed to those related to future liability.

61

DHB does not contend that this is the only factor to be considered. Here, however, numerous other factors also weigh against any finding that this settlement is against public policy: that Brooks had to provide significant consideration, including the $22 million in cash to fund the Settlement; that the Settlement was critical to avoiding financial disaster for the Company, and was approved by an independent committee; and that the indemnification only involved the SEC's derivative remedy to obtain funds for the benefit of the Company, as opposed to the government's direct civil and criminal remedies under section 10(b) and other statutes that include forfeiture, restitution, disgorgement and civil penalties.

The DOJ contends that affirming the Settlement here "would render the Commission's enforcement power toothless. . ." and "offer CEOs a roadmap for evading Section 304 liability in the future."  (DOJ Br. at 24-25). DHB respectfully submits that these assertions are unsupportable in light of the facts of this case.  The § 304 indemnity here, taking into consideration all of the facts and circumstances of the Settlement, could not plausibly be described as encouraging lawlessness, or seen as a "roadmap" by some hypothetical CEO hoping to misstate financial statements and not be held accountable, particularly in light of the criminal and SEC actions being pursued against Brooks.  The District Court acted within its discretion in

approving the Settlement and rejecting the argument that the indemnification was against public policy.

## POINT III

### THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN REJECTING THE FEE AND EXPENSE APPLICATION OF COHEN'S COUNSEL

Cohen argues that the District Court denied his counsel's request for attorneys' fees and expenses in error, but points to no abuse of the Court's discretion in this regard.

An objector may be entitled to an award of attorneys' fees if his or her objections result in improving the settlement. *See e.g., In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 376-77 (S.D.N.Y. 2005) (awarding objector's fees for offering "detailed and substantive grounds" for opposing attorneys' fee application and persuading the court to reduce the application). *See also, White v. Auerbach*, 500 F.2d 822, 828 (2d Cir. 1974) (for an objector's counsel to be entitled to any fees or expenses, they must show that the settlement was improved as a result of their efforts). Cohen argues that his objections <u>would have</u> improved the settlement, if only the District Court had heeded them. (Cohen Br. at 45). This is not a basis to award fees.

The District Court considered all of Cohen's objections to the Settlement and rejected all of them. The District Court also specifically

considered Cohen's alleged contributions to the Settlement and held that denial of his fee application was warranted "because the settlement agreement has not been improved as a result of Mr. Cohen's counsel's efforts." (A-1803).

Cohen's application for attorneys' fees has been heard and its denial was within the District Court's discretion. Cohen presents no reason for this Court to find that discretion to have been abused. As such, there are no grounds upon which to overturn the District Court's decision on this issue.

C055352/0202426/1546445.1

## **CONCLUSION**

For all the reasons set forth in this Brief, it is respectfully requested that the Judgment of the District Court be affirmed in its entirety.

Dated: New York, New York
August 14, 2009

Respectfully submitted,

BRYAN CAVE LLP

By: _____/s/ Eric Rieder_____
    Eric Rieder
    David P. Kasakove
    Chris M. LaRocco
1290 Avenue of Americas
New York, New York 10104
(212) 541-2000

*Attorneys for Defendant-Appellee DHB Industries, Inc., now known as Point Blank Solutions, Inc.*

C055352/0202426/1546445.1

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, according to the word count of Microsoft Word 2003, it contains 13,854 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14 point Times New Roman font.

Dated:  New York, New York
         August 14, 2009

                      BRYAN CAVE LLP

                      By:   /s/ Eric Rieder       
                            Eric Rieder
                      1290 Avenue of Americas
                      New York, New York 10104
                      (212) 541-2000

                      *Attorneys for Defendant-Appellee Point Blank Solutions, Inc., formerly known as DHB Industries, Inc.*

STATE OF NEW YORK    )
                              )    ss.:
COUNTY OF NEW YORK  )

**AFFIDAVIT OF SERVICE BY OVERNIGHT EXPRESS MAIL**

     I,               , being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age and resides at the address shown above or at

   **On**

deponent served the within: **Brief for Defendant-Appellee DHB Industries, Inc.**

    **upon: See attached Service List**

the address(es) designated by said attorney(s) for that purpose by depositing **2** true copy(ies) of same, enclosed in a postpaid properly addressed wrapper in a Post Office Official Overnight Express Mail Depository, under the exclusive custody and care of the United States Postal Service, within the State of New York and served electronically via email.

