IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

_____
                                      )
In Re:                                ) Chapter 11
                                      )
POINT BLANK SOLUTIONS INC., et al.,[1] ) Case No. 10-11255 (PJW)
                                      ) Jointly Administered
        Debtors.                      ) **Re: Docket# 1067**
                                      )
                                      ) Hearing Date: February 14, 2011 at 2:00 P.M.
_____) Obj. Deadline: February 9, 2011 at 4:00 P.M.


**LIMITED OBJECTION OF RODNEY MCFADDEN TO THE DEBTOR'S MOTION FOR ENTRY OF AN ORDER (A) APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT; (B) SCHEDULING A HEARING TO CONFIRM THE JOINT CHAPTER 11 PLAN OF REORGANIZATION; (C) ESTABLISHING DEADLINE FOR FILING OBJECTIONS TO CONFIRMATION OF PLAN; (D) APPROVING FORM OF BALLOTS, VOTING DEADLINE AND SOLICITATION PROCEDURES; (E) APPROVING SUBSCRIPTION FORM FOR PURPOSES OF THE RIGHTS OFFERING AND RELATED PROCEDURES IN CONNECTION THEREWITH; AND (F) APPROVING FORM AND MANNER OF NOTICE**

**Introduction**

1. Comes now, Rodney McFadden, a holder of so-called Class 7 equity interests in Point Blank Solutions[2], to respectfully bring to this Court's attention a limited objection to the Rights Offering Procedures contained within the "Voting Procedures Motion" [Docket# 1067]. Under the "Rights Offering Procedures" non-accredited equity holders in Class 7 would be precluded from participating in the Rights Offering, such that those equity holders would ultimately receive less than other members of the same Class in violation of Section 1123(a)(4) of the Code. Section 1123(a)(4) provides that "a plan shall - . . . (4) provide the same treatment

---

[1] The Debtors in the above-captioned cases, along with the last four digits of each Debtor's federal tax identification number and their respective addresses, are: Point Blank Solutions Inc. (9361), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor Inc. (4044), 2102 S.W. 2' Street, Pompano Beach, FL 33069; Protective Apparel Corporation of America *(9051),* 179 Mine Lane, Jacksboro, TN 37757; and PBSS, LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.

[2] As of February 8, 2011, I held 111,377 shares of Point Blank Solutions Common Stock (PBSOQ.PK)

1

for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4).

2. The disparity in treatment here of non-accredited equity holders in Class 7 as compared to others within the same class is both conspicuous and easily resolved, or at least mitigated: most if not all individual investors holding Old Equity Interests would be *categorically disqualified* from participating in the Rights Offering for stakes in the Reorganized Parent, simply by virtue of the unregistered design of the Rights Offering, even as such investors' current equity stakes are extinguished rather than converted. This disparity in treatment of individual investors in Class 7 relative to institutional, hedge fund and/or well-heeled investors (such as those comprising the Backstop Group) in Class 7 is especially problematic: the design of the Rights Offering Procedures ensures that the bulk of the value available to current equity holders (whose equity shares in the Debtors are due to be extinguished and whose stakes in any proceeds ultimately flowing through the Recovery Trust would pale by comparison to the stakes held by the Reorganized Parent's equity investors) would come only via the Rights Offering for shares in the Reorganized Parent; yet this Rights Offering is altogether *illusory* for individual investors who would be artificially disqualified from participating, *notwithstanding* that they are situated *identically* to fellow investors in terms of their equity holdings and otherwise, for no other reason that they are individuals and the Rights Offering has an unregistered design.

3. Presumably, the disparate treatment is contemplated because one or more of the Backstop Parties want the Reorganized Parent to become a private company on a post-reorg basis. For the avoidance of doubt, I do not object to the existence of a Rights Offering as a mechanism of injecting fresh capital to reorganize the business, I simply object to any provision that forecloses participation by non-accredited shareholders, for any reason. For the reasons

briefly discussed above and more fully described below, this aspect of the "Rights Offering Procedures" should not be approved.

