# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.

SECURITIES AND EXCHANGE COMMISSION,

        **Plaintiff,**

v.

DHB INDUSTRIES, INC. n/k/a POINT BLANK
SOLUTIONS, INC.

        **Defendant.**

_____/

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission alleges as follows:

I.    **INTRODUCTION**

1.    DHB Industries, Inc., n/k/a Point Blank Solutions, Inc. ("DHB" or "the Company"), is a supplier of body armor to the U.S. military and law enforcement agencies. From at least 2003 through 2005, DHB and others engaged in widespread accounting fraud, disclosure fraud, and misappropriation of Company assets that resulted in DHB filing materially false and misleading current, quarterly, and annual reports with the Commission.

2.    DHB's lack of internal accounting and financial reporting controls allowed senior management and others to manipulate the Company's reported gross profit, net income, and other key figures in its earnings releases and public filings. They did so by overstating inventory values, failing to include appropriate charges for obsolete inventory, and falsifying journal entries.

3.    For example, DHB's former chief executive officer, David H. Brooks, with the assistance of the former chief financial officer, Dawn Schlegel, and chief operating officer, Sandra Hatfield, manipulated DHB's gross profit margins and earnings by overstating inventory

values, falsifying journal entries, and failing to include appropriate charges for obsolete inventory.

4.      DHB's lack of internal controls also enabled former CEO David Brooks to funnel at least $10 million out of DHB through fraudulent transactions with a related entity he controlled. Brooks and others also misappropriated millions from the Company through the use of Company credit cards, checks, and cash to pay for personal expenses, including luxury cars, jewelry, extravagant vacations, prostitutes, and his horse racing empire.

5.      On October 1, 2007, DHB filed a comprehensive Form 10-K, which included restated financial results for 2003, 2004, and 2005, which eliminated all of DHB's previously reported 2003 and 2004 profits.

6.      By engaging in the conduct described above and more fully described below, DHB violated, and unless enjoined is reasonably likely to continue to violate, Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9.

## II.     JURISDICTION AND VENUE

7.      The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§78u(d), 78u(e), 78u-1(a), and 78aa.

8.      The Court has personal jurisdiction over the Defendant, and venue is proper in the Southern District of Florida because many of the acts and transactions constituting the violations alleged in this Complaint occurred in the Southern District of Florida. DHB's headquarters are located in the Southern District of Florida. DHB also conducted shareholder meetings in the Southern District of Florida, and it held conference calls which included members of DHB's management and other DHB employees, who participated from the Southern District of Florida.

Additionally, much of the field work conducted by DHB's auditors occurred in the Southern District of Florida.

9.     The Defendant, directly and indirectly, made use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange in connection with the acts, practices, and courses of business set forth in this Complaint.

## III.     DEFENDANT AND RELEVANT ENTITY

### A.     Defendant

10.     DHB is a publicly-traded Delaware corporation with its headquarters and primary manufacturing facilities in Broward County, Florida. DHB designs, manufactures and sells body armor products for the United States military and domestic law enforcement agencies. In 2006, DHB relocated its headquarters from New York to Florida. The Company's primary manufacturing facilities are in South Florida and Tennessee. DHB's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was listed on the American Stock Exchange, n/k/a NYSE Euronext ("AMEX"), until September 8, 2006, when it was delisted and deregistered for non-compliance with AMEX listing standards. On October 2, 2007, the Company changed its name to Point Blank Solutions, Inc. On April 14, 2010, DHB filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court in Delaware. The Company's stock is currently registered pursuant to Section 12(g) of the Exchange Act and is quoted on the Pink Sheets.

### B.     Relevant Entity

11.     Tactical Armor Products ("TAP") is a private entity which, at the time relevant to this action, Brooks' wife ostensibly ran but Brooks actually controlled. TAP had two primary business segments: the assembly of hard armor plates for insertion into DHB's vests, and the

3

financing of Brooks' multi-million dollar horse racing empire, which included the funding of race horses, horse training, and grooms. Brooks and his brother owned or otherwise controlled more than 800 race horses all over North America.

