IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

_____

|  |  |  |
|---|---|---|
| In Re: | ) | Chapter 11 |
|  | ) |  |
| POINT BLANK SOLUTIONS INC., et al.,[1] | ) | Case No. 10-11255 (PJW) |
|  | ) | Jointly Administered |
| Debtors. | ) | Re: Docket# 1006, 1007, 1067, 1122 |
|  | ) |  |
|  | ) | **Hearing Date: March 3, 2011 at 2:00 P.M.** |
| _____ ) | | **Obj. Deadline: February 24, 2011 at 4:00 P.M.** |

**STATEMENT OF ADDITIONAL OBJECTIONS TO CONFIRMATION OF THE JOINT
CHAPTER 11 PLAN OF REORGANIZATION, AND IN OPPOSITION TO DEBTOR'S
MOTION FOR ENTRY OF AN ORDER APPROVING THE ADEQUACY OF THE
DISCLOSURE STATEMENT AND RELATED RELIEF**

Comes now, Rodney McFadden, a holder of so-called Class 7 Equity Interests in Point

Blank Solutions who hereby introduces additional objections to the Debtor's Chapter 11 Plan of

Reorganization [docket # 1006] and Disclosure Statement Describing the Joint Chapter 11 Plan

of Reorganization [docket #1007] filed by Point Blank Solutions, Inc., et al. I have previously

filed *pro se* objections to the Debtor's Plan of Reorganization [Docket # 1016], Disclosure

Statement [Docket # 1051] and Rights Offering Procedures [Docket # 1111]. In support of the

instant Objections[2], I respectfully represent as follows:

_____

[1] The Debtors in the above-captioned cases, along with the last four digits of each Debtor's federal tax
identification number and their respective addresses, are: Point Blank Solutions Inc. (9361), 2102 S.W.
2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor Inc. (4044), 2102 S.W. 2' Street,
Pompano Beach, FL 33069; Protective Apparel Corporation of America *(9051),* 179 Mine Lane,
Jacksboro, TN 37757; and PBSS, LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.

[2] These objections were intended to be made in reference to the "Amended Plan" and "Amended Disclosure
Statement" but those documents have not been filed, despite the fact that the related objection deadline has lapsed
and despite the fact that the hearing date has not been rescheduled. Efforts were made by at least one shareholder to
reach out to the Debtors and the Equity Committee regarding the confusion and ambiguity surrounding the timing of
the Amended Disclosure Statement Objection Deadline and the related hearing date. To my knowledge, those
communications were ignored or were otherwise unanswered and certainly there is no evidence within the docket to
suggest the concerns that were raised surrounding those confusions and ambiguities were ever addressed.

**PRELIMINARY STATEMENT REGARDING THE "AMENDED DISCLOSURE STATEMENT" OBJECTION DEADLINE**

1.      On February 10, 2011, the Debtors filed the *Notice of Adjournment of Disclosure Statement Hearing* [Docket # 1122]. Within that filing, the Debtors announced that they intended to file an "Amended Disclosure Statement" and an "Amended Plan". They also established February 24, 2011 as the deadline to object to the "Amended Disclosure Statement" and established March 3rd as the date for the Court to consider the adequacy of the "Amended Disclosure Statement".

2.      As of February 28, 2011, neither the "Amended Disclosure Statement" nor the "Amended Plan" has been released for public viewing. Even if those documents were to be released today, February 28th, this would leave only a few days to critically review the documents, determine their adequacy and import and to then formulate and file an objection and make an appearance at the March 3rd omnibus hearing. This is an inadequate amount of time and provides basis enough alone to reject any "Amended Disclosure Statement" currently presented or hereinafter presented without adequate additional notice and opportunity to Object further.

