# **EXHIBIT 1**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | )   Chapter 11 |
| | ) |
| POINT BLANK SOLUTIONS, INC., *et al.*,[1] | )   Case No. 10-11255 (PJW) |
| | ) |
| Debtors. | )   Jointly Administered |
| | ) |

## AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

---

**THIS CHAPTER 11 PLAN IS BEING SUBMITTED FOR APPROVAL BY
THE BANKRUPTCY COURT. THE DISCLOSURE STATEMENT ACCOMPANYING
THIS CHAPTER 11 PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY
COURT. ACCORDINGLY, THIS IS NOT A SOLICITATION OF ACCEPTANCE
OR REJECTION OF THE CHAPTER 11 PLAN. ACCEPTANCES OR
REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

Dated: ~~January [ ]~~ _____, 2011

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number and address, are: Point Blank Solutions, Inc. (9361), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor, Inc. (4044), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Protective Apparel Corporation of America (9051), 179 Mine Lane, Jacksboro, TN 37757; and PBSS, LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.

# TABLE OF CONTENTS

ARTICLE 1 DEFINED TERMS, RULES OF INTERPRETATION,  COMPUTATION OF TIME
AND GOVERNING LAW .................................................................................................2
    1.1      Defined Terms ...........................................................................................2
    1.2      Rules of Interpretation ...........................................................................~~14~~13
    1.3      Computation of Time ............................................................................~~15~~13
    1.4      Governing Law ......................................................................................~~15~~13
    1.5      Reference to Monetary Figures...............................................................~~15~~14

ARTICLE 2 CLASSIFICATION OF CLAIMS AND INTERESTS ...................................~~15~~14
    2.1      General Rules of Classification ..............................................................~~15~~14
    2.2      Administrative Claims and Priority Tax Claims .....................................~~15~~14
    2.3      Summary of Classification .....................................................................~~16~~14

ARTICLE 3 TREATMENT OF CERTAIN UNCLASSIFIED CLAIMS ...........................~~16~~14
    3.1      Administrative Claims............................................................................~~16~~14
    3.2      U.S. Trustee Fees...................................................................................~~17~~15
    3.3      Priority Tax Claims ...............................................................................~~17~~16

ARTICLE 4 TREATMENT OF CLASSES OF CLAIMS AND INTERESTS ....................~~17~~16
    4.1      Treatment of Allowed Class 1 Claims (Other Priority Claims) ...............~~17~~16
    4.2      Treatment of Allowed Class 2 Claims (DIP Claims) ...............................~~18~~16
    4.3      Treatment of Allowed Class 3 Claims (Miscellaneous Secured Claims) ...........................~~18~~16
    4.4      Treatment of Allowed Class 4 Claims (General Unsecured Claims)..................~~18~~17
    4.5      Treatment of Allowed Class 5 Claims (Subordinated Unsecured Claims) .........~~19~~17
    4.6      Treatment of Allowed Class 6 Claims (Class Action Claims) ..................~~19~~17
    4.7      Treatment of Allowed Class 7 Interests (Old Equity Interests) ...............~~19~~18
    4.8      Treatment of Allowed Class 8 Claims and Interests (Other Subordinated Claims
            and Interests)........................................................................................~~20~~18
    4.9      Treatment of Allowed Class 9 Interests (Unexercised Options)...............~~20~~18

ARTICLE 5 ACCEPTANCE REQUIREMENTS..............................................................~~20~~19
    5.1      Acceptance or Rejection of the Plan .......................................................~~20~~19
    5.2      Tabulation of Votes on a Non-Consolidated Basis ..................................~~20~~19

ARTICLE 6 MEANS FOR IMPLEMENTATION OF THE PLAN....................................~~21~~19
    6.1      Inter-Debtor Compromise......................................................................~~21~~19
    6.2      Exit Facility..........................................................................................~~22~~20
    6.3      ~~Rights Offering~~Direct Subscription.............................................................~~22~~20
    6.4      Additional Cash Contribution ................................................................21
    ~~6.4~~6.5      Sources of Consideration for Plan Distributions ....................................~~24~~21
    ~~6.5~~6.6      Issuance of New Common Stock ~~Purchased in the Rights Offering~~.................~~24~~21
    ~~6.6~~      ~~Additional Issuance of New Common Stock~~.............................................~~25~~
    6.7      Cancellation/Conversion of Securities and Agreements ..........................~~25~~22
    6.8      Exemptions for Issuance of New Common Stock .....................................~~25~~22
    6.9      Corporate Existence ..............................................................................~~26~~22
    6.10    New Certificate of Incorporation and New By-Laws...............................~~26~~22
    6.11    Reorganized Debtors' Boards of Directors..............................................~~26~~22
    6.12    Officers of Reorganized Debtors ...........................................................~~26~~23
    6.13    Employee Benefits.................................................................................~~26~~23
    6.14    Vesting of Assets in the Reorganized Debtors ........................................~~27~~23
    6.15    Corporate Action...................................................................................~~27~~23
    6.16    Effectuating Documents; Further Transactions........................................~~27~~24

6.17 General Settlement of Claims and Interests ........................................................ 2724
6.18 Section 1146 Exemption from Certain Taxes and Fees ................................... 2824
6.19 D&O Liability Insurance Policies and Indemnification Provisions ............... 2824
6.20 Preservation of Rights and Causes of Action ................................................ 2825
6.21 Payment of Fees and Expenses of the DIP Lenders ..................................... 2925
6.22 Non-Participation of Other Subordinated Claims and Interests .................. 2925

ARTICLE 7 TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................. 2925
7.1 Assumption and Rejection of Executory Contracts and Unexpired Leases .......... 2925
7.2 Objections to Assumption; Determination of Cure Claims ........................ 3026
7.3 Claims Based on Rejection of Executory Contracts or Unexpired Leases ......... 3127
7.4 Insurance Policies ......................................................................... 3128
7.5 Modifications, Amendments, Supplements, Restatements or Other Agreements. ... 3128
7.6 Reservation of Rights ..................................................................... 3228
7.7 Contracts and Leases Entered Into After the Petition Date. ..................... 3228

ARTICLE 8 RECOVERY TRUST ....................................................................... 3228
8.1 Purpose of Trust ........................................................................... 3228
8.2 Governing Document; Funding .......................................................... 3229
8.3 Vesting of Assets; Allocation ........................................................... 3229
8.4 Tax Treatment .............................................................................. 3331
8.5 Trust Interests .............................................................................. 3332
8.6 Administration of the Recovery Trust ................................................. 3533
8.7 Rights and Responsibilities of Recovery Trustee .................................. 3534

ARTICLE 9 PROVISIONS GOVERNING DISTRIBUTIONS ....................................... 3534
9.1 Record Date for Distributions ........................................................... 3534
9.2 Timing and Calculation of Amounts to Be Distributed ........................... 3534
9.3 Disbursing Agent .......................................................................... 3635
9.4 Delivery of Distributions and Undeliverable or Unclaimed Distributions ....... 3635
9.5 Withholding and Reporting Requirements ............................................ 3635
9.6 Setoffs ....................................................................................... 3635
9.7 Claims or Interests Paid or Payable by Third Parties ............................. 3736
9.8 Postpetition Interest ...................................................................... 3736
9.9 Section 506(c) Reservation ............................................................. 3736
9.10 Single Satisfaction of Claims .......................................................... 3736

ARTICLE 10 PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED AND DISPUTED CLAIMS ........................................................................... 3736
10.1 Prosecution of Objections to Claims ................................................. 3736
10.2 Allowance of Claims ..................................................................... 3837
10.3 Disputed Claims Reserve ............................................................... 3837
10.4 Distributions After Allowance ......................................................... 3837
10.5 Distribution of Excess Amounts in the Disputed Claims Reserve ............. 3837
10.6 Property Held in Reserve for Disputed Claims .................................... 3837
10.7 Estimation of Claims ..................................................................... 38
10.8 Deadline to File Objections to Claims ............................................... 3938

ARTICLE 11 SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS .......... 3938
11.1 Compromise and Settlement of Claims, Interests and Controversies .......... 3938
11.2 Releases by the Debtors ................................................................. 3938
11.3 Releases by Holders of Claims and Interests ...................................... 4039
11.4 Exculpation ................................................................................. 4039
11.5 Discharge of Claims and Termination of Interests ............................... 40
11.6 Injunction ................................................................................... 4140
11.7 Term of Injunctions or Stays .......................................................... 4241

11.8     Injunction Against Interference With Plan ........................................................ 4241
11.9     Injunction Related to Releases and Exculpation ........................................ 4241
11.10   Protection Against Discriminatory Treatment ........................................ 4241
11.11   No Consent to Change of Control Required ........................................ 4241
11.12   Release of Liens ........................................................................................ 4342

ARTICLE 12 CONDITIONS TO THE CONFIRMATION DATE AND EFFECTIVE DATE.................. 4342
12.1     Conditions Precedent to Confirmation ........................................ 4342
12.2     Conditions Precedent to the Effective Date ........................................ 4342
12.3     Waiver of Conditions .................................................................. 4443
12.4     Effect of Failure of Conditions ........................................................ 4443

ARTICLE 13 MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN.................. 4544
13.1     Modification and Amendments ........................................................ 4544
13.2     Effect of Confirmation on Modifications ........................................ 4544
13.3     Revocation or Withdrawal of the Plan ........................................ 4544

ARTICLE 14 RETENTION OF JURISDICTION ................................................................ 4544

ARTICLE 15 MISCELLANEOUS PROVISIONS ........................................................ 4746
15.1     Immediate Binding Effect ........................................................ 4746
15.2     Additional Documents ................................................................ 4746
15.3     Dissolution of Statutory Committees ........................................ 47
15.4     Successors and Assigns ................................................................ 4847
15.5     Service of Documents ................................................................ 4847
15.6     Entire Agreement ...................................................................... 4948
15.7     Severability of Plan Provisions ........................................ 4948
15.8     Exhibits ...................................................................................... 4948
15.9     Votes Solicited in Good Faith ........................................ 4948
15.10   Closing of Chapter 11 Cases ........................................ 4948
15.11   Conflicts ........................................................................ 49

# INTRODUCTION

Point Blank Solutions, Inc., Point Blank Body Armor, Inc., Protective Apparel Corporation of America and PBSS, LLC, as debtors and debtors in possession in these Chapter 11 Cases, together with the Creditors' ~~Committee, the Equity~~ Committee, Privet Fund Management LLC (as investment manager to Privet Fund LP and Privet Opportunity Fund I, LLC), Privet Opportunity Fund I, LLC, Prescott Group Capital Management, LLC and Lonestar Capital Management, LLC, as investment advisor to Lonestar Partners, LP and manager to PB Funding, LLC (the "Plan Proponents"), respectfully propose the following joint chapter 11 plan of reorganization (the "Plan").

This Plan is proposed by and on behalf of each Debtor as its individual, separate plan under chapter 11 of the Bankruptcy Code. Reference is made to the Disclosure Statement accompanying the Plan for a discussion of the Debtors' history, results of operations, historical financial information and properties, and for a summary and analysis of the Plan. All holders of Claims against or Interests in a Debtor are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan. Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to such terms in Section 1.1 unless otherwise noted. Unless otherwise noted herein, section (§) references are to the Bankruptcy Code.

The Plan contemplates the reorganization of the Debtors' businesses and the resolution of the outstanding Claims against and Interests in the Debtors. Generally, the Plan is structured around three key components.

(a) ~~The Rights Offering~~/Direct Subscription. In addition to Cash on hand and an Exit Facility, if one is necessary and available, the Debtors intend to fund their reorganization effort—including the payment of all amounts due under the Plan—through the issuance and sale of shares of New Common Stock in Reorganized Parent in a minimum amount of $15,000,000 and (subject to certain consents and other conditions) up to a maximum of $25,000,000. A portion of such Commitment may be in the form of the Purchaser Loans as described in Section 6.3(a). The New Common Stock will be sold ~~(i) through a Rights Offering to eligible holders of Allowed General Unsecured Claims and Allowed Old Equity Interests, backstopped by the Debtors' existing DIP Lenders, and (ii)~~ through a direct subscription of shares to ~~two of the~~ existing DIP Lenders, ~~Privet and Prescott. The Rights Offering and~~ or one or more of their respective Affiliates. The direct subscription ~~are~~is described more fully in Section 6.3 and in the Subscription ~~and Backstop~~ Agreement.

