# EXHIBIT 2

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| POINT BLANK SOLUTIONS, INC., *et al.*,[1] | ) Case No. 10-11255 (PJW) |
| | ) |
| | ) |
| Debtors. | ) |

---

## DISCLOSURE STATEMENT DESCRIBING ~~AMENDED~~ AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

---

### IMPORTANT DATES

~~Subscription Record Date: _____, 2011 at 4:00 p.m.~~

**Voting Deadline:** _____, 2011 at 4:00 p.m.
~~Subscription Commencement Date: _____, 2011 at 4:00 p.m.~~
~~Subscription Expiration Date: _____, 2011 at 4:00 p.m.~~
**Objection Deadline:** _____, 2011 at 4:00 p.m.
**Confirmation Hearing:** _____, 2011 at _:_0 _.m.

**Dated: ~~January~~ April __, 2011**

Counsel for Debtors and Debtors in Possession:
PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua Fried (CA Bar No. 181541)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
~~Telephone: 302-652-4100~~
~~Facsimile: 302-652-4400~~

Counsel to Lonestar Capital Management, LLC
PEPPER HAMILTON LLP
David B. Stratton, Esq.
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19899-1709

-and-

AKIN GUMP STRAUSS HAUER & FELD LLP
David P. Simonds, Esq.
2029 Century Park East, Suite 2400
Los Angeles, CA 90067

-and-

AKIN GUMP STRAUSS HAUER & FELD LLP
Michael P. Cooley, Esq.
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201-4675

---

[1] The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification numbers and their respective addresses, are: Point Blank Solutions, Inc (9361), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor, Inc. (4044), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Protective Apparel Corporation of America (9051), 179 Mine Lane, Jacksboro, TN 37757; and PBSS, LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.□

70934-001\DOCS_~~DE:166861.1~~SF:75816.7

Counsel to Privet Opportunity Fund I, LLC and Privet Fund Management LLC
REED SMITH LLP
Edward J. Estrada, Esq.
599 Lexington Avenue, 22nd Floor
New York, NY 10022

-and-

REED SMITH LLP
Kurt F. Gwynne, Esq.
1201 Market Street, Suite 1500
Wilmington, DE 19801

Counsel for the ~~Equity~~Official Committee of Unsecured Creditors
~~MORRISON COHEN LLP~~
~~Joseph T. Moldovan~~
MESSANA ROSNER & STEM LLP
Brian L. Arban, Esq.
~~909 Third Avenue~~
~~New York, NY 10022-4731~~

-and-

~~BAYARD, P.A.~~
~~Neil B. Glassman~~
Fred Rosner, Esq.
~~222 Delaware Avenue~~1000 N. West Street, Suite ~~900~~1200
Wilmington, DE ~~19899~~19801

-and-

ARENT FOX LLP
Robert M. Hirsh, Esq.
George P. Angelich, Esq.
1675 Broadway
New York, NY 10019
~~Counsel for the Creditors' Committee~~
~~MESSANA ROSNER & STEM LLP~~
~~Brian L. Arban, Esq.~~
~~Fred Rosner, Esq.~~
~~1000 N. West Street, Suite 1200~~
~~Wilmington, DE 19801~~

-and-

~~ARENT FOX LLP~~
~~Robert M. Hirsh, Esq.~~
~~George Angelich, Esq.~~
~~1675 Broadway~~
~~New York, NY 10019~~

Counsel to Prescott Group Capital Management
ASHBY & GEDDES
Ricardo Palacio, Esq.
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE, OR REJECTION OF THE PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| I. PREFATORY STATEMENT AND DEFINITIONS |  |  | 1 |
| II. PLAN SUMMARY |  |  | 1 |
| III. INTRODUCTION AND OVERVIEW |  |  | 5 |
|  | A. | Introduction | 5 |
|  | B. | Disclaimers | 6 |
|  | C. | An Overview of the Chapter 11 Process | 7 |
|  | D. | Voting on the Plan | ~~7~~8 |
|  |  | 1. Who May Vote | ~~7~~8 |
|  |  | 2. Voting Deadline and Voting Record Date | 9 |
|  |  | 3. How to Vote | 9 |
|  |  | 4. Brokerage Firms, Banks, and Other Nominees | 10 |
|  | E. | Confirmation of the Plan | 10 |
|  |  | 1. Generally | 10 |
|  |  | 2. Objections to Confirmation | 10 |
|  |  | 3. Hearing on Confirmation | 13 |
| IV. HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTORS |  |  | 13 |
|  | A. | Overview of the Debtors and Their Operations | 13 |
|  |  | 1. Business Operations and the Debtors' Customers | 13 |
|  |  | ~~2.~~1. Postpetition Operations | 15 |
|  | B. | Pre-Petition Capital Structure and Directors | 15 |
|  |  | 1. Prepetition Secured Financing | 16 |
|  |  | 2. Prepetition Corporate Governance | 17 |
|  | C. | Significant Legal Proceedings | 17 |
|  |  | 1. Criminal Prosecution of Former Officers | 17 |
|  |  | 2. Class Action and Derivative Lawsuits | 19 |
|  |  | 3. Turnover Action | 21 |
|  |  | 4. Securities Litigation | 21 |
|  |  | 5. Zylon Litigation | ~~21~~22 |
|  | D. | Events Leading to Bankruptcy | 22 |
|  | E. | The Commencement of the Chapter 11 Cases | 23 |

| | | | |
|---|---|---|---|
| | F. | First Day Motions and Other Material Relief | 23<u>24</u> |
| | | 1. Joint Administration | 24 |
| | | 2. Employees | 24 |
| | | 3. Cash Management | 24 |
| | | 4. Taxes | 24<u>25</u> |
| | | 5. Utilities | 25 |
| | | 6. Retention of Customer Programs | 25 |
| | | 7. Prepetition Shipper, Freight Forwarder, and Related Obligations | 25 |
| | | 8. Retention of Key Professionals | 25<u>26</u> |
| | | 9. Critical Vendors | 26 |
| | | 10. DIP Loan Agreement | 26 |
| | G. | Bar Dates for Filing Proofs of Claim | 28 |
| | H. | Filing of Schedules and Statement of Financial Affairs | 28 |
| | I. | Appointment of Creditors' Committee | 28 |
| | J. | Appointment of Equity Committee | 28 |
| | K. | Deadline Extensions for Various Matters | 28<u>29</u> |
| | L. | Litigation with the Creditors' Committee and Office of United States Trustee's Filing of Motion to Appoint Examiner | 29<u>30</u> |
| | M. | The Sale and Reorganization Process and Replacement DIP Financing | 30 |
| V. | | DESCRIPTION OF THE PLAN | 33<u>34</u> |
| | A. | General | 33<u>34</u> |
| ~~VI.~~ | | ~~TREATMENT OF CERTAIN UNCLASSIFIED CLAIMS~~ | ~~33~~ |
| <u>VI.</u> | | <u>Treatment of certain unclassified claims</u> | <u>35</u> |
| | A. | Administrative Claims | 34<u>35</u> |
| | | 1. Administrative Claims | 34<u>35</u> |
| | | 2. ~~Administrative~~<u>Professional Fee</u> Claims ~~Bar Date~~ | 34 <u>35</u> |
| | | ~~3. Professionals' Fees and Expenses~~ | ~~34~~ |
| | B. | U.S. Trustee Fees | 35<u>36</u> |
| | C. | Priority Tax Claims | 35<u>36</u> |
| VII. | | TREATMENT OF CLASSES OF CLAIMS AND INTERESTS | 35<u>37</u> |
| | A. | Treatment of Allowed Class 1 Claims (Other Priority Claims) | 35<u>37</u> |
| | | ~~1. Classification:~~ | ~~35~~ |
| | | ~~2. Treatment:~~ | ~~35~~ |

|  |  | 3. | Voting: | 35 |
|---|---|---|---|---|
| B. | Treatment of Allowed Class 2 Claims (DIP Claims) | | | 36~~37~~ |
|  |  | 1. | Classification: | 36 |
|  |  | 2. | Treatment: | 36 |
|  |  | 3. | Voting: | 36 |
| C. | Treatment of Allowed Class 3 Claims (Miscellaneous Secured Claims) | | | 36~~38~~ |
|  |  | 1. | Classification: | 36 |
|  |  | 2. | Treatment: | 36 |
|  |  | 3. | Voting: | 37 |
| D. | Treatment of Allowed Class 4 Claims (General Unsecured Claims) | | | 37~~38~~ |
|  |  | 1. | Classification: | 37 |
|  |  | 2. | Treatment: | 37 |
|  |  | 3. | Voting: | 37 |
| E. | Treatment of Allowed Class 5 Claims (Subordinated Unsecured Claims) | | | 37~~39~~ |
|  |  | 1. | Classification: | 37 |
|  |  | 2. | Treatment: | 37 |
|  |  | 3. | Voting: | 38 |
| F. | Treatment of Allowed Class 6 Claims (Class Action Claims) | | | 38~~39~~ |
|  |  | 1. | Classification: | 38 |
|  |  | 2. | Treatment: | 38 |
|  |  | 3. | Voting: | 38 |
| G. | Treatment of Allowed Class 7 Interests (Old Equity Interests) | | | 38~~40~~ |
|  |  | 1. | Classification: | 38 |
|  |  | 2. | Treatment: | 39 |
|  |  | 3. | Voting: | 39 |
| H. | Treatment of Allowed Class 8 Claims and Interests (Other Subordinated Claims and Interests) | | | 39~~40~~ |
|  |  | 1. | Classification: | 39 |
|  |  | 2. | Treatment: | 39 |
|  |  | 3. | Voting: | 39 |
| I. | Treatment of Allowed Class 9 Interests (Unexercised Options) | | | 39~~41~~ |
|  |  | 1. | Classification: | 39 |
|  |  | 2. | Treatment: | 39 |

|  |  | 3. | Voting: | 40 |
| VIII. | ACCEPTANCE REQUIREMENTS |  |  | 40<u>41</u> |
|  | A. | Acceptance or Rejection of the Plan |  | 40<u>41</u> |
|  |  | 1. | Voting Class | 40<u>41</u> |
|  |  | 2. | Presumed Acceptance of the Plan | 40<u>41</u> |
|  |  | 3. | Presumed Rejection of Plan | 40<u>41</u> |
|  | B. | Tabulation of Votes on a Non-Consolidated Basis |  | 40<u>42</u> |
| IX. | MEANS FOR IMPLEMENTATION OF THE PLAN |  |  | 41<u>42</u> |
|  | A. | Inter-Debtor Compromise |  | 41<u>42</u> |
|  |  | 1. | Settlement Authority. | 41<u>42</u> |
|  |  | 2. | Inter-Debtor Settlement. | 41<u>43</u> |
|  | B. | Exit Facility |  | 42<u>43</u> |
|  | ~~C.~~ | ~~Rights Offering~~ |  | 42 |
|  | <u>C.</u> | <u>Direct Subscription</u> |  | 43 |
|  |  | 1. | The ~~Rights Offering~~ ~~42~~<u>Direct Subscription</u> <u>43</u> | |
|  |  | 2. | ~~The Backstop Commitments~~ | 43 |
|  |  | ~~3.~~ | ~~Subscription Exercise Period~~ | 43 |
|  |  | ~~4.~~ | ~~Exercise of Rights~~ | 44 |
|  |  | ~~5.~~ | ~~Distribution of New Common Stock.~~ | 45 |
|  |  | ~~6.~~ | ~~Fractional Rights.~~ | 45 |
|  |  | ~~7.~~ | ~~Validity of Exercise of Rights.~~ | 45 |
|  |  | ~~8.~~ | Use of Proceeds. | 45<u>44</u> |
|  |  | <u>3.</u> | <u>Additional Cash Contribution</u> | <u>44</u> |
|  |  | ~~9.~~<u>4.</u> | Sources of Consideration for Plan Distributions | 46<u>45</u> |
|  | D. | Issuance of New Common Stock ~~Purchased in the Rights Offering~~ |  | 46 <u>45</u> |
|  |  | 1. | Issuance of New Common Stock | 46<u>45</u> |
|  |  | 2. | New Stockholders Agreement | 46<u>45</u> |
|  | ~~E.~~ | ~~Additional Issuance of New Common Stock~~ |  | 46 |
|  | ~~F.~~ | Cancellation/Conversion of Securities and Agreements |  | 46<u>45</u> |
|  | <s>G</s><u>F</u>. | Exemptions for Issuance of New Common Stock |  | 47<u>46</u> |
|  | <s>H</s><u>G</u>. | Corporate Existence |  | 47<u>46</u> |
|  | <s>I</s><u>H</u>. | New Certificate of Incorporation and New By-Laws |  | 47<u>46</u> |

