# EXHIBIT B

# SECOND PLAN SUPPORT AGREEMENT

This SECOND PLAN SUPPORT AGREEMENT (the "Agreement") is made and entered into as of April [ 8 ], 2011 by and among the following parties, each of whom is a "Party" and, collectively, the "Parties": (i) (a) Point Blank Solutions, Inc., (b) Point Blank Body Armor, Inc., (c) Protective Apparel Corporation of America and (d) PBSS, LLC, as debtors and debtors in possession (collectively, the "Debtors"); (ii) the Official Committee of Unsecured Creditors (the "Creditors Committee"); (iii) Lonestar Capital Management, LLC, as investment advisor to Lonestar Partners, LP, or one or more of its affiliates, designees or assignees (the "Lonestar Support Party"), and (iv) (a) Privet Opportunity Fund I, LLC, (b) Privet Fund Management LLC and (c) Prescott Group Capital Management (together, the "Equity Support Parties" and, together with the Lonestar Support Party, the "Support Parties").[1]

## RECITALS

**WHEREAS,** on April 14, 2010, the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")[2] in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS,** the Parties (together with the Official Committee of Equity Security Holders) previously entered into that certain Plan Support Agreement dated as of December 10, 2010 (including all exhibits and attachments thereto, the "First Plan Support Agreement");[3]

**WHEREAS,** on January 11, 2011 the Debtors filed with the Bankruptcy Court (1) that certain Joint Chapter 11 Plan of Reorganization (together with the exhibits and Plan Supplements annexed thereto or referred to therein, the "Plan") and (2) a disclosure statement in support of the Plan (together with the exhibits and schedules annexed thereto or referred therein, the "Disclosure Statement");

**WHEREAS,** Termination Events (as defined in the First Plan Support Agreement") occurred under, *inter alia*, Sections 7(a)(3)(ix) and (x) of the First Plan Support Agreement, including any applicable extensions of the deadlines contained therein, and the First Support Agreement was accordingly automatically terminated in accordance with its terms;

**WHEREAS,** the Parties desire to file an Amended Joint Chapter 11 Plan of Reorganization in substantially the form attached hereto as Attachment 1 (together with the exhibits and supplements annexed thereto or referred to therein and as may be further amended or modified from time to time, the "Amended Plan") and disclosure statement in support thereof

---

[1] Unless otherwise noted herein or in the DIP Credit Agreement, any rights, actions, approvals, or consents of the Support Parties provided for herein shall require the approval or consent of each of the Support Parties.

[2] Unless otherwise noted, section (§) references herein are to the Bankruptcy Code.

[3] The Equity Committee was a signatory to the First Plan Support Agreement, and participated to some extent in the negotiation of the terms set forth herein. Shortly before the execution of this Agreement, however, the Equity Committee terminated its existing counsel. Pending a determination whether the Equity Committee intends to support the Amended Plan as a plan proponent, the Parties are proceeding with the prosecution of the Amended Plan as described herein.

(together with the exhibits and schedules annexed thereto or referred therein, the "Amended Disclosure Statement");

WHEREAS, in accordance with Final DIP Order and the terms and conditions of that certain Debtor-in-Possession Financing Agreement (the "DIP Credit Agreement"), dated December ___, 2010, the Support Parties provided replacement senior secured postpetition financing (the "DIP Facility") that was used, among other things, to repay in full the Debtors' prior senior secured postpetition financing (the "First DIP Facility");

WHEREAS, the Support Parties have agreed to provide a financial investment to be provided in accordance with the terms and conditions of a Subscription Agreement (the "Subscription Agreement"), the material terms of which are have been negotiated;

WHEREAS, the Parties now desire to file, obtain confirmation of, and consummate the Amended Plan;[4]

WHEREAS, the Parties have engaged in good faith negotiations with each other and with the objective of reaching an agreement with regard to the Amended Plan;

WHEREAS, each Party has reviewed, or has had the opportunity to review, this Agreement and the Amended Plan with the assistance of professional legal advisors of its own choosing;

WHEREAS, each Party desires to support the Amended Plan; and

WHEREAS, subject to the execution of definitive documentation and appropriate approvals by the Bankruptcy Court of the Amended Plan and the Amended Disclosure Statement (as the same may be amended pursuant to this Agreement from time to time in accordance with this Agreement), which shall be consistent with the terms of the Amended Plan, the following sets forth the agreement between the Parties concerning their respective obligations.

## AGREEMENT

NOW THEREFORE, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

### Section 1.    Plan of Reorganization.

The Amended Plan is incorporated herein by reference and is made part of this Agreement as if fully set forth herein. In the event of any inconsistencies between the terms of this Agreement and the Amended Plan, the terms of the Amended Plan shall govern.

---

[4]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Amended Plan.

**Section 2.**     **Effectuating the Amended Plan.**

To implement the Amended Plan, the Parties have agreed, on the terms and conditions set forth herein, that the Parties shall use reasonable best efforts to effectuate the Amended Plan, and without limiting the foregoing, shall use reasonable best efforts to take all actions necessary and appropriate to:

(a)     on or prior to April 8, 2011, file a motion with the Bankruptcy Court, seeking the entry of an order approving this Agreement and authorizing the Parties to enter into, and perform under, this Agreement (the "Second PSA Motion");

(b)     move the Bankruptcy Court to enter an order approving the Amended Disclosure Statement (the "Disclosure Statement Order") as expeditiously as practicable under the Bankruptcy Code and the Bankruptcy Rules and, in any event, have the Disclosure Statement Order entered on or prior to April 25, 2011;

(c)     solicit the requisite acceptances of the Amended Plan in accordance with §§ 1125 and 1126 and the terms of the Disclosure Statement Order;

(d)     move the Bankruptcy Court to confirm the Amended Plan as expeditiously as practicable under the Bankruptcy Code and the Bankruptcy Rules, and, in any event, the order confirming the Amended Plan entered on or prior to June 3, 2011; and

(e)     consummate the Amended Plan as expeditiously as practicable and, in any event, on or prior to June 17, 2011, in accordance with its terms and the terms of this Agreement.

**Section 3.**     **Commitments of the Parties to this Agreement.**

As long as a Termination Event (as defined herein) has not occurred, or has occurred but has been duly waived or cured in accordance with the terms hereof, each Party hereto agrees for itself, that it will, subject to Section 8(c) hereof and subject to any restrictions imposed by applicable law:

(a)     promptly upon execution of this Agreement, negotiate in good faith to prepare and finalize the definitive restructuring documentation (including, without limitation, the Amended Plan, the Amended Disclosure Statement and solicitation materials, post-reorganization financing documents, the Subscription Agreement, the Recovery Trust Agreement, any other agreements or documents relating to the transactions contemplated hereby and the Amended Plan, and any motions, orders or other pleadings or court filings associated with the foregoing), which (i) shall contain provisions consistent with this Agreement and the Amended Plan and such other provisions as are mutually acceptable to the Parties and (ii) shall not be filed with the Bankruptcy Court, distributed or disseminated to third parties or otherwise finalized without being approved by each of the Support Parties, which approval shall not be unreasonably delayed or withheld;

(b)     in the case of each of the Debtors and Creditors Committee, as the case may be, except where not reasonably practicable, provide draft copies of all motions or applications and other documents that any of such Parties intends to file with the Bankruptcy Court to counsel for the Support Parties at least three business days prior to the proposed filing date and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(c)     from and after the date hereof not directly or indirectly seek or support, as applicable, any other plan, sale, proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of the Debtors that could reasonably be expected to prevent, delay or impede solicitation, confirmation or consummation of the Amended Plan or any document filed with the Bankruptcy Court in furtherance of soliciting or confirming the Amended Plan or consummating the transactions contemplated thereby;

(d)     agree, if applicable, to permit disclosure in the Amended Disclosure Statement and any filings by the Debtors with the Securities and Exchange Commission of the contents of this Agreement;

(e)     not object to or otherwise commence any proceeding or take any other action opposing any of the terms of this Agreement, the Amended Disclosure Statement or the Amended Plan, provided that nothing in this Agreement shall be construed as to prohibit any Party from appearing as a party in interest in any matter to be adjudicated in the Debtors' chapter 11 cases so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with the obligations of this Agreement and are not for the purpose of hindering, delaying or preventing the consummation of the Amended Plan and the transactions contemplated thereby;

(f)     in the case of the Debtors, not take any action in connection with the operation of their businesses or the administration of the Debtors' chapter 11 cases inconsistent with this Agreement or the Amended Plan;

(g)     in the case of the Creditors Committee, after the Amended Disclosure Statement has been approved, pursuant to § 1125, recommend to their members and constituents that they vote in favor of the Amended Plan; and

(h)     in the case of the Support Parties, use reasonable best efforts to assist the Debtors in preparing and formulating the Amended Disclosure Statement and the Amended Plan.

**Section 4.     Mutual Representations, Warranties, and Covenants.**

Each Party makes the following representations and warranties, solely with respect to itself, to each of the other Parties:

(a)     <u>Enforceability</u>.  Subject to the provisions of § 1125 and 1126, and except as set forth herein, this Agreement is a legal, valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited

by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(b)   No Consent or Approval. Except as expressly provided in this Agreement, no consent or approval is required by any other entity for it to carry out the provisions of this Agreement; *provided*, *however*, that the Debtors shall have obtained all required consents and approvals no later than the hearing on the Second PSA Motion.

(c)   Power and Authority. It has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement and the Amended Plan.

(d)   Authorization. The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

(e)   No Conflicts. The execution, delivery and performance of this Agreement does not and shall not: (a) violate any provision of law, rule or regulations applicable to it or any of its subsidiaries; (b) violate its certificate of incorporation, bylaws or other organizational documents or those of any of its subsidiaries; or (c) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

**Section 5.**   **No Waiver of Participation and Preservation of Rights.**

This Agreement and the Amended Plan are part of a proposed settlement of disputes among the Parties. Without limiting the foregoing sentence in any way, if the transactions contemplated by this Agreement or otherwise set forth in the Amended Plan are not consummated as provided herein, if a Termination Event occurs, or if this Agreement is otherwise terminated for any reason, the Parties each fully reserve any and all of their respective rights, remedies, claims and interests.

