IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| POINT BLANK SOLUTIONS, INC., et al.,[1] | ) | Case No. 10-11255 (PJW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

Objection Deadline: April 18, 2011 at 12:00 p.m. noon (prevailing Eastern Time)
Hearing Date: April 21, 2011 at 9:30 a.m. (prevailing Eastern Time)

## MOTION FOR ORDER AUTHORIZING DEBTORS TO (I) ENTER INTO SUBSCRIPTION AGREEMENT AND (II) PAY RELATED EXPENSES AND INDEMNIFY PURCHASERS

Point Blank Solutions, Inc. ("Parent"), Point Blank Body Armor, Inc., Protective Apparel Corporation of America and PBSS, LLC (collectively with Parent, the "Debtors"),[2] debtors and debtors in possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), seek entry of an order, substantially in the form filed herewith (the "Order"), (i) approving Parent's entry into a Subscription Agreement (the "Subscription Agreement"),[3] substantially in the form set forth in Exhibit A attached hereto,[4] to be executed by and among Parent, Prescott Group Capital Management LLC, an Oklahoma limited liability company ("Prescott"), Privet Opportunity Fund I LLC, a Delaware limited liability company ("Privet"), and Lonestar Capital Management, LLC, as manager to PB Funding, LLC, a Delaware limited liability company ("PB Funding" and, together with Prescott and Privet, each a "Purchaser" and, collectively, the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number and its address, are: Point Blank Solutions, Inc. (9361), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor, Inc. (4044), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Protective Apparel Corporation of America (9051), 179 Mine Lane, Jacksboro, TN 37757; and PBSS, LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan, unless otherwise noted.

[3] The description of the Subscription Agreement presented herein is a summary of the principal terms of the Subscription Agreement, and is qualified in all respect—and the parties' obligations thereunder are subject to—to the actual terms and conditions of the Subscription Agreement.

[4] The parties to the Subscription Agreement are still finalizing certain terms of the Subscription Agreement, and the Debtors expect to file a revised Subscription Agreement prior to the hearing on this motion.

"Purchasers"), in connection with the *Amended Joint Chapter 11 Plan of Reorganization* dated April 8, 2011 (as may be amended, modified or supplemented from time to time, the "Plan") and (ii) authorizing and approving the Debtors' (a) reimbursement of reasonable fees, expenses, disbursements and charges of the Purchasers incurred in connection with the Subscription Agreement and (b) indemnification of the Purchasers in accordance with the indemnification provisions set forth in the Subscription Agreement. In support of this motion,[5] the Debtors respectfully state as follows:

## I.
## PRELIMINARY STATEMENT

1. Through the Chapter 11 Cases, the Debtors have worked diligently toward ensuring an expeditious exit from chapter 11 in order to maximize the value of their estates for the benefit of their stakeholders. The Debtors have made substantial progress toward a successful reorganization. Specifically, the Court granted final approval of a $25,000,000 replacement debtor in possession financing facility (the "DIP Financing"), which enabled the Debtors to carry on their business in the normal course and shore up certain liquidity issues. On January 11, 2011, the Debtors, the statutory committees and the three Purchasers jointly proposed a chapter 11 plan of reorganization (the "Original Plan") for the Debtors that proposed to finance the Debtors' exit from chapter 11 through an equity rights offering backstopped by the three Purchasers. Contemporaneously, the Debtors filed a motion for approval of a proposed Backstop and Subscription Purchase Agreement (the "Backstop Agreement"), pursuant to which the Purchasers agreed to backstop the proposed rights offering—and Privet and Prescott agreed to directly subscribe for a portion of the new equity—in exchange for the payment of a subscription fee, reimbursement of incurred expenses and certain indemnification protections.

---

[5] The Debtors reserve the right to amend or supplement this motion, as necessary, prior to the hearing date.

