## Exhibit A

## Subscription Agreement

## SUBSCRIPTION AGREEMENT

THIS SUBSCRIPTION AGREEMENT (the "Agreement"), dated as of [__], 2011, is made and entered into by and among Point Blank Solutions, Inc., a Delaware corporation (as a debtor in possession and a reorganized debtor, as applicable, the "Company"), Prescott Group Capital Management LLC, an Oklahoma limited liability company ("Prescott"), Privet Fund Management LLC, a Delaware limited liability company ("Privet"), and Lonestar Capital Management, LLC ("Lonestar"), as manager to PB Funding, LLC, a Delaware limited liability company. Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings provided in the Plan.

### WITNESSETH:

WHEREAS, the Company and each of its wholly-owned subsidiaries, Point Blank Body Armor, Inc., Protective Apparel Corporation of America and PBSS, LLC, are debtors and debtors in possession (collectively, the "Debtors") in the chapter 11 cases currently pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 10-11255 (PJW) (jointly administered) (the "Chapter 11 Cases");

WHEREAS, on or about April __, 2011, the Debtors filed with the Bankruptcy Court (1) that certain *Amended Joint Chapter 11 Plan of Reorganization* (together with the exhibits and Plan Supplements annexed thereto or referred to therein, and as such may be modified or amended from time to time, the "Plan") and (2) a disclosure statement in support of the Plan (together with the exhibits and schedules annexed thereto or referred therein, as such may be modified or amended from time to time, the "Disclosure Statement");

WHEREAS, the Plan provides, among other things, that Prescott, Privet and Lonestar, in each case either directly or through one or more of its Affiliates, will, subject to the terms and the conditions set forth in the Plan, subscribe for and purchase from the Company simultaneously with the Effective Date, shares (the "Purchased Shares") of newly-issued common stock, par value $0.01 per share, of the Company (the "New Common Stock"), representing 100% of the outstanding common stock of the Company on the Effective Date, in an aggregate amount of $15,000,000 and (subject to certain consents and other conditions as set forth in the Plan) up to a maximum of $25,000,000, at a price per share equal to $5.00 (the "Subscription Price"), allocated as set forth on Schedule I attached hereto;

NOW, THEREFORE, for and in consideration of the premises, and other good and valuable consideration the receipt and sufficiency of all of which is hereby acknowledged, the parties hereto agree as follows:

1.      The Commitments.

(a)      Subject to the terms, conditions and limitations set forth herein and in the Plan, each of Prescott, Privet and Lonestar (together, the "Purchasers") agrees (severally and not jointly), or agrees (severally and not jointly) to cause one or more of its Affiliates, to purchase from the Company, and the Company agrees to sell to the Purchasers or their Affiliates, as the case may be, the Purchased Shares at the Subscription Price in accordance with the allocation set forth in Schedule I hereto. The

aggregate amount of the Purchased Shares will equal $15,000,000; provided, however, the Purchasers may elect in their sole discretion to increase the Subscription Amount up to $25,000,000, which discretion shall be exercised in good faith. The obligations of Prescott, Privet and Lonestar described in this Section 1 shall be referred to herein as the "Commitments." The Purchasers by unanimous consent may in good faith determine to fund a portion of the Commitments in the form of loans to the Company in lieu of a purchase of Purchased Shares, provided that all Purchasers make such loans on the same terms and conditions and on a pro rata basis based on the allocation set forth in Schedule I hereto (the "Purchaser Loans"), to be evidenced by loan documents acceptable to the Purchasers, including the issuance of notes or other evidence of indebtedness with respect thereto (the "Notes"). In such event the amount of Purchased Shares purchased hereunder by the Purchasers shall be reduced dollar-for-dollar by the aggregate principal amount of such Purchaser Loans.

2.    The Closing.

(a)    The delivery of and payment for the Purchased Shares (and, if applicable, the Notes) is referred to herein as the "Closing," which shall take place at the offices of Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, Wilmington, DE 19801 on the Effective Date.

(b)    The following shall occur contemporaneously at the Closing:

(i)    each Purchaser, in satisfaction of its Commitment, shall pay to the Company, at the Closing, the purchase price for the Purchased Shares (and, if applicable, the Notes) purchased by such Purchaser (or its Affiliates) pursuant to Section 1, by wire transfer in immediately available funds to such account of the Company as the Company shall have designated no later than two Business Day prior to the Closing by notice to the Purchasers; provided, however, that, upon written notice of any such Purchaser to the Company, such Purchaser may instead cause all or part of its payment obligations to be satisfied by offsetting against any outstanding amounts of the DIP Claims that the Company owes to such Purchaser (or its Affiliates) under the DIP Loan Agreement and the amount of the Expenses of such Purchaser, in each case, as of the Effective Date (together, the "Outstanding Company Obligations"); provided, further, that in the event the purchase price payable by such Purchaser is greater than the Outstanding Company Obligations (such amount, the "Difference"), such Purchaser shall pay to the Company, at the Closing, an amount equal to the Difference by wire transfer in immediately available funds to such account of the Company as the Company shall have designated, no later than two Business Day prior to the Closing, by notice to the Purchasers;

(ii)    the Purchased Shares to be purchased by each Purchaser, in the name of such Purchaser or its nominee as the Purchaser may specify prior to the Closing, shall be recorded in the register of the Company stockholders by the Company or by a transfer agent selected by the Board of Directors of the Company to maintain such register;

