# EXHIBIT 2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| POINT BLANK SOLUTIONS, INC., *et al.*,[1] | ) | Case No. 10-11255 (PJW) |
| | ) | |
| | ) | |
| Debtors. | ) | |

---

## DISCLOSURE STATEMENT DESCRIBING AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

---

**IMPORTANT DATES**

~~Subscription Record Date: _____, 2011 at 4:00 p.m.~~

Voting Deadline: _____, 2011 at 4:00 p.m.
~~Subscription Commencement Date: _____, 2011 at 4:00 p.m.~~
~~Subscription Expiration Date: _____, 2011 at 4:00 p.m.~~
Objection Deadline: _____, 2011 at 4:00 p.m.
Confirmation Hearing: _____, 2011 at _:_0_.m.

**Dated:** ~~January~~April __, 2011

Counsel for Debtors and Debtors in Possession:
PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua Fried (CA Bar No. 181541)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
~~Telephone: 302-652-4100~~
~~Facsimile: 302-652-4400~~

Counsel to Lonestar Capital Management, LLC
PEPPER HAMILTON LLP
David B. Stratton, Esq.
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19899-1709

-and-

AKIN GUMP STRAUSS HAUER & FELD LLP
David P. Simonds, Esq.
2029 Century Park East, Suite 2400
Los Angeles, CA 90067

-and-

AKIN GUMP STRAUSS HAUER & FELD LLP
Michael P. Cooley, Esq.
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201-4675

---

[1] The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification numbers and their respective addresses, are: Point Blank Solutions, Inc (9361), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor, Inc. (4044), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Protective Apparel Corporation of America (9051), 179 Mine Lane, Jacksboro, TN 37757; and PBSS, LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.☐

Counsel to Privet Opportunity Fund I, LLC and Privet Fund Management LLC
REED SMITH LLP
Edward J. Estrada, Esq.
599 Lexington Avenue, 22nd Floor
New York, NY 10022

-and-

REED SMITH LLP
Kurt F. Gwynne, Esq.
1201 Market Street, Suite 1500
Wilmington, DE 19801

Counsel to Prescott Group Capital Management
ASHBY & GEDDES
Ricardo Palacio, Esq.
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

Counsel for the ~~Equity~~Official Committee of Unsecured Creditors
~~MORRISON COHEN LLP~~
~~Joseph T. Moldovan~~
MESSANA ROSNER & STEM LLP
Brian L. Arban, Esq.
~~909 Third Avenue~~
~~New York, NY 10022-4731~~

~~-and-~~

~~BAYARD, P.A.~~
~~Neil B. Glassman~~
Fred Rosner, Esq.
~~222 Delaware Avenue~~1000 N. West Street, Suite ~~900~~1200
Wilmington, DE ~~19899~~19801

-and-

ARENT FOX LLP
Robert M. Hirsh, Esq.
George P. Angelich, Esq.
1675 Broadway
New York, NY 10019
~~Counsel for the Creditors' Committee~~
~~MESSANA ROSNER & STEM LLP~~
~~Brian L. Arban, Esq.~~
~~Fred Rosner, Esq.~~
~~1000 N. West Street, Suite 1200~~
~~Wilmington, DE 19801~~

~~-and-~~

~~ARENT FOX LLP~~
~~Robert M. Hirsh, Esq.~~
~~George Angelich, Esq.~~
~~1675 Broadway~~
~~New York, NY 10019~~

---

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE, OR REJECTION OF THE PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

# TABLE OF CONTENTS

Page

I. PREFATORY STATEMENT AND DEFINITIONS ........... 1

II. PLAN SUMMARY ........... 1

III. INTRODUCTION AND OVERVIEW ........... 5

    A.    Introduction ........... 5

    B.    Disclaimers ........... 6

    C.    An Overview of the Chapter 11 Process ........... 7

    D.    Voting on the Plan ........... 7̶8

        1.    Who May Vote ........... 7̶8

        2.    Voting Deadline and Voting Record Date ........... 9

        3.    How to Vote ........... 9

        4.    Brokerage Firms, Banks, and Other Nominees ........... 10

    E.    Confirmation of the Plan ........... 10

        1.    Generally ........... 10

        2.    Objections to Confirmation ........... 10

        3.    Hearing on Confirmation ........... 13

IV. HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTORS ........... 13

    A.    Overview of the Debtors and Their Operations ........... 13

        1.    Business Operations and the Debtors' Customers ........... 13

        2̶.1.    Postpetition Operations ........... 15

    B.    Pre-Petition Capital Structure and Directors ........... 15

        1.    Prepetition Secured Financing ........... 16

        2.    Prepetition Corporate Governance ........... 17

    C.    Significant Legal Proceedings ........... 17

        1.    Criminal Prosecution of Former Officers ........... 17

        2.    Class Action and Derivative Lawsuits ........... 19

        3.    Turnover Action ........... 21

        4.    Securities Litigation ........... 21

        5.    Zylon Litigation ........... 2̶1̶22

    D.    Events Leading to Bankruptcy ........... 22

    E.    The Commencement of the Chapter 11 Cases ........... 23

| | F. | First Day Motions and Other Material Relief | 23 24 |
|---|---|---|---|
| | | 1. Joint Administration | 24 |
| | | 2. Employees | 24 |
| | | 3. Cash Management | 24 |
| | | 4. Taxes | 24 25 |
| | | 5. Utilities | 25 |
| | | 6. Retention of Customer Programs | 25 |
| | | 7. Prepetition Shipper, Freight Forwarder, and Related Obligations | 25 |
| | | 8. Retention of Key Professionals | 25 26 |
| | | 9. Critical Vendors | 26 |
| | | 10. DIP Loan Agreement | 26 |
| | G. | Bar Dates for Filing Proofs of Claim | 28 |
| | H. | Filing of Schedules and Statement of Financial Affairs | 28 |
| | I. | Appointment of Creditors' Committee | 28 |
| | J. | Appointment of Equity Committee | 28 |
| | K. | Deadline Extensions for Various Matters | 28 29 |
| | L. | Litigation with the Creditors' Committee and Office of United States Trustee's Filing of Motion to Appoint Examiner | 29 30 |
| | M. | The Sale and Reorganization Process and Replacement DIP Financing | 30 |
| V. | | DESCRIPTION OF THE PLAN | 33 34 |
| | A. | General | 33 34 |
| VI. | | TREATMENT OF CERTAIN UNCLASSIFIED CLAIMS | 33 |
| VI. | | Treatment of certain unclassified claims | 35 |
| | A. | Administrative Claims | 34 35 |
| | | 1. Administrative Claims | 34 35 |
| | | 2. Administrative Professional Fee Claims Bar Date | 34 35 |
| | | 3. Professionals' Fees and Expenses | 34 |
| | B. | U.S. Trustee Fees | 35 36 |
| | C. | Priority Tax Claims | 35 36 |
| VII. | | TREATMENT OF CLASSES OF CLAIMS AND INTERESTS | 35 37 |
| | A. | Treatment of Allowed Class 1 Claims (Other Priority Claims) | 35 37 |
| | | 1. Classification: | 35 |
| | | 2. Treatment: | 35 |

|     |     | 3. | Voting: | 35 |
| B.  | Treatment of Allowed Class 2 Claims (DIP Claims) | | | 36~~3637~~ |
|     |     | 1. | Classification: | 36 |
|     |     | 2. | Treatment: | 36 |
|     |     | 3. | Voting: | 36 |
| C.  | Treatment of Allowed Class 3 Claims (Miscellaneous Secured Claims) | | | ~~36~~38 |
|     |     | 1. | Classification: | 36 |
|     |     | 2. | Treatment: | 36 |
|     |     | 3. | Voting: | 37 |
| D.  | Treatment of Allowed Class 4 Claims (General Unsecured Claims) | | | ~~37~~38 |
|     |     | 1. | Classification: | 37 |
|     |     | 2. | Treatment: | 37 |
|     |     | 3. | Voting: | 37 |
| E.  | Treatment of Allowed Class 5 Claims (Subordinated Unsecured Claims) | | | ~~37~~39 |
|     |     | 1. | Classification: | 37 |
|     |     | 2. | Treatment: | 37 |
|     |     | 3. | Voting: | 38 |
| F.  | Treatment of Allowed Class 6 Claims (Class Action Claims) | | | ~~38~~39 |
|     |     | 1. | Classification: | 38 |
|     |     | 2. | Treatment: | 38 |
|     |     | 3. | Voting: | 38 |
| G.  | Treatment of Allowed Class 7 Interests (Old Equity Interests) | | | ~~38~~40 |
|     |     | 1. | Classification: | 38 |
|     |     | 2. | Treatment: | 39 |
|     |     | 3. | Voting: | 39 |
| H.  | Treatment of Allowed Class 8 Claims and Interests (Other Subordinated Claims and Interests) | | | ~~39~~40 |
|     |     | 1. | Classification: | 39 |
|     |     | 2. | Treatment: | 39 |
|     |     | 3. | Voting: | 39 |
| I.  | Treatment of Allowed Class 9 Interests (Unexercised Options) | | | ~~39~~41 |
|     |     | 1. | Classification: | 39 |
|     |     | 2. | Treatment: | 39 |

|  |  | 3. | Voting: | 40 |
| VIII. | ACCEPTANCE REQUIREMENTS | | | 40~~41~~ |
|  | A. | Acceptance or Rejection of the Plan | | 40~~41~~ |
|  |  | 1. | Voting Class | 40~~41~~ |
|  |  | 2. | Presumed Acceptance of the Plan | 40~~41~~ |
|  |  | 3. | Presumed Rejection of Plan | 40~~41~~ |
|  | B. | Tabulation of Votes on a Non-Consolidated Basis | | 40~~42~~ |
| IX. | MEANS FOR IMPLEMENTATION OF THE PLAN | | | 41~~42~~ |
|  | A. | Inter-Debtor Compromise | | 41~~42~~ |
|  |  | 1. | Settlement Authority. | 41~~42~~ |
|  |  | 2. | Inter-Debtor Settlement. | 41~~43~~ |
|  | B. | Exit Facility | | 42~~43~~ |
|  | ~~C.~~ | ~~Rights Offering~~ | | ~~42~~ |
|  | C. | Direct Subscription | | 43 |
|  |  | 1. | The ~~Rights Offering~~ ~~42~~Direct Subscription 43 | |
|  |  | 2. | ~~The Backstop Commitments~~ | ~~43~~ |
|  |  | ~~3.~~ | ~~Subscription Exercise Period~~ | ~~43~~ |
|  |  | ~~4.~~ | ~~Exercise of Rights~~ | ~~44~~ |
|  |  | ~~5.~~ | ~~Distribution of New Common Stock.~~ | ~~45~~ |
|  |  | ~~6.~~ | ~~Fractional Rights.~~ | ~~45~~ |
|  |  | ~~7.~~ | ~~Validity of Exercise of Rights.~~ | ~~45~~ |
|  |  | ~~8.~~ | Use of Proceeds. | 45~~44~~ |
|  |  | 3. | Additional Cash Contribution | 44 |
|  |  | 9.4. | Sources of Consideration for Plan Distributions | 46~~45~~ |
|  | D. | Issuance of New Common Stock ~~Purchased in the Rights Offering~~ | | 46 45 |
|  |  | 1. | Issuance of New Common Stock | 46~~45~~ |
|  |  | 2. | New Stockholders Agreement | 46~~45~~ |
|  | ~~E.~~ | ~~Additional Issuance of New Common Stock~~ | | ~~46~~ |
|  | ~~F.~~ | Cancellation/Conversion of Securities and Agreements | | 46~~45~~ |
|  | ~~G~~F. | Exemptions for Issuance of New Common Stock | | 47~~46~~ |
|  | ~~H~~G. | Corporate Existence | | 47~~46~~ |
|  | ~~I~~H. | New Certificate of Incorporation and New By-Laws | | 47~~46~~ |

| | J̶I. | Reorganized Debtors' Boards of Directors | 48̶46 |
|---|---|---|---|
| | K̶J. | Officers of Reorganized Debtors | 48̶46 |
| | L̶K. | Employee Benefits | 48̶47 |
| | M̶L. | Vesting of Assets in the Reorganized Debtors | 48̶47 |
| | N̶M. | Corporate Action | 49̶47 |
| | O̶N. | Effectuating Documents; Further Transactions | 49̶48 |
| | P̶O. | General Settlement of Claims and Interests | 49̶48 |
| | Q̶P. | Section 1146 Exemption from Certain Taxes and Fees | 50̶48 |
| | R̶Q. | D&O Liability Insurance Policies and Indemnification Provisions | 50̶49 |
| | S̶R. | Preservation of Rights and Causes of Action | 51̶49 |
| | T̶S. | Payment of Fees and Expenses of the DIP Lenders | 51̶50 |
| | U̶T. | Non-Participation of Other Subordinated Claims and Interests | 51̶50 |
| X. | | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 52̶50 |
| | A. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 52̶50 |
| | B. | Objections to Assumption; Determination of Cure Claims | 53̶51 |
| | C. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 54̶53 |
| | D. | Insurance Policies | 55̶53 |
| | E. | Modifications, Amendments, Supplements, Restatements or Other Agreements. 55̶54 | |
| | F. | Reservation of Rights. | 55̶54 |
| | G. | Contracts and Leases Entered Into After the Petition Date. | 56̶54 |
| XI. | | RECOVERY TRUST | 56̶54 |
| | A. | Purpose of Trust | 56̶54 |
| | B. | Governing Document; Funding | 56̶55 |
| | C. | Vesting of A̶s̶s̶e̶t̶s̲A̲s̲s̲e̲s̲t̲s̲;̲ Allocation 55 | |
| | | 1̲. Trust Assets | 55 |
| | | 2̲. Allocation of Additional Cash Contribution | 56 |
| | | 3̲. Allocation of other Trust Assets | 56 |
| | D. | Tax Treatment | 57 |
| | E. | Trust Interests | 58 |
| | | 1. Issuance of Trust Interests | 58 |
| | | 2. Distributions on Trust Interests | 58̶59 |
| | F. | Administration of the Recovery Trust | 59̶60 |

|       | G.  | Rights and Responsibilities of Recovery Trustee | 60 61 |
| XII.  |     | PROVISIONS GOVERNING DISTRIBUTIONS | 60 62 |
|       | A.  | Record Date for Distributions | 60 62 |
|       | B.  | Timing and Calculation of Amounts to Be Distributed | 60 62 |
|       | C.  | Disbursing Agent | 61 62 |
|       | D.  | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 61 62 |
|       |     | 1. Delivery of Distributions in General | 61 62 |
|       |     | 2. Undeliverable Distributions and Unclaimed Property | 61 63 |
|       | E.  | Withholding and Reporting Requirements | 62 63 |
|       | F.  | Setoffs | 62 63 |
|       | G.  | Claims Paid or Payable by Third Parties | 62 64 |
|       | H.  | Postpetition Interest | 63 64 |
|       | I.  | Section 506(c) Reservation | 63 64 |
|       | J.  | Single Satisfaction of Claims | 63 64 |
| XIII. |     | PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS | 63 65 |
|       | A.  | Prosecution of Objections to Claims | 63 65 |
|       | B.  | Allowance of Claims | 63 65 |
|       | C.  | Disputed Claims Reserve | 64 65 |
|       | D.  | Distributions After Allowance | 64 65 |
|       | E.  | Distribution of Excess Amounts in the Disputed Claims Reserve | 64 66 |
|       | F.  | Property Held in Reserve for Disputed Claims | 64 66 |
|       | G.  | Estimation of Claims | 64 66 |
|       | H.  | Deadline to File Objections to Claims | 65 66 |
| XIV.  |     | SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS | 65 67 |
|       | A.  | Compromise and Settlement of Claims, Interests and Controversies | 65 67 |
|       | B.  | Releases by the Debtors | 65 67 |
|       | C.  | Releases by Holders of Claims and Interests | 66 67 |
|       | D.  | Exculpation | 67 68 |
|       | E.  | Discharge of Claims and Termination of Interests | 67 69 |
|       | F.  | Injunction | 68 69 |
|       | G.  | Term of Injunctions or Stays | 69 71 |
|       | H.  | Injunction Against Interference With Plan | 69 71 |

| | I. | Injunction Related to Releases and Exculpation | 69~~71~~ |
|---|---|---|---|
| | J. | Protection Against Discriminatory Treatment | 69~~71~~ |
| | K. | No Consent to Change of Control Required | 70~~71~~ |
| | L. | Release of Liens | 70~~71~~ |
| XV. | | CONDITIONS TO THE CONFIRMATION DATE AND EFFECTIVE DATE | 70~~72~~ |
| | A. | Conditions Precedent to Confirmation | 70~~72~~ |
| | B. | Conditions Precedent to the Effective Date | 71~~72~~ |
| | C. | Waiver of Conditions | 73~~74~~ |
| | D. | Effect of Failure of Conditions | 73~~74~~ |
| XVI. | | MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN | 73~~74~~ |
| | A. | Modification and Amendments | 73~~74~~ |
| | B. | Effect of Confirmation on Modifications | 74~~75~~ |
| | C. | Revocation or Withdrawal of the Plan | 74~~75~~ |
| XVII. | | RETENTION OF JURISDICTION | 74~~75~~ |
| XVIII. | | MISCELLANEOUS PROVISIONS | 77~~78~~ |
| | A. | Immediate Binding Effect | 77~~78~~ |
| | B. | Additional Documents | 77~~78~~ |
| | C. | Dissolution of Statutory Committees | 77~~78~~ |
| | D. | Successors and Assigns | 77~~78~~ |
| | E. | Service of Documents | 77~~78~~ |
| | F. | Entire Agreement | 79~~80~~ |
| | G. | Severability of Plan Provisions | 79~~80~~ |
| | H. | Exhibits | 79~~80~~ |
| | I. | Votes Solicited in Good Faith | 79~~80~~ |
| | J. | Closing of Chapter 11 Cases | 80~~81~~ |
| | K. | Conflicts | 80~~81~~ |
| XIX. | | MISCELLANEOUS PROVISIONS | 80~~81~~ |
| | A. | Notices | 80~~81~~ |
| XX. | | FEASIBILITY | 82~~83~~ |
| XXI. | | LIQUIDATION ANALYSIS | 83~~84~~ |
| XXII. | | RISK FACTORS | 85~~86~~ |
| | A. | Risk Factors Under the Plan | 86 |

|   | B. | Risks to the Debtors' Continued Business Operations | 87 |
|   | C. | Certain Federal Income Tax Consequences of the Plan | 8692 |
|   | BD. | Consequences to Holders of Claims | 8693 |
|   | CE. | Withholding | 8894 |
|   |   | 1. Importance of Obtaining Professional Tax Assistance. | 95 |
| XXIII. | CONCLUSION | | 891 |

# I.

## PREFATORY STATEMENT AND DEFINITIONS

Pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Point Blank Solutions Inc. ("Parent" or "PBSI"); Point Blank Body Armor, Inc. ("Point Blank"); Protective Apparel Corporation of America ("PACA"); and PBSS, LLC ("PBSS"), the debtors and debtors in possession in the above-captioned cases (together, the "Debtors" or the "Company") along with the Official Committee of Unsecured Creditors (the "Creditors'~~ Committee"), the Official Committee of Equity Security Interest Holders (the~~ ~~"Equity~~ Committee"), Privet Fund Management LLC (as investment manager for Privet Opportunity Fund I, LLC and Privet Fund LP) ("Privet Fund Management"), Privet Opportunity Fund I, LLC ("Privet"), Prescott Group Capital Management, LLC ("Prescott") and Lonestar Capital Management, LLC, as investment advisor to Lonestar Partners, LP and manager of PB Funding, LLC (collectively, the "Plan Proponents") submit this disclosure statement (the "Disclosure Statement") in support of the *Amended Joint Chapter 11 Plan of Reorganization*, dated ~~January~~April __, 2011 (the "Plan"). Unless otherwise noted, capitalized terms used herein have the meanings set forth in the Plan. The Plan is the result of extensive negotiations by the Plan Proponents, each of whom support confirmation of the Plan.

## II.

## **PLAN SUMMARY**

The Plan contemplates the reorganization and continuation of the Debtors' business through a restructuring of each Debtor's debt obligations and the generation of new capital through a ~~Rights Offering~~direct subscription of new common stock by the Purchasers (i.e. PB Funding, LLC; Privet and Prescott) in the Reorganized Debtors,~~ backstopped by the Backstop Parties. The Rights Offering~~ (the "Direct Subscription"). The Direct Subscription, combined with the Debtors' available cash from operations going forward and exit financing, if necessary and available, will provide the funding necessary to consummate the Plan and pay remaining secured and unsecured creditors in accordance with the terms of the Plan. All of the prepetition equity Interests in Parent (the "Old Equity Interests") will be deemed surrendered, and 100% of the equity securities interests in the Reorganized Parent (the "New ~~Members Interests~~Common Stock") will be acquired pursuant to the ~~Rights Offering~~Direct Subscription. Additional details regarding the ~~Rights Offering~~Direct Subscription may be found in Article IX of this Disclosure Statement and in Section 6.3 of the Plan.

The Plan contemplates the reorganization of the Debtors' businesses and the resolution of the outstanding Claims against and Interests in the Debtors. Generally, the Plan is structured around three key components.

(a) The ~~Rights Offering/~~Direct Subscription. In addition to Cash on hand and an Exit Facility, if one is necessary and available, the Debtors intend to fund their reorganization effort—including the payment of all amounts due under the Plan—through the issuance and sale of shares of New Common Stock in Reorganized Parent in a minimum amount of $15,000,000 and (subject to certain consents and other conditions) up to a maximum of ~~$25,000,000.~~25,000,000, a portion of which may be in the form of Purchaser Loans as described in Section 6.3(a) of the Plan and summarized in Article IX.C of this Disclosure Statement. The New Common Stock will be sold ~~(i) through a Rights Offering to eligible holders of Allowed General Unsecured Claims and Allowed Old Equity Interests, backstopped by the Debtors' existing DIP Lenders, and (ii)~~ through a direct subscription of shares to ~~two of the existing DIP Lenders, Privet and Prescott. The Rights Offering and direct subscription are~~the Purchasers or one or more of their Affiliates. The Direct Subscription is described more fully in Section 6.3 of the Plan and in the Subscription ~~and Backstop~~ Agreement. [2]

(b) The Inter-Debtor Compromise. The Plan Proponents have identified several potential Claims, Causes of Action and other disputes that may exist between the several Debtors, including existing and potential disputes regarding (i) the value and disposition of Intercompany Claims, (ii) the valuation of the individual Debtor's Estates, (iii) the individual Debtor's respective ownership interest in certain potentially valuable lawsuits, (iv) the susceptibility of two or more of the Debtors' Estates to substantive consolidation and (v) the consideration, if any, that should be paid by Parent to retain its existing Interests in the Debtor Subsidiaries. The treatment to be provided under the Plan to each Class of Claims against or Interests in the respective Debtors is in part a product of a global compromise and settlement of these and other potential Claims, Causes of Action and disputes that would be costly and time-consuming to litigate. It is the Plan Proponents' view that the Inter-Debtor Compromise is the best way to resolve these disputes, avoid the delay and expense of litigating these issues and ensuring the equitable treatment of the Debtors' Creditors and Interest holders. The Inter-Debtor Compromise is described more fully in Section IX.A of the Disclosure Statement and Section ~~6.5~~6.1 of the Plan.

