Bankruptcy Court's *Order Extending Deadline to Assume or Reject Unexpired Leases of Nonresidential Real Property*, the Section 365(d)(4) Deadline was extended to November 10, 2010 [Docket No. 338]. The Debtors subsequently entered into voluntary agreements with the landlords of the Debtors' facilities at Pompano Beach, FL and Jacksboro, TN and moved to further extend the Section 365(d)(4) Deadline for these two leases through April 30, 2011.

The Debtor also sought and obtained various extensions of the deadline to remove actions pursuant to 28 U.S.C. Section 1452.

Finally, on August 11, 2010, the Debtors filed their first motion to extend their exclusive periods to both file a plan and to solicit acceptances with respect thereto [Docket No. 454], pursuant to which they sought to extend by one hundred twenty days the period under § 1121(b) during which the Debtors have the exclusive right to file a Chapter 11 plan (the "Exclusive Filing Period") and the period under § 1121(c)(3) during which the Debtors have the exclusive right to solicit acceptances of a Chapter 11 plan (the "Exclusive Solicitation Period," together with the Exclusive Filing Period, the "Exclusive Periods"). On September 20, 2010, the Bankruptcy Court entered an order extending the Exclusive Filing Period through and including October 12, 2010 and extending the Exclusive Solicitation Period through and including December 10, 2010 [Docket No. 597]. On October 8, 2010, the Debtors filed a motion to further extend the Exclusive Periods [Docket No. 662]. On November 24, 2010, the Equity Committee filed an objection to the Debtors' second motion to further extend the Exclusive Periods [Docket 806]. On December 15, 2010, the Bankruptcy Court entered an order approving a joint stipulation between the Debtors, the Equity Committee and the Creditors' Committee further extending the Exclusive Filing Period to February 9, 2011 and the Exclusive Solicitation Period to April 11, 2011, with such exclusivity to be shared co-exclusively with the Creditors' Committee and the Equity Committee (the "Exclusivity Extension Stipulation") [Docket No. 927]. However, the Exclusivity Extension Stipulation also provided that nothing therein would modify or alter the obligations of the Debtors, Creditors' Committee and Equity Committee with respect to their respective obligations under the First Plan Support Agreement (defined below).

L.    **Litigation with the Creditors' Committee and Office of United States Trustee's Filing of Motion to Appoint Examiner**

On July 13, 2010, the Creditors' Committee filed the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Appointing a Chapter 11 Trustee, Or in the Alternative, Appointing an Examiner Pursuant to 11 U.S.C. §§ 1104(a) & (C) & 105(A) And Bankruptcy Rules 2007.1 and 9014* [Docket No. 334] (the "Trustee Motion"), pursuant to which the Creditors' Committee requested appointment of a Chapter 11 trustee in the Debtors' cases, or, alternatively, appointment of an examiner. The Debtors' filed their preliminary objection to the Trustee Motion [Docket No. 362] and their objection to the Trustee Motion [Docket No. 511] on July 19, 2010 and August 24, 2010, respectively.

On July 30, 2010, the Office of the United States Trustee filed its *United States Trustee's Motion for Order Directing Appointment of Examiner* [Docket No. 423] (the "Examiner Motion"), pursuant to which the Office of the United States Trustee requested appointment of an examiner for the limited purpose of investigating the facts and circumstances surrounding: (i) the connections between Steel Partners and the Debtors and the independence of the Board, and

(ii) the allegations of the Creditors' Committee and David Cohen regarding whether the approval of the settlement of the Class Action Suit and Derivative Action will benefit the estate and who would be entitled to any proceeds from a successful resolution of the SEC civil action against Brooks. The Debtors filed their opposition to the Examiner Motion on August 25, 2010 [Docket No. 513].

On September 1, 2010, the Debtors and Creditors' Committee entered into a stipulation to settle the Trustee Motion [Docket No. 537] (the "Trustee Motion Settlement"). Pursuant to the Trustee Motion Settlement, the Debtors and Creditors' Committee agreed, among other things, for the withdrawal of the Trustee Motion and for the appointment of an observer mutually selected by the Debtors and the Creditors' Committee to observe and report to the Creditors' Committee on the meetings of the Debtors' Board. The Office of the United States Trustee agreed to continue the hearing to consider the Trustee Motion Settlement.

## M.    The Sale and Reorganization Process and Replacement DIP Financing

As noted above, the Debtors' Original DIP Facility contained sale milestones that required the filing of a motion to approve an asset purchase agreement initially by November 1, 2010 which deadline was later extended to November 19, 2010 pursuant to the Second DIP Amendment. As such, the Debtors were on a very tight timeframe to conduct either a sale of their assets or restructuring of their business. The Debtors formally commenced their sale process on July 8, 2010. On or about July 9, 2010, CRG sent out a teaser memorandum highlighting the Debtors' assets to approximately 2,000 financial and strategic investors and industry participants. The Debtors drafted and provided an offering memorandum and access to their data room to those parties who signed nondisclosure agreements. Over sixty parties returned executed non-disclosure agreements and conducted initial due diligence. CRG created an electronic data room with key documents and company-specific information in order to streamline the due diligence process. CRG received sixteen initial indications of interest, which were subsequently narrowed to six letters of intent. To those parties submitting letters of intent, CRG provided additional, more detailed information about the Debtors, and scheduled meetings with the Debtors' management. The Debtors, with the assistance of CRG and other professionals, subsequently engaged in negotiations with certain of the parties submitting letters of intent on the details of a sale. Sale materials were prepared and then marketed to prospective purchasers.

By mid-November, the Debtors had not yet reached any definitive agreements with any potential acquirers. Because the Original DIP Agreement expired on December 31, 2010 pursuant to the Second DIP Amendment, the Debtors determined that it would be in the best interests of their estates to conduct an auction for and sale of substantially all of their operating assets in order to obtain approval of a sale of the Debtors' assets to meet the deadline constraints imposed by the Second DIP Amendment. On November 24, 2010, the Debtors filed their *Motion for an Order (A) Approving Asset Purchase Agreement and Authorizing Sale of Assets Outside Ordinary Course of Business; (B) Authorizing the Sale Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code*, et seq. (the "Sale Motion") [Docket 802] and *Motion for Entry of an Order (A) Approving Bid Procedures for the Sale of the Debtors' Assets, (b) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto*; et seq. (the

"Bid Procedures Motion") [Docket 800], in order to complete the sale process prior to the expiration of the DIP Facility on December 31, 2010. The Creditors' Committee filed an objection to the Bid Procedures Motion that was joined and supplemented by the Equity Committee [Docket No. 838 and Docket No. 842].

N.     The First Plan Support Agreement and
       Replacement Debtor in Possession Financing

After the filing of the Sale Motion and Bid Procedures Motion, the Debtors engaged in discussions with the Creditors' Committee, the Equity Committee, Lonestar, Privet, Privet Fund Management, and Prescott with respect to the transactions that would eventually form the basis of the Replacement DIP Facility, ~~the~~ and that certain *Plan Support Agreement*, dated as of December 10, 2011 (the "First Plan Support Agreement ~~and the Plan Term Sheet~~"). Privet Fund Management and Prescott Group Capital, either directly or through their investors or affiliates, are existing shareholders in PBSI. Lonestar Partners, L.P., an affiliate of Lonestar, holds General Unsecured Claims (collectively, the "Lonestar Pre-Petition Claims") (i) against PACA in the amount of $373,572.10 as reflected in PACA's schedules of assets and liabilities, (ii) against PBBA (as defined below) in the amount of $8,126,774.32 as reflected in PBBA's schedules of assets and liabilities, and (iii) against PBSI in the amount $8,512,858.34 as reflected in Proof of Claim No. 284.

After extensive discussions Lonestar, though its affiliate, PB Funding, LLC, and, Privet and Prescott (together, the "DIP Lenders") agreed to provide an alternate source of post-petition financing that would permit the Debtors to retire the Original DIP Facility, obtain relief from the existing sale-related covenants and pursue a reorganization of the Debtors' business enterprise. This new financing involved three separate but interdependent agreements. The first agreement is a fully negotiated $25,000,000 post-petition secured credit facility (the "DIP Facility"), the terms of which are set forth in the DIP Loan Agreement between the Debtors, as borrowers, and the DIP Lenders. The proceeds from the DIP Facility, among other things, repaid the Debtors' outstanding obligations under the Original DIP Facility in their entirety.

The ~~second agreement is the~~First Plan Support Agreement, ~~which sets forth~~ provided for the commitment of the Debtors, the Creditors' Committee, the Equity Committee, Lonestar Capital Management, LLC, as investment advisor to Lonestar Partners manager of PB Funding, LLC, L.P., Privet, Privet Fund Management and Prescott, ~~with respect~~ to a plan of reorganization ~~based on an accompanying term sheet that formed the basis for the Plan as~~ negotiated ~~among~~by the parties to the First Plan Support Agreement. In addition, the First Plan Support Agreement ~~contains~~contained a series of deadlines by which certain milestones were to be achieved, including the approval by the Bankruptcy Court of ~~this~~the Prior Disclosure Statement (defined below) by February 18, 2011, Confirmation of the Prior Plan (defined below) by March 30, 2011 and consummation of the Prior Plan (*i.e.*, the Effective Date) by April 14, 2011. The First Plan Support Agreement also ~~provides~~provided for payment of (i) a break-up fee of $750,000 divided among Privet and Privet Fund Management, Prescott, and Lonestar pursuant to the terms of the First Plan Support Agreement and (ii) up to a maximum of $200,000 to Privet and Privet Fund Management, and each of Prescott and Lonestar in expense reimbursement, payable solely in the event that Privet, Privet Fund Management, Prescott and Lonestar ~~are~~were not in material breach of the First Plan Support Agreement and the Debtors either (a) ~~consummate~~consummated a sale

of all or a substantial portion of their assets, (b) ~~confirm~~confirmed a plan of reorganization other than the Plan or (c) ~~obtain~~obtained approval of another financing arrangement, (other than the Exit Financing) the proceeds of which ~~are~~would be used to repay the DIP Facility.

~~Key to the plan of reorganization summarized by the plan term sheet is an equity infusion collectively provided by the Backstop Parties of no less than $15 million and no more than $25 million through a backstopped rights-offering and direct subscription of shares. The Backstop Parties' agreement is memorialized in a Subscription and Backstop Purchase Agreement, dated January ___, 2011. Both the Rights Offering and the DIP Lenders' commitments in respect thereof are described more fully in the Plan. Together, the Plan Support Agreement, the DIP Loan Agreement and the Subscription and Backstop Agreement form the expected cornerstones of the Debtors' plan to emerge from Chapter 11, as encapsulated in the Plan filed contemporaneously with this Disclosure Statement.~~

On December 7, 2010, the Equity Committee and Creditors' Committee filed a joint motion for approval of the new DIP Facility and the First Plan Support Agreement [Docket No. 874]. The First Plan Support Agreement was subsequently approved pursuant to the Interim DIP Order on December 10, 2010, and the DIP Facility was approved on an interim basis pursuant to the Interim DIP Order and on a final basis pursuant to the Final DIP Order entered on December 29, 2010 [Docket No. 968].

With the approval of the DIP Facility, the Debtors were able to fully repay the outstanding balance owed to Steel under the Original DIP Loan Agreement, and were no longer constrained by the December 31, 2010 termination date of the Original DIP Loan Agreement. The DIP Facility, by contrast, ~~does~~did not expire until June 15, ~~2011,~~2011 (and, as described below, which deadline the Debtors have moved to extend until July 31, 2011) and provides the ~~Debtors~~Plan Proponents with sufficient time to ~~complete the plan process under the milestones described in the Plan Support Agreement~~solicit and confirm their Plan. The DIP Loan Agreement also contains a budget that allows for the use of proceeds to fund, among other things, working capital needs and general corporate purposes, to finance capital expenditures in order to allow the Debtors to continue to operate through confirmation and effectiveness of the Plan. The Interim and Final DIP Orders also provided for the allowance of the Lonestar Pre-petition Claims in full, subject to certain reconciliation as provided more fully in the Interim and Final DIP Orders.

In light of the approval of both the DIP ~~Facility~~Loan Agreement and the First Plan Support Agreement, the Debtors, along with the other Plan Proponents, ~~believe~~believed that the transactions contemplated thereby constitute the highest and best return for holders of Claims and Interests. Therefore, the Debtors withdrew the Sale Motion and the Bid Procedures Motion on December 15, 2010.

In accordance with provisions of the First Plan Support Agreement, the Plan Proponents filed their *Disclosure Statement Describing Joint Chapter 11 Plan of Reorganization* [Docket 1007] (the "Prior Disclosure Statement") and their *Joint Chapter 11 Plan of Reorganization* [Docket 1006] (the "Prior Plan"). The Plan Proponents sought approval of the Prior Disclosure Statement and scheduled a hearing to consider approval of the Prior Disclosure Statement for February 14, 2011, which hearing was continued from time to time. As noted above, in response to certain objections and other informal responses received to the Prior Disclosure Statement, including the objection filed by the Staff of the SEC on the grounds that the proposed rights offering to creditors and certain equity holders set forth in the Prior Disclosure Statement would not meet the requirements of the Securities Act of 1933, the Plan Proponents modified the Prior Disclosure Statement and Prior Plan, which modifications are reflected in this Disclosure Statement and accompanying Plan. In particular, among other proposed changes, pursuant to the revisions to the Prior Plan and revisions to the Prior Disclosure Statement, the Plan now provides that the New Common Stock described in the Plan will be proposed to be sold to the Purchasers through the Direct Subscription. Accordingly, the New Common Stock will not be sold through a rights offering to creditors or existing equity holders, as previously provided in the Prior Disclosure Statement.

## O. The Second Plan Support Agreement and the Amendment to the DIP Loan Agreement

As noted above, the Equity Committee was reformed on March 25, 2011 with the appointment of three additional members. The Equity Committee's prior counsel was terminated and on April 1, 2011, the Equity Committee filed a motion to employ new counsel effective as of April 1, 2011. Because the provisions of the First Plan Support Agreement required the consent of all parties thereto with respect to the modification or amendment of such agreement (including the Equity Committee), the Plan Proponents entered into that certain *Second Plan Support Agreement* (the "Second Plan Support Agreement"), which replaced the provisions of the terminated First Plan Support Agreement and does not have the Equity Committee as a signatory thereto. Similar to the provisions of the First Plan Support Agreement, the Second Plan Support Agreement contains a series of deadlines by which certain milestones are to be achieved, including the approval by the Bankruptcy Court of this Disclosure Statement by April 25, 2011, Confirmation of the Plan by June 3, 2011 and consummation of the Plan (i.e., the Effective Date) by June 17, 2011. The Second Plan Support Agreement also provides for payment of (i) a break-up fee of $750,000 divided among Privet and Privet Fund Management, Prescott, and Lonestar pursuant to the terms of the Second Plan Support Agreement and (ii) up to a maximum of $200,000 to Privet and Privet Fund Management, and each of Prescott and Lonestar in expense reimbursement, payable solely in the event that Privet, Privet Fund Management, Prescott and Lonestar are not in material breach of the Second Plan Support Agreement and the Debtors either (a) consummate a sale of all or a substantial portion of their assets, (b) confirm a plan of reorganization other than the Plan, or (c) obtain approval of another financing arrangement (other than the Exit Financing) the proceeds of which are used to repay the DIP Facility.

On April ___, 2011, the Debtors filed their *Motion for Order Approving (A) Second Plan Support Agreement; and (B) Amendment to Debtor in Possession Financing Agreement* [Docket _____] (the "Second Plan Support Agreement Approval Motion") pursuant to which the Plan Proponents seek approval of the Second Plan Support Agreement substantially in the form attached to the Second Plan Support Agreement Approval Motion.

The Second Plan Support Agreement Approval Motion also seeks approval of that certain *Amendment to the Debtor in Possession Financing Agreement*, substantially in the form attached to the Second Plan Support Agreement Approval Motion and which, among other things, extends the expiration date of the DIP Loan Agreement from the current June 15, 2011 date through and including July 31, 2011. A hearing on the Second Plan Support Agreement Approval Motion has been scheduled for April ___, 2011.

Pursuant to the terms of the Second Plan Support Agreement, the Plan Proponents filed the Disclosure Statement and the Plan on April ___, 2011. The Plan provides for a capital infusion collectively provided by the Purchasers in a minimum amount of $15,000,000 and (subject to certain consents and other conditions), up to $25,000,000 through a direct subscription of shares. The Purchasers' agreement is memorialized in a Subscription Agreement, dated April ___, 2011. The direct subscription for the New Common Stock by the Purchasers is described more fully in the Plan. Together, the Second Plan Support Agreement, the DIP Loan Agreement (as amended by the DIP Loan Agreement Amendment), and the Subscription Agreement form the expected cornerstones of the Debtors' plan to emerge from Chapter 11, as encapsulated in the Plan filed contemporaneously with this Disclosure Statement. A description of the Plan is set forth below.

## V.

## DESCRIPTION OF THE PLAN

A DISCUSSION OF THE PRINCIPAL PROVISIONS OF THE PLAN AS THEY RELATE TO THE TREATMENT OF CLASSES OF ALLOWED CLAIMS AND INTERESTS IS SET FORTH IN ARTICLES VI THROUGH VIII BELOW. THE DISCUSSION OF THE PLAN THAT FOLLOWS CONSTITUTES A SUMMARY ONLY AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES. YOU ARE URGED TO READ THE PLAN IN FULL TO EVALUATE WHETHER TO ACCEPT OR REJECT THE DEBTORS' PROPOSED PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THIS SUMMARY AND THE PLAN, THE TERMS OF THE PLAN CONTROL. ALL CAPITALIZED TERMS NOT OTHERWISE DEFINED HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

### A. General

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of themselves and their creditors and stockholders.

Formulation of a plan is the principal objective of Chapter 11. In general, a plan (i) divides Claims and Interests into separate classes, (ii) specifies the property that each Class is to

receive under the Plan and (iii) contains other provisions necessary to the reorganization of a debtor. Alternatively, the Bankruptcy Code allows a debtor to file a plan of liquidation which allows for the orderly liquidation of the assets of a debtor.

Chapter 11 does not require each holder of a claim or equity security interest to vote in favor of a plan in order for the court to confirm the plan. However, the Plan must be accepted by the holders of at least one class of claims that is impaired without considering the votes of "insiders" within the meaning of the Bankruptcy Code.

Distributions to be made under the Plan will be made after Confirmation of the Plan, on the Effective Date or as soon thereafter as is practicable, or at such other time or times specified in the Plan.

