## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| POINT BLANK SOLUTIONS, INC., et al.,[1] | ) | Case No. 10-11255 (PJW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Related Docket No. 1630** |

**Proposed Hearing Date:  October 28, 2011 at 10:00 a.m. Eastern Time**
**Proposed Objection Deadline:  October 21, 2011 at 4:00 p.m. Eastern Time**

**DEBTORS' AMENDED MOTION FOR ORDER (A) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF ASSETS OUTSIDE THE ORDINARY COURSE OF BUSINESS; (B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, RIGHTS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363(b), 363(f) AND 363(m); (C) AUTHORIZING THE ASSUMPTION, ASSIGNMENT AND SALE OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO BANKRUPTCY CODE SECTIONS 363 AND 365; AND (D) GRANTING RELATED RELIEF**

Point Blank Solutions, Inc. ("PBSI"), *et al.*, the above-captioned debtors and debtors in possession (collectively, the "Debtors"), file this amended motion (this "Amended Sale Motion") for entry of an order:  (a) approving the asset purchase agreement and authorizing the sale of assets outside the ordinary course of business; (b) authorizing the sale of assets free and clear of all liens, claims, rights, encumbrances and other interests pursuant to sections 105, 363(b), 363(f) and 363(m) of the Bankruptcy Code; (c) authorizing the assumption and assignment of certain executory contracts and unexpired leases pursuant to sections 363 and 365 of the Bankruptcy Code; and (d) granting related relief.

---

[1] The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification numbers and their respective addresses, are:  Point Blank Solutions, Inc. (9361), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Point Blank Body Armor, Inc. (4044), 2102 S.W. 2nd Street, Pompano Beach, FL 33069; Protective Apparel Corporation of America (9051), 179 Mine Lane, Jacksboro, TN 37757; and PBSS, LLC (8203), 2102 S.W. 2nd Street, Pompano Beach, FL 33069.

Concurrently herewith, the Debtors are filing the *Amended Motion for Order (A) Approving Bid Procedures For the Sale of Substantially All of the Debtors' Assets Related to Operation of Their Bullet, Fragmentation and Stab Resistant Apparel Manufacturing Business; (B) Scheduling An Auction and Hearing To Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts; (D) Approving Certain Expense Reimbursement Provisions and a Break-Up Fee; and (E) Granting Related Relief* (the "Amended Bid Procedures Motion"), which seeks approval of certain sale and bidding procedures for the sale, as more particularly set forth therein (the "Bid Procedures").

By this Amended Sale Motion, the Debtors seek approval of a sale of substantially all of the Debtors' operating assets (the "Sale") to Barrier Acquisition, LLC (the "Stalking Horse Purchaser"), or the highest or otherwise best bidder or bidders (a "Successful Bidder"), at the auction provided for in the Amended Bid Procedures Motion and the Bid Procedures (the "Auction"), to take place in accordance with the order to be entered by the Court on the Amended Bid Procedures Motion (the "Bid Procedures Order").

In support of this Amended Sale Motion, the Debtors respectfully state as follows:

### Preliminary Statement

1.      Pursuant to the Amended Sale Motion, the Debtors seek to continue with the process of obtaining the Court's approval of the sale of assets of the Debtors to the Stalking Horse Purchaser or to the highest or otherwise best bidder or bidders for the assets at auction. On August 26, 2011, the Debtors initially filed a motion to approve bid procedures and a motion to approve the sale of assets (collectively with all exhibits thereto, the "Original Sale Pleadings")

2

based on an earlier version of asset purchase agreement between the Debtors and the Stalking

Horse Purchaser (the "Original Agreement").[2] At the end of the due diligence period under the

Original Agreement (which occurred after the Original Sale Pleadings had been filed and noticed

for hearing) and based upon the results of its diligence, the Stalking Horse Purchaser requested

that the Debtors agree to certain changes to the Original Agreement, including relating to a

reduction in the purchase price.

       2.      On September 27, 2011, after further negotiations and in consultation with

the Debtors' DIP Lenders, the Official Committee of Unsecured Creditors and the Official

Committee of Equity Security Holders each of whom support the relief requested herein, the

Debtors entered into the *Amended and Restated Asset Purchase Agreement* (the "Amended

Agreement") with the Stalking Horse Purchaser.  A copy of the Amended Agreement, without

schedules, is attached hereto as Exhibit A.  The material changes to the terms in the Original

Agreement are (i) a reduction in the amount of the purchase price (before working capital

adjustments) from $30,000,000 to $20,000,000 (Amended Agreement, at § 2.1); (ii) a reduction

of the benchmark for the working capital adjustment from $30,000,000 to $25,000,000

(Amended Agreement, at § 2.7); (iii) a decrease in the amount of the break-up fee from $750,000

---

[2] *See Debtors' Motion for Order:  (A) Approving Bid Procedures for the Sale of Substantially All of the Debtors' Assets Related to Operation of Their Bullet, Fragmentation and Stab Resistant Apparel Manufacturing Business; (B) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts; (D) Approving Certain Expense Reimbursement Provisions and a Break-Up Fee; and (E) Granting Related Relief* [Docket No. 1629], and *Debtors' Motion for Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Assets Outside the Ordinary Course of Business; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Rights, Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 105, 363(b), 363(f) and 363(m); (C) Authorizing the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases Pursuant to Bankruptcy Code Sections 363 and 365; and (D) Granting Related Relief* [Docket No. 1630].

to $500,000 and the amount of the expense reimbursement from $350,000 to $250,000

(Amended Agreement, at § 11.1); and (iv) the elimination of the requirement that the sale order

be a final order as a condition to closing of the proposed sale (Amended Agreement, at § 10.1.4).

In addition, since the Stalking Horse Purchaser has completed its due diligence, there is no

remaining diligence "out" in the Amended Agreement. *See* Amended Agreement, at § 10.2.

Moreover, the prohibition on credit bids has been waived (subject to the Bid Procedures

requirement that any credit bid also include a cash component of at least $750,000). *See*

Amended Agreement, at § 10.1.9. Blacklines reflecting the revisions that have been made to the

Original Agreement and the order attached to the Original Sale Motion are attached to this

Amended Sale Motion as Exhibit B.

      3.      By this Amended Sale Motion, the Debtors seek authorization to sell

substantially all of the assets related to the operation of their bullet, fragmentation and stab

resistant apparel manufacturing business. The proposed transaction documents contemplate that

the assets will be sold free and clear of liens, claims, encumbrances, rights and other interests

and that the sale proceeds will be distributed to pay indebtedness of the estates, including the

Debtors' postpetition secured loans. However, the proposed transaction contemplates that

certain estate assets that are unrelated to the operation of the Debtors' manufacturing business

will be excluded from the sale that is described herein. The Sale does not include, among other

things, material litigation assets, cash and the member interest of PBSS, LLC in LifeStone

Materials, LLC.

