UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ X
In re:         :   Chapter 11
             :
S.S. BODY ARMOR I, Inc. *et al.*  :   Case No. 10-11255 (CSS)
             :   Jointly Administered
Debtors.        :
             :   Hearing Date: February 15, 2018 at 11:00 .m. (ET)
------------------------------------------------------------ X   Obj. Deadline: January 31, 2018 at 4:00 p.m. (ET)


**MOTION OF CARTER LEDYARD & MILBURN LLP
TO ESTABLISH RESERVE TO PAY FEE AWARD
<u>PURSUANT TO ORDER DATED DECEMBER 3, 2015</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..........................................................................................1

      The $132 Million Settlement Is Attributable to the SOX 304 Claim ...................................3

FACTS ..........................................................................................................................6

   A.     Background ..............................................................................................6

   B.     Section 304 of the Sarbanes-Oxley Act ....................................................7

   C.     Cohen's Objection to the Illegal Indemnification of Brooks and Successful
            Appeal ....................................................................................................8

   D.     Cohen's Claim for Fees .............................................................................9

   E.     The Revised Settlement Agreement ..........................................................9

   F.     This Court Rules that Cohen and CLM Are Entitled to an Award of Fees
            from a SOX 304 Recovery in an Amount to be Determined ....................11

   G.     Confirmation of the Plan of Liquidation ..................................................13

   H.     Brooks' Criminal Conviction, Forfeiture Order, and the Restitution Awards
            Abate ....................................................................................................14

   I.      Florida District Court Denies Motion to Dismiss SOX 304 Claim and Grants
            Motion to Strike SOX 304 Affirmative Defenses ....................................15

   J.      SEC Settles for $132 Million ....................................................................16

ARGUMENT ..............................................................................................................17

  I.     THE RESERVE IS REQUIRED TO ENSURE THERE ARE SUFFICIENT
          ASSETS TO PAY THE FEE AWARD TO CLM AND COHEN ..........................17

  II.    THE SIZE OF THE RESERVE IS APPROPRIATE AS EACH OF THE
          FACTORS USED TO DETERMINE A FEE AWARD WEIGHS HEAVILY IN
          CLM'S FAVOR ......................................................................................18

   A.     Size of Fund Created ................................................................................19

   B.     Time and Labor Expended by Counsel ....................................................21

   C.     Magnitude and Complexity of Case ........................................................21

   D.     Skill and Efficiency of Attorneys ............................................................22

   E.     Risk of Litigation and Non-Payment ......................................................22

   F.     Public Policy Considerations ..................................................................23

   G.     Comparison to Other Objector Fee Awards ............................................24

   H.     Comparison to Class Counsel's Fee Awards ..........................................26

CONCLUSION ............................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Arnett v. Bank of America N.A.*,
    Case No. 3:11-CV-1372-SI, 2014 WL 5419125 (D. Oregon 2014) .................................25, 26

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) .................................................................................................................19

*Cohen v. Viray*,
    622 F. 3d 188 (2d Cir. 2017) ........................................................................................... passim

*Detroit v. Grinnell*,
    495 F.2d 448 (2d Cir. 1974) ..............................................................................................19, 22

*Dewey v. Volkswagen of America*,
    909 F. Supp. 2d 373 (D.N.J. 2012) .........................................................................................25

*Eubank v. Pella Corp.*,
    753 F.3d 718 (7th Cir. 2014) ...................................................................................................23

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000) ..............................................................................................19, 22, 23, 24

*In re Cendant Corp. Sec. Litig.*,
    404 F.3d 173 (3d Cir. 2005) ....................................................................................................24

*In re Cont'l Airlines, Inc.*,
    236 B.R. 318 (Bankr.D.Del.1999) ..........................................................................................17

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995) ......................................................................................................23

*In re Marcus Hook Dev. Park, Inc.*,
    943 F.2d 261 (3d Cir. 1991) ....................................................................................................17

*In re Protarga, Inc.*,
    329 B.R. 451 (Bankr. D. Del. 2005) .................................................................................17, 18

*In re Prudential Ins. Co. of Amer. Sales Practices Lit.*,
    273 F. Supp. 2d 563 (D.N.J. 2003) .................................................................................19, 21, 22, 25

*In re Puerto Rican Cabotage Antitrust Litigation*,
    815 F. Supp. 2d 448 (D. Puerto Rico 2011) ...........................................................................26

*In re Trans Union Corp. Privacy Litig.*,
    629 F.3d 741 (7th Cir. 2011) ...................................................................................................23

8179762.8

*In re Transpacific Passenger Air Transportation Antitrust Litigation*,
No. C 07-05634 CRB, 2015 WL 4776946 (N.D. Ca. Aug. 13, 2015)....................................25

*Kaufman v. Am. Express Travel Related Services, Co.*,
Case No. 07-cv-01707, 2016 WL 806546 (N.D. Ill. Mar. 2, 2016)........................................26

*Kokesh v. SEC*,
137 S. Ct. 1635 (2017)........................................................................................5, 15, 16

*McDonough v. Toys R Us, Inc.*,
80 F. Supp. 3d 626, 661 (E.D. Pa. 2015) ..................................................................21, 24, 25

*U.S. v. Baker*,
Case No. A-12-CA-285-SS, 2012 U.S. Dist. LEXIS 161784 (W.D. Tex. 2012) .....................3

*U.S. v. Brooks*,
872 F.3d 78 (2d Cir. 2017)..................................................................................2, 5, 15

*United States v. Libous*,
858 F.3d 64 (2d Cir. 2017)...............................................................................................14

*White v. Auerbach*,
500 F.2d 822 (1974)....................................................................................................9, 10, 11

## STATUTES

11 U.S.C. § 105(a) (2017)...........................................................................................17

15 U.S.C. § 7243 (2017) ..............................................................................................7

Bankruptcy Code. Section 105(a) ...............................................................................17

## OTHER AUTHORITIES

Melissa Maleske, *Executives Can't Negotiate Away SOX Clawbacks*, INSIDE COUNSEL
(Jan. 1, 2011)..........................................................................................................24

8179762.8

Carter Ledyard & Milburn LLP ("*CLM*") hereby moves this Court for an order establishing a reserve of $25 million from the proceeds of an anticipated $132 million settlement to ensure that adequate funds are available to satisfy an award of fees (the "*Award*") by this Court to CLM and its client D. David Cohen ("*Cohen*") pursuant to this Court's Order dated December 3, 2015 [Dkt No. 3624] ("*2015 Fee Order*"), a copy of which is attached hereto as Exhibit A.

## PRELIMINARY STATEMENT

In 2015, this Court determined that Cohen and CLM "preserv[ed] the Sarbanes-Oxley claim of approximately $186 million" and are entitled to a fee for their "terrific efforts" in the event there was a recovery from that claim. *See* 11/10/15 Bankr. Hearing Tr., pp. 191:22–193:8, 199:18–201:3 and Ex. A (2015 Fee Order). This Court did not determine the amount of the Award. Instead, this Court "completely reserved" that question and retained jurisdiction to make that determination if and when the Debtors or their successors-in-interest received funds from the Sarbanes-Oxley § 304 ("*SOX 304*") claim. That claim had been asserted by the Securities and Exchange Commission ("*SEC*") against David H. Brooks ("*Brooks*") in the United States District Court of the Southern District of Florida,[1] but had been stayed for a decade while criminal proceedings were pending against Brooks in the Eastern District of New York (the "*EDNY*").

