# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SS BODY ARMOR I, INC., et al.,[1] | ) | Case No. 10-11255 (CSS) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | **Related Docket No. 4019** |

**Objection Deadline: January 31, 2018 at 4:00 p.m.**
**Hearing Date: February 15, 2018 at 11:00 a.m.**

## OPPOSITION OF POST-CONFIRMATION DEBTOR SS BODY ARMOR I, INC. AND THE RECOVERY TRUSTEE TO MOTION OF CARTER LEDYARD & MILBURN LLP TO ESTABLISH A $25 MILLION RESERVE TO PAY A FEE AWARD TO D. DAVID COHEN AND CARTER LEDYARD & MILBURN LLP

SS Body Armor I, Inc. (the "Debtor"), the post-confirmation debtor in this chapter 11 case, and the Recovery Trustee ("Recovery Trustee") of the Recovery Trust established pursuant to the confirmed Plan respectfully submit this opposition to the *Motion of Carter Ledyard & Milburn LLP to Establish Reserve to Pay Fee Award Pursuant to Order Dated December 3, 2015* [D.I. 4019] (the "Motion"), by which Carter Ledyard & Milburn LLP ("CLM") requests that the Court order the Debtor to establish a $25,000,000 reserve to fund an administrative fee award to CLM and its client, D. David Cohen ("Cohen").[2]  In support of this opposition, the Debtor and the Recovery Trustee state as follows:

## Preliminary Statement

1.      CLM seeks the establishment of a reserve that is 1344% higher than the $1,860,000 administrative claim filed by Cohen and CLM in September 2015, is more than 45.4

---

[1]  The pre-confirmation debtors in these cases, and the last four digits of each debtor's federal tax identification number, were:  SS Body Armor I, Inc. (9361); SS Body Armor II, Inc. (4044); SS Body Armor III, Inc. (9051); and PBSS, LLC (8203).  All correspondence and pleadings for the Debtor must be sent to SS Body Armor I, Inc., c/o Pachulski Stang Ziehl & Jones LLP, 919 North Market St., 17th Floor, Wilmington, DE 19801, Attn: Laura Davis Jones, Esq.

[2]  While the Motion was filed only by CLM, it seeks the establishment of a reserve to fund the administrative fee award requested by both Cohen and CLM in September 2015 [D.I. 3300].

times greater than CLM's lodestar ($549,472.61) for fees incurred by Cohen and CLM in connection with the SOX 304 claim, and (if the Court were to order a $25,000,000 fee award) would charge the Debtor and its constituencies an astonishing rate of $16,642.26 per hour for the 1502.2 hours of work CLM performed for Cohen with respect to the SOX 304 claim. Moreover, the $25,000,000 reserve requested by Cohen and CLM represents more than 35% of the Debtor's potential recovery of approximately $70,000,000 pursuant to a global settlement agreement currently pending (but not yet approved, finalized, executed or funded) between the Debtor, the Recovery Trust, the U.S. Government, the estate of David Brooks, individual members of the Brooks family, and the lead plaintiffs ("Class Plaintiffs") in the pre-petition securities class action filed in the Eastern District of New York ("EDNY") against the Debtor, David Brooks, Terry Brooks and other parties.[3]

2.      Cohen/CLM's enormous fee request is based upon a fundamental misconception of the proposed global settlement (the "Global Settlement"). CLM asserts in the Motion that "the $132 million settlement of the SEC Action is attributable to the SOX 304 claim." Motion at pg. 3. It is not. The Global Settlement contemplates the forfeiture of approximately $143 million of the assets restrained by the U.S. Government in its Civil Forfeiture Proceeding against David Brooks' assets, and the payment (after costs and expenses of the U.S. Government) of the forfeited assets to the Debtor, the Class Plaintiffs and other qualifying victims on account of their respective petitions for remission submitted to the Department of Justice. The Debtor's petition for remission details losses in excess of $117 million, an amount that the U.S. Government has supported both during and after the criminal action against David Brooks, and the Class Plaintiffs' petition for remission details losses of approximately $186 million. The payments the

---

[3]   Any capitalized terms used but not defined in the Preliminary Statement have the meanings ascribed to such terms in the remaining sections of this opposition.

Debtor and the Class Plaintiffs will receive on account of their respective petitions for remission are attributable to the Civil Forfeiture Proceeding and the assets restrained in connection with that proceeding, **not** the SOX 304 claim. In fact, the SEC will not even be a party to the global settlement agreement between the U.S. Government, the Debtor, the Recovery Trust, the Class Plaintiffs and the Brooks parties – instead, the SEC and the Brooks estate will enter into a separate agreement (subject to approval by the SEC Commissioners) resolving the SOX 304 claim and the equally substantial disgorgement claims asserted in the SEC Action, by which the SEC seeks disgorgement of all of David Brooks' ill-gotten gains resulting from numerous securities law violations. Moreover, after application of the sharing arrangement established under the bankruptcy settlement between the Debtor and the Class Plaintiffs, the Debtor's anticipated recovery under the Global Settlement is approximately $70 million – not the $132 million repeatedly asserted in the Motion.

3. CLM also erroneously states in the Motion that the Debtor's potential recovery in the Civil Forfeiture Proceeding is a "modest $700,000 claim" [Motion at pg. 4], and that the Debtor has sought only $59 million as remission [Motion at ¶ 23] in connection with the criminal action against David Brooks. The Debtor's status as a victim, and its request for remission of $117 million of the restrained assets through **civil** forfeiture, are not discussed in the Motion. This is not surprising, given that Cohen has denied the Debtor's status as a victim, and therefore Cohen and CLM cannot attempt to claim credit (or enormous fees) if they acknowledge that the payments under the Global Settlement are to be received by the Debtor as a victim of Brooks' misconduct, not as a SOX 304 beneficiary. *See, e.g.*, D.I. 2923 at ¶ 19 (objection by Cohen arguing that "[t]here are no precedents (none at all) permitting a criminally controlled enterprise to secure an MVRA award from any of its underlings, or even from the principal wrongdoer …[n]one (or almost none) of the Debtors [sic] current constituencies were actually damaged by

the crimes in the criminal period"); *United States v. Brooks*, Case No. 06-cr-00550 (EDNY), at D.I. 1903, pg. 3 (motion by Cohen for leave to appeal the EDNY District Court's restitution order, arguing that "allocating $53.9 Million in payments to the bankrupt Company seems to assure that many persons who were <u>not</u> in any way victimized by Brooks' crimes will be receiving 'windfall' amounts prohibited by the MVRA") (emphasis in original).

