FILED
2020 OCT 28  AM 11:35
CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

-----------------------------------------------------------X
In Re:

SS BODY ARMOR I, INC., *et al*,

Debtors.

Chapter 11

Case No: 10-11255 (CSS)
Jointly Administered

Re: D.I. 4501

-----------------------------------------------------------X

**AFFIDAVIT IN SUPPORT OF
SETTLEMENT STIPULATION
WITH CLAIMANT D. DAVID COHEN**

STATE OF NEW YORK    )
                     )ss:
COUNTY OF NASSAU     )

D. David Cohen, being duly sworn, deposes and says:

1.  The current Recovery Trustee of the Recovery Trust In re SS Body Armor I, Inc. et al, *fka* Point Blank Solutions, Inc. et al. (the "Debtor") has submitted a Settlement Stipulation resolving certain Claims which I have against the Debtor. Under the Stipulated Settlement Agreement, I am to receive a Settlement Payment of $940,000 from the Debtor. I have also reserved my right to obtain from my former counsel, Carter Ledyard Milburn, LP ("CLM") the amounts I previously paid to CLM in connection with my engagement of CLM to perform legal services relative to a prior Second Circuit proceeding an additional amount not to exceed $139,600. I also retain my Class 6 interests as a small stockholder of the Debtor. See *infra* para 9. I submit this Affidavit in support of the Stipulation of Settlement seeking this Court's approval. The Settlement has been approved unanimously by the Recovery Oversight Committee, there is a substantive basis for the Settlement and no substantive objection to the Settlement. This Affidavit

also relates to other proceedings pending before this Court, to wit, the motion of the Recovery Trustee for a status conference. See paras 16 & 17, *infra*.

2. This is a complex case in which the Debtor and a Class Action group together have recently recovered more than $130 Million. I have two types of unsecured interest group 3 claims against the Debtor: (a) Creditor Claims for liabilities existing as of the filing date, April 14, 2010 (Motion, Para 20, $1, 886,850) and (b) professional fee claims pursuant to 11 U.S.C. 503(b) for Substantial Contribution to the Debtor's Estate. (Motion Paras 21 and 22, $736,285.42). Thus, my total claims were more than $2.5 Million before the SOX 304 victory and the $130 Million collected.

3. In view of differences with CLM, I have chosen, to settle my personal creditor claims only and subject to approval of the Settlement by this Court. See Cohen Aff. September 27, 2020, in Opposition to Motion to Quash Subpoenas and in Further Support of Motion to Compel, para 10 et seq., not to pursue any professional fees claim for myself if this Settlement is approved.

## THE SETTLEMENT

4. There are two main elements of my creditor claims. A. My Employment Claim, and B. My Warrant/Securities Claim. Both claims arise out of contractual obligations which the Debtor had to me and which the Debtor's principal (Brooks) and the Debtor breached in a wide-ranging fraud of me and others. That fraud is proven and provable again, if necessary. So, there would be no issue of Debtor's liability to me, only of amount.

5. I undertook to work for the Debtor in late 2001 on an emergency basis for an arrangement which was to pay me $14,000 a month for continuing legal and executive

services which arrangement would kick in only when I secured a listing of DHB Common Stock on the American Stock Exchange ("ASE"). Securing that listing was thought to be an impossible task. The Debtor's listing on NASDAQ had been terminated in 1999 by NASDAQ because of a terrible fight with Brooks. By 2001, NASDAQ owned the ASE. By very hard work, and personal assurances to the ASE that I, with a perfect record of compliance with SEC and ASE regulations in the past, was becoming an officer of the Debtor and would be personally involved with the integrity of the Debtor's operations and SEC filings thereafter, I won the listing for the Debtor.

