# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SS BODY ARMOR I, INC. *et al.*,[1] | Case No. 10-11255 (CSS) |
| Debtors. | (Jointly Administered) |
| | **Hearing date: Mar. 24, 2021, at 10:00 a.m. (ET)** |
| | **Obj. Deadline: Mar. 10, 2021 at 4:00 p.m. (ET)** |

**DECLARATION OF BRIAN K. RYNIKER IN SUPPORT OF**
**MOTION OF RECOVERY TRUST FOR ORDERS (I) APPROVING**
**SETTLEMENTS WITH CLASS PLAINTIFFS AND CARTER LEDYARD**
**& MILBURN LLP; (II) AUTHORIZING DISSOLUTION PROTOCOL;**
**(III) ENTERING FINAL DECREE; AND (IV) GRANTING RELATED RELIEF**

I, Brian K. Ryniker, declare as follows:

1. I am the Recovery Trustee (the "<u>Recovery Trustee</u>") of the Recovery Trust established under the *Second Amended Joint Chapter 11 Plan of Liquidation Proposed by Debtors and Official Committee of Unsecured Creditors* [D.I. 3261] (the "<u>Plan</u>").

*2.* I submit this declaration (the "<u>Declaration</u>"), solely in my capacity as Recovery Trustee, in support of the *Motion of Recovery Trust for Orders (I) Approving Settlements with Class Plaintiffs and Carter Ledyard & Milburn LLP; (II) Authorizing Dissolution Protocol; (III) Entering Final Decree; and (IV) Granting Related Relief* (the "<u>Case Closing Motion</u>").[2]

3. All matters set forth in this Declaration are based on: (i) my personal knowledge; (ii) my review of relevant documents; (iii) my understanding, based on my experience and

---

[1] The pre-confirmation debtors in these cases, along with the last four digits of each debtor's federal tax identification numbers were: SS Body Armor I, Inc. (9361) (f/k/a Point Blank Solutions, Inc.); SS Body Armor II, Inc. (4044) (f/k/a Point Blank Body Armor, Inc.); SS Body Armor III, Inc. (9051) (f/k/a Protective Apparel Corporation of America); and PBSS, LLC (8203). All correspondence and pleadings for the Post-Confirmation Debtor must be sent to SS Body Armor I, Inc., et al., c/o Pachulski Stang Ziehl & Jones LLP, 919 North Market St., 17th Floor, Wilmington, DE 19801, Attn: Laura Davis Jones.

[2] All capitalized terms used but not defined herein shall have the meaning ascribed to them in the Case Closing Motion.

knowledge of the operations and personnel of the Debtors and Recovery Trust; or (iv) as to matters involving United States bankruptcy laws or rules or other applicable laws, my reliance on the advice of counsel or other advisors to the Recovery Trust. If called upon to testify, I could and would testify competently to the facts set forth herein.

### A. **Background**

4. I hold a Bachelor of Science degree in accounting from the State University of New York at Albany. I am also a Certified Public Accountant and Certified Insolvency and Restructuring Advisor. I have been providing accounting, restructuring, and insolvency services for more than 20 years.

5. Previously, I served as financial advisor to the Official Committee of Unsecured Creditors in this case, in my former capacity as a Managing Director of CBIZ Accounting, Tax & Advisory of New York, LLC.

6. I was appointed as the Recovery Trustee of the Recovery Trust on November 20, 2015. The Recovery Trust is governed by the Recovery Trust Agreement dated November 20, 2015 (the "Recovery Trust Agreement," or "RTA"). A true and correct copy of the Recovery Trust Agreement is attached hereto as **Exhibit 1**. The Recovery Trust became effective on November 23, 2015, the Effective Date of the Plan.

7. Pursuant to Section 6.4(b) of the Plan, the Recovery Trust is overseen by the Recovery Trust Committee. The Recovery Trust Committee is comprised of (i) General Larry Ellis, a former officer of the Debtors who is a creditor and a holder of Class 6 Interests; (ii) Sanjay Nayar, a holder of Class 6 Interests and the designee of the Official Committee of Equity Security Holders ("Equity Committee") under the Plan; and (iii) Rick Rosenbloom, the former independent

board observer appointed early in these cases as part of a consensual resolution to the Creditors' Committee's motion for a trustee.

8.     On the Effective Date, all Debtors other than the Post-Confirmation Debtor, SS Body Armor I, Inc., were deemed dissolved.   The Recovery Trust holds the sole share of the Post-Confirmation Debtor.   The Post-Confirmation Debtor remained in existence following the Effective Date in order to perform the Post-Confirmation Debtor Functions (as defined in the Plan). The Post-Confirmation Debtor is governed by the Third Amended and Restated By-Laws of SS Body Armor I, Inc. (the "By-Laws"). A true and correct copy of the By-Laws is attached hereto as **Exhibit 2**.

9.     Pursuant to Section 6.3 of the Plan, the Post-Confirmation Debtor Functions are carried out by the Post-Confirmation Debtor Representative, T. Scott Avila, subject to the oversight of the Post-Confirmation Debtor Oversight Committee.   The Post-Confirmation Debtor Oversight Committee is comprised of Mr. Rosenbloom, Equity Committee designee Jack Thurmon (also a holder of Class 6 Interests), and myself (in my capacity as Recovery Trustee).

10.     As Recovery Trustee and a member of the Post-Confirmation Debtor Oversight Committee, I am generally familiar with the Recovery Trust's and Post-Confirmation Debtor's financial affairs and books and records (the "Books and Records") that reflect, among other things, the Debtor's liabilities, the amount thereof owed to creditors, and the details surrounding the equity interests held by former shareholders of the Debtor.

11.     The Beneficiaries of the Recovery Trust are the Holders of Allowed Class 3 Claims (general unsecured claims) and Allowed Class 6 Interests (old common stock interests).

12.     As Recovery Trustee, I am responsible for reconciling claims and interests asserted against the Debtor's estates, prosecuting and resolving objections, collecting Recovery Trust

3

Assets and the proceeds thereof, and issuing distributions to Beneficiaries in accordance with the Plan and Recovery Trust Agreement. I am also responsible for paying and reserving for the administrative costs and liabilities of the Recovery Trust.

### B. The Underlying Settlements

13. The Plan was originally contemplated to be funded pursuant to the Amended Settlement Agreement and Addendum entered into between the Debtor and Class Plaintiffs. A true and correct copy of the Settlement Agreement and Addendum is attached hereto as **Exhibit 3**.

14. The Amended Settlement Agreement and Addendum provided for, among other things, (i) a $20 million interest-free loan from the Class Plaintiffs and (ii) an agreed-sharing of all proceeds realized by the parties relating to claims against the Debtor's former CEO, David Brooks, or his assets.

15. At the time the parties executed the Addendum to the Amended Settlement Agreement, the EDNY had granted substantial restitution awards to both the Debtor and the Class Plaintiffs, which were pending on appeal when the Plan was confirmed. Following confirmation of the Plan, Mr. Brooks died, resulting in the abatement of his criminal convictions and abatement of the restitution award.

16. In late 2017, the Debtor and Recovery Trust negotiated and engaged in a global mediation with the Class Plaintiffs, Securities & Exchange Commission, the DOJ (which had restrained approximately $168 million of Brooks-related assets in connection with the criminal prosecution against Brooks and the related civil forfeiture proceeding), and Mr. Brooks' estate and family. In early 2018, the parties reached the Global Settlement, which was ultimately executed

4

in October 2018 and approved by the EDNY in November 2018. A true and correct copy of the Global Settlement is attached hereto as **Exhibit 4**.

17. The Global Settlement resulted in (i) the EDNY-approved forfeiture of approximately $143 million of assets restrained from Mr. Brooks, his family members and/or related entities; (ii) a subsequent remission award, from among those restrained assets, of more than $70 million to the Debtor by MLARS; (iii) forgiveness of the $20 million loan by the Class Plaintiffs; and (iv) a division of proceeds with the Class Plaintiffs that placed the Recovery Trust in a position to pay allowed general unsecured claims in full with interest.

18. The remission award was grounded in the government's acceptance of the Debtor's position that it was a victim of Brooks' crimes, which was by no means a given in this matter.

C. **Reconciliation of Class 3 Claims and Class 6 Interests**

19. Following the Effective Date and through the present, the Recovery Trust and Post-Confirmation Debtor have cooperated, in accordance with Section 4.4 of the Recovery Trust Agreement, to implement the Plan and reconcile the claims pool.

20. Through these efforts, the Recovery Trust and Post-Confirmation Debtor reduced the general unsecured claims pool from approximately $205 million to approximately $35 million.

21. In addition, the Recovery Trust successfully expunged the equity interests of Mr. Brooks and numerous family members and related parties, as well as various duplicative proofs of interests filed by beneficial holders already covered by proofs of interest filed by brokers or banks. As a result of such expungement, there are now 33,282,841 Allowed Class 6 Interests (exclusive of the Stock Share, as defined below).

22. As of the date hereof, the Recovery Trust has issued distributions to all holders of Allowed Class 3 Claims, except CLM, equal to the full amount of their Allowed Class 3 Claims

AFDOCS/23784465.1

with interest at the Federal Judgment Rate. CLM holds the CLM Fee Claim, which I understand to be valid a general unsecured claim for fees in a yet-to-be determined amount. The amount of the CLM Fee Claim is currently a pending contested matter before this Court.

23. The Post-Confirmation Debtor has reserved $5 million for the potential payment of the CLM Fee Claim pursuant to this Court's *Order Establishing Reserve* [D.I. 4049] dated February 23, 2018.

24. All other holders of Allowed Class 3 Claims have been paid in full with interest at the Federal Judgment Rate. A small percentage of such holders have not claimed their distributions. In accordance with Section 7.9 of the Recovery Trust Agreement, the Recovery Trust filed a motion to deem such distributions as unclaimed and forfeited, such that the Recovery Trust may repurpose the unclaimed funds in accordance with the Plan and Recovery Trust Agreement.

25. I anticipate that the Unclaimed Distributions Motion, if granted by the Court, will enable the Recovery Trust to increase the Final Distribution to holders of Class 6 Interests by approximately $0.01 to $0.02. per share.

26. Because all Allowed Class 3 Claims other than CLM have been paid, and a reserve has been established for payment of the CLM Fee Claim, the Recovery Trust has issued and continues to issue interim distributions to holders of Allowed Class 6 Interests.

27. In or about July 2020, the Recovery Trust issued its first interim distribution to holders of Allowed Class 6 Interests in the amount of $0.15 per share.

28. The Recovery Trust is effectuating a second interim distribution to holders of Allowed Class 6 Interests in the amount of approximately $0.03 per share. I expect that the second interim distribution will be made prior to the March 24 hearing in this case.

29. As explained below, final distributions depend on Court approval of the Proposed Settlements, Bar Order, and Unclaimed Distributions Motion.

**D. Reserves**

30. I anticipate that, following the issuance of the second interim distribution to Class 6, and the payment of expenses incurred through February 28, 2021, the Recovery Trust's unreserved cash will be exhausted. The Recovery Trust's reserves will consist of the following:

    a. Reserve for unclaimed distributions, pending resolution of the Unclaimed Distributions Motion.

    b. Reserve for the Class Plaintiff Stock Share and interim distributions held in abeyance with respect to the Class Plaintiff Stock Share.

    c. Reserve for Class Plaintiff Settlement payment, pending resolution of the Case Closing Motion.

    d. Reserve for wind-down expenses pursuant to Sections 3.3, 3.7, 5.5(f), 5.5(m), 5.5(s), and 5.5(cc) of the Recovery Trust Agreement and Section 6.4(d) of the Plan, to complete the Dissolution Protocol.

31. In addition, the Recovery Trust and Post-Confirmation Debtor will have funded professional retainers and indemnification reserves, to be held by their respect professionals, pursuant to Sections 5.5(m), 5.5(cc), 5.12, 5.17, and 5.18; Article 7 of the By-Laws; and Sections 1.1, 6.2, 6.3, 6.4, and 6.5 of the Plan.

32. I believe the amounts reserved by the Recovery Trust and Post-Confirmation Debtor are reasonable and appropriate, and were funded based on good faith estimates of the amounts reasonably necessary to carry out and fulfill the remaining obligations and dissolution of the Recovery Trust and Post-Confirmation Debtor. I developed these estimates based on my experience and knowledge, and in consultation with the Recovery Trust's professionals pursuant to Section 5.5 of the Recovery Trust Agreement and the Post-Confirmation Debtor Representative pursuant to Section 5.1 of the By-Laws, including with respect to: (i) the steps generally necessary

to wind down bankruptcy cases, post-confirmation debtors, and liquidating trusts; (ii) the terms of the Plan, Confirmation Order, Recovery Trust Agreement, and By-Laws; (iii) the financial picture of the Recovery Trust and Post-Confirmation Debtor; (iv) the historical costs of administration and litigation in this case; and (v) the pending matters to be resolved in this case, including threats made by Jon E. Jacks.

33.     I understand that upon the funding of professional retainers and indemnification reserves, and in light of the $5 million reserve for the CLM Fee Claim, the unreserved cash of the Post-Confirmation Debtor will be exhausted.

### E.  Proposed Settlements to Effectuate Case Closure and Dissolution Protocol

34.     Over the course of several weeks in December 2020 and January 2021, the Recovery Trust, CLM, Post-Confirmation Debtor, Class Plaintiffs, and Revised Equity Group (led by Mr. Jacks) participated in voluntary mediation with the Honorable Kevin Gross (Ret.).

35.     The mediation resulted in agreements: (i) between the Recovery Trust and Post-Confirmation Debtor on the one hand, and CLM on the other, that the CLM Fee Claim will be allowed and paid in the amount of $3,750,000, pursuant to the *Settlement Agreement Resolving Carter Ledyard Milburn LLP Fee Award Contested Matter*, attached to the Case Closing Motion as **Exhibit D**; and (ii) between the Recovery Trust and Post-Confirmation Debtor, on the one hand, and the Class Plaintiffs, on the other, that the Class Plaintiffs will provide in excess of $1,250,000 in value to the Recovery Trust, pursuant to the *Joint Stipulation and Order Regarding Final Allocation of Shared Proceeds*, attached hereto as **Exhibit 5**.

36.     The CLM Settlement provides that the CLM Fee Claim will be Allowed as a Class 3 Claim in the amount of $3,750,000 and disallowed otherwise.  CLM will be paid $3,750,000 million from the $5 million CLM Fee Claim Reserve upon the entry of a Final Order approving

8

the CLM Settlement. The remaining $1,250,000 million from the CLM Fee Claim Reserve will be released to the Recovery Trust.

37.     The CLM Settlement will avoid the substantial delay and cost of litigating the CLM Fee Claim before this Court and in connection with any appeal, and will mitigate the uncertainties attendant to the outcome of such litigation with CLM. The CLM Fee Claim is already the subject of two decisions by the Third Circuit Court of Appeals and I believe that, after completion of discovery, motion practice, the retention of experts and a trial before this Court, an outcome that is unsatisfactory to CLM would likely result in a third appeal to the Third Circuit.

38.     Such litigation would require the creation of substantial reserves for the Recovery Trust and Post-Confirmation Debtor to fund professional fees. The CLM Settlement eliminates the need to establish additional professional fee reserves, and also frees up $1,250,000 from the CLM Fee Claim Reserve currently held by the Post-Confirmation Debtor so that holders of Class 6 Interests may receive distributions faster and in larger denominations.

39.     The Class Plaintiff Settlement provides that the Class Plaintiffs will pay $750,000 to the Recovery Trust. Further, the Class Plaintiffs will release their entitlement to 50% of the economic value of 3,184,713 Class 6 Interests (the "Stock Share"). The estimated value of the Stock Share set forth in the Class Plaintiff Settlement was $517,500, although the final value of the Stock Share will ultimately depend on the total amount of distributions made to Class 6.

40.     In my view, the primary roadblock to a full recovery from the Class Plaintiffs is the lack of funds available to satisfy a full recovery. MLARS made remission distributions directly to members of the class and specified that the funds were "not [to be] used to satisfy any other Class obligations." Global Settlement, Exh. C, p. 1. That is consistent with my understanding of MLARS' practice of compensating victims according to their individual losses.

9

41.     I understand that, based on the manner of MLARS' funding and the Class Plaintiffs' payment of approved expenses, the Class Plaintiffs hold only approximately $1,500,000 in cash available to satisfy the shortfall of $4,772,765.50 under the Amended Settlement Agreement and Global Settlement.  I also understand that the Class Plaintiffs' cash on hand is itself subject to outstanding expense obligations with competing claims to the funds, and additional expenses anticipated by the Class Plaintiffs.

42.     Finally, the Amended Settlement Agreement contemplates that the parties use their "reasonable best efforts, consistent with their respective fiduciary duties" to achieve the agreed-to allocation; there is no absolute or unequivocal allocation.  Thus, it is possible the Class Plaintiffs may not be required to satisfy the shortfall in full.  The Class Plaintiff Settlement resolves these issues and uncertainties by requiring the Class Plaintiffs to contribute $750,000 in cash and the Stock Share (valued at approximately $517,500) to the Recovery Trust.

43.     The Recovery Trust Committee voted unanimously to approve the settlements with the Class Plaintiffs and CLM, respectively, in accordance with the Proposed Settlements.

44.     Likewise, the Post-Confirmation Debtor Oversight Committee, of which I am a member in my capacity of Recovery Trustee, voted unanimously to approve the Class Plaintiff Settlement and support the CLM Settlement.

45.     In accordance with this Court's April 2020 Decision, the Class Plaintiffs, Post-Confirmation Debtor, and Recovery Trust submitted the Class Plaintiff Settlement to the EDNY on February 22, 2021, requesting the EDNY's approval of the final allocation of settlement proceeds.  On February 23, 2021, the EDNY entered the Order approving the final allocation embodied in the Class Plaintiff Settlement.  Attached hereto as **<u>Exhibit 5</u>** is a true and correct copy of the Joint Stipulation and Order Regarding Final Allocation of Shared Proceeds, So Ordered by

the EDNY on February 23, 2021. However, the Class Plaintiff Settlement will not become effective until the Orders of the EDNY and this Court approving the Class Plaintiff Settlement become Final Orders.

46. In my capacity as Recovery Trustee and member of the Post-Confirmation Debtor Oversight Committee, I believe that the Class Plaintiff Settlement and CLM Settlement are reasonable, sound exercises of business judgment, and in the best interests of the Recovery Trust, its Beneficiaries, and the Post-Confirmation Debtor.

47. The Revised Equity Group's positions, although not pending before any court at the time of the mediation, were also heard, considered, and evaluated during the course of good-faith efforts to reach a mediated resolution. Unfortunately, the Post-Confirmation Debtor and Recovery Trust were unable to reach such a resolution with the Revised Equity Group.

48. I anticipate that Mr. Jacks may object to the Case Closing Motion or take other positions adverse to the Recovery Trust, as he has done in his Opposition to the Motion to Extend Trust, previously stricken Motion to Re-Establish (in which he asserted the previously rejected $40 million reversionary interest theory), and otherwise. In my view, based on my knowledge and experience, the positions asserted by Mr. Jacks (including but not limited to the rejected reversionary interest theory) do not give rise to any meaningful claim for relief, and do not provide any basis for delaying the Final Distribution, dissolution of the Recovery Trust and Post-Confirmation Debtor, or closure of the Bankruptcy Case.

49. Nonetheless, I anticipate Mr. Jacks will pursue litigation against the fiduciaries and professionals of the Recovery Trust and Post-Confirmation Debtor, regardless of the merits of his assertions. Due in large part to Mr. Jacks' conduct and allegations, the Recovery Trust and Post-Confirmation Debtor funded retainers and reserves in connection with Mr. Jacks' stated litigation

agenda. In order to alleviate the effect of those retainers and reserves upon the remainder of Class 6, and in particular to increase the Final Distribution to Class 6, and in light of the unique circumstances of this case, the Recovery Trust requests that the Court enter the Bar Order precluding any further litigation regarding the subject matter of the Proposed Settlements or other Final Orders of this Court.

50.     If the relief requested in the Case Closing Motion is granted, including approval of the Proposed Settlements and entry of the Bar Order, I estimate that the holders of Allowed Class 6 Interests will ultimately receive total distributions as high as approximately 34 cents per share (or approximately 35-36 cents per share if the Unclaimed Distributions Motion is also allowed). If the Bar Order is not entered, the total distributions to Class 6 will likely decrease by approximately 9 cents per share. As a result, the Bar Order is critical to enable maximum distributions to be made, prevent delays, and to obtain finality and closure.

51.     The Recovery Trust intends to use the $2,000,000 in cash ($1,250,000 from the CLM Fee Claim Reserve + $750,000 from the Class Plaintiffs) to be received by the Recovery Trust pursuant to the Proposed Settlements, as well as the nearly $300,000 reserved for the Class Plaintiff Stock Share (on account of interim distributions held in abeyance pending resolution of the Class Plaintiff Recovery Issues), to fund the Final Distribution to holders of Class 6 Interests.

52.     Approval of the Bar Order in connection with the Proposed Settlements will facilitate the release of approximately $2,980,000 in indemnification and expense reserves and professional retainers held by the professionals of the Recovery Trust and Post-Confirmation Debtor, to be used instead to fund the Final Distribution to holders of Class 6 Interests.

53.     The approximately $5,280,000 in settlement funds, released indemnification reserves and professional retainers, and released Stock Share reserve, will be used to fund a Final

Distribution of approximately $0.16 to holders of Class 6 Interests, bringing total distributions to approximately $0.34 (First Interim Distribution $0.15 + Second Interim Distribution $0.03 + projected Third and Final Distribution $0.16). Allowance of the Unclaimed Distribution Motion would increase the cash available for a Final Distribution by approximately $300,000 - $550,000, increasing the distributions by approximately $0.01 - $0.02, for a total final distribution as high as approximately $0.35 - $0.36 per share.

54.    In the event the Court does not enter the Bar Order, the $2,980,000 in indemnification reserves and professional retainers will not be released upon the entry of a Final Order approving the Case-Closing Motion and will instead be held by professionals to cover the estimated obligations of the Recovery Trust. As a result, if the Bar Order is not entered, the maximum Final Distribution will likely be reduced by approximately $0.09 per share, reducing the total distribution to $0.27 (or less) per share

**F.  Satisfaction of Claims and Interests**

55.    All Allowed Class 3 Claims (as well as the Class 3 Claim of CLM to be allowed in the amount of $3,750,000 pursuant to the CLM Settlement) are set forth in the Schedule of Allowed Class 3 Claims attached hereto as **Exhibit 6**.

56.    All Allowed Class 6 Interests held by Registered Holders and Brokers or Banks are set forth in the Schedule of Allowed Class 6 Interests attached hereto as **Exhibit 7**.

57.    The Recovery Trust seeks an Order that upon the payment of the CLM Fee Claim in the amount of $3,750,000 and the issuance of the Final Distribution to Class 6, all Allowed Class 3 Claims and Class 6 Interests will be deemed satisfied.

AFDOCS/23784465.1

58.     Based on the estimates of the Recovery Trust and Post-Confirmation Debtor, it is unlikely there will be further funds available to distribute to Class 6 following the Final Distribution.

59.     In the event there are further funds as a result of reserve or retainer residues, such funds will be transferred to the distribution agent to be distributed to Class 6.

60.     KCC will then disburse the residue (minus any costs) to holders of Class 6 Interests *pro rata*, provided, however, that in the event the cost of making such disbursements is likely to exceed the value of the residue to be disbursed, the distribution agent will be permitted to donate the residue to a charity, consistent with section 5.5(s) of the Recovery Trust Agreement.

### G.     Termination of Expenses

61.     The Recovery Trust and Post-Confirmation Debtor seek to eliminate certain ongoing expenses that they have determined will be unnecessary following approval of the Proposed Settlements and entry of final decree by Final Orders, including the following:

    a.   Destruction of Records.  Pursuant to Section 6.9 of the Plan and Section 12.3(b) of the Recovery Trust Agreement, the Recovery Trust and the Post-Confirmation Debtor intend to destroy the substantial volume of records that are no longer required to effectuate the terms of the Plan and Recovery Trust Agreement.

    b.   Disposal of Burdensome Materials.  Pursuant to Section 3.4 of the Recovery Trust Agreement, the Post-Confirmation Debtor intends to abandon and dispose of any stock, materials or components in order to eliminate continuing storage costs

    c.   Disbandment of Oversight Committees. Following approval of the Proposed Settlements by Final Orders and the issuance of the Final Distribution, the Recovery Trust Oversight Committee and Post-Confirmation Debtor Oversight Committees will be disbanded, as the purpose of the Recovery Trust will be fulfilled at that time, the Post-Confirmation Debtor Functions will be completed, the interests of Beneficiaries will be satisfied and, therefore, the duties of the oversight committees will be complete.  *See, e.g.*, RTA, §§ 3.1, 5.6; By-Laws, § 5.1.

    d.   Termination of Epiq.  Upon the entry of a Final Order granting the Case Closing Motion, the Recovery Trust will terminate the services of Epiq, the case website

will be shut down and Epiq will be required to fulfill its obligations under Local Rule 2002-1(f).

**H. <u>Dissolution of the Post-Confirmation Debtor</u>**

62.     In accordance with the provisions of the Plan, Recovery Trust Agreement, and By-Laws, the Post-Confirmation Debtor will be dissolved and the Post-Confirmation Debtor Oversight Committee will be disbanded, following the (a) approval by this Court of the Proposed Settlements, and the orders approving the Proposed Settlements becoming final and non-appealable; (b) the EDNY's Order dated February 23, 2021 approving the Class Plaintiff Settlement becoming final and non-appealable; (c) the receipt by the Recovery Trust of all consideration to be paid by the Class Plaintiffs pursuant to the Class Plaintiff Settlement; and (d) receipt by the Recovery Trust of the $1,250,000 residue of the CLM Fee Claim Reserve to be released by the Post-Confirmation Debtor pursuant to the CLM Settlement.

**I. <u>Dissolution of the Recovery Trust</u>**

63.     Pursuant to Section 11.1 of the Recovery Trust Agreement, the Recovery Trust seeks an Order dissolving the Recovery Trust and terminating the Recovery Trust Agreement, except as to Sections 5.12, 5.18, and related provisions, as of the date that the Final Distribution is made.  All other provisions of the Recovery Trust Agreement unrelated to the administration of indemnification reserves, professional fees and expenses, and the limited administrative obligations surviving dissolution of the Recovery Trust (*e.g.*, the filing of the final tax return, as required by law) will be deemed terminated and of no further force and effect.

64.     I will continue in the role of Recovery Trustee for the limited purpose of administering the surviving provisions of the Recovery Trust Agreement until all remaining obligations of the Recovery Trust are satisfied.

AFDOCS/23784465.1

**J. Final Tax Returns**

65.     Pursuant to section 5.5(w) of the Recovery Trust Agreement, the Recovery Trust is authorized to "[f]ile, if necessary, any and all tax and information returns with respect to the Recovery Trust treating the Recovery Trust as a grantor trust pursuant to Section 1.671-4(a) of the Treasury Regulations and pay taxes properly payable by the Recovery Trust, if any, and make distributions to Beneficiaries net of any such taxes."

66.     Pursuant to section 1.1 ("Post Confirmation Debtor Functions") of the Plan, the Post-Confirmation Debtor Representative is authorized to file tax returns for the Post-Confirmation Debtor.

67.     The final tax return of the Recovery Trust is due 90 days from date of dissolution, with additional time granted in the event a timely extension is filed on behalf of the Recovery Trust.  The final tax return for the Post-Confirmation Debtor is due on the 15th day of the fourth month following its dissolution (the period can be extended with a timely filed extension).

68.     I anticipate that it will likely be necessary for the Recovery Trust and Post-Confirmation Debtor to file tax returns for tax years 2020, 2021, and potentially 2022 in the event of prolonged appeals.  The anticipated costs associated with such filings are being reserved through the funding of professional retainers.

**K. Final Decree and Report**

69.     The Recovery Trust seeks, with the support of the Post-Confirmation Debtor, entry of the final decree closing the Bankruptcy Case.

70.     I believe that entry of the final decree is in the best interests of the Recovery Trust, its Beneficiaries, and the Post-Confirmation Debtor because it will reduce and minimize the remaining costs of administration, including continued incurrence of quarterly UST fees and other

AFDOCS/23784465.1

expenses, the cost of storing certain documents, preparing monthly operating reports, maintaining a case website, and monitoring the docket.

71.     All accrued expenses arising from the administration of the Debtor's estate and the Chapter 11 Cases, including UST Fees, have been paid or will be paid as and when such expenses come due.  The Recovery Trust will pay any remaining UST Fees within thirty (30) days of the Court's entry of the final decree.

72.     A verified final report, as required by Local Rule 3022-1(c), will be submitted within 14 days of the hearing on the Case Closing Motion.

73.     To the extent there are further necessary expenses associated with the wind-down, the Recovery Trust and Post-Confirmation have reserved for the payment of such expenses in accordance with non-bankruptcy law and without the need for Court approval.  *See* RTA, §3.7; Plan, § 6.3(c).  Such amounts will either be (a) paid prior to the dissolution of the Recovery Trust or Post-Confirmation Debtor, as applicable; (b) paid pursuant to the Plan and/or surviving provisions of the Recovery Trust Agreement (RTA, §§ 5.12 & 5.18); or (c) to the extent such reserves are not exhausted, any remaining funds shall be transferred to the disbursement agent to be disbursed among the holders of Class 6 Interests or donated to charity without the need for Court oversight. *See* Plan, § 6.3(a) (Post-Confirmation Debtor's remaining cash to be transferred to Recovery Trust); RTA, § 5.5(cc) & (m) (Recovery Trustee may arrange for payment of distributions and expenses "without further Bankruptcy Court approval").

74.     For all of the foregoing reasons, I believe that the Case Closing Motion is in the best interests of the Recovery Trust, its Beneficiaries, the Post-Confirmation Debtor, and the public interest.

AFDOCS/23784465.1

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.**

Executed this 24th day of February, 2021,

/s/Brian K. Ryniker
By:  Brian K. Ryniker, on behalf of the
Recovery Trust, solely in his capacity as
Recovery Trustee

AFDOCS/23784465.1

# EXHIBIT 1

# RECOVERY TRUST AGREEMENT

THIS RECOVERY TRUST AGREEMENT (the "Agreement") is entered into this 20th day of November, 2015, by and among SS Body Armor I, Inc., *et al.*[1], as debtors and debtors in possession (collectively, the "Debtors"); the Official Committee of Unsecured Creditors of the Debtors (the "Creditors' Committee"); T. Scott Avila, in his capacity as the Post-Confirmation Debtor Representative (as defined in the Plan); and Brian K. Ryniker in capacity as the Recovery Trustee of the Recovery Trust (the "Recovery Trustee") (collectively, the "Parties").

W I T N E S S E T H:

WHEREAS, on April 14, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 10-11255 (CSS) (jointly administered);

WHEREAS, the Debtors and the Creditors' Committee filed the Second Amended Joint Chapter 11 Plan of Liquidation Proposed by the Debtors and the Creditors' Committee (the "Plan Proponents") [ECF No. 3261] (as amended, modified, or supplemented, the "Plan") with the Bankruptcy Court;

WHEREAS, on November 10, 2015, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order");

WHEREAS, the Plan provides, among other things, for the establishment of a liquidating trust (the "Recovery Trust") for the benefit of its Beneficiaries (defined below) and for the appointment of the Recovery Trustee as the trustee and manager of the Recovery Trust;

WHEREAS, the Recovery Trustee has agreed to act as trustee under this Agreement for purposes herein provided;

WHEREAS, the Recovery Trust is established for the sole purpose of administering Recovery Trust Assets (defined below) and implementing the Recovery Trust Functions (defined below), in accordance with Treasury Regulations Section 301.7701-4(d), with no objective or authority to continue or engage in the conduct of a trade or business;

WHEREAS, the Recovery Trust is intended to qualify as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d) that is treated as "grantor trust" for federal and applicable state income tax purposes;

NOW, THEREFORE, for and in consideration of the promises and mutual covenants herein contained, pursuant to the Plan, the Parties do hereby covenant and agree as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: SS Body Armor I, Inc. (9361); SS Body Armor II, Inc. (4044); SS Body Armor III, Inc. (9051); and PBSS, LLC (8203).

# ARTICLE I

## Definitions; Interpretive Rules.

1.1 <u>Terms Defined in Plan</u>. Any capitalized term used and not defined herein shall have the meaning assigned to it in the Plan.

1.2 <u>Interpretive Rules</u>. For purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires: (a) references to "Articles", "Sections", and other subdivisions, without reference to a particular document, are to be designated Articles, Sections, and other subdivisions of this Agreement; (b) the use of the term "including" means "including but not limited to"; and (c) the words "herein", "hereof", "hereunder", and other words of similar import refer to this Agreement as a whole and not to any particular provision (unless otherwise specified). The enumeration and headings contained in this Agreement are for convenience of reference only and are not intended to have any substantive significance in interpreting this Agreement. The singular shall include the plural and the plural the singular, when the context so requires, and the feminine, the masculine, and the neuter genders shall be mutually inclusive.

# ARTICLE II

## Establishment of the Recovery Trust, Appointment of the Recovery Trustee

2.1 <u>Establishment of the Recovery Trust</u>. Pursuant to the Plan, the Parties hereby establish the Recovery Trust. Bryan K. Ryniker is hereby appointed as the Recovery Trustee and hereby accepts such appointment. On the Effective Date, the Recovery Trust will become effective, in order to carry out the Recovery Trust Functions (defined below). On the Effective Date, pursuant to the Plan and Sections 1123, 1141 and 1146(a) of the Bankruptcy Code, the Debtors and the Estates will transfer, grant, assign, convey, set over, and deliver to the Recovery Trustee, for the benefit of the Recovery Trust, all of the Debtors' and Estates' right, title and interest in and to the Recovery Trust Assets, including (i) the Recovery Trust Reserve, (ii) the Estate Claims, (iii) any Settlement Recoveries, (iv) any SOX Recoveries, (v) the share of the New Common Stock to be issued pursuant to the Plan, (vi) any remaining Cash in the Administrative/Priority/Tax Claims Reserve after the exercise of the Post-Confirmation Debtor Representative's distribution powers set forth in Section 6.3(a) of the Plan, and (vii) any other assets of the Debtors that have not been liquidated, abandoned or otherwise disposed of as of the Effective Date, free and clear of all Liens, Claims, encumbrances or interests of any kind in such property, except as otherwise provided for in the Plan and the Settlement Agreement. For the avoidance of doubt, the Recovery Trust Assets shall not include the Administrative/Priority/Tax Claims Reserve (except as set forth herein above) or the Post-Confirmation Debtor Reserve. On the Effective Date and automatically and without further action, the Recovery Trustee will have full power and authority as the trustee of the Recovery Trust in accordance with the Plan and this Agreement. On and after the Effective Date, the Recovery Trustee, on behalf of the Recovery Trust, will take any and all actions as he believes may be necessary, desirable or appropriate with respect to the Recovery Trust, subject to the terms of the Plan and this Agreement. The Recovery Trust is organized and established as a trust for the benefit of the Beneficiaries (defined below) and is intended to qualify as a liquidating trust within the meaning of Treasury

Regulation 301.7701-4(d). In accordance with Treasury Regulation 301.7701-4(d), the initial sole beneficiaries of the Recovery Trust will be the holders of Allowed Claims in Class 3 (General Unsecured Claims) and Class 4 (Subordinated Unsecured Claims) and Allowed Interests in Class 6 (Old Common Stock Interests). Upon payment in full of all Allowed Class 3 Claims, the holders of Allowed Claims in Class 4 and Allowed Interests in Class 6 will then constitute the sole beneficiaries of the Recovery Trust. Upon payment in full of all Allowed Class 4 Claims, the holders of Allowed Interests in Class 6 will then constitute the sole beneficiaries of the Recovery Trust. The Recovery Trust will not be deemed a successor-in-interest of the Estate for any purpose other than as specifically set forth in the Plan and this Agreement. This Agreement and the Recovery Trust created under the Plan are hereby declared to be irrevocable and the Debtors shall not have any right at any time to withdraw any of the property held hereunder or to revoke, annul, or cancel the Recovery Trust created under the Plan in whole or in part, or to alter, amend, or modify this Agreement in any respect. To the extent that there are any material inconsistencies between (a) this Agreement and (b) the Plan or the Confirmation Order, the Plan and the Confirmation Order shall govern.

2.2 <u>Vesting of Estate Assets, Free and Clear of Liens</u>. Upon the Effective Date, the Recovery Trust will be vested with all right, title, and interest in the Recovery Trust Assets, and such property will become the property of the Recovery Trust free and clear of all Claims, Liens, charges, other encumbrances, and Interests, except as set forth in the Plan. Further, as of the Effective Date, the Recovery Trust will retain the New Common Stock and retain any rights to which such stock may be entitled under applicable law with respect to such shares, subject to any applicable conditions or restrictions set forth in the Plan, and the Certificate of Amendment and Restatement of the Certificate of Incorporation of SS Body Armor I, Inc., together with the Third Amended and Restated By-Laws of SS Body Armor I, Inc. (as such documents may be amended or modified)

2.3 <u>Trust Name</u>. The trust created hereby shall be known as the Recovery Trust of SS Body Armor I, Inc., in which name the Recovery Trustee may, among other things, carry out the Recovery Trust Functions, conduct the business of the Recovery Trust, retain counsel and other professionals and pay fees and costs incurred by counsel and other professionals, make and execute contracts on behalf of the Recovery Trust, sue and be sued on behalf of the Recovery Trust, and take such other actions as the Recovery Trustee is authorized to take under the Plan and this Agreement.

ARTICLE III

**Recovery Trust, Purpose, Administration**

3.1 <u>Purpose of the Recovery Trust</u>. The Recovery Trust shall be established for the purpose of carrying out the Recovery Trust Functions and liquidating, distributing and resolving the claims to the Recovery Trust Assets, in accordance with Treasury Regulations Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. Accordingly, the Recovery Trustee shall, in an expeditious but orderly manner, carry out the Recovery Trust Functions, liquidate and convert to Cash the Recovery Trust Assets, make timely Distributions and not unduly prolong the duration of the Recovery Trust.

3.2     Governance of the Recovery Trust.  The Recovery Trust will be administered and controlled by the non-voting Recovery Trustee and the Recovery Trust Committee. The Recovery Trust Committee will oversee the functions and activities of the Recovery Trustee in relation to the Recovery Trust.

3.3     Purpose of this Agreement and Recovery Trust Functions.  The parties hereby enter into this Agreement for the purposes of establishing the Recovery Trust contemplated by the Plan and authorizing the Recovery Trustee to, among other things, implement and carry out the recovery trust functions as follows: (i) the filing, prosecution, settlement and/or other disposition of any and all objections to, or requests for subordination, compromise or settlement of, proofs of claim or Claims against the Debtors, other than Claims that are Allowed under the Plan; (ii) the evaluation and, if appropriate, filing, prosecution, settlement and/or other disposition of any and all Avoidance Actions, Causes of Action, and other Estate Claims; (iii) the creation of appropriate reserves for Disputed Claims; (iv) the incurring of post-confirmation debt to fund replenishment of the Recovery Trust Reserve to the extent the Recovery Trust Reserve is insufficient; (v) the payment of the reasonable fees and expenses of the Recovery Trustee and his professionals and agents, without need of further Court approval or notice; (vi) the maintenance of books and records; (vii) the liquidation or other disposition of the Recovery Trust Assets; and (viii) the distribution of the proceeds of the Recovery Trust Assets (after payment of or reserve for all Recovery Trust expenses) to the Recovery Trust beneficiaries pursuant to this Agreement (collectively "Recovery Trust Functions"); provided that the Recovery Trust Functions shall not include activities which constitute Post-Confirmation Debtor Functions or are subject to disposition by the Post-Confirmation Debtor as part of its exercise of the Post-Confirmation Debtor Functions.  Where reasonably appropriate, the Recovery Trustee shall have consultation rights with regard to the Post-Confirmation Debtor Functions, and the Post-Confirmation Debtor Representative shall have consultation rights with regard to Recovery Trust Functions.  Any dispute regarding what constitutes a Post-Confirmation Debtor Function and what constitutes a Recovery Trust Function shall be resolved by the Bankruptcy Court.  All Recovery Trust Functions and related activities of the Recovery Trustee shall be reasonably necessary to, and consistent with, the accomplishment of these purposes; all of such purposes benefit the Recovery Trust.  Except as set forth herein, nothing contained herein shall be deemed to limit the authority of the Recovery Trustee.

3.4     Administration of the Recovery Trust Assets.  From and after the Effective Date, the Recovery Trustee shall take all steps necessary to liquidate all Recovery Trust Assets and distribute the proceeds in accordance with the Plan, Confirmation Order, and this Agreement, including selling, leasing, prosecuting, litigating, settling or otherwise liquidating and reducing the Recovery Trust Assets to money, or abandoning the Recovery Trust Assets on such terms and for such consideration as he deems to be reasonable and in the best interests of the beneficiaries.

3.5     Authority of the Recovery Trustee. The Recovery Trustee will serve as a fiduciary to the Beneficiaries of the Recovery Trust and will be empowered to: (a) implement the Recovery Trust Functions; (b) effect all actions, execute and deliver all agreements, instruments and other documents, make the distributions contemplated, and perform all of the obligations and agreements of the Recovery Trust and/or of the Recovery Trustee necessary to implement the

provisions of the Plan, this Agreement, and the Settlement Agreement (to the extent applicable); (c) other than in relation to the Post-Confirmation Debtor Functions, perform the duties, exercise the powers, and assert the rights of a trustee under sections 704 and 1106 of the Bankruptcy Code as the Debtors' representative appointed for such purpose pursuant to section 1123(b)(3) of the Bankruptcy Code, including commencing prosecuting or settling all Estate Claims, and enforcing contracts, asserting claims, defenses, offsets and privileges; (d) determine, satisfy, object to, and estimate any and all claims or liabilities created, incurred or assumed by the Recovery Trust; (e) pay all expenses and make all other payments relating to the Recovery Trust; (f) other than in relation to the Post-Confirmation Debtor Functions, object to claims, including Disputed Claims, and prosecute or settle such objections, including objections requesting disallowance of equity interests, and related litigation with respect to certain insiders and their related entities: David H. Brooks ("David Brooks"); Terry Brooks, Victoria Brooks, Andrew Brooks, and Elizabeth Brooks (collectively, "Brooks Family"); and Jeffrey R. Brooks ("Jeffrey Brooks" and together with David Brooks and Brooks Family, "Brooks Insiders"); (g) establish, keep, and maintain a reserve for the benefit of Disputed Claims and Disputed Interests; (h) engage and reasonably compensate professionals, including attorneys, accountants, experts, other professionals and others to assist the Recovery Trustee in carrying out his duties, provided, however, that counsel that will represent the Recovery Trust in any action to pursue claim objections (to the extent such are not within the Post-Confirmation Debtor Functions), requests for disallowance of equity interests, and related litigation with respect to Brooks Insiders shall be chosen by the Equity Committee designee; (i) consult regularly with and provide information to the Recovery Trust Committee at such times and with respect to such issues relating to the conduct of the Recovery Trust as is appropriate; (j) prepare and deliver written statements or notices, quarterly or otherwise, required by law to be delivered to beneficiaries of the Recovery Trust and the Recovery Trust Committee; (k) prepare, or have prepared, and file with the appropriate taxing authority on behalf of the Recovery Trust any and all tax returns, information returns, and other required documents with respect to the Recovery Trust and pay taxes properly payable by the Recovery Trust, if any, and cause all taxes payable by the Recovery Trust, if any, to be paid exclusively out of the Recovery Trust; (l) other than in relation to the Post-Confirmation Debtor Functions, waive or assert the attorney-client privilege or any other privilege of and on behalf of the Debtors and Estates; and (m) nothwithstanding subparagraph (f) herein, have standing to review and object to any post-petition, pre-confirmation professional fee claims.

3.6    Recovery Trust Committee.  The Recovery Trustee shall be supervised by an oversight committee (the "Recovery Trust Committee"), which shall have the rights set forth in this Agreement and the Plan.

(a)    The Recovery Trust Committee shall be created on the Effective Date and shall be comprised of three (3) voting members. Two (2) members of the Recovery Trust Committee will be selected by the Creditors' Committee and one member will be selected by the Equity Committee. The Equity Committee will designate a list of individuals to replace the Creditors' Committee selected representatives upon Class 3 Satisfaction and Class 4 Satisfaction. Upon the occurrence of the Class 3 Satisfaction and Class 4 Satisfaction, the Creditors' Committee selected representatives will resign and be replaced by the Equity Committee designees.  In the event of a vacancy of a member selected by the Creditors' Committee, the other member selected by the Creditors' Committee, in consultation with the Recovery Trustee,

shall have the authority to fill such vacancy. In the event of a vacancy of a member selected by the Equity Committee, a majority of the former members of the Equity Committee in consultation with the Recovery Trustee, shall have the authority to fill such vacancy. In the event any position is vacant for more than thirty (30) days, unless otherwise notified in writing by a majority of the former members of the Equity Committee that good faith efforts are being made to fill the vacant position for the Equity Committee designee, the Recovery Trustee shall have the authority, without need of notice to the remaining members of the Recovery Trust Committee, to fill such vacancy at his sole discretion.

(b)     The Recovery Trustee shall consult regularly with the Recovery Trust Committee when carrying out the purpose and intent of the Recovery Trust. The Recovery Trust Committee shall be entitled to monitor the status and progress made by the Recovery Trustee. The Recovery Trust Committee may meet and/or consult periodically with the Recovery Trustee and keep itself apprised of the affairs of the Recovery Trust.

(c)     The Recovery Trust Committee will advise the Recovery Trustee and make certain determinations regarding the administration and liquidation of the Recovery Trust Assets in consultation with the Recovery Trustee. Unless otherwise specified herein, approval of a majority of the members of the Recovery Trust Committee shall be required for the Recovery Trust Committee to act or provide instructions, directions, consents or approvals to the Recovery Trustee for certain actions specified hereunder. The members of the Recovery Trust Committee shall be deemed to be third-party beneficiaries of this Agreement.

3.7     Expenses of the Recovery Trust. The Recovery Trust Assets will be used to pay all liabilities, costs and expenses of the Recovery Trust, including compensation then due and payable to the Recovery Trustee, his agents, representatives, professionals and employees and all costs, expenses, and liabilities incurred by the Recovery Trustee in connection with the performance of his duties. Each member of the Recovery Trust Committee will be entitled to reimbursement of reasonable costs and expenses in the exercise of his or her duties, and a stipend of $1,500 per month in compensation for services in such capacity. The reasonable fees and expenses of the Recovery Trustee and his counsel and agents will be paid out of the Recovery Trust Reserve, without need of Bankruptcy Court approval, subject to the terms set forth in Section 5.18 herein.

3.8     Tax Treatment of Recovery Trust. For United States federal and applicable state income tax purposes, the transfer of the Recovery Trust Assets to the Recovery Trust pursuant to and in accordance with the Plan shall be treated as a disposition of such assets directly to and for the benefit of the Beneficiaries. The Beneficiaries will be treated as the grantors and owners of the Recovery Trust. All earnings of the Recovery Trust shall be currently taxable to the Beneficiaries in the year in which such earnings are realized, including earnings retained in the Recovery Trust Reserve, in accordance with their respective rights to such earnings. The Recovery Trust is intended to qualify as a liquidating trust that is treated as a "grantor trust" for federal income tax purposes, and the Recovery Trustee shall use his best efforts to operate and maintain the Recovery Trust in compliance with Internal Revenue Service Revenue Procedure 94-45, 1994-2 C.B. 684, and Treasury Regulation Sections 1.671-4(a) and 301.7701-4(d) and all subsequent guidelines regarding liquidating trusts issued by the Internal Revenue Service.

3.9     Incorporation of Plan.  The Plan is hereby incorporated into this Agreement and made a part hereof by this reference.

## ARTICLE IV

### Post-Confirmation Debtor; Corporate Action; Winding-Up of Affairs

4.1     Post-Confirmation Debtor.  Under the Plan, all Debtors other than the Post-Confirmation Debtor will be deemed dissolved for all purposes as of the Effective Date, without need of further Court order, notice or action; provided, however, without the need of any further approval, the Post-Confirmation Debtor Representative, in his discretion, may execute and file documents and take all other actions as he deems appropriate relating to the dissolution of the Debtors under applicable state laws, and in such event, all applicable regulatory or governmental agencies will take all steps necessary to allow and effect the prompt dissolution of the subject Debtor as provided in the Plan, without the payment of any fee, tax, or charge and without need for the filing of reports or certificates.

(a)     All existing Interests in the Debtors will be deemed extinguished and cancelled as of the Effective Date, and as of such date, the New Common Stock of the Post-Confirmation Debtor will be deemed issued and held by the Recovery Trustee, for the benefit of the Beneficiaries of the Recovery Trust. The Post-Confirmation Debtor Representative will dissolve the Post-Confirmation Debtor pursuant to applicable non-bankruptcy law, at such time as he reasonably determines, after consultation with the Recovery Trustee, that the Post-Confirmation Debtor Functions have been completed or otherwise satisfied.

(b)     From and after the Effective Date, (i) all of the Debtors, for all purposes, will be deemed to have withdrawn their respective business operations from any state in which they were previously conducting or are registered or licensed to conduct business operations, and the Debtors will not be required to file any document, pay any sum or take any other action, in order to effectuate such withdrawal, and (ii) the Debtors other than the Post-Confirmation Debtor will not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

(c)     The Post-Confirmation Debtor will continue and remain in existence on and after the Effective Date solely for implementation of the Post-Confirmation Debtor Functions.

4.2     Board of Directors; Officers.  Under the Plan, on the Effective Date and automatically and without further action, (i) each existing member of the board of directors, officer and manager (as applicable) of the Debtors will be deemed to have resigned on the Effective Date without any further corporate action, (ii) the Post-Confirmation Debtor Representative will be deemed the sole director, officer and representative of the Post-Confirmation Debtor to exercise the rights, power and authority of the Post-Confirmation Debtor under applicable provisions of the Plan and bankruptcy and non-bankruptcy law, and (iii) all matters provided under the Plan will be deemed to be authorized and approved without further approval from the Bankruptcy Court.

4.3     Post-Confirmation Debtor Oversight Committee. Under the Plan, the Post-Confirmation Debtor Representative will carry out the Post-Confirmation Debtor Functions, subject to the Post-Confirmation Debtor Oversight Committee, which shall be comprised of the Recovery Trustee, Mr. Rick Rosenbloom, and a representative selected by the Equity Committee that will oversee the functions and activities of the Post-Confirmation Debtor.

4.4     Post-Confirmation Debtor and Recovery Trustee Cooperation. The Post-Confirmation Debtor Representative and the Recovery Trustee will cooperate and coordinate their efforts to implement the Plan, including, among other things, addressing any circumstances where Post-Confirmation Debtor Functions and Recovery Trust Functions may overlap or omit actions or functions necessary to implement the Plan or Settlement Agreement.

## ARTICLE V

### Duties, Rights and Powers of Recovery Trustee

5.1     Status of the Recovery Trustee. The Recovery Trustee shall be the "representative of the estate" as that phrase is used in section 1123(b)(3)(B) of the Bankruptcy Code with respect to the rights and powers granted in this Agreement and in the Plan and Confirmation Order. Except as otherwise set forth in the Plan and Confirmation Order, the Recovery Trust shall be the successor-in-interest to the Debtors with respect to all Recovery Trust Assets, including all Estate Claims and Avoidance Actions that were or could have been commenced by the Debtors or the Estates prior to the Effective Date and shall be deemed substituted for the same as the party in such action. All actions, claims, rights or interests constituting Recovery Trust Assets are preserved and retained and may be enforced by the Recovery Trust as the representative of the Debtors and/or the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.   The Recovery Trust shall be a party-in-interest as to all matters over which the Bankruptcy Court has jurisdiction and shall be the only party to have standing to file, prosecute, settle, or compromise all Recovery Trust Assets, including all Estate Claims and Avoidance Actions. For avoidance of doubt, such authority and standing (i) shall include standing to review and object to professional fee claims but otherwise (ii) shall not include standing to prosecute any causes of action which are included within the Post-Confirmation Debtor Functions.

5.2     Duties of the Recovery Trustee. The Recovery Trustee shall have the exclusive right and duty to administer and liquidate the Recovery Trust Assets, file, prosecute, litigate, compromise, settle, and abandon Estate Claims and Avoidance Actions assigned and delivered to the Recovery Trust, pursue and oversee the objections and resolution of Claims and related processes, and collect all income and make distributions to the Beneficiaries from the Recovery Trust, as provided under this Agreement, the Plan, and Confirmation Order. For avoidance of doubt, such authority and standing (i) shall include standing to review and object to professional fee claims but otherwise (ii) shall not include authority or standing to prosecute any causes of action  or to object to or resolve claims which are included within the Post-Confirmation Debtor Functions.   Nothing contained herein, or in the Post-Confirmation Debtor governance documents (including any bylaws or articles of incorporation) shall prevent the Post-Confirmation Debtor from assigning any assets, including claims and causes of action, to the Recovery Trust.

5.3　Standard of Care. The Recovery Trustee shall exercise its rights and powers vested in it by this Agreement and use reasonable business judgment in its exercise of his duties. Subject to applicable law, the Recovery Trustee shall not be liable to the Recovery Trust or any Beneficiary for any act he may do or omit to do as a Recovery Trustee while acting in good faith and in the exercise of his reasonable business judgment. The foregoing limitation on liability will apply equally to the agents, professionals, accountants, attorneys, and/or employees of the Recovery Trustee acting on behalf of the Recovery Trustee in the fulfillment of the Recovery Trustee's duties hereunder.

5.4　Bond. The Recovery Trustee shall not be required to post a bond.

5.5　Recovery Trustee's Rights and Powers. The Recovery Trustee shall act on behalf of the Recovery Trust and except as otherwise provided for under the Plan, shall be vested with all rights, powers, privileges, and benefits afforded to the Debtors' Estates and/or a "trustee" under sections 704 and 1106 of the Bankruptcy Code, including, without limitation, attorney-client and work product privilege, and he shall be vested with any such rights, powers, privileges, and benefits of the Debtors and their Estates with respect to the Recovery Trust Functions. The Recovery Trustee shall have all the powers and authority set forth herein and in the Plan and Confirmation Order necessary to effect the disposition, orderly liquidation, and/or distribution of all Recovery Trust Assets and proceeds thereof. As of the Effective Date, the rights and powers of the Recovery Trustee shall include, subject to the limitations set forth in the Plan or Confirmation Order, the right and power, without further Bankruptcy Court approval, to:

(a)　Liquidate or otherwise reduce to Cash the Recovery Trust Assets in accordance with the Plan and this Agreement;

(b)　Settle, resolve and object to Claims and to file, prosecute, compromise and settle Estate Claims assigned and delivered to the Recovery Trust, whether or not the Estate Claims or objections to Claims have been commenced prior to the Effective Date, and shall be substituted as the real party in interest in any such action or objection by or against the Debtors, the Creditors' Committee, or the Equity Committee;

(c)　Make distributions to the Beneficiaries hereunder;

(d)　Seek an estimation of contingent or unliquidated Claims under section 502(c) of the Bankruptcy Code;

(e)　Invest the Recovery Trust Assets, which investment powers of the Recovery Trustee are limited by Section 5.14 herein;

(f)　Establish, maintain and administer Recovery Trust Reserve;

(g)　Maintain and administer the Cash in the Recovery Trust;

(h)　Pay and satisfy Allowed Claims and trust expenses from the Recovery Trust and pay all fees due pursuant to Section 1930 of Chapter 123 of Title 28 of the United States Code until such time as the Bankruptcy Court enters a final decree closing the Chapter 11 Cases;

(i)     Enforce, carry out, and comply with the terms of the Plan, Confirmation Order, and this Agreement;

(j)     Enforce, carry out and perform the Recovery Trustee's duties and Recovery Trust Functions under this Agreement and the Plan;

(k)     Sell at public or private sale, or exchange, transfer, or convey, on such terms and conditions, and at such time or times as the Recovery Trustee shall determine, any or all of the Recovery Trust Assets; and to that end, grant options, make contracts, retain brokers, and sign, seal, acknowledge, and deliver any and all proper deeds, or other instruments of conveyance or transfer thereof; and delegate to an attorney-in-fact the power to execute all documents necessary to accomplish a sale, lease, transfer, or exchange of such property;

(l)     Obtain and maintain such space, facilities, equipment, supplies and personnel as shall be reasonably necessary for the performance of the Recovery Trustee's duties hereunder and under the Plan and Confirmation Order;

(m)     Pay all expenses and obligations of the Recovery Trust, including professional fees, out of the Recovery Trust Assets;

(n)     Subject to the provisions of ¶ 3.5 herein, retain counsel or special counsel, financial advisor or accountant, and employ other individuals in connection with the administration or the liquidation, and pay all reasonable and necessary costs of any litigation directly or indirectly involving the Debtors or the Estates, or the Recovery Trust Assets;

(o)     Consult regularly with and provide information to the Recovery Trust Committee at such times and with respect to such issues relating to the conduct of the Recovery Trust as is appropriate;

(p)     Prepare and deliver written statements or notices, quarterly or otherwise, required by law or by the terms of this Agreement to be delivered to Beneficiaries and the Recovery Trust Committee;

(q)     Subject to consultation with the Post-Confirmation Debtor Representative, exercise all powers regarding the Debtors' tax matters, including filing tax returns, to the same extent as if the Recovery Trustee were the debtor in possession to the extent necessary;

(r)     When all Disputed Claims filed against the Debtors have become Allowed Claims or have been disallowed by Final Order, and all of the Recovery Trust Assets have been liquidated and distributed in accordance with the Plan and this Agreement, seek authority, in consultation with the Post-Confirmation Debtor Representative, from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules;

(s)     If at any time the Recovery Trustee determines, in reliance upon such professionals as the Recovery Trustee may retain and with the consent of the Recovery Trust Committee, that the expense of administering the Recovery Trust so as to make a final distribution to the Beneficiaries is likely to exceed the value of the assets remaining in the Recovery Trust, the Recovery Trustee shall apply to the Bankruptcy Court for authority to (i)

reserve any amounts necessary to close the Chapter 11 Cases, (ii) donate a balance to a charitable organization exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code that is unrelated to the Recovery Trust, the Recovery Trustee, and (iii) close the Chapter 11 Cases in accordance with the Bankruptcy Code and Bankruptcy Rules;

(t)     Hold legal title to any and all rights of the Beneficiaries in or arising from the Recovery Trust or Recovery Trust Assets;

(u)     Execute and file any and all documents, regulatory filings and transfer applications and take any and all other actions related to, or in connection with, the liquidation of the Recovery Trust, the exercise of the Recovery Trustee's powers granted herein and the enforcement of any and all instruments, contracts, agreements, claims, or causes of action relating to the Recovery Trust or the Recovery Trust Assets;

(v)     Open and maintain bank accounts and deposit funds, draw checks and make disbursements in accordance with this Agreement and the Plan;

(w)     File, if necessary, any and all tax and information returns with respect to the Recovery Trust treating the Recovery Trust as a grantor trust pursuant to Section 1.671-4(a) of the Treasury Regulations and pay taxes properly payable by the Recovery Trust, if any, and make distributions to Beneficiaries net of any such taxes;

(x)     In the event the Recovery Trustee determines that any of the Beneficiaries of the Recovery Trust may, will or has become subject to adverse tax consequences, take such actions that in his reasonable discretion will, or are intended to, alleviate such adverse tax consequences, such as dividing the Recovery Trust Assets into several trusts or other structures and/or paying certain Beneficiaries in a manner different than that originally contemplated hereunder (but not otherwise inconsistent with the provisions of this Agreement or the Plan), provided, however, the Recovery Trustee shall be under no obligation to take any such actions;

(y)     Withhold from the amount allocable, payable or distributable to any Entity such amount as may be sufficient or required to pay any tax or other charge which the Recovery Trust has determined, in his reasonable discretion, is required to be withheld therefrom under the income tax laws of the United States or of any state or political subdivision thereof, and to pay or deposit such withheld tax with the appropriate governmental authority. In the exercise of his discretion and judgment, the Recovery Trustee may enter into agreements with taxing or other governmental authorities for the payment of such amounts as may be withheld in accordance with the provisions hereof;

(z)     Seek any relief from or resolution of any disputes concerning the Plan, the Recovery Trust, or the Recovery Trust Assets by the Bankruptcy Court or any other court with proper jurisdiction;

(aa)    Appear and participate in any proceeding before the Bankruptcy Court or any other court with proper jurisdiction with respect to any matter regarding or relating to this Agreement, the Plan, Confirmation Order, Recovery Trust, or the Recovery Trust Assets;

(bb)     Review and object to professional fee claims to the extent provided herein; and

(cc)     Otherwise take such other actions as shall be necessary to implement the Plan, Confirmation Order, the terms of this Agreement, wind down the affairs of the Recovery Trustee and effect the closing of the Chapter 11 Cases or to carry out the Recovery Trust Functions and related obligations and to exercise its rights in accordance with and subject to the Plan and Confirmation Order, and shall perform all of the duties, responsibilities and obligations as set forth in this Agreement.

5.6     Limitation on Recovery Trustee's Authority.

(a)     Notwithstanding Section 5.5, the Recovery Trustee shall procure approval by a majority vote of the members of the Recovery Trust Committee  prior to (i) taking any action (including settling or selling) with respect to a Recovery Trust Asset (excluding any asset used for the operation of the Trust or for payment of any fees and expenses of professionals employed by the Recovery Trustee) having a value of $300,000 or more, (ii) commencing any litigation, other than objections to Disputed Claims or Avoidance Actions, or making any settlement with respect to any Retained Cause of Action, or such litigation, in connection with which there is a recovery (or potential recovery) to the Recovery Trust of $300,000 or more, or (iii) taking any action that would give rise to or alleviate adverse tax consequences to the Recovery Trust or the Beneficiaries, provided, however, in the event the Recovery Trust Committee fails to approve any of the above action by a majority vote, the matter may be submitted to the Bankruptcy Court for approval of such action. Furthermore, and notwithstanding Section 5.5, the Recovery Trustee shall procure approval by a unanimous vote of the members of the Recovery Trust Committee  prior to settling any Disputed Claim for an amount of $500,000 or more, provided, however, in the event the Recovery Trust Committee fails to approve such settlement proposed by unanimous vote, but does obtain approval of a majority of the Recovery Trust Committee, then the Recovery Trustee may submit the matter to the Bankruptcy Court for approval of such action and the non-consenting member of the Recovery Trust Committee shall have standing to be heard in opposition to such request.

(b)     The Recovery Trustee will consult with the Recovery Trust Committee on a regular basis, but in no event less than on a quarterly basis, and inform the Recovery Trust Committee of actions that the Recovery Trustee is pursuing and is planning to pursue in connection with the discharge of the Recovery Trust Functions and the Recovery Trustee's duties hereunder. Except as provided herein, the Recovery Trustee will exercise independent business judgment with respect to the administration of the Recovery Trust.

5.7     Estimation of Claims. The Recovery Trustee may at any time request that the Bankruptcy Court estimate any Claim pursuant to section 502(c) of the Bankruptcy Code to the extent that such Claim has not already been adjudicated by the Bankruptcy Court on the same grounds. In the event that the Bankruptcy Court estimates any Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Recovery Trustee may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection,

estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court, provided, however, any Claim settled for an amount in excess of $300,000 shall be governed by the procedures set forth in Section 5.6(a).

      5.8    <u>Limitations on the Recovery Trustee's and the Recovery Trust Committee's Liabilities</u>. The Recovery Trustee, the members of the Recovery Trust Committee, or any of their respective professionals, including accountants, financial advisors, legal advisors, shall not be responsible and shall not have any liability whatsoever to any person for any loss or liability the Debtors, the Estates, or the Recovery Trust may sustain or incur, except as otherwise provided in Section 5.12 of this Agreement.

      5.9    <u>Selection of Agents</u>. The Recovery Trustee may select and employ, and determine compensation for, any professionals, including accountants, financial advisors, legal advisors, brokers, consultants, custodians, investment advisors, asset services, auditors, and other agents, as the Recovery Trustee deems necessary (collectively, the "<u>Trustee Professionals</u>") to assist it in carrying out his duties, with the reasonable fees and expenses of such professionals to be paid by the Recovery Trust. Subject to the Plan and this Agreement, the Recovery Trustee may pay the salaries, fees, and expenses of such persons or firms out of the Recovery Trust Assets. The Recovery Trustee shall not be liable for any loss to the Debtors, the Estates, or the Recovery Trust or any person interested therein, including Beneficiaries, by reason of any mistake or default of any such agent or consultant.

      5.10    <u>Signature</u>. As of the Effective Date of the Plan, the Recovery Trustee shall have the signature power and authority on behalf of the Recovery Trust to (a) open and close accounts with any banking, financial or investment institution; (b) make deposits and withdrawals of cash and other property into or from any such account; (c) make or endorse checks with respect to any such account; and (d) effectuate purchases and sales of securities and give security purchase and sale orders to brokers or any other third parties, and the exercise of such power and authority shall be deemed to be authorized by and to represent the decision of the Recovery Trustee then entitled to make such decision.

      5.11    <u>Maintenance of Register</u>. The Recovery Trustee shall at all times maintain or cause to be maintained a register of the names, addresses, and amount of the Beneficiaries.

      5.12    <u>Liability of Recovery Trustee</u>.

      (a)    <u>Liability; Indemnification</u>. The Recovery Trustee, the Trustee Professionals, the Recovery Trustee's agents and servants, and any of the members of the Recovery Trust Committee shall not in any way be liable for any acts or omissions to act except by reason of their gross negligence, willful misconduct, fraud, or a criminal act in the performance of their duties under the Plan, Confirmation Order, or this Agreement. The Recovery Trust shall indemnify the Recovery Trustee, the Trustee Professionals, the Recovery Trustee's agents and servants, and any of the members of the Recovery Trust Committee and hold them harmless from and against any and all liabilities, expenses, claims, damages and losses incurred by them as a direct result of actions taken or omissions to act by them in such capacity

or otherwise related to this Agreement or the Recovery Trust. The Recovery Trust shall indemnify and hold harmless any Entity who was, or is, a party, or is threatened to be made a party, to any pending or contemplated action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such Entity is or was the Recovery Trustee, a Trustee Professional, the Recovery Trustee's agent or servant, or a member of the Recovery Trust Committee, against all costs, expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by such Entity in connection with such action, suit or proceeding, or the defense or settlement of any claim, issue or matter therein, to the fullest extent permitted by applicable law, except in the case of the Recovery Trustee, if such costs and expenses, judgments, fines or amounts paid in settlement are found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from the Recovery Trustee's gross negligence, willful misconduct, or fraud. Costs or expenses incurred by any Entity entitled to the benefit of the provisions of this Section 5.12 in defending any such action, suit or proceeding may be paid by the Recovery Trust in advance of the institution or final disposition of such action, suit or proceeding, if authorized by the Recovery Trustee, subject to providing an undertaking to repay all such advanced amounts if it is subsequently determined that such Entity is not entitled to indemnification under this Section 5.12. Any dispute regarding such indemnification of the Recovery Trustee shall be resolved only by the Bankruptcy Court, which shall retain jurisdiction over matters relating to the indemnification provided under this Section 5.12. The Recovery Trustee may in its discretion purchase and maintain insurance on behalf of any Entity who is or was a beneficiary of this provision. Promptly after receipt by an indemnified party or parties (the "Indemnified Party") of notice of any claim, or notice of commencement of any action, suit, or proceeding by an Entity other than the Recovery Trustee, in respect of which the Indemnified Party may seek indemnification from the Recovery Trust pursuant to this Section 5.12, the Indemnified Party, if not the Recovery Trust, shall notify the Recovery Trustee of such claim, action, suit or proceeding and shall thereafter promptly convey all further communications and information in respect thereof to the Recovery Trustee. If the Indemnified Party is the Recovery Trustee, the Recovery Trustee shall notify the Bankruptcy Court of such claim, action, suit, or proceeding and shall thereafter promptly convey all further communications and information in respect thereof to the Bankruptcy Court. The Recovery Trustee shall, if it so elects, have sole control at the expense of the Recovery Trust over the contest, settlement, adjustment, or compromise of any claim, action, suit, or proceeding in respect of which this Section 5.12 requires that the Recovery Trust indemnify the Indemnified Party. If the Recovery Trustee is the Indemnified Party, he shall obtain the written approval of Bankruptcy Court before settling, adjusting, or compromising any claim, action suit, or proceeding in respect of which this Section 5.12 requires that the Recovery Trust indemnify the Indemnified Party. The Indemnified Party shall cooperate with the reasonable requests of the Recovery Trustee in connection with such contest, settlement, adjustment, or compromises, provided that (i) the Indemnified Party may, if it so elects, employ counsel at its own expense to assist in (but not control) the handling of such claim, action, suit, or proceeding, (ii) the Recovery Trustee shall obtain the prior written approval of the Indemnified Party before entering into any settlement, adjustment, or compromise of such claim, action, suit, or proceeding, or ceasing to defend against such claim, action, suit, or proceeding, if pursuant thereto or as a result thereof injunction or other relief would be imposed upon the Indemnified Party, and (iii) the Indemnified Party shall obtain the prior written approval of the Recovery Trustee, or, if the Recovery Trustee is the Indemnified Party, the prior written approval of the Bankruptcy Court,

before entering into any settlement, adjustment or compromise of such claim, action, suit, or proceeding, or ceasing to defend against such claim, action, suit, or proceeding, and no such settlement, adjustment, or compromise shall be binding on the Recovery Trust without such approval.

        (b)      No Liability for Acts of Predecessor.  No successor Recovery Trustee shall be in any way responsible for the acts or omissions of any Recovery Trustee in office prior to the date on which such person becomes a Recovery Trustee, nor shall he be obligated to inquire into the validity or propriety of any such act or omission, unless such successor Recovery Trustee expressly assumes such responsibility.  Any successor Recovery Trustee shall be entitled to accept as conclusive any final accounting and statement of the Recovery Trust Assets furnished to such successor Recovery Trustee by such predecessor Recovery Trustee and shall further be responsible only for those Recovery Trust Assets included in such statement.

        (c)      No Implied Obligations.  The Recovery Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth herein, in the Plan and Confirmation Order or specified in written instructions or directions delivered to the Recovery Trustee by the Recovery Trust Committee, and no other or further covenants or obligations shall be implied into this Agreement.  The Recovery Trustee shall not be responsible in any manner whatsoever for the correctness of any recitals, statements, representations, or warranties herein or in any documents or instrument evidencing or otherwise constituting a part of the Recovery Trust Assets.  The Recovery Trustee makes no representations as to the value of the Recovery Trust Assets or any part thereof, nor as to the validity, execution, enforceability, legality, or sufficiency of this Agreement; and the Recovery Trustee shall incur no liability or responsibility with respect to any such matters.

        (d)      Reliance by Recovery Trustee on Documents or Advice of Counsel or Other Entities.  Except as otherwise provided herein, the Recovery Trustee may rely and shall be protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, and other paper or document reasonably believed to be genuine and to have been signed or presented by the proper party or parties, and shall have no liability or responsibility with respect to the form, execution, or validity thereof.  None of the provisions hereof shall require the Recovery Trustee to expend or risk his own funds or otherwise incur financial liability or expense in the performance of any duties hereunder.

        (e)      No Personal Obligation for Debtors' Liabilities.  Beneficiaries, holders of Claims, holders of Equity, or other persons dealing with the Recovery Trustee in his capacity as Recovery Trustee within the scope of this Agreement shall look solely to the Recovery Trust Assets to satisfy any liability incurred by the Recovery Trustee to such person in carrying out the terms of this Agreement, and the Recovery Trustee shall have no personal or individual obligation to satisfy any such liability.

        5.13      Establishment of Trust Accounts.  The Recovery Trustee may establish or cause to be established and maintained any accounts needed in connection with the purposes of the Recovery Trust (the "Trust Account").  Such accounts shall be maintained only at FDIC insured financial institutions and shall bear a designation clearly indicating that the funds deposited therein are held for the benefit of the Recovery Trust.

5.14    Investment of Cash.  (a) Cash in the Trust Accounts and any other amounts contemplated by this Agreement shall be maintained in United States dollars or shall be invested by the Recovery Trustee in (i) direct obligations of, or obligations guaranteed by, the United States of America, (ii) obligations of any agency or corporation that is or may hereafter be created by or pursuant to an act of Congress of the United States of America as an agency or instrumentality thereof, or (iii) such other obligations or instruments as may from time to time be permitted under section 345 of the Bankruptcy Code; provided that the Recovery Trustee may, to the extent necessary to implement the provisions of the Plan and this Agreement, deposit moneys in demand deposits, time accounts or checking accounts at any banking institution or trust company having combined capital stock and surplus in excess of $100,000,000 based upon its most recently available audited financial statements, regardless of whether such investments and deposits are insured or as otherwise provided in Section 5.13 above.  Such investments shall mature in such amounts and at such times as the Recovery Trustee, in his discretion, shall deem appropriate to provide funds when needed to transfer funds in accordance with the Plan and Confirmation Order, make payments to the Trust Accounts or make Distributions in accordance with this Agreement and the Plan and Confirmation Order.  The Recovery Trust may not retain cash or cash equivalents in excess of a reasonable amount to meet claims and contingent liabilities or to maintain the value of the Recovery Trust Assets in liquidation or maintain or fund on adequate and sufficient reserve.

5.15    Tax Returns.  From and after the Effective Date, to the extent required, the Recovery Trustee shall be responsible for the preparation and filing of any and all federal and state tax returns or other filings as required by law to be filed on behalf of the Recovery Trust.  Such returns shall be consistent with the treatment of the Recovery Trust as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d) that is a grantor trust pursuant to Section 1.671-4(a) of the Treasury Regulations.  Unless otherwise provided under the Plan, subject to consultation with the Post-Confirmation Debtor Representative, the Recovery Trustee shall (a) complete and file as soon as possible, to the extent not previously filed, the Debtors' final federal, state, and local tax returns, (b) request an expedited determination of any unpaid tax liability of the Debtors under section 505(b) of the Bankruptcy Code for all tax periods of the Debtors ending after the Petition Date through the liquidation of the Debtors as determined under applicable tax laws, to the extent not previously requested, and (c) represent the interest and account of the Debtors before any taxing authority in all matters, including, but not limited to, any action, suit, proceeding, or audit.

5.16    Compensation for Recovery Trustee.  The Recovery Trustee shall be paid on an hourly basis plus actual out-of-pocket expenses, to be paid monthly from the Recovery Trust Assets, pursuant to Section 5.18 and related provisions of this Agreement.

5.17    Reimbursements.  The Recovery Trustee, any agents or consultants employed pursuant to this Agreement, Trustee Professionals and members of the Recovery Trust Committee shall be reimbursed from the Recovery Trust Assets for all reasonable out-of-pocket expenses incurred in the performance of their duties hereunder in addition to any compensation received pursuant to Section 5.18 and related provisions of this Agreement.

5.18    Reimbursement of the Recovery Trustee's and Trustee Professionals' Fees and Expenses.  Pursuant to the terms of the Plan, Confirmation Order, and this Agreement, the

Recovery Trustee may pay from the Recovery Trust Assets all reasonable fees and expenses incurred in connection with the duties and actions of the Recovery Trustee, including, but not limited to, fees and expenses of any Trustee Professionals retained under this Agreement and fees and expenses to pay insurance, taxes and other expenses arising in the ordinary course of business in maintaining, liquidating, disposing of, and distributing the Recovery Trust Assets and compensation to the Recovery Trustee. The Recovery Trustee may also pay fees and expenses allowed by the Bankruptcy Court of the Debtors, the Post-Confirmation Debtor Representative, the Creditors' Committee, or the Equity Committee arising from the prosecution or objection of any final fee applications filed by any of their respective professionals in accordance with the Plan. The Trustee Professionals shall prepare monthly statements in the same manner as required during the Chapter 11 Cases, and the Trustee Professionals shall serve such statements on the Recovery Trustee. The Recovery Trustee shall forward the Recovery Trustee's and the Trustee Professionals' monthly statements to the Recovery Trust Committee and shall provide five (5) business days prior notice of any payment of such fees and expenses. If the majority of the Recovery Trust Committee timely objects to the reasonableness of such fees and expenses and such objection cannot be resolved consensually, the matter shall be submitted to the Bankruptcy Court for approval of the reasonableness of such fees and expenses.

## ARTICLE VI

### Beneficiaries

6.1     Identification of Beneficiaries. The Trust is created for the benefit of the following beneficiaries (the "Beneficiaries"): (a) the initial sole beneficiaries of the Recovery Trust will be the holders of Allowed Claims in Class 3 (General Unsecured Claims) and Class 4 (Subordinated Unsecured Claims) and Allowed Interests in Class 6 (Old Common Stock Interests); (b) upon payment in full of all Allowed Class 3 Claims, the holders of Allowed Claims in Class 4 and Allowed Interests in Class 6 will then constitute the sole beneficiaries of the Recovery Trust; and (c) upon payment in full of all Allowed Class 4 Claims, the holders of Allowed Interests in Class 6 will then constitute the sole beneficiaries of the Recovery Trust. The Beneficiaries shall each have an undivided beneficial interest in the assets of the Recovery Trust ("Beneficial Interest").

6.2     Rights of Beneficiaries. Each Beneficiary shall be entitled to participate in the rights due to a Beneficiary hereunder and the Plan. Each Beneficiary shall take and hold its Beneficial Interest subject to all in the terms and provisions of this Agreement and the Plan. The Beneficial Interests shall not be certificated. No Beneficiary shall have legal title to any part of the Recovery Trust Assets. The interest of a Beneficiary of the Recovery Trust is in all respects personal property, and upon the death, insolvency or incapacity of an individual Beneficiary, such Beneficiary's Beneficial Interest shall pass to the legal representative of such Beneficiary. A Beneficiary shall have no title to, or any right to possess, manage or control, the Recovery Trust Assets, or any portion thereof or interest therein, except as expressly provided herein. No surviving spouse, heir, or devisee of any deceased Beneficiary shall have any right of dower, homestead or inheritance, or of partition, or any other right, statutory or otherwise, in the Recovery Trust Assets, but the whole title to all the Recovery Trust Assets shall be vested in the Recovery Trustee and the sole interest of the Beneficiaries shall be the rights and benefits provided to such persons under this Agreement and the Plan.

# ARTICLE VII

## Distributions

7.1 <u>Distributions under the Plan</u>. Subject to the terms of the Plan and the Confirmation Order, distributions under the Plan shall be made as follows:

(a)     The Recovery Trust and Post-Confirmation Debtor will administer Claims subject to the Recovery Trust Functions and Post-Confirmation Debtor Functions, respectively. The Post-Confirmation Debtor Representative will make Distributions to holders of Allowed Administrative Claims, Priority Tax Claims and Other Priority Claims, out of the Administrative/Priority/Tax Claims Reserve. The Recovery Trust will make Distributions in respect of all other Allowed Claims and, if applicable, Allowed Interests against the Estates, except as may otherwise be expressly provided in the Settlement Agreement. Distributions to be made by the Post-Confirmation Debtor Representative and Recovery Trust may be made by any Person(s) designated or retained to serve as the disbursing agent(s) without the need for any further order of the Bankruptcy Court.

(b)     Subject to prior consultation with the Recovery Trust Committee and any applicable provisions of the Recovery Trust Agreement, the Recovery Trustee shall be authorized, in his or her discretion, to delay distributions to holders of Class 3 Trust Interests, Class 4 Trust Interests and/or Class 6 Trust Interests or otherwise determine reasonable distribution dates for such holders, including, without limitation, based upon the status and progress of the liquidation of Recovery Trust Assets, the total number of and/or asserted claim amounts of Disputed Claims, and any other relevant factors.

7.2     <u>Estimation</u>. In order to establish appropriate reserves under the Plan and avoid undue delay in the administration of the Chapter 11 Cases, the Recovery Trust and Post-Confirmation Debtor (subject to the Recovery Trust Functions and Post-Confirmation Debtor Functions, respectively) will have the right to seek orders of the Bankruptcy Court pursuant to Section 502(c) of the Bankruptcy Code, estimating the amounts of Claims.

7.3     <u>Distributions on Account of Disputed Claims and Interests</u>. Except as otherwise provided in a Final Order or as agreed by the relevant parties, Distributions on account of Disputed Claims and Interests that become Allowed after the Effective Date will be made by the Recovery Trustee or Post-Confirmation Debtor Representative (as applicable) at such periodic intervals as the Recovery Trust and Post-Confirmation Debtor Representative (as applicable) determine to be reasonably prudent.

7.4     <u>No Distributions Pending Allowance</u>. Notwithstanding anything in the Plan to the contrary: (a) no Distribution will be made with respect to any Disputed Claim or Interest until such Claim or Interest becomes an Allowed Claim or Interest (as applicable), and (b) unless determined otherwise by the Recovery Trustee or Post-Confirmation Debtor Representative (as applicable), no Distribution will be made to any Person that holds both (i) an Allowed Claim or Interest and (ii) either a Disputed Claim or Interest until such Person's Disputed Claims or Interests have been resolved by settlement or Final Order.

7.5     <u>Objection Deadline</u>. The Recovery Trustee or Post-Confirmation Debtor Representative (as applicable, and subject to the Recovery Trust Functions and Post-Confirmation Debtor Functions, respectively) will file all objections to Disputed Claims or Interests, and will file all motions to estimate Claims under Section 502(c) of the Bankruptcy Code, on or before the Claims Objection Deadline, provided however that the Recovery Trustee or Post-Confirmation Debtor Representative may request that the Bankruptcy Court extend the Claims Objection Deadline. The Claims Objection Deadline is the first Business Day that is 180 days after the occurrence of the Effective Date (unless such date is extended by the Bankruptcy Court). Notwithstanding the foregoing, there will be no deadline for the Recovery Trust to file objections to Disputed Interests.

7.6     <u>Disputed Claims Reserve</u>. On and after the Effective Date, the Recovery Trust will maintain in reserve such Cash as the Recovery Trust estimates to be reasonably necessary to satisfy the Distributions that could be required to be made under the Plan and the Recovery Trust Agreement (the "<u>Disputed Claims Reserve</u>"). On and after the Effective Date, the Recovery Trust will maintain in reserve such Cash as the Recovery Trust estimates to be reasonably necessary to satisfy the Distributions that could be required to be made by the Recovery Trustee under the Plan and the Recovery Trust Agreement (the "<u>Disputed Claims Reserve</u>"). The Disputed Claims Reserve is separate from the Administrative/Priority/Tax Claims Reserve to be maintained by the Post-Confirmation Debtor Representative as set forth in Section 6.3(a) of the Plan. For the avoidance of doubt, Distributions to any Person holding a Disputed Claim or Interest that becomes an Allowed Claim or Interest (as applicable) (including, without limitation, Administrative Claims, Priority Tax Claims and Other Priority Claims) after the Effective Date will be made together with any payments or other distributions that would have been made to such Person had its Disputed Claim or Interest become an Allowed Claim or Interest on or prior to the Effective Date.

7.7     <u>Settling Disputed Claims (or Interests)</u>. The Recovery Trustee or Post-Confirmation Debtor Representative (as applicable, and subject to the Recovery Trust Functions and Post-Confirmation Debtor Functions, respectively) will be authorized to settle, or withdraw any objections to, any Disputed Claims (or Interests) following the Effective Date without need for approval of the Bankruptcy Court.

7.8     <u>Distributions in Cash</u>. The Recovery Trustee or Post-Confirmation Debtor Representative (as applicable, and subject to the Recovery Trust Functions and Post-Confirmation Debtor Functions, respectively) will make any required Cash payments to the holders of Allowed Claims or Interests: (X) in U.S. dollars by check, draft or warrant, drawn on a domestic bank, or by wire transfer from a domestic bank, and (Y) by first-class mail (or by other equivalent or superior means as determined by the Recovery Trustee).

7.9     <u>Unclaimed Distributions</u>. Any entity which fails to claim any Cash within one hundred twenty (120) days from the date upon which a distribution is first made to such entity will forfeit all rights to any Distribution under the Plan, and the Recovery Trustee or Post-Confirmation Debtor Representative (as applicable, and subject to the Recovery Trust Functions and Post-Confirmation Debtor Functions, respectively) will be authorized to cancel any Distribution that is not timely claimed. Pursuant to Section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) will revert to the Recovery Trust free of

any restrictions under the Plan, the Bankruptcy Code or the Bankruptcy Rules. Upon forfeiture, the claim of any Creditor or Interest holder with respect to such funds will be discharged and forever barred against the Recovery Trust, the Post-Confirmation Debtor and the Estates, notwithstanding any federal or state escheat laws to the contrary, and such Creditor or Interest holder will have no claim whatsoever against the Recovery Trust, the Post-Confirmation Debtor, the Estates, or any holder of an Allowed Claim or Interest to whom distributions are made by the Recovery Trust.

7.10 <u>Setoff</u>. Nothing contained in the Plan shall constitute a waiver or release by the Recovery Trust and Post-Confirmation Debtor of any right of setoff or recoupment the Estates, the Recovery Trust, or Post-Confirmation Debtor may have against any Creditor or Interest holder. To the extent permitted by applicable law, the Recovery Trustee or Post-Confirmation Debtor Representative (as applicable) may, but is not required to, set off or recoup against any Claim or Interest and the payments or other distributions to be made under the Plan in respect of such Claim or Interest, claims of any nature whatsoever that arose before the Petition Date that the Estates or the Recovery Trust may have against the holder of such Claim or Interest.

7.11 <u>Taxes</u>. Pursuant to Section 346(f) of the Bankruptcy Code, the Recovery Trustee or Post-Confirmation Debtor Representative (as applicable) will be entitled to deduct and withhold any federal, state, or local taxes from any Cash payments made with respect to Allowed Claims or Interests, as appropriate. The Recovery Trustee or Post-Confirmation Debtor Representative (as applicable) will be authorized to take all actions necessary to comply with applicable withholding and recording requirements. Notwithstanding any provision of the Plan, each holder of an Allowed Claim or Interest that has received a Distribution of Cash under the Plan will have sole and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligation, on account of such distribution. For tax purposes, Distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.

7.12 <u>Legal Proceedings</u>. If any Estate Claims or Avoidance Actions are asserted and if such claims or any other legal proceedings are initiated or prosecuted against any Creditor pursuant to the Plan, Confirmation Order, or this Agreement, or asserted as an objection to any Claim, then notwithstanding anything to the contrary contained in the Plan or Confirmation Order, until such proceeding or contested matter is finally resolved and all payments to the Debtors' Estates required by such resolution have been made, such Creditor shall only receive Distributions under the Plan or Confirmation Order to the extent that the distributions to which such Creditor is otherwise entitled exceed the maximum liability of such Creditor to the Debtors' Estates asserted in such proceedings.

7.13 <u>De Minimis Distributions</u>. If any interim Distribution under the Plan to the holder of an Allowed Claim or Interest would be less than $500.00, the Recovery Trustee or Post-Confirmation Debtor Representative (as applicable) may withhold such Distribution until a final Distribution is made to such holder. If any final Distribution under the Plan to the holder of an Allowed Claim or Interest would be less than $25.00, the Recovery Trustee or Post-Confirmation Debtor Representative (as applicable) may cancel such Distribution. Any

unclaimed Distributions pursuant to Section 7.12 of the Plan will be treated as unclaimed property under Section 7.9 of the Plan. To the extent that the Recovery Trust has assets remaining that do not exceed $25,000 in value, the Recovery Trustee, in his discretion, can donate such assets to a charitable organization of his choice.

ARTICLE VIII

**Removal or Resignation of the Recovery Trustee**

8.1     <u>Removal of the Recovery Trustee</u>.  The Recovery Trustee may be removed (i) by majority vote of the Recovery Trust Committee in the event such termination is for "cause" and (ii) by unanimous vote of the Recovery Trust Committee in the event such termination is without cause. For purposes of this Agreement, the term "cause" shall mean (a) the Recovery Trustee's gross negligence, willful misconduct or willful failure to perform his duties under the Plan, the Confirmation Order and this Agreement or (b) the Recovery Trustee's misappropriation or embezzlement of any Recovery Trust Assets or the proceeds thereof. If a Recovery Trustee is removed for cause, such Recovery Trustee shall not be entitled to any accrued but unpaid fees, reimbursements or other compensation under this Agreement or otherwise. If the Recovery Trustee is removed by the Bankruptcy Court other than for "cause", or is unwilling or unable to serve (a) by virtue of his inability to perform his duties under this Agreement due to death, illness, or other physical or mental disability, (b) by virtue of appointment of a new Recovery Trustee by a majority vote of the reconstituted Advisory Committee following the satisfaction of all Allowed Claims (including the full and final satisfaction of all Allowed General Unsecured Claims and Allowed Subordinated Claims), or (c) for any other reason whatsoever other than for "cause," subject to a final accounting, the Recovery Trustee shall be entitled to all accrued and unpaid fees, reimbursement, and other compensation, to the extent incurred or arising or relating to events occurring before such removal, and to any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties and all rights to any successor Recovery Trustee.

8.2     <u>Resignation of the Recovery Trustee</u>.  The Recovery Trustee may resign as Recovery Trustee at any time by giving prior written notice thereof to the Recovery Trust Committee (the "<u>Notice</u>"); provided, <u>however</u>, that such resignation shall not be effective earlier than thirty (30) days after the date of such Notice, unless an earlier effective date is allowed by the Bankruptcy Court or by the Recovery Trust Committee. If the Recovery Trustee resigns from his position hereunder, subject to a final accounting, he shall be entitled to all accrued unpaid fees, reimbursement, and other compensation to the extent incurred or arising or relating to events occurring before such resignation, and any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties to the successor Recovery Trustee.

8.3     <u>Successor to the Recovery Trustee</u>.  In the event of the resignation, removal or death of the Recovery Trustee, the Recovery Trust Committee will, by majority vote, designate a person to serve as the successor Recovery Trustee. A notice identifying any successor Recovery Trustee will be filed with the Bankruptcy Court and served on the Post-Confirmation Service List. The successor Recovery Trustee, without any further act, will become fully vested with all of the rights, powers, duties, and obligations of his or her predecessor.

# ARTICLE IX

## Effect of the Agreement on Third Parties

9.1    There is no obligation on the part of any person dealing with the Debtors' Estates, the Debtors, the Post-Confirmation Debtor Representative, the Post-Confirmation Debtor Oversight Committee, the Recovery Trustee, the Trustee Professionals, or any member of the Recovery Trust Committee to see to the application of the money or other consideration paid or delivered to the Recovery Trustee, or any agent of the Recovery Trustee, or to inquire into the validity, expediency, or propriety of any such transaction, or the authority of the Recovery Trustee, or any agent of the Recovery Trustee, to enter into or consummate the same, except upon such terms as the Recovery Trustee may deem advisable.

# ARTICLE X

## Waiver

10.1    No failure or delay of any party to exercise any right or remedy pursuant to this Agreement shall affect such right or remedy or constitute a waiver by such party of any right or remedy pursuant thereto.  Resort to one form of remedy shall not constitute a waiver of alternative remedies.

# ARTICLE XI

## Termination of the Agreement and Amendment

11.1    <u>Termination of the Agreement</u>.  This Agreement (other than Section 5.12, 5.18 and related provisions) shall terminate and the Recovery Trust shall dissolve and terminate and be of no further force or effect upon the earlier to occur of (i) the final Distribution of all monies and other Recovery Trust Assets in accordance with the terms of this Agreement, the Plan and Confirmation Order and (ii) entry of a Final Order of the Bankruptcy Court terminating and dissolving the Recovery Trust as provided under the Plan.  The Recovery Trust will terminate no later than the third (3rd) anniversary of the Effective Date, <u>provided</u>, <u>however</u>, that, on or prior to the date six (6) months prior to such termination, the Bankruptcy Court, upon motion by the Recovery Trustee or a party in interest, may extend the term of the Recovery Trust for a fixed period if it is necessary to facilitate or complete the liquidation and distribution of the Recovery Trust Assets.  Notwithstanding the foregoing, additional extensions can be obtained so long as Bankruptcy Court approval is obtained at least six (6) months prior to the expiration of each previously extended term; <u>provided</u>, <u>however</u>, that the aggregate of all such extensions shall not exceed five (5) years, unless the Recovery Trustee receives a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Recovery Trust as a grantor trust for federal income tax purposes.  The Recovery Trustee will not unduly prolong the duration of the Recovery Trust and will at all times endeavor to resolve, settle or otherwise dispose of all Claims and the Recovery Trust Assets, to effect Distributions to Beneficiaries in accordance with the terms hereof, the Plan and Confirmation Order and to terminate the Recovery Trust as soon as practicable in a prompt and timely fashion.  In the event that the Recovery Trustee elects to terminate the Recovery Trust, subject to consultation with the

Post-Confirmation Debtor Representatives, he shall provide twenty (20) day notice thereof to the Office of United States Trustee and the Recovery Trust Committee, and file such notice with the Bankruptcy Court and upon such termination, the Recovery Trustee shall cease to act as the Recovery Trustee and the Recovery Trust Committee shall be disbanded such that neither the Recovery Trustee nor the members of the Recovery Trust Committee shall have any further duties or responsibilities under the Agreement or otherwise.

11.2 <u>Amendment of the Agreement</u>. Except as otherwise set forth herein, any provisions of this Agreement may be amended, modified, terminated, revoked, or altered only in writing by the Recovery Trustee and a majority vote (unless the provision to be amended requires a unanimous vote, and then approval of the amendment will require unanimity) of the members of the Recovery Trust Committee (subject to consultation with the Post-Confirmation Debtor Representative) pursuant to an Order of the Bankruptcy Court. Notwithstanding this Section 11.2, any amendments to this Agreement shall not be inconsistent with the purpose and intention of the Recovery Trust to liquidate in an expeditious but orderly manner the Recovery Trust Assets in accordance with Treasury Regulations Section 301.7701-4(d) and this Agreement.

ARTICLE XII

**Miscellaneous**

12.1 <u>Intention of Parties to Establish the Recovery Trust</u>. This Agreement is not intended to create, and shall not be interpreted as creating, an association, partnership or joint venture of any kind. It is intended as a trust to be governed and construed in all respects as a trust.

12.2 <u>Filing Documents</u>. A copy of this Agreement and all amendments thereof shall be maintained in an office or residence of the Recovery Trustee and shall be available for inspection.

12.3 <u>Books and Records</u>.

(a) Other than books and records retained by the Post-Confirmation Debtor Representative which are needed to perform the Post-Confirmation Debtor Functions, on the date hereof, the Debtors shall transfer to the Recovery Trust all of the books and records of the Debtors in the Debtors' possession (other than the Post-Confirmation Debtor Reserve transferred to the Post-Confirmation Debtor Representative under the Plan), and shall instruct any third parties or professionals possessing such books and records (including computer generated or computer maintained books, records and data, legal and accounting files maintained by any professional of the Debtors and other of the Debtors' books and records maintained by or in the possession of third parties), to turn over or permit access to (at the election of the party to whom the request is made) such books and records as may be reasonably requested by the Recovery Trustee, <u>provided that</u> the Recovery Trustee shall only request such books and records or access thereto to the extent reasonably necessary to the Recovery Trustee's performance of his duties hereunder, <u>provided, further,</u> that the out of pocket expenses of complying with any such request shall not be borne by the party upon whom the request is made, absent agreement to the contrary.

(b)     The Post-Confirmation Debtor and Recovery Trust will maintain reasonably good and sufficient books and records in respect to matters related to the Post-Confirmation Debtor Functions and Recovery Trust Functions, respectively. The Post-Confirmation Debtor and Recovery Trustee may, upon notice to the Post-Effective Date Service List and without Bankruptcy Court approval, destroy any documents that each believes are no longer required to effectuate the terms and conditions of the Plan or the Settlement Agreement. Upon the entry of a final decree closing the Chapter 11 Cases, unless otherwise ordered by the Court, the Post-Confirmation Debtor and Recovery Trustee may destroy or otherwise dispose of all records maintained by them.

12.4    <u>Tax Identification Numbers</u>.  The Recovery Trustee may require any Beneficiary to furnish to the Recovery Trustee, (i) its employer or taxpayer identification number as assigned by the Internal Revenue Service, and (ii) such other information, records or documents necessary to satisfy the Recovery Trustee's tax reporting obligations (including certificates of non-foreign status).  The Recovery Trustee may condition the payment of any Distribution to any Beneficiary upon receipt of such identification number and requested documents.

12.5    <u>U.S. Trustee Fees and Post-Confirmation Reports</u>.  After the Effective Date, the Recovery Trust shall pay any statutory fees due for the post-Effective Date period pursuant to 28 U.S.C. § 1930(a)(6) and such fees shall be paid until entry of a final decree or an order converting or dismissing the Chapter 11 Cases.  After the Effective Date, the Post-Confirmation Debtor Representative and Recovery Trustee will file separate post-confirmation status reports (unless the Post-Confirmation Debtor Representative and Recovery Trustee mutually agree to file joint status reports) on a quarterly basis up to the entry of a final decree closing the Chapter 11 Cases or as otherwise ordered by the Court.

12.6    <u>Privilege</u>.  Solely with respect to the Recovery Trust Functions, the attorney-client privilege, work product doctrine or other privileges or immunities inuring to the benefit of the Debtors or attaching to documents or communications of the Debtors shall be transferred to the Recovery Trust and shall be shared between the Recovery Trustee and the Post-Confirmation Debtor.  The Recovery Trustee is authorized to assert or waive any such privilege or doctrine, as necessary or appropriate for the administration of the Recovery Trust; <u>provided that</u>, to the extent any such privilege or doctrine is waived in connection with information requested of any professional previously employed by the Debtors, the Recovery Trustee agrees that such information request shall be made solely for the purpose of carrying out the Recovery Trustee's duties hereunder, that the Recovery Trustee shall act in good faith and shall use their best efforts to tailor as narrowly as possible any request so as not to be unduly invasive or burdensome to the professional upon whom the request is made.

12.7    <u>Valuation of the Recovery Trust Assets</u>.  As soon as practicable after the Effective Date, the Recovery Trustee, in reliance upon such professionals as the Recovery Trustee may retain, may make a good faith valuation of the Recovery Trust Assets.  Such valuation shall be made available from time to time, to the extent relevant, as reasonably determined by the Recovery Trustee in reliance on his professionals, and used consistently by all parties, including, without limitation, the Post-Confirmation Debtor, the Recovery Trust, and Beneficiaries, for all purposes, including federal income tax purposes.

12.8     Governing Law. THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

12.9     Severability. If any one or more of the provisions herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect, and of the remaining provisions, shall not be in any way impaired or affected. In such event, there shall be added as part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable. The effective date of the added provision shall be the date upon which the prior provision was held to be invalid, illegal or unenforceable.

12.10     Entire Agreement. This Agreement (including the recitals), the Plan and the Confirmation Order constitute the entire agreement of the parties and there are no representations, warranties, covenants, or obligations except as set forth herein or therein. This Agreement, the Plan, and the Confirmation Order supersede all prior and contemporaneous agreements, understandings, negotiations, and discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder. In the event of any inconsistency between this Agreement, the Plan, and the Confirmation Order, the Confirmation Order shall govern provided, however, that the Recovery Trustee may amend, modify and/or correct the terms hereof to supersede the Plan and/or the Confirmation Order, with the approval of the Bankruptcy Court and subject to consultation with the Post-Confirmation Debtor Representative. Except as otherwise specifically provided herein, nothing in this Agreement is intended or shall be construed to confer upon or to give any person other than the parties hereto and their respective heirs, administrators, executors, successors, and assigns any rights or remedies under or by reason of this Agreement.

12.11     Jurisdiction; Venue. Each party hereto irrevocably agrees that any suit, action or proceeding with respect to this Agreement shall be brought in the United States Bankruptcy Court for the District of Delaware, and by execution and delivery of this Agreement, each party (a) irrevocably submits to each such jurisdiction and venue, (b) waives, to the fullest extent permitted by law, any objection that it may have to the laying of the venue of any such suit, action or proceeding brought in such court has been brought in an inconvenient forum, and (c) agrees that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding upon it and may be enforced in any court to the jurisdiction of which such party is subject by a suit upon such judgment, provided that service of process is effected as otherwise permitted by law.

12.12     Notices. Unless otherwise expressly specified or permitted by the terms hereof, any notice, request, submission, instruction or other document to be given hereunder by a party shall be in writing and shall be deemed to have been given, (a) when received if given in person, (b) upon delivery, if delivered by a nationally known commercial courier service providing next day delivery service (such as Federal Express), or (c) upon delivery, or refusal of

delivery, if deposited in the U.S. mail, certified or registered mail, return receipt requested, postage prepaid:

**If to the Recovery Trustee, addressed as follows:**

Brian Ryniker
CBIZ MHM, LLC
1065 Avenue of the Americas, 11th Floor
New York, NY 10018
Telephone: 212-790-5899
Facsimile: 212-634-0099
Email: bryniker@cbiz.com

With a copy to his counsel:

Robert M. Hirsh, Esq.
Arent Fox LLP
1675 Broadway
New York, NY 10019
Telephone: 212-457-5430
Facsimile: 212-484-3990
Email: robert.hirsh@arentfox.com

**If to the Post-Confirmation Debtor Representative, addressed as follows:**

T. Scott Avila
Deloitte CRG
350 South Grand Avenue, Ste. 200
Los Angeles, CA 90071-3462
Telephone: (213) 688-3216
Email: savila@deloitte.com

With a copy to his counsel:

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, DE 19801
Attn: Laura Davis Jones / Alan Kornfeld
Telephone: 302-652-4100
Facsimile: 302-652-4400
Email: ljones@pszjlaw.com
        akornfeld@pszjlaw.com

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

12.13  WAIVER OF JURY TRIAL.  EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY.

12.14  Further Assurances.  Each Party hereto (and his respective successors and assigns) shall, upon the Recovery Trustee's reasonable request, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such further instruments, and do or cause to be done, such further acts, as may be necessary to carry out the purposes of this Agreement and to vest in the Recovery Trustee the powers and duties contemplated hereunder.

12.15  Exculpatory Provisions and Survival Thereof.  Whether or not expressly therein so provided, any and all exculpatory provisions, immunities and indemnities, and any limitations and negations of liability contained in this Agreement, in each case inuring to the benefit of the Recovery Trustee, shall survive (i) the termination or revocation of this Agreement, and (ii) as to any person who has served as Recovery Trustee, the resignation or removal of such person as Recovery Trustee.

12.16  Conflicts.  In the event of any inconsistency between the Plan or Confirmation Order, on the one hand, and this Agreement, on the other, the terms and provisions of the Plan or Confirmation Order shall govern.

12.17  Headings.  The headings of the various Articles and Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

12.18  Successors and Assigns.  All covenants and agreements contained herein shall, as applicable, be binding upon, and inure to the benefit of the Creditors' Committee, the Equity Committee, the Recovery Trustee and its successors, the Estates and the Debtors and its successors, including the Post-Confirmation Debtor, all as herein provided.

12.19  Separate Counterparts.  This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

IN WITNESS WHEREOF, the undersigned have either executed and acknowledged this Agreement or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

RECOVERY TRUSTEE:

By: _____
Brian K. Ryniker

DEBTORS AND DEBTORS IN POSSESSION:

By: _____
Name: T. Scott Avila
Title: Chief Restructuring Officer

CREDITORS' COMMITTEE:

By: _____
Name: Larry Ellis
Title: Chairperson

POST-CONFIRMATION DEBTOR REPRESENTATIVE:

By: _____
Name: T. Scott Avila

IN WITNESS WHEREOF, the undersigned have either executed and acknowledged this Agreement or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

RECOVERY TRUSTEE:

By: _____
[___]

DEBTORS AND DEBTORS IN POSSESSION:

By: _____
Name: T. Scott Avila
Title: Chief Restructuring Officer

CREDITORS' COMMITTEE:

By: _____
Name: [___]
Title: [___]

POST-CONFIRMATION DEBTOR REPRESENTATIVE:

By: _____
Name: T. Scott Avila

IN WITNESS WHEREOF, the undersigned have either executed and acknowledged this Agreement or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

RECOVERY TRUSTEE:

By: _____
Brian K. Ryniker

DEBTORS AND DEBTORS IN POSSESSION:

By: _____
Name: T. Scott Avila
Title: Chief Restructuring Officer

CREDITORS' COMMITTEE:

By: _____
Name: Larry Ellis
Title: Chairperson

POST-CONFIRMATION DEBTOR REPRESENTATIVE:

By: _____
Name: T. Scott Avila

# EXHIBIT 2

# SS BODY ARMOR I, INC.

---

A Delaware Corporation

## THIRD AMENDED AND RESTATED BY-LAWS

As of November __, 2015

---

# ARTICLE 1

## STOCKHOLDERS

Section 1.1    GENERAL.    An annual meeting of stockholders for the purpose of electing directors and of transacting such other business as may come before it shall be held each year at such date, time, and place, either within or without the State of Delaware, as may be specified by the Board of Directors.

Section 1.2    SPECIAL MEETINGS OF STOCKHOLDERS. Except as required by law or the Plan, special meetings of stockholders may be called only by the Board of Directors pursuant to a resolution approved by a majority of the then authorized number of directors or by the Chairman or Co-Chairman of the Board of Directors. Stockholders of the Corporation are not permitted to call a special meeting or to require that the Board of Directors or the Chairman or Co-Chairman of the Board of Directors call a special meeting of stockholders. The business permitted at any special meeting of stockholders shall be limited to the business brought before the meeting by or at the direction of the Board of Directors or the Chairman or Co-Chairman of the Board of Directors.

Section 1.3    NOTICE OF MEETING.

Notice of stockholders meetings, stating the place, if any, date and hour thereof, the means of remote communication, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given by the Chairman of the Board, if any, the President, any Vice President, the Secretary, or any Assistant Secretary, to each stockholder entitled to vote thereat at least ten days but not more than sixty days before the date of the meeting, unless a different period is prescribed by law.

Section 1.4    QUORUM.

Except as otherwise provided by law or in the Certificate of Incorporation or these By-Laws, at any meeting of stockholders, the holders of a majority of the voting power of the

outstanding shares of all classes of stock entitled to vote at the meeting shall be present or represented by proxy in order to constitute a quorum for the transaction of any business. Where a separate vote by a class or classes or series is required, a majority of the voting power of the shares of such class or classes or series present in person or represented by proxy shall constitute a quorum entitled to take action with respect to that vote on that matter. In the absence of a quorum, a majority in interest of the stockholders present or the chairman of the meeting may adjourn the meeting from time to time in the manner provided in <u>Section 1.5</u> of these By-Laws until a quorum shall attend.

Section 1.5    ADJOURNMENT.

Any meeting of stockholders, annual or special, may adjourn from time to time to reconvene at the same or some other place, if any, and notice need not be given of any such adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 1.6    ORGANIZATION.

The Chairman of the Board, if any, or in the Chairman's absence, the President, or in their absence any Vice President, shall call to order meetings of stockholders and shall act as chairman of such meetings. The chairman of any meeting of stockholders shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him or her in order. The chairman shall have the power to adjourn the meeting to another place, if any, date and time. The Board of Directors or, if the Board fails to act, the stockholders may appoint any stockholder, director, or officer of the Corporation to act as chairman of any meeting in the absence of the Chairman of the Board, the President, and all Vice Presidents.

The Secretary of the Corporation shall act as secretary of all meetings of stockholders, but, in the absence of the Secretary, the chairman of the meeting may appoint any other person to act as secretary of the meeting.

Section 1.7    VOTING.

Subject to the General Corporation Law of the State of Delaware and the Plan, each share of capital stock of the Corporation shall entitle the holder thereof to one vote, in person or by proxy (either written or as otherwise permitted by the General Corporation Law of the State of Delaware). Except as otherwise provided by law in the Certificate of Incorporation, these By-Laws or the Plan, at any meeting duly called and held at which a quorum is present, a majority of the votes cast at such meeting upon given question by the holders of outstanding shares of stock of all classes of stock of the Corporation entitled to vote thereon who are present in person or by proxy shall decide such questions. No shares of the capital stock of the Corporation shall be voted in any manner that is inconsistent with the Plan.

## ARTICLE 2

## BOARD OF DIRECTORS

Section 2.1    (a)    GENERAL: TERM OF OFFICE.  The business, property and affairs of the Corporation shall be managed by or under the direction of the Board of Directors subject to the terms of the Plan.  Subject to the Plan, the director(s) shall be subject to re-election by the holders of shares entitled to vote thereon at the annual meeting of stockholders, and each shall serve (subject to the provisions of Article 4) until the next succeeding annual meeting of stockholders and until a respective successor has been elected and qualified.

(b)    NUMBER AND ELIGIBILITY.  The Board of Directors shall consist of one (1) member, who shall at all times be the Post-Confirmation Debtor Representative (as such term is defined in the Plan).  Upon any removal of the Post-Confirmation Debtor Representative in accordance with the Plan, the Post-Confirmation Debtor Representative shall cease to be eligible to serve as a director of the Corporation and shall thereupon be deemed to have been removed, without need for further action by the Board of Directors or the stockholders of the Corporation.  Upon the resignation, removal or death of the Post-Confirmation Debtor Representative, the person designated in accordance with the Plan to serve as the successor to the Post-Confirmation Debtor Representative shall serve as the director of the Corporation.

Section 2.2    CHAIRMAN OF THE BOARD.

The Post-Confirmation Debtor Representative, as sole director, shall be the Chairman of the Board of Directors.  The Chairman of the Board shall perform such duties as may from time to time be assigned by the Board.

Section 2.3    MEETINGS.

The annual meeting of the Board of Directors, for the election of the officers and the transaction of such other business as may come before the meeting, may be held without notice at the same place as, and immediately following, the annual meeting of the stockholders.

Regular meetings of the Board of Directors may be held without notice at such time and place as shall from time to time be determined by the Board.

Special meetings of the Board of Directors shall be held at such time and place as shall be designed in the notice of the meeting whenever called by the Chairman of the Board, if any, the President, or by a majority of the directors of the office.

Section 2.4    NOTICE OF SPECIAL MEETINGS.

Notice of any special meeting of the Board of Directors shall be given to each director by the Secretary or, in the Secretary's absence, any other officer of the Corporation (a) by giving notice to such director in person or by telephone at least 24 hours in advance of the meeting, (b) by sending a telegram, telecopy, facsimile, telex or electronic mail, or delivering written notice

by hand, to a director's last known business, home or electronic mail address at least 24 hours in advance of the meeting, or (c) by mailing written notice to a director's last known business or home address at least 72 hours in advance of a meeting. A notice or waiver of notice need not specify the purpose of the meeting. Unless otherwise stated in the notice thereof, any and all business may be transacted at any meeting without specification of such business in the notice.

Section 2.5    QUORUM AND ORGANIZATION OF MEETINGS.

A majority of the total number of members of the Board of Directors as constituted from time to time shall constitute a quorum for the transaction of business, but if at any meeting of the Board of Directors (whether or not adjourned from a previous meeting) there shall be less than a quorum present, a majority of those present may adjourn the meeting to another time and place, and the meeting may be held as adjourned without further notice or waiver. Except as otherwise provided by law or in the Certificate of Incorporation or these By-Laws, a majority of the directors present at any meeting at which a quorum is present may decide any question brought before such meeting. Meetings shall be presided over by the Chairman of the Board, if any, or in the Chairman's absence, by the President, if the President is also a director, or in the absence of both by such other directors as the directors may determine. The Secretary of the Corporation shall act as secretary of the meeting, but in the Secretary's absence, the chairman of the meeting may appoint any person to act as secretary of the meeting.

Section 2.6    ACTION WITHOUT MEETING.

Nothing contained in these By-Laws shall be deemed to restrict the power of members of the Board of Directors to take any action required or permitted to be taken by them without a meeting.

Section 2.7    TELEPHONE MEETINGS.

Nothing contained in these By-Laws shall be deemed to restrict the power of members of the Board of Directors to participate in a meeting of the Board by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other.

**ARTICLE 3**

**OFFICERS**

Section 3.1    GENERAL.

The Corporation shall have an officer position having the title "Post-Confirmation Debtor Representative." The Corporation also shall have a Chairman of the Board, President, Secretary, Treasurer and may have such other officers as may from time to time be established and appointed by the Board of Directors. Initially, the Post-Confirmation Debtor Representative shall also serve as Chairman of the Board, President, Secretary, and Treasurer. Subject to the Plan, the officers of the Corporation shall be elected by the Board of Directors.

Section 3.2    AUTHORITIES AND DUTIES.

The Post-Confirmation Debtor Representative, as an officer of the Corporation, shall have all of the powers, authority, duties and responsibilities assigned to such position under the Plan and is hereby delegated, to the fullest extent permissible by the General Corporation Law of the State of Delaware, all power and authority of the Board of Directors to manage the affairs and properties of the Corporation, subject to (a) the terms of the Plan and (b) the consultation, reporting and other requirements of the Post-Confirmation Debtor Representative with respect to the Post-Confirmation Debtor Oversight Committee, and subject to prior consultation with the Recovery Trustee. All officers, as between themselves and the Corporation, shall have such authority and perform such duties in the management of the business and affairs of the Corporation as may be prescribed by the Board of Directors or set forth in these By-Laws, subject to the terms of the Plan, including, without limitation, the terms in relation to the duties and powers of the Post-Confirmation Debtor Representative and the reporting and other requirements of the Post-Confirmation Debtor Representative with respect to the Post-Confirmation Debtor Oversight Committee. The Post-Confirmation Debtor Representative shall consult with the Post-Confirmation Debtor Oversight Committee prior to the retention of legal or financial advisors to the Post-Confirmation Debtor, and nothing continued herein or within the Plan shall restrict or otherwise limit whom the Post-Confirmation Debtor may retain for such representations.

Section 3.3    TENURE AND REMOVAL.

The officers of the Corporation shall be elected or appointed to hold office until their respective successors are elected or appointed. All officers shall hold office at the pleasure of the Board of Directors, and any officer elected or appointed by the Board of Directors may be removed at any time by the Board of Directors for cause or without cause at any regular meeting.

Section 3.4    COMPENSATION.

Subject to the Plan and consultation with the Post-Confirmation Debtor Oversight Committee, the salaries of officers elected by the Board of Directors shall be fixed from time to time by the Board of Directors or officers as may be designated by resolution of the Board of Directors.

## ARTICLE 4

## RESIGNATION, REMOVAL AND VACANCIES.

Section 4.1    RESIGNATIONS.

Any director or officer of the Corporation, including the Post-Confirmation Debtor Representative, may resign at any time by giving notice to the Board of Directors, the President, or the Secretary of the Corporation. Any such resignation shall take effect at the time specified therein, or if the time be not specified therein, then upon receipt thereof. The acceptance of such resignation shall not be necessary to make it effective.

The Post-Confirmation Debtor Representative may resign at any time by giving prior written notice thereof to the Post-Confirmation Debtor Oversight Committee (the "Notice"); provided, however, that such resignation shall not be effective earlier than thirty (30) days after the date of such Notice, unless an earlier effective date is allowed by the Bankruptcy Court or by the Post-Confirmation Debtor Oversight Committee.

Section 4.2    REMOVALS.

Subject to the terms of the Plan, any director on the entire Board of Directors, including the Post-Confirmation Debtor Representative, may be removed, with or without cause, by the holders of a majority of the shares entitled at the time to vote at an election of directors; *provided, however*, that so long as there shall be a Post-Confirmation Debtor Oversight Committee, no shares of the capital stock of the Corporation may be voted to remove any director, including the Post-Confirmation Debtor Representative, except with the prior written consent of the Post-Confirmation Debtor Oversight Committee as and to the extent provided by the Plan and *provided, further*, upon the request of the Post-Confirmation Debtor Oversight Committee to remove any Post-Confirmation Debtor Representative and to replace such Post-Effective Debtor Representative with his or her successor in accordance with the Plan, all shares entitled at the time to vote at an election of directors shall promptly be voted to effect such removal and such appointment of a successor.

The Post-Confirmation Debtor Representative may be removed (i) by majority vote of the Post-Confirmation Debtor Oversight Committee in the event such termination is for "cause" and (ii) by unanimous vote of the Post-Confirmation Debtor Oversight Committee in the event such termination is without cause. For purposes of this Agreement, the term "cause" shall mean (a) the Post-Confirmation Debtor Representative's gross negligence, willful misconduct or willful failure to perform his duties and Post-Confirmation Debtor Functions under the Plan and the Confirmation Order or (b) the Post-Confirmation Debtor Representative's misappropriation or embezzlement. If a Post-Confirmation Debtor Representative is removed for the cause specified in the preceding clause (b), such Post-Confirmation Debtor Representative shall not be entitled to any accrued but unpaid fees, reimbursements or other compensation. If the Post-Confirmation Debtor Representative is removed other than for "cause" pursuant to (b) above, or is unwilling or unable to serve (a) by virtue of his inability to perform his duties due to death, illness, or other physical or mental disability, or (b) for any other reason whatsoever other than for "cause," subject to a final accounting, the Post-Confirmation Debtor Representative shall be entitled to all accrued and unpaid fees, reimbursement, and other compensation, to the extent incurred or arising or relating to events occurring before such removal or other applicable termination of service, and to any out-of-pocket expenses reasonably incurred in connection with the transfer of all powers and duties and all rights to any successor Post-Confirmation Debtor Representative. In the event of any dispute relating to the Post-Confirmation Debtor Representative's removal for cause between the Post-Confirmation Debtor and Post-Confirmation Debtor Oversight Committee that cannot be consensually resolved, such dispute shall be presented to and adjudicated by the Bankruptcy Court at the election of the subject Post-Confirmation Debtor Representative.

Section 4.3    VACANCIES.

Any vacancy on the Board of Directors, howsoever resulting, including through an increase in the number of directors, shall only be filled by the affirmative vote of the holders of a majority of the shares entitled to vote at the time of such election. Any director elected to fill a vacancy shall hold office for the same remaining term as that of his or her predecessor, or if such director was elected as a result of an increase in the number of directors, then for the term specified in the resolution providing for such increase.

## ARTICLE 5

## POST-CONFIRMATION DEBTOR OVERSIGHT COMMITTEE

Section 5.1    ESTABLISHMENT AND POWERS OF OVERSIGHT COMMITTEE.

The Post-Confirmation Debtor Oversight Committee shall be established as of the Effective Date of the Plan, and shall have the duties, rights and powers set forth in the Plan, including, without limitation, sections 1.1 (definition of "Post-Confirmation Debtor Functions") and 6.3 of the Plan. For avoidance of doubt, the Post-Confirmation Debtor Oversight Committee shall be established and shall operate pursuant to the Plan, and none of the members of the Post-Confirmation Debtor Oversight Committee by virtue of such service shall be deemed to be directors or officers of the Corporation, and the Post-Confirmation Debtor Oversight Committee shall not be deemed to be a committee of the Board of Directors. Excluding the Recovery Trustee who shall be compensated in his capacity as Recovery Trustee, the members of the Post-Confirmation Debtor Oversight Committee shall receive compensation in the amount of $1,500.00 per month from the Corporation for their services and shall be entitled to reimbursement by the Corporation of any reasonable, documented, out-of-pocket expenses (excluding any attorneys' and advisors' fees) incurred by the members in carrying out their responsibilities hereunder and under the Plan. Such expenses shall be paid by the Post-Confirmation Debtor Representative using funds from the Post-Confirmation Debtor Reserve.

The Post-Confirmation Debtor Representative shall consult as regularly as reasonably practicable with the Post-Confirmation Debtor Oversight Committee when carrying out the Post-Confirmation Debtor Functions. The Post-Confirmation Debtor Oversight Committee shall be entitled to call meetings as reasonably necessary and consistent with the terms of the Plan, on reasonable notice, with the Post-Confirmation Debtor Representative and to monitor the status and progress made by the Post-Confirmation Debtor Representative. The Post-Confirmation Debtor Oversight Committee may meet and/or consult periodically with the Post-Confirmation Debtor Representative and keep itself apprised of the affairs of the Post-Confirmation Debtor.

The Post-Confirmation Debtor Oversight Committee will advise the Post-Confirmation Debtor Representative regarding the administration of the Post-Confirmation Debtor in consultation with the Post-Confirmation Debtor representative. Unless otherwise specified under the Plan, approval of the majority of the members of the Post-Confirmation Debtor Oversight Committee shall be required for the Post-Confirmation Debtor Oversight Committee to act or provide instructions, directions, consents or approvals to the Post Confirmation Debtor Representative, if any.

Section 5.2    RESIGNATIONS, REMOVALS, AND VACANCIES.

A Committee Member may resign at any time.  The resignation shall be effective on the later of (i) the date specified in the notice delivered to the other Committee Members, Post-Confirmation Debtor Representative and U.S Trustee or (ii) the date that is thirty days (30) after the date such notice is delivered.

A Committee Member may only be removed by entry of a Bankruptcy Court order finding that cause exists to remove such member.

The Post-Confirmation Debtor Oversight Committee must, at all times, have no fewer than three (3) members.  In the event that a Committee Member designated by the Creditors Committee (as defined in the Plan) resigns or a vacancy is created by such Committee Member's death, incapacity, or removal, the vacancy shall be filled by a person set forth on a list of potential replacement representatives provided to the Post-Confirmation Debtor Oversight Committee by the Creditors Committee as of the Effective Date of the Plan.  In the event that a Committee Member designated by the Equity Committee (as defined in the Plan) resigns or a vacancy is created by such Committee Member's death, incapacity, or removal, the vacancy shall be filled by a person set forth on a list (the "Equity Committee Designees List") of potential replacement representatives provided to the Post-Confirmation Debtor Oversight Committee by the Equity Committee as of the Effective Date of the Plan.  Upon the occurrence of the Class 3 Satisfaction and Class 4 Satisfaction, the Committee Member designated by the Creditors' Committee shall resign and be replaced by a person set forth on the Equity Committee Designees List.  None of the foregoing designations of replacement Committee Members shall require approval of the Board of Directors, the Bankruptcy Court or any other party.

Section 5.3    POST-CONFIRMATION DEBTOR AND RECOVERY TRUSTEE COOPERATION.

The Post-Confirmation Debtor Representative and the Recovery Trustee will cooperate and coordinate their efforts to implement the Plan, including, among other things, addressing any circumstances where Post-Confirmation Debtor Functions and Recovery Trust Functions may overlap or omit actions or functions necessary to implement the Plan or Settlement Agreement.

## ARTICLE 6

## CAPITAL STOCK

Section 6.1    STOCK CERTIFICATES.

The certificate for shares of the capital stock of the Corporation shall be in such form as shall be prescribed by law and approved, from time to time, by the Board of Directors.

Section 6.2    TRANSFER OF SHARES.

Shares of the capital stock of the Corporation shall be held by the Recovery Trustee in accordance with the Plan, and shall not be transferable to any person other than a successor to the Recovery Trustee in accordance with the Plan.  All shares of the capital stock of the Corporation

shall, following the resignation, removal or death of the Recovery Trustee, thereupon be deemed to have been transferred in their entirety to the person designated in accordance with the Plan to serve as successor to the Recovery Trustee.

Section 6.3    FIXING RECORD DATE.

(a)    Subject to <u>Section 6.3(b)</u>, in order that the Corporation may determine the stockholders entitled to notice of or to vote any meeting of stockholders or any adjournment thereof (or to express consent to corporate action without a meeting), or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion, or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which, unless otherwise provided by law, shall not be more than sixty days nor less that ten days before the date of such meeting, nor more than sixty days prior to any other action.

(b)    In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting (including by telegram, cablegram or other electronic transmission as permitted by law), the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than 10 days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. Any stockholder of record seeking to have the stockholders authorize or take corporate action by consent shall, by written notice to the Secretary, request the Board of Directors to fix a record date. The Board of Directors shall promptly, but in all events within 10 days after the date on which such a request is received, adopt a resolution fixing the record date (unless a record date has previously been fixed by the Board of Directors pursuant to the first sentence of this <u>Section 6.3(b)</u>). If no record date has been fixed by the Board of Directors within 10 days of the date on which such a request is received, the record date for determining stockholders entitled to consent to corporate action without a meeting, when no prior action by the Board of Directors is required by applicable law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation by delivery to its registered office in the State of Delaware, its principal place of business, or any officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by applicable law, the record date for determining stockholders entitled to consent to corporate action without a meeting shall be at the close of business on the date on which the Board of Directors adopts the resolution taking such prior action.

Section 6.4    LOST CERTIFICATES.

Unless the stock is uncertificated, the Board of Directors or any transfer agent of the Corporation may direct a new certificate or certificates representing stock of the Corporation to be issued in place of any certificate or certificates therefore issued by the Corporation, alleged to have been lost, stolen or destroyed, upon making of an affidavit of that fact by the person claiming the certificate to be lost, stolen or destroyed. When authorizing such issue of a new

certificate or certificates, the Board of Directors (or any transfer agent of the Corporation authorized to do so by a resolution of the Board of Directors) may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen, or destroyed certificate or certificates, or the owner's legal representative, to give the Corporation a bond in such sum as the Board of Director (or any transfer agent authorized) shall direct to indemnify the Corporation against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost, stolen, or destroyed or the issuance of such new certificates, and such requirement may be general or confined to specific instances.

Section 6.5    REGULATION.

The Board of Directors shall have power and authority to make all such rules and regulations as it may deem expedient concerning the issue, transfer, resignation, cancellation, and replacement of certificates representing stock of the Corporation.

## ARTICLE 7

## INDEMNIFICATION

Section 7.1    MANDATORY INDEMNIFICATION.

The Corporation shall indemnify, to the fullest extent permitted by Delaware law, the Post-Confirmation Debtor Representative, any agents, professionals, accountants, attorneys, and/or employees of the Post-Confirmation Debtor Representative and/or Post-Confirmation Debtor, any members of the Post-Confirmation Debtor Oversight Committee, and any person who was or is a defendant or is threatened to be made a defendant to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, including, without limitation, any action, suit or proceeding in relation to any act or omission by the indemnitee prior to the date hereof, by reason of the fact that such person (an "*indemnitee*"):

(a)    Excluding any Excluded Party, is or was a director or officer of the Corporation; or

(b)    Excluding any Excluded Party, is or was serving at the request of the Corporation as a director, trustee or officer of another corporation, partnership, limited liability company, joint venture, trust or other enterprise against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding.

Notwithstanding any of the foregoing, to the fullest extent such exclusion is permitted by the General Corporation Law of the State of Delaware, the Corporation shall not indemnify any person who served (a) as a director or officer of the Corporation or (b) at the request of the Corporation, as director, officer, employee, agent, partner or trustee (or in any similar position) of any other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, in each case where any and all such service terminated prior to the Petition Date and did not thereafter re-commence (each an "Excluded Party" and collectively, the "Excluded Parties").

Section 7.2    PERMITTED INDEMNIFICATION.

The Corporation may indemnify, to the fullest extent permitted by Delaware law, any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was an employee or agent of the Corporation against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding.

Section 7.3    EXPENSES PAYABLE IN ADVANCE.

Expenses (including attorneys' fees) incurred by any person (other than an Excluded Party) who is or was a director or officer of the Corporation, or any person who is or was serving at the request of the Corporation as a director, trustee, or officer of another corporation, partnership, limited liability company, joint venture, trust or other enterprise, in defending or investigating a threatened or pending action, suit or proceeding, whether civil, criminal, administrative or investigative, shall be paid by the Corporation to the fullest extent permitted by Delaware law in advance of the final disposition of such action, suit or proceeding, upon receipt of an undertaking by or on behalf of such person to repay such amount if it ultimately shall be determined by final judicial decision from which there is no further right of appeal that such person is not entitled to be indemnified by the Corporation as authorized in this Article VII. Such expenses incurred by any person who is was an employee or agent of the Corporation, or any person who is or was serving at the request of the Corporation as an employee or agent of another corporation, partnership, limited liability company, joint venture, trust or enterprise may be so paid upon such terms and conditions, if any, as the Board of Directors deems appropriate.

Section 7.4    JUDICIAL DETERMINATION OF MANDATORY INDEMNIFICATION OR MANDATORY ADVANCEMENT OF EXPENSES.

If a claim under Section 7.1, 7.2 or 7.3 of this Article VII is not paid in full by the Corporation within sixty (60) days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be twenty (20) days, the indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim, subject to the terms of the Plan. In (i) any suit brought by the indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the indemnitee has not met any applicable standard for indemnification set forth in the General Corporation Law of the State of Delaware (subject to the terms of the Plan). Neither the failure of the Corporation (including its director or directors who are not parties to such action, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such suit that indemnification of the indemnitee is proper in the circumstances because the indemnitee has met the applicable standard of conduct set forth in the General Corporation Law of the State of Delaware (subject to the terms of the Plan), nor an actual determination by the Corporation (including its director or directors who are

not parties to such action, independent legal counsel, or its stockholders) that the indemnitee has not met such applicable standard of conduct, shall create a presumption that the indemnitee has not met the applicable standard of conduct or, in the case of such a suit brought by the indemnitee, be a defense to such suit. Subject to the terms of the Plan, the burden of proving that such person is not entitled to such mandatory indemnification or mandatory advancement of expenses, or that the Corporation is entitled to recover the mandatory advancement of expenses pursuant to the terms of an undertaking shall be on the Corporation. If successful in whole or in part in obtaining an order for mandatory indemnification or mandatory advancement of expenses, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, such person shall also be entitled to be paid all costs (including attorneys' fees and expenses) in connection therewith.

Section 7.5    NON-EXCLUSIVITY.

The indemnification and advancement of expenses mandated or permitted by, or granted pursuant to, this Article VII shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any By-Law, agreement, contract, vote of stockholders or disinterested directors, or pursuant to the direction (howsoever embodied) of any court of competent jurisdiction or otherwise both as to action by the person in an official capacity and as to action in another capacity while holding such office. The provisions of this Article VII shall not be deemed to preclude the indemnification of any person who is not specified in this Article VII, but whom the Corporation has the power or obligation to indemnify under Delaware law or the Plan otherwise.

Section 7.6    INSURANCE.

The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, any member of the Post-Confirmation Debtor Oversight Committee, or is or was serving at the request of the Corporation as a director, officer, trustee, member, member representative, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise whether or not the Corporation would have the power or the obligation to indemnify such person against such liability under the provisions of this Article VII.

Section 7.7    DEFINITIONS.

For the purposes of this Article VII references to "the Corporation" shall include, in addition to the resulting company, any constituent company (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, trustees, members, member representatives, employees or agents, so that any person who is or was a director, officer, trustee, member, member representative, employee or agent of such constituent company, or is or was serving at the request of such constituent company as a director, officer, trustee, member, member representative, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Article VII with respect to the resulting or surviving company as such person would have with respect to such constituent company if its separate existence had

continued. The term "other enterprise" as used in this <u>Article VII</u> shall include employee benefit plans. The phrase "serving at the request of the Corporation" shall include any service as a director, officer, trustee, member, member representative, employee or agent that imposes duties on, or involves services by, such director, officer, trustee, member, member representative, employee or agent with respect to any employee benefit plan, its participants or beneficiaries.

Section 7.8    SURVIVAL.

The indemnification and advancement of expenses provided by, or granted pursuant to, this <u>Article VII</u> shall continue as to a person who has ceased to be a director, officer, employee or agent of the Corporation, and to a person who has ceased to serve at the request of the Corporation as a director, officer, trustee, member, member representative, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise, and, in each case, shall inure to the benefit of the heirs, executors and administrators of such person.

Section 7.9    REPEAL, AMENDMENT OR MODIFICATION.

Any repeal, amendment or modification of this <u>Article VII</u> shall not affect any rights or obligations then existing between the Corporation and any person referred to in this <u>Article VII</u> with respect to any state of facts then or theretofore existing or any action, suit or proceeding theretofore brought based in whole or in part upon such state of facts.

## ARTICLE 8

## MISCELLANEOUS

Section 8.1    CORPORATE SEAL.

The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization, and the words "Corporate Seal" and "Delaware" and shall be in such form as may be approved from time to time by the Board of Directors.

Section 8.2    FISCAL YEAR.

The fiscal year of the Corporation shall begin on the 1st day of January in each year and terminate on the 31st day of December in each succeeding year.

Section 8.3    NOTICES AND WAIVERS THEREOF.

Whenever any notice whatever is required by law, the Certificate of Incorporation, or these By-Laws to be given to any stockholder, director, or officer, such notice, except as otherwise provided by law or as set forth herein, may be given personally, or by mail, or, in the case of directors or officers, by telegram, cable, radiogram or other electronic transmission addressed to such address as appears on the books of the Corporation. Any notice given by telegram, cable, or radiogram or other electronic transmission shall be deemed to have been given when it shall have been delivered for transmission and any notice given by mail shall be deemed to have been given when it shall have been deposited in the United States mail with

postage thereon prepaid. Notwithstanding the foregoing, any notice to stockholders may be given by electronic transmission in the manner provided in Section 232 of the General Corporation Law of the State of Delaware.

Whenever any notice is required to be given by law, the Certificate of Incorporation, or these By-Laws, a waiver thereof, given by the person entitled to such notice, whether before or after the meeting or the time stated therein, shall be deemed equivalent in all respects to such notice to the full extent permitted by law.

Section 8.4    STOCK OF OTHER CORPORATIONS OR OTHER INTERESTS.

Unless otherwise ordered by the Board of Directors, the President, the Secretary, and such attorneys or agents of the Corporation as may be from time to time authorized by the Board of Directors or the President, shall have full power and authority on behalf of this Corporation to attend and to act and vote in person or by proxy at any meeting of the holders of securities of any corporation or other entity in which this Corporation may own or hold shares or other securities, and at such meetings shall possess and may exercise all the rights and powers incident to the ownership of such shares or other securities which this Corporation, as the owner or holder thereof, might have possessed and exercised if present. The Chairman, President, Secretary, or such attorneys or agents, may also execute and deliver on behalf of this Corporation powers of attorney, proxies, consents, waivers, and other instruments relating to the shares or securities owned or held by this Corporation.

## ARTICLE 9

## AMENDMENTS

The By-Laws of the Corporation may be adopted, amended or repealed by the affirmative vote of a majority of the outstanding share entitled to vote in the election of directors, and except as otherwise provided by law, the Board of Directors shall have the power equal in all respects to that of the stockholders to adopt, amend, or repeal the By-Laws by vote of not less than a majority of the entire Board of Directors; *provided, however*, so long as there is any Post-Confirmation Debtor Oversight Committee, the By-Laws may not be amended or repealed, and new By-Laws may not be adopted, (i) without the approval of the Post-Confirmation Debtor Oversight Committee and (ii) in any manner that is inconsistent with the terms of the Plan.

## ARTICLE 10

## PLAN OF LIQUIDATION

These By-Laws have been adopted pursuant to the *Second Amended Joint Chapter 11 Plan of Liquidation Proposed by Debtors and Official Committee of Unsecured Creditors* (subject to the Confirmation Order, the "Plan"), as confirmed by order of the United States District Court for the District of Delaware on ___, 2015 in In re SS Body Armor I, Inc., *et al.*, Case No. 10-11255 (CSS) Jointly Administered (the "Confirmation Order") and are subject to the Plan in all respects. These By-Laws shall become effective upon the Effective Date of the

Plan and, in the case of any conflict or inconsistency between any provision of these By-Laws and any provision of the Plan, the provisions of the Plan shall govern and control.

# EXHIBIT 3

## AMENDED SETTLEMENT AGREEMENT

This Amended Settlement Agreement (the "Agreement"), amending and superseding an agreement executed on February 6, 2015, is made and entered into by and among the following parties (referred to collectively as the "Parties" and each individually as a "Party"): (a) SS Body Armor I, Inc. ("SSBA I"), formerly known as Point Blank Solutions, Inc., on behalf of itself and its affiliated debtors and debtors in possession SS Body Armor II, Inc., SS Body Armor III, Inc. and PBSS, LLC (collectively, the "Debtors") in the chapter 11 proceeding pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") captioned *In re SS Body Armor I, Inc., et al.*, Case No. 10-11255 (CSS) (the "Bankruptcy Proceeding"); (b) the lead plaintiffs[1] in the consolidated securities class action ("Lead Plaintiffs") captioned *In re DHB Industries, Inc. Class Action Litigation*, Case No. 05-cv-04296 (E.D.N.Y.) (the "Class Action"), on behalf of themselves and all members of the class previously certified in the Class Action (collectively, the "Plaintiffs"); (c) Plaintiffs' counsel ("Plaintiffs' Counsel") in the Class Action, namely Robbins Geller Rudman & Dowd LLP and Labaton Sucharow LLP; and (d) plaintiff's counsel in the consolidated derivative action captioned *In re DHB Industries, Inc. Derivative Litigation*, Case No. 05-cv-04345 (E.D.N.Y.) (the "Derivative Action"), namely the Law Offices of Thomas G. Amon and Robbins Arroyo LLP ("Derivative Counsel").

## RECITALS

WHEREAS, on and after September 9, 2005, multiple class actions were filed in the United States District Court for the Eastern District of New York (the "District Court") against SSBA I (then known as DHB Industries, Inc.), David H. Brooks ("David Brooks"), Terry Brooks, Sandra Hatfield, Dawn M. Schlegel, Cary Chasin, Jerome Krantz, Gary Nadelman, Barry Berkman, David Brooks International Inc., Andrew Brooks Industries Inc. and Elizabeth Brooks Industries, Inc.; and

WHEREAS, the class actions were consolidated into the Class Action; and

WHEREAS, on and after September 14, 2005, multiple derivative actions were filed in the District Court on behalf of SSBA I against David Brooks, Jeffrey R. Brooks ("Jeffrey Brooks"), Terry Brooks, Sandra Hatfield, Dawn M. Schlegel, Cary Chasin, Jerome Krantz, Gary Nadelman, Barry Berkman, Larry R. Ellis, David Brooks International Inc., Andrew Brooks Industries Inc., Elizabeth Brooks Industries, Inc. and Tactical Armor Products, Inc. ("TAP"); and

WHEREAS, the derivative actions were consolidated into the Derivative Action; and

WHEREAS, on November 30, 2006, the parties to the Class and Derivative Actions entered into a *Stipulation and Agreement of Settlement* (the "EDNY Stipulation"), pursuant to which the parties agreed, among other things, that (a) the Class Action would be settled for $34,900,000 in cash, plus 3,184,713 shares of SSBA I common stock, and (b) the Derivative Action would be settled for SSBA I's adoption of certain corporate governance policies and the payment of $300,000 for attorneys' fees and expenses to Derivative Counsel; and

---

[1] For purposes of this Agreement, Robino Stortini Holdings LLC will not be deemed a lead plaintiff since it has been cancelled of record as a Delaware LLC. Its status as a lead plaintiff is the subject of a motion to withdraw as lead plaintiff pending in the District Court.

WHEREAS, pursuant to the EDNY Stipulation, the cash portion of the settlement, in the total amount of $35,200,000, was deposited in an escrow account maintained by Robbins Geller Rudman & Dowd LLP, then known as Lerach Coughlin Stoia Geller Rudman & Robbins LLP, as the escrow agent designated under a related Escrow Agreement; and

WHEREAS, the approximate current value of the cash held in the escrow account established pursuant to the EDNY Stipulation (the "Escrowed Funds"), including amounts provisionally paid as attorneys' fees, is $37,000,000; and

WHEREAS, on April 14, 2010 (the "Petition Date"), the Debtors commenced the Bankruptcy Proceeding by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, on April 26, 2010, the Office of the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee") in the Bankruptcy Proceeding; and

WHEREAS, on July 27, 2010, the Office of the U.S. Trustee appointed an Official Committee of Equity Security Holders (the "Equity Committee") in the Bankruptcy Proceeding; and

WHEREAS, on September 17, 2010, SSBA I moved to reject the EDNY Stipulation and certain related agreements [D.I. 589]; and

WHEREAS, on December 22, 2010, the Bankruptcy Court entered an order [D.I. 949] in the Bankruptcy Proceeding (the "Rejection Order") approving SSBA I's rejection of the EDNY Stipulation and related agreements as of the Petition Date; and

WHEREAS, the Plaintiffs and David Brooks filed notices of appeal from the Rejection Order; and

WHEREAS, on November 16, 2010, SSBA I commenced an adversary proceeding in the Bankruptcy Court, captioned *Point Blank Solutions Inc. v. Robbins Geller Rudman & Dowd LLP, et al.*, Adv. No. 10-55361 (CSS) (the "Turnover Adversary Proceeding") against Plaintiffs' Counsel and Derivative Counsel, among other parties; and

WHEREAS, in the Turnover Adversary Proceeding, Plaintiffs' Counsel and Derivative Counsel have filed, among other things, a motion for a determination that the Turnover Adversary Proceeding is not a core proceeding [Bankr. Adv. D.I. 38-39] ("Core Motion") and a motion to withdraw the reference of the Turnover Adversary Proceeding [Bankr. Adv. D.I. 58, 60] ("Withdrawal Motion"); and

WHEREAS, on May 20, 2011, the Bankruptcy Court entered an order in the Turnover Adversary Proceeding denying the Core Motion [Bankr. Adv. D.I. 92] ("Core Order"); and

WHEREAS, on June 3, 2011, Plaintiffs' Counsel and Derivative Counsel filed a notice of appeal from the Core Order [Bankr. Adv. D.I. 97] and also filed a motion requesting leave to appeal the Core Order [Bankr. Adv. D.I. 99-100]; and

WHEREAS, the Lead Plaintiffs, individually and on behalf of the class certified in the Class Action (the "Class"), have filed Claim Nos. 458, 460, 461, 482, 484 and 485 against SSBA I in the Bankruptcy Proceeding; and

WHEREAS, in a criminal action filed against David Brooks, Sandra Hatfield and Dawn M. Schlegel in the District Court, captioned *United States v. Schlegel, et al.*, Case No. 06-cr-00550 (JS) (E.D.N.Y.) (the "Criminal Action"), David Brooks has pled guilty to or been convicted by a jury of multiple counts including, among other things, securities fraud, wire fraud, insider trading and tax counts of conspiracy to defraud the United States; and

WHEREAS, upon the filing of the indictment against David Brooks in the Criminal Action in October 2007, and in connection with a related civil forfeiture proceeding in the District Court, captioned *U.S. v. All Assets Listed on Schedule I Attached Hereto and All Proceeds Traceable Thereto*, Case No. 10-cv-04750 (E.D.N.Y.) (the "Civil Forfeiture Proceeding"), the United States Government (the "Government") has restrained various cash and non-cash assets that were the proceeds of David Brooks' criminal conduct; and

WHEREAS, the cash, cash equivalents and securities held in certain accounts restrained by the Government in connection with the Civil Forfeiture Proceeding and/or the Criminal Action are identified as Asset Nos. 86-103 (collectively, "Restrained Cash Assets") on Schedule I to the complaint in the Civil Forfeiture Proceeding ("Schedule I"); and

WHEREAS, the non-cash assets restrained by the Government in connection with the Civil Forfeiture Proceeding and/or the Criminal Action are identified as Asset Nos. 1-85 and 104-113 on Schedule I ("Restrained Non-Cash Assets" and, with Restrained Cash Assets, "Restrained Assets"); and

WHEREAS, in addition to the Restrained Assets, David Brooks forfeited approximately $19 million in bail funds (the "Bail Funds") when he violated his bail conditions prior to trial in the Criminal Action; and

WHEREAS, the Debtors have submitted, among other things, a claim for restitution of more than $117 million in the Criminal Action; and

WHEREAS, the Plaintiffs, on behalf of the investors victimized by David Brooks' criminal conduct, have submitted, among other things, a claim for restitution of more than $186 million in the Criminal Action; and

WHEREAS, on or about November 25, 2014, the Parties executed a *Settlement Term Sheet* (the "Term Sheet") that reflects an agreement in principle among the Parties to resolve all pending litigation and claims that have been or may be asserted between and/or among the Parties, and to provide a means for the Parties to focus on a joint effort to maximize and accelerate a distribution to the Debtors and the Plaintiffs as victims of the fraud perpetrated by David Brooks; and

WHEREAS, on or about February 6, 2015, the Parties executed a *Settlement Agreement* that fully documented the agreement in principle reflected in the Term Sheet; and

WHEREAS, the District Court, in a memorandum and order [D.I. 1869] dated March 27, 2015 (the "Restitution Order"), ordered restitution in the Criminal Action of $53,912,545.62 to the Debtors (the "Debtors' Restitution Award") and $37,584,301.30 to the investor victims identified in the Restitution Order (the "Investor Victims' Restitution Award"); and

WHEREAS, the Parties have entered into this Agreement, which supersedes and replaces the *Settlement Agreement* executed on February 6, 2015, in order to take into account the Restitution Order, the Debtors' Restitution Award and the Investor Victims' Restitution Award.

## **AGREEMENT**

NOW, THEREFORE, after good faith, arm's length negotiations without collusion, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the following terms:

1. Effective Date. Except as set forth in sections 3(e) and 7 of this Agreement, the effective date of this Agreement for the specific purposes set forth herein (the "Effective Date") shall occur upon satisfaction of each of the following conditions (the "Court Approvals"):

(a) Entry of an order by the Bankruptcy Court in the Bankruptcy Proceeding approving the Agreement.

(b) Entry of an order(s) by the District Court in the Class Action and the Derivative Action approving the Agreement.

(c) Entry of an order by the Bankruptcy Court in the Bankruptcy Proceeding confirming the Chapter 11 Plan (defined below).

2. Distribution of Escrowed Funds – Plaintiffs' Loan.

(a) Except as set forth in section 2(b) of this Agreement, as soon as reasonably practicable after the occurrence of the Effective Date, the Escrowed Funds will be distributed in accordance with section 5 of the EDNY Stipulation, section 6.5 of the EDNY Stipulation, the *Order Awarding Attorneys' Fees and Expenses* entered as D.E. 354 in the Class Action, and the plan of allocation approved by the District Court in the Class Action on July 21, 2008 (the "Plan of Allocation"), net of any unpaid costs of administration and noticing.

(b) On the Effective Date, the Plaintiffs will loan $20,000,000.00 from the Escrowed Funds to the Debtors (the "Plaintiffs' Loan") to fund the Chapter 11 Plan. The Plaintiffs' Loan will be disbursed to the Debtors on the Effective Date by wire transfer pursuant to the wire instructions set forth in section 22 of this Agreement. The Plaintiffs' Loan will be non-recourse as to the Debtors' bankruptcy estates, except that the Plaintiffs' Loan will be secured by, and

repayable solely from, fifty percent (50%) of each dollar of any Recoveries/Proceeds (defined below) realized by the Debtors from any of the Shared Recovery Matters (defined below) (the "Debtors' Recovery"), up to $40,000,000.00, whether the Debtors' Recovery is obtained pursuant to this Agreement or otherwise. Any repayments on the Plaintiffs' Loan will be made to the Plaintiffs by wire transfer pursuant to the wire instructions set forth in section 22 of this Agreement.

(c) The Plaintiffs will not have any claims against the Debtors, the Debtors' bankruptcy estates, the Debtors' Recovery or the Debtors' Share (defined below) on account of the Plaintiffs' Loan, except as set forth in section 2(b), 2(d) and 2(e) of this Agreement.

(d) The Plaintiffs' Loan will not incur interest, or any other fees or charges, and will have no maturity date except that, upon receipt by the Debtors of any portion of the Debtors' Recovery up to $40,000,000.00, fifty percent (50%) of each dollar of the Debtors' Recovery paid to the Debtors will become immediately due and payable to the Plaintiffs in repayment of the Plaintiffs' Loan.

(e) In the event that an appeal(s) is filed from any of the Court Approvals, and the Plaintiffs' Loan is funded prior to the issuance of a stay pending any such appeal(s):

   (i) The Debtors, or any post-confirmation fiduciary of the Debtors' bankruptcy estates appointed pursuant to the Chapter 11 Plan, shall create and maintain an escrow account (the "Post-Confirmation Escrow"). The funds in the Post-Confirmation Escrow shall be earmarked to replenish the Escrowed Funds in the event that any of the Court Approvals are reversed on appeal and the Plaintiffs' Loan is required to be returned to the Escrowed Funds. The Parties understand and agree that, as set forth in section 2(e)(iii) of this Agreement, the Plaintiffs' Loan will not be deposited in the Post-Confirmation Escrow.

   (ii) The balance of the Post-Confirmation Escrow must at all times meet or exceed the outstanding balance of the Plaintiffs' Loan.

   (iii) The Post-Confirmation Escrow shall be funded by any and all cash from any source, other than the Plaintiffs' Loan, received by the Debtors or any post-confirmation entity created pursuant to the Chapter 11 Plan.

   (iv) Upon each of the Court Approvals becoming final and non-appealable, or the Plaintiffs' Loan being repaid in full to the Plaintiffs, whichever is earlier, the Post-Confirmation Escrow shall be released to the Debtors, and shall be distributed in accordance with the Chapter 11 Plan.

3.      Shared Recovery Matters.

(a) The Parties will utilize their reasonable best efforts, consistent with their respective fiduciary duties, to effectuate a division (the "50/50 Division") of any and all Recoveries/Proceeds realized by any of the Parties such that the ultimate value of fifty percent (50%) of the Recoveries/Proceeds is realized by the Debtors' bankruptcy estates (the "Debtors' Share") and fifty percent (50%) of the Recoveries/Proceeds is realized by the Plaintiffs (the "Plaintiffs' Share") for the benefit of the investor victims identified in the Class Action and the Criminal Action, as set forth in section 3(f) of this Agreement.

(b) Subject to section 3(a) above, the Parties will employ the following mechanisms, in the following order, as necessary to equalize the Debtors' Share and the Plaintiffs' Share:

(i)    The 50/50 Division of the Recoveries/Proceeds between the Debtors' bankruptcy estates and the Plaintiffs will take into account the distribution of the Escrowed Funds, the Plaintiffs' Stock Share, the Restrained Assets, and the Bail Funds; and

(ii)    The Plaintiffs will forgive the Plaintiffs' Loan to the extent necessary to equalize the Debtors' Share and the Plaintiffs' Share.[2]

(c) As used herein, the term "Recoveries/Proceeds" means the recoveries or proceeds realized by any of the Parties arising out of the Shared Recovery Matters, the Escrowed Funds and the Plaintiffs' Stock Share.

(d) The matters covered by the sharing arrangement described in this section 3 of the Agreement (the "Shared Recovery Matters") consist of:

(i)    Any and all rights or claims of the Parties against (A) David Brooks; (B) TAP; (C) any entities other than the Debtors or the Brooks Family Entities (defined below) in which David Brooks has a direct or indirect interest (collectively and with TAP, the "David Brooks Entities") that filed claims to assets restrained in the Civil Forfeiture Proceeding and/or filed claims in the Bankruptcy Proceeding, including without limitation David Brooks International Inc.; (D) Terry Brooks, Victoria Brooks, Andrew Brooks and Elizabeth Brooks (the "Brooks Family"); (E) any entities other than the Debtors in which the Brooks Family has a direct or indirect interest (collectively, the "Brooks Family Entities") that filed claims to assets restrained in the Civil Forfeiture Proceeding and/or filed

---

[2] The equalization of the Debtor's Share and the Plaintiffs' Share under one hypothetical recovery scenario is depicted, solely for purposes of providing an example of the 50/50 Division, at **Exhibit 1** to this Agreement. For the avoidance of doubt, Exhibit 1 is intended to be for illustrative purposes only, and the terms of this Agreement shall govern the calculation of the 50/50 Division in all respects.

EXECUTION VERSION

claims in the Bankruptcy Proceeding, including without limitation any such entities of which Jeffrey Brooks is a trustee or manager; (F) Jeffrey Brooks; (G) the Jeffrey R. Brooks Individual Retirement Account (the "Brooks IRA"); and (H) any entities other than the Debtors or the Brooks Family Entities in which Jeffrey Brooks and/or the Brooks IRA have a direct or indirect interest or of which Jeffrey R. Brooks is a trustee or manager (collectively, the "Jeffrey Brooks Entities") that filed claims to assets restrained in the Civil Forfeiture Proceeding and/or filed claims in the Bankruptcy Proceeding; provided that the Class Action and the Derivative Action will be dismissed with prejudice as set forth in section 6(a) of this Agreement;

  (ii)  Any and all rights or claims of the Parties to the Restrained Cash Assets;

  (iii)  Any and all rights or claims of the Parties to the Restrained Non-Cash Assets;

  (iv)  Any and all rights or claims of the Parties to the Bail Funds; and

  (v)  Any and all other rights or claims of the Parties in the Civil Forfeiture Proceeding and/or the Criminal Action, including but not limited to, for the avoidance of any doubt, the Debtors' Restitution Award, the Investor Victims' Restitution Award, and any and all other rights or claims of the Parties in connection with the Restitution Order.

(e)  To the extent that any Restrained Assets or Bail Funds are released by the Government and/or by virtue of any decisions or orders in the Criminal Action or Civil Forfeiture Proceeding to any of the Parties prior to the Effective Date, any such Restrained Assets or Bail Funds will be held in an escrow or trust account until the occurrence of the Effective Date. However, it is expressly understood that any payments to any of the Plaintiffs individually by virtue of any decision or order of the District Court in the Criminal Action shall not be subject to this section 3(e) of the Agreement, but shall be taken into account for purposes of sections 3(a)-(d) and 3(f) of this Agreement. All Escrowed Funds held in escrow as of the date of execution of this Agreement will remain in escrow until the occurrence of the Effective Date.

(f)  The Investor Victims' Restitution Award will be distributed pursuant to the Restitution Order unless subsequently modified by a court of competent jurisdiction. The Escrowed Funds, net of expenses and attorneys' fees paid to Plaintiffs' Counsel and Derivative Counsel, and the Plaintiffs' Stock Share (defined below) will be distributed exclusively to members of the class certified in the Class Action in accordance with the EDNY Stipulation and the Plan of Allocation previously approved in connection therewith. The balance, if any, of the Plaintiffs' Share (*i.e.*, sums other than the Escrowed Funds, the Plaintiffs' Stock Share and the Investor Victims' Restitution Award) will be distributed among the Plaintiffs and the additional investor victims identified by the

Page **7** of **17**

DOCS_LA:284146.8 70934-001

Government in the Criminal Action (collectively with the Plaintiffs, the "Plaintiff/Investor Claimants") in accordance with a distribution and allocation procedure to be established by the District Court (the "Additional Allocation Procedure"). To the extent any Plaintiff/Investor Claimant asserts a claim pursuant to the Additional Allocation Procedure, that claim shall be reduced by the amount of the gross distribution to such Plaintiff/Investor Claimant (whether or not already paid) from the Investor Victims' Restitution Award and the Escrowed Funds/Plaintiffs' Stock Share, calculated prior to the payment of attorneys' fees and expenses as previously awarded by the District Court in connection with the EDNY Stipulation. The amount of the Plaintiffs' Share remaining, if any, after payment of one hundred percent (100%) of the loss with respect to all claims allowed by the procedures referenced in this section 3(f) of the Agreement, and the payment of all costs and expenses incurred in connection with such procedures, will revert to the Debtors' bankruptcy estates and be distributed in accordance with the Chapter 11 Plan.

(g) The Parties will take any and all reasonable and appropriate actions, consistent with their respective fiduciary duties, to effectuate the terms of this Agreement in order to maximize their respective rights, claims and recoveries in connection with the Shared Recovery Matters and to cooperate and otherwise support each other regarding such efforts. All litigation on behalf of the Debtors and their bankruptcy estates with respect to the Shared Recovery Matters will be prosecuted by counsel for the Debtors. Counsel for the Debtors, Plaintiffs' Counsel and bankruptcy counsel to the Plaintiffs, consistent with their respective fiduciary duties, will cooperate with each other to maximize the Parties' respective rights, claims and recoveries as to the Shared Recovery Matters.

(h) Nothing in this Agreement shall affect or limit the Debtors' rights to prosecute: (i) the adversary proceeding in the Bankruptcy Court captioned *Point Blank Solutions Inc. v. Jeffrey R. Brooks Individual Retirement Account, et al.*, Adv. No. 11-51759 (the "Injunction Adversary Proceeding"); (ii) the action filed by the Brooks IRA in the Supreme Court of the State of New York captioned *Jeffrey R. Brooks Individual Retirement Account v. James R. Henderson,* Index No. 650781/2011 (the "State Court Action"); (iii) the action filed by Jeffrey Brooks and the Brooks IRA in the Court of Chancery of the State of Delaware under the caption *Jeffrey Brooks, et al. v. SS Body Armor I, Inc.*, C.A. No. 10878-VCP (the "Chancery Court Action") and the related adversary proceeding in the Bankruptcy Court captioned *SS Body Armor I, Inc. v. Jeffrey R. Brooks*, Adv. No. 15-50261 (the "Shareholder Meeting Adversary Proceeding"); or (iv) any objections to any and all claims or equity security interests filed by, scheduled or listed for, or otherwise asserted by David Brooks, the David Brooks Entities, the Brooks Family, the Brooks Family Entities, Jeffrey Brooks, the Brooks IRA, the Jeffrey Brooks Entities, Sandra Hatfield, Dawn M. Schlegel, Cary Chasin, Jerome Krantz, Gary Nadelman, Barry Berkman, Larry R. Ellis and/or their current or former attorneys in the Bankruptcy Proceeding, whether as creditors, equity security holders or otherwise (collectively, the "Claim Objections").

4.        Plaintiffs' Stock Share.  Upon the occurrence of the Effective Date, the Plaintiffs will be entitled to an additional distribution from SSBA I's bankruptcy estate equivalent to the value of 3,184,713 shares of SSBA I common stock that were to be delivered to the Plaintiffs pursuant to section 2.4 of the EDNY Stipulation (the "Plaintiffs' Stock Share").  The Plaintiffs' Stock Share shall be payable to the Plaintiffs at the same time as and on a pro rata basis with any payment made to the holders of SSBA I's common stock pursuant to the Chapter 11 Plan.  The Plaintiffs' Stock Share shall be paid to the Plaintiffs by wire transfer pursuant to the wire instructions set forth in section 22 of this Agreement, to be distributed as set forth in section 3(f) of this Agreement.

5.        Releases.

(a) Effective as of the date on which each of the Court Approvals becomes final and non-appealable, the Plaintiffs, except as to the Shared Recovery Matters and as otherwise set forth in this Agreement:

(i) Unconditionally and irrevocably release, waive and discharge any and all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity or otherwise, that the Plaintiffs have, may have or are entitled to assert against the Debtors, their bankruptcy estates, and/or their current or former officers, directors, members, employees, agents, attorneys, consultants, insurers, representatives, predecessors, successors, parents and subsidiaries, provided that nothing herein shall be deemed to release any claims that the Plaintiffs have, may have or are entitled to assert as equity security holders in the Bankruptcy Proceeding, and nothing herein shall be deemed to release any claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action that the Plaintiffs have, may have or are entitled to assert against David Brooks, the David Brooks Entities, the Brooks Family, the Brooks Family Entities, Jeffrey Brooks, the Brooks IRA, the Jeffrey Brooks Entities, Sandra Hatfield, Dawn M. Schlegel, Cary Chasin, Jerome Krantz, Gary Nadelman, Barry Berkman, Larry R. Ellis and/or their current or former officers, directors, members, employees, agents, attorneys, consultants, insurers, representatives, predecessors, successors, parents and subsidiaries to the extent such release would in any way preclude or impact the Plaintiffs' receipt of any portion of the Shared Recovery Matters.  For the avoidance of doubt, only claims asserted by the Plaintiffs in the Class Action or claims that could have been asserted by the Plaintiffs in the Class Action are being released under this paragraph 5(a)(i).

(b) Effective as of the date on which each of the Court Approvals becomes final and non-appealable, Plaintiffs' Counsel and Derivative Counsel, except as to the Shared Recovery Matters and as otherwise set forth in this Agreement:

(i) Unconditionally and irrevocably release, waive and discharge any and all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity or otherwise, that Plaintiffs' Counsel and/or Derivative Counsel have, may have or are entitled to assert against the Debtors, their bankruptcy estates, and/or their current or former officers, directors, members, employees, agents, attorneys, consultants, insurers, representatives, predecessors, successors, parents and subsidiaries, <u>provided that</u> nothing herein shall be deemed to release any claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action that Plaintiffs' Counsel and/or Derivative Counsel have, may have or are entitled to assert against David Brooks, the David Brooks Entities, the Brooks Family, the Brooks Family Entities, Jeffrey Brooks, the Brooks IRA, the Jeffrey Brooks Entities, Sandra Hatfield, Dawn M. Schlegel, Cary Chasin, Jerome Krantz, Gary Nadelman, Barry Berkman, Larry R. Ellis and/or their current or former officers, directors, members, employees, agents, attorneys, consultants, insurers, representatives, predecessors, successors, parents and subsidiaries to the extent such release would in any way preclude or impact Plaintiffs' Counsel's and/or Derivative Counsel's receipt of any portion of the Shared Recovery Matters.

(c) Effective as of the date on which each of the Court Approvals becomes final and non-appealable, the Debtors, except as to the Shared Recovery Matters and as otherwise set forth in this Agreement:

(i) Unconditionally and irrevocably release, waive and discharge any and all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity or otherwise, that the Debtors or their bankruptcy estates have, may have or are entitled to assert against the Plaintiffs, Plaintiffs' Counsel, Derivative Counsel and/or their current or former officers, directors, members, employees, agents, attorneys, consultants, insurers, representatives, predecessors, successors, parents and subsidiaries, <u>provided that</u> nothing herein shall release any claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action that the Debtors or their bankruptcy estates have, may have or are entitled to assert against David Brooks, the David Brooks Entities, the Brooks Family, the Brooks Family Entities, Jeffrey Brooks, the Brooks IRA, the Jeffrey Brooks Entities, Sandra

Hatfield, Dawn M. Schlegel, Cary Chasin, Jerome Krantz, Gary Nadelman, Barry Berkman, Larry R. Ellis and/or their current or former officers, directors, members, employees, agents, attorneys, consultants, insurers, representatives, predecessors, successors, parents and subsidiaries to the extent such release would in any way preclude or impact the Debtors' receipt of any portion of the Shared Recovery Matters; and

 (ii) Unconditionally and irrevocably release, waive and discharge any and all claims, rights and interests that the Debtors or their bankruptcy estates have or may have in the Escrowed Funds.

(d) Nothing in this Agreement shall release, affect or limit: (i) the Parties' claims, rights, interests and arguments in connection with the Shared Recovery Matters, the Restrained Assets, the Bail Funds, the Civil Forfeiture Proceeding and/or the Criminal Action, all of which claims, rights, interests and arguments are expressly preserved; (ii) the Debtors' claims, rights, interests and arguments in connection with the Injunction Adversary Proceeding, the State Court Action, the Chancery Court Action or the Shareholder Meeting Adversary Proceeding, all of which claims, rights, interests and arguments are expressly preserved; or (iii) the Debtors' claims, rights, interests and arguments in connection with any Claim Objections, all of which claims, rights, interests and arguments are expressly preserved.

6.  <u>Dismissal of Pending Litigation and Withdrawal of Claims</u>.  Upon each of the Court Approvals becoming final and non-appealable:

(a) The Parties will enter into any appropriate stipulations to dismiss with prejudice: (i) the Plaintiffs' appeal of the Rejection Order; (ii) the Turnover Adversary Proceeding; (iii) any pending motions filed by the Parties in connection with the Turnover Adversary Proceeding; (iv) the Class Action; and (v) the Derivative Action.

(b) The Parties will, as necessary to effectuate the terms of this Agreement, take any and all reasonable and appropriate actions to obtain the reversal of the Rejection Order as it relates to the EDNY Stipulation, the dismissal of any other appeal(s) of the Rejection Order, or the affirmation of the Rejection Order on appeal.

(c) The Lead Plaintiffs will withdraw with prejudice the proofs of claim they filed individually and on behalf of the Class in the Bankruptcy Proceeding based upon the allegations in the Class Action, including without limitation Claim Nos. 458, 460, 461, 482, 484 and 485 filed against SSBA I in the Bankruptcy Proceeding.

7.  <u>Chapter 11 Plan</u>.  The Parties will support, and use their best efforts to obtain confirmation of, a chapter 11 plan of reorganization or liquidation to be jointly proposed by the Debtors and the Creditors Committee in the Bankruptcy Proceeding, upon consultation with Plaintiffs' Counsel and the Equity Committee, that is consistent with the requirements of the

Bankruptcy Code to the extent applicable and the terms of this Agreement (the "Chapter 11 Plan"). The Debtors and the Creditors Committee will provide Plaintiffs' Counsel and the Equity Committee with a reasonable opportunity to review and comment on the Chapter 11 Plan prior to filing the Chapter 11 Plan in the Bankruptcy Proceeding, provided that the ultimate decision on whether to incorporate any comments received from Plaintiffs' Counsel and/or the Equity Committee shall be made by the Debtors and the Creditors Committee so long as such decision is consistent with the terms of this Agreement. The effective date of the Chapter 11 Plan will not be contingent upon the finality of the Bankruptcy Court's order confirming the Chapter 11 Plan. The Chapter 11 Plan will incorporate reasonable and appropriate provisions necessary to implement this Agreement and the distributions to be made in accordance herewith. The Chapter 11 Plan will not release any claims that constitute or pertain to the Shared Recovery Matters.

8.    Allowed Administrative Claim. Lowenstein Sandler LLP, as bankruptcy counsel to the Plaintiffs, and Plaintiffs' Counsel will have an allowed administrative claim in the Bankruptcy Proceeding in the amount of $1,500,000.00 as of the confirmation of the Chapter 11 Plan. The fees and expenses of Derivative Counsel in the Derivative Action, to the extent previously paid, will be retained by Derivative Counsel.

9.    Cancellation of Agreement. In the event that the Effective Date does not occur, or any of the Court Approvals are reversed, modified or vacated on appeal or reconsideration, this Agreement will be null and void, and each of the Parties will revert to their respective positions that existed on the date immediately prior to execution of the Term Sheet, unless the Parties otherwise agree in writing.

10.    Release of Unknown Claims. The Parties, and each of them, understand and acknowledge that there are laws that may invalidate releases of claims that are unknown to the releasing party. The Parties, and each of them, expressly acknowledge and agree that the releases set forth in section 5 of this Agreement will waive and relinquish any and all rights that they have or might have (except those that are expressly reserved in section 5(d) of the Agreement) against the Parties they release pursuant to this Agreement, or any of them, under such laws, including but not limited to any and all rights afforded under California Civil Code § 1542 or any other similar federal or state statute or case law. California Civil Code § 1542 reads as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OF OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

In connection with such waiver and relinquishment, the Parties, and each of them, acknowledge that they are aware that they may later discover facts in addition to or different from those that they currently know or believe to be true with respect to the subject matter of this Agreement, but that it is their intention to fully, finally and forever release all of the matters and claims identified in the releases contained in this Agreement, which now exist, may exist, or previously existed between them and any of the Parties they release pursuant to this Agreement, whether known or unknown, suspected or unsuspected. In furtherance of such intention, the releases contained in this Agreement

shall be and remain in effect as full and complete releases, notwithstanding the discovery or existence of such additional or different facts by any of the Parties or by any person acting on their respective behalves.

11.  Representations by All Parties.  Each Party hereby represents and warrants, subject to the Court Approvals, that: (a) such Party and the signatory hereto has the power and authority to execute, deliver and perform this Agreement; (b) such Party has taken all necessary actions to authorize the execution, delivery and performance of this Agreement; (c) this Agreement has been duly executed and delivered by such Party and constitutes the legal, valid, and binding obligations of such Party, enforceable against it in accordance with their respective terms; (d) such Party's execution, delivery, and performance of this Agreement does not and will not conflict with, or constitute a violation or breach of, or constitute a default under any obligation of such Party and will not violate any applicable law, or any order or decree of any court or government instrumentality applicable to such Party; and (e) such Party has entered into this Agreement in reliance on its own independent investigation and analysis of the facts underlying the subject matter of this Agreement, has not relied upon any representations by any other Party or any other Party's attorneys, managers, agents, employees or representatives other than those that are set forth in this Agreement, and no representations, warranties, or promises of any kind have been made directly or indirectly to induce it to execute this Agreement other than those that are set forth in this Agreement.

12.  No Assignment.  Each of the Lead Plaintiffs, the Debtors, Plaintiffs' Counsel and Derivative Counsel warrants and represents that it has not assigned or transferred any released matter or any right to any consideration provided pursuant to this Agreement.  Lead Plaintiffs, the Debtors, Plaintiffs' Counsel and Derivative Counsel each agree to defend, indemnify and hold the others harmless from any and all claims based on or arising out of any such assignment or transfer made or claimed.

13.  Attorneys' Fees, Costs and Expenses.  Each of the Parties agrees to bear its own costs and expenses, including attorneys' fees, arising out of the matters raised in the litigation, claims and appeals covered by this Agreement, or arising out of the drafting, filing or presentation of this Agreement and/or any documents or agreements to be executed, provided or filed pursuant to this Agreement; provided, however, that nothing herein shall preclude Plaintiffs' Counsel from seeking fees and/or expenses in the District Court on a common fund, common benefit, or substantial benefit theory based on additional recoveries or benefits obtained for the Plaintiffs in the Class Action and/or for investor victims generally, which fees and expenses shall be payable solely from the Plaintiffs' Share.

14.  Voluntary Agreement.  Each Party acknowledges that it has read all of the terms of this Agreement, has had an opportunity to consult with counsel of its own choosing or voluntarily waived such right, and enters into this Agreement voluntarily and without duress.

15.  Joint Drafting.  This Agreement shall be deemed to have been jointly drafted by the Parties, and in construing and interpreting this Agreement, no provision shall be construed and interpreted for or against any Party because such provision or any other provision of the Agreement was purportedly prepared or requested by such Party.

16.     Applicable Law.   The validity, interpretation and performance of this Agreement shall be construed and interpreted according to the laws of the State of New York.

17.     No Waiver of Breach.   A waiver of the breach of any term or condition of this Agreement shall not be deemed to constitute a waiver of any subsequent breach of the same term or condition, or any other term or condition.

18.     Non-Assignability.   This Agreement shall not be assignable or transferable by the Parties except pursuant to the Chapter 11 Plan.

19.     Binding Effect.   This Agreement shall be binding on and shall inure to the benefit of each of the Parties and their respective agents, employees, attorneys, affiliates, successors and assigns.

20.     No Admissions.   This Agreement, including the releases and other terms provided for herein, is made, executed, given and accepted as part of a compromise and settlement of disputed claims.   No provision(s) of this Agreement, nor any acceptance of the benefits thereof by or on behalf of any of the Parties, shall be construed or deemed to be evidence of an admission of any fact, matter, thing or liability of any kind to any other Party.   Each of the Parties deny any liability of any kind to any other Party for any purpose, and this Agreement is made solely and entirely as a compromise and for the purpose of fully and finally resolving the disputed matters referenced herein.   Neither this Agreement nor any term(s) thereof shall be offered or received as evidence in any proceeding in any forum as an admission of any liability or wrongdoing on the part of any of the Parties; provided that nothing herein shall limit or affect the use or admissibility of this Agreement or any term(s) thereof in any proceeding regarding the validity, interpretation or performance of this Agreement.

21.     Notices.   All notices, consents, waivers and other communications under this Agreement must be in writing and shall be delivered by email, with a copy by U.S. Mail, to the appropriate addresses set forth below, or to such other addresses as a Party may designate by notice to the other Parties in accordance with this paragraph:

> **If to the Debtors:**
> Laura Davis Jones, Esq.
> Alan J. Kornfeld, Esq.
> David M. Bertenthal, Esq.
> Pachulski Stang Ziehl & Jones LLP
> 919 N. Market Street, 17th Floor
> P.O. Box 8705
> Wilmington, DE  19899-8705 (Courier 19801)
> Telephone:     (302) 652-4100
> Email:   ljones@pszjlaw.com
>                 akornfeld@pszjlaw.com
>                 dbertenthal@pszjlaw.com

**If to the Plaintiffs, Plaintiffs' Counsel and/or Derivative Counsel:**
Michael S. Etkin, Esq.
Nicole Stefanelli, Esq.
Lowenstein Sandler LLP
65 Livingston Avenue
Roseland, NJ 07068
Telephone:     (973) 597-2500
Email: metkin@lowenstein.com
            nstefanelli@lowenstein.com

22.    Wire Instructions.

(a) All transfers of funds to the Debtors pursuant to this Agreement, including the disbursement of the Plaintiffs' Loan and any transfers relating to the Debtors' Share, shall be made by wire transfer to the Debtors pursuant to wire instructions to be provided.

(b) All transfers of funds to the Plaintiffs pursuant to this Agreement, including any repayments on the Plaintiffs' Loan, any distributions with respect to the Plaintiffs' Stock Share and any transfers relating to the Plaintiffs' Share, shall be made by wire transfer to the Plaintiffs pursuant to wire instructions to be provided.

23.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.  Delivery of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of the original signature page to this Agreement.

24.    Entire Agreement.  This Agreement constitutes the entire agreement between the Parties, and may only be modified in writing signed by the Parties or their duly appointed agents. All prior agreements and understandings between the Parties concerning the subject matter hereof, including without limitation the Term Sheet and the *Settlement Agreement* executed on or about February 6, 2015, are superseded by the terms of this Agreement.

WHEREFORE, the Parties have executed this Agreement and/or have caused this Agreement to be executed by their duly authorized counsel on the dates shown below.

**ACCEPTED AND AGREED TO BY:**

Dated: May 4, 2015

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones
Alan J. Kornfeld
919 N. Market Street, 17th Floor
Wilmington, DE 19801

Counsel for Debtors and Debtors in Possession

Dated: May 4, 2015

SS BODY ARMOR I, INC.

T. Scott Avila
Chief Restructuring Officer
c/o Deloitte Transactions and
Business Analytics LLP
350 S. Grand Ave.
Los Angeles, CA 90071

Debtors and Debtors in Possession

Dated: May 4, 2015

LOWENSTEIN SANDLER LLP

Michael S. Etkin
65 Livingston Avenue
Roseland, NJ 07068

Bankruptcy Counsel for Plaintiffs' Counsel,
Derivative Counsel and Plaintiffs, as defined
herein

Dated: May __, 2015

ROBBINS GELLER RUDMAN & DOWD LLP

Samuel H. Rudman
58 South Service Road, Suite 200
Melville, NY 11747

Plaintiffs' Counsel and on behalf of Plaintiffs, as
defined herein

Page **16** of **17**

WHEREFORE, the Parties have executed this Agreement and/or have caused this Agreement to be executed by their duly authorized counsel on the dates shown below.

**ACCEPTED AND AGREED TO BY:**

Dated: May __, 2015

PACHULSKI STANG ZIEHL & JONES LLP

Dated: May __, 2015

SS BODY ARMOR I, INC.

---

Laura Davis Jones
Alan J. Kornfeld
919 N. Market Street, 17th Floor
Wilmington, DE 19801

Counsel for Debtors and Debtors in Possession

T. Scott Avila
Chief Restructuring Officer
c/o Deloitte Transactions and
Business Analytics LLP
350 S. Grand Ave.
Los Angeles, CA 90071

Debtors and Debtors in Possession

Dated: May __, 2015

LOWENSTEIN SANDLER LLP

Dated: May __, 2015

ROBBINS GELLER RUDMAN & DOWD LLP

---

Michael S. Etkin
65 Livingston Avenue
Roseland, NJ 07068

Bankruptcy Counsel for Plaintiffs' Counsel, Derivative Counsel and Plaintiffs, as defined herein

Samuel H. Rudman
58 South Service Road, Suite 200
Melville, NY 11747

Plaintiffs' Counsel and on behalf of Plaintiffs, as defined herein

Page **16** of 17

Dated: May __/__, 2015

LABATON SUCHAROW LLP

_____
Ira A. Schochet
140 Broadway
New York, NY 10005

Plaintiffs' Counsel and on behalf of Plaintiffs,
as defined herein

Dated: May __, 2015

LAW OFFICES OF THOMAS G. AMON

_____
Thomas G. Amon
250 W. 57th Street, Suite 1316
New York, NY 10107

Derivative Counsel

Dated: May __, 2015

ROBBINS ARROYO LLP

_____
Brian J. Robbins
600 B Street, Suite 1900
San Diego, CA 92101

Derivative Counsel

DOCS_LA:284146.8 70934-001

Dated: May __, 2015

LABATON SUCHAROW LLP

_____
Ira A. Schochet
140 Broadway
New York, NY 10005

Plaintiffs' Counsel and on behalf of Plaintiffs,
as defined herein

Dated: May **2**, 2015

LAW OFFICES OF THOMAS G. AMON

_Thomas D. Amon /perm PPA_
Thomas G. Amon
250 W. 57th Street, Suite 1316
New York, NY 10107

Derivative Counsel

Dated: May _l_, 2015

ROBBINS ARROYO LLP

_Brian J. Robbins w/perm DOA_
Brian J. Robbins
600 B Street, Suite 1900
San Diego, CA 92101

Derivative Counsel

DOCS_LA:284146.8 70934-001

# EXHIBIT 1

This Exhibit 1 is intended solely for purposes of providing an example of a potential calculation of the Debtors' Share and the Plaintiffs' Share under a hypothetical recovery scenario. This example is for descriptive purposes only, and any actual calculation and distribution of the Debtors' Share and Plaintiffs' Share will be governed in all respects by the specific terms of the Agreement.

**Hypothetical Recovery Scenario: $129.2 Million of Recoveries/Proceeds Available**

This hypothetical recovery scenario assumes that a total of $91,400,000 of Recoveries/Proceeds are realized by the Parties from the Shared Recovery Matters, and that the Plaintiffs' Stock Share is valued at $800,000 (*i.e.*, approximately $0.25 per share). The remainder of the Recoveries/Proceeds ($37,000,000) are the Escrowed Funds.

| Source of Funds | Debtors' Share | Plaintiffs' Share |
|---|---|---|
| District Court Restitution Award | $53,900,000 | $37,500,000 |
| Escrowed Funds | $0 | $37,000,000 |
| Plaintiffs' Stock Share | $0 | $800,000 |
| Plaintiffs' Loan | $20,000,000 | -$20,000,000 |
| Partial Repayment/Forgiveness of Plaintiffs' Loan | -$9,300,000 | $9,300,000 |
| **Total:** | $64,600,000 | $64,600,000 |

## ADDENDUM TO AMENDED SETTLEMENT AGREEMENT

This Addendum to the Amended Settlement Agreement dated May 4, 2015 (the "Addendum") is made and entered into by and among the following parties (collectively, the "Parties"): (a) SS Body Armor I, Inc., formerly known as Point Blank Solutions, Inc., on behalf of itself and its affiliated debtors and debtors in possession SS Body Armor II, Inc., SS Body Armor III, Inc. and PBSS, LLC in the chapter 11 proceeding pending in the United States Bankruptcy Court for the District of Delaware captioned *In re SS Body Armor I, Inc., et al.*, Case No. 10-11255 (CSS); (b) the lead plaintiffs in the consolidated securities class action captioned *In re DHB Industries, Inc. Class Action Litigation*, Case No. 05-cv-04296 (E.D.N.Y.), on behalf of themselves and all members of the class previously certified in the Class Action; (c) Plaintiffs' counsel in the Class Action, namely Robbins Geller Rudman & Dowd LLP and Labaton Sucharow LLP; and (d) plaintiff's counsel in the consolidated derivative action captioned *In re DHB Industries, Inc. Derivative Litigation*, Case No. 05-cv-04345 (E.D.N.Y.), namely the Law Offices of Thomas G. Amon and Robbins Arroyo LLP. The purpose of this Addendum is to amend certain sections of the Amended Settlement Agreement executed by the Parties on or about May 4, 2015 (the "Agreement"). Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Agreement. Except as specifically amended herein, all other provisions of the Agreement remain in full force and effect.

### Addendum to Section 3(a) of the Agreement:

The 50/50 Division shall apply only to the Plaintiffs' Stock Share and the first $128,400,000 of any and all other Recoveries/Proceeds realized by any of the Parties, individually or collectively. As of the date(s) of execution of this Addendum, the sum of $128,400,000 reflects the combined amount of the Debtors' Restitution Award, the Investor Victims' Restitution Award and the Escrowed Funds. For the avoidance of any doubt, to the extent that the combined amount of the Recoveries/Proceeds ultimately realized by the Parties, individually or collectively, arising out of the Debtors' Restitution Award, the Investor Victims' Restitution Award and the Escrowed Funds is less than $128,400,000, the 50/50 Division shall nonetheless continue to apply to the first $128,400,000 of any and all Recoveries/Proceeds realized by any of the Parties, individually or collectively, and to the Plaintiffs' Stock Share.

As to any and all Recoveries/Proceeds realized by the Parties, individually or collectively, in excess of $128,400,000 (the "Excess Recoveries"), the Parties will utilize their reasonable best efforts, consistent with their respective fiduciary duties, to effectuate a division (the "63/37 Division") of the Excess Recoveries such that:

(i)     the ultimate value of sixty-three percent (63%) of the Excess Recoveries is realized by the Debtors' bankruptcy estates, and shall be considered part of the "Debtors' Share" as that term is used in the Agreement; and

(ii)    the ultimate value of thirty-seven percent (37%) of the Excess Recoveries is realized by the Plaintiffs for the benefit of the investor victims identified in the Class Action and the Criminal Action, as set forth in section 3(f) of the Agreement, and shall be considered part of the "Plaintiffs' Share" as that term is used in the Agreement; provided, however, that notwithstanding any provision of the Agreement or this Addendum to the contrary, the portion of the Excess Recoveries realized by the Plaintiffs arising out of the 63/37 Division necessary

to satisfy any shortfall in the Escrowed Funds distributable to the investor victims with allowed claims in the Class Action shall be distributed exclusively to those members of the class certified in the Class Action in accordance with the EDNY Stipulation and the Plan of Allocation previously approved in connection therewith, prior to any distribution pursuant to the Additional Allocation Procedure.

**Addendum to Section 3(b) of the Agreement:**

The Parties will employ the mechanisms identified in sections 3(b)(i) and 3(b)(ii) of the Agreement as necessary to equalize the Debtors' Share and the Plaintiffs' Share for purposes of effectuating the 50/50 Division.

WHEREFORE, the Parties have executed this Addendum and/or have caused this Addendum to be executed by their duly authorized counsel on the dates shown below.

**ACCEPTED AND AGREED TO BY:**

Dated: June 10, 2015

PACHULSKI STANG ZIEHL & JONES LLP

_Alan Kornfeld/EAW_
Laura Davis Jones
Alan J. Kornfeld
919 N. Market Street, 17th Floor
Wilmington, DE 19801

Counsel for Debtors and Debtors in Possession

Dated: June 10, 2015

SS BODY ARMOR I, INC.

T. Scott Avila
Chief Restructuring Officer
c/o Deloitte Transactions and
Business Analytics LLP
350 S. Grand Ave.
Los Angeles, CA 90071

Debtors and Debtors in Possession

Dated: June ___, 2015

LOWENSTEIN SANDLER LLP

Michael S. Etkin
65 Livingston Avenue
Roseland, NJ 07068

Bankruptcy Counsel for Plaintiffs' Counsel, Derivative Counsel and Plaintiffs, as defined in the Agreement

Dated: June ___, 2015

ROBBINS GELLER RUDMAN & DOWD LLP

Samuel H. Rudman
58 South Service Road, Suite 200
Melville, NY 11747

Plaintiffs' Counsel and on behalf of Plaintiffs, as defined in the Agreement

WHEREFORE, the Parties have executed this Addendum and/or have caused this Addendum to be executed by their duly authorized counsel on the dates shown below.

**ACCEPTED AND AGREED TO BY:**

Dated: June __, 2015

PACHULSKI STANG ZIEHL & JONES LLP

Dated: June __, 2015

SS BODY ARMOR I, INC.

Laura Davis Jones
Alan J. Kornfeld
919 N. Market Street, 17th Floor
Wilmington, DE 19801

Counsel for Debtors and Debtors in Possession

T. Scott Avila
Chief Restructuring Officer
c/o Deloitte Transactions and
Business Analytics LLP
350 S. Grand Ave.
Los Angeles, CA 90071

Debtors and Debtors in Possession

Dated: June 10, 2015

LOWENSTEIN SANDLER LLP

Michael S. Etkin
65 Livingston Avenue
Roseland, NJ 07068

Bankruptcy Counsel for Plaintiffs' Counsel, Derivative Counsel and Plaintiffs, as defined in the Agreement

Dated: June 10 2015

ROBBINS GELLER RUDMAN & DOWD LLP

Samuel H. Rudman
58 South Service Road, Suite 200
Melville, NY 11747

Plaintiffs' Counsel and on behalf of Plaintiffs, as defined in the Agreement

Dated: June ___, 2015

LABATON SUCHAROW LLP

_____
Ira A. Schochet
140 Broadway
New York, NY 10005

Plaintiffs' Counsel and on behalf of Plaintiffs,
as defined in the Agreement


Dated: June ___, 2015

ROBBINS ARROYO LLP


_____
Brian J. Robbins
600 B Street, Suite 1900
San Diego, CA 92101

Derivative Counsel


Dated: June ___, 2015

LAW OFFICES OF THOMAS G. AMON

_____
Thomas G. Amon
250 W. 57th Street, Suite 1316
New York, NY 10107

Derivative Counsel

DOCS_LA:289394.2 70934-001

Dated: June ___, 2015

LABATON SUCHAROW LLP

_____
Ira A. Schochet
140 Broadway
New York, NY 10005

Plaintiffs' Counsel and on behalf of Plaintiffs,
as defined in the Agreement

Dated: June 10, 2015

LAW OFFICES OF THOMAS G. AMON

_____
Thomas G. Amon
250 W. 57th Street, Suite 1316
New York, NY 10107

Derivative Counsel

Dated: June 10, 2015

ROBBINS ARROYO LLP

_____
Brian J. Robbins
600 B Street, Suite 1900
San Diego, CA 92101

Derivative Counsel

# EXHIBIT 4

This settlement agreement (the "Agreement") dated as of October 25, 2018, is made and entered into by and among the following parties (collectively the "Parties" and each individually a "Party"):

(a)     the United States of America ("United States");

(b)     SS Body Armor I, Inc. ("SSBA I") f/k/a Point Blank Solutions, Inc. f/k/a DHB Industries, Inc., the post-confirmation debtor in the Chapter 11 proceeding in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") captioned as *In re SS Body Armor I, Inc., et al.*, Case No. 10-bk-11255 (CSS) ("Bankruptcy Proceeding");

(c)     the Recovery Trust ("Recovery Trust") formed pursuant to the Chapter 11 plan confirmed in the Bankruptcy Proceeding on November 10, 2015 (the "Plan");

(d)     the lead plaintiffs ("Lead Plaintiffs") in the consolidated securities class action captioned as *In re DHB Industries, Inc. Class Action Litigation*, Case No. 05-cv-04296 (EDNY) ("Class Action"), on behalf of themselves and all members of the class previously certified in the Class Action (collectively with the Lead Plaintiffs, the "Class Plaintiffs");

(e)     the Estate of David H. Brooks (the "Brooks Estate"), through Jeffrey R. Brooks as its personal representative ("Personal Representative"), and any entities (i) in which the Brooks Estate has a direct or indirect interest, (ii) of which the Brooks Estate or its Personal Representative (in his capacity as such) is a shareholder, trustee, officer or manager, and/or (iii) on whose behalf David H. Brooks filed claims in the Bankruptcy Proceeding and/or in the civil forfeiture proceeding captioned as *U.S. v. All Assets Listed on Schedule I Attached Hereto and All Proceeds Traceable Thereto*, Case No. 10-cv-04750 (EDNY) (the "Civil Forfeiture Action")( collectively with the Brooks Estate, the "David Brooks Claimants"). The David Brooks Claimants include, but are not limited to, David Brooks International, Inc.;

(f)     Terry S. Brooks, Elizabeth Brooks, Victoria Brooks and Andrew Brooks (collectively, the "Brooks Family"), and any entities (i) in which any member of the Brooks Family has a direct or indirect interest, (ii) of which any member of the Brooks Family is a shareholder, trustee, officer or manager, (iii) on whose behalf any member of the Brooks Family

filed verified claims to any assets restrained in the Civil Forfeiture Action, and/or (iv) on whose behalf any member of the Brooks Family filed claims in the Bankruptcy Proceeding (collectively with the Brooks Family, the "Brooks Family Claimants"). The Brooks Family Claimants include, but are not limited to, the following entities: Tactical Armor Products Inc. ("TAP"); Brooks Industries of Long Island, Inc.; Brooks Industries of Long Island – Profit Sharing Plan and Trust; Gear to Gear Trust; Victoria Brooks Industries, Inc.; Magic Moments Trust; VRB Inc.; Andrew Brooks Industries, Inc.; Saving Lives Trust; ASB Inc.; Elizabeth Brooks Industries, Inc.; Show Time Trust; EJB Inc.; Vianel Industries, Inc.; VAE Enterprises LLC (now VAE LLC); Perfect World Partners, LLC; Wildfire Holdings, LLC; and True Grit Holdings, LLC; and

(g)    Jeffrey R. Brooks, the Jeffrey R. Brooks Individual Retirement Account ("Jeffrey Brooks IRA"), and any entities (i) in which Jeffrey R. Brooks and/or the Jeffrey Brooks IRA have a direct or indirect interest, (ii) of which Jeffrey R. Brooks and/or the Jeffrey Brooks IRA is a shareholder, trustee, officer or manager, (iii) on whose behalf Jeffrey R. Brooks and/or the Jeffrey Brooks IRA filed verified claims to any assets restrained in the Civil Forfeiture Action, and/or (iv) on whose behalf Jeffrey R. Brooks and/or the Jeffrey Brooks IRA filed claims in the Bankruptcy Proceeding (collectively, the "Jeffrey Brooks Claimants"). The Jeffrey Brooks Claimants include, but are not limited to, the following entities: Pathfinder Trust; Like a Prayer Trust; Private Time Trust; Perfect World Partners, LLC; Wildfire Holdings, LLC; and True Grit Holdings LLC.

## RECITALS

WHEREAS, on and after September 9, 2005, multiple class actions were filed in the United States District Court for the Eastern District of New York ("EDNY District Court") against SSBA I, David H. Brooks ("David Brooks"), Terry S. Brooks, Sandra Hatfield, Dawn M. Schlegel, Cary Chasin, Jerome Krantz, Gary Nadelman, Barry Berkman, David Brooks International Inc., Andrew Brooks Industries Inc. and Elizabeth Brooks Industries, Inc.; and

WHEREAS, the class actions were consolidated into the Class Action; and

WHEREAS, on and after September 14, 2005, multiple derivative actions were filed in the EDNY District Court on behalf of SSBA I against David Brooks, Jeffrey R. Brooks, Terry S. Brooks, Sandra Hatfield, Dawn M. Schlegel, Cary Chasin, Jerome Krantz, Gary Nadelman, Barry Berkman, Larry R. Ellis, David Brooks International Inc., Andrew Brooks Industries Inc., Elizabeth Brooks Industries, Inc. and TAP; and

WHEREAS, the derivative actions were consolidated and captioned as *In re DHB Industries, Inc. Derivative Litigation*, Case No. 05-cv-04345 (EDNY) ("Derivative Action"); and

WHEREAS, on or about November 30, 2006, the parties to the Class Action and Derivative Action entered into a Stipulation and Agreement of Settlement ("2006 Stipulation"), later approved by the EDNY District Court in separate orders and judgments in both actions, pursuant to which certain funds were deposited in escrow (the "Escrowed Funds"); and

WHEREAS, on or about October 24, 2007, David Brooks was arrested on various charges of fraud, obstruction of justice, and tax offenses in a criminal proceeding in the Eastern District of New York captioned as *United States v. Schlegel, et al.,* Case No. 06-cr-00550 (EDNY) (the "Criminal Action"); and

WHEREAS, on October 25, 2007, the United States Securities and Exchange Commission (the "SEC") commenced a civil enforcement action against David Brooks in the United States District Court for the Southern District of Florida ("Florida District Court"), which action was captioned as *Securities and Exchange Commission v. Brooks*, 07-cv-61526 (SD Fla.) (the "SEC Action"); and

WHEREAS, following the arrest of David Brooks in the Criminal Action, and later in connection with the Civil Forfeiture Action filed by the United States, the United States restrained 113 cash and non-cash assets (the "Restrained Assets") that were identified as the proceeds of, and/or property involved in, David Brooks's alleged criminal conduct; and

WHEREAS, in or around January 2008, David Brooks was released on bail based on a $400 million bond (the "Bond") which was partially secured by cash collateral (the "Cash Collateral"); and

WHEREAS, the Bond also contained financial disclosure requirements, among other conditions of bail ("Bail Conditions"); and

WHEREAS, in or around January 2010, the EDNY District Court revoked David Brooks's bail based upon a finding that he had violated the Bail Conditions; and

WHEREAS, as of March 2010, and after most of the Cash Collateral had been released by the EDNY District Court for the payment of David Brooks's legal fees, $19.5 million of the Cash Collateral remained ("Remaining Cash Collateral"); and

WHEREAS, the Bankruptcy Proceeding was commenced on April 14, 2010 in the Bankruptcy Court; and

WHEREAS, on or about September 14, 2010, a jury in the Eastern District of New York convicted David Brooks of multiple offenses (the "Non-Tax Convictions"), including multiple counts of securities fraud, mail fraud and wire fraud (the "Fraud Convictions"), which convictions have since been abated; and

WHEREAS, on or about October 15, 2010, the United States filed the Civil Forfeiture Action against the Restrained Assets; and

WHEREAS, in the Civil Forfeiture Action, SSBA I (as Point Blank Solutions), the David Brooks Claimants, the Brooks Family Claimants, and the Jeffrey Brooks Claimants filed claims to certain of the Restrained Assets based upon their alleged direct and indirect interests in such Restrained Assets; and

WHEREAS, on August 10, 2011, David Brooks pleaded guilty to one count of conspiring to defraud the United States and two counts of tax evasion ("Tax Convictions"); and

WHEREAS, at David Brooks's sentencing in August 2013, the EDNY District Court ordered David Brooks to pay $2,883,056 in restitution plus interest pursuant to 18 U.S.C. § 3612(f) (the "Tax Restitution Order") to the Internal Revenue Service (the "IRS") in connection with the Tax Convictions; and

Global Settlement Agreement (dated as of October 25, 2018)                    Page **4** of **37**

WHEREAS, at David Brooks's sentencing, the EDNY District Court, among other things, also imposed as part of David Brooks's sentence the following financial obligations: forfeiture of $65,167,612 (the "Forfeiture") based upon the Fraud Convictions, which amount was to be satisfied from the Restrained Assets; an $8.7 million fine (the "Fine"); and a special assessment of $1,700 (the "Special Assessment"); and

WHEREAS, on or about August 26, 2013, David Brooks filed a notice of appeal ("Criminal Appeal"); and

WHEREAS, in a March 27, 2015 memorandum and order entered in the Criminal Action (the "Fraud Restitution Order"), the EDNY District Court further sentenced David Brooks to pay restitution, based upon the Fraud Convictions, in the total approximate amount of $91,496,847, of which approximately $53,912,546 was owed to SSBA I and approximately $37,584,301 was owed to the investor victims identified in the Fraud Restitution Order; and

WHEREAS, on April 24, 2015, the Brooks Family, as sureties on the Bond, filed a motion in the Criminal Action to set aside the forfeiture of approximately $17.7 million of the Remaining Cash Collateral ("Bail Remission Motion"); and

WHEREAS, on or about May 4, 2015, the Lead Plaintiffs in the Class Action, on behalf of the Class Plaintiffs, and SSBA I, among other parties, entered into an Amended Settlement Agreement, as modified by an Addendum to Amended Settlement Agreement executed on June 10, 2015 (as modified, the "Amended Settlement Agreement"), amending a settlement agreement entered into by the same parties on or about February 6, 2015 to resolve certain disputes that had arisen in connection with the Bankruptcy Proceeding and an appeal from the judgment approving the 2006 Stipulation in the Derivative Action; and

WHEREAS, the Amended Settlement Agreement governs the sharing and allocation of certain "Recoveries/Proceeds" (as defined in the Amended Settlement Agreement) among the parties to the Amended Settlement Agreement, including, among other things, any Forfeited Assets (as defined in Section 2(a) of this Agreement); and

WHEREAS, on June 2, 2015, the EDNY District Court denied the Bail Remission Motion; and

WHEREAS, on September 1, 2015, the Plan was filed with the Bankruptcy Court; and

WHEREAS, on November 10, 2015, the Bankruptcy Court entered an order confirming the Plan in the Bankruptcy Proceeding; and

WHEREAS, the effective date of the Plan (as defined in the Plan) occurred on November 23, 2015; and

WHEREAS, David Brooks died on or about October 27, 2016, while the Criminal Appeal was pending; and

WHEREAS, on or about January 26, 2017, the Florida District Court granted the SEC's motion to re-open the SEC Action, and Jeffrey R. Brooks was substituted as the defendant in the SEC Action in his capacity as the Personal Representative of the Brooks Estate; and

WHEREAS, on September 8, 2017, following the forfeiture of 68 of the Restrained Assets in the Civil Forfeiture Action, the United States filed an Amended Complaint in the Civil Forfeiture Action seeking the forfeiture of the remaining 45 Restrained Assets (the "Remaining Restrained Assets"); and

WHEREAS, the Remaining Restrained Assets are listed on Schedule I ("Schedule I") to the Amended Complaint filed in the Civil Forfeiture Action, a copy of which is attached hereto as **Exhibit A**; and

WHEREAS, as set forth in the verified claims filed in the Civil Forfeiture Action, SSBA 1 (as Point Blank Solutions), the Brooks Family Claimants, the David Brooks Claimants and the Jeffrey Brooks Claimants have asserted direct and indirect claims to the Remaining Restrained Assets; and

WHEREAS, on September 20, 2017, the United States Court of Appeals for the Second Circuit (the "Second Circuit") issued a decision ("Second Circuit Decision"): (i) holding that David Brooks's death while the Criminal Appeal was pending resulted in the abatement of the Non-Tax Convictions, the Forfeiture, the Fraud Restitution Order, the Fine, and the Special Assessment; (ii) holding that the Tax Convictions, the Tax Restitution Order, and forfeiture of the Remaining Cash Collateral did not abate; (iii) remanding the case to the EDNY District

Court for dismissal of the indictment relating to the Non-Tax Convictions; and (iv) affirming the EDNY District Court's denial of the Bail Remission Motion; and

WHEREAS, on December 4, 2017, the Brooks Family filed a Petition for Rehearing on the affirmance of the EDNY District Court's denial of the Bail Remission Motion; and

WHEREAS, on December 4, 2017, the Brooks Estate filed a Petition for Rehearing and Rehearing *en banc* on the Second Circuit's ruling regarding the Tax Convictions and the Tax Restitution Order; and

WHEREAS, during a mediation on December 6, 2017 and December 7, 2017 ("Mediation"), the Parties reached a global agreement, reflected in a formal term sheet which was executed by the Parties at the Mediation ("Term Sheet") subject to more definitive documentation and further governmental approvals; and

WHEREAS, on January 12, 2018, the Second Circuit denied the Brooks Family's and the Brooks Estate's Petitions for Rehearing; and

WHEREAS, SSBA I sought remission of the Restrained Assets to compensate SSBA I for losses suffered by SSBA I, pursuant to 28 C.F.R. Part 9, in petitions and supplemental petitions submitted to the United States Department of Justice's Money Laundering and Asset Recovery Section ("MLARS") on or about May 27, 2015, September 8, 2017, February 27, 2018 and June 18, 2018; and

WHEREAS, the Lead Plaintiffs, on behalf of the Class Plaintiffs, sought remission of the Restrained Assets to compensate the Class Plaintiffs for losses suffered by the Class Plaintiffs, pursuant to 28 C.F.R. Part 9, in petitions and supplemental petitions submitted to MLARS on or about January 5, 2018 and March 1, 2018; and

WHEREAS, on or about July 11, 2018, MLARS (i) notified SSBA I by letter that its petition for remission had been preliminarily granted up to the amount of $78,815,232.06 for losses suffered by SSBA I, with the grant of remission contingent upon the entry of a final order of forfeiture for the Restrained Assets and subject to conditions set forth in the approval letter, attached hereto as **Exhibit B**, and (ii) notified the Lead Plaintiffs by letter that their petition for remission on behalf of the Class Plaintiffs had been preliminarily granted up to

the amount of $81,540,718.81 for losses suffered by the Class Plaintiffs, with the grant of remission contingent upon the entry of a final order of forfeiture for the Restrained Assets and subject to conditions set forth in the approval letter, attached hereto as **Exhibit C** (Exhibits B and C, together, the "MLARS Approvals"); and

WHEREAS, this Agreement serves as definitive documentation of the global agreement contemplated in the Term Sheet, the purpose of which is to resolve the Civil Forfeiture Action, the Derivative Action, the Class Action, the SEC Action and all other related claims and disputes pending among and between the Parties in connection with the facts at issue in the Civil Forfeiture Action, the Derivative Action, the Class Action, the SEC Action and the Bankruptcy Proceeding.

## AGREEMENT

NOW, THEREFORE, after good faith, arm's length negotiations without collusion, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the following terms:

1.    Effective Date. The effective date of this Agreement (the "Effective Date") shall occur upon satisfaction of all of the following conditions:

(a)    Execution of this Agreement by all of the Parties;

(b)    Issuance of the MLARS Approvals to SSBA I and the Lead Plaintiffs, on behalf of the Class Plaintiffs, which occurred on or about July 11, 2018 as described above;

(c)    Notification by the SEC to the Parties that the SEC Commissioners have approved the *Consent to Final Judgment of Defendant Jeffrey Brooks, as Personal Representative of the Estate of David H. Brooks* ("SEC Consent") and the *Final Judgment Against Defendant Jeffrey Brooks, as Personal Representative of the Estate of David H. Brooks* ("SEC Final Judgment"), copies of which are attached hereto as **Exhibit D**;

(d)    Entry of an order by the EDNY District Court making the Remaining Cash Collateral available for distribution pursuant to Sections 2(c) and 2(d)(iii)-(v) of this Agreement (the "Cash Collateral Order"), which Cash Collateral Order was entered on or

about February 6, 2018 and amended on September 18, 2018 (the "Amended Cash Collateral Order"), which Amended Cash Collateral Order is attached hereto as **Exhibit E**;

(e)     Entry of a *Consent Final Decree of Forfeiture and Order for Delivery* in substantially the form attached hereto as **Exhibit F** (the "Final Forfeiture Order") by the EDNY District Court in the Civil Forfeiture Action, with the consent of all Parties who have filed claims to the Remaining Restrained Assets in the Civil Forfeiture Action; this condition shall be deemed to have been met despite any modifications the Court may make to any recitals in the Final Forfeiture Order as entered by the Court;

(f)     The funding of the Payments (as defined in Section 2 below) pursuant to Sections 2(a) through 2(d) of this Agreement;

(g)     Entry of an order by the Florida District Court approving the SEC Consent and SEC Final Judgment;

(h)     To the extent necessary, entry of an order by the EDNY District Court in the Class Action authorizing the Lead Plaintiffs to effectuate any of the terms of this Agreement;

(i)     Within ten (10) business days of execution of this Agreement, withdrawal with prejudice of: (1) any pending petitions for certiorari to the U.S. Supreme Court filed in connection with the Second Circuit Decision by any of the Parties, including any of the David Brooks Claimants and the Brooks Family Claimants; (2) all claims by the Brooks Family Claimants, the David Brooks Claimants and the Jeffrey Brooks Claimants against the United States, its agencies, its employees and/or any unnamed federal defendants in any pending litigation, whether or not referenced in this Agreement, including the voluntary dismissal with prejudice by the Brooks Family Claimants, the David Brooks Claimants and the Jeffrey Brooks Claimants of any pending litigation, whether or not referenced in this Agreement, against the United States, its agencies, its employees and/or any unnamed federal defendants, including but not limited to the dismissal with prejudice of the action captioned as *Brooks v. Sposato, et al.*, Case No. 12-cv-4740 (EDNY), which action shall be dismissed by the filing of the stipulation attached hereto as **Exhibit G**, unless such action has already been terminated; and

(3) any pending appeals in any court by the Brooks Family Claimants, the David Brooks Claimants and the Jeffrey Brooks Claimants against any other Party to this Agreement; and

(j)     Within five (5) business days of execution of this Agreement, identification by the Brooks Family Claimants, the David Brooks Claimants and the Jeffrey Brooks Claimants to SSBA I and the Recovery Trust, which identification shall be made in writing and delivered to SSBA I and the Recovery Trust pursuant to Section 17 of this Agreement, of each of the following: (1) the legal name of each of the Brooks Family Releasors (as defined in Section 3(a) below) that holds (directly or indirectly) any right, claim or interest in the Recovery Trust as an equity interest holder, holds (directly or indirectly) any shares of SSBA I stock, or on whose behalf any claim based on equity interests has been filed or scheduled in the Bankruptcy Proceeding; (2) the legal name of each of the Jeffrey Brooks Releasors (as defined in Section 3(b) below) that holds (directly or indirectly) any right, claim or interest in the Recovery Trust as an equity interest holder, holds (directly or indirectly) any shares of SSBA I stock, or on whose behalf any claim based on equity interests has been filed or scheduled in the Bankruptcy Proceeding; (3) the legal name of each of the David Brooks Releasors (as defined in Section 3(c) below) that holds (directly or indirectly) any right, claim or interest in the Recovery Trust as an equity interest holder, holds (directly or indirectly) any shares of SSBA I stock, or on whose behalf any claim based on equity interests has been filed or scheduled in the Bankruptcy Proceeding; and (4) the nominee name(s) or "street" name(s) in which any of the foregoing rights, claims, interests or shares are held.

2.     The Payments.  The settlement and remission payments to be made pursuant to Sections 2(a) through 2(d) of this Agreement (collectively, the "Payments") shall be funded with the Remaining Restrained Assets and the Remaining Cash Collateral, which the Parties agree have an approximate total value of $168,000,000 and $19,500,000, respectively.  If the Effective Date does not occur because not all of the prerequisite conditions have been satisfied, then each Party that has received any Payment(s) must return such Payment(s) to the Party that made the Payment(s). The distribution of the Remaining Restrained Assets and Remaining Cash Collateral shall be as follows:

(a)     Forfeiture of a Portion of the Remaining Restrained Assets. The Parties consent to the civil forfeiture of the Remaining Restrained Assets, except the specific assets and cash to be distributed to the Brooks Family under Section 2(d)(i) of this Agreement, pursuant to 18 U.S.C. § 981(a)(1)(C) and/or 18 U.S.C. § 981(a)(1)(A) (the "Forfeited Assets"). The Parties agree that the Forfeited Assets have an approximate total value of $143,000,000 and will be used for purposes of remission, pursuant to 18 U.S.C. § 981(d) and 28 C.F.R. Part 9, and as specified below and subject to the conditions in the MLARS Approvals. The Forfeited Assets shall be forfeited pursuant and subject to the terms of this Agreement and the Final Forfeiture Order, which order the United States shall submit to the EDNY District Court upon execution of this Agreement by the Parties. The Parties further agree that the Forfeited Assets shall be forfeited under prevailing forfeiture law.

(b)     Distribution of Forfeited Assets to the United States and Victims. The Parties agree that the Forfeited Assets shall be distributed and/or used as follows:

(i)     The Forfeited Assets shall first be used to pay the costs and expenses (the "Government Expenses") of the United States related to and/or incurred in connection with the prosecution of the Criminal Action and the Civil Forfeiture Action, and the disbursement of the Forfeited Assets under this Agreement, as authorized by law. The Parties agree that the costs and expenses payable to the United States pursuant to this Section 2(b)(i) of the Agreement (1) total approximately $1,847,000 with respect to Government Expenses related to and/or incurred in connection with the prosecution of the Criminal Action and the Civil Forfeiture Action, and (2) will not exceed approximately $650,000 with respect to Government Expenses related to and/or incurred in connection with the management, liquidation and disbursement of the Forfeited Assets under this Agreement. The Parties further agree that the Government Expenses may be paid fully or partially out of the Forfeited Assets and/or the assets forfeited by Dawn Schlegel and Sandra Hatfield in the Criminal Action, at the United States's discretion.

(ii)     After deduction of the Government Expenses pursuant to Section 2(b)(i) of this Agreement, the balance of the Forfeited Assets shall be distributed in accordance with the MLARS Approvals, pursuant to 18 U.S.C. § 981(d) and 28 C.F.R. Part 9, as follows: (1) a

Payment to SSBA I in accordance with the MLARS Approval issued to SSBA I on or about July 11, 2018, which approved SSBA I's petition for remission in an amount up to $78,815,232.06 subject to the terms and conditions set forth therein, and (2) a Payment to the Class Plaintiffs in accordance with the MLARS Approval issued to the Lead Plaintiffs on or about July 11, 2018, which approved the Lead Plaintiffs' petition for remission, submitted on behalf of the Class Plaintiffs, in an amount up to $81,540,718.81 subject to the terms and conditions set forth therein. The Payment made to SSBA I pursuant to this Section 2(b)(ii) of the Agreement shall be wired to the "Pachulski Stang Ziehl & Jones LLP Client Trust Account" and the Payment made to the Class Plaintiffs pursuant to this Section 2(b)(ii) of the Agreement shall be wired to the "DHB Industries Settlement Fund – Remission" account for the Class Plaintiffs. The Payments made pursuant to this Section 2(b)(ii) of the Agreement shall not be disbursed from the above-referenced accounts (except as to the payment to be made by SSBA I to Terry S. Brooks pursuant to Section 2(d)(vi) of the Agreement) until the Effective Date.

(iii) The claims filed by SSBA I (as Point Blank Solutions) in the Civil Forfeiture Action shall be withdrawn and dismissed with prejudice pursuant to the Final Forfeiture Order.

(c) Payment of Tax Restitution Order. The Parties agree that the Remaining Cash Collateral shall be used to pay the Tax Restitution Order in the amount of $2,883,056, plus all accrued interest pursuant to 18 U.S.C. § 3612(f) until the date of payment. The Parties further agree that such funds will be disbursed to the Clerk of Court for further remittance to the IRS. Execution of this Agreement by the United States shall constitute acknowledgement on behalf of the United States that the disbursement to the Clerk of Court pursuant to this Section 2(c) of the Agreement shall satisfy the Tax Restitution Order in full. Pursuant to the Amended Cash Collateral Order, the United States shall file a request for such disbursement to satisfy the Tax Restitution Order. The United States will request that the EDNY District Court order payment of these funds to the Clerk of Court by filing the proposed order attached hereto as **Exhibit H**, which proposed order will be filed contemporaneously with the United States's filing of the Final Forfeiture Order.

(d)    Distribution to the Brooks Family.  The Parties agree to the distribution of certain cash and non-cash assets to the Brooks Family as follows:

(i)    $25,000,000 of the Remaining Restrained Assets, which shall consist of $24,837,525 in cash (the "Returned Cash") (subject to the deduction of one-half of the amount of the Interest Remainder Payment, discussed below) and the items listed as Asset Nos. 6, 10, 11, 14, 15, 107 and 109 on Schedule I (the "Returned Non-Cash Assets" and, together with the Returned Cash, the "Returned Cash and Assets"), shall be paid and/or distributed to the Brooks Family by the U.S. Marshals Service, on behalf of the United States.  For the avoidance of any doubt, the Parties do not consent to the forfeiture of the Returned Cash and Assets, and the Returned Cash and Assets shall be paid or distributed as set forth herein solely to the Brooks Family, and not to the David Brooks Claimants or any other claimant.  The payments or distributions to the Brooks Family pursuant to this Section 2(d)(i) of the Agreement shall be conditioned upon entry of the Final Forfeiture Order.  The United States shall make a request that the Returned Cash be distributed to the Brooks Family Attorney Escrow Account (as defined in this Section 2(d)(i)), and that the Returned Non-Cash Assets be made available to the Escrow Agent (in accordance with Section 2(d)(ii) below).  Pursuant to the Amended Cash Collateral Order, the amount of Returned Cash shall be reduced by one-half of the amount of the Interest Remainder Payment (as defined in Section 2(d)(iv) below).  The amount of the Returned Cash distributed under this Agreement may also be reduced pursuant to the Treasury Offset Program as set forth in this Section 2(d)(i) of this Agreement.  The Returned Cash due pursuant to this Section 2(d)(i) shall be remitted by wire to Richard C. Klugh, on behalf of the Brooks Family, as Escrow Agent of an attorney escrow account to be designated in a digitally and fully completed ACH form submitted by the Brooks Family to the United States (the "Brooks Family Attorney Escrow Account").  The Brooks Family must attach to the ACH form a schedule listing the names and social security numbers of each member of the Brooks Family. The Returned Cash shall be subject to any offset pursuant to the Treasury Offset Program. Within fifteen business days of the date on which the United States receives the above-referenced ACH form and attached schedule, so long as the conditions in Section 1(i)-(j) have been met, the U.S. Marshals Service shall cause the Returned Cash to be remitted to the Brooks Family Attorney Escrow Account.  The Debt Collection Improvement Act of 1996 ("DCIA"),

31 U.S.C. § 3716, requires the United States Department of the Treasury, and any other disbursing officials, to offset Federal payments to collect delinquent non-tax debts owed to the United States, or delinquent debts owed to states, including past due child support enforced by states. If any offset to the Returned Cash is made during an electronic funds transfer, the Brooks Family will receive a notification from the United States at the last address provided by the debtor to the creditor. If the Brooks Family believes that the Returned Cash may be subject to an offset, the Brooks Family may contact the United States Department of the Treasury at 1-800-304-3107. The Parties and the Escrow Agent (Richard C. Klugh) agree that the disbursement of the Returned Cash from the Brooks Family Attorney Escrow Account shall be governed by Section 2(d)(v) of this Agreement.

        (ii)     The Returned Non-Cash Assets shall be made available to Judd Burstein, Esq., as Escrow Agent on behalf of the Brooks Family, upon the United States's request to the Federal Bureau of Investigation. The Parties and Escrow Agent (Judd Burstein) agree that the Escrow Agent shall not distribute the Returned Non-Cash Assets to the Brooks Family, or to any other individual or entity, until SSBA I and the Lead Plaintiffs have received the Payments identified in Section 2(b)(ii) of this Agreement. The Parties and Escrow Agent (Judd Burstein) further agree that any distribution of the Returned Non-Cash Assets by the Escrow Agent prior to receipt of the Payments by SSBA I and the Lead Plaintiffs shall constitute a material breach of this Agreement.

        (iii)    $16,616,944 of the Remaining Cash Collateral shall be remitted by wire to the Brooks Family Attorney Escrow Account, on behalf of the Brooks Family, in accordance with the Amended Cash Collateral Order and represent funds to be returned to the Brooks Family. The United States will request that the EDNY District Court order payment of these funds and any excess funds remaining in the Cash Collateral Account to the Brooks Family Attorney Escrow Account by filing the Order Directing Payment of Cash Collateral, which order will be filed contemporaneously with the United States's filing of the Final Forfeiture Order. The Parties and Escrow Agent (Richard C. Klugh) agree that the disbursement of these funds from the Brooks Family Attorney Escrow Account shall be governed by Section 2(d)(v) of this Agreement.

(iv)     The United States shall calculate the "Interest Remainder Payment" contemporaneously with the filing of the Order Directing Payment of Cash Collateral. The Interest Remainder Payment shall be calculated as the balance in the Cash Collateral Account at that time, minus the amount of the Payment described in Section 2(c), and minus the amount due to the Brooks Family pursuant to Section 2(d)(iii).

(v)     With respect to all funds remitted or paid to the Brooks Family Attorney Escrow Account pursuant to Sections 2(d)(i) and 2(d)(iii)-(iv) of this Agreement, the Parties and the Escrow Agent (Richard C. Klugh) agree that the Escrow Agent shall not make any disbursements of such funds, and no disbursements of such funds shall otherwise be made, from the Brooks Family Attorney Escrow Account until SSBA I and the Lead Plaintiffs have received the Payments identified in Section 2(b)(ii) of this Agreement. The Parties and the Escrow Agent further agree that any disbursement of such funds from the Brooks Family Attorney Escrow Account prior to receipt of the Payments by SSBA I and the Lead Plaintiffs shall constitute a material breach of this Agreement. Upon the request of the United States, the Escrow Agent (Richard C. Klugh) shall provide the United States with proof that no disbursements have been made from the Brooks Family Attorney Escrow Account prior to the receipt of the Payments by SSBA I and the Lead Plaintiffs. Upon the request of the United States, the Escrow Agent (Judd Burstein) shall provide the United States with proof that no distributions of the Returned Non-Cash Assets have occurred, prior to the receipt of the Payments by SSBA I and the Lead Plaintiffs.

(vi)     $9,545,531 shall be remitted by wire to Terry S. Brooks, on behalf of the Brooks Family, from SSBA I, which amount shall be payable solely from the Payment that SSBA I receives under Section 2(b)(ii) of this Agreement, and shall be paid from the principal of such funds in satisfaction of the claim filed by Terry S. Brooks against SSBA I. Upon receipt by SSBA I and the Lead Plaintiffs of the Payments contemplated under Section 2(b)(ii) of this Agreement in immediately available funds, SSBA I shall initiate the payments or distributions to Terry S. Brooks pursuant to this Section 2(d)(vi) of the Agreement.

(vii)     As specified in Sections 3 and 3(a)-3(c) of this Agreement, all creditor claims and claims based on equity interests filed or scheduled in the Bankruptcy Proceeding

by or for the Brooks Family Releasors (as defined in Section 3(a) of this Agreement), the Jeffrey Brooks Releasors (as defined in Section 3(b) of this Agreement) and the David Brooks Releasors (as defined in Section 3(c) of this Agreement) shall be deemed disallowed; all shares of SSBA I stock held directly or indirectly by the Brooks Family Releasors, the Jeffrey Brooks Releasors and the David Brooks Releasors, and all interests and benefits flowing from such shares, shall be cancelled, waived and released; and all rights, claims and interests in the Recovery Trust held directly or indirectly by the Brooks Family Releasors, the Jeffrey Brooks Releasors and the David Brooks Releasors, as creditors or as equity interest holders, shall be released, waived and discharged.

          (viii)   The claims filed by the David Brooks Claimants, the Brooks Family Claimants and the Jeffrey Brooks Claimants in the Civil Forfeiture Action shall be withdrawn and dismissed with prejudice pursuant to the Final Forfeiture Order.

3.     Mutual Releases.  The Parties agree to exchange the releases set forth below, which releases shall become effective upon: (1) receipt by SSBA I and the Lead Plaintiffs of the Payments identified in Section 2(b)(ii) of this Agreement, (2) distribution of the Returned Cash to the Brooks Family Attorney Escrow Account and release of the Returned Non-Cash Assets to the Escrow Agent pursuant to Sections 2(d)(i)-(ii) of this Agreement, (3) distribution of $16,616,944 of the Remaining Cash Collateral, and the Interest Remainder Payment and any excess funds remaining in the Cash Collateral Account, to the Brooks Family Attorney Escrow Account pursuant to Sections 2(d)(iii)-(iv) of this Agreement; and (4) the payment of $9,545,531 to Terry S. Brooks pursuant to Section 2(d)(vi) of this Agreement. However, the failure of SSBA I to make the Payment of $9,545,531 to Terry S. Brooks pursuant to Section 2(d)(vi) of this Agreement shall have no effect on the mutual releases between the United States and any other Party, which releases shall remain binding and in full force and effect.

          (a)     The Brooks Family Claimants, on behalf of themselves and on behalf of their heirs, agents, assigns, representatives and successors, any entities in which they individually, collectively, directly or indirectly hold any ownership interest, and any entities they individually, collectively, directly or indirectly control or manage (collectively, the "Brooks Family Releasors"), shall:

(i)       Release, waive and discharge any and all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity or otherwise, that the Brooks Family Releasors have, may have or are entitled to assert against SSBA I, the Recovery Trust and/or their respective current or former officers, directors, members, employees, agents, attorneys, consultants, insurers, representatives, predecessors, successors, parents and subsidiaries;

(ii)      Release, waive and discharge any and all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity or otherwise, that the Brooks Family Releasors have, may have or are entitled to assert against the Class Plaintiffs, Class Plaintiffs' counsel in the Class Action and the Bankruptcy Proceeding, plaintiff's counsel in the Derivative Action and/or their respective current or former officers, directors, members, employees, agents, attorneys, consultants, insurers, representatives, predecessors, successors, parents and subsidiaries;

(iii)     Release, waive and discharge all rights, claims and interests in the Forfeited Assets;

(iv)      Release, waive and discharge all rights, claims and interests in the Escrowed Funds;

(v)       Release, waive and discharge all rights, claims and interests in the Recovery Trust, whether such rights, claims and interests are held directly or indirectly, or are held as creditors or as equity interest holders;

(vi)      Agree that all shares of SSBA I stock held directly or indirectly by the Brooks Family Releasors, and all interests and benefits in whatever form flowing from such shares, are cancelled, waived and released;

(vii)    Agree that all creditor claims and claims based on equity interests filed by or scheduled for the Brooks Family Releasors in the Bankruptcy Proceeding shall be deemed disallowed;

(viii)    Release, waive and discharge any and all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity or otherwise, that the Brooks Family Releasors have, may have or are entitled to assert against the United States, its agencies, and/or its current or former agents, officers or employees for or on account of any matter, including but not limited to the prosecution of the Criminal Action (including all litigation relating to the Bail Conditions) and/or the Civil Forfeiture Action, the seizure and restraint of the Restrained Assets, the condition of any Returned Non-Cash Assets, and the forfeiture of the Forfeited Assets, provided that: (1) such releases shall exclude any future claim against the United States, its agencies, and/or its current or former agents, officers or employees with respect to any personal injuries and/or the death of David Brooks (a "Tort Action") asserted by or on behalf of any member of the Brooks Family Releasors; (2) that this exclusion only shall be effective if the Brooks Family Claimants, the Jeffrey Brooks Claimants, and the David Brooks Claimants and/or any individual members thereof shall serve, along with the summons and complaint of any such Tort Action, a copy of this Agreement in its entirety upon the United States Attorney's Office for the United States District Court in which the Tort Action is filed, and if there is no service of this Agreement under this provision, then the exclusion provided under provision (1) of this paragraph is null and void; and (3) in the event any such Tort Action is filed and the Brooks Family Releasors do not prevail on the merits, the Brooks Family Releasors agree that they shall be liable to the United States for all litigation costs and attorneys' fees incurred in connection with the defense of such Tort Action, in the same manner and at the same rate as a plaintiff may recover fees and costs against the United States under the Equal Access to Justice Act;

(ix)    In the event a third party, other than the United States, its agencies, agents, officers, and employees, past and present, asserts a claim to any of the Remaining

Restrained Assets, hold the United States, its agencies, agents, officers, and employees, past and present, harmless from such claims;

(x) Release, waive and discharge any and all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity or otherwise, that the Brooks Family Releasors have, may have or are entitled to assert against the SEC and/or its current or former agents, officers or employees;

(xi) Agree to waive any and all rights the Brooks Family Releasors may have to recover attorneys' fees, costs or interest under the Equal Access to Justice Act, the Civil Asset Forfeiture Reform Act, and/or any other applicable case law or statute.

(b) The Jeffrey Brooks Claimants, on behalf of themselves and their heirs, agents, assigns, representatives and successors, any entities in which they individually, collectively, directly or indirectly hold any ownership interest, and any entities they individually, collectively, directly or indirectly control or manage (collectively, the "Jeffrey Brooks Releasors"), shall:

(i) Release, waive and discharge any and all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity or otherwise, that the Jeffrey Brooks Releasors have, may have or are entitled to assert against SSBA I, the Recovery Trust and/or their respective current or former officers, directors, members, employees, agents, attorneys, consultants, insurers, representatives, predecessors, successors, parents and subsidiaries, including without limitation all claims asserted by Jeffrey R. Brooks and/or the Jeffrey Brooks IRA in the action filed in New York state court under the caption *Jeffrey R. Brooks Individual Retirement Account v. James R. Henderson*, Index No. 650781/2011 (N.Y. Sup. Ct.) (the "NY State Court Action");

(ii)     Agree to request, within ten (10) business days of the date on which the releases set forth in this Section 3 of the Agreement become effective, the dismissal with prejudice of the NY State Court Action;

(iii)     Release, waive and discharge any and all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity or otherwise, that the Jeffrey Brooks Releasors have, may have or are entitled to assert against the Class Plaintiffs, Class Plaintiffs' counsel in the Class Action and the Bankruptcy Proceeding, plaintiff's counsel in the Derivative Action and/or their respective current or former officers, directors, members, employees, agents, attorneys, consultants, insurers, representatives, predecessors, successors, parents and subsidiaries;

(iv)     Release, waive and discharge all rights, claims and interests in the Forfeited Assets;

(v)     Release, waive and discharge all rights, claims and interests in the Escrowed Funds;

(vi)     Release, waive and discharge all rights, claims and interests in the Recovery Trust, whether such rights, claims and interests are held directly or indirectly, or are held as creditors or as equity interest holders;

(vii)     Agree that all shares of SSBA I stock held directly or indirectly by the Jeffrey Brooks Releasors, and all interests and benefits in whatever form flowing from such shares, are cancelled, waived and released;

(viii)     Agree that all creditor claims and claims based on equity interests filed by or scheduled for the Jeffrey Brooks Releasors in the Bankruptcy Proceeding shall be deemed disallowed;

(ix)     Release, waive and discharge any and all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or

unforeseen, matured or unmatured, in law, equity or otherwise, that the Jeffrey Brooks Releasors have, may have or are entitled to assert against the United States, its agencies, and/or its current or former agents, officers or employees for or on account of any matter, including but not limited to the prosecution of the Criminal Action (including all litigation relating to the Bail Conditions) and/or the Civil Forfeiture Action, the seizure and restraint of the Restrained Assets, the condition of any Returned Non-Cash Assets, and the forfeiture of the Forfeited Assets, provided that (1) such releases shall exclude any Tort Action brought by or on behalf of any of the Jeffrey Brooks Releasors, (2) that this exclusion only shall be effective if the Brooks Family Claimants, the Jeffrey Brooks Claimants, and the David Brooks Claimants and/or any individual members thereof shall serve, along with the summons and complaint of any such Tort Action, a copy of this Agreement in its entirety upon the United States Attorney's Office for the United States District Court in which the Tort Action is filed, and if there is no service of this Agreement under this provision, then the exclusion provided under provision (1) of this paragraph is null and void, and (3) in the event any such Tort Action is filed and the Jeffrey Brooks Releasors do not prevail on the merits, the Jeffrey Brooks Releasors agree that they shall be liable to the United States for all litigation costs and attorneys' fees incurred in connection with the defense of such Tort Action, in the same manner and at the same rate as a plaintiff may recover fees and costs against the United States under the Equal Access to Justice Act;

(x)     In the event a third party, other than the United States, its agencies, agents, officers, and employees, past and present, asserts a claim to any of the Remaining Restrained Assets, hold the United States, its agencies, agents, officers, and employees, past and present, harmless from such claims;

(xi)     Release, waive and discharge any and all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity or otherwise, that the Jeffrey Brooks Releasors have, may have or are entitled to assert against the SEC and/or its current or former agents, officers or employees; and

(xii)    Agree to waive any and all rights the Jeffrey Brooks Releasors may have to recover attorneys' fees, costs or interest under the Equal Access to Justice Act, the Civil Asset Forfeiture Reform Act, and/or any other applicable case law or statute.

(c)    The David Brooks Claimants, on behalf of themselves and their heirs, agents, assigns, representatives and successors, any entities in which they individually, collectively, directly or indirectly hold any ownership interest, and any entities they individually, collectively, directly or indirectly control or manage (collectively, the "David Brooks Releasors"), shall:

(i)    Release, waive and discharge any and all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity or otherwise, that the David Brooks Releasors have, may have or are entitled to assert against SSBA I, the Recovery Trust and/or their respective current or former officers, directors, members, employees, agents, attorneys, consultants, insurers, representatives, predecessors, successors, parents and subsidiaries;

(ii)    Release, waive and discharge any and all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity or otherwise, that the David Brooks Releasors have, may have or are entitled to assert against the Class Plaintiffs, Class Plaintiffs' counsel in the Class Action and the Bankruptcy Proceeding, plaintiff's counsel in the Derivative Action and/or their respective current or former officers, directors, members, employees, agents, attorneys, consultants, insurers, representatives, predecessors, successors, parents and subsidiaries;

(iii)    Release, waive and discharge all rights, claims and interests in the Forfeited Assets;

(iv)    Release, waive and discharge all rights, claims and interests in the Escrowed Funds;

(v)     Release, waive and discharge all rights, claims and interests in the Recovery Trust, whether such rights, claims and interests are held directly or indirectly, or are held as creditors or as equity interest holders;

(vi)     Agree that all shares of SSBA I stock held directly or indirectly by the David Brooks Releasors, and all interests and benefits in whatever form flowing from such shares, are cancelled, waived and released;

(vii)     Agree that all creditor claims and claims based on equity interests filed by or scheduled for the David Brooks Releasors in the Bankruptcy Proceeding shall be deemed disallowed;

(viii)     Release, waive and discharge any and all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity or otherwise, that the David Brooks Releasors have, may have or are entitled to assert against the United States, its agencies, and/or its current or former agents, officers or employees for or on account of any matter, including but not limited to the prosecution of the Criminal Action (including all litigation relating to the Bail Conditions) and/or the Civil Forfeiture Action, the seizure and restraint of the Restrained Assets, the condition of any Returned Non-Cash Assets, and the forfeiture of the Forfeited Assets, provided that (1) such releases shall exclude any Tort Action brought by or on behalf of any of the David Brooks Releasors, (2) that this exclusion only shall be effective if the Brooks Family Claimants, the Jeffrey Brooks Claimants, and the David Brooks Claimants and/or any individual members thereof shall serve, along with the summons and complaint of any such Tort Action, a copy of this Agreement in its entirety upon the United States Attorney's Office for the United States District Court in which the Tort Action is filed, and if there is no service of this Agreement under this provision, then the exclusion provided under provision (1) of this paragraph is null and void, and (3) in the event any such Tort Action is filed and the David Brooks Releasors do not prevail on the merits, the David Brooks Releasors agree that they shall be liable to the United States for all litigation costs and attorneys' fees incurred in connection with the defense of such Tort Action, in the same manner and at the

same rate as a plaintiff may recover fees and costs against the United States under the Equal Access to Justice Act;

(ix)     In the event a third party, other than the United States, its agencies, agents, officers, and employees, past and present, asserts a claim to any of the Remaining Restrained Assets, hold the United States, its agencies, agents, officers, and employees, past and present, harmless from such claims;

(x)     Release, waive and discharge any and all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity or otherwise, that the David Brooks Releasors have, may have or are entitled to assert against the SEC and/or its current or former agents, officers or employees; and

(xi)     Agree to waive any and all rights the David Brooks Releasors may have to recover attorneys' fees, costs or interest under the Equal Access to Justice Act, the Civil Asset Forfeiture Reform Act, and/or any other applicable case law or statute.

(d)     The United States shall:

(i)     Release the Brooks Family, the Brooks Family Claimants, the Jeffrey Brooks Claimants, and the David Brooks Claimants from any civil or administrative claim for monetary or injunctive relief that the United States has or may have related to the conduct (the "Covered Conduct") alleged in the Criminal Action and/or the Civil Forfeiture Action, provided that such releases are subject to the exceptions in Section 7 below (concerning excluded claims) and are conditioned on full compliance with the terms and conditions herein by the Brooks Family, the Brooks Family Claimants, the Jeffrey Brooks Claimants, and the David Brooks Claimants; and

(ii)     As the Criminal Action has previously been dismissed against David Brooks in accordance with the Second Circuit Decision, the United States will request entry of the Final Forfeiture Order to dispose of the Remaining Restrained Assets and effect the return of the Returned Cash and Assets in accordance with Section 2(d) of this Agreement.

(e)     The Class Plaintiffs shall:

(i)     Release, waive and discharge any and all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity or otherwise, that the Class Plaintiffs have, may have or are entitled to assert against the David Brooks Claimants, the Brooks Family Claimants, the Jeffrey Brooks Claimants and/or their respective current or former officers, directors, members, employees, agents, attorneys, consultants, insurers, representatives, predecessors, successors, parents and subsidiaries; and

(ii)    Release, waive and discharge all rights, claims and interests in the Restrained Assets and Remaining Cash Collateral, except as set forth in this Agreement.

(f)     Robbins Geller Rudman & Dowd, LLP and Labaton Sucharow, LLP as court-appointed lead counsel in the Class Action ("Lead Counsel") shall:

(i)  Cooperate with and make reasonable best efforts to assist the United States in the defense of any litigation of any claim asserted against the United States, or any of its agencies, agents, officers and employees, past and present, in connection with the Payment to the Class Plaintiffs, provided that all obligations of the Lead Counsel under this Section 3(f)(i) of the Agreement shall expire upon the disbursement by the Lead Plaintiffs of the Payment set forth in Section 2(b)(ii) to members of the class. A breach of this Section 3(f)(i) shall be considered a material breach of this Agreement, the only remedy for which shall be that the United States shall have the right to compel specific performance of this Section 3(f)(i) in any appropriate court.

(g)     SSBA I and the Recovery Trust shall:

(i)     Release, waive and discharge any and all claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, liabilities, and causes of action, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, in law, equity or otherwise, that SSBA I and/or the Recovery Trust have, may have or are entitled to assert against the David Brooks Claimants,

the Brooks Family Claimants, the Jeffrey Brooks Claimants and/or their respective current or former officers, directors, members, employees, agents, attorneys, consultants, insurers, representatives, predecessors, successors, parents and subsidiaries;

(ii) Release, waive and discharge all rights, claims and interests in the Restrained Assets and Remaining Cash Collateral, except as set forth in this Agreement; and

(iii) Intervene and participate in, and cooperate with and make reasonable best efforts to assist the United States in the defense of, any litigation of any claim asserted against the United States, or any of its agencies, agents, officers and employees, past and present, with respect to the Payment to SSBA I, provided that all obligations of SSBA I and the Recovery Trust under this Section 3(g)(iii) of the Agreement shall expire upon the issuance of a final decree by the Bankruptcy Court in the Bankruptcy Proceeding closing SSBA I's Chapter 11 case. A breach of this Section 3(g)(iii) shall be considered a material breach of this Agreement by SSBA I and the Recovery Trust but shall not affect the rights of any other Party to this Agreement.

4. Release of Unknown Claims By The Parties. Except for the rights reserved by the United States in Section 7 of this Agreement, the Parties, and each of them, understand and acknowledge that there are laws that may invalidate releases of claims that are unknown to the releasing party. The Parties, and each of them, expressly acknowledge and agree that, subject to the terms of this Agreement, they are waiving and relinquishing any and all rights that they have or might have against the persons or entities they release pursuant to this Agreement, or any of them, under such laws, including but not limited to any and all rights afforded under California Civil Code § 1542 or any other similar state or federal statute and/or case law. California Civil Code § 1542 reads as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OF OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

In connection with such waiver and relinquishment, the Parties, and each of them, acknowledge that they are aware that they may later discover facts in addition to or different from those that

they currently know or believe to be true with respect to the subject matter of this Agreement, but that it is their intention to, subject to the terms of this Agreement, fully, finally, and forever release all of the matters and claims identified in the releases contained in this Agreement, which now exist, may exist, or previously existed between them and any of the persons or entities they release pursuant to this Agreement, whether known or unknown, suspected, or unsuspected. In furtherance of such intention, the releases contained in this Agreement shall be and remain in effect, subject to the terms of this Agreement, as full and complete releases, notwithstanding the discovery or existence of such additional or different facts by any of the Parties or by any person acting on their respective behalves.

5.     Representations and Warranties.

(a)     Except as otherwise set forth herein with respect to necessary court or governmental approvals, which the Parties agree they will utilize their reasonable best efforts to obtain, each Party and signatory hereto represents and warrants that: (i) such Party has the power and authority to execute, deliver and perform this Agreement, and that each signatory hereto has the authority to bind the Party on whose behalf he or she is signing; (ii) such Party and/or signatory has taken all necessary actions to authorize the execution, delivery and performance of this Agreement; (iii) this Agreement has been duly executed and delivered by such Party and/or signatory, and constitutes the legal, valid and binding obligations of such Party and/or signatory; (iv) the execution, delivery, and performance of this Agreement does not and will not conflict with, or constitute a violation or breach of, or constitute a default under any obligation of such Party and/or signatory, and will not violate any applicable law, or any order or decree of any court or government instrumentality applicable to such Party and/or signatory; and (v) such Party and/or signatory has entered into this Agreement in reliance on its own independent investigation and analysis of the facts underlying the subject matter of this Agreement, and no representations, warranties, or promises of any kind have been made directly or indirectly to induce it to execute this Agreement other than those that are expressly set forth in this Agreement, including the exhibits hereto.

(b)     For the avoidance of any doubt, SSBA I represents and warrants that the Post-Confirmation Debtor Oversight Committee (as such term is defined in the Plan) was

consulted regarding this Agreement, and that SSBA I has the authority to enter into this Agreement.

(c) For the avoidance of any doubt, the Recovery Trust represents and warrants that the Recovery Trust Committee (as such term is defined in the Plan) was consulted regarding this Agreement, and that the Recovery Trust has the authority to enter into this Agreement.

(d) For the avoidance of any doubt, the Parties expressly agree that the United States has made no representations regarding the tax treatment of any Payments or distributions made to, or any assets distributed to, the Brooks Family or any other Party pursuant to this Agreement.

6. No Admissions of Culpability, Liability or Guilt. This Agreement, including the releases and other terms provided for herein, is made, executed, given and accepted as part of a compromise and settlement of disputed claims. No provisions of this Agreement, nor any acceptance of the benefits thereof by or on behalf of any of the Parties, shall be construed or deemed to be evidence of an admission of any fact, matter, thing or liability of any kind to any other Party. Each of the Parties denies any liability of any kind to any other Party for any purpose, and this Agreement is made solely and entirely as a compromise and for the purpose of fully and finally resolving the disputed matters referenced herein. Neither this Agreement nor any terms thereof shall be offered or received as evidence in any proceeding in any forum as an admission of any liability or wrongdoing on the part of any of the Parties. For the avoidance of any doubt, this Agreement shall in no way be deemed an admission of culpability, liability or guilt on behalf of any of the David Brooks Claimants, any of the Brooks Family Claimants or any of the Jeffrey Brooks Claimants in the Civil Forfeiture Action. Furthermore, the Brooks Estate is not admitting or denying the allegations asserted by the SEC in the SEC Action, except the allegations as to personal and subject matter jurisdiction, which the Brooks Estate admits. This Agreement does not and shall not in any way constitute a reflection upon the merits of the pending claims and defenses asserted by the United States, the SEC or any other Party in any of the proceedings referenced herein. In addition, the Brooks Family, the Brooks Family Claimants, the David Brooks Claimants, and the Jeffrey Brooks Claimants

waive their rights, if any, to use the Civil Forfeiture Action or this Agreement as a basis for any statutory or constitutional defense in any other civil, criminal, tax, or administrative action, including, without limitation, venue, defenses based upon the Double Jeopardy Clause of the Fifth Amendment and the Excessive Fines Clause of the Eighth Amendment.

7.     Reservations and Exclusions to Releases Granted by the United States. Notwithstanding any other provision of this Agreement other than the provisions dealing with the payment of the Tax Restitution Order, specifically reserved and excluded from the scope of this Agreement and the releases set forth in Section 3(d) are: (a) any claim of the United States, or its agencies, arising out of any conduct other than the Covered Conduct; (b) any criminal liability concerning any matter, including but not limited to the Covered Conduct; and (c) any liability the Brooks Family, the Brooks Family Claimants, the David Brooks Claimants, and/or the Jeffrey Brooks Claimants have or may have to the IRS under Title 26 of the United States Code for any period of time or for any transaction or event, including but not limited to the time period of the Covered Conduct. Except for the obligations of the United States set forth in this Agreement, the releases it has granted under Section 3, and the rights to the Payments set forth in this Agreement, nothing else contained herein shall be deemed to limit or affect any right held by the United States, or any of its agencies. Furthermore, except for the obligations of the United States set forth in this Agreement, the releases it has granted under Section 3, and the rights to the Payments set forth in this Agreement, nothing else contained herein shall be read in any way to alter, affect, abrogate, or impair the ability and obligations of the United States.

8.     Cancellation of Agreement. If the Effective Date does not occur, or the Payments identified in Section 2(b)(ii) of this Agreement are not received by SSBA I and the Lead Plaintiffs, or the payments and distributions identified in Section 2(d) of this Agreement are not received by the Brooks Family, this Agreement will be null and void, and each of the Parties will revert to their respective positions that existed on the date immediately prior to execution of this Agreement, unless the Parties otherwise agree in writing.

9.     No Assignment. Each of the Parties represents and warrants that it has not assigned or transferred any released matter or any right to consideration provided pursuant to this

Agreement. The Parties each agree to defend, indemnify and hold the others harmless from any and all claims based on or arising out of any such assignment or transfer made, purported or claimed.

10.     Venue and Personal Jurisdiction. The Parties and signatories agree that any dispute regarding the validity, interpretation or performance of this Agreement shall be brought in the EDNY District Court, if such dispute concerns the United States's obligations under this Agreement, and/or the United States Bankruptcy Court for the District of Delaware, and each of the Parties and signatories consents to personal jurisdiction and venue in such courts in connection with any such dispute.

11.     Applicable Law. The validity, interpretation and performance of this Agreement shall be construed and interpreted according to the laws of the State of New York.

12.     Voluntary Agreement. Each Party and signatory acknowledges that it has read all of the terms of this Agreement, has had an opportunity to consult with counsel of its own choosing or voluntarily waived such right, and enters into this Agreement voluntarily and without duress.

13.     Joint Drafting. This Agreement shall be deemed to have been jointly drafted by the Parties, and in construing or interpreting this Agreement, no provision shall be construed or interpreted for or against any Party because such provision or any other provision of the Agreement was purportedly prepared or requested by such Party.

14.     Costs, Expenses and Attorneys' Fees. Except as provided in Sections 3(a)(viii), 3(b)(ix) and 3(c)(viii), the Parties agree that each Party shall bear its own costs, expenses and attorneys' fees, and the David Brooks Claimants, the Brooks Family Claimants, and the Jeffrey Brooks Claimants further waive any and all rights they may have to recover attorneys' fees, interest and/or costs under the Equal Access to Justice Act, the Civil Asset Forfeiture Reform Act, and/or any other applicable case law or statute.

15.     Prevailing Party (Other Than the United States). Notwithstanding Section 14 of this Agreement, in the event of a dispute regarding the validity, interpretation or performance of this Agreement, the prevailing Party(ies) (other than the United States) shall be entitled to

recover its costs and expenses, including reasonable attorneys' fees, against the opposing Party(ies) (other than the United States) to such dispute.

16.     Successors and Assigns. This Agreement shall be binding on and inure to the benefit of the Parties and their respective agents, employees, affiliates, successors and assigns.

17.     Notices.     All notices, consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given when: (i) delivered by hand, with written confirmation of receipt; or (ii) received by the addressee, if sent by U.S. Mail, overnight mail and/or email, in each case to the appropriate addresses and representatives set forth below, or to such other addresses or representatives as a Party may designate by notice to the other Parties in accordance with this section:

**If to the United States:**
Richard P. Donoghue
United States Attorney
Eastern District of New York
Attn:   Laura Mantell, AUSA
        Karin Orenstein, AUSA
        Artemis Lekakis, AUSA
271 Cadman Plaza, East
Brooklyn, New York 11201
Telephone: (718) 254-7000
Email: laura.mantell@usdoj.gov
       karin.orenstein@usdoj.gov
       artemis.lekakis@usdoj.gov

**If to SSBA I:**
Alan J. Kornfeld
Elissa A. Wagner
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Telephone: (310) 277-6910
Email: akornfeld@pszjlaw.com
       ewagner@pszjlaw.com

-and-

T. Scott Avila
Paladin Management Group
633 W. 5th Street, 28th Floor
Los Angeles, CA 90071
Telephone: (213) 223-2289
Email: savila@paladinmgmt.com

**If to the Recovery Trust:**
Robert M. Hirsh
Beth M. Brownstein
Arent Fox LLP
1301 Avenue of the Americas, 42nd Floor
New York, New York 10019
Telephone: (212) 457-5430
Email: robert.hirsh@arentfox.com
        beth.brownstein@arentfox.com

-and-

Brian Ryniker
CBIZ MHM, LLC
1065 Avenue of Americas, 11th Floor
New York, New York 10018
Telephone: (212) 790-5899
Email: bryniker@cbiz.com

**If to the Class Plaintiffs:**
Michael S. Etkin
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone: (973) 597-2312
Email: metkin@lowenstein.com

-and-

Ira A. Schochet
Labaton Sucharow LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Email: ischochet@labaton.com

-and-

Samuel H. Rudman
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, New York 11747
Telephone: (631) 367-7100
Email: srudman@rgrdlaw.com

**If to the David Brooks Claimants, the Brooks Family Claimants and/or the Jeffrey Brooks Claimants:**
Richard C. Klugh
Richard C. Klugh, P.A.
Courthouse Center, Penthouse One
40 N.W. 3rd Street
Miami, Florida 33128
Telephone: (305) 536-1191
Email: rickklu@aol.com

-and-

Jeffrey Marcus
Marcus Neiman & Rashbaum LLP
1 S. Biscayne Blvd., Suite 1750
Miami, Florida 33131
Telephone: (305) 400-4262
Email: jmarcus@mnrlawfirm.com

-and-

Ian M. Comisky
Fox Rothschild LLP
2000 Market Street, 20th Floor
Philadelphia, Pennsylvania 19103
Telephone: (215) 299-2000
Email: icomisky@foxrothschild.com

-and-

Justine Harris
Sher Tremonte LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Telephone: (212) 300-2440
Email: jharris@shertremonte.com

-and-

Judd Burstein
Judd Burstein, P.C.
5 Columbus Circle
New York, New York 10019
Telephone: (212) 974-2400
Email: jburstein@burlaw.com

18. Counterparts. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement. Delivery of a signature page to this Agreement by email or other electronic means shall be effective as delivery of the original signature page to this Agreement.

19. No Waiver Upon Breach. No waiver of any breach of this Agreement shall be construed as an implied amendment to this Agreement, or as an implied agreement by any Party to amend or modify any provision of this Agreement.

20. Entire Agreement. This document, including the exhibits hereto, contains the entire Agreement between the Parties, and may only be modified in writing signed by the Parties or their duly appointed agents. All prior agreements and understandings between the Parties concerning the subject matter hereof are superseded by the terms of this document, including the exhibits hereto. The Final Forfeiture Order is not intended to and does not modify the terms of this Agreement.

WHEREFORE, the Parties have executed this Agreement on the dates shown below.

Dated: October 29 2018

_____
Laura Mantell, AUSA, on behalf of
the United States

Dated: October 25, 2018                    Dated: October 26, 2018

_____          _____
T. Scott Avila, on behalf of SSBA I       Alan J. Kornfeld
                                          Pachulski Stang Ziehl & Jones LLP
                                          Counsel to SS Body Armor I, Inc.

Dated: October __, 2018                    Dated: October __, 2018

_____          _____
Brian Ryniker, as Recovery Trustee        Robert M. Hirsh
on behalf of the Recovery Trust           Arent Fox LLP
                                          Counsel to the Recovery Trust

Dated: October __, 2018                    Dated: October __, 2018

_____          _____
Samuel H. Rudman                          Ira A. Schochet
Robbins Geller Rudman & Dowd LLP          Labaton Sucharow LLP
Court-Appointed Co-Lead Counsel,          Court-Appointed Co-Lead Counsel,
on behalf of the Class Plaintiffs, and    on behalf of the Class Plaintiffs, and
as to paragraph 3(f) only, on behalf of   as to paragraph 3(f) only, on behalf of
Lead Counsel                              Lead Counsel

WHEREFORE, the Parties have executed this Agreement on the dates shown below.

Dated: October ___, 2018

_____
Laura Mantell, AUSA, on behalf of
the United States

Dated: October ___, 2018                        Dated: October ___, 2018

_____          _____
T. Scott Avila, on behalf of SSBA I              Alan J. Kornfeld
                                                Pachulski Stang Ziehl & Jones LLP
                                                Counsel to SS Body Armor I, Inc.

Dated: October 26, 2018                          Dated: October 26, 2018

_____          _____
Brian Ryniker, as Recovery Trustee              Robert M. Hirsh
on behalf of the Recovery Trust                  Arent Fox LLP
                                                Counsel to the Recovery Trust

Dated: October ___, 2018                        Dated: October ___, 2018

_____          _____
Samuel H. Rudman                                Ira A. Schochet
Robbins Geller Rudman & Dowd LLP                Labaton Sucharow LLP
Court-Appointed Co-Lead Counsel,                Court-Appointed Co-Lead Counsel,
on behalf of the Class Plaintiffs, and          on behalf of the Class Plaintiffs, and
as to paragraph 3(f) only, on behalf of         as to paragraph 3(f) only, on behalf of
Lead Counsel                                    Lead Counsel

WHEREFORE, the Parties have executed this Agreement on the dates shown below.

Dated: October __, 2018

_____
Laura Mantell, AUSA, on behalf of
the United States

Dated: October __, 2018                    Dated: October __, 2018

_____          _____
T. Scott Avila, on behalf of SSBA I       Alan J. Kornfeld
                                           Pachulski Stang Ziehl & Jones LLP
                                           Counsel to SS Body Armor l, Inc.

Dated: October __, 2018                    Dated: October __, 2018

_____          _____
Brian Ryniker, as Recovery Trustee        Robert M. Hirsh
on behalf of the Recovery Trust           Arent Fox LLP
                                           Counsel to the Recovery Trust

Dated: October 26 2018                     Dated: October 26, 2018

_____          _____
Samuel H. Rudman                           Ira A. Schochet
Robbins Geller Rudman & Dowd LLP          Labaton Sucharow LLP
Court-Appointed Co-Lead Counsel,          Court-Appointed Co-Lead Counsel,
on behalf of the Class Plaintiffs, and    on behalf of the Class Plaintiffs, and
as to paragraph 3(f) only, on behalf of   as to paragraph 3(f) only, on behalf of
Lead Counsel                               Lead Counsel

Dated: October 27, 2018

*[signature]*

Jeffrey Marcus, as counsel for the
Brooks Estate and David Brooks
International, Inc.


Dated: October 27, 2018

*[signature]*

Richard C. Klugh, as counsel for David
Brooks; David Brooks International,
Inc., the Jeffrey Brooks Claimants.
TAP and as Escrow Agent for the
Brooks Family Attorney Escrow
Account


Dated: October __, 2018

_____

Ian Comisky, on behalf of True Grit
Holdings, LLC, Wildfire Holdings
LLC and Perfect World Partners,
LLC


Dated: October __, 2018

_____

Jeffrey R. Brooks, individually, and
on behalf of the Jeffrey Brooks
Claimants, the Brooks Estate, and the
David Brooks Claimants


Dated: October 31, 2018

*[signature]*

Justine A. Harris, as counsel for Terry
S. Brooks, Brooks Industries of Long
Island, Inc., Brooks Industries of Long
Island – Profit Sharing Plan and Trust,
and Gear to Gear Trust


Dated: October __, 2018

*[signature]*

Judd Burstein, as Escrow Agent for the
Returned Non-Cash Assets and as
counsel for Victoria Brooks, VRB Inc.,
Victoria Brooks Industries, Inc. and
Magic Moments Trust, Andrew Brooks,
ASB, Inc., Andrew Brooks Industries,
Inc. and Saving Lives Trust, Elizabeth
Brooks, EJB, Inc., Elizabeth Brooks
Industries, Inc. and ShowTime Trust,
VAE Enterprises, LLC (now VAE
LLC), Vianel Industries, Inc.

Dated: October __, 2018

Dated: October __, 2018

_____
Jeffrey Marcus, as counsel for the
Brooks Estate and David Brooks
International, Inc.

_____
Richard C. Klugh, as counsel for David
Brooks; David Brooks International,
Inc., the Jeffrey Brooks Claimants,
TAP and as Escrow Agent for the
Brooks Family Attorney Escrow
Account

Dated: October 29, 2018

Dated: October __, 2018

_____
Ian Comisky, on behalf of True Grit
Holdings, LLC, Wildfire Holdings
LLC and Perfect World Partners,
LLC

_____
Jeffrey R. Brooks, individually, and
on behalf of the Jeffrey Brooks
Claimants, the Brooks Estate, and the
David Brooks Claimants

Dated: October __, 2018

Dated: October __, 2018

_____
Justine A. Harris, as counsel for Terry
S. Brooks, Brooks Industries of Long
Island, Inc., Brooks Industries of Long
Island – Profit Sharing Plan and Trust,
and Gear to Gear Trust

_____
Judd Burstein, as Escrow Agent for the
Returned Non-Cash Assets and as
counsel for Victoria Brooks, VRB Inc.,
Victoria Brooks Industries, Inc. and
Magic Moments Trust, Andrew Brooks,
ASB, Inc., Andrew Brooks Industries,
Inc. and Saving Lives Trust, Elizabeth
Brooks, EJB, Inc., Elizabeth Brooks
Industries, Inc. and ShowTime Trust,
VAE Enterprises, LLC (now VAE
LLC) , Vianel Industries, Inc.

Dated: October __, 2018

_____
Jeffrey Marcus, as counsel for the
Brooks Estate and David Brooks
International, Inc.

Dated: October __, 2018

_____
Lin Comisky, on behalf of True Grit
Holdings, LLC, Wildfire Holdings
LLC, and Perfect World Partners,
LLC

Dated: October __, 2018

_____
Justine A. Harris, as counsel for Terry
S. Brooks, Brooks Industries of Long
Island, Inc., Brooks Industries of Long
Island - Profit Sharing Plan and Trust,
and Gear to Gear Trust

Dated: October 17, 2018

_____
Richard C. Klugh, as counsel for David
Brooks; David Brooks International
Inc., the Jeffrey Brooks Claimants,
EAP and as Escrow Agent for the
Brooks Family Attorney Escrow
Account

Dated: October __, 2018

_____
Jeffrey R. Brooks, individually, and
on behalf of the Jeffrey Brooks
Claimants, the Brooks Estate, and the
David Brooks Claimants

Dated: October __, 2018

_____
Judd Burstein, as Escrow Agent for the
Returned Non-Cash Assets and as
counsel for Victoria Brooks, VRB Inc.,
Victoria Brooks Industries, Inc. and
Magic Moments Trust, Andrew Brooks
ASB, Inc., Andrew Brooks Industries
Inc. and Saving Lives Trust, Elizabeth
Brooks, EJB, Inc., Elizabeth Brooks
Industries, Inc. and Show Time Trust,
VAE Enterprises, LLC (now VAE
LLC), Vianel Industries, Inc.

Dated: October 31, 2018

_Terry Brooks_

Terry S. Brooks, individually and
on behalf of the Brooks Family
Claimants

Dated: October 3 1 2018

_Elizabeth Brooks_

Elizabeth Brooks, individually and on
behalf of the Brooks Family
Claimants

Dated: ~~October~~ November 1, 2018

_Victoria Brooks_

Victoria Brooks, individually and
on behalf of the Brooks Family
Claimants

Dated: October 25, 2018

_Andrew Brooks_

Andrew Brooks, individually and on
behalf of the Brooks Family
Claimants

## Exhibits

| A | Schedule I to the Amended Complaint filed in the Civil Forfeiture Action |
| B | MLARS Approval Letter to SSBA dated July 11, 2018 |
| C | MLARS Approval Letter to Lead Counsel dated July 11, 2018 |
| D | SEC Consent and SEC Final Judgment |
| E | Amended Cash Collateral Order |
| F | Final Forfeiture Order |
| G | Stipulation of Dismissal (*Brooks v. Sposato, et al.*) |
| H | Order Directing Payment of Cash Collateral |

# EXHIBIT "A"

EXHIBIT "A"

## SCHEDULE I

**I.    The Looted Assets**

1.    One flag bracelet with rubies, diamonds, and sapphires, reference # 101620-MX.

2.    One necklace, #1 starball with star pendant, reference #100540-20X.

3.    One ring, floral cross pave diamonds, reference #104010-080DP.

4.    One 22 karat gold ring, dagger with diamonds, reference #1G4000-085D.

5.    One 22 karat gold bracelet - dagger ID with diamonds, reference #1G1500-MD.

6.    One belt buckle studded with diamonds, rubies and sapphires, reference # 323003.

7.    One 22 karat gold men's watch band fancy star motif, reference # 1G6510-MA7C9999.

8.    One 22 karat gold watchband dagger with diamonds, reference #1G6560-MADC9999.

9.    One 22 karat gold ring keeper diamond special stone, reference #1G4020-090DC98.

10.    One necklace - tiny E Ch plus 15" w heart charm with pink sapphires, reference #100910-15PIIOS.

11.    One LT charm lips & tongue w pave ruby/diamond 20" gold, reference #LT80002-RPDP.

12.    One LT keyring LG lips & tongue, reference #LT80700.

13.    One LT pendant 22 karat gold lips & tongue with braided leather tips, reference #LT8G000-l.

14.    One 22 karat gold bracelet - 5 char. BXPRSNL ID David/PV DM S:M, reference #1G1699-MDPC999.

15.    One 22 karat gold roller chain 2 clips, 22 karat dagger with pave diamonds, and dagger with pave diamonds large pendant (no reference # on invoice).

\*       \*       \*

83.    Replica statue of the Wall Street Bull

\*       \*       \*

85.    2006 Bentley Continental Flying Spur, VIN #SCBBR53W06C034834.

## II.    The Laundered Insider Trading Proceeds

86.    Goldman Sachs account 040-94665-9 in the name of David Brooks International, Inc. (excluding 171,732 shares of DHB stock on deposit in the account).

87.    Goldman Sachs account 001-92471-1 in the name of True Grit Holdings LLC.

88.    Goldman Sachs account 001-88875-9 in the name of Pathfinder Trust.

89.    $9,740,625.02 previously on deposit at Jefferies & Company account 605-00046 in the name of Perfect World Partners, and presently held in account PJV001063 at Pershing LLC, A Bank of Mellon Company.

90.    $4,345,000.00 on deposit at Jefferies & Company account 620-00057 in the name of Wildfire Holdings.

91.    Scott Trade Inc. account 18824110 in the name of David Brooks.

92.    Laidlaw Company account 70974099 in the name of David Brooks International.

93.    Laidlaw Company account 74895065 in the name of David Brooks IRA.

94.    Laidlaw Company account 65078716 in the name of Brooks Industries of Long Island – Profit Sharing.

95.    $9,314,854.00 on deposit at Laidlaw Company account 23992092 in the name of Brooks Industries of Long Island, Inc.

96.    Washington Mutual account 0356-612551-0 in the name of Vianel Industries, Inc.

97.    Washington Mutual account 0444-213248-9 in the name of Terry Brooks.

98.    Washington Mutual account 0369-603518-4 in the name of David Brooks International, Inc.

99.    Washington Mutual account 0356-612557-8 in the name of VAE Enterprises, LLC.

100.    Lantern Investments account 557-98262-14 in the name of Andrew Brooks IRA.

101.    Lantern Investments account 557-95004-13 in the name of Victoria Brooks IRA.

102.    Lantern Investments account 557-21378 in the name of Victoria Brooks.

103.    Lantern Investments account 557-21644 in the name of Andrew Brooks.

104.    6,757,099 shares of DHB stock.

105.  3,500 Kruggerands;

106.  One Breitling Men's All Diamond Flying B Watch, Automatic Date GT's, Reference J2836263/A636.

107.  One Patek Phillippe Men's Watch 18kt Manual Wind Date GT's, Reference 6000/W.

108.  One Fred Ladies 18kwg necklace.

109.  One Patek Phillipe Ladies Watch 18 kwg Quartz Plain GT's

110.  One splash diamond black dial, diamonds on the lugs, diamond bezel #2, diamond buckle, 2 movement timepiece for $21,500.00.

111.  One splash diamond pink dial, plain case, bezel #1, diamond buckle, 2 movement timepiece.

112.  One 18 karat rose gold manual wind day/date GT's watch, perpetual calendar chrono, tachometer, silver dial, with brown cocoa strap, reference Patek #5970/R.

113.  One 2005 Ferrari 612 Scaglietti VIN ZFFAA54A95014689.

# EXHIBIT "B"

EXHIBIT "B"



**U.S. Department of Justice**

Criminal Division

---

*Money Laundering and Asset Recovery Section*          *Washington, D.C. 20530*

JUL 11 2018

SS Body Armor, Inc. (formerly known as Point Blank Solutions, Inc. and before that DHB
Industries, Inc.) and its subsidiaries ("Company")
C/O George Kostolampros and Alan J. Kornfeld
Venable LLP
600 Massachusetts Avenue, NW
Washington, DC 20001

Re:     **Petition for Remission**
        *United States v. All Assets Listed on Schedule I* (E.D.N.Y.)
        Civil Case Number: 2:10-CV-04750-JS-AKT
        FBI Case Number: 318A-NY-285785
        Asset Identification Numbers: 08-FBI-000252 / 000381 / 000382 / 000383 /
        000386 / 000388 / 000389 / 000390 thru 000394 / 000396 thru 000400 / 000874 /
        000883 / 000884 / 000886 / 001633 / 001686 / 001687 / 001732 / 001733 /
        001734 / 001735 / 001737 / 001743 / 001746 / 001748 / 10-FBI-003690 / 003693
        / 003695 thru 003707 / 003724 thru 003736 / 003738 / 003741 / 003743 / 003744
        / 003746 / 003747 / 003751 / 003752 / 003753 / 003755 / 003758 / 003759 /
        003760 / 003762 / 003764 / 003766 / 003769 / 003771 / 003773 / 003776 /
        003778 / 003780 / 003873 thru 003882 / 033887 thru 003891 / 003984 / 003986 /
        003987 / 003989 / 003990 / 003992 / 003994 thru 003997 / 003999 / 004004 thru
        004008 / 004010 / 004014 / 004041 / 004043 thru 004050 / 005357 / 005359 thru
        00005364 / 005366 / 005368
        Petitioner: the Company
        Party ID: 1934544

Dear Messrs. Kostolampros and Kornfeld:

        The petition for remission or mitigation of forfeiture that you submitted on behalf of the
Company is preliminarily granted up to the amount of $78,815,232.06. This grant of remission is
contingent upon the entry of a final order of forfeiture for the above referenced assets. Please
note that the United States anticipates forfeiting less funds than what is required to fully
compensate each of the victims in this case. As a result, you will receive a pro-rata payment of
this loss amount.

        The petition is denied as to $3,641,678.35 in losses attributed to Category of Loss
Numbers 5(a), (b), (d), and (f) as outlined in the Company's June 28, 2018, supplemental

petition. These ancillary costs are not compensable under the applicable remission regulations. *See* 28 C.F.R. § 9.8(c). In addition, the Company's requests in prior petition submissions for legal fees, remediation and restatement expenses, and bankruptcy costs are also denied.

Should the aggregate value of recompense the Company receives for its loss in this case from any source whatsoever (including remission, civil judgments, insurance, or restitution payments) ever exceed its total pecuniary loss amount of $78,815,232.06, it must return to the Assets Forfeiture Fund any such excess up to the amount of the remission. Acceptance of this grant of remission signifies the Company's acceptance of this condition.

This decision does not constitute a determination as to the priority or validity of any ownership interest that the Company may claim to the property as against any other party, and the allowance of this petition is subject to the rules and regulations set forth at 28 C.F.R. § 9.9 (2012).

If you have any evidence not previously submitted that you believe would constitute a basis upon which we might revise our ruling on the petition, you may apply for a reconsideration of our decision. Should you so elect, a reconsideration application must be sent within ten days of the receipt of this letter directly to Alice W. Dery, Chief, Program Management and Training Unit, Money Laundering and Asset Recovery Section, Criminal Division, U.S. Department of Justice, 1400 New York Avenue, NW, Washington, DC 20530, and to Assistant United States Attorney Laura Mantell, U.S. Attorney's Office, Eastern District of New York, 271 Cadman Plaza East, Brooklyn, NY 11201.

After a final order of forfeiture is entered, the remission payment will be made by electronic funds transfer to a bank account that you designate. In order to expedite payment, you must complete and submit a Unified Financial Management System (UFMS) Vendor Request Form which can be found on the U.S. Department of Justice Asset Forfeiture Program website at http://www.justice.gov/criminal-afmls/victims. In addition, please review the UFMS Vendor Request Form Instructions for Claimants and Petitioners, also located on this website, which includes detailed instructions to assist you in completing the form. In order to receive payment you must include your Party ID, as listed in the case caption above, in Box 24 (NCIC Code) on the UFMS Vendor Request Form. Please electronically complete the UFMS Vendor Request Form and email it to the USMS within 30 days at AFD.ACHForms@usdoj.gov. Failure to submit this form within 30 days after forfeiture could result in revocation of your remission reward. Questions regarding the ACH form should be directed to the United States Marshals Service at (703) 740-9326 or by email to AFD.ThirdPartyPayments@usdoj.gov.

The Debt Collection Improvement Act of 1996 (DCIA), 31 U.S.C. § 3716, requires the Department of the Treasury and other disbursing officials to offset Federal payments to collect delinquent non-tax debts owed to the United States, or delinquent debts owed to states, including past-due child support enforced by states. If an offset is made during an electronic funds

transfer, the petitioner will receive a notification from the Department of the Treasury at the last address provided by the debtor to the creditor. If you believe that your payment may be subject to an offset, you may contact the Treasury Department at 1-800-304-3107.

If you have any questions concerning this remission decision, you may contact Senior Attorney Advisor Matthew Colon at (202) 514-1263.

Sincerely,

Deborah Connor, Acting Chief
Money Laundering and
   Asset Recovery Section

By:

Alice W. Dery, Chief
Program Management and Training Unit
Money Laundering and
  Asset Recovery Section

cc:    Laura Mantell
       Assistant U.S. Attorney
       Eastern District of New York

       Karin Orenstein
       Assistant U.S. Attorney
       Eastern District of New York

       Financial Litigation Unit
       United States Attorney's Office
       Eastern District of New York

       Stephen Jobe, Unit Chief
       Legal Forfeiture Unit
       Federal Bureau of Investigation

# EXHIBIT "C"

EXHIBIT "C"



**U.S. Department of Justice**

Criminal Division

---

*Money Laundering and Asset Recovery Section*                    *Washington, D.C. 20530*

JUL 11 2018

Members of Certified Class in the case of *In re DHB Industries, Inc.*
C/O Samuel H. Rudman
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, New York 11747

Re:    **Petition for Remission**
        *United States v. All Assets Listed on Schedule I* (E.D.N.Y.)
        Civil Case Number: 2:10-CV-04750-JS-AKT
        FBI Case Number: 318A-NY-285785
        Asset Identification Numbers: 08-FBI-000252 / 000381 / 000382 / 000383 /
        000386 / 000388 / 000389 / 000390 thru 000394 / 000396 thru 000400 / 000874 /
        000883 / 000884 / 000886 / 001633 / 001686 / 001687 / 001732 / 001733 /
        001734 / 001735 / 001737 / 001743 / 001746 / 001748 / 10-FBI-003690 / 003693
        / 003695 thru 003707 / 003724 thru 003736 / 003738 / 003741 / 003743 / 003744
        / 003746 / 003747 / 003751 / 003752 / 003753 / 003755 / 003758 / 003759 /
        003760 / 003762 / 003764 / 003766 / 003769 / 003771 / 003773 / 003776 /
        003778 / 003780 / 003873 thru 003882 / 033887 thru 003891 / 003984 / 003986 /
        003987 / 003989 / 003990 / 003992 / 003994 thru 003997 / 003999 / 004004 thru
        004008 / 004010 / 004014 / 004041 / 004043 thru 004050 / 005357 / 005359 thru
        00005364 / 005366 / 005368
        Petitioner: Members of Certified Class in the case of *In re DHB Industries, Inc.*
        ("Class Members")
        Party ID: 1934518

Dear Mr. Rudman:

      The Money Laundering and Asset Recovery Section ("MLARS") has reviewed the
petition for remission or mitigation of forfeiture that you submitted on behalf of the Class
Members. The petition is preliminarily granted up to the amount of $81,540,718.81. Please note
that the United States anticipates forfeiting less funds than what is required to fully compensate
each of the victims in this case. As a result, you will receive a pro-rata payment of this loss
amount. This grant of remission is contingent upon the entry of a final order of forfeiture for the
above referenced assets. In addition, all funds remitted through the petition for remission
process must be distributed directly to the Class Members and not used to satisfy any other Class
obligations.

Should the aggregate value of recompense the Class Members receive for its loss in this case from any source whatsoever (including remission, civil judgments, insurance, or restitution payments) ever exceed its total pecuniary loss amount of $81,540,718.81, it must return to the Assets Forfeiture Fund any such excess up to the amount of the remission. Acceptance of this grant of remission signifies the Class Members' acceptance of this condition.

This decision does not constitute a determination as to the priority or validity of any ownership interest that the Class Members may claim to the property as against any other party, and the allowance of this petition is subject to the rules and regulations set forth at 28 C.F.R. § 9.9 (2012).

After a final order of forfeiture is entered, the remission payment will be made by electronic funds transfer to a bank account that you designate. In order to expedite payment, you must complete and submit a Unified Financial Management System (UFMS) Vendor Request Form which can be found on the U.S. Department of Justice Asset Forfeiture Program website at http://www.justice.gov/criminal-afmls/victims. In addition, please review the UFMS Vendor Request Form Instructions for Claimants and Petitioners, also located on this website, which includes detailed instructions to assist you in completing the form. In order to receive payment you must include your Party ID, as listed in the case caption above, in Box 24 (NCIC Code) on the UFMS Vendor Request Form. Please electronically complete the UFMS Vendor Request Form and email it to the USMS within 30 days at AFD.ACHForms@usdoj.gov. Failure to submit this form within 30 days after forfeiture could result in revocation of your remission reward. Questions regarding the ACH form should be directed to the United States Marshals Service at (703) 740-9326 or by email to AFD.ThirdPartyPayments@usdoj.gov.

The Debt Collection Improvement Act of 1996 (DCIA), 31 U.S.C. § 3716, requires the Department of the Treasury and other disbursing officials to offset Federal payments to collect delinquent non-tax debts owed to the United States, or delinquent debts owed to states, including past-due child support enforced by states. As counsel for the Class Members, you will need to provide MLARS with the Social Security or Tax Identification Numbers of all Class Members receiving payment. Those numbers will be processed through the Department of Treasury. Any Class Member shown to have a corresponding debt will have their remission payment processed by the United States Marshals Service. If an offset is made during an electronic funds transfer, the petitioner will receive a notification from the Department of the Treasury at the last address provided by the debtor to the creditor. If you believe that your payment may be subject to an offset, you may contact the Treasury Department at 1-800-304-3107.

If you have any questions concerning this remission decision, you may contact Senior Attorney Advisor Matthew Colon at (202) 514-1263.

Sincerely,

Deborah Connor, Acting Chief
Money Laundering and
Asset Recovery Section

By:

Alice W. Dery, Chief
Program Management and Training Unit
Money Laundering and
Asset Recovery Section

cc:   Laura Mantell
      Assistant U.S. Attorney
      Eastern District of New York

      Karin Orenstein
      Assistant U.S. Attorney
      Eastern District of New York

      Financial Litigation Unit
      United States Attorney's Office
      Eastern District of New York

      Stephen Jobe, Unit Chief
      Legal Forfeiture Unit
      Federal Bureau of Investigation

# EXHIBIT "D"

EXHIBIT "D"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-61526-CIV-ALTONAGA/GOODMAN

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

JEFFREY BROOKS, as Personal Representative
of the Estate of David H. Brooks

Defendant.

_____/

## CONSENT TO FINAL JUDGMENT OF DEFENDANT JEFFREY BROOKS, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DAVID H. BROOKS

1.    Defendant Jeffrey Brooks, as Personal Representative of the Estate of David H. Brooks ("Defendant") acknowledges having been served with the Summons and the Amended Complaint in this action, enters a general appearance, and admits the Court's jurisdiction over the Defendant and over the subject matter of this action.

2.    Without admitting or denying the allegations of the Amended Complaint (except as to personal and subject matter jurisdiction, which Defendant admits), Defendant hereby consents to entry of the Final Judgment in the form attached hereto and incorporated by reference herein, which, among other things:

(a)    orders Defendant to pay to the Securities and Exchange Commission disgorgement in the amount of $117,500,000 and prejudgment interest on disgorgement in the amount of $24,500,000;

(b)    orders Defendants to reimburse SS Body Armor I, Inc. f/k/a Point Blank Solutions, Inc. f/k/a DHB Industries Inc. ("DHB") $142,000,000 for

bonuses and profits received from DHB stock sales, pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243(a)]; and

(c)    deems payment of the foregoing obligations satisfied by the entry of the Consent Decree of Forfeiture and Order for Delivery to be entered in the matter *United States of America v. All Assets Listed on Schedule I Attached Hereto and All Proceeds Traceable Thereto,* No. 2:10cv4750 (E.D.N.Y.), which provides for the forfeiture of approximately $142,000,000 of assets.

3.    Defendant enters into this Consent voluntarily after consulting with undersigned counsel, and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce Defendant or anyone acting on his behalf to enter into this Consent.

4.    Defendant agrees this Consent shall be incorporated into the Final Judgment with the same force and effect as if fully set forth therein.

5.    Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

6.    Defendant agrees the Commission may present the attached proposed Final Judgment to the Court for signature and entry, and further agrees the Court shall retain jurisdiction over him and over the subject matter of this action.

7.    Defendant waives any right he may have to appeal from the entry of the Final Judgment.

8.    Defendant waives service of the Final Judgment once entered, and agrees the entry of the Final Judgment by the Court and filing with the Clerk in the Southern District of Florida will constitute notice to him of the terms and conditions of the Final Judgment.

9.    Consistent with 17 C.F.R. § 202.5(f), this Consent resolves only the claims asserted against Defendant in this civil proceeding.  Defendant acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability. Defendant waives any claim of Double Jeopardy based on the settlement of this proceeding, including the imposition of any remedy or civil penalty herein.

10.    Defendant understands and agrees to comply with the terms of 17 C.F.R. § 202.5(e), which provide in part that it is the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings," and "a refusal to admit the allegations is equivalent to a denial, unless the defendant or respondent states that he neither admits nor denies the allegations."  As part of Defendant' agreement to comply with the terms of Section 202.5(e), Defendant: (i) will not take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the Amended Complaint or creating the impression that the Amended Complaint is without factual basis; (ii) will not make or permit to be made any public statement to the effect that Defendant does not admit the allegations of the Amended Complaint, or that this Consent contains no admission of the allegations, without also stating that Defendant does not deny the allegations; and (iii) upon the filing of this Consent, Defendant hereby withdraws any papers filed in this action to the extent that they deny any

3

allegation in the Amended Complaint  If Defendant breaches this agreement, the Commission

may petition the Court to vacate the Final Judgment and restore this action to its active docket.

Nothing in this paragraph affects Defendant's: (i) testimonial obligations; or (ii) right to take

legal or factual positions in litigation or other legal proceedings in which the Commission is not

a party.

11.     Defendant hereby waives any rights under the Equal Access to Justice Act, the

Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to

seek from the United States, or any agency, or any official of the United States acting in his or

her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees,

expenses, or costs expended by Defendant to defend against this action.  For these purposes,

Defendant agrees he is not the prevailing party in this action since the parties have reached a

good faith settlement.

By:  Jeffrey Brooks, as Personal Representative of
     the Estate of David H. Brooks


STATE OF FLORIDA        )
                        )
COUNTY OF MIAMI-DADE    )

        On this 24th day of ~~December 2017~~ March 2018, before me personally appeared Jeffrey Brooks, who
____ is personally known to me, or ✓ who produced Driver's license _____ bearing
his name and photograph as identification, and who executed this Consent, and acknowledged to
me that he executed the same.

_____          7/23/2018
Notary Public                    Commission Expires



REBECCA VIERA
Notary Public - State of Florida
Commission # FF 107736
My Comm. Expires Jul 23, 2018

APPROVED AS TO FORM:

_____

Jeffrey D. Marcus
Marcus Neiman & Rashbaum LLP
2 South Biscayne Boulevard—Suite 1750
Miami, Florida 33131
Telephone: 305-400-4268
Counsel for Defendant Jeffrey Brooks as Personal
Representative of the Estate of David H. Brooks

5

# EXHIBIT "D" (2)

EXHIBIT "D" (2)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-61526-CIV-ALTONAGA/GOODMAN

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

v.

JEFFREY BROOKS, as Personal Representative
of the Estate of David H. Brooks

        Defendant.

_____/

## FINAL JUDGMENT AGAINST DEFENDANT JEFFREY BROOKS, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DAVID H. BROOKS

This cause comes before the Court upon the Motion by Plaintiff Securities and Exchange Commission for Entry of a Final Judgment ("Final Judgment") against Defendant Jeffrey Brooks, as Personal Representative of the Estate of David H. Brooks ("Defendant"). By the Consent attached hereto, and without admitting or denying the allegations of the Amended Complaint (except that Defendant admits the jurisdiction of this Court over the Defendant and over the subject matter of this action), Defendant has entered a general appearance, agreed to entry of this Final Judgment, waived findings of fact and conclusions of law, and waived any right to appeal from this Final Judgment. The Court finds that good cause exists for entry of the Final Judgment. Accordingly, the Commission's Motion is **GRANTED**. The Court further orders as follows:

## I.

### DISGORGEMENT AND PREJUDGMENT INTEREST

**IT IS ORDERED AND ADJUDGED** that Defendant is liable to the Commission for disgorgement of $117,500,000, representing profits gained as a result of the conduct alleged in the Amended Complaint, together with prejudgment interest in the amount of $24,500,000, for a total of $142,000,000.

## II.

### REIMBURSEMENT UNDER SECTION 304(a) OF THE SARBANES-OXLEY ACT

**IT IS FURTHER ORDERED AND ADJUDGED** that Defendant shall reimburse SS Body Armor I, Inc. f/k/a Point Blank Solutions, Inc. f/k/a DHB Industries Inc. ("DHB") $142,000,000 for bonuses and profits received from DHB stock sales, pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243(a)].

## III.

### SATISFACTION OF OBLIGATIONS

**IT IS FURTHER ORDERED AND ADJUDGED** that the obligations set forth in paragraphs I and II are deemed satisfied by the entry of the Consent Decree of Forfeiture and Order for Delivery [Docket Entry No. __] in the matter *United States of America v. All Assets Listed on Schedule I Attached Hereto and All Proceeds Traceable Thereto*, No. 2:10cv4750 (E.D.N.Y.), which provides for the forfeiture of approximately $142,000,000 of assets.

2

## IV.

## INCORPORATION OF CONSENT

**IT IS FURTHER ORDERED AND ADJUDGED** that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings and agreements set forth therein.

## V.

## RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED AND DECREED** that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

**DONE AND ORDERED** in Miami, Florida this \_\_\_\_ day of _____. 2018.

_____
CECILIA M. ALTONAGA
UNITED STATES DISTRICT JUDGE

# EXHIBIT "E"

EXHIBIT "E"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                    *Plaintiff,*                    06-CR-0550 (JS)

            - against -
                                                          **AMENDED**
SANDRA HATFIELD, DAVID H. BROOKS, and              **CONSENT ORDER**
PATRICIA LENNEX,

                                    *Defendants.*
------------------------------------------------------------------X

        **WHEREAS,** David Brooks ("Brooks") was indicted in this action on or about October 25,

2007; and

        **WHEREAS,** in January of 2008, the Court ordered that Brooks would be released on bail

based upon a personal recognizance bond ("Bond") in the amount of $400,000,000, as to which

Brooks, two of his children, his brother Jeffrey Brooks, and his ex-wife Terry Brooks served as

sureties, and which was secured by $48 million in assets, including cash (the "Cash Collateral")

posted by two entities held directly or indirectly in the names of Brooks, his ex-wife and/or

children; and

        **WHEREAS,** the Bond also contained financial disclosure requirements, among other

conditions of bail ("Bail Conditions"); and

        **WHEREAS,** in January of 2010, the Court revoked Brooks's bail, and remanded him to

incarceration, based upon a finding that Brooks had violated the Bail Conditions; and

        **WHEREAS,** as of March of 2010, and after most of the Cash Collateral had been released

by the Court for the payment of Brooks's legal fees, $19.5 million of the Cash Collateral remained

("Remaining Cash Collateral"); and

**WHEREAS**, on August 10, 2011, Brooks pleaded guilty to one count of conspiring to defraud the United States and two counts of tax evasion ("Tax Convictions"); and

**WHEREAS**, in August 2013, the Court ordered Brooks to pay $2,883,056 in restitution (the "Tax Restitution Order") to the Internal Revenue Service in connection with the Tax Convictions; and

**WHEREAS**, on April 24, 2015, Terry, Victoria, Andrew and Elizabeth Brooks (the "Brooks Family") filed a motion seeking to set aside the forfeiture of approximately $17.7 million of the Remaining Cash Collateral ("Bail Remission Motion"); and

**WHEREAS**, on June 2, 2015, the Court entered an Order denying the Bail Remission Motion; and

**WHEREAS**, the Court's June 2, 2015 Order specifically held: "The Court RESERVES DECISION as to the ultimate disposition of the forfeited funds and therefore ORDERS the entirety of said funds be placed into an escrow account pending a future order of this Court." (Docket Entry No. 1901); and

**WHEREAS**, the Remaining Cash Collateral is currently held in Account No. PR6-008563 at Lantern Investments ("Lantern Account"); and

**WHEREAS**, on September 20, 2017, the United States Court of Appeals for the Second Circuit (the "Court of Appeals") affirmed the Court's denial of the Bail Remission Motion; and

**WHEREAS**, on September 20, 2017, the Court of Appeals also held that the Tax Convictions, the Tax Restitution Order, and the bail forfeiture did not abate as a result of Brooks's death in October 2016; and

**WHEREAS**, on December 4, 2017, the Brooks Family filed a Petition for Rehearing on the affirmance of the Court's denial of the Bail Remission Motion; and

**WHEREAS**, on December 4, 2017, the Estate of David Brooks ("Estate") filed a Petition for Rehearing and Rehearing *en banc* on the Court of Appeals's refusal to abate the Tax Convictions and the Tax Restitution Order; and

**WHEREAS**, on January 12, 2018, the Court of Appeals denied the Brooks Family's and the Estate's petitions for rehearing; and

**WHEREAS**, this action is just one of multiple proceedings (hereinafter the other proceedings listed below will be collectively referred to as the "Related Proceedings") arising from some of the same or similar conduct for which Brooks was charged in this case;

    a.    *In re SS Body Armor I, Inc., et al.*, Case No. 10-11255 (Bankr. D. Del.) (the "Bankruptcy Proceeding");

    b.    *United States v. All Assets Listed on Schedule I Attached Hereto and All Proceeds Traceable Thereto*, Case No. 10-cv-04750 (E.D.N.Y.) (the "Civil Forfeiture Action");

    c.    *In re DHB Industries, Inc. Class Action Litigation*, Case No. 05-cv-04296 (E.D.N.Y.) (the "Class Action"); and

    d.    *Securities and Exchange Commission v. Brooks*, Case No. 07-cv-61526 (S.D. Fla.) (the "SEC Action"); and

**WHEREAS**, one of the Court's primary concerns throughout this litigation, as well as in the Civil Forfeiture Action, has been to ensure that monies are remitted to victims of the crimes for which Brooks was charged ("Victims"); and

WHEREAS, the Brooks Family, Jeffrey Brooks, and the Estate, as well as other related entities (collectively, the "Brooks Claimants") have filed claims in the Civil Forfeiture Action, alleging that they either have a superior interest in and/or are innocent owners of property (the "Restrained Assets") which the Government seeks to forfeit; and

WHEREAS, on December 6, 7, and 8, 2017, counsel for all the parties in the Related Proceedings, as well as the parties themselves, participated in a global mediation in Miami, Florida; and

WHEREAS, pursuant Fed. R. Crim. P. 46(f)(2), the Court has the authority to set aside a bail forfeiture if "it appears that justice does not require a bail forfeiture"; and

WHEREAS, counsel for the parties in the Related Proceedings participated in a telephone conference with the Court on December 7, 2017; and

WHEREAS, counsel for the parties in the Related Proceedings explained to the Court's satisfaction that it would be in the Victims' best interest for the Court to agree to release $2,883,056 of the Remaining Cash Collateral to satisfy the Tax Restitution Order, and permit $16,616,944 of the Remaining Cash Collateral to be paid to the Brooks Family in connection with a global resolution (the "Global Resolution") to which the parties have agreed in principle, thereby making more of the Restrained Assets available to compensate the Victims, pursuant to 28 C.F.R. Part 9; and

WHEREAS, the global mediation resulted in the execution of a term sheet (the "Term Sheet") outlining the Global Resolution; and

**WHEREAS**, if the Global Resolution is not effectuated, remission of funds to the Victims in any proceedings will likely be significantly delayed, and result in significant and unnecessary burdens not only upon this Court, but also upon the courts in the Bankruptcy Proceeding, the SEC Action and the Class Action; and

**WHEREAS**, the Term Sheet contemplates vacatur of the Court's decision to forfeit the Remaining Cash Collateral so that the funds may later be released as follows: (a) $2,883,056 to satisfy the Tax Restitution Order; and (b) $16,616,944 to the Brooks Family; and

**WHEREAS**, pursuant to 18 U.S.C. § 3612(f), interest began accruing on September 6, 2013, and continues to accrue on the restitution obligation under the Tax Restitution Order at the rate of 0.13%; and

**WHEREAS**, interest has accrued and may continue to accrue on the Remaining Cash Collateral in the Lantern Account; and

**WHEREAS**, the United States and the Brooks Claimants have agreed that the interest that has accrued and may continue to accrue on the Remaining Cash Collateral should be used to pay the interest that has accrued and continues to accrue on the restitution obligation under the Tax Restitution Order;

**WHEREAS**, the United States and the Brooks Claimants have agreed that after (1) payment to the Clerk of Court in full satisfaction of the restitution obligation under the Tax Restitution Order, including $2,883,056 and all interest accrued thereon up until the date of the payment, and (2) payment of $16,616,944 to the Brooks Family, any and all excess funds remaining in the Lantern Account as a result of accrued interest and/or dividends shall be paid to the Brooks Family in a separate payment (the "Interest Remainder Payment"); and

WHEREAS, the Term Sheet contemplates, *inter alia*, that the United States shall release $24,837,525 in cash from the Restrained Assets to the Brooks Family (the "Cash Distribution");

WHEREAS, the United States and the Brooks Claimants have agreed that the United States shall deduct half of the amount of the Interest Remainder Payment from the Cash Distribution, and the requirement of such a deduction will be memorialized in any fully-executed final settlement agreement implementing the Global Resolution; and

WHEREAS, pursuant to the Term Sheet, the Court shall continue to restrain the Remaining Cash Collateral until the parties to the Term Sheet execute a final settlement agreement implementing the Global Resolution; and

WHEREAS, pursuant to the Term Sheet, the United States will make good faith efforts to request that the following payments shall be issued contemporaneously: payment to the Brooks Family and Clerk of Court from the Remaining Cash Collateral, and payments to the Brooks Family and Victims from the Restrained Assets in the Civil Forfeiture Action; and

WHEREAS, the Court finds that the Global Resolution and settlement of the Related Proceedings constitutes new facts which lead it to conclude that justice does not require a bail forfeiture; and

WHEREAS, the Government and each of the Brooks Claimants have jointly requested that the Court enter this order amending the prior of the Court dated February 6, 2018, as set forth below:

SUFFICIENT CAUSE BEING SHOWN, IT IS HEREBY:

ORDERED, that the Remaining Cash Collateral shall continue to be held in the Lantern Account; and it is further

**ORDERED**, that upon the United States' request for disbursement of the Remaining Cash Collateral (such request to be mandated by a fully-executed final settlement agreement implementing the Global Resolution), the Court shall issue an Order directing Lantern to disburse the Remaining Cash Collateral as follows: (a) payment in the amount of $2,883,056 plus all interest accrued pursuant to 18 U.S.C. § 3612(f) up to the date of payment to the Clerk of Court in full satisfaction of the Tax Restitution Order, with a further order that the funds will be forwarded to the Internal Revenue Service, (b) payment in the amount of $16,616,944 to an attorney escrow account designated by the Brooks Family; and (c) payment of the Interest Remainder Payment to an attorney escrow account designated by the Brooks Family; and it is further

ORDERED, that after the disbursement of the three above-listed payments, should any additional funds remain or be deposited in the Lantern Account, such funds shall be paid to an attorney escrow account designated by the Brooks Family; and it is further

ORDERED, that all funds paid to an attorney escrow account pursuant to this Order be maintained in such account and not be released unless and until all the conditions for the release

of such funds, as set forth in the final settlement agreement implementing the Global Resolution, have been met.

**SO ORDERED:**

_/s/ JOANNA SEYBERT_
HONORABLE JOANNA SEYBERT
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

September    18    , 2018
Date

# EXHIBIT "F"

EXHIBIT "F"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | CONSENT FINAL DECREE OF FORFEITURE AND ORDER FOR DELIVERY |
| - against - | |
| ALL ASSETS LISTED ON SCHEDULE I ATTACHED HERETO AND ALL PROCEEDS TRACEABLE THERETO, | Civil Action No. 10-4750 (Seybert, J.) (Tomlinson, M.J.) |
| Defendants *in rem.* | |

- - - - - - - - - - - - - - - - - - - - - - - - - - X

WHEREAS, on or about October 15, 2010, the United States of America

("United States" or "Plaintiff") filed a Verified Complaint *In Rem* (the "Verified Complaint")

seeking to forfeit one hundred and seventeen (117) assets (the "Defendant Assets") listed on

"Schedule I" attached to the Verified Complaint, which assets the United States also

previously sought to forfeit in the related criminal action (the "Criminal Action"), *United*

*States v. Brooks*, 06-CR-0550, against defendants David H. Brooks, Sandra Hatfield, and

other defendants;

WHEREAS, in the Verified Complaint, the United States alleged that the

Defendant Assets are subject to forfeiture pursuant to: (a) 18 U.S.C. § 981(a)(1)(C), as

proceeds of mail, wire, securities fraud and/or a conspiracy to commit mail, wire, and

securities fraud; (b) 18 U.S.C. § 981(a)(1)(A), as property involved in financial transactions

that were designed to conceal or disguise the nature, the location, the source, the ownership,

or the control of criminal proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and (c) 18

U.S.C. § 981(a)(1)(A), as property involved in financial transactions with intent to engage in

conduct constituting a violation of sections 7201 or 7206 of the Internal Revenue Code, in

violation of 18 U.S.C. § 1956(a)(1)(A)(ii);

WHEREAS, on or about November 9, 2010, the Court issued a Warrant for

Arrest of Articles *In Rem* (the "Warrant"), pursuant to Rule G(3) of the Supplemental Rules

for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules"),

authorizing the United States to seize the Defendant Assets;

WHEREAS, pursuant to Rule G(4)(b)(i) of the Supplemental Rules, Plaintiff

executed process and served copies of the Verified Complaint and the Warrant on all known

potential claimants to the Defendant Assets;

WHEREAS, consistent with the custom and practice in this district, the United

States published notice of this action on an official government website, www.forfeiture.gov,

for at least (30) consecutive days, beginning on November 11, 2010 and ending on December

10, 2010;

WHEREAS, in March 2011, Warren Hatfield, Randall Keith Hatfield, and

Sandra Hatfield filed claims to various Defendant Assets, listed as Defendant Assets Nos.

114 through and including 117 on Schedule I (the "Hatfield Assets");

WHEREAS, in April 2011, the following persons and entities (the

"Claimants") filed claims to various Defendant Assets, listed as Defendant Assets Nos. 1

through 113 on Schedule I:  Point Blank Solutions, Inc. n/k/a SS Body Armor I, Inc. ("Point

Blank"); David H. Brooks; David Brooks International, Inc.; Jeffrey Brooks; Jeffrey Brooks

IRA; Pathfinder Trust; Like a Prayer Trust; Private Time Trust; Gear to Gear Trust; Perfect

World Partners, LLC; True Grit Holdings, LLC; Wildfire Holdings LLC; Terry S. Brooks;

Brooks Industries of Long Island, Inc.; Brooks Industries of Long Island – Profit Sharing

Plan and Trust; Victoria Brooks; Victoria Brooks Industries, Inc.; Magic Moments Trust;

VRB Inc.; Andrew Brooks; Andrew Brooks Industries, Inc.; Saving Lives Trust; ASB Inc.;

Elizabeth Brooks; Elizabeth Brooks Industries, Inc.; Show Time Trust; EJB Inc.; Vianel

Industries, Inc.; and VAE Enterprises, LLC;

   WHEREAS, following a lengthy stay of the proceedings herein pending

appeals in the Criminal Action, and the death of David Brooks on or about October 30, 2016,

the Court lifted the stay in November 2016, and the Estate of David H. Brooks was

substituted for David H. Brooks as a Claimant in February 2017;

   WHEREAS, pursuant to a Final Order of Forfeiture entered against Sandra

Hatfield in the Criminal Action on or about May 18, 2017, the Hatfield Assets were forfeited

or ordered to be applied to satisfy Sandra Hatfield's restitution obligations imposed as part of

her sentence in the Criminal Action;

   WHEREAS, pursuant to a Consent Partial Decree of Forfeiture and Order for

Delivery entered by the Court on or about June 30, 2017, Defendant Assets Nos. 16 through

82, and 84, and all proceeds traceable thereto (the "Point Blank Assets"), were forfeited to

the United States, and the related claims asserted by Point Blank, as the only claimant to such

Defendant Assets, were withdrawn;

   WHEREAS, on September 8, 2017, the United States filed an Amended

Verified Complaint In Rem (the "Amended Complaint") seeking to forfeit the following

remaining Defendant Assets (the "Remaining Defendant Assets") -- *i.e.* all Defendant Assets

other than the Hatfield Assets and the Point Blank Assets that were previously forfeited or

otherwise disposed of pursuant to prior orders of the Court -- as listed on "Schedule I"

attached to the Amended Complaint (a copy of which is also attached hereto), and all

proceeds traceable thereto: Defendant Assets Nos. 1 through and including 15, 83, and 85

through and including 113;

        WHEREAS, in the Amended Complaint, the United States alleges that the

Remaining Defendant Assets are subject to forfeiture as pursuant to: (a) 18 U.S.C.

§ 981(a)(1)(C), as constituting or derived from the proceeds of mail, wire, and securities

fraud and a conspiracy to commit mail, wire, and securities fraud; (b) 18 U.S.C.

§ 981(a)(1)(A), as having been involved in financial transactions that were designed to

conceal or disguise the nature, the location, the source, the ownership, or the control of these

criminal proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); (c) 18 U.S.C. § 981(a)(1)(A),

as having been involved in monetary transactions in criminally derived property of a value

greater than $10,000 and which was derived from mail, wire, and securities fraud and a

conspiracy to commit mail, wire, and securities fraud, in violation of 18 U.S.C. § 1957(a);

and (d) 18 U.S.C. § 981(a)(1)(A), as having been involved in financial transactions with

intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal

Revenue Code, in violation of 18 U.S.C. § 1956(a)(1)(A)(ii);

WHEREAS, in response to the Amended Complaint, the following Claimants filed claims to the Remaining Defendant Assets, as indicated below:

| Claimant | Defendant Assets No(s). Claimed |
|---|---|
| Point Blank | 1-15, 83 and 85 |
| David H. Brooks (Estate of) | 1-4, 6-8, 14-15, 83, 85, 89-92, 106 and 112-13 |
| David Brooks International, Inc. | 86-89, 92, 98, 107 and 113 |
| Victoria Brooks | 87, 89, 96, 99, 101-02, 106, 110 and 113 |
| VRB Inc. | 89, 96 and 99 |
| Victoria Brooks Industries Inc. | 87, 89, 106, 110 and 113 |
| Magic Moments Trust (2 claims filed) | 87, 89, 106, 108-11, 113 |
| Andrew Brooks | 5, 9, 12-13, 87, 89, 96, 99-100, 103, 106, 110 and 113 |
| ASB Inc. | 89, 96 and 99 |
| Andrew Brooks Industries, Inc. | 87, 89, 106, 110 and 113 |
| Saving Lives Trust (2 claims filed) | 87, 89, 106, 108-11 and 113 |
| Elizabeth Brooks | 10-11, 87, 89, 96, 99, 106, 110 and 113 |
| EJB Inc. | 89, 96 and 99 |
| Elizabeth Brooks Industries, Inc. | 87, 89, 106, 110 and 113 |
| Show Time Trust (2 claims filed) | 87, 89, 106, 108-11 and 113 |
| Like a Prayer Trust | 87, 89, 106, 108-11 and 113 |
| Pathfinder Trust | 87-89, 106, 108-11 and 113 |
| VAE Enterprises, LLC | 89, 96 and 99 |
| Vianel Industries, Inc. | 89 and 96 |

| Claimant | Defendant Assets No(s). Claimed |
|---|---|
| True Grit Holdings LLC | 87, 89, 106, 108-11 and 113 |
| Perfect World Partners LLC | 89 |
| Wildfire Holdings, LLC | 90 |
| Jeffrey Brooks | 89 |
| Jeffrey Brooks IRA | 89 |
| Terry Brooks<br><br>Brooks Industries of Long Island, Inc.<br><br>Brooks Industries of Long Island – Profit Sharing Plan and Trust<br><br>Gear to Gear Trust<br><br>(joint claim filed) | 89-90, 93-95, 97, 104-05, 108-09 and 111 |
| Gear to Gear Trust<br><br>Private Time Trust<br><br>(joint claim filed) | 90 |

WHEREAS, pursuant to a settlement agreement (the "Global Settlement Agreement") entered into by and among the United States, each of the Claimants, the Recovery Trust (as such term is defined in the Global Settlement Agreement), the Class Plaintiffs (as such term is defined in the Global Settlement Agreement), and other parties and dated as of October 25, 2018, the United States and each of the Claimants have agreed, among other things, to:

(a)    disbursement to Judd Burstein, Esq., as Escrow Agent for Terry, Victoria, Andrew and Elizabeth Brooks (the "Brooks Family"), of the following Remaining Defendant Assets (the "Returned Non-Cash Assets"), as specified in and subject to the terms of the Global Settlement Agreement and upon the United States's request to the Federal

Bureau of Investigation ("FBI"), which request shall be made in accordance with the terms

of the Global Settlement Agreement:  Defendant Assets Nos. 6, 10, 11, 14, 15, 107 and 109;

      (b)    remittance by the U.S. Marshals Service of a portion of Defendant

Asset No. 87 in the amount of $24,837,525 minus half of the Interest Remainder Payment, as

defined in the Global Settlement Agreement, (the "Returned Cash") to an attorney escrow

account to be designated in a digitally and fully completed ACH form submitted by the

Brooks Family to the United States (the "Brooks Family Attorney Escrow Account") which

account shall be maintained by Richard C. Klugh as Escrow Agent, and as specified in and

subject to the terms of the Global Settlement Agreement;

      (c)    forfeiture of the following Remaining Defendant Assets, as well as all

proceeds traceable thereto (the "Forfeited Assets"):  Defendant Asset Nos. 1 through and

including 5, 7 through and including 9, 12, 13, 83, 85, 86, the balance of Defendant Asset

No. 87 after deduction of the Returned Cash, 88 through and including 106, 108, 110 through

and including 113; and

      (d)    withdrawal of the Claimants' claims to the Remaining Defendant

Assets;

      WHEREAS, the Court finds that the Claims by the Brooks Family would most

likely have resulted in additional years of litigation;

      WHEREAS, had the Brooks Family prevailed on their Claims they may have

secured tens of millions more than they are receiving under Global Settlement Agreement;

      WHEREAS, the Court has concluded that the distributions to the Brooks

Family provided for in the Global Settlement are a fair and just compromise of their claims;

UPON the application of the United States and the Claimants, and upon all papers filed and proceedings had herein, and pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 981(a)(1)(A), it is hereby

ORDERED, ADJUDGED AND DECREED that:

1.     The Returned Non-Cash Assets shall be disbursed to Judd Burstein, Esq., as Escrow Agent on behalf of the Brooks Family, as specified in and subject to the terms of the Global Settlement Agreement and upon the United States's request to the FBI, which request shall be made in accordance with the terms of the Global Settlement Agreement.

2.     The Returned Cash shall be remitted first to the U.S. Marshals Service. The U.S. Marshals Service shall then remit the Returned Cash to Richard C. Klugh, as Escrow Agent for the Brooks Family Attorney Escrow Account, as specified in and subject to the terms of the Global Settlement Agreement.

3.     The Forfeited Assets are hereby forfeited to the United States, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 981(a)(1)(A).

4.     The Claims filed by each of the Claimants are hereby dismissed with prejudice, subject to the terms of the Global Settlement Agreement.

5.     The U.S. Marshals Service and its agents and/or duly authorized contractors are directed to pay the United States's costs incurred incident to this proceeding and the Criminal Action as specified in and subject to the terms of the Global Settlement Agreement, and are directed to seize and dispose of the Forfeited Assets in accordance with all applicable laws and regulations.

6.    As the Hatfield Assets and Point Blank Assets were disposed of pursuant to prior Orders of the Court, and all pending claims as to the Remaining Defendant Assets are resolved herein in accordance with and subject to the terms of the Global Settlement Agreement, and the time to file any additional claims to any of the Defendant Assets has long since expired, this action is hereby dismissed, subject to the terms of the Global Settlement Agreement.

7.    The District Court shall retain jurisdiction to enforce this Consent Final Decree of Forfeiture and Order for Delivery.

8.    The Clerk of the Court shall forward four (4) certified copies of this Consent Final Decree of Forfeiture and Order for Delivery to the United States Attorney's

Office, Eastern District of New York, 271-A Cadman Plaza East, Brooklyn, New York, Attn:

Assistant U.S. Attorney Laura D. Mantell.

Dated:  Brooklyn, New York  
        October _____, 2018

        RICHARD P. DONOGHUE  
        United States Attorney  
        Eastern District of New York  
        271 Cadman Plaza East, 7th Fl.  
        Brooklyn, New York 11201

By: _____  
        Laura D. Mantell  
        Karin Orenstein  
        Assistant United States Attorneys

Dated:  New York, New York  
        October _____, 2018

        SHER TREMONTE LLP  
        90 Broad Street, 23rd Floor, New  
        York, NY 10004

By: _____  
        Justine A. Harris, Esq.  
        *Counsel for Terry S. Brooks, Brooks*  
        *Industries of Long Island, Inc., Brooks*  
        *Industries of Long Island – Profit Sharing*  
        *Plan and Trust, and Gear to Gear Trust*

Dated:  New York, New York
        October ____, 2018

JUDD BURSTEIN, P.C.
1790 Broadway, Suite 1501
New York, New York 10019


By:    _____

       Judd Burstein, Esq.
       *As Escrow Agent for the Brooks Family for
       the Returned Non-Cash Assets,   and as
       Counsel for Victoria Brooks, VRB Inc.,
       Victoria Brooks Industries, Inc. and Magic
       Moments Trust, Andrew Brooks, ASB, Inc.,
       Andrew Brooks Industries, Inc. and Saving
       Lives Trust, Elizabeth Brooks, EJB, Inc.,
       Elizabeth Brooks Industries, Inc. and
       ShowTime Trust, VAE Enterprises, LLC
       (now VAE LLC), Vianel Industries, Inc.*



Dated:  Philadelphia, Pennsylvania
        October ____, 2018

FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103


By:    _____

       Ian M. Comisky
       Matthew Lee
       *Counsel for Claimants True Grit Holdings
       LLC; Wildfire Holdings, LLC; and Perfect
       World Partners, LLC*

---

Consent Final Decree of Forfeiture and Order for Delivery                    Page 11
*United States v. All Assets Listed on Schedule I*, 10-CV-4750 (JS)(AKT)

Dated:  Miami, Florida
        October ____, 2018

RICHARD C. KLUGH, P.C.
25 SE Second Avenue, Suite 1100
Miami, Florida 33131

By: _____

Richard Klugh, Esq.
*As Escrow Agent for the Brooks Family
Attorney Escrow Account and as Counsel
for the Estate of David H. Brooks; David
Brooks International, Inc.; Jeffrey
Brooks; Jeffrey Brooks IRA; Pathfinder
Trust; Like a Prayer Trust; Magic
Moments Trust; Private Time Trust;
Saving Lives Trust; Show Time Trust;
and Gear to Gear Trust*

Dated:  Los Angeles, California
        October ____, 2018

PACHULSKI STANG ZIEHL &
JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067

By: _____

Alan J. Kornfeld
*Counsel for Claimant SS Body Armor I,
Inc.*

Dated:  Central Islip, New York
        October ____, 2018

SO ORDERED:

_____
HONORABLE JOANNA SEYBERT
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

# EXHIBIT "G"

EXHIBIT "G"

SLR:JHK
F.#2011V01188

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

JEFFREY BROOKS, as Personal
Representative of the Estate of
David H. Brooks, Deceased,

               Plaintiff,

          -against-

MICHAEL SPOSATO, as Acting Sheriff
of Nassau County and the Warden of the
Nassau County Correctional Facility, et al.

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

**STIPULATION AND ORDER
OF DISMISSAL WITH PREJUDICE**

Civil Action No.
12 CV 4740

(Brodie, J.)
(Pollak, M.J.)

IT IS HEREBY STIPULATED AND AGREED, pursuant to Fed. R. Civ. P. 41(a)(2), by

and between Plaintiff JEFFREY BROOKS, as Personal Representative of the Estate of David H.

Brooks, Deceased ("Plaintiff"), and Defendants Timothy Hogan, a Deputy United States Marshal;

Richard Viets, a Deputy United States Marshal; and John Quaranto, a Deputy United States Marshal

(the "Federal Defendants"), by and through their respective undersigned attorneys, that this action

be dismissed on the merits with prejudice as against the Federal Defendants and without costs,

[Left Blank Intentionally]

attorneys' fees, expenses or disbursements to any party.

Dated: Miami, Florida
     July ___, 2018

                     BARZEE FLORES, LLP
                     40 NW 3rd Street, Ph-1
                     Miami, Forida 33128

By:    _____
         Alexander T. Rundlet
         (305) 374-3998

Dated: Central Islip, New York
     July ___, 2018

                     RICHARD P. DONOGUE
                     United States Attorney
                     Eastern District of New York
                     Attorney for Defendants
                     610 Federal Plaza, 5th Floor
                     Central Islip, New York 11722

By:    _____
         JAMES H. KNAPP
         Assistant United States Attorney
         (631) 715-7879

**SO ORDERED:**

Dated: Brooklyn, New York
     July ___, 2018

_____
HONORABLE MARGO K. BRODIE
United States District Judge

# EXHIBIT "H"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

UNITED STATES OF AMERICA,

$\qquad$*Plaintiff,*$\qquad\qquad\qquad$06-CR-0550 (JS)

$\qquad$- against -

$\qquad\qquad\qquad\qquad\qquad\qquad\qquad$**<u>PROPOSED ORDER</u>**

SANDRA HATFIELD, DAVID H. BROOKS, and
PATRICIA LENNEX,

$\qquad\qquad\qquad\qquad$*Defendants.*
------------------------------------------------------------------X

$\qquad$WHEREAS, to effectuate a global settlement (the "Global Settlement")

reached by the United States, the Estate of David H. Brooks, David H. Brooks's family

members Terry, Victoria, Andrew and Elizabeth Brooks (the "Brooks Family"), and others,

the Court issued an order on September 18, 2018 (the "September 18, 2018 Order"),

providing that upon the United States's request for disbursement of the funds held in

Account No. PR6-008563 at Lantern Investments ("Lantern Account"), the Court would

issue an order directing that such funds be distributed as follows: (a) payment in the amount

of $2,883,056 plus all interest accrued pursuant to 18 U.S.C. § 3612(f) up to the date of

payment to the Clerk of Court, (b) payment in the amount of $16,616,944 to an attorney

escrow account designated by the Brooks Family; and (c) payment of excess funds remaining

in the Lantern Account as a result of accrued interest and/or dividends to an attorney escrow

account designated by the Brooks Family;

$\qquad$WHEREAS, in the September 18, 2018 Order, the Court further ordered that,

after disbursement of the three above-listed payments, should any additional interest and/or

dividends be deposited in the Lantern Account, they be paid to an attorney escrow account designated by the Brooks Family;

NOW THEREFORE, IT IS HEREBY ORDERED that, Lantern Investments shall immediately liquidate all funds on deposit held in the Lantern Account and:

(a)     issue a check made payable to the "Clerk of the Court" in the amount of $_____ and deliver it to 610 Federal Plaza, 5th Floor, Central Islip, New York 11722 Attn: Brian Gappa, Asset Forfeiture Specialist;

(b)     wire payment in the amount of $16,616,944 to [an attorney escrow account designated by the Brooks Family] (the "Brooks Family Attorney Escrow Account");

(c)     wire payment in the amount of $_____ to the Brooks Family Attorney Escrow Account; and

IT IS FURTHER ORDERED that, in the event that any additional funds remain or are deposited into the Lantern Account after the disbursement of the above-listed payments, Lantern shall remit payment of such funds to the Brooks Family Attorney Escrow Account; and

IT IS FURTHER ORDERED that Richard C. Klugh, Esq., as Escrow Agent for the Brooks Family Attorney Escrow Account, shall maintain all funds received in such account pursuant to this Order and shall not release any such funds unless and until all the conditions for the release of such funds, as set forth in the Global Settlement have been met; and

IT IS FURTHER ORDERED that the Clerk of the Court shall forwarded the payment received from Lantern Investments pursuant to this order to the Internal Revenue

Service in satisfaction of the restitution order entered against David Brooks in the above-

captioned case.

Dated:   Central Islip, New York

_____, 2018


_____
HONORABLE JOANNA SEYBERT
UNITED STATES DISTRICT JUDGE

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re DHB INDUSTRIES, INC. CLASS ACTION LITIGATION | Civil Action No. 05-cv-04296-JS-ETB |
| This Document Relates To: | CLASS ACTION |
| ALL ACTIONS. | |

**JOINT STIPULATION AND ~~[PROPOSED]~~ ORDER REGARDING**
**FINAL ALLOCATION OF SHARED PROCEEDS**

SS Body Armor I, Inc. ("SSBA I" or the "Debtor") f/k/a Point Blank Solutions, Inc. f/k/a

DHB Industries, Inc., the post-confirmation debtor in the Chapter 11 proceeding in the United

States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") captioned *In re SS*

*Body Armor I, Inc., et al.*, Case No. 10-bk-11255 (CSS) (the "Bankruptcy Case"); the Recovery

Trust created pursuant to the *Second Amended Joint Chapter 11 Plan of Liquidation* [Bankr.

ECF No. 3261][1] ("Chapter 11 Plan") of SS Body Armor I, Inc. *et al.* (the "Recovery Trust" and

together with the Debtor, the "Debtor Parties"); and lead plaintiffs George Baciu and the NECA-

IBEW Pension Fund (the "Lead Plaintiffs"), on behalf of the certified settlement class

(collectively, the "Class Plaintiffs," and together with the Debtor Parties, the "Parties"), by and

through undersigned counsel, hereby stipulate as follows:

WHEREAS, the Debtor and Class Plaintiffs are parties to that certain Amended

Settlement Agreement dated May 4, 2015, and Addendum to Amended Settlement Agreement

dated June 10, 2015 (together, the "Settlement"), approved by this Court by order dated August

18, 2015 and by the Bankruptcy Court by order dated July 9, 2015 [Bankr. ECF No. 3109].  The

---

[1] References to the Bankruptcy Case docket will be to "Bankr. ECF No. ___."  References to this Court's docket will be to ECF No. ___.

Settlement was also incorporated into the Chapter 11 Plan confirmed by the Bankruptcy Court by order dated November 10, 2015 (the "Confirmation Order").  These orders by this Court and the Bankruptcy Court as well as the Confirmation Order are now final and not subject to appeal.

WHEREAS, approximately $35,000,000 was placed in escrow (the "Escrow" or the "Escrowed Funds") pursuant to the Stipulation and Agreement of Settlement dated as of November 30, 2006 (the "EDNY Stipulation"), which settled the Class Action and was approved by the Court by order dated July 8, 2008.

WHEREAS, pursuant to the Settlement, the Class Plaintiffs loaned $20,000,000 to SSBA I to fund the Chapter 11 Plan (as defined in section 2(b) of the Settlement, "Plaintiffs' Loan").[2]

WHEREAS, the Class Plaintiffs also paid $9,923,635.65 in approved legal fees from the Escrow.[3]

WHEREAS, the Debtor Parties and Class Plaintiffs later entered into that certain Global Settlement Agreement dated as of October 25, 2018 (the "Global Settlement"), which resolved multiple issues as between the Estate of David Brooks, the family of David Brooks, the Debtor Parties, the Class Plaintiffs, the SEC, and the U.S. Department of Justice (the "DOJ"), including the forfeiture of restrained assets being held by the DOJ's Money Laundering and Asset Recovery Section ("MLARS").

WHEREAS, in accordance with the Global Settlement, the Class Plaintiffs filed a petition for remission with respect to their allocation of the Forfeited Funds.[4]

---

[2] *See* Bankr. Op. at 4.

[3] *See* ECF No. 457 (approving Settlement), ECF Nos. 460 and 465 (Second Circuit mandates dismissing appeals); *see also* Bankr. ECF No. 4423 (Third Circuit judgment affirming Bankruptcy Court approval of Settlement).

[4] *See, e.g.,* Bankr. Op. at 11-12, n. 26.

WHEREAS, MLARS, in a letter received by Class Counsel in July 2018, thereafter recognized losses to the Class in the amount of $81,540,718.81 in connection with its approved petition for remission (the "Class Remission").[5]

WHEREAS, MLARS calculated the total remission payment to members of the Class in the amount of $73,067,322.49 (the "Class Remission Payment").

WHEREAS, those remission payments have been made, as directed and required by MLARS; the recipients of returned checks are being located and contacted, and those checks are being reissued; and other reissue requests are being processed, where possible.

WHEREAS, the Debtor filed a petition for remission with respect to its allocation of the Forfeited Funds, and MLARS thereafter recognized losses to the Debtor in the amount of $78,815,232.06 in connection with its approved petition for remission (the "Debtor Remission").[6]

WHEREAS, MLARS made an actual remission payment to the Debtor in the total amount of $70,625,057.78 (the "Debtor Remission Payment").

WHEREAS, pursuant to the Addendum to section 3(a) of the Amended Settlement Agreement, the Parties are required to use reasonable best efforts consistent with their respective fiduciary duties to achieve the allocation of Shared Recovery Matters provided thereunder.

WHEREAS, pursuant to the terms of the Settlement, the Class Plaintiffs have (a) forgiven the Plaintiffs' Loan; and (b) at the request of the Debtor, transferred $5,333,168.17 to the Debtor Parties (the "Class Plaintiffs' Payment"), in an effort to achieve the agreed allocation of settlement proceeds.

---

[5] *Id.*; *see also Letter from Lead Plaintiffs* [ECF No. 4287-5]; Allocation Motion, at 10-12, § II.B.

[6] *See* Global Settlement Agreement, § 2(b)(ii); *see also* Bankr. Op. at 6-7.  The actual Class Remission Payment was less than the Class Remission and the Debtor Remission Payment was less than the Debtor Remission because the parties received pro rata remission payments from MLARS which were not enough to satisfy each Remission in full.

WHEREAS, the Debtor Parties have claimed that the Class Plaintiffs owe the Debtor Parties an additional $4.773 million pursuant to the Settlement (the "Alleged Shortfall"), over and above the Class Plaintiffs' Payment previously paid by Class Plaintiffs.

WHEREAS, the Alleged Shortfall, to the extent actually owed, would be a Recovery Trust Asset.

WHEREAS, the Class Plaintiffs deny that they owe the Alleged Shortfall and take the position that they have satisfied all obligations under the terms of the Settlement.

WHEREAS, during the pendency of the Alleged Shortfall dispute, the Recovery Trust has withheld distributions owing to the Class Plaintiffs under the Settlement associated with their 50% share of the value of 3,184,713 shares of SSBA I common stock (the "Stock Share").

WHEREAS, the Recovery Trust estimates the economic value of the 50% Stock Share is between $414,000 and $621,000, although the final value of the Stock Share is dependent on risks, costs, and factors that will not be fully determined or known until final distributions are made.

WHEREAS, on April 15, 2020, the Bankruptcy Court issued an Opinion [Bankr. ECF No. 4374] (the "Bankruptcy Opinion") and Order [Bankr. ECF No. 4373] (the "Bankruptcy Order"), denying in part and granting in part the Equity Group's[7] *Motion to Enforce the Second Amended Joint Chapter 11 Plan of Liquidation Proposed by Debtors and Official Committee of Unsecured Creditors Regarding Allocation of Remission Proceeds Among the Debtors and Class Plaintiffs* [Bankr. ECF No. 4285] (the "Enforcement Motion").

WHEREAS, the Bankruptcy Opinion required the Debtor to seek approval from this Court as to the "amounts to be distributed under the Bankruptcy Settlement" because "[t]he

---

[7] Capitalized terms not otherwise defined herein will have the meaning given in the Bankruptcy Opinion or the Turnover Motion (defined below), as applicable.

EDNY District Court has jurisdiction to oversee the combination of funds 'realized by any of the Parties' to distribute in accordance with the Bankruptcy Settlement."[8]

WHEREAS, on June 22, 2020, the Class Plaintiffs filed their *Motion to Approve Final Allocation of Shared Proceeds* [ECF Nos. 472-474] (the "Allocation Motion").

WHEREAS, on July 6, 2020, the Debtor Parties filed their *Partial Objection to Class Plaintiffs' Motion to Approve Final Allocation of Shared Proceeds* [ECF No. 477] (the "Partial Objection to Allocation Motion"), in which the Debtor Parties (i) did not dispute those portions of the Allocation Motion addressing the Bankruptcy Court's rejection of the Equity Group's arguments concerning the Additional Allocation Procedure under section 3(f) of the Settlement, and (ii) objected to the final allocation as sought by the Class Plaintiffs through the Allocation Motion because the Debtor Parties maintained that the Class Plaintiffs still owed them the Alleged Shortfall.

WHEREAS, no party opposed the Allocation Motion other than the Debtor Parties.

WHEREAS, on July 6, 2020, the Debtor Parties filed their *Motion to Enforce Settlement Agreement, Approve Final Allocation of Shared Proceeds, and Compel Turnover of Funds* [ECF Nos. 478-481] (the "Turnover Motion"), which requested that this Court order the Class Plaintiffs to (i) satisfy the Alleged Shortfall, and (ii) turn over to the Debtor Parties the Available Assets in order to immediately reduce the Alleged Shortfall.

WHEREAS, on July 22, 2020, the Class Plaintiffs filed their *Omnibus Memorandum of Law (1) in Further Support of Their Motion to Approve Final Allocation of Shared Proceeds, and (2) in Opposition to the Debtor Parties' Motion to Enforce, Approve and Compel* [ECF Nos. 485-486] (the "Class Plaintiffs' Omnibus Opposition").

---

[8] Bankr. Op. at 2, 13, 18.

WHEREAS, no party opposed the Turnover Motion other than the Class Plaintiffs.

WHEREAS, on August 6, 2020, the Debtor Parties filed their *Reply Memorandum in Further Support of Motion to Enforce Settlement Agreement, Approve Final Allocation of Shared Proceeds, and Compel Turnover of Funds* [ECF Nos. 487-488] (the "Debtor Parties' Reply").

WHEREAS, the Allocation Motion and the Turnover Motion have been *sub judice* before this Court as of August 6, 2020.

WHEREAS, over the course of several days in December 2020 and January 2021, the Debtor Parties and the Class Plaintiffs participated in a consensual mediation (the "Mediation") led by the Honorable Kevin Gross (Ret.),[9] in an effort to resolve the issues raised in the Allocation Motion and the Turnover Motion and otherwise resolve all disputes between the Debtor Parties and the Class Plaintiffs.

WHEREAS, through the Mediation and after good-faith, arm's length negotiations, the Debtor Parties and the Class Plaintiffs desire to consensually resolve the Allocation Motion and Turnover Motion pending before this Court and all issues and disputes that may remain between them in connection with the Settlement and otherwise (the "Allocation Settlement"), summarized as follows:

 a. The Class Plaintiffs (i) will turn over $750,000 in cash from the Escrow to the Recovery Trust within three (3) business days following the approval of the Allocation Settlement by this Court, and (ii) at the same time, will relinquish their interest in the Stock Share to the Recovery Trust (together, the "Allocation Settlement Consideration"), both as pursuant to the terms more specifically set forth below;

 b. The Recovery Trust will hold the Allocation Settlement Consideration in a separate reserve until the Bankruptcy Court approves the Allocation Settlement by a final order (the "Bankruptcy Court Approval Order") and the occurrence of (i) the expiration of time to appeal such order, provided that such order is not stayed and no appeal(s) has been taken from such order, or (ii) resolution of any

---

[9] Judge Gross is the former Chief Judge of the United States Bankruptcy Court for the District of Delaware.

appeal(s) from such order, provided that such order is not reversed, stayed, modified or amended on appeal (the satisfaction of conditions (i) or (ii) rendering any order described herein a "Final Order");

c.    The Recovery Trust will seek approval by the Bankruptcy Court of the Allocation Settlement by and through its *Motion of Recovery Trust for Orders (I) Approving Settlements with Class Plaintiffs and Carter Ledyard & Milburn LLP; (II) Authorizing Dissolution Protocol; (III) Entering Final Decree; and (IV) Granting Related Relief* (the "Bankruptcy Motion"), which the Recovery Trust will file in the Bankruptcy Court by or before February 24, 2021, to be heard on March 24, 2021;

d.    The Class Plaintiffs will support the approval of the Allocation Settlement sought by the Recovery Trust through the Bankruptcy Motion so long as such relief is consistent in all respects with this Stipulation and Order and is not in any way contingent upon or conditioned on any other relief sought by the Debtor Parties before the Bankruptcy Court, including other relief sought by the Debtor Parties in the Bankruptcy Motion;

e.    Upon this Court "so ordering" this Stipulation and the entry of the Bankruptcy Court Approval Order by the Bankruptcy Court, and both orders becoming Final Orders, the Class Plaintiffs' right, title, and interest in the Allocation Settlement Consideration shall be extinguished, as will any right, title, and interest of the Debtor Parties in the Alleged Shortfall, and the mutual releases described herein shall become effective.

WHEREAS, in consideration of the promises and mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Debtor Parties and the Class Plaintiffs agree as follows:

1.    The foregoing recitals are incorporated herein in their entirety as if restated in full and are expressly made a part of this Stipulation and Order.

2.    Pursuant to the Settlement, the Debtor and Class Plaintiffs agreed to use reasonable best efforts, consistent with their respective fiduciary duties, to achieve a 50/50 Division of the first $128,400,000 of any Recoveries/Proceeds (as defined in the Settlement).[10] The Debtor and Class Plaintiffs also agreed to use reasonable best efforts, consistent with their respective fiduciary duties, to achieve a 63/37 Division of any Recoveries/Proceeds in excess of

---

[10] *See* Amended Settlement Agreement, § 3(a) and Addendum.

$128,400,000, with the Debtor receiving 63% of the Excess Recoveries and the Lead Plaintiffs, on behalf of the Class Plaintiffs, receiving 37% of the Excess Recoveries.[11]

3.      Pursuant to the Global Settlement Agreement, the Debtor was to immediately pay to Terry S. Brooks, on behalf of the Brooks Family, $9,545,531 upon receipt of the funds pursuant to Section 2(b)(ii) of the Global Settlement Agreement (the "Terry Brooks Payment").[12]

4.      The actual amounts received by the Debtor and the Class Plaintiffs, not including the Stock Share, were as follows:

a.      The Debtor's actual remission payment was $70,625,057.78.

b.      Upon making the Terry Brooks Payment, which was the same as the amount listed in the Global Settlement Agreement ($9,545,531), the Debtor was left with $61,079,526.78.

c.      The Class Plaintiffs' actual remission payment was $73,067,322.49.

d.      The actual Escrowed Funds received by the Class Plaintiffs pursuant to the EDNY Stipulation, including interest, totaled $37,087,214.94.

e.      Thus, the actual settlement proceeds (prior to the payment of fees, costs, and expenses) realized by the Debtor and Class Plaintiffs, as determined pursuant to the Settlement and Global Settlement Agreement,[13] totaled $171,234,064 (comprised of: $70.625 million + $73.067 million + $37 million (escrow) − $9.5 million to the Brooks family), not including the Stock Share.

5.      Applying the terms set forth in the Settlement, the Debtor and Class Plaintiffs were required to use reasonable best efforts, consistent with their respective fiduciary duties, to achieve the following allocation of the $171,234,064 (not including the Stock Share) in total settlement proceeds (the "Agreed Separation of Shared Proceeds"):

---

[11] *See id.*; *see also* Bankr. Op. at 5-6.

[12] *See* Global Settlement Agreement, § 2(d)(vi); *see also* Bankr. Op. at 8, 13-15.

[13] *See* Bankr. Op. at 2.

|  |  | **Debtor's Share** | **Class Plaintiffs' Share** |
|---|---|---|---|
| Amount Subject to 50/50 Division | $128,400,000 | $64,200,000 | $64,200,000 |
| Amount Subject to 63/37 Division | $42,834,064.21 | $26,985,460.45 | $15,848,603.75 |
| **Total** | **$171,234,064.21** | **$91,185,460.45** | **$80,048,603.76** |

6.      Pursuant to section 3(a) of the Settlement, the Parties utilized their reasonable best efforts, consistent with their respective fiduciary duties, to effectuate the terms of the Settlement. On June 14, 2019, the Class Plaintiffs made the Class Plaintiffs' Payment.

7.      Although satisfying their obligation to utilize their reasonable best efforts consistent with their respective fiduciary duties, the Parties could not achieve the Agreed Separation of Shared Proceeds advocated by the Debtor Parties and disputed by Class Plaintiffs because: (i) the Class Remission Payment was made directly to members of the Class at the direction of and as required by MLARS, which barred the application of such funds to the payment of the Class Plaintiffs' costs and expenses or "any other Class obligations"; (ii) the Escrow had been reduced by $9,923,634.65 in approved legal fees and litigation expenses pursuant to a final and non-appealable ruling by this Court; (iii) the Escrow has been or will be reduced by additional payments of approved costs and expenses incurred to date in the amount of $2,717,458.45,[14] which includes $449,388.73 of the Escrow reserved by Class Plaintiffs for estimated additional costs and expenses pursuant to section 3(f) of the Settlement (including, without limitation, costs and expenses for administering the settlement fund, locating class members, and making and finalizing further distributions to class members), leaving insufficient

---

[14] This figure includes payments made for taxes on the interest earned on the Escrowed Funds, bank fees and tax preparation fees related to the funds, and payments made or additional amounts presently owed to Gilardi & Co. LLC ("Gilardi") for claims administration services.

funds to transfer to the Debtor Parties to achieve the Agreed Separation of Shared Proceeds and satisfy the Alleged Shortfall, to the extent the Recovery Trust is entitled to the Alleged Shortfall.

8.       In light of the foregoing, the Alleged Shortfall shall be satisfied by the Allocation Settlement Consideration, to wit: (i) a cash payment of $750,000 by the Class Plaintiffs to the Recovery Trust, and (ii) the relinquishment of the Stock Share by the Class Plaintiffs to the Recovery Trust.

9.       The Allocation Settlement Consideration will result in the following distributions under the Settlement arising from the Parties' reasonable best efforts, consistent with their respective fiduciary duties (the "Final Allocation"):

| | To Debtor | To Class Plaintiffs |
|---|---|---|
| Remission Payments | $70,625,057.78 | $73,067,322.49 |
| Terry Brooks Payment | ($ 9,545,531.00) | $        0.00 |
| Escrowed Funds | $        0.00 | $37,087,214.94 |
| Plaintiffs' Stock Share (est.) | $        0.00 | $ 1,035,000.00 |
| 50/50 Division of Stock Share (est.) | $    517,500.00 | ($  517,500.00) |
| Class Plaintiffs' Loan | $20,000,000.00 | ($20,000,000.00) |
| Forgiveness of Class Plaintiffs' Loan | $        0.00 | $        0.00 |
| **Subtotal** | **$81,597,026.78** | **$90,672,037.43** |
| Class Plaintiffs' Payment | $ 5,333,168.17 | ($ 5,333,168.17) |
| **Subtotal** | **$86,930,194.95** | **$85,338,869.26** |
| Allocation Settlement Consideration | $    750,000.00 | ($    750,000.00) |
| Recovery Trust Stock Share Savings (est.) | $    517,500.00 | ($    517,500.00) |
| **Recoveries Before Costs & Expenses** | **$88,197,694.95** | **$84,071,369.26** |
| Plaintiff Costs and Expenses to Date | N/A | ($2,268,069.72)[15] |
| Reserve for Costs and Expenses (est.) | N/A | (    $449,388.73) |
| **Net Settlement Recoveries** | **$88,197,694.95** | **$81,353,910.81** |

10.      After taking into account the payment of the Class Plaintiffs' losses as determined by MLARS, the payment of the Class Plaintiffs' Payment and the Allocation Settlement

---

[15] As noted, this figure does not include the attorneys' fees and expenses paid from the Escrowed Funds pursuant to the final orders of this Court and the Bankruptcy Court.

Consideration, and the payment of (and reasonable reserve for) costs and expenses pursuant to section 3(f) of the Settlement, there will be no "amount of the Plaintiffs' Share remaining"; therefore, the Additional Allocation Procedure pursuant to section 3(f) of the Settlement will not be triggered, and the Debtor has no reversionary interest in the Class Plaintiffs' remission award under section 3(f) of the Settlement.[16]

11.    Upon entry of this Stipulation and Order and the Bankruptcy Court Approval Order, and such orders becoming Final Orders, the Debtor and the Recovery Trust, including the Post-Confirmation Debtor Representative and the Recovery Trustee, and any of their respective heirs, successors, and assigns, fully, finally and forever release, relinquish and discharge the Class Plaintiffs and their respective agents, attorneys, successors, assigns, administrators, representatives, members, employees, and professionals from all rights, claims, demands, damages of any kind, and causes of action of every nature and description, whether known or unknown, asserted or unasserted, except as to the Debtor Parties' rights to the Allocation Settlement Consideration and any claims arising out of a breach of this Stipulation and Order.

12.    Upon entry of this Stipulation and Order and the Bankruptcy Court Approval Order, and such orders becoming Final Orders, the Class Plaintiffs and any of their respective heirs, successors, and assigns fully, finally and forever release, relinquish and discharge the Debtor and the Recovery Trust, including the Post-Confirmation Debtor Representative and the Recovery Trustee, and any of their respective agents, attorneys, successors, assigns, administrators, representatives, members, employees, oversight committee members, and professionals from all rights, claims, demands, damages of any kind, and causes of action of

---

[16] *See* Settlement § 3(f), Allocation Motion, § III.A; Partial Objection to Allocation Motion, at 2 (supporting sections III.A and III.B of the Allocation Motion); Bankr. Op. at 11-12, n.26.

every nature and description, whether known or unknown, asserted or unasserted, except as to any claims arising out of a breach of this Stipulation and Order.

13.    The individuals signing this Stipulation and Order represent and warrant that they are authorized to sign this Stipulation and Order on behalf of the entity or entities for which they have so signed, provided that the Recovery Trust shall seek Bankruptcy Court approval of the Allocation Settlement by having the Bankruptcy Motion heard on March 24, 2021.

14.    The Class Plaintiffs will support the approval of the Allocation Settlement sought by the Recovery Trust through the Bankruptcy Motion so long as such relief is consistent in all respects with this Stipulation and Order and is not in any way contingent upon or conditioned on any other relief sought by the Debtor Parties before the Bankruptcy Court.

15.    This Stipulation and Order shall become effective upon (i) this Stipulation and Order being entered by and becoming a Final Order of this Court; and (ii) the entry of the Bankruptcy Court Approval Order and such order becoming a Final Order of the Bankruptcy Court.

16.    Subject to Paragraphs 15, 17 and 18 herein, (i) the Class Plaintiffs shall relinquish any right to and interest in the Stock Share, and any distribution based thereon, upon this Court's entry of this Stipulation and Order; and (ii) the Class Plaintiffs shall make the cash payment of $750,000 to the Recovery Trust within three (3) business days after the entry of this Stipulation and Order by this Court.  Counsel for the Recovery Trust shall provide wiring instructions and an executed W-9 form to counsel for the Class Plaintiffs within one (1) business day after the entry of this Stipulation and Order by this Court.

17.     The Recovery Trust shall hold the Allocation Settlement Consideration in a separate reserve pending this Stipulation and Order becoming a Final Order of this Court and the Bankruptcy Court Approval Order becoming a Final Order of the Bankruptcy Court.

18.     Upon this Stipulation and Order becoming a Final Order of this Court and the Bankruptcy Court Approval Order becoming a Final Order of the Bankruptcy Court, the Class Plaintiffs' right, title, and interest in the Allocation Settlement Consideration shall be extinguished, as will any right, title, and interest of the Debtor Parties in the Alleged Shortfall, and the mutual releases described herein shall become effective.

19.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Stipulation and Order.

Dated: February 22, 2021
       New York, New York

**PACHULSKI STANG ZIEHL
& JONES LLP**

*/s/ Alan J. Kornfeld* (with permission)
Alan J. Kornfeld
John Morris
780 Third Avenue
34th Floor
New York, NY 10017-2024
Telephone: (212) 561-7700
Facsimile: (212) 561-7777
Email: akornfeld@pszjlaw.com
       jmorris@pszjlaw.com

*Counsel to the Post-Confirmation Debtor*

**ARENT FOX LLP**

*/s/ George P. Angelich* (with permission)
George P. Angelich
Beth Brownstein

**ROBBINS GELLER RUDMAN & DOWD
LLP**

*/s/ Samuel H. Rudman*
Samuel H. Rudman
Mark T. Millkey
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  (631) 367-7100
Facsimile:  (631) 367-1173
Email:  srudman@rgrdlaw.com
        mmillkey@rgrdlaw.com

**LABATON SUCHAROW LLP**

Ira A. Schochet
Nicole M. Zeiss
140 Broadway, 34th Floor

1301 Avenue of the Americas, 42nd Floor
New York, New York 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
Email: george.angelich@arentfox.com
      beth.brownstein@arentfox.com

Jackson D. Toof
1717 K Street, N.W.
Washington, DC 20006
Telephone: (202) 857-6000
Facsimile: (202) 857-6395
Email: jackson.toof@arentfox.com

Justin A. Kesselman (admitted *pro hac vice*)
The Prudential Tower
800 Boylston Street, 32nd Floor
Boston, MA 02199
Telephone: (617) 973-6102
Facsimile: (617) 722-4993
Email: justin.kesselman@arentfox.com

*Counsel to the Recovery Trust*

New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: ischochet@labaton.com
      nzeiss@labaton.com

*Counsel to Class Plaintiffs*

**LOWENSTEIN SANDLER LLP**

Michael S. Etkin
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2313
Email: metkin@lowenstein.com

*Bankruptcy Counsel for Plaintiffs' Counsel
and Class Plaintiffs*

The letter motion pending at ECF No. 493 is GRANTED and this Joint Stipulation and Order is SO ORDERED. The Clerk of the Court is directed to terminate the motions pending at ECF Nos. 472 and 478. This action remains CLOSED. However, the Court retains jurisdiction to hear and determine all matters arising from or related to the implementation of this Stipulation and Order.

**SO ORDERED:**

Dated: <u>February 23, 2021</u>
     Central Islip, New York

<u>/s/ JOANNA SEYBERT</u>
THE HONORABLE JOANNA SEYBERT
UNITED STATES DISTRICT JUDGE

# EXHIBIT 6

## Exhibit 6 - Allowed Class 3 Claim Holders

| CLAIM NUMBER | SCHEDULE NUMBER | CLAIM NAME | CLAIM DATE | UNSECURED CLAIMED AMOUNT |
|---|---|---|---|---|
| 434 | | **CARTER LEDYARD & MILBURN LLP**[i] | **8/13/2010** | *See endnote i.* |
| 86 | 255000010 | A & M TAPE AND PACKAGING | 6/21/2010 | $295.58 |
| | 257000080 | AIN FLORIDA | | $13,281.94 |
| 295 | 257000280 | AMERICAN & EFIRD MILLS | 7/19/2010 | $27,423.66 |
| 98 | 259000050 | AMERICAN BAG AND LINEN COMPANY | 6/21/2010 | $4,635.00 |
| 43 | 255002230 | AMERICAN INFOSOURCE LP AS AGENT FOR | 6/7/2010 | $2,193.03 |
| | 255000140 | AMERICAN STOCK TRANSFER | | $4,000.00 |
| | 257001360 | ARGO PARTNERS | | $2,737.55 |
| | 257000950 | ARGO PARTNERS | | $1,634.00 |
| | 255002370 | ARGO PARTNERS | | $133.92 |
| | 257007610 | ARGO PARTNERS | | $4,745.40 |
| 99 | 257001720 | ARGO PARTNERS | 6/21/2010 | $4,491.84 |
| 182 | 255000280 | ARGO PARTNERS | 6/28/2010 | $5,257.25 |
| 215 | 255002200 | ARGO PARTNERS | 7/6/2010 | $4,672.00 |
| 75 | 259000490 | ASM CAPITAL III, L.P. | 6/21/2010 | $3,620.00 |
| 350 | 255000520 | ASM CAPITAL III, L.P. | 8/2/2010 | $178,702.00 |
| 404 | 257007140 | ASM CAPITAL III, L.P. | 8/11/2010 | $79,770.00 |
| 74 | 257003900 | ASM CAPITAL, L.P. | 6/21/2010 | $65,644.72 |
| 150 | 257000020 | ASM CAPITAL, L.P. | 6/28/2010 | $27,588.72 |
| 151 | 259000020 | ASM CAPITAL, L.P. | 6/28/2010 | $5,237.52 |
| 405 | 255002080 | ASM CAPITAL, L.P. | 8/11/2010 | $5,930.00 |
| | 255000210 | AUSA INC | | $5,000.00 |
| 284 | | AXAR MASTER FUND, LTD. | 7/16/2010 | $4,256,429.17 |
| 284.02 | | AXAR MASTER FUND, LTD. | 7/16/2010 | $4,256,429.17 |
| 450 | | AXAR MASTER FUND, LTD. | 8/13/2010 | $3,209,204.40 |

| | | | | |
|---|---|---|---|---|
| 429 | 255000250 | BAKER BOTTS LLP | 8/12/2010 | $692,586.87 |
| | 257000850 | BETHEL INDUSTRIES INC | 7/22/2010 | $233,400.00 |
| | 257000960 | BROWARD BOLT | | $1,393.48 |
| 193 | 255000340 | BRYAN CAVE LLP | 7/2/2010 | $236,242.74 |
| 480 | | BURR PILGER MAYER, INC. | 8/17/2010 | $45,840.00 |
| | 255000370 | CARR & PALMER LLP | | $6,526.60 |
| 450.01 | | CEDAR GLADE CAPITAL, LLC | 8/13/2010 | $1,000,000.00 |
| 149 | 255000890 | CEDAR GLADE LP | 6/25/2010 | $62,951.68 |
| 430 | | CIVF I - FL2W01, LLC | 8/12/2010 | $915,000.00 |
| | 255000500 | COAST TO COAST COMPUTER | | $217.74 |
| 402 | | COHEN, D. DAVID | 8/10/2010 | $940,000.00 |
| 32 | | COLEMAN AMERICAN MOVING SERVICES INC. | 5/24/2010 | $7,770.96 |
| 427 | 255000510 | COVINGTON & BURLING LLP | 8/12/2010 | $299,977.11 |
| 426 | 255000540 | CROWE HORWATH LLP | 8/12/2010 | $185,394.31 |
| | 257001520 | CROWN EQUIPMENT CORP | | $9,328.00 |
| 396 | 259000220 | CUSTOM APPAREL | 8/9/2010 | $46,257.60 |
| 228 | | DSM DYNEEMA LLC | 7/12/2010 | $147,312.00 |
| | 257001880 | DUNLAP INDUSTRIES INC. | | $167.00 |
| 53 | | EDDINGTON THREAD CO. | 6/17/2010 | $2,744.77 |
| 27 | | ELLIS, LARRY R. | 5/19/2010 | $2,679,653.60 |
| | 259000660 | FAIR HARBOR CAPITAL, LLC | | $1,525.00 |
| | 257004380 | FAIR HARBOR CAPITAL, LLC | | $1,300.30 |
| | 257001500 | FAIR HARBOR CAPITAL, LLC | | $1,395.81 |
| | 259000800 | FAIR HARBOR CAPITAL, LLC | | $1,395.00 |
| 16 | | FAIR HARBOR CAPITAL, LLC | 5/10/2010 | $21,275.00 |
| 40 | | FAIR HARBOR CAPITAL, LLC | 6/1/2010 | $17,133.72 |
| 181 | | FAIR HARBOR CAPITAL, LLC | 6/30/2010 | $9,161.50 |
| 303 | 257001460 | FAIR HARBOR CAPITAL, LLC | 7/19/2010 | $9,971.23 |
| 304 | 259000180 | FAIR HARBOR CAPITAL, LLC | 7/19/2010 | $8,287.68 |
| 144 | 257006260 | FAIR HARBOR CAPITAL, LLC AS ASSIGNEE | 6/25/2010 | $16,930.34 |
| 273 | | FEDEX CUSTOMER INFORMATION SERVICES | 7/7/2010 | $554.66 |
| 124 | | FEDEX FREIGHT INC | 6/24/2010 | $6,389.19 |
| | 257002440 | FLORIDA POWER AND LIGHT | | $10,463.60 |
| 65 | 257002760 | GLOBAL TECHNICAL NETWORK INC. | 6/18/2010 | $10,431.20 |
| | 257002800 | GRAINGER | | $155.61 |

| | | | | |
|---|---|---|---|---:|
| | 255002140 | HAINCO, LLC | | $5,681.50 |
| 93 | 255001610 | HAINCO, LLC | 6/21/2010 | $12,750.00 |
| 409 | 255001840 | HAINCO, LLC | 8/11/2010 | $10,000.00 |
| 410 | 255000180 | HAINCO, LLC | 8/11/2010 | $97,478.13 |
| | 255000930 | HODGES DOUGHTY & CARSON | | $667.00 |
| | 257002940 | HOLSTON GASES | | $63.81 |
| | 259000370 | HOLSTON GASES | | $127.62 |
| | 255003420 | ILLINOIS TOOL WORKS, INC SUCCESSOR TO | | $46.36 |
| | 257003210 | ILLINOIS TOOL WORKS, INC SUCCESSOR TO | | $53,871.64 |
| | 255001020 | INSIGHT | | $766.95 |
| 22 | | INTEGRITY FURNITURE | 5/13/2010 | $9,274.00 |
| 73 | 259000410 | INTERNATIONAL TEXTILE GRP | 6/21/2010 | $82,401.20 |
| | 259000420 | J. O. KING INC | | $220.00 |
| | 259000470 | KNOX FIRE EXTINGUISHER CO | | $109.25 |
| | 255001350 | LAW OFFICES OF ROBERT C GOTTLIEB | | $765.00 |
| 482 | | LEAD PLAINTIFFS IN RE DHB INDUSTRIES INC | 8/18/2010 | $0.00 |
| 69 | 257000720 | LIQUIDITY SOLUTIONS, INC. | 6/21/2010 | $31,793.04 |
| 214 | 259000450 | LIQUIDITY SOLUTIONS, INC. | 7/6/2010 | $1,492.01 |
| 407 | 255001920 | LIQUIDITY SOLUTIONS, INC. | 8/11/2010 | $178,223.59 |
| 576 | | MCS CAPITAL LLC | 4/30/2013 | $3,500,000.00 |
| 36 | 257005630 | MSC INDUSTRIAL SUPPLY | 5/24/2010 | $1,347.85 |
| | 257005690 | NATIONAL CUSTOM PRTG INC | | $181.33 |
| | 257005910 | NOVA TECH INTERNATIONAL LLC | | $790.00 |
| | 257006020 | ONLINE LABELS INC. | | $1,124.67 |
| | 259000600 | ONLINE LABELS INC. | | $86.38 |
| 403 | 255001740 | OTR /STR (OHIO PARTNERSHIP) | 8/11/2010 | $671,555.92 |
| 23 | | PIONEER FUNDING GROUP, LLC | 5/14/2010 | $15,175.00 |
| | 257006270 | PRATT INDUSTRIES USA | | $13,538.65 |
| | 259000670 | QUILL CORPORATION | | $108.10 |
| 96 | 257006370 | R L CARRIERS | 6/21/2010 | $118.10 |
| 368 | | ROSEN, LEONARD | 8/4/2010 | $258,621.74 |
| 362 | 255002150 | SMX SERVICES & CONSULTING INC. | 8/3/2010 | $99,106.00 |
| 76 | | SONAR CREDIT PARTNERS III, LLC | 6/21/2010 | $629.52 |
| 134 | | SONAR CREDIT PARTNERS III, LLC | 6/24/2010 | $20,405.36 |
| 345 | 257000290 | SONAR CREDIT PARTNERS III, LLC | 8/2/2010 | $3,245.30 |

| | | | | |
|---|---|---|---|---|
| | 259000780 | SONOBOND ULTRASONICS | | $2,139.30 |
| 21 | 257007350 | STAPLES, INC. | 5/10/2010 | $3,495.88 |
| 132.02 | | STATE OF CALIFORNIA FRANCHISE TAX BOARD | 6/24/2010 | $143.39 |
| 511 | | STATE OF DELAWARE | 10/7/2010 | $540.00 |
| | 259000820 | STIMPSON CO. INC. | | $461.50 |
| 2 | 255003560 | TAYLOR, LISA L. | 4/26/2010 | $37,126.95 |
| 563.02 | | TENNESSEE DEPARTMENT OF REVENUE | 1/9/2012 | $45.00 |
| | 259000860 | TIME PAYMENT CORP | | $784.94 |
| | 259000610 | TRC MASTER FUND LLC | | $3,719.64 |
| | 255001860 | TRC MASTER FUND LLC | | $61,000.00 |
| | 255000130 | TRC MASTER FUND LLC | | $12,206.00 |
| | 257005700 | TRC MASTER FUND LLC | | $11,739.20 |
| | 255002670 | TRC MASTER FUND LLC | | $16,669.00 |
| | 259000560 | TRC MASTER FUND LLC | | $12,801.38 |
| | 257006110 | TRC MASTER FUND LLC | | $2,703.00 |
| | 257007040 | TRC MASTER FUND LLC | | $1,645.00 |
| | 255001230 | TRC MASTER FUND LLC | | $8,433.40 |
| | 259000540 | TRC MASTER FUND LLC | | $1,075.00 |
| | 255002330 | TRC MASTER FUND LLC | | $1,550.00 |
| | 257000610 | TRC MASTER FUND LLC | | $62,318.80 |
| 14 | | TRC MASTER FUND LLC | 5/4/2010 | $73,346.94 |
| 15 | 257006100 | TRC MASTER FUND LLC | 5/6/2010 | $31,853.68 |
| 17 | 255004190 | TRC MASTER FUND LLC | 5/12/2010 | $10,106.18 |
| 70 | 259000570 | TRC MASTER FUND LLC | 6/21/2010 | $1,070.50 |
| 71 | 257005900 | TRC MASTER FUND LLC | 6/21/2010 | $5,782.00 |
| 108 | | TRC MASTER FUND LLC | 6/21/2010 | $17,287.77 |
| 122 | | TRC MASTER FUND LLC | 6/24/2010 | $92,400.21 |
| 154 | 257006200 | TRC MASTER FUND LLC | 6/28/2010 | $15,098.45 |
| 198 | 257001930 | TRC MASTER FUND LLC | 7/2/2010 | $12,039.92 |
| 222 | 257005640 | TRC MASTER FUND LLC | 7/7/2010 | $16,068.15 |
| 229 | | TRC MASTER FUND LLC | 7/12/2010 | $23,075.81 |
| 370 | 259000640 | TRC MASTER FUND LLC | 8/4/2010 | $21,143.03 |
| 391 | | TRC MASTER FUND LLC | 8/9/2010 | $37,066.96 |
| 415 | 257001920 | TRC MASTER FUND LLC | 8/11/2010 | $566,380.24 |
| 424 | 259000440 | TRC MASTER FUND LLC | 8/12/2010 | $41,765.35 |

| | | | | |
|---|---|---|---|---|
| 425 | 257003510 | TRC MASTER FUND LLC | 8/12/2010 | $74,140.00 |
| 519 | 255002660 | TRC MASTER FUND LLC | 10/18/2010 | $21,537.16 |
| 520 | 255003240 | TRC MASTER FUND LLC | 10/21/2010 | $57,061.57 |
| 146 | 257007560 | TROPICAL TRAILER LEASING | 6/25/2010 | $10,649.59 |
| | 257007580 | ULINE | | $7,843.82 |
| | 259000890 | ULINE | | $475.96 |
| | 257003040 | UNITED STATES DEBT RECOVERY RESIDUALS | | $731.60 |
| 42 | | UNITED STATES DEBT RECOVERY RESIDUALS | 6/3/2010 | $10,838.25 |
| 84 | 257000600 | UNITED STATES DEBT RECOVERY RESIDUALS | 6/21/2010 | $504.37 |
| 191 | 255002020 | UNITED STATES DEBT RECOVERY RESIDUALS | 7/1/2010 | $3,096.80 |
| 49 | | VELCRO USA INC. | 6/16/2010 | $31,135.00 |
| 317 | 255002380 | VENABLE LLP | 7/26/2010 | $998,354.49 |
| 341 | | VERIZON WIRELESS | 7/26/2010 | $114.42 |
| 451 | | YOUNG CONAWAY STARGATT & TAYLOR, LLP | 8/13/2010 | $18,650.44 |
| | 259000060 | ASCOM HASLER/GE CAP PROG | | $66.97 |
| | 255000220 | AVAYA FINANCIAL SERVICES | | $60,305.00 |
| 57 | 255001430 | CEDAR GLADE LP | 6/9/2010 | $39,750.00 |
| 45 | | CIT TECHNOLOGY FINANCING SERVICES, INC. | 6/4/2010 | $70,344.60 |
| 189 | 257001470 | COMP-AIR SERVICE CO | 7/1/2010 | $536.35 |
| | 255000630 | DELL FINANCIAL SERVICES LLC | | $29,298.00 |
| 104 | | DELTA DENTAL INSURANCE CO | 6/21/2010 | $13,750.60 |
| 25 | 255001200 | EXPORT DEVELOPMENT CANADA | 5/17/2010 | $45,758.92 |
| | 255000820 | FLAT IRON CAPITAL | | $15.00 |
| 46 | | G SQUARED CONSULTING | 6/8/2010 | $47,400.00 |
| 66 | 255000870 | GERBER SERVICE | 6/18/2010 | $10,351.48 |
| 26 | | GIONFRIDDO, PAUL W. | 5/18/2010 | $5,400.00 |
| | 255001000 | HYPERION SOFTWARE | | $15,534.00 |
| 371 | 255001080 | IRON MOUNTAIN INFORMATION MANAGEMENT INC | 8/5/2010 | $479.55 |
| 583 | | KOBRE & KIM LLP | 4/1/2015 | $220,000.00 |
| 588 | | LIFESTONE MATERIALS, LLC | 1/13/2016 | $1,500,000.00 |
| 454 | 255001560 | MICROSOFT CORPORATION AND MICROSOFT | 8/13/2010 | $42,197.36 |
| | 255001770 | PAUL GIONFRIDDO | | $5,000.00 |
| | 255001830 | PITNEY BOWES GLOBAL FINANCIAL SERVICES L | | $328.70 |
| 401 | | SCOVILL FASTENERS | 8/10/2010 | $102,959.80 |
| 10 | 255002070 | SERGEANT MAJOR ASSOCIATES, INC. | 5/5/2010 | $70,000.00 |

| | | | | |
|---|---|---|---|---|
| | 255002260 | TERREMARK NORTH AMERICA INC. | | $2,874.86 |
| | 255002300 | THE MERGIS GROUP | | $1,488.00 |
| | 257007530 | TOYOTA FINANCIAL SERVICES | | $14,858.67 |
| 553 | | TOYOTA MOTOR CREDIT CORPORATION | 7/18/2011 | $10,706.24 |
| 554 | | TOYOTA MOTOR CREDIT CORPORATION | 7/18/2011 | $9,752.24 |
| | 255002350 | UNISHRED FL LLC | | $100.00 |

---

[i] Note: The amount of the CLM Fee Claim is currently a pending contested matter before this Court.  CLM's Class 3 Claim is to be allowed in the amount of $3.75 million pursuant to the CLM Settlement.

# EXHIBIT 7

# Exhibit 7 - Holders of Allowed Class 6 Interests

## Registered Holder Shares

| Name 1 | Name 2 | | | Payable Shares |
|---|---|---|---|---|
| LARRY ELLIS | | | | 100,000 |
| KENNETH S GROSSMAN FAMILY LP | | | | 100,000 |
| BERNARD BAILEY | | | | 50,815 |
| JAMES HENDERSON | | | | 43,950 |
| MICHAEL A BROOKS | T O D HARVEY BROOKS | | | 26,470 |
| JARET L BROOKS | T O D HARVEY BROOKS | | | 26,470 |
| LISA TAYLOR | | | | 26,015 |
| MERRILL MCPEAK | | | | 20,510 |
| PATRICIA A ROSE | | | | 20,000 |
| ERVIN PEARSON | | | | 15,608 |
| CLARENCE HUTTON | | | | 15,051 |
| TERRY GIBSON | | | | 14,650 |
| MICHAEL FOREMAN | | | | 8,557 |
| JAMES MCKEE & | BETTY JEAN MCKEE JT TEN | | | 8,215 |
| DARRELL PEETZ | | | | 6,529 |
| DARRELL S PEETZ | | | | 5,000 |
| MICHAEL ASSOC INVEST LLC | ATTN ALFRED RICCIARDI | | | 4,071 |
| RICHARD A AUERBACH | | | | 1,500 |
| LEONARD D KIRSCH | | | | 1,500 |
| WAYNE V WILSON & | THELMA J WILSON JT TEN | | | 1,030 |
| MARK DAUGHERTY & | RAYMA DAUGHERTY JT TEN | | | 500 |
| CLEVELAND B HOLLOWAY JR | | | | 500 |
| ROY DE FRANCIS | | | | 500 |
| JAMES M KILLFOIL | C-O UNIVERSAL INSULATION INC | | | 500 |
| ELEANOR K METRO | | | | 355 |
| ILSE L KOSIK & | AUSTIN KOSIK | | | 350 |
| JAMES KNOX | | | | 300 |
| HARRY A LOUGH & | MILDRED R LOUGH JT TEN | | | 200 |

| Name 1 | Name 2 | | | Payable Shares |
|---|---|---|---|---|
| WILMA H LEKAN | | | | 100 |
| MARY ANN FERNANDEZ | | | | 60 |
| SHARON LUDEWIG | | | | 50 |
| GARY G NORMAN & | MARIANNE NORMAN JT TEN | | | 50 |
| SAMUEL B WHITE | | | | 5,000 |

**Broker and Bank Shares**

| Participant Name | Participant Number | | | Payable Shares |
|---|---|---|---|---|
| AEI SERVICES INC. | 756 | | | 31,916 |
| APEX CLEAR CORP | 158 | | | 45,350 |
| BMO NESBITT BURNS | 5043 | | | 4,313 |
| BROWN BROS HARRIMAN | 10 | | | 51,800 |
| CETERA INVESTMENT | 701 | | | 2,297 |
| CHARLES SCHWAB & CO. | 164 | | | 1,092,649 |
| COR CLEARING LLC | 52 | | | 2,409 |
| D. A. DAVIDSON & CO. | 361 | | | 1,750 |
| E*TRADE CLEARING LLC | 385 | | | 2,126,180 |
| EDWARD D JONES | 57 | | | 30,024 |
| FIRST CLEARING, LLC | 141 | | | 203,355 |
| FIRST SOUTHWEST CO. | 309 | | | 707,817 |
| GOLDMAN SACHS | 5 | | | 638,413 |
| HILLTOP SECURITIES | 279 | | | 15,927 |
| INT BROK RETAIL EQUI | 534 | | | 2,222,912 |
| J.P. MORGAN CLEARING | 352 | | | 1,708,016 |
| JEFFERIES LLC | 19 | | | 1,721,253 |
| JMS LLC | 374 | | | 3,990 |
| JPM CHASE BANK, N.A. | 902 | | | 485,891 |
| MERRILL LYNCH SFKG | 5198 | | | 1,167,237 |

| Participant Name | Participant Number | | | Payable Shares |
|---|---|---|---|---|
| MORGAN STAN SMTH BAR | 15 | | | 843,522 |
| NAT'L FIN SVCS LLC | 226 | | | 3,454,368 |
| NBCN INC | 5008 | | | 7,600 |
| NRTHRN TRUST COMPNY | 2669 | | | 27,918 |
| OPPENHEIMER & CO. INC | 571 | | | 249,552 |
| OPTIONSXPRESS, INC. | 338 | | | 23,874 |
| PERSHING LLC | 443 | | | 825,110 |
| RAYMND JMS&ASSC INC | 725 | | | 1,414,782 |
| RBC CAP MKTS LLC | 235 | | | 38,017 |
| RBC/DOMINION SEC | 5002 | | | 703,730 |
| SCOTTRADE, INC. | 705 | | | 2,833,199 |
| STIFEL NICOLAUS & CO. | 793 | | | 41,501 |
| STOCKCROSS FIN SVC | 445 | | | 573 |
| TD AMERITRADE CLEAR | 188 | | | 8,847,597 |
| TD WATERHOUSE CA | 5036 | | | 69,640 |
| UBS FINANCIAL SVCS | 221 | | | 1,133,953 |