# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|                                      |   |                                    |
|--------------------------------------|---|------------------------------------|
| In re:                               | ) | Chapter 11                         |
|                                      | ) |                                    |
| SS BODY ARMOR I, INC., et al.,[1]    | ) | Case No. 10-11255 (CSS)            |
|                                      | ) |                                    |
| Debtors.                             | ) | Jointly Administered               |
|                                      | ) |                                    |
| _____     | ) | **Related to Docket Nos. 4550 and 4552** |

## POST-CONFIRMATION DEBTOR AND RECOVERY TRUST'S OPPOSITION TO MOTION FOR ORDER REMOVING ESTATE FIDUCIARIES FOR CAUSE, REQUIRING DISGORGEMENT OF FEES AND RELATED RELIEF FILED BY JON JACKS

T. Scott Avila, in his capacity as Post-Confirmation Debtor Representative of SS Body Armor I, Inc. (the "Debtor"), the post-confirmation debtor in this chapter 11 case, and Brian K. Ryniker, in his capacity as Recovery Trustee of the Recovery Trust of SS Body Armor I, Inc. (the "Recovery Trust" and, with the Debtor, the "Estate Fiduciaries") appointed pursuant to the Second Amended Joint Chapter 11 Plan of Liquidation [D.I. 3261] (the "Plan"), by and through undersigned counsel, respectfully submit this opposition of the Post-Confirmation Debtor and Recovery Trust to the *Motion for an Order Removing Estate Fiduciaries for Cause, Requiring Disgorgement of Fees and Related Relief* [D.I. 4550] (the "Third Control Motion") filed by Jon Jacks ("Jacks").[2]

---

[1]  The pre-confirmation debtors and the last four digits of each debtor's federal tax identification number were:  SS Body Armor I, Inc. (9361); SS Body Armor II, Inc. (4044); SS Body Armor III, Inc. (9051); and PBSS, LLC (8203).  All correspondence and pleadings must be sent to SS Body Armor I, Inc., c/o Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801, Attn: Laura Davis Jones.

[2]  On February 26, 2021, the Estate Fiduciaries filed their *Motion for an Order Striking Jon Jacks' Motion for Order Removing Estate Fiduciaries for Cause, Requiring Disgorgement of Fees and Related Relief* [D.I. 4552] (the "Motion to Strike").

1.       The Third Control Motion is replete with meritless and frivolous charges and allegations that Jacks knows are false.  His tale of a "secret" criminal conspiracy is based on information that has been repeatedly disclosed in numerous public filings, and on the record in this chapter 11 case (the "<u>Bankruptcy Case</u>").  Moreover, the Third Control Motion is a blatant attempt by Jacks – a disgruntled post-petition investor who is angry that he is not receiving a windfall to which he mistakenly believes he is entitled – to relitigate issues that the Court already has decided in favor of the Debtor and Recovery Trust, and against Jacks.  Thus, in the event that the Court does not strike the Third Control Motion (as requested in the Motion to Strike), the Estate Fiduciaries respectfully submit that the Court should deny the Third Control Motion.

2.       Against all odds and over the course of more than a decade, the estate representatives and professionals in Jacks' crosshairs have achieved a "home run" result for all of the Debtor's constituencies, bringing this case from a point where neither unsecured creditors nor equity interest holders had any real chance of recovery, to a point where the estate has (i) paid allowed unsecured claims in full with interest, and (ii) made interim distributions of $0.15 per share, with additional distributions to follow.  The Estate Fiduciaries are now on the verge of closing this challenging chapter 11 case, through mediated settlements of the two remaining material disputes, the issuance of final distributions, payment of remaining expenses, and the implementation of a protocol for the orderly dissolution of the Debtor and Recovery Trust.[3]  The magnitude of the final distributions to equity interest holders will, of course, depend in large part on whether Jacks and his associates are barred from continuing to pursue the frivolous allegations that form the basis of the Third Control Motion.

---

[3]  *See Motion of Recovery Trust for Orders (I) Approving Settlements with Class Plaintiffs and Carter Ledyard & Milburn LLP; (II) Authorizing Dissolution Protocol; (III) Entering Final Decree; and (IV) Granting Related Relief* [D.I. 4547] (the "<u>Case Closing Motion</u>").

3. As the Court observed at the hearing on the Allocation Motion[4] (**Exhibit 1**) filed by Jacks and his associates:

> We're in a bankruptcy case with too much money and the knives really come out when there's too much money in bankruptcy court.
>
> ...
>
> It's kind of interesting that a case that started with unmitigated greed is going to collapse because of unmitigated greed.

07/15/19 Hrg. Tr. [D.I. 4312] at 15:21-23, 15:25-16:2 (**Exhibit 3**). Jacks' litigation strategy epitomizes that unmitigated greed: he makes as much noise as possible and accuses everyone else of malfeasance, with no regard for the accuracy or merit of his positions, in the hope that he will receive some type of "nuisance value" payment or concession. Indeed, Jacks has bragged about his willingness to drag out litigation just to try to "beat down" opposing counsel.[5] Unfortunately, Jacks fails to see that his litigation tactics are destroying, not creating, value for himself and other equity interest holders, as the Debtor and Recovery Trust, and ultimately their stakeholders, have been forced to carry the expense of responding to all of Jacks' numerous failed takeover attempts and other meritless litigation.[6]

4. In keeping with Jacks' litigation strategy in this case, the Third Control Motion accuses estate fiduciaries and professionals of being part of a "criminal conspiracy" that exists only in Jacks' head. Jacks' allegations are demonstrably and deliberately false. As detailed below:

---

[4] Capitalized terms not defined in this Preliminary Statement are defined in the Statement of Facts.

[5] Jacks' apparent vendetta against the estate representatives and professionals dates back at least to early 2015 when Jacks unsuccessfully tried to formulate a competing chapter 11 plan with David Brooks. In Jacks' own words, in a series of emails accompanied by a proposal to elect Jacks to the Debtor's board of directors: "I'm probably the best friend they [the Brooks family] have in the bankruptcy case ... I intentionally drug out a civil case 5 years just to beat down a lawyer on the other side ...." *See* **Exhibit 5**.

[6] As explained herein, the Recovery Trust has not been dissolved and the Recovery Trust Agreement has not been terminated, which means that the obligations thereunder to fund professional expenses and reserves in response to Jacks' threats remains intact. Entry of the bar order requested in the Case Closing Motion would mitigate that cost and risk for the benefit of all parties (including Jacks). *See* Case Closing Motion ¶¶ 56-60.

- Jacks accuses the Estate Fiduciaries of waiving a "$43 million reversionary asset" – but this Court already has determined that the Debtor has no such reversionary asset.

- Jacks insists that Estate Fiduciaries concealed information from this Court in connection with the Allocation Motion – but that information was disclosed to the Court in the very same documents Jacks relies upon in his Third Control Motion, and was discussed by the Debtor's counsel at the hearing on the Allocation Motion.

- Jacks tries to manufacture a "secret" conspiracy – but his "evidence" of that "secret" conspiracy consists of public filings in this Court and in the United States District Court for the Eastern District of New York ("EDNY District Court") and information that was readily and repeatedly disclosed in those public filings.

5.     At its core, the Third Control Motion is nothing more than a reflection of Jacks' resentment regarding the positions taken by the Estate Fiduciaries in response to the Allocation Motion, and his frustration about the Court's decision on the Allocation Motion.  By the Allocation Motion, Jacks and the rest of the Equity Group requested, *inter alia*, that the Court compel the Debtor to petition the EDNY District Court to review and reallocate the remission payments made by the Department of Justice ("DOJ") to the Class Plaintiffs, in the hopes that the Debtor could claim some reversionary interest in the Class Plaintiffs' remission award pursuant to the Class Settlement Agreement.  In response to that request, the Court (i) held that review and amendment of the DOJ's remission payments to the Class Plaintiffs was outside the EDNY District Court's jurisdiction because "this Court and the EDNY District Court are without authority to review what Congress put squarely in the discretion of the DOJ, and here, MLARS" (Allocation Opinion at pp. 9, 11 (**Exhibit 4**)), (ii) determined the Debtor "has no reversionary interest in the Class Plaintiffs' remission award" (Allocation Opinion at p. 11-12 n.26), and (iii) directed the Debtor "to return to the EDNY District Court and to seek approval of distribution of 'Recoveries/Proceeds realized by any of the Parties' in accordance with the Settlement Agreement" (Allocation Opinion p. 13).

6. While Jacks is now once again proceeding *pro se* – his counsel filed a notice of withdrawal in early January 2021 – he was represented by counsel in connection with the Allocation Motion, had a full and fair opportunity to litigate his position in this Court, opted not to appeal the Allocation Order, and chose not to object to the motions filed by the Estate Fiduciaries and the Class Plaintiffs in the EDNY District Court following this Court's Allocation Opinion or otherwise seek to intervene in the EDNY District Court proceedings. Jacks' unhappiness about the Court's decision, which is now final and non-appealable, is not an excuse to force the Debtor's stakeholders to incur the expense of relitigating the same claims and issues the Court already decided in connection with the Allocation Motion.

7. The Court's decision on the Allocation Motion makes Jacks' fabrications regarding Debtor's supposed "reversionary asset" particularly reprehensible. Jacks repeatedly asserts that the Estate Fiduciaries "thumbed their noses" at the Court's decision on the Allocation Motion and "gifted the Debtor's $43 million reversionary asset to the Class Plaintiffs." *See, e.g.,* Third Control Mot. at p. 4 and ¶¶ 16, 28-29. These are deliberately false accusations in light of the Court's clear ruling in the Allocation Opinion that the Debtor has **no** reversionary interest in the Class Plaintiffs' remission award.