**Sworn to before me on**

_Maryna Sapyelkina_
**Notary Public State of New York
No. 01SA6177490
Qualified in Kings County
Commission Expires Nov. 13, 2011**

                   Job # 224321

## SERVICE LIST

Gary D. Sesser
CARTER LEDYARD & MILBURN LLP
*Attorneys for Intervenor-Appellant*
*D. David Cohen*
2 Wall Street
New York, New York 10005
(212) 732-3200
sesser@clm.com

Israel David
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
*Attorneys for Defendant-Appellee Terry*
*Brooks*
One New York Plaza, 24th Floor
New York, New York 10004
(212) 859-8000
Israel. David@friedfrank.com

Brian Robbins
ROBBINS UMEDA LLP
600 B Street, Suite 1900
San Diego, California 92101
(619) 525-3990
brobbins@robbinsumeda.com

-and-

Thomas Amon
LAW OFFICES OF THOMAS G. AMON
250 West 57th Street, Suite 1316
New York, New York 10107
(212) 810-2430
tamon@amonlaw.com

*Attorneys for Plaintiff-Appellee Alvin Viray,*
*Derivatively on Behalf of DHB Industries,*
*Inc.*

Jeffrey L. Nagel
GIBBONS P.C.
*Attorneys for Defendant-Appellee Tactical*
*Armor Products*
One Pennsylvania Plaza, 37th Floor
New York, New York 10019
(212) 613-2000
jnagel@gibbonslaw.com

Earl Silbert
DLA PIPER US LLP
*Attorneys for Defendant-Appellee Larry*
*Ellis*
500 Eighth Street, N.W.
Washington, DC 20004
(202) 799-4517
earl.silbert@dlapiper.com

Jerome Gotkin
MINTZ LEVIN COHN FERRIS GLOVSKY &
POPEO PC
*Attorneys for Defendant-Appellee David H.*
*Brooks*
Chrysler Center
666 Third Avenue, 25th Floor
New York, New York 10017
(212) 935-3000
jgotkin@mintz.com

Ian Levy
Steven G. Kobre
KOBRE & KIM LLP
*Attorneys for Defendant-Appellee Dawn M.*
*Schlegel*
800 Third Avenue
New York, New York 10022
(212) 488-1200
ian.levy@kobrekim.com
steven.kobre@kobrekim.com

Roland G. Riopelle
SERCARZ & RIOPELLE, LLP
*Attorneys for Defendant-Appellee Sandra Hatfield*
Carnegie Hall Tower
152 West 57th Street, Suite 24C
New York, New York 10019
(212) 586-4900
rriopelle@juno.com

JEFFREY BROOKS
*Defendant-Appellee Pro Se*
1500 South Ocean Blvd.
Boca Raton, Florida 33234
(561) 361-2888

Neil Gray
MILBANK TWEED HADLEY & MCCLOY LLP
*Attorneys for Defendants-Appellees David Brooks International Inc., Elizabeth Brooks International Inc. and Andrew Brooks International Inc.*
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000
cngray@milbank.com

Mark Holland
Mary K. Dulka
GOODWIN PROCTER LLP
*Attorneys for Defendants-Appellees Barry Berkman, Cary Chasin, Gary Nadelman and Jerome Krantz*
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 813-8800
mholland@goodwinprocter.com
mdulka@goodwinprocter.com

Thomas M. Bondy
Edward Himmelfarb
U.S. DEPARTMENT OF JUSTICE
*Attorneys for the United States of America as Amicus Curiae*
Civil Division, Room 7646
Department of Justice
Washington D.C. 20530
(202) 514-3547
Thomas.Bondy@usdoj.gov
Edward.Himmelfarb@usdoj.gov

Nicole Zeiss
LABATON SUCHAROW LLP
*Attorneys for Lead Class Plaintiffs as Proposed Amicus Curiae*
140 Broadway, 34th Floor
New York, NY 10005
(212) 907-0867
nzeiss@labaton.com

C055352/0202426/1546266.2

# ANTI-VIRUS CERTIFICATION FORM
Pursuant to Second Circuit Local Rule 32(a)(1)(E)

CASE NAME: D. David Cohen v. Alvin Viray, et al.

DOCKET NUMBER: 08-3860-cv

I, Maryna Sapyelkina, certify that I have scanned for viruses the PDF version of the

_____ Appellant's Brief

\_\_\_X\_\_ Appellee's Brief

_____ Reply Brief

_____ Notice of Appearance

that was submitted in this case as an email attachment to <civilcases@ca2.uscourts.gov> and that no viruses were detected.

Please print the **name** and the **version** of the anti-virus detector that you used:

Vipre AntiVirus version 3.1 was used.

_____
Maryna Sapyelkina

Date: August 14, 2009