4. In asking this court to approve the Rights Offering Procedures in their present form, the Debtors and Backstop Parties ask this court to navigate between Scylla & Charybdis. If the current iteration of the Rights Offering Procedures is approved, §1123(a)(4) of the Bankruptcy code will be violated because non-accredited shareholders will be treated disparately and any resultant recovery will be speculative at best and will be received years hence, if ever. If non-accredited Class 7 Interest Holders receive any recovery under the current Plan they will only begin to do so after the Backstop Parties and other wealthy and financially advantaged members of the creditor and equity constituencies have feasted on the proceeds of the operations of the Reorganized Parent, including as directors, officers, and potentially employees thereof, and the Reorganized Parent's initial unauthorized preferential stake in the Recovery Trust. After the Backstop Parties have enjoyed the first-fruits from the Recovery Trust, only then will Class 6 Claimants and non accredited Interest Holders of Class 7 receive anything from the Recovery Trust. Even then the sharing of the proceeds of the Recovery Trust is both (i) slanted with an unlawful discrimination in favor of the accredited investors as holders of the Common Stock of the Reorganized Parent; and (ii) unbelievably permissive in allowing such accredited investors to "double dip" again by also taking their separate share of the minority portion of the Recovery Trust set aside for all Class 7 Interest Holders.

**5.** Because the current Plan and Rights Offering Procedures are inextricably tied, the §1123(a)(4) violation must be dealt with before the Rights Offering Procedures, Disclosure Statement or Plan can be approved. Because of their import, the approval, rejection or modification of the proposed Rights Offering Procedures will undoubtedly shape the direction of these chapter 11 cases, going forward. Indeed, the upcoming omnibus hearing may well be one

3

of the most important hearings remaining on the docket because the approval of the proposed Rights Offering Procedures and proposed Disclosure Statement in their current form will lay the groundwork for the Debtors and Backstop Parties to unceremoniously dispatch non-accredited equity investors on a permanent basis within the Plan that will come for confirmation next month. As such, I raise the instant objection forthwith so that the record may be made clear.

## Preliminary Statements

6. On January 11, 2011, I caused my Limited Objection to the Debtor's Plan of Reorganization to be filed in this proceeding [Docket # 1016]. Later, on January 21, 2011, I caused my Objection to the Debtor's Disclosure Statement to be filed [Docket #1051]. The objection to the Plan was filed the day after the Plan was released and was filed more than 2 months before objections are actually due. I filed my objection to the Disclosure Statement more than 2 weeks before such objections were actually due. I offered these objections well in advance of the deadlines, as a *courtesy* to other parties in interest, so that the issues and concerns might be addressed in an expeditious manner. I had hoped that by lodging my objections early, the Debtors, the Backstopping Parties or the Equity Committee might reach out to see if there is something that might be done to correct the deficiencies in the Plan that violate §1123(a)(4) and trample the rights of other similarly situated equity holders. To date, I have received no communication from any of the above referenced parties. The Bankruptcy Code permits pre-confirmation Plan modification. I urge the Plan Proponents to revise the Proposed Plan and/or Rights Offering Procedures to provide for a fair and equitable outcome for non-accredited equity holders. My lines of communication remain open and I stand ready to help in any way that I can.

7. Instead of reaching out, in the "Voting Procedure Motion" the Debtors responded by attempting to silence some objectors by asking the Court to dismiss all objections that don't conform to "local rules" among other things. I am respectfully asking the Court to forgive and

look past any technical deficiencies my filings may contain and instead look to the message and content. I and other individual shareholders have written to the Court in anguish which amounts almost to disbelief. The Debtor and all other parties in this case are sponsoring a Plan which deprives likely 99% of the Class 7 interests of fair and equitable treatment, while using our money to affect this outcome. I have made a good faith attempt to conform to the local and federal rules to the best of my abilities and I would respectfully ask the Court to take Judicial notice of such and to realize that I am left to my own devices (financially and otherwise) when it comes to advancing my arguments, defending my assertions and responding to the myriad filings of the Debtors that contain provisions that are, in my view of the world, unpalatable to the non-accredited shareholder because those provisions violate §1123(a)(4) of the Bankruptcy Code. I find it wholly disingenuous for the parties represented by counsel (whose toll charge is paid in full and out of estate resources) to ask the Court to ignore the pleadings of individual shareholders and to seek to have their voices silenced merely because of some technical deficiencies in their filings. That posture alone is worthy of the instant objection and any other rebuke contained herein.