## IV.    FACTUAL ALLEGATIONS

### A.    Background and Prior Commission Actions

12.    DHB is organized as a holding company and manufactures and sells its body armor products through two subsidiaries, Point Blank Body Armor ("Point Blank") and Protective Apparel Corporation of America. DHB's primary product is the Interceptor vest, a bullet-resistant vest all branches of the U.S. military wear.

13.    Following the September 11th terrorist attacks and the subsequent rise in military expenditures, DHB experienced a substantial increase in its business, becoming one of the largest suppliers of body armor to the military and various federal, state, and local law enforcement agencies.

14.    On August 17, 2006, the Commission filed a civil action against DHB's former CFO, Dawn Schlegel, and former COO Sandra Hatfield. *Securities and Exchange Commission v. Dawn M. Schlegel and Sandra Hatfield* (U.S. District Court for the Southern District of Florida, Civil Action No. 06-61251-CIV-SEITZ/McAliley). The action was based on Schlegel and Hatfield's violations of the antifraud provisions of the securities laws, and their having aided and abetted DHB's violations of the reporting, books and records and internal control provisions of the securities laws. In addition, the United States Attorney's Office for the Eastern District of New York simultaneously filed criminal charges against Schlegel and Hatfield. The Commission's action against Schlegel and Hatfield was subsequently stayed, pending the outcome of the criminal proceedings. Schlegel pled guilty to the criminal charges pursuant to a

plea agreement.

15.     On April 3, 2006, DHB filed a Form 8-K stating that its interim reports for 2005 could not be relied upon.  On August 18, 2006, the Company filed another Form 8-K stating that the financials for 2003 and 2004 could not be relied upon.

16.     On October 1, 2007, DHB filed a comprehensive Form 10-K, which included restated financial statements for 2003, 2004, and 2005.  The restated Form 10-K disclosed that DHB's gross profit margins and net income for 2003 and 2004 were materially lower than the Company had previously reported.  These restated financials eliminated all of DHB's 2003 and 2004 profits.

17.     On October 25, 2007, the Commission filed a civil action against Brooks, alleging he engaged in accounting fraud, misappropriation of corporate funds, and insider trading, and aided and abetted DHB's violations of the reporting, books and records, and internal control provisions. *Securities and Exchange Commission v. David H. Brooks* (U.S. District Court for the Southern District of Florida, Civil Action No. 07-61526-CIV-Altonaga/Turnoff).

18.     The United States Attorney's Office for the Eastern District of New York simultaneously filed criminal charges against Brooks alleging securities fraud, conspiracy to commit securities fraud, insider trading, and obstructing the Commission's investigation.  The Commission's civil action is stayed pending the resolution of the criminal action.  The criminal trials against Brooks and Hatfield were joined. *United States v. David H. Brooks and Sandra Hatfield* (U.S. District Court for the Eastern District of New York, Criminal Docket No. 06-CR-550/Seybert).  Schlegel has been a cooperating witness in the criminal case and has pled guilty to criminal charges pursuant to a plea agreement.

19.     On September 14, 2010, a jury found Brooks and Hatfield  guilty of multiple

counts of insider trading, fraud, and obstruction of justice charges, including obstructing the staff's investigation, based on the same conduct that led to the Commission's action against them. The forfeiture phase of the criminal trial is expected to continue into spring 2011, and sentencing will occur sometime afterwards.

**B.     DHB's Materially False and Misleading Filings**

20.     From at least 2003 through 2005, DHB, through Brooks, Schlegel, Hatfield, and others engaged in widespread accounting or disclosure fraud by manipulating inventory, failing to disclose Brooks' control over TAP and the true nature of DHB's transactions with TAP, and falsely stating the Company had agreed to pay Brooks' personal expenses. As a result of the widespread fraud, DHB filed materially false and misleading periodic reports with the Commission from at least 2003 through 2005.

**1.     Inventory Overvaluation**

21.     Between 2003 and 2005, DHB overstated its inventory quantities and created bogus, unsubstantiated bills of material to price its "work in process" and "finished goods" inventory. These fraudulent bills of material overstated labor costs, the amount of raw materials, overhead costs, and the unit prices of DHB's four primary vest components.