3.      The public shareholders (save and except for the two former Equity Committee Members who are now Plan Proponents) own 90% of the Common Stock of the Debtor. Yet, Debtors counsel, purporting to speak in the name of the Debtor and for the benefit of the Debtor does not communicate with or cooperate with the public shareholders. Further to the point, the Debtors dropped the following cryptic message within the Notice of Adjournment of Disclosure Statement Hearing [Docket # 1122]: "*The hearing may be continued from time to time by announcing such continuance in open court or otherwise, without further notice to parties in interest.*" With all due respect, the hearing to consider the adequacy of a Disclosure Statement is a vitally important event within a Chapter 11 proceeding. As such, proper notice of the

adjournment of said hearing should be given to parties in interest, not merely as a courtesy, but because the Debtors have a *fiduciary duty* to do so. I respectfully ask this Court to direct the Debtors to communicate and give proper notice regarding <u>all</u> future adjournments.

4.      Given the inadequate time available to parties in interest to review and object to the unfiled "amended" documents (including the numerous shareholders, U. S. Trustee's Office and the SEC, all of whom objected to the original Disclosure Statement)[3], I respectfully ask the Court to (i) consider any and all objections, late-filed or otherwise that are received within a reasonable timeframe (as may be determined by the Court) and (ii) direct the debtors to establish a new objection deadline (originally February 24, 2011) for the "Amended Disclosure Statement" whenever it is finally released.

5.      Additionally, I respectfully ask that the Court direct the Debtors to postpone the hearing to approve the adequacy of the heretofore unfiled "Amended Disclosure Statement" to a date beyond the March 3rd omnibus hearing date. It is patently absurd to require disenfranchised shareholders and other parties in interest to be required to object and respond to documents that have not even been filed. It is even more egregious to conduct a hearing to consider the adequacy

---

[3] Curious in their silence, the Equity Committee has not filed any formal objections to any of the current attempts by the Debtors and Plan Proponents to provide for inequitable or disparate treatment of shareholders and has not objected to the inadequate disclosure that has been contemplated by the Debtors in its Plan and Disclosure Statement. This is particularly puzzling when considering that no less than 16 objections have now been filed collectively by individual shareholders, the SEC and the U.S. Trustee's Office regarding items affecting shareholders within the Plan and Disclosure Statement. I have now personally filed (4) objections and have received <u>absolutely no communication</u> from the Debtors or the Equity Committee regarding the concerns I have raised. These legitimate concerns continue to fall on deaf ears.

By comparison, I (and other shareholders) have raised a number of these same concerns directly with the U.S. Trustee's Office and the SEC and each has, in turn, filed objections regarding some of those concerns in the manner they saw fit. This is just another set of facts that supports the notion that the Debtors and the Equity Committee do not vigorously represent (if they represent at all) the interests of shareholders who are ultimately the fulcrum security holders in these Chapter 11 cases. To date, shareholders have been left to their own devices or have had to seek support from the U.S. Trustee or the SEC, despite the existence of a statutorily appointed Equity Committee whose lead counsel was the private counsel of one of the Plan Proponents who was a former Equity Committee member. Consequently, shareholders face an uphill battle in attempting to stop the Plan Proponents from separating shareholders from their assets, As evidenced by the volume of shareholder objections on the docket, these shareholders have recognized that they have absolutely no voice in these proceedings and have been forced to formulate their own objections.

of those unfiled documents when proper notice and objection periods have not been given. This is true especially in light of the fact that the posture of the Debtors is that they don't need to give any such notice or courtesy out side of what may be discussed in open court.

## INTRODUCTION

6.      These Chapter 11 cases do not fit the mold of the traditional Chapter 11 proceeding that is encompassed by the Debtors and secured creditors arguing for a lower enterprise value for the reorganized business while the junior creditors or equity holders attempt to strain the limits of the value that the markets might assign to the company at the time of confirmation based upon trailing or projected future earnings in order to obtain some minor recovery. Quite to the contrary, here we are presented with a situation where, *inter alia*, there is a pool of assets available to be recaptured from a Sarbanes Oxley Act, "SOX" §304 Action that, if returned to the Debtor's Estate, will be well in excess of the amounts owed to creditors. In such a case, the equity holders of Class 7 would be the holders of the fulcrum security and a deeply "in the money" constituency.