(b) The Inter-Debtor Compromise. The Plan Proponents have identified several potential Claims, Causes of Action and other disputes that may exist between the several Debtors, including existing and potential disputes regarding (i) the value and disposition of Intercompany Claims, (ii) the valuation of the individual Debtor's Estates, (iii) the individual Debtor's respective ownership interest in certain potentially valuable lawsuits, (iv) the susceptibility of two or more of the Debtors' Estates to substantive consolidation and (v) the consideration, if any, that should be paid by Parent to retain its existing Interests in the Debtor Subsidiaries. The treatment to be provided under the Plan to each Class of Claims against or Interests in the respective Debtors is in part a product of a global compromise and settlement of these and other potential Claims, Causes of Action and disputes that would be costly and time-consuming to litigate. It is the Plan Proponents' view that the Inter-Debtor Compromise is the best way to resolve these disputes, avoid the delay and expense of litigating these issues and ensuring the equitable treatment of the Debtors' Creditors and Interest holders. The Inter-Debtor Compromise is described more fully in Section 6.1

(c) The Recovery Trust. Under the Plan, holders of Allowed General Unsecured Claims, Allowed Subordinated Unsecured Claims, Allowed Class Action Claims and Allowed Old Equity Interests will be issued beneficial interests in a Recovery Trust established for the purpose of liquidating certain assets and distributing the proceeds thereof to the trust beneficiaries and making certain disbursements or distributions to Reorganized Parent. Allowed Excess Fee Claims of certain Professionals will also be paid out of the proceeds from the Recovery Trust prior to payments to the trust beneficiaries. On the Effective Date, the Reorganized Debtors will fund a Recovery Trust with ~~a cash payment of $3 million, an additional $1 million for expenses and~~ rights to certain potentially valuable Causes of Action, the proceeds of which will be shared with the Reorganized Parent (in accordance with the waterfall described in Section 8.3(c)) and distributed to the beneficiaries of the Recovery Trust in accordance with the waterfall provisions described in Sections 8.3(c) and 8.5. In addition, the Recovery Trust will be provided with initial funding for litigation and related expenses as described in Section ~~8.5~~8.2, and may be

1

funded with a portion of the Additional Cash Contribution, in which case such amount will be distributed as described in Section 8.3(b). The Recovery Trust is~~may~~ also be able to borrow certain funds from the Reorganized Parent as described ~~more fully~~in Section 8.2. The foregoing summary is qualified by the provisions governing the Recovery Trust as described in Article 8 and in the Recovery Trust Agreement, which will be filed as part of the Plan Supplement.

**ARTIC**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME AND GOVERNING LAW**

**0.1     *Defined Terms***

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form:

"*Additional Cash Contribution*" means the sum of $3,000,000 that shall be funded on the Effective Date from the sources of funding described in Section 6.5 and allocated in accordance with Section 6.4.

"*Administrative Claim*" means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of the Debtors of the kind specified in § 503(b) and entitled to priority pursuant to §§ 507(a)(2) or 507(b), including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (ii) Professional Fee Claims; (iii) all fees and charges assessed against the Estates pursuant to 28 U.S.C. §§ 1911-1930 or the Bankruptcy Rules; and (iv) all obligations designated as Administrative Claims pursuant to an order of the Bankruptcy Court.

"*Administrative Claims Bar Date*" means, for any Administrative Claim, the date which is thirty (30) days after the Effective Date or such earlier deadline that has been or may be set by order of the Bankruptcy Court, including the Administrative Claims Bar Date Order, for filing a request for allowance of such Administrative Claim. Professional Fee Claims shall not be subject to the Administrative Claims Bar Date.

"*Administrative Claims Bar Date Order*" means the *Order (1) Fixing Bar Date for the Filing of Proofs of Claim, (2) Fixing Bar Date for the Filing of Proofs of Claim By Governmental Units, (3) Fixing Bar Date for the Filing of Requests for Allowance of Bankruptcy Code § 503(b)(9) Administrative Expense Claims, (4) Fixing Bar Date for the Filing of Requests for Allowance of WARN Act Claims, (5) Designating Form and Manner of Notice Thereof and (6) Granting Related Relief* [Docket No. 237], entered on June 10, 2010.

"*Affiliate*" has the meaning set forth in § 101(2).

"*Allowed*" means, when used with respect to a Claim or Interest, (i) a Claim that has been scheduled by the Debtors in their Schedules as other than disputed, contingent or unliquidated that has not been superseded by a filed Proof of Claim and as to which the Debtors or any other party in interest has not filed an objection on or before the 180th day after the Effective Date (unless such date is extended, for cause, by the Bankruptcy Court upon request of the Reorganized Debtors or the Recovery Trustee); (ii) any Claim (or portion thereof) that is set forth in a timely filed Proof of Claim or Interest as to which no action to dispute, deny, equitably subordinate or otherwise limit recovery with respect thereto, or alter priority thereof, has been filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or order of the Bankruptcy Court; or (iii) any Claim (or portion thereof) or Interest that is allowed (a) in any contract, instrument, indenture or other agreement entered into in connection with the Plan, (b) pursuant to the terms of the Plan, (c) by Final Order of the Bankruptcy Court, or (d) with respect to an Administrative Claim only, (1) that was incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases to the extent due and owing without defense, offset, recoupment or counterclaim of any kind, and (2) that is not otherwise Disputed.

"*Avoidance Actions*" mean all claims and Causes of Action arising under chapter 5 of the Bankruptcy Code, including under §§ 506(d), 510(c), 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and 553, and any state

2

law equivalents, whether or not such claims or causes of action seek an affirmative recovery or are raised as a defense to or offset against the allowance of a Claim.

~~"*Backstop Approval Order*" means that order entered by the Bankruptcy Court on [_____], 2011, authorizing and approving, among other things, (i) the Debtors' entry into and performance under the Subscription and Backstop Agreement and (ii) payment of the Backstop Fee, Backstop Expenses and Indemnification Obligations.~~

~~"*Backstop Commitment*" means the commitment of each Backstop Purchaser to backstop a portion of the Rights Offering as, and to the extent, provided in the Subscription and Backstop Agreement.~~

~~"*Backstop Expenses*" means the expenses of the Backstop Parties to be reimbursed under the terms of the Subscription and Backstop Agreement.~~

~~"*Backstop Fee*" means the fee payable to the Backstop Purchasers, as defined, and as provided for, in the Subscription and Backstop Agreement.~~

~~"*Backstop Indemnification Obligations*" means the indemnification obligations described in Section 12 of the Subscription and Backstop Agreement.~~

~~"*Backstop Purchaser*" or "*Backstop Purchasers*" means PB Funding, Prescott and Privet, each in their capacities as a Backstop Purchaser (as defined in the Subscription and Backstop Agreement).~~

"*Ballot*" means the ballot on which holders of Impaired Claims and Interests will, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the Voting Instructions.

"*Bankruptcy Code*" means title 11 of the United States Code, as amended from time to time and applicable to the Chapter 11 Cases.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under § 2075 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as well as the general and local rules of the Bankruptcy Court, as they may be amended from time to time.

"*Beneficiary*" and "*Beneficiaries*" means any "beneficiary" of the Recovery Trust, as that term is defined in the Recovery Trust Agreement.

"*Board Observer*" means Eric J. Rosenbloom, in his capacity as observer of the Board of Directors of Parent pursuant to the terms of the *Order Authorizing Appointment of Eric J. Rosenbloom to Serve as Observer of Board of Directors Nunc Pro Tunc to September 15, 2010*, entered on November 19, 2010 [Docket No. 785]

"*Business Day*" means any day other than a Saturday, Sunday or legal holiday, as that term is defined in Bankruptcy Rule 9006(a)(6).

"*Cash*" means the legal tender of the United States of America or the equivalent thereof.

"*Cash Management Order*" means the *Order Authorizing (i) Maintenance of Existing Bank Accounts, (ii) Continued use of Existing Business Forms, (iii) Continued Use of Existing Cash Management System, and (iv) Continued Performance of Intercompany Transactions and Providing Administrative Expense Priority Status to Postpetition Intercompany Claims, and (v) Waiver of Section 345(b) Deposit and Investment Requirements* [Docket No. 42], dated April 16, 2010.

"*Causes of Action*" means any and all actions, proceedings, causes of action, obligations, suits, judgments, damages, demands, debts, accounts, controversies, agreements, promises, liabilities, legal remedies, equitable remedies, and claims (and any rights to any of the foregoing), whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, known or unknown, foreseen or unforeseen, fixed, contingent, matured, unmatured, disputed, undisputed, then existing or thereafter arising, secured or unsecured, whether asserted or assertable directly or derivatively, in law, equity or otherwise including any recharacterization, subordination, avoidance or other claim arising under or pursuant to § 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law.

"*Chapter 11 Case*" or "*Chapter 11 Cases*" means (i) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (ii) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under Case No. 10-11255(PJW).

"*Claim*" means any claim, as defined in § 101(5), against a Debtor.

"*Class*" means a class of Claims or Interests as set forth in Article 4.

"*Class 1*" means any or all of Classes 1A, 1B, 1C and 1D, as the context may require.

"*Class 2*" means any or all of Classes 2A, 2B, 2C and 2D, as the context may require.

"*Class 4*" means any or all of Classes 4A, 4B, 4C and 4D, as the context may require.

"*Class 4 ~~and~~/Class 5 Satisfaction*" has the meaning set forth in Section 8.3.

"*Class 4 Trust Interest*" means a Trust Interest issued to a holder of an Allowed Class 4 General Unsecured Claim or reserved for issuance to a holder of a Disputed Class 4 General Unsecured Claim in accordance with Section 8.5.

"*Class 5*" means any or all of Classes 5A, 5B, 5C and 5D, as the context may require.

"*Class 5 Trust Interest*" means a Trust Interest issued to a holder of an Allowed Class 5 Subordinated Unsecured Claim or reserved for issuance to a holder of a Disputed Class 5 Subordinated Unsecured Claim in accordance with Section 8.5.

"*Class 6*" means any or all of Classes 6A, 6B, 6C and 6D, as the context may require.

"*Class 6 Trust Interest*" means a Trust Interest issued to a holder of an Allowed Class 6 Class Action Claim or reserved for issuance to the holder of a Disputed Class 6 Class Action Claim in accordance with Section 8.5.

"*Class 7*" means any or all of Classes 7A, 7B, 7C and 7D, as the context may require.

"*Class 7 Trust Interest*" means a Trust Interest issued to a holder of an Allowed Class 7 Old Equity Interest in accordance with Section 8.5.

"*Class 8*" means any or all of Classes 8A, 8B, 8C and 8D, as the context may require.

"*Class Action Claims*" means any Claim arising out of or relating to *In re DHB Industries, Inc. Class Action Litigation* (No. CV 05-4296) in the United States District Court for the Eastern District of New York, including claims of attorneys and other professionals arising therefrom.

"*Class Action Escrow*" means the escrow account created under the Escrow Agreement, dated July 26, 2006, in connection with the Class Action Settlement Agreement.

4

"*Class Action Settlement Agreement*" means the Stipulation and Agreement of Settlement (the "Settlement Agreement"), dated November 30, 2006, between the parties in *In re DHB Industries, Inc. Class Action Litigation* (No. CV 05-4296) and *In re DHB Industries, Inc. Derivative Litigation* (No. CV 05-4345).

"*Collateral*" means any property or interest in property of the Debtors subject to a Lien securing the payment or performance of a Claim.