| | | | |
|---|---|---|---|
| | J̶I. | Reorganized Debtors' Boards of Directors | 4̶8̶46 |
| | K̶J. | Officers of Reorganized Debtors | 4̶8̶46 |
| | L̶K. | Employee Benefits | 4̶8̶47 |
| | M̶L. | Vesting of Assets in the Reorganized Debtors | 4̶8̶47 |
| | N̶M. | Corporate Action | 4̶9̶47 |
| | O̶N. | Effectuating Documents; Further Transactions | 4̶9̶48 |
| | P̶O. | General Settlement of Claims and Interests | 4̶9̶48 |
| | Q̶P. | Section 1146 Exemption from Certain Taxes and Fees | 5̶0̶48 |
| | R̶Q. | D&O Liability Insurance Policies and Indemnification Provisions | 5̶0̶49 |
| | S̶R. | Preservation of Rights and Causes of Action | 5̶1̶49 |
| | T̶S. | Payment of Fees and Expenses of the DIP Lenders | 5̶1̶50 |
| | U̶T. | Non-Participation of Other Subordinated Claims and Interests | 5̶1̶50 |
| X. | | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 5̶2̶50 |
| | A. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 5̶2̶50 |
| | B. | Objections to Assumption; Determination of Cure Claims | 5̶3̶51 |
| | C. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 5̶4̶53 |
| | D. | Insurance Policies | 5̶5̶53 |
| | E. | Modifications, Amendments, Supplements, Restatements or Other Agreements. 5̶5̶54 | |
| | F. | Reservation of Rights. | 5̶5̶54 |
| | G. | Contracts and Leases Entered Into After the Petition Date. | 5̶6̶54 |
| XI. | | RECOVERY TRUST | 5̶6̶54 |
| | A. | Purpose of Trust | 5̶6̶54 |
| | B. | Governing Document; Funding | 5̶6̶55 |
| | C. | Vesting of A̶s̶s̶e̶t̶s̶Assests; Allocation 55 | |
| | | 1. Trust Assets | 55 |
| | | 2. Allocation of Additional Cash Contribution | 56 |
| | | 3. Allocation of other Trust Assets | 56 |
| | D. | Tax Treatment | 57 |
| | E. | Trust Interests | 58 |
| | | 1. Issuance of Trust Interests | 58 |
| | | 2. Distributions on Trust Interests | 5̶8̶59 |
| | F. | Administration of the Recovery Trust | 5̶9̶60 |

|   |   | | |
|---|---|---|---|
| | G. | Rights and Responsibilities of Recovery Trustee | 60~~61~~ |
| XII. | | PROVISIONS GOVERNING DISTRIBUTIONS | 60~~62~~ |
| | A. | Record Date for Distributions | 60~~62~~ |
| | B. | Timing and Calculation of Amounts to Be Distributed | 60~~62~~ |
| | C. | Disbursing Agent | 61~~62~~ |
| | D. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 61~~62~~ |
| | | 1. Delivery of Distributions in General | 61~~62~~ |
| | | 2. Undeliverable Distributions and Unclaimed Property | 61~~63~~ |
| | E. | Withholding and Reporting Requirements | 62~~63~~ |
| | F. | Setoffs | 62~~63~~ |
| | G. | Claims Paid or Payable by Third Parties | 62~~64~~ |
| | H. | Postpetition Interest | 63~~64~~ |
| | I. | Section 506(c) Reservation | 63~~64~~ |
| | J. | Single Satisfaction of Claims | 63~~64~~ |
| XIII. | | PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS | 63~~65~~ |
| | A. | Prosecution of Objections to Claims | 63~~65~~ |
| | B. | Allowance of Claims | 63~~65~~ |
| | C. | Disputed Claims Reserve | 64~~65~~ |
| | D. | Distributions After Allowance | 64~~65~~ |
| | E. | Distribution of Excess Amounts in the Disputed Claims Reserve | 64~~66~~ |
| | F. | Property Held in Reserve for Disputed Claims | 64~~66~~ |
| | G. | Estimation of Claims | 64~~66~~ |
| | H. | Deadline to File Objections to Claims | 65~~66~~ |
| XIV. | | SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS | 65~~67~~ |
| | A. | Compromise and Settlement of Claims, Interests and Controversies | 65~~67~~ |
| | B. | Releases by the Debtors | 65~~67~~ |
| | C. | Releases by Holders of Claims and Interests | 66~~67~~ |
| | D. | Exculpation | 67~~68~~ |
| | E. | Discharge of Claims and Termination of Interests | 67~~69~~ |
| | F. | Injunction | 68~~69~~ |
| | G. | Term of Injunctions or Stays | 69~~71~~ |
| | H. | Injunction Against Interference With Plan | 69~~71~~ |

| | | | |
|---|---|---|---|
| | I. | Injunction Related to Releases and Exculpation | ~~69~~71 |
| | J. | Protection Against Discriminatory Treatment | ~~69~~71 |
| | K. | No Consent to Change of Control Required | ~~70~~71 |
| | L. | Release of Liens | ~~70~~71 |
| XV. | | CONDITIONS TO THE CONFIRMATION DATE AND EFFECTIVE DATE | ~~70~~72 |
| | A. | Conditions Precedent to Confirmation | ~~70~~72 |
| | B. | Conditions Precedent to the Effective Date | ~~71~~72 |
| | C. | Waiver of Conditions | ~~73~~74 |
| | D. | Effect of Failure of Conditions | ~~73~~74 |
| XVI. | | MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN | ~~73~~74 |
| | A. | Modification and Amendments | ~~73~~74 |
| | B. | Effect of Confirmation on Modifications | ~~74~~75 |
| | C. | Revocation or Withdrawal of the Plan | ~~74~~75 |
| XVII. | | RETENTION OF JURISDICTION | ~~74~~75 |
| XVIII. | | MISCELLANEOUS PROVISIONS | ~~77~~78 |
| | A. | Immediate Binding Effect | ~~77~~78 |
| | B. | Additional Documents | ~~77~~78 |
| | C. | Dissolution of Statutory Committees | ~~77~~78 |
| | D. | Successors and Assigns | ~~77~~78 |
| | E. | Service of Documents | ~~77~~78 |
| | F. | Entire Agreement | ~~79~~80 |
| | G. | Severability of Plan Provisions | ~~79~~80 |
| | H. | Exhibits | ~~79~~80 |
| | I. | Votes Solicited in Good Faith | ~~79~~80 |
| | J. | Closing of Chapter 11 Cases | ~~80~~81 |
| | K. | Conflicts | ~~80~~81 |
| XIX. | | MISCELLANEOUS PROVISIONS | ~~80~~81 |
| | A. | Notices | ~~80~~81 |
| XX. | | FEASIBILITY | ~~82~~83 |
| XXI. | | LIQUIDATION ANALYSIS | ~~83~~84 |
| XXII. | | RISK FACTORS | ~~85~~86 |
| | A. | <u>Risk Factors Under the Plan</u> | <u>86</u> |

| | B. | Risks to the Debtors' Continued Business Operations | 87 |
| | C. | Certain Federal Income Tax Consequences of the Plan | 8692 |
| | BD. | Consequences to Holders of Claims | 8693 |
| | CE. | Withholding | 8894 |
| | 1. | Importance of Obtaining Professional Tax Assistance. | 95 |
| XXIII. CONCLUSION | | | 891 |

# I.

## PREFATORY STATEMENT AND DEFINITIONS

Pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Point Blank Solutions Inc. ("Parent" or "PBSI"); Point Blank Body Armor, Inc. ("Point Blank"); Protective Apparel Corporation of America ("PACA"); and PBSS, LLC ("PBSS"), the debtors and debtors in possession in the above-captioned cases (together, the "Debtors" or the "Company") along with the Official Committee of Unsecured Creditors (the "Creditors' ~~Committee"), the Official Committee of Equity Security Interest Holders (the "Equity~~ Committee"), Privet Fund Management LLC (as investment manager for Privet Opportunity Fund I, LLC and Privet Fund LP) ("Privet Fund Management"), Privet Opportunity Fund I, LLC ("Privet"), Prescott Group Capital Management, LLC ("Prescott") and Lonestar Capital Management, LLC, as investment advisor to Lonestar Partners, LP and manager of PB Funding, LLC (collectively, the "Plan Proponents") submit this disclosure statement (the "Disclosure Statement") in support of the *Amended Joint Chapter 11 Plan of Reorganization,* dated ~~January~~April __, 2011 (the "Plan"). Unless otherwise noted, capitalized terms used herein have the meanings set forth in the Plan. The Plan is the result of extensive negotiations by the Plan Proponents, each of whom support confirmation of the Plan.

# II.

## PLAN SUMMARY

The Plan contemplates the reorganization and continuation of the Debtors' business through a restructuring of each Debtor's debt obligations and the generation of new capital through a ~~Rights Offering~~direct subscription of new common stock by the Purchasers (i.e. PB Funding, LLC; Privet and Prescott) in the Reorganized Debtors, ~~backstopped by the Backstop Parties. The Rights Offering~~ (the "Direct Subscription"). The Direct Subscription, combined with the Debtors' available cash from operations going forward and exit financing, if necessary and available, will provide the funding necessary to consummate the Plan and pay remaining secured and unsecured creditors in accordance with the terms of the Plan. All of the prepetition equity Interests in Parent (the "Old Equity Interests") will be deemed surrendered, and 100% of the equity securities interests in the Reorganized Parent (the "New ~~Members Interests~~Common Stock") will be acquired pursuant to the ~~Rights Offering~~Direct Subscription. Additional details regarding the ~~Rights Offering~~Direct Subscription may be found in Article IX of this Disclosure Statement and in Section 6.3 of the Plan.

The Plan contemplates the reorganization of the Debtors' businesses and the resolution of the outstanding Claims against and Interests in the Debtors. Generally, the Plan is structured around three key components.

(a)    The ~~Rights Offering/~~Direct Subscription.  In addition to Cash on hand and an Exit Facility, if one is necessary and available, the Debtors intend to fund their reorganization effort—including the payment of all amounts due under the Plan—through the issuance and sale of shares of New Common Stock in Reorganized Parent in a minimum amount of $15,000,000 and (subject to certain consents and other conditions) up to a maximum of ~~$25,000,000.~~25,000,000, a portion of which may be in the form of Purchaser Loans as described in Section 6.3(a) of the Plan and summarized in Article IX.C of this Disclosure Statement. The New Common Stock will be sold ~~(i) through a Rights Offering to eligible holders of Allowed General Unsecured Claims and Allowed Old Equity Interests, backstopped by the Debtors' existing DIP Lenders, and (ii)~~ through a direct subscription of shares to ~~two of the existing DIP Lenders, Privet and Prescott.  The Rights Offering and direct subscription are~~the Purchasers or one or more of their Affiliates.  The Direct Subscription is described more fully in Section 6.3 of the Plan and in the Subscription ~~and Backstop~~ Agreement.  [2]

(b)    The Inter-Debtor Compromise.  The Plan Proponents have identified several potential Claims, Causes of Action and other disputes that may exist between the several Debtors, including existing and potential disputes regarding (i) the value and disposition of Intercompany Claims, (ii) the valuation of the individual Debtor's Estates, (iii) the individual Debtor's respective ownership interest in certain potentially valuable lawsuits, (iv) the susceptibility of two or more of the Debtors' Estates to substantive consolidation and (v) the consideration, if any, that should be paid by Parent to retain its existing Interests in the Debtor Subsidiaries.  The treatment to be provided under the Plan to each Class of Claims against or Interests in the respective Debtors is in part a product of a global compromise and settlement of these and other potential Claims, Causes of Action and disputes that would be costly and time-consuming to litigate.  It is the Plan Proponents' view that the Inter-Debtor Compromise is the best way to resolve these disputes, avoid the delay and expense of litigating these issues and ensuring the equitable treatment of the Debtors' Creditors and Interest holders.  The Inter-Debtor Compromise is described more fully in Section IX.A of the Disclosure Statement and Section ~~6.5~~6.1 of the Plan.