**Section 6.**   **Acknowledgement.**

This Agreement and the Amended Plan and the transactions contemplated herein and therein are the product of negotiations between the Parties and their respective representatives. This Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance of a plan of reorganization for the purposes of §§ 1125 and 1126 or otherwise. The Parties will not solicit acceptances of the Amended Plan from any holder of a Claim in any manner inconsistent with the Bankruptcy Code or applicable nonbankruptcy law.  For the avoidance of doubt, nothing herein shall require any of the Parties to vote in favor of the Amended Plan.

**Section 7.**   **Termination.**

(a)   Termination Events. This Agreement shall be terminated upon the earliest to occur of any the following:

(1) upon the written agreement of each and all of the Parties to terminate this Agreement;

(2) by any Party, upon three (3) business days' written notice to the other Parties (or such lesser time if the voting deadline for the Amended Plan is to occur, or if the Confirmation Hearing is to commence within such period), if

(i) subject to Section 3 hereof, any change, effect, event, occurrence, development, circumstance or state of facts occurs that has or would be expected to have a material adverse effect or that materially impairs the ability of any of the Parties to perform its obligations under this Agreement or have a material adverse effect on, or prevent or materially delay the consummation of the transactions contemplated by this Agreement; or

(ii) if any other Party has materially breached any term of this Agreement; or

(3) immediately and automatically, without any action required by the Parties, if:

(i) any of the Debtors' chapter 11 cases is dismissed or converted to a case under chapter 7 of the Bankruptcy Code; or

(ii) the Bankruptcy Court has entered an order in any of the Debtors' chapter 11 cases appointing an examiner with expanded powers or a trustee under chapter 7 or chapter 11 of the Bankruptcy Code;

(iii) any court has entered a final, non-appealable judgment or order declaring this Agreement or any material portion of this Agreement to be unenforceable;

(iv) any governmental authority, including any regulatory authority or court of competent jurisdiction, issues any ruling or order enjoining the consummation of a material portion of the transactions contemplated by this Agreement;

(v) the Debtors have not filed the Amended Plan and the Amended Disclosure Statement with the Bankruptcy Court on or before **April 8, 2011** or such later date as may be agreed to by the Support Parties;

(vi) the Debtors have not filed the Second PSA Motion on or before **April 8, 2011** or such later date as may be agreed to by the Support Parties;

(vii) the Consenting Professionals fail to execute and deliver that certain side letter memorializing the agreement of each Consenting

Professional to accept treatment of its Allowed Professional Fee Claim different from that provided to other holders of Allowed Professional Fee Claims under Section 3.1 of the Plan, which letter shall be in form and substance satisfactory to the Debtors and the Support Parties, on or before **April 14, 2011** or such later date as may be agreed to by each of the Support Parties;

(viii)    an order approving the Amended Disclosure Statement, in form and substance acceptable to the Support Parties, shall not have been entered by the Bankruptcy Court on or before **April 25, 2011** or such later date as may be agreed to by the Parties;

(ix)    all conditions to the effectiveness of this Agreement shall have occurred on or before **April 25, 2011** or such later date as may be agreed to by the Support Parties;

(x)    an order confirming the Amended Plan, in form and substance acceptable to the Support Parties, shall not have been entered by the Bankruptcy Court on or before **June 3, 2011** or such later date as may be agreed to by the Support Parties;

(xi)    the Amended Plan and the transactions contemplated therein shall not have been consummated on or before **June 17, 2011** or such later date as may be agreed to by the Support Parties;

(xii)    the Debtors have withdrawn the Amended Plan or publicly announced their intention not to support the Amended Plan or provided written notice to the Support Parties (or any of their respective representatives) of such intention in violation of this Agreement;

(xiii)    any Party files, propounds or otherwise supports any plan or reorganization or liquidation other than the Amended Plan;

(xiv)    (a) any term of any document contemplated herein or in the Amended Plan, including, without limitation, any of the definitive documents referenced in Section 3(2) of this Agreement, that has been executed, been filed with the Bankruptcy Court, become effective or otherwise been finalized, has not been approved by the Support Parties in accordance with this Agreement or the Amended Plan or (b) any such document that has been previously approved by the Support Parties is modified without the consent of the Support Parties required by such document;

(xv)    a "Termination Date" (as defined in the DIP Credit Agreement) occurs; or

(xvi)    the effective date of the Amended Plan occurs.

Each of the foregoing shall be a "Termination Event."  The provisions of this Section 7(a) are intended solely for the benefit of the Parties; *provided, however,* that a Party may not seek to terminate this Agreement based upon a material breach or a failure of a condition in this Agreement arising out of its own actions or omissions.  The Parties hereby waive any requirement under § 362 to lift the automatic stay (the "Automatic Stay") in connection with giving any notice described in this Section 7(a) (and agree not to object to any non-breaching Party seeking to lift the Automatic Stay in connection with giving any such notice, if necessary).  Any such termination (or partial termination) of this Agreement shall not restrict the Parties' rights and remedies for any breach of this Agreement by any Party, including, but not limited to, the reservation of rights set forth in Section 5 hereof.

(b)  Effects of Termination.  In the event this Agreement is terminated (or is terminated with respect to any Party), the Parties hereto (or the Parties with respect to which this Agreement has been terminated, as applicable) shall not have any continuing liability or obligation under this Agreement and each Party (or each Party with respect to which this Agreement has been terminated, as applicable) shall have all the rights and remedies available to it under applicable law; *provided, however,* that (i) no such termination shall relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of termination and (ii) for the avoidance of doubt, the provisions and obligations of Section 9 shall survive any termination of this Agreement.

**Section 8.**     **Miscellaneous Terms.**

(a)  Binding Obligation.  Subject to the provisions of §§ 1125 and 1126, this Agreement is a legally valid and binding obligation of the Parties, enforceable in accordance with its terms, and shall inure to the benefit of the Parties and their representatives.  Nothing in this Agreement, express or implied, shall give to any entity, other than the Parties and their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, Affiliates, successors, assigns, heirs, executors, administrators and representatives, any benefit or any legal or equitable right, remedy or claim under this Agreement.

(b)  Assignment.  Except with respect to Participants (as defined in the DIP Credit Agreement), no rights or obligations of any Party under this Agreement may be assigned or transferred to any other entity.

(c)  Fiduciary Duties.  Notwithstanding anything to the contrary herein, nothing in this Agreement shall prohibit the Debtors or any member of any statutory committee appointed in these cases or its professionals from taking or refraining from taking any action deemed necessary by such entity while acting in such fiduciary capacity to comply with its or their fiduciary obligations under applicable law.  Nothing herein will limit or affect, or give rise to any liability, to the extent required for the discharge of the fiduciary obligations described in this section except for the payment of the Break-Up Fee and Transaction Expenses as required in Section 9 below.

(d)    Further Assurances.  The Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the agreements and understandings of the Parties, whether the same occurs before or after the date of this Agreement.

(e)    Headings.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof.

(f)    Governing Law.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAWS PRINCIPLES THEREOF. By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought exclusively in the Bankruptcy Court to the extent such court has jurisdiction and agrees to exercise it.  By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the exclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding.  If the Bankruptcy Court lacks or declines to exercise such jurisdiction, the Parties agree that any action relating to this Agreement shall be brought in the state or federal courts of the State of New York.

(g)    Complete Agreement, Interpretation and Modification.

(1)    Complete Agreement. This Agreement, the Amended Plan, the Subscription Agreement and the other agreements, exhibits and other documents referenced herein and therein constitute the complete agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, oral or written, between or among the Parties with respect thereto.

(2)    Interpretation. This Agreement is the product of negotiation by and among the Parties. Any Party enforcing or interpreting this Agreement shall interpret it in a neutral manner. There shall be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

(3)    Modification of this Agreement and the Amended Plan.  The Amended Plan and this Agreement may only be modified, altered, amended or supplemented, or otherwise deviated from by waiver, consent or otherwise, by an agreement in writing signed by each Party hereto.

(h)     Conditions to Effectiveness.  This Agreement shall become effective upon the satisfaction of the following conditions precedent (unless waived by the Parties in their respective sole discretion):

(1)     each Party hereto shall have duly executed and delivered a counterpart to this Agreement to each other Party hereto;

(2)     the Debtors shall have filed the Amended Plan on or prior to **April ____, 2011**;

(3)     the Bankruptcy Court shall have entered an order approving the terms of this Agreement and authorizing the Parties to perform their obligations hereunder; and

(4)     no Termination Event shall have occurred prior to the time upon which the conditions set forth in clauses (2) and (3) of this Section 8(h) shall have been satisfied.

(i)     Execution of this Agreement.  This Agreement may be executed and delivered (by facsimile or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

(j)     Settlement Discussions.  This Agreement and the Amended Plan are part of a proposed settlement of a dispute between the Parties. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

(k)     Consideration.  The Debtors and the other Parties hereby acknowledge that no consideration, other than that specifically described herein and in the Amended Plan, shall be due or paid to any Party for its agreement to support the Amended Plan in accordance with the terms and conditions of this Agreement, other than the Debtors' representations, warranties and agreement to use its commercially reasonable best efforts to obtain approval of the Amended Disclosure Statement and to seek to confirm and consummate the Amended Plan.