2. Following certain informal objections and concerns raised by the Securities and Exchange Commission, the Debtors and the other Plan Sponsors indicated that the Original Plan would be amended, and determined not to proceed with the backstopped rights offering.

3. Contemporaneously with the filing of this Motion, the Debtors, the Creditors Committee and the Purchasers have now proposed the Plan and accompanying *Disclosure Statement Describing Amended Joint Chapter 11 Plan of Reorganization* (as may be amended, modified or supplemented from time to time, the "Disclosure Statement"), which set forth the Debtors' blueprint for a successful reorganization. A hearing to consider the adequacy of the Disclosure Statement is scheduled for April 21, 2011 at 9:30 a.m. (prevailing Eastern time).

4. To fund the Debtors' Plan obligations and anticipated post-Effective Date working capital needs under the Plan, each Purchaser has agreed to subscribe for, and purchase from Reorganized Parent, the Purchased Shares at the Subscription Price on the terms set forth in the Plan and the Subscription Agreement. The aggregate amount of the Purchased Shares (the "Subscription Amount") will be $15,000,000; *provided, however*, the Purchasers may elect in their sole discretion to increase the Subscription Amount up to $25,000,000, which discretion shall be exercised in good faith. Subject to the terms of the Subscription Agreement, the Purchased Shares shall be allocated 40.00% to Lonestar and 30.00% to each of Privet and Prescott. Pursuant to the Subscription Agreement, the Purchasers may in good faith elect to fund a portion of the Commitment as loans to the Reorganized Parent (the "Purchaser Loans"); provided that all Purchasers provide such Purchaser Loans on the same terms and on a pro rata basis based on the allocation of Direct Subscription set forth above.

5. The Subscription Agreement is an integral component of the Plan. Without the proceeds assured by the Purchasers' commitments under the Subscription Agreement, it is

unlikely that the Debtors would be able to raise an adequate amount of capital or have a viable strategy for exiting from chapter 11—an untenable result for the Debtors that, by and large, are still dependent upon infusions of capital to fund their operations.

6. The terms of the Subscription Agreement are fair and reasonable and generally consistent with those terms commonly seen in the marketplace. When viewed in light of the specific facts and circumstances of the Chapter 11 Cases, the commitments in the Subscription Agreement represent a remarkable result. Moreover, as has been set forth at length in court hearings to date, the selection of the various mechanisms and parties to provide the Debtors' overall chapter 11 financing is the result of a diligent process conducted by the Debtors in consultation with the Creditors Committee and their retained professionals.[6]

7. In short, the Debtors' decision to enter into the Subscription Agreement is a prudent exercise of their business judgment in connection with their efforts to maximize value for all of their stakeholders, especially in light of the direction that the Chapter 11 Cases had been taking. The Debtors need liquidity to emerge from chapter 11, and submit that the direct subscription on the terms provided in the Plan and the Subscription Agreement provides the Debtors' best vehicle to obtain such liquidity. The Subscription Agreement reflects a fully and fairly negotiated agreement that provides crucial support to the Debtors' efforts to successfully emerge from chapter 11. Accordingly, the Debtors respectfully request that the Court enter an order approving the Subscription Agreement, including the other obligations payable thereunder, and authorizing the Debtors to enter into the Subscription Agreement and perform their obligations thereunder.

---

[6] Although the Equity Committee and its retained professionals participated in earlier negotiations regarding the plan and the Subscription Agreement, upon information and belief the Equity Committee does not now support the Plan or the relief requested in this Motion.

## II.
## JURISDICTION AND VENUE

8. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

9. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10. The bases for the relief requested herein are §§ 105(a), 363(b), 503(b) and 507(a) of title 11 of the United States Code (the "Bankruptcy Code")[7] and Rules 2002, 6004(h) and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## III.
## BACKGROUND

A. **The Chapter 11 Cases**

11. On April 14, 2010 (the "Petition Date"), the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to §§ 1107(a) and 1108. No examiner or trustee has been appointed in the Chapter 11 Cases. On April 26, 2010, the Office of the United States Trustee formed the Official Committee of Unsecured Creditors (the "Creditors' Committee") and appointed five initial members thereto. On July 27, 2010, the Office of the United States Trustee appointed an Official Committee of Equity Security Holders (the "Equity Committee") and appointed seven initial members thereto.