(iii)    the Company shall issue and deliver to each Purchaser or its Affiliates, as applicable, (A) share certificates evidencing the Purchased Shares issued to such Purchaser (or its Affiliate, if applicable) hereunder and (B) the Notes evidencing the Purchaser Loans of such Purchaser, if applicable;

2

(iv)     the Company shall pay the reasonable out-of-pocket fees, costs, and expenses incurred in connection with this Agreement by each of the Purchasers, including, if not paid previously, reasonable fees and expenses of one law firm (and, if applicable, local counsel) acting on behalf of each Purchaser (all of the fees, costs, and expenses set forth in this Section 2(b)(iv) collectively, the "Expenses"), provided that each Purchaser may give notice pursuant to Section 2(b)(i) to offset its payment obligations with respect to the Purchased Shares (and, if applicable, the Notes) by the amount of any Expenses owed to it by the Company;

(v)     each party to this Agreement and any Affiliate thereof acquiring shares of New Common Stock who will hold shares of New Common Stock immediately following the Closing, shall deliver to each other party a duly executed stockholders agreement in the form to be agreed by the parties hereto (the "Stockholders Agreement") based on the Stockholders' Agreement Term Sheet attached hereto as Exhibit A; and

(vi)     the Company shall deliver all certificates, instruments, and other documents required to satisfy the conditions set forth herein.

3.     Representations and Warranties.

(a)     Except as set forth in the corresponding section of the disclosure schedules delivered by the Company to each Purchaser in connection with the execution of this Agreement (the "Company Disclosure Schedules"), the Company represents and warrants the following to each of the Purchasers:

(i)     Organization and Qualification. Each Debtor is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and has all requisite corporate or other power and authority to own, lease, and operate its properties and assets and to conduct its business as now being conducted, subject to the restrictions that may result solely from its status as a debtor in possession under the Bankruptcy Code. Each Debtor is duly qualified to transact business in each jurisdiction in which the nature of property owned or leased by it or the conduct of its business requires it to be so qualified, except where the failure to be duly qualified to transact business, would not reasonably be expected to be material.

(ii)     Company's Authorized Capital Stock. On the Effective Date, the authorized capital stock of the Company will consist of 10,000,000 shares of New Common Stock and the outstanding capital stock of the Company will consist of up to 5,000,000 shares of New Common Stock (depending upon the number of the Purchased Shares to be purchased hereunder), and all such capital stock will be duly authorized, validly issued, fully paid, and nonassessable, and, except as set forth in the Stockholders Agreement or the New Charter, all such shares will be free and clear of all Liens and not subject to any preemptive rights, rights of first refusal, option, warrant, call, subscription, and similar rights that would not be cancelled and extinguished under the Plan on the Effective Date.

(iii)     Other Debtors' Equity Interests. All of the issued capital stock and membership interests, as the case may be, of the Debtors (except for the Company) shall be duly and validly authorized and issued, fully paid, nonassessable (but only with respect to issued capital stock), and directly owned by the Company free and clear of all Liens and not subject to any preemptive rights, rights

3

of first refusal, option, warrant, call, subscription, and similar rights that would not be cancelled and extinguished under the Plan on the Effective Date, except as shall be explicitly provided for under the Plan or the Confirmation Order (including any Liens granted under the Exit Facility).

(iv) <u>Power and Authority; Enforceability</u>. The Company and each other Debtor, as the case may be, has the requisite corporate or other power and authority to execute and deliver this Agreement, the Ancillary Documents to which such Debtor is a party or bound by, the Plan, the Disclosure Statement and, subject to the approval of the Bankruptcy Court, the definitive documents necessary or appropriate to consummate the transactions contemplated hereby and thereby, and, as applicable, to file such documents with the Bankruptcy Court and, subject to the approval of the Bankruptcy Court, consummate the transactions contemplated hereby and thereby. The formulation, preparation, and, as applicable, filing of this Agreement, the Ancillary Documents, the Plan, the Disclosure Statement and such definitive documents have been, or shall have been on the filing date thereof, (A) duly and validly authorized by all necessary corporate or other action on the part of the Debtors, as applicable, and (B) duly and validly executed and delivered by the Debtor, as applicable. Upon the entry by the Bankruptcy Court of the Subscription Approval Order, this Agreement shall constitute a valid and binding obligation of the Debtors, enforceable against them in accordance with its terms.

(v) <u>No Conflict</u>. Subject to entry of the Subscription Approval Order, (A) the execution and delivery of this Agreement, the Ancillary Documents, the Plan, the Disclosure Statement and each of the definitive documents necessary to effect the transactions contemplated hereby and thereby by the Debtors, do not and shall not (1) violate any provision of the articles of incorporation or by-laws or other organizational documents of the Debtors, as such documents may be amended pursuant to the Plan, this Agreement or the Ancillary Documents, or (2) conflict with, violate, constitute a breach of, or result in the creation of a Lien or any other encumbrance (except in connection with the Exit Facility) against the Debtors or their properties pursuant to, any material contract, agreement, or instrument by which the Debtors are bound, or any judgment, order, decree, law, statute, rule, regulation, or other judicial or governmental restriction to which the Debtors are subject; and (B) the performance of this Agreement, the Ancillary Documents, the Plan, the Disclosure Statement and each of the definitive documents necessary to effect the transactions contemplated hereby and thereby by the Debtors, as applicable, and the consummation by the Debtors of the transactions contemplated hereby and thereby in accordance with the terms hereof and thereof, shall not (1) violate any provision of the articles of incorporation or by-laws or other organizational documents of such Debtor, as such documents may be amended pursuant to the Plan, this Agreement or the Ancillary Documents, or (2) conflict with, violate, constitute a breach of, or result in the creation of a Lien or any other encumbrance (except in connection with the Exit Facility) against the Debtors or their properties pursuant to, any material contract, agreement, or instrument by which the Debtors shall be bound, or any judgment, order, decree, law, statute, rule, regulation, or other judicial or governmental restriction to which the Debtors shall be subject in each case as of, and following, the Effective Date.