(c) The Recovery Trust. Under the Plan, holders of Allowed General Unsecured Claims, Allowed Subordinated Unsecured Claims, Allowed Class Action Claims and Allowed Old Equity Interests will be issued beneficial interests in a Recovery Trust established for the purpose of liquidating certain assets and distributing the proceeds thereof to the trust beneficiaries and making certain disbursements or distributions to the Reorganized Parent. Allowed Excess Fee Claims of certain Professionals will also be paid out of the proceeds from the Recovery Trust prior to payment of trust beneficiaries. On the Effective Date, the Reorganized Debtors will fund a Recovery Trust with ~~a cash payment of $3 million, an additional $1 million for expenses and~~ rights to certain potentially valuable Causes of Action, the proceeds

---

[2] In response to certain objections and other informal responses received by Debtors to the prior disclosure statement filed on January 11, 2011 [Docket No. 1007] (the "Prior Disclosure Statement"), including the objection filed by the Staff of the Securities and Exchange Commission on the grounds that the proposed rights offering to creditors and certain equity holders set forth in the Prior Disclosure Statement would not meet the requirements of the Securities Act of 1933, the Plan Proponents have modified the Disclosure Statement and Plan. In particular, among other proposed changes, pursuant to the revisions to the Plan and revisions to the Disclosure Statement, the Plan now provides that the New Common Stock described in the Plan will be proposed to be sold to the Purchasers through the Direct Subscription. Accordingly, the New Common Stock will not be sold through a rights offering to creditors or existing equity holders, as previously provided in the Prior Disclosure Statement.

of which will be <u>shared with the Reorganized Parent (in accordance with the waterfall described in Section 8.3(c) of the Plan) and</u> distributed to the beneficiaries of the Recovery Trust in accordance with the waterfall <u>provisions</u> described in ~~Article XI.E of the Disclosure Statement and Section~~<u>Sections 8.3(c) and</u> 8.5 of the Plan. <u>In addition, the Recovery Trust will be provided with initial funding for litigation and related expenses as described in Section 8.2 of the Plan, and may be funded with a portion of the Additional Cash Contribution, in which case such amount will be distributed as described in Section 8.3(b) of the Plan. The Recovery Trust may also be able to borrow certain funds from the Reorganized Parent as described in Section 8.2. of the Plan.</u> The Recovery Trust is described more fully in Article 8 of the Plan and in the Recovery Trust Agreement<u>, which will be filed as part of the Plan Supplement</u>.

**The Plan Proponents believe the Plan treats all Classes of Creditors and Interest holders fairly and equitably, in observance of the absolute priority rule of § 1129(b)(2). The Plan Proponents believe the Plan provides all Creditors and Interest holders with at least as much as they would receive in a Chapter 7 liquidation of the Debtors and provides all General Unsecured Creditors substantially more than they would receive in a Chapter 7 liquidation. Because, among other things, certain contemplated settlements and objections to Claims have not been resolved, the Plan Proponents are not certain what the total amount of Allowed General Unsecured Claims will be.**

Set forth in detail elsewhere in this Disclosure Statement is a description of the technical aspects of the classification of Claims and Interests, the relative allocations of property to holders of such Claims and Interests, the methodology as to how such property is to be distributed, the risks inherent in the proposed Plan and the applicable bankruptcy and tax consequences of the reorganization of the Debtors. The Plan is complex and is the product of lengthy discussions between the Plan Proponents and certain other parties in interest and is based upon the analysis of all Claims asserted or known as of the date hereof, an evaluation of the relative merits of potential conflicting Claims and a compromise between such Claims consistent with the goals of the Bankruptcy Code. The Plan Proponents believe that the following broad overview of what Creditors and Interest holders will receive under the Plan will be helpful in your consideration of whether you wish to accept or reject the Plan. This summary does not purport to be complete and should only be relied upon for voting purposes when read in conjunction with the Plan and the Disclosure Statement in their entirety. In the event of any inconsistency between the Plan and the Plan Documents, on the one hand, and this Disclosure Statement, on the other hand, the Plan and the Plan Documents shall control and take precedence with respect to such inconsistency.

The following Table 1 sets forth a quick reference guide to the classification and treatment of Allowed Claims against and Allowed Interests in the Debtors. Table 1 is a summary only and is subject in all respects to the specific provisions of the Plan.

| Table 1[23] | | | |
| **Summary of Claims Against and Interests in the Debtors** | | | |
| **Class** | **Description** | **Estimated Dollar Amount[34]** | **General Description of Class** |
| --- | --- | --- | --- |
| 1 | Other Priority Claims | Unknown | Claims entitled to priority under § 507(a), excluding Administrative Claims, DIP Claims and Priority Tax Claims. |
| 2 | DIP Claims | $25,000,000 | Claim arising under the DIP Loan Agreement or Final DIP Order for payment of outstanding Obligations (as defined in the DIP Loan Agreement). |
| 3 | Miscellaneous Secured Claim | Unknown | Secured Claims other than the DIP Claims. |
| 4 | General Unsecured Claims | $40 to $57 million[5] | Any Claim that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, DIP Claim, Miscellaneous Secured Claim, Subordinated Unsecured Claim, Class Action Claim or Other Subordinated Claims and Interests. Most Claims fall within this Class. |
| 5 | Subordinated Unsecured Claims | Unknown | Claims, if any, that are subordinated to General Unsecured Claims.. |
| 6 | Class Action Claims | To Be Determined | Claims, if any, arising out of or relating to *In re DHB Industries, Inc. Class Action Litigation* (No. CV 05-4296) in the United States District Court for the Eastern District of New York. |
| 7 | Old Equity Interests | N/A | Any of the authorized, issued and outstanding Interests in Parent as of the Petition Date. |
| 8 | Other Subordinated Claims and Interests | N/A | Claims and Interests, if any, subordinated to Old Equity Interests. |
| 9 | Unexercised Options | N/A | Any outstanding and unexercised options to purchase equity security interests in Parent. |

---

[23] All references to Classes also include the specific subclasses denoted in the Plan. □

[34] This chart is only a summary of the classification and treatment of Claims and Interests under the Plan and the amounts and recoveries are only current estimates of the Claims asserted against the Debtors and of the potential allowed of amount of claims that have not been liquidated. Because (i) many Claims have not yet been liquidated against the Debtors and (ii) potential litigation recoveries by the Debtors, including those described in Section IV.C. of the Disclosure Statement, are currently unknown, it is not possible to estimate with any certainty the actual allowed amount of such Claims. The total amount of Allowed Claims and recoveries may differ significantly from the estimated amounts set forth in this Disclosure Statement. References should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

[5] This claim estimate range does not include the various intercompany claims by and between the Debtors.

Table 2 is a summary of estimated recoveries for holders of Claims against and Interests in the Debtors, and is subject in all respects to the Plan.

| Table 2[46] | |
|---|---|
| **Projected Treatment of Claims Against and Interests in the Debtors** | |
| **If you have an Allowed Claim in this Class:** | **You are expected to receive this treatment:** |
| Class 1 (Other Priority Claims) | Payment in full. |
| Class 2 (DIP Claims) | Payment in full. |
| Class 3 (Miscellaneous Secured Claims) | Payment in full |
| Class 4 (General Unsecured Claims) | Ratable Proportion of Distributions from the Recovery Trust~~, and Rights to participate in the Rights Offering~~. |
| Class 5 (Subordinated Unsecured Claims) | Ratable Proportion of Distributions, if any, from the Recovery Trust after payment in full (with interest) of Allowed Class 4 Claims. |
| Class 6 (Class Action Claims) | Ratable Proportion of Distributions from the Recovery Trust, *pari passu* with Class 7 |
| Class 7 (Old Equity Interests) | Ratable Proportion of Distributions from the Recovery Trust, *pari passu* with Class ~~6 and Rights to participate in the Rights Offering.~~6. |
| Class 8 (Other Subordinated Claims and Interests) | No recovery. |
| Class 9 (Unexercised Options) | No recovery |

# III.

# INTRODUCTION AND OVERVIEW

## A.   Introduction

On April 14, 2010 (the "Petition Date"), the Debtors commenced these bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions under Chapter 11 of the Bankruptcy Code.

This Disclosure Statement, submitted in accordance with section 1125 of the Bankruptcy Code,[57] contains information regarding the Plan proposed by the Plan Proponents. A copy of the Plan accompanies this Disclosure Statement. The Disclosure Statement is being distributed to you to help you make an informed judgment about the Plan.

---

[46] All references to Classes also include the specific subclasses denoted in the Plan.
[57] Unless stated otherwise, section references are to the Bankruptcy Code.

In addition to summarizing the Plan, the Disclosure Statement describes: (1) the Debtors' history, businesses, assets and liabilities; (2) the Debtors' pending litigation; (3) proposed distributions under the Plan; (3) the Plan's feasibility; and (5) alternatives to confirmation of the Plan. The Debtors strongly urge you to carefully review the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor or Interest holder.

The Bankruptcy Court approved this Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor to make an informed judgment about the Plan. Under §1125, this approval enabled the Debtors to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not passed on the Plan itself or conducted a detailed investigation into the contents of this Disclosure Statement.

Your vote on the Plan is important. Absent acceptance of the Plan, there may be protracted delays in any subsequent reorganization, or, alternatively, or a liquidation under Chapter 7 of the Bankruptcy Code. These alternatives may not provide for distribution of as much value to Creditors holding Allowed Claims or Interest holders as does the Plan. Accordingly, the Plan Proponents believe that the Plan is in the best interests of holders of Allowed Claims and Interests and urge you to accept the Plan by completing and returning the enclosed ballot(s) no later than _____, at _:00 _.m. Eastern Time (the "Voting Deadline").

## B.    **Disclaimers**

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PROPOSED PLAN. PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. SEE 11 U.S.C. § 1125(a).

FOR THE CONVENIENCE OF CREDITORS AND INTEREST HOLDERS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN CONTROL.

NO REPRESENTATIONS CONCERNING THE DEBTORS' FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE PLAN PROPONENTS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS

CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED. MOREOVER, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE BOOKS AND RECORDS OF THE DEBTORS, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE OR INACCURATE. REASONABLE EFFORT HAS BEEN MADE, HOWEVER, TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

THE PLAN PROPONENTS, AS WELL AS THEIR COUNSEL AND ADVISORS, INCLUDING THE DEBTORS' COUNSEL AND ADVISORS, HAVE RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH THIS DISCLOSURE STATEMENT AND HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS, OR TAX ADVICE. EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS, HER OR ITS OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX, AND OTHER MATTERS CONCERNING ITS CLAIM AND/OR INTEREST.

## C.    **An Overview of the Chapter 11 Process**

Chapter 11 of the Bankruptcy Code contains numerous provisions, the general effect of which is to provide the debtor with "breathing space" within which to propose a restructuring of its obligations to third parties. The filing of a Chapter 11 bankruptcy petition creates a bankruptcy estate comprising all of the property interests of the debtors. Unless a trustee is appointed by the Bankruptcy Court for cause (no trustee has been appointed in these Chapter 11 Cases), a debtor remains in possession and control of all its assets as a "debtor in possession." The debtor may continue to operate its business in the ordinary course on a day-to-day basis without Bankruptcy Court approval. Bankruptcy Court approval is only required for various enumerated kinds of transactions (such as certain financing transactions) and transactions out of the ordinary course of a debtor's business. The filing of the bankruptcy petition gives rise to what is known as the "automatic stay" which, generally, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a Chapter 11 case. The Bankruptcy Court can grant relief from the automatic stay under certain specified conditions or for cause.

The Bankruptcy Code authorizes the creation of one or more official committees to protect the interests of some or all creditors or interest holders. The fees and expenses of counsel and other professionals employed by such official committees and approved by the Bankruptcy Court are generally borne by a bankruptcy estate. Two official committees have been appointed in these Chapter 11 Cases, the Creditors' Committee, which represents the collective interests of general unsecured creditors, and the Equity Committee, which represents the collective interests of equity security holders of PBSI.

A Chapter 11 debtor may emerge from bankruptcy by successfully confirming a plan of reorganization. A plan may be either consensual or non-consensual and may provide, among other things, for the treatment of the claims of creditors and the interests of equity holders and the holders of options or warrants. The provisions of the Plan are summarized in Article 5 of this Disclosure Statement.

## D. **Voting on the Plan**

### 1. Who May Vote

Table 3 provides a summary of the voting eligibility of Creditors and Interest holders in each Class under the Plan, based on whether or not those Claims and Interests are Impaired or Unimpaired.

| Table 3 Voting Eligibility Under the Plan | | |
|---|---|---|
| | Impairment | Entitled to Vote? |
| **Class** | **Description** | | |
| 1 | Other Priority Claims | Impaired | YES |
| 2 | DIP Claims | Unimpaired | NO (deemed to accept) |
| 3 | Miscellaneous Secured Claim | Impaired | YES |
| 4 | General Unsecured Claims | Impaired | YES |
| 5 | Subordinated Unsecured Claims | Impaired | YES |
| 6 | Class Action Claims | Impaired | YES |
| 7 | Old Equity Interests | Impaired | YES |
| 8 | Other Subordinated Claims and Interests | Impaired | NO (deemed to reject) |
| 9 | Unexercised Options | Impaired | NO (deemed to reject) |

Some Creditors and Interest holders may hold Impaired Claims and Interests in more than one Class and must vote separately for each Class. If you hold Claims or Interests in more than one Class, you must cast a separate Ballot based on each individual Claim or Interest. If you hold multiple Claims in the same Class, you must cast a separate Ballot on each individual Claim.

Please do not return any other documentation with your Ballot. For further information on casting a Ballot to vote on the Plan, please see Section VI.A. of this Disclosure Statement.

Each Creditor holding an Allowed Claim in Classes 1 and 3-6 and each Interest holder in Class 7 is entitled to vote either to accept or to reject the Plan. Only those votes cast by holders of Allowed Claims or Interests shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation. Creditors holding Claims in Class 2 are unimpaired, are deemed to accept the Plan and are not entitled to vote. An Impaired Class of Claims shall have accepted the Plan if (excluding any Creditor designated under § 1126(e)): (a) the Creditors holding at least two-thirds in amount of the Allowed Claims actually

voted in such Class have voted to accept the Plan, and (b) the Creditors holding more than one-half in number of the Allowed Claims actually voted in such Class have voted to accept the Plan.

An Impaired Class of Interests shall have accepted the Plan if (excluding any Interest holder designated under § 1126(e)) it has been accepted by at least two-thirds in amount of the Allowed Interests actually voted in such Class. Class 7 is impaired and entitled to vote on the Plan. Class 8 and Class 9 are each also Impaired under the Plan, but will not receive any Distributions under the Plan and, consequently, is deemed to reject the Plan and is not entitled to vote thereon. Because Class 8 and Class 9 are each deemed to reject the Plan by operation of law, the Debtors will ask the Bankruptcy Court to confirm the Plan in accordance with § 1129(b) over the deemed rejection of the Plan by Class 8 and Class 9. Without limiting the foregoing, in the event that any Class of Claims or Interests entitled to vote on the Plan fails to accept the Plan as required by § 1129(a), the Plan may be amended or, alternatively, the Debtors will seek confirmation of the Plan over the deemed rejection of the Plan by Class 8 and Class 9 as well as over the rejection of the Plan by any Class of Claims or Interests pursuant to § 1129(b).

2.      Voting Deadline and Voting Record Date

The deadline for voting on the Plan is _____, 2011 (the "Voting Deadline"). To be entitled to vote to accept or reject the Plan, a holder of a Claim or Interest against the Debtors must be the record holder of such Claim or Interest at the close of business on the voting record date fixed by the Bankruptcy Court (the "Voting Record Date"). Holders who acquire Claims or Interests against the Debtors after the Voting Record Date must arrange with their seller to receive a proxy from the holder of record of such Claim or Interest on the Voting Record Date.

3.      How to Vote

All votes to accept or to reject the Plan must be cast by using the appropriate form of Ballot. No votes other than ones using such Ballots will be counted except to the extent ordered otherwise by the Bankruptcy Court. A form of Ballot is being provided to Creditors in Classes 1 and 3-6 and Interest holders in Class 7 by which Creditors and Interest holders in such Classes may vote their acceptance or rejection of the Plan. To vote on the Plan, after carefully reviewing the Plan and this Disclosure Statement, please complete the Ballot, as indicated thereon, (1) by indicating on the enclosed Ballot that (a) you accept the Plan or (b) you reject the Plan and (2) by signing your name and mailing the Ballot in the envelope provided for this purpose. Epiq Bankruptcy Solutions, LLC, as the Voting Tabulator and Balloting Agent, (the "Balloting Agent") will count the Ballots.

IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND RECEIVED BY THE BALLOTING AGENT, NO LATER THAN 4:00 P.M. EASTERN TIME ON _____, 2011, AT THE FOLLOWING ADDRESS:

If by first class mail:

Point Blank Solutions, et al, Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
P.O. Box 5014

New York, NY 10150-5014

If by overnight mail or hand delivery:

Point Blank Solutions, et al., Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

**DO NOT SEND YOUR BALLOT VIA FACSIMILE OR E-MAIL.**

IF YOUR BALLOT IS NOT PROPERLY COMPLETED, SIGNED AND RECEIVED AS DESCRIBED, IT WILL NOT BE COUNTED. IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY REQUEST A REPLACEMENT BY MAKING A WRITTEN REQUEST TO THE ADDRESS SHOWN ABOVE. FACSIMILE OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE COUNTED.

4.     Brokerage Firms, Banks, and Other Nominees

A brokerage firm, commercial bank, trust company, or other nominee that is the registered holder of securities for a beneficial owner, or that is a participant in a securities clearing agency and is authorized to vote in the name of such securities clearing agency pursuant to an omnibus proxy and that is acting for a beneficial owner, can vote on behalf of such beneficial owner by (i) distributing a copy of this Disclosure Statement and all appropriate ballots to such owner, (ii) collecting all such ballots, and (iii) transmitting such completed ballots to the Balloting Agent. A proxy intermediary acting on behalf of a brokerage firm or bank may follow the procedures outlined in the preceding sentence to vote on behalf of such beneficial owner. A brokerage firm, commercial bank, trust company, or other nominee may prevalidate a beneficial owner's ballot by indicating on the ballot the record holder of the notes or shares to be voted and the appropriate account numbers through which the beneficial owner's holdings are derived, and distribute the prevalidated ballot with a copy of the Disclosure Statement to the beneficial owner for voting, with such beneficial owner then completing the prevalidated ballot and returning it directly to the Balloting Agent in the enclosed preaddressed, postage prepaid envelope.

**E.     Confirmation of the Plan**

5.     1.  Generally

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation. The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed in detail below.

6.     2.  Objections to Confirmation

Any objections to Confirmation of the Plan must be in writing, conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware, and must be filed with the Clerk of the Bankruptcy Court and served on counsel for the Debtors, counsel to the Creditors' Committee, Counsel for the Equity

Committee, Counsel for Privet and Privet Fund Management, Counsel for Prescott, Counsel for Lonestar, and the United States Trustee on or before the date set forth in the notice of the hearing on Plan Confirmation sent to you with this Disclosure Statement and the Plan.

Counsel on whom objections must be served are:

Counsel for the Debtors
Laura Davis Jones, Esq.
Timothy Cairns, Esq.
Pachulski Stang Ziehl & Jones LLP
919 North Market St., 17th Floor
Wilmington, DE 19899-8705

-and-

David M. Bertenthal, Esq.
Joshua M. Fried, Esq.
Pachulski Stang Ziehl & Jones LLP
150 California St., 15th Floor
San Francisco, CA 94111

Counsel for the Creditors' Committee
Brian L. Arban, Esq.
Fred Rosner, Esq.
Messana Rosner & Stem LLP
1000 N. West Street, Suite 1200
Wilmington, DE 19801

-and-

Robert M. Hirsh, Esq.
George P. Angelich, Esq.
Arent Fox LLP
1675 Broadway
New York, NY 10019

Counsel for the Equity Committee
~~Joseph T. Moldovan, Esq.~~
~~Morrison Cohen LLP~~
~~909 Third Avenue~~
~~New York, NY 10022-4731~~

-and-

~~Neil B. Glassman, Esq.~~
~~Bayard, P.A.~~
~~222 Delaware Avenue, Suite 900~~
~~Wilmington, DE 19899~~

Counsel to Privet Opportunity Fund I, LLC and Privet Fund
Management LLC
Edward J. Estrada, Esq.
Reed Smith LLP
599 Lexington Avenue, 22nd Floor
New York, NY 10022

-and-

Kurt F. Gwynne, Esq.
Reed Smith LLP
1201 Market Street, Suite 1500
Wilmington, DE 19801

Counsel to Prescott Group Capital Management
Ricardo Palacio, Esq.
Ashby & Geddes
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

Counsel to Lonestar Capital Management, LLC
David B. Stratton, Esq.
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19899-1709

-and-

David P. Simonds, Esq.
Akin Gump Strauss Hauer & Feld LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067

-and-

Michael P. Cooley, Esq.
Akin Gump Strauss Hauer & Feld LLP

1700 Pacific Avenue, Suite 4100
Dallas, TX 75201-4675

United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19801

7.    3. Hearing on Confirmation

The Court has set_____, 2011, at _____.m. for a hearing (the "Confirmation Hearing") to determine whether the Plan has been accepted by the requisite number of Creditors and Interest holders and whether the other requirements for Confirmation of the Plan have been satisfied. The Confirmation Hearing will be held in Courtroom —2 of the United States Bankruptcy Court, 824 Market Street, Wilmington, DE 19801, before the Honorable Peter J. Walsh, United States Bankruptcy Judge. The Confirmation Hearing may be continued from time to time and day to day without further notice. If the Court confirms the Plan, it will enter the Confirmation Order.

## IV.

## HISTORY, ORGANIZATION
## AND ACTIVITIES OF THE DEBTORS

### A.    Overview of the Debtors and Their Operations

The Debtors are collectively a leading manufacturer and provider of bullet, fragmentation and stab resistant apparel and related ballistic accessories, which are used domestically and internationally by military, law enforcement, security and corrections personnel, as well as government agencies. Since 1998, Parent has supplied over 80% of U.S. military soft body armor vest requirements to protect soldiers and law enforcement personnel around the world. Parent and its debtor subsidiaries PBBA and PACA are major suppliers in the domestic law enforcement market with broad brand recognition and "best value" reputation. The Debtors manufacture several body armor products and related accessories that are sold worldwide to a variety of customers. The Debtors' armor products and related accessories protect individuals from bodily injury and death from multiple threats, including bullets, knives, and other sharp instruments and shrapnel fragments. The Debtors design, build and sell advanced systems that safeguard users from specific threats as well. The Debtors' products are sold through a variety of means, including a corporate sales force, sales agents and a network of distributors.

### 8.    1. Business Operations and the Debtors' Customers

The Debtors currently employ ~~approximately 615~~over 800 full-time employees in hourly, salaried, supervisory, management, sales, administrative and manufacturing positions to perform the functions necessary to effectively and efficiently operate the Debtors' business. The Debtors currently maintains two manufacturing facilities located in Pompano Beach, FL and Jacksboro, TN. The Debtors' products are designed for domestic, international, military and law enforcement customers, as described below.

Products are sold domestically to the U.S. military, state and local law enforcement agencies, correctional facilities, federal agencies and distributors. Sales to the U.S. military or federal government agencies accounted for approximately 50.4% and 39.1% and 62.1% of revenues for the years ended December 31, 2009 2010 and 2008, 2009, respectively. The remaining sales are primarily to domestic state and local law enforcement agencies, security and intelligence agencies, distributors, federal law enforcement agencies and state correctional facilities, and to select international markets.