~~VI.~~

**VI.**

**TREATMENT OF CERTAIN UNCLASSIFIED CLAIMS**

In accordance with § 1123(a)(1), Administrative Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article 4 and shall have the treatment set forth in this Article 3.

## A.    **Administrative Claims**

### 27.    ~~1.~~ Administrative Claims

Except to the extent that an Allowed Administrative Claim is not yet due and owing or to the extent a holder of an Allowed Administrative Claim has been paid prior to the Effective Date or agrees to different treatment, in full satisfaction, settlement, release and discharge of and in exchange for each Allowed Administrative Claim (excluding any Professional Fee ~~Claims~~Claim), the holder thereof shall receive Cash from the Reorganized Debtors equal to the amount of such Allowed Administrative Claim on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date on which such Administrative Claim becomes Allowed by Final Order. Allowed Administrative Claims not yet due and owing as of the Effective Date shall be paid by the Reorganized Debtors in the ordinary course of business.

### 2.    ~~Administrative Claims Bar Date~~

Except as otherwise provided in ~~this~~ Article 3~~,~~3 of the Plan, requests for payment of Administrative Claims must be filed and served on the Reorganized Debtors no later than the applicable Administrative Claims Bar Date. Holders of Administrative Claims (other than Claims for Professionals' fees and expenses) that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, the Recovery Trust or the Reorganized Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to requests for payment of Administrative Claims filed after the Effective Date must be filed and served on the Reorganized Debtors and the requesting party no later than seventy-five (75) days after the Effective Date.

Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to (i) any Administrative Claim previously Allowed by a Final Order, including any Administrative Claim expressly Allowed under the Plan, and (ii) any Ordinary Course Claim.

3. ~~Professionals' Fees and Expenses~~

28. Professional Fee Claims

Any Professional or other Entity asserting a Professional Fee Claim must file and serve on counsel for each of the Plan Proponents, Reorganized Parent and the Recovery Trustee and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Claim no later than sixty (60) days after the Effective Date. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court.

On and after the Effective Date, any requirement that a Professional comply with §§ 327 through 331 and 1103 and seek approval from the Bankruptcy Court in connection with such Professional's retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors and the Recovery Trust may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action (including without the need to file a fee application), order or approval of the Bankruptcy Court.

Except to the extent that a holder of an Allowed Professional Fee Claim, including each Consenting Professional, has agreed to different treatment, the holder thereof shall receive Cash from the Reorganized Debtors equal to the amount of such Allowed Professional Fee Claim on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date on which such Professional Fee Claim becomes payable pursuant to the Compensation Procedures Order or other order of the Bankruptcy Court in full satisfaction, settlement, release and discharge of and in exchange for each Allowed Professional Fee Claim. Upon the occurrence of the Effective Date, the funds identified in Section 12.2(n) for the payment of Allowed Professional Fee Claims shall be placed in escrow.

For each Consenting Professional that has agreed to have a portion of its Allowed Professional Fee Claim treated as an Excess Fee Claim, such Excess Fee Claim shall receive the treatment specified in Article 8 of the Plan and the corresponding sections of the Recovery Trust Agreement.

**B.    U.S. Trustee Fees**

On the Effective Date, the Debtors shall pay all U.S. Trustee Fees that are due and owing as of the Effective Date.

**C.    Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid prior to the Effective Date, or agrees to different treatment, each holder of an Allowed Priority Tax Claim

shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Tax Claim, at the election of the Reorganized Debtors, (i) Cash on the Effective Date in an amount equal to such Allowed Priority Tax Claim (without interest), or (ii) regular installment payments in Cash of a total value, as of the Effective Date, equal to the amount of the Allowed Priority Tax Claim over a period ending not later than five years after the Petition Date. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.

VII.

VII.

## TREATMENT OF CLASSES OF CLAIMS AND INTERESTS

### A.  Treatment of Allowed Class 1 Claims (Other Priority Claims)

1. 1. Classification:

Class 1A consists of Other Priority Claims against Parent. Class 1B consists of Other Priority Claims against Point Blank. Class 1C consists of Other Priority Claims against PACA. Class 1D consists of Other Priority Claims against PBSS.

2. 2. Treatment:

Except to the extent that a holder of an Allowed Other Priority Claim (i) has been paid by the Debtors prior to the Effective Date or (ii) agrees to a less favorable treatment, each holder of an Allowed Other Priority Claim shall receive from the Reorganized Debtors, in full satisfaction, settlement, release and discharge of, and in exchange for such Other Priority Claim, Cash equal to the amount of such Allowed Other Priority Claim on the later of the date which is on or as soon as reasonably practicable after the Effective Date and the date such Other Priority Claim becomes an Allowed Claim.

3. 3. Voting:

Class 1 is Impaired. Therefore, holders of Other Priority Claims are entitled to vote to accept or reject the Plan.

### B.  Treatment of Allowed Class 2 Claims (DIP Claims)

1. 1. Classification:

Class 2A consists of the DIP Claims against Parent. Class 2B consists of the DIP Claims against Point Blank. Class 2C consists of the DIP Claims against PACA. Class 2D consists of the DIP Claims against PBSS.

2. 2. Treatment:

On the Effective Date, each DIP Claim shall be indefeasibly paid in full in Cash as provided in the DIP Loan Agreement; provided that, in accordance with Section 6.3(d~~a~~) of the Plan and the terms of the Subscription ~~and Backstop~~ Agreement, the ~~Rights Exercise Payment or~~ Commitment of any DIP Lender or its affiliate (in its capacity as a ~~holder of Allowed Class 7 Old Equity Interests Allowed Class 4 General Unsecured Claims or Backstop Purchaser, as the case may be~~Purchaser) may, at the election of such DIP Lender and its affiliate, be reduced by or credited against (i) any outstanding DIP Claims that the Company owes to such DIP Lender and (ii) the Subscription Expenses. Upon payment and satisfaction in full of all DIP Claims, including by reduction or credit as set forth in the preceding sentence, all liens and security interests granted to secure such obligations shall be terminated and immediately released and the DIP Lenders shall execute and deliver to the Reorganized Debtors such instruments of release, satisfaction and/or assignments (in recordable form) as may be reasonably requested by the Reorganized Debtors.

3. 3. Voting:

Class 2 is Unimpaired, and the holders of DIP Claims are conclusively presumed to have accepted the Plan. Therefore, holders of DIP Claims are not entitled to vote to accept or reject the Plan.

## C.   **Treatment of Allowed Class 3 Claims (Miscellaneous Secured Claims)**

1. 1. Classification:

Class 3 consists of Miscellaneous Secured Claims. Although all Miscellaneous Secured Claims have been placed in one Class for the purposes of nomenclature, each Miscellaneous Secured Claim, to the extent secured by a Lien on any property or interest in property of the Debtors different from that securing any other Miscellaneous Secured Claim, shall be treated as being in a separate sub-Class for the purpose of receiving Distributions under the Plan.

2. 2. Treatment:

Except to the extent that a holder of an Allowed Miscellaneous Secured Claim has been paid by the Debtors, in whole or in part, prior to the Effective Date, on the Effective Date, at the option of the Debtors, (i) each Allowed Miscellaneous Secured Claim shall be reinstated and Unimpaired in accordance with § 1124 or (ii) each holder of an Allowed Miscellaneous Secured Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Miscellaneous Secured Claim, (x) payment in full in Cash of the unpaid portion of such Allowed Miscellaneous Secured Claim, (y) return of the collateral securing such Claim or (z) such other treatment as may be agreed to by the holder. The Debtors shall inform each holder of a Miscellaneous Secured Claim of the treatment of such Creditor's Secured Claim not less than ten (10) days prior to the Confirmation Hearing.

3. 3. Voting:

Class 3 is Impaired. Therefore, holders of Miscellaneous Secured Claims are entitled to vote to accept or reject the Plan.

**D.** **Treatment of Allowed Class 4 Claims (General Unsecured Claims)**

~~1.~~ 1. Classification:

Class 4A consists of General Unsecured Claims against Parent. Class 4B consists of General Unsecured Claims against Point Blank. Class 4C consists of General Unsecured Claims against PACA. Class 4D consists of General Unsecured Claims, if any, against PBSS.

~~2.~~ 2. Treatment:

On the Effective Date, each holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such General Unsecured Claim, a Trust Interest in the Recovery Trust in the form of Class 4 Trust Interests issued pursuant to Section 8.5 of the Plan and summarized in Article XI of the Disclosure Statement. ~~In addition, Eligible Creditors in Class 4 shall receive Rights to participate (subject to applicable securities and other laws) in the Creditor Rights Offering.~~ Pursuant to the terms of the Inter-Debtor Compromise, on the Effective Date, all Intercompany Claims asserted by one Debtor against another Debtor shall be deemed waived, released and expunged without further order of the Bankruptcy Court, and no Distribution shall be paid on account of any such Intercompany Claim.

~~3.~~ 3. Voting:

General Unsecured Claims are Impaired. Therefore, holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

**E.** **Treatment of Allowed Class 5 Claims (Subordinated Unsecured Claims)**

~~1.~~ 1. Classification:

Class 5A consists of Subordinated Unsecured Claims, if any, against Parent. Class 5B consists of Subordinated Unsecured Claims, if any, against Point Blank. Class 5C consists of Subordinated Unsecured Claims, if any, against PACA. Class 5D consists of Subordinated Unsecured Claims, if any, against PBSS.

~~2.~~ 2. Treatment:

On the Effective Date, each holder of an Allowed Subordinated Unsecured Claim shall receive a Trust Interest in the Recovery Trust in the form of Class 5 Trust Interests issued pursuant to Section 8.5 of the Plan and summarized in Article XI of the Disclosure Statement and subordinated in right of payment to the Class 4 Trust Interests as set forth more fully in Section 8.5 of the Plan and the Recovery Trust Agreement.

~~3.~~ 3. Voting:

Class 5 is Impaired. Therefore, holders of Subordinated Unsecured Claims are entitled to vote to accept or reject the Plan.

**F.      Treatment of Allowed Class 6 Claims (Class Action Claims)**

1. 1. Classification:

Class 6A consists of Class Action Claims, if any, against Parent. Class 6B consists of Class Action Claims, if any, against Point Blank. Class 6C consists of Class Action Claims, if any, against PACA. Class 6D consists of Class Action Claims, if any, against PBSS.

2. 2. Treatment:

Each holder of an Allowed Class Action Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Class Action Claim, a Trust Interest in the Recovery Trust in the form of Class 6 Trust Interests issued pursuant to Section 8.5 of the Plan and summarized in Article XI of the Disclosure Statement, subordinated in right of payment to the Class 4 Trust Interests and Class 5 Trust Interests and *pari passu* with the Class 7 Trust Interests, all as set forth more fully in Section 8.5 of the Plan and summarized in Article XI of the Disclosure Statement and the Recovery Trust Agreement. Distributions on account of all Class 6 Trust Interests issued under the Plan shall be (i) capped at the least of (A) $35,200,000, (B) the aggregate amount of all Allowed Class Action Claims as determined by Final Order of a court of competent jurisdiction, and (C) such other amount that is estimated by the Bankruptcy Court pursuant to § 502(c) or otherwise, and (ii) reduced dollar-for-dollar to the extent of any amounts retained by the holders of Class Action Claims or their counsel and not turned over to the Debtors or the Recovery Trust, as applicable, from funds held in the Class Action Escrow or otherwise previously disbursed under the Class Action Settlement Agreement, including the $9,925,000 previously disbursed to plaintiffs' counsel and the remaining balance of not less than $25,275,000 still on deposit in the Class Action Escrow.

3. 3. Voting:

Class 6 is Impaired. Therefore, holders of Class Action Claims are entitled to vote to accept or reject the Plan.

**G.      Treatment of Allowed Class 7 Interests (Old Equity Interests)**

1. 1. Classification:

Class 7 consists of Old Equity Interests in Parent, excluding any Old Equity Interests that are subordinated and treated in Class 8.

2. 2. Treatment:

On the Effective Date, Old Equity Interests shall be deemed surrendered to Reorganized Parent, and each holder of an Allowed Old Equity Interest shall receive a Trust Interest in the Recovery Trust in the form of Class 7 Trust Interests issued pursuant to Section 8.5 of the Plan and summarized in Article XI of the Disclosure Statement, subordinated in right of payment to

the Class 4 Trust Interests and Class 5 Trust Interests and *pari passu* with the Class 6 Trust Interests, all as set forth more fully in Section 8.5 of the Plan and in the Recovery Trust Agreement and as summarized in Article XI of the Disclosure Statement. ~~In addition, Eligible Equity Holders in Class 7 shall receive Rights to participate (subject to applicable securities and other laws) in the Equity Rights Offering.~~ As described more fully in Section 8.3(c) of the Plan and in the Recovery Trust Agreement, if Class 7 votes to accept the Plan, a greater percentage of proceeds remaining in the Recovery Trust shall be reserved for application and Distribution, including to holders of Class 7 Trust Interests, as set forth in Sections 8.3(c) and 8.5 of the Plan and in the Recovery Trust Agreement.

3. 3. Voting:

Class 7 is Impaired. Therefore, holders of Old Equity Interests are entitled to vote to accept or reject the Plan.

## H. Treatment of Allowed Class 8 Claims and Interests (Other Subordinated Claims and Interests)

1. 1. Classification:

Class 8A consists of Other Subordinated Claims and Interests, if any, against Parent. Class 8B consists of Other Subordinated Claims and Interests, if any, against Point Blank. Class 8C consists of Other Subordinated Claims and Interests, if any, against PACA. Class 8D consists of Other Subordinated Claims and Interests, if any, against PBSS.

2. 2. Treatment:

Other Subordinated Claims and Interests will be subordinated to Class 7 Interests and will receive no recovery under the Plan or from the Recovery Trust.

3. 3. Voting:

Class 8 is Impaired, and the holders of Other Subordinated Claims and Interests are conclusively presumed to have rejected the Plan. Therefore, holders of Other Subordinated Claims and Interests are not entitled to vote to accept or reject the Plan.

## I. Treatment of Allowed Class 9 Interests (Unexercised Options)

1. 1. Classification:

Class 9 consists of Interests, if any, with respect to Unexercised Options.

2. 2. Treatment:

Unexercised Options will be canceled and will receive no recovery under the Plan or from the Recovery Trust.

3. 3. Voting:

Class 9 is Impaired, and the holders of Unexercised Options are conclusively presumed to have rejected the Plan. Therefore, holders of Unexercised Options are not entitled to vote to accept or reject the Plan.

~~VIII.~~

### VIII.

## ACCEPTANCE REQUIREMENTS

### A.    Acceptance or Rejection of the Plan

29.    ~~1.~~ Voting Class

Classes 1, 3, 4, 5, 6 and 7 are Impaired under the Plan and are receiving property under the Plan. Therefore, such Classes are entitled to vote to accept or reject the Plan.

30.    ~~2.~~ Presumed Acceptance of the Plan

Class 2 is Unimpaired under the Plan and, therefore, is conclusively presumed to have accepted the Plan pursuant to § 1126(f).

31.    ~~3.~~ Presumed Rejection of Plan

Classes 8 and 9 are Impaired under the Plan and are receiving no recovery under the Plan or the Recovery Trust. Therefore, Classes 8 and 9 are conclusively presumed to have rejected the Plan pursuant to § 1126(g).

### B.    Tabulation of Votes on a Non-Consolidated Basis

The Debtors will tabulate all votes on the Plan on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies § 1129(a)(8) with respect to each Debtor. For each Debtor that satisfies § 1129(a)(8), and provided that all other requirements to Confirmation of the Plan are met, the Confirmation of the Plan as to such Debtor shall be deemed to occur by operation of the Plan. For any Debtor that fails to satisfy § 1129(a)(8), the Confirmation of the Plan as to such Debtor shall be subject to a determination of the Bankruptcy Court that the Inter-Debtor Settlement satisfies the requirements for approval under §§ 1123(b)(3) and (6), § 1129(b) and Bankruptcy Rule 9019, which determination may be made at the Confirmation Hearing. If all Classes of a Debtor accept the Plan, then the Inter-Debtor Compromise set forth in Section 6.1 of the Plan shall be deemed to be reasonable and in the best interests of Creditors and Interest holders as to that Debtor without any further evidentiary showing than such acceptances. If any Impaired Class of a Debtor rejects the Plan, then the approval of the Inter-Debtor Compromise as to that Debtor shall be addressed at the Confirmation Hearing as to such Debtor's rejecting Class in order to implement the Inter-Debtor Compromise.

## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Inter-Debtor Compromise

32.    1. Settlement Authority.

Pursuant to Bankruptcy Rule 9019(a), each Debtor may compromise and settle certain Claims it has against other Debtors. The Confirmation Order shall authorize, and constitute Bankruptcy Court approval of, the compromises and settlements set forth in Section 6.1 of the Plan pursuant to Bankruptcy Rule 9019(a) and §§ 1123(b)(3) and (6). The Debtors reserve the right to modify the Plan in accordance with Article 13 to the extent any compromise and settlement described below is not approved by the Bankruptcy Court, in whole or in part.

Pursuant to §§ 1123(b)(3) and (6) and Bankruptcy Rule 9019, and in settlement and compromise of certain existing and potential disputes regarding (i) Intercompany Claims and related matters, (ii) valuation of the individual Debtor entities, (iii) the individual Debtor's respective ownership interest in the Estate Claims and other assets being contributed to the Recovery Trust, (iv) the susceptibility of two or more of the Debtors' Estates to substantive consolidation and (v) the consideration, if any, that should be paid by Parent to acquire the New Equity Interests to be issued by the Debtor Subsidiaries on the Effective Date, each Class of Claims against or Interests in the several Debtors shall receive the corresponding treatment provided for in the Plan. This settlement and compromise shall neither affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, nor cause the transfer of any assets. Except as otherwise provided by or permitted in the Plan, each Debtor shall continue to exist as a separate legal Entity. This settlement and compromise (and the treatment derived therefrom) serves only as a mechanism to resolve certain claims and disputes between and among the Debtors and effectuate the making of Distributions under the Plan.

33.    2. Inter-Debtor Settlement.

Effective as of the Effective Date, in exchange for the mutual compromise, settlement and release as contemplated by Section 6.1 of the Plan, the Debtors agree that all Claims and disputes between them, including all Intercompany Claims, shall be settled and waived pursuant to the following terms:

a.    On the Effective Date, all Intercompany Claims asserted by any Debtor against any other Debtor shall be deemed waived, released and expunged without further order of the Bankruptcy Court, and no Distribution shall be paid on account of any such Intercompany Claim.

b.    In exchange for valuable consideration being provided by Parent to the Debtor Subsidiaries in the Plan, Parent shall continue to hold and retain all

Old Intercompany Interests in the Debtor Subsidiaries on and after the Effective Date, the legal, equitable and contractual rights arising under which Intercompany Interests shall remain unaltered.

    c. Allowed Claims against and Interests in the several Debtors shall receive the treatment set forth in Article 4 of the Plan.