**Jurisdiction**

4.     This Court has jurisdiction over this Amended Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (M), (N) and (O).

5.     Venue of these proceedings and this Amended Sale Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     The statutory predicates for the relief sought herein are sections 105, 363, 364, 365, 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9008, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

**Background**

7.     On April 14, 2010 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under the Bankruptcy Code.  The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  No trustee has been appointed in the Debtors' Chapter 11 Cases.

8.     On April 26, 2010, the Office of the United States Trustee formed the Official Committee of Unsecured Creditors (the "Creditors' Committee") and appointed five initial members thereto.

5

9.      On July 27, 2010, the Office of the United States Trustee appointed an

Official Committee of Equity Security Holders (the "Equity Committee" – and collectively with

the Creditors' Committee, the "Committees") and appointed seven initial members thereto.

10.      On May 12, 2010, the Bankruptcy Court entered its *Final Order*

*(1) Authorizing Incurrence by the Debtors of Postpetition Secured Indebtedness With Priority*

*Over All Secured Indebtedness and With Administrative Superpriority, (2) Granting Liens,*

*(3) Authorizing Use of Cash Collateral and Providing Adequate Protection and, (4) Modifying*

*the Automatic Stay* [Docket No. 120] (the "Original Final DIP Order").  Pursuant to the Original

Final DIP Order, the Debtors obtained authority to borrow from their previous postpetition

lender, Steel Partners L.P. ("Steel Partners"), up to the lesser of $20,000,000, or the borrowing

base amount described in the agreement that was the subject of the Original Final DIP Order (the

"Original DIP Agreement"), pursuant to a senior secured, first priority debtor in possession

revolving credit facility.

11.      Because the Original DIP Agreement was to terminate on September 30,

2010, the Debtors commenced a process to sell their assets or, alternatively, to obtain a financial

restructuring of their business, in early July 2010.

12.      The Original DIP Agreement was amended twice by orders entered on

September 1, 2010 [Docket No. 546] and November 9, 2010 [Docket No. 750], respectively.

These amendments contained sale milestones that required, among other things, the filing of a

motion to approve an asset purchase agreement or a proposed plan of reorganization by

6

November 1, 2010 (which was subsequently extended to November 19, 2010). Also pursuant to these amendments, the Original DIP Agreement was extended to December 31, 2010.

13.    On November 24, 2010, the Debtors filed their *Motion for an Order (a) Approving Asset Purchase Agreement and Authorizing Sale of Assets Outside Ordinary Course of Business; (b) Authorizing the Sale Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code, et seq.* (the "First Sale Motion") [Docket 802] and *Motion for Entry of an Order (a) Approving Bid Procedures for the Sale of the Debtors' Assets, (b) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto; et seq.* (the "First Bid Procedures Motion") [Docket 800], in order to complete the sale process prior to the expiration of the Original DIP Agreement on December 31, 2010.

14.    The Creditors' Committee filed an objection to the First Bid Procedures Motion that was joined and supplemented by the Equity Committee [Docket No. 838 and Docket No. 842]. Both the Creditors' Committee and the Equity Committee advocated against the First Sale Motion and in favor of pursuing a transaction that would provide the Debtors with replacement debtor in possession financing to replace the financing of Steel Partners and proceeding with the restructuring transaction set forth the First Plan Support Agreement (defined below).

15.    On December 6, 2010, the Creditors' Committee and the Equity Committee jointly filed their *Motion for Interim and Final Orders (A) Authorizing (i) Replacement Post-Petition Secured Financing, (ii) Use of Cash Collateral and*

7

*(iii) Repayment of Existing Post-Petition Secured Financing; (B) Authorizing Entry Into Plan*

*Support Agreement; and (C) Scheduling a Final Hearing* [Docket 874] (the "Replacement DIP

Financing Motion") pursuant to which the Creditors' Committee and Equity Committee both

sought approval of replacement debtor in possession financing by the DIP Lenders (defined

below) and the First Plan Support Agreement.

       16.     After the filing of the of the Replacement DIP Financing Motion, the

Debtors engaged in discussions with the Creditors' Committee and the Equity Committee, as

well as with the proposed lenders under the Replacement DIP Financing Motion, Privet Fund

Management (as investment manager to Privet Fund LP and Privet Opportunity Fund I, LLC),

Privet Opportunity Fund I, LLC, Prescott Group Capital Management, LLC and Lonestar Capital

Management, LLC, as investment advisor to Lonestar Partners, LP and manager to PB Funding,

LLC (together, the "DIP Lenders") with respect to the transactions that would eventually provide

the Debtors with replacement debtor in possession financing and that certain *Plan Support*

*Agreement*, dated as of December 10, 2010 (the "First Plan Support Agreement").

       17.     After extensive discussions and negotiations among the Debtors, the

Creditors' Committee, the Equity Committee, and the DIP Lenders, those lenders agreed to

provide $25,000,000 via a post-petition secured credit facility (the "Replacement DIP

Agreement") secured by liens on substantially all of the Debtors' assets.

       18.     The First Plan Support Agreement was approved on December 10, 2010 as

was the Replacement DIP Agreement, on an interim basis [Docket No. 912] (the "Replacement

8

Interim DIP Order"). The Replacement DIP Agreement was approved on a final basis on

December 29, 2010 [Docket No. 968] (the "Replacement Final DIP Order").

      19.    In accordance with provisions of the First Plan Support Agreement, both

the *Disclosure Statement Describing Joint Chapter 11 Plan of Reorganization* [Docket 1007]

(the "Disclosure Statement") and the *Joint Chapter 11 Plan of Reorganization* [Docket 1006]

(the "Plan") were filed on January 12, 2011. The proponents of the Plan were the Debtors, the

Creditors' Committee, the Equity Committee, and each of the DIP Lenders (collectively, the

"Plan Proponents"). Subsequently, the Plan Proponents (which no longer included the Equity

Committee) modified the Disclosure Statement and Plan, in order to address the objection thereto

raised by the Securities and Exchange Commission, which modifications were reflected in the

*Disclosure Statement Describing Amended Joint Chapter 11 Plan of Reorganization*, dated as of

April 8, 2011 (the "Amended Disclosure Statement") and the *Amended Joint Chapter 11 Plan of*

*Reorganization*, dated as of April 8, 2011 (the "Amended Plan").[3]

      20.    On March 28, 2011, the U.S. Trustee reconstituted the original Equity

Committee through its *Third Amended Notice of Appointment of Committee of Equity Secured*

*Holders*. At a meeting of the reconstituted Equity Committee held on March 31, 2011, the

reconstituted Equity Committee terminated its then counsel, Morrison Cohen LLP and Bayard,

P.A., and engaged Baker & McKenzie and Bifferato LLC as its new counsel.