In October 2016, Brooks died in prison while his appeal from his criminal conviction was pending. The Government conceded that Brooks' death abated the $65 million criminal forfeiture order and the $8.7 million in criminal fines. *See* Government's Response to Motion to Abate, Second Circuit Case No. 13-3213, Dkt. No. 544, p. 2. The Second Circuit determined that the criminal restitution awards (approximately $93 million in the aggregate) abated upon Brooks'

---

[1] *SEC v. Estate of David H. Brooks*, S.D. Fl. Case No. 07-61526-CIV (the "*SEC Action*").

death. *U.S. v. Brooks*, 872 F.3d 78 (2d Cir. 2017). Recoveries from the restitution awards and from the Debtors' pending $59 million remission claim (to be paid from the money forfeited by Brooks to the Government) were the basis upon which the creditors, shareholders, and victims of Brooks' criminal fraud were to be paid under the settlement agreement and bankruptcy plan approved in 2015.

Immediately following Brooks' death, CLM contacted the SEC and urged that the SOX 304 claim be pursued because it was the only feasible means for securing compensation for the creditors, shareholders, and victims of Brooks' criminal misconduct, in light of the likely abatement of the criminal forfeiture and restitution awards and the dismissal with prejudice of the class action and derivative claims against Brooks in the EDNY. *See* Letter from Gary D. Sesser to SEC dated November 2, 2016, attached hereto as Exhibit B. In January 2017, the stay was lifted and the SEC obtained permission to pursue its claims against the Brooks estate. Thereafter, a motion by the Brooks estate to dismiss the SEC's Amended Complaint was denied and, most significantly, the SEC's motion to strike all of the affirmative defenses to the SOX 304 claim was granted. In the meantime, the District Court directed the parties to participate in mediation in Florida in December 2017.

At the mediation on December 6-7, 2017, the SEC agreed to settle its claims against the Brooks estate (the "***SEC Settlement***"), subject to the approval of the full Commission. Although CLM has not seen the settlement terms in writing, it is informed that the Post-Confirmation Debtor will receive $132 million. Once the settlement is approved by the Commission and becomes final, CLM will apply to this Court for a substantial fee award pursuant to the 2015 Fee Order. The purpose of this motion is to ensure that adequate funds are reserved pending the determination by this Court of the amount of fees to be awarded to CLM. Because the Post-

Confirmation Debtor and the Recovery Trust are authorized to make distributions to creditors without further Court order (*see* Plan, § 7.1), there is a risk that the settlement proceeds may be distributed without reserving an adequate amount to pay the fees of CLM. Given the extraordinary result achieved, and in light of the factors considered by the courts in determining fees in such situations, CLM requests that $25 million be held in reserve pending this Court's determination.

## The $132 Million Settlement Is Attributable to the SOX 304 Claim

There can be no legitimate dispute that the $132 million settlement of the SEC Action is attributable to the SOX 304 Claim. First, the amount of the SOX 304 claim — $186 million — is not disputed and by itself exceeds the total amount of the settlement. *See* 11/10/15 Bankr. Hearing Tr., p. 191:24-25 ("THE COURT: . . . there's no question that the amount of the [SOX 304] claim is approximately $186 million").

Second, as the Debtors have acknowledged, SOX 304 is virtually a strict liability statute. There is no dispute that Brooks was the CEO of the public company then-known as DHB Industries, Inc. (the "*Company*" or "*DHB*"), that DHB was required to restate its financial reports for the period during which Brooks served as CEO, and that Brooks obtained $186 million in profits trading DHB stock during that 2003–2005 time period. Most significantly, DHB's 10K filings in 2006–2007 admitted that the financial reports had to be restated as a result of misconduct. Furthermore, the guilty plea of CFO Dawn Schlegel and the criminal conviction of Sandra Hatfield in the EDNY conclusively establish the "misconduct" element of SOX 304, which is a low bar in any event. *See, e.g.*, *U.S. v. Baker*, Case No. A-12-CA-285-SS, 2012 U.S. Dist. LEXIS 161784, at *13–14 (W.D. Tex. 2012) ("it was Congress's purpose to recapture the additional compensation paid to a CEO during any period in which the corporate issuer was not in compliance with financial reporting requirements"); *see also* Schlegel Guilty Plea, EDNY

Case No. 06-cr-0550, Dkt. No. 82 (admitting to, among other things, making misleading statements of material fact in securities filings); Hatfield Verdict Form, EDNY Case No. 06-cr-550, Dkt. No. 1336 (finding Hatfield guilty of, among other things, securities fraud and mail and wire fraud).

Third, the SOX 304 claim was ripe for summary judgment at the time of the mediation that produced the $132 million settlement. The Brooks estate's motion to dismiss the SOX 304 claim had been denied and its application for interlocutory review of that decision likewise had been denied. More importantly, the District Court in Florida had granted the SEC's motion to strike *all* of the Brooks estate's affirmative defenses to the SOX 304 claim.[2]

Fourth, the SOX 304 claim is the *only* claim, with one minor exception, in which the proceeds of any recovery were *required* to be paid to the Debtors, the successors-in-interest to the Company. (The Debtors also asserted a modest $700,000 claim in the asset forfeiture proceeding in the EDNY).[3] The proceeds of any recovery from the SEC's disgorgement claims would go to the Commission. Unlike the SOX 304 claim, any proceeds from SEC's disgorgement claims or from the Government's asset forfeiture claims in the EDNY would not belong to the Debtors as a matter of right. *See, e.g.*, *Cohen v. Viray*, 622 F.3d 188, 195 (2d Cir. 2017) (SOX 304 recoveries are intended to reimburse the harmed company*); see also* SEC's Response to Brooks Estate's Motion to Dismiss, SEC Action, Dkt. No. 61, p. 2 ("SOX 304 claim is remedial, because by statute any recovery the Commission obtains goes to DHB (the harmed person in this case")).

---

[2] The Debtors' counsel advised this Court in 2015 that, in light of the Company's restatement of its financial reports for the years 2003, 2004, and 2005, Brooks' liability under SOX 304 was a virtual certainty and "should lead to a judgment [against Brooks] after [a] summary judgment motion." 7/6/15 Bankr. Hearing Tr., p. 27:22–24.

[3] *See* Verified Claim of Point Blank Solutions, Inc., EDNY Case No. 10-cv-4750, Dkt. No. 33, ¶¶ 6-10.

8179762.8

Fifth, apart from SOX 304, which was ripe for summary judgment, no other claims resolved as part of the settlement were remotely close to trial or appropriate for summary judgment. The disgorgement claims essentially would require a retrial of the Brooks criminal prosecution and the calculation of any damages would be both complex and uncertain. Moreover, while the District Court in Florida denied the motion of the Brooks estate to dismiss those claims, there was a genuine risk that they would not survive an appeal. In *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), the Supreme Court recently held that SEC disgorgement claims are "penalties" for statute of limitations purposes. The Brooks estate argued that in the Eleventh Circuit and elsewhere, penalties abate upon the death of the defendant. The same argument does not apply to SOX 304, which is considered "remedial" (and not a penalty) because the proceeds of recovery go to the public company victim. *Brooks*, 872 F.3d at 89.