4.      Thus, it is clear that Cohen and CLM did not create the "common fund" from which the Debtor will receive its anticipated recovery under the Global Settlement – in fact, Cohen opposed the very basis for that recovery.  As a result, it would be appropriate to deny any fee award to Cohen and CLM under the "common fund" doctrine, which provides for fee awards to parties who actually create the common fund, or prevent its diminution.  The Court's order on the Cohen/CLM fee application reflects this concept, providing that any fee award to Cohen/CLM will be paid solely from funds the Debtor receives on account of the SOX 304 claim, if any, and further provides that "if the Debtors do not receive any funds on account of the SOX 304 Claim, no fee shall be payable."  *See* Ex. A to Motion at pgs. 2-3.

5.      Cohen and CLM may argue, in response to this opposition, that they nonetheless contributed to the Global Settlement because the existence of the SOX 304 claim provided some "leverage" in the negotiation of the Global Settlement.  That type of secondary contribution, of course, is a far cry from what is claimed in the Motion, where Cohen and CLM attempt to take credit for "saving" the Plan and single-handedly making "tens of millions of dollars" available for the Debtor's constituencies.  Motion at ¶ 51.  The position taken by Cohen and CLM ignores the reality of this chapter 11 case.  The Global Settlement and the recoveries that will flow to the Debtor's stakeholders as a result of the Global Settlement are the culmination of years of effort by (among other parties) the U.S. Government and its agencies, the Debtor's CRO and financial advisors, the Debtor's bankruptcy counsel and special counsel, the Class Plaintiffs and their

counsel, the pre-confirmation Committees in the chapter 11 case, the Committees' respective counsel and financial advisors, and the Recovery Trust (including its counsel and advisors) established pursuant to the confirmed Plan. The work required to bring all parties to the Global Settlement to a point of resolution involved, among other things:

- the Class Action and Derivative Action filed in 2005;

- the investigation, preparation and successful prosecution of the criminal action against David Brooks, filed in 2007;

- the identification of Brooks' assets in the United States and abroad, and the restraint of those assets in the Civil Forfeiture Proceeding, filed in 2010;

- the Debtor's bankruptcy in 2010, litigation with the Class Plaintiffs in the chapter 11 case, further litigation with Cohen and other parties regarding the bankruptcy settlement and the plan (including Cohen's attempts to argue that the bankruptcy settlement was "too rich" for the Debtor, and his collusion with the Brooks family in their attempt to replace the Debtor's board of directors) and, ultimately, the Debtor's successful exit from chapter 11 in November 2015;

- two years of global settlement negotiations between the Debtor, the Class Plaintiffs, the pre-confirmation Committees and the Brooks family that began in 2011, and related negotiations, meetings and other discussions between the Debtor's bankruptcy counsel, counsel for the Class Plaintiffs and the U.S. Government during that time period;

- the investigation and preparation of the petitions for remission on behalf of the Debtor by the Debtor's special counsel, and the investigation and preparation of the petition for remission on behalf of the Class Plaintiffs by their counsel;

- litigation between the Brooks family and the U.S. Government regarding the restrained assets, with the Brooks family having asserted claims to at least $85 million of the restrained assets;

- the re-opening of the SEC Action in 2017 following David Brooks' death in October 2016, with the SOX 304 claim as only one of fourteen claims asserted by

the SEC, and substantial motion practice in 2017 between the SEC and the Brooks estate; and

- finally, the successful negotiation of the Global Settlement, which required (among other things) an agreement between the U.S. Government and the Brooks family (subject to DOJ approval) regarding the allocation of the restrained assets, agreements among the Debtor, the Class Plaintiffs, the Brooks estate and the Brooks family to resolve the claims pending between them (including the Brooks family's unsecured claims and equity interests in the chapter 11 case, the claims asserted in the Derivative Action, and the claims asserted in the Class Action), and a separate agreement between the SEC and the Brooks estate to conclude the SEC Action (subject to approval by the SEC Commissioners).

6. Therefore, it is an understatement to say that Cohen and CLM were not the sole or primary parties responsible for the Debtor's anticipated recoveries under the Global Settlement. The work performed by Cohen and CLM related to only one of the many claims "on the table" during the negotiation of the Global Settlement. Neither Cohen nor CLM made any contribution to any other aspect of the Global Settlement – as discussed above, they had no involvement in the Civil Forfeiture Proceeding, Cohen denied the Debtor's status as a victim with respect to the Restrained Assets, and Cohen opposed the mechanisms that ultimately will provide for distribution to the Debtor's stakeholders (*i.e.*, the bankruptcy settlement and Plan).

7. Under these circumstances, a fee award to Cohen/CLM as a percentage of the Debtor's anticipated recovery under the Global Settlement is not appropriate. Where, as here, a party has (at best) made some type of unquantifiable, tangential contribution to a multi-faceted settlement that involved numerous other parties, courts calculate any fee award using the lodestar method, and must carefully consider whether the application of a multiplier is warranted. *See, e.g., Winston & Strawn LLP v. F.D.I.C.*, 894 F. Supp. 2d 115, 129 (D.D.C. 2012) (denying any percentage of recovery award, and refusing to apply lodestar multiplier, where consulting

attorney failed to demonstrate that he was responsible for entire settlement amount, performed the least amount of work of all professionals involved, and court was unable to calculate what portion of settlement, if any, resulted from attorney's work); *Cooperstock v. Pennwalt Corp.*, 820 F. Supp. 921, 926-27 (E.D. Pa. 1993) (where different actions had been filed by both shareholder plaintiffs and other parties, applying lodestar method with no multiplier to shareholder plaintiffs' request for fees and holding that "awarding a fee based on a percentage of the monetary fund would be inappropriate" because the court found "the benefit conferred by [plaintiffs] to be unquantifiable" and that plaintiffs could "only be partly credited with conferring the benefit achieved"). In light of the nature of the Global Settlement, and the limited (if any) involvement of Cohen and CLM in the success achieved through the Global Settlement, the Debtor and the Recovery Trustee respectfully submit that, in the event the Court determines that some fee award to Cohen/CLM is appropriate: (i) no fee should be payable until the Global Settlement is executed and the Debtor receives its anticipated recovery under the Global Settlement; and (ii) the amount of any fee award should be calculated using the lodestar method based on CLM's actual fees of $549,472.61, with either no multiplier or a multiplier that does not exceed the 3.38 multiplier espoused in the Cohen/CLM fee application, resulting in a maximum fee of $1.86 million. *See* D.I. 3300 at ¶¶ 107-108.