6.  The Listing was secured on February 1, 2002. Instead of complying with Debtor's arrangement with me, Brooks preemptively fired me four months later. Because he could not afford to have any ethical, honest, law abiding person in charge of review of submissions being made by the Company to the SEC and the ASE. Instead of hiring someone else to take the responsibilities Brooks and the Debtor had promised the ASE I would fulfill, Debtor gave the job of oversight to no one. For the next 94 months, July of 2003 to April of 2010, in the best interests of the Debtor and its equity holders other than Brooks, the Brooks family and their cohorts. I performed substantial services for the Debtor without any compensation. See Aff. Re: Motion to Quash, Para 19 (a) through (f) $14,000 a month for 94 months equals $1,316,000. My services were easily worth that much to the Debtor on an equitable basis. I, and only I, objected to the Class Action Settlement, I filed an Objection in the EDNY, took an appeal and hired CLM, personally paying it an additional $100,000 advance to prosecute the appeal and to keep open for the Debtor any and all claims, not only the SOX 304 claim, against Brooks. If I had to litigate my creditor claim, based on my employment and retainer amounts alone, I believe I

would have succeeded on the full amount, but for negotiated resolution I used an amount between $493,500 and $658,000, (the larger number being exactly one half of the total stipulated contract amount).

7. The second element of my creditor claim is the Warrant. Brooks tried to buy my Warrant from me in 2004. He and a director named Cary Chasin offered me $300,000 in mid-2004. He, in front of a whole slew of Debtor people and my wife, later in mid-2004 offered me $350,000. The Common Stock was then trading in the mid-teens at about $15, so there was a $10 spread on 100,000 Shares. I had the right to buy 100,000 Shares at $5 per Share and immediately resell at market: (then a One Million Dollar profit). The Debtor was clearly and unquestionably unrightfully holding my Warrant back from me. The Debtor has no known defense to that assertion.

8. In November and December, 2004, all of the other directors holding warrants exercised and sold shares. On November 29, Jerome Krantz sold 85,178 Shares at $19.61 per Share, and on November 30, he sold 31,050 Shares at $18.75 per Share. He got a total profit of $2,251,551. On November 29, Cary Chasin sold 46,486 Shares at $19,61 per Share, and on November 30, Chasin sold 62,000 Shares at $18.57 per Share. He had a total profit of $2,063,127. Gary Nadelman sold 102,374 Shares at $19. 51 per Share for a total profit of $2,007,554. At those prices, my 100,000 Share Warrant exercisable at $5 per Share was worth between $1,357,000 and $1,461,000 to me but for Debtor's wrongful withholding of it.

9. In January of 2005, I knew that the Cashless Warrant raid Brooks had pulled off was not in the best interests of the Company, that the stock price would come tumbling down and the Warrant would have been rendered worthless over time, unless

new people could wrest control from Brooks. I exchanged my warrant for 40,000 Shares worth $588,500 on the date of Settlement. Further fraudulent conduct as the Debtor later disclosed dragged the value of those Shares down eventually to almost zero. The highest price the shares were ever at while salable by me was $5.50 per Share. I gave away 15.000 Shares to a former counsel and three employees. I still hold 13,242 Shares, my section 6 interests. I understand that there are risks in my fraud claim on the Warrant  If it is not worth the entirety of $1,400,000, it is certainly worth for settlement purposes a minimum of $780,000. ($1,000,000 value as of mid-2004, minus $220,000, the highest price I could ever have gotten for the 40,000 Shares) (I did not, in fact, realize even $100,000 from those Shares).

10.    Thus, I went into the negotiations for Settlement of my creditor claims with a real case, with prospective witnesses, old documents and other evidence intending to argue for a compromise of between $1,273,500 and $1,438,000 for myself. Counsel for the Recovery Trustee argued in good faith that the number had to be less than $1,000,000 in order to satisfy goals the Recovery Trust and the Oversight Committee had. I gave up my negotiating position in order to get terms including terms which said that the Settlement in no way disadvantaged CLM. I cut off all negotiations with the Recovery Trustee at one time months ago to make sure I, in no way, would be participating in a ploy by Debtor to claim a settlement with me equals a settlement with CLM. I am confident that the Settlement Agreement cannot be read that way. I am confident of the good faith of the Recovery Trustee and Recovery Trustee's counsel as to this Settlement and all aspects of it.