8. Equally as glaring are Jacks' demonstrably false assertions regarding the statements made or positions taken by the Estate Fiduciaries in this Court. Jacks' accusations relate to the amount of the "true-up" needed to implement the sharing arrangement mandated by the Class Settlement Agreement, and thereby achieve the appropriate allocation of settlement proceeds between the Debtor and the Class Plaintiffs. In response to the Allocation Motion, the Debtor informed the Court that the Class Plaintiffs already had made an approximately $5.3 million true-up payment. Allocation Opposition at ¶¶ 1, 13 n.5 (**Exhibit 2**). Neither the Debtor nor any other Estate Fiduciary ever suggested to the Court that the $5.3 million true-up payment

was the "final" amount that would cover the approximately $10 million shortfall. In fact, the Debtor's counsel specifically informed the Court that discussions with the Class Plaintiffs regarding additional true-ups were ongoing, and that "we expect there will be additional true ups." 07/15/19 Hrg. Tr. at 32:25-33:1. The transcript of the hearing on the Allocation Motion, not to mention the Allocation Opposition itself, belies Jacks' assertion that the Debtor's counsel "lied" to the Court, or told the Court "that no additional true-up was needed" under the Class Settlement Agreement or that "the $5.3 million true-up made by the Class Plaintiffs was the final true-up." Third Control Mot. at pp. 3, 5.

9.  Jacks' final accusation of misconduct – a "secret" conspiracy to hide the remaining approximately $4.7 million shortfall, or the fact that the initial $5.3 million true-up demand was the result of a mathematical miscalculation – is equally ludicrous. The Class Plaintiffs' true-up obligation is subject to section 3(a) of the Class Settlement Agreement, which provides that the parties will use "their reasonable best efforts, consistent with their respective fiduciary duties" to effectuate the sharing arrangement. The only assets that were available to satisfy the remaining shortfall were (i) the value of 50% of the Class Plaintiffs' shares in the Debtor (now beneficial interests in the Recovery Trust), (ii) the remaining escrowed funds, which are presently estimated at approximately $1.5 million and are subject to outstanding expense obligations and additional anticipated expenses of the Class Plaintiffs, and (iii) a relatively de minimis amount of undistributed proceeds (*e.g.*, uncashed checks). As set forth in the Case Closing Motion, the Estate Fiduciaries recently reached a settlement with the Class Plaintiffs that takes into account the lack of funds sufficient to satisfy the remaining shortfall in full. The EDNY District Court approved that settlement on February 23, 2021, and the Recovery Trust has now requested that this Court approve the settlement in connection with the Case Closing Motion.

10.     There is not and there **never** has been anything "secret" about the shortfall, the mathematical miscalculation, or the Estate Fiduciaries' efforts to collect as much of the shortfall as possible. As outlined above, the Debtor and Recovery Trust were engaged in discussions with the Class Plaintiffs about the remaining true-up amount in or around late June 2019 – a fact that was readily disclosed at the hearing on the Allocation Motion. Those discussions continued while the Allocation Motion was under submission and after the Court entered the Allocation Order. When it became apparent that the parties would not reach a consensual resolution, the Debtor and Recovery Trust filed a motion in the EDNY District Court seeking approval of the final allocation of settlement proceeds, and the turnover of all assets available to cover the shortfall. The total amount of the shortfall, the amount of the first true-up demand and payment, the mathematical miscalculation, and the amount of the remaining shortfall were readily, repeatedly, and thoroughly disclosed in no less than five documents filed on the public docket in the Class Action. The recent settlement with the Class Plaintiffs likewise was filed on the public docket in the Class Action. Jacks' attempt to manufacture a "secret" conspiracy out of publicly disclosed information is utter nonsense.

11.     In sum, all of Jacks' accusations against the Estate Fiduciaries are flatly disproved by the same documents upon which he relies in the Third Control Motion. Moreover, Jacks rehashes the same claims and issues already litigated by the parties and decided by the Court in connection with the Allocation Motion, *e.g.*, whether the Debtor could or should have asked the EDNY District Court to reallocate the remission award to the Class Plaintiffs, and whether the Debtor had any reversionary interest in that remission award. Therefore, for the reasons set forth herein, and to the extent that the Third Control Motion is not stricken in its entirety, the Estate Fiduciaries respectfully request that the Third Control Motion be denied.

DOCS_LA:335074.6 70934/001

**Statement of Facts**

## I. The Class Settlement Agreement and DOJ Settlement Agreement

12.     This chapter 11 case was filed more than a decade ago, in April 2010. After years of tumultuous litigation, the case turned into a "home run" due in large part to funding obtained through two settlement agreements. The first agreement (the "Class Settlement Agreement") was entered into in May 2015 (with an addendum in June 2015) by the Debtor and the plaintiffs (the "Class Plaintiffs") in a pre-petition securities class action filed in the EDNY District Court (the "Class Action"). The Class Settlement Agreement provided for, among other things: (i) a $20 million loan to fund the Debtor's chapter 11 plan; (ii) a "sharing arrangement" whereby the Debtor and Class Plaintiffs would cooperate to maximize their collective recoveries from various claims against David Brooks (or his assets) and then divide those recoveries; and (iii) a reversionary interest to the Debtor if (and only if) any amount of the Class Plaintiffs' share remained after payment to the Class Plaintiffs of 100% of their losses, and payment of certain costs and expenses. With respect to the sharing arrangement, section 3(a) of the Class Settlement Agreement provides that the parties will use "their reasonable best efforts, consistent with their respective fiduciary duties" to effectuate the sharing arrangement.

13.     The second settlement agreement (the "DOJ Settlement Agreement") was entered into between the U.S. Government (through the DOJ), the Debtor, the Recovery Trust, the Class Plaintiffs, and various Brooks-related parties in October 2018. The DOJ Settlement Agreement provided for (or resulted in): (i) the forfeiture of approximately $143 million of Brooks-related assets restrained in a civil forfeiture proceeding in the EDNY District Court; (ii) a pro rata remission payment of $70,625,057.78 to the Debtor, based on the DOJ's determination that the Debtor had suffered approximately $78.8 million of losses as a result of David Brooks' misconduct; (iii) a pro rata remission payment of $73,067,322.49 to the Class Plaintiffs, based on

DOCS_LA:335074.6 70934/001

the DOJ's determination that the Class Plaintiffs had suffered approximately $81.54 million of losses as a result of David Brooks' misconduct; and (iv) an approximately $9.5 million payment by the Debtor to David Brooks' ex-wife, Terry Brooks, which was "payable solely" from the Debtor's remission payment.

14.     The remission payments to the Debtor and Class Plaintiffs were made via the DOJ's Money Laundering and Asset Recovery Section ("MLARS"), which is the division of the DOJ with exclusive authority over funds forfeited in civil or criminal proceedings and the adjudication of related petitions for remission. MLARS required, among other terms and conditions set forth in its July 11, 2018 letter to counsel for the Class Plaintiffs approving the Class Plaintiffs' petition for remission, that "all funds remitted through the petition for remission process must be distributed directly to the Class Members and not used to satisfy any other Class obligations." D.I. 4293-1 at p. 1.

## II.     **The Allocation Motion**

15.     On July 2, 2019, Jon Jacks, Chong Sin, Daniel Khaykis, John Malone, Rodney McFadden, Jeff Dardarian, and Mohawk Capital, LLC (collectively, the "Equity Group") filed a motion in this Court [D.I. 4285] (the "Allocation Motion") challenging the allocation of the settlement proceeds among the Debtor and the Class Plaintiffs. The Equity Group requested that the Court order the Debtor to petition the EDNY District Court to establish an "additional allocation procedure" under section 3(f) of the Class Settlement Agreement to govern the distribution of the DOJ's remission payment to the Class Plaintiffs. *See, e.g.,* Allocation Mot. at ¶¶ 2, 20. According to the Equity Group, the EDNY District Court could recalculate the amount of losses suffered by the Class Plaintiffs to a lower amount than awarded by the DOJ, thereby giving the Debtor a reversionary interest in the remainder of the DOJ's remission payment to the Class Plaintiffs. *See, e.g.*, Allocation Mot. at ¶ 25. In particular, the Equity Group argued that

the Debtor "should be required to take the necessary steps to require the Plaintiffs to undergo the Additional Allocation Procedure so that the value of the Debtors' reversionary interest in the Plaintiffs' Share can be determined in accordance with section 3(f) of the Settlement Agreement" and that a failure to do so would constitute a "direct breach of the Plan and the Confirmation Order, both of which implemented and did not alter the Settlement Agreement." Allocation Mot. at ¶¶ 20, 26.

16. The Equity Group also requested that the Court order the Debtor to recalculate the division of the settlement proceeds "to deduct the payment to Terry Brooks after determining the parties' respective shares, not before." Allocation Mot. at ¶ 2. According to the Equity Group, the payment to Terry Brooks should have been accounted for as follows:

| Calculations/Adjustments | Debtor's Share | Plaintiffs' Share |
|---|---|---|
| Remission Payments | $70,625,057.78 | $73,067,322.49 |
| *Payment to Terry Brooks* | *-$9,545,531.00* | *$0.00* |
| Escrowed Funds | $0.00 | $37,000,000.00 |
| Plaintiffs' Stock Share | $0.00 | $300,000.00 |
| Plaintiffs' Loan | $20,000,000.00 | -$20,000,000.00 |
| Forgiveness of Plaintiffs' Loan | $0.00 | $0.00 |
| *Amt. Owed to Debtors by Plaintiffs* | *$10,200,988.26* | *-$10,200,988.26* |
| | $91,280,515.04 | $80,166,334.23 |
| *Plaintiff's Pmt. Of ½ T. Brooks Claim* | *$4,772,765.50* | *-$4,772,765.50* |
| | $96,053,280.54 | $75,393,568.73 |

Allocation Mot. at ¶ 30 (emphasis in italics added). In other words, the Equity Group contended that a total true-up payment of approximately $14.97 million was owed by the Class Plaintiffs to the Debtor ($10,200,988.26 + $4,772,765.50 = $14,973,753.76) in order to properly account for the payment to Terry Brooks. The Equity Group also included additional calculations that factored in both the Equity Group's proposed treatment of the payment to Terry Brooks and the

-10-

Debtor's purported reversionary interest in the Class Plaintiffs' remission award. Allocation Mot. at ¶¶ 31-32. Based on these additional calculations, the Equity Group further argued that the "probable" true-up amount would be at least approximately $52 million ($10,200,988.26 + $4,772,765.50 + $37,154,189.23 = $52,127,942.99). *Id.*

17. The Debtor filed its opposition [D.I. 4293] (the "<u>Allocation Opposition</u>") on July 9, 2019.[7] With respect to the Equity Group's argument relating to section 3(f) of the Class Settlement Agreement, the Debtor argued that it should not be required to petition the EDNY District Court to establish "additional allocation procedures" because the EDNY District Court lacked jurisdiction to review or reallocate MLARS' remission payment to the Class Plaintiffs. *See, e.g.*, Allocation Opposition at ¶¶ 29-32. The Debtor also argued that it had no reversionary interest in the Class Plaintiffs' remission award because the Class Plaintiffs would not receive a 100% recovery on their claims. Allocation Opposition at ¶ 39.