8. The Debtors further seek to impose restrictions on Objectors that the Federal Rules of Bankruptcy Procedure do not otherwise provide for. Specifically, they seek to silence any objectors that did not "describe the nature and amount of the objector's Claim or Interest". Ostensibly this is a reference to FRBP §2019(a) which I am not subject to because I have made a *Pro se* appearance in these cases, I am not represented by any counsel much less counsel representing more than one party, I am not filing any of my objections under the advice of counsel and I am not otherwise required to disclose my holdings under any SEC rules or any other outstanding order of this Court. Nevertheless, in the spirit of cooperation and for the

convenience of the inquiring minds, I have complied with their request to disclose the nature and amount of my holdings within this filing.

**The Backstop Agreement Violates Section 1123(a)(4) of the Bankruptcy Code Because the Rights Offering Contemplated Thereunder Will be Available to Only Certain Members of the Same Class**

9. Section 1129(a)(1) of the Bankruptcy Code provides that a plan cannot be confirmed unless it "complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). The legislative history of section 1129(a)(1) explains that it encompasses the requirements of sections 1122 and 1123 governing classification of claims and contents of the plan, respectively. *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978).

10. Section 1123(a)(4) of the Bankruptcy Code clearly provides that, unless a creditor or interest holder agrees to disfavored treatment, the treatment of each claim or equity interest in a particular class must be the same as the treatment of each other claim or equity interest in such class. 11 U.S.C. § 1123(a)(4). Section 1123(a)(4) is intended to "advance the policy of equality of distribution of estate property in bankruptcy law." *In re Journal Register Co.*, 407 B.R. 520, 532 (Bankr. S.D.N.Y. 2009). The "the key inquiry under § 1123(a)(4) is . . . whether [claimants] have the same opportunity." *In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2009); *see In re Joint E. & S. Dist. Litig.*, 982 F.2d 721, 749 (2nd Cir. 1992) (The "same treatment" standard of section 1123(a)(4) does not require that all claimants within a class receive the same amount of money; as long as all claimants in the same class are given the same *opportunity*, section 1123(a)(4) is satisfied.). The instant case poses a situation where most (if not substantially all) members of Class 7 would *not* be afforded the same *opportunity* as only a few select members of that same class.

11. The proposed Rights Offering Procedures only allow a very limited number of equity interest holders to participate. Originally, the Plan of Reorganization provided that only an

6

"Accredited Investor" qualifies as an Eligible Equity Holder. Conversely, and by process of elimination, all "non-accredited" equity holders would be excluded.[3] When the much anticipated Rights Offering Procedures were finally filed, they further limited the ability of other Holders to participate because, under the current iteration of this ever moving target, one must hold a large enough position in the old equity to be able to subscribe for $35,000 of the Reorganized Parent stock. This inequality in opportunity to participate in the Rights Offering defies the mandate of section 1123(a)(4) of the Bankruptcy Code and renders the plan "structurally defective." *See In re Pac. Gas & Elec. Co.*, 273 B.R. 795, 807 (Bankr. N.D. Cal. 2002) (holding that a plan that lacks any of the seven components of section 1123 of the Bankruptcy Code is "structurally defective" because the "shall" directive of section 1123(a) has not been satisfied). Consequently, the proposed Rights Offering Procedures should not be approved until the disparate treatment issues are resolved.

12. To restrict the Rights Offering to a select few members of the equity class while withholding the Rights Offering from otherwise identically situated members of the same equity class, depending on whether the investor is an institution or wealthy enough to be "accredited," would effect *exactly* the sort of unequal and disparate treatment that Section 1123(a)(4) prohibits. The Court should not allow the Debtors to discriminate against holders of equity interests because they are not "accredited" or because they don't own enough stock to subscribe for $35,000 of the

---

[3] The Plan also disqualifies certain other equity holders, specifically, "if such holder or such holder's relative (as defined in § 101(45)) has been convicted of a crime (whether misdemeanor or felony) based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Petition Date in any way relating any Debtor, or (iii) if such holder is an assignee of, or counsel to, a holder excluded in the foregoing clause (ii)."

It is of course reasonable to exclude certain of these members; this limited objection does not encompass particular holders who may be barred from participation for violations of securities law, or who were involved or otherwise affiliated with someone involved in the demise of the Company that necessitated the commencement of these Chapter 11 proceedings. This objection is being pressed only to the extent that certain holders of equity interests are precluded from participation solely because they lack "Accredited Investor" status or they don't hold enough stock to participate in the Rights Offering at the artificially created $35,000 level.