22.     Throughout this period, DHB, through Hatfield, falsely adjusted its inventory schedules to increase the inventory value. For example, in the fourth quarter of 2004, Hatfield falsely adjusted Point Blank's inventory schedules to increase the ending inventory value from approximately $2 million to $9 million. Schlegel and Brooks were aware the inventory was overvalued, but did nothing to correct the Company's financial statements.

23.     These manipulations caused DHB's annual reports to materially overvalue inventories by $24 million in 2003 and $30 million in 2004, and caused the Company to

materially overvalue its inventories by $33 million in its quarterly report as of September 2005. By overvaluing its inventories, DHB also materially overstated its reported gross profit and net income during these periods.

24.     DHB and others failed to devise and maintain internal controls sufficient to provide reasonable assurance that DHB accounted for its inventory, cost of goods sold, gross profit, gross margin, SG&A expenses, pre-tax income, net income, and other key figures in conformity with Generally Accepted Accounting Principles ("GAAP").

25.     DHB's lack of internal controls resulted in the filing of materially false and misleading earnings releases and public filings with the Commission.

### a.     Excess and Obsolete Inventory

26.     Between 2003 and 2005, DHB further manipulated its inventory valuation by failing to account properly for excess and obsolete inventory as GAAP required, i.e. valuing inventory at the lower of cost or market value. DHB's failure to properly report its inventory values falsely inflated its gross profit and net income in its public filings and earnings releases.

27.     In 2004, approximately $12.5 million of hard armor plates, a key component of DHB's vests, became obsolete when the U.S. Army changed specifications for the plates. Since the U.S. military was DHB's main customer, this meant the Company could not use those armor plates in marketable vests. An additional $4.5 million of inventory became obsolete due to other specification changes, including the discontinuation of certain vest colors and fabrics. The changed specifications left DHB with a large inventory of plates and fabrics it could not sell.

28.     DHB and others should have disclosed the known material risk and uncertainty concerning the marketability of these plates and established an inventory valuation reserve by recognizing an obsolescence charge for the plates in its 2004 Form 10-K. However the

Company failed to do so, thereby falsely misrepresenting and overstating its inventory, gross profit, and pre-tax income for 2004 by at least $17 million.

29.     DHB and others additionally failed to recognize charges for impaired inventory totaling $1 million in 2003 and $6 million as of September 2005. This caused DHB to materially understate its cost of goods sold and materially overstate its gross profit and pre-tax income stated in its annual reports.

<b>b.      Fraudulent Expense Reclassification Entries</b>

30.     Between 2003 and 2005, DHB and others also manipulated the Company's reported gross profit margin by reclassifying amounts from cost of goods sold to "research and development," an expense category on DHB's income statement. These reclassification entries had the effect of materially understating DHB's cost of goods sold and overstating its expenses, resulting in an overstatement of DHB's gross profit (with no effect on net income and related per share data).

31.     Schlegel (with Brooks' knowledge) routinely directed members of the accounting staff to record journal entries that reclassified these expenses without any supporting documentation. DHB recorded these bogus amounts as research and development expenses, purportedly relating to sample vests provided to sales personnel and customers. However, these amounts were baseless because, among other things, they represented tens of thousands more sample vests than DHB normally used. Furthermore, the corresponding overstated expenses were several times more than DHB's actual cost of samples.

32.     DHB's fraudulently reclassified entries totaling $8.8 million in 2003, $7.1 million in 2004, and $8.2 million as of September 2005, resulting in a material increase to DHB's gross profits reported in its earnings releases and public filings.

## 2.    Brooks' Misappropriation of Corporate Funds

### a.    DHB Failed to Disclose Brooks' Looting of $10 Million from the Company Through TAP

33.    From at least 2003 to 2006, Brooks funneled approximately $10 million out of DHB through the Company's fraudulent business arrangement with TAP. DHB and others did not publicly disclose TAP as a related party until July 2003, and even then, they failed to accurately divulge Brooks' control over TAP and the nature of the business arrangement.

34.    TAP had no significant assets or access to credit, and DHB was its only customer. TAP assembled the hard armor plates DHB purchased for its vests, which involved mainly gluing and sewing services DHB could have performed itself. TAP then resold the assembled plates to DHB for insertion into its vest products.