7.      What complicates matters is the timing of the ultimate realization of those assets. This timing issue is key because it presents the court with a dilemma; does the court recognize equity as the fulcrum security at confirmation based on future realizable assets or does it deem the creditor constituency to be the fulcrum security at confirmation notwithstanding the enormous pool of assets that may ultimately be available to satisfy creditor claims in full and to also provide a substantial recovery to shareholders.

8.      The Plan Proponents have taken the view that they can bridge this timing gap by providing fresh capital to reorganize the business thereby entrenching themselves between the

public shareholders and their assets while forever foreclosing existing shareholder participation in the reorganized business owned by those same public shareholders. In exchange for recapitalizing the business via Direct Subscription[4] for the Reorganized Parent stock, the Plan Proponents seek to become the sole owners of the Reorganized Parent and in the process, have also reserved for themselves an outrageously disproportionate share of the proposed Recovery Trust, the majority if not all of which, if realized, should rightfully inure to the benefit of the public shareholders of the Debtors.

9.      The particular combination of the DIP loan and the funds raised via Direct Subscription to recapitalize the business and to bridge the timing gap are characteristic of a "loan to own" arrangement. The reservation by the Plan Proponents of a disproportionate share of the Recovery Trust effectively amounts to forbearance/deferment costs, the magnitude of which is beyond the pale.

10.     Some of the key issues I propose for the Court's consideration are as follows: (1) Is the distribution of assets within the proposed Recovery Trust under the Debtor's Plan of Reorganization a fair and equitable outcome for the defrauded public shareholders? (2) Does the Reorganized Parent have "standing" to lay claim to the funds that may be recaptured in the SEC's SOX 304 proceeding? (3) Are Class 7 Interest Holders faring at least as well as they would under a Chapter 7 liquidation proceeding? (4) Have the Debtors exercised reasonable business judgment with respect to the management of certain assets of the estate?

11.     While some of the issues might typically constitute objections to Plan confirmation, I respectfully ask the Court to consider these issues at the disclosure statement stage for two principal reasons; (1) as an individual shareholder it is cumbersome to continue to

---

[4] The Direct Subscription construct was alluded to in Docket # 1122 but the details have not yet been publicly disclosed.

raise objections to each and every Plan related document and their related amendments, particularly in light of the aggressive case management schedule we are operating under and especially when inadequate time is given to raise objections to Plan related documents that are not docketed in a timely fashion; and (2) Because some of the issues raised herein would foreclose confirmation of the Plan if the Court finds them meritorious, it would be a waste of time and estate resources to delay their introduction until the confirmation hearing.

**THE DISTRIBUTION OF ASSETS WITHIN THE DEBTOR'S PROPOSED RECOVERY TRUST UNDER THE DEBTOR'S PLAN IS NOT A FAIR AND EQUITABLE OUTCOME FOR THE DEFRAUDED PUBLIC SHAREHOLDERS**

12. Under the Debtor's proposed Plan, the Debtor's seek to establish the proposed Recovery Trust whereby the first tranche of funds flowing through the Trust will be distributed 80% to the Creditors in Classes 4 and 5 and 20% to the Reorganized Parent, until such time that Classes 4 & 5 are paid in full. After the claims of Creditor Classes 4 and 5 are fully satisfied, the Plan provides that any remaining funds will be split 70% to the Reorganized Parent and 30% to Classes 6 & 7.

**13.** The Debtors propose to initially fund the Recovery Trust with a $4 million cash payment, including a $1 million payment and $3 million of "GUC Cash". Additional funds which may ultimately flow through the Recovery Trust include as much as $39 million from a Rejected Settlement and as much as $186 million in recaptured assets from the Securities and Exchange Commission's (SEC) pending SOX §304 Action against former members of the Company's Management, one of which pled guilty and two of which have been convicted by a jury in September 2010, and are awaiting sentencing. If all of these assets are ultimately returned to the Estate, the sum-total of the assets that may be available for distribution via the Recovery Trust are in the $230 million context.