~~"*Commitment*" has the meaning set forth in the Subscription and Backstop Agreement.~~

"*Commitment*" means the commitment of each Purchaser to subscribe for and purchase the New Common Stock as, and to the extent, provided in the Plan and the Subscription Agreement (including Purchasers' right to fund in good faith a portion of the commitment as loans to Reorganized Parent under the terms of the Subscription Agreement as described in Section 6.3(a)).

"*Compensation Procedures Order*" means the *Administrative Order Establishing Procedures for Interim Compensation Pursuant to Section 331 of the Bankruptcy Code* [Docket No. 114], entered May 12, 2010.

"*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases of the Debtors in accordance with Bankruptcy Rules 5003 and 9021.

"*Confirmation Hearing*" means the hearing held by the Bankruptcy Court concerning Confirmation of the Plan pursuant to §§ 1128 and 1129, as such hearing may be adjourned continued from time to time.

"*Confirmation Order*" means the order entered by the Bankruptcy Court confirming the Plan pursuant to § 1129.

"*Consenting Professional*" or "*Consenting Professionals*" means Pachulski Stang Ziehl & Jones LLP, CRG Partners Group LLC, Arent Fox LLP, The Rosner Law Group LLC, CBIZ Accounting, Tax & Advisory of New York, LLC and [_____].

"*Creditor*" means any creditor, as defined in § 101(10).

~~"*Creditor Rights Offering*" has the meaning set forth in Section 6.3(a).~~

~~"*Creditor Rights Offering Pro Rata Share*" means, with respect to any Eligible Creditor as of the Subscription Record Date, an amount equal to (i) the quotient of (a) such Eligible Creditor's Rights Participation Amount on account of such Creditor's Class 4 General Unsecured Claim divided by (b) the aggregate total of all Rights Participation Amounts on account of all Class 4 General Unsecured Claims, as then multiplied by (ii) the product of (a) the Rights Offering Amount and (b) 50.633%.~~

"*Creditors' Committee*" means the statutory committee of unsecured creditors of the Debtors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to § 1102, as the same may be reconstituted from time to time.

"*Cure Claim*" means a Claim based upon a monetary default, if any, by any Debtor on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to § 365.

"*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers' and officers' liability, whether or not set forth on the *Schedule of Insurance Policies* to be included in the Plan Supplement.

"*Debtor*" or "*Debtors*" means Point Blank Solutions, Inc., Point Blank Body Armor Inc., Protective Apparel Corporation of America and PBSS, LLC, each in its capacity as a debtor and debtor in possession in the Chapter 11 Cases.

5

"*DIP Claim*" means any Claim derived from or based upon the DIP Loan Agreement and Final DIP Order for payment of outstanding Obligations (as defined in the DIP Loan Agreement), including Claims for principal, interest, fees and expenses owing thereunder (including, to the extent provided in the DIP Loan Agreement or the Final DIP Order, all reasonable, actual and documented fees, expenses and disbursements of (i) PB Funding and its advisors, including Akin Gump Strauss Hauer & Feld LLP and Pepper Hamilton LLP, (ii) Privet and its advisors, including Reed Smith LLP, and (iii) Prescott and its advisors, including Ashby & Geddes, P.A.).

"*DIP Lenders*" means PB Funding, Privet and Prescott.

"*DIP Loan Agreement*" means that certain Debtor-In-Possession Financing Agreement, dated as of December 10, 2010, between and among the Debtors, as borrowers, and the DIP Lenders, as lenders, as <u>well as any other documents entered into in connection therewith, as the same</u> may be amended, modified, ratified, extended, renewed or restated, ~~as well as any other documents entered into in connection therewith and as modified by the Final DIP Order~~.

"*Disallowed*" means, when used with respect to a Claim or an Interest, a Claim or an Interest that has been disallowed pursuant to a Final Order or by operation of the Bankruptcy Code and Bankruptcy Rules.

"*Disbursing Agent*" means Reorganized Parent or the Entity or Entities designated by the Reorganized Debtors to make or facilitate Distributions pursuant to the Plan. On and after the Effective Date of the Plan, the Recovery Trustee shall be the Disbursing Agent except with respect to the payment of Administrative Claims, Priority Tax Claims, Other Priority Claims and Miscellaneous Secured Claims, as to which Reorganized Parent or its designee shall be the Disbursing Agent.

"*Disclosure Statement*" means the disclosure statement that relates to the Plan, as such disclosure statement may be amended, modified or supplemented (including all exhibits and schedules annexed thereto or referred to therein).

"*Disputed*" means, when used with respect to a Claim or Interest, that portion (or the whole) of a Claim or Interest that is not an Allowed Claim or Interest, and as to which (i) a Proof of Claim has been filed or deemed filed under applicable law or order of the Bankruptcy Court; (ii) an objection has been or may be timely filed (including for the subordination of any Claim or Interest); or (iii) such objection has not been (a) withdrawn, (b) overruled or denied pursuant to a Final Order or (c) granted pursuant to a Final Order. Before the time that an objection has been or may be filed, a Claim or Interest shall be considered to be Disputed (i) if the amount or classification of the Claim or Interest specified in any Proof of Claim or Interest exceeds or varies from the amount or classification of any corresponding Claim or Interest scheduled by the Debtor in its Schedules or reflected in its stock register, as applicable, to the extent of such excess or variance; (ii) in its entirety, if any corresponding Claim or Interest scheduled by the Debtor has been scheduled as contingent, unliquidated or disputed in its Schedules; or (iii) in its entirety, if no corresponding Claim or Interest has been scheduled by the Debtor in its Schedules or list of equity security holders or reflected in its stock register. It may also refer to a Disputed Claim in a specified class; for example, a Disputed General Unsecured Claim is a Disputed Claim in the Class of General Unsecured Claims.

"*Disputed Claims Reserve Account*" has the meaning set forth in Section 10.3.

"*Distribution*" means the distributions to be made pursuant to the Plan, but excludes the ~~Rights Offering~~<u>issuance of the Purchased Shares</u>.

"*Distribution Record Date*" means the date that the Confirmation Order is entered by the Bankruptcy Court.

"*DTC*" means the Depository Trust Company.

"*Effective Date*" means the first Business Day after which all provisions, terms and conditions specified in Section 12.2 have been satisfied or waived pursuant to Section 12.3.

"*Eligible Holder*" means an Eligible Creditor and an Eligible Equity Holder.

"*Eligible Creditor*" means a holder of a Class 4 General Unsecured Claim that is entitled to participate in the Rights Offering; *provided, however,* that such holder's ability to exercise its Rights in the Rights Offering shall be subject to securities and other applicable laws; and *provided, further,* that no such holder shall be an Eligible Creditor (i) if such holder or such holder's relative (as defined in § 101(45)) has been convicted of a crime (whether misdemeanor or felony) based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Petition Date in any way relating any Debtor, or (ii) if such holder is an assignee of, or counsel to, a holder excluded in the foregoing clause (i). Holders of Intercompany Claims shall not be Eligible Creditors.

"*Eligible Equity Holder*" means a record or beneficial holder of a Class 7 Old Equity Interest that is entitled to participate in the Rights Offering; *provided, however,* that such holder's ability to exercise its Rights in the Rights Offering shall be subject to securities and other applicable laws; and *provided, further,* that no such holder shall be an Eligible Equity Holder (i) on account of any Interests that are Class 8 Other Subordinated Claims and Interests or Class 9 Unexercised Options, (ii) if such holder or such holder's relative (as defined in § 101(45)) has been convicted of a crime (whether misdemeanor or felony) based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Petition Date in any way relating any Debtor, or (iii) if such holder is an assignee of, or counsel to, a holder excluded in the foregoing clause (ii).

"*Employee Benefits*" has the meaning assigned to it in Section 6.13.

"*Entity*" has the meaning set forth in § 101(15).

"*Equity Committee*" means the statutory committee of equity holders of the Debtors appointed in the Chapter 11 Cases by the U.S. Trustee pursuant to § 1102, as the same may be reconstituted from time to time

"*Equity Rights Offering*" has the meaning assigned to it in Section 6.3(a).

"*Equity Rights Offering Pro Rata Share*" means, with respect to any Eligible Equity Holder as of the Subscription Record Date, an amount equal to (i) the quotient of (a) the number of Class 7 Old Equity Interests held by such Eligible Equity Holder divided by (b) the total number of issued and outstanding Class 7 Old Equity Interests, multiplied by (ii) the product of (a) the Rights Offering Amount and (b) 49.367%.

"*Estate*" means, as to a Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to § 541.

"*Estate Claim*" means the Debtors' interests, if any, in any of the following Causes of Action or the proceeds thereof: (i) all Avoidance Actions and Causes of Action arising under applicable state or federal law providing for the avoidance and recovery of fraudulent conveyances or transfers; (ii) claims against the Debtors' current or former officers and directors; (iii) any rights related to recovery of funds in any class action or derivative claim; (iv) any and all claims to forfeiture proceeds and SOX 304 proceeds, the Toyobo litigation and all other litigation claims, causes of action (including derivative claims), recoveries and proceeds thereof belonging to the Estates; (v) claims and proceeds under Insurance Policies and contracts related to Insurance Policies (including the Release, Indemnity and Settlement Agreement, dated July 26, 2006, and entered into by National Union Fire Insurance Co. of Pittsburgh, Pa., XL Specialty Insurance Co., DHB Industries, Inc., David H. Brooks, Sandra Hatfield, Dawn M. Schlegel, Larry Elis, Barry Berkman, Cary Chasin, Jerome Krantz, and Gary Nadelman); (vi) commercial tort claims; (vii) *In re DHB Industries, Inc. Class Action Litigation* (No. CV 05-4296) and *In re DHB Industries, Inc. Derivative Litigation* (No. CV 05-4345) in the United States District Court for the Eastern District of New York; (viii) (A) *United States of America v. All Assets Listed on Schedule I, Attached Hereto and All Proceeds Traceable Thereto*, Civil Action No. 10 CV 4750 (Seybert, J.), and the Department of Justice action seeking criminal forfeiture of approximately $190 million in assets from David Brooks and Sandra Hatfield (No. 2:06-cr-00550-JS-AKT) in the United States District Court for the Eastern District of New York, and any and all claims to forfeiture proceeds from any and all civil and criminal forfeiture actions, whether pending or to be commenced; (ix) the separate actions by the SEC against David Brooks (No. 07-cv-61526-CMA) and Dawn M. Schlegel and Sandra L. Hatfield (No. 06-cv-61251-PAS) in the United States District Court for the Southern District of Florida seeking

7

disgorgement of approximately $180 million for the benefit of one or more of the Debtors under SOX 304; (x) the action brought by Point Blank Solutions, Inc. against Robbins Geller Rudman & Dowd LLP, Labaton Sucharow LLP, Law Offices of Thomas G. Amon and Robbins Umeda LLP in the United States Bankruptcy Court for the District of Delaware (No. 10-55361) seeking the turnover of funds; (xi) the action brought by Point Blank Solutions, Inc. against Toyobo America, Inc. and Toyobo Co., Ltd. in the United States District Court for the Southern District of Florida (No. 09-61166); (xii) any and all claims and causes action and any pending actions including but not limited to claims for indemnity and/or contribution against David Brooks or any other person related to any pending litigation against any of the Debtors; and (xiii) any other federal or state investigation or lawsuit (whether initiated by the Department of Justice or any other federal, state or local or international authority or agency). For the avoidance of doubt, no Cause of Action related to continued operation of the Reorganized Debtors' business post-Effective Date is an Estate Claim unless specifically enumerated above as an Estate Claim. By way of example, an Avoidance Action against a vendor doing business with the Reorganized Debtors is an Estate Claim; a breach of warranty claim against the same vendor is not.

"*Excess Fee Claim*" means, for any Consenting Professional, the portion of such Professional's Allowed Professional Fee Claim, if any, that such Professional has agreed to be paid under the terms of Article 8 and the Recovery Trust Agreement.