(c)    The Recovery Trust.  Under the Plan, holders of Allowed General Unsecured Claims, Allowed Subordinated Unsecured Claims, Allowed Class Action Claims and Allowed Old Equity Interests will be issued beneficial interests in a Recovery Trust established for the purpose of liquidating certain assets and distributing the proceeds thereof to the trust beneficiaries and making certain disbursements or distributions to the Reorganized Parent.  Allowed Excess Fee Claims of certain Professionals will also be paid out of the proceeds from the Recovery Trust prior to payment of trust beneficiaries.  On the Effective Date, the Reorganized Debtors will fund a Recovery Trust with ~~a cash payment of $3 million, an additional $1 million for expenses and~~ rights to certain potentially valuable Causes of Action, the proceeds

---

[2]  In response to certain objections and other informal responses received by Debtors to the prior disclosure statement filed on January 11, 2011 [Docket No. 1007] (the "Prior Disclosure Statement"), including the objection filed by the Staff of the Securities and Exchange Commission on the grounds that the proposed rights offering to creditors and certain equity holders set forth in the Prior Disclosure Statement would not meet the requirements of the Securities Act of 1933, the Plan Proponents have modified the Disclosure Statement and Plan.  In particular, among other proposed changes, pursuant to the revisions to the Plan and revisions to the Disclosure Statement, the Plan now provides that the New Common Stock described in the Plan will be proposed to be sold to the Purchasers through the Direct Subscription.  Accordingly, the New Common Stock will not be sold through a rights offering to creditors or existing equity holders, as previously provided in the Prior Disclosure Statement.

of which will be <u>shared with the Reorganized Parent (in accordance with the waterfall described in Section 8.3(c) of the Plan) and</u> distributed to the beneficiaries of the Recovery Trust in accordance with the waterfall <u>provisions</u> described in ~~Article XI.E of the Disclosure Statement and Section~~<u>Sections 8.3(c) and</u> 8.5 of the Plan. <u>In addition, the Recovery Trust will be provided with initial funding for litigation and related expenses as described in Section 8.2 of the Plan, and may be funded with a portion of the Additional Cash Contribution, in which case such amount will be distributed as described in Section 8.3(b) of the Plan. The Recovery Trust may also be able to borrow certain funds from the Reorganized Parent as described in Section 8.2. of the Plan.</u> The Recovery Trust is described more fully in Article 8 of the Plan and in the Recovery Trust Agreement<u>, which will be filed as part of the Plan Supplement</u>.

**The Plan Proponents believe the Plan treats all Classes of Creditors and Interest holders fairly and equitably, in observance of the absolute priority rule of § 1129(b)(2). The Plan Proponents believe the Plan provides all Creditors and Interest holders with at least as much as they would receive in a Chapter 7 liquidation of the Debtors and provides all General Unsecured Creditors substantially more than they would receive in a Chapter 7 liquidation. Because, among other things, certain contemplated settlements and objections to Claims have not been resolved, the Plan Proponents are not certain what the total amount of Allowed General Unsecured Claims will be.**

Set forth in detail elsewhere in this Disclosure Statement is a description of the technical aspects of the classification of Claims and Interests, the relative allocations of property to holders of such Claims and Interests, the methodology as to how such property is to be distributed, the risks inherent in the proposed Plan and the applicable bankruptcy and tax consequences of the reorganization of the Debtors. The Plan is complex and is the product of lengthy discussions between the Plan Proponents and certain other parties in interest and is based upon the analysis of all Claims asserted or known as of the date hereof, an evaluation of the relative merits of potential conflicting Claims and a compromise between such Claims consistent with the goals of the Bankruptcy Code. The Plan Proponents believe that the following broad overview of what Creditors and Interest holders will receive under the Plan will be helpful in your consideration of whether you wish to accept or reject the Plan. This summary does not purport to be complete and should only be relied upon for voting purposes when read in conjunction with the Plan and the Disclosure Statement in their entirety. In the event of any inconsistency between the Plan and the Plan Documents, on the one hand, and this Disclosure Statement, on the other hand, the Plan and the Plan Documents shall control and take precedence with respect to such inconsistency.

The following Table 1 sets forth a quick reference guide to the classification and treatment of Allowed Claims against and Allowed Interests in the Debtors. Table 1 is a summary only and is subject in all respects to the specific provisions of the Plan.

| Table 1[23] Summary of Claims Against and Interests in the Debtors | | | |
|---|---|---|---|
| **Class** | **Description** | **Estimated Dollar Amount[34]** | **General Description of Class** |
| 1 | Other Priority Claims | Unknown | Claims entitled to priority under § 507(a), excluding Administrative Claims, DIP Claims and Priority Tax Claims. |
| 2 | DIP Claims | $25,000,000 | Claim arising under the DIP Loan Agreement or Final DIP Order for payment of outstanding Obligations (as defined in the DIP Loan Agreement). |
| 3 | Miscellaneous Secured Claim | Unknown | Secured Claims other than the DIP Claims. |
| 4 | General Unsecured Claims | $40 to $57 million[5] | Any Claim that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, DIP Claim, Miscellaneous Secured Claim, Subordinated Unsecured Claim, Class Action Claim or Other Subordinated Claims and Interests. Most Claims fall within this Class. |
| 5 | Subordinated Unsecured Claims | Unknown | Claims, if any, that are subordinated to General Unsecured Claims.. |
| 6 | Class Action Claims | To Be Determined | Claims, if any, arising out of or relating to *In re DHB Industries, Inc. Class Action Litigation* (No. CV 05-4296) in the United States District Court for the Eastern District of New York. |
| 7 | Old Equity Interests | N/A | Any of the authorized, issued and outstanding Interests in Parent as of the Petition Date. |
| 8 | Other Subordinated Claims and Interests | N/A | Claims and Interests, if any, subordinated to Old Equity Interests. |
| 9 | Unexercised Options | N/A | Any outstanding and unexercised options to purchase equity security interests in Parent. |

[23] All references to Classes also include the specific subclasses denoted in the Plan. □

[34] This chart is only a summary of the classification and treatment of Claims and Interests under the Plan and the amounts and recoveries are only current estimates of the Claims asserted against the Debtors and of the potential allowed of amount of claims that have not been liquidated. Because (i) many Claims have not yet been liquidated against the Debtors and (ii) potential litigation recoveries by the Debtors, including those described in Section IV.C. of the Disclosure Statement, are currently unknown, it is not possible to estimate with any certainty the actual allowed amount of such Claims. The total amount of Allowed Claims and recoveries may differ significantly from the estimated amounts set forth in this Disclosure Statement. References should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

[5] This claim estimate range does not include the various intercompany claims by and between the Debtors.

Table 2 is a summary of estimated recoveries for holders of Claims against and Interests in the Debtors, and is subject in all respects to the Plan.

| Table 2[46] | |
|---|---|
| **Projected Treatment of Claims Against and Interests in the Debtors** | |
| **If you have an Allowed Claim in this Class:** | **You are expected to receive this treatment:** |
| Class 1 (Other Priority Claims) | Payment in full. |
| Class 2 (DIP Claims) | Payment in full. |
| Class 3 (Miscellaneous Secured Claims) | Payment in full |
| Class 4 (General Unsecured Claims) | Ratable Proportion of Distributions from the Recovery Trust~~, and Rights to participate in the Rights Offering~~. |
| Class 5 (Subordinated Unsecured Claims) | Ratable Proportion of Distributions, if any, from the Recovery Trust after payment in full (with interest) of Allowed Class 4 Claims. |
| Class 6 (Class Action Claims) | Ratable Proportion of Distributions from the Recovery Trust, *pari passu* with Class 7 |
| Class 7 (Old Equity Interests) | Ratable Proportion of Distributions from the Recovery Trust, *pari passu* with Class ~~6 and Rights to participate in the Rights Offering.~~6. |
| Class 8 (Other Subordinated Claims and Interests) | No recovery. |
| Class 9 (Unexercised Options) | No recovery |

## III.

## INTRODUCTION AND OVERVIEW

### A. Introduction

On April 14, 2010 (the "Petition Date"), the Debtors commenced these bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions under Chapter 11 of the Bankruptcy Code.

This Disclosure Statement, submitted in accordance with section 1125 of the Bankruptcy Code,[57] contains information regarding the Plan proposed by the Plan Proponents. A copy of the Plan accompanies this Disclosure Statement. The Disclosure Statement is being distributed to you to help you make an informed judgment about the Plan.

---

[46] All references to Classes also include the specific subclasses denoted in the Plan.
[57] Unless stated otherwise, section references are to the Bankruptcy Code.

In addition to summarizing the Plan, the Disclosure Statement describes: (1) the Debtors' history, businesses, assets and liabilities; (2) the Debtors' pending litigation; (3) proposed distributions under the Plan; (3) the Plan's feasibility; and (5) alternatives to confirmation of the Plan. The Debtors strongly urge you to carefully review the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor or Interest holder.

The Bankruptcy Court approved this Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor to make an informed judgment about the Plan. Under §1125, this approval enabled the Debtors to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not passed on the Plan itself or conducted a detailed investigation into the contents of this Disclosure Statement.

Your vote on the Plan is important. Absent acceptance of the Plan, there may be protracted delays in any subsequent reorganization, or, alternatively, or a liquidation under Chapter 7 of the Bankruptcy Code. These alternatives may not provide for distribution of as much value to Creditors holding Allowed Claims or Interest holders as does the Plan. Accordingly, the Plan Proponents believe that the Plan is in the best interests of holders of Allowed Claims and Interests and urge you to accept the Plan by completing and returning the enclosed ballot(s) no later than _____, at _:00 _.m. Eastern Time (the "Voting Deadline").

## B. **Disclaimers**

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PROPOSED PLAN. PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. SEE 11 U.S.C. § 1125(a).

FOR THE CONVENIENCE OF CREDITORS AND INTEREST HOLDERS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN CONTROL.

NO REPRESENTATIONS CONCERNING THE DEBTORS' FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE PLAN PROPONENTS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS

CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED. MOREOVER, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE BOOKS AND RECORDS OF THE DEBTORS, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE OR INACCURATE. REASONABLE EFFORT HAS BEEN MADE, HOWEVER, TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

THE PLAN PROPONENTS, AS WELL AS THEIR COUNSEL AND ADVISORS, INCLUDING THE DEBTORS' COUNSEL AND ADVISORS, HAVE RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH THIS DISCLOSURE STATEMENT AND HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS, OR TAX ADVICE. EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS, HER OR ITS OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX, AND OTHER MATTERS CONCERNING ITS CLAIM AND/OR INTEREST.

## C.    An Overview of the Chapter 11 Process

Chapter 11 of the Bankruptcy Code contains numerous provisions, the general effect of which is to provide the debtor with "breathing space" within which to propose a restructuring of its obligations to third parties. The filing of a Chapter 11 bankruptcy petition creates a bankruptcy estate comprising all of the property interests of the debtors. Unless a trustee is appointed by the Bankruptcy Court for cause (no trustee has been appointed in these Chapter 11 Cases), a debtor remains in possession and control of all its assets as a "debtor in possession." The debtor may continue to operate its business in the ordinary course on a day-to-day basis without Bankruptcy Court approval. Bankruptcy Court approval is only required for various enumerated kinds of transactions (such as certain financing transactions) and transactions out of the ordinary course of a debtor's business. The filing of the bankruptcy petition gives rise to what is known as the "automatic stay" which, generally, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a Chapter 11 case. The Bankruptcy Court can grant relief from the automatic stay under certain specified conditions or for cause.