(l)     Relationship Among Parties.  Notwithstanding anything herein to the contrary, the duties and obligations of the Parties under this Agreement shall be several, not joint. Furthermore, it is understood and agreed that, other than as provided in this Agreement, no Party has any duty of trust or confidence in any form with any other Party, and there are no commitments among or between them. In this regard, it is understood and agreed nothing in this Agreement shall affect that any Party's right to trade in any debt or equity securities of the Debtors and their subsidiaries without the consent of the Debtors or any other Party, subject to applicable securities laws or any other agreement to

which any Support Party and the Debtors are party. No Party shall have any responsibility for any such trading by any other entity by virtue of this Agreement. No prior history, pattern or practice of sharing confidences among or between Parties shall in any way affect or negate this understanding and agreement.

(m)  Notices. All notices hereunder shall be delivered in writing and sent by facsimile, courier or registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice), as the case may be:

(1)  If to the Debtors, to:

Point Blank Solutions, Inc.
2101 S.W. 2nd Street
Pompano Beach, FL 33069

with copies (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
919 North Market Street
17th Floor
Wilmington, DE 19801
Facsimile:  (302) 652-4400
Attention: Laura Davis Jones

(2)  If to the Creditors Committee, to:

Arent Fox LLP
1675 Broadway
New York, NY 10019
Facsimile:  (212) 484-3990
Attention: Robert M. Hirsh

(3)  If to the Lonestar Support Party, to:

Lonestar Capital Management, LLC
One Maritime Plaza
Suite 1105
San Francisco, CA 94111
Facsimile:  (415) 362-7977
Attention: Vikas Tandon

with copies (which shall not constitute notice) to:

Akin Gump Strauss Hauer & Feld LLP

2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010
Facsimile: (310) 229-1001
Attention: David P. Simonds

(4)     If to the Equity Support Parties, to:

Privet Opportunity Fund I, LLC
Privet Fund Management LLC
50 Old Ivy Road, Suite 230
Atlanta, GA 30324
Attention: Ryan Levenson

with copies (which shall not constitute notice) to:

Reed Smith LLP
1201 Market Street - Suite 1500
Wilmington, DE 19801
Facsimile: (302) 778-7575
Attention: Kurt F. Gwynne

and

Reed Smith LLP
599 Lexington Avenue
22nd Floor
New York, NY 10022
Facsimile: (21) 521-5450
Attention: Edward J. Estrada

and to

Prescott Group Capital Management
1924 S. Utica Avenue, Suite 1120
Tulsa, OK 74104
Attention: Eric Green

with copies (which shall not constitute notice) to:

Ashby & Geddes, P.A.
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE  19801
Facsimile: (302) 654-2067
Attention: Ricardo Palacio

Any notice given by delivery, mail or courier shall be effective when received. Any notice given by facsimile or email shall be effective upon oral or machine confirmation of transmission.

      (n)    <u>Time is of the Essence</u>.  The Parties agree that time is of the essence with respect to each and every term and provision of this Agreement.

### Section 9.     <u>Break-Up Fee and Transaction Expenses Reimbursement for Support Parties</u>.

      (a)    The Parties hereby agree and acknowledge that Support Parties have made a "substantial contribution" (within the meaning of § 503(b)(3)(D)) in the Debtors' chapter 11 cases by, among other things, (i) engaging in legal, business and other due diligence, negotiation and documentation relating to the DIP Facility, this Agreement and the Subscription Agreement, and (ii) executing and delivering a definitive DIP Credit Agreement, all of which enables the Parties to pursue the Amended Plan as a superior alternative to the sale of all or a substantial portion of the Debtors' assets pursuant to the previously scheduled auction or otherwise.

      (b)    As a result of such substantial contribution and demonstrable value provided by Support Parties to the Debtors' estates and creditors, and in order to induce the Support Parties to execute and deliver this Agreement by providing the Support Parties with economic protection against the risk of the Debtors, notwithstanding the terms of this Agreement, pursuing a Competing Transaction (as defined below), the Parties hereby agree that Support Parties shall be entitled, pursuant to §§ 363 and 503(b), to payment of (i) a fee in the aggregate amount of $750,000 (the "<u>Break-Up Fee</u>"), payable pro rata based upon the allocation of the direct subscription set forth in Section 6.3 of the Plan, plus (ii) reimbursement for all of their reasonable costs and expenses incurred in connection with the transactions contemplated by this Agreement and the DIP Facility (including without limitation, the reasonable fees and expenses of their respective legal counsel, Akin Gump Strauss Hauer & Feld LLP, Pepper Hamilton LLP and Reed Smith LLP, and any other professionals retained by Support Parties) up to a maximum of $200,000 per Support Party (collectively, the "<u>Transaction Expenses</u>"), which Break-Up Fee and Transaction Expenses shall be payable solely in the event the Support Parties are not in material breach of this Agreement and the Debtors (i) consummate a transaction relating to the sale of all or a substantial portion of the Debtors' assets, (ii) confirm a plan of reorganization or liquidation of the Debtors other than pursuant to the Amended Plan or (iii) obtain approval of any new postpetition financing (other than exit financing in connection with the Amended Plan) the proceeds of which are used to repay the DIP Facility (any such transaction other than the transaction contemplated by the Amended Plan, a "<u>Competing Transaction</u>"). For the avoidance of doubt, the right to attorneys' fees under this Agreement is separate and independent of any Party's right (including in their capacity as DIP Lender under the DIP Credit Agreement) to recover attorneys' fees under the DIP Credit Agreement.

      (c)    In furtherance of the Debtors' payment obligations in respect of the Break-Up Fee and Transaction Expenses, the Parties agree that the Debtors shall use

commercially reasonable efforts to obtain, and all Parties shall support, entry of an order (the "Break-Up Fee Approval Order"), in form and substance reasonably satisfactory to the Support Parties, authorizing payment of the Break-Up Fee and the Transaction Expenses in immediately available funds to Support Parties in accordance with the terms and conditions of this Section. The Break-Up Fee Approval Order may be incorporated into the order of the Bankruptcy Court approving the Debtors' execution, delivery and performance of this Agreement. Payment of the Break-Up Fee and the Transaction Expenses shall be the Support Parties' sole and exclusive right and remedy relating to any Competing Transaction under this Agreement.

(d)     This Section is without prejudice to the right of any other Party to assert that it is entitled to a substantial contribution payment under § 503(b)(3)(D), and if any such request is made by any such Party (other than the Support Parties pursuant to this Section), all Parties other than such requesting Party reserve their rights to oppose any such request.

(e)     Nothing in this Agreement shall limit any right, power, or protection provided to the Support Parties under the DIP Credit Agreement, including any right to reimbursement of fees and expenses.

(f)     Upon the effectiveness of this Agreement in accordance with Section 8(h), the Support Parties (i) waive any right to payment of the Break-Up Fee and Transaction Expenses pursuant to Section 9 of the First Plan Support Agreement arising out of the First Plan Support Agreement and (ii) waive any default under the DIP Credit Agreement or the Final DIP Order arising from any termination of the First Plan Support Agreement. For the avoidance of doubt, neither the entry into this Agreement nor the occurrence of any Termination Event under the First Plan Support Agreement, in and of itself, is intended to nor shall trigger any obligation for payment of the Break-Up Fee and Transaction Expenses pursuant to Section 9 of the First Plan Support Agreement. The waivers provided in this Section 9(f) are expressly limited as set forth herein and conditioned upon the effectiveness of this Agreement. In the event this Agreement does not become effective in accordance with Section 8(h), the waivers provided in this Section 9(f) shall be deemed null and void and of no further force or effect, in which case the rights of the Support Parties under Section 9 of the First Plan Support Agreement shall thereupon be preserved in all respects to the extent provided in the First Plan Support Agreement. For the avoidance of doubt, in no event shall the Support Parties be entitled to collect a Breakup Fee and Transaction Expenses under both Section 9 of the First Plan Support Agreement and Section 9 of this Agreement.

IN WITNESS WHEREOF, the Parties have entered into this Agreement as of the date first set forth above.

Point Blank Solutions, Inc.,
Point Blank Body Armor, Inc.,
Protective Apparel Corporation of America
PBSS, LLC, as debtors and debtors in
possession

By: _____

Privet Fund Management LLC


By: _____

Privet Opportunity Fund I, LLC


By: _____

　　Privet Fund Management LLC
　　Its Investment Advisor


The Official Committee of Unsecured
Creditors


By: _____

Lonestar Capital Management, LLC, as
investment advisor to Lonestar Partners, LP


By: _____

Prescott Group Capital Management


By: _____

IN WITNESS WHEREOF, the Parties have entered into this Agreement as of the date first set forth above.

Point Blank Solutions, Inc.,
Point Blank Body Armor, Inc.,
Protective Apparel Corporation of America
PBSS, LLC, as debtors and debtors in
possession

The Official Committee of Unsecured
Creditors

By: _____

By: _/s/ Larry R. Ellis_____

Privet Fund Management LLC

Lonestar Capital Management, LLC, as
investment advisor to Lonestar Partners, LP

By: _____

By: _____

Privet Opportunity Fund I, LLC

Prescott Group Capital Management

By: _____

By: _/s/ Ricardo Palacio_____
<br>Counsel for Prescott Group Capital Management

    Privet Fund Management LLC
<br>    Its Investment Advisor

IN WITNESS WHEREOF, the Parties have entered into this Agreement as of the date first set forth above.

Point Blank Solutions, Inc.,
Point Blank Body Armor, Inc.,
Protective Apparel Corporation of America
PBSS, LLC, as debtors and debtors in
possession

The Official Committee of Unsecured
Creditors

By: _____

Privet Fund Management LLC

By: _____

Lonestar Capital Management, LLC, as
investment advisor to Lonestar Partners, LP

By: _____

Privet Opportunity Fund I, LLC

By: _____

Prescott Group Capital Management

By: _____

Privet Fund Management LLC
Its Investment Advisor

By: _____

IN WITNESS WHEREOF, the Parties have entered into this Agreement as of the date first set forth above.