12. On May 14, 2010, the Debtors filed their schedules of assets and liabilities and, on October 12, 2010, the Debtors filed certain amendments thereto (as amended, the "Schedules").

---

[7] Unless otherwise noted, section (§) references used herein are to the Bankruptcy Code.

B.  **The Subscription Agreement**

13. A key component of the Plan is the Purchasers' proposed commitments to directly subscribe for the New Common Stock of Reorganized Parent to be issued as part of the proposed Plan.

14. The Subscription Agreement provides that each of Lonestar, Prescott and Privet will subscribe for and purchase, in accordance with the allocation set forth in <u>Schedule I</u> to the Subscription Agreement, an aggregate of $15,000,000 of New Common Stock (the "<u>Subscription Shares</u>"), which may be increased up to maximum of $25,000,000, subject to the Purchasers' right to convert some portion of their investment to Purchaser Loans. The Purchasers' obligations in connection with the foregoing direct subscription are referred to in the Subscription Agreement as the "<u>Commitments</u>."

15. In consideration of their agreement to provide the Backstop Commitments, the Debtors will pay the reasonable out-of-pocket fees, costs, and expenses incurred in connection with the Subscription Agreement by each of the Purchasers, including, if not paid previously, reasonable fees and expenses of one law firm (and, if applicable, local counsel) acting on behalf of each Purchaser (collectively, the "<u>Expenses</u>"). Pursuant to the application terms of the Plan and the Subscription Agreement, each Purchaser may elect to offset its payment obligations under the Subscription Agreement for the purchase of Purchased Shares against (i) any outstanding Expenses owed to such Purchaser and (ii) any outstanding amount of the DIP Claims owed to such Purchaser or its Affiliate.

16. As set forth more fully in Section 10 of the Subscription Agreement, the Debtors have also agreed to indemnify (the "<u>Indemnification</u>") each Purchaser and the other Indemnified Parties (as defined in the Subscription Agreement) from and against any losses, damages, liabilities, claims, costs and expenses arising out of or relating to (i) any breach or inaccuracy of

the Surviving Representations, (ii) any breach or violation by the Debtors of their covenants and agreements set forth in this Agreement, and (iii) any such action, suit, or proceeding by a third-party that is not an Affiliate of any party hereto arising out of or related to this Agreement or the transactions contemplated hereby; provided that the Indemnification shall not extend to losses, damages, liabilities, claims, costs, and expenses, including interest, court costs, attorneys' fees or expenses relating thereto, to the extent that they are finally judicially determined to have resulted from (x) the fraud or willful misconduct of such Indemnified Party, or (y) with respect to clause (iii) in the immediately preceding sentence, the gross negligence of such Indemnified Party.

## IV.
## RELIEF REQUESTED

17. By this motion, the Debtors respectfully request that the Court (i) authorize Parent to enter into and perform its obligations under the Subscription Agreement, (ii) authorize the payment of the Expenses and (iii) authorize the Indemnification of the Purchasers, all as provided for more fully in the Subscription Agreement.

## V.
## BASIS FOR RELIEF REQUESTED

A. **Sound Business Justification Exists for Entry into the Subscription Agreement**

18. Section 363(b)(1) provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A court may authorize such a use of the property of an estate if a debtor demonstrates a sound business judgment for it and when the use of the property is proposed in good faith. *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *The Official Comm. of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992); *see also Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991).