(vi) <u>No Material Adverse Effect</u>. Since November 2, 2010, a Material Adverse Effect has not occurred with respect to any Debtor.

4

(vii)     Title to Property. Each Debtor owns and has good and marketable title to all of its material real and personal properties, which, on the Effective Date, shall be free and clear of all Liens, except as shall be explicitly provided in the Confirmation Order.

(viii)    Litigation. There is no pending litigation, proceeding, or governmental investigation (collectively, "Litigation") (a) to which any Debtor is a party or (b) to the knowledge of any Debtor, threatened against any Debtor or any properties or rights of any Debtor that would, individually or in the aggregate, reasonably be expected to be materially adverse to Debtors.

(ix)      No Violation or Default. No Debtor is in violation of any term of any judgment, writ, decree, injunction, or order entered by any court or governmental authority and outstanding against it or any of its properties or rights, subject to the restrictions that may result solely from its status as a debtor-in-possession under the Bankruptcy Code. No Debtor is in conflict with, or in default or violation of, any law or agreement applicable to it or by which any property or asset of such Debtor is bound or affected, except to the extent that the same would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(x)       Disclosure Statement. The Disclosure Statement, when approved by the Bankruptcy Court pursuant to the Solicitation Order, will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading. Notwithstanding the foregoing, the Company makes no representation and warranty with respect to any statements or omissions made in reliance on and in conformity with information that any Purchaser furnished to the Company in writing expressly for use in the Disclosure Statement or any amendment or supplement thereto.

(xi)      Securities Registration Exemption. Assuming the representations of each Purchaser set forth in Section 3(b)(v) and (vi) are true and correct, the issuance of the Subscription Shares to each of the Purchasers shall be exempt from registration pursuant to Regulation D as promulgated under the Securities Act of 1933, as amended (the "Securities Act").

(xii)     Takeover Statutes; Charter. No "fair price," "moratorium," "control share acquisition", "business combination" or other similar anti-takeover statute or regulation is applicable to the Company, the New Common Stock, the sale and issuance of the Purchased Shares (or if applicable, the Notes) or the other transactions contemplated by this Agreement and the Plan.

(xiii)    No Broker's Fees. No Debtor is a party to any contract, agreement or understanding with any person that would give rise to a valid claim against any Debtor or the Purchasers for a brokerage commission, finder's fee or like payment in connection with the transactions contemplated by this Agreement and the Plan. No professional employed or compensated by the Debtors (including any person or entity employed under Section 363 of the Bankruptcy Code) or by any statutory committee appointed in any of the Chapter 11 Cases shall be considered a "broker" for purposes of this Section 3(a)(xiii).

(xiv)     Arm's Length. Notwithstanding anything herein to the contrary, the Company acknowledges and agrees that (a) the transactions contemplated hereby are arm's length

commercial transactions between the Company, on the one hand, and the Purchasers, on the other, (b) in connection therewith and with the processes leading to such transactions, each Purchaser is acting solely as a principal and not the agent or fiduciary of the Company or any other Debtor, (c) no Purchaser has assumed an advisory or fiduciary responsibility in favor of any of the Debtors or their estates with respect to any legal, tax, investment, accounting, regulatory, or other matters involving the transactions contemplated herein or the processes leading thereto (irrespective of whether such Purchaser has advised or is currently advising any Debtor on other matters), and (d) the Company and the other Debtors have consulted their own legal and financial advisors to the extent they deemed appropriate. The Company agrees that it will not, and agrees that it will cause the other Debtors not to, claim that any Purchaser has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to any of the Debtors or their estates, in connection with the transactions contemplated herein or the processes leading thereto.

(b)     Each Purchaser, severally and not jointly, hereby represents and warrants the following to the Company:

(i)     <u>Organization; Power and Authority</u>. It is a limited liability company duly organized, validly existing, and in good standing under the laws of its state of organization and has all requisite power and authority to execute, deliver, and perform its obligations hereunder and to consummate the transactions contemplated hereby.

(ii)     <u>Execution and Delivery</u>. The execution, delivery, and performance by such Purchaser, of this Agreement, and the Stockholders Agreement, and the consummation by such Purchaser of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of such Purchaser.

(iii)     <u>Enforceability</u>. This Agreement has been duly executed and delivered by such Purchaser and constitutes the legal, valid, and binding obligation of such Purchaser, enforceable against such Purchaser in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or affecting the enforcement of creditors' rights in general and by general principles of equity.

(iv)     <u>No Conflict</u>. The execution, delivery, and performance of this Agreement and the consummation by such Purchaser of the transactions contemplated hereby do not and shall not (A) violate any provision of the limited liability company agreement or other organizational documents of such Purchaser or (B) conflict with, violate, constitute a breach of, or result in the creation of a Lien or any other encumbrance against, such Purchaser or its properties pursuant to any material contract, agreement, or instrument by which such Purchaser is bound or any judgment, order, decree, law, statute, rule, regulation, or other judicial or governmental restriction to which such Purchaser is subject.

(v)     <u>Accredited Investor</u>. It is an "accredited investor" within the meaning of Regulation D of the Securities Act, with such knowledge and experience in financial and business matters as are necessary in order to evaluate the merits and risks of an investment in the Purchased Shares.