### a. **Military**

The Debtors' military models are built to meet military specifications and undergo a rigorous test program as well as routine performance testing at independent U.S. testing facilities and at U.S. Army testing centers. The Debtors' principal customer for these vests is the U.S. military and Department of Defense. The U.S. military and other government agencies purchase the Debtors' products directly through the contract bid process through the U.S. General Services Administration or through third parties whereby the Debtors serve as the ballistic subcontractor.

In 1998, the U.S. Army and Marine Corps procured the Debtors' Interceptor™ Outer Tactical Vest system ("OTV"), which is a soft armor vest with pouches for hard armor plates for added ballistic protection over vital organs. The Debtors designed the Interceptor™ OTV as a continually upgradeable, modular, soft body armor system specifically for the U.S. military. The system evolved to include a removable yoke/collar, as well as throat and groin protection that can be customized by the wearer to address the specific threat faced.

In 2004, the Debtors developed for the U.S. Marine Corps an Armor Protection Enhancement System. This modular system was designed to enhance the current Interceptor™ OTV by providing equivalent protection to areas not previously covered by the Interceptor™ OTV, including the underarm, shoulder and upper arms. The Interceptor™ OTV system was first extensively used in combat in Afghanistan during Operation Enduring Freedom, where it was credited with reducing the number of life-threatening wounds. During Operation Iraqi Freedom, the Interceptor™ OTV system was widely deployed among U.S. combat forces.

In 2007, the Debtors developed the Improved Outer Tactical Vest ("IOTV"), which is the latest advancement in ballistic soft armor systems. The IOTV is currently the primary system used by the U.S. military and other government agencies and its predecessor, the OTV is also worn in combat by these customers.

The Debtors manufacture and supply the Interceptor™ OTV and the IOTV to the U.S. military through contracts with the U.S. Army, the U.S. Department of Defense and pursuant to standard purchasing contracts of a type issued by the U.S. General Services Administration. The Debtors have developed multiple models of the Interceptor™ OTV and IOTV customized to meet mission requirements. Since the development of these products, the Debtors have delivered over 1.7 million Interceptor™ OTVs and Improved Outer Tactical Vests ("IOTVs") to the military.

In ~~2009,~~2010, the Debtors derived approximately $~~61,884,000~~69,342,000 in sales to the U.S. military and U.S. government, which was approximately ~~39.1~~50.4% of all sales for that year.

### b.    Law Enforcement

The Debtors manufacture and distribute a large variety of standard and specialized products to the law enforcement community, including police, federal agencies, corrections officers and security guards. The Debtors test these and other vests in their own advanced technology center, as well as in independent U.S. test laboratories, to ensure that the vests meet or exceed National Institute of Justice standards. The Debtors sell products to commercial customers directly through a sales force and through an extensive network of distributors. The Debtors believe that they are currently the number two supplier of soft body armor ballistic systems to the domestic law enforcement market.

The majority of the Debtors' sales to law enforcement are concealable vests, which are sold to federal, state and local law enforcement. These vests are individually sized to provide the optimal fit and protection. The Debtors also make body armor products that are used by tactical law enforcement officer (most commonly, SWAT). The Debtors also produce ballistic systems for other personnel in corrections facilities and other law enforcement employees who are exposed to threats primarily from knives and other sharp instruments. These vests are constructed with special blended fabrics, stainless steel and flexible woven fabrics, and are available in both concealable and tactical models. The Debtors' body armor products also include tactical police jackets, unique vests for special agents, corrections vests and K-9 protection.

For ~~2009,~~2010, the Debtors derived approximately $~~27,572,000~~34,160,000 in domestic/distributor sales, which constituted ~~17.4~~24.8% of total ~~2009~~2010 sales.

### c.    International Sales

While the Debtors sell the same products internationally that they do domestically, the Debtors' International Interceptor, Frontier, and PACA International vests all target specifically the international tactical body armor market. The Debtors increased international sales from $~~25,035,000~~1,000,000 in ~~2008~~2007 to $~~64,047,000~~34,466,000 in ~~2009~~2010 based on multiple awards for the Interceptor OTV and related accessories, as well as through direct sales to select international customers.

For ~~2009,~~2010, the Debtors derived approximately $~~64,047,000~~34,466,000 in international sales, which constituted ~~40.5~~25.1% of total sales for ~~2009.~~2010.

### 9.    ~~2.~~Postpetition Operations

The Debtors continue to operate their day-to-day business consistent with operating practices prior to the Petition Date. The Debtors' financial results for YTD ~~2010~~2011 relative to YTD ~~2009~~2010 have showed strong performance across most areas, including strength in the domestic and distributor business and the military and federal segment. In addition, profit

margins have improved during 2010 and 2011 as the Debtors continue to execute certain operating improvements and cost cutting initiatives.

## B. Pre-Petition Capital Structure and Directors

Prior to the Petition Date, Parent was a publicly traded company. Parent's common stock is currently listed and traded on the OTC Bulletin Board. ~~As of~~On the Petition Date, the largest holders of Parent's common stock were David Brooks (22.6%) and Prescott Group Capital Management (9.5%). ~~The~~ with the remaining equity of Parent ~~is~~being publicly held.

PBBA, PACA and PBSS are each subsidiaries of Parent. James Henderson is the Chief Executive Officer of the Debtors and is also the Chairman of the Board of Directors of each of the Debtors. Mr. Henderson is a managing director and operating partner of Steel Partners LLC ("Steel Partners"), a global management firm and has been associated with Steel Partners since August 1999. In addition to Mr. Henderson, Terry Gibson serves on the Board of Directors of Parent and is affiliated with Steel Partners as a managing director of SP Corporate Services LLC, an affiliate of SP Holdings, LP. The other two directors of Parent are General Merrill A. McPeak and Robert Chefitz, and are not affiliated with Steel Partners.

As of December 31, ~~2009,~~2010, on an unaudited consolidated basis, the Debtors reported total book value assets of approximately $~~68,254,000~~54,299,000 including approximately $~~14,462,000~~9,819,000 in accounts receivable and $~~33,178,000~~11,754,000 in net inventory, and $~~71,997,000~~75,023,000 in liabilities, which included $~~21,655,000 in~~5,453,000 in post-petition accounts payable, $~~15,103,000~~6,373,000 in ~~other~~post-petition accrued expenses and ~~current liabilities, $10,000,000 under the balance of their prepetition term loan commitment, and $11,703,000 on the balance of the prepetition revolving loan commitment. For the 2009~~$25,000,000 under the post-petition DIP loan agreement. For the 2010 fiscal year, the Debtors, on an unaudited consolidated basis, reported net sales of $~~158,262,000~~137,541,000 and a net loss of approximately $~~40,000,000.~~17,210,000.

10. ~~1.~~Prepetition Secured Financing

In 2007, the Debtors entered into a credit facility with Bank of America, N.A. ("BOFA"), pursuant to that certain *Amended and Restated Loan and Security Agreement*, dated as of April 3, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Loan Agreement"). The obligations under the Prepetition Loan Agreement were guaranteed by Parent and PBSS.

Pursuant to the Prepetition Loan Agreement and associated documentation, the Debtors borrowed certain funds under (a) a revolving loan commitment (the "Revolving Loan"), and (b) a loan commitment (the "Term Loan"). In addition, pursuant to the Prepetition Loan Agreement, certain letters of credit were issued on behalf of the Debtors for the benefit of various third parties. E.I. duPont de Nemours and Company ("DuPont") fully guaranteed the Debtors' obligations under the Term Loan made under the Prepetition Loan Agreement (the "DuPont Prepetition Guaranty"). As security for the contingent obligations of the Debtors under the Prepetition Loan Agreement, the Debtors granted to DuPont a junior, subordinated security interest in substantially the same assets and property that are subject to the prepetition liens

conveyed to BOFA as security for the Debtors' obligations under the Prepetition Loan Agreement.

In January 2010, BOFA requested that the Debtors find alternative financing and requested that the Debtors engage a consultant for the purpose of reviewing and analyzing the Debtors' cash flows. The Debtors, accordingly, engaged CRG Partners Group LLC ("CRG")to perform this review. On February 23, 2010, BOFA declared a default under the Prepetition Loan Agreement at which time collections and/or funds from the Debtors' accounts were applied by BOFA to reduce the Revolving Loan to zero. BOFA further advised the Debtors that any further collections received in the Debtors' deposit accounts would be applied as a reduction to the outstanding balance of the Term Loan. This effectively eliminated the Debtors' ability to obtain access to the working capital necessary to operate their businesses.

As of the Petition Date, the Debtors owed approximately $10,526,000 million under the Prepetition Loan Agreement, and all of the Debtors' assets, including all of their cash, were encumbered by perfected, first priority security interests in favor of BOFA.

      11.   2. Prepetition Corporate Governance

On December 28, 2009, the Debtors' Board of Directors (the "Board") created an independent subcommittee (the "Subcommittee") consisting of directors Robert Chefitz and General Merrill McPeak, each of whom is an independent Board member under applicable NASDAQ corporate governance rules and each of whom is also independent of Steel Partners. The Subcommittee was initially created to independently evaluate a potential equity infusion by Steel Partners, II L.P. ("Steel"), an affiliate of Steel Partners, and other potential investors in the Debtors in 2009 that would have provided necessary funding to enable the Debtors to continue to operate after BOFA informed the Debtors that it would not renew the then-existing credit facility. On January 7, 2010, the Subcommittee retained its own counsel, Pillsbury Winthrop Shaw Pittman ("Pillsbury") who continues to advise the Subcommittee postpetition. The Subcommittee remains in place postpetition, along with the Debtors' Chief Restructuring Officer, T. Scott Avila.

## C.   **Significant Legal Proceedings**

The Debtors are involved in certain legal proceedings that occurred prior to the appointment of the Debtors' current Board and current management, certain of which are summarized below.

      12.   1. Criminal Prosecution of Former Officers

In July 2006, the Company's founder and former Chief Executive Officer David Brooks ("Brooks"), was removed from his position as an officer and director of the Company.

In August 2006, Brooks was indicted, along with the Company's former Chief Operating Officer, Sandra Hatfield ("Hatfield"), and the former Chief Financial Officer Dawn Schlegel ("Schlegel"), for securities fraud. See *United States v. Brooks, Hatfield et al.,* Criminal Action

No. 06 CR 0550 (Seybert, J.), U.S. District Court, Eastern District of New York. Hatfield had been removed from her position as Chief Operating Officer in July 2005.

Pursuant to an October 23, 2007 superseding indictment, Schlegel was charged with securities fraud conspiracy and tax fraud conspiracy. On or about October 23, 2007, Schlegel pled guilty to both counts of the superseding indictment.

Pursuant to an October 24, 2007 superseding indictment (the "Superseding Indictment"), Brooks and Hatfield were indicted on charges of securities fraud, mail and wire fraud, insider trading and obstruction of justice, among other charges. The new indictment alleged that the defendants manipulated the financial records of DHB (which later became PBSI) in order to increase reported earnings and profit margins, thereby inflating the price of DHB's stock, of which they both had significant holdings. The Superseding Indictment alleged that they also conspired to enrich themselves and their families at the expense of DHB by causing the company to pay personal expenses and millions of dollars above the defendants' authorized compensation. When DHB's stock price rose to nearly $20 per share in late 2004, Brooks and Hatfield sold several million shares of their DHB stock, with Brooks realizing more than $185 million and Hatfield more than $5 million. The defendants also allegedly defrauded the United States government out of millions of dollars in tax revenue by failing to report to the IRS more than $10 million dollars in bonus payments to themselves and other DHB employees. In total, 17 counts were levied against both Brooks and Hatfield.

Pursuant to a criminal forfeiture count in the Superseding Indictment, the United States sought forfeiture of at least $190,604,894 of Brooks' assets under Title 18, United States Code section 981(a)(1)(C) and Title 28, United States Code Section 2461(c) which require any person convicted of such offences to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offense. The United States seized approximately $~~180,000,000~~160,000,000 of Brooks' assets in connection with the criminal proceeding against Brooks Additionally, and as discussed below, in October 2007, the United States Securities and Exchange Commission filed a civil complaint against Brooks in federal court in the Southern District of Florida.

On September 14, 2010, Brooks and Hatfield were convicted of insider trading, securities fraud, conspiracy to commit securities fraud, conspiracy to commit mail and wire fraud, conspiracy to obstruct justice and obstruction of justice. In addition, the jury convicted Brooks of mail fraud, wire fraud and lying to auditors, and acquitted Hatfield of the (non-conspiracy) mail and wire fraud counts against her. Following the verdict, the parties waived their rights to a jury trial on criminal forfeiture. The criminal forfeiture trial commenced on November 15, 2010 and concluded on November 22, 2010. The United States District Court for the Eastern District of New York (the "EDNY Court") set deadlines in February and March 2011 for post-trial briefs. Both Brooks and Hatfield are currently awaiting sentencing in the EDNY Court.

On October 15, 2010, the United States commenced a civil action *in rem* to forfeit and condemn to the use of the United States of America certain one hundred and seventeen (117) assets listed on "Schedule I" attached to the complaint and all proceeds traceable thereto (the "Defendants *in rem*") pursuant to 18 U.S.C. §§ 981(a)(1)(A) & (C). *See United States v. All Assets Listed on Schedule I, Attached Hereto and All Proceeds Traceable Thereto*, Civil Action

No. 10 CV 4750 (Seybert, J.), U.S. District Court, Eastern District of New York. The civil forfeiture action is related to the pending criminal forfeiture action against defendants Brooks and Hatfield. The assets that are subject to forfeiture consist of property that was either seized or restrained pursuant to seizure warrants and restraining orders previously issued in the criminal proceeding against Brooks and Hatfield.

In the verified complaint, the United States of America alleges that the Defendants *in rem* constitute the proceeds of the conspiracy, fraud, and insider trading offenses for which Brooks and Hatfield were convicted. The Defendants *in rem* are broken into several parts as follows: (1) the first one hundred and thirteen (113) assets listed on Schedule I to the complaint that are the "Brooks Assets" are divided into (a) the "Unauthorized Compensation Assets" and (b) the "Insider Trading Assets"; and (2) the last four (4) assets listed on Schedule I to the complaint that are the "Hatfield Assets."

In its complaint, the United States requests, *inter alia*, that the Defendants *in rem* be forfeited and condemned to the use and benefit of the United States of America and that the United States of America be awarded its costs and disbursements in the action. The complaint and selected pleadings can be found at www.epiqbankruptcysolutions.com.

On April 6, 2011, the Debtors filed a Verified Claim in the civil forfeiture action asserting claims to the Unauthorized Compensation Assets seized by the United States. In order to assert an ownership interest in the civil forfeiture proceeding, a claimant must establish an ownership interest in the underlying seized assets. In its civil forfeiture complaint, the United States alleged and traced the purchase of the Unauthorized Compensation Assets to funds looted from the Debtors. Accordingly, the Debtors asserted claims to those Unauthorized Compensation Assets.

13.    2. Class Action and Derivative Lawsuits

In 2005, a number of purported class actions lawsuits were filed in the EDNY Court against PBSI and certain of their former officers and directors. The complaints were filed on behalf of purchasers of PBSI's publicly traded securities during the period from April 21, 2004 through August 29, 2005. The complaints alleged, among other things, that PBSI's public disclosures were false or misleading and that the Debtors body armor products were defective and failed to meet customer standards and that these facts should have been publicly disclosed. The class action lawsuits were consolidated into a single class action lawsuit in March 2006 (the "Class Action Suit") as the complaints were substantially similar to one another.

During the same period, a number of derivative complaints were filed in the EDNY Court against PBSI and certain of the Debtors' former officers and directors and, in some cases, against the Debtors' former auditors. The complaints alleged, among other things, that PBSI's breached their fiduciary duties, engaged in fraud, misrepresentation, misappropriation of corporate information, waste of corporate assets, abuse of control and unjust enrichment. The derivative complaints were consolidated into a single shareholder derivative action (the "Derivative Action") in March 2006.

In July 2006, PBSI entered into a memorandum of understanding (the "MOU") to settle both the Class Action Lawsuit and the Derivative Action. Under the MOU, the Class Action Suit

was to be settled subject to approval by the EDNY Court, for $35.2 million in cash and 3,184,713 shares of the Debtors' common stock. The Derivative Action would be settled, also subject to approval by the EDNY Court, in consideration of the adoption of certain corporate governance provisions, and the payment of $0.3 million in legal fees to the lead counsel in the Derivative Action. The Debtors deposited into escrow $22.3 million in cash which represented the Debtors' portion for the cash settlement which was funded as follows: (i) $7.5 million from the exercise by the Debtors' former Chief Executive Officer, Brooks, of a warrant to acquire 3,000,000 shares of the Debtors' common stock at an exercise price of $2.50 per share, and (ii) $14.8 million from the purchase by Brooks of 3,007,099 shares of stock at $4.93 per share. The Debtors' directors and liability insurers funded the remaining portion of the cash settlement, $12.9 million pursuant to buyouts of the policies, which escrowed amount totaled $35,200,000 and deposited with the escrow agent under the Settlement Agreement (the "Escrow Agent"). In addition to the cash settlement, the settlement also provided for the issuance of an additional 3,184,713 of the Debtors' common stock to the plaintiffs. On July 8, 2008, the EDNY Court entered an order approving a settlement agreement that incorporated the terms of the MOU (the "Settlement Agreement").[68]

The Settlement Agreement provided for PBSI to release and indemnify Brooks and Schlegel for any amounts paid by them to Point Blank pursuant to a judgment in any action under § 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243 ("SOX § 304"). On October 25, 2007, the Securities and Exchange Commission filed a complaint against Brooks in the United States District Court for the Southern District of Florida (the "SEC Action") seeking reimbursement to Point Blank under SOX § 304 of certain bonuses and stock profits received by Brooks, including approximately $180 million of proceeds from Brooks' sale of DHB stock. Under the terms of the Settlement Agreement and prior to the Petition Date, if Brooks was required to reimburse all or some portion of this $180 million to Point Blank pursuant to a judgment in the SEC Action, then Point Blank would have been required to return the same amount to Brooks.

Equity holder D. David Cohen filed an appeal (the "Appeal") with the United States Court of Appeals for the Second Circuit (the "Second Circuit") from order approving the Settlement Agreement. As a result of the filing of Appeal, the effective date of the Settlement Agreement did not occur because it never became a "final order" pursuant to its terms. The Appeal argued that the Settlement Agreement impermissibly released and indemnified Brooks and Schlegel against all liability arising under SOX § 304.

PBSI filed a motion to reject the Settlement Agreement in the Bankruptcy Court on September 17, 2010 [Docket 589] (the "Rejection Motion"). PBSI sought to reject the Settlement Agreement for a number of reasons. First, rejection of the Settlement Agreement would allow PBSI to potentially recover approximately $35,200,000 of the cash settlement as property of PBSI's estate. Second, if the Settlement Agreement were rejected, PBSI would be entitled to assert the claims from the derivative action against Brooks and Schlegel, among others and the general releases exchanged between PBSI and Brooks pursuant to the Settlement Agreement will become null and void. Finally, because the Appeal had not yet been decided at the time of the filing of the Rejection Motion, rejection of the Settlement Agreement would

---

[68] Under the various agreements, $9,925,000 million has already been distributed from escrow to the lead plaintiff's counsel in the Class Action Suit and Derivative Action which, as described below, Parent is attempting to recover for the benefit of its estate.

ensure that the Debtors would be relieved of any obligation to indemnify Brooks and Schlegel for any amounts paid by them to Point Blank under SOX § 304 and retain any amounts paid by Brooks or Schlegel under SOX § 304.

On September 30, 2010, the Second Circuit granted the Appeal and held that the indemnification and release provisions of the Settlement Agreement violated SOX § 304. The Second Circuit vacated and reversed the judgment of the EDNY Court with respect to this portion of the Settlement Agreement. Meanwhile, PBSI proceeded with the prosecution of the Rejection Motion in the Bankruptcy Court because of the additional benefits that would inure to the benefit of PBSI's estate summarized above beyond the excising of PBSI's indemnification obligations as mandated by the Second Circuit's disposition of the Appeal. On December 22, 2010, the Bankruptcy Court entered an order granting the Rejection Motion.⁷ (the "Rejection Order").⁹ The lead plaintiffs to the Class Action Suit filed an appeal of the Rejection Order on December 30, 2010 [Docket No. 979].

14.    3. Turnover Action

On November 16, 2010, PBSI filed a complaint for turnover of property of the estate against the attorneys for the lead plaintiffs in the Class Action Suit and the Derivative Action (together, the "Actions"). On January 4, 2011, PBSI filed an amended complaint in the turnover action (the "Turnover Complaint") against both the attorneys for the lead plaintiffs in the Actions (collectively, the "Law Firm Defendants") and the PBSI's former officers and directors party to the Settlement Agreement (collectively, the "Former Officer and Director Defendants"). The turnover action seeks recoveryPursuant to the Turnover Complaint, PBSI seeks: (i) declaratory judgment against both the Law Firm Defendants and the Former Officer and Director Defendants (collectively, the "Defendants") finding that the settlement funds, plus interest thereon, constitute property of the PBSI estate; and (ii) the entry of an order compelling the turnover of the settlement funds as property of the, plus interest thereon, to PBSI's estate. TheIn the Turnover Complaint, PBSI alleges, among other things, that: (i) the Law Firm Defendants are in possession of $9,925,000 that was provisionally paid to the Law Firm Defendants pursuant to the terms of the Settlement Agreement. Because the payments; and (ii) that Law Firm Defendant Robbins Geller Rudman & Dowd LLP, in its capacity as Escrow Agent, is in possession of the remainder of the $35,200,000 cash settlement. These funds must be returned to PBSI's estate because their payments under the Settlement Agreement were expressly conditioned on final court approval in the Actions, and as a result ofwhich cannot occur in light of (i) the Second Circuit's decision on the Appeal, and/or (ii) PBSI's rejection of the Settlement Agreement during its bankruptcy. Since the Settlement Agreement cannot become final, and the portion of the funds provisionally paid to the Law Firm Defendants, and those funds being held by Law Firm Defendant Robbins Geller Rudman & Dowd LLP, in its capacity as Escrow Agent, must be returned to the PBSI's estate. In addition, the Turnover Complaint alleges that one of the Law Firm Defendants, Robbins Geller Rudman & Dowd LLP in its capacity as Escrow Agent, is in

⁷⁹ In connection with the Rejection Motion, on November 18, 2010, the lead plaintiffs in the Class Action filed a motion for relief from the automatic stay in the Bankruptcy Court (the "Stay Relief Motion") to allow them to proceed with approval of the Settlement Agreement in the EDNY Court to purportedly obtain a final order of the Settlement Agreement in light of the Second Circuit's ruling on the Appeal. The Debtors, who as noted above, sought to reject the Settlement Agreement rather than approve it, opposed the Stay Relief Motion. The Bankruptcy Court denied the Stay Relief Motion in connection with the Bankruptcy Court's approval of the relief requested in the Rejection Motion.

possession of the remainder of the $35,200,000 of the cash settlement which must be returned to the PBSI's estate. Finally, the Turnover Complaint seeks declaratory judgment against both the Law Firm Defendants and the Former Officer and Director Defendants finding that the settlement funds, plus interest thereon, constitute property of the PBSI's estate. estate. The Law Firm Defendants have filed motions (1) to dismiss the Actions; (2) to determine that the Actions are non-core proceedings and to withdraw the references of the Actions from the Bankruptcy Court; and (3) to stay prosecution of the Actions pending an order resolving certain of these motions. The Debtors have filed oppositions to each of these motions. In addition, David Brooks filed a motion to dismiss the Turnover Complaint or, alternatively, to stay the prosecution of the Actions, which motion the Debtors have also opposed.