    ~~d.~~ ~~Eligible Holders of Claims against and Interests in each of the Debtors shall be permitted to participate (subject to securities and other applicable laws) in the Rights Offering as set forth in, and subject to, Section 6.3 of the Plan.~~

    <u>d.</u> ~~e.~~ On the Effective Date, each Debtor shall be deemed to have executed the releases provided in Section 11.2 of the Plan.

## B.   <u>Exit Facility</u>

On the Effective Date, one or more of the Reorganized Debtors may enter into an Exit Facility, and grant all liens and security interests provided for thereunder. The Reorganized Debtors, if any, that are the guarantors under the Exit Facility shall issue the guarantees and grant Liens and security interests as provided thereunder. The Exit Facility shall be on substantially similar terms and conditions to those set forth in the Plan Supplement.

## C.   ~~Rights Offering~~<u>Direct Subscription</u>

    ~~1.~~ ~~The Rights Offering~~

~~Pursuant to the Rights Offering, Parent will distribute to (i) each holder of an Allowed Class 7 Old Equity Interest (including, for the avoidance of doubt, each of Privet Fund LP and Prescott or their respective affiliates, designees or nominees) Rights (the "Equity Rights") that will grant each Eligible Equity Holder the right, but not the obligation, to subscribe for and purchase, at the Subscription Price, a portion of the New Common Stock, up to such Eligible Equity Holder's Equity Rights Offering Pro Rata Share of the New Common Stock; provided, that (A) an Eligible Equity Holder must subscribe for at least $[●],000 of New Common Stock, and (B) if an Eligible Equity Holder's pro rata share of the Allowed Class 7 Old Equity Interests entitles such Eligible Equity Holder to less than $[●],000 of New Common Stock, then such Eligible Equity Holder must exercise all its Equity Rights in order to subscribe for and purchase New Common Stock, and (ii) each holder of an Allowed Class 4 General Unsecured Claim (including, for the avoidance of doubt, Lonestar Partners, LP) Rights (the "Creditor Rights") that will grant each Eligible Creditor the right, but not the obligation, to subscribe for and purchase, at the Subscription Price, a portion of the New Common Stock, up to such Eligible Creditor's Creditor Rights Offering Pro Rata Share of New Common Stock; provided, that (A) an Eligible Creditor must subscribe for at least $[●],000 of New Common Stock, and (B) if an Eligible Creditor's pro rata share of the total Rights Participation Amount for Allowed Class 4 General Unsecured Claims entitles such Eligible Creditor to less than $[●],000 of New Common Stock, then such Eligible Creditor must exercise all its Creditor Rights in order to subscribe for and~~

~~purchase New Common Stock. The Rights will not be listed or quoted on any public or over the counter exchange or quotation system.~~

~~The aggregate amount of the Rights Offering ("Rights Offering Amount") will equal (a) $11,850,000, or (b) in the event an Exit Facility is unavailable, or cannot be obtained in an amount, or on terms and conditions, that are acceptable to the Backstop Purchasers, then the Backstop Purchasers in their sole discretion may increase the Rights Offering Amount up to a maximum total amount of $19,750,000 (the "Rights Offering Maximum"). Notwithstanding anything to the contrary, 49.367% of the Rights Offering Amount shall be allocated to the holders of Allowed Class 7 Old Equity Interests (the "Equity Rights Offering") and 50.633% of the Rights Offering Amount shall be allocated to the holders of Allowed Class 4 General Unsecured Claims (the "Creditor Rights Offering").~~

34. The Direct Subscription

Each Purchaser has agreed to subscribe for, and purchase from Reorganized Parent, the Purchased Shares at the Subscription Price on the terms set forth in the Plan and the Subscription Agreement. The aggregate amount of the Purchased Shares (the "Subscription Amount") will be $15,000,000; *provided, however*, the Purchasers may elect in their sole discretion to increase the Subscription Amount up to $25,000,000, which discretion shall be exercised in good faith. Subject to the terms of the Subscription Agreement, the Purchased Shares shall be allocated among Privet, Prescott and Lonestar as follows:

| Purchaser | Allocation of Direct Subscription |
|-----------|-----------------------------------|
| Lonestar | 40.00% |
| Privet | 30.00% |
| Prescott | 30.00% |

The ~~closing of the Rights Offering and the~~ issuance and sale of the ~~New Common Stock~~Purchased Shares shall take place on the Effective Date pursuant to the ~~Rights Offering Procedures and~~terms of the Plan and the Subscription Agreement. Reorganized Parent will issue the New Common Stock to the ~~Backstop~~ Purchasers ~~and Exercising Holders, as applicable,~~or one or more of their respective Affiliates in accordance with the terms of the Plan and the ~~Rights Offering Procedures.~~

2. The Backstop CommitmentsPursuant to the terms of the Subscription and Backstop Agreement, in order to facilitate the Rights Offering and implementation of the Plan, (i) Privet and Prescott, severally and not jointly, have agreed to purchase, and Parent has agreed to issue and sell to Privet and Prescott, at the Subscription Price based upon the allocation set forth in the Subscription and Backstop Agreement, any Unsubscribed Equity Offering Shares, and (ii) PB Funding has agreed to purchase, and Parent has agreed to issue and sell to PB Funding, at the Subscription Price, any Unsubscribed Creditor Offering Shares, in each case, up to the respective Backstop Purchaser's Backstop Commitment. Subscription Agreement. Pursuant to the Subscription Agreement, the Purchasers may in good faith elect to fund a portion of the Commitment as loans to the Reorganized Parent (the "Purchaser Loans"): provided that all Purchasers provide such Purchaser Loans on the same terms and on a pro rata basis based on the Allocation of Direct Subscription set forth in section 6.3 of the Plan and summarized above.

On the Effective Date, in accordance with the Backstop Approval Order, (i) the Debtors will pay to the Backstop Purchasers the Backstop Expenses and (ii) the Backstop Purchasers will receive the Backstop Fee. The Subscription and BackstopSubscription Approval Order and the Subscription Agreement, each Purchaser will receive payment of its Subscription Expenses, if any. Any payment owed by a Purchaser or its Affiliate in connection with the purchase of the Purchased Shares may, at the election of such Purchaser, be reduced by or credited against (i) any outstanding DIP Claims that the Company owes to such Purchaser in its capacity as DIP Lender under the DIP Loan Agreement and (ii) such Purchaser's Subscription Expenses.

The Subscription Agreement is terminable if the Rights Offering istransactions contemplated therein are not consummated by April 14,[＿＿＿＿＿], 2011 and upon the occurrence of certain other events. If terminated, the Backstop Purchasers shall have no further obligations thereunder. However, notwithstanding such termination, Parent shall be obligated to pay each Purchaser its Subscription Expenses and indemnify the Purchasers to the extent set forth in the Subscription Approval Order and the Subscription Agreement.

3. Subscription Exercise Period

The Rights Offering shall commence on the Subscription Commencement Date and shall end at 5:00 p.m. (prevailing Eastern time) on the Subscription Expiration Date (or such later date as the Debtors, subject to the approval of the Required Backstop Purchasers, may specify in a notice provided to the Backstop Purchasers before 9:00 a.m. (prevailing Eastern time) on the Business Day before the then current Subscription Expiration Date) (such period of time, the "Subscription Exercise Period"). After the expiration of the Subscription Exercise Period, any exercise of Rights by any Person shall be null and void and the Subscription Agent shall not honor any such exercise of Rights, regardless of when the documents relating to such exercise were sent.

4. Exercise of Rights

In order to facilitate the exercise of the Rights, on or about the Subscription Commencement Date, the Subscription Form shall be mailed to each Eligible Holder (or to the record holder for any Eligible Holder of an Old Equity Interest) together with appropriate

instructions for the proper completion, due execution and timely delivery of the Subscription Form and submission of payment. The Eligible Holders will not be obligated to exercise their Rights, but in order to properly exercise the Rights, an Eligible Holder must (a) return a duly completed Subscription Form to the Subscription Agent, which form must be received by the Subscription Agent on or prior to 5:00 p.m. (prevailing Eastern time) on the Subscription Expiration Date. On the Subscription Form, the Eligible Holder shall, among other things, (i) confirm that such Eligible Holder is an "accredited investor" within the meaning of Regulation D of the Securities Act, (ii) indicate whether such Eligible Holder is an Eligible Equity Holder or an Eligible Creditor, as applicable, (iii) if such Eligible Holder is an Eligible Equity Holder, indicate the number of Equity Rights it is exercising, and (iv) if such Eligible Holder is an Eligible Creditor, indicate the number of Creditor Rights it is exercising. In addition, the Eligible Holder shall pay in Cash, by wire transfer in immediately available funds, an amount equal to the full Subscription Price in respect of the number of shares of New Common Stock issuable pursuant to the exercise of such Eligible Holder's Rights assuming the Backstop Purchasers would elect to increase the Rights Offering Amount to the Rights Offering Maximum (the "Rights Exercise Payment"), or, in the case of securities held through a bank or brokerage firm, send the Subscription Form to the bank or brokerage firm (or follow such firm's directions with respect to submitting subscription instructions to the firm) with sufficient time for the bank or brokerage firm to effect the subscription through the Depository Trust Company on or prior to 5:00 p.m. (prevailing Eastern time) on the Subscription Expiration Date. If the Subscription Agent for any reason does not receive from a given Eligible Holder both a timely and duly completed Subscription Form and timely payment of such Eligible Holder's Rights Exercise Payment, such Eligible Holder shall be deemed to have relinquished and irrevocably waived its right to participate in the Rights Offering; provided that, the Rights Exercise Payment of any DIP Lender or its affiliate (in its capacity as a holder of Allowed Class 7 Old Equity Interests or Allowed Class 4 General Unsecured Claims, as the case may be) may, at the election of such DIP Lender and its affiliate, be reduced by or credited against any outstanding DIP Claims that the Company owes to such DIP Lender under the DIP Loan Agreement.

The payments received by the Subscription Agent in connection with the Rights Offering shall be deposited and held by the Subscription Agent in a trust account or similarly segregated account or accounts separate and apart from the Subscription Agent's general operating funds and any other funds subject to any lien or similar encumbrance and which segregated account or accounts shall be maintained for the purpose of holding such money for administration of the Rights Offering until the Effective Date. The Subscription Agent shall not use such funds for any other purpose prior to such date and shall not encumber or permit such funds to be encumbered with any lien or encumbrance. Each Eligible Holder intending to participate in the Rights Offering must affirmatively elect to exercise all of its respective Rights and make proper payment for the New Common Stock on or prior to 5:00 p.m. (prevailing Eastern time) on the Subscription Expiration Date. The exercise of Rights by an Exercising Holder shall be irrevocable.

In the event that the Rights Offering is made for an amount less than the Rights Offering Maximum, the Subscription Agent shall return to the Exercising Holders Cash (without any interest thereon) in immediately available funds in an amount equal to the product of (i) the Subscription Purchase Price and (ii) the difference between the number of shares of New Common Stock that would have been issued to such Exercising Holder under a Rights Offering

of $19,750,000 and the actual number of shares of New Common Stock issued to such Exercising Holder under the Rights Offering. In the event the Rights Offering fails to close, the Subscription Agent shall return to the Exercising Holders all Cash paid in connection with (i) the exercise of Rights pursuant to the Rights Offering and (ii) to the extent the purchase price has been paid prior to such date, the issuance of the Subscription Shares.

5. Distribution of New Common Stock.

On the Effective Date, the Disbursing Agent shall distribute or record in the register of Reorganized Parent's stockholders the shares of New Common Stock purchased by the Exercising Holders pursuant to the Rights Offering, and by the Backstop Parties pursuant to the Subscription and Backstop Agreement.

6. Fractional Rights.

No fractional shares of New Common Stock shall be issued. The number of shares of New Common Stock available for purchase by Exercising Holders shall be rounded down to the nearest share. Any New Common Stock not subscribed for as a result of such rounding shall be deemed to be an Unsubscribed Share and purchased by the Backstop Purchasers (or affiliates of the Backstop Purchasers) in accordance with, and subject to, the terms of the Subscription and Backstop Agreement.

7. Validity of Exercise of Rights.

Subject to the terms of the Plan, the Confirmation Order or other order of the Bankruptcy Court, all questions concerning the timeliness, viability, form and eligibility of any exercise of Rights shall be determined by the Debtors, in consultation with the Backstop Purchasers, whose determinations shall be final and binding. The Debtors, subject to the prior written approval of the Required Backstop Purchasers, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as the Debtors determine, or reject the purported exercise of any Rights. Subscription Forms shall be deemed not to have been received or accepted until all irregularities have been waived or corrected within such time as the Debtors (subject to the prior written approval of the Required Backstop Purchasers) determine in their discretion. Neither the Debtors, the Backstop Purchasers nor the Subscription Agent shall be under any duty to give notification of any defect or irregularity in connection with the submission of Subscription Forms or incur any liability for failure to give such notification.

35. 8. Use of Proceeds.

The proceeds received by Reorganized Parent from the Rights Offering and proceeds received from the issuance of SubscriptionPurchased Shares to Prescott and Privet on the Effective Date, together with Cash on handin the Debtors' possession as of the Effective Date and the proceeds of any Exit Facility, shall be used to fund the Reorganized Debtors' emergence and provide necessary post-emergence liquidity.

### 36. Additional Cash Contribution

Prior to the Effective Date, the Debtors may allocate some or all of the Additional Cash Contribution for such purposes as they determine in the exercise of their reasonable business judgment and after obtaining the prior written consent of the Required Purchasers, including to settle Claims against one or more of the Debtors' Estates. Any remaining portion of such Additional Cash Contribution on the Effective Date shall be allocated to the Recovery Trust for distribution by the Recovery Trustee pursuant to Sections 8.3 and 8.5 of the Plan and the terms of the Recovery Trust Agreement. For the avoidance of doubt, the Recovery Trust Agreement may not modify any payment priorities or allocations provided for under the Plan, including the provisions of Section 8.3 of the Plan.

### 37. ~~9.~~ Sources of Consideration for Plan Distributions

All Cash consideration necessary for the Debtors or the Reorganized Debtors, as applicable, to make payments or Distributions pursuant hereto shall be obtained from ~~the Rights Offering,~~ the issuance of the ~~Subscription~~Purchased Shares, the Purchaser Loans, if any, any Exit Facility and ~~other~~ Cash ~~on hand~~in the Debtors' possession, including Cash derived from business operations.

### ~~D.~~ ~~Issuance of New Common Stock Purchased in the Rights Offering~~

### **D.** ~~1.~~ **Issuance of New Common Stock**

### 38. Issuance of New Common Stock

On the Effective Date, Reorganized Parent shall issue to the ~~Exercising Holders~~Purchasers the shares of New Common Stock ~~to the Exercising Holders~~ in accordance with the terms and conditions ~~of the Rights Offering~~ set forth in the Plan and ~~the Plan Supplement and to the Backstop Parties in accordance with the terms and conditions set forth in~~ the Subscription ~~and Backstop~~ Agreement and on the Effective Date immediately following such issuance, the Purchasers will own all of the outstanding New Common Stock of Reorganized Parent.

### 39. ~~2.~~ New Stockholders Agreement

Reorganized Parent, Lonestar (or one or more of its affiliates), Privet (or one or more of its affiliates)~~,~~ and Prescott (or one or more of its affiliates) ~~and any other Person acquiring shares of New Common Stock who holds in the aggregate 10% or more of the New Common Stock outstanding immediately following the Effective Date~~ shall be parties to the New Stockholders Agreement.

### ~~E.~~ ~~Additional Issuance of New Common Stock~~

~~Pursuant to the Subscription and Backstop Agreement, each of Prescott and Privet have agreed to subscribe for, and purchase from Reorganized Parent, shares of New Common Stock (the "Subscription Shares") at the Subscription Price having an aggregate value equal to the product of (a) 53.846% and (b) the aggregate amount of the Equity Rights Offering. On the Effective Date, and simultaneously with the issuance of the New Common Stock in accordance~~

with the Rights Offering, Reorganized Parent shall issue to Prescott and Privet the shares of the Subscription Shares in accordance with the terms and conditions set forth in the Subscription and Backstop Agreement. For the avoidance of doubt, the issuance of Subscription Shares to Prescott and Privet is in addition to any other shares of New Common Stock issued to Prescott, Privet Fund Management or Privet Fund LP or any of their respective affiliates under the Rights Offering in their capacity as Eligible Equity Holders or as Backstop Parties.

**E.    F. Cancellation/Conversion of Securities and Agreements**

On the Effective Date, except as otherwise specifically provided for in the Plan (i) the obligations of the Debtors under the DIP Loan Agreement and any other certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan or such Old Equity Interests that are surrendered to Reorganized Parent under the Plan), shall be canceled and the holders thereof shall have no rights by reason thereof, and such instruments shall evidence no rights, except the right to receive the Distributions, if any, to be made to holders of such instruments under the Plan, and (ii) the obligations of the Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of the Debtors that are specifically reinstated or assumed pursuant to the Plan) shall be deemed extinguished (or, in the case of Old Equity Interests, surrendered to the Reorganized Parent), released, and discharged and the holders thereof shall have no rights by reason thereof, and such instruments shall evidence no rights, except the right to receive the Distributions, if any, to be made to holders of such instruments under thePlanthe Plan. As a condition to receiving any Distribution under the Plan, each promissory note, certificate, or other instrument evidencing a Claim or Interest shall be deemed extinguished (or, in the case of Old Equity Interests, surrendered to the Reorganized DebtorsParent or theirits designees).

**F.    G. Exemptions for Issuance of New Common Stock**

The issuance of the New Common StockPurchased Shares pursuant to the Rights Offering and the Subscription and Backstop Agreement shall be exempt from registration under § 1145, § 4(2) of the Securities Act and other applicable laws, in each case to the extent applicable, as of the Effective Date without further act or action by any person, unless required by provision of the relevant documents or applicable law, regulation, order or rule, and all documents evidencing the same shall be executed and delivered as provided for in the Plan, the Subscription Agreement or the Plan Supplement.

**G.    H. Corporate Existence**

Each Debtor, as Reorganized, shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may

be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed. The New Governance Documents shall be substantially in the form filed with the Plan Supplement or as otherwise approved in the Confirmation Order and acceptable to the Backstop Purchasers. As of the Effective Date, Reorganized Parent will not be a reporting company under the Securities Act; provided, however, that nothing contained in the Plan shall preclude Reorganized Parent from thereafter becoming a reporting company under the Securities Act.