      21.    Because the provisions of the First Plan Support Agreement required the

consent of all parties thereto with respect to the modification or amendment of such agreement,

---

[3] The SEC initially contacted the Debtors on January 27, 2011 by letter pursuant to which it set forth its
concerns with the proposed Rights Offering.

DOCS_LA:245176.4 70934-001

the Plan Proponents (minus the Equity Committee who no longer supported the plan after the

addition of the three new members on March 28, 2011) entered into that certain *Second Plan*

*Support Agreement* (the "Second Plan Support Agreement"), which replaced the provisions of

the terminated First Plan Support Agreement and did not have the Equity Committee as a

signatory thereto.

         22.    On April 8, 2011, the Plan Proponents also filed their *Motion for Order*

*Approving (A) Second Plan Support Agreement; and (B) Amendment to Debtor in Possession*

*Financing Agreement* [Docket 1284] (the "Second Plan Support Agreement Approval Motion")

pursuant to which they sought approval of the Second Plan Support Agreement and approval of

an amendment to the Replacement DIP Agreement, which, among other things, extended the

expiration date of the Replacement DIP Agreement from the current June 15, 2011 date through

and including July 31, 2011.  The Equity Committee filed objections to the Amended Disclosure

Statement, the Amended Plan, approval of the Second Plan Support Agreement, and the

amendment to the Replacement DIP Agreement.

         23.    On April 21, 2011, the Court conducted a hearing on, *inter alia*, the

Amended Plan and Amended Disclosure Statement.  During the hearing, the Court, among other

things, directed the Plan Proponents to meet and confer in order to try and consensually resolve

their disagreements.  Pursuant to the Court's directives, the parties did meet and confer.

Ultimately after extensive negotiations the parties were unable to agree on the terms of an

amended plan of reorganization.  Accordingly, the Debtors, with the support of both Committees

Case 10-11255-CSS    Doc 1705    Filed 09/27/11    Page 11 of 36

and the DIP Lenders, are proceeding with the sale of substantially all of their operating assets on the terms and pursuant to the procedures underlying this Amended Sale Motion.[4]

24.       In the absence of agreement on an amended Plan, in order to maximize the value of their business and assets for the benefit of the Debtors' stakeholders, the Debtors determined that they would recommence efforts to market and to sell the Debtors' assets related to the operation of their bullet, fragmentation and stab resistant apparel manufacturing business to the highest or otherwise best bidder during the bankruptcy cases.

### The Business

25.       PBSI is a leading manufacturer and provider of bullet, fragmentation and stab resistant apparel and related ballistic accessories, which are used domestically and internationally by military, law enforcement, security and corrections personnel, as well as various government agencies.  PBSI and its debtor subsidiaries, Point Blank Body Armor, Inc. ("PBBA") and Protective Apparel Corporation of America, Inc. ("PACA") are also major suppliers in the domestic law enforcement market with broad brand recognition.

26.       The Debtors manufacture several body armor products and related accessories that are sold worldwide to a variety of domestic and international military and law

---

[4] On September 19, 2011, the Court entered its order approving the Debtors' *Motion of Debtors for Approval of Forbearance Agreement Under Replacement DIP Credit Agreement* (the "Forbearance Agreement Motion").  As described therein, the June 15, 2011, maturity date under the Replacement DIP Credit Agreement has occurred without the repayment of the loans made to the Debtors under the agreement.  As a consequence, an event of default arose under the Replacement DIP Credit Agreement.  The Debtors and the DIP Lenders entered into a forbearance agreement dated August 26, 2011 (the "Forbearance Agreement"), under which the DIP Lenders have agreed, pursuant to the terms and conditions set forth therein, to forbear (though November 11, 2011) from exercising their rights and remedies under the Replacement DIP Credit Agreement while the Debtors pursue the sale process described herein and otherwise continue their operations in the ordinary course of business according to the terms of an extended approved budget.

enforcement customers.  The Debtors' armor products and related accessories protect individuals

from bodily injury and death from multiple threats, including bullets, knives, and other sharp

instruments and shrapnel fragments.  The Debtors design, build and sell advanced systems that

safeguard users from specific threats as well.  The Debtors' products are sold through a variety

of means, including sales contracts, a corporate sales force, sales agents and a network of

distributors.

      27.     The Debtors maintain and conduct manufacturing and related operations

in two leased manufacturing facilities in Pompano Beach, Florida (also the company's

headquarters) and Jacksboro, Tennessee.

      28.     The proposed transaction that is described herein contemplates the sale of

the Debtors' assets that relate to the operation of the Debtors' bullet, fragmentation and stab

resistant apparel manufacturing business (the "Assets") to the Stalking Horse Purchaser or a

successful overbidder.  Among other things, the proposed transaction does not include, inter alia,

material litigation assets, cash and the member interest of PBSS, LLC in LifeStone Materials,

LLC ("LifeStone").

<div align="center">**Marketing Process**</div>

      29.     The Debtors retained CRG Partners Group LLC ("CRG") prepetition as

their financial advisor and investment banker to advise the Debtors on restructuring and business

matters, including the potential marketing and sale of their assets.  Significant efforts have been

undertaken by the Debtors and their agents, including the preparation of marketing materials,

creation of an electronic data room and other marketing efforts.

<div align="center">12</div>

30.     As discussed above, the Debtors initially conducted a process to sell their assets in 2010.  The Debtors formally commenced that process on July 8, 2010.  On or about July 9, 2010, CRG sent out a teaser memorandum highlighting the Debtors' assets to approximately 2,000 industry participants and strategic and financial investors.  The Debtors drafted and provided an offering memorandum and access to their data room to those parties who signed nondisclosure agreements.  Over sixty parties returned executed non-disclosure agreements and conducted initial due diligence.  CRG created an electronic data room with key documents and company-specific information in order to streamline the due diligence process.  CRG received sixteen initial indications of interest, which were subsequently narrowed to six letters of intent.  To those parties submitting letters of intent, CRG provided additional, more detailed information about the Debtors, and scheduled meetings with the Debtors' management.  The Debtors, with the assistance of CRG and other professionals, subsequently engaged in negotiations with certain of the parties submitting letters of intent on the details of a sale.  These negotiations terminated in December 2010 upon the commencement of efforts to confirm a plan of reorganization that would not include a sale of the Debtors' assets.