Similarly, the Government's asset forfeiture proceeding in the EDNY was still at the pleading stage at the time of the mediation (and remains at the pleading stage) and also would have involved a retrial of many of the issues involved in the Brooks criminal prosecution. As noted, the Debtors' only direct claim in that action was for approximately $700,000.

Finally, any suggestion that there were no assets available to satisfy the strict liability SOX 304 claim is specious. The Debtors' bankruptcy plan was based on recovery of $93 million in criminal restitution awards against assets frozen in the EDNY. Those funds, and more, became available to satisfy the SOX 304 claim against Brooks when the Second Circuit ruled in September 2017 that those criminal restitution awards abated upon Brooks' death. *Brooks,* 872 F.3d 78. The Debtors represented that any amounts awarded to them as a result of Brooks' fraudulent acts could be satisfied from "Brooks' funds" that were frozen in the EDNY. *See, e.g.*, Amended Disclosure Statement with Respect to the Second Amended Joint Plan of Liquidation

8179762.8

[Dkt. No. 3262] (the "***Disclosure Statement***"), Art.II.U.2, p. 26 ("the Debtors have obtained restitution and forfeiture awards from Brooks' funds restrained by the government. Moreover, the Debtors are seeking remission with respect to additional Brooks' funds that were restrained by the government.").

In summary, while some self-interested parties may be tempted to try to diminish Cohen's and CLM's achievement, and thereby minimize a fee award to Cohen and CLM, by arguing that the $132 million settlement was not significantly attributable to the SOX 304 claim, the facts clearly show otherwise. This settlement was made possible by the efforts of Cohen and CLM to preserve the $186 million strict liability SOX 304 claim in the face of long odds and determined opposition from lawyers for the Class, the Company and Brooks.

## FACTS[4]

### A.  Background

1.      In 2007, several years prior to the bankruptcy filing, the Debtors attempted to settle a consolidated class action (the "***Class Action***") and consolidated derivative action (the "***Derivative Action***"), which were each pending in the EDNY. In the Class and Derivative Actions, the respective plaintiffs each alleged that the Company's officers and directors had unjustly enriched themselves and caused hundreds of millions in damages through, among other things, massive fraud, habitual self-dealing, and insider trading.

2.      The parties to those actions entered into a single settlement (the "***Stipulation of Settlement***") to resolve both actions. Pursuant to the Stipulation of Settlement, DHB agreed to pay approximately $35 million in cash (funded by D&O insurance and Brooks' purchase of

---

[4]  This memorandum provides a summary of events leading up to Cohen's September 2015 fee application. The complete history of Cohen's efforts in preserving the SOX 304 claim is set forth in the Application of D. David Cohen and Carter Ledyard & Milburn LLP for Fees and Expenses and Memorandum in Opposition to the Payment of Fees and Expenses of Derivative Counsel, dated September 25, 2015 [Dkt. No. 3300] (the "***First Fee Application***").

additional shares) and contribute 3 million shares of stock (at that time valued at approximately $13 million) to the class. *See* Stipulation of Settlement, ¶ 2.1. The Stipulation of Settlement also contained a provision — which was contemporaneously described by counsel for Brooks and the Company as the "key term" and the "*sine qua non*" of the entire agreement (*see* First Fee Application, Ex. D, p. 3; *id.* at Ex. E, p. 7:10–15) — that required the Company to indemnify Brooks and CFO Dawn Schlegel for their obligation to reimburse the Company under SOX 304. Stipulation of Settlement, ¶ 4.7.

**B.      Section 304 of the Sarbanes-Oxley Act**

3.      SOX 304 provides that if a public company is required to restate its financial reports as a result of misconduct, the CEO and the CFO must reimburse the company for all bonuses, incentive-based compensation, and trading profits they received attributable to the restatement period. 15 U.S.C. § 7243. The purpose of SOX 304 is to promote integrity in financial reporting for public companies and to ensure that the senior officers of the company do not personally profit from false financial statements. *Cohen*, 622 F.3d at 195.

4.      As the Debtors acknowledged in this Court, SOX 304 is virtually a strict liability statute. *See* 7/6/15 Bankr. Hearing Tr., p. 27:18–20) ("KORNFELD: . . . The good news about a SOX 304 litigation is that it's almost a strict liabilities standard."). If a company is required to restate its financials, the CEO and CFO *must* reimburse the company for the amount they received in bonuses, incentive compensation, and trading profits. It is a "mandatory duty." *Cohen*, 622 F.3d at 194.

5.      On October 25, 2007, the SEC commenced the SEC Action alleging, among other things, a SOX 304 claim totaling approximately $186 million. *See also Cohen*, 622 F.3d at 192.

6.      Because only the SEC had a cause of action under SOX 304, neither Class Counsel nor Derivative Counsel would benefit from any SOX 304 recovery by the Company.

Instead, as a result of the unusual structure of the statute, they had a perverse incentive to use the SOX 304 claim as a bargaining chip with Brooks — which is exactly what happened. The Debtors admitted that without the illegal indemnification provision, there would have been no settlement. *See* First Fee Application, Ex. D, p. 3 (describing the indemnification provision as the "*sine qua non*" of the entire agreement); *see also id.*, Ex. E, p. 7:10–15 (Brooks' counsel describing term as "essential" to the settlement).

7.     Nevertheless, it is clear that the Company, its creditors and its shareholders would have been vastly better off with a $186 million SOX 304 recovery from Brooks than with a $48 million settlement that indemnified and released Brooks from his SOX 304 liability, particularly as 25% of that $48 million (approximately $12 million) was awarded to Class Counsel in fees.

**C.     Cohen's Objection to the Illegal Indemnification of Brooks and Successful Appeal**

8.     Cohen objected to the Stipulation of Settlement arguing, among other things, that the SOX 304 indemnification provision was illegal and violated public policy. After his objections were overruled by the EDNY, Cohen was the only objector to pursue an appeal to the Second Circuit.[5]

9.     On September 30, 2010, the Second Circuit vacated the judgment that had approved the Stipulation of Settlement, agreeing with Cohen that the Stipulation of Settlement illegally indemnified Brooks and Schlegel against liability arising under SOX 304. *Cohen*, 622 F.3d at 190. The Second Circuit recognized that Cohen's appeal raised "novel issues of law" that "no court ha[d] previously addressed" and that Cohen's appeal "further[ed] important public purposes" such as the "enforcement mechanism that ensures the integrity of the financial

---

[5] The EDNY also overruled the objections of the Department of Justice (the "***DOJ***"), whose participation had been solicited by Cohen. The DOJ filed a notice of appeal, but withdrew their appeal following the Company's motion to dismiss their appeal as untimely. Based on the significant public policy issues raised by Cohen, the DOJ (representing the SEC) supported Cohen's appeal on the SOX 304 issue as *amicus curiae*.

markets." *Id.* at 193, 195.