### Statement of Relevant Facts

8. The post-petition settlement agreement between the Debtor and the Class Plaintiffs (the "Bankruptcy Settlement") was approved by this Court on July 9, 2015, and was approved by the EDNY District Court in the Class Action on August 18, 2015. On the same date, the EDNY District Court entered an order granting the Debtor's motion to dismiss the Derivative Action, with the dismissal to become effective once all of the other settlement

approval orders become final and non-appealable. Cohen filed appeals from the EDNY District Court's orders in both the Class Action and the Derivative Action. On July 29, 2016, the Second Circuit affirmed the EDNY District Court's dismissal of the Derivative Action. *Cohen v. Huston, et al.*, 2016 WL 4059543, *1-2 (2d Cir. July 29, 2016). On February 19, 2016, the Second Circuit dismissed Cohen's Class Action appeal for lack of standing, because he "opted out of the class and is not a party to the settlement" and "has not stated a plausible interest affected by the judgment." *In re DHB Industries, Inc. Class Action Litigation*, Case No. 15-2935 (2d Cir.) at D.I. 71. Two additional appeals, both filed by Cohen, remain pending in the United States District Court for the District of Delaware with respect to the Bankruptcy Settlement: (i) Cohen's appeal from this Court's order approving the Bankruptcy Settlement; and (ii) Cohen's appeal from this Court's order regarding the $1.86 million Cohen/CLM fee application and the $300,000 fee paid prior to the petition date and retained by Derivative Counsel pursuant to the Bankruptcy Settlement. The Delaware District Court has stayed both of those appeals, with joint status reports due to be filed on April 20, 2018.

9.      The Bankruptcy Settlement provides for, among other things: (i) the interest-free non-recourse $20 million loan from the Class Plaintiffs that was used to fund the chapter 11 plan co-sponsored by the Debtor and the Official Committee of Unsecured Creditors (the "Plan"); and (ii) a 50/50 division among the Debtor and the Class Plaintiffs of certain recoveries up to $128.4 million, with a 63/37 division (in favor of the Debtor) of any recoveries in excess of $128.4 million.[4] The recoveries to be shared among the Debtor and the Class Plaintiffs include, among other things, any recoveries on account of the parties' rights or claims to the assets restrained ("Restrained Assets") by the U.S. Government in the civil forfeiture proceeding captioned as

---

[4]   The Court confirmed the Plan on November 10, 2015. The appeals from the confirmation order filed by David Brooks and Jeffrey Brooks have been dismissed, and thus the confirmation order has become final and non-appealable.

*United States v. All Assets Listed on Schedule I Attached Hereto and All Proceeds Traceable Thereto*, Case No. 10-cv-04750 (EDNY) (the "Civil Forfeiture Proceeding").[5]

10.     Both the Debtor and the Class Plaintiffs have submitted petitions for remission (the "Petitions for Remission") to the Department of Justice ("DOJ") requesting that the U.S. Government use the Restrained Assets to compensate the Debtor and the Class Plaintiffs (respectively) for the devastating losses suffered as a result of David Brooks' misconduct. Neither the Petitions for Remission nor the Civil Forfeiture Proceeding abated upon Brooks' death in October 2016.[6]

11.     With respect to the Debtor's Petitions for Remission, the Debtor submitted a Petition for Remission on May 27, 2015, which the DOJ referred to its Asset Forfeiture and Money Laundering section ("AFMLs").  At that time, the Debtor sought as remission the approximately $59 million of losses that Judge Seybert had not ordered as restitution to the Debtor in the criminal action against David Brooks.  After David Brooks' death, AFMLs requested that the Debtor supplement its Petition for Remission.  By letter dated September 8, 2017, the Debtor submitted its supplemental Petition for Remission.  The Debtor's supplemental Petition for Remission details the full amount of losses, totaling in excess of $117 million, that the Debtor suffered as a result of Brooks' misconduct, including: (i) a fraudulent compensation scheme by which David Brooks awarded himself approximately $8.6 million in unauthorized compensation; (ii) a fraudulent manufacturing arrangement that allowed David Brooks to siphon $21.5 million from the Debtor; (iii) $2.5 million in IRS taxes, penalties and interest paid by the

---

[5]   The description of the Bankruptcy Settlement set forth herein is intended solely as a summary.  The precise terms of the Bankruptcy Settlement, including terms related to the division of any shared recoveries, are set forth in the Amended Settlement Agreement dated May 4, 2015 and the Addendum to Amended Settlement Agreement dated June 10, 2015.

[6]   On September 20, 2017, the Second Circuit held that David Brooks' death abated his criminal conviction and the EDNY District Court's order awarding restitution to the Debtor and the Class Plaintiffs.

Debtor; (iv) legal fees, including those incurred by the Debtor and those advanced by the Debtor to David Brooks and other former officers and directors, in excess of $28 million; (v) more than $16.7 million of remediation and restatement costs incurred by the Debtor; and (vi) losses in excess of $39.9 million incurred by the Debtor in connection with its chapter 11 case.

12.     In all conversations between the Debtor's counsel, the United States Attorney's Office for the Eastern District of New York ("USAO-EDNY") and AFMLs, the U.S. Government has acknowledged that the Debtor was a victim of David Brooks' crimes. This is consistent with the USAO-EDNY's position in the criminal action against Brooks, in which the U.S. Government advocated that the Debtor was the single largest victim of the fraud and other misconduct committed by David Brooks and the other criminal defendants. Judge Seybert agreed, stating as follows in the March 2015 restitution order:

> In 2003, Defendants [David Brooks and his co-defendants] began a number of schemes to reap millions in personal profit at the expense of the Company and its shareholders. The sheer number and diversity of these fraudulent schemes strains belief. It is no stretch to say that Defendants ransacked that Company for their own gain, and their conduct was devastating to both the Company and its shareholders.

*See United States v. Brooks*, Case No. 06-cr-00550 (EDNY), at D.I. 1869, pgs. 4-5.

13.     The Class Plaintiffs also submitted a Petition for Remission to the DOJ after David Brooks' death. The Class Plaintiffs' Petition for Remission details losses of approximately $186 million, based on David Brooks' securities fraud, mail fraud, wire fraud, insider trading and conspiracy to commit those crimes for which he was criminally convicted. That conduct was the direct cause of the significant losses incurred by the investor victims.