## THE OBJECTIONS

11. Shareholder Jacks contends that the Recovery Trustee does not have authority to make any Settlement with anyone.[1] Jacks has filed a Limited Objection. He has no substantive basis to object and cites none. Still, in footnote 4 he adds while "nobody would like . . . Cohen to go more than Jacks" ... "now is not the time to start throwing the dissolved trust's money around willy-nilly" Jacks Limited Objection. October 19, 2020, fn. 4. Cohen has no stake in the fight between the Recovery Trustee and Jacks. But, as one of only two unpaid creditors remaining, Cohen has a pressing need for a final determination of his claim. There is nothing willy-nilly about the Settlement presented to the Court.

12. In tandem with Jacks, CLM files a sur-reply Response to Cohen's Affidavit of September 27, 2020. Mostly, CLM's response purports to be a response to allegedly derogatory statements Cohen made about CLM. But see, Para 10, *supra,* and Para 14, *infra.* It cites no such statement and mostly engages in a fierce retribution against its former client. Potentially relevant to the motion for approval of the Stipulation of Settlement, CLM claims that Cohen's creditor claims money belongs to them to cover the hundreds of thousands of dollars of out of expenses they incurred representing themselves. In fact, there is irrefutable written evidence that CLM repeatedly assured Cohen that he was liable for "nothing" - no part of CLM's billings or out of pocket

---

[1] The testimony would show in this case that the Objector Jacks did not become a shareholder of the Debtor until after the Bankruptcy had been filed and he learned second-hand of the litigation assets of Brooks which Cohen was insisting the Debtor pursue, and that Jacks total investment in the Shares is pennies per Share, compared to the many public shareholders victimized by the pre-Bankruptcy events. Jacks antipathy to Cohen is, Cohen submits, not in the best interests of the Class 6 interests generally. Jacks has little in common with the victim shareholders who bought their shares while the fraud was ongoing. Cohen has a small stake in the contest as to who shall be the Recovery Trustee or the Recovery Trustee's counsel but urges that the decision be made based on the best interests of the majority of the people affected.

expenses beyond the $131,000 plus amounts advanced by Cohen before this bankruptcy began.

13. CLM also asserts (implying I was trying to hide) the engagement letter I signed with them for the 2d Circuit Appeal in 2008. The engagement letter is of course true and correct and was never denied by or hidden by Cohen. I adhered to it entirely and it entirely covered the Second Circuit matter. It did not and does not cover the Bankruptcy matter which started in 2010, and has now run more than 10 years, in which I have represented myself and been represented by multiple other counsel. CLM's assertions of 100% entitlement for themselves were and are, in my opinion abusive and inconsiderate to me, to the facts and to this tribunal. Their intent to bootstrap such entitlement by suggesting no other law firms would have taken the 2d Circuit Appeal is pure speculative hogwash. At the time I, suffering from a serious injury, engaged CLM "to do me a favor" and take over the appeal, I had already secured the Justice Department to be on my side, and Brooks and others had already been criminally indicted. Securing "other qualified counsel" to take the matter on would have been no problem at all. But securing other qualified counsel to step in my shoes and litigate the matter on my behalf with me as the sole derivative plaintiff, and the owner of the claim, for the benefit of the publicly owned entity was a difficult find. I relied on William Sondericker, Esq. of CLM and CLM kept that promise and bargain with me throughout the 2d Circuit Appeal. The Second Circuit Appeal was not about maximizing my fee or their fee, but about bringing about a just determination for the Debtor. In the brief period between the argument on January 15, 2010 and the Bankruptcy filing on April 14, 2010. I was offered money to forego the challenge to the phony settlement in the EDNY. The amount of money

offered was unclear but at one time I said to Debtor's then counsel: "assuming it is $1,000,000 being offered, I will settle for nothing, provided Brooks gives $100 Million back to the Company". It took almost ten years and Brooks death in-between to make that return of more than $100 Million happen, but it has. In the Second Circuit, CLM was exclusively entitled to press a professional fees claim, and Cohen was exclusively pressing any and all of his claims, including for his continuing professional actions in a then pending action in Nassau Supreme Court, and nothing barred Cohen from seeking compensation therein for his past services, continuing services and future services. The filing of the Bankruptcy stayed both proceedings. Neither the Engagement in the Second Circuit nor the subsequent Bankruptcy disenfranchised Cohen from entitlement for compensation for his professional services. But, in the Settlement Agreement, if approved, Cohen foregoes any such professional fees claim in Bankruptcy.