18. With respect to the appropriate division of the settlement proceeds, the Debtor demonstrated that the Debtor and Class Plaintiffs had received net settlement proceeds to date of $171,234,064.21 after taking into account the payment to Terry Brooks:

| | |
|---|---|
| Debtor's Remission Payment: | $70,625,057.78 |
| Class Plaintiffs' Remission Payment: | $73,067,322.49 |
| Escrowed Funds: | $37,087,214.94 |
| Payment to Terry Brooks: | ($9,545,531.00) |
| **Net Recoveries/Proceeds:** | **$171,234,064.21** |

Allocation Opposition at ¶ 43. Applying the sharing arrangement required under the Class Settlement Agreement, the Debtor calculated the allocation of settlement proceeds as follows:

---

[7] The Recovery Trust and the Class Plaintiffs each filed statements in support of the Allocation Opposition. D.I. 4294, 4297.

| | Debtor's Share | Plaintiffs' Share |
|---|---|---|
| Amt. Subject to 50-50 Division: | $128,400,000.00 | $64,200,000.00 | $64,200,000.00 |
| Amt. Subject to 63-37 Division: | $42,834,064.21 | $26,985,460.45 | $15,848,603.76 |
| | $171,234,064.21 | $91,185,460.45 | $80,048,603.76 |

Allocation Opposition at ¶ 43.

19.     As to the amount of the shortfall, the Debtor did not dispute the portion of the Equity Group's calculations that reflected an approximately $10 million shortfall.  Indeed, using that amount as the shortfall, the Equity Group's calculations agreed with the Debtor's calculations, *i.e.*, that the Debtor's share was approximately $91.2 million and the Class Plaintiffs' share was approximately $80 million.[8]  Moreover, the Debtor reported that the Class Plaintiffs had made a true-up payment of $5,333,168.17. *See, e.g.*, Allocation Opposition at ¶ 1. The Allocation Opposition **never** characterized that as a "final" true-up payment.  To the contrary, the Debtor stated that "[i]f a further true-up payment is required once the liquidation value of the Class Plaintiffs' stock share is determined, the Debtor will make a supplemental demand on the Class Plaintiffs."  Allocation Opposition at ¶¶ 1, 13 n.5.

20.     The Debtor did dispute, however, the Equity Group's additional calculations regarding the payment to Terry Brooks – in other words, the calculations that would have resulted in an at least approximately $14.97 million shortfall – because the Equity Group was "double-counting" the payment to Terry Brooks.  In particular, the Debtor argued:

> To the extent the Equity Group contends that additional adjustments for the payment to Terry Brooks should be factored in after the calculation of the Debtor's share and Class Plaintiffs' share – which, as set forth above, already takes into account the payment to Terry Brooks – in order to increase the Debtor's share to either $96 million or $133.2 million, and decrease the Class Plaintiffs' share to either $75.4 million or $38.2 million, that position is contrary to Sections 3(a) and 3(c) of the Bankruptcy Settlement.

---

[8] The fairly minor differences in exact amounts appears to be due to the fact that the Equity Group's calculation included a $300,000 estimate for the shares held by the Class Plaintiffs, and did not use the exact amount of the escrowed funds.

Allocation Opposition at ¶ 13; *see also* Allocation Opposition at ¶ 45.

21.     The Court heard the Allocation Motion on July 15, 2019, on shortened notice as requested by the Equity Group. *See* D.I. 4285-1 (notice setting forth Equity Group's proposed schedule); D.I. 4289 (order granting Equity Group's motion to expedite hearing).  Jacks was present at the hearing.  07/15/19 Hrg. Tr. at 4:22-24.

22.     The bulk of the argument presented at the July 15, 2019 hearing, and counsel's responses to questions posed by the Court, addressed the reallocation/jurisdictional issue and the Debtor's purported reversionary interest in the Class Plaintiffs' remission award.  Counsel for the Debtor, however, also discussed both the true-up payment made by the Class Plaintiffs as of the date of the hearing, and the parties' ongoing discussions regarding additional true-ups.  Again, the true-up payment made by the Class Plaintiffs as of the date of the hearing was **never** described as a "final" true-up payment.  To the contrary, counsel for the Debtor stated:

> One point with respect to the Terry Brooks issue and the allocation with the class. We've already received an over $5 million true up payment from the class, their [sic] [are] discussions about additional true up payments. As you know, Your Honor, one of the components of the settlement is three million shares of stock that the class received pursuant to the settlement. Nobody disputes that that provision of the settlement agreement remains in existence. Those shares are going to have to be valued. Once those shares are valued which obviously won't happen until the recovery trustee is ready to distribute to equity, once those shares are valued, we expect there will be additional true ups. Everybody understands that to try to do a true up now is somewhat premature.
>
> The numbers the class was working at was[,] we had discussions with the class prior to this hearing. We provided as we did in connection with the settlement, the first iteration of the settlement agreement has hypothetical allocations so people could understand it. We also provided a hypothetical allocation to Equity Group members. They were doing their calculations off that hypothetical calculation. Will that be the final calculation? Not exactly.  It's going to depend on the numbers. So I suggest that the issue about the true up continues to be an issue but it's not ripe for adjudication.

07/15/19 Hrg. Tr. at 32:15-33:13.

23.     At the conclusion of the hearing, the Court took the matter under advisement. In the Court's comments in that regard, the Court stated:

DOCS_LA:335074.6 70934/001

... I am going to take the matter under advisement to issue a written decision. I think that's important here because of the complexity but also the likelihood of appeal so I want to make sure I create a record for my appellate court or courts to have an opportunity to understand where the Court is coming from.

07/15/19 Hrg. Tr. at 50:17-22.

24. The Court issued its Opinion [D.I. 4374] (the "<u>Allocation Opinion</u>") and Order [D.I. 4375] (the "<u>Allocation Order</u>") granting in part and denying in part the Allocation Motion on April 15, 2020. As to the Equity Group's request for an order compelling the Debtor "to petition the EDNY District Court to review and to reallocate the DOJ's remission payments to the Class Plaintiffs" (Allocation Opinion p. 9), the Court (i) held that review and amendment of the DOJ's remission payments was outside the EDNY District Court's jurisdiction because "this Court and the EDNY District Court are without authority to review what Congress put squarely in the discretion of the DOJ, and here, MLARS" (Allocation Opinion pp. 9, 11), and (ii) directed the Debtor "to return to the EDNY District Court and to seek approval of distribution of 'Recoveries/Proceeds realized by any of the Parties' in accordance with the Settlement Agreement" (Allocation Opinion p. 13).

25. In its analysis of the reallocation/jurisdictional issue, the Court found that the Debtor has **no** reversionary interest in the Class Plaintiffs' remission award:

> In making its decision on remission, MLARS evaluated the losses claimed by the individual class members, granted its remission award to the Class Plaintiffs in the total amount of approved losses, and allocated the Class Plaintiffs' remission award among individual class members based on the amount of the losses established for each class member. The Class Plaintiffs asserted claims in excess of $186 million in connection with the class action, the criminal action, and this chapter 11 case; and established losses of $81.54 million. The Class Plaintiffs' share of net recoveries subject to the sharing arrangement under the Bankruptcy Settlement, however, is only $80.1 million. **Therefore, the Class Plaintiffs will not receive a 100% recovery on their claims, and the Debtor has no reversionary interest in the Class Plaintiffs' remission award.**

Allocation Opinion p. 11-12 n.26 (emphasis added).

26.     With respect to the payment to Terry Brooks, the Court rejected the Equity Group's contention that the payment should be divided again after the true-up process. Allocation Opinion p. 16.   In its analysis of this issue, the Court utilized the allocation calculations set forth by the Debtor in the Allocation Opposition – in other words, the calculations reflecting that the Debtor's share of the settlement proceeds was $91,185,460.45 and the Class Plaintiffs' share was $80,048,603.76.  Allocation Opinion p. 15.  As discussed above, those allocation calculations also were consistent with the Equity Group's calculations up until the point at which the Equity Group began "double-counting" the payment to Terry Brooks.

27.     No party appealed the Allocation Order or Allocation Opinion.  The Allocation Order is now a final and non-appealable order.

## III.     Subsuequent Proceedings in the EDNY District Court

28.     As specifically stated by counsel for the Debtor at the hearing on the Allocation Motion, the Debtor and Class Plaintiffs were engaged in discussions regarding the additional true-up amount needed to cover the remainder of the shortfall.   After taking into account the true-up payment of $5,333,168.17 made by the Class Plaintiffs in June 2019, but without factoring in the value of the shares in the Recovery Trust held by the Class Plaintiffs or the Class Plaintiffs' expenses, the remaining shortfall was $4,772,765.50, calculated as follows:

|  | Debtor's Share | Plaintiffs' Share |
|---|---|---|
| Remission Payments | $70,625,057.78 | $73,067,322.49 |
| Payment to Terry Brooks | ($9,545,531.00) | $0.00 |
| Escrowed Funds | $0.00 | $37,087,214.94 |
| Class Plaintiffs' Loan | $20,000,000.00 | ($20,000,000.00) |
| Forgiveness of Class Plaintiffs' Loan | $0.00 | $0.00 |
| June 2019 Pymt by Class Plaintiffs | $5,333,168.17 | ($5,333,168.17) |
| Remaining Shortfall | $4,772,765.50 | ($4,772,765.50) |
| **Agreed Allocation of Proceeds** | **$91,185,460.45** | **$80,048,603.76** |

-15-

A supplemental true-up demand was made in writing to the Class Plaintiffs on October 8, 2019. Although the Debtor and Recovery Trust attempted to consensually resolve the demand made upon the Class Plaintiffs, those efforts ultimately proved unsuccessful.