Reorganized Parent stock. The Bankruptcy code is given to us by Congress while the "Rights Offering Procedures" are proposed by the Debtors and opportunistic hedge funds. The spirit and intent of the drafters of the Bankruptcy Code were to allow *all members* of the same class to have the *same opportunity*. Here, by the design of the Rights Offering Procedures, precious few will be eligible to participate. Whether by intent or accident, the end result is that §1123(a)(4) of the Bankruptcy Code is transgressed because the Plan and Rights Offering Procedures provide for disparate treatment to certain members of Class 7 who do not have the same opportunity presumably because one or more of the Backstop Parties wants the Reorganized Parent to be a private company.

13. When looking at the current terms of the Rights Offering it appears that, indeed, very few will qualify to participate in the reorganization from the equity side given that the Debtors and Backstopping Parties are now establishing the minimum subscription for the Rights Offering at $35,000 for eligible accredited equity holders. Using the Debtor's numbers in Exhibit G [Docket # 1067], the maximum raised from the "Eligible" equity holders in Class 7, specifically excluding the Backstopping Parties, will be $4,427,500. According to the Debtors (also in Exhibit G), there are apparently 31,640,000 shares currently in the potentially eligible category (before considering whether a holder is accredited and before considering whether the holder owns enough stock to participate) which comes out to about $0.14 per share of old Point Blank Solutions stock if one is eligible and ultimately chooses to participate. Dividing the minimum participation amount of $35,000 by $0.14 per share yields a required ownership level of approximately 250,000 shares. However, since the Eligible Holder can elect to participate or "oversubscribe" at a level that is up to double their actual holdings (subject to other restrictions) one must hold at least 125,000 shares in order to even be in the discussion, they must double subscribe for all shares owned and of course one must also be an accredited holder. These are all *artificial* thresholds that this Court should ultimately reject after asking "<u>Why</u>, must the Rights Offering be structured this way?"

14. Looking at the "List of Equity Security Holders" (Attached to Docket #1) <u>there appear to be less than 20 "eligible"</u> holders out of the 6412 shareholders (0.3%) as of the petition date that owned more than 125,000 shares. <u>There appear to be only 3 "eligible" shareholders</u> out of the 6412 shareholders (0.05%) that owned more than 250,000 shares as of the petition date. The Debtors and Backstoppers have asked this Court to use its "equitable powers" to allow them to fashion a Plan and Rights Offering that funnels virtually all of the reorganized stock into their hands (and as a consequence, the lion's share of the distributable value in the Recovery Trust). It cannot seriously be contended that this is the outcome that justice cries out for or that this is a "fair and reasonable" end result such that the Court should use its "equitable powers" to ensure that this outcome is obtained. While I agree that Congress has conferred great "equitable powers" upon the Bankruptcy Courts, I disagree with the notion that the exercise of those powers must be limited to serve the pecuniary interests of the Backstop Parties.

15. Any Plan which is in violation of Section 1123(a)(4) of the Bankruptcy Code is per se not a reasonable exercise of business judgment. Opening the Rights Offering to all shareholders desirous of participating *would* be an appropriate exercise of business judgment, while at the same time providing for a fair and equitable outcome. If the Backstop Parties insist that they need to take this Company private, there are clearly other ways to provide for equitable treatment for the non-accredited equity interest holders.

16. If the $35,000 minimum subscription level wasn't enough of a deterrent to continuing participation, the Debtors also seek to limit the participation amongst the equity constituency to the largest 100 subscriptions received from Class 7 equity interest holders. However, it should be noted that this 100 participant maximum is altogether *illusory* and is offered to give the Court the *appearance* that many will qualify when in fact, as I have just demonstrated above, precious few will qualify to participate under the current structure. The 100 participant maximum is also offered as an "anchor" for comparison purposes to give this Court the *appearance* that very few, relatively

speaking, took the Debtors up on the opportunity to participate in the reorganization when the actual number of subscribers comes in well below the maximum of 100 that is being bandied about. I respectfully ask this court to take notice of the "appearance vs. reality" and recognize that the Rights Offering is actually being made available to only a few select hedge funds. I also respectfully ask the Court to reject any notion that the Plan or the Rights Offering Procedures are actually "fair and equitable" in their current form.