35.    Although Brooks' wife was listed as running TAP, Brooks actually controlled it. Brooks authorized and reviewed all of TAP's checks prior to disbursement, personally signed TAP checks, directed Schlegel to sign his wife's name to TAP checks, authorized the payment of bonuses to TAP employees (including horse trainers) out of DHB's accounts, controlled the price TAP charged DHB for plates, and made decisions regarding TAP's capital expenditures and personnel. TAP spent the majority of proceeds it received from the sale of the plates to DHB on Brooks' horse racing empire, or Brooks transferred the money to another entity he controlled.

36.    TAP charged DHB roughly double the amount of reasonable labor costs for its services. Brooks determined these prices.

37.    By directing DHB to pay TAP's inflated labor costs and purchase TAP's entire inventory, Brooks was able to funnel at least $10 million from DHB through TAP, disguising it as cost of sales in DHB's financial statements and disclosures.

38.    DHB's earnings releases and public filings with the Commission misrepresented

funds paid to TAP as part of DHB's routine manufacturing expenses. These releases and filings also failed to properly account for and disclose the true nature of the transactions between DHB and TAP, and Brooks' control over TAP.

39.     DHB and others concealed the existence of Brooks' relationship with TAP from auditors and investors until 2003, when the auditors required the Company to file an amended 2002 Form 10-K to disclose TAP's ownership and DHB's related party transactions with TAP.

40.     On July 24, 2003, DHB filed an amended 2002 annual report, which for the first time disclosed TAP as a related party that Brooks' wife owned. The amended 2002 Form 10-K failed to disclose, however, that although Brooks' wife was TAP's president and owner, Brooks controlled all aspects of TAP's business.

### b.     DHB Concealed its Payment of $4.7 million for Brooks' Personal Expenses

41.     DHB lacked internal accounting controls over the use of corporate checks and credit cards, enabling Brooks to use DHB as his personal piggy bank. Between 1997 and 2005, Brooks used DHB checks and corporate credit cards to divert approximately $4.7 million in Company funds to his private entities and to pay for millions of dollars in personal expenses. These expenses benefited Brooks and others and included such items as luxury cars, jewelry, art, real estate, extravagant vacations, use of personal aircraft, prostitutes, horse training, clothing and accessories from high fashion designers such as Hermes and Louis Vuitton, and more than $120,000 for iPods included in gift bags for guests at a multi-million dollar party for his daughter.

42.     DHB paid for $975,000 of Brooks' personal expenses in 2003, $788,000 in 2004, and $1.3 million in 2005. In addition, between 1997 and 2002, DHB paid for at least $1.7 million of Brooks' personal purchases on corporate credit cards. Brooks did not repay DHB

these amounts.

###   c.   DHB Made Fraudulent Statements in its 2004 Proxy Statement to Justify Its Payment of Brooks' Personal Expenses

43.     Following Commission subpoenas requesting documents relating to DHB's payment of Brooks' personal expenses, the Company and others issued a proxy statement in November 2004 disclosing DHB's payment of only $2 million of those expenses.  In the proxy statement, DHB and others attempted to justify payment of Brooks' personal expenses through a previously-undisclosed corporate resolution.  This resolution, purportedly executed in 1997, granted Brooks the right to reimbursement for business and personal expenses in an aggregate amount not to exceed 10% of DHB's annual net income (the "1997 Resolution").

44.     In fact, the 1997 Resolution was a fraudulent document created to support the Company's funding of Brooks' lavish lifestyle and the payment of his personal expenses.

45.     The signature of an Audit and Compensation Committee member, Gary Nadelman, purportedly appears on the bogus 1997 Resolution, supposedly on behalf of the Compensation Committee.  However, the only other Compensation Committee member at the time the 1997 Resolution was allegedly executed did not know it existed.  Further demonstrating the fraudulent nature of this document, Nadelman has given inconsistent statements on  whether he had actually executed the 1997 Resolution.