14.     According to the Debtor's Disclosure Statement, the claims of Creditor Classes 4 and 5 are estimated to be allowed in a range between $40 million and $57 million. Assuming these Claims are allowed in the amount of $50 million, which would be slightly above the midrange estimate, the first tranche of distributions in an 80/20 split would yield $50 million for Classes 4 and 5 and approximately $13 million for the Reorganized Parent. The $13 million distribution to the Reorganized Parent in the first tranche of distributions is nearly as much as the $15 million raised via Direct Subscription to recapitalize the Reorganized Parent.

15.     Continuing to assume that the total assets available for distribution from the Recovery Trust total $230 million, the remaining $167 million (after satisfaction of Class 4 and 5 claims and payment to the Reorganized Parent) would be distributed in a 70/30 split between the Reorganized Parent and Classes 6 and 7. Classes 6 and 7 would be *pari passu*. This 70/30 split would yield an additional $117 million for the Reorganized Parent. Under these assumptions, the Reorganized Parent stands to receive a total of approximately $130 million from the Recovery Trust under the Debtor's proposed Plan while Classes 6 and 7 will have to split approximately $50 million. Given that Class 7 equity holds the fulcrum security if the recovered funds from the pending SOX §304 are ultimately returned to the Estate, this disproportionate sharing arrangement is most assuredly not a fair deal for shareholders.

16.     Further, according to the Financial Projections included within "Exhibit A" to the Debtor's Disclosure Statement, the Debtors estimate that the Reorganized Parent will realize approximately $8.3 million in EBITDAR during 2011. Applying an extremely conservative EV/EBITDA multiple of 6x would imply an enterprise value of approximately $50 million for the Reorganized Parent[5].

---

[5] Industry Competitor, Ceradyne (CRDN) trades at an EV/EBITDA multiple of 11.4 times, according to Yahoo Finance as of February 28, 2011. According to Ceradyne's 10-Q as of September 2010, its component revenues

17.     Under these assumptions, the aggregate value that will inure to the benefit of the Plan Proponents comprising the Reorganized Parent under the Debtor's Plan will toll in the $180 million range ($130 million from the Recovery Trust plus the $50 million enterprise value of the Reorganized Parent) all for a maximum $15 to $25 Million capital infusion into the Reorganized Parent. Quite simply, the provision of the Plan that siphons off this disproportionate stake in the Recovery Trust for the Plan Proponents (at the expense of shareholders) strains credulity.

18.     It cannot be seriously contended that the defrauded shareholders should be required to surrender value approaching $180 million and that this outcome is what justice demands. The transfer of these assets effectively amounts to forbearance costs for bridging the timing gap until the SOX §304 assets can be recovered for the Debtor's Estate. Those assets rightfully belong to the public shareholders of the Debtor, who were defrauded by former management. Accordingly, the disproportionate distribution of funds between the Reorganized Parent and Classes 6 and 7 contemplated by the Debtors is not a fair and equitable outcome for the defrauded public shareholders. I ask the Court to consider whether a $15-$25 million capital injection should entitle these (3) hedge funds to receive value in excess of $180 million that amount to forbearance payments and to consider whether this arrangement is fair and equitable for shareholders.

19.     This is an issue that is much larger than one bankruptcy case, indeed this Court's decision as to what is a fair, equitable and just outcome for these Chapter 11 cases and the aggrieved shareholders will impact upon the public at large because it will send a message the public and the financial markets as to what will be tolerated within this circuit with respect to (i)

---

generated from common business lines to that of Point Blank Solutions in 2010 and 2009 were 30%+ and 50%+ respectively. Using an EV/EBITDA multiple of 6x represents a 45% discount to the multiple currently applied by the financial markets to one of the few comparable companies (CRDN) available amongst publicly reporting companies.

the treatment of defrauded shareholders and (ii) the distribution of funds recaptured on behalf of defrauded companies and shareholders under SOX §304.

20.     This is an opportunity for this Court to bestow great honor upon itself in standing up for what is just and equitable by righting the numerous wrongs that have been foisted upon the shareholders of this company for many years. I beg this Court to take judicial notice of the implication that its decision will have for public confidence in the judicial system and in the financial markets.