"*Exculpated Party*" means each of (i) the Debtors, the Reorganized Debtors and their Affiliates, (ii) the Creditors' Committee ~~and~~, the Equity Committee and their respective current and former members (in such capacity), and (iii) Lonestar, PB Funding, Lonestar Partners, LP, Privet, Prescott and the Party Affiliates (as defined in the Subscription ~~and Backstop~~ Agreement) in connection with the Chapter 11 Cases, including the DIP Loan Agreement, the Plan Support Agreement, the Second Plan Support Agreement, the Subscription ~~and Backstop~~ Agreement, the Plan, the Disclosure Statement and related documents, agreements and releases and (iv) with respect to each of the foregoing Entities, such Entities' subsidiaries, affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners and representatives, in each case solely in their capacity as such.

"*Executory Contracts*" and "*Unexpired Leases*" means any executory contract or unexpired lease, as appropriate, as referenced in § 365, to which one or more of the Debtors is a party.

~~"*Exercising Holder*" means any Eligible Holder that timely exercises all of its Rights at the Subscription Price in compliance with the procedures and requirements governing the Rights Offering.~~

"*Exit Facility*" means any credit facility, indenture or other loan facilities (in whatever form) that may be entered into as of the Effective Date by one or more of the Reorganized Debtors and the lenders party thereto in order to satisfy the Reorganized Debtors' Plan obligations and working capital needs on and after the Effective Date, in form and substance acceptable to the ~~Backstop~~ Purchasers.

"*Final DIP Order*" means the *Order Authorizing on a Final Basis (i) Replacement Postpetition Secured Financing, (ii) Use of Cash Collateral, (iii) Repayment of Existing Postpetition Secured Financing and (iv) Authorizing Entry into Plan Support Agreement* [Docket No. 968], entered December 28, 2010.

"*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek *certiorari* has expired and no appeal or petition for *certiorari* has been timely taken, or as to which any appeal that has been taken or any petition for *certiorari* that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which *certiorari* could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice. Such order or judgment shall be a Final Order notwithstanding that it still may be subject to § 502(j), § 1144 or Bankruptcy Rules 9023 or 9024.

"*General Unsecured Claim*" means any Claim that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, DIP Claim, Miscellaneous Secured Claim, Subordinated Unsecured Claim, Class Action Claim or Other Subordinated Claim and Interest.

8

~~"*GUC Cash*" means the sum of $3,000,000, which sum shall be distributed in accordance with the terms of the Plan.~~

"*Impaired*" has the meaning set forth in § 1124.

"*Indemnification Provisions*" means each of the indemnification provisions, agreements or obligations, whether in the bylaws, certificates of incorporation or other formation documents (in the case of a limited liability company), board resolutions or employment contracts, in place as of the Petition Date.

"*Insurance Policies*" means, collectively, all of the Debtors' insurance policies, whether or not listed on the *Schedule of Insurance Policies* to be included in the Plan Supplement.

"Inter-Debtor Compromise" means the global compromise and settlement set forth in Section 6.1.

"*Intercompany Claim*" means any Claim held by a Debtor against another Debtor. The Debtors shall include a schedule of Intercompany Claims in the Plan Supplement.

"*Interest*" means any equity security in a Debtor as defined in § 101(16), including all issued, unissued, authorized or outstanding shares of capital stock of the Debtors together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto.

"*Lien*" has the meaning set forth in § 101(37).

"*Lonestar*" means Lonestar Capital Management, LLC, as investment advisor to Lonestar Partners, LP and manager of PB Funding, or one or more of its affiliates, designees or assignees.

"*Lonestar Pre-Petition Claims*" means the General Unsecured Claims of Lonestar Partners, L.P. (i) against PACA in the amount of $373,572.10 as reflected in PACA's *Schedules of Assets and Liabilities*, (ii) against Point Blank in the amount of $8,126,774.32 as reflected in Point Blank's *Schedules of Assets and Liabilities*, and (iii) against the Parent in the amount of $8,512,858.34 as reflected in Proof of Claim No. 284.

"*Miscellaneous Secured Claims*" means any Secured Claim against the Debtors other than the DIP Claims.

"*New Board*" means, with respect to each Reorganized Debtor, the initial board of directors, or similar governing body, of such Entity appointed as of the Effective Date, the members of which shall be identified in the Plan Supplement.

"*New By-Laws*" means, with respect to each Reorganized Debtor that is a corporation, the new by-laws of such Entity, the form of which shall be included in the Plan Supplement and shall be satisfactory to the ~~Backstop~~ Purchasers.

"*New Certificate of Incorporation*" means, with respect to each Reorganized Debtor, the form of the initial certificate of incorporation (or other applicable formation document) of each such Entity, the form of which shall be included in the Plan Supplement and shall be satisfactory to the ~~Backstop~~ Purchasers.

"*New Common Stock*" means the newly issued common stock of Reorganized Parent, par value $0.01 per share, authorized pursuant to the Plan and issued pursuant to the Plan and the Subscription ~~and Backstop~~ Agreement, ~~including (i) the Subscription Shares and (ii) the common stock being issued through the Rights Offering~~. The rights, preferences and privileges of the New Common Stock shall be set forth in Parent's New Certificate of Incorporation and, to the extent applicable, the New Stockholders Agreement.

"*New Employment Agreements*" means employment agreements that the Debtors may enter into with certain individuals in the Debtors' senior management satisfactory to the Required ~~Backstop~~ Purchasers, the form of which may be included in the Plan Supplement and shall be satisfactory to the Required ~~Backstop~~ Purchasers.

9

"*New Governance Documents*" means the New Certificates of Incorporation, the New Stockholders Agreement and the New By-Laws, substantially final forms of each of which shall be filed with the Bankruptcy Court in the Plan Supplement.

"*New Stockholders Agreement*" means that certain agreement to be executed on or before the Effective Date providing for, among other things, certain rights and obligations of ~~certain~~ holders of the New Common Stock, the form of which will be filed as part of the Plan Supplement and shall be acceptable to the ~~Backstop~~ Purchasers.

"*Notice and Claims Agent*" means Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, New York, New York 10017, which has been appointed as the Debtors' notice, claims and balloting agent, or such other Entity as the Bankruptcy Court may appoint as the Debtors notice, claims and balloting agent.

"*Old Equity Interests*" mean any of the authorized, issued and outstanding Interests in Parent as of the Petition Date that is not (i) a Class 8 Other Subordinated Claims and Interests or (ii) a Class 9 Unexercised Option.

"*Old Intercompany Interests*" mean any Interests in a Debtor held by another Debtor.

"*Ordinary Course Claim*" means an Administrative Claim incurred by a Debtor in the ordinary course of business based on either (i) post-petition accounts payable; (ii) post-petition employee-related expenses and claims; or (iii) post-petition contracts (including capital leases), but specifically excluding Professional Fee Claims.

"*Ordinary Course Professional Order*" means the *Order Pursuant to Sections 105(a), 327, 328 and 330 of the Bankruptcy Code Authorizing the Debtors to Retain, Employ and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business* [Docket No. 111].

"*Other Priority Claim*" means any Claim accorded priority in right of payment under ~~section~~§ 507(a) ~~of the Bankruptcy Code~~, other than an Administrative Claim, a DIP Claim or a Priority Tax Claim.

"*Other Subordinated Claim and Interest*" means any Claim or Interest, including any Old Equity Interest, that has been subordinated in priority and right to the payment of Old Equity Interests.

"*PACA*" means Protective Apparel Corporation of America, a New York corporation.

"*Parent*" means Point Blank Solutions, Inc., a Delaware corporation.

"*PB Funding*" means PB Funding, LLC, a Delaware limited liability company.

"*PBSS*" means PBSS, LLC, a Delaware limited liability company.

"*Person*" means a person, as defined in § 101(41).

"*Petition Date*" means April 14, 2010.

"*Plan*" means this _Amended_ Joint Chapter 11 *Plan of Reorganization* and all exhibits hereto, including the Plan Supplement, which is incorporated herein by reference, as the same may be amended, modified or supplemented from time to time, in each case, in form and substance acceptable to the Plan Proponents.

"*Plan Proponents*" means the Debtors, the Creditors' Committee, ~~the Equity Committee,~~ Privet, Privet Fund Management, Prescott and Lonestar.

"*Plan Supplement*" means the compilation of documents and forms of documents, schedules and exhibits to the Plan, in each case in form and substance acceptable to the Required ~~Backstop~~ Purchasers unless otherwise stated herein, to be filed by the Plan Proponents ~~by~~on or prior to the Plan Supplement Filing Date ~~comprised of~~and composed, among other things, of the following: (i) the New Governance Documents, (ii) the identity of the known members of the New Boards, the Recovery Trustee and the initial members of the Recovery Trust Committee and

the nature and compensation for any such director, Recovery Trustee or member of the Recovery Trust Committee who is an "insider" under the Bankruptcy Code; (iii) the Schedule of Rejected Contracts; (iv) the Recovery Trust Agreement; (v) any New Employment Agreements; (vi) a schedule of the Insurance Policies; (vii) a schedule of Intercompany Claims; and (viii) all exhibits, attachments, supplements, annexes, schedules and ancillary documents related to each of the foregoing.

*"Plan Supplement Filing Date"* means the date on which the Plan Supplement shall be filed with the Bankruptcy Court, which date shall be at least ten days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice; *provided*, *however*, that the Schedule of Rejected Contracts, the identity of the initial members of the New Boards, the Recovery Trustee and the members of the Recovery Trust Committee and the nature and compensation for any such director, Recovery Trustee or member of the Recovery Trust Committee who is an "insider" under the Bankruptcy Code known at the time shall not be required to be disclosed and filed with the Bankruptcy Court until ~~10~~ten days prior to the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court without further notice.

*"Plan Support Agreement"* means that certain ~~agreement~~Plan Support Agreement, dated as of December 10, 2010, by and between the Debtors, the Creditors' Committee, the Equity Committee, Lonestar, Privet, Privet Fund Management LLC and Prescott, as amended, supplemented or modified from time to time.

*"Point Blank"* means Point Blank Body Armor, Inc., a Delaware corporation.

*"Prescott"* means Prescott Group Capital Management, LLC, an Oklahoma limited liability company.

*"Prime Rate"* means the greater of (a) 3.50% per annum or (b) the variable annual rate of interest equal to the "prime rate" as published from time to time in the Wall Street Journal or any other financial news service chosen by the Required Lenders from time to time.

*"Priority Tax Claim"* means any Claim of a governmental unit, as defined in § 101(27), of the kind specified in § 507(a)(8).

*"Privet"* means Privet Opportunity Fund I, LLC, a Delaware limited liability company.

*"Privet Fund Management"* means Privet Fund Management, LLC, a Delaware limited liability company.

*"Professional"* means an Entity (i) retained pursuant to a Final Order in accordance with §§ 327, 363 or 1103 and to be compensated for services rendered before or on the Effective Date, pursuant to §§ 328, 329, 330, 331 and 363, or (ii) awarded compensation and reimbursement by the Bankruptcy Court pursuant to § 503(b)(4).

*"Professional Fee Claim"* means any Claim asserted by a Professional or other Entity for compensation for legal, financial advisory, accounting and other services and reimbursement of expenses Allowed pursuant to §§ 328, 330(a), 331, 363, 503(b) or 1103 or otherwise for the period commencing on the Petition Date and through the Effective Date.

*"Proof of Claim"* means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

~~*"Purchase Notice"* means a notice provided by the Subscription Agent to the Backstop Purchasers that sets forth the calculation of the number of Unsubscribed Creditor Offering Shares or Unsubscribed Equity Offering Shares, as applicable, and the aggregate Subscription Price therefor.~~

*"Purchaser"* or *"Purchasers"* means PB Funding, Prescott and Privet, each in its capacity as a Purchaser (as defined in the Subscription Agreement).

*"Purchaser Loans"* has the meaning assigned to it in Section 6.3(a).