The Bankruptcy Code authorizes the creation of one or more official committees to protect the interests of some or all creditors or interest holders. The fees and expenses of counsel and other professionals employed by such official committees and approved by the Bankruptcy Court are generally borne by a bankruptcy estate. Two official committees have been appointed in these Chapter 11 Cases, the Creditors' Committee, which represents the collective interests of general unsecured creditors, and the Equity Committee, which represents the collective interests of equity security holders of PBSI.

A Chapter 11 debtor may emerge from bankruptcy by successfully confirming a plan of reorganization. A plan may be either consensual or non-consensual and may provide, among other things, for the treatment of the claims of creditors and the interests of equity holders and the holders of options or warrants. The provisions of the Plan are summarized in Article 5 of this Disclosure Statement.

**D.**     **Voting on the Plan**

1.     Who May Vote

Table 3 provides a summary of the voting eligibility of Creditors and Interest holders in each Class under the Plan, based on whether or not those Claims and Interests are Impaired or Unimpaired.

| | Table 3 Voting Eligibility Under the Plan | | |
|---|---|---|---|
| Class | Description | Impairment | Entitled to Vote? |
| 1 | Other Priority Claims | Impaired | YES |
| 2 | DIP Claims | Unimpaired | NO (deemed to accept) |
| 3 | Miscellaneous Secured Claim | Impaired | YES |
| 4 | General Unsecured Claims | Impaired | YES |
| 5 | Subordinated Unsecured Claims | Impaired | YES |
| 6 | Class Action Claims | Impaired | YES |
| 7 | Old Equity Interests | Impaired | YES |
| 8 | Other Subordinated Claims and Interests | Impaired | NO (deemed to reject) |
| 9 | Unexercised Options | Impaired | NO (deemed to reject) |

Some Creditors and Interest holders may hold Impaired Claims and Interests in more than one Class and must vote separately for each Class. If you hold Claims or Interests in more than one Class, you must cast a separate Ballot based on each individual Claim or Interest. If you hold multiple Claims in the same Class, you must cast a separate Ballot on each individual Claim.

Please do not return any other documentation with your Ballot. For further information on casting a Ballot to vote on the Plan, please see Section VI.A. of this Disclosure Statement.

Each Creditor holding an Allowed Claim in Classes 1 and 3-6 and each Interest holder in Class 7 is entitled to vote either to accept or to reject the Plan. Only those votes cast by holders of Allowed Claims or Interests shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation. Creditors holding Claims in Class 2 are unimpaired, are deemed to accept the Plan and are not entitled to vote. An Impaired Class of Claims shall have accepted the Plan if (excluding any Creditor designated under § 1126(e)): (a) the Creditors holding at least two-thirds in amount of the Allowed Claims actually

voted in such Class have voted to accept the Plan, and (b) the Creditors holding more than one-half in number of the Allowed Claims actually voted in such Class have voted to accept the Plan.

An Impaired Class of Interests shall have accepted the Plan if (excluding any Interest holder designated under § 1126(e)) it has been accepted by at least two-thirds in amount of the Allowed Interests actually voted in such Class. Class 7 is impaired and entitled to vote on the Plan. Class 8 and Class 9 are each also Impaired under the Plan, but will not receive any Distributions under the Plan and, consequently, is deemed to reject the Plan and is not entitled to vote thereon. Because Class 8 and Class 9 are each deemed to reject the Plan by operation of law, the Debtors will ask the Bankruptcy Court to confirm the Plan in accordance with § 1129(b) over the deemed rejection of the Plan by Class 8 and Class 9. Without limiting the foregoing, in the event that any Class of Claims or Interests entitled to vote on the Plan fails to accept the Plan as required by § 1129(a), the Plan may be amended or, alternatively, the Debtors will seek confirmation of the Plan over the deemed rejection of the Plan by Class 8 and Class 9 as well as over the rejection of the Plan by any Class of Claims or Interests pursuant to § 1129(b).

2.      Voting Deadline and Voting Record Date

The deadline for voting on the Plan is _____, 2011 (the "Voting Deadline"). To be entitled to vote to accept or reject the Plan, a holder of a Claim or Interest against the Debtors must be the record holder of such Claim or Interest at the close of business on the voting record date fixed by the Bankruptcy Court (the "Voting Record Date"). Holders who acquire Claims or Interests against the Debtors after the Voting Record Date must arrange with their seller to receive a proxy from the holder of record of such Claim or Interest on the Voting Record Date.

3.      How to Vote

All votes to accept or to reject the Plan must be cast by using the appropriate form of Ballot. No votes other than ones using such Ballots will be counted except to the extent ordered otherwise by the Bankruptcy Court. A form of Ballot is being provided to Creditors in Classes 1 and 3-6 and Interest holders in Class 7 by which Creditors and Interest holders in such Classes may vote their acceptance or rejection of the Plan. To vote on the Plan, after carefully reviewing the Plan and this Disclosure Statement, please complete the Ballot, as indicated thereon, (1) by indicating on the enclosed Ballot that (a) you accept the Plan or (b) you reject the Plan and (2) by signing your name and mailing the Ballot in the envelope provided for this purpose. Epiq Bankruptcy Solutions, LLC, as the Voting Tabulator and Balloting Agent, (the "Balloting Agent") will count the Ballots.

IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND RECEIVED BY THE BALLOTING AGENT, NO LATER THAN 4:00 P.M. EASTERN TIME ON _____, 2011, AT THE FOLLOWING ADDRESS:

If by first class mail:

Point Blank Solutions, et al, Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
P.O. Box 5014

New York, NY 10150-5014

If by overnight mail or hand delivery:

Point Blank Solutions, et al., Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

**DO NOT SEND YOUR BALLOT VIA FACSIMILE OR E-MAIL.**

IF YOUR BALLOT IS NOT PROPERLY COMPLETED, SIGNED AND RECEIVED
AS DESCRIBED, IT WILL NOT BE COUNTED. IF YOUR BALLOT IS DAMAGED OR
LOST, YOU MAY REQUEST A REPLACEMENT BY MAKING A WRITTEN REQUEST TO
THE ADDRESS SHOWN ABOVE. FACSIMILE OR ELECTRONICALLY TRANSMITTED
BALLOTS WILL NOT BE COUNTED.

4.    Brokerage Firms, Banks, and Other Nominees

A brokerage firm, commercial bank, trust company, or other nominee that is the
registered holder of securities for a beneficial owner, or that is a participant in a securities
clearing agency and is authorized to vote in the name of such securities clearing agency pursuant
to an omnibus proxy and that is acting for a beneficial owner, can vote on behalf of such
beneficial owner by (i) distributing a copy of this Disclosure Statement and all appropriate ballots
to such owner, (ii) collecting all such ballots, and (iii) transmitting such completed ballots to the
Balloting Agent. A proxy intermediary acting on behalf of a brokerage firm or bank may follow
the procedures outlined in the preceding sentence to vote on behalf of such beneficial owner. A
brokerage firm, commercial bank, trust company, or other nominee may prevalidate a beneficial
owner's ballot by indicating on the ballot the record holder of the notes or shares to be voted and
the appropriate account numbers through which the beneficial owner's holdings are derived, and
distribute the prevalidated ballot with a copy of the Disclosure Statement to the beneficial owner
for voting, with such beneficial owner then completing the prevalidated ballot and returning it
directly to the Balloting Agent in the enclosed preaddressed, postage prepaid envelope.

**E.    Confirmation of the Plan**

5.    1. Generally

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of
reorganization or liquidation. The timing, standards and factors considered by the Bankruptcy
Court in deciding whether to confirm a plan of reorganization are discussed in detail below.

6.    2. Objections to Confirmation

Any objections to Confirmation of the Plan must be in writing, conform to the Federal
Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the United States Bankruptcy
Court for the District of Delaware, and must be filed with the Clerk of the Bankruptcy Court and
served on counsel for the Debtors, counsel to the Creditors' Committee, Counsel for the Equity

Committee, Counsel for Privet and Privet Fund Management, Counsel for Prescott, Counsel for Lonestar, and the United States Trustee on or before the date set forth in the notice of the hearing on Plan Confirmation sent to you with this Disclosure Statement and the Plan.

Counsel on whom objections must be served are:

Counsel for the Debtors
Laura Davis Jones, Esq.
Timothy Cairns, Esq.
Pachulski Stang Ziehl & Jones LLP
919 North Market St., 17th Floor
Wilmington, DE 19899-8705

-and-

David M. Bertenthal, Esq.
Joshua M. Fried, Esq.
Pachulski Stang Ziehl & Jones LLP
150 California St., 15th Floor
San Francisco, CA 94111

Counsel for the Creditors' Committee
Brian L. Arban, Esq.
Fred Rosner, Esq.
Messana Rosner & Stem LLP
1000 N. West Street, Suite 1200
Wilmington, DE 19801

-and-

Robert M. Hirsh, Esq.
George P. Angelich, Esq.
Arent Fox LLP
1675 Broadway
New York, NY 10019

Counsel for the Equity Committee
~~Joseph T. Moldovan, Esq.~~
~~Morrison Cohen LLP~~
~~909 Third Avenue~~
~~New York, NY 10022-4731~~

-and-

~~Neil B. Glassman, Esq.~~
~~Bayard, P.A.~~
~~222 Delaware Avenue, Suite 900~~
~~Wilmington, DE 19899~~

Counsel to Privet Opportunity Fund I, LLC and Privet Fund Management LLC
Edward J. Estrada, Esq.
Reed Smith LLP
599 Lexington Avenue, 22nd Floor
New York, NY 10022

-and-

Kurt F. Gwynne, Esq.
Reed Smith LLP
1201 Market Street, Suite 1500
Wilmington, DE 19801

Counsel to Prescott Group Capital Management
Ricardo Palacio, Esq.
Ashby & Geddes
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

Counsel to Lonestar Capital Management, LLC
David B. Stratton, Esq.
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19899-1709

-and-

David P. Simonds, Esq.
Akin Gump Strauss Hauer & Feld LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067

-and-

Michael P. Cooley, Esq.
Akin Gump Strauss Hauer & Feld LLP

1700 Pacific Avenue, Suite 4100
Dallas, TX 75201-4675

<u>United States Trustee</u>
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19801

7.    ~~3.~~ Hearing on Confirmation

The Court has set_____, 2011, at ____ __.m. for a hearing (the "Confirmation Hearing") to determine whether the Plan has been accepted by the requisite number of Creditors and Interest holders and whether the other requirements for Confirmation of the Plan have been satisfied. The Confirmation Hearing will be held in Courtroom ──2 of the United States Bankruptcy Court, 824 Market Street, Wilmington, DE 19801, before the Honorable Peter J. Walsh, United States Bankruptcy Judge. The Confirmation Hearing may be continued from time to time and day to day without further notice. If the Court confirms the Plan, it will enter the Confirmation Order.

<div align="center">

**IV.**

**HISTORY, ORGANIZATION
<u>AND ACTIVITIES OF THE DEBTORS</u>**

</div>

**A.    <u>Overview of the Debtors and Their Operations</u>**

The Debtors are collectively a leading manufacturer and provider of bullet, fragmentation and stab resistant apparel and related ballistic accessories, which are used domestically and internationally by military, law enforcement, security and corrections personnel, as well as government agencies. Since 1998, Parent has supplied over 80% of U.S. military soft body armor vest requirements to protect soldiers and law enforcement personnel around the world. Parent and its debtor subsidiaries PBBA and PACA are major suppliers in the domestic law enforcement market with broad brand recognition and "best value" reputation. The Debtors manufacture several body armor products and related accessories that are sold worldwide to a variety of customers. The Debtors' armor products and related accessories protect individuals from bodily injury and death from multiple threats, including bullets, knives, and other sharp instruments and shrapnel fragments. The Debtors design, build and sell advanced systems that safeguard users from specific threats as well. The Debtors' products are sold through a variety of means, including a corporate sales force, sales agents and a network of distributors.