Point Blank Solutions, Inc.,
Point Blank Body Armor, Inc.,
Protective Apparel Corporation of America
PBSS, LLC, as debtors and debtors in
possession

The Official Committee of Unsecured
Creditors

By: _____

By: _____

Privet Fund Management LLC

Lonestar Capital Management, LLC, as
investment advisor to Lonestar Partners, LP

By: _____

By: _____

Privet Opportunity Fund I, LLC

Prescott Group Capital Management

By: _____

By: _____

    Privet Fund Management LLC
    Its Investment Advisor

**Attachment 1 to Second Plan Support Agreement**

**Amended Plan**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| POINT BLANK SOLUTIONS, INC., *et al.*,[1] | ) |
| | ) Case No. 10-11255 (PJW) |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) |

## AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

<div style="border:1px solid black">

**THIS CHAPTER 11 PLAN IS BEING SUBMITTED FOR APPROVAL BY THE BANKRUPTCY COURT. THE DISCLOSURE STATEMENT ACCOMPANYING THIS CHAPTER 11 PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. ACCORDINGLY, THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE CHAPTER 11 PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

</div>

Dated: April 8, 2011

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number and address, are: Point Blank Solutions, Inc. (9361), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor, Inc. (4044), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Protective Apparel Corporation of America (9051), 179 Mine Lane, Jacksboro, TN 37757; and PBSS, LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.

DATE   4-8-11

DOCKET #   1278

# TABLE OF CONTENTS

**ARTICLE 1 DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW** ..................................................................................................2
- 1.1     Defined Terms .......................................................................................................2
- 1.2     Rules of Interpretation ........................................................................................13
- 1.3     Computation of Time ..........................................................................................13
- 1.4     Governing Law ...................................................................................................13
- 1.5     Reference to Monetary Figures ...........................................................................14

**ARTICLE 2 CLASSIFICATION OF CLAIMS AND INTERESTS** ......................................14
- 2.1     General Rules of Classification ..........................................................................14
- 2.2     Administrative Claims and Priority Tax Claims ..................................................14
- 2.3     Summary of Classification ..................................................................................14

**ARTICLE 3 TREATMENT OF CERTAIN UNCLASSIFIED CLAIMS** ..............................14
- 3.1     Administrative Claims .........................................................................................14
- 3.2     U.S. Trustee Fees ...............................................................................................15
- 3.3     Priority Tax Claims ............................................................................................16

**ARTICLE 4 TREATMENT OF CLASSES OF CLAIMS AND INTERESTS** ......................16
- 4.1     Treatment of Allowed Class 1 Claims (Other Priority Claims) .............................16
- 4.2     Treatment of Allowed Class 2 Claims (DIP Claims) ...........................................16
- 4.3     Treatment of Allowed Class 3 Claims (Miscellaneous Secured Claims) ..............16
- 4.4     Treatment of Allowed Class 4 Claims (General Unsecured Claims) .....................17
- 4.5     Treatment of Allowed Class 5 Claims (Subordinated Unsecured Claims) .............17
- 4.6     Treatment of Allowed Class 6 Claims (Class Action Claims) ...............................17
- 4.7     Treatment of Allowed Class 7 Interests (Old Equity Interests) .............................18
- 4.8     Treatment of Allowed Class 8 Claims and Interests (Other Subordinated Claims and Interests) ...................................................................................................18
- 4.9     Treatment of Allowed Class 9 Interests (Unexercised Options) ...........................18

**ARTICLE 5 ACCEPTANCE REQUIREMENTS** .................................................................19
- 5.1     Acceptance or Rejection of the Plan ...................................................................19
- 5.2     Tabulation of Votes on a Non-Consolidated Basis ..............................................19

**ARTICLE 6 MEANS FOR IMPLEMENTATION OF THE PLAN** ......................................19
- 6.1     Inter-Debtor Compromise ...................................................................................19
- 6.2     Exit Facility ........................................................................................................20
- 6.3     Direct Subscription .............................................................................................20
- 6.4     Additional Cash Contribution .............................................................................21
- 6.5     Sources of Consideration for Plan Distributions .................................................21
- 6.6     Issuance of New Common Stock .........................................................................21
- 6.7     Cancellation/Conversion of Securities and Agreements ......................................22
- 6.8     Exemptions for Issuance of New Common Stock .................................................22
- 6.9     Corporate Existence ............................................................................................22
- 6.10    New Certificate of Incorporation and New By-Laws ...........................................22
- 6.11    Reorganized Debtors' Boards of Directors .........................................................22
- 6.12    Officers of Reorganized Debtors .........................................................................23
- 6.13    Employee Benefits ..............................................................................................23
- 6.14    Vesting of Assets in the Reorganized Debtors ....................................................23
- 6.15    Corporate Action ................................................................................................23
- 6.16    Effectuating Documents; Further Transactions ...................................................24
- 6.17    General Settlement of Claims and Interests ........................................................24

| | | |
|---|---|---|
| 6.18 | Section 1146 Exemption from Certain Taxes and Fees | 24 |
| 6.19 | D&O Liability Insurance Policies and Indemnification Provisions | 24 |
| 6.20 | Preservation of Rights and Causes of Action | 25 |
| 6.21 | Payment of Fees and Expenses of the DIP Lenders | 25 |
| 6.22 | Non-Participation of Other Subordinated Claims and Interests | 25 |

**ARTICLE 7 TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ......... 25

| | | |
|---|---|---|
| 7.1 | Assumption and Rejection of Executory Contracts and Unexpired Leases | 25 |
| 7.2 | Objections to Assumption; Determination of Cure Claims | 26 |
| 7.3 | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 27 |
| 7.4 | Insurance Policies | 28 |
| 7.5 | Modifications, Amendments, Supplements, Restatements or Other Agreements. | 28 |
| 7.6 | Reservation of Rights. | 28 |
| 7.7 | Contracts and Leases Entered Into After the Petition Date. | 28 |

**ARTICLE 8 RECOVERY TRUST** ......... 28

| | | |
|---|---|---|
| 8.1 | Purpose of Trust | 28 |
| 8.2 | Governing Document; Funding | 29 |
| 8.3 | Vesting of Assets; Allocation | 29 |
| 8.4 | Tax Treatment | 31 |
| 8.5 | Trust Interests | 32 |
| 8.6 | Administration of the Recovery Trust | 33 |
| 8.7 | Rights and Responsibilities of Recovery Trustee | 34 |

**ARTICLE 9 PROVISIONS GOVERNING DISTRIBUTIONS** ......... 34

| | | |
|---|---|---|
| 9.1 | Record Date for Distributions | 34 |
| 9.2 | Timing and Calculation of Amounts to Be Distributed | 34 |
| 9.3 | Disbursing Agent | 35 |
| 9.4 | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 35 |
| 9.5 | Withholding and Reporting Requirements | 35 |
| 9.6 | Setoffs | 35 |
| 9.7 | Claims Paid or Payable by Third Parties | 36 |
| 9.8 | Postpetition Interest | 36 |
| 9.9 | Section 506(c) Reservation | 36 |
| 9.10 | Single Satisfaction of Claims | 36 |

**ARTICLE 10 PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS** ......... 36

| | | |
|---|---|---|
| 10.1 | Prosecution of Objections to Claims | 36 |
| 10.2 | Allowance of Claims | 37 |
| 10.3 | Disputed Claims Reserve | 37 |
| 10.4 | Distributions After Allowance | 37 |
| 10.5 | Distribution of Excess Amounts in the Disputed Claims Reserve | 37 |
| 10.6 | Property Held in Reserve for Disputed Claims | 37 |
| 10.7 | Estimation of Claims | 38 |
| 10.8 | Deadline to File Objections to Claims | 38 |

**ARTICLE 11 SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS** ......... 38

| | | |
|---|---|---|
| 11.1 | Compromise and Settlement of Claims, Interests and Controversies | 38 |
| 11.2 | Releases by the Debtors | 38 |
| 11.3 | Releases by Holders of Claims and Interests | 39 |
| 11.4 | Exculpation | 39 |
| 11.5 | Discharge of Claims and Termination of Interests | 40 |
| 11.6 | Injunction | 40 |
| 11.7 | Term of Injunctions or Stays | 41 |
| 11.8 | Injunction Against Interference With Plan | 41 |

11.9      Injunction Related to Releases and Exculpation ........................................41

11.10    Protection Against Discriminatory Treatment ......................................41

11.11    No Consent to Change of Control Required .........................................41

11.12    Release of Liens ...................................................................................42

**ARTICLE 12 CONDITIONS TO THE CONFIRMATION DATE AND EFFECTIVE DATE** ................42

12.1      Conditions Precedent to Confirmation ................................................42

12.2      Conditions Precedent to the Effective Date ........................................42

12.3      Waiver of Conditions ..........................................................................43

12.4      Effect of Failure of Conditions ...........................................................43

**ARTICLE 13 MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN** ....................44

13.1      Modification and Amendments.............................................................44

13.2      Effect of Confirmation on Modifications .............................................44

13.3      Revocation or Withdrawal of the Plan .................................................44

**ARTICLE 14 RETENTION OF JURISDICTION** .............................................................44

**ARTICLE 15 MISCELLANEOUS PROVISIONS**...............................................................46

15.1      Immediate Binding Effect....................................................................46

15.2      Additional Documents ........................................................................46

15.3      Dissolution of Statutory Committees ..................................................47

15.4      Successors and Assigns.......................................................................47

15.5      Service of Documents .........................................................................47

15.6      Entire Agreement ...............................................................................48

15.7      Severability of Plan Provisions............................................................48

15.8      Exhibits ...............................................................................................48

15.9      Votes Solicited in Good Faith .............................................................48

15.10    Closing of Chapter 11 Cases ...............................................................48

15.11    Conflicts .............................................................................................49

# INTRODUCTION

Point Blank Solutions, Inc., Point Blank Body Armor, Inc., Protective Apparel Corporation of America and PBSS, LLC, as debtors and debtors in possession in these Chapter 11 Cases, together with the Creditors' Committee, Privet Fund Management LLC (as investment manager to Privet Fund LP and Privet Opportunity Fund I, LLC), Privet Opportunity Fund I, LLC, Prescott Group Capital Management, LLC and Lonestar Capital Management, LLC, as investment advisor to Lonestar Partners, LP and manager to PB Funding, LLC (the "Plan Proponents"), respectfully propose the following joint chapter 11 plan of reorganization (the "Plan").