19. The debtor has the burden to establish that a valid business purpose exists for the use of estate property in a manner that is not in the ordinary course of business. *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999). *See also Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983). Once the debtor articulates a valid business justification, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief the action was in the best interest of the company. *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc).*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *see also In re S.N.A. Nut Co.*, 186 B.R. 98 (Bankr. N.D. Ill. 1995). The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. *Integrated Res., Inc.*, 147 BR. At 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see Committee of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions"). Thus, the Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification. *See Schipper*, 933 F.2d at 515; *Lionel*, 722 F.2d at 1071.

20. Additionally, § 105(a) provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Pursuant to § 105(a), orders are appropriate where they are essential to the debtor's reorganization efforts and do not pose a burden on the debtor's creditors. *See U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n (In re U.S. Lines, Inc.)*, 197 F.3d 631, 640 (2d Cir. 1999); *Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d

1132, 1136 (2d Cir. 1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.").

21. The Debtors submit that their entry into the Subscription Agreement for purposes of effectuating the direct issuance of New Common Stock to the Purchasers is a sound exercise of business judgment. In consultation with their advisors and other interested parties, the Debtors have concluded that the Subscription will provide the necessary financing for the Debtors to exit chapter 11 with sufficient liquidity. The Debtors are a capital-intensive enterprise that still requires funding in order to address their liquidity needs. The funds provided by the direct subscription are integral to the Debtors' ability to successfully emerge from chapter 11 and is one of the key elements to the viability of the Plan

22. In return, and with regard to economic terms, the Purchasers require reimbursement of the Expenses and the incurrence of the Indemnification. The Debtors believe that the terms and conditions set forth in the Subscription Agreement are fair and reasonable, are well within the range of "market" protections and other terms typically received by parties in connection with direct subscriptions of similar size and complexity and reflect an exercise of their sound business judgment. Moreover, the terms of the Subscription Agreement are the result of extensive negotiations among the Debtors, both statutory committees and the Purchasers, as well as their respective counsel and financial advisors. The Debtors also believe that, in light of all of the facts and circumstances of the Chapter 11 Cases, not only are these terms (and the other terms provided for in the Subscription Agreement) fair, reasonable and appropriate and negotiated at arm's length, but they are integral to assuring that the Debtors' estates can maximize their value for all of their stakeholders.

23. In light of the foregoing, the Debtors submit that the relief requested herein represents a prudent exercise of their business judgment, as it will aid in providing the Debtors with the financing necessary for the implementation of the Plan and an effective and successful emergence from chapter 11. It should also provide the Debtors with additional capital that should leave the Debtors with a healthy balance sheet upon exit and allow the Debtors to continue their current operations and undertake future improvements and developments in their operations and facilities.

B.  **The Expenses and Indemnification Are Reasonable**

24. The Debtors submit that both the reimbursement of Expenses and the Indemnification are reasonable, appropriate and customary in financing transactions such as this, both in and out of chapter 11, and should be approved. The Expenses, specifically, will compensate the Purchasers for their actual costs incurred in connection with their obligations under the Subscription Agreement and participating in the negotiation of Plan. The Expenses and the Indemnification are also the result of arm's length negotiations between the Debtors, the two statutory committees and the Purchasers, and the Debtors believe that the terms thereof are fair and reasonable in light of the undertakings that the Purchasers have had to date, and will continue to have, in developing and pursuing confirmation of the Plan.

25. Notably, the Purchasers are not being paid any fee in connection with their Commitments under the Subscription Agreement.