(vi)     <u>Securities Laws Compliance</u>. The Purchased Shares to be received by such Purchaser hereunder will be acquired for such Purchaser's own account or on behalf of managed

6

accounts and not with a view to the resale or distribution of any part thereof in violation of the Securities Act, and such Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same in violation of the Securities Act. Notwithstanding anything in this Section 3(b)(vi) to the contrary (and without limiting any provision of the Stockholders Agreement), by making the representations herein, such Purchaser does not agree to hold the Purchased Shares for any minimum or other specific term and reserves the right to dispose of its Purchased Shares at any time in accordance with or pursuant to a registration statement or an exemption from the registration requirements under the Securities Act and any applicable state securities laws.

(vii)　　Funds. At the Closing, each Purchaser will have sufficient cash or Outstanding Company Obligations available to pay or set-off any amount it may owe the Company in accordance with Section 2(b)(i).

(viii)　　Independent Investigation; Retention of Tax Advisors. It has made its own inquiry and investigation into the Company and has undertaken such investigation and had access to such information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement. It has consulted its own tax advisors with regard to the transactions contemplated by this Agreement and the tax consequences thereof.

(ix)　　No Registration Under the Securities Act. It understands (i) that the Purchased Shares to be purchased by it pursuant to the terms of this Agreement have not been registered under the Securities Act or any state securities laws, (ii) that the Company shall not be required to effect any registration or qualification of the Purchased Shares under the Securities Act or any state securities laws (except as required by the Stockholders Agreement), (iii) that the Purchased Shares will be issued in reliance upon exemptions contained in the Securities Act or interpretations thereof and in the applicable state securities laws, in each case to the extent that Section 1145 of the Bankruptcy Code is not applicable, and (iv) that the Purchased Shares may not be offered for sale, sold or otherwise transferred, in each case to the extent Section 1145 of the Bankruptcy Code is not applicable, except pursuant to a registration statement under the Securities Act or in a transaction exempt from or not subject to registration under the Securities Act.

(x)　　No Proceedings. No litigation or proceeding against such Purchaser is pending before any court, arbitrator, or administrative or governmental body, nor, to each Purchaser's knowledge, is any such proceeding threatened against such Purchaser that would adversely affect such Purchaser's ability to enter into this Agreement or fully perform its obligations hereunder.

4.　　Certain Conditions.

(a)　　The obligations of each Purchaser to consummate the transactions contemplated herein shall be subject to the satisfaction (or waiver by such Purchaser) of each of the following conditions:

(i)　　(A) one or more orders approving the Disclosure Statement (collectively, the "Solicitation Order"), in each case in form and substance acceptable to the Purchasers, which approval shall not be unreasonably denied, withheld or delayed, shall have been entered by the Bankruptcy Court

no later than **April 25, 2011** and (B) the Subscription Approval Order shall, as of the Closing, be a Final Order and otherwise in effect;

(ii)     (A) an order (or orders, if more than one) approving the Plan and the Ancillary Documents (the "Confirmation Order"), in form and substance acceptable to the Purchasers, which approval shall not be unreasonably denied, withheld or delayed, shall have been entered by the Bankruptcy Court no later than **June 3, 2011** and (B) the Confirmation Order shall, as of the Closing, be a Final Order and otherwise in effect, and (C) none of the Debtors shall have made a public announcement, entered into an agreement, or filed any pleading, evidencing its intention to support or otherwise supports any transaction with respect to the reorganization or sale of any of the Debtors or otherwise shall have taken any action that is materially inconsistent with the transactions contemplated by the Plan or this Agreement;

(iii)     the Plan shall be consummated in all respects in accordance with its terms and with Section 8(a) of this Agreement, and all of the conditions precedent to the Confirmation and the occurrence of the Effective Date of the Plan (other than the consummation of the transactions contemplated by this Agreement) shall have been satisfied in all respects or waived, in each case in accordance with [Section 12.2 and Section 12.3] of the Plan, on or prior to **June 17, 2011** in a manner satisfactory to the Purchasers;

(iv)     the Plan and Disclosure Statement shall be in form and substance acceptable to the Purchasers, which approval shall not be unreasonably denied, withheld or delayed;

(v)     all conditions to the consummation of the Purchasers' subscription for the Purchased Shares or, if applicable, the purchase of the Notes, set forth in the Plan shall have been satisfied;

(vi)     no other Purchaser shall have notified the Company or any other Purchaser of its intention to terminate, or otherwise not perform, its obligations under this Agreement and each other Purchaser shall have paid in full the purchase price for the Purchased Shares (and if applicable, the Notes) purchased by it or its Affiliates (after taking into account any offset of Outstanding Company Obligations by each Purchaser if effected pursuant to Section 2(b)(1) hereof);

(vii)     each party hereto shall have executed and delivered to each other party hereto the Stockholders Agreement;

(viii)     on or prior to the Effective Date, the Company shall have filed with the office of the Delaware Secretary of State a complete and valid amended and restated certificate of incorporation in the form to be agreed by the parties hereto ("New Charter") and the New Charter shall be in full force and effect;

8

(ix)     on or prior to the Effective Date, the Company shall have duly adopted the amended and restated by-laws in the form to be agreed by the parties hereto ("New By-Laws," and together with the New Charter, the Stockholders Agreement and the New Employment Agreements, the "Ancillary Documents") and the New By-Laws shall be in full force and effect;