The Law Firm Defendants and Former Officer and Director Defendants have asserted (or may assert) claims to all or some portion of the $35,200,000, however35,200,000. However, it is the Debtors' position that such funds are property of the PBSI's estate. It is difficult to predict the outcome of this contested matter at this time due to the inherent uncertainty in litigation.

15.    4. Securities Litigation

The Debtors arewere subject to ongoing investigationsinvestigation by the SEC and the U.S. Attorneys'Attorney's Office for the Eastern District of New York regarding alleged violations of federal securities laws stemming from accounting irregularities and disclosure issues from 2003 through 2005. In August 2009, the Debtors' received a "Wells Notice from the SEC" informing them that the SEC's regional staff conducting the investigation had made a preliminary decision to recommend that the SEC bring a civil injunctive action against the Debtors for possible violations of the securities regulations in connection with the criminal trial oflaws based on conduct of the Debtors' former senior management, Schlegel, Hatfield and Brooks discussed above. The Debtors have agreed to a settlement with the Securities and Exchange Commission concerning a potential non-prosecution agreement, which the Debtors expect will be submitted to the Bankruptcy Court for approval. On February 24, 2011, the Debtors filed a motion seeking Bankruptcy Court approval of a consent agreement (the "Consent Agreement") entered into with the SEC that provides for entry of a final judgment in federal court permanently enjoining the Debtors from violating the antifraud, proxy, record-keeping and reporting provisions of the securities laws. The Consent Agreement does not require the payment of any civil money penalty or disgorgement. In connection with approval of the Consent Agreement, the Debtors sought authority to de-register as a public company. On March 14, 2011, the Bankruptcy Court approved the Consent Agreement. The Bankruptcy Court denied a motion for stay of the order approving the Consent Agreement pending appeal and entered its order approving the Consent Agreement and authorizing the Debtors to de-register as a public company on March 29, 2001 [Docket 1259].

16.    5. Zylon Litigation

The Debtors are subject to an industry-wide investigation by the Civil Division of the U.S. Department of Justice (the "DOJ") into the manufacture and sale of body armor products containing Zylon, a ballistic yarn manufactured and marketed by Toyobo Co., Ltd. and Toyobo America, Inc (together, "Toyobo").

On October 7, 2010, the DOJ filed a complaint ("DOJ Complaint") in the United States District Court for the District of Columbia (the "DC Court") against PBSI, PBBA and PACA seeking damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-33 and to recover damages for breach of contract, payment by mistake and unjust enrichment relating to alleged false statements in connection with the sale of Zylon to the United States. The DOJ Complaint alleges that the Zylon that was manufactured by Toyobo and then sold to the Debtors was defective. The DOJ filed a proof of claim against PBBA and asserts a civil penalty of not less than $5,000 and not more than $10,000 for each false claim or false statement and damages for breach of contract, payment by mistake and unjust enrichment.

The Debtors filed a complaint against Toyobo, which manufactured the Zylon, in *Point Blank Solutions, Inc., et al.,vs. Toyobo America, Inc., and Toyobo Co., Ltd,* Case No. 09-61166-Seitz/O'Sullivan (the "Toyobo Litigation") in the United States District Court for the Southern District of Florida. Pursuant to the Toyobo Litigation, the Debtors asserted claims against Toyobo in excess of $20 million for breach of express warranty, breach of implied warranty of merchantability, false, misleading and deceptive advertising, fraudulent inducement, and deceptive and unfair trade practices as defined by the Florida Deceptive and Unfair Trade Practices Act. Trial on the Toyobo Litigation is currently scheduled for July 2011.

## D.      Events Leading to Bankruptcy

The events that occurred during 2008 and 2009 presented a significant challenge to the Debtors. Significant delays in the awarding of U.S. Military and Federal Government soft body armor contracts, uncertainties in the transition of civilian law enforcement body armor certification standards, the continuing poor economic climate and the crisis in the credit markets contributed to substantially reduced sales in 2008 and 2009. In 2009, the Debtors implemented staff reductions and facility consolidations as part of the "lean manufacturing" transformation of operations and cost cutting measures. Due to careful and focused management during this difficult economic period, the Company preserved operating capacity by building rapidly scalable production cells and reducing operating waste.

Due to the percentage of Company sales to the U.S. military and federal law enforcement agencies, it is important to understand the nature of contracting with the federal government and the possible effect of the federal government's budgeting process on the Debtors' operating results and production backlog in any given year. Frequently, there were events surrounding the U.S. and other defense budgets that create fluctuations in the Debtors' backlog and portfolio of contracts with the federal government. These events included availability of year-end monies to accomplish important last minute contracts for supplies and services, enactment of a continuing resolution which limits spending to the previous year's level until a budget is signed into law, late approval of a new budget, use and timing of a supplemental appropriation, and several other possible events.

In late 2009, the Debtors were awarded a 65,000 unit IOTV contract from the U.S. Army. In the past, the testing process took approximately one week, after which the Debtors would receive a Letter of Approval thereby allowing the Debtors to ship the order, record the account receivable and sale at that time. The eligible accounts receivables provided a basis to obtain an advance of funds from the Revolving Loan. The percentage of the eligible receivables that were

pledged to BOFA secured the payment of the funds that were advanced. However, in the fourth quarter of 2009, the Army elected to test the pulled vests at the U.S. Army Aberdeen testing facility, which increased the test period from three days to thirty six days. Further adding to the delay, the U.S. Army identified certain deficiencies with the vests as tested, and required the Company to submit a corrective action report and enhanced inspection procedures. While the vests were ultimately certified, the remedial activities included a stop work order for the U.S. Army vests from February 5, 2010 to February 27, 2010.

This increased testing time and remedial actions significantly delayed approval for the lots being tested, thereby preventing the Debtors from obtaining advances against the eligible receivables from the orders of the U.S. Army. The extended testing period at the Aberdeen testing facility combined with the contract payment terms of net, 30 days, resulted in a cash cycle of up to 10 weeks from the date the raw materials were originally received by the Debtors to the date of payment. This extended payment cycle in conjunction with the contractually agreed "Pull" dates and the vendor payment terms ranging from cash in advance to net, 30 days, placed severe strain on the Debtors' working capital. While the U.S. Army attempted to alleviate the cash strain through early performance billing, additional testing resulting from quality issues caused a further slow down in shipments and payments. In January 2010, BOFA reduced the amount it would advance on accounts receivable from 85% to 75% and for inventory from 29.5% to 20%. Additionally, availability blocks on borrowing remained in place as well as scheduled credit line reductions.

Due to the Debtors' operational difficulties, the continued deterioration in the Debtors' cash flow, to help ensure that day-to-day operations during the pendency of the Chapter 11 Cases continued uninterrupted, that administrative expenses in the Chapter 11 Cases were paid, and that an orderly process could be implemented to create an ongoing path for the Debtors and their employees, the Debtors determined that it was in the best interest of the Debtors, their estates, and their creditors to commence the Chapter 11 Cases.

## E.    The Commencement of the Chapter 11 Cases

The Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for District of Delaware on April 14, 2010. No trustee or examiner has been appointed in the Chapter 11 Cases. The Creditors' Committee was appointed on July 27, 2010, to represent the interests of Debtors' general unsecured creditors. The Equity Committee was appointed on July 27, 2010 to represent the interests of holders of equity security interests in PBSI.

## F.    First Day Motions and Other Material Relief

On the Petition Date, the Debtors sought approval from the Bankruptcy Court of certain motions and applications (collectively, the "First Day Motions"), which the Debtors filed simultaneously with, or around the same time as, their voluntary petitions. The Debtors sought this relief to minimize disruption of the Debtors' business operations as a result of the Chapter 11 filings, to establish procedures in the Chapter 11 Cases regarding the administration of the cases and to facilitate reorganization efforts. Specifically, the First Day Motions addressed the following issues, among others:

17. 1. Joint Administration

On the Petition Date, the Debtors filed their *Motion for an Order Authorizing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only* [Docket No. 2], pursuant to which the Debtors sought an order directing the joint administration of their Chapter 11 Cases and the consolidation thereof for procedural purposes only. On April 16, 2010, the Bankruptcy Court entered an order granting the relief requested [Docket No. 39].

18. 2. Employees

On the Petition Date, the Debtors filed their *Motion for Entry of an Order: (I) Authorizing the Debtor to (A) Pay Wages, Salaries and Other Compensation, (B) Maintain Employee Medical and Similar Benefits, and (C) Pay Reimbursable Employee Expenses, and (II) Authorizing and Directing Banks and Other Financial Institutions to Pay All Checks and Electronic Payment Requests Made by the Debtors Relating to the Foregoing* [Docket No. 12], pursuant to which the Debtors sought an order authorizing them to pay and/or honor, among other things, certain prepetition claims for wages, salaries and other compensation, as well as to honor paid time off, medical benefits, contributions to employee benefit plans, and other employee benefits that the Debtors historically paid in the ordinary course of business, to reimburse certain reimbursable unpaid employee obligations, and to pay all costs incident to the foregoing. The Bankruptcy Court entered an order approving this motion on April 16, 2010, 2010 [Docket No. 44].

19. 3. Cash Management

On the Petition Date, the Debtors filed their *Motion for Entry of an Order Under 11 U.S.C. Sections 105, 345, 363, 503(b), 1107 and 1108 Authorizing (I) Maintenance of Certain Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System; (IV) Continued Performance of Intercompany Transactions and Exercise of Intercompany Setoff Rights, (V) Grant of Postpetition Administrative Priority to Intercompany Claims, and (VI) Limited Waiver of Section 345(b) Deposit and Investment Requirements* [Docket No. 10] pursuant to which the Debtors sought an order authorizing them to maintain their existing cash management system, bank accounts and business forms. The Debtors further requested that they be excused from compliance with certain aspects of section 345(b) of the Bankruptcy Code which requires compliance with certain deposit or investment procedures. The Bankruptcy Court entered its order granting the relief requested by the motion on April 16, 2010 [Docket No. 42].

20. 4. Taxes

On the Petition Date, the Debtors filed their *Motion for Entry of an Order (A) Authorizing the Debtors to Pay Certain Prepetition Sale and Use and Similar Taxes in the Ordinary Course of Business and (B) Authorizing and Directing Financial Institutions to Honor Related Checks and Electronic Payment Requests* [Docket No. 19] pursuant to which the Debtors sought authority to pay, in the Debtors' sole discretion, prepetition taxes and regulatory fees. The Bankruptcy Court granted the motion by order entered on April 16, 2010 [Docket No. 46].

21. 5. Utilities

On the Petition Date, the Debtors filed their *Motion for Entry of Interim and Final Orders Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment* [Docket No. 13], pursuant to which the Debtors sought an order establishing "adequate assurance" procedures for efficient administration of the Debtors' responsibilities under section 366 of the Bankruptcy Code. On April 16, 2010, the Bankruptcy Court entered its interim order implementing the procedures proposed by the Debtors [Docket No. 45]. A final order was entered on May 12, 2010 [Docket No. 116].

22. 6. Retention of Customer Programs

On the Petition Date, the Debtors filed their *Motion for Entry of an Order Pursuant to Sections 105(a), 363(c), 1107(a) and 1108 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 Authorizing the Debtors to Honor Prepetition Obligations to Customers and to Otherwise Continue Customer Practices and Programs in the Ordinary Course of Business* [Docket No. 7], pursuant to which the Debtors sought authorization to continue to honor certain programs to maximize sales, engender customer loyalty, and develop and sustain brand loyalty and a positive reputation in the marketplace. The Court entered an order granting the relief requested on April 16, 2010 [Docket No. 41].

23. 7. Prepetition Shipper, Freight Forwarder, and Related Obligations

On the Petition Date, the Debtors filed their *Motion for an Order Authorizing, But Not Directing, Debtors to Pay Prepetition Claims of Shippers and Granting Related Relief* [Docket No. 16], pursuant to which Debtors sought authority to pay certain essential prepetition shipper, freight forwarder and related obligations in the ordinary course of business. The Bankruptcy Court entered an order granting the relief requested on April 16, 2010 [Docket No. 47].

24. 8. Retention of Key Professionals

On the Petition Date, the Debtors filed a number of applications to employ Professionals, including:

- *Application Pursuant to Section 327(a) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014-1 For Authorization to Employ and Retain Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date* [Docket No. 4], pursuant to which the debtors sought to retain PSZ&J as general bankruptcy counsel. An order was entered authorizing PSZ&J's retention on May 12, 2010 [Docket No. 115].

- *Application for Entry of An Order Authorizing Retention and Employment of CRG Partners Group LLC to Provide Restructuring Services to the Debtors and of T. Scott Avila As Chief Restructuring Officer of the Debtors Nunc Pro Tunc to the Petition Date* [Docket No. 8], to approve the retention of CRG as their financial and reorganization consultants and T. Scott Avila as the Debtors' Chief Restructuring Officer. The

Bankruptcy Court granted the application by order entered on May 12, 2010 [Docket No. 126].

- *Application for Entry of An Order Authorizing Retention and Employment of Epiq Bankruptcy Solutions, LLC as Notice, Claims and Balloting Agent* [Docket No. 5], pursuant to which the Debtors also sought to employ Epiq Bankruptcy Solutions, LLC as noticing, claims and balloting agent. The Bankruptcy Court authorized this retention on April 16, 2010 [Docket No. 40].

25. 9. Critical Vendors

On the Petition Date, the Debtors filed their *Motion of the Debtors Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 for an Order Authorizing, but not Requiring, the Payment of Certain Prepetition Claims of Critical Trade Vendor, E.I. DuPont De Nemours and Company* [Docket No. 11], pursuant to which the Debtors sought authority to pay, in their sole discretion, up to $700,000 of a prepetition claim of a critical vendor, E.I. DuPont De Nemours and Company (the "DuPont Claim"), whose continued assistance was critical to the Debtors' reorganization efforts. The Bankruptcy Court granted the motion by order entered April 16, 2010 [Docket No. 43] (the "Critical Vendor Order"). Pursuant to the Critical Vendor Order, the Debtors paid $600,000 of the DuPont Claim.

26. 10. DIP Loan Agreement

Prior to the Petition Date, the Debtors and their advisors canvassed approximately twenty sources of prospective postpetition financing, including financing from BOFA, and various other third parties. In particular, CRG prepared a comprehensive presentation seeking financing proposals. BOFA indicated that it was not willing to extend further credit to the Debtors and insisted on full repayment of all outstanding obligations under the Prepetition Loan Agreement. The Debtors compared the proposals received from four potential lenders and negotiated with each of these parties expeditiously to obtain the most favorable lending terms for the benefit of the estates. Following the Debtors' evaluation and comparison of the various financing proposals and the Subcommittee's consideration and approval, the Debtors selected Steel Partners L.P. ("Steel") to provide senior secured superpriority credit to the Debtors and negotiated the definitive terms and documentation set forth in the *Debtor Possession Financing Agreement*, dated April 12, 2010 (the "Original DIP Agreement"). Accordingly, on the Petition Date, the Debtors filed their *Motion of Debtors for Interim and Final Orders for Authorization to: (1) Incur Senior Secured Superpriority Postpetition Financing; (2) Repay Prepetition Secured Debt Upon Entry of Interim Order; (3) Use Cash Collateral; (4) Grant Liens and Provide Superpriority Administrative Expense Status; (5) Grant Adequate Protection; (6) Modify the Automatic Stay; and (7) Schedule a Final Hearing* [Docket No. 23] (the "Original DIP Financing Motion").

Pursuant to the Original DIP Financing Motion, the Debtors sought authority to borrow from Steel Partners L.P. (the "Original DIP Lender"), up to the lesser of $20,000,000, or the borrowing base amount described in the Original DIP Agreement, pursuant to a senior secured, first priority debtor in possession revolving credit facility (the "Original DIP Facility"). The borrowing base under the Original DIP Facility consisted of the sum of (a) 80% of the face amount of eligible accounts receivable; (b) 20% of eligible inventory; and (c) the amount of third

party recourse available for the benefit of Steel through the provision by DuPont of a postpetition guaranty, less certain reserves described in the Original DIP Agreement, as well as the use of cash collateral. BOFA consented to the release of its collateral subject to full repayment of the amounts due under the Prepetition Credit Agreement. DuPont also agreed to furnish a guaranty of the last $10,000,000 borrowed under the Original DIP Facility (the "Postpetition DuPont Guaranty") on the condition that its aggregate potential liability under the Prepetition DuPont Guaranty and Postpetition DuPont Guaranty did not exceed the principal sum of $10,000,000 (plus interest and collection costs).

On April 16, 2010, the Bankruptcy Court entered its *Interim Order Pursuant to 11 U.S.C. sections 105, 361, 362, 363 and 364, Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules 2002-1 and 4001-2: (1) Authorizing Incurrence by the Debtors of Post-Petition Secured Indebtedness with Priority Over All Secured Indebtedness and With Administrative Superpriority, (2) Authorize Repayment in Full of Pre-Petition Secured Debt Upon Entry of Interim Order, (34) Granting Liens, (4) Authorizing Use of Cash Collateral and Providing Adequate Protection, (5) Modifying the Automatic Stay and (5) Scheduling Final Hearing* [Docket No. 48] (the "Original Interim DIP Order") which authorized, on an interim basis, the Debtors' use of cash collateral and additional borrowings under the Original DIP Facility pursuant to the terms of the budget, and granted certain adequate protection to the Original DIP Lender and authority to satisfy the amounts owed to BOFA under the Prepetition Loan Agreement. The Bankruptcy Court entered its *Final Order (1) Authorizing Incurrence by the Debtors of Postpetition Secured Indebtedness With Priority Over All Over Secured Indebtedness and With Administrative Superpriority, (2) Granting Liens, (3) Authorizing Use of Cash Collateral and Providing Adequate Protection and, (4) Modifying the Automatic Stay* on May 12, 2010 [Docket No. 120], a final order granting the Original DIP Motion (the "Original Final DIP Order"). As provided in the Original DIP Agreement and related orders, the Debtors used certain of the proceeds of the Original DIP Facility to fully repay their obligations to the Prepetition Lenders under the Prepetition Credit Agreement, as well as to fund postpetition working capital needs.

In August 2010, the Debtors failed to meet certain related financial targets under the budget approved by the Original Final DIP Order (the "DIP Budget"). The Original DIP Lender waived these defaults under the terms and conditions of that certain *Waiver and First Amendment to Credit Agreement*, dated September 1, 2010 (the "First DIP Amendment"), which the Bankruptcy Court approved on September 2, 2010 and which included timetable for the Debtors to effectuate a sale of their assets or, alternatively, a reorganization process and an extended maturity date from September 30, 2010 to December 31, 2010. In the fall of 2010, the Debtors again failed to meet the sale or reorganization timetable and the financial targets mandated by the DIP Budget. The Debtors sought to modify certain of the sale/restructuring milestones agreed under the First DIP Amendment, as set forth under that certain *Waiver and Second Amendment to Credit Agreement*, dated October 26, 2010 (the "Second DIP Amendment"). Under the Second DIP Amendment, the Debtors agreed to revised sale/restructuring milestones which included, *inter alia*, a sale hearing to be conducted no later than December 16, 2010 and fixed December 31, 2010 as the maturity date for the DIP Facility. On November 9, 2010, the Bankruptcy Court entered an order approving the Second DIP Amendment [Docket No. 750]. As discussed below, the Original DIP Facility was fully repaid from the proceeds received in respect of the DIP

Facility (defined below) approved by the Court on December 9, 2010. The DIP Facility expires on June 15, 2011.

## G. Bar Dates for Filing Proofs of Claim

The Bankruptcy Court entered an order on June 10, 2010 [Docket No. 237] which established August 13, 2010 as the deadline for filing proofs of claim for any Claims against the Debtors that arose before the Petition Date (including WARN Act Claims, but excluding the claims of governmental entities), and October 12, 2010 as the deadline for filing proofs of claim for any Claims against the Debtors of governmental entities. A schedule of the filed proofs of claim is maintained by Epiq Bankruptcy Solutions, LLC, the Debtors' noticing and claims.

## H. Filing of Schedules and Statement of Financial Affairs

On May 14, 2010, the Debtors filed their respective schedules of assets and liabilities (the "Schedules") and each of their respective *Statement of Financial Affairs* with the Bankruptcy Court [Docket Nos. 150-57]. On October 12, 2010, the Debtors filed amendments to their Schedules with the Bankruptcy Court [Docket Nos. 668-70].

## I. Appointment of Creditors' Committee

On April 26, 2010, the Office of the United States Trustee formed the Creditors' Committee and appointed five (5) initial members thereto. The Creditors' Committee subsequently met and voted to retain Arent Fox LLP and The Rosner Group LLC as counsel to the Creditors' Committee, which retentions the Bankruptcy Court approved on June 10, 2010 [Docket Nos. 238 and 234]. On April 28, 2010, the Creditors' Committee selected and voted to retain CBIZ MHM LLC as its financial advisors, which retention the Bankruptcy Court approved by order entered on June 10, 2010 [Docket No. 235].

## J. Appointment of Equity Committee

On July 27, 2010, the Office of the United States Trustee appointed an Official Committee of Equity Security Holders (the "Equity Committee") and appointed seven (7) initial members thereto. The Equity Committee subsequently met and voted to retain Morrison & Cohen LLP and Bayard, PA as counsel to the Equity Committee, which retention the Bankruptcy Court approved on August 18, 2010 [Docket Nos. 491 and 492]. On April 28, 2010, the Equity Committee selected and voted to retain Goldin Associates, LLC as its financial advisors, which retention the Bankruptcy Court approved order entered on September 29, 2010 [Docket No. 631].

On March 25, 2011 Office of the United States Trustee reformed the Equity Committee through the appointment of three (3) new members pursuant to that certain Second Amended Notice of Appointment of Committee of Equity Security Holders [Docket No. 1242]. The Equity Committee voted to terminate Morrison & Cohen LLP and Bayard, PA as its counsel and filed a motion to retain Baker & McKenzie as its new counsel on April 1, 2011.

## K. Deadline Extensions for Various Matters

On June 25, 2010 the Debtors' filed a request for an extension of the deadline to assume or reject unexpired leases and executory contracts (the "Section 365(d)(4) Deadline"). Per the

Bankruptcy Court's *Order Extending Deadline to Assume or Reject Unexpired Leases of Nonresidential Real Property*, the Section 365(d)(4) Deadline was extended to November 10, 2010 [Docket No. 338]. The Debtors subsequently entered into voluntary agreements with the landlords of the Debtors' facilities at Pompano Beach, FL and Jacksboro, TN and moved to further extend the Section 365(d)(4) Deadline for these two leases through April 30, 2011.

The Debtor also sought and obtained various extensions of the deadline to remove actions pursuant to 28 U.S.C. Section 1452.