## H.   I. New Certificate of Incorporation and New By-Laws

On or as soon as reasonably practicable after the Effective Date, each of the Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states of organization in accordance with the laws of the respective states of organization. After the Effective Date, each of the Reorganized Debtors that is a corporation may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states of incorporation, the New Stockholders Agreement and their respective New Certificates of Incorporation and New By-Laws.

## I.   J. Reorganized Debtors' Boards of Directors

The initial members of the New Boards of each of the Reorganized Debtors shall be identified in the Plan Supplement. Such directors shall be deemed elected or appointed, pursuant to the Confirmation Order, but shall not take office and shall not be deemed to be elected or appointed until the occurrence of the Effective Date

## J.   K. Officers of Reorganized Debtors

To the extent known, officers of each of the other Reorganized Debtors shall be identified in the Plan Supplement. Such officers shall serve in accordance with applicable non-bankruptcy law and, to the extent applicable, the New Employment Agreements. The officers of each of the Reorganized Debtors will be determined by the New Boards of each of the Reorganized Debtors.

## K.   L. Employee Benefits

Except as otherwise provided herein, on and after the Effective Date, the Reorganized Debtors will (i) honor, in the ordinary course of business, any policies, programs and plans for, among other things, compensation (other than equity based compensation related to Interests), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance and accidental death and dismemberment insurance (collectively, "Employee Benefits") for the directors, officers and employees of any of the Debtors who served in such capacity at any time and (ii) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising before the Petition Date; provided, however, that the Debtors' or Reorganized Debtors' performance under any employment policy, program or plan will not entitle any person to any benefit or alleged entitlement under any policy, program or plan that has expired or been terminated before the Effective Date, or restore, reinstate or revive any such benefit or alleged entitlement under any such policy, program or plan. Any contract or

agreement for Employee Benefits that is an Executory Contract shall be assumed or rejected by the Debtors in accordance with Article 7 of the Plan. Nothing herein shall limit, diminish or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action or other rights with respect to any such contracts, agreements, policies, programs and plans.

**L.**     ~~M.~~ **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated therein, and except to the extent that such property or Causes of Action are being transferred to the Recovery Trust and vesting in the Recovery Trustee pursuant to the terms of the Recovery Trust Agreement and Article 8 of the Plan, on the Effective Date any and all property in each Estate and all Causes of Action (except those released pursuant to the Releases by the Debtors) shall vest in each respective Reorganized Debtor free and clear of all Liens, Claims, charges or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action (excluding Estate Claims) without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**M.**     ~~N.~~ **Corporate Action**

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) entry into any New Employment Agreements; (ii) appointment of the directors and officers of the Reorganized Debtors; (iii) the Distribution of the New Common Stock as provided herein; and (iv) all other actions contemplated by the Plan (whether occurring before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate or other action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors, officers, managers or members of the Debtors or the Reorganized Debtors, pursuant to Section 303 of the Delaware General Corporations Law or other similar applicable law.

The appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, operating agreements and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including any and all agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by Section 6.15 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**N.**     ~~O.~~ **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors and the managers, officers and members of the boards of directors thereof are authorized to issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and

on behalf of the Reorganized Debtors, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

**O.      P. General Settlement of Claims and Interests**

As discussed in detail in the Disclosure Statement and as otherwise provided herein, as one element of, and in consideration for, an overall negotiated settlement of disputed Claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and § 1123, and in consideration for the classification, Distributions, releases and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including the Inter-Debtor Settlement. Pursuant to Rule 408 of the Federal Rules of Evidence, the Plan, the Disclosure Statement, the Plan Support Agreement, the Second Plan Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto shall not be admissible into evidence in any proceeding unless and until the Plan in consummated, and then only in accordance with the Plan. In the event the Plan is not consummated, provisions of the Plan, and the Disclosure Statement, the Plan Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto shall not be binding or probative.

Subject to Article 9 of the Plan, all Distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final and indefeasible.

**P.      Q. Section 1146 Exemption from Certain Taxes and Fees**

Pursuant to § 1146(a), any transfers of property in contemplation of, in connection with or pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies to, among other things, (i) the creation of any mortgage, deed of trust, lien or other security interest; (ii) the making or assignment of any lease or sublease; or (iii) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any (a) merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under the Plan.

**Q.      R. D&O Liability Insurance Policies and Indemnification Provisions**

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the D&O Liability Insurance Policies in full force) all D&O Liability Insurance Policies that are Executory Contracts pursuant to § 365(a). Any D&O Liability Insurance Policies that are not Executory Contracts, but under which any Debtor has enforceable rights, shall vest in the corresponding Reorganized Debtor on the Effective Date pursuant to Section 6.14 of the Plan. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' assumption of, or the revesting of, each of the D&O Liability Insurance Policies. As of the Effective Date,

the directors, officers, members, attorneys, employees and other agents of the Debtors who served the Debtors immediately prior to (but not on or after) the Effective Date shall retain any rights or recourse to insurance coverage, including with respect to the D&O Liability Insurance Policies, as existed immediately prior to the Effective Date.

In addition, the New Governance Documents of the Reorganized Debtors shall contain provisions that (i) eliminate the personal liability of the Debtors' and the Reorganized Debtors' then-present and future directors and officers for post-Effective Date monetary damages resulting from post-Effective Date breaches of their fiduciary duties to the fullest extent permitted by applicable law in the jurisdiction in which the subject Reorganized Debtor is organized; and (ii) require such Reorganized Debtor, subject to appropriate procedures, to indemnify the Debtors' and the Reorganized Debtors' directors, officers, and other key employees (as such key employees are identified by the New Board) serving after the Effective Date for all post-Effective Date claims and actions to the fullest extent permitted by applicable law in the jurisdiction in which the subject Reorganized Debtor is incorporated or organized.

**R.** ~~S.~~ **Preservation of Rights and Causes of Action**

In accordance with § 1123(b), and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Releases by the Debtors provided by Section 11.2 of the Plan), (i) the Recovery Trustee shall retain and, as the representative of the Debtors' Estates appointed for such purpose, may enforce all rights to commence and pursue, as appropriate, any and all Estate Claims, whether arising before or after the Petition Date, and (ii) the Reorganized Debtors shall retain and, as the representatives of the Debtors' Estates appointed for such purpose, may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action other than Estate Claims, whether arising before or after the Petition Date. The Recovery Trustee's and the Reorganized Debtors' respective rights to retain, enforce, commence, prosecute and settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference to any Cause of Action against them in the Plan, the Disclosure Statement or any other Plan Document as any indication that the Recovery Trustee or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such retained Causes of Action upon, after or as a consequence of the Confirmation, the Effective Date or consummation of the Plan.

**S.** ~~T.~~ **Payment of Fees and Expenses of the DIP Lenders**

In accordance with, and subject to the terms of, the Final DIP Order, the fees and expenses of the DIP Lenders shall be finally allowed. On the Effective Date (and thereafter with respect to fees and expenses, if any, relating to post-Effective Date services under the Plan) or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the DIP Lenders.

**T.**    ~~U.~~ **Non-Participation of Other Subordinated Claims and Interests**

Holders of Other Subordinated Claims and Interests shall not receive any recovery under the Plan or Recovery Trust ~~and shall not be entitled to participate in the Rights Offering~~. The right of the Debtors and their successors or assigns to request subordination of any Claim or Interest, including the Other Subordinated Claims and Interests pursuant to § 510, is fully reserved, and the treatment afforded any Claim or Interest that becomes an Other Subordinated Claim and Interest, at any time, shall be modified to reflect such subordination. ~~For the avoidance of doubt, Parent shall not distribute to holders of Other Subordinated Claims and Interests any Rights to participate in the Rights Offering or otherwise subscribe for the purchase of New Common Stock at the Subscription Price~~

~~X.~~

**X.**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.**    **Assumption and Rejection of Executory Contracts and Unexpired Leases**

Except as otherwise provided herein, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, each of the Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease (i) was assumed or rejected previously by the Debtors; (ii) expired or terminated pursuant to its own terms before the Effective Date; (iii) is the subject of a motion to assume filed on or before the Effective Date; or (iv) is identified on the Schedule of Rejected Contracts.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court, effective as of the Effective Date, (i) approving the assumption and assignment, or rejection, as the case may be, of Executory Contracts and Unexpired Leases, as described above, pursuant to §§ 365(a) and 1123(b)(2) and as set forth in the Plan, (ii) finding that the Reorganized Debtors had properly provided for the cure of any defaults that might have existed, (iii) finding that each assumption and assignment was in the best interest of the Reorganized Debtors, their estates and all parties in interest in the Chapter 11 Cases and (iv) finding the requirements for assumption and assignment of any Executory Contract or Unexpired Lease to be assumed have been satisfied. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the Debtors (with the consent of the Required ~~Backstop~~ Purchasers) or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify or supplement the Schedule of Proposed Cure Claims or the Schedule of Rejected Contracts at any time before the Effective Date; provided, however, that to the extent that, as of the Effective Date, there is any pending dispute between one or more Debtors and a counterparty to an Executory Contract or Unexpired Lease

regarding such counterparty's Cure Claim, the Debtors and Reorganized Debtors shall reserve the right to add the applicable Executory Contract or Unexpired Lease to the Schedule of Rejected Contracts following the resolution of such dispute, in which event such Executory Contract or Unexpired Lease shall be deemed rejected and such counterparty shall have the right to file a Rejection Claim as provided in Section 7.3 of the Plan. After the Effective Date, the Reorganized Debtors shall have the right to terminate, amend or modify any intercompany contracts, leases or other agreements without approval of the Bankruptcy Court.

Each Executory Contract and Unexpired Lease assumed under Section 7.1 of the Plan shall be assumed only to the extent, if any, that it constitutes an executory contract or unexpired lease as contemplated by § 365, and nothing contained herein shall constitute an admission by any Debtor or Reorganized Debtor that such contract or lease is an executory contract or unexpired lease or that any Debtor or Reorganized Debtor has any liability thereunder. Further, such assumption is subject to the same rights that any Debtor or Reorganized Debtor held or holds at, on, or after the Petition Date to modify or terminate such agreements under applicable non-bankruptcy law. To the extent the Bankruptcy Court or any other court of competent jurisdiction, determines, either before, on, or after the Effective Date, that any agreement in the form of a lease of real or personal property identified for assumption pursuant to this Article 7 of the Plan is, in fact, a secured transaction, the resulting secured indebtedness arising from such determination shall be treated in accordance with the applicable section of the Plan. Each Executory Contract and Unexpired Lease assumed pursuant to Article 7 of the Plan shall revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

## B.    Objections to Assumption; Determination of Cure Claims

Not less than twenty (20) days prior to the Confirmation Hearing, the Debtors shall file the Schedule of Proposed Cure Claims and serve it on all parties to the contracts and leases listed therein. Among other things, the Schedule of Proposed Cure Claims shall set forth the proposed Cure Claim, if any, to be paid in connection with the assumption by the Debtors of the Executory Contracts and Unexpired Leases identified in the Schedule of Proposed Cure Claims. The proposed Cure Claim, if any, identified for any Executory Contract or Unexpired Leases in the Schedule of Proposed Cure Claims is the only amount necessary to cure any and all outstanding defaults under such contract or lease, and no other defaults exist under said contract or lease. The Debtors believe that any Executory Contract or Unexpired Lease that is listed on the Schedule of Proposed Cure Claims and does not list a corresponding proposed Cure Claim, or lists a proposed Cure Claim of $0.00, may be assumed by the Debtor without the payment of any monetary cure amount.

Any Entity objecting to the proposed assumption of an Executory Contract or Unexpired Lease based on any ground, including the adequacy of the proposed Cure Claim, if any, associated with such contract or lease, must file and serve a written objection to the proposed assumption of such contract or lease within the same deadline and in the same manner established for filing objections to Confirmation. Failure to timely object to the proposed assumption of any Executory Contract or Unexpired Lease and the associated proposed Cure Claim, if any, shall constitute consent to the assumption of such contract or lease and the amount

of such Cure Claim, including an acknowledgment that the Debtors are providing adequate assurance of future performance to the extent required by § 365(b)(1).

To the extent that any objections to the amounts set forth in the Schedule of Proposed Cure Claims are timely filed and served and such objections are not resolved between the Debtor and the objecting Entities, the Bankruptcy Court shall resolve such disputes at the Confirmation Hearing. The resolution of such disputes shall not affect the Debtor's assumption of the contracts or leases that are the subject of such a dispute, but rather shall affect only the "cure" amount the Debtor must pay in order to assume such contract or lease. Notwithstanding the immediately preceding sentence, if at any time the Debtors in their discretion determine that the amount asserted to cure outstanding defaults in connection with the assumption of any Executory Contract or Unexpired Lease proposed to be assumed under the Plan would, if ordered by the Bankruptcy Court, make the assumption of such contract or lease imprudent, then the Debtors may, at or prior to the Confirmation Hearing, elect to reject such contract or lease pursuant to Section 7.3 of the Plan.

If not the subject of a timely filed objection pursuant to Section 7.2 of the Plan, any and all monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan shall be satisfied by the Debtors, pursuant to § 365(b)(1), by payment in Cash of the Cure Claim amount set forth in the Schedule of Proposed Cure Claims or such other amount as ordered by the Bankruptcy Court or agreed upon by the Debtors or Reorganized Debtors, as applicable, on or as soon as reasonably practicable after the Effective Date or on such other date as agreed to by the parties to such contract or lease. In the event of a dispute pursuant to Section 9.4 of the Plan, payment of the amount otherwise payable hereunder shall be made on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date on which such Cure Claim is determined by Final Order of the Bankruptcy Court, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. Assumption of any Executory Contract or Unexpired Lease and payment of the associated cure obligation, if any, pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

If the Bankruptcy Court ultimately determines that the Debtors cannot assume an Executory Contract or Unexpired Lease or cannot provide adequate assurance of future performance as proposed or in any modified proposal submitted by the Debtors or the Reorganized Debtors, then such contract or lease shall automatically thereupon be deemed to have been rejected pursuant to Section 7.3 of the Plan.

C.     **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Subject to the occurrence of the Effective Date, on the Effective Date, all executory contracts and unexpired leases listed on the Schedule of Rejected Contracts shall be rejected by the Reorganized Debtors. Entry of the Confirmation Order shall constitute an order of the

Bankruptcy Court, approving, effective as of the Effective Date, the rejection of all Executory Contracts and Unexpired Leases identified on the Schedule of Rejected Contracts.

All proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of Executory Contracts and Unexpired Leases not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order or approval of the Bankruptcy Court. All Allowed Rejection Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases that are Rejection Claims shall be classified as Class 4 General Unsecured Claims against the applicable Debtor and shall be treated in accordance with Section 4.4 of the Plan. The deadline to object to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, shall be the later of (a) 180 days following the date on which such Claim was filed and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections as of the Effective Date, pursuant to § 365, effective as of the Petition Date. Unless otherwise ordered by the Bankruptcy Court, any party to an Executory Contract or Unexpired Lease identified for rejection as provided herein may, within the same deadline and in the same manner established for filing objections to Confirmation, file any objection thereto. Failure to file any such objection within the time period set forth above shall constitute consent and agreement to the rejection.

**D.    Insurance Policies**

Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the Insurance Policies in full force) all of the Insurance Policies pursuant to § 365(a) to the extent such Insurance Policies are Executory Contracts. Any Insurance Policy that is not an Executory Contract, but under which any Debtor has enforceable rights, shall vest in the corresponding Reorganized Debtor on the Effective Date pursuant to Section 6.14 of the Plan. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the foregoing assumption of each of the Insurance Policies.

**E.    Modifications, Amendments, Supplements, Restatements or Other Agreements.**

Unless otherwise provided, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other fully-integrated agreements that affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed (unless otherwise agreed by the contract counterparty) to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

**F.      Reservation of Rights.**

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Contracts, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**G.      Contracts and Leases Entered Into After the Petition Date.**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order, unless the parties thereto agree to any modifications, amendments, supplements or restatements.

<s>XI.</s>

<u>XI.</u>

<strong><u>RECOVERY TRUST</u></strong>

**A.      Purpose of Trust**

The Recovery Trust shall be established for the sole purpose of liquidating its assets in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Recovery Trust. From and after the Effective Date, the Recovery Trust shall, in accordance with the terms of the Recovery Trust Agreement, among other things: (a) liquidate, by conversion to Cash or other methods, or distribute directly to holders of Trust Interests and Reorganized Parent, as applicable, the Trust Assets, as expeditiously as reasonably possible in order to maximize the recovery for the holders of Trust Interests and for Reorganized Parent subject to the terms hereof; (b) enforce and prosecute all Estate Claims; and (c) object to, settle, compromise and prosecute Disputed Claims.

**B.    Governing Document; Funding**

The Recovery Trust shall be governed by the Recovery Trust Agreement. The Recovery Trust Reserve shall be funded with ~~an initial~~a Distribution of $~~1,000,000~~500,000 on the Effective Date to be used for trust expenses and administration (including legal fees and expenses). An additional Distribution of $500,000 shall be funded to Reorganized Parent on the Effective Date, which Reorganized Parent shall fund to the Recovery Trust on the date that is ninety (90) days after the Effective Date.

The Recovery Trust shall be ~~authorized~~entitled to borrow, on terms and conditions acceptable to the Recovery Trustee and ~~the~~ Reorganized ~~Debtors~~Parent in its sole discretion, up to ~~an additional~~ $500,000 per year from Reorganized Debtors; *provided, however,* that the aggregate amount of all such borrowings (including all accrued interest therein and other fees, charges or obligations) shall not exceed $1,000,000 outstanding at any time. The loans described in the foregoing sentence shall be repaid *pari passu* with Trust Litigation Expenses pursuant to Section 8.3(c)(i) of the Plan and the Recovery Trust Agreement, and shall accrue interest at a rate equal to the Prime Rate plus 11.00% per annum, payable quarterly in arrears; *provided, however,* that such interest may be paid in kind (PIK) to the extent there is insufficient Cash to make such payments. In addition, the Recovery Trust shall reimburse the Reorganized Parent for any sums paid to Replacement EC Professionals on account of their Allowed Professional Fee Claims, if any, pursuant to Section 8.3(c) of the Plan and the corresponding provisions of the Recovery Trust Agreement. The reimbursement obligations described in the foregoing sentence shall be paid pursuant to Section 8.3(c)(iii) of the Plan and the Recovery Trust Agreement, and shall accrue interest at a rate equal to the Prime Rate plus 6.00% per annum, payable quarterly in arrears; *provided, however,* that such interest may be paid in kind (PIK) to the extent there is insufficient Cash to make such payments. To the extent the Recovery Trust borrows funds from Reorganized Parent, the Recovery Trust is expressly prohibited from making any Distributions contemplated in Section 8.5(b) of the Plan or the Recovery Trust Agreement (other than distributions to Reorganized Parent) so long as any obligations under such borrowings remain outstanding.