31.     Commencing in late April of 2011, CRG communicated to approximately 32 parties that had previously expressed an interest in acquiring the Debtors' assets that the Debtors were considering the sale of their operating assets as an alternative to the Amended Plan.  CRG has provided access to the electronic data room to each of the parties who signed, or had previously signed, nondisclosure agreements.  CRG has received nine letters of intent.  To certain parties submitting letters of intent, CRG provided additional, more detailed information

13

about the Debtors, and scheduled meetings with the Debtors' management. The Debtors, with

the assistance of CRG and other professionals, subsequently engaged in negotiations with certain

of the parties submitting letters of intent on the details of a sale. Additionally, the Debtors will

send, or will have sent, notice of the Amended Sale Motion and Bid Procedures to all parties that

CRG believes may be potentially interested in acquiring the Assets.[5]

        32.    On August 26, 2011, after extensive negotiations, the Debtors entered into

an *Asset Purchase Agreement* (the "Original Agreement") with the Stalking Horse Purchaser.

Pursuant to the terms of the Original Agreement, the Stalking Horse Purchaser agreed to

purchase the Assets and assume certain contracts and leases, subject to an auction and sale

process. On August 26, 2011, based on the Original Agreement, the Debtors filed a motion to

approve bidding procedures and expense reimbursement and a break-up fee and a motion to

approve the sale of assets to the Stalking Horse Purchaser or other party submitting a higher or

otherwise better bid. The bid procedures motion was set for hearing on September 15, 2011. At

the end of the due diligence period under the Original Agreement (which occurred after the

Original Sale Pleadings had been filed and the bid procedures motion noticed for hearing) and

based upon the results of its diligence, the Stalking Horse Purchaser requested that the Debtors

agree to certain changes to the Original Agreement, including relating to a reduction in the

purchase price.

---

[5] In addition to this service upon the approximately 30 parties known by the Debtors to be potentially interested in acquiring the Debtors' operating assets, the Debtors intend to send notice of the sale hearing and amended bid procedures to the approximately 2,000 parties described in paragraph 28, above. In light of the volume, this notice will be in the form of an email to which the notice of the sale hearing will be attached.

33.     On September 27, 2011, after further negotiations, the Debtors entered

into the *Amended and Restated Asset Purchase Agreement* with the Stalking Horse Purchaser, a

copy of which is attached hereto, without schedules, as <u>Exhibit A</u> (the "Amended Agreement").

The material terms of the Amended Agreement are set forth below.  Pursuant to the terms of the

Amended Agreement and subject to entry by the Court of an order substantially in the form

attached hereto as <u>Exhibit B</u> (the "Sale Order"), the Stalking Horse Purchaser, subject to higher

or better bids, will purchase the Assets and assume certain contracts and leases.  The Committees

and DIP Lenders have reviewed and provided detailed input on the Amended Agreement and the

Sale Order.

34.     The Debtors believe that the consummation of the Sale to the Stalking

Horse Purchaser or to a successful overbidder will provide their creditors and other stakeholders

with the best opportunity possible for maximizing value by realizing upon the Assets through a

sale as a going concern.

<u>**Amended Agreement With Stalking Horse Purchaser**</u>

35.     The key terms of the Stalking Horse Purchaser's Amended Agreement and

the Sale Order are summarized below.  The description below only summarizes certain

provisions of the Amended Agreement and the Sale Order as a convenience to the Court and

parties in interest, and the terms of the Amended Agreement or Sale Order, as applicable, control

in the event of any inconsistency.

a.     **Purchase Price**.  The purchase price payable for all the Assets shall be

$20,000,000 in cash, subject to certain adjustments as set forth in section 2.7 of the Amended

Agreement (the "Purchase Price"). *See* Agreement § 2.1. The provisions in section 2.7 of the

Amended Agreement contemplate that the Purchase Price may be adjusted, either up or down,

depending upon the extent to which the computation of Working Capital (as defined in the

Amended Agreement) varies from $25,000,000 by more than $250,000. *See* Amended

Agreement, at § 2.7.

        b.    **Assets**. Substantially all of the assets that the Sellers heretofore used

primarily in connection with or arising out of the operation of the manufacturing and sale of

bullet, fragmentation, and stab resistant apparel and related ballistic accessories (the "Business"),

except for the Excluded Assets as defined in the Amended Agreement (as summarized below),

including certain leases and contracts; personal property; intangible property such as patents,

processes, trademarks and good will of the business; governmental permits; accounts receivable;

inventory; vendor items; certain claims and certain insurance rights related to the Business. *See*

Amended Agreement, at Recitals A & B and § 1.1.

        c.    **Excluded Assets.** The assets that are excluded from the sale include,

among other items:

        (i)    all cash deposits, certain prepaid items, cash, and cash equivalents;

        (ii)    certain tax refunds, certain rebates, credits and similar items;

        (iii)    certain insurance proceeds;

        (iv)    Excluded Contracts (as defined in section 1.2 of the Amended Agreement);

        (v)    securities of any Seller or any other entity, including, without limitation, all equity or other interests of PBSS in LifeStone and all promissory notes receivable owing by LifeStone to PBSS;

        (vi)    certain rights, claims and causes of action of the Debtors;

(vii)    preference or avoidance claims and actions of the Debtors, including, without limitation, any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code; and

(viii)    certain additional assets, as set forth in the Amended Agreement.

*See* Amended Agreement, at § 1.2.

d.    **Assumed Liabilities**.  The Stalking Horse Purchaser shall assume all the following liabilities and obligations of the Sellers:

(i)    all obligations of the Sellers now existing or hereafter arising or accruing under the leases and contracts actually assigned to the Stalking Horse Purchaser at the closing;

(ii)    employee liabilities of the Sellers arising or accruing to the extent incurred in the ordinary course;

(iii)    trade payables now existing or hereafter arising or accruing to the extent incurred in the ordinary course after the commencement of these bankruptcy cases and obligations to customers of the Sellers for refunds, rebates, returns, discounts and the like existing as of the closing date;

(iv)    cure obligations required to be paid pursuant to the Sale Order as a condition to the Sellers' assumption and assignment of executory contracts and unexpired leases; and

(v)    such additional liabilities and obligations as may be set forth or described on Schedule 2.2.1-(vii) to the Amended Agreement.