10.     When the Company filed for bankruptcy protection in 2010, the $186 million SOX 304 claim against Brooks was not listed as an asset of the estate. *See* Point Blank Solutions, Inc., Schedule B (Personal Property) [Dkt. No. 156]. Up to that point, the Company had opposed Cohen in the EDNY and supported the SOX 304 indemnification of Brooks in the Second Circuit. After the bankruptcy filing, however, the Debtors adopted Cohen's position and argued that the Stipulation of Settlement was not in the Debtors' interests. The Debtors acknowledged the "substantial benefits" conferred on the Debtors as a result of Cohen's objection and Second Circuit appeal. *See* Debtor's Motion to Reject dated September 17, 2010 [Dkt. No. 589], ¶¶ 43–46.

**D.      Cohen's Claim for Fees**

11.     At the time of his objections, Cohen had also moved before the EDNY for the payment of his fees pursuant to the Second Circuit law. *See, e.g.*, *White v. Auerbach*, 500 F.2d 822 (1974) (objectors "are entitled to an allowance as compensation for attorneys' fees and expenses where a proper showing has been made that the settlement was improved as a result of their efforts"). Cohen's fee application was denied by the District Court and Cohen appealed that ruling. The Second Circuit did not reach the fee issue, but remanded the case to the EDNY to reexamine Cohen's fee application in the context of a revised settlement or further litigation. *Cohen*, 622 F.3d at 196.

**E.      The Revised Settlement Agreement**

12.     In or around December 2014, the Debtors and the plaintiffs in the Class Action and the Derivative Action, among others, reached a revised settlement agreement (the "***Settlement Agreement***").

13.     Pursuant to the Settlement Agreement (i) the plaintiffs in the Class Action (the "***Plaintiffs***") agreed to loan to the Debtors $20 million of the funds paid by the Company in connection with the Stipulation of Settlement and which were then held in escrow (the "***Escrowed Funds***"), on an unsecured, non-recourse, and interest-free basis to fund a plan of liquidation, and (ii) the Plaintiffs and the Debtors agreed to equalize their respective recoveries from "Shared Recovery Matters," which included the parties' claims in the civil forfeiture proceeding and the criminal action, each of which was then pending in the EDNY. "Shared Recovery Matters" included the restitution that the EDNY had awarded to the Debtors (approximately $54 million) and to the investor-victims (approximately $37.5 million). Settlement Agreement, ¶¶ 2–3. Critically, while Brooks' criminal appeals were still pending, *i.e.* prior to the criminal conviction and restitution awards becoming final, the Settlement Agreement provided for the dismissal *with prejudice* of the Class and Derivative Actions, effectively releasing Brooks from the claims asserted against him. *Id.* at ¶ 6. These terms were the economic foundation of the Debtors' plan of liquidation. *See, e.g.*, Debtors' Amended Motion to Approve Settlement Agreement dated February 2, 2016 [Dkt. No. 2865], ¶ 36 ("the proposed settlement will provide the Debtors with an immediate source of cash to fund a Chapter 11 Plan, [and] will allow the Debtors and the Class Plaintiffs to cooperatively maximize their restitution/forfeiture recoveries . . . .").

14.     The Settlement Agreement also ratified the payment of the approximately $10 million in fees previously advanced to Class Counsel in 2008 in connection with the Stipulation of Settlement (which was subsequently vacated by the Second Circuit), as well as providing an additional $1.5 million in fees for bankruptcy counsel for the Class. Settlement Agreement, ¶¶ 2(a), 8. The Settlement Agreement also contained a provision requiring the dismissal of the

turnover proceeding commenced by the Debtors against Class Counsel to recover the fees provisionally advanced in 2008 pursuant to the vacated Stipulation of Settlement. *Id.* at ¶ 6(a).

**F. This Court Rules that Cohen and CLM Are Entitled to an Award of Fees from a SOX 304 Recovery in an Amount to be Determined**

15.     On or about September 25, 2015, Cohen and CLM filed their application for fees and expenses in connection with their meritorious objection to the illegal indemnification of Brooks and their success in preserving the $186 million SOX 304 claim. *See* First Fee Application [Dkt. No. 3300]. Because the SEC Action was stayed pending Brooks' criminal appeals and it was unclear whether the SOX 304 claim would ever be pursued, Cohen and CLM requested a very modest award of $1.86 million based on the important public interests vindicated in the successful Second Circuit appeal. *Id.* at ¶ 89.

16.     The First Fee Application made clear that if the Debtors ultimately received a SOX 304 recovery, Cohen and CLM would be entitled to a far greater award, including, for example, a fee of up to $44 million. *See, e.g.*, *id.* (if the Debtors were to recover $186 million, "Cohen would be in line to receive a fee of $44 million based upon the 25% rate approved for Class Counsel by the EDNY"); *see also* 11/10/15 Bankr. Hearing Tr., p. 145:16–22 ("SESSER: . . . [D]oubts about the full collectability of the SOX 304 claim have already been factored into Mr. Cohen's fee claim. If it were a dead certainty that we were going to recover $186 million, do you think that we would be asking for one percent, [we] would be in line for a fee of tens of millions of dollars, literally, if the recovery was a certain $186 million.").

17.     At the hearing on the First Fee Application, the Debtors acknowledged the value provided by Cohen, but argued Cohen and CLM were not entitled to a fee award solely because they had not yet created a "common fund." *See, e.g.*, 11/10/15 Bankr. Hearing Tr., p. 169:22–170:2 ("KORNFELD: . . . Cohen's contribution, and there is a contribution, and we've

acknowledged that contribution repeatedly, is that he preserved the SOX 304 claim . . . [but t]here's no benefit created right now."); *id.* at 182:17–19 ("If this fund had thrown off some money, if any of the $186 million had been collected, this would be a very different discussion."). Indeed, counsel stated that the "only difference" between Class Counsel and CLM, i.e., the only reason Class Counsel was entitled to a fee of $13.5 million while CLM was entitled to nothing, was the fact that Class Counsel "created a common fund." *Id.* at 177:1–2.[6]

18.     At the conclusion of the hearing on November 10, 2015, this Court recognized Cohen's and CLM's "terrific efforts," and acknowledged that Cohen and CLM had performed "a lot of work" and expended "a lot of money" in preserving the SOX 304 claim. *Id.* at 191:22–192:8. This Court held that "Cohen and his counsel are entitled to a fee based on their preservation of the Sarbanes-Oxley claims." *Id.* at 199:18–200:2; *see also* Ex. A (2015 Fee Award), pp. 2–3. This Court did not determine the amount of the Award, but instead retained jurisdiction to resolve this question when the Post-Confirmation Debtor received a SOX 304 recovery. *Id.* (the Award will be "determined by this Court, with such award to be paid solely from the funds received by the Debtors or their successors-in-interest on account of the SOX 304 Claim.").[7]

19.     The Court also made clear that on any renewed fee application, CLM would not be limited by its prior fee request. The Court stated that the Award "could be one percent, it could be higher. I'm not deciding today what an appropriate percentage is." 11/10/15 Bankr.