14.     In addition to the Petitions for Remission asserted in connection with the Civil Forfeiture Proceeding, the Debtor and the Class Plaintiffs have other civil claims against the Brooks estate, members of the Brooks family and various Brooks-related entities that remain extant following David Brooks' death. In particular, David Brooks' death did not abate the

Debtor's breach of fiduciary duty, unjust enrichment and other civil claims against the Brooks estate, Terry Brooks, Jeffrey Brooks and related entities (*i.e.*, the Derivative Action claims), or the Class Plaintiffs' securities fraud claims against the Brooks estate, Terry Brooks and other parties (*i.e.*, the Class Action claims). Neither the Derivative Action nor the Class Action has been dismissed, as the Bankruptcy Settlement provides that the actions will not be dismissed until all of the settlement approval orders become final. Moreover, in the absence of a global resolution, if the provisions of the Bankruptcy Settlement requiring dismissal had been triggered, the Debtor and Class Plaintiffs fully intended to request permission from this Court and the EDNY District Court to amend the Bankruptcy Settlement to eliminate the provisions regarding dismissal, given the changed circumstances since the parties executed the Bankruptcy Settlement – specifically, Brooks' death and the abatement of the restitution order.

15. The SEC's civil enforcement action (the "SEC Action"), in which the SEC has asserted fourteen claims against the Brooks estate, including the SOX 304 claim and disgorgement claims for all of Brooks' ill-gotten gains from his multiple securities violations, also did not abate on Brooks' death. The SEC Action was filed in 2007 in the United States District Court for the Southern District of Florida ("Florida District Court") under the caption *SEC v. Brooks*, Case No. 07-cv-61526 (S.D. Fla.), but then was stayed during the pendency of the criminal action against David Brooks. The SEC Action was re-opened in January 2017 and Jeffrey Brooks, as the personal representative of the Brooks estate, was substituted in as the defendant in the SEC Action.

16. In light of the wide variety of unresolved claims arising out of David Brooks' misconduct, and the numerous parties involved in all of the pending litigation matters, the U.S. Government, the Debtor, the Recovery Trust, the Class Plaintiffs, the Brooks estate, individual members of the Brooks family (who asserted claims to at least $85 million of the Restrained Assets)

and the SEC participated in a two-day global mediation that began on December 6, 2017. That mediation resulted in the proposed Global Settlement, the terms of which currently are being finalized and documented, and remain subject to the requisite internal approvals at the DOJ and the SEC. At present, the salient terms of the Global Settlement are as follows:

- The U.S. Government, the Debtor, the Recovery Trust, the Class Plaintiffs, the Brooks estate and the Brooks family (individually and on behalf of related entities) will execute a final settlement agreement. The SEC will not be a party to that agreement.

- Pursuant to the final settlement agreement, the parties will agree to the forfeiture of approximately $143 million of the Restrained Assets. That amount will first be used to pay the costs and expenses incurred by the U.S. Government in connection with the prosecution of the Civil Forfeiture Proceeding and the criminal action against David Brooks. The remaining amount will be made available for remission to all persons who qualify as victims under 28 CFR §§ 9.2 and 9.8, including the Debtor and the Class Plaintiffs.

- The Debtor's share of the forfeited assets, as calculated according to the sharing arrangement established by the Bankruptcy Settlement, is expected to total approximately $70 million.

- Upon funding of the global settlement, mutual releases will be exchanged by the Debtor, the Recovery Trust and the Class Plaintiffs, on the one hand, and the Brooks estate and the Brooks family, on the other hand. Significantly, the Brooks estate and the Brooks family will release all rights to distributions from the Recovery Trust related to (i) any creditor claims asserted in the Debtor's chapter 11 case, and (ii) any equity interests in the Debtor.

- Separately, the SEC and the Brooks estate will enter into a consensual final judgment, subject to approval by the SEC Commissioners and the Florida District Court, which judgment will be deemed satisfied by the distributions under the final settlement agreement between the U.S. Government, the Debtor, the Recovery Trust, the Class Plaintiffs, the Brooks estate and the Brooks family.

DOCS_LA:311772.10 70934/001

17.    As stated above, the terms of the Global Settlement have not yet been finalized, the DOJ and SEC have not yet obtained the necessary internal approvals of the Global Settlement, the U.S. Government, the Debtor, the Recovery Trust, the Class Plaintiffs, the Brooks estate and the Brooks family have not yet executed a final settlement agreement, and the SEC and the Brooks estate have not yet executed the consensual final judgment in the SEC Action.    At present, the Debtor and the Recovery Trustee anticipate that final settlement documents will be executed within the next several months.    In accordance with the Plan, the Global Settlement will not be the subject of a motion for approval by this Court under Fed. R. Bankr. P. 9019.    *See* Plan [D.I. 3261] at Section 6.3(a) (Post-Confirmation Debtor shall carry out Post-Confirmation Debtor Functions "without supervision or approval by the Bankruptcy Court") and Section 1.1 (Post-Confirmation Debtor Functions include the "prosecution, pursuit, collection, settlement and/or any other disposition of Settlement Recoveries" and Settlement Recoveries means the "Debtors' Share" as defined in Bankruptcy Settlement); Bankruptcy Settlement [Ex. A to Plan] at Sections 3(a)-(d) (defining Debtors' Share to include the Debtor's percentage allocation of (among other things) any recoveries on account of rights or claims to the Restrained Assets).

## Argument

### I.    Cohen and CLM Did Not Create the "Common Fund" From Which the Debtor Will Receive Its Anticipated $70 Million Recovery Under the Global Settlement

18.    According to Cohen and CLM, "Cohen's efforts … resulted in a $132 million recovery" for the Debtor, "saved" the Plan, and "will allow for tens of millions of dollars to flow to creditors and equity holders."    Motion at ¶¶ 48, 51.    Based on these self-aggrandizing and inaccurate statements, Cohen and CLM argue that an award of up to $25 million – which

amounts to approximately 35% of the Debtor's anticipated recovery of an estimated $70 million under the Global Settlement – may be "entirely appropriate" in this case. Motion at ¶ 47.

19. Cohen/CLM's position is based on a mischaracterization of the terms of the Global Settlement. As set forth above, the Debtor anticipates an approximately $70 million recovery under the Global Settlement, not a $132 million recovery. Moreover, the Civil Forfeiture Proceeding (not the SOX 304 claim) is the source of the funds to be distributed under the Global Settlement, and the settlement amount is to be paid to the Debtor as remission based on its status as a victim of David Brooks' misconduct, to partially compensate the Debtor for its $117 million of losses.