14. CLM's perverse pleading of October 19,[2] whatever it is, has nothing to do with the motion to quash and is also not a valid objection to the Stipulation of Settlement. This Court should be assured, however, and there should be no doubt about it, CLM, and CLM alone won with great professional skills, two very important "precedential" victories critical to the outcome of this case. CLM deserves a very large professional fee

---

[2] CLM also suggests that Cohen should have said nothing in this Court which has exclusive judgment for determination of professional fees to be charged to the Estate and then sued CLM in New York for a fraction of the fee "it" would have won alone, as if the Third Circuit had said that only CLM was entitled to a fee. Perverse is too kind of a word for that suggestion when it follows three years in which I offered to negotiate, mediate, arbitrate or even submit to one highly qualified wise person our differences over fee sharing. Mr. Sesser of CLM refused any and all of those alternatives and would never put his refusal in writing. It is ugly and disconcerting that CLM suggests bypassing this Court would have been appropriate. No law firm of merit and integrity, and CLM is clearly and unquestionably a law firm of merit and integrity, should have made any such suggestion. Their doing so when the Stipulation of Settlement gives Cohen zero percent of the professional fees and leaves CLM with 100% of its earned fee minus only its contractual obligation to return to Cohen the advances I gave to them per the 2d Circuit engagement letter suggests an anticipatory breach of even that obligation by CLM.

for the results. It is simply too bad and too sad that CLM in their frustration at having been denied a fee for so long they have chosen to belittle me and potentially interfere with the Stipulation of Settlement for my creditor claims.

### DEBTOR'S NEGOTIATED RESOLUTION WITH THE BROOKS ESTATE AND FAMILY

15. The Debtor asserts and all the parties tend to agree that the funding which enabled this Estate to be in the process of being liquidated with more than a 100% payout to unsecured creditors and a dividend to shareholders was created by a negotiated resolution with the Brooks Estate and Family. Debtors counsel, Class Action counsel, other bankruptcy counsel and CLM are largely litigating among themselves about credit and compensation for the amount of that negotiated resolution. It takes almost unimaginable hubris for anyone to deny my more than 15 years of efforts, including those specifically aimed at securing a negotiated resolution with Brooks. I continued to remain in regular contact with the victims of the Brooks/DHB frauds for 10 years; I testified before the EDNY on Brooks sentencing, urging a maximum jail sentence. After the sentencing hearing, I was invited by Jeffrey Brooks and urged by Creditor Committee representatives to seek to negotiate a settlement. I met with David Brooks and David W, Goldstein, Esq. Brooks then Florida counsel with multiple visits in 2014 at the Brooklyn Federal Prison. Those efforts resulted in my securing an offer for the Debtor of $111 Million (above the more than $25 Million then in escrow in the EDNY). That 2014 Brooks-Goldstein Settlement Offer, which I did not recommend, turned out to have been a marginally better deal for the Debtor alone than the transaction which the Debtor and Class Action counsel did together with the Brooks Estate and family after his death. My

personal Settlement with the Recovery Trustee in 2020 includes zero consideration to me or for me for any and all of those efforts.

## A RELATED MOTION

16.   The Recovery Trust and the Post Confirmation Debtor (together the "Estate Fiduciaries") have moved for a status conference to be held on 11/2. Shareholder Jacks and CLM oppose the holding of a status conference, CLM filed its opposition today, 10/26/2020. Cohen agrees in part with, and dissents in part from, CLM's opposition. CLM asserts that Jacks and it are committed to resolving the remaining issues expeditiously; Cohen agrees with the need for expeditious resolution. Cohen also agrees with CLM that global mediation would be and could be the most expeditious way to dispose of the rest of the case, but Cohen's assent thereto is predicated upon this Court's prior adjudication of the Recovery Trustee's Settlement Stipulation with him.