29.     On June 22, 2020, the Class Plaintiffs filed a *Motion for Approval of Final Allocation of Shared Proceeds* in the EDNY District Court.  EDNY D.I. 472.[9]  The Class Plaintiffs' brief in support of their motion set forth (and refuted) the positions taken by the Equity Group in the Allocation Motion.  *See, e.g.,* EDNY D.I. 475 at pp. 3-5, 15-16, 19-24.

30.     On July 6, 2020, the Debtor and Recovery Trust filed a *Partial Objection to Class Plaintiffs' Motion to Approve Final Allocation of Shared Proceeds* in the EDNY District Court. EDNY D.I. 477 (**Exhibit 6**).  The Debtor and Recovery Trust objected to the Class Plaintiffs' motion to the extent the Class Plaintiffs asserted that no further true-up was required.  *Id.* at p. 2. The Debtor and Recovery Trust did not, however, object to those portions of the Class Plaintiffs' brief that addressed section 3(f) of the Class Settlement Agreement, because the Class Plaintiffs' position on that issue was consistent with the positions taken by the Debtor and Recovery Trust in this Court.

31.     Also on July 6, 2020, and in accordance with this Court's ruling on the Allocation Motion, the Debtor and Recovery Trust filed a *Motion to Enforce Settlement Agreement, Approve Final Allocation of Shared Proceeds, and Compel Turnover of Funds* in the EDNY District Court.  EDNY D.I. 478.  By that motion, the Debtor and Recovery Trust sought the entry of an order (i) compelling the Class Plaintiffs to turn over the remaining shortfall owed to the Debtor, and (ii) approving the final allocation of settlement proceeds among the Debtor and Class Plaintiffs.  *Id.* at p. 1.  As with the opening brief filed with the Class Plaintiffs' motion, the opening brief filed by the Debtor and Recovery Trust apprised the EDNY District Court of the

---

[9]     All references herein to "EDNY D.I. ___" refer to the docket in the Class Action, *In re DHB Industries, Inc. Sec. Litig.*, Case No. 05-cv-4296 (JS) (E.D.N.Y.).

positions taken by the Equity Group in the Allocation Motion, and this Court's ruling on the Allocation Motion, and provided the EDNY District Court with copies of the Allocation Opinion, the Allocation Order, the Allocation Motion, and the various responses to the Allocation Motion. EDNY D.I. 479 (**Exhibit 7**) at pp. 5 n.4, 12-15.

32. Counsel for the Debtor also submitted a declaration describing the discussions with the Class Plaintiffs prior to the October 8, 2019 written supplemental demand, *i.e.*, the same discussions that counsel referenced at the July 15, 2019 hearing in this Court. That declaration reflects, among other things, that (i) the Debtor notified the Class Plaintiffs of the remaining shortfall in late June 2019, and (ii) the "parties also knew this was not the last reconciliation point because the share value of the 1.6 million shares held by the Recovery Trust remained outstanding and yet to be determined." EDNY D.I. 488 (**Exhibit 9**) at ¶¶ 7, 11.

33. The total amount of the shortfall, the amount of the first true-up demand and payment by the Class Plaintiffs, the fact that the first true-up demand was the result of a mathematical error, and the amount of the remaining shortfall were disclosed in at least the following documents, all of which were publicly filed on the docket in the Class Action:

- The Debtor and Recovery Trust's objection to the Class Plaintiffs' motion, which discusses the amount of the first true-up demand and payment, and the fact that shortly after receiving the first payment, the Debtor notified the Class Plaintiffs of the approximately $4.7 million remaining shortfall. EDNY D.I. 477 at pp. 2-5.
- The opening brief in support of the Debtor and Recovery Trust's motion, which discloses all of the above information, acknowledges the shortfall error, and seeks turnover of all assets available to cover the remaining shortfall. EDNY D.I. at pp. 11-12, 18-19.
- A declaration submitted by the Recovery Trustee in support of the Debtor and Recovery Trust's motion, which sets forth the calculations reflecting the remaining shortfall, and discusses the first true-up demand and payment, and the Debtor's notice shortly thereafter to the Class Plaintiffs regarding the remaining shortfall. EDNY D.I. 481 (**Exhibit 8**) at ¶¶ 7-10.

- The declaration submitted by the Debtor's counsel in further support of the Debtor and Recovery Trust's motion, which discusses the first true-up demand and payment, the mathematical mistake, the amount of the remaining shortfall, and related discussions with counsel for the Class Plaintiffs. EDNY D.I. 488 at ¶¶ 4-11.

- The reply brief filed by the Debtor and the Recovery Trust, which discusses, among other things, the correct calculations, the mathematical error, and the related discussions between the Debtor, Recovery Trust and Class Plaintiffs. EDNY D.I. 487 (**Exhibit 10**) at pp. 1-2, 6.

34. Despite being on notice of the proceedings in the EDNY District Court, neither Jacks nor any other member of the Equity Group filed oppositions or otherwise sought to intervene in the EDNY District Court. *See, e.g.,* EDNY D.I. 485, 486 (reflecting service by email on July 22, 2020 on then-counsel to the Equity Group). Briefing with respect to the motion filed by the Class Plaintiffs and the motion filed by the Debtor and Recovery Trust was completed in the EDNY District Court as of August 6, 2020.

35. The matter remained under submission with the EDNY District Court until February 23, 2021, when the EDNY District Court entered the *Joint Stipulation and Order Regarding Final Allocation of Shared Proceeds* approving the Estate Fiduciaries' recent settlement with the Class Plaintiffs.[10] EDNY D.I. 494. As with all of the other submissions regarding the shortfall dispute, the parties' request for the EDNY District Court's approval was filed on the public docket in the Class Action. *See* EDNY D.I. 493.

## IV. Purported *Pro Se* Motions Filed By Jacks in this Court

36. Potter Anderson & Corroon LLP ("Potter Anderson") represented Jacks and the other members of the Equity Group in connection with the Allocation Motion and subsequent proceedings. On November 16, 2020, Potter Anderson filed a *Revised Notice of Appearance and Demand for Service of Papers* [D.I. 4524] appearing as counsel for Jon Jacks, John Malone,

---

[10] The *Joint Stipulation and Order Regarding Final Allocation of Shared Proceeds* was filed in this Court with the Case Closing Motion, as Exhibit 5 to the Ryniker Declaration.

Rodney McFadden, Jeff Dardarian, One-Up Investments LLC, Richard Jacks and James R. Jacks, Jr. (collectively, the "Revised Equity Group"). On January 5, 2021, Potter Anderson filed a *Notice of Withdrawal of Appearance* [D.I. 4537] withdrawing as counsel to the Revised Equity Group.

37.     While Jacks and the Equity Group (including John Malone) were represented by Potter Anderson, Jacks filed numerous pleadings *pro se*, using John Malone's CM/ECF credentials notwithstanding that John Malone was not admitted to the Delaware Bar. *See* D.I. 4492, 4499, 4503, 4512. Those pleadings included a *Motion for an Order Re-Establishing a Recovery Trust, Removing Certain Estate Fiduciaries for Cause, Requiring Disgorgement of Fees and Related Relief* [D.I. 4492] in which Jacks asserted, much like the Third Control Motion, that the Debtor was required to pursue in the EDNY District Court a purported reversionary interest in the Class Plaintiffs' remission award. All of the supposedly *pro se* filings were stricken pursuant to this Court's Order [D.I. 4516] entered on November 2, 2020, and Order [D.I. 4529] entered on November 20, 2020.

## Argument

## I.      The Third Control Motion is Based on Patently False Allegations

38.     The allegations and other factual contentions set forth in the Third Control Motion have **no** basis in reality. Jacks has knowingly and deliberately misstated, among other things, the position asserted in the Debtor's opposition to the Allocation Motion and at the hearing on the Allocation Motion, and the Court's decision on the Allocation Motion. Jacks' motion is based on at least five knowingly false assertions.

39.     **First,** Jacks falsely states that, in the Allocation Opposition, the Debtor asserted "that the Class Plaintiffs' $5.3 million true-up payment was the **final** true-up payment, aside from the valuation of the Class Plaintiff's [sic] stock share." Third Control Mot. at p. 3

(emphasis in original). As set forth above, the Allocation Opposition never characterized the June 2019 payment from the Class Plaintiffs as a "final" true-up payment. Instead, the Allocation Opposition plainly states that "[i]f a further true-up payment is required once the liquidation value of the Class Plaintiffs' stock share is determined, the Debtor will make a supplemental demand on the Class Plaintiffs." Allocation Opposition at ¶¶ 1, 13 n.5.

40.     **Second,** Jacks falsely states that counsel for the Debtor "lied" to this Court at the hearing on the Allocation Motion, and that other Estate Fiduciaries "went along with the fraud." *See, e.g.,* Third Control Mot. at pp. 3, 6 and ¶¶ 7, 12-15. According to Jacks, counsel for the Debtor "told ... this Court at the July 15, 2019 hearing that no additional true-up was needed, and the $5.3 million true-up made by the Class Plaintiffs was the final true-up," and "said the $5.3 million true-up payment was the final true-up payment until the value of the shares was determined." Third Control Mot. at p. 5; *see also id.* at ¶ 9 (asserting that Debtor's counsel "lie[d] at the July 15, 2019 hearing" and concealed the need for an additional true-up); *id.* at ¶¶ 4, 12-14 (accusing the Post-Confirmation Debtor Representative, Recovery Trustee, and counsel for the Recovery Trustee of being part of the imaginary "conspiracy"). Jacks was present at the hearing and clearly has the hearing transcript (a copy of which was included as an exhibit to the Third Control Motion), thus he is or should be well aware that Debtor's counsel specifically addressed the need for additional true-ups at the hearing:

> One point with respect to the Terry Brooks issue and the allocation with the class. **We've already received an over $5 million true up payment from the class, their [sic] [are] discussions about additional true up payments.** As you know, Your Honor, one of the components of the settlement is three million shares of stock that the class received pursuant to the settlement. Nobody disputes that that provision of the settlement agreement remains in existence. Those shares are going to have to be valued. Once those shares are valued which obviously won't happen until the recovery trustee is ready to distribute to equity, once those shares are valued, **we expect there will be additional true ups.** Everybody understands that to try to do a true up now is somewhat premature.