**17.** The Debtors and/or Plan Supporters may argue that the Rights Offering would be restricted to include only accredited investors simply to avoid the administrative burden of issuing stock to small holders or to avoid the time and expense of registering the securities with the SEC or to ensure that the Reorganized Parent is taken private. However, nothing in section 1123(a)(4) permits discrimination between members of the same class for *any* reason, much less for the sake of any of the above referenced excuses as Judge Walrath recently observed. *See In re Washington Mutual Inc., et al.*, Case No. 08-12229 (Bankr. D. Del.), Doc. No. 6528 at 97 & n.46. Moreover, any appeal to the above referenced excuses should be met with particular skepticism here given the lengths the Plan and Rights Offering Procedures go to in order to extinguish (rather than convert) Old Equity Interests, to disqualify non-accredited investors from obtaining (via the Rights Offering) new equity interests in the Reorganized Parent, to feed to the Backstop Parties any additional shares not exercised via the Rights Offering, and to allocate disproportionately excessive stakes in the Recovery Trust to new equity investors in the Reorganized Parent as compared to old equity investors in the Debtors. Whatever might be said in defense of any of these features standing alone, the peculiar combination of them in the Plan and Rights Offering Procedures seems both conspicuous and suspect. Certainly administrative convenience does not explain why the Plan and Rights Offering Procedures would be so solicitous towards only a select few equity investors even as they systematically and permanently foreclose non-accredited equity investors from retaining any persisting equity stake. Resort to

administrative convenience or the desire to take the Reorganized Parent private (or any other excuse not contemplated herein) in defending this Plan or the Rights Offering Procedures should therefore fail as a matter of law, as a matter of fact, and as a matter of basic fairness.

**The Disparate Treatment of Certain Equity Interests Results in Additional Benefits to Other Members of the Same Class at the Expense of the Disparately Treated Members**

18. It bears noting that the equity holders who are currently barred from participation in the rights offering would receive a smaller distribution as a result of their inability to participate. Not only do a select few Old Equity Interest Holders in Class 7 receive more than other members of the same class, but the select few members who have the opportunity and elect to participate in the Rights Offering will enjoy additional benefits at the expense of the remaining members of the same class who currently are barred from participation. The Plan provides that, once classes 4 and 5 have been paid in full with interest, the Reorganized Parent will receive the lion's share of any funds that the SEC may claw back from former employees or Directors in its pending action against those parties for violating SOX §304. The clawback of these funds will be split 20% to the Reorganized Parent and 80% to the Recovery Trust, which first distributes funds to Classes 4 & 5 until those classes are paid in full. Stated another way, the Plan Proponents and other accredited investors get 20% of the Recovery Trust proceeds before Class 6 Claimants and non-accredited Class 7 Interest Holders get one penny. After Classes 4 and 5 are paid in full, with interest, the Plan provides that any remaining funds will be split 70/30 between the Reorganized Parent and the Recovery Trust, which would then make distributions to classes 6 & 7, in the event that any funds remain. It is the mechanics and order of the funds splitting that gives rise to one aspect of the disparate treatment. Indeed, much of the value that comes back to the estate will inure first and disproportionately to the benefit of those who own stock in the Reorganized Parent. Accordingly, merely holding the right to participate in this Rights Offering affords critical additional value and benefits that are unavailable to non-accredited Old Equity Interest Holders.

19. The inability of non-accredited equity interest holders to participate in the potential profits from the operations of the Reorganized Parent is also of concern. When the Company emerges from bankruptcy, it will mark the first time in many years that it will operate as a going concern without the dark cloud that has hovered over it for so long. Participation in the Rights Offering affords equity holders the opportunity to finally own a piece of the business unshadowed by cloud.

20. Notably, the ability to participate in the Rights Offering may ultimately be the *only* way an Old Equity Interest Holder has any realistic hope of receiving a recovery under the Plan. This decreased recovery potential of non-accredited Old Equity Interest Holders occurs *as a direct result of* the disproportionate percentage distribution of funds between the Reorganized Parent and the Recovery Trust. However, this submission does not call upon the Court to second guess or alter the proposed percentages. On the contrary, the easiest way to remedy the disparity in opportunity and treatment would be to equalize the terms of the Rights Offering Procedures by removing all of the restrictions that require an equity holder be "accredited" and to own enough stock in the Debtors to subscribe at the $35,000 level in order to participate in the Rights Offering. As such, non-accredited Old Equity Interest Holders would then have the right and opportunity, albeit not the obligation, to participate on equal terms in the benefits that come with continuing equity participation.