46.     Moreover, Schlegel had never seen or heard of the 1997 Resolution until after DHB received the Commission subpoena relating to DHB's payment of Brooks' personal expenses.  Casting further doubt on the legitimacy of the 1997 Resolution, DHB had never previously tracked or reported Brooks' personal expenses as the 1997 Resolution would have required.

47.     Significantly, DHB never disclosed the 1997 Resolution in any of its public

filings issued in the seven years prior to November 2004 proxy statement. Moreover, DHB's outside auditors had not seen the resolution or heard of its existence before the purported resolution materialized in mid-2004.

48.     Furthermore, Brooks' employment agreement was renegotiated in 2000. That agreement neither mentioned nor incorporated the 1997 Resolution, even though it contained a detailed compensation and bonus provision.

49.     DHB and others included detailed disclosures regarding the bogus 1997 Resolution and its terms in its November 2004 proxy statement, thereby causing that filing to be materially false and misleading.

50.     These material false and misleading disclosures by DHB and others had the effect of artificially raising the price of DHB's stock.

## V.     VIOLATIONS

### COUNT I

### Fraud in Violation of Section 10(b) and Rule 10b-5 of the Exchange Act

51.     The Commission repeats and re-alleges paragraphs 1 through 50 as if fully set forth herein.

52.     From at least 2003 through 2005, DHB, in connection with the purchase or sale of securities as described herein, by the use of means or instrumentalities of interstate commerce or of the mails, directly or indirectly, knowingly, willfully, or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud or deceit upon other persons.

53.     By reason of the foregoing, DHB, violated Section 10(b) and Rule 10b-5 of the Exchange Act [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

## COUNT II

### Violations of Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 of the Exchange Act

54.     The Commission repeats and re-alleges paragraphs 1 through 50 of its Complaint as if fully restated herein.

55.     DHB failed to file timely accurate periodic and other reports with the Commission containing required information, and failed to add additional material information necessary to make the required periodic reports or statements, in the light of the circumstances under which they are made, not misleading.

56.     As a result of the accounting actions set forth above, DHB violated Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 of the Exchange Act [15 U.S.C. § 78m(a); and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

## COUNT III

### Violations of Section 13(b)(2)(A) and (B) of the Exchange Act

57.     The Commission repeats and re-alleges paragraphs 1 through 50 of its Complaint as if fully restated herein.

58.     DHB failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets, and failed to devise and maintain a system of internal controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with U.S. GAAP or any other criteria applicable to such statements.

59.     As a result of the accounting actions set forth above, DHB violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and (b)(2)(B)].

## COUNT IV

### Violations of Section 14(a) of the Exchange Act and Rule 14a-9

60.     The Commission repeats and re-alleges paragraphs 1 through 50 of its Complaint as if fully restated herein.

61.     DHB, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or of the facility of a national securities exchange, knowingly, recklessly or negligently solicited proxies by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing statements which, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, or which omitted to state material facts which were necessary in order to make the statements made not false or misleading or which were necessary to correct statements in earlier false or misleading communications with respect to the solicitation of proxies for the same meeting or subject matter.

62.     By engaging in the conduct described above, DHB violated Section 14(a) and Rule 14a-9of the Exchange Act [15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9].

## VI.     RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### Declaratory Relief

Declare, determine, and find that DHB has committed the violations of the federal securities laws alleged in this Complaint.

## II.

### Permanent Injunction

Permanently restrain and enjoin DHB, its agents, servants, employees, representatives, attorneys-in-fact, and assigns and those persons in active concert or participation with them, and each of them, from violating Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a), and Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), 78m(b)(5), and 78n(a), and 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and 240.14a-9].

## III.

### Further Relief

Grant such other relief as this Court may deem just and appropriate.

## IV.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this court.

January _____, 2011                          Respectfully submitted,


By:    _____
       Christopher E. Martin, Esq.
       Senior Trial Counsel
       SD Fla. Bar No. A5500747
       Direct Dial: (305) 982-6386
       E-mail: martinc@sec.gov

Sondra Hickey Panahi, Esq.
Senior Counsel
SD Fla. Bar No. A5501199
Direct Dial: (305) 416-6296
E-mail: panahis@sec.gov

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE**
**COMMISSION**
801 Brickell Avenue
Suite 1800
Miami, FL 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154