21.     I respectfully ask that the Court consider whether this outcome is a fair and equitable deal for shareholders and if the Court takes a view that it is not fair and equitable then I also respectfully ask that the Court direct the Debtors to amend the distribution of the Recovery Trust to allocate the assets in such a manner that the Court deems fair and equitable. If the Court takes a different view and ultimately approves the proposed distribution scheme, the "Amended Disclosure Statement", when filed, should at least be further modified to prominently disclose the amount that the Plan Proponents stand to benefit from their Recovery Trust scheme, as presented.

## THE REORGANIZED PARENT LACKS STANDING TO LAY CLAIM TO THE FUNDS THAT MAY BE RECAPTURED IN THE SEC's SOX §304 ACTION

22.     The Debtor's Disclosure Statement fails to disclose the applicable code section(s) or any settled case law that would allow the Reorganized Parent (a Private company) to lay claim on behalf of or to direct the distribution of any of the proceeds from the SEC's SOX §304 Action into the hands of the 3 hedge funds that will constitute the Reorganized Parent. The potential clawback of some $186 million in funds from a SOX §304  Action by the Securities and Exchange Commission only arises on account of the Public Shareholders of the Debtors having

been victims of frauds committed by former management who were subsequently convicted of such crimes.

23.     SOX §304  states:

*"If an issuer is required to prepare an accounting restatement due to the material noncompliance of the **issuer**, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the **issue**r for…"*

The SEC provides clear guidance as to the meaning of the term *issuer* in its *Sarbanes Oxley Act Frequently Asked Questions* "SOX FAQs"[6] where it states "…the definition of *issuer* applies only to issuers required to file reports."

24.     The Reorganized Parent, as a private, non-reporting company, lacks standing to claim <u>any</u> of the SOX §304 clawback funds because it becomes a private company, as of the Effective Date of the Plan or as soon thereafter as all conditions precedent have been satisfied. The lack of standing on the part of the Reorganized Parent is premised on the fact that, as a non-reporting private company, the Reorganized Parent no longer fits the strict definition of an *issuer* of registered securities as that term is used in SOX §304, defined in the Securities Exchange Act of 1934 and then further clarified in the SOX FAQs. As such, the Plan is unconfirmable and the Disclosure Statement is unworthy of approval;

25.     Accordingly, when the "Amended Plan" and "Amended Disclosure Statement" are released, they must not contain any provision that allows the Reorganized Parent to receive the lion's share of the SOX §304 clawback funds via the Recovery Trust that the Debtors have proposed to establish. Under the current Plan of Reorganization, the Debtors purport to give the

---

[6] http://www.sec.gov/divisions/corpfin/faqs/soxact2002.htm

lion's share of the Recovery Trust to the holders of stock in the Reorganized Parent which is to be constituted solely by a handful of hedge funds. The largest component of the Recovery Trust would be the clawback of $186 million in assets from the SEC's pending SOX §304 Action. These assets rightfully belong to the public shareholders of the company that was defrauded by former management. As such, after Classes 4 and 5 have been satisfied, the balance of those recovered assets should inure to the sole benefit of the Public shareholders via the Recovery Trust mechanism, not to the few wealthy holders of stock in the Reorganized Parent.

26.     There is no precedent in the 3rd Circuit (or any other Circuit) for a circumstance such as this and as such the shareholders need the support of the Court in taking the lead in establishing that these Chapter 11 cases are the "poster child" precedent transaction for such a circumstance, going forward. With that in mind, this instant precedent case should have a Plan that has fairness, equitable treatment and justice as its chief design. At present, the Debtor's Plan cannot be characterized by any of these elements.