11

"*Purchased Shares*" means the shares of New Common Stock to be issued to Privet, Prescott and Lonestar, in each case either directly or through one or more of their respective Affiliates, pursuant to Section 6.3 and the Subscription Agreement, which shares shall constitute 100% of the outstanding common stock of Reorganized Parent on the Effective Date.

"*Ratable Proportion*" means, with reference to any Distribution on account of a Claim against (or Interest in) a given Class, a Distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Claim (or Interest) bears to the aggregate amount of all Claims (or Interests) in the identical Class that have not been Disallowed against each Debtor; *provided, however*, that pursuant to the Inter-Debtor Compromise Intercompany Claims are expressly excluded from the calculation of Ratable Proportion for Class 4. ~~By way of example, if the aggregate Allowed General Unsecured Claims asserted against the Debtors collectively total $30,000,000, a Creditor holding an Allowed Claim against any Debtor in the amount of $300,000 would receive 1.0% of the GUC Cash.~~

"*Recovery Trust*" means that certain "Recovery Trust" created pursuant to the Recovery Trust Agreement for the purposes set forth in the Plan and the Recovery Trust Agreement, in form and substance acceptable to the Plan Proponents.

"*Recovery Trust Agreement*" means that certain trust agreement, dated as of the Effective Date (as amended from time to time) by and between the Recovery Trustee and Parent, in its capacity as both Parent and Reorganized Parent, for the benefit of the Beneficiaries (as defined in the Recovery Trust Agreement) and for the benefit of Reorganized Parent.

"*Recovery Trust Committee*" has the meaning assigned to it in Section ~~8.5~~8.6 and as more fully defined in the Recovery Trust Agreement.

"*Recovery Trust Reserve*" means the sum of $1,000,000 to be funded into the Recovery Trust pursuant to ~~the terms of the Plan~~Section 8.2 and the Recovery Trust Agreement.

"*Recovery Trustee*" means the trustee of the Recovery Trust, who shall be chosen by ~~the Creditors'~~majority vote of the members of the Recovery Trust Committee, ~~in consultation with Lonestar, pursuant to~~excluding the Recovery Trustee, in accordance with the terms of the Recovery Trust Agreement. On the Effective Date, the initial Recovery Trustee shall be [_____].

"*Rejection Claim*" means a Claim arising from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code, excluding any Claim arising from the rejection of the Settlement Agreement, which shall be a Class 6 Class Action Claim.

"*Releasing Parties*" means all Entities who have held, hold or may hold Claims or Interests that have been or are released pursuant to Sections 11.2 or 11.3, discharged pursuant to Section 11.5 or subject to exculpation pursuant to Section 11.4.

"*Released Party*" means each of (in each case solely in their respective capacities) (i) the directors and officers of the Debtors who are directors or officers of the Debtors immediately prior to the Effective Date; (ii) the DIP Lenders; (iii) the ~~Backstop~~ Purchasers and the Party Affiliates (as defined in the Subscription ~~and Backstop~~ Agreement); (iv) the Creditors' Committee and the current and former members thereof (in such capacity); (v) the Equity Committee and the current and former members thereof (in such capacity); (vi) the Board Observer and the Debtors' agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners and representatives; and (vii) with respect to each of the foregoing Entities in clauses (i) through (v), such Entities' subsidiaries, affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners and representatives, in each case, only in their capacity as such.

"*Reorganized Debtor*" or "*Reorganized Debtors*" means Reorganized Parent and Reorganized Subsidiaries.

"*Reorganized Parent*" means Parent, or any successor thereto by merger, consolidation or otherwise, on and after the Effective Date.

"*Reorganized Subsidiary*" or "*Reorganized Subsidiaries*" means Point Blank, PACA and PBSS, or any successor thereto by merger, consolidation or otherwise, on and after the Effective Date.

"*Required ~~Backstop~~ Purchasers*" means those ~~Backstop~~ Purchasers that have committed to provide, subject to the terms of the Subscription ~~and Backstop~~ Agreement, at least 66 $^2/_3$% of the Commitments (as defined in the Subscription ~~and Backstop~~ Agreement) in the aggregate.

"Replacement EC Professional" means any Professional retained or employed by the Equity Committee other than [          ]. For the avoidance of doubt, Baker & McKenzie LLP is a Replacement EC Professional.

~~"*Rights*" means the nontransferable Rights to purchase shares of New Common Stock issued in the Rights Offering on the terms and subject to the conditions set forth in the Plan and the Rights Offering Procedures.~~

~~"*Rights Exercise Payment*" has the meaning assigned to it in Section 6.3(d).~~

~~"*Rights Offering*" means the offering of the Rights by Parent to Eligible Holders to purchase shares of the New Common Stock in accordance with the Rights Offering Procedures and the Plan.~~

~~"*Rights Offering Amount*" has the meaning assigned to it in Section 6.3(a).~~

~~"*Rights Offering Maximum*" has the meaning assigned to it in Section 6.3(a).~~

~~"*Rights Offering Procedures*" means the procedures governing the Rights Offering as set forth in Section 6.3 and offering documents relating to the Rights Offering.~~

~~"*Rights Participation Amount*" means (i) as to any Claim as to which a Proof of Claim has not been timely filed, the amount (if any) of such Claim listed in the Debtors' Schedules that is not listed as contingent, unliquidated or disputed; (ii) as to any Claim as to which a Proof of Claim has been timely filed and as to which an objection has not been filed, the liquidated amount, if any, of such Claim listed on the Proof of Claim or such amount that is reflected in a Final Order of the Bankruptcy Court prior to the Subscription Record Date as (1) estimated pursuant to § 502(c) or Bankruptcy Rule 3018, as applicable, or (2) Allowed; and (iii) as to any Claim as to which a Proof of Claim has been timely filed and as to which an objection has been filed, the greater of (a) the amount of such Claim (if any) listed on the Debtors' Schedules that is not listed as contingent, unliquidated or disputed, (b) the amount of such claim that the objecting party has explicitly admitted in its objection should be Allowed; and (c) the amount that is reflected in a Final Order of the Bankruptcy Court prior to the Subscription Record Date as either (1) estimated pursuant to § 502(c) or Bankruptcy Rule 3018, as applicable, or (2) Allowed. Notwithstanding the foregoing, any Eligible Creditor asserting an Allowed Claim against more than one Debtor shall be treated as holding a single Allowed Claim for purposes of calculating the Rights Participation Amount and participating in the Rights Offering. For the avoidance of doubt, any Eligible Creditor that has filed a Claim in an unliquidated or undetermined amount shall hold a Rights Participation Amount of $0.00 in the absence of a Final Order of the Bankruptcy Court as provided in (ii) above.~~

"*Sarbanes-Oxley*" means the Sarbanes-Oxley Act of 2002, as amended from time to time and applicable to the Debtors.

"*Schedule of Proposed Cure Claims*" means the list (as may be amended) of Executory Contracts and Unexpired Leases that will be assumed by the Debtors and proposed Cure Claims, if any, associated with the assumption of such contracts and leases pursuant to § 365 and the provisions of Article 7. The inclusion or exclusion of any Executory Contract or Unexpired Lease on the Schedule of Proposed Cure Claims shall be determined by the Debtors, with the consent of the Required ~~Backstop~~ Purchasers.

"*Schedule of Rejected Contracts*" means the list (as may be amended) of Executory Contracts and Unexpired Leases that will be rejected by the Debtors pursuant to § 365 and the provisions of Article 7. The inclusion or exclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Contracts shall be determined by the Debtors, with the consent of the Required ~~Backstop~~ Purchasers.

13

"*Schedules*" means, collectively, the *Schedules of Assets and Liabilities* and *Statements of Financial Affairs* filed by the Debtors pursuant to § 521 and in substantial accordance with the Official Bankruptcy Forms, as may be amended from time to time before entry of a final decree.

"*SEC*" means the Securities and Exchange Commission.

"*Second Plan Support Agreement*" means that certain Second Plan Support Agreement, dated as of _____, 2011, by and between the Debtors, the Creditors' Committee, Lonestar, Privet, Privet Fund Management LLC and Prescott, as amended, supplemented or modified from time to time.

"*Secured*" means, when referring to a Claim, (i) secured by a Lien on property in which the Estate of the Debtor against which the Claim is asserted has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order and not subject to avoidance under the Bankruptcy Code or other applicable non-bankruptcy law, to the extent of the value of the Creditor's interest in such Estate's interest in such property as determined pursuant to § 506(a); (ii) subject to setoff pursuant to § 553 to the extent of the value of the property subject to setoff and solely to the extent such right of setoff is exercised prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court; or (iii) otherwise Allowed by Final Order of the Court (which order may be the Confirmation Order) as a Secured Claim.

"*Securities Act*" means the U.S. Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"*SOX 304*" means Section 304 of Sarbanes-Oxley.

"*Subordinated Unsecured Claim*" means a Claim that has been subordinated in priority and right of payment to General Unsecured Claims, but is senior in right of payment to Class Action Claims and Old Equity Interests.

"~~*Subscription Agent*~~" ~~means the Person engaged by the Debtors, with the consent of the Required Backstop Purchasers, to administer the Rights Offering; *provided, however,* that the Notice and Claims Agent shall serve as Subscription Agent unless otherwise agreed by the Debtors and the Required Backstop Purchasers.~~

"*Subscription Approval Order*" means that order entered by the Bankruptcy Court on [_____], 2011, authorizing and approving, among other things, (i) the Debtors' entry into and performance under the Subscription Agreement, (ii) payment of the Subscription Expenses, if any, and (iii) Subscription Indemnification Obligations.

"*Subscription ~~and Backstop~~ Agreement*" means that certain Subscription ~~and Backstop Purchase~~ Agreement, dated as of [_____], 2011, between Parent and the ~~Backstop~~ Purchasers, as the same may be amended, modified or supplemented from time to time.

"~~*Subscription Commencement Date*~~" ~~means the Business Day approved by the Bankruptcy Court on which the Rights Offering shall commence.~~

"*Subscription ~~Exercise Period~~Amount*" has the meaning assigned to it in Section 6.3(e~~a~~).

"*Subscription Expenses*" means the expenses of the Purchasers to be reimbursed under the terms of the Subscription Agreement.

"*Subscription Indemnification Obligations*" means the indemnification obligations described in Section 12 of the Subscription Agreement.

"~~*Subscription Expiration Date*~~" ~~means the final date by which an Eligible Holder may deliver to the Subscription Agent an election to exercise its Rights and payment for the New Common Stock, which shall be not more than 30 days after the Subscription Commencement Date or such later date as Parent, subject to the prior written approval of the Required Backstop Purchasers, may specify in a notice provided to the Backstop Purchasers~~

14

~~before 9:00 a.m. (prevailing Eastern time) on the Business Day before the then effective Subscription Expiration Date.~~

~~"*Subscription Form*" means the form to be used by an Eligible Holder to exercise its Rights.~~

~~"*Subscription Record Date*" means the date of the order approving the Disclosure Statement.~~

"*Subscription Price*" means $[5.00] per share of New Common Stock.

"*Subscription Shares*~~Trust Litigation Expenses*~~" has the meaning assigned to it in Section ~~6.6~~8.3(c).

"*Trust Administration Expenses*" has the meaning assigned to it in Section 8.3(c).

"*Trust Interest*" means an interest in the Recovery Trust issued to the applicable Beneficiary as a Class 4 Trust Interest, Class 5 Trust Interest, Class 6 Trust Interest or Class 7 Trust Interest in accordance with the Plan and the Recovery Trust Agreement.

"*Trust Assets*" has the meaning assigned to it in Section 8.3.

"*Unexercised Options*" means any warrants, options or contractual rights to purchase or acquire Interests in Parent that had not been exercised as of the Petition Date and all rights arising with respect thereto.

"*Unimpaired*" means any Class, or any Claim or Interest, that is not Impaired.