8.    ~~1.~~ Business Operations and the Debtors' Customers

The Debtors currently employ ~~approximately 615~~over 800 full-time employees in hourly, salaried, supervisory, management, sales, administrative and manufacturing positions to perform the functions necessary to effectively and efficiently operate the Debtors' business. The Debtors currently maintains two manufacturing facilities located in Pompano Beach, FL and Jacksboro, TN. The Debtors' products are designed for domestic, international, military and law enforcement customers, as described below.

Products are sold domestically to the U.S. military, state and local law enforcement agencies, correctional facilities, federal agencies and distributors. Sales to the U.S. military or federal government agencies accounted for approximately ~~50.4% and~~ 39.1% ~~and 62.1%~~ of revenues for the years ended December 31, ~~2009~~2010 and ~~2008,~~2009, respectively. The remaining sales are primarily to domestic state and local law enforcement agencies, security and intelligence agencies, distributors, federal law enforcement agencies and state correctional facilities, and to select international markets.

### a.    Military

The Debtors' military models are built to meet military specifications and undergo a rigorous test program as well as routine performance testing at independent U.S. testing facilities and at U.S. Army testing centers. The Debtors' principal customer for these vests is the U.S. military and Department of Defense. The U.S. military and other government agencies purchase the Debtors' products directly through the contract bid process through the U.S. General Services Administration or through third parties whereby the Debtors serve as the ballistic subcontractor.

In 1998, the U.S. Army and Marine Corps procured the Debtors' Interceptor™ Outer Tactical Vest system ("OTV"), which is a soft armor vest with pouches for hard armor plates for added ballistic protection over vital organs. The Debtors designed the Interceptor™ OTV as a continually upgradeable, modular, soft body armor system specifically for the U.S. military. The system evolved to include a removable yoke/collar, as well as throat and groin protection that can be customized by the wearer to address the specific threat faced.

In 2004, the Debtors developed for the U.S. Marine Corps an Armor Protection Enhancement System. This modular system was designed to enhance the current Interceptor™ OTV by providing equivalent protection to areas not previously covered by the Interceptor™ OTV, including the underarm, shoulder and upper arms. The Interceptor™ OTV system was first extensively used in combat in Afghanistan during Operation Enduring Freedom, where it was credited with reducing the number of life-threatening wounds. During Operation Iraqi Freedom, the Interceptor™ OTV system was widely deployed among U.S. combat forces.

In 2007, the Debtors developed the Improved Outer Tactical Vest ("IOTV"), which is the latest advancement in ballistic soft armor systems. The IOTV is currently the primary system used by the U.S. military and other government agencies and its predecessor, the OTV is also worn in combat by these customers.

The Debtors manufacture and supply the Interceptor™ OTV and the IOTV to the U.S. military through contracts with the U.S. Army, the U.S. Department of Defense and pursuant to standard purchasing contracts of a type issued by the U.S. General Services Administration. The Debtors have developed multiple models of the Interceptor™ OTV and IOTV customized to meet mission requirements. Since the development of these products, the Debtors have delivered over 1.7 million Interceptor™ OTVs and Improved Outer Tactical Vests ("IOTVs") to the military.

In ~~2009,~~2010, the Debtors derived approximately $~~61,884,000~~69,342,000 in sales to the U.S. military and U.S. government, which was approximately ~~39.1~~50.4% of all sales for that year.

### b.    Law Enforcement

The Debtors manufacture and distribute a large variety of standard and specialized products to the law enforcement community, including police, federal agencies, corrections officers and security guards. The Debtors test these and other vests in their own advanced technology center, as well as in independent U.S. test laboratories, to ensure that the vests meet or exceed National Institute of Justice standards. The Debtors sell products to commercial customers directly through a sales force and through an extensive network of distributors. The Debtors believe that they are currently the number two supplier of soft body armor ballistic systems to the domestic law enforcement market.

The majority of the Debtors' sales to law enforcement are concealable vests, which are sold to federal, state and local law enforcement. These vests are individually sized to provide the optimal fit and protection. The Debtors also make body armor products that are used by tactical law enforcement officer (most commonly, SWAT). The Debtors also produce ballistic systems for other personnel in corrections facilities and other law enforcement employees who are exposed to threats primarily from knives and other sharp instruments. These vests are constructed with special blended fabrics, stainless steel and flexible woven fabrics, and are available in both concealable and tactical models. The Debtors' body armor products also include tactical police jackets, unique vests for special agents, corrections vests and K-9 protection.

For ~~2009,~~2010, the Debtors derived approximately $~~27,572,000~~34,160,000 in domestic/distributor sales, which constituted ~~17.4~~24.8% of total ~~2009~~2010 sales.

### c.    International Sales

While the Debtors sell the same products internationally that they do domestically, the Debtors' International Interceptor, Frontier, and PACA International vests all target specifically the international tactical body armor market. The Debtors increased international sales from $~~25,035,000~~1,000,000 in ~~2008~~2007 to $~~64,047,000~~34,466,000 in ~~2009~~2010 based on multiple awards for the Interceptor OTV and related accessories, as well as through direct sales to select international customers.

For ~~2009,~~2010, the Debtors derived approximately $~~64,047,000~~34,466,000 in international sales, which constituted ~~40.5~~25.1% of total sales for ~~2009.~~2010.

### 9.    ~~2.~~Postpetition Operations

The Debtors continue to operate their day-to-day business consistent with operating practices prior to the Petition Date. The Debtors' financial results for YTD ~~2010~~2011 relative to YTD ~~2009~~2010 have showed strong performance across most areas, including strength in the domestic and distributor business and the military and federal segment. In addition, profit

margins have improved during 2010 and 2011 as the Debtors continue to execute certain operating improvements and cost cutting initiatives.

## B.     Pre-Petition Capital Structure and Directors

Prior to the Petition Date, Parent was a publicly traded company. Parent's common stock is currently listed and traded on the OTC Bulletin Board. As ofOn the Petition Date, the largest holders of Parent's common stock were David Brooks (22.6%) and Prescott Group Capital Management (9.5%). The with the remaining equity of Parent isbeing publicly held.

PBBA, PACA and PBSS are each subsidiaries of Parent. James Henderson is the Chief Executive Officer of the Debtors and is also the Chairman of the Board of Directors of each of the Debtors. Mr. Henderson is a managing director and operating partner of Steel Partners LLC ("Steel Partners"), a global management firm and has been associated with Steel Partners since August 1999. In addition to Mr. Henderson, Terry Gibson serves on the Board of Directors of Parent and is affiliated with Steel Partners as a managing director of SP Corporate Services LLC, an affiliate of SP Holdings, LP. The other two directors of Parent are General Merrill A. McPeak and Robert Chefitz, and are not affiliated with Steel Partners.

As of December 31, 2009,2010, on an unaudited consolidated basis, the Debtors reported total book value assets of approximately $68,254,00054,299,000 including approximately $14,462,0009,819,000 in accounts receivable and $33,178,00011,754,000 in net inventory, and $71,997,00075,023,000 in liabilities, which included $21,655,000 in5,453,000 in post-petition accounts payable, $15,103,0006,373,000 in otherpost-petition accrued expenses and current liabilities, $10,000,000 under the balance of their prepetition term loan commitment, and $11,703,000 on the balance of the prepetition revolving loan commitment. For the 2009$25,000,000 under the post-petition DIP loan agreement. For the 2010 fiscal year, the Debtors, on an unaudited consolidated basis, reported net sales of $158,262,000137,541,000 and a net loss of approximately $40,000,000.17,210,000.

10.     1. Prepetition Secured Financing

In 2007, the Debtors entered into a credit facility with Bank of America, N.A. ("BOFA"), pursuant to that certain *Amended and Restated Loan and Security Agreement*, dated as of April 3, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Loan Agreement"). The obligations under the Prepetition Loan Agreement were guaranteed by Parent and PBSS.

Pursuant to the Prepetition Loan Agreement and associated documentation, the Debtors borrowed certain funds under (a) a revolving loan commitment (the "Revolving Loan"), and (b) a loan commitment (the "Term Loan"). In addition, pursuant to the Prepetition Loan Agreement, certain letters of credit were issued on behalf of the Debtors for the benefit of various third parties. E.I. duPont de Nemours and Company ("DuPont") fully guaranteed the Debtors' obligations under the Term Loan made under the Prepetition Loan Agreement (the "DuPont Prepetition Guaranty"). As security for the contingent obligations of the Debtors under the Prepetition Loan Agreement, the Debtors granted to DuPont a junior, subordinated security interest in substantially the same assets and property that are subject to the prepetition liens

conveyed to BOFA as security for the Debtors' obligations under the Prepetition Loan Agreement.

In January 2010, BOFA requested that the Debtors find alternative financing and requested that the Debtors engage a consultant for the purpose of reviewing and analyzing the Debtors' cash flows. The Debtors, accordingly, engaged CRG Partners Group LLC ("CRG")to perform this review. On February 23, 2010, BOFA declared a default under the Prepetition Loan Agreement at which time collections and/or funds from the Debtors' accounts were applied by BOFA to reduce the Revolving Loan to zero. BOFA further advised the Debtors that any further collections received in the Debtors' deposit accounts would be applied as a reduction to the outstanding balance of the Term Loan. This effectively eliminated the Debtors' ability to obtain access to the working capital necessary to operate their businesses.

As of the Petition Date, the Debtors owed approximately $10,526,000 million under the Prepetition Loan Agreement, and all of the Debtors' assets, including all of their cash, were encumbered by perfected, first priority security interests in favor of BOFA.

11. 2. Prepetition Corporate Governance

On December 28, 2009, the Debtors' Board of Directors (the "Board") created an independent subcommittee (the "Subcommittee") consisting of directors Robert Chefitz and General Merrill McPeak, each of whom is an independent Board member under applicable NASDAQ corporate governance rules and each of whom is also independent of Steel Partners. The Subcommittee was initially created to independently evaluate a potential equity infusion by Steel Partners, II L.P. ("Steel"), an affiliate of Steel Partners, and other potential investors in the Debtors in 2009 that would have provided necessary funding to enable the Debtors to continue to operate after BOFA informed the Debtors that it would not renew the then-existing credit facility. On January 7, 2010, the Subcommittee retained its own counsel, Pillsbury Winthrop Shaw Pittman ("Pillsbury") who continues to advise the Subcommittee postpetition. The Subcommittee remains in place postpetition, along with the Debtors' Chief Restructuring Officer, T. Scott Avila.

## C.   Significant Legal Proceedings

The Debtors are involved in certain legal proceedings that occurred prior to the appointment of the Debtors' current Board and current management, certain of which are summarized below.

12. 1. Criminal Prosecution of Former Officers

In July 2006, the Company's founder and former Chief Executive Officer David Brooks ("Brooks"), was removed from his position as an officer and director of the Company.

In August 2006, Brooks was indicted, along with the Company's former Chief Operating Officer, Sandra Hatfield ("Hatfield"), and the former Chief Financial Officer Dawn Schlegel ("Schlegel"), for securities fraud. *See United States v. Brooks, Hatfield et al.,* Criminal Action

No. 06 CR 0550 (Seybert, J.), U.S. District Court, Eastern District of New York. Hatfield had been removed from her position as Chief Operating Officer in July 2005.

Pursuant to an October 23, 2007 superseding indictment, Schlegel was charged with securities fraud conspiracy and tax fraud conspiracy. On or about October 23, 2007, Schlegel pled guilty to both counts of the superseding indictment.