This Plan is proposed by and on behalf of each Debtor as its individual, separate plan under chapter 11 of the Bankruptcy Code. Reference is made to the Disclosure Statement accompanying the Plan for a discussion of the Debtors' history, results of operations, historical financial information and properties, and for a summary and analysis of the Plan. All holders of Claims against or Interests in a Debtor are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan. Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to such terms in Section 1.1 unless otherwise noted. Unless otherwise noted herein, section (§) references are to the Bankruptcy Code.

The Plan contemplates the reorganization of the Debtors' businesses and the resolution of the outstanding Claims against and Interests in the Debtors. Generally, the Plan is structured around three key components.

      (a)     *Direct Subscription.* In addition to Cash on hand and an Exit Facility, if one is necessary and available, the Debtors intend to fund their reorganization effort—including the payment of all amounts due under the Plan—through the issuance and sale of shares of New Common Stock in Reorganized Parent in a minimum amount of $15,000,000 and (subject to certain consents and other conditions) up to a maximum of $25,000,000. A portion of such Commitment may be in the form of the Purchaser Loans as described in Section 6.3(a). The New Common Stock will be sold through a direct subscription of shares to the DIP Lenders or one or more of their respective Affiliates. The direct subscription is described more fully in Section 6.3 and in the Subscription Agreement.

      (b)     *The Inter-Debtor Compromise.* The Plan Proponents have identified several potential Claims, Causes of Action and other disputes that may exist between the several Debtors, including existing and potential disputes regarding (i) the value and disposition of Intercompany Claims, (ii) the valuation of the individual Debtor's Estates, (iii) the individual Debtor's respective ownership interest in certain potentially valuable lawsuits, (iv) the susceptibility of two or more of the Debtors' Estates to substantive consolidation and (v) the consideration, if any, that should be paid by Parent to retain its existing Interests in the Debtor Subsidiaries. The treatment to be provided under the Plan to each Class of Claims against or Interests in the respective Debtors is in part a product of a global compromise and settlement of these and other potential Claims, Causes of Action and disputes that would be costly and time-consuming to litigate. It is the Plan Proponents' view that the Inter-Debtor Compromise is the best way to resolve these disputes, avoid the delay and expense of litigating these issues and ensuring the equitable treatment of the Debtors' Creditors and Interest holders. The Inter-Debtor Compromise is described more fully in Section 6.1

      (c)     *The Recovery Trust.* Under the Plan, holders of Allowed General Unsecured Claims, Allowed Subordinated Unsecured Claims, Allowed Class Action Claims and Allowed Old Equity Interests will be issued beneficial interests in a Recovery Trust established for the purpose of liquidating certain assets and distributing the proceeds thereof to the trust beneficiaries and making certain disbursements or distributions to Reorganized Parent. Allowed Excess Fee Claims of certain Professionals will also be paid out of the proceeds from the Recovery Trust prior to payments to the trust beneficiaries. On the Effective Date, the Reorganized Debtors will fund a Recovery Trust with rights to certain potentially valuable Causes of Action, the proceeds of which will be shared with the Reorganized Parent (in accordance with the waterfall described in Section 8.3(c)) and distributed to the beneficiaries of the Recovery Trust in accordance with the waterfall provisions described in Sections 8.3(c) and 8.5. In addition, the Recovery Trust will be provided with initial funding for litigation and related expenses as described in Section 8.2, and may be funded with a portion of the Additional Cash Contribution, in which case such amount will be distributed as described in Section 8.3(b). The Recovery Trust may also be able to borrow certain funds from the Reorganized Parent as described in Section 8.2. The foregoing summary is qualified by the

1

provisions governing the Recovery Trust as described in Article 8 and in the Recovery Trust Agreement, which will be filed as part of the Plan Supplement.

## ARTICLE 1
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME AND GOVERNING LAW

### 1.1    Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form:

"*Additional Cash Contribution*" means the sum of $3,000,000 that shall be funded on the Effective Date from the sources of funding described in Section 6.5 and allocated in accordance with Section 6.4.

"*Administrative Claim*" means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of the Debtors of the kind specified in § 503(b) and entitled to priority pursuant to §§ 507(a)(2) or 507(b), including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (ii) Professional Fee Claims; (iii) all fees and charges assessed against the Estates pursuant to 28 U.S.C. §§ 1911-1930 or the Bankruptcy Rules; and (iv) all obligations designated as Administrative Claims pursuant to an order of the Bankruptcy Court.

"*Administrative Claims Bar Date*" means, for any Administrative Claim, the date which is thirty (30) days after the Effective Date or such earlier deadline that has been or may be set by order of the Bankruptcy Court, including the Administrative Claims Bar Date Order, for filing a request for allowance of such Administrative Claim. Professional Fee Claims shall not be subject to the Administrative Claims Bar Date.

"*Administrative Claims Bar Date Order*" means the *Order (1) Fixing Bar Date for the Filing of Proofs of Claim, (2) Fixing Bar Date for the Filing of Proofs of Claim By Governmental Units, (3) Fixing Bar Date for the Filing of Requests for Allowance of Bankruptcy Code § 503(b)(9) Administrative Expense Claims, (4) Fixing Bar Date for the Filing of Requests for Allowance of WARN Act Claims, (5) Designating Form and Manner of Notice Thereof and (6) Granting Related Relief* [Docket No. 237], entered on June 10, 2010.

"*Affiliate*" has the meaning set forth in § 101(2).

"*Allowed*" means, when used with respect to a Claim or Interest, (i) a Claim that has been scheduled by the Debtors in their Schedules as other than disputed, contingent or unliquidated that has not been superseded by a filed Proof of Claim and as to which the Debtors or any other party in interest has not filed an objection on or before the 180th day after the Effective Date (unless such date is extended, for cause, by the Bankruptcy Court upon request of the Reorganized Debtors or the Recovery Trustee); (ii) any Claim (or portion thereof) that is set forth in a timely filed Proof of Claim or Interest as to which no action to dispute, deny, equitably subordinate or otherwise limit recovery with respect thereto, or alter priority thereof, has been filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or order of the Bankruptcy Court; or (iii) any Claim (or portion thereof) or Interest that is allowed (a) in any contract, instrument, indenture or other agreement entered into in connection with the Plan, (b) pursuant to the terms of the Plan, (c) by Final Order of the Bankruptcy Court, or (d) with respect to an Administrative Claim only, (1) that was incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases to the extent due and owing without defense, offset, recoupment or counterclaim of any kind, and (2) that is not otherwise Disputed.

"*Avoidance Actions*" mean all claims and Causes of Action arising under chapter 5 of the Bankruptcy Code, including under §§ 506(d), 510(c), 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and 553, and any state law equivalents, whether or not such claims or causes of action seek an affirmative recovery or are raised as a defense to or offset against the allowance of a Claim.

2

"*Ballot*" means the ballot on which holders of Impaired Claims and Interests will, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the Voting Instructions.

"*Bankruptcy Code*" means title 11 of the United States Code, as amended from time to time and applicable to the Chapter 11 Cases.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the District of Delaware.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under § 2075 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as well as the general and local rules of the Bankruptcy Court, as they may be amended from time to time.

"*Beneficiary*" and "*Beneficiaries*" means any "beneficiary" of the Recovery Trust, as that term is defined in the Recovery Trust Agreement.

"*Board Observer*" means Eric J. Rosenbloom, in his capacity as observer of the Board of Directors of Parent pursuant to the terms of the *Order Authorizing Appointment of Eric J. Rosenbloom to Serve as Observer of Board of Directors Nunc Pro Tunc to September 15, 2010*, entered on November 19, 2010 [Docket No. 785]

"*Business Day*" means any day other than a Saturday, Sunday or legal holiday, as that term is defined in Bankruptcy Rule 9006(a)(6).

"*Cash*" means the legal tender of the United States of America or the equivalent thereof.

"*Cash Management Order*" means the *Order Authorizing (i) Maintenance of Existing Bank Accounts, (ii) Continued use of Existing Business Forms, (iii) Continued Use of Existing Cash Management System, and (iv) Continued Performance of Intercompany Transactions and Providing Administrative Expense Priority Status to Postpetition Intercompany Claims, and (v) Waiver of Section 345(b) Deposit and Investment Requirements* [Docket No. 42], dated April 16, 2010.

"*Causes of Action*" means any and all actions, proceedings, causes of action, obligations, suits, judgments, damages, demands, debts, accounts, controversies, agreements, promises, liabilities, legal remedies, equitable remedies, and claims (and any rights to any of the foregoing), whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, known or unknown, foreseen or unforeseen, fixed, contingent, matured, unmatured, disputed, undisputed, then existing or thereafter arising, secured or unsecured, whether asserted or assertable directly or derivatively, in law, equity or otherwise including any recharacterization, subordination, avoidance or other claim arising under or pursuant to § 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law.

"*Chapter 11 Case*" or "*Chapter 11 Cases*" means (i) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (ii) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under Case No. 10-11255(PJW).

"*Claim*" means any claim, as defined in § 101(5), against a Debtor.

"*Class*" means a class of Claims or Interests as set forth in Article 4.

"*Class 1*" means any or all of Classes 1A, 1B, 1C and 1D, as the context may require.

"*Class 2*" means any or all of Classes 2A, 2B, 2C and 2D, as the context may require.