26. Courts in this and other districts have approved similar fees and premiums as a reasonable use of assets in other recent chapter 11 cases. *See In re Aventine Renewable Energy Holdings, Inc.*, No. 09-11214 (KG) (Bankr. D. Del. Jan. 13, 2010) (approving a breakup fee, expense reimbursement and indemnification obligations); *In re Accuride Corp.*, No. 09-13449 (BLS) (Bankr. D. Del. Nov. 2, 2009) (approving (i) a $5,600,000 Subscription Fee plus 4% of

new equity issued under a plan related to a $140,000,000 notes offering, (ii) a break-up fee of $10,000,000 and (iii) expense reimbursement); *In re Dayton Superior Corp.*, No. 09-11351 (BLS) (Bankr. D. Del. Aug. 24, 2009) (alternate transaction fee of 3% of the rights offering amount); *In re Landsource Cmtys. Dev. LLC*, No. 08-11111 (KJC) (Bankr. D. Del. June 2, 2009) (approving premium equal to 5% of a $140,000,000 offering, which was payable in cash in the event that an "Alternative Transaction" occurred, and approving expense reimbursement); *In re Key Plastics, Inc.*, No. 08-13324 (MFW) (Bankr. D. Del. Dec. 17, 2008) (approving an alternate transaction fee of 7.5% of the rights offering amount); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Aug. 17, 2007) (approving a Subscription Fee of 4% of the rights offering amount and an alternative transaction fee of 3% of the rights offering amount).

C. **The Reimbursement of the Expenses and the Incurrence of the Indemnification Should Be Afforded Administrative Expense Status**

27. Finally, in accordance with §§ 503(b)(1)(A) and 507(a)(2), the Expenses and Indemnification (if an indemnification event occurs) should be afforded administrative expense priority. The costs and expenses charged and incurred by the Purchasers for the benefit of the Debtors in connection with the direct subscription are entitled to the highest level of priority for their "actual, necessary costs and expenses of preserving the estate...." 11 U.S.C. § 503(b)(1). Under the prevailing test, for a claim to be entitled to administrative expense priority under § 503(b)(1), "the debt must arise from a transaction with the debtor in possession...[and] the consideration supporting the claimant's right to payment [must be] beneficial to the debtor in possession in the operation of the business." See, e.g., *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 532-33 (3d Cir. 1999) (quoting *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 950 (1st Cir. 1976)).

11

28. The Purchasers' efforts to date and their ongoing commitments under the Subscription Agreement have been, and will be, of direct benefit to the Debtors, their estates and the future success of the Chapter 11 Cases. The Purchasers have been integrally involved in the negotiation and formulation of the proposed Plan and its key terms. Under the terms of the Subscription Agreement, the Purchasers further propose to support a necessary infusion of equity financing that will facilitate the Debtors' emergence from chapter 11 under the terms of the Plan.

29. For all of the foregoing reasons, the Expenses and Indemnification associated with the proposed Subscription Agreement are actual and necessary costs of preserving the Debtors' estates, and should therefore be granted under § 503(b)(1)(a).

## VI.
## WAIVER OF THE STAY PROVIDED BY BANKRUPTCY RULE 6004

30. The Debtors further seek a waiver of any stay of the effectiveness of the Order. Pursuant to Bankruptcy Rule 6004(h), "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Based upon the facts and circumstances set forth herein, the Debtors submit that ample cause exists to justify a waiver of any stay imposed by Bankruptcy Rules 6004(h), 7062 or 9014 to the extent they apply. The Debtors must proceed expeditiously to ensure the direct subscription can be consummated simultaneously with confirmation of the proposed Plan. By approving this motion, this Court will be approving a motion integral to confirmation of the Plan.

31. The Debtors submit that the waiver of the stay under Bankruptcy Rule 6004 is appropriate here. The certainty of funding and, consequently, the viability of the Plan depend on approval of the Subscription Agreement and the related relief sought in this motion.

Accordingly, the Debtors submit that a waiver of the stay under Bankruptcy Rule 6004 is appropriate and necessary.

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter an order, substantially in the form filed herewith, (i) granting the relief requested herein and (ii) granting such other and further relief as may be appropriate.

Dated: April _8_, 2011

PACHULSKI STANG ZIEHL & JONES LLP

/s/ 

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
       dbertenthal@pszjlaw.com
       jfried@pszjlaw.com
       tcairns@pszjlaw.com

Counsel for the Debtors and Debtors in Possession