(x)     neither the DIP Loan Agreement nor the Second Plan Support Agreement shall have terminated or expired in accordance with its respective terms;

(xi)     (A) the representations and warranties of the Company contained in this Agreement that are qualified as to materiality, material adverse effect, Material Adverse Effect, or similar qualifiers, and the representation and warranty contained in Section 3(a)(vi) (No Material Adverse Effect), shall be true and correct in all respects on and as of the date hereof and as of the Effective Date with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all respects as of such specified date), and (B) the representations and warranties of the Company contained in this Agreement that are not so qualified shall be true and correct in all material respects on and as of the date hereof and as of the Effective Date with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all material respects as of such specified date), and (C) in all material respects, the Company shall have performed or complied with, or caused the other Debtors to have performed or complied with, all covenants required to be performed or complied with under this Agreement on or prior to the Effective Date, and the Company shall have delivered to each of the Purchasers a certificate of its Chief Executive Officer or Chief Financial Officer to the effect that each of the conditions specified in this Section 4(a)(xi) is satisfied in all respects; and

(xii)     no provision of any applicable law or regulation and no judgment, injunction, decree, or other legal restraint shall prohibit the consummation of the Plan or the transactions contemplated by this Agreement.

(b)     The obligations of the Company to consummate the transactions contemplated herein shall be subject to the satisfaction (or waiver by the Company) of each of the following conditions:

(i)     (x) the Confirmation Order shall have been entered by the Bankruptcy Court, in form and substance acceptable to the Company and the Purchasers, which approval shall not be unreasonably denied, withheld or delayed, and (y) all of the conditions precedent to the Confirmation and the occurrence of the Effective Date of the Plan (other than the consummation of the transactions contemplated by this Agreement) shall have been satisfied in all respects or waived, in each case in accordance with [Section 12.2 and Section 12.3] of the Plan, on or prior to **[June 10]**, 2011 in a manner satisfactory to the Company;

(ii)     (A) the representations and warranties of each of the Purchasers contained in this Agreement that are qualified as to materiality, material adverse effect, or similar qualifiers shall be true and correct in all respects, on and as of the date hereof and the Effective Date with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty

9

shall be true and correct as of such specified date), and (B) the representations and warranties of each of the Purchasers contained in this Agreement that are not so qualified shall be true and correct in all material respects on and as of the date hereof and the Effective Date with the same force and effect as though made on and as of such date (except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all material respects as of such specified date), and (C) in all material respects, each of the Purchasers shall have performed or complied with its covenants required to be performed or complied with under this Agreement on or prior to the Effective Date, and each of the Purchasers shall have delivered to the Company a certificate to the effect that each of the conditions specified in this Section 3(b)(ii) is satisfied in all respects; and

        (iii)     no provision of any applicable law or regulation and no judgment, injunction, decree, or other legal restraint shall prohibit the consummation of the Plan or the transactions contemplated by this Agreement.

        (iv)     No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued in each case by any federal or state government or applicable regulatory authority that, as of the Effective Date, prohibits the issuance or sale pursuant to this Agreement of the Purchased Shares (or if applicable, the Notes).

        (c)     The Purchasers may not rely as a basis for not consummating the transactions contemplated herein, on the failure of any condition set forth in Section 4(a) to be satisfied, if such failure was the direct result of a significant action taken by all (and not less than all) of the Purchasers in breach of the Purchasers' obligations hereunder, provided, however, in no event shall any action or inaction taken by the Purchasers as lenders in accordance with the DIP Loan Agreement be deemed to be a breach of the Purchasers' obligations hereunder. For the avoidance of doubt and notwithstanding the ability of any Purchaser who did not so breach its obligations hereunder to rely on the failure of any closing condition set forth in Section 4(a), nothing in this Section 4(c) shall prevent the Company from exercising any rights it may have with respect to a Purchaser that actually breached its obligations hereunder.

        (d)     Notwithstanding anything to the contrary contained herein, nothing contained in this Agreement shall limit or impair any right or remedy of a Purchaser as an owner of any loan or other debt incurred by Company or any of its Subsidiaries or impose any liability or obligation upon any Purchaser with respect to its ownership of such indebtedness.

    5.     <u>Satisfaction of the Commitment.</u>

        Each Purchaser may, in its sole discretion, satisfy its Commitment directly or indirectly through one or more of its Affiliates, separate accounts within its control, or investment funds under its or its Affiliates' management.

    6.     <u>Certain Covenants.</u>

        (a)     <u>Plan and Disclosure Statement.</u>  The Plan and the Disclosure Statement shall be in form and substance acceptable to the Company and the Purchasers, which approval shall not be unreasonably denied, withheld or delayed.  The Company will provide to the Purchasers and their counsel a copy of any amendments, modifications, or changes to the Plan, the Disclosure Statement or any

10

Ancillary Document, and in each case, the Company shall provide the Purchaser and their counsel a reasonable opportunity to review and comment on such documents; provided, that the Company shall not file or otherwise make any amendment, modification or change to the Plan, the Disclosure Statement or any Ancillary Document without obtaining the prior written consent of the Purchasers, which shall not be unreasonably denied, withheld or delayed.

(b)     Reasonable Best Efforts.  The Company shall use reasonable best efforts to cause the conditions set forth in Section 4 (Certain Conditions) to be satisfied and to consummate the transactions contemplated herein within the time periods specified in Section 4 or otherwise as promptly as practicable after the date hereof and to use reasonable best efforts to seek entry of the Confirmation Order.