Finally, on August 11, 2010, the Debtors filed their first motion to extend their exclusive periods to both file a plan and to solicit acceptances with respect thereto [Docket No. 454], pursuant to which they sought to extend by one hundred twenty days the period under § 1121(b) during which the Debtors have the exclusive right to file a Chapter 11 plan (the "Exclusive Filing Period") and the period under § 1121(c)(3) during which the Debtors have the exclusive right to solicit acceptances of a Chapter 11 plan (the "Exclusive Solicitation Period," together with the Exclusive Filing Period, the "Exclusive Periods"). On September 20, 2010, the Bankruptcy Court entered an order extending the Exclusive Filing Period through and including October 12, 2010 and extending the Exclusive Solicitation Period through and including December 10, 2010 [Docket No. 597]. On October 8, 2010, the Debtors filed a motion to further extend the Exclusive Periods [Docket No. 662]. On November 24, 2010, the Equity Committee filed an objection to the Debtors' second motion to further extend the Exclusive Periods [Docket No. 806]. On December 15, 2010, the Bankruptcy Court entered an order approving a joint stipulation between the Debtors, the Equity Committee and the Creditors' Committee further extending the Exclusive Filing Period to February 9, 2011 and the Exclusive Solicitation Period to April 11, 2011, with such exclusivity to be shared co-exclusively with the Creditors' Committee and the Equity Committee (the "Exclusivity Extension Stipulation") [Docket No. 927]. However, the Exclusivity Extension Stipulation also provided that nothing therein would modify or alter the obligations of the Debtors, Creditors' Committee and Equity Committee with respect to their respective obligations under the First Plan Support Agreement (defined below).

## L.    Litigation with the Creditors' Committee and Office of United States Trustee's Filing of Motion to Appoint Examiner

On July 13, 2010, the Creditors' Committee filed the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Appointing a Chapter 11 Trustee, Or in the Alternative, Appointing an Examiner Pursuant to 11 U.S.C. §§ 1104(a) & (C) & 105(A) And Bankruptcy Rules 2007.1 and 9014* [Docket No. 334] (the "Trustee Motion"), pursuant to which the Creditors' Committee requested appointment of a Chapter 11 trustee in the Debtors' cases, or, alternatively, appointment of an examiner. The Debtors' filed their preliminary objection to the Trustee Motion [Docket No. 362] and their objection to the Trustee Motion [Docket No. 511] on July 19, 2010 and August 24, 2010, respectively.

On July 30, 2010, the Office of the United States Trustee filed its *United States Trustee's Motion for Order Directing Appointment of Examiner* [Docket No. 423] (the "Examiner Motion"), pursuant to which the Office of the United States Trustee requested appointment of an examiner for the limited purpose of investigating the facts and circumstances surrounding: (i) the connections between Steel Partners and the Debtors and the independence of the Board, and

(ii) the allegations of the Creditors' Committee and David Cohen regarding whether the approval of the settlement of the Class Action Suit and Derivative Action will benefit the estate and who would be entitled to any proceeds from a successful resolution of the SEC civil action against Brooks. The Debtors filed their opposition to the Examiner Motion on August 25, 2010 [Docket No. 513].

On September 1, 2010, the Debtors and Creditors' Committee entered into a stipulation to settle the Trustee Motion [Docket No. 537] (the "Trustee Motion Settlement"). Pursuant to the Trustee Motion Settlement, the Debtors and Creditors' Committee agreed, among other things, for the withdrawal of the Trustee Motion and for the appointment of an observer mutually selected by the Debtors and the Creditors' Committee to observe and report to the Creditors' Committee on the meetings of the Debtors' Board. The Office of the United States Trustee agreed to continue the hearing to consider the Trustee Motion Settlement.

## M.     The Sale and Reorganization Process and Replacement DIP Financing

As noted above, the Debtors' Original DIP Facility contained sale milestones that required the filing of a motion to approve an asset purchase agreement initially by November 1, 2010 which deadline was later extended to November 19, 2010 pursuant to the Second DIP Amendment. As such, the Debtors were on a very tight timeframe to conduct either a sale of their assets or restructuring of their business. The Debtors formally commenced their sale process on July 8, 2010. On or about July 9, 2010, CRG sent out a teaser memorandum highlighting the Debtors' assets to approximately 2,000 financial and strategic investors and industry participants. The Debtors drafted and provided an offering memorandum and access to their data room to those parties who signed nondisclosure agreements. Over sixty parties returned executed non-disclosure agreements and conducted initial due diligence. CRG created an electronic data room with key documents and company-specific information in order to streamline the due diligence process. CRG received sixteen initial indications of interest, which were subsequently narrowed to six letters of intent. To those parties submitting letters of intent, CRG provided additional, more detailed information about the Debtors, and scheduled meetings with the Debtors' management. The Debtors, with the assistance of CRG and other professionals, subsequently engaged in negotiations with certain of the parties submitting letters of intent on the details of a sale. Sale materials were prepared and then marketed to prospective purchasers.

By mid-November, the Debtors had not yet reached any definitive agreements with any potential acquirers. Because the Original DIP Agreement expired on December 31, 2010 pursuant to the Second DIP Amendment, the Debtors determined that it would be in the best interests of their estates to conduct an auction for and sale of substantially all of their operating assets in order to obtain approval of a sale of the Debtors' assets to meet the deadline constraints imposed by the Second DIP Amendment. On November 24, 2010, the Debtors filed their *Motion for an Order (A) Approving Asset Purchase Agreement and Authorizing Sale of Assets Outside Ordinary Course of Business; (B) Authorizing the Sale Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code*, et seq. (the "Sale Motion") [Docket 802] and *Motion for Entry of an Order (A) Approving Bid Procedures for the Sale of the Debtors' Assets, (b) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto*; et seq. (the

"Bid Procedures Motion") [Docket 800], in order to complete the sale process prior to the expiration of the DIP Facility on December 31, 2010. The Creditors' Committee filed an objection to the Bid Procedures Motion that was joined and supplemented by the Equity Committee [Docket No. 838 and Docket No. 842].

**N.    The First Plan Support Agreement and Replacement Debtor in Possession Financing**

After the filing of the Sale Motion and Bid Procedures Motion, the Debtors engaged in discussions with the Creditors' Committee, the Equity Committee, Lonestar, Privet, Privet Fund Management, and Prescott with respect to the transactions that would eventually form the basis of the Replacement DIP Facility, the and that certain *Plan Support Agreement, dated as of December 10, 2011 (the "First* Plan Support Agreement and the Plan Term Sheet"). Privet Fund Management and Prescott Group Capital, either directly or through their investors or affiliates, are existing shareholders in PBSI. Lonestar Partners, L.P., an affiliate of Lonestar, holds General Unsecured Claims (collectively, the "Lonestar Pre-Petition Claims") (i) against PACA in the amount of $373,572.10 as reflected in PACA's schedules of assets and liabilities, (ii) against PBBA (as defined below) in the amount of $8,126,774.32 as reflected in PBBA's schedules of assets and liabilities, and (iii) against PBSI in the amount $8,512,858.34 as reflected in Proof of Claim No. 284.

After extensive discussions Lonestar, though its affiliate, PB Funding, LLC, and, Privet and Prescott (together, the "DIP Lenders") agreed to provide an alternate source of post-petition financing that would permit the Debtors to retire the Original DIP Facility, obtain relief from the existing sale-related covenants and pursue a reorganization of the Debtors' business enterprise. This new financing involved three separate but interdependent agreements. The first agreement is a fully negotiated $25,000,000 post-petition secured credit facility (the "DIP Facility"), the terms of which are set forth in the DIP Loan Agreement between the Debtors, as borrowers, and the DIP Lenders. The proceeds from the DIP Facility, among other things, repaid the Debtors' outstanding obligations under the Original DIP Facility in their entirety.

The second agreement is the First Plan Support Agreement, which sets forth provided for the commitment of the Debtors, the Creditors' Committee, the Equity Committee, Lonestar Capital Management, LLC, as investment advisor to Lonestar Partners manager of PB Funding, LLC, L.P., Privet, Privet Fund Management and Prescott, with respect to a plan of reorganization based on an accompanying term sheet that formed the basis for the Plan as negotiated among by the parties to the First Plan Support Agreement. In addition, the First Plan Support Agreement contains contained a series of deadlines by which certain milestones were to be achieved, including the approval by the Bankruptcy Court of this the Prior Disclosure Statement (defined below) by February 18, 2011, Confirmation of the Prior Plan (defined below) by March 30, 2011 and consummation of the Prior Plan (*i.e.*, the Effective Date) by April 14, 2011. The Prior Plan Support Agreement also provides provided for payment of (i) a break-up fee of $750,000 divided among Privet and Privet Fund Management, Prescott, and Lonestar pursuant to the terms of the First Plan Support Agreement and (ii) up to a maximum of $200,000 to Privet and Privet Fund Management, and each of Prescott and Lonestar in expense reimbursement, payable solely in the event that Privet, Privet Fund Management, Prescott and Lonestar are were not in material breach of the First Plan Support Agreement and the Debtors either (a) consummate consummated a sale

of all or a substantial portion of their assets, (b) ~~confirm~~confirmed a plan of reorganization other than the Plan or (c) ~~obtain~~obtained approval of another financing arrangement, (other than the Exit Financing) the proceeds of which ~~are~~would be used to repay the DIP Facility.

~~Key to the plan of reorganization summarized by the plan term sheet is an equity infusion collectively provided by the Backstop Parties of no less than $15 million and no more than $25 million through a backstopped rights offering and direct subscription of shares. The Backstop Parties' agreement is memorialized in a Subscription and Backstop Purchase Agreement, dated January ___, 2011. Both the Rights Offering and the DIP Lenders' commitments in respect thereof are described more fully in the Plan. Together, the Plan Support Agreement, the DIP Loan Agreement and the Subscription and Backstop Agreement form the expected cornerstones of the Debtors' plan to emerge from Chapter 11, as encapsulated in the Plan filed contemporaneously with this Disclosure Statement.~~

On December 7, 2010, the Equity Committee and Creditors' Committee filed a joint motion for approval of the new DIP Facility and the First Plan Support Agreement [Docket No. 874]. The First Plan Support Agreement was subsequently approved pursuant to the Interim DIP Order on December 10, 2010, and the DIP Facility was approved on an interim basis pursuant to the Interim DIP Order and on a final basis pursuant to the Final DIP Order entered on December 29, 2010 [Docket No. 968].

With the approval of the DIP Facility, the Debtors were able to fully repay the outstanding balance owed to Steel under the Original DIP Loan Agreement, and were no longer constrained by the December 31, 2010 termination date of the Original DIP Loan Agreement. The DIP Facility, by contrast, ~~does~~did not expire until June 15, ~~2011,~~2011 (and, as described below, which deadline the Debtors have moved to extend until July 31, 2011) and provides the ~~Debtors~~Plan Proponents with sufficient time to ~~complete the plan process under the milestones described in the Plan Support Agreement~~solicit and confirm their Plan. The DIP Loan Agreement also contains a budget that allows for the use of proceeds to fund, among other things, working capital needs and general corporate purposes, to finance capital expenditures in order to allow the Debtors to continue to operate through confirmation and effectiveness of the Plan. The Interim and Final DIP Orders also provided for the allowance of the Lonestar Pre-petition Claims in full, subject to certain reconciliation as provided more fully in the Interim and Final DIP Orders.

In light of the approval of both the DIP ~~Facility~~Loan Agreement and the First Plan Support Agreement, the Debtors, along with the other Plan Proponents, ~~believe~~believed that the transactions contemplated thereby constitute the highest and best return for holders of Claims and Interests. Therefore, the Debtors withdrew the Sale Motion and the Bid Procedures Motion on December 15, 2010.

In accordance with provisions of the First Plan Support Agreement, the Plan Proponents filed their *Disclosure Statement Describing Joint Chapter 11 Plan of Reorganization* [Docket 1007] (the "Prior Disclosure Statement") and their *Joint Chapter 11 Plan of Reorganization* [Docket 1006] (the "Prior Plan"). The Plan Proponents sought approval of the Prior Disclosure Statement and scheduled a hearing to consider approval of the Prior Disclosure Statement for February 14, 2011, which hearing was continued from time to time. As noted above, in response to certain objections and other informal responses received to the Prior Disclosure Statement, including the objection filed by the Staff of the SEC on the grounds that the proposed rights offering to creditors and certain equity holders set forth in the Prior Disclosure Statement would not meet the requirements of the Securities Act of 1933, the Plan Proponents modified the Prior Disclosure Statement and Prior Plan, which modifications are reflected in this Disclosure Statement and accompanying Plan. In particular, among other proposed changes, pursuant to the revisions to the Prior Plan and revisions to the Prior Disclosure Statement, the Plan now provides that the New Common Stock described in the Plan will be proposed to be sold to the Purchasers through the Direct Subscription. Accordingly, the New Common Stock will not be sold through a rights offering to creditors or existing equity holders, as previously provided in the Prior Disclosure Statement.

## O. The Second Plan Support Agreement and the Amendment to the DIP Loan Agreement

As noted above, the Equity Committee was reformed on March 25, 2011 with the appointment of three additional members. The Equity Committee's prior counsel was terminated and on April 1, 2011, the Equity Committee filed a motion to employ new counsel effective as of April 1, 2011. Because the provisions of the First Plan Support Agreement required the consent of all parties thereto with respect to the modification or amendment of such agreement (including the Equity Committee), the Plan Proponents entered into that certain *Second Plan Support Agreement* (the "Second Plan Support Agreement"), which replaced the provisions of the terminated First Plan Support Agreement and does not have the Equity Committee as a signatory thereto. Similar to the provisions of the First Plan Support Agreement, the Second Plan Support Agreement contains a series of deadlines by which certain milestones are to be achieved, including the approval by the Bankruptcy Court of this Disclosure Statement by April 25, 2011, Confirmation of the Plan by June 3, 2011 and consummation of the Plan (i.e., the Effective Date) by June 17, 2011. The Second Plan Support Agreement also provides for payment of (i) a break-up fee of $750,000 divided among Privet and Privet Fund Management, Prescott, and Lonestar pursuant to the terms of the Second Plan Support Agreement and (ii) up to a maximum of $200,000 to Privet and Privet Fund Management, and each of Prescott and Lonestar in expense reimbursement, payable solely in the event that Privet, Privet Fund Management, Prescott and Lonestar are not in material breach of the Second Plan Support Agreement and the Debtors either (a) consummate a sale of all or a substantial portion of their assets, (b) confirm a plan of reorganization other than the Plan, or (c) obtain approval of another financing arrangement (other than the Exit Financing) the proceeds of which are used to repay the DIP Facility.

On April ___, 2011, the Debtors filed their *Motion for Order Approving (A) Second Plan Support Agreement; and (B) Amendment to Debtor in Possession Financing Agreement* [Docket _____ ] (the "Second Plan Support Agreement Approval Motion") pursuant to which the Plan Proponents seek approval of the Second Plan Support Agreement substantially in the form attached to the Second Plan Support Agreement Approval Motion.

The Second Plan Support Agreement Approval Motion also seeks approval of that certain *Amendment to the Debtor in Possession Financing Agreement*, substantially in the form attached to the Second Plan Support Agreement Approval Motion and which, among other things, extends the expiration date of the DIP Loan Agreement from the current June 15, 2011 date through and including July 31, 2011. A hearing on the Second Plan Support Agreement Approval Motion has been scheduled for April ___, 2011.

Pursuant to the terms of the Second Plan Support Agreement, the Plan Proponents filed the Disclosure Statement and the Plan on April ___, 2011. The Plan provides for a capital infusion collectively provided by the Purchasers in a minimum amount of $15,000,000 and (subject to certain consents and other conditions), up to $25,000,000 through a direct subscription of shares. The Purchasers' agreement is memorialized in a Subscription Agreement, dated April ___, 2011. The direct subscription for the New Common Stock by the Purchasers is described more fully in the Plan. Together, the Second Plan Support Agreement, the DIP Loan Agreement (as amended by the DIP Loan Agreement Amendment), and the Subscription Agreement form the expected cornerstones of the Debtors' plan to emerge from Chapter 11, as encapsulated in the Plan filed contemporaneously with this Disclosure Statement. A description of the Plan is set forth below.

## V.

## DESCRIPTION OF THE PLAN

A DISCUSSION OF THE PRINCIPAL PROVISIONS OF THE PLAN AS THEY RELATE TO THE TREATMENT OF CLASSES OF ALLOWED CLAIMS AND INTERESTS IS SET FORTH IN ARTICLES VI THROUGH VIII BELOW. THE DISCUSSION OF THE PLAN THAT FOLLOWS CONSTITUTES A SUMMARY ONLY AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES. YOU ARE URGED TO READ THE PLAN IN FULL TO EVALUATE WHETHER TO ACCEPT OR REJECT THE DEBTORS' PROPOSED PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THIS SUMMARY AND THE PLAN, THE TERMS OF THE PLAN CONTROL. ALL CAPITALIZED TERMS NOT OTHERWISE DEFINED HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

### A.    General

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of themselves and their creditors and stockholders.

Formulation of a plan is the principal objective of Chapter 11. In general, a plan (i) divides Claims and Interests into separate classes, (ii) specifies the property that each Class is to

receive under the Plan and (iii) contains other provisions necessary to the reorganization of a debtor. Alternatively, the Bankruptcy Code allows a debtor to file a plan of liquidation which allows for the orderly liquidation of the assets of a debtor.

Chapter 11 does not require each holder of a claim or equity security interest to vote in favor of a plan in order for the court to confirm the plan. However, the Plan must be accepted by the holders of at least one class of claims that is impaired without considering the votes of "insiders" within the meaning of the Bankruptcy Code.

Distributions to be made under the Plan will be made after Confirmation of the Plan, on the Effective Date or as soon thereafter as is practicable, or at such other time or times specified in the Plan.

~~VI.~~

**VI.**

**TREATMENT OF CERTAIN UNCLASSIFIED CLAIMS**

In accordance with § 1123(a)(1), Administrative Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article 4 and shall have the treatment set forth in this Article 3.

## A. **Administrative Claims**

27. ~~1.~~ Administrative Claims

Except to the extent that an Allowed Administrative Claim is not yet due and owing or to the extent a holder of an Allowed Administrative Claim has been paid prior to the Effective Date or agrees to different treatment, in full satisfaction, settlement, release and discharge of and in exchange for each Allowed Administrative Claim (excluding any Professional Fee ~~Claims~~Claim), the holder thereof shall receive Cash from the Reorganized Debtors equal to the amount of such Allowed Administrative Claim on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date on which such Administrative Claim becomes Allowed by Final Order. Allowed Administrative Claims not yet due and owing as of the Effective Date shall be paid by the Reorganized Debtors in the ordinary course of business.

2. ~~Administrative Claims Bar Date~~

Except as otherwise provided in ~~this~~ Article 3~~,~~3 of the Plan, requests for payment of Administrative Claims must be filed and served on the Reorganized Debtors no later than the applicable Administrative Claims Bar Date. Holders of Administrative Claims (other than Claims for Professionals' fees and expenses) that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Recovery Trust or the Reorganized Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to requests for payment of Administrative Claims filed after the Effective Date must be filed and served on the Reorganized Debtors and the requesting party no later than seventy-five (75) days after the Effective Date.

Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to (i) any Administrative Claim previously Allowed by a Final Order, including any Administrative Claim expressly Allowed under the Plan, and (ii) any Ordinary Course Claim.

> 3. ~~Professionals' Fees and Expenses~~

> 28. Professional Fee Claims

Any Professional or other Entity asserting a Professional Fee Claim must file and serve on counsel for each of the Plan Proponents, Reorganized Parent and the Recovery Trustee and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Claim no later than sixty (60) days after the Effective Date. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court.

On and after the Effective Date, any requirement that a Professional comply with §§ 327 through 331 and 1103 and seek approval from the Bankruptcy Court in connection with such Professional's retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors and the Recovery Trust may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action (including without the need to file a fee application), order or approval of the Bankruptcy Court.

Except to the extent that a holder of an Allowed Professional Fee Claim, including each Consenting Professional, has agreed to different treatment, the holder thereof shall receive Cash from the Reorganized Debtors equal to the amount of such Allowed Professional Fee Claim on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date on which such Professional Fee Claim becomes payable pursuant to the Compensation Procedures Order or other order of the Bankruptcy Court in full satisfaction, settlement, release and discharge of and in exchange for each Allowed Professional Fee Claim. Upon the occurrence of the Effective Date, the funds identified in Section 12.2(n) for the payment of Allowed Professional Fee Claims shall be placed in escrow.

For each Consenting Professional that has agreed to have a portion of its Allowed Professional Fee Claim treated as an Excess Fee Claim, such Excess Fee Claim shall receive the treatment specified in Article 8 of the Plan and the corresponding sections of the Recovery Trust Agreement.

## B.     U.S. Trustee Fees

On the Effective Date, the Debtors shall pay all U.S. Trustee Fees that are due and owing as of the Effective Date.

## C.     Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid prior to the Effective Date, or agrees to different treatment, each holder of an Allowed Priority Tax Claim

shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Tax Claim, at the election of the Reorganized Debtors, (i) Cash on the Effective Date in an amount equal to such Allowed Priority Tax Claim (without interest), or (ii) regular installment payments in Cash of a total value, as of the Effective Date, equal to the amount of the Allowed Priority Tax Claim over a period ending not later than five years after the Petition Date. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.

<del>VII.</del>

## VII.

## TREATMENT OF CLASSES OF CLAIMS AND INTERESTS

### A.  Treatment of Allowed Class 1 Claims (Other Priority Claims)

<del>1.</del>1. Classification:

Class 1A consists of Other Priority Claims against Parent. Class 1B consists of Other Priority Claims against Point Blank. Class 1C consists of Other Priority Claims against PACA. Class 1D consists of Other Priority Claims against PBSS.

<del>2.</del>2. Treatment:

Except to the extent that a holder of an Allowed Other Priority Claim (i) has been paid by the Debtors prior to the Effective Date or (ii) agrees to a less favorable treatment, each holder of an Allowed Other Priority Claim shall receive from the Reorganized Debtors, in full satisfaction, settlement, release and discharge of, and in exchange for such Other Priority Claim, Cash equal to the amount of such Allowed Other Priority Claim on the later of the date which is on or as soon as reasonably practicable after the Effective Date and the date such Other Priority Claim becomes an Allowed Claim.

<del>3.</del>3. Voting:

Class 1 is Impaired. Therefore, holders of Other Priority Claims are entitled to vote to accept or reject the Plan.

### B.  Treatment of Allowed Class 2 Claims (DIP Claims)

<del>1.</del>1. Classification:

Class 2A consists of the DIP Claims against Parent. Class 2B consists of the DIP Claims against Point Blank. Class 2C consists of the DIP Claims against PACA. Class 2D consists of the DIP Claims against PBSS.

2. 2. Treatment:

On the Effective Date, each DIP Claim shall be <u>indefeasibly</u> paid in full in Cash as provided in the DIP Loan Agreement; provided that, in accordance with Section 6.3(d<u>a</u>) <u>of the Plan</u> and the terms of the Subscription ~~and Backstop~~ Agreement, the ~~Rights Exercise Payment or~~ Commitment of any DIP Lender or its affiliate (in its capacity as a ~~holder of Allowed Class 7 Old Equity Interests Allowed Class 4 General Unsecured Claims or Backstop Purchaser, as the case may be~~<u>Purchaser</u>) may, at the election of such DIP Lender and its affiliate, be reduced by or credited against <u>(i)</u> any outstanding DIP Claims that the Company owes to such DIP Lender <u>and (ii) the Subscription Expenses</u>. Upon payment and satisfaction in full of all DIP Claims, including by reduction or credit as set forth in the preceding sentence, all liens and security interests granted to secure such obligations shall be terminated and immediately released and the DIP Lenders shall execute and deliver to the Reorganized Debtors such instruments of release, satisfaction and/or assignments (in recordable form) as may be reasonably requested by the Reorganized Debtors.