**C.    Vesting of Assets; Allocation**

   40.   Trust Assets

Unless otherwise dealt with under the Plan, (i) the ~~GUC Cash~~Additional Cash Contribution (subject to Section 6.4 of the Plan), (ii) the Recovery Trust Reserve, (iii) the Estate Claims, and (iv) any other assets, recoveries or properties identified on Schedule 8.3 to the Plan shall vest in the Recovery Trust on the Effective Date (such property when vested in the Recovery Trust, the "Trust Assets"). Notwithstanding the foregoing, if the Debtors or Reorganized Debtors and the Recovery Trustee determine in mutual consultation that the assignment of an Estate Claim to the Recovery Trust may materially impair the enforcement or collectability of such Estate Claim by the Debtors, Reorganized Debtors or Recovery Trustee, such Estate Claim shall remain in the name of the Debtors or Reorganized Debtors, as applicable, for the sole purpose of preserving the ability to enforce and collect on such Estate Claim; provided, however, that such Estate Claim shall be treated for all other purposes under the Plan and the Trust Agreement as though it had fully vested in the Recovery Trustee, including for purposes of authorizing the Recovery Trustee to prosecute or settle such Estate Claim and collect

the proceeds thereof for Distribution in accordance with this Article 8 ~~of the Plan~~ and the Trust Agreement.

41. Allocation of Additional Cash Contribution

The Additional Cash Contribution that is transferred to or vests in the Recovery Trust, if any, shall be allocated and promptly distributed by the Recovery Trustee in the following manner:

  a. the first $500,000 of such funds shall be allocated for distribution to the holders of Allowed General Unsecured Claims pro rata based on the Class 4 Trust Interests held by each such holder relative to all Class 4 Trust Interests distributed or reserved at such time;

  b. if the Additional Cash Contribution exceeds $500,000, the second $500,000 of such funds shall be allocated for distribution to the holders of Allowed Excess Fee Claims pro rata based on the amount of Excess Fee Claims held by each affected Professional relative to the amount of all Excess Fee Claims outstanding at such time; and

  c. if the Additional Cash Contribution exceeds $1,000,000, any such excess amount shall be allocated for distribution fifty percent (50%) to the holders of Allowed General Unsecured Claims pro rata based on the Class 4 Trust Interests held by each such holder relative to all Class 4 Trust Interests distributed or reserved at such time, and fifty percent (50%) to the holders of Allowed Excess Fee Claims pro rata based on the amount of Excess Fee Claims held by each affected Professional relative to the amount of all Excess Fee Claims outstanding at such time.

For the avoidance of doubt, the Recovery Trustee shall distribute any portion of the Additional Cash Consideration allocable to Allowed Excess Fee Claims as soon as practicable after the occurrence of the Effective Date, and shall not reserve or use any part of the Additional Cash Consideration for payment of expenses of the Recovery Trust or otherwise. Any Additional Cash Contribution remaining in the Recovery Trust after payment in full of all Allowed Excess Fee Claims and Allowed General Unsecured Claims in accordance with Section 8.3(b) of the Plan (including such amounts as required to be reserved for the holders of any Disputed Excess Fee Claims and any Disputed General Unsecured Claims in accordance with the Plan and the Recovery Trust Agreement), shall be allocated and distributed in accordance with Section 8.3(c) and 8.5(b) of the Plan. So long as any Allowed Excess Fee Claims have not been paid in full, the Recovery Trustee is expressly prohibited from making any Distributions contemplated in Section 8.5(b) of the Plan or the corresponding section of the Recovery Trust Agreement or from making any reimbursement to Reorganized Parent on account of any payment with respect to Replacement EC Professionals' Allowed Professional Fee Claims.

42. Allocation of other Trust Assets

~~Initially, from and after the Effective Date, the~~All Cash or other proceeds ~~of Estate Claims~~ received by or vested in the Recovery Trust (~~net of fees and costs directly attributable to~~

~~the recovery of such proceeds) shall be allocated as follows: (i) eighty percent (80%) to the Recovery Trust and (ii) twenty percent (20%) to Reorganized Parent.  A~~other than any portion of the Additional Cash Contribution, if vested with the Recovery Trust) shall be allocated and distributed in the following manner:

> a. first, to pay [or reserve in good faith reasonable amounts payable in respect of] any and all litigation costs and expenses of the Recovery Trust that directly relate to efforts to recover proceeds from the applicable Estate Claims being distributed pursuant to Section 8.3(c) of the Plan ("Trust Litigation Expenses") and to pay any and all obligations outstanding at such time under any borrowings from the Recognized Parent described in Section 8.2(b) of the Plan;

> b. second, to the extent any proceeds remain, and as soon as practicable after the receipt of Cash or other proceeds by the Recovery Trust, excluding the Recovery Trust Reserve (after establishment of reasonable reserves for the payment Trust Litigation Expenses), to the holders of Allowed Excess Fee Claims, if any, pro rata based on the amount of Excess Fee Claims held by each affected Professional relative to the amount of all Excess Fee Claims outstanding at such time until such holders have been paid (after taking into account all amounts paid to such holders pursuant to Section 8.3(b) of the Plan) an amount equal to 100% of such Allowed Claims (without interest) (including such amounts as required to be reserved for the holders of any Disputed Excess Fee Claims in accordance with the Plan and Recovery Trust Agreement);

> c. third, to the extent any proceeds remain, to reimburse Reorganized Parent for [or reserve in good faith, and in consultation with the Reorganized Debtors, reasonable amounts payable in respect of] the payment of the Replacement EC Professionals' Allowed Professional Fee Claims, if any;

> d. fourth, to the extent any proceeds remain,

>> i. 20% of such proceeds shall be allocated and distributed to the Reorganized Parent until the occurrence of a Class 4/Class 5 Satisfaction; and

>> ii. 80% of such proceeds shall be retained by the Recovery Trust as Trust Assets and applied, reserved or distributed as set forth in Section 8.3(c)(v) – (vi) below and Section 8.5(b) and the Recovery Trust Agreement until the occurrence of a Class 4/Class 5 Satisfaction;

>> *provided, however,* that from and after the occurrence of a Class 4/Class 5 Satisfaction, to the extent any proceeds remain,

>> iii. 70% of such proceeds shall thereafter be allocated and distributed to the Reorganized Parent; and

        iv.     30% of such proceeds shall thereafter be retained by the Recovery Trust as Trust Assets and applied, reserved or distributed as set forth in Section 8.3(c)(v) – (vi) below and Section 8.5(b) and the Recovery Trust Agreement;

*provided, further,* that if Class 7 votes to accept the Plan, then from and after the occurrence of a Class 4/Class 5 Satisfaction, to the extent any proceeds remain,

        v.     60% of such proceeds shall thereafter be allocated and distributed to the Reorganized Parent; and

        vi.     40% of such proceeds shall thereafter be retained by the Recovery Trust as Trust Assets and applied, reserved or distributed as set forth in Section 8.3(c)(v) – (vi) below and Section 8.5(b) and the Recovery Trust Agreement;

e.     fifth, to pay [or reserve in good faith reasonable amounts payable in respect of] all other liabilities, costs and expenses of the Recovery Trust that are not Trust Litigation Expenses, including the compensation then due and payable to the Recovery Trustee pursuant to the Recovery Trust Agreement, the amounts, if any, payable to the Recovery Trustee and his agents, representatives, professional advisors and employees pursuant to the indemnification provisions specified therein, and the reimbursement for any and all costs, expenses and liabilities incurred by the Recovery Trustee in connection with the administration of the Recovery Trust, including any costs and expenses incurred in objecting to the allowance of any Claim or Interest or seeking to subordinate or recharacterize any Claim or Interest (the "Trust Administration Expenses");

f.     sixth, to the extent any proceeds remain, to pay [or reserve in good faith reasonable amounts payable in respect of] all the compensation to, and the liabilities, costs and expenses of, the members of the Recovery Trust Committee, including the amounts then due and payable to the members of the Recovery Trust Committee pursuant to the indemnification provisions specified in the Recovery Trust Agreement, and the reimbursement for any and all costs, expenses and liabilities incurred by the members of the Recovery Trust Committee in connection with the performance of their duties thereunder (excluding for the avoidance of doubt, any Trust Litigation Expenses).

"*Class 4/Class 5 Satisfaction*" shall mean such time as the holders of Allowed Class 4 General Unsecured Claims have received Distributions in an amount equal to the Allowed amount of their Class 4 Claims plus interest at a rate of eight percent (8.0%) per annum from the Petition Date until the date of such payment in full to the holders of such Allowed Claims (including such amounts as are required to be reserved for the holders of any Disputed Class 4 Claims pursuant to the Plan and the Recovery Trust Agreement) and the holders of Allowed Class 5 Subordinated

Unsecured Claims have been paid an amount equal to the Allowed amount of their Class 5 Claims (without interest) (including such amounts as required to be reserved for the holders of any Disputed Class 5 Claims pursuant to the terms of the Plan and the Recovery Trust Agreement) ~~(the "Class 4 and Class 5 Satisfaction"), any additional proceeds of Estate Claims received by the Recovery Trust (net of fees and costs directly attributable to the recovery of such proceeds) shall be allocated as follows: (i) thirty percent (30%) to the Recovery Trust and (ii) seventy percent (70%) to Reorganized Parent.~~.

## D.    **Tax Treatment**

The Debtors, the Recovery Trustee, and the holders of Trust Interests will treat the Recovery Trust as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and any comparable provision of state or local law. The Recovery Trust shall be considered a "grantor" trust and is intended to comply with the requirements of a liquidating trust, which is a grantor trust, as set forth in Revenue Procedure 94-45, 1994-2 C.B. 684. For all United States federal income tax purposes, all parties (including the Debtors, the Recovery Trustee, the Beneficiaries, Reorganized Parent and the Recovery Trust Committee) shall treat the transfer of the Trust Assets to the Recovery Trust as (1) a transfer of the Trust Assets (subject to the liabilities and Allowed Claims indicated herein, whether such Claims are Allowed Claims on or after the Effective Date of the Plan) directly to the Beneficiaries (except to the extent retained by Reorganized Parent) and, to the extent Trust Assets are allocable to Disputed Claims, to the Disputed Claims Reserve Account, followed by (2) the transfer by such Beneficiaries and Reorganized Parent to the Recovery Trust of the Trust Assets (other than the portion of the Trust Assets allocable to the Disputed Claims Reserve Account) in exchange for Trust Interests in accordance with the Plan. The Recovery Trustee will then distribute, through the book-entry thereof on the books and records of the Recovery Trust, the Trust Interests to the Beneficiaries, in exchange for such Beneficiaries' Claims. Accordingly, the Beneficiaries and Reorganized Parent shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Trust Assets (other than such portion of the Trust Assets as is allocable to reserves as provided in the Recovery Trust Agreement). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. The Recovery Trustee shall be authorized to take any action necessary to maintain compliance with this Treasury Regulation or its successor that does not contradict the terms of the Plan, the Recovery Trust Agreement, or the Confirmation Order. The Recovery Trustee, in consultation with the Recovery Trust Committee, will in good faith value all Trust Assets, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Recovery Trust (including the Debtors, the Recovery Trustee, Reorganized Parent, and the Beneficiaries) for all United States federal income tax purposes.

## E.    **Trust Interests**

    <u>43.</u>   ~~1.~~ Issuance of Trust Interests

Holders of Allowed Claims and Allowed Interests in Classes 4, 5, 6 and 7 shall be issued Trust Interests in the Recovery Trust as follows:

a. each holder of an Allowed Class 4 General Unsecured Claim shall be issued a Class 4 Trust Interest for every $1.00 of such holder's Allowed Class 4 Claim;

b. each holder of an Allowed Class 5 Subordinated Unsecured Claim shall be issued one Class 5 Trust Interest for every $1.00 of such holder's Allowed Class 5 Claim;

c. each holder of an Allowed Class 6 Class Action Claim shall be issued one Class 6 Trust Interest for each share of common stock in Parent associated with such holder's Allowed Class 6 Claim; and

d. each holder of an Allowed Class 7 Old Equity Interest shall be issued one Class 7 Trust Interest for each share of Old Equity Interest held by such holder in Parent.

No fractional Trust Interests shall be issued. The number of Trust Interests issued to any holder pursuant to Section 8.5 of the Plan and the Recovery Trust Agreement shall be rounded down to the nearest whole Trust Interest. The Trust Interests shall not be transferable, except by will, intestate succession or operation of law, and shall not be certificated.

44. 2. Distributions on Trust Interests

Each holder of a Trust Interest~~shall~~ entitle the holder to proceeds from the Recovery Trust, ~~after~~subject to and after payment of all amounts required to be paid pursuant to the allocation set forth in Section 8.3(c) of the Plan, based on the priorities below, which shall be distributed in the following manner:

a. first, to the extent any proceeds remain, to the holders of Allowed Class 4 General Unsecured Claims pro rata based on the number of Class 4 Trust Interests held by each such holder relative to all Class 4 Trust Interests distributed or reserved at such time, until such holders have been paid (after taking into account all payments made to such holders pursuant to Section 8.3 of the Plan) an amount equal to 100% of such Allowed Claims plus interest at a rate of eight percent (8.0%) per annum from the Petition Date until the date of such payment in full to the holders of such Allowed Claims (including such amounts as are required to be reserved for the holders of any Disputed Class 4 General Unsecured Claims pursuant to the terms of the Plan and the Recovery Trust Agreement);

b. second, to the extent any proceeds remain, to holders of Allowed Class 5 Subordinated Unsecured Claims pro rata based on the number of Class 5 Trust Interests held by each such holder relative to all Class 5 Trust Interests distributed or reserved at such time until such holders have been paid 100% of such Allowed Claims (without interest) (including such amounts as are required to be reserved for the holders of any Disputed

Class 5 Subordinated Unsecured Claims pursuant to the terms of the Plan and the Recovery Trust Agreement);

c.  third, to the extent any proceeds remain, to holders of Allowed Class 6 Class Action Claims and Allowed Class 7 Old Equity Interests pro rata based on the aggregate number of Trust Interests held by each such holder relative to the sum of all Class 6 and Class 7 Trust Interests distributed or reserved at such time until holders of Allowed Class 6 Claims have been paid 100% of such Allowed Claims (without interest and as capped under Section 4.6 of the Plan) (including such amounts as are required to be reserved for the holders of any Disputed Class 6 Claims pursuant to the terms of the Plan and the Recovery Trust Agreement); and

d.  fourth, to the extent any proceeds remain, to the holders of Allowed Class 7 Old Equity Interests pro rata based on the number of Class 7 Trust Interests held by each such holder relative to all Class 7 Trust Interests distributed.

~~Notwithstanding anything to the contrary herein, the portion of the Trust Assets constituting the GUC Cash shall be distributed to holders of Class 4 Trust Interests on or as soon as reasonably practicable after the Effective Date, subject to reservation on account of Disputed Class 4 Claims pursuant to the terms of the Recovery Trust.~~ The Recovery Trustee shall establish and maintain reserves and reserve accounts pursuant to the terms of the Recovery Trust Agreement.

## F. **Administration of the Recovery Trust**

The Recovery Trust will be administered and controlled initially by a five-member oversight committee comprising four members plus the Recovery Trustee (the "Recovery Trust Committee"). On and after the Effective Date of the Plan, the Recovery Trust Committee shall comprise five voting board members selected as follows: (i) two members shall be chosen by the Creditors' Committee, in consultation with Lonestar and Parent or Reorganized Parent, as applicable; (ii) one member shall be chosen by Reorganized Parent; (iii) one member shall be chosen by Lonestar; and (iv) the Recovery Trustee. Upon the occurrence of the Class 4 ~~and~~ /Class 5 Satisfaction, the two board members appointed by the Creditors' Committee shall resign promptly. Thereafter, the Recovery Trust Committee shall be reconstituted to comprise ~~four~~three voting board members ~~selected as follows~~: (i) two members, ~~who~~ shall be chosen by Reorganized Parent; and (ii) ~~one member shall be the individual, and any alternates thereto, chosen by the Equity Committee and named in the Plan Supplement; and (iii)~~ the Recovery Trustee.

The Recovery Trust Committee shall have the right to replace the Recovery Trustee in accordance with the terms of the Recovery Trust Agreement, and vacancies shall be filled in accordance with the terms of the Recovery Trust Agreement. The Recovery Trustee shall be recused from any such vote and the Recovery Trustee's vote shall not be counted for such purposes. The Recovery Trustee may also be replaced by Final Order entered by the Bankruptcy Court.

The Recovery Trustee may retain such law firms, accounting firms, experts, advisors, financial advisors, consultants, investigators, appraisers, auctioneers or other professionals as it may deem necessary (collectively, the "Trustee Professionals"), in its sole discretion, to aid in the performance of its responsibilities pursuant to the terms of the Plan including the liquidation and distribution of Trust Assets. Trustee Professionals shall prepare monthly statements in the same manner and in the same detail as required pursuant to the Compensation Procedures Order, and shall serve such statements on the Recovery Trustee and each member of the Recovery Trust Committee. In the event two or more members of the Recovery Trust Committee object to the reasonableness of such fees and expenses, the matter shall be submitted to the Bankruptcy Court for approval of the reasonableness of such fees and expenses.

Notwithstanding the foregoing, the following law firms that were representing the Debtors prior to the Effective Date of the Plan shall serve as counsel to the Recovery Trustee in connection with the litigation identified below:

| Law Firm | Lawsuits or categories of litigation |
|---|---|
| Pachulski Stang Ziehl & Jones LLP | Matters relating to David Brooks, including D&O litigation, SEC-related litigation, SOX 304 litigation, class action/derivative litigation and any fraudulent conveyance litigation. |
| Venable LLP | Matters relating to "Zylon" claims, including the Toyobo litigation and DOJ litigation. |
| Carr & Palmer LLP | Matters relating to "Zylon" claims, including the Toyobo litigation and DOJ litigation. |

The Recovery Trustee may, with the consent of a majority of the members of the Recovery Trust Committee (including the Recovery Trustee), replace any of the foregoing law firms or employ additional counsel in any matter if such replacement or employment is in the best interests of the Recovery Trust.