*See* Amended Agreement, at § 2.4.

e.    **Closing and Related Deadlines**.  The closing shall be held upon the second (2nd) business day following the satisfaction of the last of the conditions set forth in sections 3.1 and 3.2 of the Amended Agreement.  Amended Agreement at § 2.8.2.  The Amended Agreement may be terminated by either the Stalking Horse Purchaser or the Sellers if

(i)    the hearing on the Amended Bid Procedures Motion is not held on or before October 10, 2011;

(ii)    the order on the Amended Bid Procedures Motion has not been entered within three (3) business days following such hearing;

<div style="margin-left:2em">

(iii)    the hearing on this Motion is not held within seven (7) days following the Auction;

(iv)    the Bankruptcy Court has not entered the order on this Motion within three (3) business days following such hearing; or

(v)    the closing shall not have occurred by the close of business that is the date that is three (3) business days after entry of the order on this Motion.

</div>

*See* Amended Agreement, at §§ 10.1.2, 10.1.3 & 10.1.4.

f.    **Good Faith Deposit.** Concurrently with the mutual execution and delivery of the Amended Agreement, the Stalking Horse Purchaser deposited an amount equal to $1,500,000 (the "Deposit"), which deposit is held in an interest-bearing escrow account at Wells Fargo. At closing, the Deposit and any accrued interest thereon shall be credited against the Purchase Price. However, upon the termination of the Amended Agreement for any reason other than termination by Sellers pursuant to section 10.1.6 of the Amended Agreement, the Deposit shall be refunded, together with all interest earned thereon, to the Stalking Horse Purchaser. The Deposit shall become nonrefundable upon the termination of this Amended Agreement by the Sellers pursuant to section 10.1.6 of the Amended Agreement. *See* Amended Agreement, at § 2.2.

g.    **Representations and Warranties**. The Amended Agreement contains standard representations and warranties for a transaction of this nature. *See* Amended Agreement, Arts. 4 & 5.

h.    **Indemnification.** The Amended Agreement provides that the Sellers and the Buyer each represent and warrant to the other that, other than any success fee to which CRG Partners (the "Broker") may be entitled in connection with the consummation of the transactions

18

contemplated therein, such party has incurred no liability to any broker or agent with respect to the payment of any commission or other compensation regarding the consummation of the transaction contemplated thereby.   It is agreed that if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions are ever asserted against the Stalking Horse Purchaser or the Sellers in connection with this transaction by any party other than the Broker (for whose commission or other compensation the Sellers shall be solely responsible), all such claims shall be handled and paid by the party whose actions form the basis of such claim and such party shall indemnify, defend (with counsel reasonably satisfactory to the Party entitled to indemnification), protect and save and hold the other harmless from and against any and all such claims or demands asserted by any person, firm or corporation in connection with the transaction contemplated by the Amended Agreement. *See* Amended Agreement, at § 12.12.

       i.     **Use of Proceeds.**  The Sale Order provide as follows with respect to the use of proceeds of the sale:

      (i)     At or as soon as reasonably practicable after the Closing Date, the Debtors shall disburse the Purchase Price (subject to the terms of the Amended Agreement relating thereto) and all other cash and cash equivalents of Debtors as of such disbursement date, including cash generated from operations, but in each case excluding the Retained Funds (as defined below), solely as follows: (i) first, for deposit to the Carve Out Account (as defined in the DIP Order) on account of accrued but unpaid Professional Fees and Expenses (as defined in the DIP Credit Agreement) in an amount not to exceed (a) the Professional Fee Carve Out (as defined in the DIP Credit Agreement and modified by the forbearance agreement relating thereto) in accordance with the terms applicable to such Professional Fee Carve Out, plus (b) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and fees payable to the clerk of the Bankruptcy Court; and (ii) second, to the DIP Lenders, *pro rata* in accordance with the amount of the Obligations (as such term is defined in the DIP Credit Agreement) owed to each DIP Lender, to reduce the outstanding amount of the

Obligations due under the Loan Documents until indefeasibly paid in full in cash. The "Retained Funds" shall mean the sum of: (w) $4.5 million less the amount, if any, by which the Purchase Price at the Closing Date has been reduced pursuant to Section 2.7.2 of the Amended Agreement (the "Purchase Price Adjustment Reserve"), (x) funds (the *"Post-Closing Expense Reserve"*) sufficient in the Debtors' reasonable judgment (subject to consultation with the DIP Lenders) to pay any accrued operating expenses set forth in the Approved Budget that were unpaid as of the Closing Date (the "Accrued Expenses"), (y) all proceeds of litigation (other than litigation relating to the Amended Agreement) and (z) the sum of $1,000,000.

(ii)     The Deposit and the Purchase Price Adjustment Reserve shall be disbursed in the following priority: (1) first, to the Purchaser, to cover such amounts, if any, that are payable to the Purchaser pursuant to Section 2.7 of the Amended Agreement, and (2) second, to the DIP Lenders on account of any remaining Obligations outstanding under the DIP Facility (or to the Debtors, if such Obligations have been indefeasibly paid in full in cash), which payment shall be made not later than two (2) business days after the final adjustment to the Purchase Price. The Post-Closing Expense Reserve and any proceeds of the Toyobo litigation, if not disbursed pursuant to the Approved Budget, shall be disbursed: (a) first, to the payment of the Accrued Expenses and (b) second, to the extent of any remaining funds, to the DIP Lenders on the earlier of the Commitment Termination Date (as defined in the DIP Order) and the date that is two (2) weeks after the Closing Date on account of any remaining Obligations outstanding under the DIP Facility. For the avoidance of doubt, any Retained Funds remaining in the Debtors' estates shall remain subject in all respects to the DIP Liens (as defined in the DIP Order), which shall be subject to any applicable payment priorities set forth above, and no further action on the part of the DIP Lenders shall be required for perfection as to such funds; *provided, however,* nothing in this Order shall be deemed a finding or ruling as to the issues raised in the Equity Committee's *Motion of the Official Committee of Equity Security Holders under FRCP 60(b) for Order (a) Vacating Interim and Final DIP Financing Orders [Docket No. 912, 968] and (b) Granting Related Relief* [Docket No. 1360], and all parties' rights in respect thereof are expressly preserved.