---

[6] Even Class Counsel had acknowledged the benefits conferred by Cohen. First Fee Application, Ex. F, 32:21–22 ("RUDMAN: . . . I'm giving up on [arguing whether a benefit was created by Cohen] and agreeing that a benefit was created.").

[7] Cohen and CLM appealed that portion of the decision which made their entitlement to a fee award entirely contingent on a SOX 304 recovery by the Debtors. In the event the SEC Settlement becomes final, Cohen and CLM intend to dismiss that appeal.

8179762.8

Hearing Tr., p. 200:2–5. The Court made clear that the question of the proper amount of the Award was "completely reserved." *Id.*

### G.  Confirmation of the Plan of Liquidation

20.    On September 1, 2015, the Debtors filed the Second Amended Joint Chapter 11 Plan of Liquidation Proposed by Debtors and Official Committee of Unsecured Creditors (the "***Plan***") [Dkt. No. 3261] and Disclosure Statement.

21.    Following a hearing on November 9-10, 2015, the Plan was confirmed. *See* Dkt. No. 3526.

22.    The Plan was funded by the Plaintiffs' loan of the Escrowed Funds (the "***Loan***"). Over 70% of the Loan was used to pay professional fees and expenses. *See* Final Fee Application of Debtors' Counsel [Dkt. No. 3757]; Disclosure Statement, Exhibit B [Dkt. No. 3262-2].

23.    The Plan envisioned that the distributions to unsecured creditors, class members, and equity holders would be funded from the restitution awards and any money received on account of the Debtors' then-pending $59 million remission claim (to be paid from the funds forfeited to the Government on account of the criminal forfeiture order). *See, e.g.*, Disclosure Statement, Art. II.U.2, pp. 26–27.

24.    On November 23, 2015, the Plan became Effective. Dkt. No. 3584. On the Effective Date, the Debtors were dissolved and the Post-Confirmation Debtor was established. Plan, Art. III.D. The Plan also established a Recovery Trust for the purpose of, among other things, making distributions to holders of Claims or Interests. *See* Recovery Trust Agreement [Dkt. No. 3519-1], § 3.3.

25.    The Plan provides that post-Effective Date distributions may be made by the Post-Confirmation Debtor Representative and Recovery Trust "without need for any further order of the Bankruptcy Court." Plan, § 7.1.

**H.** **Brooks' Criminal Conviction, Forfeiture Order, and the Restitution Awards Abate**

26.     On or about September 24, 2010, Brooks was convicted of numerous crimes, including securities fraud, mail fraud, wire fraud, insider trading, and obstruction of justice. *See* Disclosure Statement, Art. II.D.1, pp. 11-12. Brooks was subsequently sentenced to 17 years in prison. On April 13, 2015, he appealed from his conviction. *Id.*

27.     On March 27, 2015, the EDNY issued the restitution awards. The restitution awards provided that the criminal defendants must pay approximately $54 million in restitution to the Company, and approximately $37.5 million in restitution to the shareholder victims of Brooks' fraud. *Id.*, at Art. II.D.3, p. 14. The EDNY also ordered Brooks to pay criminal fines totaling $8.7 million and ordered Brooks to forfeit over $65 million in ill-gotten gains to the Government. *See* Amended Preliminary Order of Forfeiture, EDNY Case No. 06-cr-550, Dkt. No. 1702.

28.     On October 27, 2016, while his criminal appeal was pending, Brooks died in federal prison. Pursuant to long-standing case law, Brooks' criminal conviction abated. *See United States v. Libous*, 858 F.3d 64, 66 (2d Cir. 2017) ("[W]hen a convicted defendant dies while his direct appeal as of right is pending, his death abates not only the appeal but also all proceedings had in the prosecution from its inception.").

29.     The Government conceded that the $65 million forfeiture order and $8.7 million in criminal fines abated at Brooks' death, but contended that the restitution awards survived. *See* Government's Response to Motion to Abate, Second Circuit Case No. 13-3213, Dkt. No. 544, p. 2 ("Brooks's order of forfeiture, fine and special assessment abate . . . However, Brooks's restitution obligation and the forfeiture of his bail bond should not abate."). The Brooks' estate argued that Brooks' death also abated the restitution awards.

30.     On September 20, 2017, the Second Circuit held that the restitution awards abated. *See U.S. v. Brooks*, 872 F.3d 78, 89 (2d Cir. 2017) ("we hold that when a criminal conviction abates upon the death of a defendant, any restitution ordered as a result of that conviction must also abate").

31.     The abatement of the criminal forfeiture order, criminal fines and restitution awards in conjunction with the dismissals with prejudice of the Class and Derivative Actions left the strict liability SOX 304 claim as the only viable claim for the Post-Confirmation Debtor and the victims to collect against the funds (in excess of $180 million) frozen in the EDNY. Following Brooks' death, CLM promptly notified the SEC and urged the Commission to seek relief from the stay and pursue the SOX 304 claim. *See* Ex. B (Letter from Gary D. Sesser to SEC dated November 2, 2016).

I.      **Florida District Court Denies Motion to Dismiss SOX 304 Claim and Grants Motion to Strike SOX 304 Affirmative Defenses**

32.     In 2007, the SEC commenced the SEC Action against Brooks asserting claims for, among other things, failure to reimburse the Company as required by SOX 304. *See* Amended Complaint, SEC Action, Dkt. No. 49, ¶¶ 107-119, 174–88. In January 2017, following Brooks' death, the stay was lifted.

33.     On April 21, 2017, the Brooks estate filed a motion to dismiss the SEC's Amended Complaint. The Brooks estate argued that the SOX 304 claim and the SEC's disgorgement claims are "penalties" and, under applicable precedent, they abated upon Brooks' death in October 2016. The Brooks estate argued that SEC disgorgement claims were determined to be penalties for statute of limitations purposes under the recent U.S. Supreme Court decision in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017). The SEC opposed the motion, arguing, among other things, that the SOX 304 claim should not be construed as a penalty for

abatement purposes because, under the statute, the proceeds of any recovery must go to reimburse the public company and do not go to the Commission (as is the case with disgorgement claims).[8] *See, e.g.*, SEC's Response to Brooks Estate's Motion to Dismiss, SEC Action, Dkt. No. 61, p. 2 ("SOX 304 claim is remedial, because by statute any recovery the Commission obtains goes to DHB (the harmed person in this case).").

34.     On August 3, 2017, the District Court in Florida denied the motion to dismiss and held, among other things, that the SOX 304 claim did not abate. *See* Order Denying Motion to Dismiss, SEC Action, Dkt. No. 87. On September 1, 2017, the District Court denied the Brooks estate's motion for interlocutory appeal. *See* Order Denying Interlocutory Appeal, SEC Action, Dkt. No. 90.

35.     Following the denial of the motion to dismiss, the Brooks estate filed its Answer to the Amended Complaint. *See* Answer, SEC Action, Dkt. No. 88. The Answer contained five affirmative defenses, each directed at the SOX 304 claim. *See id.* at pp. 16–17.