20. Cohen and CLM appear to misunderstand, and certainly misstate in the Motion, the nature and extent of the recovery available to the Debtor through the Civil Forfeiture Proceeding. In the Motion, CLM argues that even if the U.S. Government successfully prosecuted the Civil Forfeiture Proceeding, the most the Debtor could have received from that action was a "modest $700,000 claim." Motion at pg. 4. CLM is wrong. Pursuant to 18 U.S.C. § 981, the Attorney General has authority to use assets forfeited in a civil forfeiture proceeding to compensate victims. *See* 18 U.S.C. § 981(d). The DOJ recognizes this authority in the U.S. Attorney's Manual, stating that "[i]n civil forfeitures also, the Attorney General is authorized to decide petitions for remission or mitigation." 28 C.F.R. Part 9-121.100 (citing 18 U.S.C. § 981(d) and 21 U.S.C. § 881(d)). Throughout the criminal action and following David Brooks' conviction, the USAO-EDNY has agreed and taken the position in numerous filings that the Debtor was a victim of Brooks' and the other defendants' criminal conduct. *See, e.g., United States v. Brooks*, Case No. 06-cr-00550 (EDNY), at D.I. 1762 (November 25, 2013 letter from the USAO-EDNY to Judge Seybert describing the Debtor's losses of $117 million, and the evidence submitted by the Debtor in support of those losses, and advocating for the Debtor's

-14-

status as a victim entitled to recovery of its losses). Ultimately, Judge Seybert agreed that the Debtor was a victim of David Brooks' misconduct, and was entitled to restitution.

21. The determination that the Debtor is a victim (as defined in federal statutes) and suffered losses in excess of $117 million is the result of years of extensive work and advocacy by the USAO-EDNY – which (among other things) advocated for the Debtor's status as a victim and for recovery of the full amount of losses suffered by the Debtor – and the Debtor's special counsel (now at Venable LLP) – who researched, prepared and advocated for the Debtor's restitution claims and the Debtor's detailed Petitions for Remission. Neither Cohen nor CLM made any contribution to those efforts. In fact, Cohen has taken the position that the Debtor was **not** a victim of David Brooks' misconduct, arguing in one of his objections to the Bankruptcy Settlement that:

> There are many precedents limiting Restitution to <u>actual</u> damage suffered by <u>actual</u> Victims of the criminal wrongdoings. There are no precedents (none at all) permitting a criminally controlled enterprise to secure an MVRA award from any of its underlings, or even from the principal wrongdoer. A Restitution award to <u>these</u> Debtors, with completely changed constituencies, partly for cost and expenses incurred more than four years after the crimes occurred is highly questionable. None (or almost none) of the Debtors [sic] current constituencies were actually damaged by the crimes in the criminal period.

D.I. 2923 at ¶ 19 (emphasis in original). Cohen repeated that argument in the EDNY District Court, where he unsuccessfully sought leave to appeal Judge Seybert's criminal restitution order on the grounds that, among other things, "allocating $53.9 Million in payments to the bankrupt Company seems to assure that many persons who were <u>not</u> in any way victimized by Brooks' crimes will be receiving 'windfall' amounts prohibited by the MVRA." *United States v. Brooks*, Case No. 06-cr-00550 (EDNY), at D.I. 1903, pg. 3 (emphasis in original).

22. Given that Cohen has denied the Debtor's status as a victim, and that neither Cohen nor CLM performed any work in connection with the Debtor's rights and claims to the

-15-

Restrained Assets (*i.e.*, the source of the "common fund" arising out of the Global Settlement), it would be entirely appropriate for this Court to award no recovery to either Cohen or CLM under the "common fund" doctrine. The "common fund" doctrine authorizes a fee award only when an individual (or his counsel) has caused the creation of the common fund, or prevented its diminution. *See, e.g., In re Holocaust Victim Assets Litigation*, 424 F.3d 150, 157 (2d Cir. 2005) ("a material benefit to the class is the sine qua non for an attorney's entitlement to an award of fees from the common fund"); *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) ("the attorneys whose efforts created the fund are entitled to a reasonable fee – set by the court – to be taken from the fund"); *C. Robert Suess v. Fed. Deposit Ins. Corp.*, 770 F. Supp. 2d 32, 41 (D.D.C. 2011) ("sine qua non to recovery from a common fund is the creation of that fund from the lawyer's efforts…. In other words, the lawyer's efforts must either cause the fund to come into creation or, once in creation and in control of the court, her efforts must keep it from being diminished…. [The party seeking a fee award] must show that its work was the cause in fact of the creation or preservation of the fund or that, but for its action, the fund would not have been created or preserved.") (citations omitted).

23. Consistent with established case law on this issue, the Court's order on the Cohen/CLM fee application provides that any fee award will "be paid solely from funds received by the Debtors or their successors-in-interest on account of the SOX 304 Claim, if any" and further provides that "if the Debtors do not receive any funds on account of the SOX 304 Claim, no fee shall be payable." *See* Ex. A to Motion at pgs. 2-3. Here, contrary to Cohen/CLM's arguments, the settlement funds that will be returned to the Debtor and the Class Plaintiffs are derived wholly from the assets restrained in the Civil Forfeiture Proceeding, not from any funds attributable to the SOX 304 claim. In fact, as stated above, the SEC will not even be a party to the global settlement agreement between the U.S. Government, the Debtor, the Recovery Trust,

-16-

the Class Plaintiffs and the Brooks parties – subject to approval by the SEC Commissioners, the SEC will enter into a separate agreement with the Brooks estate to resolve the SEC's claims against the Brooks estate and conclude the SEC Action. Because the Debtor is not receiving a recovery on the SOX 304 claim, but rather is receiving a recovery from the Restrained Assets based on the Petitions for Remission and the Civil Forfeiture Proceeding, neither existing case law nor this Court's order on the Cohen/CLM fee application require any fee award to Cohen or CLM.

## II. To the Extent Any Fee Award to Cohen/CLM Is Granted Under the "Common Fund" Doctrine, It Should Not Be Calculated Using the "Percentage of Recovery" Method

24. In calculating awards of attorneys' fees under the "common fund" doctrine, courts typically use either the "percentage of recovery" method or the "lodestar" method. *See generally In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 820-21 (3d Cir. 1995). By the Motion, Cohen/CLM argue for the establishment of a $25 million reserve, and a $25 million fee award, based on the "percentage of recovery" method. *See* Motion at ¶¶ 65-69. In doing so, Cohen/CLM urge the Court to grant them a percentage fee award based on the entire amount the Debtor expects to receive under the Global Settlement.