17.   Jacks is willy-nilly opposed to any settlement with Cohen. To the extent CLM stands shoulder to shoulder with Jacks, CLM implicitly opposes resolution of Cohen's claims, even after CLM asserts that the Estate Fiduciaries have been engaged in an "on-going effort to steal the credit from CLM and . . . Cohen" for the favorable outcome of this Bankruptcy Liquidation. CLM Opposition, *supra, p.2, para 3*. As noted in Para 15 herein, everyone agrees that the funding for the final settlement came from a negotiated resolution with the Brooks Estate and family. Cohen and CLM assert that the SOX 304 claim was the *sin qua non* driving force for that resolution. Cohen surely opposes anyone stealing from CLM the credit and *compensation* due to CLM. But Jacks had nothing to do with either (a) the SEC's SOX 304 claims against Brooks on behalf of the Debtor or (b) the Debtor's and Class Action negotiated resolution with the Brooks

10

Estate and Family. Jacks is the ultimate "Johnny-come-lately" to this case. If he came forward with an admission of understanding of the important effort and work done by others prior to his belated arrival, it would be one thing. It is quite another when Jacks motion completely ignores the Third Circuit's sagacious directions to this Court, and also opposes any resolution of Cohen's claims: his efforts are the most obvious attempt by any party to this complex case to steal credit and compensation, For that reason, and to that extent, Cohen submits that a status conference on 11/2 is called for, if in the discretion of this Court, this Court determines that such a status conference may prove helpful to the Court's efforts to direct the parties to proceed to a conclusion of the case expeditiously. Whoever is ultimately charged with closing the case for the Estate Fiduciaries will have to march to the tune established by this Court.

## CONCLUSION

18.  On the face of it, the Stipulation of Settlement amount proposed is a fraction of the value the Debtor is securing from the claims being surrendered and resolved. There is no valid objection to the Settlement. Cohen further submits that he would not have settled at all but for (a) his own age and health and (b) his concern for the Equity holders and them getting something out of one fortuitous event which has happened in this case, the death of Brooks when it was still possible for the Debtor to get a large judgment from his Estate due to the Brooks Estate's liability under SOX 304. By the end of 2016, the Brooks Estate had no liability, zero liability, to the Debtor under any other pending legal action theory, or provision. But for his objection to the 2008 Class Action Settlement, the proceedings instituted in the EDNY and his engagement of CLM to prosecute the appeal, this Debtor would have been liquidated with certainly well less

than 100% payout to the unsecured creditors and zero to the Equity. That fact alone multiplies both the value of Cohen's claims and the extraordinary value of CLM's highly skilled and "precedential" wins in both the Second Circuit (2010) and the Third Circuit (2020).

19. I settled in part to avoid conflict with CLM. and in part to make a large concession to the Debtor and the Equity Holders, equipping all parties, subject to each of the parties self-interested determinations, to possibly reach accommodations which can potentially bring this case and the internal controversies to a safe landing and final conclusion. I do not pretend altruism; I cannot really afford more delay, complex proceedings, additional legal fees and costs. And the likelihood of having to carry the albatross of being pitted against my former counsel. I would not have made the Settlement and the concessions described herein if I am to wait indefinitely for the payment to be made. Grave inequity would result to Cohen from denial or extended deferral of approval. Neither Recovery Trustee nor any other party is bound to or limited by this Affidavit.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

**WHEREFORE**, Cohen respectfully requests that this Court, after full and fair consideration, of all of the matters before it, including any objections to the Settlement, approve the Stipulation of Settlement and so Order.

Respectfully Submitted,

_____
D. David Cohen

Sworn to before me
this 26th day of October, 2020

_____
Notary Public

Notary Public
State of New York
Qual. in Nassau County
# 02Z19799815
Exp. 05/31/2022

D. David Cohen, Esq.
P.O. Box 316
Roslyn, New York 11576
Appearing *Pro Se*
(516) 510 3401