07/15/19 Hrg. Tr. at 32:15-33:2 (emphasis added).

41.     **Third,** Jacks falsely states that (i) the Equity Group "sought confirmation from the Court that the proper Bankruptcy Settlement 'true-up' was approximately $10 million and the Debtor was entitled to approximately $43 million in received funds pursuant to section 3(f) of the Bankruptcy Settlement," (ii) that the Post-Confirmation Debtor Representative and counsel for the Debtor (among other parties) "disputed the $10 million" true-up amount, and (iii) that the Court "agreed with Equity Group's positions." Third Control Mot. at ¶¶ 7, 9.

42.     The Equity Group in fact argued that the "proper calculation" required an at least approximately $14.97 million true-up payment from the Class Plaintiffs. Allocation Mot. at ¶ 30 ("For the agreement to split the Terry Brooks payment to have any real value to the Debtors, it must be taken out of the respective shares after the true-up payment and any reversion."). The calculations provided by the Equity Group in support of its position required a true-up payment of $10,200,988.26, and then an additional true-up payment of $4,772,765.50 – in other words, a total payment of at least $14,973,753.76. *Id.*

43.     Moreover, the Debtor did not dispute the approximately $10 million shortfall. As is plainly stated in the Allocation Opposition, the Debtor took issue with the Equity Group's calculations that "double-counted" the payment to Terry Brooks:

> The Equity Group also seeks an order compelling the Debtor to recalculate the shared recoveries under the Bankruptcy Settlement so that the Debtor's payment of approximately $9.5 million to Terry Brooks, made pursuant to the DOJ Settlement from the forfeited assets distributed by MLARS, is factored into the calculation of the shared recoveries twice: once in determining the amounts of the parties' respective shares and the amount of the "true-up" payment owed to the Debtor, and then again as an additional adjustment after all other calculations required under the Bankruptcy Settlement have been performed.
> ...
> To the extent the Equity Group contends that additional adjustments for the payment to Terry Brooks should be factored in after the calculation of the Debtor's share and Class Plaintiffs' share – which, as set forth above, already takes into account the payment to Terry Brooks – in order to increase the Debtor's share to either $96 million or $133.2 million, and decrease the Class Plaintiffs' share to either $75.4 million or $38.2 million, that position is contrary to Sections 3(a) and 3(c) of the Bankruptcy Settlement.

DOCS_LA:335074.6 70934/001

Allocation Opposition at ¶¶ 12-13.  And, the Court agreed with the Debtor – not the Equity Group – on this issue.  In the Allocation Opinion, the Court stated:

> The Equity Group asserts that the amount for Ms. Brooks must be divided *after* the remission payments are "trued-up." However, the DOJ Settlement states that amounts to Ms. Brooks are to come from the MLARS remission amounts. The amount to Ms. Brooks does not need to be delayed while the parties seek approval of distributions under the Bankruptcy Settlement in the EDNY District Court; nor should the other sources of money be calculated before Ms. Brooks receives payment. The payment to Ms. Brooks should come directly from the MLARS distribution; the remaining MLARS funds should be divided pursuant between and among the parties, along with the other sources of money, pursuant to the Bankruptcy Settlement and approval should be sought before the EDNY District Court.

Allocation Opinion p. 16 (emphasis in original); *see also* Allocation Opinion p. 15 (setting forth calculations showing the Debtor's share was approximately $91.2 million and the Class Plaintiffs' share was approximately $80 million – in other words, not the $96 million (Debtor) and $75.4 million (Class Plaintiffs) split advocated by the Equity Group).

44.    **Fourth,** Jacks repeatedly accuses the Estate Fiduciaries of misrepresentations and malfeasance regarding the purported "$43 million reversionary interest" in the Class Plaintiffs' remission award.  *See* Third Control Mot. at pp. 4-5 (asserting the fact that the Equity Group "lost concerning the $43 million reversionary interest" was a "false narrative" by the Debtor's counsel that was not contradicted by other Estate Fiduciaries); *id.* at p. 4 (arguing that estate professionals erred in not pursuing "the approximately $43 million the Class Plaintiffs owed the Debtor" under the Class Settlement Agreement, and that the Post-Confirmation Debtor Representative and Recovery Trustee "waived the $43 million reversionary asset"); *id.* at p. 6 (again arguing that Debtor's counsel "waive[d] ... the Debtor's rights to a $43 million reversionary interest").  These are intentionally false statements given that the Allocation Opinion plainly states that "**the Class Plaintiffs will not receive a 100% recovery on their claims, and the Debtor has no reversionary interest in the Class Plaintiffs' remission award**." Allocation Opinion p. 11-12 n.26 (emphasis added).  Enough is enough.

45.     **Fifth**, Jacks' allegations of a "secret" criminal conspiracy to "conceal" the remaining shortfall owed by the Class Plaintiffs is ludicrous.  Third Control Mot. at p. 4 and ¶¶ 4, 8-9.  The existence of an approximately $10 million shortfall, the payment by the Class Plaintiffs of only approximately $5.3 million in June 2019, the need for additional true-ups, and the ongoing discussions with the Class Plaintiffs regarding additional true-ups were disclosed and not disputed in connection with the Allocation Motion.  Moreover, as described in detail above, these same facts were repeatedly disclosed in numerous public filings in the EDNY District Court, including the briefs filed by the Debtor and Recovery Trust, and the declarations filed by the Recovery Trustee and the Debtor's counsel.  In short, there has never been anything "secret" or "criminal" about the allocation of the settlement proceeds, or the Debtor and Recovery Trust's efforts to collect the remaining shortfall from the Class Plaintiffs.[11]

46.     Thus, all of Jacks' allegations of misconduct and "criminal conspiracy" by Estate Fiduciaries relating to the allocation of settlement proceeds are completely devoid of merit.  Far from establishing any "cause" for removal or disgorgement of fees, or "reasonable grounds" for a referral pursuant to 18 U.S.C. § 3057(a),  the Third Control Motion is based entirely on a tale that Jacks has cut from whole cloth.[12]  The Third Control Motion should be denied.

---

[11] To suggest otherwise in the face of reality and the publicly available facts is reckless and shameful, and potentially damaging to the reputations of professionals who routinely appear before this Court. Therefore, the Court should sanction Jacks for his conduct pursuant to the Estate Fiduciaries' concurrent Motion to Strike. The Estate Fiduciaries and their professionals also reserve their rights to bring defamation and other claims against Jacks as appropriate.

[12] On a motion pursuant to 18 U.S.C. § 3057, the Court must determine whether "reasonable grounds" exist to refer the matter for criminal investigation. *See, e.g., Prosser v. Gerber (In re Prosser)*, 2011 Bankr. LEXIS 5009, *4 (Bankr. D.V.I. December 20, 2011) (denying motion because court found "no basis upon which to make a referral" as to alleged crimes and/or professional conduct violations, where "what [was] lacking [was] an intent to violate the law and sufficient evidence to warrant the relief sought"). Here, as set forth above, there is **no** evidence of any criminal or unethical conduct whatsoever, much less any intentional misconduct.

DOCS_LA:335074.6 70934/001

## II. The Relief Requested in the Third Control Motion is Barred by Res Judicata and Collateral Estoppel

47.     The Third Control Motion seeks relief that directly contradicts this Court's final and non-appealable decision on the Allocation Motion.  This could not, by any stretch of the imagination, be viewed as inadvertent, given that the Third Control Motion repeatedly references the Allocation Opinion.

48.     By the Third Control Motion, Jacks demands that the Court remove the Estate Fiduciaries "for cause" and order the disgorgement of all fees received since November 2018 because the Estate Fiduciaries purportedly "gifted the Debtor's $43 million reversionary asset to the Class Plaintiffs." Third Control Mot. at ¶¶ 16, 28-29. Jacks does not even attempt to reconcile these claims for relief with the Court's prior determinations that (i) the EDNY District Court lacked jurisdiction to reallocate the DOJ's remission payments to the Class Plaintiffs, and (ii) the Debtor has no reversionary interest in the Class Plaintiffs' remission award.  As discussed below, the relief that Jacks seeks in the Third Control Motion is barred by the doctrines of res judicata and collateral estoppel, because the Third Control Motion is a transparent attempt by Jacks to relitigate the claims and issues previously determined **against** him and the rest of the Equity Group in the Allocation Order and Allocation Opinion.

### A. The Claims Asserted in the Third Control Motion Are Barred By the Doctrine of Res Judicata

49.     The preclusive effect of the Allocation Order is governed by federal law.  *See, e.g., McLaughlin v. Bd. of Trs. of the Nat'l Elevator Indus. Health Ben. Plan*, 686 F. Appx. 118, 121 n.1 (3d Cir. 2017) (in cases involving the preclusive effect of a prior federal court determination, federal law applies). Under federal law, there are three requirements for res judicata, or claim preclusion.  There must be "(1) a final judgment on the merits in a prior suit

-24-

involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action." *Zahl v. Warhaftig*, 655 F. Appx. 66, 72 (3d Cir. 2016) (citation omitted).