**Recent Precedent Has Been Set in This District That Supports This Objection**

21. On Friday, January 7, 2011, Judge Walrath handed down a ruling that is instructive for present purposes. See In re Washington Mutual Inc., et al., Case No. 08-12229 (Bankr. D. Del.), Doc. No. 6528. There, Judge Walrath identified a violation of Section 1123(a)(4) that foreclosed confirmation. In the Washington Mutual case, the Plan Supporters sought to issue unregistered securities as part of its Rights Offering so as to avoid taking the Reorganized Parent public. Judge Walrath identified a violation of Section 1123(a)(4) that ultimately foreclosed confirmation. In order to maintain the unregistered design of the newly created securities in the Reorganized Parent, the

Debtors had proposed a Rights Offering that was to be made available exclusively to certain holders of PIERS securities who held claims in excess of a $2-million threshold while excluding all others in the same class. Judge Walrath explained that such disparate treatment was impermissible under Section 1123(a)(4), ordering that the plan be amended to allow all PIERS claims holders the opportunity to participate in the rights offering. Id. (Doc. No. 6528) at 96-100. The same reasoning and outcome should obtain here because the instant Rights Offering Procedures have the same design and intent as the ones that were disallowed by Judge Walrath.

**The Recovery Prospects Have Improved but Non-Accredited Class 7 Interest Holders are Artificially Barred from Fully Participating in the Improved Prospects**

22. There is much discussion on the docket regarding the recovery of certain rejected settlement funds in the $35 million to $39 million context. To the extent that the amount raised in the Rights Offering is actually $15 million, the actual risk to the subscriber appears to be roughly half of the capital committed due to the construct of the Recovery Trust. Indeed, for every dollar that flows into the Recovery Trust, including the rejected settlement funds, the Reorganized Parent will receive 20% of those funds until Classes 4 and 5 are paid in full, with interest. Upon satisfaction of all Claims of Classes 4 and 5, the reorganized Debtors will share the remaining funds, if any, with Classes 6 and 7 with the Reorganized Parent receiving 70% of the remaining funds while Classes 6 and 7 only receive 30% of the remaining funds, if any.

23. With respect to the clawback of the $35-$39 million in rejected settlement funds, the reorganized Debtors will receive 20% or roughly $7 million in cash which happens to be just under half of the total amount of money raised in the Rights Offering. To the extent that this outcome is obtained, it will be those rejected settlement funds that, until recently, were destined to be paid to Class 6 claimants that have effectively partially recapitalized the Reorganized

Parent. Thus, when all of this information is bathed in a new light, the rejected settlement represents a "game-changer"[4] for these Chapter 11 cases.

**The Definition of What Constitutes an "Eligible" Holder With Respect to Participating in the Rights Offering Has Been a "Moving Target"**

24. It should be noted that certain members of the Backstop Group were uniquely well positioned, by virtue of their prior, privileged perch on the Equity Committee, to spot and pursue an opportunity to structure the Plan and Rights Offering on terms favorable to them and their peers – reposing maximum value in the Reorganized Parent stock accessible only via the Rights Offering, restricting artificially the ability of non-accredited equity holders to participate in or retain shares via the Rights Offering, and ensuring that many more shares would thus be reserved for acquisition exclusively by the Backstop Group – and to do so at the expense of those least likely to have the financial power and capacity to effectively object and make themselves heard, namely individual, non-accredited investors who would learn only via the fine print and at the eleventh hour (if ever) that they had been frozen out from opportunity to retain any persisting equity stake. Whatever the intentions surrounding the terms of the Rights Offering, it is troubling that an important disparity in treatment of non-accredited Old Equity Interest Holders was so long and thoroughly buried by the Plan Proponents, two of which were Members of the Equity Committee who had a fiduciary responsibility to represent the entire Class while they held positions on a statutorily appointed committee.

---

[4] It certainly doesn't hurt that the potential clawback of roughly $185 million from the SEC's SOX §304 action vs. former Officers is back on the table due to circumstances surrounding the rejected Settlement Agreement. It is probably by mere coincidence but it is interesting to note that the lion's share of any funds received by the Recovery Trust on account of the SOX §304 clawback would go first and foremost to holders of interests in the reorganized Debtors. As a consequence, the funds would not be distributed first or foremost to the most aggrieved parties in interest in these Cases, the Holders of Class 6 Claims and Class 7 Interests unless such holder happens to be wealthy enough to enjoy "Accredited Investor" status **and** if they own enough stock to participate at the $35,000 level. Failing that, as a direct result of the current Plan construct, a "non accredited" Holder in Class 7 is unlikely to receive a meaningful distribution, if any at all and is barred from participating in the reorganization even though other wealthy members of the same class are not foreclosed from participating in the reorganization.