## CLASS 7 EQUITY HOLDERS DO NOT FARE AS WELL UNDER THE DEBTOR'S REORGANIZATION PLAN AS THEY WOULD IN A CHAPTER 7 LIQUIDATION

27.     Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

28.     Class 7 Interest Holders of the Debtors are a deeply "in the money" constituency and are Holders of the "fulcrum security" on account of the assets that may flow through the

Recovery Trust and on account of the derivative action claims that could also toll in the multi-million dollar range. Under the Debtor's Plan, Class 7 Interest Holders are receiving less than they would in liquidation if the Reorganized Parent (a Private company) receives any of the recovered assets from the SOX §304 Action via the Recovery Trust. As such, if Class 7 votes to reject the Plan, the Plan is unconfirmable in its present form because all dissenting classes must receive at least as much as they would in liquidation. Here, the Class 7 interests would ultimately receive less under the proposed Plan if the Reorganized Parent were to receive even as much as one penny of the assets recoverable under the SEC's pending SOX §304 Action.

29.     The facts clearly support the notion that the shareholders of Point Blank Solutions are actually receiving less than they would in liquidation because, in liquidation, the shareholders would ultimately be able to retain more (if not all) of the assets recovered under the SOX §304 Action were it not for the Plan Proponents and their impermissible grab of shareholder assets derived from the SOX §304 Action proceeds.

30.     The Recovery Trust mechanism contemplated under the Plan is not an asset distribution scheme that is exclusive to a reorganization proceeding. Indeed, it is not at all uncommon for a recovery or litigation trust to be established as a means to distribute assets, at some future date or pending the outcome of some ongoing or future litigation, whether a liquidation or reorganization is employed. As such, Class 7 Interest Holders would be receiving less under the Plan because the Reorganized Parent is receiving a disproportionate share of the Recovery Trust proceeds.  This aspect renders the Plan unconfirmable as a matter of law and accordingly, the Disclosure Statement is rendered unworthy of approval because it fails to disclose this fact and it is premised upon an unconfirmable Plan;

## THE DEBTORS HAVE NOT EXERCISED REASONABLE BUSINESS JUDGEMENT
## WITH RESPECT TO THE MANAGEMENT OF CERTAIN ASSETS OF THE ESTATE

31.     Given the posture of the SEC as evidenced by its objection [Docket # 874] to the
Debtor's attempts to direct the SOX §304 funds wherever they so choose, the Debtors run the
risk of damaging if not destroying the recoverability of these assets entirely.  Reserving the lion's
share (approximately $130 million under the assumptions above) of the assets recoverable under
the SOX §304 Action for the few hedge funds that will comprise the non-reporting Reorganized
Parent is tantamount to "thumbing its nose" at the SEC who will undoubtedly desire an outcome
that is fair for the defrauded shareholders. The disproportionate distribution of the Recovery
Trust in favor of a private, non-reporting company that is not comprised of the defrauded
shareholder base may cause the SEC to be less inclined to pursue the recovery of these assets for
the Estate if the defrauded shareholders are not the ultimate beneficiaries of the assets that are
recoverable under the SEC's pending SOX §304 Action.

32.     Also, the decision to give the broad releases that the Plan contemplates may also
destroy the derivative action claims which could yield many additional millions of dollars of
recovery for the aggrieved shareholders. The Debtors have a fiduciary duty and should exercise
that duty to take any and all necessary action (or to cease any actions or posturing that may
inflame the SEC or damage shareholder derivative claims) in order to preserve the value of these
extremely valuable assets for the benefit of the defrauded public shareholders.

33.     Although the Debtors currently have fashioned a Plan that purports to structure
the Reorganized Parent as a private, non-reporting company and to permanently foreclose public
shareholder participation in the Reorganized Parent, that outcome is not set in stone until the
Plan is confirmed. As such, the business should be operated in such a manner that preserves all

of the assets for the benefit of all parties in interest, especially for the benefit of the defrauded shareholders.

**CONCLUSION**

34.     As more fully discussed above, the Plan and Disclosure Statement contain significant and material deficiencies that must be addressed before they can be approved. For the foregoing reasons, I respectfully ask that the Court direct the Debtors to modify the Plan and Disclosure Statement to provide for: (1) a distribution of assets within the proposed Recovery Trust under the Debtor's Plan of Reorganization such that a fair and equitable outcome for the defrauded public shareholders is obtained; (2) the  removal of the Plan provision that allows the Reorganized Parent to become a beneficiary of any assets that stand to be recovered from the SECs SOX §304 Action and (3) an outcome that would allow for shareholders to retain at least as much as they would in a Chapter 7 liquidation.