~~"*Unsubscribed Creditor Offering Shares*" means those shares of New Common Stock offered in the Creditor Rights Offering that either are not subscribed for or are not properly subscribed and paid for in accordance with the Rights Offering Procedures.~~

~~"*Unsubscribed Equity Offering Shares*" means those shares of New Common Stock offered in the Equity Rights Offering that either are not subscribed for or are not properly subscribed and paid for in accordance with the Rights Offering Procedures.~~

~~"*Unsubscribed Shares*" means, collectively, the Unsubscribed Creditor Offering Shares and the Unsubscribed Equity Offering Shares.~~

"*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

"*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) or accrued interest thereon arising under 31 U.S.C. § 3717.

"*Voting Deadline*" means 5:00 p.m. (prevailing Eastern Time) on [_____], 2011.

### 1.2    Rules of Interpretation

For purposes of the Plan, (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Article __" and "Section __.__" are references to articles or sections hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in

15

§ 102 shall apply; and (h) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order. In any term, condition or section of the Plan calling for the approval, acceptance or consent by any or all of the ~~Backstop~~ Purchasers or the Plan Proponents, such approval, acceptance or consent shall not be unreasonably withheld, delayed or denied; *provided, however,* that the foregoing shall not apply to the ~~Backstop~~ Purchasers' exercise of their sole discretion under Section 6.3(a).

### 1.3    *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

### 1.4    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however,* that governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated or organized in Delaware shall be governed by the laws of the jurisdiction of incorporation or organization of the applicable Debtor or Reorganized Debtor.

### 1.5    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE 2
## CLASSIFICATION OF CLAIMS AND INTERESTS

### 2.1    *General Rules of Classification*

Pursuant to § 1122, set forth below is a designation of Classes of Claims against and Interests in the Debtors. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

### 2.2    *Administrative Claims and Priority Tax Claims*

As provided in § 1123(a), Administrative Claims and Priority Tax Claims shall not be classified for voting or receiving Distributions under the Plan. Rather, all such Claims shall be treated separately as unclassified Claims on the terms set forth in Article 3.

16

### 2.3 *Summary of Classification*

The following chart represents the general classification of Claims and Interests against the Debtors pursuant to the Plan:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Impaired | Yes |
| 2 | DIP Claims | Unimpaired | No (deemed to accept) |
| 3 | Miscellaneous Secured Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | Subordinated Unsecured Claims | Impaired | Yes |
| 6 | Class Action Claims | Impaired | Yes |
| 7 | Old Equity Interests | Impaired | Yes |
| 8 | Other Subordinated Claims and Interests | Impaired | No (deemed to reject) |
| 9 | Unexercised Options | Impaired | No (deemed to reject) |

## ARTICLE 3
## TREATMENT OF CERTAIN UNCLASSIFIED CLAIMS

In accordance with § 1123(a)(1), Administrative Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article 4 and shall have the treatment set forth in this Article 3.

### 3.1 *Administrative Claims*

(a) *Administrative Claims*

Except to the extent that an Allowed Administrative Claim is not yet due and owing or to the extent a holder of an Allowed Administrative Claim has been paid prior to the Effective Date or agrees to different treatment, in full satisfaction, settlement, release and discharge of and in exchange for each Allowed Administrative Claim (excluding any Professional Fee ~~Claims~~Claim), the holder thereof shall receive Cash from the Reorganized Debtors equal to the amount of such Allowed Administrative Claim on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date on which such Administrative Claim becomes Allowed by Final Order. Allowed Administrative Claims not yet due and owing as of the Effective Date shall be paid by the Reorganized Debtors in the ordinary course of business.

~~(b)~~ ~~*Administrative Claims Bar Date*~~

Except as otherwise provided in this Article 3, requests for payment of Administrative Claims must be filed and served on the Reorganized Debtors no later than the applicable Administrative Claims Bar Date. Holders of Administrative Claims (other than Claims for Professionals' fees and expenses) that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Recovery Trust or the Reorganized Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to requests for payment of Administrative Claims filed after the Effective Date must be filed and served on the Reorganized Debtors and the requesting party no later than seventy-five (75) days after the Effective Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to (i) any Administrative Claim previously Allowed by a Final Order, including any Administrative Claim expressly Allowed under the Plan, and (ii) any Ordinary Course Claim.

17

(c) ~~Professionals' Fees and Expenses~~

(b) <u>*Professional Fee Claims*</u>

Any Professional or other Entity asserting a Professional Fee Claim must file and serve on counsel for each of the Plan Proponents<u>, Reorganized Parent</u> and the Recovery Trustee and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Claim no later than sixty (60) days after the Effective Date. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court.

On and after the Effective Date, any requirement that a Professional comply with §§ 327 through 331 and 1103 and seek approval from the Bankruptcy Court in connection with such Professional's retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors and the Recovery Trust may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action (including without the need to file a fee application), order or approval of the Bankruptcy Court.

<u>Except to the extent that a holder of an Allowed Professional Fee Claim, including each Consenting Professional, has agreed to different treatment, the holder thereof shall receive Cash from the Reorganized Debtors equal to the amount of such Allowed Professional Fee Claim on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date on which such Professional Fee Claim becomes payable pursuant to the Compensation Procedures Order or other order of the Bankruptcy Court, in full satisfaction, settlement, release and discharge of and in exchange for each Allowed Professional Fee Claim. Upon the occurrence of the Effective Date, the funds identified in Section 12.2(n) for the payment of Allowed Professional Fee Claims shall be placed in escrow.</u>

<u>For each Consenting Professional that has agreed to have a portion of its Allowed Professional Fee Claim treated as an Excess Fee Claim, such Excess Fee Claim shall receive the treatment specified in Article 8 and the corresponding sections of the Recovery Trust Agreement.</u>

### 3.2    *U.S. Trustee Fees*

On the Effective Date, the Debtors shall pay all U.S. Trustee Fees that are due and owing as of the Effective Date.

### 3.3    *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid prior to the Effective Date, or agrees to different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Tax Claim, at the election of the Reorganized Debtors, (i) Cash on the Effective Date in an amount equal to such Allowed Priority Tax Claim (without interest), or (ii) regular installment payments in Cash of a total value, as of the Effective Date, equal to the amount of the Allowed Priority Tax Claim over a period ending not later than five years after the Petition Date. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.

### ARTICLE 4
### TREATMENT OF CLASSES OF CLAIMS AND INTERESTS

### 4.1    *Treatment of Allowed Class 1 Claims (Other Priority Claims)*

(a)    *Classification*:  Class 1A consists of Other Priority Claims against Parent.  Class 1B consists of Other Priority Claims against Point Blank.  Class 1C consists of Other Priority Claims against PACA. Class 1D consists of Other Priority Claims against PBSS.

18

(b) *Treatment*: Except to the extent that a holder of an Allowed Other Priority Claim (i) has been paid by the Debtors prior to the Effective Date or (ii) agrees to a less favorable treatment, each holder of an Allowed Other Priority Claim shall receive from the Reorganized Debtors, in full satisfaction, settlement, release and discharge of, and in exchange for such Other Priority Claim, Cash equal to the amount of such Allowed Other Priority Claim on the later of the date which is on or as soon as reasonably practicable after the Effective Date and the date such Other Priority Claim becomes an Allowed Claim.

(c) *Voting*: Class 1 is Impaired. Therefore, holders of Other Priority Claims are entitled to vote to accept or reject the Plan.

### 4.2 Treatment of Allowed Class 2 Claims (DIP Claims)

(a) *Classification*: Class 2A consists of the DIP Claims against Parent. Class 2B consists of the DIP Claims against Point Blank. Class 2C consists of the DIP Claims against PACA. Class 2D consists of the DIP Claims against PBSS.

(b) *Treatment*: On the Effective Date, each DIP Claim shall be indefeasibly paid in full in Cash as provided in the DIP Loan Agreement; *provided* that, in accordance with Section 6.3(d̶a̶) and the terms of the Subscription ~~and Backstop~~ Agreement, the ~~Rights Exercise Payment or~~ Commitment of any DIP Lender or its affiliate (in its capacity as a ~~holder of Allowed Class 7 Old Equity Interests Allowed Class 4 General Unsecured Claims or Backstop~~ Purchaser, ~~as the case may be~~) may, at the election of such DIP Lender and its affiliate, be reduced by or credited against (i) any outstanding DIP Claims that the Company owes to such DIP Lender and (ii) the Subscription Expenses. Upon payment and satisfaction in full of all DIP Claims, including by reduction or credit as set forth in the preceding sentence, all liens and security interests granted to secure such obligations shall be terminated and immediately released and the DIP Lenders shall execute and deliver to the Reorganized Debtors such instruments of release, satisfaction and/or assignments (in recordable form) as may be reasonably requested by the Reorganized Debtors.

(c) *Voting*: Class 2 is Unimpaired, and the holders of DIP Claims are conclusively presumed to have accepted the Plan. Therefore, holders of DIP Claims are not entitled to vote to accept or reject the Plan.

### 4.3 Treatment of Allowed Class 3 Claims (Miscellaneous Secured Claims)

(a) *Classification*: Class 3 consists of Miscellaneous Secured Claims. Although all Miscellaneous Secured Claims have been placed in one Class for the purposes of nomenclature, each Miscellaneous Secured Claim, to the extent secured by a Lien on any property or interest in property of the Debtors different from that securing any other Miscellaneous Secured Claim, shall be treated as being in a separate sub-Class for the purpose of receiving Distributions under the Plan.

(b) *Treatment*: Except to the extent that a holder of an Allowed Miscellaneous Secured Claim has been paid by the Debtors, in whole or in part, prior to the Effective Date, on the Effective Date, at the option of the Debtors, (i) each Allowed Miscellaneous Secured Claim shall be reinstated and Unimpaired in accordance with § 1124 or (ii) each holder of an Allowed Miscellaneous Secured Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Miscellaneous Secured Claim, (x) payment in full in Cash of the unpaid portion of such Allowed Miscellaneous Secured Claim, (y) return of the collateral securing such Claim or (z) such other treatment as may be agreed to by the holder. The Debtors shall inform each holder of a Miscellaneous Secured Claim of the treatment of such Creditor's Secured Claim not less than ten (10) days prior to the Confirmation Hearing.

(c) *Voting*: Class 3 is Impaired. Therefore, holders of Miscellaneous Secured Claims are entitled to vote to accept or reject the Plan.

DOCS_DE:166862.1

***4.4    Treatment of Allowed Class 4 Claims (General Unsecured Claims)***

(a)    *Classification*: Class 4A consists of General Unsecured Claims against Parent. Class 4B consists of General Unsecured Claims against Point Blank. Class 4C consists of General Unsecured Claims against PACA. Class 4D consists of General Unsecured Claims, if any, against PBSS.

(b)    *Treatment*: On the Effective Date, each holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such General Unsecured Claim, a Trust Interest in the Recovery Trust in the form of Class 4 Trust Interests issued pursuant to Section 8.5. ~~In addition, Eligible Creditors in Class 4 shall receive Rights to participate (subject to applicable securities and other laws) in the Creditor Rights Offering.~~ Pursuant to the terms of the Inter-Debtor Compromise, on the Effective Date, all Intercompany Claims asserted by one Debtor against another Debtor shall be deemed waived, released and expunged without further order of the Bankruptcy Court, and no Distribution shall be paid on account of any such Intercompany Claim.

(c)    *Voting*:    General Unsecured Claims are Impaired. Therefore, holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

***4.5    Treatment of Allowed Class 5 Claims (Subordinated Unsecured Claims)***

(a)    *Classification*: Class 5A consists of Subordinated Unsecured Claims, if any, against Parent. Class 5B consists of Subordinated Unsecured Claims, if any, against Point Blank. Class 5C consists of Subordinated Unsecured Claims, if any, against PACA. Class 5D consists of Subordinated Unsecured Claims, if any, against PBSS.