Pursuant to an October 24, 2007 superseding indictment (the "Superseding Indictment"), Brooks and Hatfield were indicted on charges of securities fraud, mail and wire fraud, insider trading and obstruction of justice, among other charges. The new indictment alleged that the defendants manipulated the financial records of DHB (which later became PBSI) in order to increase reported earnings and profit margins, thereby inflating the price of DHB's stock, of which they both had significant holdings. The Superseding Indictment alleged that they also conspired to enrich themselves and their families at the expense of DHB by causing the company to pay personal expenses and millions of dollars above the defendants' authorized compensation. When DHB's stock price rose to nearly $20 per share in late 2004, Brooks and Hatfield sold several million shares of their DHB stock, with Brooks realizing more than $185 million and Hatfield more than $5 million. The defendants also allegedly defrauded the United States government out of millions of dollars in tax revenue by failing to report to the IRS more than $10 million dollars in bonus payments to themselves and other DHB employees. In total, 17 counts were levied against both Brooks and Hatfield.

Pursuant to a criminal forfeiture count in the Superseding Indictment, the United States sought forfeiture of at least $190,604,894 of Brooks' assets under Title 18, United States Code section 981(a)(1)(C) and Title 28, United States Code Section 2461(c) which require any person convicted of such offences to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offense. The United States seized approximately $~~180,000,000~~160,000,000 of Brooks' assets in connection with the criminal proceeding against Brooks Additionally, and as discussed below, in October 2007, the United States Securities and Exchange Commission filed a civil complaint against Brooks in federal court in the Southern District of Florida.

On September 14, 2010, Brooks and Hatfield were convicted of insider trading, securities fraud, conspiracy to commit securities fraud, conspiracy to commit mail and wire fraud, conspiracy to obstruct justice and obstruction of justice. In addition, the jury convicted Brooks of mail fraud, wire fraud and lying to auditors, and acquitted Hatfield of the (non-conspiracy) mail and wire fraud counts against her. Following the verdict, the parties waived their rights to a jury trial on criminal forfeiture. The criminal forfeiture trial commenced on November 15, 2010 and concluded on November 22, 2010. The United States District Court for the Eastern District of New York (the "EDNY Court") set deadlines in February and March 2011 for post-trial briefs. Both Brooks and Hatfield are currently awaiting sentencing in the EDNY Court.

On October 15, 2010, the United States commenced a civil action *in rem* to forfeit and condemn to the use of the United States of America certain one hundred and seventeen (117) assets listed on "Schedule I" attached to the complaint and all proceeds traceable thereto (the "Defendants *in rem*") pursuant to 18 U.S.C. §§ 981(a)(1)(A) & (C). *See United States v. All Assets Listed on Schedule I, Attached Hereto and All Proceeds Traceable Thereto*, Civil Action

No. 10 CV 4750 (Seybert, J.), U.S. District Court, Eastern District of New York. The civil forfeiture action is related to the pending criminal forfeiture action against defendants Brooks and Hatfield. The assets that are subject to forfeiture consist of property that was either seized or restrained pursuant to seizure warrants and restraining orders previously issued in the criminal proceeding against Brooks and Hatfield.

In the verified complaint, the United States of America alleges that the Defendants *in rem* constitute the proceeds of the conspiracy, fraud, and insider trading offenses for which Brooks and Hatfield were convicted. The Defendants *in rem* are broken into several parts as follows: (1) the first one hundred and thirteen (113) assets listed on Schedule I to the complaint that are the "Brooks Assets" are divided into (a) the "Unauthorized Compensation Assets" and (b) the "Insider Trading Assets"; and (2) the last four (4) assets listed on Schedule I to the complaint that are the "Hatfield Assets."

In its complaint, the United States requests, *inter alia*, that the Defendants *in rem* be forfeited and condemned to the use and benefit of the United States of America and that the United States of America be awarded its costs and disbursements in the action. The complaint and selected pleadings can be found at www.epiqbankruptcysolutions.com.

On April 6, 2011, the Debtors filed a Verified Claim in the civil forfeiture action asserting claims to the Unauthorized Compensation Assets seized by the United States. In order to assert an ownership interest in the civil forfeiture proceeding, a claimant must establish an ownership interest in the underlying seized assets. In its civil forfeiture complaint, the United States alleged and traced the purchase of the Unauthorized Compensation Assets to funds looted from the Debtors. Accordingly, the Debtors asserted claims to those Unauthorized Compensation Assets.

13. 2. Class Action and Derivative Lawsuits

In 2005, a number of purported class actions lawsuits were filed in the EDNY Court against PBSI and certain of their former officers and directors. The complaints were filed on behalf of purchasers of PBSI's publicly traded securities during the period from April 21, 2004 through August 29, 2005. The complaints alleged, among other things, that PBSI's public disclosures were false or misleading and that the Debtors body armor products were defective and failed to meet customer standards and that these facts should have been publicly disclosed. The class action lawsuits were consolidated into a single class action lawsuit in March 2006 (the "Class Action Suit") as the complaints were substantially similar to one another.

During the same period, a number of derivative complaints were filed in the EDNY Court against PBSI and certain of the Debtors' former officers and directors and, in some cases, against the Debtors' former auditors. The complaints alleged, among other things, that PBSI's breached their fiduciary duties, engaged in fraud, misrepresentation, misappropriation of corporate information, waste of corporate assets, abuse of control and unjust enrichment. The derivative complaints were consolidated into a single shareholder derivative action (the "Derivative Action") in March 2006.

In July 2006, PBSI entered into a memorandum of understanding (the "MOU") to settle both the Class Action Lawsuit and the Derivative Action. Under the MOU, the Class Action Suit

was to be settled subject to approval by the EDNY Court, for $35.2 million in cash and 3,184,713 shares of the Debtors' common stock. The Derivative Action would be settled, also subject to approval by the EDNY Court, in consideration of the adoption of certain corporate governance provisions, and the payment of $0.3 million in legal fees to the lead counsel in the Derivative Action. The Debtors deposited into escrow $22.3 million in cash which represented the Debtors' portion for the cash settlement which was funded as follows: (i) $7.5 million from the exercise by the Debtors' former Chief Executive Officer, Brooks, of a warrant to acquire 3,000,000 shares of the Debtors' common stock at an exercise price of $2.50 per share, and (ii) $14.8 million from the purchase by Brooks of 3,007,099 shares of stock at $4.93 per share. The Debtors' directors and liability insurers funded the remaining portion of the cash settlement, $12.9 million pursuant to buyouts of the policies, which escrowed amount totaled $35,200,000 and deposited with the escrow agent under the Settlement Agreement (the "Escrow Agent"). In addition to the cash settlement, the settlement also provided for the issuance of an additional 3,184,713 of the Debtors' common stock to the plaintiffs. On July 8, 2008, the EDNY Court entered an order approving a settlement agreement that incorporated the terms of the MOU (the "Settlement Agreement").[68]

The Settlement Agreement provided for PBSI to release and indemnify Brooks and Schlegel for any amounts paid by them to Point Blank pursuant to a judgment in any action under § 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243 ("SOX § 304"). On October 25, 2007, the Securities and Exchange Commission filed a complaint against Brooks in the United States District Court for the Southern District of Florida (the "SEC Action") seeking reimbursement to Point Blank under SOX § 304 of certain bonuses and stock profits received by Brooks, including approximately $180 million of proceeds from Brooks' sale of DHB stock. Under the terms of the Settlement Agreement and prior to the Petition Date, if Brooks was required to reimburse all or some portion of this $180 million to Point Blank pursuant to a judgment in the SEC Action, then Point Blank would have been required to return the same amount to Brooks.

Equity holder D. David Cohen filed an appeal (the "Appeal") with the United States Court of Appeals for the Second Circuit (the "Second Circuit") from order approving the Settlement Agreement. As a result of the filing of Appeal, the effective date of the Settlement Agreement did not occur because it never became a "final order" pursuant to its terms. The Appeal argued that the Settlement Agreement impermissibly released and indemnified Brooks and Schlegel against all liability arising under SOX § 304.

PBSI filed a motion to reject the Settlement Agreement in the Bankruptcy Court on September 17, 2010 [Docket 589] (the "Rejection Motion"). PBSI sought to reject the Settlement Agreement for a number of reasons. First, rejection of the Settlement Agreement would allow PBSI to potentially recover approximately $35,200,000 of the cash settlement as property of PBSI's estate. Second, if the Settlement Agreement were rejected, PBSI would be entitled to assert the claims from the derivative action against Brooks and Schlegel, among others and the general releases exchanged between PBSI and Brooks pursuant to the Settlement Agreement will become null and void. Finally, because the Appeal had not yet been decided at the time of the filing of the Rejection Motion, rejection of the Settlement Agreement would

---

[68] Under the various agreements, $9,925,000 million has already been distributed from escrow to the lead plaintiff's counsel in the Class Action Suit and Derivative Action which, as described below, Parent is attempting to recover for the benefit of its estate.

ensure that the Debtors would be relieved of any obligation to indemnify Brooks and Schlegel for any amounts paid by them to Point Blank under SOX § 304 and retain any amounts paid by Brooks or Schlegel under SOX § 304.

On September 30, 2010, the Second Circuit granted the Appeal and held that the indemnification and release provisions of the Settlement Agreement violated SOX § 304. The Second Circuit vacated and reversed the judgment of the EDNY Court with respect to this portion of the Settlement Agreement. Meanwhile, PBSI proceeded with the prosecution of the Rejection Motion in the Bankruptcy Court because of the additional benefits that would inure to the benefit of PBSI's estate summarized above beyond the excising of PBSI's indemnification obligations as mandated by the Second Circuit's disposition of the Appeal. On December 22, 2010, the Bankruptcy Court entered an order granting the Rejection Motion.⁷ (the "Rejection Order").⁹ The lead plaintiffs to the Class Action Suit filed an appeal of the Rejection Order on December 30, 2010 [Docket No. 979].

14. ~~3.~~ Turnover Action

On November 16, 2010, PBSI filed a complaint for turnover of property of the estate against the attorneys for the lead plaintiffs in the Class Action Suit and the Derivative Action (together, the "Actions"). On January 4, 2011, PBSI filed an amended complaint in the turnover action (the "Turnover Complaint") against both the attorneys for the lead plaintiffs in the Actions (collectively, the "Law Firm Defendants") and ~~the~~ PBSI's former officers and directors party to the Settlement Agreement (collectively, the "Former Officer and Director Defendants"). ~~The turnover action seeks recovery~~Pursuant to the Turnover Complaint, PBSI seeks: (i) declaratory judgment against both the Law Firm Defendants and the Former Officer and Director Defendants (collectively, the "Defendants") finding that the settlement funds, plus interest thereon, constitute property of the PBSI estate; and (ii) the entry of an order compelling the turnover of the settlement funds ~~as property of the,~~ plus interest thereon, to PBSI's estate. ~~The~~In the Turnover Complaint, PBSI alleges, among other things, that: (i) the Law Firm Defendants are in possession of $9,925,000 that was provisionally paid to the Law Firm Defendants pursuant to the terms of the Settlement Agreement. ~~Because the payments;~~ and (ii) that Law Firm Defendant Robbins Geller Rudman & Dowd LLP, in its capacity as Escrow Agent, is in possession of the remainder of the $35,200,000 cash settlement. These funds must be returned to PBSI's estate because their payments under the Settlement Agreement were expressly conditioned on final court approval in the Actions, ~~and as a result of~~which cannot occur in light of (i) the Second Circuit~~'s~~ decision on the Appeal, and/or (ii) PBSI's rejection of the Settlement Agreement during its bankruptcy. Since the Settlement Agreement cannot become final, ~~and~~the portion of the funds provisionally paid to the Law Firm Defendants, and those funds being held by Law Firm Defendant Robbins Geller Rudman & Dowd LLP, in its capacity as Escrow Agent, must be returned to the PBSI~~'s estate. In addition, the Turnover Complaint alleges that one of the Law Firm Defendants, Robbins Geller Rudman & Dowd LLP in its capacity as Escrow Agent, is in~~

---

⁷⁹ In connection with the Rejection Motion, on November 18, 2010, the lead plaintiffs in the Class Action filed a motion for relief from the automatic stay in the Bankruptcy Court (the "Stay Relief Motion") to allow them to proceed with approval of the Settlement Agreement in the EDNY Court to purportedly obtain a final order of the Settlement Agreement in light of the Second Circuit's ruling on the Appeal. The Debtors, who as noted above, sought to reject the Settlement Agreement rather than approve it, opposed the Stay Relief Motion. The Bankruptcy Court denied the Stay Relief Motion in connection with the Bankruptcy Court's approval of the relief requested in the Rejection Motion.