3

"*Class 4*" means any or all of Classes 4A, 4B, 4C and 4D, as the context may require.

"*Class 4/Class 5 Satisfaction*" has the meaning set forth in Section 8.3.

"*Class 4 Trust Interest*" means a Trust Interest issued to a holder of an Allowed Class 4 General Unsecured Claim or reserved for issuance to a holder of a Disputed Class 4 General Unsecured Claim in accordance with Section 8.5.

"*Class 5*" means any or all of Classes 5A, 5B, 5C and 5D, as the context may require.

"*Class 5 Trust Interest*" means a Trust Interest issued to a holder of an Allowed Class 5 Subordinated Unsecured Claim or reserved for issuance to a holder of a Disputed Class 5 Subordinated Unsecured Claim in accordance with Section 8.5.

"*Class 6*" means any or all of Classes 6A, 6B, 6C and 6D, as the context may require.

"*Class 6 Trust Interest*" means a Trust Interest issued to a holder of an Allowed Class 6 Class Action Claim or reserved for issuance to the holder of a Disputed Class 6 Class Action Claim in accordance with Section 8.5.

"*Class 7*" means any or all of Classes 7A, 7B, 7C and 7D, as the context may require.

"*Class 7 Trust Interest*" means a Trust Interest issued to a holder of an Allowed Class 7 Old Equity Interest in accordance with Section 8.5.

"*Class 8*" means any or all of Classes 8A, 8B, 8C and 8D, as the context may require.

"*Class Action Claims*" means any Claim arising out of or relating to *In re DHB Industries, Inc. Class Action Litigation* (No. CV 05-4296) in the United States District Court for the Eastern District of New York, including claims of attorneys and other professionals arising therefrom.

"*Class Action Escrow*" means the escrow account created under the Escrow Agreement, dated July 26, 2006, in connection with the Class Action Settlement Agreement.

"*Class Action Settlement Agreement*" means the Stipulation and Agreement of Settlement (the "Settlement Agreement"), dated November 30, 2006, between the parties in *In re DHB Industries, Inc. Class Action Litigation* (No. CV 05-4296) and *In re DHB Industries, Inc. Derivative Litigation* (No. CV 05-4345).

"*Collateral*" means any property or interest in property of the Debtors subject to a Lien securing the payment or performance of a Claim.

"*Commitment*" means the commitment of each Purchaser to subscribe for and purchase the New Common Stock as, and to the extent, provided in the Plan and the Subscription Agreement (including Purchasers' right to fund in good faith a portion of the commitment as loans to Reorganized Parent under the terms of the Subscription Agreement as described in Section 6.3(a)).

"*Compensation Procedures Order*" means the *Administrative Order Establishing Procedures for Interim Compensation Pursuant to Section 331 of the Bankruptcy Code* [Docket No. 114], entered May 12, 2010.

"*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases of the Debtors in accordance with Bankruptcy Rules 5003 and 9021.

"*Confirmation Hearing*" means the hearing held by the Bankruptcy Court concerning Confirmation of the Plan pursuant to §§ 1128 and 1129, as such hearing may be adjourned continued from time to time.

4

"*Confirmation Order*" means the order entered by the Bankruptcy Court confirming the Plan pursuant to § 1129.

"*Consenting Professional*" or "*Consenting Professionals*" means Pachulski Stang Ziehl & Jones LLP, CRG Partners Group LLC, Arent Fox LLP, The Rosner Law Group LLC, CBIZ Accounting, Tax & Advisory of New York, LLC and [_____].

"*Creditor*" means any creditor, as defined in § 101(10).

"*Creditors' Committee*" means the statutory committee of unsecured creditors of the Debtors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to § 1102, as the same may be reconstituted from time to time.

"*Cure Claim*" means a Claim based upon a monetary default, if any, by any Debtor on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to § 365.

"*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers' and officers' liability, whether or not set forth on the *Schedule of Insurance Policies* to be included in the Plan Supplement.

"*Debtor*" or "*Debtors*" means Point Blank Solutions, Inc., Point Blank Body Armor Inc., Protective Apparel Corporation of America and PBSS, LLC, each in its capacity as a debtor and debtor in possession in the Chapter 11 Cases.

"*DIP Claim*" means any Claim derived from or based upon the DIP Loan Agreement and Final DIP Order for payment of outstanding Obligations (as defined in the DIP Loan Agreement), including Claims for principal, interest, fees and expenses owing thereunder (including, to the extent provided in the DIP Loan Agreement or the Final DIP Order, all reasonable, actual and documented fees, expenses and disbursements of (i) PB Funding and its advisors, including Akin Gump Strauss Hauer & Feld LLP and Pepper Hamilton LLP, (ii) Privet and its advisors, including Reed Smith LLP, and (iii) Prescott and its advisors, including Ashby & Geddes, P.A.).

"*DIP Lenders*" means PB Funding, Privet and Prescott.

"*DIP Loan Agreement*" means that certain Debtor-In-Possession Financing Agreement, dated as of December 10, 2010, between and among the Debtors, as borrowers, and the DIP Lenders, as lenders, as well as any other documents entered into in connection therewith, as the same may be amended, modified, ratified, extended, renewed or restated.

"*Disallowed*" means, when used with respect to a Claim or an Interest, a Claim or an Interest that has been disallowed pursuant to a Final Order or by operation of the Bankruptcy Code and Bankruptcy Rules.

"*Disbursing Agent*" means Reorganized Parent or the Entity or Entities designated by the Reorganized Debtors to make or facilitate Distributions pursuant to the Plan. On and after the Effective Date of the Plan, the Recovery Trustee shall be the Disbursing Agent except with respect to the payment of Administrative Claims, Priority Tax Claims, Other Priority Claims and Miscellaneous Secured Claims, as to which Reorganized Parent or its designee shall be the Disbursing Agent.

"*Disclosure Statement*" means the disclosure statement that relates to the Plan, as such disclosure statement may be amended, modified or supplemented (including all exhibits and schedules annexed thereto or referred to therein).

"*Disputed*" means, when used with respect to a Claim or Interest, that portion (or the whole) of a Claim or Interest that is not an Allowed Claim or Interest, and as to which (i) a Proof of Claim has been filed or deemed filed under applicable law or order of the Bankruptcy Court; (ii) an objection has been or may be timely filed (including for the subordination of any Claim or Interest); or (iii) such objection has not been (a) withdrawn, (b) overruled or denied pursuant to a Final Order or (c) granted pursuant to a Final Order. Before the time that an objection has been

5

or may be filed, a Claim or Interest shall be considered to be Disputed (i) if the amount or classification of the Claim or Interest specified in any Proof of Claim or Interest exceeds or varies from the amount or classification of any corresponding Claim or Interest scheduled by the Debtor in its Schedules or reflected in its stock register, as applicable, to the extent of such excess or variance; (ii) in its entirety, if any corresponding Claim or Interest scheduled by the Debtor has been scheduled as contingent, unliquidated or disputed in its Schedules; or (iii) in its entirety, if no corresponding Claim or Interest has been scheduled by the Debtor in its Schedules or list of equity security holders or reflected in its stock register. It may also refer to a Disputed Claim in a specified class; for example, a Disputed General Unsecured Claim is a Disputed Claim in the Class of General Unsecured Claims.

"*Disputed Claims Reserve Account*" has the meaning set forth in Section 10.3.

"*Distribution*" means the distributions to be made pursuant to the Plan, but excludes the issuance of the Purchased Shares.

"*Distribution Record Date*" means the date that the Confirmation Order is entered by the Bankruptcy Court.

"*DTC*" means the Depository Trust Company.

"*Effective Date*" means the first Business Day after which all provisions, terms and conditions specified in Section 12.2 have been satisfied or waived pursuant to Section 12.3.

"*Employee Benefits*" has the meaning assigned to it in Section 6.13.

"*Entity*" has the meaning set forth in § 101(15).

"*Equity Committee*" means the statutory committee of equity holders of the Debtors appointed in the Chapter 11 Cases by the U.S. Trustee pursuant to § 1102, as the same may be reconstituted from time to time

"*Estate*" means, as to a Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to § 541.

"*Estate Claim*" means the Debtors' interests, if any, in any of the following Causes of Action or the proceeds thereof: (i) all Avoidance Actions and Causes of Action arising under applicable state or federal law providing for the avoidance and recovery of fraudulent conveyances or transfers; (ii) claims against the Debtors' current or former officers and directors; (iii) any rights related to recovery of funds in any class action or derivative claim; (iv) any and all claims to forfeiture proceeds and SOX 304 proceeds, the Toyobo litigation and all other litigation claims, causes of action (including derivative claims), recoveries and proceeds thereof belonging to the Estates; (v) claims and proceeds under Insurance Policies and contracts related to Insurance Policies (including the Release, Indemnity and Settlement Agreement, dated July 26, 2006, and entered into by National Union Fire Insurance Co. of Pittsburgh, Pa., XL Specialty Insurance Co., DHB Industries, Inc., David H. Brooks, Sandra Hatfield, Dawn M. Schlegel, Larry Ellis, Barry Berkman, Cary Chasin, Jerome Krantz, and Gary Nadelman); (vi) commercial tort claims; (vii) *In re DHB Industries, Inc. Class Action Litigation* (No. CV 05-4296) and *In re DHB Industries, Inc. Derivative Litigation* (No. CV 05-4345) in the United States District Court for the Eastern District of New York; (viii) (A) *United States of America v. All Assets Listed on Schedule I, Attached Hereto and All Proceeds Traceable Thereto*, Civil Action No. 10 CV 4750 (Seybert, J.), and the Department of Justice action seeking criminal forfeiture of approximately $190 million in assets from David Brooks and Sandra Hatfield (No. 2:06-cr-00550-JS-AKT) in the United States District Court for the Eastern District of New York, and any and all claims to forfeiture proceeds from any and all civil and criminal forfeiture actions, whether pending or to be commenced; (ix) the separate actions by the SEC against David Brooks (No. 07-cv-61526-CMA) and Dawn M. Schlegel and Sandra L. Hatfield (No. 06-cv-61251-PAS) in the United States District Court for the Southern District of Florida seeking disgorgement of approximately $180 million for the benefit of one or more of the Debtors under SOX 304; (x) the action brought by Point Blank Solutions, Inc. against Robbins Geller Rudman & Dowd LLP, Labaton Sucharow LLP, Law Offices of Thomas G. Amon and Robbins Umeda LLP in the United States Bankruptcy Court for the District of Delaware (No. 10-55361) seeking the turnover of funds; (xi) the action brought by Point Blank Solutions, Inc. against Toyobo America, Inc. and Toyobo Co., Ltd. in the United States District Court for the Southern District