(c)     Payment of Expenses.  The Company shall pay or cause to be paid in full all Expenses incurred by the Purchasers in accordance with Section 2(b)(iv) or, if this Agreement is terminated prior to the Effective Date, at the time of any such termination.

(d)     Notice of Changes.  The Company shall promptly deliver to each of the Purchasers written notice upon becoming aware of any matter, event, or development that would (i) render any representation or warranty made by it herein inaccurate or incomplete in any material respect or (ii) constitute or result in a material breach by it of, or a failure by it to comply with, any covenant, condition or agreement in the Plan or herein to be complied with or satisfied by it on or prior to the Effective Date.

(e)     Further Assurances.  The Company shall, and shall cause the other Debtors to, execute and deliver, or cause to be executed and delivered, such further instruments or documents or take such other action as may be reasonably necessary (or as reasonably requested by the Purchasers) to carry out the transactions contemplated by this Agreement.

7.      Limitation on Other Purchaser Commitments.

Notwithstanding anything to the contrary herein, no Purchaser shall have any liability for or obligation with respect to the Commitment (or any portion thereof) of any other Purchaser.  No Party Affiliate shall have any liability or obligation of any nature whatsoever in connection with or under this Agreement or the transactions contemplated hereby (except for any fraud or willful misconduct by such party), and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

8.      Certain Consent Rights.

Each Debtor hereby covenants that, without the prior written consent of the Purchasers, which shall not be unreasonably denied, withheld or delayed, it shall not, prior to the termination of this Agreement, enter into any agreement with respect to its securities, or amend any existing agreement with respect to such securities in any manner inconsistent with the rights of any of the Purchasers pursuant to this Agreement.

9.      Termination by Purchaser; Survival.

(a)     The Purchasers shall be entitled to terminate their obligations under this Agreement (i) by, and upon delivery of, written notice thereof to the Company in the event any Debtor (A) breaches this Agreement and fails to cure such breach within ten Business Days (or such shorter period of time if the Closing is scheduled to occur in less than ten Business Days) from the receipt of notice of such breach, (B) fails to satisfy any of the terms or conditions of this Agreement or the Plan (subject to the same cure rights as set forth in clause (i)(A) above), or the satisfaction of any such term or condition becomes impossible to satisfy, or (C) does not or cannot satisfy all of the conditions set forth in Section 6 (Certain Conditions) by **June 17, 2011**; or (ii) upon the termination or expiration of the Plan Support Agreement or the DIP Loan Agreement.

(b)     The Company agrees and acknowledges that the representations and warranties set forth in Section 5(a) (the "Surviving Representations") shall survive the Closing.

(c)     Upon any termination or expiration of this Agreement, the provisions of Section 6(c) (Payment of Expenses), Section 7 (Limitation on Other Purchaser Commitments), Section 9 (Termination by Purchaser; Survival), Section 10 (Indemnification; Several, Not Joint, Obligations), Section 11 (Notices), Section 12 (Successor and Assigns; Assignment), Section 13 (Entire Agreement), Section 14 (Interpretation and Construction), Section 15 (Amendments), Section 16 (Extension; Waivers), Section 18 (Governing Law; Jurisdiction) and Section 19 (Waiver of Jury Trial) shall survive any such termination or expiration, and the parties to this Agreement shall remain liable (subject to Section 10(b) (Several, Not Joint, Obligations)) for their respective breaches of this Agreement prior to its termination.

(d)     Nothing in this Agreement shall limit any right, power, or protection provided to the DIP Lenders under the DIP Loan Agreement, including any right to reimbursement of fees and expenses thereunder.

10.     Indemnification; Several, Not Joint, Obligations; Releases.

(a)     The Debtors, jointly and severally, (each, an "Indemnifying Party") shall indemnify, defend, and hold harmless each Purchaser and each such Purchaser's Affiliates and each of their respective officers, directors, members, managers, partners, stockholders, affiliates, employees, attorneys, advisors, agents, and other representatives and any Affiliate of the foregoing, and each of its respective successors and permitted assigns (each, an "Indemnified Party") from and against, and shall promptly reimburse each Indemnified Party for, any and all losses, damages, liabilities, claims, costs, and expenses, including, interest, court costs, and reasonable attorneys' fees and expenses relating to, arising out of, resulting from or in connection with (i) any breach or inaccuracy of the Surviving Representations, (ii) any breach or violation by the Debtors of their covenants and agreements set forth in this Agreement, and (iii) any such action, suit, or proceeding by a third-party that is not an Affiliate of any party hereto arising out of or related to this Agreement or the transactions contemplated hereby (collectively, "Indemnified Liabilities").  For the avoidance of doubt, nothing herein shall be deemed to obligate any Debtor to indemnify, defend or hold any Indemnified Party harmless of, from or against any losses, damages, liabilities, claims, costs, and expenses, including interest, court costs, attorneys' fees or expenses relating thereto, to the extent that they are finally judicially determined to have resulted from (x) the fraud or willful misconduct of such Indemnified Party, or (y) with respect to clause (iii) in the immediately preceding sentence, the gross negligence of such Indemnified Party.

12

(b)     Notwithstanding anything to the contrary herein, the agreements, representations, warranties and obligations of the Purchasers under this Agreement are, in all respects, several and not joint. Furthermore, the parties hereto understand and agree that, other than as expressly provided in this Agreement, no Purchaser holds or owes any duty of trust or confidence in any form from or to any other party hereto, and there are no commitments among or between them.  In this regard, the parties hereto understand and agree that nothing in this Agreement shall affect any the rights of any party hereto to trade in any debt or equity securities of the Debtors without the consent of the Debtors or any other party hereto, subject to applicable securities laws or any other agreement to which any party hereto is a party or bound by.  No party hereto shall have any responsibility for any such trading by such other entity by virtue of this Agreement.  No prior history, pattern or practice of sharing confidences among or between the parties hereto shall in any way affect or negate this understanding and agreement.