3. 3. Voting:

Class 2 is Unimpaired, and the holders of DIP Claims are conclusively presumed to have accepted the Plan. Therefore, holders of DIP Claims are not entitled to vote to accept or reject the Plan.

## C.     **Treatment of Allowed Class 3 Claims (Miscellaneous Secured Claims)**

1. 1. Classification:

Class 3 consists of Miscellaneous Secured Claims. Although all Miscellaneous Secured Claims have been placed in one Class for the purposes of nomenclature, each Miscellaneous Secured Claim, to the extent secured by a Lien on any property or interest in property of the Debtors different from that securing any other Miscellaneous Secured Claim, shall be treated as being in a separate sub-Class for the purpose of receiving Distributions under the Plan.

2. 2. Treatment:

Except to the extent that a holder of an Allowed Miscellaneous Secured Claim has been paid by the Debtors, in whole or in part, prior to the Effective Date, on the Effective Date, at the option of the Debtors, (i) each Allowed Miscellaneous Secured Claim shall be reinstated and Unimpaired in accordance with § 1124 or (ii) each holder of an Allowed Miscellaneous Secured Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Miscellaneous Secured Claim, (x) payment in full in Cash of the unpaid portion of such Allowed Miscellaneous Secured Claim, (y) return of the collateral securing such Claim or (z) such other treatment as may be agreed to by the holder. The Debtors shall inform each holder of a Miscellaneous Secured Claim of the treatment of such Creditor's Secured Claim not less than ten (10) days prior to the Confirmation Hearing.

3. 3. Voting:

Class 3 is Impaired. Therefore, holders of Miscellaneous Secured Claims are entitled to vote to accept or reject the Plan.

**D.** **Treatment of Allowed Class 4 Claims (General Unsecured Claims)**

~~1.~~1.Classification:

Class 4A consists of General Unsecured Claims against Parent. Class 4B consists of General Unsecured Claims against Point Blank. Class 4C consists of General Unsecured Claims against PACA. Class 4D consists of General Unsecured Claims, if any, against PBSS.

~~2.~~2.Treatment:

On the Effective Date, each holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such General Unsecured Claim, a Trust Interest in the Recovery Trust in the form of Class 4 Trust Interests issued pursuant to Section 8.5 of the Plan and summarized in Article XI of the Disclosure Statement. ~~In addition, Eligible Creditors in Class 4 shall receive Rights to participate (subject to applicable securities and other laws) in the Creditor Rights Offering.~~ Pursuant to the terms of the Inter-Debtor Compromise, on the Effective Date, all Intercompany Claims asserted by one Debtor against another Debtor shall be deemed waived, released and expunged without further order of the Bankruptcy Court, and no Distribution shall be paid on account of any such Intercompany Claim.

~~3.~~3.Voting:

General Unsecured Claims are Impaired. Therefore, holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

**E.** **Treatment of Allowed Class 5 Claims (Subordinated Unsecured Claims)**

~~1.~~1.Classification:

Class 5A consists of Subordinated Unsecured Claims, if any, against Parent. Class 5B consists of Subordinated Unsecured Claims, if any, against Point Blank. Class 5C consists of Subordinated Unsecured Claims, if any, against PACA. Class 5D consists of Subordinated Unsecured Claims, if any, against PBSS.

~~2.~~2.Treatment:

On the Effective Date, each holder of an Allowed Subordinated Unsecured Claim shall receive a Trust Interest in the Recovery Trust in the form of Class 5 Trust Interests issued pursuant to Section 8.5 of the Plan and summarized in Article XI of the Disclosure Statement and subordinated in right of payment to the Class 4 Trust Interests as set forth more fully in Section 8.5 of the Plan and the Recovery Trust Agreement.

~~3.~~3.Voting:

Class 5 is Impaired. Therefore, holders of Subordinated Unsecured Claims are entitled to vote to accept or reject the Plan.

**F.     Treatment of Allowed Class 6 Claims (Class Action Claims)**

1. Classification:

Class 6A consists of Class Action Claims, if any, against Parent. Class 6B consists of Class Action Claims, if any, against Point Blank. Class 6C consists of Class Action Claims, if any, against PACA. Class 6D consists of Class Action Claims, if any, against PBSS.

2. Treatment:

Each holder of an Allowed Class Action Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Class Action Claim, a Trust Interest in the Recovery Trust in the form of Class 6 Trust Interests issued pursuant to Section 8.5 of the Plan and summarized in Article XI of the Disclosure Statement, subordinated in right of payment to the Class 4 Trust Interests and Class 5 Trust Interests and *pari passu* with the Class 7 Trust Interests, all as set forth more fully in Section 8.5 of the Plan and summarized in Article XI of the Disclosure Statement and the Recovery Trust Agreement. Distributions on account of all Class 6 Trust Interests issued under the Plan shall be (i) capped at the least of (A) $35,200,000, (B) the aggregate amount of all Allowed Class Action Claims as determined by Final Order of a court of competent jurisdiction, and (C) such other amount that is estimated by the Bankruptcy Court pursuant to § 502(c) or otherwise, and (ii) reduced dollar-for-dollar to the extent of any amounts retained by the holders of Class Action Claims or their counsel and not turned over to the Debtors or the Recovery Trust, as applicable, from funds held in the Class Action Escrow or otherwise previously disbursed under the Class Action Settlement Agreement, including the $9,925,000 previously disbursed to plaintiffs' counsel and the remaining balance of not less than $25,275,000 still on deposit in the Class Action Escrow.

3. Voting:

Class 6 is Impaired. Therefore, holders of Class Action Claims are entitled to vote to accept or reject the Plan.

**G.     Treatment of Allowed Class 7 Interests (Old Equity Interests)**

1. Classification:

Class 7 consists of Old Equity Interests in Parent, excluding any Old Equity Interests that are subordinated and treated in Class 8.

2. Treatment:

On the Effective Date, Old Equity Interests shall be deemed surrendered to Reorganized Parent, and each holder of an Allowed Old Equity Interest shall receive a Trust Interest in the Recovery Trust in the form of Class 7 Trust Interests issued pursuant to Section 8.5 of the Plan and summarized in Article XI of the Disclosure Statement, subordinated in right of payment to

the Class 4 Trust Interests and Class 5 Trust Interests and *pari passu* with the Class 6 Trust Interests, all as set forth more fully in Section 8.5 of the Plan and ~~in~~ the Recovery Trust Agreement and ~~as~~ summarized in Article XI of the Disclosure Statement. ~~In addition, Eligible Equity Holders in Class 7 shall receive Rights to participate (subject to applicable securities and other laws) in the Equity Rights Offering.~~ As described more fully in Section 8.3(c) of the Plan and in the Recovery Trust Agreement, if Class 7 votes to accept the Plan, a greater percentage of proceeds remaining in the Recovery Trust shall be reserved for application and Distribution, including to holders of Class 7 Trust Interests, as set forth in Sections 8.3(c) and 8.5 of the Plan and in the Recovery Trust Agreement.

~~3.~~ 3. Voting:

Class 7 is Impaired. Therefore, holders of Old Equity Interests are entitled to vote to accept or reject the Plan.

## H. Treatment of Allowed Class 8 Claims and Interests (Other Subordinated Claims and Interests)

~~1.~~ 1. Classification:

Class 8A consists of Other Subordinated Claims and Interests, if any, against Parent. Class 8B consists of Other Subordinated Claims and Interests, if any, against Point Blank. Class 8C consists of Other Subordinated Claims and Interests, if any, against PACA. Class 8D consists of Other Subordinated Claims and Interests, if any, against PBSS.

~~2.~~ 2. Treatment:

Other Subordinated Claims and Interests will be subordinated to Class 7 Interests and will receive no recovery under the Plan or from the Recovery Trust.

~~3.~~ 3. Voting:

Class 8 is Impaired, and the holders of Other Subordinated Claims and Interests are conclusively presumed to have rejected the Plan. Therefore, holders of Other Subordinated Claims and Interests are not entitled to vote to accept or reject the Plan.

## I. Treatment of Allowed Class 9 Interests (Unexercised Options)

~~1.~~ 1. Classification:

Class 9 consists of Interests, if any, with respect to Unexercised Options.

~~2.~~ 2. Treatment:

Unexercised Options will be canceled and will receive no recovery under the Plan or from the Recovery Trust.

~~3.~~ 3. Voting:

Class 9 is Impaired, and the holders of Unexercised Options are conclusively presumed to have rejected the Plan. Therefore, holders of Unexercised Options are not entitled to vote to accept or reject the Plan.

~~VIII.~~

**VIII.**

## ACCEPTANCE REQUIREMENTS

**A.**     **Acceptance or Rejection of the Plan**

    29.     ~~1.~~ Voting Class

Classes 1, 3, 4, 5, 6 and 7 are Impaired under the Plan and are receiving property under the Plan. Therefore, such Classes are entitled to vote to accept or reject the Plan.

    30.     ~~2.~~ Presumed Acceptance of the Plan

Class 2 is Unimpaired under the Plan and, therefore, is conclusively presumed to have accepted the Plan pursuant to § 1126(f).

    31.     ~~3.~~ Presumed Rejection of Plan

Classes 8 and 9 are Impaired under the Plan and are receiving no recovery under the Plan or the Recovery Trust. Therefore, Classes 8 and 9 are conclusively presumed to have rejected the Plan pursuant to § 1126(g).

**B.**     **Tabulation of Votes on a Non-Consolidated Basis**

The Debtors will tabulate all votes on the Plan on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies § 1129(a)(8) with respect to each Debtor. For each Debtor that satisfies § 1129(a)(8), and provided that all other requirements to Confirmation of the Plan are met, the Confirmation of the Plan as to such Debtor shall be deemed to occur by operation of the Plan. For any Debtor that fails to satisfy § 1129(a)(8), the Confirmation of the Plan as to such Debtor shall be subject to a determination of the Bankruptcy Court that the Inter-Debtor Settlement satisfies the requirements for approval under §§ 1123(b)(3) and (6), § 1129(b) and Bankruptcy Rule 9019, which determination may be made at the Confirmation Hearing. If all Classes of a Debtor accept the Plan, then the Inter-Debtor Compromise set forth in Section 6.1 of the Plan shall be deemed to be reasonable and in the best interests of Creditors and Interest holders as to that Debtor without any further evidentiary showing than such acceptances. If any Impaired Class of a Debtor rejects the Plan, then the approval of the Inter-Debtor Compromise as to that Debtor shall be addressed at the Confirmation Hearing as to such Debtor's rejecting Class in order to implement the Inter-Debtor Compromise.

## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.** **Inter-Debtor Compromise**

32.    1. Settlement Authority.

Pursuant to Bankruptcy Rule 9019(a), each Debtor may compromise and settle certain Claims it has against other Debtors. The Confirmation Order shall authorize, and constitute Bankruptcy Court approval of, the compromises and settlements set forth in Section 6.1 of the Plan pursuant to Bankruptcy Rule 9019(a) and §§ 1123(b)(3) and (6). The Debtors reserve the right to modify the Plan in accordance with Article 13 to the extent any compromise and settlement described below is not approved by the Bankruptcy Court, in whole or in part.

Pursuant to §§ 1123(b)(3) and (6) and Bankruptcy Rule 9019, and in settlement and compromise of certain existing and potential disputes regarding (i) Intercompany Claims and related matters, (ii) valuation of the individual Debtor entities, (iii) the individual Debtor's respective ownership interest in the Estate Claims and other assets being contributed to the Recovery Trust, (iv) the susceptibility of two or more of the Debtors' Estates to substantive consolidation and (v) the consideration, if any, that should be paid by Parent to acquire the New Equity Interests to be issued by the Debtor Subsidiaries on the Effective Date, each Class of Claims against or Interests in the several Debtors shall receive the corresponding treatment provided for in the Plan. This settlement and compromise shall neither affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, nor cause the transfer of any assets. Except as otherwise provided by or permitted in the Plan, each Debtor shall continue to exist as a separate legal Entity. This settlement and compromise (and the treatment derived therefrom) serves only as a mechanism to resolve certain claims and disputes between and among the Debtors and effectuate the making of Distributions under the Plan.

33.    2. Inter-Debtor Settlement.

Effective as of the Effective Date, in exchange for the mutual compromise, settlement and release as contemplated by Section 6.1 of the Plan, the Debtors agree that all Claims and disputes between them, including all Intercompany Claims, shall be settled and waived pursuant to the following terms:

        a.     On the Effective Date, all Intercompany Claims asserted by any Debtor against any other Debtor shall be deemed waived, released and expunged without further order of the Bankruptcy Court, and no Distribution shall be paid on account of any such Intercompany Claim.

        b.     In exchange for valuable consideration being provided by Parent to the Debtor Subsidiaries in the Plan, Parent shall continue to hold and retain all

Old Intercompany Interests in the Debtor Subsidiaries on and after the Effective Date, the legal, equitable and contractual rights arising under which Intercompany Interests shall remain unaltered.

> c. Allowed Claims against and Interests in the several Debtors shall receive the treatment set forth in Article 4 of the Plan.

> d. ~~Eligible Holders of Claims against and Interests in each of the Debtors shall be permitted to participate (subject to securities and other applicable laws) in the Rights Offering as set forth in, and subject to, Section 6.3 of the Plan.~~

> d. ~~e.~~ On the Effective Date, each Debtor shall be deemed to have executed the releases provided in Section 11.2 of the Plan.

## B. Exit Facility

On the Effective Date, one or more of the Reorganized Debtors may enter into an Exit Facility, and grant all liens and security interests provided for thereunder. The Reorganized Debtors, if any, that are the guarantors under the Exit Facility shall issue the guarantees and grant Liens and security interests as provided thereunder. The Exit Facility shall be on substantially similar terms and conditions to those set forth in the Plan Supplement.

## C. ~~Rights Offering~~ Direct Subscription

> 1. ~~The Rights Offering~~

~~Pursuant to the Rights Offering, Parent will distribute to (i) each holder of an Allowed Class 7 Old Equity Interest (including, for the avoidance of doubt, each of Privet Fund LP and Prescott or their respective affiliates, designees or nominees) Rights (the "Equity Rights") that will grant each Eligible Equity Holder the right, but not the obligation, to subscribe for and purchase, at the Subscription Price, a portion of the New Common Stock, up to such Eligible Equity Holder's Equity Rights Offering Pro Rata Share of the New Common Stock; provided, that (A) an Eligible Equity Holder must subscribe for at least $[●],000 of New Common Stock, and (B) if an Eligible Equity Holder's pro rata share of the Allowed Class 7 Old Equity Interests entitles such Eligible Equity Holder to less than $[●],000 of New Common Stock, then such Eligible Equity Holder must exercise all its Equity Rights in order to subscribe for and purchase New Common Stock, and (ii) each holder of an Allowed Class 4 General Unsecured Claim (including, for the avoidance of doubt, Lonestar Partners, LP) Rights (the "Creditor Rights") that will grant each Eligible Creditor the right, but not the obligation, to subscribe for and purchase, at the Subscription Price, a portion of the New Common Stock, up to such Eligible Creditor's Creditor Rights Offering Pro Rata Share of New Common Stock; provided, that (A) an Eligible Creditor must subscribe for at least $[●],000 of New Common Stock, and (B) if an Eligible Creditor's pro rata share of the total Rights Participation Amount for Allowed Class 4 General Unsecured Claims entitles such Eligible Creditor to less than $[●],000 of New Common Stock, then such Eligible Creditor must exercise all its Creditor Rights in order to subscribe for and~~

~~purchase New Common Stock. The Rights will not be listed or quoted on any public or over-the-counter exchange or quotation system.~~

~~The aggregate amount of the Rights Offering ("Rights Offering Amount") will equal (a) $11,850,000, or (b) in the event an Exit Facility is unavailable, or cannot be obtained in an amount, or on terms and conditions, that are acceptable to the Backstop Purchasers, then the Backstop Purchasers in their sole discretion may increase the Rights Offering Amount up to a maximum total amount of $19,750,000 (the "Rights Offering Maximum"). Notwithstanding anything to the contrary, 49.367% of the Rights Offering Amount shall be allocated to the holders of Allowed Class 7 Old Equity Interests (the "Equity Rights Offering") and 50.633% of the Rights Offering Amount shall be allocated to the holders of Allowed Class 4 General Unsecured Claims (the "Creditor Rights Offering").~~

34. The Direct Subscription

Each Purchaser has agreed to subscribe for, and purchase from Reorganized Parent, the Purchased Shares at the Subscription Price on the terms set forth in the Plan and the Subscription Agreement. The aggregate amount of the Purchased Shares (the "Subscription Amount") will be $15,000,000; *provided, however,* the Purchasers may elect in their sole discretion to increase the Subscription Amount up to $25,000,000, which discretion shall be exercised in good faith. Subject to the terms of the Subscription Agreement, the Purchased Shares shall be allocated among Privet, Prescott and Lonestar as follows:

| Purchaser | Allocation of Direct Subscription |
|-----------|-----------------------------------|
| Lonestar  | 40.00% |
| Privet    | 30.00% |
| Prescott  | 30.00% |

The ~~closing of the Rights Offering and the~~ issuance and sale of the ~~New Common Stock~~Purchased Shares shall take place on the Effective Date pursuant to the ~~Rights Offering Procedures and~~terms of the Plan and the Subscription Agreement. Reorganized Parent will issue the New Common Stock to the ~~Backstop~~ Purchasers ~~and Exercising Holders, as applicable,~~or one or more of their respective Affiliates in accordance with the terms of the Plan and the ~~Rights Offering Procedures.~~

2. ~~The Backstop CommitmentsPursuant to the terms of the Subscription and Backstop Agreement, in order to facilitate the Rights Offering and implementation of the Plan, (i) Privet and Prescott, severally and not jointly, have agreed to purchase, and Parent has agreed to issue and sell to Privet and Prescott, at the Subscription Price based upon the allocation set forth in the Subscription and Backstop Agreement, any Unsubscribed Equity Offering Shares, and (ii) PB Funding has agreed to purchase, and Parent has agreed to issue and sell to PB Funding, at the Subscription Price, any Unsubscribed Creditor Offering Shares, in each case, up to the respective Backstop Purchaser's Backstop Commitment.~~ Subscription Agreement. Pursuant to the Subscription Agreement, the Purchasers may in good faith elect to fund a portion of the Commitment as loans to the Reorganized Parent (the "Purchaser Loans"); provided that all Purchasers provide such Purchaser Loans on the same terms and on a pro rata basis based on the Allocation of Direct Subscription set forth in section 6.3 of the Plan and summarized above.

On the Effective Date, in accordance with the ~~Backstop Approval Order, (i) the Debtors will pay to the Backstop Purchasers the Backstop Expenses and (ii) the Backstop Purchasers will receive the Backstop Fee. The Subscription and Backstop~~Subscription Approval Order and the Subscription Agreement, each Purchaser will receive payment of its Subscription Expenses, if any. Any payment owed by a Purchaser or its Affiliate in connection with the purchase of the Purchased Shares may, at the election of such Purchaser, be reduced by or credited against (i) any outstanding DIP Claims that the Company owes to such Purchaser in its capacity as DIP Lender under the DIP Loan Agreement and (ii) such Purchaser's Subscription Expenses.

The Subscription Agreement is terminable if the ~~Rights Offering is~~transactions contemplated therein are not consummated by ~~April 14,~~[_____], 2011 and upon the occurrence of certain other events. If terminated, the ~~Backstop~~ Purchasers shall have no further obligations thereunder. However, notwithstanding such termination, Parent shall be obligated to pay each Purchaser its Subscription Expenses and indemnify the Purchasers to the extent set forth in the Subscription Approval Order and the Subscription Agreement.

3. ~~Subscription Exercise Period~~

~~The Rights Offering shall commence on the Subscription Commencement Date and shall end at 5:00 p.m. (prevailing Eastern time) on the Subscription Expiration Date (or such later date as the Debtors, subject to the approval of the Required Backstop Purchasers, may specify in a notice provided to the Backstop Purchasers before 9:00 a.m. (prevailing Eastern time) on the Business Day before the then current Subscription Expiration Date) (such period of time, the "Subscription Exercise Period"). After the expiration of the Subscription Exercise Period, any exercise of Rights by any Person shall be null and void and the Subscription Agent shall not honor any such exercise of Rights, regardless of when the documents relating to such exercise were sent.~~

4. ~~Exercise of Rights~~

~~In order to facilitate the exercise of the Rights, on or about the Subscription Commencement Date, the Subscription Form shall be mailed to each Eligible Holder (or to the record holder for any Eligible Holder of an Old Equity Interest) together with appropriate~~

instructions for the proper completion, due execution and timely delivery of the Subscription Form and submission of payment. The Eligible Holders will not be obligated to exercise their Rights, but in order to properly exercise the Rights, an Eligible Holder must (a) return a duly completed Subscription Form to the Subscription Agent, which form must be received by the Subscription Agent on or prior to 5:00 p.m. (prevailing Eastern time) on the Subscription Expiration Date. On the Subscription Form, the Eligible Holder shall, among other things, (i) confirm that such Eligible Holder is an "accredited investor" within the meaning of Regulation D of the Securities Act, (ii) indicate whether such Eligible Holder is an Eligible Equity Holder or an Eligible Creditor, as applicable, (iii) if such Eligible Holder is an Eligible Equity Holder, indicate the number of Equity Rights it is exercising, and (iv) if such Eligible Holder is an Eligible Creditor, indicate the number of Creditor Rights it is exercising. In addition, the Eligible Holder shall pay in Cash, by wire transfer in immediately available funds, an amount equal to the full Subscription Price in respect of the number of shares of New Common Stock issuable pursuant to the exercise of such Eligible Holder's Rights assuming the Backstop Purchasers would elect to increase the Rights Offering Amount to the Rights Offering Maximum (the "Rights Exercise Payment"), or, in the case of securities held through a bank or brokerage firm, send the Subscription Form to the bank or brokerage firm (or follow such firm's directions with respect to submitting subscription instructions to the firm) with sufficient time for the bank or brokerage firm to effect the subscription through the Depository Trust Company on or prior to 5:00 p.m. (prevailing Eastern time) on the Subscription Expiration Date. If the Subscription Agent for any reason does not receive from a given Eligible Holder both a timely and duly completed Subscription Form and timely payment of such Eligible Holder's Rights Exercise Payment, such Eligible Holder shall be deemed to have relinquished and irrevocably waived its right to participate in the Rights Offering; provided that, the Rights Exercise Payment of any DIP Lender or its affiliate (in its capacity as a holder of Allowed Class 7 Old Equity Interests or Allowed Class 4 General Unsecured Claims, as the case may be) may, at the election of such DIP Lender and its affiliate, be reduced by or credited against any outstanding DIP Claims that the Company owes to such DIP Lender under the DIP Loan Agreement.

The payments received by the Subscription Agent in connection with the Rights Offering shall be deposited and held by the Subscription Agent in a trust account or similarly segregated account or accounts separate and apart from the Subscription Agent's general operating funds and any other funds subject to any lien or similar encumbrance and which segregated account or accounts shall be maintained for the purpose of holding such money for administration of the Rights Offering until the Effective Date. The Subscription Agent shall not use such funds for any other purpose prior to such date and shall not encumber or permit such funds to be encumbered with any lien or encumbrance. Each Eligible Holder intending to participate in the Rights Offering must affirmatively elect to exercise all of its respective Rights and make proper payment for the New Common Stock on or prior to 5:00 p.m. (prevailing Eastern time) on the Subscription Expiration Date. The exercise of Rights by an Exercising Holder shall be irrevocable.