## G. Rights and Responsibilities of Recovery Trustee

The Recovery Trustee will maintain a record of each Beneficiary's Trust Interests. The Recovery Trustee shall, upon written request of a Beneficiary, provide reasonably adequate documentary evidence of such Beneficiary's Trust Interest, as indicated in the books and records of the Recovery Trust. The expense of providing such documentation shall be borne by the requesting Beneficiary.

As set forth in the Plan and the Recovery Trust Agreement, the Recovery Trustee shall be authorized to retain, enforce, pursue and prosecute all Estate Claims on behalf of and for the benefit of Reorganized Parent and the Recovery Trust, and distribute the proceeds thereof to the Trust Beneficiaries.

XII.

## XII.

### PROVISIONS GOVERNING DISTRIBUTIONS

**A.    Record Date for Distributions**

As of the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Interests.  Neither the Debtors nor the Recovery Trustee shall have any obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

**B.    Timing and Calculation of Amounts to Be Distributed**

Except as otherwise provided in the Plan, on the applicable date or dates, each holder of an Allowed Claim or Allowed Interest against the Debtors shall receive the full amount of the Distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article 10 of the Plan.  Except as otherwise provided herein, holders of Claims shall not be entitled to interest, dividends or accruals on the Distributions provided for herein, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

**C.    Disbursing Agent**

Except as otherwise provided herein, all Distributions under the Plan shall be made by the Disbursing Agent except for the issuance of Trust Interests, which shall be made by the Recovery Trustee in accordance with the terms of the Plan and the Recovery Trust Agreement.  The Disbursing Agent shall not be required to obtain a bond or surety for the performance of its duties unless ordered otherwise by the Bankruptcy Court, in which case all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors or the Recovery Trust, as the case may be.

**D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions**

45.    1. Delivery of Distributions in General

Except as otherwise provided in the Plan and subject to Bankruptcy Rule 9010, Distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent (a) to the signatory set forth on any of the Proofs of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the Debtors have been notified

in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address; or (d) on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf. Distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the Distributions in the manner set forth in the Plan. None of the Debtors, the Reorganized Debtors and the applicable Disbursing Agent shall incur any liability whatsoever on account of any Distributions under the Plan except for gross negligence, willful misconduct or fraud.

All Distributions on account of Allowed Old Equity Interests shall be made through the facilities of DTC (if applicable and to the extent permitted). Distributions made to the record holders of Old Equity Interests and in turn by the record holders of Old Equity Interests to the beneficial holders thereof, shall not be made as of the Distribution Record Date but rather shall be accomplished in accordance with the applicable policies and procedures of DTC.

46.     2. Undeliverable Distributions and Unclaimed Property

In the event that any Distribution to any holder is returned as undeliverable, no Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such Distribution shall be made as soon as practicable after such Distribution has become deliverable or has been claimed to such holder without interest; provided, however, that such Distributions shall be deemed unclaimed property under § 347(b) and forfeited at the expiration of six months from the date such Distribution was first attempted. After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any holder to such property or Interest in property shall be discharged and forever barred.

**E.     Withholding and Reporting Requirements**

In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Distributions under the Plan shall be subject to any such withholding or reporting requirements.

**F.     Setoffs**

Except with respect to the Lonestar Pre-Petition Claims, the Debtors, the Reorganized Debtors and the Recovery Trustee may withhold (but not set off, except as set forth below) from the Distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtors, the Reorganized Debtors or the Recovery Trustee, as applicable, may hold against the holder of any such Allowed Claim. In the event that any such claim, equity interest, right or Cause of Action of any nature that the Debtors, the Reorganized Debtors or the Recovery Trustee may hold against the holder of any such Allowed Claim is adjudicated by Final Order or otherwise resolved, the Reorganized Debtors or the Recovery Trustee, as applicable, may, pursuant to the

Bankruptcy Code or applicable non-bankruptcy law, set off against such Allowed Claim and the Distributions to be made on account of such Allowed Claim (before any Distribution is made on account of such Allowed Claim) the amount of any such adjudicated or resolved claim, equity interest, right or Cause of Action, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors, the Reorganized Debtors or the Recovery Trustee of any such claims, equity interests, rights and Causes of Action that the Debtors, the Reorganized Debtors or the Recovery Trustee may possess against any such holder, except as specifically provided herein.

## G.  **Claims Paid or Payable by Third Parties**

The Debtors, the Reorganized Debtors and the Recovery Trustee, as applicable, shall reduce in part or in full an Allowed Claim to the extent that the holder of such Allowed Claim receives payment in part or in full on account of such Allowed Claim from a party that is not a Debtor or Reorganized Debtor or the Recovery Trustee.  To the extent a holder of an Allowed Claim receives a Distribution on account of such Allowed Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor or the Recovery Trustee on account of such Allowed Claim, such holder shall, within two weeks of receipt thereof, repay or return the Distribution to the Reorganized Debtors or the Recovery Trustee, as applicable, to the extent the holder's total recovery on account of such Allowed Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.

## H.  **Postpetition Interest**

~~Unless~~Except as expressly provided ~~herein~~in Section 8.5(b)(ii) of the Plan, the Confirmation Order, the DIP Loan Agreement and Final DIP Order, or any contract, instrument, release, settlement or other agreement entered into in connection with the Plan, or required by the Bankruptcy Code (including §§ 506(b) and 1129(b)), interest shall not accrue on or after the Petition Date on account of any Claim.

## I.  **Section 506(c) Reservation**

~~The~~Except to the extent that such rights were waived pursuant to the Final DIP Order with respect to the DIP Claims, the Debtors and the Reorganized Debtors reserve all rights under § 506(c) with respect to any and all other Secured Claims~~, except to the extent waived pursuant to the Final DIP Order~~.

## J.  **Single Satisfaction of Claims**

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim, plus interest to the extent authorized under the Plan.

XIII.

## XIII.

### PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

**A.    Prosecution of Objections to Claims**

TheOn and after the Effective Date, the Recovery Trustee shall have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to General Unsecured Claims, Subordinated Unsecured Claims, Class Action Claims and Other Subordinated Claims and Interests as permitted under the Plan.  The Reorganized Debtors shall have the authority to file, settle, compromise, withdraw or litigate to judgment any objections to Administrative Claims (including Professional Fee Claims), Priority Tax Claims, Other Priority Claims and Miscellaneous Secured Claims.  The Recovery Trustee reserves all rights to resolve Disputed Claims outside the Bankruptcy Court under applicable governing law and subject to the terms of the Recovery Trust Agreement.

**B.    Allowance of Claims**

Except as expressly provided herein or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), on and after the Effective Date the Reorganized Debtors and, to the extent applicable, the Recovery Trustee, will have and retain any and all rights and defenses held by the Debtors with respect to any Claim as of the Petition Date; provided, that the retention of defenses with respect to the Lonestar Pre-Petition Claims shall be governed by the Final DIP Order.  All Claims of any Entity against any Debtor shall be Disallowed unless and until such Entity pays, in full, the amount it owes each such Debtor.

**C.    Disputed Claims Reserve**

Reorganized Parent, in its capacity as Disbursing Agent, shall reserve for the account of each holder of a Disputed Administrative Claim, Disputed Priority Tax Claim, Disputed Other Priority Claim or Disputed Miscellaneous Claim (i) the property that would otherwise be distributable to such holder under the Plan as of such date if such Disputed Claim or Disputed Interest were an Allowed Claim or (ii) such other property as the holder of such Disputed Claim or Disputed Interest and the Disbursing Agent may agree.

Property reserved under Section 10.3 of the Plan shall be set aside and, to the extent practicable, held in one or more interest bearing accounts (each, a "Disputed Claims Reserve Account") to be established and maintained pending resolution of such Disputed Claims; provided, however, that Cash shall be invested in a manner consistent with the requirements of § 345; and provided, further, that such property may be held in the same account so long as appropriate accounting controls are maintained to ensure the separateness of property reserved on account of any Disputed Claim.

## D.     Distributions After Allowance

After a Disputed Claim becomes an Allowed Claim, the property, if any, reserved for the holder of such Claim shall be distributed by the Disbursing Agent to such holder pursuant to, and to the extent provided for in, the Plan or the Recovery Trust Agreement, as applicable, without any interest to be paid on account of such Claim (except as provided in Section 4.4 of the Plan). To the extent an objection to a Disputed Claim is sustained or a Claim is withdrawn or reduced, the reserves held on account of such Claim shall be reallocated and distributed among the holders of Allowed Claims in accordance with the applicable provisions of the Plan.

## E.     Distribution of Excess Amounts in the Disputed Claims Reserve

Any Cash held in a Disputed Claims Reserve Account after all Disputed Claims have been Allowed or Disallowed shall be reallocated and distributed in accordance with the applicable provisions of the Plan.

## F.     Property Held in Reserve for Disputed Claims

Each holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the undistributed property or Trust Assets, as applicable, reserved on account of such Disputed Claim and the property available for further Distribution to holders of Allowed Claims in the same Class as such Claim, and not to any Reorganized Debtor, any other property or the Reorganized Debtors or any assets previously distributed on account of any other Allowed Claim.

## G.     Estimation of Claims

The Debtors or Reorganized Debtors, as applicable, and the Recovery Trustee may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to § 502(c) regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or Reorganized Debtors, as applicable, or the Recovery Trustee may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim. All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## H. Deadline to File Objections to Claims

Any objections to Claims shall be filed on or before the date that is the later of (a) 180 days after the Effective Date and (b) the last day of such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to certain Claims.

~~XIV.~~

XIV.

<b>SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS</b>

## A. Compromise and Settlement of Claims, Interests and Controversies

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to § 363 and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any Distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and holders of Claims and Interests and is fair, equitable and reasonable and the product of good faith arms' length negotiations. In accordance with the provisions of the Plan, the Reorganized Debtors may compromise and settle Claims against them (excluding Claims converted to Trust Interests under the Plan) and Causes of Action (excluding Estate Claims) against other Entities after the Effective Date without any further notice to or action, order or approval of the Bankruptcy Court.

## B. Releases by the Debtors

Pursuant to § 1123(b), for good and valuable consideration, including the contributions of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors and the Estates from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Reorganized Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Released Parties, the Chapter 11 Cases, the Plan, the Disclosure Statement, the Plan Support Agreement, the <u>Second Plan Support</u>

Agreement, the Recovery Trust Agreement the Rights Offering, the Subscription and Backstop Agreement or related agreements, instruments or other documents, the DIP Loan Agreement, and other related agreements, other than Claims or liabilities to the extent arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, fraud or willful misconduct, as determined by a Final Order.

## C. Releases by Holders of Claims and Interests

As of the Effective Date, for good and valuable consideration, including the contributions of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, each holder of a Claim or an Interest that votes to accept the Plan but does not select the "release opt out" provided in the Ballot shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, the Reorganized Debtors and the Released Parties from any and all Claims, Interests, claims obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative Claims or claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Released Parties, the Chapter 11 Cases, the Plan, the Disclosure Statement, the Plan Support Agreement, the Second Plan Support Agreement, the Recovery Trust Agreement the Rights Offering, the Subscription and Backstop Agreement or related agreements, instruments or other documents, the DIP Loan Agreement, and other related agreements, other than Claims, claims or liabilities to the extent arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, fraud or willful misconduct, as determined by a Final Order; provided, however, that nothing herein shall be deemed a waiver or release of a Releasing Party's right to receive a Distribution pursuant to the terms of the Plan. For the avoidance of doubt, notwithstanding anything to the contrary herein, this Release by Holders of Claims and Interests is not and shall not be deemed a waiver of the Debtors' rights or claims against the holders of General Unsecured Claims, including to the Debtors' rights to assert setoffs, recoupments or counterclaims, or to object or assert defenses to any General Unsecured Claim, and all such rights and claims are expressly reserved except with respect to the Lonestar Pre-Petition Claims.

## D. Exculpation

No Exculpated Party shall have or incur any liability to any Entity for any act taken or omission made in connection with, relating to or arising out of the Debtors' restructuring efforts, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement, Plan, the DIP Loan Agreement, the Plan Support Agreement, the Rights Offering Second Plan Support Agreement, the Subscription and Backstop Agreement or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and

implementation of the Plan, including the issuance of Plan securities, or the Distribution of property under the Plan or any other related agreement; provided, however, that the foregoing shall not apply to the extent of any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and Distribution of the Plan securities pursuant to the Plan, and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such Distributions made pursuant to the Plan.

**E.      Discharge of Claims and Termination of Interests**

Pursuant to § 1141(d), and except as otherwise specifically provided in the Plan, the Distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Interests and causes of action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and causes of action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in §§ 502(g), 502(h) or 502(i), in each case whether or not: (i) a Proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed pursuant to § 501; (ii) a Claim or Interest based upon such Claim, debt, right or Interest is Allowed pursuant to § 502; or (iii) the holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

**F.      Injunction**

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE 11 OF THE PLAN, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE

EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE 11.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO SECTIONS 11.2 OF THE PLAN OR 11.3 OF THE PLAN, DISCHARGED PURSUANT TO SECTION 11.5 OF THE PLAN OR ARE SUBJECT TO EXCULPATION PURSUANT TO SECTION 11.4 OF THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN; AND (V) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM WITH THE PROVISIONS OF THE PLAN TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL SUCH CLAIMS AND INTERESTS SHALL BE DEEMED SURRENDERED AND EXTINGUISHED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE DEEMED SURRENDERED OR EXTINGUISHED, AS THE CASE MAY BE, AND THE DEBTORS' LIABILITY WITH

RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER § 502(G).

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

## G.     Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to §§ 105 or 362 or any order of the Bankruptcy Court and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## H.     Injunction Against Interference With Plan

Upon the entry of the Confirmation Order, all of the Releasing Parties shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

## I.     Injunction Related to Releases and Exculpation

The Confirmation Order shall permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to the Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in Sections 11.3 and 11.4.

## J.     Protection Against Discriminatory Treatment

Consistent with § 525 and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## K.     No Consent to Change of Control Required

To the fullest extent permitted by applicable law, except as otherwise expressly provided by order of the Bankruptcy Court, none of (a) the facts or circumstances giving rise to the

commencement of, or occurring in connection with, the Chapter 11 Cases, (b) the issuance of the New Common Stock pursuant to the Plan or (c) consummation of any other transaction pursuant to the Plan shall constitute a "change in ownership" or "change of control" (or a change in working control) of, or in connection with, any Debtor requiring the consent of any person other than the Debtors or the Bankruptcy Court.

**L.**     **Release of Liens**

Except as otherwise provided herein or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns. For the avoidance of doubt, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

~~XV.~~

**XV.**

**CONDITIONS TO THE CONFIRMATION DATE AND EFFECTIVE DATE**

**A.**     **Conditions Precedent to Confirmation**

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Section 12.3 of the Plan.

    1.     The Bankruptcy Court shall have entered a Final Order, in form and substance acceptable to the Plan Proponents, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of § 1125.

**B.**     **Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Section 12.3 of the Plan.

    1.     The Confirmation Order shall have been entered and become a Final Order in form and substance satisfactory to the Plan Proponents no later than ~~April 14,~~June

17, 2011, except as extended by the Debtors with the prior written consent of the ~~Backstop~~ Purchasers.

2. The transactions contemplated by the ~~Rights Offering~~Subscription Agreement and any Exit Facility shall have closed, or shall close simultaneously, upon the Effective Date, and the Reorganized Debtors shall have sufficient Cash, including the proceeds from the sale of the ~~Rights Offering, the issuance of Subscription Shares and~~Purchased Shares, and the funding of the Purchaser Loans, if any, and from any Exit Facility, to satisfy all Cash obligations under the Plan due on or as of the Effective Date, including the payment of (i) the ~~Backstop Fee and Backstop~~Subscription Expenses and (ii) the DIP Claims to the extent not credited against the ~~Backstop~~ Purchasers' Commitments under the Subscription ~~and Backstop~~ Agreement.

3. All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance acceptable to the Debtors and the Plan Proponents, the ~~Backstop~~ Purchasers or the Required ~~Backstop~~ Purchasers, as provided herein.

4. All authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained.

5. No order of a court shall have been entered and remain in effect restraining the Debtors from consummating the Plan and the transactions contemplated therein.

6. All actions, documents, certificates and agreements necessary to implement the Plan, including the New By-Laws, the New Certificate of Incorporation and any other formation documents, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

7. Each of the Plan Documents shall have been executed and delivered in accordance with their terms.

8. The Effective Date shall have occurred on or prior to ~~April 14,~~June 17, 2011, except as extended by the Debtors with the prior written consent of the ~~Backstop~~ Purchasers.

9. All conditions to the effectiveness of the Second Plan Support Agreement shall have occurred on or prior to April 25, 2011.

10. ~~9.~~ No Termination Event (as defined in the Second Plan Support Agreement) shall have occurred that resulted in the termination of the Plan Support Agreement.

11. ~~10.~~ The Subscription ~~and Backstop~~ Agreement shall not have been terminated in accordance with Section 10 ~~of the Plan~~thereof.

12. The Required Purchasers shall have approved of the proposed allocation of the Additional Cash Contribution as between the Recovery Trust and such other uses as permitted in accordance with Section 6.4.

13. ~~11.~~ Based upon evidence properly presented to the Bankruptcy Court at the Confirmation hearing, the total amount of Allowed Administrative Claims payable in accordance with Section 3.1 of the Plan, including Ordinary Course Claims but excluding Professional Fee Claims, is not expected to exceed $[█_____].

~~12. Based upon evidence properly presented to the Bankruptcy Court at the Confirmation hearing, the total amount of Allowed Administrative Claims payable in accordance with Section 3.1 of the Plan for Professional Fee Claims is not expected to exceed $[█].~~

14. The total amount of Allowed Professional Fee Claims payable in Cash from the sources of consideration set forth in Section 6.5 of the Plan in accordance with Section 3.1 of the Plan (other than the Allowed Professional Fee Claims of Replacement EC Professionals) shall not exceed the sum of (i) $[_____] and (ii) any portion of an Allowed Professional Fee Claims (other than the Allowed Professional Fee Claim of a Replacement EC Professional) that is payable pursuant to the Compensation Procedures Order or other order of the Bankruptcy Court and otherwise authorized under the Approved Budget (as defined in the Final DIP Order) and is deferred until after the Effective Date ("Deferred Fees"), which Deferred Fees shall be paid by Reorganized Parent thirty days following the Effective Date.

15. ~~13.~~ Based upon evidence properly presented to the Bankruptcy Court at the Confirmation hearing, the total amount of Allowed Priority Tax Claims payable in accordance with Section 3.2 of the Plan is not expected to exceed $[█____].