*See* Sale Order, at ¶¶ 14 & 15.

j.       **Record Retention.** Section 12.3 of the Amended Agreement provides

that, for a period of 3 years after closing, the Debtors shall have reasonable access to books and

records, in connection with the Debtors' pursuit and defense of pending litigation and claims, the

preparation of tax returns, financial statements, reports and filings and for any other reasonable purpose, to the extent that such access may reasonably be required by such party. *See* Amended Agreement, at § 12.3. The Debtors will attempt to retain such books and records that they believe will assist with pending or anticipated litigation and tax matters. The Debtors believe that the proposed 3-year access period for the Debtors to retain access to books and records that are transferred in the sale is sufficient for the Debtors to resolve significant pending and anticipated litigation and tax matters.

        k.    **Credit Bid.** The Purchase Price in the Amended Agreement does not contain a credit bid component. However, the Bid Procedures permit the DIP Lenders to submit credit bids for the Assets. The DIP Lenders' right to submit a Credit Bid shall be subject to their rights and obligations under the DIP Credit Agreement and the other DIP Financing Documents. In addition, any Credit Bid will be a Qualified Bid only if such Bid includes a cash component of at least $750,000.

        36.    The Debtors seek authority to sell the Assets to the Stalking Horse Purchaser, or to a higher or otherwise better bidder or bidders, pursuant to the terms of the Amended Agreement and the Sale Order.

        37.    The Debtors believe that the sale of the Assets as a going concern to the Stalking Horse Purchaser or a higher or otherwise better bidder determined in accordance with the Bid Procedures is far preferable to a piecemeal liquidation of the Debtors' assets. The Debtors further believe that their obtaining the Stalking Horse Purchaser as a stalking horse bidder, marketing their Assets with the assistance of CRG and their other professionals over the

last year, and holding the Auction of such Assets on the date specified by the Court, will result in the highest or otherwise best consideration for the Assets.

38.     The Debtors have examined the alternatives to a going concern sale of the Assets and have determined that, in light of the inability of the Debtors' constituencies to agree on a further amended plan, as well as the Debtors' financial situation, liquidity needs, and value of the assets as an operating unit, a viable alternative to such a sale does not exist. Moreover, as discussed above, the Replacement DIP Financing has matured and the terms of the forbearance agreement with the DIP Lenders that the Debtors are seeking to approve mandates that a sale is consummated by November 4, 2011.

39.     For the reasons stated above, and in light of the obvious benefits to the estates, the Debtors have determined, in the exercise of their business judgment, to consummate the proposal submitted under the Amended Agreement with the Stalking Horse Purchaser or, if applicable, another bidder in the event that the Debtors receive a higher or otherwise better bid to the transaction set forth in the Amended Agreement.

### Relief Requested

40.     The Debtors are requesting that this Court, *inter alia*, (a) authorize the sale of the Assets to the Stalking Horse Purchaser pursuant to the Amended Agreement, or, alternatively, to the other Successful Bidder(s) pursuant to such competing agreement(s) with such other Successful Bidder(s) entered into in accordance with the Bid Procedures Order, (b) authorize such sale to be free and clear of all liens, claims, rights, encumbrances or other interests pursuant to sections 105, 363(b), 363(f) and 363(m) and 365 of the Bankruptcy Code,

22

with such liens, claims, rights, encumbrances and interests (collectively, the "Liens") attaching to the sale proceeds of the Assets with the same validity (or invalidity), priority and perfection as existed immediately prior to such sale; (c) approve the assumption and assignment of the Assumed Contracts (as hereinafter defined) under Bankruptcy Code sections 363 and 365, subject to, and at the time of, closing under the Amended Agreement; and (d) grant such other relief as may be necessary or appropriate.

### Basis for Relief

41.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

42.    A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for doing so. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Titusville Country Club*, 128 B.R. 396 (W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991). The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling

23

circumstances" standard, finding the "sound business purpose" standard applicable and,

discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there
> is a sound business purpose for the sale include: the proportionate
> value of the asset to the estate as a whole; the amount of elapsed
> time since the filing; the likelihood that a plan of reorganization
> will be proposed and confirmed in the near future; the effect of the
> proposed disposition of the future plan of reorganization; the
> amount of proceeds to be obtained from the sale versus appraised
> values of the Property; and whether the asset is decreasing or
> increasing in value. 124 B.R. at 176.

43.     The *Delaware & Hudson Railway* court further held that "[o]nce a court is

satisfied that there is a sound business reason or an emergency justifying the pre-confirmation

sale, the court must also determine that the trustee has provided the interested parties with

adequate and reasonable notice, that the sale price is fair and reasonable and that the Buyer is

proceeding in good faith." *Id.*

44.     The Debtors have proposed the sale of the Assets after thorough

consideration of all viable alternatives and have concluded that the sale is supported by many

sound business reasons.  This conclusion is supported by both of the Committees and all of the

DIP Lenders.

45.     The Debtors, with the assistance of CRG, have extensively marketed the

Assets over the last year and have proposed Bid Procedures designed to maximize the purchase

price realized from the sale of the Assets.

46.     The Debtors have articulated sound business reasons, set forth above, for a

sale of the Assets on the proposed schedule. *See, e.g., In re Tempo Tech.*, 202 B.R. 363, 369-70

(D. Del. 1996) (approving a sale of all of the debtor's assets, within a month after the petition

date, where the debtor faced a cash shortfall, operated in an industry where there were few

potential buyers, and anticipated continuing losses and a decline in value of the bankruptcy

estates); *Delaware & Hudson Railway*, 124 B.R. at 177 (affirming the bankruptcy court's

approval of a sale of substantially all of the debtor's assets where the debtor would have been "in

liquidation mode if required to delay a sale until after filing a disclosure statement and obtaining

approval for a reorganization plan"); *Titusville Country Club*, 128 B.R. at 400 (granting an

expedited hearing on a motion to approve a sale as a result of "deterioration" of the debtor's

assets); *Coastal Indus., Inc. v. Internal Revenue Service (In re Coastal Indus., Inc.)*, 63 B.R. 361,

366-69 (Bankr. N.D. Ohio 1986) (approving an expedited sale pursuant to section 363(b) just

five weeks after the petition date where the debtor was suffering operating losses).

47.    The Debtors believe that, as a result of the marketing efforts that have

been undertaken and that they will continue to undertake, the highest or otherwise best offer(s)

obtained through the proposed Bid Procedures and Auction will provide maximum value to the

Debtors under the current circumstances.  Other potential buyers will be served with this

Amended Sale Motion and/or notice thereof.  The fairness and reasonableness of the

consideration to be paid by the Successful Bidder(s) is demonstrated by the marketing efforts

that the Debtors will undertake, followed by a fair and reasonable sale process including a

potential auction, and culminating in one or more proposed sales.

48.    The sale of the Assets is supported by sound business reasons and is in the

best interests of the Debtors and their estates.  Accordingly, the Debtors request approval under

Bankruptcy Code section 363(b) of the Sale to the Successful Bidder(s), as set forth herein.