36.     On September 7, 2017, the SEC moved to dismiss each of these affirmative defenses as legally insufficient. *See, e.g.*, SEC Motion to Dismiss, SEC Action, Dkt. No. 94. On October 6, 2017, the District Court granted the SEC's motion to strike all of the affirmative defenses to the SOX 304 claim. *See* Order Granting Motion to Dismiss, SEC Action, Dkt. No. 111.

## J.     SEC Settles for $132 Million

37.     Following the denial of Brooks' motion to dismiss the SEC's Amended Complaint and the granting of the SEC's motion to strike the SOX 304 affirmative defenses, the

---

[8] Prior to the SEC's deadline to oppose the motion to dismiss the Amended Complaint, CLM provided the SEC with a memorandum citing case law supporting the argument that Brooks' SOX 304 liability did not abate at death. Among other things, CLM provided cases that held that an analogous provision of the securities law — Section 16(b) of the Securities and Exchange Act of 1934 — does not abate at death. The SEC incorporated CLM's research and legal conclusions into its opposition brief.

parties participated in a court-ordered mediation on December 6-7, 2017. Upon information and belief, Brooks family members or their representatives, attorneys from the U.S. Attorney's Office for the Eastern District of New York, and representatives of the Post-Confirmation Debtor were invited to attend.

38.     On December 8, 2017, the SEC filed an unopposed motion to stay all deadlines for 120 days while the SEC sought the full Commission's approval of a settlement offer made by the Brooks estate and the Brooks family. *See* SEC's Motion for Stay, SEC Action, Dkt. No. 132. The District Court granted the motion.

39.     CLM has been informed by counsel for the Post-Confirmation Debtor that as a result of the SEC Settlement, the Post-Confirmation Debtor will receive $132 million. CLM has not read or reviewed the terms of the SEC Settlement.

## ARGUMENT

## I.     THE RESERVE IS REQUIRED TO ENSURE THERE ARE SUFFICIENT ASSETS TO PAY THE FEE AWARD TO CLM AND COHEN

40.     "It is axiomatic that a court possesses the inherent authority to enforce its own orders." *In re Cont'l Airlines, Inc.,* 236 B.R. 318, 325–26 (Bankr. D. Del.1999).

41.     Moreover, pursuant to 11 U.S.C. § 105(a), a bankruptcy court is authorized to issue any order, process, or judgment necessary to carry out the provisions of the Bankruptcy Code. Section 105(a) "gives the bankruptcy court 'the power and the jurisdiction to enforce its valid orders.'" *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 266 (3d Cir. 1991) (citations omitted); *see also, e.g.*, *In re Protarga, Inc.*, 329 B.R. 451, 479 (Bankr. D. Del. 2005) (holding bankruptcy court has power to enforce discharge and discharge injunction separate and apart from plan and confirmation order).

8179762.8

42.     For their work in preserving the SOX 304 claim, the Court has already held that Cohen and CLM are entitled to an Award if there is a SOX 304 recovery. Ex. A (2015 Fee Award), p. 2. All that remains is for the Court to determine the amount of the Award – for which this Court specifically retained jurisdiction — and for the payment of that Award from the $132 million settlement proceeds. *Id.* at pp. 2–3.

43.     Because the Post-Confirmation Debtor and the Recovery Trust are authorized to make distributions to creditors without further Court order (*see* Plan, § 7.1), there is a risk that the settlement proceeds may be distributed without reserving an adequate amount to pay the Award.

44.     To ensure that no steps are taken that would impair or limit the Court's ability to direct payment of fees pursuant to the 2015 Fee Order, CLM respectfully requests an order establishing a $25 million reserve from the settlement proceeds. As set forth below, the amount of the reserve is appropriate in light of the extraordinary benefit conferred by Cohen and CLM. Moreover, granting this motion will not prejudice any creditors or shareholders who likely would have received nothing in the foreseeable future, if ever, but for Cohen's and CLM's preservation of the $186 million SOX 304 claim.

45.     For the avoidance of doubt, CLM is not now requesting a $25 million fee award. CLM will seek a determination of the amount of fees pursuant to the 2015 Fee Order in due course. The establishment of the reserve merely assures that adequate funds will be available for the payment of such award as this Court may direct.

II.     **THE SIZE OF THE RESERVE IS APPROPRIATE AS EACH OF THE FACTORS USED TO DETERMINE A FEE AWARD WEIGHS HEAVILY IN CLM'S FAVOR**

46.     CLM is not a traditional administrative or unsecured creditor who will be paid from the assets of the estate. Instead, by virtue of its successful efforts in preserving the SOX

18

304 claim, and pursuant to the 2015 Fee Order, CLM's fees will be charged against the common fund that Cohen and CLM created. Ex. A (2015 Fee Order), p. 2; *see, e.g.*, *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.").[9]

47.     Although this motion does not seek a determination of the proper amount of the Award, an award of up to $25 million may be entirely appropriate in light of the established factors used to determine fees to objectors and the extraordinary circumstances of this case. These factors include: (i) the size of the fund and the number of persons benefited; (ii) the time and labor expended by counsel; (iii) the magnitude and complexities of the litigation; (iv) the skill and efficiency of counsel; (v) the risk of litigation/non-payment; (vi) public policy considerations; and (vii) comparisons to previous fees awarded to objectors. *See Detroit v. Grinnell*, 495 F.2d 448, 470 (2d Cir. 1974); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000); *In re Prudential Ins. Co. of Amer. Sales Practices Lit.*, 273 F. Supp. 2d 563, 567 (D.N.J. 2003) (citing *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 733 (3d Cir. 2001)). As set forth below, each of these factors weighs heavily in favor of CLM.

## A.     Size of Fund Created

48.     Cohen's efforts preserved a claim that ultimately resulted in a $132 million recovery for the Post-Confirmation Debtor. Although Cohen and CLM did not prosecute the SOX 304 claim (because only the SEC has standing to do so), they preserved a $186 million

---

[9] CLM had previously filed two proofs of claim (Proof of Claim Nos. 434 and 568). The claims were filed (i) to preserve CLM's right to payment; (ii) at a time when a SOX 304 recovery was uncertain; and (iii) before CLM was compelled to bear the risk and uncertainly of litigation and collection for over seven years. On or about September 25, 2015, the Debtors objected to each proof of claim as duplicative of the First Fee Application. CLM agreed that its entitlement to fees would be governed by its First Fee Application, which superseded the earlier-filed proofs of claim. *See* Response of D. David Cohen to Debtors' Objections to Proof of Claim Nos. 434 and 568 [Dkt. No. 3379].

strict liability claim that the Debtors initially did not even list as an asset of the estate. *See* Point Blank Solutions, Inc., Schedule B (Personal Property) [Dkt. No. 156].

49.     Absent Cohen's 2008 appeal to the Second Circuit, the approval of the Stipulation of Settlement, including the legality of the SOX 304 indemnification provision, would have been final and binding well before the bankruptcy filing under the doctrine of *res judicata*. In that circumstance, it is highly unlikely the SEC would have committed the resources to pursue the SOX 304 claim. In fact, that is what the SEC argued to the Second Circuit. *See Cohen*, 622 F.3d at 194–95 (indemnification effectively nullifies the rationale for pursuing § 304 remedy); s*ee also Brief for the United States as Amicus Curiae*, at 19–20, *Cohen v. Viray*, 622 F.3d 188 (2d Cir. 2010), Case No. 08-38-60-cv, 2009 WL 7755913 (same).