25. As discussed in the previous section, however, neither Cohen nor CLM created the "common fund" (*i.e.*, the portion of the Restrained Assets to be received by the Debtor) or performed any work to establish or preserve the Debtor's claims or rights to the Restrained Assets. Instead, and at best, Cohen and CLM performed work that helped to preserve one of the other claims "on the table" during the negotiation of the Global Settlement. This does not entitle Cohen or CLM to a percentage of the entire amount ($70 million) the Debtor expects to receive under the Global Settlement. *See Winston & Strawn LLP v. F.D.I.C.*, 894 F. Supp. 2d 115, 128 (D.D.C. 2012) ("Even if Mr. Fleischer succeeded in showing that he contributed to some degree to the settlement, courts are within their discretion to apply a percentage of the fund calculation

to only that portion of the fund for which counsel was responsible."). At most, Cohen or CLM could be entitled to an allocation correlating to their contribution to the SOX 304 claim, and any extra leverage the SOX 304 claim (which is just one of fourteen claims in the SEC Action) added to the negotiation of the Global Settlement, if the monetary value of that tangential contribution was amenable to the type of precise calculation required under the "percentage of recovery" method – but it is not.

26.     In the Third Circuit, courts generally apply the "lodestar" method, rather than the "percentage of recovery" method, where "the nature of the settlement evades the precise evaluation needed for the percentage of recovery method." *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d at 821 (court "may select the lodestar method…where it can calculate the relevant parameters (hours expended and hourly rate) more easily than it can determine a suitable percentage to award"). *See also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005) (lodestar method "is more typically applied … in cases where the nature of the recovery does not allow the determination of the settlement's value required for application of the percentage-of-recovery method"); *In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 498 (D.N.J. 2012) (lodestar method would be applied because the court could not "quantify in monetary terms" the benefit conferred – in that case, corporate reforms); *Weber v. Gov't Emples. Ins. Co.*, 262 F.R.D. 431, 450 (D.N.J. 2009) (applying lodestar method because not all claims had been submitted and thus benefits to class were "not readily subject to precise calculation such that a 'percentage of the total recovery'…could be discerned under the percentage-of-recovery approach"); *Petruzzi's Inc. v. Darling-Delaware Co.*, 983 F. Supp. 595, 598-599 (M.D. Pa. 1996) (lodestar method would be applied because attempts to calculate fees under percentage of recovery method – including counsel's calculation based on hypothetical

recovery that exceeded amount actually paid under settlement – ascribed "unrealistic values" to benefit conferred by counsel).[7]

27.     For instance, in *Cooperstock v. Pennwalt Corp.*, 820 F. Supp. 921 (E.D. Pa. 1993), the court applied the lodestar method to calculate the fees awarded to counsel for the shareholder plaintiffs in a derivative suit.  In that case, the plaintiffs filed their derivative suit after the announcement of a hostile takeover bid for their company (Pennwalt), seeking to (among other things) compel Pennwalt's directors to negotiate with the company (Centaur) that announced the takeover bid. *Id*. at 922-23.  Prior to the commencement of the derivative suit, Centaur had filed its own action against Pennwalt asserting similar claims. *Id*. at 923.  After the court denied Pennwalt's motion for a temporary restraining order in the Centaur action, Pennwalt found a "white knight" (Elf) that acquired all of its shares at a per-share price that exceeded Centaur's offer, which mooted the shareholder plaintiffs' derivative action. *Id*.  The shareholder plaintiffs then sought an award of attorneys' fees on the grounds that their efforts contributed to the higher per-share price received by all of Pennwalt's shareholders. *Id*. at 924-25.  The court concluded that "awarding a fee based on a percentage of the monetary fund would be inappropriate" because the court found "the benefit conferred by class plaintiffs to be

---

[7]   In each of the "percentage of recovery" cases cited in the Motion [Motion at ¶ 67], the objector's work contributed to a specific, identifiable increase in the settlement, and the objector was awarded a percentage of the amount of that increase. *See McDonough v. Toys "R" Us, Inc.*, 80 F. Supp. 3d 626, 662 (E.D. Pa. 2015) (distribution increased by $15 million as a result of issue raised on appeal, and objector awarded percentage of that amount); *Arnett v. Bank of Am., N.A.*, 2014 U.S. Dist. LEXIS 149679, *9-10 (D. Or. Oct. 22, 2014) (objections to requested expenses of $38,267 led to withdrawal of request for reimbursement, and objector awarded percentage of withdrawn amount); *Dewey v. Volkswagen of Am.*, 909 F. Supp. 2d 373, 396 (D.N.J. 2012) (where objector's work clarified recoveries for certain sub-class, court calculated benefit conferred based on value of claims submitted by affected class members and awarded objector percentage of that amount); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2015 U.S. Dist. LEXIS 106943, *12-14 (N.D. Cal. Aug. 13, 2015) (successful objection to $1 million of expenses, with award to objector of a percentage of that amount); *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 467-468, (D.P.R. 2011) (objection decreased fees by $3 million, and objector was awarded percentage of that amount); *Kaufman v. Am. Express Travel Related Servs.*, 2016 U.S. Dist. LEXIS 26167, *44-45 (N.D. Ill. Mar. 2, 2016) (objections regarding notice contributed to $1.3 million increase in claims, and court awarded objectors percentage of that amount).

unquantifiable." *Id*. at 926. In particular, the court found that the shareholder plaintiffs could "only be partly credited with conferring the benefit achieved" because Centaur's actions (including the hostile takeover bid itself) were the "critical and more persuasive factor" in Pennwalt's decision to merge with Elf. *Id*. Moreover, the shareholder plaintiffs occupied only a "secondary" monitoring role in the litigation that ultimately led to the successful merger with Elf. *Id*. at 925-26. Therefore, the court granted a fee award to the shareholder plaintiffs based on the lodestar method, without any multiplier. *Id*. at 927.

28. In this case, and as discussed further in the next section, application of the lodestar method to the fees incurred by Cohen/CLM in connection with SOX 304 claim – even with the high multiplier of 3.38 requested in the Cohen/CLM fee application – would result in a fee award of not more than $1.86 million to Cohen and CLM, an amount that bears no relation to the $25 million requested in the Motion. To try to avoid that result, Cohen and CLM attempt to claim credit, not just for their work on preserving the SOX 304 claim, but for the entire amount of the Global Settlement and all of the benefits to the Debtor's stakeholders as a result of the Global Settlement, arguing that their actions "saved" the entire Plan and will provide for the distribution of the "tens of millions of dollars" to the Debtor's constituencies. Motion at ¶ 51.