50.    Here, the Allocation Order was a "final judgment on the merits" as to (i) whether the Debtor was required to petition the EDNY District Court to reallocate the DOJ's remission payments to the Class Plaintiffs, and (ii) whether the Debtor has any reversionary interest in the Class Plaintiffs' remission award.  In bankruptcy proceedings, an order in a contested matter is final and appealable as of right if it resolves the "discrete dispute" raised in the contested matter, allows the losing party no further opportunity to assert its position in the bankruptcy court, and leaves "nothing further to be done" in the bankruptcy court. *Lubonty v. Barnard*, 2014 U.S. Dist. LEXIS 65395, *11-12 (E.D.N.Y. May 12, 2014). In this case, the Allocation Order and Allocation Opinion resolved the "discrete dispute" raised by the Equity Group, and left no further opportunities to be heard and nothing further to be done in this Court.  The fact that the Court's decision on the Allocation Motion also directed the Debtor to seek the EDNY District Court's approval of the final allocation calculation does not alter this conclusion in the slightest. *See, e.g., Ades-Berg Inv'rs v. Breeden (In re Bennett Funding Grp., Inc.)*, 439 F.3d 155, 162-64 (2d Cir. 2006) (bankruptcy court's approval of settlement agreement that also required approval by the Southern District of New York in a pending class action was a "final" order because it resolved the "discrete dispute" presented to the bankruptcy court left "nothing further to be done" in the bankruptcy court).

51.    The Allocation Motion and the Third Control Motion also involve the "same parties or their privies."  Jacks, of course, was one of the moving parties as to the Allocation Motion, and is the only moving party as to the Third Control Motion.  The Debtor and Recovery Trust also were parties to the Allocation Motion, and the remaining Estate Fiduciaries are in privity with the Debtor or Recovery Trust for purposes of the Allocation Motion and Third

Control Motion.  Specifically, the Post-Confirmation Debtor Representative, the Debtor's counsel and the Debtor's oversight committee members are in privity with the Debtor, and the Recovery Trustee, the Recovery Trust's counsel and the Recovery Trust's oversight committee members are in privity with the Recovery Trust.  *See, e.g., ASAPP Healthcare, Inc. v. Serrano*, 2020 U.S. Dist. LEXIS 228978, *17-20 (D.N.J. December 7, 2020) (because privity exists when there is "a prior legal or representative relationship between a party to the prior action" and a nonparty, the CEO and sole director of a corporation was in privity with the corporation, and the trustees of another corporation were in privity with that entity); *Hurst v. Wiegard*, 2017 U.S. Dist. LEXIS 98734, *16 (D. Del. June 27, 2017) (defendants' counsel of record in prior action was in privity with defendants for purposes of res judicata in later suit); *Umar Oriental Rugs, Inc. v. Carlson & Carlson, Inc.*, 757 F. Supp. 2d 218, 225-26 (E.D.N.Y. 2010) (privity generally exists in fiduciary and principal-agent relationships); *Liu v. Silverman (In re Liu)*, 2001 Bankr. LEXIS 547, *25 (Bankr. S.D.N.Y. May 23, 2001) (final order approving settlement agreement was preclusive of later attempt to sue both chapter 7 trustee and his counsel on grounds that settlement was improvident).

52.     The Third Control Motion also implicates the "same cause of action" as the Allocation Motion.  In the Third Circuit, "[t]he focal point of the 'same cause of action' analysis is not whether there are new facts occurring after the final judgment, but whether the *material* facts alleged in each suit are the same, and whether the witnesses and documentation required to prove the allegations are the same." *Foster v. Denenberg*, 616 F. Appx. 472, 474 (3d Cir. 2015) (emphasis in original). Thus, the "continuation of the same … activity at issue in the prior action" does not "raise a new or independent" cause of action even if new examples of that activity are alleged in the later suit. *Id.* at 474-75 (prior suit challenging allegedly fraudulent real estate transaction had preclusive effect on later suit against defendants

DOCS_LA:335074.6 70934/001

for knocking down a wall on the property, even though the wall was knocked down years after the first suit was filed, because "the right to knock that wall down depends on who owns it, and the issue of ownership is determined by reference to the parties' intentions when they negotiated the 2007 transaction," which was the matter at issue in the first suit).

53.     Courts have applied res judicata to bar subsequent claims where, as here, the plaintiff's underlying theory of liability depends on facts that existed at the time of the first suit and were at issue in the first suit.  For instance, in *Yellow Pages Photos, Inc. v. Dex Media, Inc. (In re Dex Media, Inc.)*, 595 B.R. 19 (D. Del. Nov. 28, 2018), a claimant (YPPI) asserted copyright infringement claims against the debtor (Dex Media), arguing that Dex Media had used YPPI's images without a license. *Id.* at 34. YPPI's theory was, in a nutshell, that Dex Media's use of the images was wrongful because (i) Dex Media received the images from another entity (SuperMedia) under a license that SuperMedia held as the successor-in-interest of yet another entity (Idearc), and (ii) the underlying license was not valid because it had not been properly assumed by Idearc in its prior chapter 11 case. *Id.* YPPI had previously asserted claims against SuperMedia challenging its transfer of the images to Dex Media and other parties, arguing that either the license was valid and its transfer restrictions had been breached by SuperMedia, or in the alternative, the transfers were improper because the license was not valid under the "failure to assume" theory.  *Id.* at 29. In the prior litigation, YPPI ultimately abandoned the "failure to assume" theory, and a judgment on the merits was entered in favor of YPPI based on SuperMedia's breach of the transfer restrictions.  *Id.* at 29-30.  In its subsequent litigation against Dex Media, YPPI argued that res judicata did not preclude its claims because the allegedly infringing conduct – Dex Media's use of the images – occurred after YPPI filed its complaint in the SuperMedia litigation. *Id.* at 34. The court disagreed:

As YPPI admits, to prevail on its Counterclaims against Dex Media, "YPPI needs to prove that Dex Media published YPPI's copyrighted images without having a license." … According to YPPI, the reason that Dex Media did not have a license is Idearc's breach and failure to assume the License in 2009, which would have occurred years before the filing of either the SuperMedia Litigation or the Dex Media Litigation … That the Counterclaims allege new infringement claims post-dating the SuperMedia Litigation is inconsequential where, as here, they are based on the same "failure to assume" theory that YPPI raised and abandoned in the SuperMedia Litigation in favor of its theory that the License was effectively assumed but later breached.

*Id.* Because YPPI raised "its 'failure to assume' theory claims" in the prior litigation, it could not "resurrect them in the separate litigation against SuperMedia's corporate parent." *Id*. at 36.

54.     Here, the claims asserted against the Estate Fiduciaries in the Third Control Motion with respect to the supposed "reversionary asset" are based on the same facts and the same underlying theory of supposed liability as the Allocation Motion.  The Allocation Motion sought to "enforce" the chapter 11 plan by requiring the Debtor to seek a reallocation of the Class Plaintiffs' remission award in the EDNY District Court, in order to claim a purported reversionary interest in the remission award.  *See, e.g.,* Allocation Mot. at ¶ 20 (arguing that Debtor "should be required to take the necessary steps to require the Plaintiffs to undergo the Additional Allocation Procedure so that the value of the Debtors' reversionary interest in the Plaintiffs' Share can be determined in accordance with section 3(f) of the Settlement Agreement").  The Third Control Motion seeks virtually identical relief, in that it seeks to "enforce" the Plan by removing the Estate Fiduciaries and requiring disgorgement of fees because the Estate Fiduciaries supposedly "gifted the Debtor's $43 million reversionary asset to the Class Plaintiffs" by not seeking a reallocation of the Class Plaintiffs' remission award or claiming a reversionary interest in that award in the EDNY District Court.  Third Control Motion ¶¶ 2, 16, 28.  As in *Yellow Pages Photos, Inc.*, the claims asserted in the Third Control Motion attempt to "resurrect" the same facts and theory of liability that were asserted in the Allocation Motion, which were resolved by the Court's final order holding: (i) the EDNY District Court

lacked jurisdiction to reallocate the DOJ's remission payments to the Class Plaintiffs, and (ii) the Debtor has no reversionary interest in the Class Plaintiffs' remission award.

55.     Thus, the allocation-related claims asserted against the Estate Fiduciaries are barred by a straightforward application of res judicata. The Third Control Motion should be denied as to all those claims, including Jacks' requests for the removal of Estate Fiduciaries and for disgorgement of fees, in order to avoid the relitigation of claims already decided by the Court, thereby both conserving the Court's resources and sparing the Debtor and Recovery Trust (and ultimately, their stakeholders) from incurring unnecessary litigation expense.

### B.     Jacks is Collaterally Estopped from Relitigating the Allocation-Related Issues Raised in the Third Control Motion

56.     Collateral estoppel applies under federal law if the following requirements are satisfied: (i) "the issue sought to be precluded is the same as that involved" in the prior action; (ii) the issue was "actually litigated" in the prior action; (iii) the "party against whom the earlier decision is asserted" had a "full and fair opportunity to litigate the issue" in the prior action; (iv) the issue was determined by a "final and valid" judgment; and (v) determination of the issue was "essential" to the prior judgment. *See United States ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 316 (3d Cir. 2019) (citations omitted).

57.     Here, the Third Control Motion seeks to relitigate whether the Debtor was required to petition the EDNY District Court to reallocate the Class Plaintiffs' remission award, in order to claim a supposed $43 million reversionary interest in the remission award. Those issues are the "same as that involved" in the Allocation Motion, and were "actually litigated" in connection with the Allocation Motion. It is irrelevant that some of the specific relief requested in the Third Control Motion – *e.g.,* removal of Estate Fiduciaries and disgorgement of fees – was not requested in the Allocation Motion, because the underlying issues are identical. *See, e.g., Sprint Communs. Co. L.P. v. Cequel Communs., LLC*, 2020 U.S. Dist. LEXIS 99895, *8-9 (D.

-29-

Del. June 8, 2020) (collateral estoppel barred relitigation as to interpretation of patent terms, notwithstanding that plaintiff had asserted different types of infringement claims in prior suit, because issue in both cases was identical); *Hendry v. Hendry (In re Hendry)*, 428 B.R. 68, 76-77 (Bankr. D. Del. 2010) (debtor was collaterally estopped from relitigating certain facts and legal issues in a non-dischargeability action because facts and issues had been decided in prior claim allowance proceeding, even though non-dischargeability was not at issue in first proceeding).