25. While I am cognizant of the fact that the current composition of the Equity Committee may be markedly different than it was several months ago, I am reminded that the former composition of the Equity Committee has previously filed certain documents and objections and made certain pleadings and representations before this Court in its attempts to forestall the §363 sale and obtain this Court's approval of the Plan Support Agreement that formed the basis for not only the Plan of Reorganization but the proposed Rights Offering Procedures that are the subject of this Objection. At the time of those previous pleadings, two members of the Backstop Parties were also members of the Equity Committee. As such, they had a fiduciary responsibility to represent the entire class while they held positions on a statutorily appointed committee.

26. It should be noted that those Backstopping Parties would likely not be in a position to disparately treat all non-accredited equity interest holders (constituents they had a fiduciary duty to represent the interests of) were it not for their positions on the committee. As members of a statutorily appointed committee they enjoyed the benefit of having the Debtors' estates bear the cost of legal and other 3rd party advisory representation that would have otherwise come directly out of the pocket of the backstopping parties. In effect, the Debtors' estates ultimately subsidized these efforts to disparately treat non-accredited equity interest holders in violation of 1123(a)(4).

27. On November 26, 2010 the Equity Committee filed an emergency motion to permit plan discussions among the various parties and to file its Letter of Intent under seal. Here the Equity Committee stated that:

"the Equity Committee's Plan will be financed by an offering of preferred shares to <u>existing shareholders</u> of the Company" (Docket # 807 Page 9 par 14).

In that filing the Committee represented to this court that the offering would be made to "existing shareholders". There was no indication at that point that any disparate treatment was contemplated.

    28.    The Equity Committee also cited Collier in reminding the Court that :

"A committee's role in the plan process is probably its most important role in any case. The legislative history to section 1103 makes it clear that Congress envisioned that an official committee is intended to be a party that negotiates a chapter 11 plan <u>on behalf of its constituency</u>." 1103 Collier on Bankruptcy ¶ 1103.05 [1][d] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010)." (Docket #807, Page 11, par 20).

There, the Committee posited to this Court that they were representing the entire class and provided no notification that only the wealthiest portion of the constituency would be represented and only the largest accredited shareholders of the class would be offered the opportunity to participate in the reorganization.

    29.    The Committee further represented that:

"The Equity Committee Members do not seek access to confidential material to <u>further their own interests</u>. The Equity Committee Members understand that they may not exploit their position on a statutorily appointed committee to <u>further their personal pecuniary ends</u>. (Docket #807, page 12 par. 22).

Shockingly, although the Equity Committee represented that it would not "further their own interests" or "further their personal pecuniary ends" whether intended or not, that is the *ultimate result* and the costs to obtain this result were borne by the estate.

    30.    Also on November 26, 2010, the Equity Committee filed a related motion to shorten the notice period for its motion to permit plan discussions among the various parties and to file its Letter of Intent under seal. Here, the committee stated,

16

> "The Equity Committee (as well as others) believes that a section 363 sale will generate a nominal recovery for unsecured creditors and wipe out existing equity. To avoid this unfavorable result, the Equity Committee has worked to develop a plan of reorganization that would provide greater recoveries to parties in interest, <u>including equity</u>. (Doc. # 808 p.3 par 5).

Once again, in attempting to sway this court to advance the Equity Committee's position, it did not give any indication that its efforts would ultimately inure disproportionately to the benefit and pecuniary interests of the selected few within Class 7 while providing for, at best, a speculative recovery, if any, for all other interests within the same class.

**31.** Turning the clock forward a few months, this situation has devolved to a point where only a select few are given the opportunity to participate in the reorganization. I cannot know with any degree of certainty whether this end result was intended or not or whether there are any other extenuating circumstances that shaped the current Plan construct or the proposed Rights Offering Procedures. As such, I repeat the sentiments I offered in prior filings that suggest I do not seek to impugn anyone, I merely seek to reiterate what the record actually reflects. However, I am a results oriented person and it is the end result for Class 7 non-accredited Equity Interest Holders that I am concerned with. I am respectfully asking the Court to take this end result into consideration when rendering its decision on whether to approve the Rights Offering Procedures in their current form or to require modified terms that would allow for a more equitable end result where all shareholders are afforded the opportunity to participate in the Rights Offering.