35.     Additionally, I respectfully request that the Court: (4) Direct the Debtors to postpone consideration of the heretofore unfiled "Amended Disclosure Statement" to a date beyond the March 3rd omnibus hearing date; (5) Direct the debtors to establish a new objection deadline for the "Amended Disclosure Statement" whenever it is finally released (6) Direct the Debtors to honor their *fiduciary duty* to communicate and give proper notice regarding *all* future motions and hearing adjournments; (7) Consider any late-filed objections that are docketed within a timeframe (as may be deemed reasonable by the Court) after any artificially shortened objection deadline and (8) Order such additional and other relief which the Court may determine to be just and proper under all of the facts and circumstances shown.

Respectfully submitted,

Dated: Woodway, TX

February 28, 2011

Rodney D. McFadden

By:  /s/ Rodney D. McFadden

7833 Fairway Rd.

Woodway, TX 76712

Telephone: (979) 324-4363

Email:rdmcfadden@gmail.com

## CERTIFICATE OF SERVICE

I, Rodney McFadden, hereby certify that on the 28th day of February , 2011, I served the Statement of Additional Objections to Confirmation of the Joint Chapter 11 Plan of Reorganization, and in Opposition to Debtor's Motion for Entry of an Order Approving the Adequacy of the Disclosure Statement and Related Relief  pursuant to Chapter 11 of the United States Bankruptcy Code, upon the parties in the attached service list:

_/s/ Rodney McFadden_____
RODNEY McFADDEN

Counsel for the Debtors
Laura Davis Jones, Esq.
Timothy Cairns, Esq.
Pachulske Stang Ziehl & Jones, LLP
919 North Market Street, 17th Floor
Wilmington, DE 19801

    and
David M. Bertenthal, Esq.
Joshua M. Fried, Esq.
Pachulski Stang Ziehl &Jones LLP
150 California Street, 15th Floor
San Francisco, CA 94111

Counsel for the Creditors' Committee
Frederick B. Rosner, Esq.
Brian L. Arban, Esq.
Messana Rosner & Stem, LLP
1000 N. West Street, Ste. 1200
Wilmington, DE 19801
      and
Robert M. Hirsh, Esq.
George Angelich, Esq.
Arent Fox LLP
1675 Broadway
New York, New York 10019

Counsel for the Equity Committee
Joseph T. Moldovan
Morrison Cohen LLP
909 Third Avenue
New York, New York 10022
    and

Neil B. Glassman
Bayard, P.A.
222 Delaware Avenue, Ste. 900
Wilmington, DE 19899

Counsel to Privet Opportunity Fund I, LLC and Privet Fund Management LLC
Edward J. Estrada, Esq.
Reed Smith LLP
599 Lexington Avenue, 22nd Floor
New York, New York 10022
    and
Kurt F. Gwynne, Esq.
Reed Smith LLP
1201 Market Street, Ste. 1500
Wilmington, DE 19801

Counsel to Prescott Group Capital Management
Richard Palacio, Esq.
Ashby & Geddes
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

Counsel to Lonestar Capital Management, LLC
David B. Stratton, Esq.
Pepper Hamilton LLP
Hercules Plaza, Ste. 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19801-1709
     and
David P. Simonds, Esq.
Akin Gump Strauss Hauer & Feld LLP
2029 Century Park East, Ste. 2400
Los Angeles, CA 90067-3010
     and
Michael P. Cooley, Esq.
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue, Ste. 4100
Dallas, Texas 75201-4675

United States Trustee
844 King Street, Ste. 2207
Lock box #35
Wilmington, DE 19801

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
Patricia Schrage (PS 1753)
New York Regional Office
3 World Financial Center
New York, NY 10281
(212) 336-1100