(b)    *Treatment*: On the Effective Date, each holder of an Allowed Subordinated Unsecured Claim shall receive a Trust Interest in the Recovery Trust in the form of Class 5 Trust Interests issued pursuant to Section 8.5 and subordinated in right of payment to the Class 4 Trust Interests as set forth more fully in Section 8.5 and the Recovery Trust Agreement.

(c)    *Voting*: Class 5 is Impaired. Therefore, holders of Subordinated Unsecured Claims are entitled to vote to accept or reject the Plan.

***4.6    Treatment of Allowed Class 6 Claims (Class Action Claims)***

(a)    *Classification*: Class 6A consists of Class Action Claims, if any, against Parent. Class 6B consists of Class Action Claims, if any, against Point Blank. Class 6C consists of Class Action Claims, if any, against PACA. Class 6D consists of Class Action Claims, if any, against PBSS.

(b)    *Treatment*:    Each holder of an Allowed Class Action Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Class Action Claim, a Trust Interest in the Recovery Trust in the form of Class 6 Trust Interests issued pursuant to Section 8.5, subordinated in right of payment to the Class 4 Trust Interests and Class 5 Trust Interests and *pari passu* with the Class 7 Trust Interests, all as set forth more fully in Section 8.5 and the Recovery Trust Agreement. Distributions on account of all Class 6 Trust Interests issued under the Plan shall be (i) capped at the least of (A) $35,200,000, (B) the aggregate amount of all Allowed Class Action Claims as determined by Final Order of a court of competent jurisdiction, and (C) such other amount that is estimated by the Bankruptcy Court pursuant to § 502(c) or otherwise, and (ii) reduced dollar-for-dollar to the extent of any amounts retained by the holders of Class Action Claims or their counsel and not turned over to the Debtors or the Recovery Trust, as applicable, from funds held in the Class Action Escrow or otherwise previously disbursed under the Class Action Settlement Agreement, including the $9,925,000 previously disbursed to plaintiffs' counsel and the remaining balance of not less than $25,275,000 still on deposit in the Class Action Escrow.

(c)    *Voting*: Class 6 is Impaired. Therefore, holders of Class Action Claims are entitled to vote to accept or reject the Plan.

20

### 4.7 Treatment of Allowed Class 7 Interests (Old Equity Interests)

(a) *Classification*: Class 7 consists of Old Equity Interests in Parent, excluding any Old Equity Interests that are subordinated and treated in Class 8.

(b) *Treatment*: On the Effective Date, Old Equity Interests shall be deemed surrendered to Reorganized Parent, and each holder of an Allowed Old Equity Interest shall receive a Trust Interest in the Recovery Trust in the form of Class 7 Trust Interests issued pursuant to Section 8.5, subordinated in right of payment to the Class 4 Trust Interests and Class 5 Trust Interests and *pari passu* with the Class 6 Trust Interests, all as set forth more fully in Section 8.5 and the Recovery Trust Agreement. ~~In addition, Eligible Equity Holders in Class 7 shall receive Rights to participate (subject to applicable securities and other laws) in the Equity Rights Offering.~~ As described more fully in Section 8.3(c) and the Recovery Trust Agreement, if Class 7 votes to accept the Plan, a greater percentage of proceeds remaining in the Recovery Trust shall be reserved for application and Distribution, including to holders of Class 7 Trust Interests, as set forth in Sections 8.3(c) and 8.5 and the Recovery Trust Agreement.

(c) *Voting*: Class 7 is Impaired. Therefore, holders of Old Equity Interests are entitled to vote to accept or reject the Plan.

### 4.8 Treatment of Allowed Class 8 Claims and Interests (Other Subordinated Claims and Interests)

(a) *Classification*: Class 8A consists of Other Subordinated Claims and Interests, if any, against Parent. Class 8B consists of Other Subordinated Claims and Interests, if any, against Point Blank. Class 8C consists of Other Subordinated Claims and Interests, if any, against PACA. Class 8D consists of Other Subordinated Claims and Interests, if any, against PBSS.

(b) *Treatment*: Other Subordinated Claims and Interests will be subordinated to Class 7 Interests and will receive no recovery under the Plan or from the Recovery Trust.

(c) *Voting*: Class 8 is Impaired, and the holders of Other Subordinated Claims and Interests are conclusively presumed to have rejected the Plan. Therefore, holders of Other Subordinated Claims and Interests are not entitled to vote to accept or reject the Plan.

### 4.9 Treatment of Allowed Class 9 Interests (Unexercised Options)

(a) *Classification*: Class 9 consists of Interests, if any, with respect to Unexercised Options.

(b) *Treatment*: Unexercised Options will be canceled and will receive no recovery under the Plan or from the Recovery Trust.

(c) *Voting*: Class 9 is Impaired, and the holders of Unexercised Options are conclusively presumed to have rejected the Plan. Therefore, holders of Unexercised Options are not entitled to vote to accept or reject the Plan.

## ARTICLE 5
## ACCEPTANCE REQUIREMENTS

### 5.1 Acceptance or Rejection of the Plan

(a) *Voting Class*

Classes 1, 3, 4, 5, 6 and 7 are Impaired under the Plan and are receiving property under the Plan. Therefore, such Classes are entitled to vote to accept or reject the Plan.

(b) *Presumed Acceptance of the Plan*

21

Class 2 is Unimpaired under the Plan and, therefore, is conclusively presumed to have accepted the Plan pursuant to § 1126(f).

(c) *Presumed Rejection of Plan*

Classes 8 and 9 are Impaired under the Plan and are receiving no recovery under the Plan or the Recovery Trust. Therefore, Classes 8 and 9 are conclusively presumed to have rejected the Plan pursuant to § 1126(g).

**5.2 *Tabulation of Votes on a Non-Consolidated Basis***

The Debtors will tabulate all votes on the Plan on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies § 1129(a)(8) with respect to each Debtor. For each Debtor that satisfies § 1129(a)(8), and provided that all other requirements to Confirmation of the Plan are met, the Confirmation of the Plan as to such Debtor shall be deemed to occur by operation of the Plan. For any Debtor that fails to satisfy § 1129(a)(8), the Confirmation of the Plan as to such Debtor shall be subject to a determination of the Bankruptcy Court that the Inter-Debtor Settlement satisfies the requirements for approval under §§ 1123(b)(3) and (6), § 1129(b) and Bankruptcy Rule 9019, which determination may be made at the Confirmation Hearing. If all Classes of a Debtor accept the Plan, then the Inter-Debtor Compromise set forth in Section 6.1 shall be deemed to be reasonable and in the best interests of Creditors and Interest holders as to that Debtor without any further evidentiary showing than such acceptances. If any Impaired Class of a Debtor rejects the Plan, then the approval of the Inter-Debtor Compromise as to that Debtor shall be addressed at the Confirmation Hearing as to such Debtor's rejecting Class in order to implement the Inter-Debtor Compromise.

**ARTICLE 6**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**6.1 *Inter-Debtor Compromise***

(a) *Settlement Authority.*

Pursuant to Bankruptcy Rule 9019(a), each Debtor may compromise and settle certain Claims it has against other Debtors. The Confirmation Order shall authorize, and constitute Bankruptcy Court approval of, the compromises and settlements set forth in this Section 6.1 pursuant to Bankruptcy Rule 9019(a) and §§ 1123(b)(3) and (6). The Debtors reserve the right to modify the Plan in accordance with Article 13 to the extent any compromise and settlement described below is not approved by the Bankruptcy Court, in whole or in part.

Pursuant to §§ 1123(b)(3) and (6) and Bankruptcy Rule 9019, and in settlement and compromise of certain existing and potential disputes regarding (i) Intercompany Claims and related matters, (ii) valuation of the individual Debtor entities, (iii) the individual Debtor's respective ownership interest in the Estate Claims and other assets being contributed to the Recovery Trust, (iv) the susceptibility of two or more of the Debtors' Estates to substantive consolidation and (v) the consideration, if any, that should be paid by Parent to acquire the New Equity Interests to be issued by the Debtor Subsidiaries on the Effective Date, each Class of Claims against or Interests in the several Debtors shall receive the corresponding treatment provided for in the Plan. This settlement and compromise shall neither affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, nor cause the transfer of any assets. Except as otherwise provided by or permitted in the Plan, each Debtor shall continue to exist as a separate legal Entity. This settlement and compromise (and the treatment derived therefrom) serves only as a mechanism to resolve certain claims and disputes between and among the Debtors and effectuate the making of Distributions under the Plan.

(b) *Inter-Debtor Settlement.*

Effective as of the Effective Date, in exchange for the mutual compromise, settlement and release as contemplated by this Section 6.1, the Debtors agree that all Claims and disputes between them, including all Intercompany Claims, shall be settled and waived pursuant to the following terms:

22

(i)        On the Effective Date, all Intercompany Claims asserted by any Debtor against any other Debtor shall be deemed waived, released and expunged without further order of the Bankruptcy Court, and no Distribution shall be paid on account of any such Intercompany Claim.

(ii)        In exchange for valuable consideration being provided by Parent to the Debtor Subsidiaries in the Plan, Parent shall continue to hold and retain all Old Intercompany Interests in the Debtor Subsidiaries on and after the Effective Date, the legal, equitable and contractual rights arising under which Intercompany Interests shall remain unaltered.

(iii)        Allowed Claims against and Interests in the several Debtors shall receive the treatment set forth in Article 4.

(iv)        ~~Eligible Holders of Claims against and Interests in each of the Debtors shall be permitted to participate (subject to securities and other applicable laws) in the Rights Offering as set forth in, and subject to, Section 6.3.~~

(v~~i~~v)        On the Effective Date, each Debtor shall be deemed to have executed the releases provided in Section 11.2.

### 6.2    *Exit Facility*

On the Effective Date, one or more of the Reorganized Debtors may enter into an Exit Facility, and grant all liens and security interests provided for thereunder. The Reorganized Debtors, if any, that are the guarantors under the Exit Facility shall issue the guarantees and grant Liens and security interests as provided thereunder. The Exit Facility shall be on substantially similar terms and conditions to those set forth in the Plan Supplement.

### 6.3    ~~*Rights Offering*~~*Direct Subscription*

(a)        *Direct Subscription*

Each Purchaser has agreed to subscribe for, and purchase from Reorganized Parent, the Purchased Shares at the Subscription Price on the terms set forth in the Plan and the Subscription Agreement. The aggregate amount of the Purchased Shares (the "Subscription Amount") will be $15,000,000; *provided, however,* the Purchasers may elect in their sole discretion to increase the Subscription Amount up to $25,000,000, which discretion shall be exercised in good faith. Subject to the terms of the Subscription Agreement, the Purchased Shares shall be allocated among Privet, Prescott and Lonestar as follows:

| Purchaser | Allocation of Direct Subscription |
|---|---|
| Lonestar | 40.00% |
| Privet | 30.00% |
| Prescott | 30.00% |

The issuance and sale of the Purchased Shares shall take place on the Effective Date pursuant to the terms of the Plan and the Subscription Agreement. Reorganized Parent will issue the New Common Stock to the Purchasers or one or more of their respective Affiliates in accordance with the terms of the Plan and the Subscription Agreement. Pursuant to the Subscription Agreement, the Purchasers may in good faith elect to fund a portion of the Commitment as loans to the Reorganized Parent (the "Purchaser Loans"); *provided* that all Purchasers provide such Purchaser Loans on the same terms and on a pro rata basis based on the Allocation of Direct Subscription set forth above.

On the Effective Date, in accordance with the Subscription Approval Order and the Subscription Agreement, each Purchaser will receive payment of its Subscription Expenses, if any. Any payment owed by a Purchaser or its Affiliate in connection with the purchase of the Purchased Shares may, at the election of such Purchaser, be reduced by or credited against (i) any outstanding DIP Claims that the Company owes to such

23

Purchaser in its capacity as DIP Lender under the DIP Loan Agreement and (ii) such Purchaser's Subscription Expenses.