~~possession of the remainder of the $35,200,000 of the cash settlement which must be returned to the PBSI's estate. Finally, the Turnover Complaint seeks declaratory judgment against both the Law Firm Defendants and the Former Officer and Director Defendants finding that the settlement funds, plus interest thereon, constitute property of the PBSI's estate.~~ estate. The Law Firm Defendants have filed motions (1) to dismiss the Actions; (2) to determine that the Actions are non-core proceedings and to withdraw the references of the Actions from the Bankruptcy Court; and (3) to stay prosecution of the Actions pending an order resolving certain of these motions. The Debtors have filed oppositions to each of these motions. In addition, David Brooks filed a motion to dismiss the Turnover Complaint or, alternatively, to stay the prosecution of the Actions, which motion the Debtors have also opposed.

The Law Firm Defendants and Former Officer and Director Defendants have asserted (or may assert) claims to all or some portion of the $~~35,200,000, however~~35,200,000. However, it is the Debtors' position that such funds are property of the PBSI~~'s~~ estate. It is difficult to predict the outcome of this contested matter at this time due to the inherent uncertainty in litigation.

15. ~~4.~~ Securities Litigation

The Debtors ~~are~~were subject to ~~ongoing investigations~~investigation by the SEC and the U.S. ~~Attorneys'~~Attorney's Office for the Eastern District of New York regarding alleged violations of federal securities laws stemming from accounting irregularities and disclosure issues from 2003 through 2005. In August 2009, the Debtors~~'~~ received a ~~"~~Wells Notice ~~from the SEC"~~ informing them that the SEC's regional staff conducting the investigation had made a preliminary decision to recommend that the SEC bring a civil injunctive action against the Debtors for possible violations of the securities ~~regulations in connection with the criminal trial of~~laws based on conduct of the Debtors' former senior management, Schlegel, Hatfield and Brooks ~~discussed above. The Debtors have agreed to a settlement with the Securities and Exchange Commission concerning a potential non-prosecution agreement, which the Debtors expect will be submitted to the Bankruptcy Court for approval.~~ On February 24, 2011, the Debtors filed a motion seeking Bankruptcy Court approval of a consent agreement (the "Consent Agreement") entered into with the SEC that provides for entry of a final judgment in federal court permanently enjoining the Debtors from violating the antifraud, proxy, record-keeping and reporting provisions of the securities laws. The Consent Agreement does not require the payment of any civil money penalty or disgorgement. In connection with approval of the Consent Agreement, the Debtors sought authority to de-register as a public company. On March 14, 2011, the Bankruptcy Court approved the Consent Agreement. The Bankruptcy Court denied a motion for stay of the order approving the Consent Agreement pending appeal and entered its order approving the Consent Agreement and authorizing the Debtors to de-register as a public company on March 29, 2001 [Docket 1259].

16. ~~5.~~ Zylon Litigation

The Debtors are subject to an industry-wide investigation by the Civil Division of the U.S. Department of Justice (the "DOJ") into the manufacture and sale of body armor products containing Zylon, a ballistic yarn manufactured and marketed by Toyobo Co., Ltd. and Toyobo America, Inc (together, "Toyobo").

On October 7, 2010, the DOJ filed a complaint ("DOJ Complaint") in the United States District Court for the District of Columbia (the "DC Court") against PBSI, PBBA and PACA seeking damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-33 and to recover damages for breach of contract, payment by mistake and unjust enrichment relating to alleged false statements in connection with the sale of Zylon to the United States. The DOJ Complaint alleges that the Zylon that was manufactured by Toyobo and then sold to the Debtors was defective. The DOJ filed a proof of claim against PBBA and asserts a civil penalty of not less than $5,000 and not more than $10,000 for each false claim or false statement and damages for breach of contract, payment by mistake and unjust enrichment.

The Debtors filed a complaint against Toyobo, which manufactured the Zylon, in *Point Blank Solutions, Inc., et al.,vs. Toyobo America, Inc., and Toyobo Co., Ltd,* Case No. 09-61166-Seitz/O'Sullivan (the "Toyobo Litigation") in the United States District Court for the Southern District of Florida. Pursuant to the Toyobo Litigation, the Debtors asserted claims against Toyobo in excess of $20 million for breach of express warranty, breach of implied warranty of merchantability, false, misleading and deceptive advertising, fraudulent inducement, and deceptive and unfair trade practices as defined by the Florida Deceptive and Unfair Trade Practices Act. Trial on the Toyobo Litigation is currently scheduled for July 2011.

## D.    Events Leading to Bankruptcy

The events that occurred during 2008 and 2009 presented a significant challenge to the Debtors. Significant delays in the awarding of U.S. Military and Federal Government soft body armor contracts, uncertainties in the transition of civilian law enforcement body armor certification standards, the continuing poor economic climate and the crisis in the credit markets contributed to substantially reduced sales in 2008 and 2009. In 2009, the Debtors implemented staff reductions and facility consolidations as part of the "lean manufacturing" transformation of operations and cost cutting measures. Due to careful and focused management during this difficult economic period, the Company preserved operating capacity by building rapidly scalable production cells and reducing operating waste.

Due to the percentage of Company sales to the U.S. military and federal law enforcement agencies, it is important to understand the nature of contracting with the federal government and the possible effect of the federal government's budgeting process on the Debtors' operating results and production backlog in any given year. Frequently, there were events surrounding the U.S. and other defense budgets that create fluctuations in the Debtors' backlog and portfolio of contracts with the federal government. These events included availability of year-end monies to accomplish important last minute contracts for supplies and services, enactment of a continuing resolution which limits spending to the previous year's level until a budget is signed into law, late approval of a new budget, use and timing of a supplemental appropriation, and several other possible events.

In late 2009, the Debtors were awarded a 65,000 unit IOTV contract from the U.S. Army. In the past, the testing process took approximately one week, after which the Debtors would receive a Letter of Approval thereby allowing the Debtors to ship the order, record the account receivable and sale at that time. The eligible accounts receivables provided a basis to obtain an advance of funds from the Revolving Loan. The percentage of the eligible receivables that were

pledged to BOFA secured the payment of the funds that were advanced. However, in the fourth quarter of 2009, the Army elected to test the pulled vests at the U.S. Army Aberdeen testing facility, which increased the test period from three days to thirty six days. Further adding to the delay, the U.S. Army identified certain deficiencies with the vests as tested, and required the Company to submit a corrective action report and enhanced inspection procedures. While the vests were ultimately certified, the remedial activities included a stop work order for the U.S. Army vests from February 5, 2010 to February 27, 2010.

This increased testing time and remedial actions significantly delayed approval for the lots being tested, thereby preventing the Debtors from obtaining advances against the eligible receivables from the orders of the U.S. Army. The extended testing period at the Aberdeen testing facility combined with the contract payment terms of net, 30 days, resulted in a cash cycle of up to 10 weeks from the date the raw materials were originally received by the Debtors to the date of payment. This extended payment cycle in conjunction with the contractually agreed "Pull" dates and the vendor payment terms ranging from cash in advance to net, 30 days, placed severe strain on the Debtors' working capital. While the U.S. Army attempted to alleviate the cash strain through early performance billing, additional testing resulting from quality issues caused a further slow down in shipments and payments. In January 2010, BOFA reduced the amount it would advance on accounts receivable from 85% to 75% and for inventory from 29.5% to 20%. Additionally, availability blocks on borrowing remained in place as well as scheduled credit line reductions.

Due to the Debtors' operational difficulties, the continued deterioration in the Debtors' cash flow, to help ensure that day-to-day operations during the pendency of the Chapter 11 Cases continued uninterrupted, that administrative expenses in the Chapter 11 Cases were paid, and that an orderly process could be implemented to create an ongoing path for the Debtors and their employees, the Debtors determined that it was in the best interest of the Debtors, their estates, and their creditors to commence the Chapter 11 Cases.

**E.  The Commencement of the Chapter 11 Cases**

The Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for District of Delaware on April 14, 2010. No trustee or examiner has been appointed in the Chapter 11 Cases. The Creditors' Committee was appointed on July 27, 2010, to represent the interests of Debtors' general unsecured creditors. The Equity Committee was appointed on July 27, 2010 to represent the interests of holders of equity security interests in PBSI.

**F.  First Day Motions and Other Material Relief**

On the Petition Date, the Debtors sought approval from the Bankruptcy Court of certain motions and applications (collectively, the "First Day Motions"), which the Debtors filed simultaneously with, or around the same time as, their voluntary petitions. The Debtors sought this relief to minimize disruption of the Debtors' business operations as a result of the Chapter 11 filings, to establish procedures in the Chapter 11 Cases regarding the administration of the cases and to facilitate reorganization efforts. Specifically, the First Day Motions addressed the following issues, among others:

<u>17.</u>    ~~1.~~ Joint Administration

On the Petition Date, the Debtors filed their *Motion for an Order Authorizing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only* [Docket No. 2], pursuant to which the Debtors sought an order directing the joint administration of their Chapter 11 Cases and the consolidation thereof for procedural purposes only.  On April 16, 2010, the Bankruptcy Court entered an order granting the relief requested [Docket No. 39].

<u>18.</u>    ~~2.~~ Employees

On the Petition Date, the Debtors filed their *Motion for Entry of an Order: (I) Authorizing the Debtor to (A) Pay Wages, Salaries and Other Compensation, (B) Maintain Employee Medical and Similar Benefits, and (C) Pay Reimbursable Employee Expenses, and (II) Authorizing and Directing Banks and Other Financial Institutions to Pay All Checks and Electronic Payment Requests Made by the Debtors Relating to the Foregoing* [Docket No. 12], pursuant to which the Debtors sought an order authorizing them to pay and/or honor, among other things, certain prepetition claims for wages, salaries and other compensation, as well as to honor paid time off, medical benefits, contributions to employee benefit plans, and other employee benefits that the Debtors historically paid in the ordinary course of business, to reimburse certain reimbursable unpaid employee obligations, and to pay all costs incident to the foregoing.  The Bankruptcy Court entered an order approving this motion on April 16, 2010, 2010 [Docket No. 44].

<u>19.</u>    ~~3.~~ Cash Management

On the Petition Date, the Debtors filed their *Motion for Entry of an Order Under 11 U.S.C. Sections 105, 345, 363, 503(b), 1107 and 1108 Authorizing (I) Maintenance of Certain Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System; (IV) Continued Performance of Intercompany Transactions and Exercise of Intercompany Setoff Rights, (V) Grant of Postpetition Administrative Priority to Intercompany Claims, and (VI) Limited Waiver of Section 345(b) Deposit and Investment Requirements* [Docket No. 10] pursuant to which the Debtors sought an order authorizing them to maintain their existing cash management system, bank accounts and business forms. The Debtors further requested that they be excused from compliance with certain aspects of section 345(b) of the Bankruptcy Code which requires compliance with certain deposit or investment procedures.  The Bankruptcy Court entered its order granting the relief requested by the motion on April 16, 2010 [Docket No. 42].

<u>20.</u>    ~~4.~~ Taxes

On the Petition Date, the Debtors filed their *Motion for Entry of an Order (A) Authorizing the Debtors to Pay Certain Prepetition Sale and Use and Similar Taxes in the Ordinary Course of Business and (B) Authorizing and Directing Financial Institutions to Honor Related Checks and Electronic Payment Requests* [Docket No. 19] pursuant to which the Debtors sought authority to pay, in the Debtors' sole discretion, prepetition taxes and regulatory fees.  The Bankruptcy Court granted the motion by order entered on April 16, 2010 [Docket No. 46].