6

of Florida (No. 09-61166); (xii) any and all claims and causes action and any pending actions including but not limited to claims for indemnity and/or contribution against David Brooks or any other person related to any pending litigation against any of the Debtors; and (xiii) any other federal or state investigation or lawsuit (whether initiated by the Department of Justice or any other federal, state or local or international authority or agency). For the avoidance of doubt, no Cause of Action related to continued operation of the Reorganized Debtors' business post-Effective Date is an Estate Claim unless specifically enumerated above as an Estate Claim. By way of example, an Avoidance Action against a vendor doing business with the Reorganized Debtors is an Estate Claim; a breach of warranty claim against the same vendor is not.

"*Excess Fee Claim*" means, for any Consenting Professional, the portion of such Professional's Allowed Professional Fee Claim, if any, that such Professional has agreed to be paid under the terms of Article 8 and the Recovery Trust Agreement.

"*Exculpated Party*" means each of (i) the Debtors, the Reorganized Debtors and their Affiliates, (ii) the Creditors' Committee, the Equity Committee and their respective current and former members (in such capacity), and (iii) Lonestar, PB Funding, Lonestar Partners, LP, Privet, Prescott and the Party Affiliates (as defined in the Subscription Agreement) in connection with the Chapter 11 Cases, including the DIP Loan Agreement, the Plan Support Agreement, the Second Plan Support Agreement, the Subscription Agreement, the Plan, the Disclosure Statement and related documents, agreements and releases and (iv) with respect to each of the foregoing Entities, such Entities' subsidiaries, affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners and representatives, in each case solely in their capacity as such.

"*Executory Contracts*" and "*Unexpired Leases*" means any executory contract or unexpired lease, as appropriate, as referenced in § 365, to which one or more of the Debtors is a party.

"*Exit Facility*" means any credit facility, indenture or other loan facilities (in whatever form) that may be entered into as of the Effective Date by one or more of the Reorganized Debtors and the lenders party thereto in order to satisfy the Reorganized Debtors' Plan obligations and working capital needs on and after the Effective Date, in form and substance acceptable to the Purchasers.

"*Final DIP Order*" means the *Order Authorizing on a Final Basis (i) Replacement Postpetition Secured Financing, (ii) Use of Cash Collateral, (iii) Repayment of Existing Postpetition Secured Financing and (iv) Authorizing Entry into Plan Support Agreement* [Docket No. 968], entered December 28, 2010.

"*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek *certiorari* has expired and no appeal or petition for *certiorari* has been timely taken, or as to which any appeal that has been taken or any petition for *certiorari* that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which *certiorari* could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice. Such order or judgment shall be a Final Order notwithstanding that it still may be subject to § 502(j), § 1144 or Bankruptcy Rules 9023 or 9024.

"*General Unsecured Claim*" means any Claim that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, DIP Claim, Miscellaneous Secured Claim, Subordinated Unsecured Claim, Class Action Claim or Other Subordinated Claim and Interest.

"*Impaired*" has the meaning set forth in § 1124.

"*Indemnification Provisions*" means each of the indemnification provisions, agreements or obligations, whether in the bylaws, certificates of incorporation or other formation documents (in the case of a limited liability company), board resolutions or employment contracts, in place as of the Petition Date.

"*Insurance Policies*" means, collectively, all of the Debtors' insurance policies, whether or not listed on the *Schedule of Insurance Policies* to be included in the Plan Supplement.

"*Inter-Debtor Compromise*" means the global compromise and settlement set forth in Section 6.1.

"*Intercompany Claim*" means any Claim held by a Debtor against another Debtor. The Debtors shall include a schedule of Intercompany Claims in the Plan Supplement.

"*Interest*" means any equity security in a Debtor as defined in § 101(16), including all issued, unissued, authorized or outstanding shares of capital stock of the Debtors together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto.

"*Lien*" has the meaning set forth in § 101(37).

"*Lonestar*" means Lonestar Capital Management, LLC, as investment advisor to Lonestar Partners, LP and manager of PB Funding, or one or more of its affiliates, designees or assignees.

"*Lonestar Pre-Petition Claims*" means the General Unsecured Claims of Lonestar Partners, L.P. (i) against PACA in the amount of $373,572.10 as reflected in PACA's *Schedules of Assets and Liabilities*, (ii) against Point Blank in the amount of $8,126,774.32 as reflected in Point Blank's *Schedules of Assets and Liabilities*, and (iii) against the Parent in the amount of $8,512,858.34 as reflected in Proof of Claim No. 284.

"*Miscellaneous Secured Claims*" means any Secured Claim against the Debtors other than the DIP Claims.

"*New Board*" means, with respect to each Reorganized Debtor, the initial board of directors, or similar governing body, of such Entity appointed as of the Effective Date, the members of which shall be identified in the Plan Supplement.

"*New By-Laws*" means, with respect to each Reorganized Debtor that is a corporation, the new by-laws of such Entity, the form of which shall be included in the Plan Supplement and shall be satisfactory to the Purchasers.

"*New Certificate of Incorporation*" means, with respect to each Reorganized Debtor, the form of the initial certificate of incorporation (or other applicable formation document) of each such Entity, the form of which shall be included in the Plan Supplement and shall be satisfactory to the Purchasers.

"*New Common Stock*" means the newly issued common stock of Reorganized Parent, par value $0.01 per share, authorized pursuant to the Plan and issued pursuant to the Plan and the Subscription Agreement. The rights, preferences and privileges of the New Common Stock shall be set forth in Parent's New Certificate of Incorporation and, to the extent applicable, the New Stockholders Agreement.

"*New Employment Agreements*" means employment agreements that the Debtors may enter into with certain individuals in the Debtors' senior management satisfactory to the Required Purchasers, the form of which may be included in the Plan Supplement and shall be satisfactory to the Required Purchasers.

"*New Governance Documents*" means the New Certificates of Incorporation, the New Stockholders Agreement and the New By-Laws, substantially final forms of each of which shall be filed with the Bankruptcy Court in the Plan Supplement.

"*New Stockholders Agreement*" means that certain agreement to be executed on or before the Effective Date providing for, among other things, certain rights and obligations of holders of the New Common Stock, the form of which will be filed as part of the Plan Supplement and shall be acceptable to the Purchasers.

"*Notice and Claims Agent*" means Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, New York, New York 10017, which has been appointed as the Debtors' notice, claims and balloting agent, or such other Entity as the Bankruptcy Court may appoint as the Debtors notice, claims and balloting agent.

*"Old Equity Interests"* mean any of the authorized, issued and outstanding Interests in Parent as of the Petition Date that is not (i) a Class 8 Other Subordinated Claims and Interests or (ii) a Class 9 Unexercised Option.

*"Old Intercompany Interests"* mean any Interests in a Debtor held by another Debtor.

*"Ordinary Course Claim"* means an Administrative Claim incurred by a Debtor in the ordinary course of business based on either (i) post-petition accounts payable; (ii) post-petition employee-related expenses and claims; or (iii) post-petition contracts (including capital leases), but specifically excluding Professional Fee Claims.

*"Ordinary Course Professional Order"* means the *Order Pursuant to Sections 105(a), 327, 328 and 330 of the Bankruptcy Code Authorizing the Debtors to Retain, Employ and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business* [Docket No. 111].

*"Other Priority Claim"* means any Claim accorded priority in right of payment under § 507(a), other than an Administrative Claim, a DIP Claim or a Priority Tax Claim.

*"Other Subordinated Claim and Interest"* means any Claim or Interest, including any Old Equity Interest, that has been subordinated in priority and right to the payment of Old Equity Interests.

*"PACA"* means Protective Apparel Corporation of America, a New York corporation.

*"Parent"* means Point Blank Solutions, Inc., a Delaware corporation.

*"PB Funding"* means PB Funding, LLC, a Delaware limited liability company.

*"PBSS"* means PBSS, LLC, a Delaware limited liability company.

*"Person"* means a person, as defined in § 101(41).

*"Petition Date"* means April 14, 2010.

*"Plan"* means this *Amended Joint Chapter 11 Plan of Reorganization* and all exhibits hereto, including the Plan Supplement, which is incorporated herein by reference, as the same may be amended, modified or supplemented from time to time, in each case, in form and substance acceptable to the Plan Proponents.

*"Plan Proponents"* means the Debtors, the Creditors' Committee, Privet, Privet Fund Management, Prescott and Lonestar.

*"Plan Supplement"* means the compilation of documents and forms of documents, schedules and exhibits to the Plan, in each case in form and substance acceptable to the Required Purchasers unless otherwise stated herein, to be filed by the Plan Proponents on or prior to the Plan Supplement Filing Date and composed, among other things, of the following: (i) the New Governance Documents, (ii) the identity of the known members of the New Boards, the Recovery Trustee and the initial members of the Recovery Trust Committee and the nature and compensation for any such director, Recovery Trustee or member of the Recovery Trust Committee who is an "insider" under the Bankruptcy Code; (iii) the Schedule of Rejected Contracts; (iv) the Recovery Trust Agreement; (v) any New Employment Agreements; (vi) a schedule of the Insurance Policies; (vii) a schedule of Intercompany Claims; and (viii) all exhibits, attachments, supplements, annexes, schedules and ancillary documents related to each of the foregoing.