(c)     The Party Affiliates shall be releasees covered by, and benefitting from, the releases, exculpations and injunctions to be set forth in the Plan (as described in the Plan Support Agreement).

11.     <u>Notices</u>.

(a)     All notices, requests, and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally, by facsimile transmission, by nationally recognized overnight courier or mailed (first class postage prepaid) to the parties at the following addresses or facsimile numbers.

| If to any Purchaser: | To the address set forth beneath such Purchaser's signature to this Agreement |
|---|---|
| | -- and -- |
| If to the Company: | Point Blank Solutions, Inc. 2101 S.W. 2nd Street Pompano Beach, Florida 33069 Attn: President Facsimile:  [__] |
| With a copy (which shall not constitute notice) to: | Pachulski Stang Ziehl & Jones LLP 919 North Market Street, 17th Floor Wilmington, DE 19801 Attn: Laura Davis Jones Facsimile:  (302) 652-4400 |

(b)     All such notices, requests and other communications shall be deemed to have been received (i) in the case of personal delivery or delivery by facsimile, on the date of such delivery, (ii) in the case of dispatch by nationally recognized overnight courier, on the next Business Day following such dispatch and (iii) in the case of mailing, on the fifth Business Day after the posting thereof.

12.     <u>Successors and Assigns; Assignment</u>.

13

The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Any Purchaser may assign, delegate, or otherwise transfer this Agreement or any of its rights or obligations hereunder without the consent of any other party hereto, to any of its Affiliates or any entity or person over which such Purchaser or any of its Affiliates exercises investment authority, including with respect to voting and dispositive rights; provided, that any such assignment shall not relieve such Purchaser from liability resulting from a default by any assignee of its obligations hereunder. Neither the Company nor any of the other Debtors may assign, delegate, or otherwise transfer this Agreement or any of their rights or obligations hereunder without the consent of the Purchasers, which shall not be unreasonably denied, withheld or delayed, and any purported assignment in violation of this Section 12 shall be null and void *ab initio* without limiting any other remedies available to the other parties hereto. Nothing in this Agreement is intended to confer upon any person not a party hereto (other than Indemnified Parties) any right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement, including any right to confer third party beneficiary rights.

13.    Entire Agreement.

This Agreement and the Plan Support Agreement contain the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, written or oral, with respect to such subject matter. The parties hereto represent and warrant that there are no other agreements or understandings, written or oral, regarding any of the subject matter hereof other than as set forth herein. Furthermore, in the event of a conflict or inconsistency between this Agreement and the Plan Support Agreement regarding the interpretation of the terms of this Agreement, this Agreement, together with its Exhibits, Annexes and Schedules shall govern.

14.    Interpretation and Construction.

For purposes of this Agreement, (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, any reference in this Agreement made to an Article, Section, Exhibit, Annex or Schedule refers to an Article or Section of, or Exhibit, Annex or Schedule to, this Agreement; (e) unless otherwise stated, the words "herein," "hereof" and ''hereto'' refer to this Agreement in its entirety rather than to a particular portion of this Agreement; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any immaterial effectuating provisions may be interpreted by the Debtors and their respective successor and assigns in a manner that is consistent with the overall purpose and intent of this Agreement all without further Bankruptcy Court order.

15. <u>Amendments</u>.

This Agreement may not be amended or modified except by a written instrument signed by each Purchaser and the Company. Except as otherwise set forth in this Agreement, any reference in this Agreement to documents, conditions, or other items that require the satisfaction or consent of the Purchasers, the taking of any affirmative action by them (including <u>Section 9</u> (Termination by Purchaser; Survival) hereof) shall require the satisfaction, consent, or agreement to waive by all the Purchasers, which shall not be unreasonably denied, withheld or delayed.

16. <u>Extensions; Waivers</u>.

Any party may, for itself only, (a) extend the time for the performance of any of the obligations of any other party under this Agreement, (b) waive any inaccuracies in the representations and warranties of any other party contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the agreements or conditions for the benefit of such party contained herein. Any such extension or waiver will be valid only if set forth in a writing signed by the party to be bound thereby. No waiver by any party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence. Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

17. <u>Counterparts</u>.

This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute an original and all of which when taken together shall constitute one and the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

18. <u>Governing Law; Jurisdiction</u>.

This Agreement shall be governed by the laws of the State of New York without regard to its conflicts of laws principles that would require the application of the laws of any other jurisdiction. Each party to this Agreement irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby brought by any other party or its successors or assigns shall be brought and determined (a) in the Bankruptcy Court or (b) if the Bankruptcy Court no longer has (or will not exercise) jurisdiction over the Chapter 11 Cases or such legal action or proceeding, in any New York State or federal court sitting in the Borough of Manhattan in the City of New York, or, if such court lacks subject matter jurisdiction, in any appropriate New York State or federal court. Each party to this Agreement hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

200394509 v2

19. <u>WAIVER OF JURY TRIAL</u>.

EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

21.     <u>Reorganized Debtors Obligated Post-Effective Date</u>.  For the avoidance of all doubt, upon and after the occurrence of the Effective Date, any and all references herein to "Debtor" or "Debtors" shall mean and refer only to the Debtors, each as reorganized pursuant to the Plan and Confirmation Order (collectively, the "Reorganized Debtors"), and all obligations of "Debtor" or "Debtors" hereunder shall from and after the Effective Date conclusively be deemed to be the obligations of the Reorganized Debtors only.

[Remainder of Page Intentionally Blank]

200394509 v2

IN WITNESS WHEREOF, the parties hereto have executed this Subscription Agreement as of the date first written above.

POINT BLANK SOLUTIONS, INC.

By: _____

   Name:  T. Scott Avila

   Title:  CRO

PRESCOTT GROUP CAPITAL MANAGEMENT LLC

By: __/s/ *Ricardo Palacio*_____
    Name:  Ricardo Palacio, Esquire
    Title:  Counsel for Prescott Group Capital Management LLC

Address:
1924 S. Utica Avenue, Suite 1120
Tulsa, OK 74104
Attn:  Eric Green
Facsimile:  [___]

PRIVET FUND MANAGEMENT LLC

By: _____
    Name:
    Title:

Address:
50 Old Ivy Road, Suite 230
Atlanta GA, 30342
Attn: Ryan Levenson
Facsimile: (404) 467-6101

With a copy to:

REED SMITH LLP
1201 Market Street – Suite 1500
Wilmington, DE 19801
Attn: Kurt F. Gwynne
Facsimile: (302) 778-7575

       and

REED SMITH LLP
599 Lexington Avenue
New York, NY 10022
Attn: Edward J. Estrada
      Eulalia M. Mack
      Aron Izower
Facsimile: (212) 521-5450

LONESTAR CAPITAL MANAGEMENT, LLC as manager to
PB FUNDING, LLC

By: _____

Name: Vikas Wonh

Title: CFO

Address:
One Maritime Plaza, Suite 1105
San Francisco, CA 94111
Attn: Vikas Tandon
Facsimile: (415) 362-7977

With a copy to:

AKIN GUMP STRAUSS HAUER & FELD LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
Attn: David P Simonds
Facsimile: (310) 552-6744

**Subscription Shares Allocation**

| | |
|---|---|
| Prescott | 30.00% |
| Privet | 30.00% |
| Lonestar | 40.00% |

**Index of Defined Terms**

"Affiliate" means, with respect to any person or entity, any person or entity directly or indirectly controlling, controlled by or under common control with, such other person or entity. For purposes of this definition, "control" when used with respect to any person or entity, means the possession, directly or indirectly, of the power to cause the direction of management and/or policies of such person, whether through the ownership of voting securities, by contract, or otherwise.

"Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

"Lien" means any charge, security interest, community property interest, condition, equitable interest, lien, option, pledge, mortgage, right of way, easement, encroachment, servitude, right of first offer, right of first refusal or contractual restriction of any kind, including any restriction or covenant with respect to use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"Material Adverse Effect" shall mean any change, effect, event, occurrence, development, circumstance, or state of facts which, either alone or in combination, has had or would reasonably be expected to have a materially adverse effect on the business, properties, operations, financial condition or results of operations of the Company and its subsidiaries taken as a whole (including any debarment or restriction imposed on the Debtors from serving as a government contractor), or which would reasonably be expected to materially impair its or their ability to perform its or their obligations under this Agreement or have a materially adverse effect on or prevent or materially delay the consummation of the transactions contemplated by this Agreement, the Plan or the Disclosure Statement.

"Party Affiliates" shall mean any director, officer, employee, representative or agent of any Purchaser, any of such Purchaser's Affiliates or any direct or indirect holder of any equity interests or securities of any such Purchaser (whether such holder is a limited or general partner, member, stockholder or otherwise) and, without limiting the foregoing, shall include each of: Ryan Levenson, Privet Fund Management LLC, Privet Fund, L.P., Privet Opportunity Fund I, LLC, Angel Oak Partners Fund I, LLC, James Rubright and Ben Rosenzweig.

| Term | Section |
|---|---|
| Agreement | Preamble |
| Ancillary Documents | Section 4(a)(x) |
| Bankruptcy Court | Recitals |
| Chapter 11 Cases | Recitals |
| Closing | Section 2(a) |

| Term | Section |
|------|---------|
| Commitments | Section 1(a) |
| Company | Preamble |
| Company Disclosure Schedules | Section 3(a) |
| Confirmation Order | Section 4(a)(ii) |
| Debtors | Recitals |
| Difference | Section 2(b)(i) |
| Disclosure Statement | Recitals |
| Expenses | Section 2(b)(iv) |
| Indemnified Liabilities | Section 10(a) |
| Indemnifying Party | Section 10(a) |
| Indemnified Party | Section 10(a) |
| Litigation | Section 3(a)(viii) |
| Lonestar | Preamble |
| New By-Laws | Section 4(a)(ix) |
| New Charter | Section 4(a)(viii) |
| New Common Stock | Recitals |
| Notes | Section 1(a) |
| Outstanding Company Obligations | Section 2(b)(i) |
| Plan | Recitals |
| Prescott | Preamble |
| Privet | Preamble |
| Purchased Shares | Section 1(a) |
| Purchaser Loans | Section 1(a) |
| Purchasers | Section 1(a) |
| Securities Act | Section 3(a)(xi) |
| Solicitation Order | Section 4(a)(i) |
| Stockholders Agreement | Section 2(b)(v) |
| Subscription Price | Recitals |
| Surviving Representations | Section 9(b) |

**Exhibit A**

**Stockholders' Agreement Term Sheet**

[See attached]