In the event that the Rights Offering is made for an amount less than the Rights Offering Maximum, the Subscription Agent shall return to the Exercising Holders Cash (without any interest thereon) in immediately available funds in an amount equal to the product of (i) the Subscription Purchase Price and (ii) the difference between the number of shares of New Common Stock that would have been issued to such Exercising Holder under a Rights Offering

of $19,750,000 and the actual number of shares of New Common Stock issued to such Exercising Holder under the Rights Offering. In the event the Rights Offering fails to close, the Subscription Agent shall return to the Exercising Holders all Cash paid in connection with (i) the exercise of Rights pursuant to the Rights Offering and (ii) to the extent the purchase price has been paid prior to such date, the issuance of the Subscription Shares.

5. Distribution of New Common Stock.

On the Effective Date, the Disbursing Agent shall distribute or record in the register of Reorganized Parent's stockholders the shares of New Common Stock purchased by the Exercising Holders pursuant to the Rights Offering, and by the Backstop Parties pursuant to the Subscription and Backstop Agreement.

6. Fractional Rights.

No fractional shares of New Common Stock shall be issued. The number of shares of New Common Stock available for purchase by Exercising Holders shall be rounded down to the nearest share. Any New Common Stock not subscribed for as a result of such rounding shall be deemed to be an Unsubscribed Share and purchased by the Backstop Purchasers (or affiliates of the Backstop Purchasers) in accordance with, and subject to, the terms of the Subscription and Backstop Agreement.

7. Validity of Exercise of Rights.

Subject to the terms of the Plan, the Confirmation Order or other order of the Bankruptcy Court, all questions concerning the timeliness, viability, form and eligibility of any exercise of Rights shall be determined by the Debtors, in consultation with the Backstop Purchasers, whose determinations shall be final and binding. The Debtors, subject to the prior written approval of the Required Backstop Purchasers, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as the Debtors determine, or reject the purported exercise of any Rights. Subscription Forms shall be deemed not to have been received or accepted until all irregularities have been waived or corrected within such time as the Debtors (subject to the prior written approval of the Required Backstop Purchasers) determine in their discretion. Neither the Debtors, the Backstop Purchasers nor the Subscription Agent shall be under any duty to give notification of any defect or irregularity in connection with the submission of Subscription Forms or incur any liability for failure to give such notification.

35. 8. Use of Proceeds.

The proceeds received by Reorganized Parent from the Rights Offering and proceeds received from the issuance of SubscriptionPurchased Shares to Prescott and Privet on the Effective Date, together with Cash on handin the Debtors' possession as of the Effective Date and the proceeds of any Exit Facility, shall be used to fund the Reorganized Debtors' emergence and provide necessary post-emergence liquidity.

36. Additional Cash Contribution

Prior to the Effective Date, the Debtors may allocate some or all of the Additional Cash Contribution for such purposes as they determine in the exercise of their reasonable business judgment and after obtaining the prior written consent of the Required Purchasers, including to settle Claims against one or more of the Debtors' Estates. Any remaining portion of such Additional Cash Contribution on the Effective Date shall be allocated to the Recovery Trust for distribution by the Recovery Trustee pursuant to Sections 8.3 and 8.5 of the Plan and the terms of the Recovery Trust Agreement. For the avoidance of doubt, the Recovery Trust Agreement may not modify any payment priorities or allocations provided for under the Plan, including the provisions of Section 8.3 of the Plan.

37. ~~9.~~ Sources of Consideration for Plan Distributions

All Cash consideration necessary for the Debtors or the Reorganized Debtors, as applicable, to make payments or Distributions pursuant hereto shall be obtained from ~~the Rights Offering,~~ the issuance of the ~~Subscription~~Purchased Shares, the Purchaser Loans, if any, any Exit Facility and ~~other~~ Cash ~~on hand~~in the Debtors' possession, including Cash derived from business operations.

**~~D.~~** **~~Issuance of New Common Stock Purchased in the Rights Offering~~**

**D.** **~~1.~~Issuance of New Common Stock**

38. Issuance of New Common Stock

On the Effective Date, Reorganized Parent shall issue to the ~~Exercising Holders~~Purchasers the shares of New Common Stock ~~to the Exercising Holders~~ in accordance with the terms and conditions ~~of the Rights Offering~~ set forth in the Plan and ~~the Plan Supplement and to the Backstop Parties in accordance with the terms and conditions set forth in~~ the Subscription ~~and Backstop~~ Agreement and on the Effective Date immediately following such issuance, the Purchasers will own all of the outstanding New Common Stock of Reorganized Parent.

39. ~~2.~~New Stockholders Agreement

Reorganized Parent, Lonestar (or one or more of its affiliates), Privet (or one or more of its affiliates)~~;~~, and Prescott (or one or more of its affiliates) ~~and any other Person acquiring shares of New Common Stock who holds in the aggregate 10% or more of the New Common Stock outstanding immediately following the Effective Date~~ shall be parties to the New Stockholders Agreement.

**~~E.~~** **~~Additional Issuance of New Common Stock~~**

~~Pursuant to the Subscription and Backstop Agreement, each of Prescott and Privet have agreed to subscribe for, and purchase from Reorganized Parent, shares of New Common Stock (the "Subscription Shares") at the Subscription Price having an aggregate value equal to the product of (a) 53.846% and (b) the aggregate amount of the Equity Rights Offering. On the Effective Date, and simultaneously with the issuance of the New Common Stock in accordance~~

~~with the Rights Offering, Reorganized Parent shall issue to Prescott and Privet the shares of the Subscription Shares in accordance with the terms and conditions set forth in the Subscription and Backstop Agreement. For the avoidance of doubt, the issuance of Subscription Shares to Prescott and Privet is in addition to any other shares of New Common Stock issued to Prescott, Privet Fund Management or Privet Fund LP or any of their respective affiliates under the Rights Offering in their capacity as Eligible Equity Holders or as Backstop Parties.~~

## E. ~~F.~~ Cancellation/Conversion of Securities and Agreements

On the Effective Date, except as otherwise specifically provided for in the Plan (i) the obligations of the Debtors under the DIP Loan Agreement and any other certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan or such Old Equity Interests that are surrendered to Reorganized Parent under the Plan), shall be canceled and the holders thereof shall have no rights by reason thereof, and such instruments shall evidence no rights, except the right to receive the Distributions, if any, to be made to holders of such instruments under the Plan, and (ii) the obligations of the Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of the Debtors that are specifically reinstated or assumed pursuant to the Plan) shall be deemed extinguished (or, in the case of Old Equity Interests, surrendered to the Reorganized Parent), released, and discharged and the holders thereof shall have no rights by reason thereof, and such instruments shall evidence no rights, except the right to receive the Distributions, if any, to be made to holders of such instruments under ~~the Plan~~the Plan. As a condition to receiving any Distribution under the Plan, each promissory note, certificate, or other instrument evidencing a Claim or Interest shall be deemed extinguished (or, in the case of Old Equity Interests, surrendered to the Reorganized ~~Debtors~~Parent or ~~their~~its designees).

## E. ~~G.~~ Exemptions for Issuance of New Common Stock

The issuance of the ~~New Common Stock~~Purchased Shares pursuant to the ~~Rights Offering and the~~Subscription ~~and Backstop~~ Agreement shall be exempt from registration under § 1145, § 4(2) of the Securities Act and other applicable laws, in each case to the extent applicable, as of the Effective Date without further act or action by any person, unless required by provision of the relevant documents or applicable law, regulation, order or rule, and all documents evidencing the same shall be executed and delivered as provided for in the Plan, the Subscription Agreement or the Plan Supplement.

## G. ~~H.~~ Corporate Existence

Each Debtor, as Reorganized, shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may

be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed. The New Governance Documents shall be substantially in the form filed with the Plan Supplement or as otherwise approved in the Confirmation Order and acceptable to the Backstop Purchasers. As of the Effective Date, Reorganized Parent will not be a reporting company under the Securities Act; provided, however, that nothing contained in the Plan shall preclude Reorganized Parent from thereafter becoming a reporting company under the Securities Act.

## H.    I. New Certificate of Incorporation and New By-Laws

On or as soon as reasonably practicable after the Effective Date, each of the Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states of organization in accordance with the laws of the respective states of organization. After the Effective Date, each of the Reorganized Debtors that is a corporation may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states of incorporation, the New Stockholders Agreement and their respective New Certificates of Incorporation and New By-Laws.

## I.    J. Reorganized Debtors' Boards of Directors

The initial members of the New Boards of each of the Reorganized Debtors shall be identified in the Plan Supplement. Such directors shall be deemed elected or appointed, pursuant to the Confirmation Order, but shall not take office and shall not be deemed to be elected or appointed until the occurrence of the Effective Date

## J.    K. Officers of Reorganized Debtors

To the extent known, officers of each of the other Reorganized Debtors shall be identified in the Plan Supplement. Such officers shall serve in accordance with applicable non-bankruptcy law and, to the extent applicable, the New Employment Agreements. The officers of each of the Reorganized Debtors will be determined by the New Boards of each of the Reorganized Debtors.

## K.    L. Employee Benefits

Except as otherwise provided herein, on and after the Effective Date, the Reorganized Debtors will (i) honor, in the ordinary course of business, any policies, programs and plans for, among other things, compensation (other than equity based compensation related to Interests), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance and accidental death and dismemberment insurance (collectively, "Employee Benefits") for the directors, officers and employees of any of the Debtors who served in such capacity at any time and (ii) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising before the Petition Date; provided, however, that the Debtors' or Reorganized Debtors' performance under any employment policy, program or plan will not entitle any person to any benefit or alleged entitlement under any policy, program or plan that has expired or been terminated before the Effective Date, or restore, reinstate or revive any such benefit or alleged entitlement under any such policy, program or plan. Any contract or

agreement for Employee Benefits that is an Executory Contract shall be assumed or rejected by the Debtors in accordance with Article 7 of the Plan. Nothing herein shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action or other rights with respect to any such contracts, agreements, policies, programs and plans.

**L.** ~~M.~~ **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated therein, and except to the extent that such property or Causes of Action are being transferred to the Recovery Trust and vesting in the Recovery Trustee pursuant to the terms of the Recovery Trust Agreement and Article 8 of the Plan, on the Effective Date any and all property in each Estate and all Causes of Action (except those released pursuant to the Releases by the Debtors) shall vest in each respective Reorganized Debtor free and clear of all Liens, Claims, charges or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action (excluding Estate Claims) without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**M.** ~~N.~~ **Corporate Action**

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) entry into any New Employment Agreements; (ii) appointment of the directors and officers of the Reorganized Debtors; (iii) the Distribution of the New Common Stock as provided herein; and (iv) all other actions contemplated by the Plan (whether occurring before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate or other action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors, officers, managers or members of the Debtors or the Reorganized Debtors, pursuant to Section 303 of the Delaware General Corporations Law or other similar applicable law.

The appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, operating agreements and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including any and all agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by Section 6.15 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**N.** ~~O.~~ **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors and the managers, officers and members of the boards of directors thereof are authorized to issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and

on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

## O.    ~~P.~~ General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, as one element of, and in consideration for, an overall negotiated settlement of disputed Claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and § 1123, and in consideration for the classification, Distributions, releases and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including the Inter-Debtor Settlement. Pursuant to Rule 408 of the Federal Rules of Evidence, the Plan, the Disclosure Statement, the_Plan_ Support Agreement, the Second Plan Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto shall not be admissible into evidence in any proceeding unless and until the Plan in consummated, and then only in accordance with the Plan. In the event the Plan is not consummated, provisions of the Plan, and the Disclosure Statement, the Plan Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto shall not be binding or probative.

Subject to Article 9 of the Plan, all Distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final and indefeasible.

## P.    ~~Q.~~ Section 1146 Exemption from Certain Taxes and Fees

Pursuant to § 1146(a), any transfers of property in contemplation of, in connection with or pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies to, among other things, (i) the creation of any mortgage, deed of trust, lien or other security interest; (ii) the making or assignment of any lease or sublease; or (iii) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any (a) merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under the Plan.

## Q.    ~~R.~~ D&O Liability Insurance Policies and Indemnification Provisions

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the D&O Liability Insurance Policies in full force) all D&O Liability Insurance Policies that are Executory Contracts pursuant to § 365(a). Any D&O Liability Insurance Policies that are not Executory Contracts, but under which any Debtor has enforceable rights, shall vest in the corresponding Reorganized Debtor on the Effective Date pursuant to Section 6.14 of the Plan. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' assumption of, or the revesting of, each of the D&O Liability Insurance Policies. As of the Effective Date,

the directors, officers, members, attorneys, employees and other agents of the Debtors who served the Debtors immediately prior to (but not on or after) the Effective Date shall retain any rights or recourse to insurance coverage, including with respect to the D&O Liability Insurance Policies, as existed immediately prior to the Effective Date.

In addition, the New Governance Documents of the Reorganized Debtors shall contain provisions that (i) eliminate the personal liability of the Debtors' and the Reorganized Debtors' then-present and future directors and officers for post-Effective Date monetary damages resulting from post-Effective Date breaches of their fiduciary duties to the fullest extent permitted by applicable law in the jurisdiction in which the subject Reorganized Debtor is organized; and (ii) require such Reorganized Debtor, subject to appropriate procedures, to indemnify the Debtors' and the Reorganized Debtors' directors, officers, and other key employees (as such key employees are identified by the New Board) serving after the Effective Date for all post-Effective Date claims and actions to the fullest extent permitted by applicable law in the jurisdiction in which the subject Reorganized Debtor is incorporated or organized.

### R. ~~S.~~ Preservation of Rights and Causes of Action

In accordance with § 1123(b), and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Releases by the Debtors provided by Section 11.2 of the Plan), (i) the Recovery Trustee shall retain and, as the representative of the Debtors' Estates appointed for such purpose, may enforce all rights to commence and pursue, as appropriate, any and all Estate Claims, whether arising before or after the Petition Date, and (ii) the Reorganized Debtors shall retain and, as the representatives of the Debtors' Estates appointed for such purpose, may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action other than Estate Claims, whether arising before or after the Petition Date. The Recovery Trustee's and the Reorganized Debtors' respective rights to retain, enforce, commence, prosecute and settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference to any Cause of Action against them in the Plan, the Disclosure Statement or any other Plan Document as any indication that the Recovery Trustee or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such retained Causes of Action upon, after or as a consequence of the Confirmation, the Effective Date or consummation of the Plan.

### S. ~~T.~~ Payment of Fees and Expenses of the DIP Lenders

In accordance with, and subject to the terms of, the Final DIP Order, the fees and expenses of the DIP Lenders shall be finally allowed. On the Effective Date (and thereafter with respect to fees and expenses, if any, relating to post-Effective Date services under the Plan) or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the DIP Lenders.

**T.** ~~U.~~ **Non-Participation of Other Subordinated Claims and Interests**

Holders of Other Subordinated Claims and Interests shall not receive any recovery under the Plan or Recovery Trust ~~and shall not be entitled to participate in the Rights Offering~~. The right of the Debtors and their successors or assigns to request subordination of any Claim or Interest, including the Other Subordinated Claims and Interests pursuant to § 510, is fully reserved, and the treatment afforded any Claim or Interest that becomes an Other Subordinated Claim and Interest, at any time, shall be modified to reflect such subordination. ~~For the avoidance of doubt, Parent shall not distribute to holders of Other Subordinated Claims and Interests any Rights to participate in the Rights Offering or otherwise subscribe for the purchase of New Common Stock at the Subscription Price~~

~~X.~~

**X.**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.** **Assumption and Rejection of Executory Contracts and Unexpired Leases**

Except as otherwise provided herein, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, each of the Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease (i) was assumed or rejected previously by the Debtors; (ii) expired or terminated pursuant to its own terms before the Effective Date; (iii) is the subject of a motion to assume filed on or before the Effective Date; or (iv) is identified on the Schedule of Rejected Contracts.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court, effective as of the Effective Date, (i) approving the assumption and assignment, or rejection, as the case may be, of Executory Contracts and Unexpired Leases, as described above, pursuant to §§ 365(a) and 1123(b)(2) and as set forth in the Plan, (ii) finding that the Reorganized Debtors had properly provided for the cure of any defaults that might have existed, (iii) finding that each assumption and assignment was in the best interest of the Reorganized Debtors, their estates and all parties in interest in the Chapter 11 Cases and (iv) finding the requirements for assumption and assignment of any Executory Contract or Unexpired Lease to be assumed have been satisfied. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the Debtors (with the consent of the Required ~~Backstop~~ Purchasers) or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify or supplement the Schedule of Proposed Cure Claims or the Schedule of Rejected Contracts at any time before the Effective Date; provided, however, that to the extent that, as of the Effective Date, there is any pending dispute between one or more Debtors and a counterparty to an Executory Contract or Unexpired Lease

regarding such counterparty's Cure Claim, the Debtors and Reorganized Debtors shall reserve the right to add the applicable Executory Contract or Unexpired Lease to the Schedule of Rejected Contracts following the resolution of such dispute, in which event such Executory Contract or Unexpired Lease shall be deemed rejected and such counterparty shall have the right to file a Rejection Claim as provided in Section 7.3 of the Plan. After the Effective Date, the Reorganized Debtors shall have the right to terminate, amend or modify any intercompany contracts, leases or other agreements without approval of the Bankruptcy Court.

Each Executory Contract and Unexpired Lease assumed under Section 7.1 of the Plan shall be assumed only to the extent, if any, that it constitutes an executory contract or unexpired lease as contemplated by § 365, and nothing contained herein shall constitute an admission by any Debtor or Reorganized Debtor that such contract or lease is an executory contract or unexpired lease or that any Debtor or Reorganized Debtor has any liability thereunder. Further, such assumption is subject to the same rights that any Debtor or Reorganized Debtor held or holds at, on, or after the Petition Date to modify or terminate such agreements under applicable non-bankruptcy law. To the extent the Bankruptcy Court or any other court of competent jurisdiction, determines, either before, on, or after the Effective Date, that any agreement in the form of a lease of real or personal property identified for assumption pursuant to this Article 7 of the Plan is, in fact, a secured transaction, the resulting secured indebtedness arising from such determination shall be treated in accordance with the applicable section of the Plan. Each Executory Contract and Unexpired Lease assumed pursuant to Article 7 of the Plan shall revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

## B.  Objections to Assumption; Determination of Cure Claims

Not less than twenty (20) days prior to the Confirmation Hearing, the Debtors shall file the Schedule of Proposed Cure Claims and serve it on all parties to the contracts and leases listed therein. Among other things, the Schedule of Proposed Cure Claims shall set forth the proposed Cure Claim, if any, to be paid in connection with the assumption by the Debtors of the Executory Contracts and Unexpired Leases identified in the Schedule of Proposed Cure Claims. The proposed Cure Claim, if any, identified for any Executory Contract or Unexpired Leases in the Schedule of Proposed Cure Claims is the only amount necessary to cure any and all outstanding defaults under such contract or lease, and no other defaults exist under said contract or lease. The Debtors believe that any Executory Contract or Unexpired Lease that is listed on the Schedule of Proposed Cure Claims and does not list a corresponding proposed Cure Claim, or lists a proposed Cure Claim of $0.00, may be assumed by the Debtor without the payment of any monetary cure amount.

Any Entity objecting to the proposed assumption of an Executory Contract or Unexpired Lease based on any ground, including the adequacy of the proposed Cure Claim, if any, associated with such contract or lease, must file and serve a written objection to the proposed assumption of such contract or lease within the same deadline and in the same manner established for filing objections to Confirmation. Failure to timely object to the proposed assumption of any Executory Contract or Unexpired Lease and the associated proposed Cure Claim, if any, shall constitute consent to the assumption of such contract or lease and the amount

of such Cure Claim, including an acknowledgment that the Debtors are providing adequate assurance of future performance to the extent required by § 365(b)(1).

To the extent that any objections to the amounts set forth in the Schedule of Proposed Cure Claims are timely filed and served and such objections are not resolved between the Debtor and the objecting Entities, the Bankruptcy Court shall resolve such disputes at the Confirmation Hearing. The resolution of such disputes shall not affect the Debtor's assumption of the contracts or leases that are the subject of such a dispute, but rather shall affect only the "cure" amount the Debtor must pay in order to assume such contract or lease. Notwithstanding the immediately preceding sentence, if at any time the Debtors in their discretion determine that the amount asserted to cure outstanding defaults in connection with the assumption of any Executory Contract or Unexpired Lease proposed to be assumed under the Plan would, if ordered by the Bankruptcy Court, make the assumption of such contract or lease imprudent, then the Debtors may, at or prior to the Confirmation Hearing, elect to reject such contract or lease pursuant to Section 7.3 of the Plan.

If not the subject of a timely filed objection pursuant to Section 7.2 of the Plan, any and all monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan shall be satisfied by the Debtors, pursuant to § 365(b)(1), by payment in Cash of the Cure Claim amount set forth in the Schedule of Proposed Cure Claims or such other amount as ordered by the Bankruptcy Court or agreed upon by the Debtors or Reorganized Debtors, as applicable, on or as soon as reasonably practicable after the Effective Date or on such other date as agreed to by the parties to such contract or lease. In the event of a dispute pursuant to Section 9.4 of the Plan, payment of the amount otherwise payable hereunder shall be made on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date on which such Cure Claim is determined by Final Order of the Bankruptcy Court, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. Assumption of any Executory Contract or Unexpired Lease and payment of the associated cure obligation, if any, pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

If the Bankruptcy Court ultimately determines that the Debtors cannot assume an Executory Contract or Unexpired Lease or cannot provide adequate assurance of future performance as proposed or in any modified proposal submitted by the Debtors or the Reorganized Debtors, then such contract or lease shall automatically thereupon be deemed to have been rejected pursuant to Section 7.3 of the Plan.

## C.     Claims Based on Rejection of Executory Contracts or Unexpired Leases

Subject to the occurrence of the Effective Date, on the Effective Date, all executory contracts and unexpired leases listed on the Schedule of Rejected Contracts shall be rejected by the Reorganized Debtors. Entry of the Confirmation Order shall constitute an order of the

Bankruptcy Court, approving, effective as of the Effective Date, the rejection of all Executory Contracts and Unexpired Leases identified on the Schedule of Rejected Contracts.

All proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of Executory Contracts and Unexpired Leases not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order or approval of the Bankruptcy Court. All Allowed Rejection Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases that are Rejection Claims shall be classified as Class 4 General Unsecured Claims against the applicable Debtor and shall be treated in accordance with Section 4.4 of the Plan. The deadline to object to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, shall be the later of (a) 180 days following the date on which such Claim was filed and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections as of the Effective Date, pursuant to § 365, effective as of the Petition Date. Unless otherwise ordered by the Bankruptcy Court, any party to an Executory Contract or Unexpired Lease identified for rejection as provided herein may, within the same deadline and in the same manner established for filing objections to Confirmation, file any objection thereto. Failure to file any such objection within the time period set forth above shall constitute consent and agreement to the rejection.