16. ~~14.~~ Based upon evidence properly presented to the Bankruptcy Court at the Confirmation hearing, the total amount of Allowed Other Priority Claims payable in accordance with Section 4.1 of the Plan is not expected to exceed $[█__].

17. Based upon evidence properly presented to the Bankruptcy Court at the Confirmation Hearing, the Debtors total net working capital shall total not less than $[_____].

## C. **Waiver of Conditions**

The conditions to Confirmation of the Plan and to the occurrence of the Effective Date set forth in Article 12 of the Plan may be waived at any time by the Debtors; provided they have obtained the prior written consent of the Plan Proponents; provided, however, that the Plan Proponents may not waive entry of the Confirmation Order.

## D.    Effect of Failure of Conditions

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any claims by or Claims against the Debtors; (ii) prejudice in any manner the rights of the Debtors, any holders of a Claim or Interest or any other Entity; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Creditors or Interest Holders or any other Entity in any respect.

~~XVI.~~

XVI.

### MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

## A.    Modification and Amendments

Except as otherwise specifically provided herein, the Debtors reserve the right, subject to the consent of the Plan Proponents, to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in § 1127 and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights, subject to the consent of the Plan Proponents, to alter, amend or modify materially the Plan with respect to any or all Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article 13 of the Plan.

In addition, prior to the Effective Date, the Debtors (with the consent of the Plan Proponents) may make appropriate technical adjustments and modifications to the Plan, without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests.

## B.    Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the commencement of the solicitation of votes on the Plan are approved pursuant to § 1127(a) and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

## C.    Revocation or Withdrawal of the Plan

The Debtors, subject to the terms of the Second Plan Support Agreement, reserve the right to revoke or withdraw the Plan before the Effective Date. If the Debtors revoke or

withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan (other than the surviving provisions of the Second Plan Support Agreement) shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests or Claims by any Debtor against any other Entity; (b) prejudice in any manner the rights of such Debtor, the holder of any Claim or Interest or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor or any other Entity.

~~XVII.~~

XVII.

### RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of or related to, the Chapter 11 Cases and the Plan including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate or establish the priority, Secured or Unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or Unsecured status, priority, amount or allowance of Claims;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to (i) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Rejection Claims and Cure Claims pursuant to § 365 or any other matter related to such Executory Contract or Unexpired Lease; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Debtors' amending, modifying or supplementing, after the Effective Date, pursuant to Section 7.5 of the Plan, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired.

4. ensure that Distributions to holders of Allowed Claims and Allowed Old Equity Interests are accomplished pursuant to the provisions of the Plan and the Recovery Trust Agreement;

5. adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. adjudicate, decide or resolve any and all matters related to any Cause of Action;

7. adjudicate, decide or resolve any and all matters related to § 1141;

8. enter and enforce any order for the sale of property pursuant to §§ 363, 1123 or 1146(a);

9. resolve any Avoidance Action or dispute regarding the subordination of any Claim or Interest;

10. resolve any cases, claims, controversies, suits, disputes or causes of action that may arise in connection with the consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11. resolve any cases, controversies, suits, disputes or causes of action that may arise in connection with or under the DIP Loan Agreement;

12. issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

13. resolve any cases, controversies, suits, disputes or causes of action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in Article 11 and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

14. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

15. determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

16. adjudicate any and all disputes arising from or relating to Distributions made under the Plan or the Recovery Trust Agreement;

17. consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in the Plan or any Bankruptcy Court order, including the Confirmation Order;

18. determine requests for the payment of Claims and Interests entitled to priority pursuant to § 507;

19. hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

20.

20. 21. hear and determine disputes arising in connection with the Recovery Trust, including in connection with the interpretation, implementation and enforcement of the Recovery Trust Agreement;

21. 22. hear and determine matters concerning state, local and federal taxes in accordance with §§ 346, 505 or 1146;

22. 23. hear and determine disputes concerning the application or enforcement of any exemption provided under § 1145;

23. 24. hear and determine all disputes involving the existence, nature or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

24. 25. enforce all orders previously entered by the Bankruptcy Court;

25. 26. hear any other matter not inconsistent with the Bankruptcy Code; and

26. 27. enter an order dismissing or closing the Chapter 11 Cases.

# ~~XVIII.~~

# XVIII.

## MISCELLANEOUS PROVISIONS

### A.    Immediate Binding Effect

Subject to Section 12.2 of the Plan, and notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are Allowed or Disallowed or were voted to accept or reject the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

### B.    Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### C.    Dissolution of Statutory Committees

On the Effective Date, the Creditors' Committee and the Equity Committee shall dissolve and the respective members thereof shall be released and discharged from all rights, duties, responsibilities and obligations from or related to the Chapter 11 Cases, except with respect to (i) filing, settling, compromising, withdrawing or litigating to Final Order any objection to Professional Fee Claims and (ii) prosecuting or participating in any appeal of the Confirmation Order or any request for reconsideration thereof.  In addition, except as otherwise specified in the Plan, the retention and employment of the attorneys, accountants and other agents of each of the Creditors' Committee and the Equity Committee shall terminate on the Effective Date.

### D.    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of such Entity.

**E.** **Service of Documents**

After the Effective Date, any pleading, notice or other document required by the Plan to be served on or delivered to the Debtors or the Reorganized Debtors shall be served on:

Point Blank Solutions, Inc.
2101 S.W. 2nd Street
Pompano Beach, FL 33069
Facsimile: [_____]
Attn: [_____]

with copies to:

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, DE 19801
Facsimile: (302) 652-4400
Attn: Laura Davis Jones

After the Effective Date, any pleading, notice or other document required by the Plan to be served on or delivered to the Recovery Trustee shall be served on:

[_____]
[_____]
[_____], Recovery Trustee

with copies to:

[Counsel to Recovery Trustee]
[_____]
[_____]

After the Effective Date, any pleading, notice or other document required by the Plan to be served on or delivered to the Creditors' Committee shall be served on:

Arent Fox LLP
1675 Broadway
New York, NY 10019
Facsimile: (212) 484-3990
Attn: Robert M. Hirsh
Attn: George Angelich

After the Effective Date, the Debtors may, in their sole discretion, notify Entities that, in order to continue receiving documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

## F.    **Entire Agreement**

Except as otherwise indicated, the Plan, the Subscription Agreement, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

## G.    **Severability of Plan Provisions**

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted so long as such term or provision is acceptable to the Plan Proponents. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (iii) nonseverable and mutually dependent.

## H.    **Exhibits**

AllThe Subscription Agreement and all exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon request to the Debtors' counsel, by contacting Laura Davis Jones, Esq., and Timothy Cairns, Esq., Pachulski Stang Ziehl & Jones LLP, 919 Market Street, 17th Floor, P.O.

Box 8705, Wilmington, DE 19899-8705, Telephone: (302) 652-4100, email: ljones@pzsjlaw.com, tcairns@pzsjlaw.com, at the Bankruptcy Court's web site at ecf.deb.uscourts.gov or at the website of the Notice and Claims Agent, at dm.epiq11.com/PBS/project/Default.aspx.

### I. Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to § 1125(e), the Debtors and their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of Plan securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the New Common Stock offered and sold under the Plan.

### J. Closing of Chapter 11 Cases

Promptly after the full administration of the Chapter 11 Cases, the Reorganized Debtors shall, in consultation with the Recovery Trustee, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases. Nothing contained herein shall preclude the Recovery Trustee from appearing and being heard on any request by the Reorganized Debtors to close the Chapter 11 Cases.

### K. Conflicts

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibit, schedule, appendix, supplement or amendment to any of the foregoing), conflicts or is in any way inconsistent with any provision of the Plan, the Plan shall govern and control; provided, however, that if. If there is a conflict between the Plan and a Plan Supplement document or the Subscription Agreement, the Plan Supplement document shall govern and control; and provided further, however, that to the extent that or Subscription Agreement, as applicable, shall govern and control; provided, however, that in the case of the Recovery Trust Agreement, the Plan shall control. If any provision of the Plan conflicts with or is in any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control.

## XIX.

## MISCELLANEOUS PROVISIONS

### A. Notices

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtors shall be sent by first class U.S. mail, postage prepaid to:

Counsel for the Debtors
Laura Davis Jones, Esq.
Timothy Cairns, Esq.
Pachulski Stang Ziehl & Jones LLP
919 North Market St., 17th Floor
Wilmington, DE 19899-8705

-and-

David M. Bertenthal, Esq.
Joshua M. Fried, Esq.
Pachulski Stang Ziehl & Jones LLP
150 California St., 15th Floor
San Francisco, CA 94111

Counsel for the Creditors' Committee
Brian L. Arban, Esq.
Fred Rosner, Esq.
Messana Rosner & Stem LLP
1000 N. West Street, Suite 1200
Wilmington, DE 19801

-and-

Robert M. Hirsh, Esq.
George Angelich, Esq.
Arent Fox LLP
1675 Broadway
New York, NY 10019

~~Counsel for the Equity Committee~~
~~Joseph T. Moldovan, Esq.~~
~~Morrison Cohen LLP~~
~~909 Third Avenue~~
~~New York, NY 10022-4731~~

~~-and-~~

~~Neil B. Glassman, Esq.~~
~~Bayard, P.A.~~
~~222 Delaware Avenue, Suite 900~~
~~Wilmington, DE 19899~~

Counsel to Privet Opportunity Fund I, LLC and Privet Fund Management LLC
Edward J. Estrada, Esq.

Reed Smith LLP
599 Lexington Avenue, 22nd Floor
New York, NY 10022

-and-

Kurt F. Gwynne, Esq.
Reed Smith LLP
1201 Market Street, Suite 1500
Wilmington, DE 19801

Counsel to Prescott Group Capital Management
Ricardo Palacio, Esq.
Ashby & Geddes
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899

Counsel to Lonestar Capital Management, LLC
David B. Stratton, Esq.
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, DE 19899-1709

-and-

David P. Simonds, Esq.
Akin Gump Strauss Hauer & Feld LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067

-and-

Michael P. Cooley, Esq.
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201-4675

United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19801

# XX.

## FEASIBILITY

Section 1129(a)(11) of the Bankruptcy Code requires, as a condition to Confirmation, that the Bankruptcy Court find that Confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation is contemplated by the Plan. For purposes of demonstrating that the Plan meets this "feasibility" standard, the ~~Debtors, with the assistance of CRG, have~~Plan Proponents analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses, taking into account the ~~Debtors'~~ financial projections submitted as **Exhibit A** hereto (the "Financial Projections").

As noted in **Exhibit A**, the Financial Projections present information with respect to all the Reorganized Debtors on a consolidated basis. The Reorganized Debtors' operations are to be funded after the Effective Date from a combination of Cash on hand, proceeds of ongoing operations, and amounts received from the ~~Rights Offering and the~~direct subscription for the New Common Stock by the Purchaser and any Exit Financing.

Prior to the hearing to approve the Disclosure Statement, the ~~Debtors~~Plan Proponents may replace the Financial Projections with revised financial projections. The ~~Debtors~~Plan Proponents have prepared the Financial Projections solely for the purpose of providing "adequate information" under § 1125 to enable Creditors to make an informed judgment about the Plan and the Financial Projections should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors. The Financial Projections are subject to change over time and the ~~Debtors~~Plan Proponents disclaim any obligation to update them on any basis (including new information or discovery of mistake).

In addition to the cautionary notes contained elsewhere in this Disclosure Statement and in the Financial Projections, it is underscored that the ~~Debtors~~Plan Proponents make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are subject to significant uncertainties. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the financial results. Therefore, the actual results achieved throughout the projection period may vary from the Financial Projections and the variations may be material. All holders of Claims and Interests are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of, and voting on, the Plan.

Based upon the Financial Projections and the funds that will be available to the Reorganized Debtors pursuant to the transactions contemplated by the Plan, the ~~Debtors~~Plan Proponents believe that they will be able to make all distributions and payments under the Plan and that Confirmation of the Plan is not likely to be followed by the Debtors' liquidation or need for further restructuring.

# XXI.

## LIQUIDATION ANALYSIS

Pursuant to § 1129(a)(7), unless there is unanimous acceptance of the Plan by an impaired Class, the ~~Debtors~~Plan Proponents must demonstrate, and the Bankruptcy Court must determine that, with respect to such Class, each holder of a Claim or Interest will receive property of a value, that is not less than the amount that such holder would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. This requirement is commonly referred to as the "Best Interests Test." For the reasons set forth herein and the annexed Chapter 7 Liquidation Analysis, the ~~Debtors~~Plan Proponents believe the Plan satisfies the Best Interests Test.

Holders of all Allowed Claims and Interests will receive under the Plan proposed by the Debtors property of a value that is not less than the amount such Creditors and Interest holders would receive in a Chapter 7 case. However, the Plan – which provides for the reorganization, rather than the liquidation, of the Debtors – presents a better alternative to Creditors and Interest holders than a Chapter 7 liquidation because, among other factors, the Reorganized Debtors will preserve their business as a going concern, which will provide a greater recovery to Creditors and Interest holders than a piecemeal liquidation of the Debtors in a Chapter 7 case. In addition, the Reorganized Debtors and the Recovery Trust will in all likelihood be able to manage, and realize upon the Debtors' assets more expeditiously and cost-effectively than a trustee and his or her professionals and agents who are unfamiliar with the Debtors' businesses, assets and liabilities. Further, as suggested above, the ~~Debtors~~Plan Proponents are doubtful that a Chapter 7 trustee could analyze and pursue causes of action as successfully and economically as the Debtors, because the trustee would not have the knowledge and information possessed by the Debtors and their successors and their respective professionals.

It is also anticipated that a Chapter 7 liquidation would result in a significant delay in the payments to Creditors and Interest holders. Among other things, a Chapter 7 case would trigger a new bar date for filing Claims that would be more than ninety days following conversion of the Chapter 11 Cases to Chapter 7. Fed. R. Bankr. P. 3002(c). Hence, a Chapter 7 liquidation would not only delay distribution but also raise the prospect of additional claims that were not asserted in the Chapter 11 Cases.

The ~~Debtors~~Plan Proponents have prepared the hypothetical Chapter 7 Liquidation Analysis attached as **Exhibit B** to the Disclosure Statement to assist holders of Impaired Claims and Interests to reach their determination as to whether to accept or reject the Plan. The liquidation analysis indicates the estimated values which may be obtained by Classes of Claims and Interests if the assets of the Debtors are liquidated pursuant to Chapter 7, as an alternative to the scenario proposed by the Plan. The liquidation analysis is provided solely to disclose the effects of a hypothetical liquidation of the Debtors under Chapter 7 of the Bankruptcy Code, subject to the assumptions set forth in **Exhibit B**.

Underlying the analyses set forth in **Exhibit B** are a number of estimates and assumptions that, although developed and considered reasonable by ~~management of the Debtors~~Plan

Proponents, are inherently subject to economic and business uncertainties and contingencies beyond the control and knowledge of the ~~Debtors~~Plan Proponents. The values underlying estimates and assumptions are subject to further reconciliation by the ~~Debtors~~Plan Proponents and their professionals and, accordingly, may be higher or lower than those set forth in **Exhibit B**. Accordingly, there can be no assurance that the values assumed in the Chapter 7 Liquidation Analysis would be realized. In addition, any liquidation that would be undertaken would necessarily take place in future circumstances which cannot currently be predicted. While the liquidation analysis is necessarily presented with numerical specificity, if the Debtors were liquidated under Chapter 7, the actual liquidation proceeds could vary, perhaps substantially, from the amounts set forth in **Exhibit B** No representation or warranty can be or is being made with respect to the actual proceeds that could be received in a Chapter 7 liquidation and/or under the Plan. Nothing contained in the analyses set forth in **Exhibit B** is intended or may constitute a concession or admission of the ~~Debtors~~Plan Proponents for any other purpose.

To determine what Holders of Claims and Interests in each impaired Class would receive if the Debtors were liquidated under Chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a Chapter 7 liquidation case. The Cash amount that would be available for satisfaction of Claims and Interests would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation case. Such Cash amount would be reduced by the costs and expenses of liquidation and by such additional administrative and priority Claims that might result from the termination of the Debtors' business and the use of Chapter 7 for the purposes of liquidation. The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. In addition, other Claims that might arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors during the Cases, such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay general unsecured Claims. Under each of the potential liquidation scenarios set forth in the Liquidation Analysis, Creditors would not receive any amounts on account of their Claims. As set forth in the Liquidation Analysis, the ~~Debtors~~Plan Proponents have determined that confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is not less than the recovery such Holder would receive pursuant to the liquidation of the Debtors under Chapter 7.

## XXII.

## RISK FACTORS

### A. Risk Factors Under the Plan

The principal risk associated with the Plan is that it may not be confirmed by the Bankruptcy Court, either because the requisite votes in favor of the Plan are not received or the Bankruptcy Court decides not to confirm the Plan on some other basis. Notwithstanding the

risks, however, the Debtors believe that the very same risks described herein are present in and significantly greater to Creditors in a Chapter 7 case.

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in Article —12 of the Plan have not occurred or been waived by the Debtors and, therefore, the Effective Date does not occur, upon notification submitted by the Proponents to the Bankruptcy Court: (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtors and all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

The projections and analyses supporting the confirmation of the Plan, including the Financial Projections, are dependent upon the successful implementation of the Plan and the validity of the other assumptions contained therein. All projections, by nature, are forward-looking and contain estimates and assumptions. There can be no assurance that such statements will reflect actual outcomes. The projections made in this Disclosure Statement (including, without limitation, its exhibits) reflect numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms, the closing of the transactions contemplated thereunder, the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions and other matters, many of which are beyond the control of the Debtors and the Reorganized Debtors. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of the Reorganized Debtors. Although the Debtors believe that the projections are reasonably attainable, variations between the actual financial results and those projected may occur and may be material.

**B.      Risks to the Debtors' Continued Business Operations**

In addition, the Debtors have certain business risks associated with the continued operation of their business, as set forth below.

> 1.      A substantial portion of the Debtors' revenue is dependent on U.S. military business, and a decrease or delay in contract awards in such business could have a material adverse effect on the Debtors.

U.S. military contracts account for a significant amount of the Debtors' revenue. The U.S. military funds its contracts in increments based on annual authorization and appropriation,

as well as supplemental bills passed by Congress and approved by the President, which may not be enacted or may provide funding that is greater than or less than the amount of the contract. Changes in the U.S. military's budget, spending allocations or the timing of such spending could adversely affect the Debtors' ability to receive future contracts. The Debtors' contracts with the U.S. military do not have a minimum purchase commitment, and the U.S. military generally has the right to cancel the Debtors' contracts unilaterally with limited notice. A significant reduction or delay in U.S. military expenditures for ballistic-resistant products would have a material adverse effect on the Debtors' business, financial condition, results of operations and liquidity.