**The Proposed Sale Satisfies the Requirements of Section 363(f) of the
Bankruptcy Code For a Sale Free and Clear of Liens, Claims, and Interests**

49.     Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell Property under subsection (b) or (c) of this section
> free and clear of any interest in such Property of an entity other than the
> estate, only if –
>
> (1) applicable nonbankruptcy law permits sale of such Property free and
> clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such Property is to be sold
> is greater than the aggregate value of all liens on such Property;
>
> (4) such interest is in a bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to
> accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

50.     Section 363(f) of the Bankruptcy Code provides for the sale of assets "free

and clear of any interests." The term "any interest," as used in section 363(f), is not defined

anywhere in the Bankruptcy Code. *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209

F.3d 252, 259 (3d Cir. 2000). In *Folger Adam*, the Third Circuit specifically addressed the scope

of the term "any interest." 209 F.3d at 258. The Third Circuit observed that while some courts

have "narrowly interpreted that phrase to mean only *in rem* interests in Property," the trend in

modern cases is toward "a broader interpretation which includes other obligations that may flow

from ownership of the Property." *Id.* at *258* (citing 3 *Collier on Bankruptcy* ¶ 363.06[1]). As

determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th

Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*, the

26

scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in *Folger*

*Adam* made clear that debtors "could sell their assets under §363(f) free and clear of successor

liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

      51.    Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of

the requirements enumerated therein will suffice to warrant the sale of the Assets free and clear

of all the Liens, except with respect to any Liens that constitute Assumed Liabilities under the

Amended Agreement. *See Citicorp Homeowners Services, Inc. v. Elliot*, 94 B.R. 343, 345 (E.D.

Pa. 1988). The DIP Lenders have consented to the Sale and thus section 363(f)(2) is satisfied as

to their liens on the Assets. Moreover, the Debtors submit that each Lien that is not an assumed

liability satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and

that any such Lien will be adequately protected by either being paid in full at the time of closing,

or by having it attach to the sale proceeds, subject to any claims and defenses the Debtors may

possess with respect thereto. The Debtors accordingly request authority to convey the Assets to

the Successful Bidder(s), free and clear of all Liens except for the Liens that are Assumed

Liabilities under the express terms of the Amended Agreement, with such Liens to attach to the

proceeds of the Sale, with the same validity (or invalidity), priority and perfection as existed

immediately prior to the Sale, subject to the terms of the Amended Agreement and the Sale

Order.

      52.    The Debtors have conducted a UCC search of purported lienholders of the

Assets in conjunction with the proposed Sale of the Assets. The Debtors have served such

27

purported lienholders with notice of this Amended Sale Motion, and will serve notice of the Sale

Order if and when such order is entered by the Court.

53.    Accordingly, this Court should approve the sale of the Assets to the

Successful Bidder(s) free and clear of Liens under Bankruptcy Code section 363(f), and any

potential claimants should be compelled to look exclusively to the proceeds of the sale for

satisfaction of their claims.

**Good Faith Under Section 363(m) of the Bankruptcy Code;**
**Sale Not In Violation of Section 363(n) of the Bankruptcy Code**

54.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of Property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such Property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(n) of the Bankruptcy Code, among other things, provides, in

turn, that a trustee may avoid a sale under such section if the sale price was controlled by an

agreement among potential bidders as the sale.  *See* 11 U.S.C. § 363(n).  Although the

Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of*

*Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), held that:

> [t]he requirement that a Buyer act in good faith . . speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a Buyer's good faith
> status at a judicial sale involves fraud, collusion between the Buyer
> and other bidders or the trustee, or an attempt to take grossly unfair
> advantage of other bidders.

788 F.2d at 147 (citations omitted).

55.    The Amended Agreement is a negotiated, arms' length transaction, in which the Stalking Horse Purchaser has acted in good faith, without collusion or fraud of any kind, and in compliance with the *Abbotts Dairies* standards.  The Stalking Horse Purchaser is not an "insider" or "affiliate" of the Debtors as those terms are defined in the Bankruptcy Code. Neither the Debtors nor the Stalking Horse Purchaser has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or otherwise implicate section 363(n) of the Bankruptcy Code with respect to the consummation of the sale transaction or the transfer of the Assets and the Assumed Contracts to the Stalking Horse Purchaser.  In addition, if a party other than the Stalking Horse Purchaser is the Successful Bidder, the Debtors intend to make an appropriate showing at the Sale Hearing that the purchase agreement with the other Successful Bidder is a negotiated, arms' length transaction, in which the Successful Bidder at all times has acted in good faith under and otherwise in accordance with such standards.

56.    The Debtors thus request that the Court find that the Stalking Horse Purchaser or the Successful Bidder has purchased the Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code, and is entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code.

**B.    Authorization of Assumption and Assignment of Assumed Contracts**

57.    In order to enhance the value to the Debtors' estate, the Debtors request approval of the assumption and assignment of the executory contracts and unexpired leases as identified in the Amended Agreement (the "Assumed Contracts")[6] to the Successful Bidder(s)

---

[6]  The inclusion of any agreement as an Assumed Contract does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under section

upon the closing of the transactions contemplated under the Amended Agreement and payment

of the cure costs (the "Cure Costs"), which amounts, if any, are what the Debtors believe are

owed to each counterparty (each a "Counterparty," and collectively, the "Counterparties") to an

Assumed Contract in order to cure any defaults that exist under such contract or lease.

58.    If a contract or lease is assumed and assigned pursuant to the Court's order

approving same, then unless the affected counterparty properly files and serves an objection to

the Cure Costs and satisfies all its burdens on any such objection, the Counterparty will receive

at the time of the closing (or as soon as reasonably practicable thereafter), the Cure Costs, with

payment made pursuant to the terms of the applicable Amended Agreement, or the agreement of

the applicable Successful Bidder.

59.    The Successful Bidder(s), on behalf of the Debtors, shall promptly pay or

cause to be paid the Cure Costs with respect to the Assumed Contracts, other than those Cure

Costs, if any, which are to be paid by the Debtors pursuant to the agreement with the Successful

Bidder(s).  The Successful Bidder(s) shall be responsible for satisfying any requirements

regarding adequate assurances of future performance that may be imposed under section 365(b)

of the Bankruptcy Code in connection with the proposed assignment of any Assumed Contracts,

which the Stalking Horse Purchaser shall satisfy through its promise to perform obligations

under the Assumed Contracts following closing of the Sale.  The Debtors propose that the Court

make its determinations concerning adequate assurance of future performance under the

Assumed Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing or in

---

365 of the Bankruptcy Code, and the Debtors expressly reserve the right to challenge the status of any
agreement included as an Assumed Contract.