50.     Although DHB supported the illegal indemnification of Brooks, opposed Cohen's appeal, and failed to list the $186 million SOX 304 claim as an asset of the bankruptcy estate, the Debtors subsequently admitted that Cohen was right in 2007 when he objected to the illegal SOX 304 indemnification and that his efforts had provided substantial benefits to the Debtors. *See* Debtors' Motion to Reject [Dkt. No. 589], ¶¶ 43–46.

51.     Cohen's preservation of the SOX 304 claim saved the bankruptcy plan following Brooks' death and the abatement of the criminal restitution awards and forfeiture upon which that plan was predicated. The proceeds of the SEC Settlement will allow for tens of millions of dollars to flow to creditors and equity holders, where there otherwise could very well have been nothing for them. Ten years after their meritorious objection to the illegal indemnification of Brooks and successful appeal to the Second Circuit, CLM deserves to be appropriately rewarded.

## B.     Time and Labor Expended by Counsel

52.     From February 2007 through December 31, 2017, CLM billed over 5,200 hours and incurred legal fees totaling $2,402,178.55 and expenses totaling $216,995.58.[10]

53.     There is no doubt that the time spent on this matter was reasonable, particularly when compared with the $13.5 million in fees awarded to counsel for the class who supported the illegal indemnification of Brooks and achieved a far smaller recovery. *See* ¶¶ 70-73, *infra.* While Class Counsel incurred approximately the same amount in legal fees (approximately $2.3 million) and billed approximately the same amount of time (4,933.35 hours) (*see* First Fee Application, Ex. J, p. 10), Cohen and CLM achieved far greater success ($48 million v. $132 million).

## C.     Magnitude and Complexity of Case

54.     This factor considers the length of the litigation and complexity of the issues raised. *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 661 (E.D. Pa. 2015). Where an objector litigates issues of "first impression" or prosecutes appeals that present "novel" issues of law, this factor weighs in favor of the objector. *Id.*; *In re Prudential*, 273 F. Supp. 2d at 569.

55.     The Second Circuit explicitly recognized that the issues that Cohen raised in his objection and appeal were "novel issues of law" that "no court ha[d] previously addressed." *Cohen*, 622 F.3d at 193, 195. The magnitude of the claim preserved was $186 million and the recovery is $132 million. Accordingly, there is no doubt that this factor weighs very heavily in favor of CLM.

---

[10] The fees billed in this matter substantially undervalue the amounts actually incurred because, as an accommodation to Cohen, senior partner William F. Sondericker generally did not bill for the substantial time he devoted on this matter. *See* Declaration of William F. Sondericker in Support of First Fee Application dated September 24, 2015 [Dkt. No. 3300-2] ¶ 6.

## D.  Skill and Efficiency of Attorneys

56.  Cohen and CLM not only asserted a meritorious objection to the SOX 304 indemnification of Brooks on public policy grounds, they overcame an adverse ruling by the EDNY, persuaded the Second Circuit on an issue of first impression, prevented subversion of a statute that the SEC and the Second Court described as vital to the integrity of the financial markets, and preserved a $186 million strict liability claim for the public company. They accomplished this against a united opposition of prestigious law firms, including Bryan Cave; Mintz Levin, Cohen Ferris Glovsky & Popeo PC; Milbank Tweed Hadley & McCloy; and Robbins Geller Rudman & Dowd LLP. Accordingly, there is no doubt that this factor weighs heavily in CLM's favor.

## E.  Risk of Litigation and Non-Payment

57.  Where counsel faced the legitimate risk that they would not be paid for their considerable time and effort, such as in a contingency fee arrangement, this factor weighs in the objector's favor. *See In re Prudential*, 273 F. Supp. 2d at 571; *Grinnell*, 495 F.2d at 470 ("No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success."). Courts have described this factor as "perhaps the foremost" factor to be considered in determining a reasonable fee award. *See, e.g., Goldberger,* 209 F.3d at 54.

58.  Other than the initial approximately $139,000 that Cohen paid, CLM agreed to represent Cohen on this vital issue entirely on a contingency fee basis. CLM clearly bore the substantial risk associated with litigating issues of first impression that no court had previously addressed.

59.     Even after winning a highly significant Second Circuit appeal against long odds and stout opposition, CLM has borne the risk for nearly a decade that the SEC would not pursue the SOX 304 claim (which was stayed for ten years) because there would be insufficient assets in the EDNY to satisfy a SOX 304 judgment. CLM continued to bear that risk even after this Court recognized that it performed "a lot of work" and expended "a lot of money" in providing a "terrific" service. 11/10/15 Bankr. Hearing Tr., p. 191:22-192:8.

## F.     Public Policy Considerations

60.     Courts have repeatedly recognized that large fee awards are appropriate to recognize the importance of the issues raised and to incentivize others to do so in the future. *See, e.g.*, *Goldberger*, 209 F.3d at 51 (attorneys' fees awarded as incentive for attorneys to pursue arguments that serve the public interest); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 820 (3d Cir. 1995) (recognizing that there is a very real danger that class or derivative counsel will urge a settlement "on less-than-optimal basis in exchange for red-carpet treatment on fees."); *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 743 (7th Cir. 2011) (Posner, C.J.) (third-party "interlopers" prevent collusive or unfair settlements of class or derivative actions by exposing such "cozy deals," and otherwise provide information and legal arguments that enable courts to properly assess and evaluate a settlement); *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014) (Posner, C.J.) (third parties "who smell a rat can object to approval of the settlement."). For this reason, courts have held that objectors' "requests for fees must not be slighted." *In re Trans Union Corp.*, 629 F.3d at 743.

61.     There is no question that this factor weighs heavily in favor of CLM. The Second Circuit expressly recognized that Cohen's appeal furthered "important public purposes" because SOX 304 ensures the "integrity of the public markets." *Cohen*, 622 F.3d at 195. Moreover, as a result of Cohen's appeal, executives can no longer use class and derivative settlements to shift

liability for fraudulent conduct onto the shareholder victims and evade the law. *See, e.g.*, Melissa Maleske, *Executives Can't Negotiate Away SOX Clawbacks*, INSIDE COUNSEL (Jan. 1, 2011).

### G.    Comparison to Other Objector Fee Awards

62.    Courts have recognized that this factor is of limited value because the impact that objectors have on settlements can vary widely. *McDonough,* 80 F. Supp. 3d at 661 (expressing wariness about "placing too much emphasis on the awards in similar cases . . . .The impact objectors have on class action settlements varies widely."). Indeed, the extraordinary facts of this case prove why there should not be an overreliance on prior fee awards to objectors.

63.    There has never been a case in which an objector litigated an issue of first impression against uniform opposition and successfully preserved a $186 million iron-clad, strict liability claim, resulting in a $132 million recovery, particularly a litigant who was compelled to wait a decade to receive payment and, in the interim, bore all the risks of litigation and collection. CLM and Cohen deserve an award commensurate with their "terrific efforts" and the extraordinary benefit they conferred.