29. Cohen and CLM's position, however, relies on a distorted view of the history of this chapter 11 case. The process that allowed the Debtor to successfully exit chapter 11, and now be in a position to receive and distribute an estimated $70 million pursuant to the Global Settlement, was the result of the extensive work performed by many different individuals, including work performed to protect the Debtor from litigation tactics employed by Cohen that were adverse to all of the Debtor's stakeholders. As just a few of many examples:

- The Bankruptcy Settlement, which provided $20 million of funding for the Plan, established the sharing arrangement between the Debtor and the Class Plaintiffs

with respect to the $37 million of escrowed funds and the other shared recoveries, and eliminated the approximately $186 million of unsecured claims filed by the Class Plaintiffs in the chapter 11 case, was the result of extensive negotiation among the Debtor (through its CRO), the Debtor's bankruptcy counsel, the Class Plaintiffs and their counsel, the Creditors' Committee and its counsel, and the Equity Committee and its counsel. Cohen cannot claim any credit for the Bankruptcy Settlement, which he vehemently opposed with both nonsensical arguments – including that the Bankruptcy Settlement would allow the Debtor's counsel to become counsel for the Class Plaintiffs – and arguments inimical to the Debtor's interests – including that the Debtor had no right to the escrowed funds and that the Class Plaintiffs should not release their claims against the Debtor. *See, e.g.*, D.I. 2923 at ¶¶ 3-4.

- The Plan, which allowed the Debtor to exit chapter 11 more than five years after the petition date and will now provide for distributions to the Debtor's stakeholders, was prepared, co-sponsored and ultimately confirmed through the efforts of the Debtor, the Debtor's CRO and financial advisors, the Debtor's bankruptcy counsel, the Creditors' Committee, and the Creditors' Committee's counsel and financial advisors, with the support of the Class Plaintiffs and their counsel. Cohen not only objected to the Plan, but also went so far as to work with David Brooks to try to develop a competing plan. *See* 03/19/15 Hearing Tr. at 30:18-31:15. Cohen also supported and was "actively involved" in the Brooks family's attempt to replace the Debtor's board with a Brooks-sponsored board (and thereby interfere with the Plan) [D.I. 2885 at ¶ 10], filed a joinder [D.I. 2885] in support of Jeffrey Brooks' related motion for relief from the automatic stay, and testified at length on March 19, 2015 in support of the stay relief motion.

- The Global Settlement is the result of years of work performed by a multitude of individuals: the USAO-EDNY and the federal agents who investigated Brooks' extensive misconduct, identified and located the Restrained Assets in the United States and abroad, assembled a successful case against Brooks in the criminal action (with that evidence now available in the Civil Forfeiture Proceeding) and are prosecuting the Civil Forfeiture Proceeding; the Debtor, the Class Plaintiffs, the pre-confirmation Committees in the chapter 11 case, the Recovery Trust

Committee, and their respective counsel, financial advisors and representatives, who commenced global settlement negotiations with the Brooks family approximately six years ago (with a term sheet executed in 2011), negotiated with the U.S. Government regarding the first global settlement for over two years, and/or negotiated the current Global Settlement with the Brooks family and the U.S. Government; and the SEC, which commenced the SEC Action in 2007 and has been actively prosecuting both the SOX 304 claim and the disgorgement claims since January 2017. In keeping with Cohen and CLM's attempt to claim unearned credit for the Global Settlement, the Motion not only ignores all work performed by the U.S. Government, the Debtor, the Recovery Trust, the Class Plaintiffs and the Debtor's other constituencies, but even tries to insinuate that Cohen is responsible for the work performed by the SEC. *See* Motion at pg. 2 (implying that Cohen and CLM are responsible for the SEC's decision to re-open the SEC Action) and pg. 16 fn. 8 (attempting to claim credit, with no evidence, for the SEC's briefing on abatement issues).

- The Petitions for Remission submitted on behalf of the Debtor ($117 million) and the Class Plaintiffs ($186 million), through which the Debtor and the Class Plaintiffs will receive their respective recoveries under the Global Settlement. As discussed above, neither Cohen nor CLM contributed anything to the Debtor's Petitions for Remission – in fact, they appear to be ignorant of the nature and extent of the Debtor's submissions, and Cohen has actually taken the position that the Debtor is **not** a victim entitled to recovery.

- In addition to the funds to be allocated among the Debtor and the Class Plaintiffs on account of the Petitions for Remission, the Global Settlement will eliminate the at least $85 million of unsecured claims asserted by the Brooks parties (including a $63 million indemnification claim and more than $20 million of claims for rejection damages) and will cancel the equity interests held by the Brooks parties and related entities, which accounted for at least 25% of the outstanding shares in the Debtor prior to confirmation. The elimination of these claims and interests is due to the efforts of the Debtor's CRO, its bankruptcy counsel and its financial advisors, and the Recovery Trust, its counsel and its financial advisors, with no assistance from Cohen or CLM.

DOCS_LA:311772.10 70934/001

30.    Using the reasoning employed by Cohen and CLM in the Motion, all of the professionals that actually performed the work leading up to the Global Settlement should be entitled to a dramatic fee enhancement – Cohen and CLM have requested a reserve for a 1344% increase on their $1.86 million administrative claim – and a substantial percentage of the Debtor's recovery under the Global Settlement. *See, e.g., Winston & Strawn LLP*, 894 F. Supp. 2d at 129 ("[E]quity does not favor Mr. Fleischer's request for a percentage of the fund. None of the other attorneys in this case have been compensated based on the common fund doctrine. It would [be] inequitable to compensate Mr. Fleischer under a common fund theory when no other attorney has been paid on that basis. This is particularly true given that Mr. Fleischer, while he may have contributed creative legal theories, appears to have performed the least amount of work of the four shareholder firms.").  Of course, fee enhancements for all of the parties who contributed to the Global Settlement would in all likelihood eliminate any recovery on account of unsecured claims or equity interests.  In this regard, it is significant to note that, while Cohen and CLM claim that their requested reserve "will not prejudice any creditors or shareholders" [Motion at ¶ 44], a $25 million reserve may impact the amounts that would otherwise be available for immediate distribution on unsecured claims and/or equity interests, keeping in mind that Cohen's appeal regarding this Court's jurisdiction to award fees to Cohen/CLM remains pending, and that Cohen and CLM apparently intend to file another fee application at some point in the future.