58.     As a member of the Equity Group, Jacks was a party to the prior litigation, and had a "full and fair" opportunity to litigate all of the same allocation-related issues he now raises in the Third Control Motion.  The allocation-related issues were brought before the Court on the Equity Group's motion, the Equity Group opted to have the motion heard on shortened notice, and the Court set the schedule requested by the Equity Group.  Moreover, the Equity Group submitted an opening brief, voluminous exhibits and a reply brief, and was represented by counsel during briefing, at the hearing, and while appellate review of the Allocation Order and Allocation Opinion was still available.[13]

59.     Finally, as discussed above, the Allocation Order was a final order, and it squarely determined the same allocation-related issues that Jacks raises again in the Third Control Motion. As to the issue of whether the Debtor was required to petition the EDNY District Court to reallocate the Class Plaintiffs' remission award, the Court held that review and amendment of the DOJ's remission payments was outside the EDNY District Court's jurisdiction because "this Court and the EDNY District Court are without authority to review what Congress put squarely in the discretion of the DOJ, and here, MLARS." Allocation Opinion pp. 9, 11.  As to whether the Debtor has any reversionary interest in the Class Plaintiffs' remission award, the Court found that "the Class Plaintiffs will not receive a 100% recovery on their claims, and the Debtor has no

---

[13] The Equity Group also was represented by counsel at the time the Class Plaintiffs and the Estate Fiduciaries filed their briefs in the EDNY District Court.

reversionary interest in the Class Plaintiffs' remission award." Allocation Opinion p. 11-12 n.26. The Court's determination of these issues was "essential" to the Court's decision on the Allocation Motion, in order to address one of the primary (if not **the** primary) arguments asserted by the Equity Group, namely that the Debtor "should be required to take the necessary steps to require the Plaintiffs to undergo the Additional Allocation Procedure so that the value of the Debtors' reversionary interest in the Plaintiffs' Share can be determined in accordance with section 3(f) of the Settlement Agreement," and that a failure to do so would constitute a "direct breach of the Plan and the Confirmation Order, both of which implemented and did not alter the Settlement Agreement." Allocation Mot. at ¶¶ 20, 26.

60. In sum, the allocation-related issues raised in the Third Control Motion are the same issues that were fully and fairly litigated in connection with the Allocation Motion, and squarely decided by the Court in the Allocation Opinion and Allocation Order. As a result, Jacks is now collaterally estopped from relitigating the same allocation-related issues against the Estate Fiduciaries.

## III.     Jacks' Argument that the Recovery Trust Has Terminated Lacks Merit

61. Jacks also uses the Third Control Motion to repeat his now familiar argument that the Recovery Trust has terminated. Third Control Mot. at ¶¶ 17-24. This argument, which is premised on one sentence cherry-picked from Section 11.1 of the Recovery Trust Agreement, still lacks merit—no matter how many times Jacks asserts it. The Recovery Trust remains in full force and effect, and the Recovery Trustee's duties to administer the Recovery Trust pursuant to the Recovery Trust Agreement have not ceased. This is true under the plain language of the Recovery Trust Agreement, and under applicable New York law.

**A.**    **The Plain Language of Section 11.1 Demonstrates that the Recovery Trust Agreement and the Recovery Trust Remain in Full Force and Effect**

62.    The Recovery Trust Agreement is a contract and, as such, is subject to firmly established principles of contract interpretation.  *In re Chase Manhattan Bank*, 846 N.E.2d 806, 808–09 (N.Y. 2006).  The "primary objective" of contract interpretation under New York law "is to give effect to the intent of the parties as revealed by the language of their agreement," giving "full meaning and effect to all of its provisions."  *Chesapeake Energy Corp. v. Bank of New York Mellon Trust Co., N.A.*, 773 F.3d 110, 113 (2d Cir. 2014) (interpreting New York law).

63.    Section 11.1 of the Recovery Trust Agreement consists of three parts, which distinguish between (a) termination of the Recovery Trust Agreement and its resulting consequences, addressed in Part 1, and (b) termination of the Recovery Trust, addressed in Parts 2 and 3, and its resulting consequences:

- "Part 1" provides: "This *Agreement . . . shall terminate* and the Recovery Trust shall *dissolve and terminate* and be of no further force or effect upon the earlier to occur of (i) the *final Distribution* of all monies and other Recovery Trust Assets in accordance with the terms of this Agreement, the Plan and Confirmation Order and (ii) *entry of a Final Order* of the Bankruptcy Court terminating and dissolving the Recovery Trust as provided under the Plan." *Id.* (emphasis added).

- "Part 2" provides: "The *Recovery Trust* will *terminate* no later than the third (3rd) anniversary of the Effective Date, provided, however, that, on or prior to the date six (6) months prior to such termination, the Bankruptcy Court, upon motion by the Recovery Trustee or a party in interest, *may extend* the term of the *Recovery Trust* for a fixed period if it is necessary to facilitate or complete the liquidation and distribution of the Recovery Trust Assets." *Id.* (emphasis added).

- "Part 3" provides, in relevant part: "In the event the Recovery Trustee *elects to terminate* the Recovery Trust, subject to consultation with the Post-Confirmation Debtor Representatives, he shall provide twenty (20) day notice thereof to the Office of the United States Trustee and the Recovery Trust Committee, and file such notice with the Bankruptcy Court . . . ." *Id.* (emphasis added).  Only upon such election is the Recovery Trustee relieved of his duties to administer the Recovery Trust, and neither the "Recovery Trustee nor the members of the Recovery Trust Committee shall have any further duties or responsibilities under the Agreement or otherwise." *Id.*

-32-

### 1. The Recovery Trust Agreement Remains in Full Force and Effect, such that the Recovery Trust has not "Dissolved"

64.     Notably, Section 11.1 only provides for an automatic "dissolution" of the Recovery Trust where the Recovery Trust *Agreement* is terminated pursuant to Part 1. *See id.*, Part 1 (when the "Agreement" terminates, the Recovery Trust "shall dissolve *and* terminate and be of no further force or effect."). "Dissolution," under the plain language of the Recovery Trust Agreement and under general New York trust principles, implies the end of a trust's continued existence, and termination of a trust, standing alone, does not absolve the trustee of his or her continued duty to administer and wind up the trust. *See, e.g.*, *In re Klosinski*, 746 N.Y.S.2d 350, 358 (N.Y. Sup. 2002) ("When the time for the termination of the trust has arrived, the duties and powers of the trustee do not immediately cease; until the trust is actually wound up, he has such duties and powers as are appropriate for the winding up of the trust); *see also* Rest. (Third) of Trusts § 89 ("powers of a trustee do not end on the trust's termination date but may be exercised as appropriate to the performance of the trustee's duties in winding up administration ...").

65.     Jacks does not argue—nor could he—that the Recovery Trust Agreement has terminated, as there has been no "final distribution" of the Recovery Trust's assets and no "final order" of the Bankruptcy Court terminating and dissolving the Recovery Trust. *See* Agr. § 11.1, Part 1. The Recovery Trust has not automatically "dissolved" under Part 1. At best, Jacks' argument—that the Recovery Trust lapsed under Part 2—does not have the impact he ascribes. Even assuming a lapse in time, the Recovery Trustee's duties remain in full force and effect. *See, e.g.*, *In re Klosinski*, 746 N.Y.S.2d 350.

### 2. The Recovery Trust Has Not "Terminated" And Even if it Did, the Recovery Trustee's Duties to Administer the Trust are Ongoing

66.     The Recovery Trust did not terminate after three years pursuant to Part 2, but even assuming *arguendo* that it did, the Recovery Trust Agreement makes clear that the

Recovery Trustee's *duties* only end when the Recovery Trustee *elects* to terminate the Recovery Trust pursuant to Part 3.

67.     The Recovery Trust Agreement distinguishes between *mandatory* and *permissive* termination of the Recovery Trust. Part 1 of Section 11.1 provides for mandatory termination, stating that the Recovery Trust "shall" terminate if final distributions are made or the Bankruptcy Court enters an order terminating and dissolving the Recovery Trust. Agr. § 11.1, Part 1; *see also, e.g.*, *In re Jarlsberg's Trust*, 154 N.Y.S.2d 612, 614 (N.Y. Sup. 1956) (use of word "shall" imposed a "mandatory" duty on trustee to appoint successor). In contrast, Parts 2 and 3 of Section 11.1, particularly when read together, provide for permissive termination. *See* Agr. § 11.1, Parts 2, 3 (allowing Recovery Trustee to extend the term of the trust and make an election to terminate it, with notice); *see also, e.g.*, *Givanti v. Air Techniques, Inc.*, 960 N.Y.S.2d 196, 198 (N.Y. App. Div. 2013) (contract must be interpreted "as a whole" to give full meaning to each provision).

68.     Jacks' position—that the Recovery Trust lapsed through the temporal provisions of Part 2—is contradicted by the plain language of the agreement (as stated above), and also by well-settled principles of trust law, which provide:

> Where by the trust instrument it is provided that the trust is to terminate on the expiration of a certain period, the *trust will not terminate on the expiration of the period if at that time the purposes of the trust have not been accomplished, and if the settlor manifested an intention that the trust should continue until the accomplishment of the purposes of the trust*. In such a case the provision that the trust is to terminate on the expiration of the period is construed as being merely directory.

Rest. (Second) of Trusts § 334 comment a (emphasis added); *see Neary v. City Bank Farmers Tr. Co.*, 24 N.Y.S.2d 264, 267 (N.Y. App. Div. 1940) ("The trust is at an end when the trustee has finally accounted, conveyed the property to the persons entitled to it, and been discharged."); *Massachusetts ex rel. Bal. v. Couto's Realty Inv. Co. II, LLC*, 2011 WL 1344743, *6 (D. Mass. Feb. 23, 2011), report and recommendation adopted sub nom. *Massachusetts (Dep't of Revenue)*

-34-

*v. Couto's Realty Inv. Co. II, LLC*, 2011 WL 1367044 (D. Mass. Mar. 7, 2011) ("A trust, even of fixed term, generally does not terminate until the corpus is distributed by the trustees.").

69.     Similarly, even termination of a trust does not absolve the trustee of its duties to administer the trust:  "When the time for the termination of the trust has arrived, the duties and powers of the trustee do not immediately cease; until the trust is actually wound up, he has such duties and powers as are appropriate for the winding up of the trust." *In re Klosinski*, 746 N.Y.S.2d at 358; *see also* Rest. (Third) of Trusts § 89 (the "powers of a trustee do not end on the trust's termination date but may be exercised as appropriate to the performance of the trustee's duties in winding up administration, including making distribution, in a manner consistent with the purposes of the trust and the interests of the beneficiaries").