## CONCLUSION

**32.** Due to prior commitments, I will not likely be able to appear, in person, at the courthouse for the hearing on February 14th. However, I do plan to appear telephonically and will

17

endeavor to follow the "Instructions for Telephonic Appearances" established by the Court. I beg leave of the Court to permit other parties, including but not limited to Equity Committee counsel and/or other non-accredited shareholders, to speak as to these issues I have raised herein if they so desire.

33. For the foregoing reasons, I respectfully ask the Court to order the Debtors to amend the Rights Offering Procedures to remove the disparate treatment that inexplicably violates §1123(a)(4) so as to afford all eligible "non-accredited" equity interest holders the opportunity to participate on equal terms in the Rights Offering, or in the alternative, require other modifications to some other aspects of the Plan that would actually confer more than a speculative recovery upon Class 7 non-accredited Equity Interest Holders. I also respectfully request that this Court order such additional and other relief which the Court may determine to be just and proper under all of the facts and circumstances shown.

Respectfully submitted,


Dated: Woodway, TX

February 9, 2011

                                        Rodney D. McFadden, *Pro Se*

                                        By:  /s/ Rodney D. McFadden


                                        7833 Fairway Rd.

                                        Woodway, TX 76712

                                        Telephone: (979) 324-4363

                                        Email: rdmcfadden@gmail.com

# CERTIFICATE OF SERVICE

I, Rodney McFadden, hereby certify that on the 9th day of February , 2011, I served the Limited Objection of Rodney McFadden to the Debtors' Motion for Entry of an Order(A) Approving the Adequacy of the Disclosure Statement; (b) Scheduling a Hearing to Confirm the Joint Chapter 11 Plan of Reorganization; (C) Establishing Deadline for Filing Objections to Confirmation of Plan; (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures; (E) Approving Subscription Form for Purposes of the Rights Offering and Related Procedures in Connection Therewith; and (F) Approving Form and Manner of Notice Pursuant to Chapter 11 of the United States Bankruptcy Code, upon the parties in the attached service list:

                                                      _/s/ Rodney McFadden_____
                                                     RODNEY McFADDEN


<u>Counsel for the Debtors</u>
Laura Davis Jones, Esq.
Timothy Cairns, Esq.
Pachulske Stang Ziehl & Jones, LLP
919 North Market Street, 17th Floor
Wilmington, DE 19801
      and
David M. Bertenthal, Esq.
Joshua M. Fried, Esq.
Pachulski Stang Ziehl &Jones LLP
150 California Street, 15th Floor
San Francisco, CA 94111

<u>Counsel for the Creditors' Committee</u>
Frederick B. Rosner, Esq.
Brian L. Arban, Esq.
Messana Rosner & Stem, LLP
1000 N. West Street, Ste. 1200
Wilmington, DE 19801
       and
Robert M. Hirsh, Esq.
George Angelich, Esq.
Arent Fox LLP
1675 Broadway
New York, New York 10019

<u>Counsel for the Equity Committee</u>
Joseph T. Moldovan
Morrison Cohen LLP
909 Third Avenue
New York, New York 10022
    and

Neil B. Glassman
Bayard, P.A.
222 Delaware Avenue, Ste. 900
Wilmington, DE 19899

Counsel to Privet Opportunity Fund I, LLC and Privet Fund Management LLC
Edward J. Estrada, Esq.
Reed Smith LLP
599 Lexington Avenue, 22nd Floor
New York, New York 10022
    and
Kurt F. Gwynne, Esq.
Reed Smith LLP
1201 Market Street, Ste. 1500
Wilmington, DE 19801

Counsel to Prescott Group Capital Management
Richard Palacio, Esq.
Ashby & Geddes
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

Counsel to Lonestar Capital Management, LLC
David B. Stratton, Esq.
Pepper Hamilton LLP
Hercules Plaza, Ste. 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19801-1709
    and
David P. Simonds, Esq.
Akin Gump Strauss Hauer & Feld LLP
2029 Century Park East, Ste. 2400
Los Angeles, CA 90067-3010
    and
Michael P. Cooley, Esq.
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue, Ste. 4100
Dallas, Texas 75201-4675

United States Trustee
844 King Street, Ste. 2207
Lock box #35
Wilmington, DE 19801