(a) ~~The Rights Offering~~

~~Pursuant to the Rights Offering, Parent will distribute to (i) each holder of an Allowed Class 7 Old Equity Interest (including, for the avoidance of doubt, each of Privet Fund LP and Prescott or their respective affiliates, designees or nominees) Rights (the "Equity Rights") that will grant each Eligible Equity Holder the right, but not the obligation, to subscribe for and purchase, at the Subscription Price, a portion of the New Common Stock, up to such Eligible Equity Holder's Equity Rights Offering Pro Rata Share of the New Common Stock; provided, that (A) an Eligible Equity Holder must subscribe for at least $[],000 of New Common Stock, and (B) if an Eligible Equity Holder's pro rata share of the Allowed Class 7 Old Equity Interests entitles such Eligible Equity Holder to less than $[•],000 of New Common Stock, then such Eligible Equity Holder must exercise all its Equity Rights in order to subscribe for and purchase New Common Stock, and (ii) each holder of an Allowed Class 4 General Unsecured Claim (including, for the avoidance of doubt, Lonestar Partners, LP) Rights (the "Creditor Rights") that will grant each Eligible Creditor the right, but not the obligation, to subscribe for and purchase, at the Subscription Price, a portion of the New Common Stock, up to such Eligible Creditor's Creditor Rights Offering Pro Rata Share of New Common Stock; provided, that (A) an Eligible Creditor must subscribe for at least $[•],000 of New Common Stock, and (B) if an Eligible Creditor's pro rata share of the total Rights Participation Amount for Allowed Class 4 General Unsecured Claims entitles such Eligible Creditor to less than $[],000 of New Common Stock, then such Eligible Creditor must exercise all its Creditor Rights in order to subscribe for and purchase New Common Stock. The Rights will not be listed or quoted on any public or over-the-counter exchange or quotation system.~~

~~The aggregate amount of the Rights Offering ("Rights Offering Amount") will equal (a) $11,850,000, or (b) in the event an Exit Facility is unavailable, or cannot be obtained in an amount, or on terms and conditions, that are acceptable to the Backstop Purchasers, then the Backstop Purchasers in their sole discretion may increase the Rights Offering Amount up to a maximum total amount of $19,750,000 (the "Rights Offering Maximum"). Notwithstanding anything to the contrary, 49.367% of the Rights Offering Amount shall be allocated to the holders of Allowed Class 7 Old Equity Interests (the "Equity Rights Offering") and 50.633% of the Rights Offering Amount shall be allocated to the holders of Allowed Class 4 General Unsecured Claims (the "Creditor Rights Offering").~~

~~The closing of the Rights Offering and the issuance of the New Common Stock shall take place on the Effective Date pursuant to the Rights Offering Procedures and the Plan. Reorganized Parent will issue the New Common Stock to the Backstop Purchasers and Exercising Holders, as applicable, in accordance with the terms of the Plan and the Rights Offering Procedures.~~

(b) ~~The Backstop Commitments~~

~~Pursuant to the terms of the Subscription and Backstop Agreement, in order to facilitate the Rights Offering and implementation of the Plan, (i) Privet and Prescott, severally and not jointly, have agreed to purchase, and Parent has agreed to issue and sell to Privet and Prescott, at the Subscription Price based upon the allocation set forth in the Subscription and Backstop Agreement, any Unsubscribed Equity Offering Shares, and (ii) PB Funding has agreed to purchase, and Parent has agreed to issue and sell to PB Funding, at the Subscription Price, any Unsubscribed Creditor Offering Shares, in each case, up to the respective Backstop Purchaser's Backstop Commitment.~~

~~On the Effective Date, in accordance with the Backstop Approval Order, (i) the Debtors will pay to the Backstop Purchasers the Backstop Expenses and (ii) the Backstop Purchasers will receive the Backstop Fee.~~ The Subscription ~~and Backstop~~ Agreement is terminable if the ~~Rights Offering is~~ transactions contemplated therein are not consummated by ~~April 14~~[_____], 2011 and upon the occurrence of certain other events. If terminated, the ~~Backstop~~ Purchasers shall have no further obligations thereunder. However, notwithstanding such termination, Parent shall be obligated to pay each Purchaser its Subscription Expenses and indemnify the Purchasers to the extent set forth in the Subscription Approval Order and the Subscription Agreement.

24

(c)     *Subscription Exercise Period*

The Rights Offering shall commence on the Subscription Commencement Date and shall end at 5:00 p.m. (prevailing Eastern time) on the Subscription Expiration Date (or such later date as the Debtors, subject to the approval of the Required Backstop Purchasers, may specify in a notice provided to the Backstop Purchasers before 9:00 a.m. (prevailing Eastern time) on the Business Day before the then current Subscription Expiration Date) (such period of time, the "Subscription Exercise Period"). After the expiration of the Subscription Exercise Period, any exercise of Rights by any Person shall be null and void and the Subscription Agent shall not honor any such exercise of Rights, regardless of when the documents relating to such exercise were sent.

(d)     *Exercise of Rights*

In order to facilitate the exercise of the Rights, on or about the Subscription Commencement Date, the Subscription Form shall be mailed to each Eligible Holder (or to the record holder for any Eligible Holder of an Old Equity Interest) together with appropriate instructions for the proper completion, due execution and timely delivery of the Subscription Form and submission of payment. The Eligible Holders will not be obligated to exercise their Rights, but in order to properly exercise the Rights, an Eligible Holder must (a) return a duly completed Subscription Form to the Subscription Agent, which form must be received by the Subscription Agent on or prior to 5:00 p.m. (prevailing Eastern time) on the Subscription Expiration Date. On the Subscription Form, the Eligible Holder shall, among other things, (i) confirm that such Eligible Holder is an "accredited investor" within the meaning of Regulation D of the Securities Act, (ii) indicate whether such Eligible Holder is an Eligible Equity Holder or an Eligible Creditor, as applicable, (iii) if such Eligible Holder is an Eligible Equity Holder, indicate the number of Equity Rights it is exercising, and (iv) if such Eligible Holder is an Eligible Creditor, indicate the number of Creditor Rights it is exercising. In addition, the Eligible Holder shall pay in Cash, by wire transfer in immediately available funds, an amount equal to the full Subscription Price in respect of the number of shares of New Common Stock issuable pursuant to the exercise of such Eligible Holder's Rights assuming the Backstop Purchasers would elect to increase the Rights Offering Amount to the Rights Offering Maximum (the "Rights Exercise Payment"), or, in the case of securities held through a bank or brokerage firm, send the Subscription Form to the bank or brokerage firm (or follow such firm's directions with respect to submitting subscription instructions to the firm) with sufficient time for the bank or brokerage firm to effect the subscription through the Depository Trust Company on or prior to 5:00 p.m. (prevailing Eastern time) on the Subscription Expiration Date. If the Subscription Agent for any reason does not receive from a given Eligible Holder both a timely and duly completed Subscription Form and timely payment of such Eligible Holder's Rights Exercise Payment, such Eligible Holder shall be deemed to have relinquished and irrevocably waived its right to participate in the Rights Offering; *provided* that, the Rights Exercise Payment of any DIP Lender or its affiliate (in its capacity as a holder of Allowed Class 7 Old Equity Interests or Allowed Class 4 General Unsecured Claims, as the case may be) may, at the election of such DIP Lender and its affiliate, be reduced or credited against any outstanding DIP Claims that the Company owes to such DIP Lender under the DIP Loan Agreement.

The payments received by the Subscription Agent in connection with the Rights Offering shall be deposited and held by the Subscription Agent in a trust account or similarly segregated account or accounts separate and apart from the Subscription Agent's general operating funds and any other funds subject to any lien or similar encumbrance and which segregated account or accounts shall be maintained for the purpose of holding such money for administration of the Rights Offering until the Effective Date. The Subscription Agent shall not use such funds for any other purpose prior to such date and shall not encumber or permit such funds to be encumbered with any lien or encumbrance. Each Eligible Holder intending to participate in the Rights Offering must affirmatively elect to exercise all of its respective Rights and make proper payment for the New Common Stock on or prior to 5:00 p.m. (prevailing Eastern time) on the Subscription Expiration Date. The exercise of Rights by an Exercising Holder shall be irrevocable.

In the event that the Rights Offering is made for an amount less than the Rights Offering Maximum, the Subscription Agent shall return to the Exercising Holders Cash (without any interest thereon) in immediately available funds in an amount equal to the product of (i) the Subscription Purchase Price and (ii) the difference between the number of shares of New Common Stock that would have been issued to such Exercising Holder under a Rights Offering of $19,750,000 and the actual number of shares of New Common Stock issued to such Exercising Holder under the Rights Offering. In the event the Rights Offering fails to close, the Subscription Agent shall return

25

to the Exercising Holders all Cash paid in connection with (i) the exercise of Rights pursuant to the Rights Offering and (ii) to the extent the purchase price has been paid prior to such date, the issuance of the Subscription Shares.

(e)     *Distribution of New Common Stock.*

On the Effective Date, the Disbursing Agent shall distribute or record in the register of Reorganized Parent's stockholders the shares of New Common Stock purchased by the Exercising Holders pursuant to the Rights Offering, and by the Backstop Parties pursuant to the Subscription and Backstop Agreement.

(f)     *Fractional Rights.*

No fractional shares of New Common Stock shall be issued. The number of shares of New Common Stock available for purchase by Exercising Holders shall be rounded down to the nearest share. Any New Common Stock not subscribed for as a result of such rounding shall be deemed to be an Unsubscribed Share and purchased by the Backstop Purchasers (or affiliates of the Backstop Purchasers) in accordance with, and subject to, the terms of the Subscription and Backstop Agreement.

(g)     *Validity of Exercise of Rights.*

Subject to the terms of the Plan, the Confirmation Order or other order of the Bankruptcy Court, all questions concerning the timeliness, viability, form and eligibility of any exercise of Rights shall be determined by the Debtors, in consultation with the Backstop Purchasers, whose determinations shall be final and binding. The Debtors, subject to the prior written approval of the Required Backstop Purchasers, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as the Debtors determine, or reject the purported exercise of any Rights. Subscription Forms shall be deemed not to have been received or accepted until all irregularities have been waived or corrected within such time as the Debtors (subject to the prior written approval of the Required Backstop Purchasers) determine in their discretion. Neither the Debtors, the Backstop Purchasers nor the Subscription Agent shall be under any duty to give notification of any defect or irregularity in connection with the submission of Subscription Forms or incur any liability for failure to give such notification.

(h~~b~~)     *Use of Proceeds.*

The proceeds received by Reorganized Parent from the ~~Rights Offering and proceeds received from the~~ issuance of ~~Subscription~~Purchased Shares ~~to Prescott and Privet~~ on the Effective Date, together with Cash ~~on hand~~in the Debtors' possession as of the Effective Date and the proceeds of any Exit Facility, shall be used to fund the Reorganized Debtors' emergence and provide necessary post-emergence liquidity.

### *6.4     Additional Cash Contribution*

Prior to the Effective Date, the Debtors may allocate some or all of the Additional Cash Contribution for such purposes as they determine in the exercise of their reasonable business judgment and after obtaining the prior written consent of the Required Purchasers, including to settle Claims against one or more of the Debtors' Estates. Any remaining portion of such Additional Cash Consideration on the Effective Date shall be allocated to the Recovery Trust for distribution by the Recovery Trustee pursuant to Sections 8.3 and 8.5 and the terms of the Recovery Trust Agreement. [For the avoidance of doubt, the Recovery Trust Agreement may not modify any payment priorities or allocations provided for under this Plan, including the provisions of Section 8.3.]

### *6.4~~6.5~~     Sources of Consideration for Plan Distributions*

All Cash consideration necessary for the Debtors or the Reorganized Debtors, as applicable, to make payments or Distributions pursuant hereto shall be obtained from the ~~Rights Offering, the~~ issuance of the ~~Subscription~~Purchased Shares, the Purchaser Loans, if any, any Exit Facility and ~~other~~ Cash ~~on hand~~in the Debtors' possession, including Cash derived from business operations.