21. 5. Utilities

On the Petition Date, the Debtors filed their *Motion for Entry of Interim and Final Orders Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment* [Docket No. 13], pursuant to which the Debtors sought an order establishing "adequate assurance" procedures for efficient administration of the Debtors' responsibilities under section 366 of the Bankruptcy Code. On April 16, 2010, the Bankruptcy Court entered its interim order implementing the procedures proposed by the Debtors [Docket No. 45]. A final order was entered on May 12, 2010 [Docket No. 116].

22. 6. Retention of Customer Programs

On the Petition Date, the Debtors filed their *Motion for Entry of an Order Pursuant to Sections 105(a), 363(c), 1107(a) and 1108 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 Authorizing the Debtors to Honor Prepetition Obligations to Customers and to Otherwise Continue Customer Practices and Programs in the Ordinary Course of Business* [Docket No. 7], pursuant to which the Debtors sought authorization to continue to honor certain programs to maximize sales, engender customer loyalty, and develop and sustain brand loyalty and a positive reputation in the marketplace. The Court entered an order granting the relief requested on April 16, 2010 [Docket No. 41].

23. 7. Prepetition Shipper, Freight Forwarder, and Related Obligations

On the Petition Date, the Debtors filed their *Motion for an Order Authorizing, But Not Directing, Debtors to Pay Prepetition Claims of Shippers and Granting Related Relief* [Docket No. 16], pursuant to which Debtors sought authority to pay certain essential prepetition shipper, freight forwarder and related obligations in the ordinary course of business. The Bankruptcy Court entered an order granting the relief requested on April 16, 2010 [Docket No. 47].

24. 8. Retention of Key Professionals

On the Petition Date, the Debtors filed a number of applications to employ Professionals, including:

- *Application Pursuant to Section 327(a) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014-1 For Authorization to Employ and Retain Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date* [Docket No. 4], pursuant to which the debtors sought to retain PSZ&J as general bankruptcy counsel. An order was entered authorizing PSZ&J's retention on May 12, 2010 [Docket No. 115].

- *Application for Entry of An Order Authorizing Retention and Employment of CRG Partners Group LLC to Provide Restructuring Services to the Debtors and of T. Scott Avila As Chief Restructuring Officer of the Debtors Nunc Pro Tunc to the Petition Date* [Docket No. 8], to approve the retention of CRG as their financial and reorganization consultants and T. Scott Avila as the Debtors' Chief Restructuring Officer. The

Bankruptcy Court granted the application by order entered on May 12, 2010 [Docket No. 126].

- *Application for Entry of An Order Authorizing Retention and Employment of Epiq Bankruptcy Solutions, LLC as Notice, Claims and Balloting Agent* [Docket No. 5], pursuant to which the Debtors also sought to employ Epiq Bankruptcy Solutions, LLC as noticing, claims and balloting agent. The Bankruptcy Court authorized this retention on April 16, 2010 [Docket No. 40].

     25. 9. Critical Vendors

On the Petition Date, the Debtors filed their *Motion of the Debtors Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 for an Order Authorizing, but not Requiring, the Payment of Certain Prepetition Claims of Critical Trade Vendor, E.I. DuPont De Nemours and Company* [Docket No. 11]*,* pursuant to which the Debtors sought authority to pay, in their sole discretion, up to $700,000 of a prepetition claim of a critical vendor, E.I. DuPont De Nemours and Company (the "DuPont Claim"), whose continued assistance was critical to the Debtors' reorganization efforts. The Bankruptcy Court granted the motion by order entered April 16, 2010 [Docket No. 43] (the "Critical Vendor Order"). Pursuant to the Critical Vendor Order, the Debtors paid $600,000 of the DuPont Claim.

     26. 10. DIP Loan Agreement

Prior to the Petition Date, the Debtors and their advisors canvassed approximately twenty sources of prospective postpetition financing, including financing from BOFA, and various other third parties. In particular, CRG prepared a comprehensive presentation seeking financing proposals. BOFA indicated that it was not willing to extend further credit to the Debtors and insisted on full repayment of all outstanding obligations under the Prepetition Loan Agreement. The Debtors compared the proposals received from four potential lenders and negotiated with each of these parties expeditiously to obtain the most favorable lending terms for the benefit of the estates. Following the Debtors' evaluation and comparison of the various financing proposals and the Subcommittee's consideration and approval, the Debtors selected Steel Partners L.P. ("Steel") to provide senior secured superpriority credit to the Debtors and negotiated the definitive terms and documentation set forth in the *Debtor Possession Financing Agreement*, dated April 12, 2010 (the "Original DIP Agreement"). Accordingly, on the Petition Date, the Debtors filed their *Motion of Debtors for Interim and Final Orders for Authorization to: (1) Incur Senior Secured Superpriority Postpetition Financing; (2) Repay Prepetition Secured Debt Upon Entry of Interim Order; (3) Use Cash Collateral; (4) Grant Liens and Provide Superpriority Administrative Expense Status; (5) Grant Adequate Protection; (6) Modify the Automatic Stay; and (7) Schedule a Final Hearing* [Docket No. 23] (the "Original DIP Financing Motion").

Pursuant to the Original DIP Financing Motion, the Debtors sought authority to borrow from Steel Partners L.P. (the "Original DIP Lender"), up to the lesser of $20,000,000, or the borrowing base amount described in the Original DIP Agreement, pursuant to a senior secured, first priority debtor in possession revolving credit facility (the "Original DIP Facility"). The borrowing base under the Original DIP Facility consisted of the sum of (a) 80% of the face amount of eligible accounts receivable; (b) 20% of eligible inventory; and (c) the amount of third

party recourse available for the benefit of Steel through the provision by DuPont of a postpetition guaranty, less certain reserves described in the Original DIP Agreement, as well as the use of cash collateral. BOFA consented to the release of its collateral subject to full repayment of the amounts due under the Prepetition Credit Agreement. DuPont also agreed to furnish a guaranty of the last $10,000,000 borrowed under the Original DIP Facility (the "Postpetition DuPont Guaranty") on the condition that its aggregate potential liability under the Prepetition DuPont Guaranty and Postpetition DuPont Guaranty did not exceed the principal sum of $10,000,000 (plus interest and collection costs).

On April 16, 2010, the Bankruptcy Court entered its *Interim Order Pursuant to 11 U.S.C. sections 105, 361, 362, 363 and 364, Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules 2002-1 and 4001-2: (1) Authorizing Incurrence by the Debtors of Post-Petition Secured Indebtedness with Priority Over All Secured Indebtedness and With Administrative Superpriority, (2) Authorize Repayment in Full of Pre-Petition Secured Debt Upon Entry of Interim Order, (34) Granting Liens, (4) Authorizing Use of Cash Collateral and Providing Adequate Protection, (5) Modifying the Automatic Stay and (5) Scheduling Final Hearing* [Docket No. 48] (the "Original Interim DIP Order") which authorized, on an interim basis, the Debtors' use of cash collateral and additional borrowings under the Original DIP Facility pursuant to the terms of the budget, and granted certain adequate protection to the Original DIP Lender and authority to satisfy the amounts owed to BOFA under the Prepetition Loan Agreement. The Bankruptcy Court entered its *Final Order (1) Authorizing Incurrence by the Debtors of Postpetition Secured Indebtedness With Priority Over All Over Secured Indebtedness and With Administrative Superpriority, (2) Granting Liens, (3) Authorizing Use of Cash Collateral and Providing Adequate Protection and, (4) Modifying the Automatic Stay* on May 12, 2010 [Docket No. 120], a final order granting the Original DIP Motion (the "Original Final DIP Order"). As provided in the Original DIP Agreement and related orders, the Debtors used certain of the proceeds of the Original DIP Facility to fully repay their obligations to the Prepetition Lenders under the Prepetition Credit Agreement, as well as to fund postpetition working capital needs.

In August 2010, the Debtors failed to meet certain related financial targets under the budget approved by the Original Final DIP Order (the "DIP Budget"). The Original DIP Lender waived these defaults under the terms and conditions of that certain *Waiver and First Amendment to Credit Agreement*, dated September 1, 2010 (the "First DIP Amendment"), which the Bankruptcy Court approved on September 2, 2010 and which included timetable for the Debtors to effectuate a sale of their assets or, alternatively, a reorganization process and an extended maturity date from September 30, 2010 to December 31, 2010. In the fall of 2010, the Debtors again failed to meet the sale or reorganization timetable and the financial targets mandated by the DIP Budget. The Debtors sought to modify certain of the sale/restructuring milestones agreed to under the First DIP Amendment, as set forth under that certain *Waiver and Second Amendment to Credit Agreement*, dated October 26, 2010 (the "Second DIP Amendment"). Under the Second DIP Amendment, the Debtors agreed to revised sale/restructuring milestones which included, *inter alia*, a sale hearing to be conducted no later than December 16, 2010 and fixed December 31, 2010 as the maturity date for the DIP Facility. On November 9, 2010, the Bankruptcy Court entered an order approving the Second DIP Amendment [Docket No. 750]. As discussed below, the Original DIP Facility was fully repaid from the proceeds received in respect of the DIP

Facility (defined below) approved by the Court on December 9, 2010. The DIP Facility expires on June 15, 2011.

**G.     Bar Dates for Filing Proofs of Claim**

The Bankruptcy Court entered an order on June 10, 2010 [Docket No. 237] which established August 13, 2010 as the deadline for filing proofs of claim for any Claims against the Debtors that arose before the Petition Date (including WARN Act Claims, but excluding the claims of governmental entities), and October 12, 2010 as the deadline for filing proofs of claim for any Claims against the Debtors of governmental entities. A schedule of the filed proofs of claim is maintained by Epiq Bankruptcy Solutions, LLC, the Debtors' noticing and claims.

**H.     Filing of Schedules and Statement of Financial Affairs**

On May 14, 2010, the Debtors filed their respective schedules of assets and liabilities (the "Schedules") and each of their respective *Statement of Financial Affairs* with the Bankruptcy Court [Docket Nos. 150-57]. On October 12, 2010, the Debtors filed amendments to their Schedules with the Bankruptcy Court [Docket Nos. 668-70].

**I.     Appointment of Creditors' Committee**

On April 26, 2010, the Office of the United States Trustee formed the Creditors' Committee and appointed five (5) initial members thereto. The Creditors' Committee subsequently met and voted to retain Arent Fox LLP and The Rosner Group LLC as counsel to the Creditors' Committee, which retentions the Bankruptcy Court approved on June 10, 2010 [Docket Nos. 238 and 234]. On April 28, 2010, the Creditors' Committee selected and voted to retain CBIZ MHM LLC as its financial advisors, which retention the Bankruptcy Court approved by order entered on June 10, 2010 [Docket No. 235].

**J.     Appointment of Equity Committee**

On July 27, 2010, the Office of the United States Trustee appointed an Official Committee of Equity Security Holders (the "Equity Committee") and appointed seven (7) initial members thereto. The Equity Committee subsequently met and voted to retain Morrison & Cohen LLP and Bayard, PA as counsel to the Equity Committee, which retention the Bankruptcy Court approved on August 18, 2010 [Docket Nos. 491 and 492]. On April 28, 2010, the Equity Committee selected and voted to retain Goldin Associates, LLC as its financial advisors, which retention the Bankruptcy Court approved order entered on September 29, 2010 [Docket No. 631].

On March 25, 2011 Office of the United States Trustee reformed the Equity Committee through the appointment of three (3) new members pursuant to that certain Second Amended Notice of Appointment of Committee of Equity Security Holders [Docket No. 1242]. The Equity Committee voted to terminate Morrison & Cohen LLP and Bayard, PA as its counsel and filed a motion to retain Baker & McKenzie as its new counsel on April 1, 2011.

**K.     Deadline Extensions for Various Matters**

On June 25, 2010 the Debtors' filed a request for an extension of the deadline to assume or reject unexpired leases and executory contracts (the "Section 365(d)(4) Deadline"). Per the