*"Plan Supplement Filing Date"* means the date on which the Plan Supplement shall be filed with the Bankruptcy Court, which date shall be at least ten days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice; *provided, however,* that the Schedule of Rejected Contracts, the identity of the initial members of the New Boards, the Recovery Trustee and the members of the Recovery Trust Committee and the nature and compensation for any such director, Recovery Trustee or member of the Recovery Trust Committee who is an "insider" under the Bankruptcy Code known at the time shall not be

9

required to be disclosed and filed with the Bankruptcy Court until ten days prior to the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court without further notice.

"*Plan Support Agreement*" means that certain Plan Support Agreement, dated as of December 10, 2010, by and between the Debtors, the Creditors' Committee, the Equity Committee, Lonestar, Privet, Privet Fund Management LLC and Prescott, as amended, supplemented or modified from time to time.

"*Point Blank*" means Point Blank Body Armor, Inc., a Delaware corporation.

"*Prescott*" means Prescott Group Capital Management, LLC, an Oklahoma limited liability company.

"*Prime Rate*" means the greater of (a) 3.50% per annum or (b) the variable annual rate of interest equal to the "prime rate" as published from time to time in the Wall Street Journal or any other financial news service chosen by the Required Lenders from time to time.

"*Priority Tax Claim*" means any Claim of a governmental unit, as defined in § 101(27), of the kind specified in § 507(a)(8).

"*Privet*" means Privet Opportunity Fund I, LLC, a Delaware limited liability company.

"*Privet Fund Management*" means Privet Fund Management, LLC, a Delaware limited liability company.

"*Professional*" means an Entity (i) retained pursuant to a Final Order in accordance with §§ 327, 363 or 1103 and to be compensated for services rendered before or on the Effective Date, pursuant to §§ 328, 329, 330, 331 and 363, or (ii) awarded compensation and reimbursement by the Bankruptcy Court pursuant to § 503(b)(4).

"*Professional Fee Claim*" means any Claim asserted by a Professional or other Entity for compensation for legal, financial advisory, accounting and other services and reimbursement of expenses Allowed pursuant to §§ 328, 330(a), 331, 363, 503(b) or 1103 or otherwise for the period commencing on the Petition Date and through the Effective Date.

"*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

"*Purchaser*" or "*Purchasers*" means PB Funding, Prescott and Privet, each in its capacity as a Purchaser (as defined in the Subscription Agreement).

"*Purchaser Loans*" has the meaning assigned to it in Section 6.3(a).

"*Purchased Shares*" means the shares of New Common Stock to be issued to Privet, Prescott and Lonestar, in each case either directly or through one or more of their respective Affiliates, pursuant to Section 6.3 and the Subscription Agreement, which shares shall constitute 100% of the outstanding common stock of Reorganized Parent on the Effective Date.

"*Ratable Proportion*" means, with reference to any Distribution on account of a Claim against (or Interest in) a given Class, a Distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Claim (or Interest) bears to the aggregate amount of all Claims (or Interests) in the identical Class that have not been Disallowed against each Debtor; *provided, however,* that pursuant to the Inter-Debtor Compromise Intercompany Claims are expressly excluded from the calculation of Ratable Proportion for Class 4.

"*Recovery Trust*" means that certain "Recovery Trust" created pursuant to the Recovery Trust Agreement for the purposes set forth in the Plan and the Recovery Trust Agreement, in form and substance acceptable to the Plan Proponents.

"*Recovery Trust Agreement*" means that certain trust agreement, dated as of the Effective Date (as amended from time to time) by and between the Recovery Trustee and Parent, in its capacity as both Parent and Reorganized

DOCS_DE:166862.1

Parent, for the benefit of the Beneficiaries (as defined in the Recovery Trust Agreement) and for the benefit of Reorganized Parent.

"*Recovery Trust Committee*" has the meaning assigned to it in Section 8.6 and as more fully defined in the Recovery Trust Agreement.

"*Recovery Trust Reserve*" means the sum of $1,000,000 to be funded into the Recovery Trust pursuant to Section 8.2 and the Recovery Trust Agreement.

"*Recovery Trustee*" means the trustee of the Recovery Trust, who shall be chosen by majority vote of the members of the Recovery Trust Committee, excluding the Recovery Trustee, in accordance with the terms of the Recovery Trust Agreement. On the Effective Date, the initial Recovery Trustee shall be [_____].

"*Rejection Claim*" means a Claim arising from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code, excluding any Claim arising from the rejection of the Settlement Agreement, which shall be a Class 6 Class Action Claim.

"*Releasing Parties*" means all Entities who have held, hold or may hold Claims or Interests that have been or are released pursuant to Sections 11.2 or 11.3, discharged pursuant to Section 11.5 or subject to exculpation pursuant to Section 11.4.

"*Released Party*" means each of (in each case solely in their respective capacities) (i) the directors and officers of the Debtors who are directors or officers of the Debtors immediately prior to the Effective Date; (ii) the DIP Lenders; (iii) the Purchasers and the Party Affiliates (as defined in the Subscription Agreement); (iv) the Creditors' Committee and the current and former members thereof (in such capacity); (v) the Equity Committee and the current and former members thereof (in such capacity); (vi) the Board Observer and the Debtors' agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners and representatives; and (vii) with respect to each of the foregoing Entities in clauses (i) through (v), such Entities' subsidiaries, affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners and representatives, in each case, only in their capacity as such.

"*Reorganized Debtor*" or "*Reorganized Debtors*" means Reorganized Parent and Reorganized Subsidiaries.

"*Reorganized Parent*" means Parent, or any successor thereto by merger, consolidation or otherwise, on and after the Effective Date.

"*Reorganized Subsidiary*" or "*Reorganized Subsidiaries*" means Point Blank, PACA and PBSS, or any successor thereto by merger, consolidation or otherwise, on and after the Effective Date.

"*Required Purchasers*" means those Purchasers that have committed to provide, subject to the terms of the Subscription Agreement, at least 66 $^2/_3$% of the Commitments (as defined in the Subscription Agreement) in the aggregate.

"Replacement EC Professional" means any Professional retained or employed by the Equity Committee other than [_____]. For the avoidance of doubt, Baker & McKenzie LLP is a Replacement EC Professional.

"*Sarbanes-Oxley*" means the Sarbanes-Oxley Act of 2002, as amended from time to time and applicable to the Debtors.

"*Schedule of Proposed Cure Claims*" means the list (as may be amended) of Executory Contracts and Unexpired Leases that will be assumed by the Debtors and proposed Cure Claims, if any, associated with the assumption of such contracts and leases pursuant to § 365 and the provisions of Article 7. The inclusion or exclusion of any Executory Contract or Unexpired Lease on the Schedule of Proposed Cure Claims shall be determined by the Debtors, with the consent of the Required Purchasers.

DOCS_DE:166862.1

"*Schedule of Rejected Contracts*" means the list (as may be amended) of Executory Contracts and Unexpired Leases that will be rejected by the Debtors pursuant to § 365 and the provisions of Article 7. The inclusion or exclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Contracts shall be determined by the Debtors, with the consent of the Required Purchasers.

"*Schedules*" means, collectively, the *Schedules of Assets and Liabilities* and *Statements of Financial Affairs* filed by the Debtors pursuant to § 521 and in substantial accordance with the Official Bankruptcy Forms, as may be amended from time to time before entry of a final decree.

"*SEC*" means the Securities and Exchange Commission.

"*Second Plan Support Agreement*" means that certain Second Plan Support Agreement, dated as of _____, 2011, by and between the Debtors, the Creditors' Committee, Lonestar, Privet, Privet Fund Management LLC and Prescott, as amended, supplemented or modified from time to time.

"*Secured*" means, when referring to a Claim, (i) secured by a Lien on property in which the Estate of the Debtor against which the Claim is asserted has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order and not subject to avoidance under the Bankruptcy Code or other applicable non-bankruptcy law, to the extent of the value of the Creditor's interest in such Estate's interest in such property as determined pursuant to § 506(a); (ii) subject to setoff pursuant to § 553 to the extent of the value of the property subject to setoff and solely to the extent such right of setoff is exercised prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court; or (iii) otherwise Allowed by Final Order of the Court (which order may be the Confirmation Order) as a Secured Claim.

"*Securities Act*" means the U.S. Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"*SOX 304*" means Section 304 of Sarbanes-Oxley.

"*Subordinated Unsecured Claim*" means a Claim that has been subordinated in priority and right of payment to General Unsecured Claims, but is senior in right of payment to Class Action Claims and Old Equity Interests.

"*Subscription Approval Order*" means that order entered by the Bankruptcy Court on [_____], 2011, authorizing and approving, among other things, (i) the Debtors' entry into and performance under the Subscription Agreement, (ii) payment of the Subscription Expenses, if any, and (iii) Subscription Indemnification Obligations.

"*Subscription Agreement*" means that certain Subscription Agreement, dated as of [_____], 2011, between Parent and the Purchasers, as the same may be amended, modified or supplemented from time to time.

"*Subscription Amount*" has the meaning assigned to it in Section 6.3(a).

"*Subscription Expenses*" means the expenses of the Purchasers to be reimbursed under the terms of the Subscription Agreement.

"*Subscription Indemnification Obligations*" means the indemnification obligations described in Section 12 of the Subscription Agreement.

"*Subscription Price*" means $[5.00] per share of New Common Stock.

"*Trust Litigation Expenses*" has the meaning assigned to it in Section 8.3(c).

"*Trust Administration Expenses*" has the meaning assigned to it in Section 8.3(c).

DOCS_DE:166862.1