## D.    **Insurance Policies**

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the Insurance Policies in full force) all of the Insurance Policies pursuant to § 365(a) to the extent such Insurance Policies are Executory Contracts. Any Insurance Policy that is not an Executory Contract, but under which any Debtor has enforceable rights, shall vest in the corresponding Reorganized Debtor on the Effective Date pursuant to Section 6.14 of the Plan. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the foregoing assumption of each of the Insurance Policies.

## E.    **Modifications, Amendments, Supplements, Restatements or Other Agreements.**

Unless otherwise provided, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other fully-integrated agreements that affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed (unless otherwise agreed by the contract counterparty) to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

**F.    Reservation of Rights.**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Contracts, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**G.    Contracts and Leases Entered Into After the Petition Date.**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order, unless the parties thereto agree to any modifications, amendments, supplements or restatements.

~~XI.~~

**XI.**

**RECOVERY TRUST**

**A.    Purpose of Trust**

The Recovery Trust shall be established for the sole purpose of liquidating its assets in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Recovery Trust. From and after the Effective Date, the Recovery Trust shall, in accordance with the terms of the Recovery Trust Agreement, among other things: (a) liquidate, by conversion to Cash or other methods, or distribute directly to holders of Trust Interests and Reorganized Parent, as applicable, the Trust Assets, as expeditiously as reasonably possible in order to maximize the recovery for the holders of Trust Interests and for Reorganized Parent subject to the terms hereof; (b) enforce and prosecute all Estate Claims; and (c) object to, settle, compromise and prosecute Disputed Claims.

## B. Governing Document; Funding

The Recovery Trust shall be governed by the Recovery Trust Agreement. The Recovery Trust Reserve shall be funded with ~~an initial~~a Distribution of $~~1,000,000~~500,000 on the Effective Date to be used for trust expenses and administration (including legal fees and expenses). An additional Distribution of $500,000 shall be funded to Reorganized Parent on the Effective Date, which Reorganized Parent shall fund to the Recovery Trust on the date that is ninety (90) days after the Effective Date.

The Recovery Trust shall be ~~authorized~~entitled to borrow, on terms and conditions acceptable to the Recovery Trustee and ~~the~~ Reorganized ~~Debtors~~Parent in its sole discretion, up to ~~an additional~~ $500,000 per year from Reorganized Debtors; *provided, however,* that the aggregate amount of all such borrowings (including all accrued interest therein and other fees, charges or obligations) shall not exceed $1,000,000 outstanding at any time. The loans described in the foregoing sentence shall be repaid *pari passu* with Trust Litigation Expenses pursuant to Section 8.3(c)(i) of the Plan and the Recovery Trust Agreement, and shall accrue interest at a rate equal to the Prime Rate plus 11.00% per annum, payable quarterly in arrears; *provided, however,* that such interest may be paid in kind (PIK) to the extent there is insufficient Cash to make such payments. In addition, the Recovery Trust shall reimburse the Reorganized Parent for any sums paid to Replacement EC Professionals on account of their Allowed Professional Fee Claims, if any, pursuant to Section 8.3(c) of the Plan and the corresponding provisions of the Recovery Trust Agreement. The reimbursement obligations described in the foregoing sentence shall be paid pursuant to Section 8.3(c)(iii) of the Plan and the Recovery Trust Agreement, and shall accrue interest at a rate equal to the Prime Rate plus 6.00% per annum, payable quarterly in arrears; *provided, however,* that such interest may be paid in kind (PIK) to the extent there is insufficient Cash to make such payments. To the extent the Recovery Trust borrows funds from Reorganized Parent, the Recovery Trust is expressly prohibited from making any Distributions contemplated in Section 8.5(b) of the Plan or the Recovery Trust Agreement (other than distributions to Reorganized Parent) so long as any obligations under such borrowings remain outstanding.

## C. Vesting of Assets; Allocation

### 40. Trust Assets

Unless otherwise dealt with under the Plan, (i) the ~~GUC Cash~~Additional Cash Contribution (subject to Section 6.4 of the Plan), (ii) the Recovery Trust Reserve, (iii) the Estate Claims, and (iv) any other assets, recoveries or properties identified on Schedule 8.3 to the Plan shall vest in the Recovery Trust on the Effective Date (such property when vested in the Recovery Trust, the "Trust Assets"). Notwithstanding the foregoing, if the Debtors or Reorganized Debtors and the Recovery Trustee determine in mutual consultation that the assignment of an Estate Claim to the Recovery Trust may materially impair the enforcement or collectability of such Estate Claim by the Debtors, Reorganized Debtors or Recovery Trustee, such Estate Claim shall remain in the name of the Debtors or Reorganized Debtors, as applicable, for the sole purpose of preserving the ability to enforce and collect on such Estate Claim; provided, however, that such Estate Claim shall be treated for all other purposes under the Plan and the Trust Agreement as though it had fully vested in the Recovery Trustee, including for purposes of authorizing the Recovery Trustee to prosecute or settle such Estate Claim and collect

the proceeds thereof for Distribution in accordance with this Article 8 ~~of the Plan~~ and the Trust Agreement.

### 41. Allocation of Additional Cash Contribution

The Additional Cash Contribution that is transferred to or vests in the Recovery Trust, if any, shall be allocated and promptly distributed by the Recovery Trustee in the following manner:

> a. the first $500,000 of such funds shall be allocated for distribution to the holders of Allowed General Unsecured Claims pro rata based on the Class 4 Trust Interests held by each such holder relative to all Class 4 Trust Interests distributed or reserved at such time;

> b. if the Additional Cash Contribution exceeds $500,000, the second $500,000 of such funds shall be allocated for distribution to the holders of Allowed Excess Fee Claims pro rata based on the amount of Excess Fee Claims held by each affected Professional relative to the amount of all Excess Fee Claims outstanding at such time; and

> c. if the Additional Cash Contribution exceeds $1,000,000, any such excess amount shall be allocated for distribution fifty percent (50%) to the holders of Allowed General Unsecured Claims pro rata based on the Class 4 Trust Interests held by each such holder relative to all Class 4 Trust Interests distributed or reserved at such time, and fifty percent (50%) to the holders of Allowed Excess Fee Claims pro rata based on the amount of Excess Fee Claims held by each affected Professional relative to the amount of all Excess Fee Claims outstanding at such time.

For the avoidance of doubt, the Recovery Trustee shall distribute any portion of the Additional Cash Consideration allocable to Allowed Excess Fee Claims as soon as practicable after the occurrence of the Effective Date, and shall not reserve or use any part of the Additional Cash Consideration for payment of expenses of the Recovery Trust or otherwise. Any Additional Cash Contribution remaining in the Recovery Trust after payment in full of all Allowed Excess Fee Claims and Allowed General Unsecured Claims in accordance with Section 8.3(b) of the Plan (including such amounts as required to be reserved for the holders of any Disputed Excess Fee Claims and any Disputed General Unsecured Claims in accordance with the Plan and the Recovery Trust Agreement), shall be allocated and distributed in accordance with Section 8.3(c) and 8.5(b) of the Plan. So long as any Allowed Excess Fee Claims have not been paid in full, the Recovery Trustee is expressly prohibited from making any Distributions contemplated in Section 8.5(b) of the Plan or the corresponding section of the Recovery Trust Agreement or from making any reimbursement to Reorganized Parent on account of any payment with respect to Replacement EC Professionals' Allowed Professional Fee Claims.

### 42. Allocation of other Trust Assets

~~Initially, from and after the Effective Date, the~~All Cash or other proceeds ~~of Estate Claims~~received by or vested in the Recovery Trust (~~net of fees and costs directly attributable to~~

the recovery of such proceeds) shall be allocated as follows: (i) eighty percent (80%) to the Recovery Trust and (ii) twenty percent (20%) to Reorganized Parent. At~~other than any portion of the Additional Cash Contribution, if vested with the Recovery Trust) shall be allocated and distributed in the following manner:~~

> a. first, to pay [or reserve in good faith reasonable amounts payable in respect of] any and all litigation costs and expenses of the Recovery Trust that directly relate to efforts to recover proceeds from the applicable Estate Claims being distributed pursuant to Section 8.3(c) of the Plan ("Trust Litigation Expenses") and to pay any and all obligations outstanding at such time under any borrowings from the Recognized Parent described in Section 8.2(b) of the Plan;

> b. second, to the extent any proceeds remain, and as soon as practicable after the receipt of Cash or other proceeds by the Recovery Trust, excluding the Recovery Trust Reserve (after establishment of reasonable reserves for the payment Trust Litigation Expenses), to the holders of Allowed Excess Fee Claims, if any, pro rata based on the amount of Excess Fee Claims held by each affected Professional relative to the amount of all Excess Fee Claims outstanding at such time until such holders have been paid (after taking into account all amounts paid to such holders pursuant to Section 8.3(b) of the Plan) an amount equal to 100% of such Allowed Claims (without interest) (including such amounts as required to be reserved for the holders of any Disputed Excess Fee Claims in accordance with the Plan and Recovery Trust Agreement);

> c. third, to the extent any proceeds remain, to reimburse Reorganized Parent for [or reserve in good faith, and in consultation with the Reorganized Debtors, reasonable amounts payable in respect of] the payment of the Replacement EC Professionals' Allowed Professional Fee Claims, if any;

> d. fourth, to the extent any proceeds remain,

>> i. 20% of such proceeds shall be allocated and distributed to the Reorganized Parent until the occurrence of a Class 4/Class 5 Satisfaction; and

>> ii. 80% of such proceeds shall be retained by the Recovery Trust as Trust Assets and applied, reserved or distributed as set forth in Section 8.3(c)(v) – (vi) below and Section 8.5(b) and the Recovery Trust Agreement until the occurrence of a Class 4/Class 5 Satisfaction;

>> *provided, however,* that from and after the occurrence of a Class 4/Class 5 Satisfaction, to the extent any proceeds remain,

>> iii. 70% of such proceeds shall thereafter be allocated and distributed to the Reorganized Parent; and

        iv.    30% of such proceeds shall thereafter be retained by the Recovery Trust as Trust Assets and applied, reserved or distributed as set forth in Section 8.3(c)(v) – (vi) below and Section 8.5(b) and the Recovery Trust Agreement;

*provided, further,* that if Class 7 votes to accept the Plan, then from and after the occurrence of a Class 4/Class 5 Satisfaction, to the extent any proceeds remain,

        v.    60% of such proceeds shall thereafter be allocated and distributed to the Reorganized Parent; and

        vi.    40% of such proceeds shall thereafter be retained by the Recovery Trust as Trust Assets and applied, reserved or distributed as set forth in Section 8.3(c)(v) – (vi) below and Section 8.5(b) and the Recovery Trust Agreement;

e.    fifth, to pay [or reserve in good faith reasonable amounts payable in respect of] all other liabilities, costs and expenses of the Recovery Trust that are not Trust Litigation Expenses, including the compensation then due and payable to the Recovery Trustee pursuant to the Recovery Trust Agreement, the amounts, if any, payable to the Recovery Trustee and his agents, representatives, professional advisors and employees pursuant to the indemnification provisions specified therein, and the reimbursement for any and all costs, expenses and liabilities incurred by the Recovery Trustee in connection with the administration of the Recovery Trust, including any costs and expenses incurred in objecting to the allowance of any Claim or Interest or seeking to subordinate or recharacterize any Claim or Interest (the "Trust Administration Expenses");

f.    sixth, to the extent any proceeds remain, to pay [or reserve in good faith reasonable amounts payable in respect of] all the compensation to, and the liabilities, costs and expenses of, the members of the Recovery Trust Committee, including the amounts then due and payable to the members of the Recovery Trust Committee pursuant to the indemnification provisions specified in the Recovery Trust Agreement, and the reimbursement for any and all costs, expenses and liabilities incurred by the members of the Recovery Trust Committee in connection with the performance of their duties thereunder (excluding for the avoidance of doubt, any Trust Litigation Expenses).

"***Class 4/Class 5 Satisfaction***" shall mean such time as the holders of Allowed Class 4 General Unsecured Claims have received Distributions in an amount equal to the Allowed amount of their Class 4 Claims plus interest at a rate of eight percent (8.0%) per annum from the Petition Date until the date of such payment in full to the holders of such Allowed Claims (including such amounts as are required to be reserved for the holders of any Disputed Class 4 Claims pursuant to the Plan and the Recovery Trust Agreement) and the holders of Allowed Class 5 Subordinated

Unsecured Claims have been paid an amount equal to the Allowed amount of their Class 5 Claims (without interest) (including such amounts as required to be reserved for the holders of any Disputed Class 5 Claims pursuant to the terms of the Plan and the Recovery Trust Agreement) (the "Class 4 and Class 5 Satisfaction"), any additional proceeds of Estate Claims received by the Recovery Trust (net of fees and costs directly attributable to the recovery of such proceeds) shall be allocated as follows: (i) thirty percent (30%) to the Recovery Trust and (ii) seventy percent (70%) to Reorganized Parent..

**D.** **Tax Treatment**

The Debtors, the Recovery Trustee, and the holders of Trust Interests will treat the Recovery Trust as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and any comparable provision of state or local law. The Recovery Trust shall be considered a "grantor" trust and is intended to comply with the requirements of a liquidating trust, which is a grantor trust, as set forth in Revenue Procedure 94-45, 1994-2 C.B. 684. For all United States federal income tax purposes, all parties (including the Debtors, the Recovery Trustee, the Beneficiaries, Reorganized Parent and the Recovery Trust Committee) shall treat the transfer of the Trust Assets to the Recovery Trust as (1) a transfer of the Trust Assets (subject to the liabilities and Allowed Claims indicated herein, whether such Claims are Allowed Claims on or after the Effective Date of the Plan) directly to the Beneficiaries (except to the extent retained by Reorganized Parent) and, to the extent Trust Assets are allocable to Disputed Claims, to the Disputed Claims Reserve Account, followed by (2) the transfer by such Beneficiaries and Reorganized Parent to the Recovery Trust of the Trust Assets (other than the portion of the Trust Assets allocable to the Disputed Claims Reserve Account) in exchange for Trust Interests in accordance with the Plan. The Recovery Trustee will then distribute, through the book-entry thereof on the books and records of the Recovery Trust, the Trust Interests to the Beneficiaries, in exchange for such Beneficiaries' Claims. Accordingly, the Beneficiaries and Reorganized Parent shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Trust Assets (other than such portion of the Trust Assets as is allocable to reserves as provided in the Recovery Trust Agreement). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. The Recovery Trustee shall be authorized to take any action necessary to maintain compliance with this Treasury Regulation or its successor that does not contradict the terms of the Plan, the Recovery Trust Agreement, or the Confirmation Order. The Recovery Trustee, in consultation with the Recovery Trust Committee, will in good faith value all Trust Assets, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Recovery Trust (including the Debtors, the Recovery Trustee, Reorganized Parent, and the Beneficiaries) for all United States federal income tax purposes.

**E.** **Trust Interests**

43.    1. Issuance of Trust Interests

Holders of Allowed Claims and Allowed Interests in Classes 4, 5, 6 and 7 shall be issued Trust Interests in the Recovery Trust as follows:

a. each holder of an Allowed Class 4 General Unsecured Claim shall be issued a Class 4 Trust Interest for every $1.00 of such holder's Allowed Class 4 Claim;

b. each holder of an Allowed Class 5 Subordinated Unsecured Claim shall be issued one Class 5 Trust Interest for every $1.00 of such holder's Allowed Class 5 Claim;

c. each holder of an Allowed Class 6 Class Action Claim shall be issued one Class 6 Trust Interest for each share of common stock in Parent associated with such holder's Allowed Class 6 Claim; and

d. each holder of an Allowed Class 7 Old Equity Interest shall be issued one Class 7 Trust Interest for each share of Old Equity Interest held by such holder in Parent.

No fractional Trust Interests shall be issued. The number of Trust Interests issued to any holder pursuant to Section 8.5 of the Plan and the Recovery Trust Agreement shall be rounded down to the nearest whole Trust Interest. The Trust Interests shall not be transferable, except by will, intestate succession or operation of law, and shall not be certificated.

44. 2. Distributions on Trust Interests

Each holder of a Trust Interest shall entitle the holder to proceeds from the Recovery Trust, aftersubject to and after payment of all amounts required to be paid pursuant to the allocation set forth in Section 8.3(c) of the Plan, based on the priorities below, which shall be distributed in the following manner:

a. first, to the extent any proceeds remain, to the holders of Allowed Class 4 General Unsecured Claims pro rata based on the number of Class 4 Trust Interests held by each such holder relative to all Class 4 Trust Interests distributed or reserved at such time, until such holders have been paid (after taking into account all payments made to such holders pursuant to Section 8.3 of the Plan) an amount equal to 100% of such Allowed Claims plus interest at a rate of eight percent (8.0%) per annum from the Petition Date until the date of such payment in full to the holders of such Allowed Claims (including such amounts as are required to be reserved for the holders of any Disputed Class 4 General Unsecured Claims pursuant to the terms of the Plan and the Recovery Trust Agreement);

b. second, to the extent any proceeds remain, to holders of Allowed Class 5 Subordinated Unsecured Claims pro rata based on the number of Class 5 Trust Interests held by each such holder relative to all Class 5 Trust Interests distributed or reserved at such time until such holders have been paid 100% of such Allowed Claims (without interest) (including such amounts as are required to be reserved for the holders of any Disputed

Class 5 Subordinated Unsecured Claims pursuant to the terms of the Plan and the Recovery Trust Agreement);

c.   third, to the extent any proceeds remain, to holders of Allowed Class 6 Class Action Claims and Allowed Class 7 Old Equity Interests pro rata based on the aggregate number of Trust Interests held by each such holder relative to the sum of all Class 6 and Class 7 Trust Interests distributed or reserved at such time until holders of Allowed Class 6 Claims have been paid 100% of such Allowed Claims (without interest and as capped under Section 4.6 of the Plan) (including such amounts as are required to be reserved for the holders of any Disputed Class 6 Claims pursuant to the terms of the Plan and the Recovery Trust Agreement); and

d.   fourth, to the extent any proceeds remain, to the holders of Allowed Class 7 Old Equity Interests pro rata based on the number of Class 7 Trust Interests held by each such holder relative to all Class 7 Trust Interests distributed.

Notwithstanding anything to the contrary herein, the portion of the Trust Assets constituting the GUC Cash shall be distributed to holders of Class 4 Trust Interests on or as soon as reasonably practicable after the Effective Date, subject to reservation on account of Disputed Class 4 Claims pursuant to the terms of the Recovery Trust. The Recovery Trustee shall establish and maintain reserves and reserve accounts pursuant to the terms of the Recovery Trust Agreement.

**F.   Administration of the Recovery Trust**

The Recovery Trust will be administered and controlled initially by a five-member oversight committee comprising four members plus the Recovery Trustee (the "Recovery Trust Committee"). On and after the Effective Date of the Plan, the Recovery Trust Committee shall comprise five voting board members selected as follows: (i) two members shall be chosen by the Creditors' Committee, in consultation with Lonestar and Parent or Reorganized Parent, as applicable; (ii) one member shall be chosen by Reorganized Parent; (iii) one member shall be chosen by Lonestar; and (iv) the Recovery Trustee. Upon the occurrence of the Class 4 and /Class 5 Satisfaction, the two board members appointed by the Creditors' Committee shall resign promptly. Thereafter, the Recovery Trust Committee shall be reconstituted to comprise fourthree voting board members selected as follows: (i) two members, who shall be chosen by Reorganized Parent; and (ii) one member shall be the individual, and any alternates thereto, chosen by the Equity Committee and named in the Plan Supplement; and (iii) the Recovery Trustee.

The Recovery Trust Committee shall have the right to replace the Recovery Trustee in accordance with the terms of the Recovery Trust Agreement, and vacancies shall be filled in accordance with the terms of the Recovery Trust Agreement. The Recovery Trustee shall be recused from any such vote and the Recovery Trustee's vote shall not be counted for such purposes. The Recovery Trustee may also be replaced by Final Order entered by the Bankruptcy Court.

The Recovery Trustee may retain such law firms, accounting firms, experts, advisors, financial advisors, consultants, investigators, appraisers, auctioneers or other professionals as it may deem necessary (collectively, the "Trustee Professionals"), in its sole discretion, to aid in the performance of its responsibilities pursuant to the terms of the Plan including the liquidation and distribution of Trust Assets. Trustee Professionals shall prepare monthly statements in the same manner and in the same detail as required pursuant to the Compensation Procedures Order, and shall serve such statements on the Recovery Trustee and each member of the Recovery Trust Committee. In the event two or more members of the Recovery Trust Committee object to the reasonableness of such fees and expenses, the matter shall be submitted to the Bankruptcy Court for approval of the reasonableness of such fees and expenses.

Notwithstanding the foregoing, the following law firms that were representing the Debtors prior to the Effective Date of the Plan shall serve as counsel to the Recovery Trustee in connection with the litigation identified below:

| Law Firm | Lawsuits or categories of litigation |
|---|---|
| Pachulski Stang Ziehl & Jones LLP | Matters relating to David Brooks, including D&O litigation, SEC-related litigation, SOX 304 litigation, class action/derivative litigation, and any fraudulent conveyance litigation. |
| Venable LLP | Matters relating to "Zylon" claims, including the Toyobo litigation and DOJ litigation. |
| Carr & Palmer LLP | Matters relating to "Zylon" claims, including the Toyobo litigation and DOJ litigation. |

The Recovery Trustee may, with the consent of a majority of the members of the Recovery Trust Committee (including the Recovery Trustee), replace any of the foregoing law firms or employ additional counsel in any matter if such replacement or employment is in the best interests of the Recovery Trust.

## G.  **Rights and Responsibilities of Recovery Trustee**

The Recovery Trustee will maintain a record of each Beneficiary's Trust Interests. The Recovery Trustee shall, upon written request of a Beneficiary, provide reasonably adequate documentary evidence of such Beneficiary's Trust Interest, as indicated in the books and records of the Recovery Trust. The expense of providing such documentation shall be borne by the requesting Beneficiary.

As set forth in the Plan and the Recovery Trust Agreement, the Recovery Trustee shall be authorized to retain, enforce, pursue and prosecute all Estate Claims on behalf of and for the benefit of Reorganized Parent and the Recovery Trust, and distribute the proceeds thereof to the Trust Beneficiaries.

## XII.

## PROVISIONS GOVERNING DISTRIBUTIONS

### A.     Record Date for Distributions

As of the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Interests. Neither the Debtors nor the Recovery Trustee shall have any obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

### B.     Timing and Calculation of Amounts to Be Distributed

Except as otherwise provided in the Plan, on the applicable date or dates, each holder of an Allowed Claim or Allowed Interest against the Debtors shall receive the full amount of the Distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class and in the manner provided herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article 10 of the Plan. Except as otherwise provided herein, holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for herein, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

### C.     Disbursing Agent

Except as otherwise provided herein, all Distributions under the Plan shall be made by the Disbursing Agent except for the issuance of Trust Interests, which shall be made by the Recovery Trustee in accordance with the terms of the Plan and the Recovery Trust Agreement. The Disbursing Agent shall not be required to obtain a bond or surety for the performance of its duties unless ordered otherwise by the Bankruptcy Court, in which case all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors or the Recovery Trust, as the case may be.

### D.     Delivery of Distributions and Undeliverable or Unclaimed Distributions

45.     1. Delivery of Distributions in General

Except as otherwise provided in the Plan and subject to Bankruptcy Rule 9010, Distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent (a) to the signatory set forth on any of the Proofs of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the Debtors have been notified