2.  Recent turmoil in the credit markets and the financial services industry may negatively impact the Debtors' business, results of operations, financial condition or liquidity.

Recently, the credit markets and the financial services industry have been experiencing a period of unprecedented turmoil and upheaval characterized by the bankruptcy, failure, collapse or sale of various financial institutions and an unprecedented level of intervention from the United States federal government. While the ultimate outcome of these events cannot be predicted, they may have a material adverse effect on the Debtors' liquidity and financial condition if the Debtors' ability to obtain credit from trade creditors were to be impaired. In addition, the recent economic crisis could also adversely impact some of the Debtors' customers' ability to finance the purchase of systems from the Debtors or the Debtors' suppliers' ability to provide the Debtors with product, either of which may negatively impact the Debtors' business and results of operations.

3.  Many of the Debtors' customers have fluctuating budgets, which may cause fluctuations in the Debtors' results of operations.

Customers for the Debtors' products include federal, state, municipal, foreign, military, law enforcement and other government agencies. Government tax revenues and budgetary constraints, which fluctuate from time to time, can affect budgetary allocations for these customers. Many domestic and foreign government agencies have in the past experienced budget deficits that have led to decreased spending in defense, law enforcement and other military and security areas. The Debtors' results of operations may be subject to substantial period-to-period fluctuations because of these and other factors affecting military, law enforcement and other government spending. A reduction of funding for federal, state, municipal, foreign and other government agencies could have a material adverse effect on sales of the Debtors' products and the Debtors' business, financial condition, results of operations and liquidity.

4.  The Debtors' business is subject to various laws and regulations favoring the U.S. government's contractual position, and the Debtors' failure to comply with such laws and regulations could harm operating results and prospects.

As a contractor to the U.S. government, the Debtors must comply with laws and regulations relating to the formation, administration and performance of the federal government contracts that affect how the Debtors do business with the United States government customers and may impose added costs on the Debtors' business. These rules generally favor the U.S. government's contractual position. For example, these regulations and laws include provisions

that subject the Debtors' federal government contracts to protest or challenge by unsuccessful bidders and unilateral termination, reduction or modification by the U.S. government, including requiring certain manufacturing or operating standards. Failure to comply with these or other laws and regulations could result in contract termination, suspension or debarment from contracting with the federal government, civil fines and damages and criminal prosecution and penalties, any of which could have a material adverse effect on the Debtors' business, financial condition, results of operations and liquidity.

5. The Debtors rely on certain vendors to supply the Debtors with ballistics materials and to sew non-ballistic products that if the Debtors were unable to obtain could adversely affect the Debtors' business.

The Debtors have relationships with key ballistic and non-ballistic materials vendors, as well as with key subcontractors who sew certain of the Debtors' non-ballistic products. The Debtors also rely on suppliers for vendor trade creditor financing for the Debtors' purchases of products from them. Any inability to obtain materials or services in the volumes required and at competitive prices from the Debtors' major trading partners, the loss of any major trading partner, or the discontinuation of vendor financing may seriously harm the Debtors' business because the Debtors may not be able to manufacture and sell the Debtors' customers products on a timely basis in sufficient quantities or at all. Other factors, including reduced access to credit by the Debtors' vendors resulting from economic conditions, may impair the Debtors' vendors' ability to provide products in a timely manner or at competitive prices. The Debtors also rely on other vendors for critical services such as transportation, supply chain and professional services. Any negative impacts to the Debtors' business or liquidity could adversely impact the Debtors' ability to establish or maintain these relationships.

6. Growth of operations may strain resources and if the Debtors fail to manage growth successfully, the Debtors' business could be adversely affected.

Increased orders for body armor, as well as the introduction of new products, have placed, and may continue to place, a strain on the Debtors' operational, financial and managerial resources and personnel. Any failure to manage growth effectively could have a material adverse effect on the Debtors' business, operating results, financial condition and liquidity.

Increases in the prices paid for raw materials or labor costs may adversely affect profit margins. If the Debtors experience significant increases in the prices paid for raw materials or labor costs, the Debtors may not be able to pass through to the Debtors' customers such increases in those costs. Even if the Debtors are able to pass through all or a portion of such cost increases to the Debtors' customers, profit margins on such products may be reduced. Fixed price contracts are especially susceptible to such profit margin reductions.

7. The Debtors' products are used in situations that are inherently risky. Accordingly, the Debtors may face product liability and exposure to other claims for which the Debtors may not be able to obtain adequate insurance.

The products that the Debtors manufacture are typically used in applications and situations that involve high levels of risk of personal injury. Failure to use these products for

their intended purposes, failure to use these products properly, malfunction of these products and, in some circumstances, even correct use of these products could result in serious bodily injury or death. The Debtors cannot guarantee that the Debtors' insurance coverage would be sufficient to cover the payment of any potential claim arising out of the use of the Debtors' products. Any substantial uninsured loss thus would have to be paid out of the Debtors' assets as applicable and may have a material adverse effect on the Debtors' business, financial condition, results of operations and liquidity. In addition, the Debtors cannot guarantee that the Debtors' current insurance or any other insurance coverage will continue to be available or, if available, that it will be obtainable at a reasonable cost. The cost of obtaining insurance coverage has risen substantially due to increased sales levels and increased volatility within the reinsurance industry. Any material uninsured loss could have a material adverse effect on the Debtors' business, financial condition, results of operations and liquidity. If the Debtors are unable to obtain product liability coverage, then the Debtors may be prohibited from bidding for orders from certain government customers because many governmental agencies currently require such insurance coverage. Any inability to bid for government contracts as a result of insufficient insurance coverage would have a material adverse effect on the Debtors' business, financial condition, results of operations and liquidity.

        8.     The Debtors are engaged in a highly competitive marketplace, which demands that producers continue to develop new products. The Debtors' business will be adversely affected if the Debtors are not able to continue to develop new and competitive products.

The Debtors' customers continually seek improvements in body armor and similar products that the Debtors manufacture and market. As a result, in order to meet the Debtors' customers' needs, the Debtors must continue to develop new products and innovations and enhancements to existing products. Many of the Debtors' competitors have significantly more capital than the Debtors have and as a result have the ability to devote more resources to research and development and to marketing of their products. In order to remain competitive, the Debtors must continue to devote a material portion of the Debtors' financial resources to research and development and there is no assurance that the Debtors will be successful in the Debtors' product improvement efforts in the Debtors' competitive marketplace.

        9.     The Debtors face continuous pricing pressure from the Debtors' customers and the Debtors' competitors. This will affect the Debtors' margins and therefore the Debtors' profitability and cash flow unless the Debtors can efficiently manage the Debtors' manufacturing costs and market the Debtors' products based on superior quality.

The Debtors' customers often award contracts based on product pricing, and the Debtors believe the Debtors have not received some awards due to pricing discounts given by the Debtors' competitors. Many of the Debtors' competitors have significantly greater financial resources than the Debtors have, and as a result may be able to withstand the adverse effect of discounted pricing and reduced margins in order to build market share. While one of the Debtors' strategies is also to discount to retain and increase market share, and to seek to manage the Debtors' manufacturing efficiently to sustain acceptable margins, the Debtors may not be able to maintain appropriate prices or to manage product manufacturing costs sufficiently to

sustain acceptable margins. Similarly, the Debtors seek to compete based on product quality rather than price, but the Debtors may not be successful in these efforts with enough contract awards to offset the need to reduce prices for other products. This could adversely affect the Debtors' profitability, the Debtors' liquidity and the Debtors' market share.

10.    The Debtors may have difficulty protecting the Debtors' proprietary technology.

Intellectual property and proprietary technology are important to the success of the Debtors' business. While the Debtors actively police the use of the Debtors' intellectual property and proprietary technology, it is difficult to monitor all possible misappropriations and unauthorized access to the Debtors' intellectual property and technology. Further, litigation involving these matters can be costly, with no guarantee of ultimate success. Dissemination or dilution of the aforementioned property and technology also could have an adverse effect on the Debtors' business, financial condition, results of operations and liquidity.

11.    If the Debtors are unable to successfully retain executive leadership and other key personnel, the Debtors' ability to successfully develop and market the Debtors' products and operate the Debtors' business may be harmed.

The Debtors are substantially dependent on the personal efforts and abilities of the Debtors' key management. The Debtors' relationship with certain of the Debtors' customers, particularly the U.S. military, is substantially dependent on certain of the Debtors' management personnel. Changes to the Debtors' executive officers or the inability to retain the Debtors' key personnel could delay the development and introduction of new products, harm the Debtors' ability to sell the Debtors' products and damage the image of the Debtors' brands and negatively impact the Debtors' credibility with key customers. The Debtors believe that retention of the Debtors' key personnel is critical to executing the Debtors' business strategy and the Debtors' operations going forward and the failure to retain the Debtors' key personnel may impact the Debtors' financial condition and results of operations.

12.    The Debtors have launched and expect to continue to launch strategic and operational initiatives which if not successful could adversely affect the Debtors' business.

The Debtors believe that in order to stay competitive and generate positive earnings and cash flow, the Debtors must successfully implement the Debtors' strategies. In connection with the implementation of the Debtors' strategies, the Debtors have launched, and expect to continue to launch, several operational and strategic initiatives. However, the success of any of these initiatives may not be achieved if:

•    the Debtors do not maintain adequate levels of liquidity to finance such initiatives or are unable to meet the financial ratios and other covenants contained in any exit financing loan agreements;

•    they do not result in revenue growth, generate cash flow, reduce operating costs or reduce the Debtors' working capital investments; or

• the Debtors are unable to provide the products necessary to implement these initiatives successfully or other products are introduced to the marketplace that result in the Debtors' strategies being of less value to customers.

Failure to implement one or more of the Debtors' strategies and related initiatives successfully could materially and adversely affect the Debtors' business, financial condition or results of operations.

13. Environmental issues could adversely affect the Debtors' business.

The Debtors are subject to various federal, state and local laws and regulations governing the use, discharge and disposal of hazardous material. Compliance with current laws and regulations has not had and is not expected to have a material adverse effect on the Debtors' financial condition. It is possible, however, that environmental issues may arise in the future that the Debtors cannot currently predict and which may have a material adverse effect on the Debtors' business, financial condition, results of operations and liquidity.

14 The Debtors may incur additional costs or material shortages due to new National Institute of Justice ("NIJ") certification and testing standards.

Body armor ballistic protection packages require certification to government standards in order to be sold to law enforcement and military customers. Law enforcement certification standards are set by the NIJ and the military specifications are set for each individual contract. Internationally, standards vary based on the country with whom the Debtors are dealing, though most will adhere to the NIJ certification requirements. The NIJ is in the process of revising their standard, which may result in a more complex and costly testing protocol. Any major change in testing procedures and performance standards carries both capital costs to build the testing protocol to meet the new standards, and potential material and production costs to build to the new standard. Additionally, expanding into international markets increases the likelihood that new certification standards will be required, leading to increased costs.

15. If internal control over financial reporting becomes ineffective, the Debtors' business and future prospects may suffer.

If the Debtors fail to update the Debtors' internal controls over financial reporting as the Debtors' business evolves or to integrate acquired businesses into the Debtors' control system, the Debtors may not be able to timely or accurately report the Debtors' financial condition, results of operations or cash flows or to maintain effective disclosure controls and procedures. If the Debtors are unable to report financial information in a timely and accurate manner or to maintain effective disclosure controls and procedures, the Debtors could be subject to, among other things, regulatory or enforcement actions by the SEC and a general loss of investor confidence, any one of which could adversely affect the Debtors' business prospects and the Debtors' going concern value.

Further, there are inherent limitations to the effectiveness of any system of controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures. The Debtors could face additional litigation exposure and additional SEC enforcement or other regulatory action if further restatements were to occur or other

accounting-related problems emerge. In addition, any future restatements or other accounting-related problems may adversely affect the Debtors' financial condition, results of operations and liquidity.

## C. ~~A.~~ Certain Federal Income Tax Consequences of the Plan

The following discussion is a summary of certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain Holders of Claims. This discussion does *not* address the federal income tax consequences of the Plan to (a) the Holders of unclassified Claims under Article 3 of the Plan (*i.e.*, Administrative Claims and Priority Claims), (b) the Holders of Secured Claims, or (c) the Holders of Interests.

Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law; the differences in the nature of the Claims (including Claims within the same Class) and Interests, the Holder's status and method of accounting (including Holders within the same Class) and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are subject to significant uncertainties. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to any of the issues discussed below. Furthermore, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the Holders of Claims and Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or certain Holders of Claims in light of their personal circumstances, nor does the discussion deal with tax-issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers and dealers in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, regulated investment companies and foreign taxpayers). This discussion does not address the tax consequences to certain Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local or estate and gift taxation is addressed.

THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PERSONAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR EQUITY INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## D. ~~B.~~ Consequences to Holders of Claims

The federal income tax consequences of the Plan to a Holder of a Claim will depend upon several factors including but not limited to: (i) the origin on the Holder's Claim, (ii) whether the Holder is a resident of the United States for tax purposes (or falls into any of the special classes

of taxpayers excluded from this discussion as noted above), (iii) whether the Holder reports income or the accrual or cash basis method, (iv) whether the Holder has taken a bad debt deduction or worthless security deduction with respect to this Claim and (v) whether the Holder receives distributions under the Plan in more than one taxable-year. HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS.

Generally, a Holder of an Allowed Claim will recognized gain or loss equal to the difference between the "amount realized" by such Holder and such Holder's adjusted tax basis in the Allowed Claim. The "amount realized" is equal to the sum of the Cash and the fair market value of any other consideration received under the Plan in respect of a Holder's Claim. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR ALLOWED CLAIMS.

Pursuant to the Plan, distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes. Holders of Allowed Claims not previously required to include in their taxable income any accrued by unpaid interest on an Allowed Claim may be treated as receiving taxable interest, to the extent any consideration they receive under the Plan is allocable to such accrued but unpaid interest. Holders previously required to include in their taxable income any accrued but unpaid interest on an Allowed Claim may be entitled to recognize a deductible loss, to the extent that such accrued but unpaid interest is not satisfied under the Plan. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR ALLOWED CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

Where gain or loss is recognized by a Holder of an Allowed Claim, the character of such gain or loss as a long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, but not limited to, the status of the Holder, the nature of the Allowed Claim in such Holder's hands (*i.e.*, whether the claim constitutes a capital asset in the hands of the holder), the purpose and circumstances of its acquisition, the Holder's holding period of the Allowed Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Allowed Claim. The Holder's aggregate tax basis for any consideration received under the Plan will generally equal the amount realized in the exchange (less any amount allocable to interest as described in the previous paragraph). The holding period for any consideration received under the Plan will generally begin on the day following the receipt of such consideration.

A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the Internal Revenue Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Claim (subject to a de minimis rule) generally would be characterized ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

## E. ~~C.~~ Withholding

All distributions to Holders of Allowed Claims under the Plan are subject to any applicable withholding, including employment tax withholding. The Debtors will withhold appropriate employment taxes with respect to payments made to a Holder of an Allowed Claim that constitutes a payment for compensation. The Debtors may be required to withhold a portion of any payments made to a Holder of an Allowed Claim if the Holder (a) fails to furnish the correct social security number or other taxpayer identification number ("TIN") of such Holder, (b) furnishes an incorrect TIN, (c) has failed property to report interest or dividends to the IRS in the past, or (d) under certain circumstances, fails to provide a certified statement signed under penalty of perjury, that the TIN provided is the correct number and that such Holder is not subject to backup withholding. Backup withholding is not an addition tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY FOR INFORMATIONAL PURPOSES AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND; IN SOME CASES UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT SUCH HOLDER'S TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

47. ~~1.~~ Importance of Obtaining Professional Tax Assistance.

The United States federal income tax consequences to a Holder other than a Holder receiving Cash (or other property) in satisfaction of such Holder's Claim may be different from the tax consequences described above. Creditors holding each such Claim should consult their tax advisers regarding the potential federal income tax consequences.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

# XXIII.

## CONCLUSION

The Plan Proponents believe that the Plan is in the best interests of Holders of Claims and Interests and urge such holders to vote to accept the Plan.

Dated: ~~January~~April ___, 2011          Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

/s/ Laura Davis

Laura Davis Jones (DE Bar No.
2436)
David M. Bertenthal (CA Bar
No. 167624)
Joshua Fried (CA Bar No.
181541)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705

ljones@pszjlaw.com
dbertenthal@pszjlaw.com
jfried@pszjlaw.com

Counsel to Debtors and Debtors
in Possession

OFFICIAL COMMITTEE OF
UNSECURED CREDITORS

By: /s/ Larry R. Ellis

Name: Larry R. Ellis
Title: Committee Chair

POINT BLANK SOLUTIONS,
INC.
POINT BLANK BODY ARMOR,
INC.
PROTECTIVE APPAREL
CORPORATION OF AMERICA
PBSS, LLC

By: /s/ T. Scott Avila

    Name: T. Scott Avila
    Title: Chief Restructuring
    Officer

OFFICIAL COMMITTEE OF
EQUITY SECURITY
HOLDERSUNSECURED
CREDITORS

By: /s/ Neil Glassman

    Name: Neil Glassman,
    EsquireLarry R. Ellis
    Title: Counsel to Official
    Committee
    of Equity Security
    Holders Chair

PRIVET OPPORTUNITY FUND I, LLC

LONESTAR CAPITAL
MANAGEMENT, LLC, as
investment advisor to LONESTAR
PARTNERS, LP and manager to PB
FUNDING (PRIVET)
OPPORTUNITY FUND I, LLC

By: /s/ Yedi Wong

Name: Yedi Wong
Title: Chief Financial Officer
Privet Fund Management
Its Investment Advisor

# Exhibit A

## Financial Projections

## (To ~~Bebe~~ Separately Filed)

# Exhibit B

## Liquidation Analysis

## (To ~~Be~~be Separately Filed)

Document comparison by Workshare Professional on Friday, April 08, 2011 4:34:23 PM

| Input | | |
|---|---|---|
| Document 1 ID | pcdocs://docs_de/166861/1 | |
| Description | #166861 v1 - Point Blank Disclosure Statement (FINAL) (DO NOT USE - USE SF DOCS 75816) | |
| Document 2 ID | pcdocs://docs_sf/75816/7 | |
| Description | #75816 v7 - Point Blank - Disclosure Statement | |
| Rendering set | standard | |

| Legend | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics | |
|---|---|
| | Count |
| Insertions | 665 |
| Deletions | 671 |
| Moved from | 22 |
| Moved to | 22 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 1380 |