DOCS_LA:245176.4 70934-001

the case of any Assumed Contracts not assumed and assigned to the Successful Bidder(s) at the

Sale Hearing, at such other hearing to approve assumption and assignment of such Assumed

Contract to the Successful Bidder(s). The Debtors request that Cure Costs disputed by any

Counterparty be resolved by the Court at the Sale Hearing or at such other hearing to approve

assumption and assignment of the relevant contract or lease.

      60.    Except to the extent otherwise provided in the agreement(s) entered into

with the Successful Bidder(s), subject to the payment of any Cure Costs, the assignee of any

Assumed Contracts will not be subject to any liability to the assigned contract or lease

counterparty that accrued or arose before the closing date of the sale of the Assets and the

Debtors shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k)

of the Bankruptcy Code.

      61.    The Debtors further request that the Sale Order provide that the Assumed

Contracts will be assigned to, and remain in full force and effect for the benefit of, the applicable

Successful Bidder, notwithstanding any provisions in the Assumed Contracts, including those

described in sections 365(b)(2) and (f)(1) and (f)(3) of the Bankruptcy Code, that prohibit such

assignment.

      62.    Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

31

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)      the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)      adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

63.      Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor in possession's decision to assume an executory contract, courts have consistently applied a "business judgment" test when reviewing such a decision. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *In re Taylor*, 913 F.2d 102 (3d Cir. 1990); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36 (3d Cir. 1989).

32

Accordingly, assumption or rejection of any executory contract is appropriate where the assumption or rejection would benefit the estate. *Sharon Steel*, 872 F.2d at 40. The assumption and assignment of the Assumed Contracts, or any of them, is a necessary part of the proposed Sale and, as stated above, will benefit the estates of the Debtors.

64. As set forth above with respect to Assumed Contracts to be assumed and assigned pursuant to the Sale, the Debtors will have sent a copy of the Sale Notice and Cure Notice to all Counterparties to the Assumed Contracts, notifying such Counterparties of the potential assumption by the Debtors and assignment to the Successful Bidder(s) of the Assumed Contracts at the Sale Hearing.

65. The Counterparties will have sufficient opportunity to file an objection to the proposed Cure Costs set forth on the Cure Notice. To the extent no objection is filed with regard to a particular cure amount, such cure amount shall be binding on the applicable contract or lease counterparty. The payment of the Cure Costs set forth in the Cure Notice (or a different amount either agreed to by the Debtors or resolved by the Court as a result of a timely-filed objection filed by a contract or lease counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the Counterparties for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtors determine that a particular contract is not truly executory, and does not need to be cured to transfer the Assets to the Successful Bidder or, alternatively, the Successful Bidder subsequently elects not to have any Assumed Contracts assumed or assigned to it prior to the Sale Hearing.

66.     The Stalking Horse Purchaser or other Successful Bidder is responsible for

providing evidence of "adequate assurance of future performance" to the extent required in

connection with the assumption and assignment of any Assumed Contracts.  The meaning of

"adequate assurance of future performance" for the purpose of the assumption of executory

contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the

facts and circumstances of each case, but should be given "practical, pragmatic construction."

*See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J.

1989); *see also, e.g., In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985)

(adequate assurance of future performance does not mean an absolute assurance that debtor will

thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill.

1985).  If necessary, the Stalking Horse Purchaser or other Successful Bidder shall provide

evidence of its ability to provide adequate assurances to Counterparties at the Sale Hearing.

## Notice

67.     Notice of this Amended Sale Motion, after approval and pursuant to the

terms of the Amended Bid Procedures Motion, will be provided – either by way of service of the

Amended Sale Motion, the Sale Notice or the Creditor Notice – to (a) the Office of the United

States Trustee; (b) counsel to the DIP Lenders and each of the Committees; (c) all parties who

are known by the Debtors to assert liens with respect to the Assets; (d) all entities who executed

non-disclosure agreements with the Debtors or CRG in connection with a potential acquisition of

any or all of the Assets or who otherwise have affirmatively expressed to the Debtors an interest

in purchasing the Assets; (e) all counterparties to Assumed Contracts; (f) all other creditors

known by the Debtors; (g) the United States Attorney's office; (h) all state attorneys general in states in which the Debtors do business; (i) state taxing authorities in the states in which the Debtors do business and the Internal Revenue Service; (j) environmental authorities in the states or smaller applicable jurisdictions in which the Debtors do business; (k) the Stalking Horse Purchaser and its counsel; and (l) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure.  The Debtors respectfully submit that such notice is sufficient, and request that the Court find that no further notice of the relief requested herein is required.

68.    The Debtors request, pursuant to Bankruptcy Rules 6004(h) and 6006(d), that the order approving this Motion become effective immediately upon its entry.

### Conclusion

69.    The Debtors' proposed sale of the Assets as described in this Amended Sale Motion, including the assumption and assignment of the Assumed Contracts, is in each case supported by sound business reasons, as set forth herein.  The proposed sale is proper, necessary and serves the best interests of the Debtors, their estates and creditors and all parties in interest. The Debtors thus request that the Court approve the proposed Sale of the Assets free and clear of all interests, liens, claims, and encumbrances including successor liabilities, as requested, including, without limitation, the assumption and assignment of the Assumed Contracts, to the Stalking Horse Purchaser or other Successful Bidder.

DOCS_LA:245176.4 70934-001

### No Prior Request

70.    Except with respect to the First Sale Motion as set forth above, no prior request for the relief sought in this Amended Sale Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Amended Sale Motion and authorize the sale of the Assets to the Stalking Horse Purchaser or other Successful Bidder and approve the Amended Agreement or other agreement that is in substantially the form attached to this Amended Sale Motion as Exhibit A, pursuant to the attached proposed order; (ii) approve the assumption and assignment of the Assumed Contracts; (iii) approve the form and manner of notice of this Amended Sale Motion, and of the proposed sale and assumptions and assignments; and (iv) grant such other and further relief as is just and proper.

Dated: September 27, 2011

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Joshua M. Fried (CA Bar No. 181541)
Timothy P. Cairns (Bar No. 4228)
Curtis A. Hehn (Bar No. 4264)
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone:  302/652-4100
Facsimile:  302/652-4400
Email: ljones@pszjlaw.com
        dbertenthal@pszjlaw.com
        jfried@pszjlaw.com
        tcairns@pszjlaw.com

Counsel for the Debtors and Debtors in Possession

DOCS_LA:245176.4 70934-001