64.    Cohen did exactly what a third-party objector to a collusive settlement ought to do — he successfully fought against a "cozy deal" that would have traded away a $186 million claim that will now be the source of recovery for the Post-Confirmation Debtor, the Recovery Trust and their constituencies. It would be unjust to allow all parties to benefit from the fund that Cohen's and CLM's efforts created without providing an appropriate fee award to them. *See, e.g.*, *Goldberger,* 209 F.3d at 47 (the common fund doctrine "prevents unjust enrichment of those benefitting from a lawsuit without contributing to its cost"); *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 187 (3d Cir. 2005) (the common fund doctrine "provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund . . .") (internal citations

omitted).

65. Although the facts of this case and the magnitude of Cohen's and CLM's success are unique, there is ample support for an award of $25 million (or more). For example, in *In re Prudential*, the objector increased the common fund by 1.4% and, as a result, the court awarded him 1.4% of the amount awarded to class counsel. 273 F. Supp. 2d at 572. Using this same metric, Cohen increased the common fund by 275% ($132 million/$48 million = 2.75) and thus CLM would be entitled to 275% of the fees awarded to class counsel, or approximately $37 million (2.75 x $13.5 million = $37 million).

66. The $48 million used in the equation above assumes the approximately $13 million value of the shares at the time they were contributed by the Company, which was years prior to the bankruptcy filing. The current value of those shares is unknown, and are certainly worth far less than they were in 2007. Using only the approximately $35 million cash portion of the common fund as a basis, Cohen increased the fund by 377% and by this metric would be entitled to a fee award of over $50 million (3.77 x $13.5 million = $50.9 million).

67. Moreover, courts also often grant fee awards to objectors totaling between 10–25% (and up to 34%) of the benefit conferred, even in situations in which the objector did not alter the size of the common fund. *See, e.g.*, *McDonough*, 80 F. Supp. 3d at 660 (awarding objector fee of up to 9.9% of the benefit conferred even though objector "did not alter the size of the fund"); *Arnett v. Bank of America N.A.*, Case No. 3:11-CV-1372-SI, 2014 WL 5419125, *3 (D. Oregon 2014) (awarding objector 25% of benefit conferred for objecting to expenses sought by plaintiff's counsel); *Dewey v. Volkswagen of America*, 909 F. Supp. 2d 373, 396–97 (D.N.J. 2012) (awarding objector 10.5% of the benefit conferred for identifying deficiencies in representations made by plaintiffs); *In re Transpacific Passenger Air Transportation Antitrust*

*Litigation*, No. C 07-05634 CRB, 2015 WL 4776946, *2 (N.D. Ca. Aug. 13, 2015) (awarding objecting party approximately 9% of benefit conferred for objecting to expenses sought by plaintiff's counsel); *In re Puerto Rican Cabotage Antitrust Litigation*, 815 F. Supp. 2d 448, 468 (D. Puerto Rico 2011) (awarding 10% of the benefit conferred for objecting to plaintiff's counsel's legal fee request); *Kaufman v. Am. Express Travel Related Services, Co.*, Case No. 07-cv-01707, 2016 WL 806546, *14 (N.D. Ill. Mar. 2, 2016) (awarding objector 34.8% of the benefit conferred for generating changes to notice that increased claims rate).

68.     Cohen and CLM did far more than merely object to fees, correct certain misstatements in notices to class members, or provide incidental benefits. Their contributions preserved the claim that will make unsecured creditors whole and provide tens of millions of dollars to shareholders and victims of Brooks' fraud.

69.     A $25 million award to CLM, for example, would represent only 18.9% of the common fund created, well within the 10–25% awarded to objectors for doing far less. *See, e.g.*, *Arnett*, 2014 WL 5419125 at *3 (awarding objector 25% of benefit conferred for objecting to expenses sought by plaintiff's counsel).

## H.     Comparison to Class Counsel's Fee Awards

70.     Also relevant to the determination of an appropriate fee award to CLM are the other fee awards in this matter. A fee award in the range of $20–25 million fee is hardly excessive compared to the $13.5 million in fees awarded to Class Counsel.

71.     Putting aside the critical fact that Class Counsel achieved the $48 million common fund by agreeing to *give away* a $186 million strict liability SOX 304 claim, counsel for the class were awarded $13.5 million in the aggregate — and received nearly $10 million of that amount ten years ago, and $1.5 million over two years ago.

26

72. But for the SOX 304 claim that Cohen and CLM preserved, it is unlikely that the class members would receive *anything* following counsel's agreement to dismissals with prejudice before the restitution awards became final. It would defy explanation to award Cohen and CLM fees less than the $13.5 million awarded to class counsel.

73. Ironically, Cohen's and CLM's efforts will preserve the fees awarded to Class Counsel. The proceeds of the SEC Settlement will fund the full repayment of the non-recourse Loan to the Debtors. As such, class counsel's obligation to return over $11 million in fees already paid will not be triggered. *See, e.g.*, 7/6/15 Bankr. Hearing Tr., p. 53:17-21 ("ETKIN: . . . to the extent class members don't receive the full level of consideration originally anticipated pursuant to the [Stipulation of Settlement], class counsel's fees will be reduced proportionately").

74. There can be no doubt that each of the factors above weighs heavily in favor of CLM. Tellingly, the Debtors' objection to awarding CLM fees in 2015 was solely on the ground that the benefit Cohen and CLM created was "speculative" and their efforts did not create a common fund. *See,* ¶ 17, *supra*. Subsequently, the "common fund" for which those who opposed Cohen and CLM in 2015 claimed credit vanished with the abatement of the forfeiture and criminal restitution awards against Brooks. Now, pending approval by the Commission of the SEC Settlement, the fund from which everyone will be paid is attributable to the preservation of the SOX 304 claim by Cohen and CLM and, of course, to the outstanding efforts of the SEC attorneys.

## CONCLUSION

For the reasons set forth herein, CLM respectfully request that this Court (i) issue an order establishing a $25 million reserve from the funds received as a result of the SEC Settlement to be held pending the determination of the amount of Cohen's and CLM's fee award

27

and the payment to Cohen and CLM of such award, and (ii) grant any such further relief that it deems just and proper.

Dated: Wilmington, Delaware
        January 17, 2018

                                    GELLERT SCALI BUSENKELL & BROWN, LLC

                                    */s/ Michael Busenkell*
                                    Michael Busenkell (DE 3933)
                                    1201 N. Orange Street, Suite 300
                                    Wilmington, DE 19801
                                    Tel.: (302) 425-5800
                                    Fax: (302) 425-5814
                                    Email: mbusenkell@gsbblaw.com

                                    *and*

                                    CARTER LEDYARD & MILBURN LLP

                                    Gary D. Sesser , Esq.
                                    William F. Sondericker, Esq.
                                    Leonardo Trivigno, Esq.
                                    2 Wall Street
                                    New York, New York 10005
                                    Tel. (212) 732-3200

                                    *Attorneys for Movant Carter Ledyard & Milburn LLP*

8179762.8