31.    In any event, as demonstrated above, the Debtor's anticipated recoveries under the Global Settlement, and the distributions those recoveries will allow the Debtor and the Recovery Trustee to make to the Debtor's constituencies, are the result of the efforts of numerous individuals, law firms and government agencies.  As in *Cooperstock*, Cohen and CLM's actions with respect to the preservation of the SOX 304 claim made (at best) a tangential

contribution to the Global Settlement: the SOX 304 claim is only one of fourteen claims asserted in the SEC Action, with the SEC also having asserted claims for disgorgement of all of Brooks' ill-gotten gains resulting from multiple securities violations; the SEC Action is only one of the matters to be resolved as a result of the global mediation; the SEC will not be a party to the global settlement agreement between the U.S. Government, the Debtor, the Recovery Trust, the Class Plaintiffs and the Brooks parties; the SOX 304 claim will not be resolved pursuant to the global settlement agreement, but rather will (subject to approval by the SEC Commissioners) be resolved pursuant to a separate agreement between the SEC and the Brooks estate; and the SOX 304 claim is not the source of the Debtor's recovery under the Global Settlement. As discussed above, the Debtor will receive its anticipated settlement payment as remission from the Restrained Assets, based on the Debtor's Petitions for Remission and the Civil Forfeiture Proceeding. Any additional leverage that the SOX 304 claim provided during the negotiation of the Global Settlement is a secondary, unquantifiable benefit that cannot be measured as a percentage of the Debtor's anticipated recovery. Therefore, as discussed in the next section, to the extent a fee award is granted to Cohen/CLM, the award should be contingent upon the Debtor's receipt of its anticipated recovery under the Global Settlement, should be calculated under the lodestar method, and should reflect the tangential nature of any benefit that Cohen/CLM may have provided. *See Winston & Strawn LLP*, 894 F. Supp. 2d at 129 (denying any percentage of recovery award, and refusing to apply lodestar multiplier, where consulting attorney failed to demonstrate that he was responsible for entire settlement amount, performed the least amount of work of all professionals involved, and court was unable to calculate what portion of settlement, if any, resulted from attorney's work).

**III.** **Any Lodestar Fee Award to Cohen/CLM Under the "Common Fund" Doctrine Should Not Exceed $1.86 Million**

32.     In the Motion, CLM attempts to support its request for a $25 million reserve, and a $25 million fee award, by asserting that "[f]rom February 2007 through December 31, 2017, CLM billed over 5,200 hours and incurred legal fees totaling $2,402,178.55 and expenses totaling $216,995.58.10." Motion at ¶ 52.  As Cohen and CLM admitted in the Cohen/CLM fee application, however, CLM actually only billed 1,502.2 hours, incurred legal fees totaling $549,472.61 and incurred expenses of $73,451.44 in connection with the EDNY litigation and Second Circuit appeal – a total of $622,924.05 in fees and expenses for the work allegedly performed with respect to the SOX 304 claim.  D.I. 3300 at ¶ 107.

33.     Based on the work allegedly performed with respect to the SOX 304 claim – the only work for which Cohen and CLM can even purport to request a fee in this chapter 11 case – CLM's lodestar is $549,472.61.  A $25 million fee award to Cohen/CLM would reflect a lodestar multiplier of **45.4**, and a rate of **$16,642.26 per hour** for CLM's work.  The Motion does not even attempt to justify those figures, which is not surprising given that, in the Cohen/CLM fee application, Cohen and CLM asserted that a 3.38 multiplier would be "entirely reasonable" in this case.  D.I. 3300 at ¶ 108.

34.     The 3.38 multiplier requested in the Cohen/CLM fee application, which would result in a fee award to Cohen and CLM of $1.86 million, is itself a very high multiplier in light of the limited (if any) role of Cohen/CLM's work in the ultimate result obtained by the Debtor and the Recovery Trust through the Global Settlement.  The Third Circuit has held that, while "multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied," a court awarding fees must ensure that "the application of a multiplier is justified by the facts of a particular case." *Krell v. Prudential Ins. Co. of Am. (In re*

*Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions)*, 148 F.3d 283, 341 (3d Cir. 1998) (quoting 3 Herbert Newberg & Alba Conte, Newberg on Class Actions, § 14.03 at 14-5 (3d ed. 1992)).  Here, where the Global Settlement is the result of work performed by numerous parties, and resolves a wide variety of pending actions, with the work performed by Cohen and CLM providing (at best) only additional "leverage" in the settlement negotiations, if the Court awards any fee to Cohen and CLM, it would be appropriate to calculate the fee award without the application of any multiplier at all.  *See Cooperstock*, 820 F. Supp. at 927 ("it would be inappropriate to increase the initial fee determination with a multiplier in this situation in light of the fact that the [shareholder plaintiffs] played a secondary role in this litigation and were not entirely responsible for the benefits produced").  Therefore, in the event the Court determines that an award to Cohen and CLM is warranted in this case, the fee award should be $549,472.61 (no multiplier) and under no circumstances above $1.86 million (a multiplier of 3.38), and should be contingent upon finalization, execution and funding of the Global Settlement.

[remainder of page intentionally blank]

DOCS_LA:311772.10 70934/001

## Conclusion

WHEREFORE, the Debtor and the Recovery Trustee respectfully request that the Court deny the Motion in its entirety, and grant such other relief as the Court deems just and proper.

Dated:  January 31, 2018                PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Laura Davis Jones*

Laura Davis Jones (Bar No. 2436)
Alan J. Kornfeld (CA Bar No. 130063)
James E. O'Neill (Bar No. 4042)
Elissa A. Wagner (CA Bar No. 213589)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400
Email:  ljones@pszjlaw.com
        akornfeld@pszjlaw.com
        joneill@pszjlaw.com
        ewagner@pszjlaw.com

Counsel for SS Body Armor I, Inc.

[additional signature page follows]

Dated:  January 31, 2018                          THE ROSNER LAW GROUP LLC


                                                  /s/ Scott J. Leonhardt
                                                  Frederick B. Rosner (Bar No. 3995)
                                                  Scott J. Leonhardt (Bar No. 4885)
                                                  Jason A. Gibson (Bar No. 6091)
                                                  824 N. Market Street, Suite 810
                                                  Wilmington, DE 19801
                                                  Telephone:  (302) 777-1111
                                                  Email:  rosner@teamrosner.com
                                                          leonhardt@teamrosner.com
                                                          gibson@teamrosner.com

                                                   -and-

                                                  Robert M. Hirsh
                                                  Beth M. Brownstein
                                                  ARENT FOX LLP
                                                  1675 Broadway
                                                  New York, NY 10019
                                                  Telephone:  (212) 484-3900
                                                  Facsimile:  (212) 484-3990
                                                  Email:  robert.hirsh@arentfox.com
                                                          beth.brownstein@arentfox.com

                                                  Counsel for the Recovery Trust

DOCS_LA:311772.10 70934/001