70.     Here, the Recovery Trust Agreement provides that the Recovery Trust was established for the "sole purpose of administering the Recovery Trust Assets" and expressly ties mandatory termination under Part 1 to those assets being fully and finally distributed.  The Recovery Trust Agreement thereby manifests a clear intention that the trust should not be terminated until the Recovery Trust Assets are fully administered, which has yet to occur.  Further, as noted above, Part 3 of Section 11.1 articulates specific notice procedures when Recovery Trustee "elects" to terminate the Recovery Trust. Agr. § 11.1.  This discretionary language demonstrates that the Recovery Trustee must make an affirmative election before the Recovery Trust terminates and the Trustee's duties cease.  No such election has been made and, as such, the Recovery Trust has not terminated nor have the duties of the Recovery Trustee.

### 3.     <u>General Principles of Trust Termination, Wind Up, and Dissolution Apply to Liquidating Trusts Like the Recovery Trust</u>

71.     Jacks' suggestion that liquidating trusts are not subject to the above-described general trust principles, Third Control Mot. at ¶ 23, is belied by numerous cases that have applied the common law concepts of termination, wind up, and dissolution to liquidating trusts.

-35-

*See*, *e.g.*, *Krys v. Aaron*, 106 F. Supp.3d 492, 503 (D.N.J. 2015) ("[T]he Restatement of Trusts, the distillation of trust law routinely cited by courts throughout New Jersey and New York, has long recognized that the 'powers of a trustee do not end on the trust's termination date but may be exercised as appropriate to the performance of the trustees' duties in winding up [the trust] . . . in a manner consistent with the purposes of the trust . . . .'" (quoting Rest. (Second) of Trusts § 344)); *In re Xpedior Inc.*, 354 B.R. 210, 238 (Bankr. N.D. Ill. 2006) ("The trust ordinarily does not automatically terminate merely because the time for distribution has arrived; it is terminated only when the trustee has fully conveyed and accounted for all the trust property."); *Coral Oil & Gas, Inc. v. Compton*, 2015 WL 1323507, *4 (S.D. Tex. Mar. 24, 2015) (recognizing continuing fiduciary obligation to wind up liquidating trust following termination); *In re Black Elk Energy Offshore Operations, LLC*, 2020 WL 4940806, *6 (Bankr. S.D. Tex. Aug. 21, 2020) (same); *Botsford v. Haskins & Sells*, 146 Cal. Rptr. 752, 784–85 (Cal. Ct. App. 1978) (same).

72. In each of these cases, the touchstone was the language of the trust instrument at issue. *See Krys*, 106 F. Supp. 3d at 505–06; *In re Black Elk*, 2020 WL 494806 at *6; *Coral Oil & Gas, Inc.*, 2015 WL 1323507 at *4. All analysis must "begin with the relevant trust language." *In re Black Elk*, 2020 WL 4940806 at *6; *Coral Oil & Gas, Inc.*, 2015 WL 1323507 at *4 (termination provision "must be read in the context of the trust's intended purpose").

73. In the *Krys* case, for example, the court examined a liquidating trustee's duties to administer a liquidation trust after the trust terminated due to a lapse of time. 106 F. Supp.3d at 502–05. The liquidating trust agreement provided that it would terminate either when all assets had been distributed, or upon distribution that was required to be made by the trust's fifth anniversary. *Id*. at 502. The fifth anniversary passed before the trustee had made distributions. Nonetheless, the court held that the trustee retained standing to prosecute causes of action on behalf of the trust—that is, the trustee still had duties to perform as a trustee, even assuming

arguendo that the trust had extinguished—because (1) the common law rule of trusts provides for a reasonable winding-up period; and (2) the trust agreement recognized that that trustee was permitted, among other things, to investigate and prosecute causes of action and to seek to extend the five-year termination period if its work achieving asset distribution was not completed. *Id.* The court also took note of the agreement's "winding-up" provision permitting final distributions to be made following termination, and a provision stating that the trustee's duties terminated upon discharge of the trust's liabilities and final distribution. *Id.* at 504–06. These factors demonstrated that the trustee had ongoing duties to administer trust assets. *Id.*[14]

74. Here, as in *Krys*, the Recovery Trust had not completed distributions at the conclusion of the three-year period. Rather, as of the third anniversary, the Recovery Trust (along with other key parties) had only recently entered into the DOJ Settlement Agreement and was waiting for the funds needed to make distributions. Most, but not all, of those distributions have now been made and the Recovery Trust is in the process of winding up its remaining affairs. Further, and likewise akin to the trust agreement in *Krys*, the Recovery Trust Agreement in this case manifests the intent that the Recovery Trustee be permitted to continue to distribute assets of the trust even following termination due to a lapse in time. The Recovery Trust Agreement also permits the Recovery Trustee to pursue causes of action and take other steps

---

[14] The *Krys* court distinguished the liquidating trust at issue there from the trust at issue in *Goldin v. Bartholow*, 166 F.3d 710 (5th Cir. 1999) (cited in paragraph 23 of the Third Control Motion), which was established to expeditiously liquidate the bankruptcy estate and would terminate the earlier of (1) the expiration of a set period of time or (2) at the time the assets of the estate were fully distributed. The trust agreement in *Krys*, by contrast, manifested a recognition that the trustee's work may well extend beyond the set period in that agreement such that the common law winding up rule permitted the trustee to continue to carry out its work in liquidating the estate's assets. *Krys*, 106 F. Supp.2d at 504–06. Other courts have similarly noted that the language in the trust agreement in *Goldin* necessitated the finding that the particular liquidating trust agreement, coupled with the fact that distributions had been substantially completed, necessitated the Fifth Circuit's holding. *See Coral Oil & Gas, Inc.*, 2015 WL 1323507 at *4 (distinguishing *Goldin* based on trustee's continued duties under trust agreement); *In re Black Elk*, 2020 WL 4940806 at *6 (distinguishing *Goldin* based on fact that distribution goal of trust was "largely met at the time of termination"). Similarly, *Goldin* is neither controlling nor instructive on the facts of the present case.

necessary to administer trust assets, *see* Agr. §§ 3.3, 3.4, 3.5, 5.2, 5.5; contains wind-up provisions, *id.* Art. IV and § 5.5; and permits extensions of time to be granted beyond the three-year period if assets are not yet distributed, *id.* § 11.1.

**B.     The Recovery Trust Has Moved to Extend the Trust**

75.     Finally, although the Recovery Trust has not terminated, the Recovery Trust has moved [D.I. 4527] (the "Extension Motion") for an extension of the term *nunc pro tunc*.  Recent precedent supports doing so (contrary to Jacks' contention that IRS regulations preclude the extension).[15] On October 30, 2020, the Internal Revenue Service issued a private letter ruling finding that a liquidating trust would continue to be treated for federal income tax purposes as a grantor trust under applicable tax regulations following a bankruptcy court's ruling (i) determining that the liquidating trust had not expired pursuant to a purported expiration provision in the trust documents, (ii) extending the term of the liquidating trust, and (iii) making the ruling effective on a *nunc pro tunc* basis.  *See* Private Letter Ruling 202044002 (October 30, 2020) (**Exhibit 11**).

76.     In sum, the Recovery Trust has not terminated and, even assuming *arguendo* that it has, (i) any such termination may be negated by an extension order of this Court; (ii) the Recovery Trust remains in existence until it is dissolved pursuant to the terms of the Recovery Trust Agreement; and (iii) the Recovery Trust Agreement remains operative until all distributions are made or the Court enters an order dissolving the Recovery Trust.

---

[15] Jacks filed an opposition [D.I. 4544] to the Extension Motion.  The Recovery Trust, to the extent necessary, will respond to Jacks' opposition in the context of the Recovery Trust's reply.  The Extension Motion is set to be heard on the same date (March 24, 2021) as the Third Control Motion and the Case Closing Motion.

DOCS_LA:335074.6 70934/001

## **Conclusion**

For the reasons set forth herein, to the extent the Court does not strike the Third Control Motion, the Estate Fiduciaries respectfully request that the Court deny the Third Control Motion in its entirety, and grant such other relief to the Estate Fiduciaries as the Court deems just and proper.

[remainder of page intentionally blank]

DOCS_LA:335074.6 70934/001

Dated: March 2, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**


*/s/ James E. O'Neill*
Laura Davis Jones (Bar No. 2436)
Alan J. Kornfeld (CA Bar No. 130063)
James E. O'Neill (Bar No. 4042)
Elissa A. Wagner (CA Bar No. 213589)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
       akornfeld@pszjlaw.com
       joneill@pszjlaw.com
       ewagner@pszjlaw.com

*Counsel to SS Body Armor I, Inc.*

**THE ROSNER LAW GROUP LLC**


*/s/ Jason A. Gibson*
Frederick B. Rosner (DE 3995)
Scott J. Leonhardt (DE 4885)
Jason A. Gibson (DE 6091)
824 N. Market Street, Suite 810
Wilmington, Delaware 19801
Telephone: (302) 777-1111
Email:  rosner@teamrosner.com
        leonhardt@teamrosner.com
        gibson@teamrosner.com

-and-

**ARENT FOX LLP**
George P. Angelich (admitted *pro hac vice*)
Beth M. Brownstein (admitted *pro hac vice*)
1301 Avenue of the Americas, Floor 42
New York, New York 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
Email:  george.angelich@arentfox.com
        beth.brownstein@arentfox.com

Jackson D. Toof (admitted *pro hac vice*)
1717 K Street, N.W.
Washington, DC 20006
Telephone: (202) 857-6000
Facsimile: (202) 857-6395
Email:  jackson.toof@arentfox.com

Justin A. Kesselman (admitted *pro hac vice*)
800 Boylston Street
Boston, MA 02199
Telephone: (617) 973-6102
Email:  justin.kesselman@arentfox.com

*Counsel to the Recovery Trust*

DOCS_LA:335074.6 70934/001